# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | Hearing Date:  March 11, 2020 |
| | ) | Hearing Time:  10:00 a.m. (Central Time) |
| | ) | Hearing Location: Courtroom 7 North |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING CONTINUED USE OF THE DEBTORS' EXISTING CASH MANAGEMENT SYSTEM; (B) AUTHORIZING USE OF EXISTING BANK ACCOUNTS AND BUSINESS FORMS; (C) GRANTING A LIMITED WAIVER OF REQUIREMENTS OF SECTION 345(b) OF THE BANKRUPTCY CODE; (D) AUTHORIZING CONTINUATION OF ORDINARY COURSE INTERCOMPANY TRANSACTIONS; (E) GRANTING ADMINISTRATIVE EXPENSE PRIORITY STATUS TO POSTPETITION INTERCOMPANY CLAIMS; AND (F) GRANTING RELATED RELIEF

Foresight Energy LP ("FELP") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.     By this Motion, the Debtors seek entry of interim and final orders

---

[1]    The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

(the "Proposed Orders"),[2] pursuant to sections 105(a), 345(b), 363, and 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing and approving the Debtors to continue using their existing cash management system (the "Cash Management System"); (b) authorizing the Debtors to continue using their existing bank accounts listed on **Exhibit A** attached hereto (collectively, the "Bank Accounts") at the financial institutions identified thereon (collectively, the "Banks")[3] and existing checks; (c) partially waiving the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines (as defined herein); (d) authorizing the continuation of ordinary course intercompany transactions among Debtors and between Debtors and non-Debtor affiliates, including the payment of prepetition and postpetition intercompany claims arising therefrom in the ordinary course of business; (e) granting administrative expense priority status to postpetition intercompany claims pursuant to section 503(b)(1) of the Bankruptcy Code; and (f) granting related relief.

### Jurisdiction and Venue

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. §157(b).

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 345(b), and 503(b)(1) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

---

[2]     Copies of the Proposed Orders will be made available on the Debtors' case information website at: http://cases.primeclerk.com/foresightenergy.

[3]     For the avoidance of doubt, the Banks shall include AMEX (as defined and discussed herein).

2

**Background**

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are a leading producer of thermal coal, with four mining complexes and nearly 2.1 billion tons of proven and probable coal reserves strategically located near multiple rail and river transportation access points in the Illinois Basin. The Debtors also own a barge-loading river terminal on the Ohio River. From this strategic position, the Debtors sell their coal primarily to electric utility and industrial companies located in the eastern half of the United States and across the international market.

5.      The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. Contemporaneously herewith, the Debtors filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No trustee, examiner or official committee has been appointed in these chapter 11 cases.

6.      Information regarding the Debtors' businesses, their capital and debt structure, the events leading to the filing of these cases, and the terms and structure of the proposed restructuring transaction is set forth in the *Declaration of Robert D. Moore, President and Chief Executive Officer of Foresight Energy LP, in Support of Chapter 11 Petitions* (the "Moore Declaration"), the *Declaration of Alan Boyko, Senior Managing Director of FTI Consulting, Inc., in Support of Chapter 11 Petitions and First Day Relief* (the "Boyko Declaration"), and the declaration of Seth Herman in support of the Debtors' motion for approval of debtor-in-possession financing and use of cash collateral (the "Herman Declaration," and

together with the Moore Declaration and Boyko Declaration, the "First Day Declarations"),[4] each filed contemporaneously herewith.

## The Debtors' Cash Management System

**A.      Overview**

7.      In connection with their coal mining and marketing operations, the Debtors maintain an integrated Cash Management System in the ordinary course of business that allows them to efficiently administer their cash and financial affairs.  A diagram of the Cash Management System is attached hereto as **Exhibit B**.  As described herein, any disruption to the Cash Management System would have an immediate adverse impact on and cause irreparable harm to the Debtors' businesses.  Accordingly, to minimize the disruption caused by these chapter 11 cases and maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize their existing Cash Management System during the pendency of these chapter 11 cases.  In connection with this relief, the Debtors also respectfully request a waiver of certain of the United States Trustee's Chapter 11 Guidelines for Debtors-In-Possession (the "U.S. Trustee Guidelines") established by the Office of the United States Trustee for Region 13 (the "U.S. Trustee") that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and obtain new checks bearing a "debtor-in possession" legend.

**B.      Description of Bank Accounts**

8.      The Debtors collect and concentrate the funds generated by the Debtors' operations from their customers and use such collected amounts to service the Debtors' debt obligations and to fund disbursements to their vendors, suppliers, employees, and other creditors.

---

[4]      The First Day Declarations are being filed in support of this Motion and are incorporated herein by reference. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declarations.

In its entirety, the Debtors' Cash Management System consists of eleven (11) Bank Accounts maintained at four (4) Banks.[5]  A general description of the Bank Accounts, transfers between such accounts, and their purpose in the Cash Management System is set forth in the following table:

| Bank Account | Description |
|---|---|
| Concentration Account, No. x9601<br>Bank: The Huntington National Bank ("Huntington")<br>Debtor: Foresight Energy LLC | This is the Debtors' main cash account.  The majority of amounts received throughout the day in the receivables Bank Accounts or amounts leftover in any disbursements Bank Accounts are swept into this account at the end of the day.  Likewise, the Debtors use the Concentration Account to fund the majority of their disbursements made through the disbursement Bank Accounts.  The Concentration Account is also used to receive amounts drawn on the Debtors' revolving credit facility, and to make substantial capital payments such as debt or interest payments.  The Concentration Account held a balance of approximately $1.75 million as of March 9, 2020, and in the 2019 calendar year, held an average balance of $14.8 million. |
| Coal Receipts Account, No. x6973<br>Bank: Huntington<br>Debtor: Foresight Receivables LLC | This is an account used to receive coal sale proceeds—the Debtors' main revenue generator.  As a zero-balance account ("ZBA"), this account does not maintain an overnight balance, and all amounts are swept into the Concentration Account at the end of the day. |
| Non-Coal Receipts Account, No. x6694<br>Bank: Huntington<br>Debtor: Foresight Energy LLC | This is a secondary receivables account used to receive amounts unrelated to the Debtors' coal sales, such as proceeds from mining equipment sales, scrap sales, and ordinary course intercompany receivables.  As a ZBA, all amounts in this account are swept into the Concentration Account at the end of the day. |
| Operating Account, No. x6681<br>Bank: Huntington<br>Debtor: Foresight Energy LLC | This is the Debtors' primary disbursement account, and is used to, among other things, pay amounts to the Debtors' vendors, suppliers, and servicers, make debt interest payments, and pay affiliates through ordinary course intercompany transactions.  As a ZBA, this account does not maintain an overnight balance.  Instead, Huntington keeps track of all check and wire requests made against this account throughout the day and, at the end of the day, all amounts requested are fully withdrawn from the Concentration Account to this account and then transferred to the appropriate requesting parties. |

