## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | Hearing Date:  March 11, 2020 |
| | ) | Hearing Time:  10:00 a.m.  (Central Time) |
| | ) | Hearing Location: Courtroom 7 North |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS TO PAY PREPETITION CLAIMS OF TRADE AND LIEN CLAIMANTS AND AUTHORIZING PAYMENT PROCEDURES RELATED THERETO, (B) AUTHORIZING DEBTORS TO PAY ROYALTY AND LEASEHOLD CLAIMS, (C) GRANTING ADMINISTRATIVE EXPENSE PRIORITY STATUS TO OUTSTANDING ORDERS, AND (D) GRANTING RELATED RELIEF

Foresight Energy LP and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.     By this Motion, the Debtors seek entry of interim and final orders

---

[1]     The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

(the "Proposed Orders"),[2] pursuant to sections 105(a), 363(b), and 503(b)(9) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing, but not directing, in the Debtors' discretion, the Debtors to pay prepetition claims in the ordinary course of business and in a collective amount not to exceed $23.2 million on an interim basis and $43.1 million on a final basis (as applicable, the "Vendor Claims Cap") of (i) critical vendors (collectively, the "Critical Vendors," and their claims, the "Critical Vendor Claims"), (ii) holders of claims under section 503(b)(9) of the Bankruptcy Code (collectively, the "503(b)(9) Claimants," and their claims, the "503(b)(9) Claims"), and (iii) Lien Claimants (as defined herein, and together with (i) and (ii), the "Vendor Claimants," and their collective prepetition claims, the "Vendor Claims") and authorizing procedures to pay such Vendor Claims; (b) authorizing, but not directing, in the Debtors' discretion, the Debtors to pay Royalty and Leasehold Claims (as defined herein), in the ordinary course of business and in a collective prepetition amount not to exceed $9.7 million on an interim basis and $14.5 million on a final basis; (c) granting administrative expense priority status to the Outstanding Orders (as defined herein) after the postpetition delivery of goods; and (d) granting related relief.   The estimated amounts the Debtors request authority to pay by this Motion are set forth below:

| Claim Type | Interim Amount | Final Amount |
|---|---|---|
| Critical Vendor Claims | $14,600,000 | $27,400,000 |
| 503(b)(9) Claims | $2,600,000 | $2,900,000 |
| Lien Claims | $6,000,000 | $12,800,000 |
| Royalty and Leasehold Claims | $9,700,000 | $14,500,000 |

---

[2]    Copies of the Proposed Orders will be made available on the Debtors' case information website at: http://cases.primeclerk.com/foresightenergy.

Doc#: US1:13301824v9

**Jurisdiction and Venue**

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. §157(b).

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

**Background**

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are a leading producer of thermal coal, with four mining complexes and nearly 2.1 billion tons of proven and probable coal reserves strategically located near multiple rail and river transportation access points in the Illinois Basin.  The Debtors also own a barge-loading river terminal on the Ohio River.  From this strategic position, the Debtors sell their coal primarily to electric utility and industrial companies located in the eastern half of the United States and across the international market.

5.      The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  Contemporaneously herewith, the Debtors filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No trustee, examiner or official committee has been appointed in these chapter 11 cases.

Doc#: US1:13301824v9

6.      Information regarding the Debtors' businesses, their capital and debt structure, the events leading to the filing of these cases, and the terms and structure of the proposed restructuring transaction is set forth in the *Declaration of Robert D. Moore, President and Chief Executive Officer of Foresight Energy LP, in Support of Chapter 11 Petitions* (the "Moore Declaration"), the *Declaration of Alan Boyko, Senior Managing Director of FTI Consulting, Inc., in Support of Chapter 11 Petitions and First Day Relief* (the "Boyko Declaration"), and the declaration of Seth Herman in support of the Debtors' motion for approval of debtor-in-possession financing and use of cash collateral (the "Herman Declaration," and together with the Moore Declaration and Boyko Declaration, the "First Day Declarations"),[3] filed contemporaneously herewith.

### The Debtors' Trade Claimants

7.      The Debtors extract and process coal at their mining complexes and deliver this coal to their customers in the ordinary course of business. The Debtors' ability to extract, process, and deliver coal in a timely manner is paramount to their financial performance and depends on their prompt and continuous receipt of a wide range of goods and services. Given the highly specialized nature of the machinery, equipment, supplies, and materials used in mining, processing, and producing coal products and the coal mining industry generally, the Debtors rely on specific vendors, suppliers, servicers, and shippers to provide the Debtors with goods and services necessary for their businesses to function and to ensure safe mining conditions and compliance with federal and state regulations. The Debtors therefore have limited options for their parts, materials, supplies, and repair needs.

---

[3]     The First Day Declarations are being filed in support of this Motion and are incorporated herein by reference. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declarations.

Doc#: US1:13301824v9

8.     In addition, the Debtors routinely transport coal from their mines to their customers by rail, barge, or truck, and reach their international customers through utilization of port loadout facilities.  Any disruption to the Debtors' transportation network would have an immediate and adverse impact on the Debtors' businesses.  Functional transportation is necessary for the Debtors' operations to avoid logjams in supplies or inventory and to maximize the revenue from coal shipments.  The goods and services provided by the Vendor Claimants are thus vital for the day-to-day operation of the Debtors businesses.

9.     As discussed further in the First Day Declarations, the Debtors' historic thermal coal markets have been challenged over the last decade.  These detrimental market conditions were caused by, among other things, changes in legislative priorities away from coal, greater market interest and commercialization of shale gas, natural gas, and renewable energy, and decreased consumer power demand arising from recent cooler summers and warmer winters. The Debtors originally weathered this industry downturn through selling cost-competitive coal to their customers derived through improved operational, production, and logistical efficiencies. However, industry challenges were amplified through (a) financial, legislative, and regulatory strains on the Debtors' customers and (b) the rise of Russian coal and global natural gas exports into Europe, rendering coal exports from the United States to Europe and other international markets uneconomic.

10.     Before the Petition Date, the Debtors extended payment terms for most Vendor Claimants to preserve liquidity and to ensure payment to those vendors critical to mine safety and production.  Altogether, as of the Petition Date, the Debtors estimate that they owe approximately $43.1 million in total Vendor Claims, which represents 41% of an estimated

Doc#: US1:13301824v9

$105 million[4] in all prepetition general unsecured trade claims.  Altogether, Vendor Claimants are necessary to provide the goods and services required for the Debtors to operate their businesses in a safe and economical manner, and to maximize the value of the Debtors' estates.

## A.    Critical Vendor Claims

11.    The Debtors depend on select Critical Vendors who can supply the necessary quality, type, and quantity of goods and services in a manner required for the Debtors to operate in the ordinary course of business.  Any interruption to the flow of goods or services from the Critical Vendors would disrupt the Debtors' operations and would cause irreparable harm to the Debtors' businesses, value, customer base and confidence, and industry market share, and could risk material harm to or the safety of the Debtors' mine workers.

12.    Accordingly, the Debtors have thoroughly reviewed their business relationships and identified the Critical Vendors whose particular goods or services are necessary to avoid immediate and irreparable harm to the Debtors' businesses.  In particular, the Debtors reviewed their accounts payable and prepetition vendor lists to identify the Critical Vendors using the following criteria: (a) whether vendors were sole source or limited source suppliers necessary for undisrupted business operations, (b) the availability of, and the ability and time required to locate, alternative sources of comparable and necessary goods and services, (c) whether the Debtors' inventory levels or service coverage is sufficient to meet customer demand while an alternative vendor is sourced, (d) which vendors would be prohibitively expensive to replace, (e) whether the loss of a vendor would present an unacceptable risk to the Debtors' operations given the volume of essential services or goods that such vendor provides, (f) whether non-payment of a particular vendor would cause material damage to their business,

---

[4]    For the avoidance of doubt, this amount excludes amounts related to the Royalty and Leasehold Claims and amounts that the Debtors request relief from this Court to pay through their other first day motions filed concurrently herewith.

such that the Debtors would be unlikely to do business with such vendor again in the future, (g) the extent to which vendors may have a 503(b)(9) Claim under the Bankruptcy Code, (h) the extent to which the vendor may have a Lien Claim, (i) whether the vendor is subject to an agreement or contract with the Debtors under which the Debtors could compel continued performance on prepetition terms, and (j) whether a vendor meeting the foregoing criteria is able or likely to refuse to postpetition performance if its prepetition balances are not paid.  Based on this criteria, the Critical Vendors include, among others, the following categories:

      i.   <u>Mine Safety and Compliance Suppliers and Service Providers</u>

13.     A key concern for the Debtors in these chapter 11 cases is continued mine safety.  In the ordinary course of business, the Debtors use vendors that provide specialized equipment and services to maintain safe working conditions at their mines.  Among other things, these specialized vendors provide critical mine roof and structural support systems, miner-tracking systems and safety gear, mine ventilation machinery and components, fire suppression systems,  and mine telecommunications equipment.  Altogether, these goods and services ensure miner-safety and enable compliance with a variety of governmental regulation, including those promulgated by the Mine Safety and Health Administration ("<u>MSHA</u>").  Relatedly, the Debtors require a number of consultants and servicers to assist them in remaining compliant with a variety of environmental laws with respect to the various mining permits and licenses necessary to operate their mining operations.

