## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | Hearing Date:  March 11, 2020 |
| | ) | Hearing Time:  10:00 a.m. (Central Time) |
| | ) | Hearing Location: Courtroom 7 North |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS TO PAY PREPETITION WAGES AND WORKFORCE OBLIGATIONS, (B) AUTHORIZING DEBTORS TO MAINTAIN WORKFORCE PROGRAMS AND PAY RELATED OBLIGATIONS, AND (C) GRANTING RELATED RELIEF

Foreight Energy LP and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.     By this Motion, the Debtors seek entry of interim and final orders (the "Proposed Orders"),[2] pursuant to sections 105(a), 363, and 507 of title 11 of the United

---

[1]     The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

[2]     Copies of the Proposed Orders will be made available on the Debtors' case information website at: http://cases.primeclerk.com/foresightenergy.

States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing, but not directing, the Debtors in their discretion to pay and honor their prepetition employee obligations relating to wages and workforce obligations, (b) authorizing, but not directing, the Debtors in their discretion to maintain workforce benefit programs and pay prepetition amounts related thereto, and (c) granting related relief.

## Jurisdiction and Venue

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. §157(b).

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

## Background

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are a leading producer of thermal coal, with four mining complexes and nearly 2.1 billion tons of proven and probable coal reserves strategically located near multiple rail and river transportation access points in the Illinois Basin.  The Debtors also own a barge-loading river terminal on the Ohio River.  From this strategic position, the Debtors sell their coal primarily to electric utility and industrial companies located in the eastern half of the United States and across the international market.

5.     The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.   Contemporaneously herewith, the Debtors filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).   No trustee, examiner or official committee has been appointed in these chapter 11 cases.

6.     Information regarding the Debtors' businesses, their capital and debt structure, the events leading to the filing of these cases, and the terms and structure of the proposed restructuring transaction is set forth in the *Declaration of Robert D. Moore, President and Chief Executive Officer of Foresight Energy LP, in Support of Chapter 11 Petitions* (the "Moore Declaration"), the *Declaration of Alan Boyko, Senior Managing Director of FTI Consulting, Inc., in Support of Chapter 11 Petitions and First Day Relief* (the "Boyko Declaration"), and the declaration of Seth Herman in support of the Debtors' motion for approval of debtor-in-possession financing and use of cash collateral (the "Herman Declaration," and together with the Moore Declaration and Boyko Declaration, the "First Day Declarations"),[3] each filed contemporaneously herewith.

## The Debtors' Workforce

7.     As of the Petition Date, the Debtors have a workforce of approximately 800 total employees (collectively, the "Workforce" or the "Workers").   Approximately 12 are non-insider corporate employees (the "Corporate Employees") primarily based at the Debtors' headquarters in St. Louis, Missouri.   The Corporate Employees perform SG&A functions for the Debtors' operations, including accounts payable management, accounting, payroll, information technology, and logistics.   The large remainder of the Workforce (collectively, the "Operational

---

[3]   The First Day Declarations are being filed in support of this Motion and are incorporated herein by reference. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declarations.

Workers") are employees of the Debtors' coal mining and other operations, and serve to facilitate or directly act in the Debtors' coal mining, collection, cleaning, production, and shipping operations. In addition to the Workers, the Workforce also includes independent contractors who are occasionally retained for specific mine or corporate projects, and to perform specific tasks related to mine safety (the "Independent Contractors").

8.     The Workforce forms the backbone of the Debtors' entire enterprise, and accordingly performs a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' overall restructuring. The Workers' skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability, efficiency, safety, and value. In many instances, the Workers include highly trained or specialized personnel who cannot be easily replaced during these chapter 11 cases and without whom the Debtors' reorganizational efforts will be likely jeopardized.

### The Debtors' Workforce Obligations and Programs

9.     The Debtors seek to minimize the impact of these chapter 11 cases on the Workforce, and for such reason, seek authority to pay and honor their prepetition employee-related obligations and to continue their ordinary course programs related thereto, including by: (a) paying prepetition wage and other compensation-related obligations; (b) paying employee withholding taxes and employer taxes; (c) paying certain payroll deductions; (d) paying reimbursable expenses; (e) maintaining the workers' compensation policy and honoring obligations related thereto; (f) paying and maintaining the variable wage programs; (g) continuing the Debtors' employee benefit programs and honoring obligations related thereto; (h) paying prepetition amounts owed to third-party service providers; and (i) payment of obligations to the Independent Contractors (the foregoing obligations, the "Workforce

Obligations" and their related programs, the "Workforce Programs").  Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Workforce Programs in the ordinary course of business.  The Debtors request the right to modify, change, and discontinue any of their Workforce Programs and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

10.    As of the Petition Date, the Debtors estimate the total prepetition Workforce Obligations outstanding is approximately $17.1 million, approximately $9.5 million of which consists of accrued prepetition liability that must be paid during the interim period before a final hearing on this Motion.  The Debtors do not believe any Worker is owed prepetition amounts in excess of the $13,650 priority wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, and the Debtors seek approval to pay such amounts, if any, pursuant to a final order.  Accordingly, the Debtors seek authority to pay or remit the aggregate, estimated Workforce Obligations, as set forth below:

