**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | Hearing Date: March 11, 2020 |
| | ) | Hearing Time: 10:00 a.m. (Central Time) |
| | ) | Hearing Location: Courtroom 7 North |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING THE DEBTORS TO (I) PERFORM UNDER EXISTING
COAL SALE CONTRACTS IN THE ORDINARY COURSE OF BUSINESS AND
(II) ENTER INTO AND PERFORM UNDER NEW COAL SALE CONTRACTS IN
THE ORDINARY COURSE OF BUSINESS AND (B) GRANTING RELATED RELIEF**

Foresight Energy LP and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

**Relief Requested**

1. By this Motion, the Debtors seek entry of interim and final orders (the "Proposed Orders"),[2] pursuant to sections 105 and 363 of title 11 of the United States Code

---

[1] The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251). The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

[2] Copies of the Proposed Orders will be made available on the Debtors' case information website at: http://cases.primeclerk.com/foresightenergy.

(the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing the Debtors to (i) perform under or amend existing Coal Sale Contracts (as defined herein) in the ordinary course of business and (ii) enter into, perform under, or amend postpetition Coal Sale Contracts in the ordinary course of business and (b) granting related relief.

### Jurisdiction and Venue

2.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. §157(b).

3.  The statutory and legal predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

### Background

4.  On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are a leading producer of thermal coal, with four mining complexes and nearly 2.1 billion tons of proven and probable coal reserves strategically located near multiple rail and river transportation access points in the Illinois Basin. The Debtors also own a barge-loading river terminal on the Ohio River. From this strategic position, the Debtors sell their coal primarily to electric utility and industrial companies located in the eastern half of the United States and across the international market.

5.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. Contemporaneously

herewith, the Debtors filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No trustee, examiner or official committee has been appointed in these chapter 11 cases.

6. Information regarding the Debtors' businesses, their capital and debt structure, the events leading to the filing of these cases, and the terms and structure of the proposed restructuring transaction is set forth in the *Declaration of Robert D. Moore, President and Chief Executive Officer of Foresight Energy LP, in Support of Chapter 11 Petitions* (the "Moore Declaration"), the *Declaration of Alan Boyko, Senior Managing Director of FTI Consulting, Inc., in Support of Chapter 11 Petitions and First Day Relief* (the "Boyko Declaration"), and the declaration of Seth Herman in support of the Debtors' motion for approval of debtor-in-possession financing and use of cash collateral (the "Herman Declaration," and together with the Moore Declaration and Boyko Declaration, the "First Day Declarations"),[3] each filed contemporaneously herewith.

## The Coal Sale Contracts

7. Before the Petition Date, the Debtors routinely and in the ordinary course of their businesses entered into contracts with customers to sell coal from the Debtors' mining operations or acquired from other sources (collectively, the "Coal Sale Contracts"). Generating virtually all of the Debtors' revenues, entering into, performing under, and amending Coal Sale Contracts in the ordinary course of their businesses represents a core and critical part of the Debtors' operations.

8. Because Coal Sale Contracts are often long-term agreements (sometimes continuing for several years) and cover very large quantities of coal involving millions of dollars

---

[3] The First Day Declarations are being filed in support of this Motion and are incorporated herein by reference. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declarations.

in aggregate purchase price, customers may be unwilling to transact with the Debtors without specific authorization from this Court. If the Debtors had to seek Court approval for every Coal Sale Contract they sought to enter into, perform under, or amend, the Debtors believe that they would be at a competitive disadvantage in the market and could lose customers and revenues, thus endangering their chances of successfully restructuring. Revoking the Debtors' authority to contract with customers would cause the Debtors' dynamic distribution mechanism to grind to a halt, sending customers scrambling to substitute their coal supply in favor of a more flexible competitor. In the highly competitive coal market, the Debtors must be able to enter into, perform under, and amend Coal Sale Contracts quickly and efficiently. Otherwise, the Debtors risk losing revenue if customers are unwilling to accept any perceived risk regarding whether the Debtors have the authority to enter into Coal Sale Contracts in the ordinary course of business.

