# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF ROBERT D. MOORE, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF FORESIGHT ENERGY LP, IN SUPPORT OF CHAPTER 11 PETITIONS

I, Robert D. Moore, do hereby declare, under penalty of perjury, that:

1.      I serve as the President and Chief Executive Officer of Foresight Energy GP LLC ("GP LLC"), the general partner of Foresight Energy LP ("FELP"), a publicly-held limited partnership organized under Delaware law that is affiliated with each of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or "Foresight").  I have served in my current capacity since May 2015.  Before that appointment, I held a number of other senior management positions within the coal industry, and have more than twenty-eight (28) years of experience in management, operations, finance, accounting, and acquisitions in the coal industry.  I received my Bachelor of Science degree from The Ohio State University in Accounting and Finance, Certified Public Accountant certification from the State of Ohio, and

---

[1]     The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

Master of Business Administration degree from The Ohio State University.

2.     In my capacity as Chief Executive Officer, my responsibilities include overseeing Foresight's operations and financial activities including monitoring cash flow, business relationships, workforce issues and financial planning.  In this capacity, I have been extensively involved in the events leading up to the commencement of these chapter 11 cases. Moreover, as a result of my tenure with Foresight, my review of public and non-public documents, and my discussions with other members of Foresight's management team, I have detailed knowledge of, and experience with, Foresight's businesses, financial affairs, day-to-day operations, books and records and the coal industry in which Foresight operates.

3.     Today (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") seeking relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  As described herein, before the Petition Date, and following lengthy, good faith negotiations, the Debtors entered into separate Restructuring Support Agreements (as defined herein) with (a) holders of over (i) 69% of the First Lien Loans and (ii) 82% of the Second Lien Notes, and (b) certain key contract counterparties.  Pursuant to the Restructuring Support Agreements, the Debtors' stakeholders have agreed to support a globally consensual financial restructuring of the Debtors' capital structure and related contractual obligations.  The substantial benefits this agreed restructuring will provide to the Debtors, include, among other things, a substantial de-leveraging of Foresight's balance sheet through a reduction of over $1 billion of funded indebtedness, a significant reduction in the Debtors' ongoing royalty and other contractual obligations, and competitively positioning the Debtors for further success upon emergence from these cases by providing the Debtors with sufficient post-restructuring liquidity and ongoing operational arrangements.  Given these substantial benefits, as discussed herein, I

believe that the Debtors' entry into the Restructuring Support Agreements and their support of the proposed restructuring represents a sound exercise of the Debtors' business judgement and is in the best interests of the Debtors' estates, creditors, and stakeholders.

4.    I submit this declaration (this "Declaration") in support of the Petitions and to provide an overview of Foresight, the events leading up to the Petition Date, and Foresight's current circumstances.  In addition, Alan Boyko, a Senior Managing Director of FTI Consulting, Inc. ("FTI"), Foresight's financial advisor, has submitted a declaration contemporaneously herewith (the "Boyko Declaration") in support of the Debtors' relief requested in various motions and applications (the "First Day Motions") filed with the Petitions. Finally, I refer to the declaration of Seth Herman in support of the Debtors' motion for approval of debtor-in-possession financing and use of cash collateral (the "Herman Declaration").

5.    Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees with responsibility for the relevant business and corporate matters, or my opinion based upon experience, knowledge, and information concerning Foresight and the coal industry.  I am authorized to submit this declaration on behalf of each Debtor, and if called upon to testify, I would testify to the facts set forth herein.

6.    Section I of this declaration describes the Debtors' history, businesses, operations, and corporate structure.  Section II provides an overview of the Debtors' current financial position, indebtedness, and capital structure.  Finally, Section III describes the Debtors' prepetition restructuring efforts, the events leading up to the filing of the Petitions, and the Debtors' proposed restructuring and path forward in these chapter 11 cases.

3

## I.    <u>Overview of Foresight</u>

**A.    Business Introduction, History, and Overview**

7.    Initially founded in 2006 by Christopher Cline and The Cline Group LLC (the "<u>Cline Group</u>"), Foresight is a leading producer of thermal coal.  Foresight employs approximately 790 people and operates four (4) major mining complexes in the Illinois Basin encompassing central and southern Illinois.  From its corporate headquarters in St. Louis, Missouri, Foresight has the rights to mine nearly 2.1 billion tons of proven and probable coal reserves strategically located near multiple road, rail, and river transportation access points in the Illinois Basin, including Foresight's wholly-owned barge-loading river terminal on the Ohio River and separate barge access along the Mississippi River.  From this strategic position, Foresight sells its coal primarily to electric utility and industrial companies located in the eastern half of the United States, and exports a substantial amount of coal internationally.  Altogether, Foresight's operations generated approximately $834 million in revenue related to coal sales and $185 million of Adjusted EBITDA in the year 2019.

8.    Foresight's primary competitive advantage and business function has been its ability to efficiently mine and, from a strategic and central location, ship low-cost but high-quality thermal coal.  The Illinois Basin has been a lucrative investment location for both its sediment geology and its coal type.  Specifically, Foresight's thermal coal reserves can support a heat content (British Thermal Units, or BTU) ranging from 10,800 BTU per pound to nearly 11,900 BTU per pound.  This level of BTU provides a higher than average heat ratio as against the total amount of coal purchased globally, enabling Foresight's customers to effectively purchase more energy with comparatively lower expenditures on transportation and storage costs.

4

9.     In addition, the geological makeup of Foresight's coal reserves is compatible with the highly productive "longwall" mining method because they generally consist of three (3) large, contiguous blocks of thick-seam coal with a relatively consistent sediment content over the course of the reserves.  Longwall mining systems, which are described further herein, are efficient due to their autonomous and continuous coal production, enabling Foresight to produce a high ratio of coal relative to the number of personnel needed to safely operate a longwall mining system.  This allows Foresight to provide competitive prices to its customers per ton of coal produced.

10.     Foresight currently operates four (4) of these longwall operations in addition to other mining methods.  Altogether, Foresight has capacity to maintain up to seven (7) longwall operations in its existing mining complexes without obtaining new coal reserves.

11.     Foresight also enjoys a central location in the United States near multiple forms of transportation, which ensures it can limit its transportation costs and remain a low-cost coal producer.  From this central location, Foresight maintains a variety of coal transportation operations, including rail, truck and river options, all of which Foresight uses to transport its coal in an economically efficient manner.

12.     Chief among these options is Foresight's Sitran Terminal, a transloading facility located on the Ohio River near Evansville, Indiana.  This facility is a transportation hub for enormous quantities of coal, capable of receiving coal originating from each of the Norfolk Southern, CSX Corporation, and Burlington Northern railroad networks via the Evansville Western Railroad, and is able to blend coal and store over 1 million tons of processed coal on site.  Collectively, these transportation and transloading options allow Foresight the flexibility

necessary to ship or transport coal at competitive logistics costs in an otherwise challenging industry environment.

13.     Foresight Energy LP completed its initial public offering on the New York Stock Exchange ("NYSE") on June 23, 2014, with certain of its LP Units (as defined herein) being tradeable by the public.  Following this success, Foresight's now affiliate, Murray Energy Corporation ("MEC," and together with its non-Foresight affiliates, "Murray"), purchased as significant equity stake in Foresight in April 2015, with a further equity acquisition taking place in March 2017.  Today, as discussed further herein, Foresight operates as an independent producer of coal.  As an unrestricted subsidiary within the Murray corporate group, Foresight uses its relationship with Murray and Murray's affiliates, along with Foresight's substantial logistical and customer relationships, to serve a number of major coal purchasers across the globe.

