**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF ALAN BOYKO, SENIOR
MANAGING DIRECTOR OF FTI CONSULTING, INC.,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Alan Boyko, do hereby declare, under penalty of perjury, that:

1.       I am a Senior Managing Director in the Corporate Finance and Restructuring Group at FTI Consulting, Inc. ("FTI"), which has a principal place of business at 1001 17th street, Suite 1100, Denver, Colorado 80202.  Since October 2019, FTI has been engaged as a restructuring and financial advisor to Foresight Energy LP ("FELP") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or "Foresight").  I have been a full-time restructuring advisor for over 13 years.  I received a B.S. in Finance in 2001 from Slippery Rock University and an M.B.A. in 2006 from the University of Notre Dame.  I am a Certified Insolvency and Restructuring Advisor and a

---

[1]      The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

Certified Turnaround Professional.  I have been employed by FTI since 2006, and have been in my current position since 2017.

2.    I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.  I submit this declaration (this "Declaration") to set forth the facts and circumstances that resulted in the commencement of these chapter 11 cases, and in support of (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (b) the relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").  In addition, Robert D. Moore, Foresight's President and Chief Executive Officer, has also filed a declaration (the "Moore Declaration") on the date hereof in support of Foresight's chapter 11 cases and providing an overview of Foresight, the events leading up to the Petition Date, and Foresight's current circumstances.  Finally, I refer to the declaration of Seth Herman in support of the Debtors' motion for approval of debtor-in-possession financing and use of cash collateral (the "Herman Declaration").

3.    Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, information provided to me by the Debtors' management team and advisors, including the FTI team working under my supervision, or my opinion based upon experience and knowledge.  I am authorized to submit this declaration on behalf of each Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

## I.    Introduction

4.      As described further in the Moore Declaration, the Debtors' coal businesses have suffered over the preceding years due to a recent and sustained downturn in the thermal coal market.   Through these chapter 11 cases, the Debtors seek to implement a comprehensive financial and operational restructuring that will reduce Foresight's debt burden and increase liquidity.   To ensure a smooth transition into chapter 11 and limit the operational disruption of these chapter 11 cases, the Debtors filed the First Day Motions.   For the reasons described below, the relief sought in each of the First Day Motions, including the approval of the proposed DIP Facility, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

5.      Following FTI's retention, I have overseen a team of FTI professionals who have been helping the Debtors with respect to cash forecasting, the sizing of the potential DIP financing need, the compilation of data and diligence necessary to draft the First Day Motions, and otherwise prepare for these chapter 11 cases.

6.      The Debtors operate in a highly competitive industry, made more competitive by the downturn in the thermal coal market and the shift to natural gas and renewable power generation.   Furthermore, as discussed below, the Debtors' liquidity is limited. Thus, it is important for the Debtors to secure first-day relief that will allow them to continue to satisfy their employee and operational obligations in the ordinary course, thereby avoiding unnecessary or misplaced employee and customer attrition.

7.      As a large coal mining company, the Debtors are required to operate in multiple jurisdictions and navigate the complicated operational and regulatory requirements of each.   Any restriction on the Debtors' ability to operate in the ordinary course could have

materially adverse ramifications that reverberate throughout Foresight's operational structure. The relief requested in the First Day Motions is narrowly tailored to avoid any such disruption.

## II.    Relief Sought in the Debtors' First Day Motions[2]

8.     I understand that the Bankruptcy Rules permit the Court to grant relief within the first twenty-one (21) days after the Petition Date where such relief is necessary to avoid immediate and irreparable harm.  The relief in the First Day Motions is necessary and is in the best interests of the Debtors, their creditors, and all other parties in interest.  I believe that an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.  A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below.

### A.    Administrative Motions

i.    Debtors' Motion for Entry of an Order Authorizing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion").

9.     In the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of their related chapter 11 cases and granting related relief.  The Debtors' operations are largely integrated and various Debtors play a role in other Debtors' capital structures through intercompany transactions.  Additionally numerous parties have interests in the cases of multiple Debtors and many of the motions,

---

[2]    Capitalized terms used but not defined in this section have the meanings assigned to such terms in the applicable First Day Motions.

applications, hearings, and orders that will arise in these chapter 11 cases will jointly affect each Debtor.  Furthermore, virtually all of the Debtors are liable for the Debtors' funded debt.

10.     I believe the joint administration of these chapter 11 cases will not prejudice or adversely affect the rights of the Debtors' creditors because the relief sought herein is purely procedural and is not intended to affect substantive rights.  Because these chapter 11 cases involve thirty-one (31) Debtors, I understand that joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly, and minimize the number of unnecessary delays.  Moreover, joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, and hearings, and will also allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

ii.     Debtors' Motion for Entry of an Order (A) Extending the Time to File Schedules and Statements; (B) Extending the Time to Schedule the Meeting of Creditors; (C) Partially Waiving the Requirements to (I) File Equity Lists and (II) Provide Notice to Equity Security Holders; (D) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors; (E) Authorizing the Debtors to File a Consolidated and Redacted List of Creditors in Lieu of Submitting Separate and Reformatted Creditor Matrices for Each Debtor; (F) Approving the Form and Manner of Notifying Creditors of Commencement of These Chapter 11 Cases; and (G) Granting Related Relief (the "Procedural Motion").

11.     In the Procedural Motion, the Debtors seek entry of an order (a) extending the 14-day period to file schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") an additional 19 days; (b) authorizing the Office of the United States Trustee for the Eastern District of Missouri (the "U.S. Trustee") to schedule the meeting of creditors after

5

the 40-day deadline imposed by Bankruptcy Rule 2003(a); (c) partially waiving the requirement to file a list of equity security holders (the "Equity Lists") and the requirement to give notice of the order for relief to all equity security holders of the Debtors; (d) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors; (e) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting separate and reformatted creditor matrices for each Debtor and (ii) redact certain personal identification information for individual creditors; (f) mail initial notices through Prime Clerk LLC (the "Proposed Notice and Claims Agent"); and (g) granting related relief.

**a. Schedules and Statements**

12.     I believe good cause exists for granting an extension of the time to file Schedules and Statements. To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to the claims of the Debtors' numerous creditors, as well as the Debtors' many assets and agreements. This information is voluminous and collecting it requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term. In my opinion, focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases will maintain the stability of the Debtors' business operations and facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

13.     I understand the Debtors were engaged in hard-fought prepetition negotiations over the terms of their restructuring, which culminated in (i) entry into the Restructuring Support Agreement, (ii) agreement over terms of the Plan, (iii) agreement over the

terms of much-needed debtor-in-possession financing, and (iv) preparing these chapter 11 cases for filing.

14.     While the Debtors, with the help of their professional advisors, are working diligently and expeditiously on the preparation of the Schedules and Statements, resources have concentrated on the aforementioned objectives.  Accordingly, the employees with the expertise to complete the Schedules and Statements have been significantly occupied by numerous other restructuring work streams in addition to their ordinary course duties as employees of the Debtors.  I believe that the immense volume of information that must be assembled and compiled and the potentially hundreds of employee and professional hours required to complete the Schedules and Statements constitute good and sufficient cause for granting the requested extension of time.  In addition, I understand that employee efforts during the initial postpetition period are critical, and the Debtors must devote their time and attention to business operations to maximize the value of the Debtors' estates during the first critical months.

15.     Due to the quantity of work necessary to complete the Schedules and Statements and the competing demands upon the Debtors' employees and professionals to assist in efforts to stabilize business operations during this critical time, I understand that the Debtors will not be able to properly and accurately complete the Schedules and Statements within the required 14-day period.  The Debtors anticipate, and I believe, that they will require at least 19 additional days to complete their Schedules and Statements.

**b.  Equity List**

16.     Each of the Debtors, aside from Foresight Energy LP ("FELP"), has disclosed its equity security holders in the Equity Lists filed with their respective petitions.  FELP, however, is a limited partnership with two tranches of limited partnership units (its "LP

Units"): its common LP Units (the "Common Units"), which trade over-the-counter, and its subordinated LP Units (the "Subordinated Units"), which are entirely owned by non-Debtor affiliate Murray Energy Corporation ("Murray Energy"). In addition to its 100% ownership of the Subordinated Units, Murray Energy owns 12.1% of the Common Units. The estate of Christopher Cline and the Cline Trust Company own 25.3% and 25.4% of the Common Units, respectively. The remaining Common Unit-holders include unidentified public unitholders (the "Public Unitholders") and executives and officers of FELP's general partner, Foresight Energy GP LLC.

17.     Given that FELP's Common Units are widely held and will require the assistance of third-party professionals to determine, the Debtors submit that (a) listing Public Unitholders on FELP's Equity List, along with their last-known addresses and percentage equity ownership, and (b) sending notices to all parties on that Equity List would be expensive and time-consuming. The Debtors request that the Court authorize FELP to provide an Equity List that excludes individually identified Public Unitholders and instead lists only the equity holders known to FELP as of February 21, 2019, the date of FELP's most recent 10-K filing.[3]

18.     In addition, the Debtors propose to publish, as soon as practicable after the commencement of these chapter 11 cases, the notice of commencement ("Notice of Commencement") in the *Wall Street Journal* and the *St. Louis Post Dispatch*, a St. Louis, Missouri newspaper. I believe that these publications, coupled with the national attention these chapter 11 cases will surely receive, will most likely reach the equity security holders.

---

[3]     The Debtors' 2019 10-K lists Accipiter Capital Management, LLC ("Accipiter") as a holder of 9.9% of the Common Units. However, on February 14, 2020, Accipiter disclosed to the Securities and Exchange Commission that it divested its stake in FELP. The Common Units formerly held by Accipiter are now believed to be held by Public Unitholders. FELP's Equity List accounts for this one known change, but reports the remaining holdings as reflected in FELP's 2019 10-K.

19.    I further understand that, to the extent it is determined that equity security holders are entitled to distributions from the Debtors' estates, those parties will be provided with notice of the bar date and will then have an opportunity to assert their interests.  Thus, I believe equity security holders will not be prejudiced by the requested relief.

### c.  Consolidated List of Top 30 Unsecured Creditors

20.    I understand compiling separate top 20 unsecured creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources. Moreover, because the Debtors will request that the U.S. Trustee appoint a single official the Committee in these chapter 11 cases, I believe a consolidated list of the Debtors' largest creditors will better represent the Debtors' most significant unsecured creditors and aid the U.S. Trustee in its efforts to communicate with these creditors.  As such, the I believe that filing a single, consolidated list of the 30 largest unsecured creditors in these chapter 11 cases is appropriate.

### d.  Creditor Matrix

21.    The Debtors, working together with Proposed Notice and Claims Agent have already have prepared a single, consolidated list of all the Debtors' creditors (the "Creditor Matrix") in electronic format.  In lieu of filing individual and reformatted creditor matrices for each Debtor that comply with the Creditor Matrix Procedures, the Debtors are prepared to submit to the Clerk of the Court and the U.S. Trustee both a redacted and an unredacted Creditor Matrix in electronic format (or make available in non-electronic form at such requesting party's sole cost and expense).

22.    Permitting the Debtors to file a consolidated Creditor Matrix, in lieu of filing separate and reformatted creditor matrices for each Debtor, is, in my opinion, warranted under the circumstances of these cases.  Indeed, because the Debtors have approximately 1,225

potential creditors and other parties in interest, I believe that filing separate creditor matrices for each debtor would be a duplicative and burdensome task. Additionally, I understand that reformatting the existing Creditor Matrix into creditor matrices in accordance with the Creditor Matrix Procedures would be time-consuming and, more importantly, would greatly increase the risk of error. As such, the I believe the Debtors' request to file the consolidated list of creditors as it is currently formatted and in accordance with the procedures outlined in the Procedural Motion is reasonable and warranted under the circumstances.

23. Additionally, I respectfully submit that cause exists to authorize the Debtors to redact the home addresses of the Debtors' individual creditors—many of whom are the Debtors' employees—from the Creditor Matrix because such information could be used to perpetrate identity theft.

**e. Notices**

24. The Debtors propose that the Proposed Notice and Claims Agent undertake all mailings directed by the Court or the U.S. Trustee or as required by applicable law. I believe the Proposed Notice and Claims Agent's assistance with the mailing and preparation of creditor lists and notices will ease administrative burdens that otherwise would fall upon the Court and the U.S. Trustee. With such assistance, the Debtors can file a computer-readable Creditor Matrix and also undertake all necessary mailings.

25. Accordingly, I believe that the relief requested in the Procedural Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

iii. Debtors' Motion for Entry of an Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures and (B) Granting Related Relief (the "Case Management Motion").

26. Approval of the procedures proposed in the Case Management Motion (the "Procedures") will, in my opinion, promote the efficient and orderly administration of these

chapter 11 cases by, among other things, (a) establishing requirements for filing and serving court filings, (b) delineating standards for notices of hearings and agenda letters, (c) fixing period omnibus hearing dates, (d) articulating mandatory guidelines for the scheduling of hearings and objection deadlines, and (e) limiting matters that are required to be heard by the Court.

27.     By authorizing the Debtors to schedule omnibus hearings and by establishing clear timelines for the filing of court documents, I believe the Procedures will assist the Debtors' management, professionals, and all parties in interest in organizing their time and directing the attention of their personnel to issues raised by these chapter 11 cases. For example, serving the Debtors' hundreds of creditors with each court document filed in these chapter 11 cases could, in my opinion, easily cost the Debtors tens of thousands of dollars in printing, mailing, and service costs. In comparison, the cost of email service is *de minimis*. Considering the substantial number of court documents that are likely to be filed and served in these cases, I believe the Procedures proposed herein will save the Debtors' estates significant amounts of money.

28.     Pursuant to the Procedures, hearings shall be conducted only when necessary to the resolution of disputes between the Debtors and third parties. I believe this process will reduce the estates' administrative burdens and costs associated with hearing preparation and attendance and will minimize the burden on the Court. The Procedures, by authorizing the Debtors to maintain a Case Information Website and employ the Noticing Agent, will also, in my opinion, preserve the Debtors' goodwill by providing easy and affordable access to information to keep interested parties, including their customers and employees, informed of developments in the restructuring process.

11

iv.    Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business (the "Ordinary Course Professionals Motion").

29.    The Debtors employ various professionals in the ordinary course of business (the "Ordinary Course Professionals"), who render a wide range of services to the Debtors in a variety of matters unrelated to these chapter 11 cases, including litigation, accounting, real estate law, environmental law, regulatory law, labor and employment law, tax law, as well as advice to the Debtors' board of directors and other services for the Debtors in relation to the issues that have a direct and significant impact on the Debtors' day-to-day operations.  In my opinion, it is essential that the employment of the Ordinary Course Professionals, many of whom are already familiar with the Debtors' businesses and affairs, be continued to avoid disruption of the Debtors' normal business operations.

30.    I believe that the proposed employment of the Ordinary Course Professionals and the payment of monthly compensation in accordance with the procedures set forth in the Ordinary Course Professionals Motion (the "OCP Procedures") are in the best interest of the Debtors' estates and their creditors.  The relief requested will, in my opinion, save the estates substantial expense associated with applying separately for the employment of each professional.  Furthermore, I understand that the requested relief will save the estates the substantial additional fees relating to the preparation and prosecution of interim fee applications. Likewise, I believe the OCP Procedures outlined in the Ordinary Course Professionals Motion will relieve the Court, the U.S. Trustee and any Committee of the burden of reviewing numerous fee applications involving relatively small amounts of fees and expenses.

31.    Accordingly, I believe that the retention and compensation the Ordinary Course Professionals in accordance with the OCP Procedures outlined in the Ordinary Course Professionals Motion is in the best interest of the Debtors' estates, their creditors, and all other

parties in interest and should be approved on the terms and conditions described in the Ordinary Course Professionals Motion.

> v.    Debtors' Motion for Entry of an Order (A) Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Granting Related Relief (the "Interim Compensation Procedures Motion").

32.    Given the size and complex nature of these chapter 11 cases, I believe the Debtors require the assistance of a number of professionals to efficiently manage these proceedings to successfully and timely emerge from chapter 11.  Accordingly, the Debtors have filed, or expect to file shortly after the date hereof, separate applications with the Court to employ and retain a number of professionals, including: (a) Paul, Weiss Rifkind, Wharton & Garrison LLP, as counsel to the Debtors, (b) Armstrong Teasdale LLP, as co-counsel to the Debtors, (c) FTI Consulting, Inc., as financial advisor to the Debtors, (d) Jefferies LLC, as investment banker to the Debtors, and (e) Prime Clerk LLC, as claims and noticing agent and administrative advisor (collectively, the "Estate Professionals").  I understand that the Debtors may need to retain additional Estate Professionals in connection with the continued prosecution of these chapter 11 cases.  In addition, any Committee appointed in these cases will likely retain counsel and possibly other professionals to represent it.