---

[5]    The Debtors also note that they maintain two (2) additional Bank Accounts at Banks in their name only.  One Bank Account (x020) is in the name of Foresight Energy LLC and maintained with Morgan Stanley Smith Barney LLC, which holds funds for certain section 529 plans maintained for the benefit of third-parties.  The other Bank Account (x5635) is in the name of Mach Mining, LLC and maintained with First Southern Bank, which holds certain charitable funds donated by third-parties in favor of third-parties.  The Debtors submit that (a) they do not use the funds held within or transfer amounts to or from these Bank Accounts, (b) they do not control these Bank Accounts and they are held within the Debtors' names only for convenience purposes, and (c) the funds held within these accounts are not considered property of the Debtors' estates, and are instead the property of the applicable third-parties.  Solely to the extent necessary and for the avoidance of doubt, the Debtors request that any relief or applicable waivers requested with respect to the Banks and the Bank Accounts by this Motion also apply to these Bank Accounts and their respective Banks.

| Bank Account | Description |
|---|---|
| Main Payroll Account, No. x8214<br>Bank: Huntington:<br>Debtor: Foresight Energy LLC | This account funds the majority of the Debtors' payroll disbursements to their employees, and is also used to fund the MaRyan Cash Account and Mach Cash Account (each, as defined herein). As a ZBA, this account does not maintain an overnight balance. Like the Operating Account, Huntington tracks requests for payment, and at the end of the day, withdraws the appropriate amount from the Concentration Account to pay amounts related to payroll. |
| Corporate Payroll Account, No. x6539<br>Bank: Huntington<br>Debtor: Foresight Energy Services LLC | The Debtors use this account to pay the majority of their corporate employees based in their headquarters in St. Louis, Missouri. This account is generally pre-funded from the Concentration Account two (2) business days before payroll for the Debtors' corporate employees. Generally, except in connection with prefunding payroll, the Corporate Payroll Account maintains a *de minimis* or $0 balance. |
| MaRyan Cash Account, No. x4605<br>Bank: CNB Bank & Trust, N.A.<br>Debtor: MaRyan Mining LLC | This account is used primarily to fund operations at the Macoupin mine, for which MaRyan Mining LLC makes disbursements to the employees. On average, the Debtors fund approximately $35,000 monthly to this account from the Main Payroll Account. In the year before the Petition Date, this account held an average month-end balance of approximately $5,000. |
| Mach Cash Account, No. x4129<br>Bank: First Southern Bank<br>Debtor: Mach Mining LLC | This account is used to fund petty cash amounts for operational purposes at the Williamson mine, for which Mach Mining LLC provides the employees. On average, the Debtors fund approximately $15,000 monthly to this account from the Main Payroll Account. In the year before the Petition Date, this account held an average month-end balance of approximately $7,000. |
| Hillsboro Account, No. x5031<br>Bank: Huntington<br>Debtor: Hillsboro Energy LLC | This account maintains funds provided from the Concentration Account to make payments to vendors, employees, and other parties relating to mining operations of Hillsboro Energy LLC ("Hillsboro"), and to facilitate intercompany transactions. The Hillsboro Account held a balance of approximately $510,000 as of March 9, 2020, and in the year before the Petition Date, held an average balance of approximately $5.7 million.[6] |
| Patton Cash Account, No. x6394<br>Bank: CNB Bank & Trust, N.A.<br>Debtor: Patton Mining LLC | This account is used to fund petty cash amounts for operational purposes at the Hillsboro mine, for which Patton Mining LLC provides the employees. On average, the Debtors fund approximately $600 monthly to this account from the Hillsboro Account. In the year before the Petition Date, this account held an average month-end balance of approximately $1,000. |
| Collateral Account, No. x7011<br>Bank: F.N.B. Wealth Management<br>Debtor: Foresight Energy LP | This account is a collateral account that the Debtors own jointly with their workers' compensation policy provider, Rockwood Casualty Insurance Company. The Debtors maintain funds in this account to secure their payment obligations for workers' compensation claims, and Rockwood has the right to withdraw funds from this account in the event the Debtors fail to pay such claims. As of the Petition Date, this account held a balance of approximately $1.95 million. This is an interest-bearing account, with the proceeds of such interest kept in the account and reinvested into money-market funds. |

---

[6] The relatively high average results from the receipt of insurance proceeds in late 2019 relating to a prior combustion event at the Hillsboro mining complex, which is discussed further in the First Day Declarations.

9.      The Debtors believe that the Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors in the coal industry.   Indeed, large businesses use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple corporate entities.   The Cash Management System is vital to the Debtors' ability to conduct their daily operations, including receiving revenue and paying their vendors, employees, and stakeholders.   Any disruption of the Cash Management System would accordingly be materially detrimental to the Debtors' operations.

### C.      Compliance of the Bank Accounts with Section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines

10.      Almost every Bank Account is maintained at a Bank that is insured by the Federal Deposit Insurance Corporation (the "FDIC").   Furthermore, the Bank Accounts do not generally maintain balances in excess of the FDIC insurance limit.   The limited exceptions constitute the (a) Concentration Account and Hillsboro Account each maintained at Huntington, which exceeds the FDIC insurance limits because it holds the majority of the Debtors' cash, and (b) Collateral Account, which is not FDIC insured, but maintains amounts for the benefit of Rockwood as collateral for the Debtors' workers' compensation obligations.   As such, except for the Concentration Account, the Hillsboro Account, and the Collateral Account, the Bank Accounts comply with section 345(b) of the Bankruptcy Code.   Despite this compliance, however, per the U.S. Trustee Guidelines, chapter 11 debtors are required to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee.   Here, none of the Bank Accounts are held by Banks designated as "Authorized Depositories" under the U.S. Trustee Guidelines.

11.     Notwithstanding the foregoing, the Debtors respectfully request that the Court waive compliance with (a) section 345(b) of the Bankruptcy Code with respect to the Concentration Account, Hillsboro Account, and Collateral Account and (b) the U.S. Trustee Guidelines, and instead authorize each of the Banks to continue to maintain, service, and administer the applicable Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business.  The Banks are each well-capitalized and financially stable institutions, and the amounts maintained in each of these Bank Accounts are either insured by the FDIC and/or are meant as security of the Debtors' obligations for the benefit of a third-party, as applicable.  Accordingly, the Debtors submit a limited waiver of strict compliance with section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines will not prejudice the Debtors' stakeholders or adversely impact the Debtors' ability to operate during these chapter 11 cases.