14.     Because of the industry-specific nature of these and similar goods and services, and the strict regulatory conditions placed on the Debtors and their vendors, the Debtors can only work with a limited number of safety and regulatory compliant vendors or servicers sufficiently knowledgeable of the relevant compliance obligations, for which there are few, if

any, substitutes in the market able to satisfy the Debtors' operational needs. Thus, if the Debtors were forced to suspend or change these vendors or servicers on short notice, they would likely be forced to close down their mining operations for a significant period of time pending a search for qualified replacement vendors. Indeed, in many cases, the Debtors would need to not only find a replacement vendor or servicer, but would then make changes to their mines to accommodate such vendor's or servicer's replacement goods or services and seek regulatory approval of the same, before they were appropriately authorized to re-engage in mining operations. These delays and expenses could drastically affect the value of the Debtors' estates, and cause their customers to seek alternative sources of coal while the Debtors' mines are inoperable.

ii.    Equipment and Parts Suppliers and Service Providers

15.    The Debtors require a continuous and reliable supply of equipment and parts unique to mining operations to operate in the ordinary course of business. Such specialized equipment can include shearers, longwall conveyers, power loaders, crushers, locomotives, diesel engines, and related components. Wear and tear on existing equipment requires the Debtors to continually repair, maintain, or replace parts and components of their coal mining equipment, or to buy entirely new equipment as required for safe and efficient for mining operations. Given the highly regulated and specialized nature of the coal mining industry,[5] a majority of the Debtors' mining equipment and parts can only be purchased from the original manufacturers, which are often of high quality and have limited alternative sources for after-market suppliers. The high quality in particular makes this equipment valuable and necessary to support the Debtors' efficient mining operations.

---

[5]    Most of the Debtors' mining equipment is designed, built, and regulator-approved in accordance with the MSHA.

8

16.     The specialized equipment and parts that the Debtors require to continue their mining operations and remain competitive are only available from sole-source or limited-source vendors, and many of these vendors sell equipment and parts to the Debtors through one-off purchase orders.  If the Debtors are unable to make payments to certain vendors who supply these parts, the Debtors' operations will be severely disrupted during the search for approved replacement vendors.  Accordingly, failure to pay these vendors would materially harm the Debtors operations, employees, stakeholders, and their restructuring efforts.

iii.     Operating Suppliers and Service Providers

17.     The Debtors require specific vendors to provide the materials necessary to maintain active coal mining operations in the ordinary course of business.  Such materials can include diesel fuel, lubricants, chemicals, rock dust, concrete support blocks, belts, castings, and tires for a variety of vehicles and loaders used at both surface and underground operations.[6] Many of these vendors are regionally sourced and are the only available option to satisfy economically the Debtors' quantity demands, which are typically located in remote locations. These vendors are critical to maintaining coal extraction and in preparing and cleaning coal before the Debtors ship it to their customers.   Given that the Debtors cannot operate without these materials, it is critical that the Debtors continue to pay and maintain business relationships with these vendors.

iv.     Repair and Maintenance Service Providers

18.     The Debtors use a variety of servicers to repair and maintain their mining equipment, infrastructure, and facilities.  In addition to the Debtors' routine maintenance and repair work, these servicers use trained personnel with rare expertise to provide specialized

---

[6]     Most of the Debtors' mining materials are regulator-approved in accordance with the MSHA.

repair and maintenance for gas wells, power lines, cables, and technical equipment such as loading scales and coal quality analyzers. Accordingly, these servicers offer high-quality services that the Debtors are unable to replicate from other providers, and are thus critical to preserving ongoing business operations during these chapter 11 cases.

19.     Based on the foregoing, the Debtors request authority, but not direction, in their discretion, to pay the Critical Vendor Claims, in full or in part, in the ordinary course of business, subject to the Vendor Claims Cap, which the Debtors believe will maximize the value of their estates for the benefit of all stakeholders and ensure safe and efficient mining operations.

**B.      503(b)(9) Claims**

20.     The Debtors have received certain goods and materials from vendors within the twenty (20) day period before the Petition Date. Most of these goods are generally obtained on an order-by-order basis in the ordinary course of business and are not governed by contract. Given this ad hoc relationship, certain of these vendors may refuse to supply new orders, could reduce existing trade credit, or could require payment of cash-on-delivery, without payment of their prepetition claims. The Debtors believe that the value of the goods and materials delivered within twenty (20) days before the Petition Date may be entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code.[7] The Debtors therefore believe that given (a) the ultimate administrative expense priority nature of these 503(b)(9) Claims and (b) the vital role that many, if not all of these 503(b)(9) Claimants will have in the Debtors' restructuring, it is in the best interest of their estates to have authority to pay the 503(b)(9) Claims in the ordinary course of business.

---

[7]     The Debtors do not concede that any claims described in this Motion are conclusively entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code, and expressly reserve the right to contest the extent or validity of such claims.

Doc#: US1:13301824v9

**C.**     **Lien Claimants**

21.     This category of claims is comprised of (a) the claims of shippers and warehousemen who the Debtors determine, in the exercise of their business judgement, must be paid to obtain the delivery and release of goods, parts, components, materials, equipment, coal, or other items; and (b) the claims of third parties who have or may have the ability to assert liens on the Debtors' and their customers' property if the Debtors fail to pay for goods or services rendered (collectively, the "Lien Claimants," and their claims, the "Lien Claims").

i.     Shippers and Warehousemen

22.     In the ordinary course of business, the Debtors use and make payments to (a) delivery services, barges, rail, trucking, freight terminal operators, carriers, shippers, and other transportation service providers (collectively, the "Shippers") that ship, transport, store, engage in customs business, and otherwise facilitate the movement of parts, materials, coal, and other goods used in ordinary course of the Debtors' operations; and (b) the warehousemen, bailees, storage facilities, other storage providers, customs brokers, and various governmental agencies (collectively, the "Warehousemen") who, among other things, store goods in transit and collect applicable customs duties, including in respect of customer property.  For several reasons, the Debtors seek to pay the prepetition shipping and warehousing charges with respect goods and property in transit (collectively, the "Shipping and Warehousing Claims").

23.     The services provided by the Shippers and Warehousemen are essential to the Debtors' day-to-day operations in that they enable the Debtors to obtain necessary materials to mine and process coal, to store coal inventory, and to transport coal.  Therefore, certain Shippers and Warehousemen currently possess goods and provide services that are vital to the Debtors' mining operations and the maintenance of their customer relationships.  Furthermore, if

11

the Shipping and Warehouse Claims are not paid, they may refuse to perform additional services for the Debtors.  In such event, the Debtors would incur significant additional expenses, such as premium replacement shipping and warehousing costs, that would likely exceed the amount of unpaid prepetition shipping and warehousing charges that the Debtors request the authority to pay by this Motion.  Moreover, if the Debtors were unable to promptly locate suitable replacements for the Shippers and Warehousemen, the Debtors' operations would face substantial hardship.

24.    In addition, under certain state laws, to the extent the Debtors have not paid for such services, a Shipper or Warehouseman may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the goods.[8]  Indeed, pursuant to section 363(e) of the Bankruptcy Code, the Shippers and Warehouseman, as bailees, may be entitled to adequate protection for any valid possessory lien.