| Relief Sought | Interim Amount | Total Amount |
|---|---|---|
| **Worker Wages & Compensation** | | |
| Prepetition Wages (Net) | $3,100,000 | $3,100,000 |
| Payroll Taxes (Employer) | $400,000 | $1,100,000 |
| Payroll Deductions (except 401(k) Plan Contributions) | $1,300,000 | $1,300,000 |
| Expense Obligations | $85,000 | $85,000 |
| Independent Contractors | $610,000 | $610,000 |
| **Variable Wage Programs** | | |
| Monthly Safety Program | $50,000 | $50,000 |
| Safety Threshold Program | $35,000 | $35,000 |
| Mine Performance Program | $350,000 | $350,000 |
| Operator Program | $135,000 | $285,000 |
| Attendance Program | $0 | $0 |
| Discretionary Wage Program | $0 | $0 |

| Relief Sought | Interim Amount | Total Amount |
|---|---|---|
| **Workforce Benefits Programs** | | |
|    Health and Welfare Programs | $1,800,000 | $5,600,000 |
|    Life Insurance and AD&D Programs | $30,000 | $40,000 |
|    401(k) Plan Contributions | $290,000 | $290,000 |
|    401(k) Plan Match | $155,000 | $155,000 |
|    PTO | $20,000 | $20,000 |
| **Workers' Compensation Program** | | |
|    Workers' Compensation | $950,000 | $3,900,000 |
| **Service Providers** | | |
|    Service Provider Fees and Expenses | $145,000 | $145,000 |
| **Totals** | **$9,455,000** | **$17,065,000** |

**A.      Compensation and Compensation-Related Obligations**

     i.      Wages

     11.     The Debtors seek authority to pay the Workers' net prepetition wages (the "Prepetition Wages") and to continue to pay the Workers postpetition compensation in the ordinary course of business.  The Debtors administer their payroll entirely in-house, which runs every two weeks on Friday (or the preceding business day if the Friday falls on a holiday) and represents pay performed for the two-week period ending on the second preceding weekend. The Workers are generally two weeks, and up to four weeks in arrears.  Accordingly, the Workers usually have wages and other compensation that has accrued, but is unpaid, at any given point in time.  The Debtors' monthly Prepetition Wages in the year before the Petition Date averaged approximately $4.9 million.

     ii.      Employer-Paid Payroll-Related Taxes and Government Fees

     12.     Related to the Workers' payroll, the Debtors pay certain employer-funded payroll taxes and obligations (collectively, the "Payroll Taxes").  The Payroll Taxes include federal Medicare and Social Security taxes, federal and state unemployment taxes, and *de minimis* reinsurance fees paid annually under the Affordable Care Act arising from the Debtors'

self-insured health plans.  Each of the Debtors remit these amounts directly to the applicable government authority.  The Debtors' monthly Payroll Taxes in the year before the Petition Date averaged approximately $600,000.  The Debtors request authority to continue paying the Payroll Taxes in the ordinary course of business.

       iii.    <u>Payroll Garnishments and Other Payroll Deductions</u>

      13.    In administering payroll, the Debtors deduct from Workers' paychecks certain taxes, such as payroll and Social Security taxes, that must be withheld under certain federal, state, and local taxing law.  The Debtors must also comply with occasional garnishment or child support orders requiring the withholding of a Worker's wages.  As discussed below, certain Workers have voluntary deductions for contributions to the 401(k) Plan (as defined below) and certain insurance premiums (collectively with the foregoing deductions, the "<u>Payroll Deductions</u>").  Payroll Deductions are taken from a Workers' gross payroll, are not an incremental cost obligation for the Debtors, and are often required by law.  The Debtors' monthly Payroll Deductions (excluding 401(k) Plan contributions) in the year before the Petition Date averaged approximately $2.1 million.  The Debtors seek authority to continue making Payroll Deductions and to remit such amounts to third parties in the ordinary course of business as requested or required by law.

       iv.    <u>Reimbursable Business Expenses</u>

      14.    As is customary with most large businesses, the Debtors reimburse the Workers who incur and pay approved business-related expenses in the ordinary course of performing their duties ("<u>Expense Obligations</u>").  On a monthly basis, the Debtors reimburse their eligible Workers approximately $45,000 for general business expenses, which includes mining uniforms, office supplies, travel, mileage, car rentals, lodging, meals, and internet.

Workers initially incur and pay such expenses by using personal funds or credit cards, and subsequently may be reimbursed by the Debtors only after submission and approval of expense reimbursement requests.  In addition, the Debtors maintain three (3) credit cards for general business expenses that the Debtors are directly liable for and reimburse to the issuer, American Express Company, in the ordinary course of business.[4]  Such credit card-paid and reimbursed portion of the Expense Obligations is approximately $17,500 per month, and is included in the above amount.  Each Expense Obligation requires a valid receipt and internal approval by an appropriate reviewing manager before it is reimbursed.

15.    In addition, the Debtors offer certain Workers the ability to participate in a vehicle reimbursement program if the Worker is required to use a vehicle in the ordinary course of their work and if senior management approves of using a personal vehicle for such work. Approved Workers are given a stipend, paid in conjunction with their payroll, that ranges from $500 to $1,500 a month depending on the Worker's position.  Any amounts the Worker pays for gas for this vehicle may be reimbursed using the same approval process as above for general Expense Obligations.  The Debtors' monthly Expense Obligations under this vehicle program in the year before the Petition Date averaged approximately $30,000.  The Debtors also offer certain Workers a $70.00 per month stipend for cell phone usage related to their work, with such stipend requiring approval by the head of the eligible Worker's department or group.[5]

---

[4]    Relief to maintain these Debtor-provided credit cards in the ordinary course of business is requested in the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of the Debtors' Existing Cash Management System; (B) Authorizing Use of Existing Bank Accounts and Business Forms; (C) Granting a Limited Waiver of Requirements of Section 345(b) of the Bankruptcy Code; (D) Authorizing Continuation of Ordinary Course Intercompany Transactions; (E) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims; and (F) Granting Related Relief,* filed contemporaneously herewith.