9.    At this critical early stage of the Debtors' restructuring process, the Debtors must be allowed to continue generating revenue from Coal Sale Contracts. The loss or delay of performance under even a few Coal Sale Contracts could materially impact the Debtors' business plan and jeopardize their restructuring. The Debtors must be able to reassure their customers that entering into, performing under, and amending Coal Sale Contracts with the Debtors is permissible under applicable law and authorized by the Court, and that all such actions can continue in the ordinary course. Therefore, the Debtors request express authorization to enter into, perform under, or amend the Coal Sale Contracts in the ordinary course of business. Immediate relief is required to maximize the Debtors' revenues and chance of successful restructuring, and granting the relief requested herein would benefit the Debtors' estates and promote the interests of all stakeholders.

10. Consistent with historical practice and in the ordinary course of business, the Debtors consider a number of factors before entering into or amending Coal Sale Contracts, including: (a) cost, revenue, and quality specifications of the coal at issue; (b) production and sales balances to determine availability of coal over the proposed transaction term; (c) the market, including prices from relevant indices, pricing reported to the public, and comparable transactions; (d) a customer's ability to pay for the coal; (e) transportation availability; and (f) agreement on contractual terms. Such considerations help the Debtors ensure that entering into or amending a Coal Sale Contract makes good business sense and is in their best interests. The Debtors will, of course, continue to review the advisability and feasibility of entering into new Coal Sale Contracts to ensure that any and all of the Coal Sale Contracts are advantageous to the Debtors and promote the interests of all stakeholders.

## Coal Sale Arrangements with Javelin

11. The Debtors are party to certain coal and marketing arrangements with non-Debtor affiliate Javelin Global Commodities (UK) Ltd. ("Javelin"), which is a joint venture between Murray, Javelin's management, and Uniper Global Commodities SE (formerly EON) ("Uniper"). The Debtors are affiliated with Javelin through Murray's ownership of a 34% equity interest in Javelin. Javelin facilitates the Debtors' coal exports to international markets, acting as the Debtors' coal sale marketing agent through the Javelin-Murray Coal Marketing Agreement and the Javelin Coal Sale Agreement (each, as defined herein). In the ordinary course, Javelin will purchase the Debtors' coal under the Javelin Coal Sale Agreement and then, by the terms of the Javelin-Murray Coal Marketing Agreement, Javelin will transport, export, and sell such purchased coal to an international purchaser. Through this arrangement, Foresight's export coal

sales to Javelin, and consequently sales to the Debtors' international customers, represented approximately 37% of Foresight's total coal sales revenue for 2019.

12. The Debtors also incur expenses relating to coal marketing commissions and export freight expenses to Javelin under the *Coal Marketing Agreement* between Javelin, Murray Energy Corporation ("MEC"), and The American Coal Sales Company ("ACSC"), dated June 13, 2015 (the "Original Javelin-MEC Coal Marketing Agreement"), as modified by the *Assumption and Assignment Agreement* between ACSC and Murray Global Commodities, Inc. ("MGC"), pursuant to which ACSC assigned to MGC all of its rights and obligations under the Original Javelin-MEC Marketing Agreement, dated September 15, 2015 (the "Javelin-Murray Coal Marketing Agreement"). While not a direct party to the Javelin-Murray Coal Marketing Agreement, the Debtors, as "Foresight Entities" (as defined in the Javelin-Murray Coal Marketing Agreement) and direct and indirect subsidiaries to MEC, are enabled under the terms of the Javelin-Murray Coal Marketing Agreement to use Javelin's services for international marketing and exporting of the Debtors' coal, and, are authorized to use the Javelin-Murray Coal Marketing Agreement for the same through provisions in the Management Services Agreement.

13. Accordingly, pursuant to the Javelin-Murray Coal Marketing Agreement, Javelin (a) acts as the Debtors' primary marketing agent outside of the United States, (b) communicates coal sale opportunities for the Debtors, (c) assists the Debtors in the negotiation of the best terms to maximize value for the sale and delivery of coal to prospective customers on its end of the transaction, (d) procures, when requested by the Debtors, transportation services for delivery of coal to customers, including port, rail, trucking, and ocean freight services, (e) optimizes all sale contracts and logistic arrangements for the delivery of coal, and (f) procures and advises on the procurement of blended coal.