**B.     Foresight's Mining & Other Operations**

14.     As noted above, Foresight predominantly uses longwall mining methods in its coal production.  Longwall operations are initially capital-intensive, but are highly-productive with the correct sediment make-up and are operationally low-cost once implemented.  These operations use underground hydraulic shields to support the roof and walls of a mine, while a shearing machine operates concurrently along the coal face—the portion of a coal seam being mined—to remove coal with each pass of the shearer.  Coal mined from the longwall is then funneled into a large, armored conveyor belt that moves coal around the mine to the surface or to processing and cleaning centers.  An illustrative diagram of the longwall mining process follows:



15.    A longwall operation is generally then supported by "continuous mining units," which both contribute to coal mining and production and also to prepare an area of the mine for new or additional longwall operations.  Continuous mining units are essentially large underground vehicles that continuously mine sections of earth, and use mechanized rakes under the unit to scoop coal and other sediment automatically into a flexible conveyor belt that trails behind the unit.

16.    Foresight uses these mining methods in operating its four mining complexes.  In 2018 and 2019, respectively, Foresight's coal complexes produced approximately 23.3 million and 19.9 million tons of coal, generated approximately $1.1 billion and $834 million in coal sales revenue, and resulted in approximately $314 million and $185 million in Adjusted EBITDA.  The pertinent details of Foresight's mining operations are indicated below.



17.    *Sugar Camp*.  The Sugar Camp mining complex is Foresight's largest complex.  It contains two integrated mining operations that share the same surface infrastructure and similar mining equipment and transportation.  These mining operations consist of M-Class #1 Mine and the Viking Mine, each of which are owned by Debtor Sugar Camp Energy, LLC, and jointly operated by Debtors M-Class Mining LLC and Viking Mining LLC.  The Sugar Camp complex operates two of Foresight's highly-efficient longwall mining systems and four continuous mining units, and in 2018 and 2019, respectively, collectively produced approximately 14.5 million and 12.8 million tons of coal.  With two longwall operations, Sugar Camp was the most productive coal mine in the United States in 2019 on a "clean tons produced per underground man hour basis," which is determined by data held by the federal Mine Safety and Health Administration ("MSHA").  As of December 31, 2019, Sugar Camp maintains approximately 1,297.1 million tons of proven and probable coal reserves.

18.    *Williamson*.  The Williamson mine, denominated the Mach #1 Mine or the Pond Creek Mine No. 1, was Foresight's first operational mining complex started in 2008 and is owned by Debtor Williamson Energy, LLC and operated by Debtor Mach Mining LLC.

8

Williamson is a low-sulfur, high-BTU mine selling coal primarily to international markets. Williamson maintains one longwall mining system with supporting continuous mining units, and in 2018 and 2019, respectively, collectively produced approximately 6.9 million and 5.2 million tons of coal.   Given its longwall operation, Williamson was the third-most productive underground coal mine in the United States in 2019.  As of December 31, 2019, Williamson maintains approximately 358.6 million tons of proven and probable coal reserves.

19.    *Macoupin*.  The Macoupin mine, denominated the Shay #1 Mine, is owned by Debtor Macoupin Energy LLC and operated by Debtor MaRyan Mining LLC.  Macoupin operates two continuous miner units utilizing a flexible conveyor train system.  Of Foresight's mines, Macoupin is the only mine with no current plans to implement a longwall mining system. In 2018 and 2019, respectively, Macoupin produced approximately 2.0 million and 1.7 million tons of coal.  As of December 31, 2019, Macoupin maintains approximately 72.9 million tons of proven and probable coal reserves.  As discussed further herein, given its current and anticipated near-term deficiencies with its coal quality and higher cost structure, each as compared with Foresight's other mines, Macoupin is scheduled to temporarily idle its mining operations in the near-term.

20.    *Hillsboro*.   The Hillsboro mine, denominated the Deer Run Mine, is owned by Debtor Hillsboro Energy LLC and operated by Debtor Patton Mining LLC.   As discussed further herein, following a combustion event in March 2015 causing the temporary idling of mining operations, Hillsboro returned to operation in January 2019 with one continuous miner unit.  Following approximately $27 million in prepetition capital investments, Hillsboro has recommenced full longwall mining operations at a favorable cost structure during March of 2020.  With recommencement of longwall operations, Hillsboro is anticipated to have capacity to

produce up to approximately 9.0 million tons of coal per year. As of December 31, 2019, Hillsboro maintains approximately 321.9 million tons of proven and probable coal reserves.

21.     Foresight also engages in the purchase, repair, maintenance, and sale of general and specialized mining equipment and supplies. While certain of these operations relate to those made in transactions with third-parties, as discussed further in the Boyko Declaration, most of these operations are performed by and between Foresight entities or with their non-Debtor affiliates in the ordinary course of business.

22.     As mentioned above, Foresight owes much of its competitive ability to its flexible transportation options and centralized and streamlined transportation operations, enabling Foresight to reach a geographically broad and diverse customer base at prices the rest of the coal industry cannot generally reach. As of December 31, 2019, Foresight owns three (3) locomotives and leases hundreds of railcars. These transportation options are further empowered by river access to the Sitran Terminal, which is owned and operated by Debtor Sitran LLC. The Sitran Terminal currently has a single rail loop, a bottom discharge rail car unloader, stacking tubes to facilitate ground storage and coal blending, barge loading capabilities, and throughput capacity of up to 25 million tons of coal per year. Notably, as set forth on following chart, all of Foresight's mining complexes have access to the low-cost transportation provided by the Sitran Terminal's river and barge access.

| Complex | | Williamson | Sugar Camp | Hillsboro | Macoupin |
|---|---|---|---|---|---|
| Rail | CN | ✓ | ✓ | ✓ | ✓ |
| | UP | ✓ | ✓ | ✓ | ✓ |
| | NS | ✓ | ✓ | ✓ | ✓ |
| | CSX | ✓ | ✓ | — | — |
| | BNSF | — | ✓ | — | — |
| River / Barge | OH | ✓ | ✓ | ✓ | ✓ |
| | MS | ✓ | ✓ | ✓ | ✓ |
| Truck | | ✓ | ✓ | ✓ | ✓ |
| Market Focus | | Export | Domestic | Domestic | Domestic |

23.     These transportation options give Foresight great access to customers from the Midwest to the eastern seaboard of the United States.  Indeed, using these options, for the year ended December 31, 2019, approximately 21% of Foresight's coal sales volume was shipped to domestic customers by barge, 48% to domestic customers by rail or truck, and the remainder exported internationally.   As discussed further herein, Foresight's international customers are reached through seaborne transportation and exports facilitated by Javelin Global Commodities (UK) Ltd. (collectively with its non-Debtor affiliates, "Javelin"), whose equity is owned 34% by Murray, with the remainder owned by Javelin's management team and Uniper Global Commodities SE (formerly EON).  In connection with these international arrangements with Javelin, Foresight will generally transport its coal to transloading facilities where Javelin, with its expansive international export infrastructure, logistics, and customer relationships, will proceed to ship the coal globally to wherever the ultimate purchaser is located.