33.    I believe that establishing orderly procedures (the "Interim Compensation Procedures") to pay the Estate Professionals and other professionals whose retentions are approved by this Court (together with the Estate Professionals, the "Retained Professionals") and who will be required to file applications for allowance of compensation and reimbursement of expenses ("Fee Applications") will streamline the administration of these chapter 11 cases and otherwise promote efficiency for the Court, the U.S. Trustee and all parties in interest. Specifically, a streamlined process for serving interim fee applications and notices thereof is, in my opinion, in the best interest of the Debtors because it will facilitate efficient review of the

13

Retained Professionals' fees and expenses while saving the Debtors unnecessary copying and mailing expenses.

34.    Finally, I understand that the Debtors' request that the Court limit service of Fee Applications in the manner set forth in the Interim Compensation Motion is designed to ensure that such Fee Applications reach the parties most active in the chapter 11 cases and save the expense of undue duplication and mailing that would result from serving every one of the Debtors' thousands of creditors.  Moreover, I understand that many parties in interest will receive copies of the Fee Applications through the Court's Electronic Case Files system.  I believe that establishing a streamlined process for serving and providing notice of the Fee Applications is appropriate to provide the parties most active in these chapter 11 cases the opportunity to review the Retained Professionals' fees and expenses while also saving the Debtors unnecessary administration costs.

35.    I believe that the proposed Interim Compensation Procedures will enable the Debtors to closely monitor the costs of administration, forecast cash flows, and implement efficient cash management procedures.  They also will allow the Court and key parties in interest, including the U.S. Trustee, to ensure the reasonableness and necessity of the compensation and reimbursement requested.

**B.    Financial Motions**

i.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief (the "DIP Motion").

36.    Pursuant to the DIP Motion, the Debtors seek approval of the proposed $175 million DIP Facility (as defined herein).  The proposed DIP Facility consists of (a) $100

million in New Money DIP Loans (including an immediate $55 million upon entry of the Interim Order) and (b) a "roll-up" of up to $75 million of the Debtors' obligations under the First Lien Loans (subject to entry of the Final Order, and together, the "DIP Facility"). The DIP Facility will provide cash for general working capital purposes, and will generally allow the Debtors to address their immediate and pressing liquidity concerns.

37.    As of the Petition Date, the Debtors had very limited liquidity. In the months before the chapter 11 filing, the Debtors have been forced to delay payments for many of their vendors to retain sufficient liquidity to operate their businesses. Without a cash infusion at this critical point, the Debtors will be unable to meet their commitments to vendors that provide necessary goods and services, will be unable to pay their employees in the ordinary course, and will suffer immediate and irreparable harm to their businesses. The lack of liquidity could ultimately result in the closure of mines and the loss of good paying jobs for the Debtors' employees. The DIP Facility provides the necessary cash to meet immediate operational needs, addresses significant vendor unease, and provides the liquidity for a smooth transition into chapter 11.

38.    Since FTI's retention, I have overseen a team of FTI professionals working with the Debtors' management to evaluate the Debtors' operations, including determining potential liquidity needs for chapter 11 cases. As part of that analysis, FTI analyzed the Debtors' liquidity and cash flow forecasts and liquidity position. This analysis was based upon the Debtors' business plan and books and records, as well as an estimate of the impact of these chapter 11 cases and their anticipated timeline.

39.    The Debtors and FTI also considered the adverse market conditions facing the coal industry as a whole. As further described in the Moore Declaration, domestic and

international prices for thermal coal continue to decline.  The Debtors have responded to these external pressures on EBITDA by proactively extending their vendor payment terms and by reducing their overall business spend (including by temporarily idling the Macoupin mining operation), while simultaneously increasing their efficiency (including by recommencing profitable longwall operations at the Hillsboro mine).  The downward trend in the coal market, and both the Debtors' responsive cost saving measures and efficiency increases were included in the DIP Facility sizing analysis.

40.    As further described in this Declaration, the Debtors have asked for relief to pay claims to certain vendors whose goods and services are necessary to the Debtors' operations.  Specifically, in the Vendors Motion (as defined herein), the Debtors have asked for authority to pay the prepetition claims of the Vendor Claimants (as defined herein) up to $23.2 million on an interim basis, and up to $43.1 million on a final basis.  These payments, among others that are requested by the Debtors in their First Day Motions, are essential to the success of the Debtors' reorganization and were included in the DIP Facility sizing.  Absent payment to the Vendor Claimants, the Debtors' businesses and estates, as well as their overall creditor base will suffer irreparable harm and value loss.  In addition to the foregoing operational considerations, FTI and the Debtors considered the incremental administrative costs of a complex chapter 11 filing with a large number of stakeholders, including multiple lender groups, business entities, and governmental entities, each of whom will likely be represented by counsel and other professional advisors.

41.    Based on these considerations, the Debtors and their advisors determined that smooth postpetition operations would require incremental liquidity of approximately

$100 million to operate and satisfy all administrative costs and expenses associated with these chapter 11 cases as they come due.

42.     The Debtors have an urgent and immediate need to obtain financing, particularly on an interim basis as set forth in the DIP Motion, which is necessary to finance and pay for key vendor and employee obligations.  Without the funds provided under the DIP Facility, I believe the Debtors would run out of the liquidity required to operate their businesses within the first week of their chapter 11 cases.  Moreover, without access to the liquidity provided by the DIP Facility, the Debtors could be forced to idle or shut down their mining complexes, lose valuable customer accounts, or liquidate on an expedited basis, potentially to the material detriment of the Debtors' creditors, customers, vendors, employees, and other parties in interest.  Accordingly, without the cash and stability provided by the DIP Facility, I believe that immediate and irreparable harm would occur as a result of the Debtors' inability to continue ordinary course operations.

43.     Given the Debtors' need for immediate liquidity to fund their chapter 11 cases, in my view, the covenants and restrictions included in the DIP Facility are reasonable under the circumstances of the Chapter 11 Cases, and I do not believe that they are not designed to make the Debtors disproportionately susceptible to a breach of such terms. Given the Debtors' current liquidity needs, their capital structure and current projections, the challenging situation in the coal industry, the Ad Hoc Group's refusal to consent to a priming loan, and the lack of any alternative financing, I believe that the terms of the DIP Facility represent the best terms available to the Debtors.

44.    Accordingly, based on the foregoing considerations, I believe that the proposed DIP Facility should be approved on the terms and conditions described in the DIP Motion.

ii.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of the Debtors' Existing Cash Management System; (B) Authorizing Use of Existing Bank Accounts and Business Forms; (C) Granting a Limited Waiver of Requirements of Section 345(b) of the Bankruptcy Code; (D) Authorizing Continuation of Ordinary Course Intercompany Transactions; (E) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims; and (F) Granting Related Relief (the "Cash Management Motion").

45.    Pursuant to the Cash Management Motion, the Debtors seek interim and final orders (a) authorizing and approving the Debtors to continue using their existing cash management system (the "Cash Management System"); (b) authorizing the Debtors to continue using their existing bank accounts listed on **Exhibit A** attached to the Cash Management Motion (collectively, the "Bank Accounts") at the financial institutions identified thereon (collectively, the "Banks") and existing checks; (c) partially waiving the requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines (as defined herein); (d) authorizing the continuation of ordinary course Intercompany Transactions (as defined herein) among Debtors and between Debtors and non-Debtor affiliates, including the payment of prepetition and postpetition Intercompany Claims (as defined herein) arising therefrom in the ordinary course of business; (e) granting administrative expense priority status to postpetition Intercompany Claims pursuant to section 503(b)(1) of the Bankruptcy Code; and (f) granting related relief.

a.  **The Debtors' Cash Management System**

46.    In connection with their coal mining and marketing operations, the Debtors maintain an integrated Cash Management System in the ordinary course of business that allows them to efficiently administer their cash and financial affairs.  As described herein, I believe that any disruption to the Cash Management System would have an immediate adverse

impact on and cause irreparable harm to the Debtors' businesses.  Accordingly, to minimize the disruption caused by these chapter 11 cases and maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize their existing Cash Management System during the pendency of these chapter 11 cases.  In connection with this relief, the Debtors also seek a waiver of certain of the United States Trustee's Chapter 11 Guidelines for Debtors-In-Possession (the "U.S. Trustee Guidelines") established by the U.S. Trustee that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and obtain new checks bearing a "debtor-in possession" legend.

**b.  Description of Bank Accounts**

47.    The Debtors collect and concentrate the funds generated by the Debtors' operations from their customers and use such collected amounts to service the Debtors' debt obligations and to fund disbursements to their vendors, suppliers, employees, and other creditors. In its entirety, the Debtors' Cash Management System consists of eleven (11) Bank Accounts maintained at four (4) Banks.[4]  A general description of the Bank Accounts, transfers between such accounts, and their purpose in the Cash Management System is set forth in the following table:

---

[4]    I also note that the Debtors maintain two (2) additional Bank Accounts at Banks in their name only.  One Bank Account (x020) is in the name of Foresight Energy LLC and maintained with Morgan Stanley Smith Barney LLC, which holds funds for certain section 529 plans maintained for the benefit of third-parties.  The other Bank Account (x5635) is in the name of Mach Mining, LLC and maintained with First Southern Bank, which holds certain charitable funds donated by third-parties in favor of third-parties.  I understand that (a) the Debtors do not use the funds held within or transfer amounts to or from these Bank Accounts, (b) the Debtors do not control these Bank Accounts and they are held within the Debtors' names only for convenience purposes, and (c) the funds held within these accounts are not considered property of the Debtors' estates, and are instead the property of the applicable third-parties.

| Bank Account | Description |
|---|---|
| Concentration Account, No. x9601<br>Bank: The Huntington National Bank ("Huntington")<br>Debtor: Foresight Energy LLC | This is the Debtors' main cash account. The majority of amounts received throughout the day in the receivables Bank Accounts or amounts leftover in any disbursements Bank Accounts are swept into this account at the end of the day. Likewise, the Debtors use the Concentration Account to fund the majority of their disbursements made through the disbursement Bank Accounts. The Concentration Account is also used to receive amounts drawn on the Debtors' revolving credit facility, and to make substantial capital payments such as debt or interest payments. The Concentration Account held a balance of approximately $1.75 million as of March 9, 2020, and in the 2019 calendar year, held an average balance of $14.8 million. |
| Coal Receipts Account, No. x6973<br>Bank: Huntington<br>Debtor: Foresight Receivables LLC | This is an account used to receive coal sale proceeds—the Debtors' main revenue generator. As a zero-balance account ("ZBA"), this account does not maintain an overnight balance, and all amounts are swept into the Concentration Account at the end of the day. |
| Non-Coal Receipts Account, No. x6694<br>Bank: Huntington<br>Debtor: Foresight Energy LLC | This is a secondary receivables account used to receive amounts unrelated to the Debtors' coal sales, such as proceeds from mining equipment sales, scrap sales, and ordinary course intercompany receivables. As a ZBA, all amounts in this account are swept into the Concentration Account at the end of the day. |
| Operating Account, No. x6681<br>Bank: Huntington<br>Debtor: Foresight Energy LLC | This is the Debtors' primary disbursement account, and is used to, among other things, pay amounts to the Debtors' vendors, suppliers, and servicers, make debt interest payments, and pay affiliates through ordinary course intercompany transactions. As a ZBA, this account does not maintain an overnight balance. Instead, Huntington keeps track of all check and wire requests made against this account throughout the day and, at the end of the day, all amounts requested are fully withdrawn from the Concentration Account to this account and then transferred to the appropriate requesting parties. |
| Main Payroll Account, No. x8214<br>Bank: Huntington:<br>Debtor: Foresight Energy LLC | This account funds the majority of the Debtors' payroll disbursements to their employees, and is also used to fund the MaRyan Cash Account and Mach Cash Account (each, as defined herein). As a ZBA, this account does not maintain an overnight balance. Like the Operating Account, Huntington tracks requests for payment, and at the end of the day, withdraws the appropriate amount from the Concentration Account to pay amounts related to payroll. |
| Corporate Payroll Account, No. x6539<br>Bank: Huntington<br>Debtor: Foresight Energy Services LLC | The Debtors use this account to pay the majority of their corporate employees based in their headquarters in St. Louis, Missouri. This account is generally pre-funded from the Concentration Account two (2) business days before payroll for the Debtors' corporate employees. Generally, except in connection with prefunding payroll, the Corporate Payroll Account maintains a *de minimis* or $0 balance. |
| MaRyan Cash Account, No. x4605<br>Bank: CNB Bank & Trust, N.A.<br>Debtor: MaRyan Mining LLC | This account is used primarily to fund operations at the Macoupin mine, for which MaRyan Mining LLC makes disbursements to the employees. On average, the Debtors fund approximately $35,000 monthly to this account from the Main Payroll Account. In the year before the Petition Date, this account held an average month-end balance of approximately $5,000. |

| Bank Account | Description |
|---|---|
| Mach Cash Account, No. x4129<br>Bank: First Southern Bank<br>Debtor: Mach Mining LLC | This account is used to fund petty cash amounts for operational purposes at the Williamson mine, for which Mach Mining LLC provides the employees.    On average, the Debtors fund approximately $15,000 monthly to this account from the Main Payroll Account.  In the year before the Petition Date, this account held an average month-end balance of approximately $7,000. |
| Hillsboro Account, No. x5031<br>Bank: Huntington<br>Debtor: Hillsboro Energy LLC | This account maintains funds provided from the Concentration Account to make payments to vendors, employees, and other parties relating to mining operations of Hillsboro Energy LLC ("Hillsboro"), and to facilitate intercompany transactions.    The Hillsboro Account held a balance of approximately $510,000 as of March 9, 2020, and in the year before the Petition Date, held an average balance of approximately $5.7 million.[5] |
| Patton Cash Account, No. x6394<br>Bank: CNB Bank & Trust, N.A.<br>Debtor: Patton Mining LLC | This account is used to fund petty cash amounts for operational purposes at the Hillsboro mine, for which Patton Mining LLC provides the employees.    On average, the Debtors fund approximately $600 monthly to this account from the Hillsboro Account.  In the year before the Petition Date, this account held an average month-end balance of approximately $1,000. |
| Collateral Account, No. x7011<br>Bank: F.N.B. Wealth Management<br>Debtor: Foresight Energy LP | This account is a collateral account that the Debtors own jointly with their workers' compensation policy provider, Rockwood Casualty Insurance Company.  The Debtors maintain funds in this account to secure their payment obligations for workers' compensation claims, and Rockwood has the right to withdraw funds from this account in the event the Debtors fail to pay such claims.  As of the Petition Date, this account held a balance of approximately $1.95 million.  This is an interest-bearing account, with the proceeds of such interest kept in the account and reinvested into money-market funds. |

48.    I believe that the Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors in the coal industry.  Indeed, large businesses use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple corporate entities.  I therefore believe that the Cash Management System is vital to the Debtors' ability to conduct their daily operations, including receiving revenue and paying their vendors, employees, and stakeholders.    Any disruption of the Cash Management System would accordingly be materially detrimental to the Debtors' operations.

---

[5]    The relatively high average results from the receipt of insurance proceeds in late 2019 relating to a prior combustion event at the Hillsboro mining complex, which is discussed further in the Moore Declaration.

c. **Compliance of the Bank Accounts with Section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines**

49.     Almost every Bank Account is maintained at a Bank that is insured by the Federal Deposit Insurance Corporation (the "FDIC").  Furthermore, the Bank Accounts do not generally maintain balances in excess of the FDIC insurance limit.  The limited exceptions constitute the (a) Concentration Account and Hillsboro Account each maintained at Huntington, which exceeds the FDIC insurance limits because it holds the majority of the Debtors' cash, and (b) Collateral Account, which is not FDIC insured, but maintains amounts for the benefit of Rockwood as collateral for the Debtors' workers' compensation obligations.  As such, except for the Concentration Account, the Hillsboro Account, and the Collateral Account, I understand that the Bank Accounts comply with section 345(b) of the Bankruptcy Code.  Despite this compliance, however, I further understand that per the U.S. Trustee Guidelines, chapter 11 debtors are required to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee.  Here, none of the Bank Accounts are held by Banks designated as "Authorized Depositories" under the U.S. Trustee Guidelines.

50.     Notwithstanding the foregoing, the Debtors request in the Cash Management Motion that the Court waive compliance with (a) section 345(b) of the Bankruptcy Code with respect to the Concentration Account, Hillsboro Account, and Collateral Account and (b) the U.S. Trustee Guidelines, and instead authorize each of the Banks to continue to maintain, service, and administer the applicable Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business.  The Banks are each well-capitalized and financially stable institutions, and the amounts maintained in each of these Bank Accounts are either insured by the FDIC and/or are meant as security of the Debtors'

obligations for the benefit of a third-party, as applicable. Accordingly, I believe that a limited waiver of strict compliance with section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines will not prejudice the Debtors' stakeholders or adversely impact the Debtors' ability to operate during these chapter 11 cases.