12.     Moreover, requiring the Debtors to close their Bank Accounts at the Banks and reopen them at designated Authorized Depositories would place a severely disruptive and unnecessary administrative burden on the Debtors given that there is no meaningful risk to the cash held therein.  In addition, closure of the Collateral Account, which the Debtors own jointly with Rockwood, could jeopardize the Debtors' ability to maintain a workers' compensation policy as required by law, and could impact the value of the Debtors' estates and cause undue hardship to the Debtors' employees.  Therefore, the Debtors respectfully submit that cause exists to continue to allow the Debtors to utilize the existing Bank Accounts.

**D.     Bank Fees**

13.     In the ordinary course of business, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges and other

8

fees, costs, and expenses (collectively, the "Bank Fees"). Historically, the Debtors estimate that they pay up to approximately $6,500 in Bank Fees each month, depending on transaction volume. The Debtors estimate that there are approximately $6,500 in prepetition Bank Fees outstanding on the Petition Date. To maintain the integrity of their Cash Management System, the Debtors request authority to pay prepetition Bank Fees, in addition to any other Bank Fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business.

**E.      Business Forms**

14.      As part of their Cash Management System, the Debtors utilize numerous preprinted correspondence and business forms, including letterhead, purchase orders, invoices, and preprinted checks (collectively, the "Business Forms") in the ordinary course of their businesses. To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all existing Business Forms as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as chapter 11 debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new books and records; *provided* that once the existing Business Forms have been used, the Debtors shall, during the pendency of these chapter 11 cases, reorder new Business Forms that include a stamp to reference the Debtors' status as debtors in possession and the corresponding bankruptcy case number.

**F.      Credit Card Program**

15.      The Debtors utilize three (3) corporate credit cards issued by American Express Company ("AMEX") under a program (the "Credit Card Program") in the ordinary

9

course of business to pay for certain general business expenses incurred by their employees, as is discussed further in their Employee Wages Motion.[7]  While such credit cards are issued to the applicable employees, the Debtors are directly liable to AMEX for amounts owed on account of the credit cards.  Generally, such reimbursable expenses under the Credit Card Program average approximately $17,500 a month, which the Debtors pay in the ordinary course of business.  The Debtors request authority to maintain the Credit Card Program as a part of their Cash Management System, in their discretion and in the ordinary course of business, and to authorize AMEX as a Bank hereunder, each to the extent necessary.

**G.    Intercompany Transactions**

16.    In the ordinary course of business, the Debtors engage in various intercompany activities (a) amongst themselves and (b) with their related non-Debtor affiliates Murray Energy Corporation ("MEC," and collectively with its non-Debtor affiliates and subsidiaries, "Murray") and Foresight Reserves LP (collectively with its non-Debtor affiliates, "Reserves"), all giving rise to intercompany transactions (the "Intercompany Transactions").  In the ordinary course of business, the Intercompany Transactions include payables and receivables between, against, among, and on behalf of the Debtors and their non-Debtor affiliates, giving rise to intercompany claims (the "Intercompany Claims").[8]

---

[7]    The "Employee Wages Motion" means the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay Prepetition Wages and Workforce Obligations, (B) Authorizing Debtors to Maintain Workforce Programs and Pay Related Obligations, and (C) Granting Related Relief*, filed contemporaneously herewith.  The Debtors do not seek to pay prepetition amounts on account of the Credit Card Program under this Motion, and instead seek to pay such amounts as reimbursable employee business expenses under the Employee Wages Motion.

[8]    This motion provides an overview of the Debtors' typical Intercompany Transactions.  The relief requested herein is applicable with respect to all Intercompany Transactions and Intercompany Claims, and is not limited to those described in this Motion.  To the extent that there are any Intercompany Claims against the Debtors related to Intercompany Transactions not described herein, the Debtors also seek authority to honor such obligations.

17.     The vast majority of these Intercompany Transactions are reflected as receivables and payables in the respective Debtor's or non-Debtor affiliate's accounting system. The Intercompany Claims that arise from the Intercompany Transactions generally include (a) management or services fees arising from management services agreements, (b) intercompany payables and receivables generated from payment of operating expenses or payroll and payroll related expenses by Foresight Energy LLC ("FELLC") on behalf of its Debtor-affiliates, (c) payables and receivables on account of coal sales and transportation costs, (d) payables and receivables on account of lease and royalty agreements, and (e) payables and receivables on account of services performed or goods supplied between Debtor entities or between and among a non-Debtor affiliate and a Debtor entity.

        i.     Importance of the Intercompany Transactions

18.     The Debtors' intercompany activities represent a substantial and necessary portion of the Debtors' business operations, enabling the Debtors to leverage a vast economic, production, and transportation network with which to sell their coal products domestically and internationally in a cost-effective, efficient, and timely manner.  In addition, these intercompany arrangements allow the Debtors to operate with a much smaller selling, general and administrative expense ("SG&A") footprint through reduced corporate employee headcount and associated administration costs.  The Debtors respectfully submit that without their intercompany arrangements, the Debtors would be simply incapable of performing their business operations to the extent and degree with which they have before the Petition Date, which would cause material harm to the value of the Debtors' estates and their creditor constituencies.

19.     As described herein, the Intercompany Transactions are an essential and integral component of the Debtors' operations and centralized Cash Management System.  The

Intercompany Transactions generate operational efficiencies, increase operational flexibility, provide significant cost savings, and improve the market position of both the Debtors and their non-Debtor affiliates, all of which benefit the Debtors' estates. Any interruption of the Intercompany Transactions would severely disrupt the Debtors' operations, perhaps halting such operations entirely, and would result in great harm to the Debtors' estates and their stakeholders. Accordingly, to avoid this result, the Debtors request authority to pay and honor any prepetition and postpetition Intercompany Claims in the ordinary course of business subject to the terms and conditions in the Proposed Orders.

20.     The Debtors maintain clear records of the Intercompany Transactions and can ascertain, trace, and account for Intercompany Transactions (a) between and among the Debtors and (b) between and among the Debtors and their non-Debtor affiliates, and accordingly, the Debtors will be able to continue this accounting on a postpetition basis. To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of other Debtors, and to ensure that the Debtors are otherwise able to continue their operations in the ordinary course of business, the Debtors request this Court's approval to accord administrative expense priority status to all Intercompany Claims (a) among the Debtors, and (b) held by Murray and Reserves against the Debtors arising after the Petition Date as a result of an Intercompany Transaction. If the Intercompany Claims have administrative expense priority status, each Debtor will continue to bear ultimate repayment responsibility for these ordinary course transactions, and moreover, the Debtors will be able to provide the assurances necessary to demonstrate to their non-Debtor affiliates that they will be able to continue operating in the ordinary course of business and provide fair compensation for their services and goods, consistent with prepetition practice. In addition, the Debtors believe that the relief requested

12

herein is consistent with and reciprocal of the relief the Debtors received in Murray's chapter 11 cases, as indicated in Murray's final cash management order, *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 10, 2019) (D.I. 389), and discussed further herein. A description of the Debtors' Intercompany Transactions, and their resulting Intercompany Claims, are discussed below.

      ii.    Intercompany Transactions Among Debtors

      21.    In the ordinary course of business, the Debtors maintain various business relationships, and perform certain services for, other Debtors. The Debtors' corporate accounting department records each of the resulting payables and receivables in the Debtors' centralized accounting system. Such Intercompany Transactions generally fall into the following categories:

- *Operating and Corporate Overhead Expenses*: Operating and corporate overhead expenses incurred by the Debtors are generally paid by FELLC out of the Operating Account.