25.    In light of these circumstances, the Shippers and Warehousemen may assert that they have possessory liens on goods currently in their possession for transportation or storage costs and may refuse to deliver or release those goods, including the Debtors' coal, in their possession until their invoices are paid and their liens redeemed.  Some Shippers and Warehousemen may be unwilling to release the goods in their possession on which they may be entitled to assert liens for fear of releasing security for their prepetition claims.  Moreover, Shippers and Warehousemen simply refusing to deliver the Debtors' or their customer's property if they are not paid could severely disrupt the Debtors' operations and cause the Debtors to lose a

---

[8]    For example, section 7-307 of the Uniform Commercial Code provides that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  U.C.C. § 7-703(a) (2003).

substantial amount of revenue and future business.  Accordingly, because the Debtors are dependent on these Shippers and Warehousemen, it is essential that the commencement of these cases not give any Shippers and Warehousemen reason or excuse to cease performing their obligations.

   ii.   Third-Party Providers

   26.   The Debtors also seek to pay the prepetition charges of certain contractors, repairmen, and other third-party service providers (collectively, the "Third-Party Providers") that repair, maintain, and otherwise service necessary equipment and machinery used in the Debtors' operations.  Additionally, the Debtors rely on certain vendors to provide contract labor for their mining operations, as well as specialized mining materials used in the Debtors' coal production.  Such services, labor, materials, and equipment are essential to the Debtors' daily operations.  Absent payment of prepetition amounts to the Third-Party Providers, such providers may cease to provide goods and services to the Debtors or otherwise hold the provision of goods hostage pending payment of their claims, and the Debtors would be left with no alternative provides capable of satisfying the Debtors' operational needs.  Thus, it is critical to the continuity of the Debtors' operations that they maintain their relationships with the Third-Party Providers.

   27.   More importantly, the Debtors believe that the Third-Party Providers have already or may be able to assert trade or mechanics' liens over the Debtors' leaseholds, as well as essential parts, machinery, and other equipment.[9]  In addition, pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, or to the extent accomplished within the 30-day period set forth in section 547(e)(2)(A) of the Bankruptcy Code, is expressly excluded from the automatic stay.

---

[9]   See, e.g., 770 Ill. Comp. Stat. Ann. 65/1 (providing for a mining lien).  The Debtors do not concede that any liens (contractual, common law, statutory, or otherwise) described herein are valid, and the Debtors reserve the right to contest the extent, validity, and perfection of any such liens and to seek the avoidance thereof.

Accordingly, absent payment of their outstanding prepetition Lien Claims, the Debtors believe the Third-Party Providers may refuse to provide goods or services for or to honor obligations under existing agreements with the Debtors on a go-forward basis. For these reasons, the Debtors have requested authority to pay, in their discretion, the Lien Claims in the ordinary course of business.

### **Customary Trade Terms**

28.     In return for paying the claims of the Vendor Claimants, the Debtors will use commercially reasonable efforts to require the applicable Vendor Claimant to provide favorable trade terms in line with historical practice for the go-forward delivery of goods and services. The Debtors therefore request authority to condition payment upon such party's written agreement to continue supplying goods or services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those in place (including, among other terms and programs, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability) during the twelve (12) months in place before the Petition Date (collectively, the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors in their reasonable business judgment.

29.     To the extent that the Debtors determine, in their business judgment, to condition the payment of a Vendor Claim on the agreement of the applicable Vendor Claimant to continue supplying goods or services to the Debtors on the Customary Trade Terms, the Debtors propose to send the Vendor Claimant a copy of any order granting this Motion (the "Vendor Order"), and further propose to enter into a trade agreement (a "Trade Agreement") including the following terms:

> a. The amount of the Vendor Claimant's estimated prepetition claim, after accounting for any setoffs, other credits, and discounts thereto, shall be as

14

mutually determined in good faith by the Vendor Claimant and the Debtors (but such amount shall be used only for purposes of the Vendor Order and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

b.  The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to the Vendor Order;

c.  If agreed to be paid less than 100% of their estimated prepetition claims, the Vendor Claimant's agreement to waive any remaining and to be unpaid estimated prepetition claims against the Debtors, which such remaining prepetition claims shall not be paid in accordance with the Vendor Order;

d.  The Vendor Claimant's agreement to provide goods and services to the Debtors based upon the Customary Trade Terms (including, among other terms and programs, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability), or such other trade terms as are agreed to by the Debtors and the Vendor Claimant, and the Debtors' agreement to pay the Vendor in accordance with such terms;

e.  The Vendor Claimant's agreement to not seek to discontinue, terminate, or modify any contractual agreement with the Debtors;

f.  The Vendor Claimant's agreement not to file or otherwise assert against any of the Debtors, their estates, or any of their respective assets or property any lien (a "Lien"), regardless of the statute or other legal authority upon which such Lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to the Vendor Claimant by the Debtors arising from goods and services provided to the Debtors before the Petition Date, and that, to the extent that the Vendor Claimant has previously obtained such a Lien, the Vendor Claimant shall immediately take all necessary actions to release such Lien;

g.  The Vendor Claimant's acknowledgment that it has reviewed the terms and provisions of the Vendor Order and consents to be bound thereby;

h.  The Vendor Claimant's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

i.  If a Vendor Claimant that has received payment of a prepetition claim subsequently refuses to provide goods or services to the Debtors on Customary Trade Terms or such other trade terms as are agreed to by the Debtors and the Vendor Claimant, or seeks to discontinue, terminate, or modify any contractual agreement with the Debtors, then, without the need for any further order of the Court, any payments received by the Vendor Claimant on account of such prepetition claim shall be deemed to have been in payment of any then outstanding postpetition obligations owed to such Vendor Claimant, and such Vendor Claimant shall immediately repay to the Debtors any payments received on account of its prepetition claim to the extent that the aggregate amount of such

payments exceed the postpetition obligations then outstanding to such Vendor Claimant, without the right of setoff, recoupment, or reclamation, and the Vendor's prepetition claim shall be reinstated as a prepetition claim in these chapter 11 cases and subject to the terms of any bar date order entered in these chapter 11 cases.

30.     Any such Trade Agreement, once agreed to by the Debtors and a Vendor Claimant, shall be the agreement between the parties that governs their post-petition trade relationship.  The Debtors request that they be authorized, but not required, in their discretion, to enter into Trade Agreements with the Vendors to the extent that the Debtors determine that such agreements are appropriate under the circumstances of their business relationship with such Vendor Claimant.  If a Vendor Claimant fails to comply with any Trade Agreement, or, in the event that a Trade Agreement is terminated, the Debtors reserve all rights to recover sums paid in excess of post-petition obligations owing to the particular vendor.

**Prepetition Purchase Orders**

31.     Out of an abundance of caution, the Debtors request (a) confirmation of the administrative expense priority status of the Debtors' undisputed obligations for the postpetition delivery of goods and provision of services and (b) authorization for the Debtors to satisfy such obligations in the ordinary course of business.  As noted above, in the ordinary course of business, numerous vendors provide the Debtors with goods and services that are integral to the Debtors' business operations.  As of the Petition Date, the Debtors had outstanding prepetition purchase orders (the "Outstanding Orders") with vendors for such goods and services.

32.     As a result of these chapter 11 cases, the Debtors believe that certain vendors with Outstanding Orders may perceive a risk that they will be treated as prepetition general unsecured creditors for the cost of any shipments made or services provided after the Petition Date.  As a result, such vendors may refuse to ship such goods or provide such services

16

to the Debtors unless the Debtors issue postpetition purchase orders or provide other assurances of payment. Issuing substitute purchase orders on a postpetition basis would be disruptive, administratively burdensome, time-consuming, and counterproductive to the Debtors' restructuring. Authorizing the Debtors to pay the Outstanding Orders pursuant to the terms set forth herein should eliminate the burden on this Court and the Debtors arising from numerous individual motions requesting payment on account of the Outstanding Orders.

33.     Accordingly, to prevent any disruption to the Debtors' business operations, and given that goods and services provided after the Petition Date are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code, the Debtors seek relief that:  (a) grants administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods or services subject to Outstanding Orders and (b) authorizes the Debtors to satisfy such obligations in the ordinary course of business.

## The Debtors' Royalty and Leasehold Claimants

34.     A mineral interest generally consists of an interest in minerals in place under a parcel of land, typically in the nature of a fee simple interest in real property, which entitles its royalty holder to the exclusive right to, among other things, enter the land to explore for and produce minerals from the land. Through a written agreement (a "Royalty Agreement"), holders of mineral interests (the "Royalty and Leasehold Claimants," and their claims, the "Royalty and Leasehold Claims") are entitled to royalty payments from the Debtors in consideration for depleting coal reserves or for transporting mined coal across a royalty holder's property. The fees owed under the Royalty Agreements are generally calculated upon the sale of mined coal, but payments under certain Royalty Agreements can also be calculated on a

Doc#: US1:13301824v9

production basis, such as gross tons produced, or require minimum monthly, quarterly, or annual payments.