[5]    The Debtors note that other Workers are on company-paid cell phone plans provided to facilitate their employment duties, and amounts are not reimbursed directly to the applicable Workers.  For the avoidance of doubt, the Debtors request authority to continue this Workforce Program in the ordinary course of business.

16.     Altogether, the Debtors' monthly Expense Obligations in the year before the Petition Date averaged approximately $85,000.  The Debtors believe it would be harmful and inequitable to require Workers to personally bear any approved business expenses they incurred in furtherance of their work responsibilities.  Payment of these Expense Obligations is also critical to ensuring that Workers can properly perform their duties in the ordinary course of business.  Accordingly, the Debtors request authority, in their discretion and in the exercise of their business judgment, to honor the Expense Obligations in the ordinary course of business.

v.     <u>Independent Contractors and Consulting Services</u>

17.     As noted above, in addition to the Workers, the Debtors employ and consult with a variety of Independent Contractors to undertake ad hoc and as-needed services for (a) specific corporate projects and (b) the performance of specific tasks at the Debtors' mines relating to mine safety, each of which are critical to maintain ordinary course business operations.  The Debtors directly contract with certain Independent Contractors and utilize certain companies to provide the Debtors with other Independent Contractors.  In the year before the Petition Date, payments to the Independent Contractors has averaged approximately $235,000, with fluctuations in payment obligations based on the frequency and usage of the Independent Contractors and the timing and amount of their respective payment structures.

**B.     <u>Variable Wage Programs</u>**

18.     As a part of the Workforce's ordinary course compensation, and in the Debtors' discretion and as appropriate, the Debtors maintain a number of variable wage programs for the Workers, such as a monthly safety program (the "<u>Monthly Safety Program</u>"), a safety threshold program (the "<u>Safety Threshold Program</u>"), mine performance program (the "<u>Mine Performance Program</u>"), an operator program (the "<u>Operator Program</u>"), a good

attendance program (the "Attendance Program"), and a discretionary wage program (the "Discretionary Wage Program," and together with the foregoing programs, the "Variable Wage Programs"). Through the Variable Wage Programs, the Workforce has the opportunity to earn additional compensation that is tied to meeting the criteria set forth in each applicable Variable Wage Program. Not all locations offer, and not all Workers are entitled to participate in, all Variable Wage Programs, but as implemented, such programs are consistent with the coal industry's standards and are a material and ordinary course compensation component for the Workforce.

19.     The Debtors seek authority to continue these Variable Wage Programs and to honor all obligations thereunder. To the extent deemed incentive programs under section 503(c) of the Bankruptcy Code, the Debtors will seek separate approval from the Court to the extent that the Debtors propose to make post-petition incentive payments to, or implement an incentive plan for, any insider (as defined in section 101(31) of the Bankruptcy Code).

i.     Safety-Related Programs

20.     The Monthly Safety Program provides Workers at participating locations with cash compensation for safe operations, compensating Workers who do not have a mining incident or accident in any given month. This program benefits all Workers at a given mine location and helps cause all Workers to vigilantly monitor the safety conditions and conduct of fellow Workers. Each month, a human resources director for each site prepares a list of the Workers who met the established criteria, and upon internal human resources approval, the Debtors pay their Workers under the program typically in an off-payroll cycle. Compensation payments under the Monthly Safety Program are either $100 or $200 per eligible Worker.

21.     Similar to the Monthly Safety Program, the Safety Threshold Program provides eligible Workers with specified compensation after their work at a particular mining operation exceeds a set threshold of days without an accident causing the Worker to be unable to return to the Worker's next scheduled shift—i.e., the avoidance of a "lost time accident".  For each eligible Worker, these thresholds are set at $250 per every 50 days for the first 200 days, and then an additional $500 every 100 days thereafter.  In the event a lost time accident occurs, the accumulation of time will end and then begin anew.  Upper management and those eligible for the Operator Program are not entitled to participate in the Safety Threshold Program.  In the year before the Petition Date, Workers earned approximately $1.7 million in the aggregate under the Monthly Safety Program and $1.4 million in the aggregate under the Safety Threshold Program.

ii.    Mine Performance Program

22.     The Mine Performance Program provides Workers with compensation when targets for daily footage mined are met or, at the load-out facilities, when daily processing thresholds are met.  The daily footage mined by unit and shift are used to calculate payouts per Worker, and are paid as a part of ordinary course payroll, subject to review and approval by the applicable human resource directors or mine managers.  Biweekly payments under this program range from $0 to $2,000 per eligible Worker, and the total payout under the Mine Performance Program in the year before the Petition Date was approximately $9.1 million.

iii.    Operator Program

23.     The Operator Program compensates Workers in certain non-insider management positions when their managed-locations meet or exceed established performance criteria.  The Debtors set the monthly targets for each eligible Worker at the beginning of the

year, and senior personnel in the accounting department track for each criterion (a) the target value, (b) the cost component, (c) the actual result, (d) whether the performance criteria was met or not, (e) the payout amount, and (f) the total payout for each Worker.  Once approval is obtained from the accounting department and senior management, the Worker receives a compensation payment under the Operator Program in the next regular payroll.  The total payout under the Operator Program in the year before the Petition Date was approximately $1.4 million.