14. As described, Javelin purchases the Debtors' coal directly in connection with exporting such coal to international end-users. Thus, related to the Javelin-Murray Coal Marketing Agreement, and to facilitate the Debtors' ability to sell its coal to the international market, the Debtors, specifically FELP and Foresight Coal Sales LLC, Javelin, and Uniper Global Commodities UK Limited (a Uniper affiliate), are a party to the *Amended and Restated Master Coal Purchase and Sale Agreement*, dated January 1, 2019 (the "Javelin Coal Sales Agreement"). This agreement sets forth the economic and logistic terms that the Debtors may sell and transport coal that Javelin purchases from the Debtors. Through the Javelin Coal Sales Agreement and with Javelin's material assistance, the Debtors are able to efficiently export their coal beyond the domestic market, and are able to take advantage of Javelin's transportation and bulk shipping synergies to sell coal at a competitive price in the current coal industry. Given this arrangement under the Javelin Coal Sales Agreement, the Debtors intend to continue performing under this Coal Sales Agreement and under any new Coal Sales Agreements with Javelin, inclusive of any amendments or modifications, on a postpetition basis.

## Basis for Relief Requested

### A. The Coal Sale Contracts Are Ordinary Course Transactions

15. The Debtors enter into the Coal Sale Contracts in the ordinary course of business. Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to "enter into transactions . . . [or] use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). This section is designed to serve the "'overriding goal of maximizing the value of the estate' by striking the optimal balance between the interests of the debtor and the creditors." *Habinger, Inc.* v. *Metro. Cosmetic & Reconstructive Surgical Clinic, P.A.*, 124 B.R. 784, 786 (Bankr. D. Minn. 1990) (citing *United States ex rel. Harrison* v. *Estate of Deutscher*, 115 B.R. 592 (Bankr. M.D. Tenn. 1990)). "The 'ordinary course of

business' standard is intended to allow a debtor the flexibility it needs to run its business and respond quickly to changes in the business climate." *Habinger*, 124 B.R. at 786. Thus, the Debtors have authority "to enter into transactions in the ordinary course of business without the approval of the court." *Shields* v. *Cumberland Sur. Ins. Co. (In re Am. Coal Corp.)*, 1996 Bankr. LEXIS 2013, at *16 (Bankr. D. Minn. Oct. 7, 1996).

16. A transaction qualifies as "ordinary course" if it: (a) "is of the type that is commonly undertaken within the debtor's industry," *Peltz* v. *Gulfcoast Workstation Grp. (In re Bridge Info. Sys's, Inc.)*, 293 B.R. 479, 486 (Bankr. E.D. Mo. 2003), and (b) is ordinary and consistent with the reasonable expectations of creditors. *Streetman* v. *United States (In re Russell)*, 187 B.R. 287, 292 (W.D. Ark. 1995); *see also In re Bridge Info. Sys's, Inc.*, 293 B.R. at 486 (courts look to "whether interested parties would reasonably expect[ ] the particular debtor in possession to seek court approval before entering in the questioned transaction"); *In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (Bankr. S.D.N.Y. 1983) ("The touchstone of 'ordinariness' is . . . the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing, because their objections to such transactions are likely to relate to the bankrupt's chapter 11 status, not the particular transactions themselves.").

17. An important characteristic of an "ordinary" postpetition business transaction is its similarity to a prepetition business practice. *Marshack* v. *Orange Comm. Credit (In re Nat'l Lumber & Supply, Inc.)*, 184 B.R. 74, 79 (B.A.P. 9th Cir. 1995) (to qualify as ordinary course, payment must be consistent with past practices and industry standards). Relevant factors in determining whether a transaction is ordinary include the type of business a

debtor is engaged in as well as the size and nature of the business and transaction in question. *Harrison*, 115 B.R. at 598; *see also In re Hanson Indus., Inc.*, 90 B.R. 405, 413-24 (Bankr. D. Minn. 1988) ("[T]he size, nature, or both, of the transaction may be dispositive on the issue of ordinariness.  What may be ordinary for a large, multinational corporation engaged in a number of businesses is distinctly different from what is ordinary in a smaller corporation with lesser capital, fewer employees and fewer business transactions.").