**C.    Foresight's Customer Base**

24.    Foresight's chief domestic customers include electric utility power plants and industrial companies making use of coal-heated steam boilers or other industrial processes using coal as a production material.  Foresight's domestic customers are primarily spread across the eastern half of the United States.  A summary map of facilities and customers serviced by Foresight is included below:



25.    Similar to Foresight's domestic customer base, Foresight's ultimate foreign end-users consist of utilities, industrial companies or intermediaries that can make use of Foresight's scrubbed coal, or coal that is blended with materials sufficient to meet end-market emission standards.  These end-users are located throughout the globe, including countries in Europe, South America, Africa, and Asia.  Foresight does not negotiate directly with such foreign end-users, and instead, works with Javelin as its international broker and purchaser of

coal.  Upon locating a final international purchaser of Foresight's coal, Javelin will purchase Foresight's coal for itself and perform the logistics and transportation necessary to ship the coal to the ultimate international purchaser, who then buys the coal from Javelin.  This arrangement allows Foresight to economically reach a broad international market for its coal without the associated costs and risks of marketing, transporting, and supplying such coal to the same.  Altogether, export coal sales represented approximately 17%, 27%, 38%, and 31% of Foresight's total tons of coal sold for calendar years 2016, 2017, 2018, and 2019, respectively.  A summary map of the international customers served by Foresight is included below:



**D.**     **Foresight's Corporate Structure and Debtor Information**

26.     Foresight consists of thirty-one (31) entities.  Hillsboro Energy LLC and Patton Mining LLC (together, the "Deer Run Mine Entities"), along with Foresight Receivables LLC ("Foresight Receivables" and, together with the Deer Run Mine Entities the "Non-Guarantors") are the only entities within Foresight's corporate group who do not guarantee Foresight's secured indebtedness discussed in Section II.  Foresight's entities generally operate on a consolidated basis, and account for various intercompany transactions among such entities on their respective books and records in the ordinary course of business.  As noted above, FELP is itself an independent and unrestricted subsidiary of Murray, which also owns 80% of the

13

voting interests in GP LLC, with the remainder owned by Foresight Reserves LP ("Reserves"), an affiliate of the Cline Group.  Foresight's full corporate organizational structure is set forth in **Exhibit A** attached hereto.

27.    The majority of Foresight's entities are "Restricted Subsidiaries" within the meaning of the documents governing Foresight's secured indebtedness.  Such entities guarantee Foresight's secured indebtedness, which is secured by substantially all of such entities' assets, including all assets and operations related to the Macoupin, Sugar Camp, and Williamson mining complexes, the Sitran Terminal, and Foresight's corporate headquarters.  Conversely, the Deer Run Mine Entities are "Unrestricted Subsidiaries," which means that the Hillsboro mining complex and the assets and operations maintained at the Deer Run Mine Entities are not subject to the liens and claims of the Debtors' lenders.  In addition, Foresight Receivables is not a guarantor of any of the Debtors' prepetition secured debt.  In the ordinary course of business, the guarantors of Foresight's prepetition secured debt provide financial and operational support to the Deer Run Mine Entities, including corporate management services, to the extent necessary to perform business operations.

i.    Foresight Entity Roles

28.    Each Foresight entity performs a specific role or function in the overall business enterprise.  Such roles generally fall into the following categories:

29.    *Holding and Capital Structure Companies*.  These entities hold groups of other specific entities in the Foresight enterprise, and have a key role in major capital or management decisions at Foresight.  Foresight Energy LLC ("FELLC"), is the main holding company for the Foresight enterprise, and is wholly-owned directly by FELP.  From this position, FELLC maintains control over the operating, labor, contracting and sales divisions of

14

the Foresight enterprise, and it performs key capital, cash management, debt and corporate management activities over the rest of the structure. Given its position as the key holding company, FELLC is the borrower under Foresight's First Lien Loans (as defined herein). In addition, FELLC, together with Foresight Energy Finance Corporation ("Foresight Finance"), are co-issuers of Foresight's Second Lien Notes (as defined herein).

30.     *Operating and Asset Owning Companies.* Most of Foresight's physical assets and operations are held and conducted by its operating companies. This primarily includes its mining complexes, coal reserves, and related coal mining machinery, equipment, materials and supplies, which are held by Sugar Camp Energy, LLC, Williamson Energy, LLC, Macoupin Energy LLC, and Hillsboro Energy LLC. These entities are Foresight's primary drivers of revenue, maintaining its coal mines, production and processing plants, and the facilities and equipment necessary to prepare the coal for broader transport to Foresight's customers. Related to these operating entities is Seneca Rebuild LLC, which performs Foresight's machinery and equipment rebuilding, maintenance, and repair operations.

31.     Foresight also maintains a number coal transportation and transloading-based companies, whose primary functions are to facilitate the shipment of Foresight's coal to its customers or to prepare coal for international export with cooperation from Javelin. As noted, Foresight's main transportation hub, the Sitran Terminal, is owned and operated by Sitran LLC. Foresight also maintains additional transportation-related operating companies through Oeneus LLC (d/b/a Savatran LLC) and Hillsboro Transport LLC, which generally maintain transportation related assets such as locomotives, railcars, and coal hauling vehicles or maintain sale-leaseback arrangements or transportation contracts for the same with lessors or shipping companies.

32.    *Labor Companies*.    Apart from its operating companies, Foresight maintains the employment for its employees through separate companies.  These labor-related companies then provide labor, mine operating and supervisory, and corporate employment services to the applicable Foresight entities.  Many of these labor companies are owned through a collection of labor-related holding companies such as Foresight Energy Employee Services Corporation and Foresight Energy Labor LLC.  The primary labor providers within the Foresight group are M-Class Mining LLC, Viking Mining LLC, MaRyan Mining LLC, Mach Mining LLC, and Patton Mining LLC.  These entities provide critical labor and operational services for Foresight's mining operations, and are essential for the production and processing of coal.

33.    The other labor-related companies provide key or supplementary services across the Foresight enterprise.  For example, (a) Coal Field Construction Company LLC provides employees, management, and on-the-ground supervisors for Foresight's mining complexes, (b) Coal Field Repair Services LLC provides employees who perform the rebuild, maintenance, and repair services for Foresight's mining machinery, equipment, and related vehicles, and  (c) Foresight Energy Services LLC provides corporate employee services.  Additional labor companies are Logan Mining LLC and LD Labor Company LLC, which provide supplementary labor services in the future in the event of expansion of Foresight's mining activities.

34.    *Contracting Companies*.  Foresight maintains two types of contracting companies.  The first consists of Adena Resources, LLC and Akin Energy LLC, whose primary function is to acquire and maintain various water right-of-way or other water-use rights to the Foresight enterprise.  These agreements and rights generally serve to facilitate Foresight's water-based coal shipment activities, or otherwise service their coal production processes.  The other

type of contracting companies consists of American Century Mineral LLC and American Century Transport LLC.  As discussed further in the Boyko Declaration, these two entities maintain Foresight's Lease and Overriding Royalty Agreements (as defined in the Boyko Declaration) with subsidiary affiliates of Murray, whereby Murray pays Foresight for coal mined and sold from certain mines.

35.    *Sales Companies*.  Finally, Foresight maintains two companies whose primary purpose is to facilitate the sale of Foresight's coal.  Foresight Coal Sales LLC is the primary contracting party for Foresight's coal sale agreements with its customers, covering the sales of coal produced from all of its mining complexes.  Any receipts on account of Foresight's coal sales are then received in a bank account owned and maintained by Foresight Receivables, which later sweeps such payments into a cash concentration account maintained at FELLC.

      ii.    <u>Foresight Corporate Management and Oversight</u>

36.    General decision making at Foresight is controlled by GP LLC's board of directors (the "<u>Board</u>"), subject to Foresight's organizational documents, pursuant to GP LLC's role as FELP's general partner.  GP LLC is wholly-owned by MEC and Reserves.  MEC holds an 80% voting interest in GP LLC, with Reserves holding the remaining 20%.  GP LLC's six-person Board is comprised of (a) two members who are officers of MEC, (b) one member who is an officer of Reserves, and (c) three members who are independent directors (the "<u>Independent Directors</u>").

37.    *Conflicts Committee*.  In connection with Foresight's restructuring and contemplated chapter 11 cases, and Murray's chapter 11 cases, which were commenced on October 31, 2019 (Murray's collective chapter 11 cases, the "<u>Murray Chapter 11 Cases</u>"), the Board designated the conflicts committee (the "<u>Conflicts Committee</u>") consisting of the three

17

Independent Directors with the power and authority to, on behalf of Foresight: (a) review and evaluate any and all matters (a "Restructuring Matter") relating to any financial or corporate restructuring of either Murray (each, a "Murray Restructuring") or Foresight (each, a "Foresight Restructuring," and together with a Murray Restructuring, a "Restructuring"); (b) exercise the full authority of the Board with respect to the approval of any Restructuring Matter; (c) determine whether any Restructuring is advisable and not adverse to the interest of Foresight and the holders of the LP Units (as defined herein) who are not affiliated with the members of GP LLC; and (d) as the Conflicts Committee determines appropriate, deem such other Restructuring Matters to be subject to the Conflicts Committee's authority or, alternatively, to be appropriate for evaluation and determination by the Board.  This broad grant of authority to the Conflicts Committee was intended to ensure that all decisions made by Foresight with respect to any Murray Restructuring Matter, as well as all Foresight Restructuring Matters separate from Murray, are made impartially.