51.    Moreover, I believe that requiring the Debtors to close their Bank Accounts at the Banks and reopen them at designated Authorized Depositories would place a severely disruptive and unnecessary administrative burden on the Debtors given that there is no meaningful risk to the cash held therein. In addition, closure of the Collateral Account, which the Debtors own jointly with Rockwood, could jeopardize the Debtors' ability to maintain a workers' compensation policy as required by law, and could impact the value of the Debtors' estates and cause undue hardship to the Debtors' employees. Therefore, I believe that cause exists to continue to allow the Debtors to utilize the existing Bank Accounts.

**d.  Bank Fees**

52.    In the ordinary course of business, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses (collectively, the "Bank Fees"). Historically, the Debtors estimate that they pay up to approximately $6,500 in Bank Fees each month, depending on transaction volume. The Debtors estimate that there are approximately $6,500 in prepetition Bank Fees outstanding on the Petition Date. To maintain the integrity of their Cash Management System, I believe that it is necessary and appropriate for the Court to grant the Debtors authority to pay prepetition Bank Fees, in addition to any other Bank Fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business.

**e.  Business Forms**

53.     As part of their Cash Management System, the Debtors utilize numerous preprinted correspondence and business forms, including letterhead, purchase orders, invoices, and preprinted checks (collectively, the "Business Forms") in the ordinary course of their businesses.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all existing Business Forms as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as chapter 11 debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new books and records; *provided* that once the existing Business Forms have been used, the Debtors shall, during the pendency of these chapter 11 cases, reorder new Business Forms that include a stamp to reference the Debtors' status as debtors in possession and the corresponding bankruptcy case number.

**f.  Credit Card Program**

54.     The Debtors utilize three (3) corporate credit cards issued by American Express Company ("AMEX") under a program (the "Credit Card Program") in the ordinary course of business to pay for certain general business expenses incurred by their employees, as is discussed further in their Employee Wages Motion.  While such credit cards are issued to the applicable employees, the Debtors are directly liable to AMEX for amounts owed on account of the credit cards.  Generally, such reimbursable expenses under the Credit Card Program average approximately $17,500 a month, which the Debtors pay in the ordinary course of business.  Per the Cash Management Motion, the Debtors request authority to maintain the Credit Card Program as a part of their Cash Management System, in their discretion and in the ordinary course of business, and to authorize AMEX as a Bank, each to the extent necessary.

### g.  Intercompany Transactions

55.     In the ordinary course of business, the Debtors engage in various intercompany activities (a) amongst themselves and (b) with their related non-Debtor affiliates Murray Energy Corporation ("MEC," and collectively with its non-Debtor affiliates and subsidiaries, "Murray") and Foresight Reserves LP (collectively with its non-Debtor affiliates, "Reserves"), all giving rise to intercompany transactions (the "Intercompany Transactions").  In the ordinary course of business, the Intercompany Transactions include payables and receivables between, against, among, and on behalf of the Debtors and their non-Debtor affiliates, giving rise to intercompany claims (the "Intercompany Claims").

56.     The vast majority of these Intercompany Transactions are reflected as receivables and payables in the respective Debtor's or non-Debtor affiliate's accounting system. The Intercompany Claims that arise from the Intercompany Transactions generally include (a) management or services fees arising from management services agreements, (b) intercompany payables and receivables generated from payment of operating expenses or payroll and payroll related expenses by Foresight Energy LLC ("FELLC") on behalf of its Debtor-affiliates, (c) payables and receivables on account of coal sales and transportation costs, (d) payables and receivables on account of lease and royalty agreements, and (e) payables and receivables on account of services performed or goods supplied between Debtor entities or between and among a non-Debtor affiliate and a Debtor entity.

### (i)     Importance of the Intercompany Transactions

57.     The Debtors' intercompany activities represent a substantial and necessary portion of the Debtors' business operations, enabling the Debtors to leverage a vast economic, production, and transportation network with which to sell their coal products domestically and internationally in a cost-effective, efficient, and timely manner.  In addition, these intercompany

arrangements allow the Debtors to operate with a much smaller selling, general and administrative expense ("SG&A") footprint through reduced corporate employee headcount and associated administration costs. I believe that without the Debtors' intercompany arrangements, the Debtors would be simply incapable of performing their business operations to the extent and degree with which they have before the Petition Date, which would cause material harm to the value of the Debtors' estates and their creditor constituencies.

58.    As described herein, the Intercompany Transactions are an essential and integral component of the Debtors' operations and centralized Cash Management System. The Intercompany Transactions generate operational efficiencies, increase operational flexibility, provide significant cost savings, and improve the market position of both the Debtors and their non-Debtor affiliates, all of which benefit the Debtors' estates. I believe that any interruption of the Intercompany Transactions, including the payment of resulting Intercompany Claims, would severely disrupt the Debtors' operations, perhaps halting such operations entirely, and would result in great harm to the Debtors' estates and their stakeholders.

59.    The Debtors maintain clear records of the Intercompany Transactions and can ascertain, trace, and account for Intercompany Transactions (a) between and among the Debtors and (b) between and among the Debtors and their non-Debtor affiliates, and accordingly, the Debtors will be able to continue this accounting on a postpetition basis. To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of other Debtors, and to ensure that the Debtors are otherwise able to continue their operations in the ordinary course of business, the Debtors request this Court's approval to accord administrative expense priority status to all Intercompany Claims (a) among the Debtors, and (b) held by Murray and Reserves against the Debtors arising after the Petition Date as a result of an Intercompany

Transaction.  I believe that if the Intercompany Claims have administrative expense priority status, each Debtor will continue to bear ultimate repayment responsibility for these ordinary course transactions, and moreover, the Debtors will be able to provide the assurances necessary to demonstrate to their non-Debtor affiliates that they will be able to continue operating in the ordinary course of business and provide fair compensation for their services and goods, consistent with prepetition practice.  A description of the Debtors' Intercompany Transactions, and their resulting Intercompany Claims, are discussed below.

### (ii)    Intercompany Transactions Among Debtors

60.    In the ordinary course of business, the Debtors maintain various business relationships, and perform certain services for, other Debtors.   The Debtors' corporate accounting department records each of the resulting payables and receivables in the Debtors' centralized accounting system.  Such Intercompany Transactions generally fall into the following categories:

- *Operating and Corporate Overhead Expenses*:   Operating and corporate overhead expenses incurred by the Debtors are generally paid by FELLC out of the Operating Account.

- *Payroll*:  Each operating Debtor uses employees who are employed by a related, but separate, Debtor.  The payroll of each of these employing Debtors is processed and paid by FELLC and applicable subsidiaries, except for employees relating to Hillsboro, which are processed by Hillsboro.  FELLC pays payroll for non-Hillsboro employees through the Main Payroll Account, and Hillsboro pays payroll for employees used from Patton Mining LLC through the Hillsboro Account, and, as applicable, each entity issues checks and ACH transfers to the respective employees from the applicable Bank Account.  Foresight Energy Services LLC and applicable subsidiaries pay the Debtors' corporate employees through the Corporate Payroll Account.

- *Accounts Payable*:  FELLC processes the majority of the Debtors' accounts payable in the ordinary course of business on behalf of the operating entities, including taxes, payments to holders of royalty interests, and other accounts payable, but Hillsboro and certain other Debtors fund or pay certain ordinary course or *de minimis* accounts payable as well.

- *Capital Expenditures*:  FELP manages all major capital expenditures and approves all projects at the respective operating entities.  FELLC then makes payments from the Operating Account, or on occasion the Concentration Account, to fund such capital expenditures to the extent they arise at FELP's direct or indirect subsidiaries.  To the extent that capital expenditures are made at Hillsboro, such capital expenditures are paid from the Hillsboro Account.

- *Receipt of Coal Sale Proceeds*:  All of the Debtors' coal sale proceeds are received by Foresight Receivables LLC in the Coal Receipts Account, regardless of which mine extracts the coal or which Debtor is a party to the coal sale contract.

- *Services by Debtor Entities*: Certain Debtors operate stand-alone businesses that provide goods and services such as machine repair work, parts supply, longwall rebuilds, shipping and docking services, and loading services.  As discussed herein, these entities provide goods and services to other Debtors or non-Debtor affiliates, which give rise to Intercompany Transactions and related Intercompany Claims.

**(iii)    Intercompany Transactions with Murray**

61.    The Debtors engage in the following categories of Intercompany Transactions with Murray, which are each discussed herein:  (a) ordinary course Intercompany Transactions to source coal under applicable coal sale agreements, whereby one entity will "sell" coal to the other entity at the applicable contract price ("At-Contract Intercompany Coal Sales") and the purchasing entity generates a corresponding account payable in favor of the selling entity, (b) payment of fees and expenses by the Debtors or Murray under the *Third Amended and Restated Management Services Agreement* between Murray-affiliate Murray American Coal, Inc. and Debtor Foresight Energy GP LLC, the general partner of FELP, effective as of March 28, 2017 (the "Management Services Agreement"), (c) lease payments by Murray under Debtor American Century Transport LLC's *Lease Agreement* with Murray-affiliate American Energy Corporation, dated April 16, 2015 (the "Lease Agreement") and coal royalties by Murray under Debtor American Century Mineral LLC's *Overriding Royalty Agreement* with American Energy Corporation and Murray-affiliate Consolidated Land Company, dated April 16, 2015

(the "Overriding Royalty Agreement," and together with the Lease Agreement, the "Lease and Overriding Royalty Agreements"), and (d) other ordinary course transactions, such as the provision of rebuilding services, purchase of equipment and supplies, sharing of transportation infrastructure and third party contracted capacity, and together entering into major vendor arrangements to reap the benefits of volume rebates and unit price discounts from key vendors (the "Ordinary Course Murray Transactions").

62.    *Intercompany Coal Sale Transactions.*    Pursuant to their strategic partnership and to the benefit of each of the Debtors and Murray, the Debtors and Murray from time to time fulfill coal sales under each other's respective coal sale agreements.  I believe that the resulting At-Contract Intercompany Sales between the Debtors and Murray provide a valuable synergy for both the Debtors' and Murray's businesses, as they (a) insulate the Debtors and Murray from the volatility of the spot market from which the Debtors and Murray would otherwise have to either source coal to fill orders or offload excess inventory, (b) allow the Debtors and Murray to purchase each other's available supply to satisfy their respective customers' demands, and (c) allow the Debtors and Murray to deliver blends of coal that best meet customers' needs and optimize operational and logistical efficiencies.

63.    If Murray sources coal under the Debtors' contracts, the Debtors use their Coal Receipts Account to collect the ultimate third-party purchaser's coal payment on Murray's behalf and then transfers the payment to Murray.  As such, the sale is in substance a sale to the third-party purchaser, with the Debtors simply acting as a pass-through entity for the third-party purchaser's payment to Murray.  Likewise, if the Debtors source coal under Murray's contracts, Murray collects the ultimate third-party purchaser's coal payment on the Debtors' behalf and then transfers the payment to the Coal Receipts Account.  As such, the sale is in substance a sale

to the third-party purchaser, with Murray acting as a pass-through entity for the third-party purchaser's payment to the Debtors. Even though Murray is fulfilling the Debtors' contracts in these instances, the Debtors remain the contracting party and are ultimately responsible for the obligations under the applicable agreements. As of January 31, 2020, the Debtors owe Murray approximately $170,000, and Murray owes the Debtors approximately $9.7 million, each on account of At-Contract Intercompany Coal Sales.

64.      *Management Services Agreement.*  The Debtors engage in Intercompany Transactions with Murray pursuant to the Management Services Agreement. Pursuant to the Management Services Agreement, Murray manages all aspects of the Debtors' mining operations, including (a) coordination and management of employees and contractors at the mines, (b) mine planning and engineering services, (c) coal sales and related marketing services, (d) procurement management services, (e) human resources and employee-related functions, (f) provision of information technology systems and related services, (g) compliance and investor relations services, (h) financial, accounting, and loan related services, and (i) legal services. This management under the Management Services Agreement allows the Debtors to operate with greatly reduced general and operating expenses, with limited corporate overhead and related costs.

65.      In exchange, the Debtors are obligated to pay a quarterly management fee of $5,000,000, adjusted annually for inflation. When the Debtors incur expenses on behalf of Murray, the Debtors invoice Murray for such expenses and, at the end of the quarter, Murray transfers funds to the Debtors to reimburse the Debtors for such expenses incurred in the preceding quarter, subject to the terms and conditions of the Management Services Agreement. Under the Management Services Agreement, the Debtors have incurred to Murray approximately

$5.3 million on account of quarterly management fees, other services, and reimbursable expenses, and Murray has incurred to the Debtors approximately $530,000 on account of SG&A reimbursement, each as of the Petition Date.

66.    *Lease and Overriding Royalty Agreements*.    Pursuant to the Lease Agreement, Murray pays the Debtors lease payments in the amount of $1.15 – $1.75/ton for processed coal at certain mines.    The initial term of the Lease Agreement is fifteen (15) years. Pursuant to the Overriding Royalty Agreement, Murray pays the Debtors royalty payments in the amount of $0.30 – $0.50/ton for each ton of coal sold from certain coal reserves.    The initial term of the Overriding Royalty Agreement is eighteen (18) years.    As of January 31, 2020, Murray has a discounted liability to the Debtors of approximately $63 million in both near- and long-term obligations under the Lease and Overriding Royalty Agreements, of which approximately $5.6 million constitutes near-term obligations.

67.    *Ordinary Course Murray Transactions.*    The Debtors and Murray engage in other miscellaneous Intercompany Transactions through contractual services or operational practices.    In each case, I believe both the Debtors and Murray realize significant economic and operational benefits on account of such transactions.    The Ordinary Course Murray Transactions include:

- Ordinary Course Purchasing of Building and Equipment Services:  As described above, certain of the Debtors operate standalone businesses that accept orders from or deliver equipment services to Debtors and non-Debtor affiliates.  Murray likewise has similar businesses within its corporate family that provide certain goods and equipment services to Debtors and non-Debtor affiliates.  From time to time, certain Debtors may do business with such Murray entities and *vice versa*.  Each such transaction is invoiced and recorded in the Debtors' books and records in the same manner as any other transaction.

- Sharing of Transportation Infrastructure:  The Debtors and Murray have the ability to use each other's transportation networks and contracted capacity with third-party providers, some of which are take-or-pay in nature.  In addition to

generating operational efficiencies and enabling both the Debtors and Murray to realize cost savings, such sharing provides access to rail, barge, and transloading facilities that may not otherwise be available to the Debtors or Murray independently.  To the extent the Debtors or Murray use the capacity under each other's transportation networks, each party reimburses the other at cost.

- Combined Purchasing:  The Debtors and Murray jointly enter into occasional procurement transactions, for the benefit of themselves and their respective affiliates, which combines scale and increase purchasing leverage as compared to their respective standalone companies.  Combined purchasing provides significant cost savings to both the Debtors and Murray in the form of volume rebates and unit price discounts from key vendors.

68.    As of January 31, 2020, the Debtors estimate that, on account of the Ordinary Course Murray Transactions, Murray owes the Debtors approximately $730,000, and that the Debtors owe Murray approximately $450,000.

**(iv)    Intercompany Transactions with Reserves**

69.    Debtors maintain various coal reserve royalty and lease agreements with Reserves.  The Debtors pay royalties under the:

- *Coal Mining Lease*, between Debtor Sugar Camp Energy, LLC ("Sugar Camp") and Reserves-affiliate Ruger Coal Company, LLC ("Ruger"), dated August 12, 2010, and two related overriding royalty interest agreements in favor of Ruger (collectively, as amended, the "Ruger Royalty Agreements") relating to Ruger's lease of and interest in certain coal reserves in the Sugar Camp complex to the Debtors;

- *Coal Mining Lease and Sublease*, between Debtor Williamson Energy, LLC ("Williamson") and Reserves-affiliate Colt LLC ("Colt"), dated August 12, 2010 (as amended, the "Colt-Williamson Royalty Agreement") relating to Colt's lease and sublease of certain coal reserves in the Williamson mine to the Debtors;

- *Coal Mining Lease (for "Reserve 1" and "Reserve 3")* and the *Coal Mining Lease (for "Reserve 2")*, each as between Hillsboro and Colt and dated August 12, 2010 (together, as amended, the "Colt-Hillsboro Royalty Agreements") relating to Colt's leases of certain coal reserves in the Hillsboro mine to the Debtors; and

- *Coal Mining Lease and Sublease (Macoupin North Mine Assignment)* and *Coal Mining Lease and Sublease (Unassigned Reserves)*, each as between Debtor Macoupin Energy LLC ("Macoupin") and Colt and dated August 12, 2010, and *Coal Mining Lease (New Memphis/Monterey 2 Reserves)*, between the same

32

parties and dated June 1, 2012 (together, as amended, the "Colt-Macoupin Royalty Agreements," and together with the Ruger Royalty Agreement, the Colt-Williamson Royalty Agreement, the Colt-Hillsboro Royalty Agreements, and any related agreements, the "Reserves Royalty Agreements"), relating to Colt's lease and sublease, as applicable, of certain coal reserves in the Macoupin mine to the Debtors.