- *Payroll*: Each operating Debtor uses employees who are employed by a related, but separate, Debtor. The payroll of each of these employing Debtors is processed and paid by FELLC and applicable subsidiaries, except for employees relating to Hillsboro, which are processed by Hillsboro. FELLC pays payroll for non-Hillsboro employees through the Main Payroll Account, and Hillsboro pays payroll for employees used from Patton Mining LLC through the Hillsboro Account, and, as applicable, each entity issues checks and ACH transfers to the respective employees from the applicable Bank Account. Foresight Energy Services LLC and applicable subsidiaries pay the Debtors' corporate employees through the Corporate Payroll Account.

- *Accounts Payable*: FELLC processes the majority of the Debtors' accounts payable in the ordinary course of business on behalf of the operating entities, including taxes, payments to holders of royalty interests, and other accounts payable, but Hillsboro and certain other Debtors fund or pay certain ordinary course or *de minimis* accounts payable as well.

- *Capital Expenditures*: FELP manages all major capital expenditures and approves all projects at the respective operating entities. FELLC then makes payments from the Operating Account, or on occasion the Concentration Account, to fund such capital expenditures to the extent they arise at FELP's direct or

13

indirect subsidiaries.    To the extent that capital expenditures are made at Hillsboro, such capital expenditures are paid from the Hillsboro Account.

- *Receipt of Coal Sale Proceeds*:    All of the Debtors' coal sale proceeds are received by Foresight Receivables LLC in the Coal Receipts Account, regardless of which mine extracts the coal or which Debtor is a party to the coal sale contract.

- *Services by Debtor Entities*: Certain Debtors operate stand-alone businesses that provide goods and services such as machine repair work, parts supply, longwall rebuilds, shipping and docking services, and loading services.  As discussed herein, these entities provide goods and services to other Debtors or non-Debtor affiliates, which give rise to Intercompany Transactions and related Intercompany Claims.

iii.    Intercompany Transactions with Murray

22.    The Debtors engage in the following categories of Intercompany Transactions with Murray, which are each discussed herein:  (a) ordinary course Intercompany Transactions to source coal under applicable coal sale agreements, whereby one entity will "sell" coal to the other entity at the applicable contract price ("At-Contract Intercompany Coal Sales") and the purchasing entity generates a corresponding account payable in favor of the selling entity, (b) payment of fees and expenses by the Debtors or Murray under the *Third Amended and Restated Management Services Agreement* between Murray-affiliate Murray American Coal, Inc. and Debtor Foresight Energy GP LLC, the general partner of FELP, effective as of March 28, 2017 (the "Management Services Agreement"), (c) lease payments by Murray under Debtor American Century Transport LLC's *Lease Agreement* with Murray-affiliate American Energy Corporation, dated April 16, 2015 (the "Lease Agreement") and coal royalties by Murray under Debtor American Century Mineral LLC's *Overriding Royalty Agreement* with American Energy Corporation and Murray-affiliate Consolidated Land Company, dated April 16, 2015 (the "Overriding Royalty Agreement," and together with the Lease Agreement, the "Lease and Overriding Royalty Agreements"), and (d) other ordinary course transactions, such as the

14

provision of rebuilding services, purchase of equipment and supplies, sharing of transportation infrastructure and third party contracted capacity, and together entering into major vendor arrangements to reap the benefits of volume rebates and unit price discounts from key vendors (the "Ordinary Course Murray Transactions").   In connection with its chapter 11 cases, the Debtors note that Murray has received final authority to maintain, honor, and pay its obligations with respect to the Intercompany Transactions, and the Debtors' associated claims against Murray have been granted administrative expense priority status.   *See In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 10, 2019) (D.I. 389).

23.   *Intercompany Coal Sale Transactions.*   Pursuant to their strategic partnership and to the benefit of each of the Debtors and Murray, the Debtors and Murray from time to time fulfill coal sales under each other's respective coal sale agreements with third-party customers.   The resulting At-Contract Intercompany Sales between the Debtors and Murray provide a valuable synergy for both the Debtors' and Murray's businesses, as they (a) insulate the Debtors and Murray from the volatility of the spot market from which the Debtors and Murray would otherwise have to either source coal to fill orders or offload excess inventory, (b) allow the Debtors and Murray to purchase each other's available supply to satisfy their respective customers' demands, and (c) allow the Debtors and Murray to deliver blends of coal that best meet customers' needs and optimize operational and logistical efficiencies.

24.   If Murray sources coal under the Debtors' contracts, the Debtors use their Coal Receipts Account to collect the ultimate third-party purchaser's coal payment on Murray's behalf and then transfers the payment to Murray.   As such, the sale is in substance a sale to the third-party purchaser, with the Debtors simply acting as a pass-through entity for the third-party purchaser's payment to Murray.   Likewise, if the Debtors source coal under Murray's contracts,

Murray collects the ultimate third-party purchaser's coal payment on the Debtors' behalf and then transfers the payment to the Coal Receipts Account. As such, the sale is in substance a sale to the third-party purchaser, with Murray acting as a pass-through entity for the third-party purchaser's payment to the Debtors. Even though Murray is fulfilling the Debtors' contracts in these instances, the Debtors remain the contracting party and are ultimately responsible for the obligations under the applicable agreements. As of January 31, 2020, the Debtors owe Murray approximately $170,000, and Murray owes the Debtors approximately $9.7 million, each on account of At-Contract Intercompany Coal Sales.

25.     *Management Services Agreement.* The Debtors engage in Intercompany Transactions with Murray pursuant to the Management Services Agreement. Pursuant to the Management Services Agreement, Murray manages all aspects of the Debtors' mining operations, including (a) coordination and management of employees and contractors at the mines, (b) mine planning and engineering services, (c) coal sales and related marketing services, (d) procurement management services, (e) human resources and employee-related functions, (f) provision of information technology systems and related services, (g) compliance and investor relations services, (h) financial, accounting, and loan related services, and (i) legal services. This management under the Management Services Agreement allows the Debtors to operate with greatly reduced general and operating expenses, with limited corporate overhead and related costs.