35.     As of the Petition Date, the Debtors are party to various Royalty Agreements.  Failure to make payments on account of the Royalty Agreements in the ordinary course of business would directly and adversely impact the Debtors' ability to mine, produce, transport, and sell coal from coal reserves related to the Royalty Agreements.  The Debtors therefore request authority to pay, in their discretion, prepetition Royalty and Leasehold Claims (subject to the limitations set forth herein) and to pay postpetition Royalty and Leasehold Claims, in each case in the ordinary course of business.[10]

## Basis for Relief Requested

### A.     The Court Should Authorize the Debtors to Pay the Critical Vendor Claims

36.     Sections 105(a) and 363(b) of the Bankruptcy Code authorize the requested relief.  Section 105(a) of the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]"  11 U.S.C. § 105(a).  It permits a bankruptcy court to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction."  2 COLLIER ON BANKRUPTCY ¶ 105.01.  Similarly, section 363(b)(1) of the Bankruptcy Code authorizes a debtor to use property of the estate other than in the ordinary course of business after notice and a

---

[10]    The Debtors note that certain holders of royalty interests in the Debtors' coal reserves are considered affiliates of the Debtors.  Accordingly, the Debtors consider any payments on account of royalty interests with such non-Debtor affiliates to be intercompany transactions giving rise to intercompany claims.  For the avoidance of doubt, relief requested with respect to such non-Debtor affiliate intercompany transactions and intercompany claims is set forth in the *Debtors' Motion For Entry of Interim and Final Orders (A) Authorizing Continued Use of the Debtors' Existing Cash Management System; (B) Authorizing Use of Existing Bank Accounts and Business Forms; (C) Granting a Limited Waiver of Requirements of Section 345(b) of the Bankruptcy Code; (D) Authorizing Continuation of Ordinary Course Intercompany Transactions; (E) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims; and (F) Granting Related Relief*, filed contemporaneously herewith.

Doc#: US1:13301824v9

hearing.  11 U.S.C. § 363(b)(1); *see also In re Apex Oil Co.*, 92 B.R. 847 (Bankr. E.D. Mo. 1988).

37.    The well-settled "doctrine of necessity" also supports the requested relief. This rule authorizes postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  The Supreme Court of the United States first articulated the doctrine of necessity more than a century ago in affirming the authorization of using receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See, e.g., Miltenberger* v. *Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286, 309–11 (1882).  The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  *See, e.g.*, 11 U.S.C. § 105(a); *In re Carlson*, 126 F.3d 915, 920 (7th Cir. 1997) ("Section 105(a) gives the bankruptcy court the authority to issue any order necessary to carry out the provisions of the Bankruptcy Code."); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re NWFX, Inc.*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy, however, is that equitable principles govern . . . .").

38.    This doctrine of necessity functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Wehrenberg, Inc.*, 260 B.R. 468 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the

Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor"); *see also In re Bos. & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("While the doctrine [of necessity] was not codified in the Bankruptcy Code, courts have used their equitable power under Section 105(a) of the Code to authorize the payment of prepetition claims . . . ."). The doctrine is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims.

39.     As explained above, the Debtors' ability to pay the Critical Vendors is essential to ensure that there is no disruption in the operation of the Debtors' businesses. Indeed, the authority to pay such claims will maintain the integrity of the Debtors' supply chain and mining operations, ensure the safety of their mine workers, facilitate the sale of coal and the Debtors' accounts receivable collection, facilitate the continuing support of their customers, and allow the Debtors to efficiently administer these chapter 11 cases. Moreover, such payments are necessary because the Debtors do not believe there are cost-effective, regulatory-licensed, or readily accessible alternatives to the Critical Vendors. The Debtors further submit that the total amount of Critical Vendor Claims that is requested to be paid to the Critical Vendors is minimal compared to the importance and necessity of the Debtors' uninterrupted receipt of the necessary goods and services provided by such vendors. Indeed, absent such authority to pay the Critical Vendors, the Debtors submit that the Debtors' operations will be materially harmed, if not entirely idled, and immediate and irreparable harm will accrue to the value of the Debtors and their estates.

Doc#: US1:13301824v9

40.     Courts in this and other districts have routinely granted relief similar to the relief requested herein in other chapter 11 cases.  *See, e.g.*, *In re Payless Holdings LLC*, No. 19-40883-659 (Bankr. E.D. Mo. Mar. 19, 2019) (D.I. 600) (authorizing payment of critical vendors); *In re Noranda Aluminum, Inc.*, No. 16-10083-399 (Bankr. E.D. Mo. Feb. 10, 2016) (D.I. 96) (same); *In re Arch Coal, Inc.*, No. 16-40120-705 (Bankr. E.D. Mo. Jan. 13, 2016) (D.I. 71) (same); *see also In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio. Dec. 9, 2019) (D.I. 358) (same).  The Debtors submit that the circumstances of these chapter 11 cases warrant granting similar relief, and that doing so is in the best interests of the Debtors, their estates, their creditors, and their stakeholders, and therefore should be granted.

**B.      The Court Should Authorize the Debtors to Pay the Lien Claims**

41.     The relief requested herein with respect to the Lien Claims is appropriate and warranted under both sections 105(a) and 363(b) of the Bankruptcy Code.  The authority to satisfy the Lien Claims in the initial days of these cases without disrupting the Debtors' operations will send a clear signal to the marketplace, including key suppliers and customers, that the Debtors are willing and, importantly, able to conduct business as usual during their chapter 11 cases.

42.     Failure to pay the prepetition claims of Lien Claimants could materially jeopardize the Debtors' performance and reliability.  The Debtors' businesses are dependent on the timely delivery of services and equipment to and from the areas in which they operate.  Any disruption to the Debtors' ability to timely procure equipment, repairs, or materials would have deleterious effects on the Debtors' businesses.  If the Lien Claimants are unwilling to provide the Debtors with goods or services postpetition because of their outstanding prepetition claims, the Debtors' mining operations would suffer, compromising the value of the Debtors' estates to the detriment of all parties in interest.  A lack of vital third-party transportation services, and access

21

to a limited universe of specialized service providers could substantially impair the Debtors' operations. Similarly, a lack of key equipment, supplies, parts and components to maintain the Debtors' fleet of mining equipment would also force an interruption in operations.

43.    Moreover, and as noted above, certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' assets in their possession, notwithstanding the automatic stay under section 362 of the Bankruptcy Code, in an attempt to secure payment of their prepetition claim. As described above, under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[11] As a result, the Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations. Even absent a valid lien, to the extent certain Lien Claimants have possession of the Debtors' coal or inbound inventory parts or materials, mere possession or retention could severely disrupt the Debtors' operations.

44.    Where debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this district and others in this circuit have routinely authorized payments to shippers, warehousemen, and other lien claimants under similar circumstances. *See, e.g.*, *In re Payless Holdings LLC*, No. 19-40883-659 (Bankr. E.D. Mo. Mar. 19, 2019) (D.I. 600) (authorizing payment of claims related to shippers and lien claims); *In re Armstrong Energy, Inc.*, No. 17-47541-659 (KAS) (Bankr. E.D. Mo. Nov. 2, 2017) (D.I. 92) (same); *In re Arch Coal, Inc.*, No. 16-40120-705 (Bankr. E.D. Mo. Jan. 14, 2016) (D.I. 93) (same); *In re Noranda Aluminum, Inc.*, No. 16-10083-399 (Bankr. E.D. Mo. Feb. 10, 2016)

---

[11]    *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

Doc#: US1:13301824v9

(D.I. 97) (same); *see also In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio. Dec. 9, 2019) (D.I. 358) (same).  Based on the dire consequences that could potentially arise if the Lien Claimants ceased providing goods and services, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

**C.      The Court Should Authorize the Debtors to Pay the 503(b)(9) Claims**

45.      Section 503(b)(9) provides administrative expense priority for the "value of any goods received by the debtor within twenty (20) days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."   11 U.S.C. § 503(b)(9).   These claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, payment now only provides such parties with what they would be entitled to receive later under a chapter 11 plan.  Indeed, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

46.      The Bankruptcy Code does not prohibit a debtor from paying such claims before confirmation.  As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See, e.g.*, *In re Arts Dairy, LLC*, 414 B.R. 219, 221 (Bankr. N.D. Ohio 2009) (recognizing that section 503(b)(9) claims arising from ordinary course payments may be paid when due, and not when plan becomes effective); *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006), Hr'g Tr. 49:21-23 ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval.").