        iv.    <u>Attendance Program</u>

      24.    The Attendance Program provides eligible Workers with compensation for achieving perfect attendance in a given year, running from November 1 to October 31 of the next year.  Perfect attendance includes Workers working every scheduled work day, except for excusable absences such as bereavement leave, jury duty, and other appropriate absences.  Eligible Workers receive $2,000 for the first year of perfect attendance, with an additional $1,000 added to that amount for each consecutive year of perfect attendance, up to a total compensation amount of $10,000 per year for perfect attendance.  The Attendance Program ensures that the Debtors' mining operations are efficiently staffed and operated by Workers, which helps maintain a safe operational environment and ensures that coal production can be performed without delays.  The total payout under the Attendance Program in the year before the Petition Date was $1.84 million.  There are no amounts due and owing under the Attendance Program as of the Petition Date.

        v.    <u>Discretionary Wage Program</u>

      25.    The Debtors typically pay certain Workers an annual discretionary amount each December or January under the Discretionary Wage Program.  Such amounts are generally fixed in the months leading up to their payment, and relate to (a) how the eligible Worker has

performed during the year and (b) the overall state of the Debtors' businesses and how they have performed during the preceding year.  In December 2019, the Debtors paid amounts totaling approximately $1.93 million relating to the 2019-year, with the Corporate Employees, each of whom is a non-insider, receiving an aggregate amount of $173,500.  Historically, these amounts have been paid every year in some capacity to applicable Workers, and the Debtors believe that such amounts represent an expected and material portion of the Workforce's ordinary course compensation necessary to retain Workers and to support them financially.   There are no amounts due and owing under the Discretionary Wage Program as of the Petition Date.

**C.**     **Workforce Benefit Programs**

26.     The Debtors have established Workforce Programs through various plans and policies to provide the Workforce with medical, dental, prescription drug, vision, life insurance, retirement savings, vacation, holiday pay, other paid time off, and other benefits (collectively, the "Workforce Benefits," and amounts owed thereunder, the "Workforce Benefit Obligations"), which are administered by the Debtors.  The Debtors seek the authority, but not the direction, to continue the below Workforce Benefits and to satisfy or remit the Workforce Benefit Obligations, including those that were accrued and unpaid as of the Petition Date, in the ordinary course of business during these chapter 11 cases.  Except as otherwise noted, the Workforce Benefits apply equally throughout the Workforce.

i.     Health Programs

27.     The Debtors offer several health coverage benefit programs to the Workers and their families, including medical, dental, vision, and prescription drugs (collectively, the "Health and Welfare Programs" and amounts owed thereunder, the "Health and Welfare Obligations").  The Debtors' Health and Welfare Programs are typical of those offered

by coal industry employers of similar size. The Debtors are self-insured, and the Workers do not pay any premiums. Instead the Debtors pay claims under and premiums for the Health and Welfare Programs out of pocket, which are administered by Managed Care of America Administrators, Inc. ("MCA").

28.     Given the manner in which claims and expenses are incurred, recorded, and processed under the Health and Welfare Programs, the Debtors generally rely on estimates to determine the extent of their Health and Welfare Obligations at any given time, with such estimates generally being an accurate representation of such obligations. In the year before the Petition Date, however, the aggregate claims and related stop-loss premiums under the Health and Welfare Programs totaled approximately $18.8 million, with a monthly aggregate run rate of approximately $1.6 million. The Debtors also paid MCA approximately $1.5 million in the year 2019 to administer the Health and Welfare Programs, which included processing claims and seeking reimbursement for compensable claims from the applicable Debtors. As of the Petition Date, the Debtors estimate that they owe approximately $5.6 million total in Health and Welfare Obligations.

ii.     Life Insurance and AD&D

29.     The Debtors offer life insurance to the Workforce (the "Life Insurance Program") through Metropolitan Life Insurance Company ("MetLife"). All Workers are provided at least $150,000 in benefits, with certain Corporate Employees provided increased benefits. Eligible Workers may also, at their election and through their voluntary contribution, select additional supplemental life insurance and life insurance for their dependents, which is also offered by MetLife. In addition, the Workforce is also entitled to accidental death and dismemberment ("AD&D") insurance, which is provided by Metlife. AD&D insurance provides

benefits to the Workforce in amounts comparable to those provided under the Life Insurance Program, which arise under set criteria for particularized AD&D incidents.  The Debtors pay all premiums associated with the Life Insurance Program and AD&D, which totaled approximately $350,000 for the calendar year 2019.

       iii.     <u>401(k) Plan</u>

       30.     Currently, the Debtors offer Workers a savings plan (the "<u>401(k) Plan</u>") that meets the requirements of section 401(k) of the Internal Revenue Code of 1986, which is administered by Transamerica Retirement Solutions, LLC ("<u>Transamerica</u>").  Pursuant to the 401(k) Plan, the Debtors match (a) 100% of the first 3% of a Worker's contributed compensation and (b) 50% of the next 2% of contributed compensation, up to a maximum match of 4% of a Worker's contributed compensation.  Contributions from participating Workers are withheld from such Worker's gross pay during each payroll cycle and transferred to Transamerica for deposit into the 401(k) Plan as directed by the participating Worker.  For calendar years 2019, 2018, and 2017, the Debtors' matching contributions to the 401(k) Plan totaled approximately $8.7 million, $8.51 million, and $8.06 million, respectively.  Transamerica manages Worker contributions and otherwise administers the 401(k) Plan.  As of the Petition Date, the Debtors estimate that they must remit approximately $290,000 in Worker contributions to Transamerica arising from the prepetition period and pay approximately $155,000 in related matching contributions under the 401(k) Plan.

       iv.     <u>Paid Time Off</u>

       31.     Corporate Employees generally receive three (3) weeks of paid-time off after five (5) years of service (up from an initial two (2) weeks of paid-time off), plus any days designated as a holiday ("<u>PTO</u>").  For Operational Workers, the Debtors maintain a number of

PTO policies, including (a) accrued vacation (up to 80 hours, or up to 120 hours for Workers employed for five (5) or more years), (b) holiday pay, and (c) other PTO from work. While there is some minor variation between policies at different operational locations, they are generally consistent as between Operational Workers. PTO is primarily set forth in Worker-handbooks.