18. Here, entry into, performance under, and amendment of Coal Sale Contracts is an ordinary course transaction based on the Debtors' industry and prepetition practices.  Coal Sale Contracts are at the core of the Debtors' businesses: selling coal pursuant to Coal Sale Contracts constitutes substantially all of the Debtors' revenue.  The Debtors' competitors similarly ship coal pursuant to long- and short-term contracts, and the Debtors historically compete on terms with those competitors.  All of the Debtors' creditors should expect the Debtors to operate and continue operating in this way.  As such, Coal Sale Contracts are transactions in the ordinary course of the Debtors' businesses.  The Debtors respectfully submit that they seek an order granting the relief requested herein solely out of an abundance of caution.

**B.    Authorizing the Debtors to Enter into the Coal Sale Contracts Is in the Best Interests of the Debtors and their Estates and Creditors**

19. Out of an abundance of caution and to the extent that the Debtors' actions with respect to the Coal Sale Contracts is outside of the ordinary course of business, sections 105(a) and 363(b) of the Bankruptcy Code also authorize the requested relief.  Section 105(a) of the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]"  11 U.S.C. § 105(a).  It permits a bankruptcy court to take whatever action "is appropriate or necessary in aid of the

exercise of its jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01. Similarly, section 363(b)(1) of the Bankruptcy Code authorizes a debtor to use property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1); *see also In re Apex Oil Co.*, 92 B.R. 847 (Bankr. E.D. Mo. 1988).

20. The well-settled "doctrine of necessity" also supports the requested relief. This rule authorizes postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. The Supreme Court of the United States first articulated the doctrine of necessity more than a century ago in affirming the authorization of using receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See, e.g., Miltenberger* v. *Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286, 309–11 (1882). The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See, e.g.*, 11 U.S.C. § 105(a); *In re Carlson*, 126 F.3d 915, 920 (7th Cir. 1997) ("Section 105(a) gives the bankruptcy court the authority to issue any order necessary to carry out the provisions of the Bankruptcy Code."); *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re NWFX, Inc.*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy, however, is that equitable principles govern . . . .").

21. This doctrine of necessity functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of

critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Wehrenberg, Inc.*, 260 B.R. 468 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor"); *see also In re Bos. & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("While the doctrine [of necessity] was not codified in the Bankruptcy Code, courts have used their equitable power under Section 105(a) of the Code to authorize the payment of prepetition claims . . . ."). The doctrine is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims.

22. This Court should authorize the Debtors to perform under or amend existing Coal Sale Contracts and enter into new Coal Sale Contracts because such contracts are vital to and necessary for the Debtors' operations. This authority will eliminate the need to prepare and prosecute piecemeal motions and obtain express court approval of every Coal Sale Contract and expedite the flow of cash into the estates. In addition, the relief requested will protect the Debtors against the risk of losing business opportunities or failing to meet existing obligations, maximize the production capabilities of the Debtors' active workforce, save the Debtors significant administrative costs, reduce professionals' fees, and enable the Debtors to continue their business and generate revenues for the benefit of their estates and their creditors.

23. Courts in this and other districts have routinely granted relief similar to the relief requested herein in other chapter 11 cases. *See, e.g.*, *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH) (Bankr. S.D. Ohio Dec. 10, 2019) (D.I. 388) (authorizing debtors to enter

into, perform under, and amend coal sale contracts); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 19, 2019) (D.I. 65) (same); *In re Cloud Peak Energy, Inc.*, No. 19-11047 (KG) (Bankr. D. Del. June 11, 2019) (D.I. 239) (same); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (D.I. 80) (same); *In re Peabody Energy Corp.*; No. 16-42529-399 (BSS) (Bankr. E.D. Mo. Apr. 15, 2016) (D.I. 125) (same); *In re Arch Coal, Inc.*, No. 16-40120-705 (CER) (Bankr. E.D. Mo. Jan. 14, 2016) (D.I. 89) (same); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015) (D.I. 86) (same). The Debtors submit that the circumstances of these chapter 11 cases warrant granting similar relief, and that doing so is in the best interests of the Debtors, their estates, their creditors, and their stakeholders, and therefore should be granted.