38.     In the period leading up to Foresight's Petition Date, the Board and the Conflicts Committee have regularly received reports from Foresight's management and advisors[2] regarding all material Foresight Restructuring Matters, updates on the Murray Chapter 11 Cases, and affiliate matters, including discussion of intercompany transactions among Foresight and each of Murray, Javelin, and Reserves.

39.     *Management Services Agreement*.   In connection with Murray's acquisition of Foresight, Murray-affiliate Murray American Coal, Inc. and GP LLC entered into the *Third Amended and Restated Management Services Agreement*, effective as of March 28,

---

[2]     In connection with these cases and its restructuring, and to protect its own interests, Foresight has retained its own independent advisors, consisting of:  Paul, Weiss, Rifkind, Wharton & Garrison LLP, as restructuring counsel, Armstrong Teasdale LLP, as local restructuring co-counsel, Jefferies LLC, as investment banker, Jefferies LLC, and FTI, as financial advisor.

2017 (the "Management Services Agreement").   Pursuant to the Management Services

Agreement, and as discussed further in the Boyko Declaration, Murray provides Foresight with

certain key employees and manages and administers the general operations of GP LLC, FELP,

and their subsidiaries.   Murray also from time to time reimburses certain expenses Foresight

incurs on Murray's behalf.   Under the Management Services Agreement, in return for the

foregoing services, Foresight is obligated to pay a quarterly management fee of $5,000,000.   As

of the Petition Date, Murray provides Foresight with key employees, including myself as

Chairman of Foresight's Board and Foresight's President and Chief Executive Officer, and

Jeremy Harrison as Foresight's Chief Accounting Officer.

> 40.     As noted, the Murray Chapter 11 Cases are currently pending in the

United States Bankruptcy Court for the Southern District of Ohio (the "Murray Bankruptcy

Court"), under the lead case *Murray Energy Holdings Co.*, No. 19-56885 (JEH).   While the

Murray Chapter 11 Cases and Foresight's chapter 11 cases constitute separate bankruptcy

proceedings, Murray and Foresight have coordinated, where appropriate, to ensure both a smooth

transition for Foresight into its chapter 11 proceedings, and to be mindful of Murray's rights as

debtors in the Murray Chapter 11 Cases.   Part of this coordination includes the relief that Murray

received under its cash management orders, respectively dated October 30, 2019 (D.I. 91) and

December 10, 2019 (D.I. 389), whereby the Murray Bankruptcy Court authorized Murray

maintain its intercompany arrangements with Foresight and to pay Foresight's resulting

intercompany claims against Murray, and also granted Foresight's postpetition intercompany

claims against Murray administrative expense priority status.   As is discussed in detail in the

Boyko Declaration, Foresight has requested similar relief in its cash management motion to

maintain its intercompany arrangements with Murray, subject to the requirements under the DIP Facility.

**II.**     **Overview of Foresight's Financial Position and Prepetition Debt Structure**

41.     Foresight generated total consolidated operating revenues of approximately $842 million for the fiscal year ending December 2019. These amounts were based in large part off of selling approximately 19.7 million tons of coal, which sold for an average of approximately $42 per ton, depending on coal quality, production costs, and transportation costs. Supporting this revenue, Foresight maintains approximately $2.2 billion in total consolidated assets as of the Petition Date. As noted above, these assets are primarily spread across its four (4) mining complexes and the Sitran Terminal, with Foresight owning approximately $1.9 billion in mining and transportation property, equipment, and supplies, and approximately 2.1 billion in proven and probable coal reserves.

42.     As of the Petition Date, Foresight has approximately $1.33 billion in total secured debt obligations, consisting of approximately: (a) $157 million in principal amount outstanding under a revolving first lien credit facility, (b) $743.3 million in principal amount outstanding under a first lien term loan facility, and (c) $425 million in principal amount outstanding under 11.5% second lien notes. In addition, as of the Petition Date, Foresight had, among other liabilities, approximately (i) $56.5 million in asset retirement and mine reclamation obligations, (ii) $99.8 million in outstanding surety bonds for performance and other bonding obligations, (iii) $11.3 million in workers' compensation and "black lung" obligations (including estimates for obligations incurred but not reported), and (iv) $109.7 in general accounts payable and trade payable. Foresight also maintains a number of intercompany arrangements among its

entities, and with each of Murray, Javelin, and Reserves, in the ordinary course of business, which are all discussed in the Boyko Declaration.

**A.      Foresight's Funded Indebtedness**

   i.   <u>First Lien Facilities</u>

43.     FELLC, as borrower, and FELP and the subsidiaries of FELLC (other than the Non-Guarantors), as guarantors, are each a party to that certain Credit and Guaranty Agreement, dated as of March 28, 2017 (as amended, modified, restated, or supplemented from time to time, the "<u>First Lien Credit Agreement</u>") with The Huntington National Bank, as facilities administrative agent (the "<u>First Lien Administrative Agent</u>"), Lord Securities Corporation, as term administrative agent (the "<u>Collateral Agent</u>"), Goldman Sachs Lending Partners LLC, The Huntington National Bank, Deutsche Bank Securities Inc., and Citigroup Global Markets Inc., each as joint lead arrangers and joint bookrunners, Goldman Sachs Lending Partners LLC, as syndication agent, and the other lenders a party thereto (collectively, the "<u>First Lien Lenders</u>").

44.     The First Lien Credit Agreement provides for both a revolving credit facility, including participation in letter of credit obligations and swing-line loans (collectively, the "<u>First Lien Revolver</u>") and a term loan facility (the "<u>First Lien Term Loan</u>," and collectively with the First Lien Revolver, the "<u>First Lien Loans</u>").  The obligations under the First Lien Credit Agreement in respect of the First Lien Revolver and First Lien Term Loan rank *pari passu* and are secured by (a) liens on substantially all of Foresight's assets, other than those assets held by the Non-Guarantors, and (b) a pledge of 100% of the equity interests of FELP's direct and indirect subsidiaries, including the Deer Run Mine Entities, but *excluding* Foresight Receivables

((a) and (b) together, the "Prepetition Collateral").  The First Lien Credit Agreement is governed by New York law.

45.    The First Lien Revolver bears interest at the London Interbank Offered Rate ("LIBOR"), plus 5.25% per annum, with a 1.0% LIBOR floor.  The First Lien Term Loan bears interest at a rate of LIBOR plus 5.75%.  The First Lien Revolver matures on March 28, 2021 and the First Lien Loan matures on March 28, 2022, though both are subject to earlier prepayment of outstanding borrowings based on excess cash flow, determined on an annual basis.  The First Lien Credit Agreement contains a financial maintenance covenant solely for the benefit of the First Lien Revolver, requiring compliance on a quarterly basis with a maximum net first lien secured leverage ratio of 3.50 to 1.00.  As of the Petition Date, approximately $157 million in principal amount remains outstanding under the First Lien Revolver and approximately $743.3 million in principal amount remains outstanding under the First Lien Term Loan.

ii.    Second Lien Notes

46.    FELLC and Foresight Finance co-issued the $425.0 million of 11.50% Second Lien Senior Secured Notes due 2023 (the "Second Lien Notes," and the holders of such notes, the "Second Lien Noteholders") pursuant to that certain Indenture, dated as of March 28, 2017 (as amended, modified, restated, or supplemented from time to time, the "Second Lien Notes Indenture"), by and among FELLC and Foresight Finance, as Issuers, the guarantors a party thereto, and Wilmington Trust, National Association, as trustee (the "Second Lien Indenture Trustee").  The guarantors of the Second Lien Notes are the same as the guarantors of the First Lien Loans, with the exclusion of FELP, who is not a guarantor of the Second Lien Notes, and Foresight Finance, who is only an issuer of the Second Lien Notes.