70.     In addition to the Reserves Royalty Agreements, the Debtors maintain two (2) surface leases for a coal preparation plant and rail loadout facility between Reserves-affiliate New River Royalty, LLC ("New River") and Debtor Williamson Energy, LLC (the leases together, the "Reserves Leases").  The terms of the Reserves Leases expire on October 15, 2021, but may be extended for additional five (5) year terms at Reserves' election.  The Debtors are required to pay an aggregate rent of $100,000 per year to Reserves under the Reserves Leases. The Debtors also maintain a surface lease for a transport terminal between Debtor Sitran LLC and New River.  The terms of this lease expire on December 31, 2020, but may be extended by additional five (5) year terms at the Debtors' election.  The Debtors pay an annual rent of $50,000 to Reserves under this lease.

### (v)     Necessity of Cash Management System and Intercompany Transactions

71.     I believe that the Cash Management System constitutes an ordinary course and essential business practice of the Debtors, and is consistent with those utilized by corporate enterprises comparable to the Debtors in size and complexity.  The Cash Management System provides significant benefits to the Debtors including, among other things, the ability to control corporate funds, to ensure the availability of funds when necessary, and to reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information.  Thus, to ensure the seamless operation of the Debtors' businesses and to realize the benefits of the Cash Management System, I believe that the Debtors should be allowed to continue using the Cash Management System, including the payment of

Bank Fees and the maintenance of the Credit Card Program, and should not be required to open new bank accounts.

72.     Any disruption to the Debtors' current cash management procedures would impair the Debtors' ability to successfully administer these chapter 11 cases.  It would be time consuming, difficult, and costly for the Debtors to establish an entirely new system of accounts and a new cash management system.  The attendant delays from revising cash management procedures and redirecting receipts would create unnecessary pressure on the Debtors and their employees while they work to meet the other administrative obligations imposed by chapter 11.  The Debtors will maintain records of all transfers within the Cash Management System to the same extent they were recorded by the Debtors before the Petition Date.  As a result, the Debtors will be able to document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.

73.     Furthermore, I believe that the Debtors can achieve the goals of the U.S. Trustee Guidelines without closing their existing Bank Accounts and opening new ones.  The Debtors can and will identify all prepetition checks and other forms of payment outstanding on the Petition Date and notify the appropriate bank not to pay such checks or obligations without proper authorization.  The systems currently employed by the Debtors and the Banks are sufficient to ensure that prepetition obligations are not paid improperly.  However, to avoid delays in payments to administrative creditors, to ensure a transition into chapter 11 with minimal disruption, and to aid in the Debtors' efforts to preserve and maximize the value of their assets, it is important that the Debtors be permitted to continue to maintain the Bank Accounts with the same account numbers following the Petition Date.

74.     By preserving business continuity and avoiding disruption and delay to the collection of the Debtors' receipts and making of disbursements that would necessarily result from closing the Bank Accounts and opening new accounts, I believe that all parties in interest, including employees, vendors, and customers, will be best served.  The confusion that would result absent the relief requested in the Cash Management Motion would ill serve the Debtors' chapter 11 efforts.

75.     Given the discussion herein, if the Debtors are not permitted to maintain and utilize their Bank Accounts and continue to use their existing checks as set forth herein, I believe it would (a) disrupt the ordinary financial affairs and business operations of the Debtors, (b) delay the administration of the Debtors' estates, (c) compromise the Debtors' internal controls and accounting system, and (d) require the Debtors to spend funds unnecessarily to set up new systems and open new accounts and print new checks.  Accordingly, I believe the relief requested in the Cash Management Motion should be granted.

76.     In addition, with respect to amounts in any of the Bank Accounts, particularly the Concentration Account and the Hillsboro Account, in excess of the FDIC insurance limit, I believe that cause exists to waive any such noncompliance because (a) such funds are deposited safely and prudently at Huntington, which is a financially-stable and well-capitalized banking institution, in a manner specifically designed to preserve capital and maintain liquidity; (b) it would be unnecessarily and administratively harmful for the Debtors to restructure their Cash Management System to move their Bank Accounts to other Banks, seek depository agreements, or split their funds among multiple new Bank Accounts; and (c) the Debtors' secured lenders, who maintain a security interest in the funds held in certain of the Bank Accounts, have consented to the Debtors' continued use of such Bank Accounts, thus

validating the prudence of the Debtors' use of such Bank Accounts. For similar reasons, I believe that it is appropriate to maintain funds in the Collateral Account, where such funds are intended as collateral securing their workers compensation obligations.

77.    Finally, the Intercompany Transactions are made between and among Debtors and non-Debtor affiliates in the ordinary course as part of the Cash Management System. Because the Debtors engage in the Intercompany Transactions described herein on a regular basis and such transactions are common among large enterprises similar to the Debtors, I believe that the Intercompany Transactions are ordinary course transactions.

78.    Moreover, the continued performance of ordinary course Intercompany Transactions and the payment of the Intercompany Claims arising therefrom is necessary to ensure the Debtors' ability to operate their businesses during these chapter 11 cases. If the Intercompany Transactions were to be discontinued, the Cash Management System, related administrative controls, and the Debtors' overall business operations would be disrupted, if not halted in full, to the Debtors' and each of their estates' detriment. Accordingly, I believe that the continued performance of the Intercompany Transactions, including the payment of prepetition and postpetition Intercompany Claims that arise therefrom, is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance and pay applicable claims. Furthermore, I believe that granting administrative expense priority status to Intercompany Claims of non-Debtor affiliates on account of Intercompany Transactions will preserve substantial value and business relationships benefiting the Debtors' estates, prevent unnecessary disruptions to the Debtors' businesses, and ensure continued performance under the Debtors' prepetition business arrangements with their non-Debtor affiliates.

C.    **Operational Motions**

    i.   Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay Petition Claims of Trade and Lien Claimants and Authorizing Payment Procedures Related Thereto, (B) Authorizing Debtors to Pay Royalty and Leasehold Claims, (C) Granting Administrative Expense Priority Status to Outstanding Orders, and (D) Granting Related Relief (the "<u>Vendors Motion</u>").

    79.    Under the Vendors Motion, the Debtors seek interim and final orders (a) authorizing the Debtors to pay in the ordinary course of business certain prepetition claims held by certain (i) Critical Vendors, (ii) 503(b)(9) Claimants, and (iii) Lien Claimants (each as defined in the Vendors Motion, and collectively, the "<u>Vender Claimants</u>"), in a collective amount not to exceed $23.2 million on an interim basis and $43.1 million on a final basis, (b) authorizing the Debtors to pay in the ordinary course of business certain Royalty and Leasehold Claimants (as defined herein), in an amount not to exceed $9.7 million on an interim basis and $14.5 million on a final basis, (c) granting administrative expense priority status of Outstanding Orders (as defined herein) after postpetition delivery of goods, and (d) granting related relief.

    a.  **The Debtors Trade Claimants**

    80.    The Debtors extract and process coal at their mining complexes and deliver this coal to their customers in the ordinary course of business.  The Debtors' ability to extract, process, and deliver coal in a timely manner is paramount to their financial performance and depends on their prompt and continuous receipt of a wide range of goods and services. Given the highly specialized nature of the machinery, equipment, supplies, and materials used in mining, processing, and producing coal products and the coal mining industry generally, the Debtors rely on specific vendors, suppliers, servicers, and shippers to provide the Debtors with goods and services necessary for their businesses to function and to ensure safe mining conditions and compliance with federal and state regulations.  The Debtors therefore have limited options for their parts, materials, supplies, and repair needs.

81.     In addition, the Debtors routinely transport coal from their mines to their customers by rail, barge, or truck, and reach their international customers through utilization of port loadout facilities.  Any disruption to the Debtors' transportation network would have an immediate and adverse impact on the Debtors' businesses.  Functional transportation is necessary for the Debtors' operations to avoid logjams in supplies or inventory and to maximize the revenue from coal shipments.  The goods and services provided by the Vendor Claimants are thus vital for the day-to-day operation of the Debtors businesses.

82.     As discussed further in the Moore Declaration, the Debtors' historic thermal coal markets have been challenged over the last decade.  These detrimental market conditions were caused by, among other things, changes in legislative priorities away from coal, greater market interest and commercialization of shale gas, natural gas, and renewable energy, and decreased consumer power demand arising from recent cooler summers and warmer winters. The Debtors originally weathered this industry downturn through selling cost-competitive coal to their customers derived through improved operational, production, and logistical efficiencies. However, industry challenges were amplified through (a) financial, legislative, and regulatory strains on the Debtors' customers and (b) the rise of Russian coal and global natural gas exports into Europe, rendering coal exports from the United States to Europe and other international markets uneconomic.

83.     Before the Petition Date, the Debtors extended payment terms for most Vendor Claimants to preserve liquidity and to ensure payment to those vendors critical to mine safety and production.  Altogether, as of the Petition Date, the Debtors estimate that they owe approximately $43.1 million in total Vendor Claims, which represents 41% of an estimated

$105 million[6] in all prepetition general unsecured trade claims. Altogether, I believe that Vendor Claimants are necessary to provide the goods and services required for the Debtors to operate their businesses in a safe and economical manner, and to maximize the value of the Debtors' estates.

**b. Critical Vendor Claims**

84. The Debtors depend on select Critical Vendors who can supply the necessary quality, type, and quantity of goods and services in a manner required for the Debtors to operate in the ordinary course of business. Any interruption to the flow of goods or services from the Critical Vendors would disrupt the Debtors' operations and would cause irreparable harm to the Debtors' businesses, value, customer base and confidence, and industry market share, and could risk material harm to or the safety of the Debtors' mine workers.

85. Accordingly, the Debtors, with FTI and the assistance of the Debtors' other advisors, have thoroughly reviewed their business relationships and identified the Critical Vendors whose particular goods or services are necessary to avoid immediate and irreparable harm to the Debtors' businesses. In particular, the Debtors reviewed their accounts payable and prepetition vendor lists to identify the Critical Vendors using the following criteria: (a) whether vendors were sole source or limited source suppliers necessary for undisrupted business operations, (b) the availability of, and the ability and time required to locate, alternative sources of comparable and necessary goods and services, (c) whether the Debtors' inventory levels or service coverage is sufficient to meet customer demand while an alternative vendor is sourced, (d) which vendors would be prohibitively expensive to replace, (e) whether the loss of a vendor would present an unacceptable risk to the Debtors' operations given the volume of essential

---

[6]    For the avoidance of doubt, this amount excludes amounts related to the Royalty and Leasehold Claims.

services or goods that such vendor provides, (f) whether non-payment of a particular vendor would cause material damage to their business, such that the Debtors would be unlikely to do business with such vendor again in the future, (g) the extent to which vendors may have a 503(b)(9) Claim under the Bankruptcy Code, (h) the extent to which the vendor may have a Lien Claim, (i) whether the vendor is subject to an agreement or contract with the Debtors under which the Debtors could compel continued performance on prepetition terms, and (j) whether a vendor meeting the foregoing criteria is able or likely to refuse to postpetition performance if its prepetition balances are not paid.  Based on this criteria, the Critical Vendors include, among others, the following categories of vendors:

### (i)    Mine Safety and Compliance Suppliers and Service Providers

86.    A key concern for the Debtors in these chapter 11 cases is continued mine safety.  In the ordinary course of business, the Debtors use vendors that provide specialized equipment and services to maintain safe working conditions at their mines.  Among other things, these specialized vendors provide critical mine roof and structural support systems, miner-tracking systems and safety gear, mine ventilation machinery and components, fire suppression systems,  and mine telecommunications equipment.  Altogether, these goods and services ensure miner-safety and enable compliance with a variety of governmental regulation, including those promulgated by the Mine Safety and Health Administration ("MSHA").  Relatedly, the Debtors require a number of consultants and servicers to assist them in remaining compliant with a variety of environmental laws with respect to the various mining permits and licenses necessary to operate their mining operations.

87.    Because of the industry-specific nature of these and similar goods and services, and the strict regulatory conditions placed on the Debtors and their vendors, the Debtors

can only work with a limited number of safety and regulatory compliant vendors or servicers sufficiently knowledgeable of the relevant compliance obligations, for which there are few, if any, substitutes in the market able to satisfy the Debtors' operational needs.  Thus, if the Debtors were forced to suspend or change these vendors or servicers on short notice, they would likely be forced to close down their mining operations for a significant period of time pending a search for qualified replacement vendors.  Indeed, in many cases, the Debtors would need to not only find a replacement vendor or servicer, but would then make changes to their mines to accommodate such vendor's or servicer's replacement goods or services and seek regulatory approval of the same, before they were appropriately authorized to re-engage in mining operations.  These delays and expenses could drastically affect the value of the Debtors' estates, and cause their customers to seek alternative sources of coal while the Debtors' mines are inoperable.

### (ii)    Equipment and Parts Suppliers and Service Providers

88.    The Debtors require a continuous and reliable supply of equipment and parts unique to mining operations to operate in the ordinary course of business.  Such specialized equipment can include shearers, longwall conveyers, power loaders, crushers, locomotives, diesel engines, and related components.  Wear and tear on existing equipment requires the Debtors to continually repair, maintain, or replace parts and components of their coal mining equipment, or to buy entirely new equipment as required for safe and efficient for mining operations.  Given the highly regulated and specialized nature of the coal mining industry,[7] a majority of the Debtors' mining equipment and parts can only be purchased from the original manufacturers, which are often of high quality and have limited alternative sources for after-

---

[7]    Most of the Debtors' mining equipment is designed, built, and regulator-approved in accordance with the MSHA.

market suppliers.  The high quality in particular makes this equipment valuable and necessary to support the Debtors' efficient mining operations.

89.     The specialized equipment and parts that the Debtors require to continue their mining operations and remain competitive are only available from sole-source or limited-source vendors, and many of these vendors sell equipment and parts to the Debtors through one-off purchase orders.  If the Debtors are unable to make payments to certain vendors who supply these parts, the Debtors' operations will be severely disrupted during the search for approved replacement vendors.  Accordingly, I believe that a failure to pay these vendors would materially harm the Debtors operations, employees, stakeholders, and their restructuring efforts.

### (iii)     Operating Suppliers and Service Providers

90.     The Debtors require specific vendors to provide the materials necessary to maintain active coal mining operations in the ordinary course of business.  Such materials can include diesel fuel, lubricants, chemicals, rock dust, concrete support blocks, belts, castings, and tires for a variety of vehicles and loaders used at both surface and underground operations.[8] Many of these vendors are regionally sourced and are the only available option to satisfy economically the Debtors' quantity demands, which are typically located in remote locations. These vendors are critical to maintaining coal extraction and in preparing and cleaning coal before the Debtors ship it to their customers.   Given that the Debtors cannot operate without these materials, it is critical that the Debtors continue to pay and maintain business relationships with these vendors.

---

[8]     Most of the Debtors' mining materials are regulator-approved in accordance with the MSHA.

### (iv)    Repair and Maintenance Service Providers

91.    The Debtors use a variety of servicers to repair and maintain their mining equipment, infrastructure, and facilities.  In addition to the Debtors' routine maintenance and repair work, these servicers use trained personnel with rare expertise to provide specialized repair and maintenance for gas wells, power lines, cables, and technical equipment such as loading scales and coal quality analyzers.  Accordingly, these servicers offer high-quality services that the Debtors are unable to replicate from other providers, and are thus critical to preserving ongoing business operations during these chapter 11 cases.

92.    As explained herein, I believe that the Debtors' ability to pay the Critical Vendors is essential to ensure that there is no disruption in the operation of the Debtors' businesses.  Indeed, the authority to pay such claims will maintain the integrity of the Debtors' supply chain and mining operations, ensure the safety of their mine workers, facilitate the sale of coal and the Debtors' accounts receivable collection, facilitate the continuing support of their customers, and allow the Debtors to efficiently administer these chapter 11 cases.  Moreover, I believe such payments are necessary because there are few, if any, cost-effective, regulatory-licensed, or readily accessible alternatives to the Critical Vendors.  Finally, for the foregoing reasons, I believe that payment of the Critical Vendors will maximize the value of the Debtors' estates and the recoveries for all creditors by preserving the value of the Debtors' estates and ensuring the Debtors are able to maintain ordinary course operations.

### c.  503(b)(9) Claims

93.    The Debtors have received certain goods and materials from vendors within the twenty (20) day period before the Petition Date.  Most of these goods are generally obtained on an order-by-order basis in the ordinary course of business and are not governed by

contract.  Given this ad hoc relationship, certain of these vendors may refuse to supply new orders, could reduce existing trade credit, or could require payment of cash-on-delivery, without payment of their prepetition claims.  The value of the goods and materials delivered within twenty (20) days before the Petition Date may be entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code.  Given (a) the ultimate administrative expense priority nature of these 503(b)(9) Claims and (b) the vital role that many, if not all of these 503(b)(9) Claimants will have in the Debtors' restructuring, I believe it is in the best interest of their estates to have authority to pay the 503(b)(9) Claims in the ordinary course of business.