26.     In exchange, the Debtors are obligated to pay a quarterly management fee of $5,000,000, adjusted annually for inflation. When the Debtors incur expenses on behalf of Murray, the Debtors invoice Murray for such expenses and, at the end of the quarter, Murray transfers funds to the Debtors to reimburse the Debtors for such expenses incurred in the

preceding quarter, subject to the terms and conditions of the Management Services Agreement. Under the Management Services Agreement, the Debtors owe Murray prepetition obligations of approximately $5.3 million on account of quarterly management fees, other services, and reimbursable expenses, and Murray owes the Debtors approximately $530,000 on account of SG&A reimbursement, each as of the Petition Date.

27.     *Lease and Overriding Royalty Agreements*.     Pursuant to the Lease Agreement, Murray pays the Debtors lease payments in the amount of $1.15 – $1.75/ton for processed coal at certain mines.  The initial term of the Lease Agreement is fifteen (15) years. Pursuant to the Overriding Royalty Agreement, Murray pays the Debtors royalty payments in the amount of $0.30 – $0.50/ton for each ton of coal sold from certain coal reserves.  The initial term of the Overriding Royalty Agreement is eighteen (18) years.  As of January 31, 2020, Murray has a discounted liability to the Debtors of approximately $63 million in both near- and long-term obligations under the Lease and Overriding Royalty Agreements, of which approximately $5.6 million constitutes near-term obligations.

28.     *Ordinary Course Murray Transactions.*  The Debtors and Murray engage in other miscellaneous Intercompany Transactions through contractual services or operational practices.   In each case, both the Debtors and Murray realize significant economic and operational benefits on account of such transactions.  The Ordinary Course Murray Transactions include:

- Ordinary Course Purchasing of Building and Equipment Services:  As described above and in the First Day Declarations, certain of the Debtors operate standalone businesses that accept orders from or deliver equipment services to Debtors and non-Debtor affiliates.  Murray likewise has similar businesses within its corporate family that provide certain goods and equipment services to Debtors and non-Debtor affiliates.  From time to time, certain Debtors may do business with such Murray entities and *vice versa*.  Each such transaction is invoiced and recorded in the Debtors' books and records in the same manner as any other transaction.

- <u>Sharing of Transportation Infrastructure</u>:  The Debtors and Murray have the ability to use each other's transportation networks and contracted capacity with third-party providers, some of which are take-or-pay in nature.  In addition to generating operational efficiencies and enabling both the Debtors and Murray to realize cost savings, such sharing provides access to rail, barge, and transloading facilities that may not otherwise be available to the Debtors or Murray independently.  To the extent the Debtors or Murray use the capacity under each other's transportation networks, each party reimburses the other at cost.

- <u>Combined Purchasing</u>:  The Debtors and Murray jointly enter into occasional procurement transactions, for the benefit of themselves and their respective affiliates, which combines scale and increase purchasing leverage as compared to their respective standalone companies.  Combined purchasing provides significant cost savings to both the Debtors and Murray in the form of volume rebates and unit price discounts from key vendors.

29.     As of January 31, 2020, the Debtors estimate that, on account of the Ordinary Course Murray Transactions, Murray owes the Debtors approximately $730,000, and that the Debtors owe Murray approximately $450,000.

iv.     <u>Intercompany Transactions with Reserves</u>

30.     Debtors maintain various coal reserve royalty and lease agreements with Reserves.  The Debtors pay royalties under the:

- *Coal Mining Lease*, between Debtor Sugar Camp Energy, LLC ("<u>Sugar Camp</u>") and Reserves-affiliate Ruger Coal Company, LLC ("<u>Ruger</u>"), dated August 12, 2010, and two related overriding royalty interest agreements in favor of Ruger (collectively, as amended, the "<u>Ruger Royalty Agreements</u>") relating to Ruger's lease of and interest in certain coal reserves in the Sugar Camp complex to the Debtors;

- *Coal Mining Lease and Sublease*, between Debtor Williamson Energy, LLC ("<u>Williamson</u>") and Reserves-affiliate Colt LLC ("<u>Colt</u>"), dated August 12, 2010 (as amended, the "<u>Colt-Williamson Royalty Agreement</u>") relating to Colt's lease and sublease of certain coal reserves in the Williamson mine to the Debtors;

- *Coal Mining Lease (for "Reserve 1" and "Reserve 3")* and the *Coal Mining Lease (for "Reserve 2")*, each as between Hillsboro and Colt and dated August 12, 2010 (together, as amended, the "<u>Colt-Hillsboro Royalty Agreements</u>") relating to Colt's leases of certain coal reserves in the Hillsboro mine to the Debtors; and

18

- *Coal Mining Lease and Sublease (Macoupin North Mine Assignment)* and *Coal Mining Lease and Sublease (Unassigned Reserves)*, each as between Debtor Macoupin Energy LLC ("Macoupin") and Colt and dated August 12, 2010, and *Coal Mining Lease (New Memphis/Monterey 2 Reserves)*, between the same parties and dated June 1, 2012 (together, as amended, the "Colt-Macoupin Royalty Agreements," and together with the Ruger Royalty Agreement, the Colt-Williamson Royalty Agreement, the Colt-Hillsboro Royalty Agreements, and any related agreements, the "Reserves Royalty Agreements") relating to Colt's lease and sublease, as applicable, of certain coal reserves in the Macoupin mine to the Debtors.

31.     In addition to the Reserves Royalty Agreements, the Debtors maintain two (2) surface leases for a coal preparation plant and rail loadout facility between Reserves-affiliate New River Royalty, LLC ("New River") and Debtor Williamson Energy, LLC (the leases together, the "Reserves Leases"). The terms of the Reserves Leases expire on October 15, 2021, but may be extended for additional five (5) year terms at Reserves' election. The Debtors are required to pay an aggregate rent of $100,000 per year to Reserves under the Reserves Leases. The Debtors also maintain a surface lease for a transport terminal between Debtor Sitran LLC and New River. The terms of this lease expire on December 31, 2020, but may be extended by additional five (5) year terms at the Debtors' election. The Debtors pay an annual rent of $50,000 to Reserves under this lease.