Doc#: US1:13301824v9

47.     The Debtors' ongoing ability to obtain goods as provided herein is key to their survival and necessary to preserve the value of their estates.   Absent payment of the 503(b)(9) Claims at the outset of these cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims under a chapter 11 plan—the Debtors could be denied access to the merchandise necessary to maintain safe and economical coal mining, production, and transport operations.   Failure to honor these claims in the ordinary course of business may also cause the Debtors' vendors to withhold support for the Debtors during the chapter 11 process.   Such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

48.     Indeed, courts in this circuit and in other jurisdictions have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business.   *See, e.g.*, *In re Armstrong Energy, Inc.*, No. 17-47541-659 (KAS) (Bankr. E.D. Mo. Nov. 2, 2017) (D.I. 92) (authorizing payment of claims arising under section 503(b)(9)); *In re Noranda Aluminum, Inc.*, No. 16-10083-399 (Bankr. E.D. Mo. Feb. 10, 2016) (D.I. 96) (same); *In re Arch Coal, Inc.*, No. 16-40120-705 (CER) (Bankr. E.D. Mo. Jan. 13, 2016) (D.I. 71) (same); *see also In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio. Dec. 9, 2019) (D.I. 358) (same).   The Debtors submit that the circumstances of these chapter 11 cases warrant granting similar relief, and that doing so is in the best interests of the Debtors, their estates, their creditors, and their stakeholders, and therefore should be granted.

**D.      The Court Should Confirm That Outstanding Orders Are Administrative Expense Priority Claims and That Payment of Such Claims Is Authorized**

49.     Claims for goods and services delivered, shipped, or provided after the Petition Date are likely entitled to administrative expense priority treatment.   Such claims are accorded administrative expense priority where such claims are for the actual, necessary costs

Doc#: US1:13301824v9

and expenses of preserving the bankruptcy estate. *See* 11 U.S.C. § 503(b)(1); *see also Sanchez* v. *Northwest Airlines, Inc.*, 659 F.3d 671, 677 (8th Cir. 2011) (claims are entitled to administrative expense priority status where claimant demonstrates it conducted transaction with a debtor in possession that provided benefit to debtor's estate); *In re ContinentalAFA Dispensing Co.*, 403 B.R. 653, 658 (Bankr. E.D. Mo. 2009) ("Expenses which are 'actual, necessary costs and expenses of preserving the estate' are entitled to administrative claim status and as such are given top priority for payment ahead of other priority claims.").

50.     Payment of obligations arising in connection with the Outstanding Orders is also consistent with section 363(c) of the Bankruptcy Code, which authorizes a debtor in possession to "enter into transactions . . . in the ordinary course of business without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1); *see also Habinger, Inc.* v. *Metro. Cosmetic & Reconstructive Surgical Clinic, P.A.*, 124 B.R. 784, 786 (Bankr. D. Minn. 1990) ("The 'ordinary course of business' standard is intended to allow a debtor the flexibility it needs to run its business and respond quickly to changes in the business climate.") (citing *United States ex rel. Harrison* v. *Estate of Deutscher*, 115 B.R. 592 (Bankr. M.D. Tenn. 1990)). Thus, the Debtors have authority "to enter into transactions in the ordinary course of business without the approval of the court." *In re Am. Coal Corp.*, 1996 Bankr. LEXIS 2013, *16 (Bankr. D. Minn. Oct. 7, 1996).

51.     The relief requested herein merely confirms the treatment of such obligations under the Bankruptcy Code and assures vendors that they will be paid for goods received and accepted by the Debtors postpetition under the Outstanding Orders in the ordinary course of business. By proactively laying to rest any concerns such vendors may have about the treatment of claims relating to Outstanding Orders, the relief should also ensure a continuous

25

supply of materials indispensable to the Debtors' mining operations. Furthermore, the relief requested will not prevent the Debtors from contesting the validity of any invoices, and it will not constitute postpetition assumption or reaffirmation of any of the related agreements pursuant to section 365 of the Bankruptcy Code.

52.     The relief requested herein has been provided by courts in this district and in other chapter 11 cases. *See, e.g.*, *In re Armstrong Energy, Inc.*, No. 17-47541-659 (KAS) (Bankr. E.D. Mo. Nov. 2, 2017) (D.I. 92) (granting administrative expense priority status to prepetition orders for goods delivered or services provided postpetition); *In re Noranda Aluminum, Inc.*, No. 16-10083-399 (Bankr. E.D. Mo. Feb. 10, 2016) (D.I. 85) (same); *In re Arch Coal, Inc.*, No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 13, 2016) (D.I. 77) (same); *In re Bakers Footwear Grp., Inc.*, No. 12-49658-705 (Bankr. E.D. Mo. Oct. 5, 2012) (D.I. 52) (same); *see also In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio. Dec. 9, 2019) (D.I. 358) (same).

**E.      This Court Should Authorize the Debtors to Pay Royalty and Leasehold Claims**

53.     Section 541 of the Bankruptcy Code defines property of the estate as including all property in which a debtor has a legal or equitable interest in on the petition date. *See* 11 U.S.C. § 541(a). Courts have interpreted section 541(d) to "expressly" provide that when a debtor holds only bare legal title in property, such property may not be property of the estate and must be turned over to the proper party in certain circumstances. *See, e.g.*, *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 100 (Bankr. D. Del. 2006); *In re Laurie*, No. 10-12952, 2011 WL 3879507, at *3 (Bankr. N.D. Ohio 2011) ("A debtor does not own an equitable interest in property which he holds in trust for another and such property is not property of the estate."); *In re Winkle*, 128 B.R. 529, 533 (Bankr. S.D. Ohio 1991) (same); *In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) (ordering debtor-operator to turn over amounts due to interest owners

26

because debtor-operator had no interest in such amounts beyond a "bare possessory interest as a bailee or agent").  Consistent with this case law, the Royalty and Leasehold Claims may not be property of the Debtors' estates, though the Debtors do not concede this point.  Given this and to avoid disruption to the Debtors' mining operations and to minimize unnecessary costs to the Debtors' estates, the Debtors submit that payment of the Royalty and Leasehold Claims is warranted under the circumstances.

54.     The relief requested by the Debtors herein has been granted by courts in other districts.  *See, e.g.*, *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio. Dec. 9, 2019) (D.I. 358) (authorizing payment of prepetition obligations to mineral payees and authorizing debtors to continue making such payments in ordinary course); *In re Mission Coal Co., LLC*, No. 18-04177-TOM11 (Bankr. N.D. Ala. Nov. 21, 2018) (D.I. 71) (same); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (D.I. 511) (same); *see also Chaparral Energy, Inc.*, No. 16-11144 (LSS) (Bankr. D. Del. June 7, 2016) (D.I. 158) (authorizing similar relief with respect to similar royalty and leasehold agreements in oil and gas industry).

**Processing of Checks and Electronic Funds Transfers Should Be Authorized**

55.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and anticipated access to cash collateral.  Also, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment made relating to the amounts requested to be paid in this Motion.  Accordingly, the Debtors believe that only checks or wire transfer requests relating to authorized payments will be honored and that this Court should authorize all

applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

56.     The Debtors seek immediate authorization for the relief requested in this Motion.  Pursuant to Bankruptcy Rule 6003(b), a bankruptcy court cannot grant "a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within the first twenty-one (21) days after the petition date unless the relief is "necessary to avoid immediate and irreparable harm."   Fed. R. Bankr. P. 6003(b).   For the reasons set forth herein and in the First Day Declarations, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.   Furthermore, the failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.   Accordingly, the Debtors submit that they have satisfied Bankruptcy Rule 6003(b) and therefore respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

57.     By this Motion, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause for a waiver of any stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 6004(h).  For the reasons set forth herein and in the First Day Declarations, the Debtors submit that notice of the relief requested herein is

Doc#: US1:13301824v9

appropriate under the circumstances and that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## **Reservation of Rights**

58.     Nothing contained herein is intended or should be construed as (a) an admission as to the validity or priority of any claim or lien (or the priority thereof) against the Debtors, (b) a waiver of the Debtors' or any party in interest's rights to subsequently dispute or contest such claim or lien on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion, (e) a request or authorization to assume or adopt any agreement, contract, or lease under section 365 of the Bankruptcy Code or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or applicable law.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute or contest such claim.