32.    The Debtors offer Workers at certain operational sites the option to pay out unused vacation days every year, which typically gives rise to an annual cash payment obligation. In the year before the Petition Date, the Debtors paid approximately $205,000 on account of this policy. Upon termination, the Debtors also pay certain Workers for accrued but unused vacation days in the year of termination. The Debtors anticipate that the Workers will utilize any accrued PTO in the ordinary course of business, and pay-out PTO obligations will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**D.    Workers' Compensation Programs and Benefits**

33.    The Debtors are required to maintain workers' compensation liability insurance and to provide Workers with workers' compensation coverage for claims arising from or related to their employment, including occupation pneumoconiosis (known as "black lung") claims under applicable state law and costs under the federal Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977. The Workforce is covered under a single workers' compensation policy (the "Workers' Compensation Program") with Rockwood Casualty Insurance Company ("Rockwood"). Each of the applicable Debtors pay premiums to Rockwood directly, which are based on the payroll at each entity. The Debtors rely on Rockwood for assistance in processing and administering claims under the Workers' Compensation Program, which has a deductible of $2 million per person per occurrence. When

a claim is filed with Rockwood, Rockwood will send an invoice directly to the Debtors, and will administer any payments on account of those claims.

34.    In 2019, the Debtors paid approximately $7.5 million on account of premiums, claims, and loss funding policy payments under the Workers' Compensation Program.  As of the Petition Date, the Debtors have approximately 90 in open workers' compensation and black lung claims and have accrued approximately $3.9 million on account of unpaid claims under the Workers' Compensation Program.  As required by Rockwood, to collateralize their payment claims under the Workers' Compensation Program, the Debtors: (a) maintain a $4.5 million letter of credit of with The Huntington National Bank on account of the Workers' Compensation Program, for an approximate annual renewal fee of $90,000 (keyed to a eurocurrency interest rate plus 2%), (b) maintain a collateral account jointly owned with Rockwood at F.N.B. Wealth Management, which holds approximately $1.95 million as security for workers' compensation claims,[6] and (c) as mentioned above, make monthly loss funding payments of $125,000 to a loss fund that will max at $9.7 million ($2.5 million as of the end of 2019).

35.    Failure to maintain the Workers' Compensation Program, including the letter of credit, collateral account, and loss fund, could result in administrative or legal proceedings and material fines against the Debtors and their officers and directors.  The Debtors therefore seek authority to continue paying or contesting in good faith, as appropriate in the Debtors' business judgment, all outstanding amounts related to the Workers' Compensation Program and to fully administer and comply with the obligations thereto as they become due in the ordinary course of business.  Out of an abundance of caution and to facilitate ordinary course

---

[6]    Relief to maintain this collateral account in the ordinary course of business is requested in the Cash Management Motion.

handling of workers' compensation claims and black lung claims, the Debtors further request authority, in their sole discretion, to lift the automatic stay arising under section 362 of the Bankruptcy Code to allow workers' compensation claimants and black lung claimants to pursue their claims in the ordinary course of business.

**E.      Workforce-Related Service Providers**

36.      As discussed herein, the Debtors have engaged certain third-party service providers (the "Service Providers") to assist with or administer their Workforce Programs.  The Service Providers perform a wide range of services for such programs, including: (a) MCA (health care administration); (b) Transamerica (401(k) Plan administration); (c) Rockwood (workers' compensation claims administration); (d) MetLife (life insurance administration).  As of the Petition Date, the Debtors owe approximately $145,000 total to the Service Providers. Failure to pay any of these Service Providers could result in substantial interruption of the Debtors' Workforce Programs and harm Workers' morale or the Debtors' efforts to retain necessary Workers during their chapter 11 cases.  As a result, the Debtors seek authorization, but not direction, to continue to honor all obligations to the Service Providers in the ordinary course of business as such obligations become due.

**F.      Other Benefit Programs**

37.      In addition to the Workforce Programs discussed above, the Debtors may maintain or establish from time to time other benefit programs for the Workforce, or agree on a case-by-case basis to provide additional benefits to Workers.  To the extent that any such programs are not mentioned herein or are later implemented by the Debtors in their reasonable business judgment, the Debtors seek authorization to honor or incur such obligations to the non-insider Workers in the ordinary course of business.  Furthermore, the Debtors hereby reserve

their right to modify or terminate any of the Workforce Programs discussed herein as permitted by law.

## **Basis for Relief Requested**

38.     The Debtors request authority to satisfy the Workforce Obligations and maintain the Workforce Programs in the ordinary course of their business during the pendency of these chapter 11 cases.  Efficient coal mining that uses modern techniques and equipment requires skilled laborers with mining experience and proficiency, as well as qualified managers and supervisors.  The Workforce's knowledge and understanding of the Debtors' products, operations, and infrastructure is essential to preserving the value of the Debtors' businesses.