### Processing of Checks and Electronic Funds Transfers Should Be Authorized

24. The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and anticipated access to cash collateral. Also, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment made relating to the Coal Sale Contracts. Accordingly, the Debtors believe that only checks or wire transfer requests relating to authorized payments will be honored and that this Court should authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

25. The Debtors seek immediate authorization for the relief requested in this Motion. Pursuant to Bankruptcy Rule 6003(b), a bankruptcy court cannot grant "a motion to use,

sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within the first twenty-one (21) days after the petition date unless the relief is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b).  For the reasons set forth herein and in the First Day Declarations, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied Bankruptcy Rule 6003(b) and therefore respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

26. By this Motion, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause for a waiver of any stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 6004(h).  For the reasons set forth herein and in the First Day Declarations, the Debtors submit that notice of the relief requested herein is appropriate under the circumstances and that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

### Reservation of Rights

27. Nothing contained herein is intended or should be construed as (a) an admission as to the validity or priority of any claim or lien (or the priority thereof) against the Debtors, (b) a waiver of the Debtors' or any party in interest's rights to subsequently dispute or

contest such claim or lien on any grounds, (c) a promise or requirement to pay any claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion, (e) a request or authorization to assume or adopt any agreement, contract, or lease under section 365 of the Bankruptcy Code or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or applicable law.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute or contest such claim.

### Notice

28. Notice of this Motion will be provided to: (a) the Office of the United States Trustee for Region 13; (b) counsel to the Ad Hoc First Lien Group; (c) counsel to the Ad Hoc Crossover Group; (d) counsel to the Facilities Agent; (e) counsel to the Term Agent; (f) counsel to the Indenture Trustee; (g) counsel to the collateral trustee under the Debtors' secured debt facilities; (h) counsel to the DIP Agent; (i) counsel to DIP Lenders; (j) counsel to Murray Energy Corporation; (k) counsel to Reserves; (*l*) counsel to Javelin; (m) counsel to Uniper Global Commodities UK Limited; (n) the Internal Revenue Service; (o) the Securities and Exchange Commission; (p) the United States Attorney's Office for the Eastern District of Missouri; (q) the state attorneys general for all states in which the Debtors conduct business; (r) the counterparties to the Debtors' existing Coal Sale Contracts; (s) the holders of the thirty (30) largest unsecured claims against the Debtors, on a consolidated basis; and (t) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Notice of this Motion and any order entered hereon will be served in accordance with rule 9013-3(A)(1) of the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri

(the "Local Bankruptcy Rules").  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

WHEREFORE, the Debtors respectfully request entry of the Proposed Orders granting the relief requested herein and such other relief as is just and proper.

Dated: March 10, 2020
St. Louis, Missouri

Respectfully submitted,

ARMSTRONG TEASDALE LLP

 /s/  Richard W. Engel, Jr.
Richard W. Engel, Jr. (MO 34641)
John G. Willard (MO 67049)
Kathryn Redmond (MO 72087)
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
Tel:    (314) 621-5070
Fax:   (314) 621-5065
Email: rengel@atllp.com
          jwillard@atllp.com
          kredmond@atllp.com

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Paul M. Basta (*pro hac vice* admission pending)
Alice Belisle Eaton (*pro hac vice* admission pending)
Alexander Woolverton (*pro hac vice* admission pending)
1285 Avenue of the Americas
New York, New York  10019
Tel:    (212) 373-3000
Fax:   (212) 757-3990
Email: pbasta@paulweiss.com
          aeaton@paulweiss.com
          awoolverton@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*