47.     The obligations under Second Lien Notes are secured by second priority secured liens and applicable equity pledges in the Prepetition Collateral.  The Second Lien Notes Indenture and the Second Lien Notes are governed by New York law.  The Second Lien Notes bear interest at a rate of 11.50% per annum, and mature on April 1, 2023.  As of the Petition Date, approximately $425 million in principal amount remains outstanding under the Second Lien Notes.

iii.     Existing Intercreditor Agreement

48.     The respective rights and interests of the First Lien Lenders and Second Lien Noteholders under the First Lien Credit Agreement and Second Lien Notes Indenture, respectively, are governed by that certain Collateral Trust Agreement, dated as of March 28, 2017 (as amended, modified, restated, or supplemented from time to time, the "Existing Intercreditor Agreement") among FELLC, the Grantors (as defined in the Existing Intercreditor Agreement) from time to time party thereto, the First Lien Administrative Agent, as administrative agent, the Second Lien Indenture Trustee, as trustee, and the Collateral Agent, as collateral trustee.  Specifically, the Existing Intercreditor Agreement governs the lenders' respective rights and interests relating to, among other things, their rights to the Prepetition Collateral and their ability to exercise remedies in connection with an event of default. Additionally, the Existing Intercreditor Agreement sets forth the First Lien Lenders' and Second Lien Noteholders' relative rights and obligations in the event of a chapter 11 filing by Foresight, including various enforcement, standstill, turnover, and debtor-in-possession financing provisions.  Pursuant to the Intercreditor Agreement, the liens covering the Second Lien Notes and their related obligations under the Second Lien Notes Indenture are subordinate to any liens

covering the First Lien Loans and their related obligations under the First Lien Credit Agreement.

**B.      Foresight's Other Financing Arrangements and Indebtedness**

      i.      Asset Retirement and Mine Reclamation Obligations

      49.      As is standard in the coal industry, Foresight has general asset retirement obligations related to mine reclamation and closure costs.  Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface Mining Control and Reclamation Act, as well as certain analogous state laws.

      50.      Foresight's asset retirement obligations consist of spending estimates for surface land reclamation and support facilities at their mining complexes in accordance with applicable reclamation laws in the United States, as primarily defined by each mining permit. Asset retirement obligations are determined for each mine using various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage, and the timing of these cash flows, discounted using a credit-adjusted, risk-free rate.  As of the Petition Date, Foresight estimates that it has approximately $56.5 million in asset retirement and mine reclamation obligations.

      ii.      Performance, Reclamation, and Surety Bond Obligations

      51.      As discussed further in the Boyko Declaration, Foresight is required to provide various surety bonds to governmental and regulatory agencies in connection with its mining activities.  The vast majority of these surety bonds relate to Foresight's asset retirement and reclamation obligations.  The remaining bonds generally are performance, utility or financial

bonds to secure obligations Foresight is or may be required to pay under applicable law. Indemnity National Insurance Co. ("INIC") has issued all of these bonds, as rewritten to INIC from Argonaut Insurance Company as of December 10, 2019.  Approximately $2.5 million of cash collateral has been posted with INIC to secure Foresight's obligations under the bonds, with Foresight obligated to post additional cash collateral with INIC pursuant to the applicable indemnity agreements.  Foresight currently has outstanding surety bonds with a total face amount of $99.8 million, of which approximately $92 million secures its reclamation and other asset retirement obligations.

   iii. <u>Sale-Leaseback and Similar Obligations</u>

   52. Foresight is party to several sale-leaseback arrangements with subsidiaries of Natural Resource Partners LP ("NRP"), whereby NRP's subsidiaries purchased certain coal reserves and rail facility assets from Foresight relating to its Macoupin and Sugar Camp mines, then leased such assets back to Foresight.  Foresight maintains continuing involvement in the assets sold and leased back.  As of the Petition Date, the Macoupin sale-leaseback arrangement had a carrying value of $104 million, with minimum annual payments of $16 million and an effective interest rate of 8.1%, and the Sugar Camp sale-leaseback arrangement had a carrying value of $55 million, with annual minimum payments of $5 million and an effective interest rate of 3.5%.

   iv. <u>Workers' Compensation and Black Lung Act Obligations</u>

   53. As required by the federal Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977 (together, the "Black Lung Act"), Foresight provides benefits to employees related to workers' compensation and pneumoconiosis (commonly known as black lung disease).  Pursuant to the Black Lung Act, coal miners who

suffer from pneumoconiosis and their dependents may file disability claims with the U.S. Department of Labor (the "DOL"), which then investigates the claims and assigns liability to make benefit payments for those claims ("Black Lung Act Claims") to a "responsible operator," usually the coal miner's most recent employer or a successor of the employer.

54.     Black Lung Act Claims include claims for the payment of (a) disability benefits to workers who suffer from black lung disease and (b) taxes to fund the Black Lung Disability Trust Fund (the "Black Lung Fund").  If a responsible operator fails to pay applicable benefits, the Black Lung Fund will pay such benefits and the DOL may then (i) assert liens, with the same priority as tax claims, against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant.  In addition, the Black Lung Act requires a coal operator to either secure its payment obligations by posting collateral, or to obtain insurance for its payment obligations.  A coal operator's directors and officers may also be held personally liable for unpaid benefits.

55.     Benefits under the Black Lung Act are in addition to typical workers' compensation benefits.  Foresight maintains insurance for federal and state workers' compensation and black lung benefits for employees with Rockwood Casualty Insurance Company.  In 2019, Foresight paid approximately $7.5 million under the aforementioned programs.  As of the Petition Date, Foresight estimates its liability under the Black Lung Act, as well as for general workers' compensation, totals approximately $11.3 million (including estimates for obligations incurred but not reported).

v.     Environmental Obligations

56.     In addition to asset retirement and reclamation obligations, Foresight has ongoing obligations under federal environmental laws, including the Clean Water Act and the

Clean Air Act, certain analogous state environmental laws, and Foresight's environmental permits, with respect to discharges to water bodies, air emissions, management and disposal of waste materials, subsidence, and other environmental concerns.  From time to time, Foresight receives notices of noncompliance from regulatory agencies alleging violations of applicable environmental laws and permit requirements, which in some cases result in the assessment of fines or penalties or construction of capital projects to address alleged violations.  In addition, certain mining operations have given rise to obligations to treat impacted water resources or to address alleged subsidence of nearby third party properties.

        vi.    <u>Trade Vendor and Servicer Liabilities</u>

57.    In addition to the foregoing, Foresight had approximately $109.7 million in ordinary course trade debt owed to various vendors, suppliers, and servicers that was unpaid as of the Petition Date.  Such trade debt, and Foresight's requested first day relief for such trade debt, is described further in the Boyko Declaration.

**C.**    **Foresight's Equity Ownership**

58.    Foresight consists of a limited partnership between FELP and GP LLC. FELP's limited partnership units ("<u>LP Units</u>") are split into two sets of equity:  (a) subordinated units (the "<u>Subordinated Units</u>") and (b) common units (the "<u>Common Units</u>").  On April 16, 2015, MEC acquired a 34% non-controlling voting interest in GP LLC and all of the outstanding Subordinated Units of FELP, representing a 50% ownership percentage of FELP's collective LP Units.  On March 28, 2017, Murray acquired an additional 46% voting interest in GP LLC, taking its total control to 80% of GP LLC.