94.     I believe that the Debtors' ongoing ability to obtain goods as provided herein is key to their survival and necessary to preserve the value of their estates.  Absent payment of the 503(b)(9) Claims at the outset of these cases, the Debtors could be denied access to the merchandise necessary to maintain safe and economical coal mining, production, and transport operations.  Failure to honor these claims in the ordinary course of business may also cause the Debtors' vendors to withhold support for the Debtors during the chapter 11 process.  Such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

**d.  Lien Claimants**

95.     This category of claims is comprised of (a) the claims of shippers and warehousemen who the Debtors determine, in the exercise of their business judgement, must be paid to obtain the delivery and release of goods, parts, components, materials, equipment, coal, or other items; and (b) the claims of third parties who have or may have the ability to assert liens

on the Debtors' and their customers' property if the Debtors fail to pay for goods or services rendered (collectively, the "Lien Claimants," and their claims, the "Lien Claims").

**(i)    Shippers and Warehousemen**

96.    In the ordinary course of business, the Debtors use and make payments to (a) delivery services, barges, rail, trucking, freight terminal operators, carriers, shippers, and other transportation service providers (collectively, the "Shippers") that ship, transport, store, engage in customs business, and otherwise facilitate the movement of parts, materials, coal, and other goods used in ordinary course of the Debtors' operations; and (b) the warehousemen, bailees, storage facilities, other storage providers, customs brokers, and various governmental agencies (collectively, the "Warehousemen") who, among other things, store goods in transit and collect applicable customs duties, including in respect of customer property.  I understand that for several reasons, the Debtors seek to pay the prepetition shipping and warehousing charges with respect goods and property in transit (collectively, the "Shipping and Warehousing Claims").

97.    The services provided by the Shippers and Warehousemen are essential to the Debtors' day-to-day operations in that they enable the Debtors to obtain necessary materials to mine and process coal, to store coal inventory, and to transport coal.  Therefore, certain Shippers and Warehousemen currently possess goods and provide services that are vital to the Debtors' mining operations and the maintenance of their customer relationships.  Furthermore, if the Shipping and Warehouse Claims are not paid, they may refuse to perform additional services for the Debtors.  In such event, the Debtors would incur significant additional expenses, such as premium replacement shipping and warehousing costs, that would likely exceed the amount of unpaid prepetition shipping and warehousing charges that the Debtors request the authority to

pay by the Vendors Motion.  Moreover, if the Debtors were unable to promptly locate suitable replacements for the Shippers and Warehousemen, the Debtors' operations would face substantial hardship.  In addition, I understand that under certain state laws, to the extent the Debtors have not paid for such services, a Shipper or Warehouseman may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the goods.

98.    In light of these circumstances, the Shippers and Warehousemen may assert that they have possessory liens on goods currently in their possession for transportation or storage costs and may refuse to deliver or release those goods, including the Debtors' coal, in their possession until their invoices are paid and their liens redeemed.  Some Shippers and Warehousemen may be unwilling to release the goods in their possession on which they may be entitled to assert liens for fear of releasing security for their prepetition claims.  Moreover, Shippers and Warehousemen simply refusing to deliver the Debtors' or their customer's property if they are not paid could severely disrupt the Debtors' operations and cause the Debtors to lose a substantial amount of revenue and future business.  Accordingly, because the Debtors are dependent on these Shippers and Warehousemen, I believe it is essential that the commencement of these cases not give any Shippers and Warehousemen reason or excuse to cease performing their obligations.

### (ii)    Third-Party Providers

99.    The Debtors also seek to pay the prepetition charges of certain contractors, repairmen, and other third-party service providers (collectively, the "Third-Party Providers") that repair, maintain, and otherwise service necessary equipment and machinery used in the Debtors' operations.  Additionally, the Debtors rely on certain vendors to provide contract labor for their

mining operations, as well as specialized mining materials used in the Debtors' coal production. Such services, labor, materials, and equipment are essential to the Debtors' daily operations. Absent payment of prepetition amounts to the Third-Party Providers, such providers may cease to provide goods and services to the Debtors or otherwise hold the provision of goods hostage pending payment of their claims, and the Debtors would be left with no alternative provides capable of satisfying the Debtors' operational needs. Thus, it is critical to the continuity of the Debtors' operations that they maintain their relationships with the Third-Party Providers.

100.   More importantly, I understand that the Third-Party Providers have already or may be able to assert trade or mechanics' liens over the Debtors' leaseholds, as well as essential parts, machinery, and other equipment. Accordingly, absent payment of their outstanding prepetition Lien Claims, I believe that the Third-Party Providers may refuse to provide goods or services for or to honor obligations under existing agreements with the Debtors on a go-forward basis.

101.   I believe that a failure to pay the prepetition claims of Lien Claimants could materially jeopardize the Debtors' performance and reliability. The Debtors' businesses are dependent on the timely delivery of services and equipment to and from the areas in which they operate. Any disruption to the Debtors' ability to timely procure equipment, repairs, or materials would have deleterious effects on the Debtors' businesses. If the Lien Claimants are unwilling to provide the Debtors with goods or services postpetition because of their outstanding prepetition claims, the Debtors' mining operations would suffer, compromising the value of the Debtors' estates to the detriment of all parties in interest. A lack of vital third-party transportation services, and access to a limited universe of specialized service providers could substantially impair the Debtors' operations. Similarly, a lack of key equipment, supplies, parts

and components to maintain the Debtors' fleet of mining equipment would also force an interruption in operations.

### e.  Prepetition Purchase Orders

102.    In the ordinary course of business, numerous vendors provide the Debtors with goods and services that are integral to the Debtors' business operations.  As of the Petition Date, the Debtors had outstanding prepetition purchase orders (the "Outstanding Orders") with vendors for such goods and services.  As a result of these chapter 11 cases, I believe that certain vendors with Outstanding Orders may perceive a risk that they will be treated as prepetition general unsecured creditors for the cost of any shipments made or services provided after the Petition Date.  As a result, such vendors may refuse to ship such goods or provide such services to the Debtors unless the Debtors issue postpetition purchase orders or provide other assurances of payment.  Issuing substitute purchase orders on a postpetition basis would be disruptive, administratively burdensome, time-consuming, and counterproductive to the Debtors' restructuring.  Authorizing the Debtors to pay the Outstanding Orders pursuant to the terms set forth in the Vendors Motion should eliminate the burden on this Court and the Debtors arising from numerous individual motions requesting payment on account of the Outstanding Orders.

### f.  The Debtors' Royalty and Leasehold Claimants

103.    A mineral interest generally consists of an interest in minerals in place under a parcel of land, typically in the nature of a fee simple interest in real property, which entitles its royalty holder to the exclusive right to, among other things, enter the land to explore for and produce minerals from the land.  Through a written agreement (a "Royalty Agreement"), holders of mineral interests (the "Royalty and Leasehold Claimants," and their claims, the

"Royalty and Leasehold Claims") are entitled to royalty payments from the Debtors in consideration for depleting coal reserves or for transporting mined coal across a royalty holder's property.  The fees owed under the Royalty Agreements are generally calculated upon the sale of mined coal, but payments under certain Royalty Agreements can also be calculated on a production basis, such as gross tons produced, or require minimum monthly, quarterly, or annual payments.

104.    As of the Petition Date, the Debtors are party to various Royalty Agreements.  I believe that a failure to make payments on account of the Royalty Agreements in the ordinary course of business would directly and adversely impact the Debtors' ability to mine, produce, transport, and sell coal from coal reserves related to the Royalty Agreements.

ii.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay Prepetition Wages and Workforce Obligations, (B) Authorizing Debtors to Maintain Workforce Programs and Pay Related Obligations, and (C) Granting Related Relief (the "Employee Wages Motion").

105.    Pursuant to the Employee Wages Motion, the Debtors seek interim and final orders authorizing the Debtors to pay their prepetition employee wages and benefits, and to continue their employee benefits and programs, each in the ordinary course of business.

a.  The Debtors' Workforce

106.    As of the Petition Date, the Debtors have a workforce of approximately 790 total employees (collectively, the "Workforce" or the "Workers").  Approximately 12 are non-insider corporate employees (the "Corporate Employees") primarily based at the Debtors' headquarters in St. Louis, Missouri.  The Corporate Employees perform SG&A functions for the Debtors' operations, including accounts payable management, accounting, payroll, information technology, and logistics.  The large remainder of the Workforce (collectively, the "Operational Workers") are employees of the Debtors' coal mining and other operations, and serve to

facilitate or directly act in the Debtors' coal mining, collection, cleaning, production, and shipping operations. In addition to the Workers, the Workforce also includes independent contractors who are occasionally retained for specific mine or corporate projects, and to perform specific tasks related to mine safety (the "Independent Contractors").

107.     The Workforce forms the backbone of the Debtors' entire enterprise, and accordingly performs a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' overall restructuring. The Workers' skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability, efficiency, safety, and value. In many instances, the Workers include highly trained or specialized personnel who cannot be easily replaced during these chapter 11 cases and without whom the Debtors' reorganizational efforts will be likely jeopardized.

### b.  The Debtors' Workforce Obligations and Programs

108.     The Debtors seek to minimize the impact of these chapter 11 cases on the Workforce, and for such reason, seek authority to pay and honor their prepetition employee-related obligations and to continue their ordinary course programs related thereto, including by: (a) paying prepetition wage and other compensation-related obligations; (b) paying employee withholding taxes and employer taxes; (c) paying certain payroll deductions; (d) paying reimbursable expenses; (e) maintaining the workers' compensation policy and honoring obligations related thereto; (f) paying and maintaining the variable wage programs; (g) continuing the Debtors' employee benefit programs and honoring obligations related thereto; (h) paying prepetition amounts owed to third-party service providers; and (i) payment of obligations to the Independent Contractors (the foregoing obligations, the "Workforce Obligations" and their related programs, the "Workforce Programs"). Subject to the Court's

approval of the relief requested herein, the Debtors intend to continue their prepetition Workforce Programs in the ordinary course of business.

109.    As of the Petition Date, the Debtors estimate the total prepetition Workforce Obligations outstanding is approximately $17.1 million, approximately $9.5 million of which consists of accrued prepetition liability that must be paid during the interim period before a final hearing on the Employee Wages Motion.  The Debtors do not believe any Worker is owed prepetition amounts in excess of the $13,650 priority wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, and the Debtors seek approval to pay such amounts, if any, pursuant to a final order.  Accordingly, the Debtors seek authority to pay or remit the aggregate, estimated Workforce Obligations, as set forth below:

| Relief Sought | Interim Amount | Total Amount |
|---|---|---|
| **Worker Wages & Compensation** | | |
| Prepetition Wages (Net) | $3,100,000 | $3,100,000 |
| Payroll Taxes (Employer) | $400,000 | $1,100,000 |
| Payroll Deductions (except 401(k) Plan Contributions) | $1,300,000 | $1,300,000 |
| Expense Obligations | $85,000 | $85,000 |
| Independent Contractors | $610,000 | $610,000 |
| **Variable Wage Programs** | | |
| Monthly Safety Program | $50,000 | $50,000 |
| Safety Threshold Program | $35,000 | $35,000 |
| Mine Performance Program | $350,000 | $350,000 |
| Operator Program | $135,000 | $285,000 |
| Attendance Program | $0 | $0 |
| Discretionary Wage Program | $0 | $0 |
| **Workforce Benefits Programs** | | |
| Health and Welfare Programs | $1,800,000 | $5,600,000 |
| Life Insurance and AD&D Programs | $30,000 | $40,000 |
| 401(k) Plan Contributions | $290,000 | $290,000 |
| 401(k) Plan Match | $155,000 | $155,000 |
| PTO | $20,000 | $20,000 |
| **Workers' Compensation Program** | | |
| Workers' Compensation | $950,000 | $3,900,000 |
| **Service Providers** | | |
| Service Provider Fees and Expenses | $145,000 | $145,000 |
| **Totals** | **$9,455,000** | **$17,065,000** |

### c.  Compensation and Compensation-Related Obligations

110.    _Wages_:  The Debtors seek authority to pay the Workers' net prepetition wages (the "Prepetition Wages") and to continue to pay the Workers postpetition compensation in the ordinary course of business.  The Debtors administer their payroll entirely in-house, which runs every two weeks on Friday (or the preceding business day if the Friday falls on a holiday) and represents pay performed for the two-week period ending on the second preceding weekend. The Workers are generally two weeks, and up to four weeks in arrears.  Accordingly, the Workers usually have wages and other compensation that has accrued, but is unpaid, at any given point in time.  The Debtors' monthly Prepetition Wages in the year before the Petition Date averaged approximately $4.9 million.

111.    _Employer-Paid Payroll-Related Taxes and Government Fees_:  Related to the Workers' payroll, the Debtors pay certain employer-funded payroll taxes and obligations (collectively, the "Payroll Taxes").  The Payroll Taxes include federal Medicare and Social Security taxes, federal and state unemployment taxes, and _de minimis_ reinsurance fees paid annually under the Affordable Care Act arising from the Debtors' self-insured health plans. Each of the Debtors remit these amounts directly to the applicable government authority.  The Debtors' monthly Payroll Taxes in the year before the Petition Date averaged approximately $600,000.

112.    _Payroll Garnishments and Other Payroll Deductions_:  In administering payroll, the Debtors deduct from Workers' paychecks certain taxes, such as payroll and Social Security taxes, that must be withheld under certain federal, state, and local taxing law.  The Debtors must also comply with occasional garnishment or child support orders requiring the withholding of a Worker's wages.  As discussed below, certain Workers have voluntary

deductions for contributions to the 401(k) Plan (as defined below) and certain insurance premiums (collectively with the foregoing deductions, the "Payroll Deductions"). Payroll Deductions are taken from a Workers' gross payroll, are not an incremental cost obligation for the Debtors, and are often required by law. The Debtors' monthly Payroll Deductions (excluding 401(k) Plan contributions) in the year before the Petition Date averaged approximately $2.1 million.

113.    *Reimbursable Business Expenses*:    As is customary with most large businesses, the Debtors reimburse the Workers who incur and pay approved business-related expenses in the ordinary course of performing their duties ("Expense Obligations"). On a monthly basis, the Debtors reimburse their eligible Workers approximately $45,000 for general business expenses, which includes mining uniforms, office supplies, travel, mileage, car rentals, lodging, meals, and internet. Workers initially incur and pay such expenses by using personal funds or credit cards, and subsequently may be reimbursed by the Debtors only after submission and approval of expense reimbursement requests. In addition, the Debtors maintain three (3) credit cards for general business expenses that the Debtors are directly liable for and reimburse to the issuer, American Express Company, in the ordinary course of business. Such credit card-paid and reimbursed portion of the Expense Obligations is approximately $17,500 per month, and is included in the above amount. Each Expense Obligation requires a valid receipt and internal approval by an appropriate reviewing manager before it is reimbursed.

114.    In addition, the Debtors offer certain Workers the ability to participate in a vehicle reimbursement program if the Worker is required to use a vehicle in the ordinary course of their work and if senior management approves of using a personal vehicle for such work. Approved Workers are given a stipend, paid in conjunction with their payroll, that ranges from

$500 to $1,500 a month depending on the Worker's position. Any amounts the Worker pays for gas for this vehicle may be reimbursed using the same approval process as above for general Expense Obligations. The Debtors' monthly Expense Obligations under this vehicle program in the year before the Petition Date averaged approximately $30,000. The Debtors also offer certain Workers a $70.00 per month stipend for cell phone usage related to their work, with such stipend requiring approval by the head of the eligible Worker's department or group.[9]

115.    Altogether, the Debtors' monthly Expense Obligations in the year before the Petition Date averaged approximately $85,000. I believe it would be harmful and inequitable to require Workers to personally bear any approved business expenses they incurred in furtherance of their work responsibilities. Payment of these Expense Obligations is also critical to ensuring that Workers can properly perform their duties in the ordinary course of business.

116.    _Independent Contractors and Consulting Services_:  As noted above, in addition to the Workers, the Debtors employ and consult with a variety of Independent Contractors to undertake ad hoc and as-needed services for (a) specific corporate projects and (b) the performance of specific tasks at the Debtors' mines relating to mine safety, each of which are critical to maintain ordinary course business operations. The Debtors directly contract with certain Independent Contractors and utilize certain companies to provide the Debtors with other Independent Contractors. In the year before the Petition Date, payments to the Independent Contractors has averaged approximately $235,000, with fluctuations in payment obligations based on the frequency and usage of the Independent Contractors and the timing and amount of their respective payment structures.

---

[9]    I note that other Workers are on company-paid cell phone plans provided to facilitate their employment duties, and amounts are not reimbursed directly to the applicable Workers.