## Basis for Relief Requested

### A.     The Court Should Authorize the Debtors' Continued Use of the Cash Management System, as it is Essential to the Debtors' Operations and Restructuring Efforts

32.     The Cash Management System constitutes an ordinary course and essential business practice of the Debtors, and is consistent with those utilized by corporate enterprises comparable to the Debtors in size and complexity. The Cash Management System provides significant benefits to the Debtors including, among other things, the ability to control corporate funds, to ensure the availability of funds when necessary, and to reduce costs and administrative expenses by facilitating the movement of funds and developing timely and

accurate account balance information.  Thus, to ensure the seamless operation of the Debtors'

businesses and to realize the benefits of the Cash Management System, the Debtors should be

allowed to continue using the Cash Management System, including the payment of Bank Fees

and the maintenance of the Credit Card Program, and should not be required to open new bank

accounts.

33.    Any disruption to the Debtors' current cash management procedures

would impair the Debtors' ability to successfully administer these chapter 11 cases.  It would be

time consuming, difficult, and costly for the Debtors to establish an entirely new system of

accounts and a new cash management system.    The attendant delays from revising cash

management procedures and redirecting receipts would create unnecessary pressure on the

Debtors and their employees while they work to meet the other administrative obligations

imposed by chapter 11.  The Debtors will maintain records of all transfers within the Cash

Management System to the same extent they were recorded by the Debtors before the Petition

Date.  As a result, the Debtors will be able to document and record the transactions occurring

within the Cash Management System for the benefit of all parties in interest.

34.    Allowing the Debtors to utilize their existing Cash Management System is

entirely consistent with applicable provisions of the Bankruptcy Code.  Section 363(c)(1) of the

Bankruptcy Code authorizes a debtor-in-possession to "use property of the estate in the ordinary

course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  This section provides a

debtor-in-possession with the flexibility to engage in the ordinary transactions required to

operate its business without undue oversight by creditors or the court.  *Habinger, Inc.* v. *Metro.*

*Cosmetic & Reconstructive Surgical Clinic, P.A.*, 124 B.R. 784, 786 (Bankr. D. Minn. 1990)

(citing *United States ex rel. Harrison* v. *Estate of Deutscher*, 115 B.R. 592 (Bankr. M.D. Tenn.

1990)).  Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system.  *In re Amdura Corp.*, 75 F.3d 1447, 1453 (10th Cir. 1996).  Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, and disbursement of funds pursuant to the Cash Management System described above.

35.     The Court may also exercise its equitable powers to grant the relief requested herein.  Under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets.  *See, e.g.*, *In re Carlson*, 126 F.3d 915, 920 (7th Cir. 1997) ("Section 105(a) gives the bankruptcy court the authority to issue any order necessary to carry out the provisions of the Bankruptcy Code."); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re NWFX, Inc.*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy, however, is that equitable principles govern . . . ."); *Steinberg* v. *Esposito*, 33 B.R. 812, 813 (Bankr. N.D. Ill. 1983) (The "bankruptcy court is vested with great latitude to protect the assets of the debtor's estate, including the use of equitable remedies . . . .").

36.     Continuing the Cash Management System without interruption is vital to the Debtors' survival.  In particular, an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom. Official Comm. of Unsecured Creditors* v. *Columbia Gas*

*Transmission Corp.*, 510 U.S. 1110 (1994).  The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

   37. The Cash Management System is the complex mechanism whereby the Debtors are able to transfer their revenue toward the payment of their obligations and without which the Debtors' operations would be severely disrupted.  It is well within the Court's equitable power under section 105(a) to approve the continued use of the Cash Management System.

   38. Courts in this and other districts have routinely granted relief similar to the relief requested herein in other chapter 11 cases, authorizing debtors to utilize cash management systems employed by comparable corporate enterprises.  *See, e.g.*, *In re Payless Holdings LLC*, No. 19-40883-659 (Bankr. E.D. Mo. Apr. 13, 2019) (D.I. 783) (granting motion to continue using cash management system on a final basis); *In re Armstrong Energy, Inc.*, No. 17-47541-659 (Bankr. E.D. Mo. Nov. 2, 2017) (D.I. 88) (same); *In re Noranda Aluminum, Inc.*, No. 16-10083-399 (Bankr. E.D. Mo. Feb. 9, 2016) (D.I. 79) (granting motion to continue using cash management system on an interim basis); *In re Arch Coal Inc.*, No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 13, 2016) (D.I. 56) (same); *see also In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 10, 2019) (D.I. 389) (same).  The Debtors submit that the circumstances of these chapter 11 cases warrant granting similar relief, and that doing so is in the best interests of the Debtors, their estates, their creditors, and their stakeholders, and therefore should be granted.

**B.      Maintaining Existing Bank Accounts and Checks and Providing Protections to Existing Banks Is Warranted and Appropriate under the Circumstances**

39.      The U.S. Trustee Guidelines require that chapter 11 debtors, among other things: (a) close all existing bank accounts upon filing their petitions and open new "debtor-in-possession" accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee; (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes; and (c) maintain a separate debtor-in-possession account for cash collateral. By this Motion, the Debtors seek a waiver of the U.S. Trustee Guidelines' requirement that their Bank Accounts be closed and that new postpetition bank accounts be opened.

40.      The Debtors can achieve the goals of the U.S. Trustee Guidelines without closing their existing Bank Accounts and opening new ones.  The Debtors can and will identify all prepetition checks and other forms of payment outstanding on the Petition Date and notify the appropriate bank not to pay such checks or obligations without proper authorization.  The systems currently employed by the Debtors and the Banks are sufficient to ensure that prepetition obligations are not paid improperly.  However, to avoid delays in payments to administrative creditors, to ensure a transition into chapter 11 with minimal disruption, and to aid in the Debtors' efforts to preserve and maximize the value of their assets, it is important that the Debtors be permitted to continue to maintain the Bank Accounts with the same account numbers following the Petition Date.

41.      By preserving business continuity and avoiding disruption and delay to the collection of the Debtors' receipts and making of disbursements that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best served.  The confusion that would result absent the relief requested herein would ill serve the Debtors' chapter 11 efforts.

23

42.     The Debtors also seek an order granting the Banks authority to continue to treat, service, and administer the Bank Accounts as accounts of each respective Debtor as a debtor-in-possession without interruption and in the usual and ordinary course, and to (i) receive, process, and honor and pay any and all postpetition checks, drafts, wires, or electronic funds transfers drawn on the Bank Accounts by the holders or makers thereof, (ii) receive, process, and honor and pay any and all prepetition checks, drafts, wires, or electronic funds transfers drawn on the Bank Accounts by the holders or makers thereof to the extent authorized herein, and (iii) charge back to the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including, without limitation, returned items that result from ACH transfers, wire transfers, or other electronic transfers of any kind (collectively, the "Returned Items") regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the Returned Items relate to prepetition or postpetition items or transfers.