## **Notice**

59.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for Region 13; (b) counsel to the Ad Hoc First Lien Group; (c) counsel to the Ad Hoc Crossover Group; (d) counsel to the Facilities Agent; (e) counsel to the Term Agent; (f) counsel to the Indenture Trustee; (g) counsel to the collateral trustee under the Debtors' secured debt facilities; (h) counsel to the DIP Agent; (i) counsel to DIP Lenders; (j) counsel to Murray Energy Corporation; (k) counsel to Reserves; (*l*) counsel to Javelin; (m) counsel to Uniper Global Commodities UK Limited; (n) the Internal Revenue Service; (o) the Securities and Exchange Commission; (p) the United States Attorney's Office for the Eastern District of

Missouri; (q) the state attorneys general for all states in which the Debtors conduct business; (r) the holders of the thirty (30) largest unsecured claims against the Debtors, on a consolidated basis; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").   Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-3(A)(1) of the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri (the "Local Bankruptcy Rules").  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Doc#: US1:13301824v9

WHEREFORE, the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other relief as is just and proper.

Dated:   March 10, 2020
       St. Louis, Missouri

Respectfully submitted,

ARMSTRONG TEASDALE LLP

_/s/  Richard W. Engel, Jr._
Richard W. Engel, Jr. (MO 34641)
John G. Willard (MO 67049)
Kathryn Redmond (MO 72087)
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
Tel:    (314) 621-5070
Fax:    (314) 621-5065
Email:  rengel@atllp.com
       jwillard@atllp.com
       kredmond@atllp.com

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Paul M. Basta (*pro hac vice* admission pending)
Alice Belisle Eaton (*pro hac vice* admission pending)
Alexander Woolverton (*pro hac vice* admission pending)
1285 Avenue of the Americas
New York, New York  10019
Tel:    (212) 373-3000
Fax:    (212) 757-3990
Email:  pbasta@paulweiss.com
       aeaton@paulweiss.com
       awoolverton@paulweiss.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

Doc#: US1:13301824v9

[**NTD:  Following to be made a separate document, and to not be attached to the Motion**]

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-[_____] |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | Related Docket No.:  [] |

### INTERIM ORDER (A) AUTHORIZING
### DEBTORS TO PAY PREPETITION CLAIMS OF TRADE AND
### LIEN CLAIMANTS AND AUTHORIZING PAYMENT PROCEDURES
### RELATED THERETO, (B) AUTHORIZING DEBTORS TO PAY ROYALTY AND
### LEASEHOLD CLAIMS, (C) GRANTING ADMINISTRATIVE EXPENSE PRIORITY
### STATUS TO OUTSTANDING ORDERS, AND (D) GRANTING RELATED RELIEF

Upon the Motion[2] of Foreight Energy LP and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") requesting entry of an interim order (this "Interim Order"), pursuant to sections 105(a), 363(b), and 503(b)(9) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing the Debtors to pay Vendor Claims and authorizing procedures to pay such Vendor Claims; (b) authorizing the Debtors to pay Royalty and Leasehold Claims; (c) granting administrative expense priority status

---

[1]  The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

[2]  All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

to Outstanding Orders; and (d) granting related relief, all as more fully described in the Motion; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri; and it appearing that venue of the Debtors' chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and a hearing having been held to consider the relief requested in the Motion; and upon consideration of the First Day Declarations; and upon the record of the hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      Subject to paragraph 5, the Debtors are authorized, but not directed, in their discretion, to pay the Critical Vendor Claims, 503(b)(9) Claims, and Lien Claims, in the ordinary course of business and in a collective amount not to exceed $23.2 million on an interim basis.

3.      Subject to paragraph 5, the Debtors are authorized, but not directed, in their discretion, to pay the Royalty and Leasehold Claims, in the ordinary course of business and in a collective prepetition amount not to exceed $9.7 million.  For the avoidance of doubt,

2

payment of Royalty and Leasehold Claims held by any Debtor or non-Debtor affiliate are not authorized pursuant to this Interim Order.

4.     Subject to paragraph 5, all undisputed obligations related to the Outstanding Orders arising from the postpetition delivery of goods or provision of services are granted administrative expense priority status in accordance with section 503(b)(1)(A) of the Bankruptcy Code, and the Debtors are authorized, but not directed, in their discretion, to pay such undisputed obligations related to the Outstanding Orders in the ordinary course of business; *provided* that such actions are in compliance with, and are not prohibited by, the terms of the DIP Orders (as defined below) and other documentation governing the Debtors' use of cash collateral and postpetition financing facilities, including, without limitation, the DIP Credit Agreement (as defined in the DIP Orders).

5.     The Debtors shall provide the professionals retained by each of the Ad Hoc First Lien Group and the Ad Hoc Crossover Group (each, as defined in the Restructuring Support Agreement, and together, the "Consultation Parties") with reasonable advance notice of any payment that (a) exceeds $1,000,000 individually that the Debtors propose to make on account of any (i) Critical Vendor Claim, (ii) 503(b)(9) Claim, (iii) Lien Claim, (iv) Royalty and Leasehold Claim, or (v) obligations related to the Outstanding Orders, or (b) that would be made on a prepetition claim to a member of the Creditors' Committee (as defined in the DIP Orders), and the Debtors may not pay any such claim without the prior consent, not to be unreasonable withheld, of the Required First Lien Lenders (as defined in the Restructuring Support Agreement).  Any such notice shall include, as applicable, (i) the identity of the Vendor Claimant or other claimant to be paid, (ii) the total prepetition claim owed to such Vendor Claimant or other claimant, (iii) the amount of the proposed payment, (iv) the Customary Trade Terms, (v) a

3

copy of the Trade Agreement, if any, and (vi) such other information the Consultation Parties may reasonably request.

6.        Nothing herein or in the Motion shall be construed to limit, or in any way affect, the Debtors' or any other party-in-interest's ability to dispute or contest the amount of, or basis for, any claims (or the priority thereof) against the Debtors' arising in connection with the Outstanding Orders.

7.        Any Vendor Claimant that accepts payment pursuant to the authority granted in this Interim Order shall be deemed to (a) agree to the terms and provisions of this Interim Order, (b) agree to be paid only such portion of their Vendor Claims that is agreed to be paid as between the Debtors and such Vendor Claimant, and (c) have waived any and all (i) prepetition claims against the Debtors in excess of the amounts agreed to be paid under subsection (b) of this paragraph and (ii) Liens (as defined herein) against the Debtors, their assets, and their properties.

8.        The Debtors are authorized, but not directed, in their discretion, to use commercially reasonable efforts to condition the payment of Vendor Claims on the agreement of the applicable Vendor Claimant to continue supplying goods or services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those in place (including, among other terms and programs, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability) during the twelve (12) months in place before the Petition Date (collectively, the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors in their reasonable business judgment and the applicable Vendor Claimant.

4

9.       The Debtors are further authorized, but not directed, in their discretion, to enter into Trade Agreements with Vendor Claimants, including on the following terms:

a.   The amount of the Vendor Claimant's estimated prepetition claim, after accounting for any setoffs, other credits, and discounts thereto, shall be as mutually determined in good faith by the Vendor Claimant and the Debtors (but such amount shall be used only for purposes of this Interim Order and shall not be deemed a claim allowed by this Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of this Court);

b.   The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to this Interim Order;

c.   If agreed to be paid less than 100% of their estimated prepetition claims, the Vendor Claimant's agreement to waive any remaining and to be unpaid estimated prepetition claims against the Debtors, which such remaining prepetition claims shall not be paid in accordance with this Interim Order;

d.   The Vendor Claimant's agreement to provide goods and services to the Debtors based upon the Customary Trade Terms (including, among other terms and programs, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability), or such other trade terms as are agreed to by the Debtors and the Vendor Claimant, and the Debtors' agreement to pay the Vendor in accordance with such terms;

e.   The Vendor Claimant's agreement to not seek to discontinue, terminate, or modify any contractual agreement with the Debtors;

f.   The Vendor Claimant's agreement not to file or otherwise assert against any of the Debtors, their estates, or any of their respective assets or property any lien (a "Lien"), regardless of the statute or other legal authority upon which such Lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to the Vendor Claimant by the Debtors arising from goods and services provided to the Debtors before the Petition Date, and that, to the extent that the Vendor Claimant has previously obtained such a Lien, the Vendor shall immediately take all necessary actions to release such Lien;

g.   The Vendor Claimant's acknowledgment that it has reviewed the terms and provisions of this Interim Order and consents to be bound thereby;

h.   The Vendor Claimant's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

i.   If a Vendor Claimant that has received payment of a prepetition claim subsequently refuses to provide goods or services to the Debtors on Customary Trade Terms or such other trade terms as are agreed to by the Debtors and the Vendor Claimant, or seeks to discontinue, terminate, or modify any contractual

5

agreement with the Debtors, then, without the need for any further order of the Court, any payments received by the Vendor Claimant on account of such prepetition claim shall be deemed to have been in payment of any then outstanding postpetition obligations owed to such Vendor Claimant, and such Vendor Claimant shall immediately repay to the Debtors any payments received on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding to such Vendor Claimant, without the right of setoff, recoupment, or reclamation, and the Vendor's prepetition claim shall be reinstated as a prepetition claim in these chapter 11 cases and subject to the terms of any bar date order entered in these chapter 11 cases.