39.     Given that preserving and maximizing the value of the Debtors' estates depends upon a stable and skilled workforce, any significant number of Worker departures or deterioration in morale at this time may substantially and adversely impact the Debtors' efforts in chapter 11, causing immediate and irreparable harm to the Debtors' estates and their creditors. There is a real, immediate risk that if the Debtors are not authorized to continue to satisfy the Workforce Obligations, including the payment of obligations to the Independent Contractors, and to maintain the Workforce Programs in the ordinary course, Workers and the Independent Contractors would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' ability to successfully maximize the value of their assets.  Indeed, the Debtors already maintain lean staffing to raise operational efficiency and keep business expenses minimized—all current Workers, and any Independent Contractors employed on an as-needed basis, are thus necessary for the Debtors to continue normal operations.  Accordingly, the Debtors must be authorized to continue, in the ordinary course, the Workforce Programs that were in effect before the Petition Date for the entire Workforce.

**A.      The Court Should Authorize the Debtors to Pay the Workforce Obligations**

40.      Sections 105(a) and 363(b) of the Bankruptcy Code authorize the requested relief.  Section 105(a) of the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]"  11 U.S.C. § 105(a).  It permits a bankruptcy court to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction."   2 COLLIER ON BANKRUPTCY ¶ 105.01.  Similarly, section 363(b)(1) of the Bankruptcy Code authorizes a debtor to use property of the estate other than in the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b)(1); *see also In re Apex Oil Co.*, 92 B.R. 847 (Bankr. E.D. Mo. 1988).

41.      The well-settled "doctrine of necessity" also supports the requested relief. This rule authorizes postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  The Supreme Court of the United States first articulated the doctrine of necessity more than a century ago in affirming the authorization of using receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See, e.g., Miltenberger* v. *Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286, 309–11 (1882).  The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  *See, e.g.*, 11 U.S.C. § 105(a); *In re Carlson*, 126 F.3d 915, 920 (7th Cir. 1997) ("Section 105(a) gives the bankruptcy court the authority to issue any order necessary to carry out the provisions of the Bankruptcy Code."); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion

orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re NWFX, Inc.*, 864
F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy, however, is that
equitable principles govern . . . .").

42.     This doctrine of necessity functions in a chapter 11 reorganization as a
mechanism by which the bankruptcy court can exercise its equitable power to allow payment of
critical prepetition claims not explicitly authorized by the Bankruptcy Code.   *See In re
Wehrenberg, Inc.*, 260 B.R. 468 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the
Court may authorize the payment of prepetition claims when such payments are necessary to the
continued operation of the Debtor"); *see also In re Bos. & Me. Corp.*, 634 F.2d 1359, 1382 (1st
Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for
goods and services that are indispensably necessary to the debtors' continued operation); *In re
Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("While the doctrine [of necessity] was not
codified in the Bankruptcy Code, courts have used their equitable power under Section 105(a) of
the Code to authorize the payment of prepetition claims . . . ."). The doctrine is frequently
invoked early in a reorganization, particularly in connection with those chapter 11 sections that
relate to payment of prepetition claims.

43.     The Debtors' ability to satisfy their Workforce Obligations and to
maintain their Workforce Programs is necessary to their continued and uninterrupted operations
during these chapter 11 cases. Any delay in paying any of the Workforce Obligations could
jeopardize the Debtors' relationship with the Workforce and irreparably harm Workers' finances
and morale at the very time that the Workforce's dedication, confidence, support and cooperation
are most critical. Thus, if the Debtors do not obtain immediate authority to pay the Workforce
Obligations, the Debtors' operations may be severely impaired. At this key stage, the Debtors

cannot risk such substantial disruption of their business operations that would attend any decline in Workforce morale attributable to the Debtors' failure, or worse, inability to pay, the Workforce Obligations.

44.     Most importantly, absent payment of the Prepetition Wages and satisfaction of the Workforce Obligations overall, Workers would suffer hardship and, in many instances, financial duress.  The Workforce depends on its employment income from the Debtors to meet personal and familial financial obligations.  The Workforce should not be forced to bear the costs of these chapter 11 cases.

45.     Moreover, it is necessary and appropriate under the circumstances to permit the Debtors to continue to honor their Workforce Obligations during the pendency of these chapter 11 cases.  The Workforce Programs are customary benefits that the Debtors have provided to the Workforce that are consistent with benefits provided by other coal industry employers throughout the country.  In many instances, the Workers crucially depend on the other Workforce Programs such as the Health and Welfare Programs, and it would cause a significant and undue hardship for the Workforce if the Debtors were forced to discontinue such programs. Indeed, failure to continue the Workforce Programs may result in Workers departing from the Debtors in favor of employers who can provide the Workforce with such protections and benefits.  Such departures would imperil the Debtors' efforts in these chapter 11 cases to preserve their businesses and to maximize the value of their estates.

46.     Courts in this and other districts have routinely granted relief similar to the relief requested herein in other chapter 11 cases.  *See, e.g.*, *In re Payless Holdings LLC*, No. 19-40883-659 (KAS) (Bankr. E.D. Mo. Feb. 20, 2019) (D.I. 118) (authorizing debtors to pay prepetition compensation, benefits, and expenses and continue related employee programs in

ordinary course); *In re Armstrong Energy, Inc.*, No. 17-47541-659 (Bankr. E.D. Mo. Nov. 2, 2017) (D.I. 89) (same); *In re Abengoa Bioenergy US Holding, LLC*, No. 16-41161-659 (Bankr. E.D. Mo. Mar. 4, 2016) (D.I. 92) (same); *In re Noranda Aluminum, Inc.*, No. 16-10083 (BSS) (Bankr. E.D. Mo. Feb. 9, 2016) (D.I. 78) (same); *In re Arch Coal, Inc.*, No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 13, 2016) (D.I. 54) (same); *see also In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 3, 2019) (D.I. 334) (same).  The Debtors submit that the circumstances of these chapter 11 cases warrant granting similar relief, and that doing so is in the best interests of the Debtors, their estates, their creditors, and their stakeholders, and therefore should be granted.