59.     As of the Petition Date, Murray holds 80% voting interests in GP LLC, and Reserves holds the other 20%.[3]  In addition, as of November 1, 2019, FELP had 80,996,773 outstanding Common Units and 64,954,691 outstanding Subordinated Units.  The Subordinated Units are still 100% owned by MEC.  As noted above, FELP's Common Units were tradable on the NYSE after an initial public offering on June 23, 2014.  Due to the recent coal industry downturn and related events giving rise to these Petitions, NYSE issued a notice on November 8, 2019 delisting FELP's Common Units.  These Common Units are currently tradable over the counter.  As of the Petition Date, significant holders of the Common Units include Murray (12.1%) and those units held by the Cline Group or in trust for the estate of Mr. Cline (together, 50.7%), with the remainder being publicly-held or owned in *de minimis* amounts by certain current and former employees of Foresight.

### III.    Events Leading to Foresight's Chapter 11 Cases

**A.    Adverse Market Conditions**

60.     The thermal coal markets Foresight traditionally serves have been meaningfully challenged over the last decade, both domestically and abroad.  These adverse market conditions are driven by changes in legislative priorities; the commercialization of shale gas, wind, solar, and nuclear electric generation subsidies; and low-cost natural gas exports.  In particular, the installed generation base of the U.S. power market has changed dramatically in response to both regulatory and economic forces.  Domestic regulation of emissions increased the cost of coal-fired generation, consequently incentivizing the installation of gas and renewables generation.  At the same time, technological developments in gas exploration and renewables generation has decreased the cost of alternative sources of electric power.  As a

---

[3]    In addition to these voting interests, GP LLC also maintains incentive distribution rights ("IDRs"), of which Murray holds 77.5% and Reserves 22.5%.  The Debtors consider the value of these IDRs, which entitles holders to distributions based on Foresight's performance, to be immaterial.

result, intrinsic demand for coal-fired electricity or heat generation by electric utilities and industrial manufacturers has fallen in the years leading up to the Petition Date. For instance, coal-fired installed capacity as a percentage of total installed capacity has fallen from 26 percent in 2013 to 20 percent in 2019, with coal-fired generation as a percentage of total generation falling from 35 percent in 2013 to 27 percent in early 2019. On the other hand, natural gas and renewables installed electricity generation capacity in the United States as a percentage of total installed capacity has increased from 59 percent in 2013 to 67 percent in 2019, and natural gas and renewables generation as a percentage of total generation increased from 42 percent in 2013 to 48 percent in early 2019.

61.    In addition, demand for U.S. thermal coal from international utilities has also been subject to adverse market pressures. The development of liquefied natural gas infrastructure has facilitated the export of cheap U.S. gas to Europe, reducing local utilities' reliance on Russian-sourced natural gas, and increasing the competitiveness of gas-fired generation as an alternative to coal-fired generation, resulting in reduced demand from European coal-fired generators. Moreover, the increased supply of low-priced Russian thermal coal has increased the supply available to satisfy the aforementioned diminished demand. These challenges are on top of a difficult regulatory environment in Western Europe which, like the United States, has subjected the coal-fired power industry to increased regulations and provided support for renewable energy power sources. As a result of these factors, the European benchmark price for imported thermal coal has halved in the past year.

62.    The foregoing market conditions have created a sort of race to the bottom for the coal industry, with heavy competition among coal suppliers for a shrinking customer base, all within a challenging regulatory and legislative atmosphere. Altogether, these market

conditions have caused the price of coal per ton that existing or potential customers are willing to pay to drop in recent years. Recently, the international coal market has come under additional pressure as the result of a slowdown in the global economy due to concerns over the coronavirus (COVID-19), which has rapidly spread to over 100 countries.

**B.    Foresight's Operational and Contingency Efforts**

63.    While the coal industry suffers from adverse market conditions, the costs to mine, produce, and transport coal to customers generally remain fixed at high rates, resulting in compressed margins over the past year, limiting Foresight's (a) ability to service its substantial outstanding indebtedness and other ongoing payment obligations and (b) operational liquidity and cash flexibility with which to maintain ordinary course operations.

64.    To ensure that Foresight remains competitive, Foresight has undertaken a series of go-forward coal production efficiency improvements and cost-cutting initiatives both within its mining operations and along its transportation and logistics routes. This includes operating mines at reduced hours and on a limited number of days (three or four) per week, depleting outstanding coal reserves (without or with limited coal reserve replacement) if such reserves were able to satisfy a customer's specific coal needs, and revamping a number of mine operations to reduce coal production, transportation, and logistics costs. To further reduce or delay cash expenditures, Foresight has also extended its trade payment terms with the vast majority of its ordinary course vendors and suppliers, and has renegotiated the amounts payable with several of its key vendors and suppliers for lower settled amounts. These efforts have ensured that Foresight maintains sufficient mining equipment, materials, supplies, and personnel to preserve safe ordinary course mining operations. In addition, Foresight was able to provide competitively priced coal in the marketplace, and in the months leading up to the Petition Date,

Foresight won bids on coal sale contracts that enable Foresight to ship and sell up to 17.3 million tons of coal in 2020, including export volumes placed with Javelin.

65.     In addition, in the months leading up to the Petition Date, Foresight has pursued insurance recoveries relating to a combustion event at its Hillsboro mining complex in 2015.  That combustion event was a *force majeure* under various Hillsboro-related agreements and required the idling of mining operations for over three (3) years.  While Foresight had previously received approximately $91 million in insurance recoveries related to Hillsboro mitigation costs, losses on mining equipment, and business interruption, Foresight sought further insurance recoveries for related damages to fund its operations and to restart efficient and productive longwall mining operations at Hillsboro.

66.     Following extensive negotiations with its insurance carriers, in the fourth quarter of 2019, Foresight received approximately $25.4 million in additional insurance proceeds.  These proceeds provided necessary liquidity and time which Foresight used to engage in lengthy restructuring negotiations with key stakeholders, as discussed further below.

67.     These additional insurance proceeds also allowed Foresight to temporarily idle mining operations at the Macoupin mining complex by providing Foresight with sufficient capital to rebuild and restart longwall mining operations at the Hillsboro mining complex. Specifically, Foresight determined in late 2019 that the fixed production and logistics costs of continued go-forward shipping of coal from Macoupin was unlikely to result in competitive customer prices in 2020.  Moreover, given the limited availability of new sources of coal customers, if Foresight won bids for new or additional coal sales, Foresight determined that it would be better to fulfill such coal contracts through its other mining complexes, which were anticipated to maintain profitability at a margin that made continued operations of those mines

valuable. In addition, and most importantly, Foresight determined that it could maintain efficient and competitive profitability if it were to spend the additional insurance proceeds to fully restart mining operations at its Hillsboro mine, which would then have the production capacity necessary to fulfill coal contracts that were otherwise required to be fulfilled through the Macoupin mining complex.

68.     As of the date hereof, Foresight has spent approximately $27 million to transport, manufacture, and prepare for recommenced longwall mining operations at Hillsboro. These preparations were completed and longwall operations were recommenced shortly before the Petition Date. Using its longwall operations, Hillsboro is expected to fulfill up to 3.25 million tons of coal shipments under Foresight's various coal sale contracts and obligations this year alone, and is expected to maintain a profit margin comparable to Foresight's Sugar Camp and Williamson mines. Following the temporary idling of operations at the Macoupin mine, Foresight also intends to satisfy a limited portion of its coal sale obligations through approximately 187,000 tons in standing reserves held in storage at the Macoupin mine or its Sitran Terminal, if and when such reserves can be economically transported and sold to customers.