### d. Variable Wage Programs

117.　As a part of the Workforce's ordinary course compensation, and in the Debtors' discretion and as appropriate, the Debtors maintain a number of variable wage programs for the Workers, such as a monthly safety program (the "Monthly Safety Program"), a safety threshold program (the "Safety Threshold Program"), mine performance program (the "Mine Performance Program"), an operator program (the "Operator Program"), a good attendance program (the "Attendance Program"), and a discretionary wage program (the "Discretionary Wage Program," and together with the foregoing programs, the "Variable Wage Programs").  Through the Variable Wage Programs, the Workforce has the opportunity to earn additional compensation that is tied to meeting the criteria set forth in each applicable Variable Wage Program.  Not all locations offer, and not all Workers are entitled to participate in, all Variable Wage Programs, but as implemented, such programs are consistent with the coal industry's standards and are a material and ordinary course compensation component for the Workforce.

118.　*Safety-Related Programs*:  The Monthly Safety Program provides Workers at participating locations with cash compensation for safe operations, compensating Workers who do not have a mining incident or accident in any given month.  This program benefits all Workers at a given mine location and helps cause all Workers to vigilantly monitor the safety conditions and conduct of fellow Workers.  Each month, a human resources director for each site prepares a list of the Workers who met the established criteria, and upon internal human resources approval, the Debtors pay their Workers under the program typically in an off-payroll cycle.  Compensation payments under the Monthly Safety Program are either $100 or $200 per eligible Worker.

119.    Similar to the Monthly Safety Program, the Safety Threshold Program provides eligible Workers with specified compensation after their work at a particular mining operation exceeds a set threshold of days without an accident causing the Worker to be unable to return to the Worker's next scheduled shift—i.e., the avoidance of a "lost time accident".  For each eligible Worker, these thresholds are set at $250 per every 50 days for the first 200 days, and then an additional $500 every 100 days thereafter.  In the event a lost time accident occurs, the accumulation of time will end and then begin anew.  Upper management and those eligible for the Operator Program are not entitled to participate in the Safety Threshold Program.  In the year before the Petition Date, Workers earned approximately $1.7 million in the aggregate under the Monthly Safety Program and $1.4 million in the aggregate under the Safety Threshold Program.

120.    *Mine Performance Program*:  The Mine Performance Program provides Workers with compensation when targets for daily footage mined are met or, at the load-out facilities, when daily processing thresholds are met.  The daily footage mined by unit and shift are used to calculate payouts per Worker, and are paid as a part of ordinary course payroll, subject to review and approval by the applicable human resource directors or mine managers.  Biweekly payments under this program range from $0 to $2,000 per eligible Worker, and the total payout under the Mine Performance Program in the year before the Petition Date was approximately $9.1 million.

121.    *Operator Program*:  The Operator Program compensates Workers in certain non-insider management positions when their managed-locations meet or exceed established performance criteria.  The Debtors set the monthly targets for each eligible Worker at the beginning of the year, and senior personnel in the accounting department track for each

criterion (a) the target value, (b) the cost component, (c) the actual result, (d) whether the performance criteria was met or not, (e) the payout amount, and (f) the total payout for each Worker. Once approval is obtained from the accounting department and senior management, the Worker receives a compensation payment under the Operator Program in the next regular payroll. The total payout under the Operator Program in the year before the Petition Date was approximately $1.4 million.

122.    *Attendance Program*: The Attendance Program provides eligible Workers with compensation for achieving perfect attendance in a given year, running from November 1 to October 31 of the next year. Perfect attendance includes Workers working every scheduled work day, except for excusable absences such as bereavement leave, jury duty, and other appropriate absences. Eligible Workers receive $2,000 for the first year of perfect attendance, with an additional $1,000 added to that amount for each consecutive year of perfect attendance, up to a total compensation amount of $10,000 per year for perfect attendance. The Attendance Program ensures that the Debtors' mining operations are efficiently staffed and operated by Workers, which helps maintain a safe operational environment and ensures that coal production can be performed without delays. The total payout under the Attendance Program in the year before the Petition Date was $1.84 million. There are no amounts due and owing under the Attendance Program as of the Petition Date.

123.    *Discretionary Wage Program*: The Debtors typically pay certain Workers an annual discretionary amount each December or January under the Discretionary Wage Program. Such amounts are generally fixed in the months leading up to their payment, and relate to (a) how the eligible Worker has performed during the year and (b) the overall state of the Debtors' businesses and how they have performed during the preceding year. In December

2019, the Debtors paid amounts totaling approximately $1.93 million relating to the 2019-year, with the Corporate Employees, each of whom is a non-insider, receiving an aggregate amount of $173,500.  Historically, these amounts have been paid every year in some capacity to applicable Workers, and I believe that such amounts represent an expected and material portion of the Workforce's ordinary course compensation necessary to retain Workers and to support them financially.  There are no amounts due and owing under the Discretionary Wage Program as of the Petition Date.

   e.  **Workforce Benefit Programs**

124.    The Debtors have established Workforce Programs through various plans and policies to provide the Workforce with medical, dental, prescription drug, vision, life insurance, retirement savings, vacation, holiday pay, other paid time off, and other benefits (collectively, the "Workforce Benefits," and amounts owed thereunder, the "Workforce Benefit Obligations"), which are administered by the Debtors.  The Debtors seek the authority, but not the direction, to continue the below Workforce Benefits and to satisfy or remit the Workforce Benefit Obligations, including those that were accrued and unpaid as of the Petition Date, in the ordinary course of business during these chapter 11 cases.  Except as otherwise noted, the Workforce Benefits apply equally throughout the Workforce.

125.    *Health Programs*:  The Debtors offer several health coverage benefit programs to the Workers and their families, including medical, dental, vision, and prescription drugs (collectively, the "Health and Welfare Programs" and amounts owed thereunder, the "Health and Welfare Obligations").  The Debtors' Health and Welfare Programs are typical of those offered by coal industry employers of similar size.  The Debtors are self-insured, and the Workers do not pay any premiums.  Instead the Debtors pay claims under and premiums for the

Health and Welfare Programs out of pocket, which are administered by Managed Care of America Administrators, Inc. ("MCA").

126.    Given the manner in which claims and expenses are incurred, recorded, and processed under the Health and Welfare Programs, the Debtors generally rely on estimates to determine the extent of their Health and Welfare Obligations at any given time, with such estimates generally being an accurate representation of such obligations.  In the year before the Petition Date, however, the aggregate claims and related stop-loss premiums under the Health and Welfare Programs totaled approximately $18.8 million, with a monthly aggregate run rate of approximately $1.6 million.  The Debtors also paid MCA approximately $1.5 million in the year 2019 to administer the Health and Welfare Programs, which included processing claims and seeking reimbursement for compensable claims from the applicable Debtors.  As of the Petition Date, the Debtors estimate that they owe approximately $5.6 million total in Health and Welfare Obligations.

127.    _Life Insurance and AD&D_:    The Debtors offer life insurance to the Workforce (the "Life Insurance Program") through Metropolitan Life Insurance Company ("MetLife").  All Workers are provided at least $150,000 in benefits, with certain Corporate Employees provided increased benefits.  Eligible Workers may also, at their election and through their voluntary contribution, select additional supplemental life insurance and life insurance for their dependents, which is also offered by MetLife.  In addition, the Workforce is also entitled to accidental death and dismemberment ("AD&D") insurance, which is provided by Metlife.  AD&D insurance provides benefits to the Workforce in amounts comparable to those provided under the Life Insurance Program, which arise under set criteria for particularized AD&D

incidents.   The Debtors pay all premiums associated with the Life Insurance Program and AD&D, which totaled approximately $350,000 for the calendar year 2019.

128.   *401(k) Plan*:   Currently, the Debtors offer Workers a savings plan (the "401(k) Plan") that meets the requirements of section 401(k) of the Internal Revenue Code of 1986, which is administered by Transamerica Retirement Solutions, LLC ("Transamerica"). Pursuant to the 401(k) Plan, the Debtors match (a) 100% of the first 3% of a Worker's contributed compensation and (b) 50% of the next 2% of contributed compensation, up to a maximum match of 4% of a Worker's contributed compensation.   Contributions from participating Workers are withheld from such Worker's gross pay during each payroll cycle and transferred to Transamerica for deposit into the 401(k) Plan as directed by the participating Worker.  For calendar years 2019, 2018, and 2017, the Debtors' matching contributions to the 401(k) Plan totaled approximately $8.7 million, $8.51 million, and $8.06 million, respectively. Transamerica manages Worker contributions and otherwise administers the 401(k) Plan.  As of the Petition Date, the Debtors estimate that they must remit approximately $290,000 in Worker contributions to Transamerica arising from the prepetition period and pay approximately $155,000 in related matching contributions under the 401(k) Plan.

129.   *Paid Time Off*:  Corporate Employees generally receive three (3) weeks of paid-time off after five (5) years of service (up from an initial two (2) weeks of paid-time off), plus any days designated as a holiday ("PTO").  For Operational Workers, the Debtors maintain a number of PTO policies, including (a) accrued vacation (up to 80 hours, or up to 120 hours for Workers employed for five (5) or more years), (b) holiday pay, and (c) other PTO from work. While there is some minor variation between policies at different operational locations, they are

generally consistent as between Operational Workers.  PTO is primarily set forth in Worker-handbooks.

130.    The Debtors offer Workers at certain operational sites the option to pay out unused vacation days every year, which typically gives rise to an annual cash payment obligation.  In the year before the Petition Date, the Debtors paid approximately $205,000 on account of this policy.  Upon termination, the Debtors also pay certain Workers for accrued but unused vacation days in the year of termination.  The Debtors anticipate that the Workers will utilize any accrued PTO in the ordinary course of business, and pay-out PTO obligations will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

### f.  Workers' Compensation Programs and Benefits

131.    The Debtors are required to maintain workers' compensation liability insurance and to provide Workers with workers' compensation coverage for claims arising from or related to their employment, including occupation pneumoconiosis (known as "black lung") claims under applicable state law and costs under the federal Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977.  The Workforce is covered under a single workers' compensation policy (the "Workers' Compensation Program") with Rockwood Casualty Insurance Company ("Rockwood").  Each of the applicable Debtors pay premiums to Rockwood directly, which are based on the payroll at each entity.  The Debtors rely on Rockwood for assistance in processing and administering claims under the Workers' Compensation Program, which has a deductible of $2 million per person per occurrence.  When a claim is filed with Rockwood, Rockwood will send an invoice directly to the Debtors, and will administer any payments on account of those claims.

132.    In 2019, the Debtors paid approximately $7.5 million on account of premiums, claims, and loss funding policy payments under the Workers' Compensation Program.    As of the Petition Date, the Debtors have approximately 90 in open workers' compensation and black lung claims and have accrued approximately $3.9 million on account of unpaid claims under the Workers' Compensation Program.    As required by Rockwood, to collateralize their payment claims under the Workers' Compensation Program, the Debtors: (a) maintain a $4.5 million letter of credit of with The Huntington National Bank on account of the Workers' Compensation Program, for an approximate annual renewal fee of $90,000 (keyed to a eurocurrency interest rate plus 2%), (b) maintain a collateral account jointly owned with Rockwood at F.N.B. Wealth Management, which holds approximately $1.95 million as security for workers' compensation claims, and (c) as mentioned above, make monthly loss funding payments of $125,000 to a loss fund that will max at $9.7 million ($2.5 million as of the end of 2019).

133.    I believe that failure to maintain the Workers' Compensation Program, including the letter of credit, collateral account, and loss fund, could result in administrative or legal proceedings and material fines against the Debtors and their officers and directors.

**g.    Workforce-Related Service Providers**

134.    As discussed herein, the Debtors have engaged certain third-party service providers (the "Service Providers") to assist with or administer their Workforce Programs.    The Service Providers perform a wide range of services for such programs, including: (a) MCA (health care administration); (b) Transamerica (401(k) Plan administration); (c) Rockwood (workers' compensation claims administration); (d) MetLife (life insurance administration).    As of the Petition Date, the Debtors owe approximately $145,000 total to the Service Providers.    I

believe that a failure to pay any of these Service Providers could result in substantial interruption of the Debtors' Workforce Programs and harm Workers' morale or the Debtors' efforts to retain necessary Workers during their chapter 11 cases.

135.    In addition to the Workforce Programs discussed above, the Debtors may maintain or establish from time to time other benefit programs for the Workforce, or agree on a case-by-case basis to provide additional benefits to Workers.

**h.  Necessity to Pay Workforce Obligations and Continue Workforce Programs**

136.    Efficient coal mining that uses modern techniques and equipment requires skilled laborers with mining experience and proficiency, as well as qualified managers and supervisors.   The Workforce's knowledge and understanding of the Debtors' products, operations, and infrastructure is essential to preserving the value of the Debtors' businesses.

137.    Given that preserving and maximizing the value of the Debtors' estates depends upon a stable and skilled workforce, I believe that any significant number of Worker departures or deterioration in morale at this time may substantially and adversely impact the Debtors' efforts in chapter 11, causing immediate and irreparable harm to the Debtors' estates and their creditors.  There is a real, immediate risk that if the Debtors are not authorized to continue to satisfy the Workforce Obligations, including the payment of obligations to the Independent Contractors, and to maintain the Workforce Programs in the ordinary course, Workers and the Independent Contractors would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' ability to successfully maximize the value of their assets.  Indeed, the Debtors already maintain lean staffing to raise operational efficiency and keep business expenses minimized—all current Workers, and any Independent Contractors employed on an as-needed basis, are thus necessary for the Debtors to continue normal

operations. Accordingly, I believe that the Debtors must be authorized to continue, in the ordinary course, the Workforce Programs that were in effect before the Petition Date for the entire Workforce.

138. The Debtors' ability to satisfy their Workforce Obligations and to maintain their Workforce Programs is necessary to their continued and uninterrupted operations during these chapter 11 cases. Any delay in paying any of the Workforce Obligations could jeopardize the Debtors' relationship with the Workforce and irreparably harm Workers' finances and morale at the very time that the Workforce's dedication, confidence, support and cooperation are most critical. Thus, I believe that if the Debtors do not obtain immediate authority to pay the Workforce Obligations, the Debtors' operations may be severely impaired. At this key stage, the Debtors cannot risk such substantial disruption of their business operations that would attend any decline in Workforce morale attributable to the Debtors' failure, or worse, inability to pay, the Workforce Obligations.

139. Most importantly, absent payment of the Prepetition Wages and satisfaction of the Workforce Obligations overall, Workers would suffer hardship and, in many instances, financial duress. The Workforce depends on its employment income from the Debtors to meet personal and familial financial obligations.

140. Moreover, it is necessary and appropriate under the circumstances to permit the Debtors to continue to honor their Workforce Obligations during the pendency of these chapter 11 cases. The Workforce Programs are customary benefits that the Debtors have provided to the Workforce that are consistent with benefits provided by other coal industry employers throughout the country. In many instances, the Workers crucially depend on the other Workforce Programs such as the Health and Welfare Programs, and it would cause a significant

and undue hardship for the Workforce if the Debtors were forced to discontinue such programs.

Indeed, failure to continue the Workforce Programs may result in Workers departing from the

Debtors in favor of employers who can provide the Workforce with such protections and

benefits. Such departures would imperil the Debtors' efforts in these chapter 11 cases to

preserve their businesses and to maximize the value of their estates.

141. In addition, I believe that the Variable Wage Programs represent a sound

exercise of the Debtors' business judgement and are demonstrably in the best interests of the

Debtors' estates. The Debtors' foremost concern is to ensure the safety and well-being of the

Workforce, and the Monthly Safety Program and Safety Threshold Program compensate eligible

Workers based on their ability to meet safety criteria and to ensure a safe operational

environment. Likewise, the Mine Performance Program and Operator Program compensate

Workers for meeting specific performance metrics, including production volume and safety, and

is consistent with the practices within the coal industry. The Attendance Program compensates

Workers for diligently working their scheduled shifts, and ensures that the Debtors' operations

are always adequately staffed for safe and efficient operation. Finally, the Discretionary Wage

Program represents an expected and relied-upon method of Worker compensation that is paid

annually, without which the Debtors expect they will have great difficulty in maintain their

Workforce—the value of which vastly outweighs the cost of the Discretionary Wage Program.

Altogether, the Variable Wage Programs provide outsize benefits to the Debtors' estates and are

crucial to maximizing their value.

142. Finally, I believe that cause exists here to modify the automatic stay to

permit the Workers to proceed with claims, including their black lung claims, under the

Workers' Compensation Program in the appropriate judicial or administrative forum. Staying

such claims could have a detrimental effect on the financial well-being and morale of the Workers, and could cause severe disruption to the Debtors' businesses and likely would impair the success of their restructuring.

> iii. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Continue and Renew Surety Bond Program and (B) Granting Related Relief (the "Surety Bond Motion").

143.    By the Surety Bond Motion, the Debtors seek interim and final orders (a) authorizing the Debtors to maintain, continue, and renew, in their sole discretion, their Surety Bond Program (as defined herein) and to pay any obligations related thereto, including the provision of additional collateral in an amount not to exceed $2 million, all in the ordinary course of business and consistent with past practices in effect before the Petition Date and (b) granting related relief.