43.     Notwithstanding anything to the contrary in any other order of this Court, the Debtors request that the Banks be authorized to accept and honor all representations from the Debtors as to which checks, drafts, wires, or electronic funds transfers should be honored or dishonored consistent with any order of this Court and governing law, whether such checks, drafts, wires, or electronic funds transfers are dated before, on, or subsequent to the Petition Date.  Pursuant to the relief requested in this Motion, no Bank shall incur, and each is hereby released from, any liability for relying upon a Debtor's instruction as to which checks, drafts, wires, or electronic funds transfers should be honored or dishonored or for such Bank's inadvertence in honoring any check, draft, wire, or electronic funds transfer at variance from a

Debtor's instructions unless such inadvertence constituted gross negligence or willful misconduct on the part of such Bank.

44.     By this Motion, the Debtors also seek authorization to open any new bank accounts, close any existing Bank Accounts, or make such other ordinary course changes as they may deem necessary and appropriate in their sole discretion; *provided* that (a) the opening, closing, or use of any such Bank Account is not prohibited or restricted by the terms of any approved debtor-in-possession financing facility and (b) the Debtors give notice of the closing of any Bank Accounts or the opening of any new bank accounts within fifteen (15) days thereafter to the U.S. Trustee and any statutory committees appointed in the chapter 11 cases.

45.     To minimize expenses, the Debtors further request that they be authorized to continue using their existing Business Forms; *provided*, that once the Debtors' existing check stock has been exhausted, the Debtors shall include, or direct others to include, the designation "Debtor-in-Possession" and the corresponding bankruptcy case number on all checks as soon as it is reasonably practicable to do so.

46.     If the Debtors are not permitted to maintain and utilize their Bank Accounts and continue to use their existing checks as set forth herein, it would (a) disrupt the ordinary financial affairs and business operations of the Debtors, (b) delay the administration of the Debtors' estates, (c) compromise the Debtors' internal controls and accounting system, and (d) require the Debtors to spend funds unnecessarily to set up new systems and open new accounts and print new checks.  As noted above, courts in this District routinely grant the relief requested with respect to these matters.  Accordingly, this request should be granted.

**C.     Waiver of the Deposit Requirements of Section 345 of the Bankruptcy Code and Requirements of the U.S. Trustee Guidelines**

47.     As discussed above, the Debtors request that the Court waive the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines and permit them to maintain any deposits in their Bank Accounts in accordance with their existing practices.  Section 345(a) of the Bankruptcy Code authorizes deposits or investments of money of a bankruptcy estate, such as cash, in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety.  11 U.S.C. § 345(b). A court may, however, relieve a debtor-in-possession of the restrictions imposed by section 345(b) of the Bankruptcy Code for "cause."  11 U.S.C. § 345(b).

48.     As discussed above, the majority of the Bank Accounts are maintained at Banks that are insured by the FDIC, and are therefore in compliance with section 345(b) of the Bankruptcy Code.  With respect to amounts in any of the Bank Accounts, particularly the Concentration Account and the Hillsboro Account, in excess of the FDIC insurance limit, the Debtors submit that cause exists to waive any such noncompliance because (a) such funds are deposited safely and prudently at Huntington, which is a financially-stable and well-capitalized banking institution, in a manner specifically designed to preserve capital and maintain liquidity; (b) it would be unnecessarily and administratively harmful for the Debtors to restructure their Cash Management System to move their Bank Accounts to other Banks, seek depository

26

agreements, or split their funds among multiple new Bank Accounts; and (c) the Debtors' secured lenders, who maintain a security interest in the funds held in certain of the Bank Accounts, have consented to the Debtors' continued use of such Bank Accounts, thus validating the prudence of the Debtors' use of such Bank Accounts.  Accordingly, to the extent the amounts in one or more of the Bank Accounts maintained at the Banks exceed the FDIC insurance limit during these chapter 11 cases, the Debtors request that the Court waive strict compliance with section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines requiring debtors to use Authorized Depositories.  For similar reasons, the Debtors submit that it is appropriate to maintain funds in the Collateral Account, where such funds are intended as collateral securing their workers compensation obligations.  The Debtors submit that such relief is routinely granted in large and complex cases in this and other jurisdictions, such as those indicated above.

49.     As this Motion is being filed on the first day of the Debtors' chapter 11 cases and the Debtors have in excess of 200 creditors, the Debtors request that the Court enter an order waiving the requirements of section 345(b) of the Bankruptcy Code.  Given the structure and relative security of the Cash Management System, the Debtors submit that cause exists to grant a waiver of the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines.

**D.     The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Expense Priority Status to Postpetition Intercompany Claims Against the Debtors**

50.     The Debtors move funds through the Cash Management System as described above.  At any given time, there may be Intercompany Claims owed by one Debtor to another Debtor, or a Debtor to a non-Debtor affiliate (or *vice versa*).  Intercompany Transactions are made between and among Debtors and non-Debtor affiliates in the ordinary course as part of the Cash Management System.  Because the Debtors engage in the Intercompany Transactions

described herein on a regular basis and such transactions are common among large enterprises similar to the Debtors, the Debtors submit the Intercompany Transactions are ordinary course transactions within the meaning of 363(c)(1) of the Bankruptcy Code, and thus do not require this Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis, and to pay prepetition and postpetition Intercompany Claims in the ordinary course of business subject to the terms and conditions of the Proposed Orders.  The continued performance of ordinary course Intercompany Transactions and the payment of the Intercompany Claims arising therefrom is necessary to ensure the Debtors' ability to operate their businesses during these chapter 11 cases.

51.     The Debtors track all funds transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions described herein.  The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.  Finally, as detailed above, if the Intercompany Transactions were to be discontinued, the Cash Management System, related administrative controls, and the Debtors' overall business operations would be disrupted, if not halted in full, to the Debtors' and each of their estates' detriment.  Accordingly, the Debtors respectfully submit that the continued performance of the Intercompany Transactions, including the payment of prepetition and postpetition Intercompany Claims that arise therefrom, is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance and pay applicable claims subject to the terms and conditions of the Proposed Orders.

52.     The Debtors further request that pursuant to section 503(b)(1) of the Bankruptcy Code, any Intercompany Claims against the Debtors on account of the Intercompany Transactions be accorded administrative expense priority status.  If all Intercompany Claims

against the Debtors are accorded administrative expense priority status, each entity will continue to bear ultimate payment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions will jeopardize the recoveries available to each Debtor's respective creditors.    Furthermore, granting administrative expense priority status to Intercompany Claims of non-Debtor affiliates on account of Intercompany Transactions will preserve substantial value and business relationships benefiting the Debtors' estates, prevent unnecessary disruptions to the Debtors' businesses, and ensure continued performance under the Debtors' prepetition business arrangements with their non-Debtor affiliates.  Indeed, Murray has already received reciprocal relief in its chapter 11 cases (a) to continue Intercompany Transactions with and pay all Intercompany Claims by the Debtors and (b) granting the Debtors' Intercompany Claims administrative expense priority status, and the Debtors believe that the relief requested herein is similar to such relief in form and substance to preserve the benefits of the Murray-bankruptcy court's order for relief.  *See In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 10, 2019) (D.I. 389) (authorizing continuation and payment of intercompany transactions, including the Debtors' intercompany claims against Murray, and granting administrative expense priority status to resulting claims of the Debtors against Murray in Murray's chapter 11 cases).