10.     The Debtors may, in their discretion, terminate a Trade Agreement with an individual Vendor Claimant, together with the other benefits to the Vendor Claimant as contained in this Interim Order, on the date the Debtors deliver notice to the Vendor Claimant that such Vendor Claimant has (a) not complied with the terms and provisions of the Trade Agreement or (b) failed to provide Customary Trade Terms (or such other agreed trade terms) to the Debtors.

11.     The Debtors shall maintain a "Vendor Matrix" summarizing (a) the name of each Vendor Claimant or other claimant subject to the terms of this Interim Order, (b) the amount and timing of any payment under this Interim Order, (c) the amount of the Vendor Claimant's claim or other claims subject to the terms of this Interim Order satisfied by such payment, and (d) a summary of the material payment terms.  The Debtors shall provide the Vendor Matrix on a weekly basis (or as otherwise agreed with the Consultation Parties) to the Consultation Parties; *provided* that the Consultation Parties shall keep the Vendor Matrix confidential and shall not disclose any of the information in the matrix to anyone without prior written consent of the Debtors; *provided further* that the Vendor Matrix shall be delivered to the Consultation Parties no later than the third business day following the conclusion of the weekly reporting period (or as otherwise agreed with the Consultation Parties).

Doc#: US1:13301824v9

12.     All applicable banks and other financial institutions are hereby authorized to receive, process, honor and pay any and all checks, drafts, wires, check transfer requests, automated clearing house transfers and other payment orders drawn or issued by the Debtors under this Interim Order, whether presented or issued before or after the Petition Date to the extent the Debtors have good funds standing to their credit with such bank or other financial institution.  Such banks and financial institutions are authorized to rely on representations of the Debtors as to which checks, electronic funds transfer requests, and payment orders are authorized to be paid pursuant to this Interim Order without any duty of further inquiry and without liability for following the Debtors' instructions.

13.     The Debtors are authorized to issue postpetition checks, or to affect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Vendor Claims, Royalty and Leasehold Claims, and claims related to Outstanding Orders.

14.     Notwithstanding anything in the Motion or this Interim Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable: (a) the orders approving the Debtors' use of cash collateral and/or postpetition debtor-in-possession financing facilities (collectively, the "DIP Orders"); (b) other documentation governing the Debtors' use of cash collateral and postpetition financing facilities; (c) the Budget (as defined in the DIP Orders); and (d) the terms and conditions set forth in the Restructuring Support Agreement (as defined in the DIP Orders).  To the extent there is any inconsistency between the terms of any of the DIP

7

Orders and this Interim Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

15.    Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing contained in the Motion or this Interim Order or any payment made pursuant to this Interim Order shall constitute, nor is it intended to constitute: (a) an admission as to the validity or priority of any claim or lien (or the priority thereof) against the Debtors, (b) a waiver of the Debtors' or any party in interest's rights to subsequently dispute or contest such claim or lien on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion, (e) a request or authorization to assume or adopt any agreement, contract, or lease under section 365 of the Bankruptcy Code or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or applicable law.

16.    Notwithstanding the entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

17.    Notice of the Motion as provided therein is hereby deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

18.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

19.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied because the relief sought by the Motion is necessary to avoid immediate and irreparable harm.

20.    No later than two (2) business days after the date of this Interim Order, the Debtors shall serve on the Notice Parties (a) a copy of the Interim Order and (b) a notice scheduling a final hearing on the Motion, on _____, 20___, at ___:___ __.m. (prevailing Central Time), and shall file a certificate of service no later than twenty-four (24) hours after service.

Dated: _____, 2020
        St. Louis, Missouri

_____
UNITED STATES BANKRUPTCY JUDGE

9

**Order Prepared By:**

Richard W. Engel, Jr., MO 34641
John G. Willard, MO 67049
Kathryn R. Redmond, MO 72087
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile:  (314) 621-2239
Email:  rengel@atllp.com
        jwillard@atllp.com
        kredmond@atllp.com


Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Alexander Woolverton (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019
Tel:     (212) 373-3000
Fax:     (212) 757-3990
Email:  pbasta@paulweiss.com
        aeaton@paulweiss.com
        awoolverton@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

10

**[NTD:  Following to be made a separate document, and to not be attached to the Motion]**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-[_____] |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | Related Docket No.:  [] |

**FINAL ORDER (A) AUTHORIZING
DEBTORS TO PAY PREPETITION CLAIMS OF TRADE AND
LIEN CLAIMANTS AND AUTHORIZING PAYMENT PROCEDURES
RELATED THERETO, (B) AUTHORIZING DEBTORS TO PAY ROYALTY AND
LEASEHOLD CLAIMS, (C) GRANTING ADMINISTRATIVE EXPENSE PRIORITY
STATUS TO OUTSTANDING ORDERS, AND (D) GRANTING RELATED RELIEF**

Upon the Motion[2] of Foresight Energy LP and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>") requesting entry of a final order (this "<u>Final Order</u>"), pursuant to sections 105(a), 363(b), and 503(b)(9) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), (a) authorizing the Debtors to pay Vendor Claims and authorizing procedures to pay such Vendor Claims; (b) authorizing the Debtors to pay Royalty and Leasehold Claims; (c) granting administrative expense priority status to

---

[1]     The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

[2]     All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

Outstanding Orders; and (d) granting related relief, all as more fully described in the Motion; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 9.01(B)(1) of the Local Rules of the United States District Court for the Eastern District of Missouri; and it appearing that venue of the Debtors' chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and a hearing having been held to consider the relief requested in the Motion; and upon consideration of the First Day Declarations; and upon the record of the hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      Subject to paragraph 5, the Debtors are authorized, but not directed, in their discretion, to pay the Critical Vendor Claims, 503(b)(9) Claims, and Lien Claims, in the ordinary course of business and in a collective amount not to exceed $43.1 million on a final basis.

3.      Subject to paragraph 5, the Debtors are authorized, but not directed, in their discretion, to pay the Royalty and Leasehold Claims, in the ordinary course of business and in a collective prepetition amount not to exceed $14.5 million.  For the avoidance of doubt,

Doc#: US1:13301824v9

payment of Royalty and Leasehold Claims held by any Debtor or non-Debtor affiliate are not authorized pursuant to this Final Order.

4.    Subject to paragraph 5, all undisputed obligations related to the Outstanding Orders arising from the postpetition delivery of goods or provision of services are granted administrative expense priority status in accordance with section 503(b)(1)(A) of the Bankruptcy Code, and the Debtors are authorized, but not directed, in their discretion, to pay such undisputed obligations related to the Outstanding Orders in the ordinary course of business; *provided* that such actions are in compliance with, and are not prohibited by, the terms of the DIP Orders (as defined below) and other documentation governing the Debtors' use of cash collateral and postpetition financing facilities, including, without limitation, the DIP Credit Agreement (as defined in the DIP Orders).

5.    The Debtors shall provide the professionals retained by each of the Ad Hoc First Lien Group and the Ad Hoc Crossover Group (each, as defined in the Restructuring Support Agreement, and together, the "Consultation Parties") with reasonable advance notice of any payment that (a) exceeds $1,000,000 individually that the Debtors propose to make on account of any (i) Critical Vendor Claim, (ii) 503(b)(9) Claim, (iii) Lien Claim, (iv) Royalty and Leasehold Claim, or (v) obligations related to the Outstanding Orders, or (b) that would be made on a prepetition claim to a member of the Creditors' Committee (as defined in the DIP Orders), and the Debtors may not pay any such claim without the prior consent, not to be unreasonable withheld, of the Required First Lien Lenders (as defined in the Restructuring Support Agreement).  Any such notice shall include, as applicable, (i) the identity of the Vendor Claimant or other claimant to be paid, (ii) the total prepetition claim owed to such Vendor Claimant or other claimant, (iii) the amount of the proposed payment, (iv) the Customary Trade Terms, (v) a

copy of the Trade Agreement, if any, and (vi) such other information the Consultation Parties may reasonably request.