**B.      Sections 363(c), 363(b), and 503(c) of the Bankruptcy Code Authorize the Requested Relief with Respect to Ordinary Course Variable Wage Programs**

47.      Section 363(c)(1) of the Bankruptcy Code authorizes a debtor to enter into transactions "in the ordinary course without notice or nearing, and may use the property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  As described herein, the Variable Wage Programs are for non-insider employees, do not have equity components, and are comparable to those offered by the Debtors' competitors and constitute ordinary course transactions under section 363(c)(1) of the Bankruptcy Code.  *See, e.g.*, *Mesa Air Grp.*, No. 10-10018 (MG), 2010 WL 3810899, at *3 to *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (treating as ordinary course transactions programs that were "consistent with past practices and clearly tied the performance of the Debtors").  Accordingly, the Debtors do not believe that court authorization is required to continue the Variable Wage Programs post-petition.

48.      However, even if the payments under any of the Variable Wage Programs are considered to be "outside" the ordinary course of business, the Variable Wage Programs should still be approved pursuant to sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code as

a sound exercise of the Debtors' business judgment. *In re Velo Holdings, Inc.*, 2012 WL 2015870, at *9 (Bankr. S.D.N.Y. June 6, 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."). The Debtors' foremost concern is to ensure the safety and well-being of the Workforce, and the Monthly Safety Program and Safety Threshold Program compensate eligible Workers based on their ability to meet safety criteria and to ensure a safe operational environment. Likewise, the Mine Performance Program and Operator Program compensate Workers for meeting specific performance metrics, including production volume and safety, and is consistent with the practices within the coal industry. The Attendance Program compensates Workers for diligently working their scheduled shifts, and ensures that the Debtors' operations are always adequately staffed for safe and efficient operation. Finally, the Discretionary Wage Program represents an expected and relied-upon method of Worker compensation that is paid annually, without which the Debtors expect they will have great difficulty in maintain their Workforce—the value of which vastly outweighs the cost of the Discretionary Wage Program. Altogether, the Variable Wage Programs provide outsize benefits to the Debtors' estates and are crucial to maximizing their value. Accordingly, the Variable Wage Programs satisfy the business judgment test as they are demonstrably in the best interests of the Debtors' estates.

49.     Courts in this and other jurisdictions routinely approve similar programs under similar circumstances to those here. *See, e.g.*, *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 3, 2019) (D.I. 334) (authorizing payment for various safety and employment compensation programs); *In re Payless Holdings LLC*, No. 19-40883-659 (KAS) (Bankr. E.D. Mo. Feb. 20, 2019) (D.I. 118) (approving payment for various employee

production plans); *In re Noranda Aluminum, Inc.*, No. 16-10083 (BSS) (Bankr. E.D. Mo. Feb. 9, 2016) (D.I. 78) (approving payment for production and target-based employee compensation plans); *In re Arch Coal, Inc.*, No. 16-40120-399 (CER) (Bankr. E.D. Mo. Jan. 13, 2016) (D.I. 54) (approving an "annual incentive compensation" program to reward employees for "safety and environmental achievement," regulatory compliance, and other goals); *In re Walter Energy, Inc.*, No. 15-02741 (TOM) (Bankr. N.D. Ala. July 15, 2015) (D.I. 61) (approving a safety award program as well as quarterly rewards for achieving certain targets); *In re Alpha Nat. Res., Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. Sept. 3, 2015) (D.I. 356) (approving payment of prepetition claims due under numerous reward programs, including operational safety and environmental amounts, and postpetition continuation of such programs); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. June 18, 2014) (D.I. 299) (authorizing debtors to implement incentive and safety plan); *In re Patriot Coal Corp.*, No. 12-51502-659 (Bankr. E.D. Mo. May 16, 2013) (D.I. 2819) (order authorizing debtors to implement compensation plans).

C.    **Certain Prepetition Wages May be Entitled to Priority Status**

50.    Pursuant to section 507(a)(4) of the Bankruptcy Code, individual employees may be granted a priority claim for their allowed unsecured claims relating to "wages, salaries, or commissions, including vacation, severance and sick leave" up to a statutory cap of $13,650.  *See* 11 U.S.C. § 507(a)(4); *see also* § 507(a)(5) (providing same priority framework and cap for unsecured claims relating to contributions to employee benefit plans).  Under the statute, certain Workforce Obligations are entitled to priority status under section 507(a)(4) of the Bankruptcy Code.  The Debtors would therefore be required to pay these priority claims in full to confirm any plan of reorganization.  *See* 11 U.S.C. § 1129(a)(9)(B).  As a result, payment of these Workforce Obligations is primarily a matter of timing and does not impose greater administrative expenses on the Debtors' estates than they would otherwise be subject to in

chapter 11.  Moreover, given the large number of Workers and the timing of payments and claims for reimbursement, the Debtors believe that distinguishing between priority and non-priority claims will be administratively burdensome.  Accordingly, payment of these Workforce Obligations subject to priority under the Bankruptcy Code at this time will maximize the value of the Debtors' estates by reducing the administrative burden on the Debtors' estates.