## C.     Prepetition Restructuring Negotiations with Key Stakeholders

69.     Despite the benefits Foresight anticipates it will realize as a result of the foregoing operational improvements, Foresight still faces challenging market, legislative, and regulatory conditions and substantial funded debt obligations. Accordingly, beginning in September of 2019 Foresight has engaged in lengthy, arm's-length negotiations with all of its key stakeholders over a global financial restructuring. As these negotiations progressed, Foresight was obligated to make a payment of interest under the Second Lien Notes Indenture to

holders of the Second Lien Notes. Pursuant to the Second Lien Notes Indenture, a failure to pay interest on the Second Lien Notes when due constituted an Event of Default if such failure continued for a period of thirty (30) days.

70.    To facilitate ongoing negotiations among its key constituencies, Foresight and the Second Lien Indenture Trustee (acting at the direction of a majority of the Second Lien Noteholders) entered into three (3) supplemental indentures to Foresight's Second Lien Notes Indenture, executed respectively on February 26, 2020, December 19, 2019, and October 30, 2019, which extended the 30-day grace period to March 29, 2020. These extensions avoided defaults under the Second Lien Notes Indenture from becoming Events of Default and thereby triggering cross-defaults under Foresight's First Lien Credit Agreement.

71.    With this additional time, Foresight and its management team and advisors continued extensive arm's-length and good faith negotiations with its key constituencies, including its First Lien Lenders, its Second Lien Noteholders, its major contract counterparties, and MEC. These negotiations were ultimately successful. Foresight received the agreement from a number of its key counterparties for improved economic arrangements. For example, Foresight received the agreement from several of its royalty interest owners, including those owned by affiliates of Reserves and the Cline Group, over certain of its coal reserves for reduced royalty rates, waiver of minimum payment requirements, and reduction of outstanding interest payables. In addition, Foresight received the agreement from many of its logistics and transportation counterparties for reduced transportation costs and elimination or reduction of minimum transportation route requirements. Finally, discussions over potential modifications to the Management Services Agreement with Murray are currently ongoing, and a modified arrangement is expected to be reached during the course of the Debtors' chapter 11 cases.

72.    However, the substantial benefits in favor of Foresight that would be received under these renegotiated contractual arrangements were conditioned upon the Debtors' entry into and consummation of a globally consensual restructuring with the Debtors' First Lien Lenders and Second Lien Noteholders.  Ultimately, such negotiations concluded in March 2020 just before filing these chapter 11 cases, and resulted in the parties' agreement on the terms of a financial restructuring (the "Restructuring") that would be supported by their stakeholders above, which the Debtors determined in the exercise of their reasonable business judgment to be in the best interests of their estates, and their creditors, and all of theirs stakeholders.

**D.    Restructuring Support Agreements**

73.    Following the foregoing extensive, good faith negotiations, (a) the First Lien Lenders (the "Consenting First Lien Lenders") holding over 69% of the First Lien Loans and (b) the Second Lien Noteholders (the "Consenting Second Lien Noteholders," and together with the Consenting First Lien Lenders, the "Consenting Lenders") holding over 82% of the Second Lien Notes have executed that certain restructuring support agreement with the Debtors on March 10, 2020 (the "Lender RSA"), pursuant to which they have agreed, subject to the terms and conditions of the Lender RSA, to support the Restructuring and vote in favor, once filed and solicited, of a chapter 11 plan of reorganization (the "Plan") that accords with a term sheet attached to the Lender RSA.  In addition, the counterparties to a variety of the Debtors' key contractual arrangements to be amended or modified under or in connection with the Restructuring and the Plan (collectively, the "Supporting Contract Parties") have also executed separate respective restructuring support agreements with the Debtors before the Petition Date (collectively, the "Counterparty RSAs," and together with the Lender RSA, the "Restructuring Support Agreements"), pursuant to which the Supporting Contract Parties have agreed, subject to

the applicable Counterparty RSAs, to support the Restructuring, and to implement any proposed amendments or modifications to their applicable contractual arrangements.

74.    As agreed prepetition among the Debtors and their stakeholders, the Restructuring contemplates, among other things, a substantial deleveraging of Foresight's balance sheet by providing, in pertinent part, the (a) holders of allowed claims under the First Lien Credit Agreement with 92.75% of the equity in a reorganized Foresight, (b) holders of allowed claims under the Second Lien Notes with 7.25% of the equity in a reorganized Foresight, and (c) holders of allowed general unsecured claims the right to receive either (i) their *pro rata* share of a recovery from a fixed cash pool on terms to be specified in the Plan or (ii) convenience class treatment under section 1122 of the Bankruptcy Code with a set amount of recovery to be specified under the Plan.  The Debtors have not finalized the Plan or its related disclosure statement for the Restructuring, and accordingly, have not commenced a prepetition solicitation of their impaired creditors.

75.    The Debtors believe that the proposed Restructuring agreed to between the Debtors and their stakeholders under the Restructuring Support Agreements represents the best path forward to right-size the Debtors' balance sheet and to position the Debtors for success following these chapter 11 cases.  In pertinent part, the Restructuring seeks to deleverage the Debtors' balance sheet from approximately $1.33 billion down to $225 million, reducing the Debtors' debt obligations by over $1 billion.  In addition, the Debtors' will be able to reduce many of their ongoing payment obligations, particularly those under their royalty and leasehold arrangements, with a number of their Supporting Contract Parties under the Counterparty RSAs.

76.    I believe that by coming to a consensus on the Restructuring before commencing these chapter 11 cases, the Debtors' have been enabled to reorganize in a swift and

efficient matter, reducing execution uncertainty and the overall costs and disruptions that these chapter 11 cases could have on the value of the Debtors' estates for their stakeholders. Accordingly, I believe that the substantial benefits of the Restructuring for the Debtors' businesses could not be achieved absent the Debtors reaching prepetition agreement with the Consenting Lenders and other stakeholders under the Restructuring Support Agreements.

77. As with the DIP Facility discussed below, the Lender RSA obligates the Debtors to ensure the following actions occur by certain dates set forth therein.

- **By 5 days after Petition Date**:  Entry of an interim order approving the DIP Facility.

- **By 35 days after Petition Date**:  (i) Entry of a final order approving the DIP Facility and (ii) the Debtors' filing of the Plan and related Disclosure Statement.

- **By 50 days after Petition Date**:  The Debtors' entry into finalized renegotiated contracts and leases with certain of their counterparties.

- **By 70 days after Petition Date**:  Entry of order approving the Plan's disclosure statement.

- **By 115 days after Petition Date**:  Entry of order confirming the Plan.

- **By 130 days after Petition Date**:  Consummation of the Restructuring and emergence from chapter 11.

Given the substantial benefits of the Restructuring for the Debtors, I believe that following the restructuring timeline set forth in the milestones is an exercise of the Debtors' reasonable business judgment and is in the best interests of their estates, and their creditors, and all of theirs stakeholders.

## E.     The Proposed DIP Credit Agreement

78. To finance these chapter 11 cases, the Debtors have obtained commitments from their Consenting Lenders to make a $175 million loan pursuant to a senior secured, super-priority debtor-in-possession facility (the "DIP Credit Agreement") and an

agreement regarding the consensual use of the First Lien Lenders' collateral and cash collateral. The DIP Credit Agreement is a senior secured, super-priority, multi-draw term loan credit facility in the principal amount of up to $175 million.  Under the DIP Credit Agreement, Cortland Capital Market Services LLC will act as the administrative agent for a syndicate of banks, financial institutions and other institutional lenders party thereto.  Like the First Lien Credit Agreement, the DIP Credit Agreement will be, with the consent of the First Lien Lenders and Second Lien Noteholders, secured by valid and fully perfected first priority priming liens and security interests on all of the Prepetition Collateral, as well as all of the assets of the Deer Run Mine Entities and Foresight Receivables (including the Debtors' equity interest in Foresight Receivables).  Subject to closing of the DIP Credit Agreement and entry of a final order approving the DIP Credit Agreement, it also provides for the refinancing (or a "roll-up") of $75 million of the Debtors' obligations under the First Lien Credit Agreement.  As discussed in detail in the Herman Declaration, the Debtors, in consultation with their professionals, have determined that the DIP Credit Agreement is the best option available.