144.    In the ordinary course of their businesses, the Debtors are required, pursuant to federal, state, and local law, to provide surety bonds (the "Surety Bonds," and their usage, the "Surety Bond Program") to third parties, generally governmental authorities, to secure the Debtors' payment or performance of certain other obligations, including present and future coal mine operations, coal transportation, mine reclamation and mine closure obligations, and other performance commitments.  I believe that the failure to provide, maintain, and timely renew or replace these surety bonds would jeopardize the Debtors' ability to undertake their mining operations, which are essential to the Debtors' business operations, and may risk additional liability under applicable law.  The beneficiaries of these surety bonds (the "Obligees"), their issuers (the "Issuers"),[10] their identification or policy numbers, and the total bond coverage amounts are set forth on **Exhibit A** attached to the Surety Bond Motion.

---

[10]    As of the Petition Date, all of the Surety Bonds (except for double-bonded obligations indicated herein) have been issued by Indemnity National Insurance Co. ("INIC"), as rewritten to INIC from Argonaut Insurance

### a. **Surety Bonds**

145.    The Surety Bonds issued on behalf of the Debtors are required to maintain compliance with federal, state, and local law, rules, and regulations and are crucial to the Debtors' ability to conduct required ordinary course business operations such as mine operation, closure, and reclamation efforts.  For instance, I understand that the federal Surface Mining Control and Reclamation Act (the "SMCRA"), 30 U.S.C. § 1201 *et seq.*, and other applicable state statutes require the Debtors to post surety bonds to ensure funds are available to pay the Debtors' reclamation, subsidence, and related obligations.  Without posting such bonds, the relevant government agency will not authorize or otherwise issue a permit allowing the Debtors to conduct their mining operations on a particular property.  Accordingly, without providing, maintaining, or timely replacing the Surety Bonds, the Debtors cannot operate their businesses.

146.    As of the Petition Date, the Debtors had approximately $99.8 million in outstanding Surety Bonds.  None of these Surety Bonds are self-bonded, and many of the Obligees generally discourage or have strict limitations on self-bonding.  As such, I believe it is unlikely that the Obligees would accept forms of self-bonding as replacements for the Surety Bonds, and the Debtors do not intend to engage in any form of self-bonding during these chapter 11 cases.

147.    The premiums for the Surety Bonds (the "Surety Bond Obligations") are determined annually and are paid by the Debtors at inception and quarterly thereafter.  These Surety Bond Obligations are generally paid to the Debtors' Surety Broker (as defined herein), who then remits the payments to the appropriate Issuers.  The Debtors currently pay approximately $2.5 million in annual Surety Bond Obligations, with approximately $625,000 of

---

Company ("Argonaut") as of December 10, 2019.  There is a limited number of remaining Argonaut Surety Bonds that have not yet expired, which cover certain obligations already covered by new INIC Surety Bonds.

that amount becoming due and payable on a quarterly basis.  The majority of the Debtors' next quarterly payment will become due and payable during the second week of March 2020.

### b.  Indemnity Agreements

148.    As is customary, the Debtors have entered into indemnity agreements with the Issuers with respect to the Surety Bonds (collectively, the "Indemnity Agreements") to induce the Issuers to issue such bonds, pursuant to which the Debtors agreed to indemnify the Issuers from any loss, cost, damage, or expense they may incur by reason of the Issuers' issuance of the Surety Bonds on behalf of the Debtors.  To further secure those indemnification obligations, the Debtors have posted $2.5 million in cash, provided by Foresight Energy Services LLC, to INIC, who holds such amounts as collateral for the Debtors' indemnification obligations.  In addition, the Indemnity Agreements permit the Issuers to request additional collateral from the Debtors.  As of the Petition Date, INIC has requested additional cash collateral to secure the Surety Bonds that it has issued, with such request made in connection with it taking on the Surety Bonds at the end of 2019.

### c.  The Surety Broker

149.    The Debtors obtain a majority of their Surety Bonds through their broker, The Reschini Group (the "Surety Broker").  The Surety Broker assists the Debtors with sourcing, evaluating, and paying the premiums for Surety Bonds, and negotiates with Issuers on behalf of the Debtors to obtain new or replacement Surety Bonds on favorable terms.  The Debtors compensate the Surety Broker by paying a percentage fee based on the amount of procured surety bonds (the "Broker's Fees").  These Broker's Fees are paid to the Surety Broker as a portion of the Surety Bond Obligations, which the Surety Broker retains, and then remits the

Surety Bond Obligations to the Issuers accordingly.  As of the Petition Date, the Debtors do not believe they owe any prepetition Broker's Fees.

### d. Necessity to Continue Surety Bond Program and Pay Obligations Thereunder

150.    The nature of the Debtors' businesses and the extent of their operations make it necessary for the Debtors to maintain their Surety Bond Program on an ongoing and uninterrupted basis.  The nonpayment of any Surety Bond Obligations under the Surety Bond Program could result in the Issuers terminating or declining to renew their Surety Bonds or refusing to provide Surety Bonds to the Debtors in the future.  If any Surety Bonds lapse without renewal, or the Debtors are unable to obtain new Surety Bonds for certain purposes, the Debtors could default on various legal, regulatory, or contractual obligations, which could severely disrupt or otherwise idle the Debtors' operations to the detriment of all parties in interest.  For example, failure to maintain the required Surety Bonds could cause the Debtors to be in violation of their obligations under federal or state law.

151.    Accordingly, I believe that the continuation of the Surety Bond Program, the payment of postpetition obligations arising under the Surety Bond Program, and the posting of new or additional collateral in favor of the existing or any new Issuers to secure any Surety Bonds in the Surety Bond Program, including in connection with either the maintenance or renewal of any existing Surety Bonds or the entry into new Surety Bonds, are therefore necessary to preserving the Debtors' businesses and the value of the Debtors' estates for all stakeholders.

152.    Furthermore, I believe that the Surety Bond Program is ordinary for the type, size, and nature of the Debtors' businesses, and is accordingly also consistent with the reasonable expectations of creditors, who would expect the Debtors to continue complying with

their obligations under law.  Moreover, I believe that the Surety Bond Program is consistent with industry practice.

> iv.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Maintain, Continue, and Renew Their Existing Insurance Program and (II) Honor Certain Prepetition Obligations in Respect Thereof and (B) Granting Related Relief (the "Insurance Motion").

153.    In the ordinary course of business, the Debtors maintain comprehensive insurance coverage through policies (the "Insurance Policies," and all premiums, deductibles, fees, and obligations related thereto, the "Insurance Obligations"), that are administered by various third-party insurance carriers (the "Insurance Carriers") to protect against adverse occurrences (altogether, the "Insurance Program").  Each Insurance Policy falls into one of two categories: Reschini Policies or Aon Policies (each as defined below).

### a.  The Reschini Policies

154.    The Debtors maintain general liability, umbrella, property, excess liability, excess automobile, pollution liability, and other forms of coverage through Insurance Policies procured and negotiated with the help of Reschini Agency, Inc. ("Reschini"), an insurance broker (collectively, the "Reschini Policies").  The Insurance Obligations under the Reschini Policies are financed through insurance premium financing and security agreements (each, a "Financing Agreement") with BankDirect Capital Finance, Inc.  Commissions owed to Reschini for its services as broker ("Broker's Fees") are paid to directly to Reschini by BankDirect out of the amounts the Debtors pay to BankDirect under the Financing Agreements.

155.    Pursuant to the Financing Agreements, the Debtors remitted to BankDirect cash down payments totaling approximately $1.3 million.  Under the terms of the Financing Agreements, the Debtors are required to remit aggregate monthly payments of approximately $475,000.  Additionally, as security for payment of all amounts owing under the Financing

Agreements, the Debtors assigned to BankDirect a security interest in all proceeds of the Reschini Policies. As of the Petition Date, the Debtors do not believe there are any material prepetition Insurance Obligations owed in connection with the Reschini Policies, but, out of an abundance of caution, the Debtors seek authority to satisfy any such prepetition obligations.

### b. The Aon Policies

156.    The Debtors also maintain primary and excess director and officer liability coverage, crime, and other related coverage (the "Aon Policies"). The Debtors employ Aon Insurance Services West, Inc. ("Aon") to assist with the procurement and negotiation of the Aon Policies. The Debtors pay the Aon Policy premiums, which include any Broker's Fees earned by Aon, directly to Aon. With respect to the Aon Policies, the Debtors paid $797,155 in Insurance Obligations, of which $114,378 was on account of Aon's Broker's Fees. The Debtors intend to maintain the Aon Policies, use the brokerage services provided by Aon, and pay all Insurance Obligations related thereto during these chapter 11 cases and believe that continuing this arrangement is in the best interests of their creditors and estates. As of the Petition Date, the Debtors do not believe there are material prepetition Insurance Obligations owed to Aon, but, out of an abundance of caution, the Debtors seek authority to satisfy any such prepetition obligations.

157.    Pursuant to the Insurance Program, the Debtors may be required to pay various deductibles or retention amounts (the "Insurance Deductibles") depending upon the type of claim and the Insurance Policy involved. Under certain policies, the Insurance Carriers and third-party administrators may pay claimants and then invoice the Debtors for reimbursement for claims paid within any Insurance Deductible. In such situations, the Insurance Carriers may have prepetition claims against the Debtors. As of the Petition Date, the Debtors do not believe

there are any material prepetition obligations owed to Insurance Carriers relating to Insurance Deductibles, but, out of an abundance of caution, the Debtors seek authority to satisfy any such prepetition obligations.

### c.   Necessity to Pay Insurance Obligations and Maintain Insurance Program

158.   I believe that the Debtors' ability to pay the prepetition Insurance Obligations is necessary to their continued and uninterrupted operations during these chapter 11 cases.  Maintaining the Insurance Policies is, in my opinion, necessary to preserve the value of the Debtors' assets, thereby ensuring the adequate protection of the Debtors' property for all parties in interest, and to minimize exposure to risk.  I further believe that honoring the Financing Agreements is also necessary to maintaining the Insurance Policies, as failure to make the payments required under the Financing Agreements can trigger cancellation of many of those Insurance Policies.  In addition, paying Broker's Fees will ensure that those brokers will be available to assist the Debtors in maintaining existing Insurance Policies and procuring additional necessary insurance during these chapter 11 cases.

159.   I believe that maintaining the Insurance Policies enables the Debtors to avoid the incurrence of possibly significant liabilities, and therefore represents a sound exercise of their business judgment.  The Insurance Policies protect the Debtors and other parties in interest from losses caused by casualty, natural disaster, fraud, or other unforeseen events.  Accordingly, it my opinion that it is necessary for the Debtors to pay their prepetition Insurance Obligations, including their insurance premiums, obligations owed under the Financing Agreements, and amounts owed to Aon, to ensure that the Debtors are able to renew, supplement, or purchase insurance coverage on a postpetition basis in the ordinary course of business.

      v.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Maintain Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (B) Granting Related Relief (the "Customer Programs Motion")

160.    By the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain their existing customer programs in the ordinary course of business and honor prepetition obligations related thereto and (b) granting related relief.

161.    The Debtors' customer base includes domestic utility companies, power transmission operators, and industrial companies, as well as end users through exports into international markets. The Debtors operate in a highly competitive and regulated market for coal with plentiful alternative suppliers of coal and other sources of energy available to the Debtors' customers. Maintaining the loyalty, support, and goodwill of these customers is critical to the Debtors' reorganization efforts. The Debtors must maintain positive customer relationships and their reputation for reliability to continue to sell coal and generate revenue. To that end, and consistent with industry practice, the Debtors incur various obligations to customers under coal sale contracts, including true-ups, laboratory fees, demurrage, deposits, reimbursed payments, and other customer obligations (the "Customer Programs").

162.    I believe that the Debtors' ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, meet competitive market pressures, and ensure customer satisfaction, thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability for the benefit of all of the Debtors' stakeholders.

163.    As of the Petition Date, the Debtors estimate that they have approximately $360,000 in prepetition obligations, excluding amounts that may be owed to Debtors' non-

Debtor affiliates, relating to the Customer Programs, all of which will come due during the interim period before a final hearing on the Customer Programs Motion. Separately, the Debtors estimate that their customers will owe amounts to the Debtors on account of True-Ups and Deposits (each, as defined herein). The following table describes the material Customer Programs:

| Customer Program | Description |
|---|---|
| **True-Ups** | The Debtors initially charge customers for coal shipments based on estimations of weight, quality of coal, and other considerations. In situations when the actual weight or quality varies from the estimate, the Debtors must reconcile estimated charges against actual charges (a "True-Up"). True-Ups occur in a number of different circumstances, including (a) when the Debtors make deficiency payments if coal shipments fall below the estimated weight for any shipments that provide for destination weights and (b) when the Debtors issue product quality adjustments to the extent that delivered product differs from contracted quality parameters. Quality-based True-Ups are calculated using reports by independent analytic service providers that analyze coal shipments as required by the customer contracts.<br><br>True-Ups are a key feature of the Debtors' customer practices, and virtually all of the Debtors' contracts involve one or more True-Up mechanisms. True-Ups are retroactively calculated periodically, and are generally applied to the invoice for which they are being made and are a key program that ensures that the Debtors' accurately charge customers for the value of the coal delivered. These True-Ups generally result in the Debtors' customers owing amounts to the Debtors, with the average owed for the previous four quarters totaling approximately $320,000. As of the Petition Date, the Debtors estimate that they do not have any prepetition True-Up obligations, but are owed amounts by their customers, which the Debtors should receive or set off against the applicable contracts in the ordinary course of business. |
| **Laboratory Fees** | Under certain contracts with coal purchasers, the Debtors pay a third-party servicer to sample their coal to ensure its quality meets contractual standards. For the benefit of their customers, the Debtors do not typically seek payment from the purchaser for this service. As of the Petition Date, the Debtors estimate that they owe approximately $310,000 in prepetition laboratory fees. |
| **Demurrage** | Certain contracts with export customers contain customary terms—known as "Demurrage" provisions—relating to delays that may occur in delivering coal to international ports where shipments are loaded into seaborne vessels. |

| | Such contracts generally provide that the Debtors are required to compensate the customer if the Debtors' delivery of coal to the relevant port occurs after the end of a specified target period.  As of the Petition Date, the Debtors estimate that there are approximately $50,000 in prepetition Demurrage obligations. |
|---|---|
| **Deposits** | From time to time, the Debtors post deposits to certain customers for coal shipments not yet delivered or provided to such customers (collectively, the "Deposits"), which acts as security for the Debtors' performance of their obligation to ship coal to such customers.  Generally, as the Debtors deliver or provide coal to such customers, such customers will then pay incrementally those Deposits back to the Debtors.  As of the Petition Date, the Debtors' customers owe the Debtors approximately $2 million in posted Deposits, which the Debtors anticipate will be repaid to the Debtors as they perform under the applicable coal sale contracts.  The Debtors believe that they have no prepetition obligation to post any Deposits to their customers as of the Petition Date, but request authority to continue posting postpetition Deposits in the ordinary course of business. |

164.    I believe that the Debtors' Customer Programs are typical in their industry, have been a part of the Debtors' normal business operations for many years, and are designed to address competitive pressures, encourage sales, ensure customer satisfaction, and generate goodwill for the Debtors.  Ultimately, if the Debtors are unable to honor their Customer Programs, the Debtors risk alienating a large portion of their customers to the detriment of the Debtors' estates and their creditors.

165.    Moreover, I believe that the Debtors' ability to maintain their Customer Programs and to pay prepetition obligations related thereto is necessary to their continued and uninterrupted operations during these chapter 11 cases.  The Debtors operate in a challenging and volatile market and their businesses depend on the quality and strength of their customer relationships, as well as their ability to attract new customers.  Any failure to honor or maintain their existing Customer Programs will undermine the Debtors' relationships with their customers and impair the Debtors' ongoing ability to effectively participate in a competitive marketplace.  Indeed, the Debtors' failure to honor the Customer Programs could place the Debtors at a

competitive disadvantage, exacerbating the effects of customer uncertainty that may occur during these chapter 11 cases.  For those reasons, I believe that the continuation of the Customer Programs is critical to maintain customer support and loyalty, to avoid immediate and irreparable harm to the Debtors' estates, and is therefore necessary to maximize of value in these chapter 11 cases.

vi.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Perform under Existing Coal Sale Contracts in the Ordinary Course of Business and (II) Enter into and Perform under New Coal Sale Contracts in the Ordinary Course of Business and (B) Granting Related Relief (the "Coal Sale Contracts Motion").

166.    By the Coal Sale Contracts Motion, the Debtors seek interim and final orders (a) authorizing the Debtors to (i) perform under or amend existing Coal Sale Contracts (as defined herein) in the ordinary course of business and (ii) enter into, perform under, or amend postpetition Coal Sale Contracts in the ordinary course of business and (b) granting related relief. Before the Petition Date, the Debtors routinely and in the ordinary course of their businesses entered into contracts with customers to sell coal from the Debtors' mining operations or acquired from other sources (collectively, the "Coal Sale Contracts").  Generating virtually all of the Debtors' revenues, entering into, performing under, and amending Coal Sale Contracts in the ordinary course of their businesses represents a core and critical part of the Debtors' operations.