53.     For the avoidance of doubt, the relief requested herein with respect to postpetition Intercompany Transactions and the Intercompany Claims resulting therefrom shall not constitute an admission of the Debtors or any other party as to the validity, priority, or status of any Intercompany Claims or the Intercompany Transactions from which such Intercompany Claims may have arisen.

54.     Courts have approved requests to continue intercompany funding arrangements between debtors and non-debtors. *See, e.g.*, *In re Payless Holdings LLC*, No. 19-40883-659 (Bankr. E.D. Mo. Apr. 13, 2019) [Docket No. 783]; *In re Noranda Aluminum, Inc.*, No. 16-10083-399 (Bankr. E.D. Mo. Feb. 9, 2016) [Docket No. 79]; *In re Abengoa Bioenergy US Holding, LLC*, No. 16-41161-659 (Bankr. E.D. Mo. Mar. 4, 2016) [Docket No. 93]. The Debtors submit that the circumstances of these chapter 11 cases warrant granting similar relief, and that doing so is in the best interests of the Debtors, their estates, their creditors, and their stakeholders, and therefore should be granted.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

55.     The Debtors seek immediate authorization for the relief requested in this Motion. Pursuant to Bankruptcy Rule 6003(b), a bankruptcy court cannot grant "a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within the first twenty-one (21) days after the petition date unless the relief is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). For the reasons set forth herein and in the First Day Declarations, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied Bankruptcy Rule 6003(b) and therefore respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

56.     By this Motion, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause for a waiver of any stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 6004(h).  For the reasons set forth herein and in the First Day Declarations, the Debtors submit that notice of the relief requested herein is appropriate under the circumstances and that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## **Reservation of Rights**

57.     Nothing contained herein is intended or should be construed as (a) an admission as to the validity or priority of any claim or lien (or the priority thereof) against the Debtors, (b) a waiver of the Debtors' or any party in interest's rights to subsequently dispute or contest such claim or lien on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion, (e) a request or authorization to assume or adopt any agreement, contract, or lease under section 365 of the Bankruptcy Code or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or applicable law.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute or contest such claim.

## **Notice**

58.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for Region 13; (b) counsel to the Ad Hoc First Lien Group; (c) counsel to the Ad

Hoc Crossover Group; (d) counsel to the Facilities Agent; (e) counsel to the Term Agent; (f) counsel to the Indenture Trustee; (g) counsel to the collateral trustee under the Debtors' secured debt facilities; (h) counsel to the DIP Agent; (i) counsel to DIP Lenders; (j) counsel to Murray Energy Corporation; (k) counsel to Reserves; (*l*) counsel to Javelin; (m) counsel to Uniper Global Commodities UK Limited; (n) the Internal Revenue Service; (o) the Securities and Exchange Commission; (p) the United States Attorney's Office for the Eastern District of Missouri; (q) the state attorneys general for all states in which the Debtors conduct business; (r) the Banks; (s) the holders of the thirty (30) largest unsecured claims against the Debtors, on a consolidated basis; and (t) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-3(A)(1) of the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri (the "Local Bankruptcy Rules").  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

WHEREFORE, the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other relief as is just and proper.

Dated:    March 10, 2020          Respectfully submitted,
          St. Louis, Missouri
                                   ARMSTRONG TEASDALE LLP


                                   _/s/  Richard W. Engel, Jr._
                                   Richard W. Engel, Jr. (MO 34641)
                                   John G. Willard (MO 67049)
                                   Kathryn Redmond (MO 72087)
                                   7700 Forsyth Boulevard, Suite 1800
                                   St. Louis, Missouri  63105
                                   Tel:    (314) 621-5070
                                   Fax:    (314) 621-5065
                                   Email:  rengel@atllp.com
                                           jwillard@atllp.com
                                           kredmond@atllp.com

                                   - and -

                                   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                                   Paul M. Basta (*pro hac vice* admission pending)
                                   Alice Belisle Eaton (*pro hac vice* admission pending)
                                   Alexander Woolverton (*pro hac vice* admission pending)
                                   1285 Avenue of the Americas
                                   New York, New York  10019
                                   Tel:    (212) 373-3000
                                   Fax:    (212) 757-3990
                                   Email:  pbasta@paulweiss.com
                                           aeaton@paulweiss.com
                                           awoolverton@paulweiss.com

                                   *Proposed Counsel to the Debtors and
                                   Debtors in Possession*

**Exhibit A**

**Schedule of Bank Accounts[1]**

| No. | Entity | Bank Name | Account Type | Account No. (Ending) |
|-----|--------|-----------|--------------|----------------------|
| 1. | Foresight Energy LLC | The Huntington National Bank | Concentration | 9601 |
| 2. | Foresight Receivables LLC | The Huntington National Bank | Receipts | 6973 |
| 3. | Foresight Energy LLC | The Huntington National Bank | Receipts | 6694 |
| 4. | Foresight Energy LLC | The Huntington National Bank | Disbursements – Accounts Payable | 6681 |
| 5. | Foresight Energy LLC | The Huntington National Bank | Disbursements – Payroll | 8214 |
| 6. | Foresight Energy Services LLC | The Huntington National Bank | Disbursements – Payroll | 6539 |
| 7. | MaRyan Mining LLC | CNB Bank & Trust, N.A. | Petty Cash | 4605 |
| 8. | Mach Mining LLC | First Southern Bank | Petty Cash | 4129 |
| 9. | Hillsboro Energy LLC | The Huntington National Bank | Operating | 5031 |
| 10. | Patton Mining LLC | CNB Bank & Trust, N.A. | Petty Cash | 6394 |
| 11. | Foresight Energy LP | F.N.B. Wealth Management | Collateral | 7011 |

---

[1]    As noted in the Motion, any relief or waivers authorized in the Proposed Orders with respect to the Bank Accounts and the Banks shall also apply, solely to the extent necessary and for the avoidance of doubt, to (a) the Bank Account (x020) in the name of Foresight Energy LLC and maintained with Morgan Stanley Smith Barney LLC and (b) the Bank Account (x5635) in the name of Mach Mining, LLC and maintained with First Southern Bank.

## Exhibit B

**Cash Management System Schematic**

**Foresight Energy LP**
**Cash Management System**