6.     Nothing herein or in the Motion shall be construed to limit, or in any way affect, the Debtors' or any other party-in-interest's ability to dispute or contest the amount of, or basis for, any claims (or the priority thereof) against the Debtors' arising in connection with the Outstanding Orders.

7.     Any Vendor Claimant that accepts payment pursuant to the authority granted in this Final Order shall be deemed to (a) agree to the terms and provisions of this Interim Order, (b) agree to be paid only such portion of their Vendor Claims that is agreed to be paid as between the Debtors and such Vendor Claimant, and (c) have waived any and all (i) prepetition claims against the Debtors in excess of the amounts agreed to be paid under subsection (b) of this paragraph and (ii) Liens (as defined herein) against the Debtors, their assets, and their properties.

8.     The Debtors are authorized, but not directed, in their discretion, to use commercially reasonable efforts to condition the payment of Vendor Claims on the agreement of the applicable Vendor Claimant to continue supplying goods or services to the Debtors in accordance with trade terms at least as favorable to the Debtors as those in place (including, among other terms and programs, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability) during the twelve (12) months in place before the Petition Date (collectively, the "Customary Trade Terms"), or such other trade terms as are agreed by the Debtors in their reasonable business judgment and the applicable Vendor Claimant.

4

9.       The Debtors are further authorized, but not directed, in their discretion, to enter into Trade Agreements with Vendor Claimants, including on the following terms:

a.   The amount of the Vendor Claimant's estimated prepetition claim, after accounting for any setoffs, other credits, and discounts thereto, shall be as mutually determined in good faith by the Vendor Claimant and the Debtors (but such amount shall be used only for purposes of this Final Order and shall not be deemed a claim allowed by this Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of this Court);

b.   The amount and timing of any payment agreed to be paid in satisfaction of such estimated prepetition claim by the Debtors, subject to this Final Order;

c.   If agreed to be paid less than 100% of their estimated prepetition claims, the Vendor Claimant's agreement to waive any remaining and to be unpaid estimated prepetition claims against the Debtors, which such remaining prepetition claims shall not be paid in accordance with this Final Order;

d.   The Vendor Claimant's agreement to provide goods and services to the Debtors based upon the Customary Trade Terms (including, among other terms and programs, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix, and availability), or such other trade terms as are agreed to by the Debtors and the Vendor Claimant, and the Debtors' agreement to pay the Vendor in accordance with such terms;

e.   The Vendor Claimant's agreement to not seek to discontinue, terminate, or modify any contractual agreement with the Debtors;

f.   The Vendor Claimant's agreement not to file or otherwise assert against any of the Debtors, their estates, or any of their respective assets or property any lien (a "Lien"), regardless of the statute or other legal authority upon which such Lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to the Vendor Claimant by the Debtors arising from goods and services provided to the Debtors before the Petition Date, and that, to the extent that the Vendor Claimant has previously obtained such a Lien, the Vendor shall immediately take all necessary actions to release such Lien;

g.   The Vendor Claimant's acknowledgment that it has reviewed the terms and provisions of this Final Order and consents to be bound thereby;

h.   The Vendor Claimant's agreement that it will not separately assert or otherwise seek payment of any reclamation claims; and

i.   If a Vendor Claimant that has received payment of a prepetition claim subsequently refuses to provide goods or services to the Debtors on Customary Trade Terms or such other trade terms as are agreed to by the Debtors and the Vendor Claimant, or seeks to discontinue, terminate, or modify any contractual

5

agreement with the Debtors, then, without the need for any further order of the Court, any payments received by the Vendor Claimant on account of such prepetition claim shall be deemed to have been in payment of any then outstanding postpetition obligations owed to such Vendor Claimant, and such Vendor Claimant shall immediately repay to the Debtors any payments received on account of its prepetition claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding to such Vendor Claimant, without the right of setoff, recoupment, or reclamation, and the Vendor's prepetition claim shall be reinstated as a prepetition claim in these chapter 11 cases and subject to the terms of any bar date order entered in these chapter 11 cases.

10.    The Debtors may, in their discretion, terminate a Trade Agreement with an individual Vendor Claimant, together with the other benefits to the Vendor Claimant as contained in this Final Order, on the date the Debtors deliver notice to the Vendor Claimant that such Vendor Claimant has (a) not complied with the terms and provisions of the Trade Agreement or (b) failed to provide Customary Trade Terms (or such other agreed trade terms) to the Debtors.

11.    The Debtors shall maintain a "Vendor Matrix" summarizing (a) the name of each Vendor Claimant or other claimant subject to the terms of this Interim Order, (b) the amount and timing of any payment under this Final Order, (c) the amount of the Vendor Claimant's claim or other claims subject to the terms of this Final Order satisfied by such payment, and (d) a summary of the material payment terms. The Debtors shall provide the Vendor Matrix on a weekly basis (or as otherwise agreed with the Consultation Parties) to the Consultation Parties; *provided* that the Consultation Parties shall keep the Vendor Matrix confidential and shall not disclose any of the information in the matrix to anyone without prior written consent of the Debtors; *provided further* that the Vendor Matrix shall be delivered to the Consultation Parties no later than the third business day following the conclusion of the weekly reporting period (or as otherwise agreed with the Consultation Parties).

Doc#: US1:13301824v9

12.     All applicable banks and other financial institutions are hereby authorized to receive, process, honor and pay any and all checks, drafts, wires, check transfer requests, automated clearing house transfers and other payment orders drawn or issued by the Debtors under this Final Order, whether presented or issued before or after the Petition Date to the extent the Debtors have good funds standing to their credit with such bank or other financial institution. Such banks and financial institutions are authorized to rely on representations of the Debtors as to which checks, electronic funds transfer requests, and payment orders are authorized to be paid pursuant to this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

13.     The Debtors are authorized to issue postpetition checks, or to affect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any Vendor Claims, Royalty and Leasehold Claims, and claims related to Outstanding Orders.

14.     Notwithstanding anything in the Motion or this Final Order to the contrary, any payment made or action taken by any of the Debtors pursuant to the authority granted herein, as well as the exercise of any and all rights and authorizations granted or approved hereunder, shall be subject in all respects to, as applicable: (a) the orders approving the Debtors' use of cash collateral and/or postpetition debtor-in-possession financing facilities (collectively, the "DIP Orders"); (b) other documentation governing the Debtors' use of cash collateral and postpetition financing facilities; (c) the Budget (as defined in the DIP Orders); and (d) the terms and conditions set forth in the Restructuring Support Agreement (as defined in the DIP Orders).  To the extent there is any inconsistency between the terms of any of the DIP

7

Orders and this Final Order, the terms of the DIP Order (or DIP Orders, as applicable) shall control.

15.    Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing contained in the Motion or this Final Order or any payment made pursuant to this Final Order shall constitute, nor is it intended to constitute: (a) an admission as to the validity or priority of any claim or lien (or the priority thereof) against the Debtors, (b) a waiver of the Debtors' or any party in interest's rights to subsequently dispute or contest such claim or lien on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion, (e) a request or authorization to assume or adopt any agreement, contract, or lease under section 365 of the Bankruptcy Code or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or applicable law.

16.    Notwithstanding the entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

17.    Notice of the Motion as provided therein is hereby deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

18.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

19.     No later than two (2) business days after the date of this Final Order, the Debtors shall serve on the Notice Parties a copy of the Final Order and shall file a certificate of service no later than twenty-four (24) hours after service.

Dated: _____, 2020
        St. Louis, Missouri

_____
UNITED STATES BANKRUPTCY JUDGE

9

**Order Prepared By:**

Richard W. Engel, Jr., MO 34641
John G. Willard, MO 67049
Kathryn R. Redmond, MO 72087
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile:  (314) 621-2239
Email:  rengel@atllp.com
        jwillard@atllp.com
        kredmond@atllp.com


Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Alexander Woolverton (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019
Tel:     (212) 373-3000
Fax:     (212) 757-3990
Email:  pbasta@paulweiss.com
        aeaton@paulweiss.com
        awoolverton@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

10