**D.**    **Applicable Non-Bankruptcy Law Mandates**
       **that the Debtors Maintain Certain of the Workforce Programs**

51.    Maintaining the Workforce Programs and paying amounts thereunder is, in many instances, required under applicable non-bankruptcy law.  For example, applicable state law mandates that the Debtors maintain a workers' compensation policy for their Workers.  Similarly, failure to pay payroll taxes could result in tax liabilities and penalties for both the Workers and the Debtors, and potentially the Debtors' directors and officers as well.  Likewise, the failure to transmit garnishments and other similar deductions can cause hardship to certain Workers and could result in liabilities for the Debtors in instances where applicable law mandates employer deductions.

52.    Accordingly, as authorized by sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek authority to pay the Workforce Obligations that become due and owing during the pendency of these chapter 11 cases and to continue the Workforce Programs with respect to the Workforce as such practices, programs, and policies were in effect as of the Petition Date.  The relief requested herein is essential to their ability to maximize value for their creditors.  Moreover, such relief is only intended to permit the Debtors, in their discretion or as required by applicable non-bankruptcy law, to make payments consistent with their prepetition policies to the extent that without the benefit of an order approving this Motion such payments would be inconsistent with the Bankruptcy Code.

**E.**     **The Debtors Should Be Authorized to Pay Service Providers**

53.     As discussed above, the Debtors engage a number of Service Providers who perform a wide range of critical services in connection with the Debtors' payroll and provision of Workforce Programs.  With few exceptions, these Service Providers are widely recognized companies that provide services to many large and small companies.  Because the Debtors crucially rely on these Service Providers and failure to pay any of these Service Providers could result in substantial interruption of the Workforce Programs, the Debtors should be authorized to continue to honor all obligations to the Service Providers in the ordinary course of business as such obligations become due.

**F.**     **Waiver of the Automatic Stay**
**for Workers' Compensation Claims Should Be Granted**

54.     Section 362(a)(1) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).  Section 362 of the Bankruptcy, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  *Id.* at § 362(d)(1).  Here, cause exists to modify the automatic stay to permit the Workers to proceed with claims, including their black lung claims, under the Workers' Compensation Program in the appropriate judicial or administrative forum.  Staying such claims could have a detrimental effect on the financial well-being and morale of the Workers, and could cause severe disruption to the Debtors' businesses and likely would impair the success of their restructuring.

**Processing of Checks and Electronic Funds Transfers Should Be Authorized**

55.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and anticipated access to cash collateral.  Also, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment made relating to the Workforce Obligations.  Accordingly, the Debtors believe that only checks or wire transfer requests relating to authorized payments will be honored and that this Court should authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

56.     The Debtors seek immediate authorization for the relief requested in this Motion.  Pursuant to Bankruptcy Rule 6003(b), a bankruptcy court cannot grant "a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within the first twenty-one (21) days after the petition date unless the relief is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b).  For the reasons set forth herein and in the First Day Declarations, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that

they have satisfied Bankruptcy Rule 6003(b) and therefore respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

57.    By this Motion, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause for a waiver of any stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 6004(h).  For the reasons set forth herein and in the First Day Declarations, the Debtors submit that notice of the relief requested herein is appropriate under the circumstances and that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## **Reservation of Rights**

58.    Nothing contained herein is intended or should be construed as (a) an admission as to the validity or priority of any claim or lien (or the priority thereof) against the Debtors, (b) a waiver of the Debtors' or any party in interest's rights to subsequently dispute or contest such claim or lien on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion, (e) a request or authorization to assume or adopt any agreement, contract, or lease under section 365 of the Bankruptcy Code or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or applicable law.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute or contest such claim.

## **Notice**

59.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for Region 13; (b) counsel to the Ad Hoc First Lien Group; (c) counsel to the Ad Hoc Crossover Group; (d) counsel to the Facilities Agent; (e) counsel to the Term Agent; (f) counsel to the Indenture Trustee; (g) counsel to the collateral trustee under the Debtors' secured debt facilities; (h) counsel to the DIP Agent; (i) counsel to DIP Lenders; (j) counsel to Murray Energy Corporation; (k) counsel to Reserves; (*l*) counsel to Javelin; (m) counsel to Uniper Global Commodities UK Limited; (n) the Internal Revenue Service; (o) the Securities and Exchange Commission; (p) the United States Attorney's Office for the Eastern District of Missouri; (q) the state attorneys general for all states in which the Debtors conduct business; (r) the holders of the thirty (30) largest unsecured claims against the Debtors, on a consolidated basis; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").   Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-3(A)(1) of the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri (the "Local Bankruptcy Rules").   In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

### *[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

WHEREFORE, the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other relief as is just and proper.

Dated:   March 10, 2020       Respectfully submitted,
         St. Louis, Missouri

                              ARMSTRONG TEASDALE LLP


                              _/s/ Richard W. Engel, Jr._____
                              Richard W. Engel, Jr. (MO 34641)
                              John G. Willard (MO 67049)
                              Kathryn Redmond (MO 72087)
                              7700 Forsyth Boulevard, Suite 1800
                              St. Louis, Missouri  63105
                              Tel:    (314) 621-5070
                              Fax:    (314) 621-5065
                              Email:  rengel@atllp.com
                                      jwillard@atllp.com
                                      kredmond@atllp.com

                              - and -

                              PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                              Paul M. Basta (*pro hac vice* admission pending)
                              Alice Belisle Eaton (*pro hac vice* admission pending)
                              Alexander Woolverton (*pro hac vice* admission pending)
                              1285 Avenue of the Americas
                              New York, New York  10019
                              Tel:    (212) 373-3000
                              Fax:    (212) 757-3990
                              Email:  pbasta@paulweiss.com
                                      aeaton@paulweiss.com
                                      awoolverton@paulweiss.com

                              *Proposed Counsel to the Debtors and*
                              *Debtors in Possession*