79.    Access to the DIP Credit Agreement will instill much needed confidence in parties that are critical to the success of the chapter 11 cases, including the Debtors' employees, vendors, customers and communities.  I believe this greatly enhances the Debtors' ability to ensure the stability and success of the Debtors' operations during these chapter 11 cases, focus the Debtors attention and abilities towards finalizing a Plan and related disclosure statement for the Restructuring, and to prosecute these chapter 11 cases swiftly so as to maximize value for all parties in interest.  The potential consequences to the Debtors of a failure to obtain adequate funding are dire:  among other things, the Debtors could be unable to continue their mining operations, maintain their equipment, and pay their employees.  The Debtors would

also be unable to maintain and grow valuable customer relationships, or ensure that their mining operations are run in a safe, efficient and lawful manner. Such consequences would make successful prosecution of these chapter 11 cases, or finalization and consummation of the Restructuring, impossible and would result in irreparable harm to the Debtors, their estates, and all parties in interest.

80.    The DIP Credit Agreement contains certain milestones tied to liquidity and progress of the case. Among other things, the milestones require the Debtors to finalize, file, and seek approval from this Court a disclosure statement for the Plan and the Restructuring, and to promptly after such approval commence solicitation of the holders of impaired classes of creditors. Thereafter, the Debtors must obtain an order from this Court confirming the Plan in an expeditious manner, and in no event later than 115 days after the Petition Date. As discussed above and in the Herman Declaration, the Debtors believe that the milestones provide the Debtors with a reasonable path to prosecute a value-maximizing case that will poise the Debtors for future stability and success, while permitting the Debtors to operate their businesses in the ordinary course during these chapter 11 cases.

81.    I believe that, subject to approval by the Court, each of the Debtors is qualified and authorized to enter into the DIP Credit Agreement. Specifically, each Borrower (as defined in the DIP Credit Agreement) is a partnership, corporation, or limited liability company validly existing and in good standing under the laws of the State of Delaware. Each Borrower has the power and authority to enter into and perform the Loan Documents (as defined in the DIP Credit Agreement) to which it is a party, has taken all necessary action to authorize the execution, delivery and performance of such Loan Documents, and has duly executed and delivered such Loan Documents. Furthermore, the execution and delivery by each Borrower of

the Loan Documents to which they are parties do not, and the performance by the Borrowers of their respective obligations thereunder will not (a) result in a violation of the certificate of incorporation, bylaws, or other organizational documents of such Borrower or (b) result in a violation of any order of the Court.

**F.    The Exit Facility**

82.    To finance the Plan and ensure the Debtors emerge from chapter 11 with a healthy balance sheet, in accordance with the proposed Restructuring, the Debtors anticipate obtaining exit financing from their existing lenders in the form of a $225 million senior secured credit facility (the "Exit Facility"), which cash will fund the payment of claims in connection with confirmation of the Plan and repay the funds loaned under the DIP Credit Agreement in full, with the remaining liquidity being available for a reorganized Foresight to use for general corporate purposes.   In connection therewith, the Debtors anticipate obtaining lending commitments from their existing lenders, which, in addition to the Consenting Lenders backstop commitments, should fund the entirety of the Exit Facility.  In exchange for such commitments, including those that are backstopped by the Consenting Lenders, the Debtors anticipate the committing lenders will receive premiums payable in equity in a reorganized Foresight.

<u>**Conclusion**</u>

83.    The Debtors believe that the proposed Restructuring will provide for recoveries to all of their creditors, including the holders of their general unsecured claims, that exceed what such parties would recover in any alternative.   Accordingly, I believe that the proposed Restructuring, as agreed in the Restructuring Support Agreements, presents the best mechanism for the Debtors to conclude the financial and operational restructuring that has been

underway for months and to reposition the Debtors for further future success with a de-levered

and healthy balance sheet.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Pursuant to 28, U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:   March 10, 2020                    _/s/  Robert D. Moore_____
      St. Louis, Missouri              Name: Robert D. Moore
                                  Title:   President and Chief Executive Officer
                                              Foresight Energy LP

Filed by:

ARMSTRONG TEASDALE LLP

 */s/ Richard W. Engel, Jr.*
Richard W. Engel, Jr. (MO 34641)
John G. Willard (MO 67049)
Kathryn R. Redmond (MO 72087)
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
Tel:      (314) 621-5070
Fax:      (314) 621-5065
Email:  rengel@atllp.com
          jwillard@atllp.com
          kredmond@atllp.com

          - and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Paul M. Basta (*pro hac vice* admission pending)
Alice Belisle Eaton (*pro hac vice* admission pending)
Alexander Woolverton (*pro hac vice* admission pending)
1285 Avenue of the Americas
New York, New York  10019
Tel:      (212) 373-3000
Fax:      (212) 757-3990
Email:  pbasta@paulweiss.com
          aeaton@paulweiss.com
          awoolverton@paulweiss.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

## **Exhibit A**

**Foresight Corporate Organizational Chart**

# Foresight Organization Chart†



| Members of GP LLC's Board of Directors: | Independent? |
|---|---|
| Robert D. Moore (Chairman) (MEC Nominee) | |
| Robert E. Murray (MEC Nominee) | |
| Lesslie H. Ray (Cline nominee) | |
| Daniel S. Hermann (Chairman of Audit Committee) | ✔ |
| G. Nicholas Casey Jr. | ✔ |
| Brian D. Sullivan | ✔ |

**Key**

Public Filer and guarantor under Credit and Guaranty Agreement, but not under $425mm Indenture

Borrower under Credit Agreement, Co-Issuer of Indenture Notes

Not guarantor signatory under Credit Agreement and Guaranty Agreement or $425mm indenture

Guarantor under Credit Agreement and Co-Issuer of Indenture Notes

Guarantor under Credit and Guaranty Agreement and $425mm Indenture

Non-Economic General Partner Interest

† All entities are formed in the state of Delaware. Unless otherwise noted, each LLC has FELLC as sole member and Foresight Energy Services LLC as manager.

* Reflects holdings disclosed in Foresight's 10-K for FY 2018

** Manager: Foresight Energy LLC

*** Entity has a board of directors.

**** Sole Member: Foresight Energy Labor LLC.

Murray Energy Corporation ("MEC")

The Cline Group

Foresight Reserves LP

80% Voting Interest
77.5% IDRs*

20% Voting Interest
22.5% IDRs*

GP LLC Board of Directors
**Foresight Energy
GP LLC ("GP LLC")**

Non-Economic
General Partner Interest

51.2% LP Units
(100% of the outstanding subordinated units and 12.1% of the outstanding common units)*

Cline Estate

The Cline Trust Company

Public unitholders

14.1% LP Units (common)*

14.1% LP Units (common)*

20.6% LP Units (common)*

**Foresight Energy LP ("FELP")**

**Foresight Energy LLC ("FELLC")
(managed by its sole member FELP)**

100%

Foresight Energy Employee Services Corporation***

.01%

99.99%

Foresight Energy Services LLC**

100%

99.99%

.01%

Hillsboro Energy LLC

Sugar Camp Energy, LLC

Macoupin Energy LLC

Williamson Energy, LLC

Foresight Coal Sales LLC

Tanner Energy LLC

Sitran LLC

Seneca Rebuild LLC

Oeneus LLC d/b/a Savatran LLC

Adena Resources, LLC

Hillsboro Transport LLC

American Century Transport LLC

Akin Energy LLC

American Century Mineral LLC

Foresight Energy Finance Corporation***

Foresight Receivables LLC (SPV)***

Foresight Energy Labor LLC

100%

Viking Mining LLC

Patton Mining LLC

M-Class Mining, LLC

MaRyan Mining LLC

Mach Mining, LLC

Logan Mining LLC

LD Labor Company LLC

Coal Field Repair Services LLC

Coal Field Construction Company LLC