167.    Because Coal Sale Contracts are often long-term agreements (sometimes continuing for several years) and cover very large quantities of coal involving millions of dollars in aggregate purchase price, customers may be unwilling to transact with the Debtors without specific authorization from this Court.  If the Debtors had to seek Court approval for every Coal Sale Contract they sought to enter into, perform under, or amend, I believe that they would be at a competitive disadvantage in the market and could lose customers and revenues, thus endangering their chances of successfully restructuring.  Revoking the Debtors' authority to

contract with customers would cause the Debtors' dynamic distribution mechanism to grind to a halt, sending customers scrambling to substitute their coal supply in favor of a more flexible competitor.  In the highly competitive coal market, the Debtors must be able to enter into, perform under, and amend Coal Sale Contracts quickly and efficiently.  Otherwise, the Debtors risk losing revenue if customers are unwilling to accept any perceived risk regarding whether the Debtors have the authority to enter into Coal Sale Contracts in the ordinary course of business.

168.    At this critical early stage of the Debtors' restructuring process, the Debtors must be allowed to continue generating revenue from Coal Sale Contracts.  I believe that the loss or delay of performance under even a few Coal Sale Contracts could materially impact the Debtors' business plan and jeopardize their restructuring.  The Debtors must be able to reassure their customers that entering into, performing under, and amending Coal Sale Contracts with the Debtors is permissible under applicable law and authorized by the Court, and that all such actions can continue in the ordinary course.  Immediate relief is therefore required to maximize the Debtors' revenues and chance of successful restructuring, and granting the relief requested herein would benefit the Debtors' estates and promote the interests of all stakeholders.

169.    Consistent with historical practice and in the ordinary course of business, the Debtors consider a number of factors before entering into or amending Coal Sale Contracts, including: (a) cost, revenue, and quality specifications of the coal at issue; (b) production and sales balances to determine availability of coal over the proposed transaction term; (c) the market, including prices from relevant indices, pricing reported to the public, and comparable transactions; (d) a customer's ability to pay for the coal; (e) transportation availability; and (f) agreement on contractual terms.  Such considerations help the Debtors ensure that entering into or amending a Coal Sale Contract makes good business sense and is in their best interests.  I

understand that the Debtors will, of course, continue to review the advisability and feasibility of entering into new Coal Sale Contracts to ensure that any and all of the Coal Sale Contracts are advantageous to the Debtors and promote the interests of all stakeholders.

170.    In addition, I note that the Debtors are party to certain coal and marketing arrangements with non-Debtor affiliate Javelin Global Commodities (UK) Ltd. ("Javelin"), which is a joint venture between Murray, Javelin's management, and Uniper Global Commodities SE (formerly EON) ("Uniper").  The Debtors are affiliated with Javelin through Murray's ownership of a 34% equity interest in Javelin.  Javelin facilitates the Debtors' coal exports to international markets, acting as the Debtors' coal sale marketing agent through the Javelin-Murray Coal Marketing Agreement and the Javelin Coal Sale Agreement (each, as defined herein).  In the ordinary course, Javelin will purchase the Debtors' coal under the Javelin Coal Sale Agreement and then, by the terms of the Javelin-Murray Coal Marketing Agreement, Javelin will transport, export, and sell such purchased coal to an international purchaser. Through this arrangement, Foresight's export coal sales to Javelin, and consequently sales to the Debtors' international customers, represented approximately 37% of Foresight's total coal sales revenue for 2019.

171.    The Debtors also incur expenses relating to coal marketing commissions and export freight expenses to Javelin under the *Coal Marketing Agreement* between Javelin, Murray Energy Corporation ("MEC"), and The American Coal Sales Company ("ACSC"), dated June 13, 2015 (the "Original Javelin-MEC Coal Marketing Agreement"), as modified by the *Assumption and Assignment Agreement* between ACSC and Murray Global Commodities, Inc. ("MGC"), pursuant to which ACSC assigned to MGC all of its rights and obligations under the Original Javelin-MEC Marketing Agreement, dated September 15, 2015 (the "Javelin-Murray

Coal Marketing Agreement"). While not a direct party to the Javelin-Murray Coal Marketing Agreement, the Debtors, as "Foresight Entities" (as defined in the Javelin-Murray Coal Marketing Agreement) and direct and indirect subsidiaries to MEC, are enabled under the terms of the Javelin-Murray Coal Marketing Agreement to use Javelin's services for international marketing and exporting of the Debtors' coal, and, are authorized to use the Javelin-Murray Coal Marketing Agreement for the same through provisions in the Management Services Agreement.

172.    Accordingly, pursuant to the Javelin-Murray Coal Marketing Agreement, Javelin (a) acts as the Debtors' primary marketing agent outside of the United States, (b) communicates coal sale opportunities for the Debtors, (c) assists the Debtors in the negotiation of the best terms to maximize value for the sale and delivery of coal to prospective customers on its end of the transaction, (d) procures, when requested by the Debtors, transportation services for delivery of coal to customers, including port, rail, trucking, and ocean freight services, (e) optimizes all sale contracts and logistic arrangements for the delivery of coal, and (f) procures and advises on the procurement of blended coal.

173.    As described, Javelin purchases the Debtors' coal directly in connection with exporting such coal to international end-users. Thus, related to the Javelin-Murray Coal Marketing Agreement, and to facilitate the Debtors' ability to sell its coal to the international market, the Debtors, specifically FELP and Foresight Coal Sales LLC, Javelin, and Uniper Global Commodities UK Limited (a Uniper affiliate), are a party to the *Amended and Restated Master Coal Purchase and Sale Agreement*, dated January 1, 2019 (the "Javelin Coal Sales Agreement"). This agreement sets forth the economic and logistic terms that the Debtors may sell and transport coal that Javelin purchases from the Debtors. Through the Javelin Coal Sales Agreement and with Javelin's material assistance, the Debtors are able to efficiently export their

coal beyond the domestic market, and are able to take advantage of Javelin's transportation and bulk shipping synergies to sell coal at a competitive price in the current coal industry. Given this arrangement under the Javelin Coal Sales Agreement, I understand that the Debtors intend to continue performing under this Coal Sales Agreement and under any new Coal Sales Agreements with Javelin, inclusive of any amendments or modifications, on a postpetition basis.

> vii.  Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Payment of Prepetition Taxes and Fees and (B) Granting Related Relief (the "Taxes and Fees Motion").

174.    In the ordinary course of business, the Debtors collect and incur sales, use, excise, property, and other business, environmental, and regulatory taxes, fees, and assessments (collectively, the "Taxes and Fees"). The Debtors remit Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Authorities")[11] in accordance with applicable laws, regulations, and permits. Taxes and Fees are remitted and paid by the Debtors through checks and electronic transfers that are processed by their banks and other financial institutions. The Debtors estimate that approximately $13,085,000 in prepetition Taxes and Fees has accrued and are unpaid as of the Petition Date, of which approximately $4,935,000 is currently payable or will become payable after the Petition Date and before a final hearing on the Taxes and Fees Motion.

175.    The Debtors pay the Taxes and Fees on a periodic basis, remitting them to the respective Authorities, landowner, or lessor semimonthly, monthly, quarterly, or annually, depending on the nature and incurrence of a particular Tax or Fee. The Debtors seek the authority to pay Taxes and Fees that: (a) were incurred and became due prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (b) had prepetition payments

---

[11]    With respect to certain of the Reclamation Taxes and Fees paid on account of land mitigation subsidence claims and certain of the Property Taxes, the Debtors remit some payments to the applicable landowner instead of to an Authority, as described below.

that were lost or otherwise not received in full; or (c) were incurred for prepetition periods and become due after the Petition Date.  The Taxes and Fees are summarized as follows:

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Sales and Use Taxes** | Taxes imposed on the sale and use of certain goods and services. | $90,000 | $10,000 |
| **Black Lung Excise Taxes** | Taxes related to compensating coal miners who develop black lung disease. | $700,000 | $700,000 |
| **Reclamation Taxes and Fees** | Taxes related to restoring, reclaiming, and mitigating subsidence damage to the land upon which the Debtors previously or currently conduct mining operations. | $5,720,000 | $4,000,000 |
| **Property Taxes** | Taxes and obligations related to real and personal property. | $6,500,000 | $150,000 |
| **Business Regulations and Fines** | Taxes and Fees for business, permitting, licensing, regulatory assessments (including Mine Safety and Health obligations), compliance with environmental laws and regulations, and other fees paid to the Authorities. | $75,000 | $75,000 |
| **Total** | | **$13,085,000** | **$4,935,000** |

### a. Sales and Use Taxes

176.    The Debtors incur, collect, and remit an assortment of state and local sales, use, and other similar taxes (collectively, the "Sales and Use Taxes") in connection with the operation of their businesses.  The Debtors' sales tax obligations primarily arise from the sale of certain goods and services to their customers.  The Debtors incur use taxes for the purchase of equipment, materials, supplies, and services when vendors do not, or are not registered to, collect sales taxes.  The Debtors generally remit Sales and Use Taxes to the appropriate Authorities annually.  On an annual basis, the Debtors incur and remit approximately $1 million in Sales and Use Taxes.  The Debtors estimate that approximately $90,000 in Sales and Use Taxes have

accrued and are unpaid as of the Petition Date, and approximately $10,000 are or will become due and owing during the Interim Period.

**b.  Black Lung Excise Taxes**

177.    The Debtors incur taxes on coal pursuant to Section 4121 of the Internal Revenue Code (the "Black Lung Excise Taxes").  The Black Lung Excise Taxes are held in trust by the federal government and used to compensate coal miners who develop pneumoconiosis, also known as "black lung disease."  The Debtors are required to remit Black Lung Excise Taxes on a semi-monthly basis.  In the year before the Petition Date, the Debtors incurred and remitted approximately  $6.5 million  in  Black  Lung  Excise  Taxes.    The  Debtors  estimate  that approximately $700,000 in Black Lung Excise Taxes have accrued and are unpaid as of the Petition Date, and that approximately $700,000 are or will become due and owing during the Interim Period.

**c.  Reclamation Taxes and Fees**

178.    The Debtors' mines are heavily regulated, and the Debtors are required to make certain payments to restore, reclaim, and mitigate damage to the land on which the Debtors previously conducted or currently conduct mining activities (the "Reclamation Taxes and Fees"). The  vast  majority  of  Reclamation  Taxes  and  Fees  are  paid  on  account  of  land  mitigation subsidence claims to landowners of properties on which the Debtors conduct mining operations. These payments to landowners whose property may be affected by land subsidence are generally required  under  the  government-issued  permits  that  allow  the  Debtors  to  conduct  their  mining activities, and a failure to pay such amounts may result in the revocation of the applicable mining permit.  The remaining Reclamation Taxes and Fees are remitted to the relevant Authorities on a quarterly basis in accordance with the Surface Mining Control and Reclamation Act of 1977.

179.     In 2019, the Debtors incurred and remitted to Authorities or to landowners approximately $12 million in Reclamation Taxes and Fees.  The Debtors estimate that approximately $5.7 million in Reclamation Taxes and Fees have accrued and are unpaid as of the Petition Date, and that approximately $4 million are or will become due and owing during the Interim Period.

### d.  Property Taxes

180.     The Debtors incur real and personal property taxes (the "Property Taxes") (a) directly in many of the jurisdictions in which they operate or (b) indirectly through property tax reimbursement obligations owed to landowners under their respective land or lease agreements for property that the Debtors use in the ordinary course of business.  Property Taxes directly owed by the Debtors are paid to the appropriate Authority, whereas those Property Taxes owed as reimbursement obligations are instead paid to the applicable landowner, who has the ultimate obligation to remit such amounts to the applicable Authority.  The Debtors typically pay Property Taxes in the ordinary course on a periodic basis depending on the jurisdiction and the reimbursement timing under the land or lease agreement.  On an overall annual basis, the Debtors incur and remit approximately $6.5 million in Property Taxes.  The Debtors estimate that approximately $150,000 in Property Taxes have accrued and are unpaid as of the Petition Date.

### e.  Business Regulations and Fines

181.     Federal, state, and local Authorities require the Debtors to pay a wide range of licensing, permit, registration, and reporting fees to the applicable Authorities to remain in good standing to conduct business and operate their facilities (collectively, the "Business Regulations and Fines").  The majority of Business Regulations and Fines arise from ordinary

course citations issued by the MSHA inspectors, which, if not successfully appealed, the Debtors must timely pay to maintain ordinary course operations of their mines.  The Debtors estimate that they pay approximately $1 million annually on account of such Business Regulations and Fines. The Debtors estimate that approximately $75,000 in Business Regulations and Fines have accrued as of the Petition Date, and approximately $75,000 are or will become due and owing during the Interim Period.

**f.   Necessity to Pay Taxes and Fees**

182.   I believe that the Debtors' inability to pay the Taxes and Fees may ultimately result in increased tax liability for the Debtors if interest and penalties accrue on the claims for Taxes and Fees, which amounts may also be entitled to priority treatment. Additionally, nonpayment of certain of the Taxes and Fees could result in the Authorities attempting to suspend the Debtors' mine permits or operations or pursuing other remedies that would harm the estates.

183.   I believe the relief requested in the Taxes and Fees Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes and Fees Motion should be granted.

viii.   Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "<u>Utilities Motion</u>").

184.   In the ordinary course of business, the Debtors obtain electricity, natural gas, telecommunications, water, waste management (including sewer and trash), internet, and other similar services (collectively, the "<u>Utility Services</u>") from various utility providers or brokers (the "<u>Utility Providers</u>").  While there is seasonal fluctuation, on average, the Debtors

have historically spent approximately $4.1 million per month on their Utility Services. Accordingly, the Debtors estimate that their cost for Utility Services during the next thirty (30) days (not including any deposits to be paid or any unpaid prepetition amounts that have been invoiced) will be approximately $4.1 million. Additionally, the Debtors have provided certain of the Utility Providers with prepetition cash deposits.

185.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner. I believe that cash held by the Debtors, the cash generated in the ordinary course of business, and the funds received through the Debtors' proposed debtor-in-possession financing facility will provide sufficient liquidity to pay the Utility Providers in the ordinary course of business during these chapter 11 cases.

186.    To provide additional assurance of payment, the Debtors propose to establish a segregated bank account (the "Adequate Assurance Account") and deposit $230,000 (the "Adequate Assurance Deposit") into such account within five (5) business days of the entry of an interim order granting the relief requested in the Utilities Motion to serve as adequate assurance of payment ("Adequate Assurance"). This Adequate Assurance Deposit will be equal to one-half of the Debtors' estimated monthly cost of the Utility Services, calculated as a historical average over the past twelve (12) months, less any prepetition cash deposit already held by a Utility Provider; provided, however, that such deposits may be adjusted by the Debtors to account for the termination or discontinuance of any of the Utility Services. In the event that a Utility Provider believes that additional assurance is required, the Debtors have proposed procedures in the Utilities Motion for determining additional Adequate Assurance, if any (the "Proposed Adequate Assurance Procedures").

187.    I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' anticipated liquidity during these chapter 11 cases (together, the "<u>Proposed Adequate Assurance</u>"), sufficiently insures the Utility Providers against any risk of nonpayment for future Utility Services.  To the extent that any Utility Provider believes that additional assurance is required, the Proposed Adequate Assurance Procedures, in my opinion, are reasonable and necessary to avoid a haphazard and chaotic process that could expose the Debtors to extortionate, last-minute demands under the threat of losing critical Utility Services.

188.    I believe the Proposed Adequate Assurance minimizes the risk of termination of the Utility Services, which could result in the Debtors' inability to operate their businesses to the detriment of all stakeholders.  In my opinion, preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, I believe any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations and service their customers.  Such a result could, in my opinion, seriously jeopardize the Debtors' restructuring efforts and ultimately, the value of their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Pursuant to 28, U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  March 10, 2020                    _/s/  Alan Boyko_____
       St. Louis, Missouri                    Name:  Alan Boyko
                                      Title:   Senior Managing Director
                                               FTI Consulting, Inc.

Filed by:

ARMSTRONG TEASDALE LLP

 */s/ Richard W. Engel, Jr.*
Richard W. Engel, Jr. (MO 34641)
John G. Willard (MO 67049)
Kathryn R. Redmond (MO 72087)
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
Tel:     (314) 621-5070
Fax:     (314) 621-5065
Email:  rengel@atllp.com
            jwillard@atllp.com
            kredmond@atllp.com

              - and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Paul M. Basta (*pro hac vice* admission pending)
Alice Belisle Eaton (*pro hac vice* admission pending)
Alexander Woolverton (*pro hac vice* admission pending)
1285 Avenue of the Americas
New York, New York  10019
Tel:     (212) 373-3000
Fax:     (212) 757-3990
Email:  pbasta@paulweiss.com
            aeaton@paulweiss.com
            awoolverton@paulweiss.com

*Proposed Counsel to the Debtors and
Debtors in Possession*