# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |
| | ) | Hearing Date:  March 11, 2020 |
| | ) | Hearing Time:  10:00 a.m. (Central Time) |
| | ) | Hearing Location: Courtroom 7 North |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING,
(B) GRANT SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; AND
(IV) SCHEDULING FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Foresight Energy, L.P. ("<u>FELP</u>") and its affiliated debtors and debtors in

possession in the above-captioned cases (collectively, the "<u>Debtors</u>") in the above captioned

chapter 11 cases (the "<u>Chapter 11 Cases</u>") respectfully state as follows in support of this motion

(this "<u>Motion</u>"):

---

[1]     The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

## Preliminary Statement[2]

1.      Prior to the filing of these Chapter 11 Cases, the Debtors, after protracted good faith and arm's length negotiations with their prepetition secured creditors, successfully negotiated the terms of a Restructuring Support Agreement (as defined herein), pursuant to which the Debtors intend to consummate a broadly consensual restructuring of the Debtors' balance sheet, enabling the Debtors to competitively reposition themselves for success.  In connection with these hard fought negotiations, the Debtors obtained agreement from their prepetition secured creditors to provide a much-needed postpetition debtor-in-possession financing facility and access to cash collateral, as described below.  The DIP Facility (as defined herein) will allow the Debtors to consummate their contemplated restructuring, to honor employee wages and benefits, procure goods and services integral to the Debtors' mining operations, fund operational expenses, pay administrative expenses, and allow the Debtors to maintain positive relationships with all stakeholders.  Satisfaction of these key obligations is necessary to preserve and maintain the value of the Debtors' estates to maximize value for all stakeholders.

2.      By this Motion, the Debtors seek approval of the DIP Facility, as well as the use of the Pre-Petition Lenders' Collateral, including Cash Collateral (each as defined below).  Together, this relief will provide the Debtors the liquidity it needs to execute its consensual restructuring, and will demonstrate to the market that the Debtors' business has the support of its key stakeholders.

3.      The DIP Facility consists of a superpriority senior secured $175 million term loan facility, which is comprised of (i) a new money multi-draw term loan facility in an

---

[2]     Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Interim Order or the applicable DIP Financing Documents.

2

aggregate amount of $100 million, $55 million of which will be available upon entry of the Interim Order, and (ii) a term loan facility in an aggregate principal amount of $75 million, which shall, upon entry of the Final Order, convert or refinance the First Lien Claims of the DIP Lenders into the DIP Facility on a *pro rata* basis based upon the DIP Lenders' new money commitments.

4.     The DIP Facility demonstrates substantial support provided to the Debtors by their prepetition creditors notwithstanding the volatility of existing coal markets.  More specifically, certain of the Debtors' prepetition secured first lien term and revolving lenders and secured second lien noteholders are party to both the DIP Facility and the Restructuring Support Agreement, and have committed to provide the full amount of the DIP Facility.

5.     As set forth below, access to the DIP Facilities and cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral") is critical to the Debtors' ability to continue to operate and to permit the Debtors to maximize value for all stakeholders. Moreover, the Restructuring Support Agreement provides the Debtors with a path to consummate a restructuring that already enjoys broad creditor support, as demonstrated by the Restructuring Support Agreement.

6.     In addition, the Debtors believe that the DIP Facility represents the only and best terms the Debtors could obtain under the circumstances.  Over the past several months, the Debtors have worked with their advisors to explore strategic alternatives and devise a liquidity solution for their business.  This process involved seeking to obtain financing from (i) their existing creditors on an out-of-court basis, (ii) third-party sources in connection with a potential financing secured by receivables, and (iii) either third-party sources or their pre-petition lenders secured by certain unencumbered assets.  All of these efforts were ultimately

3

unsuccessful.

7.     In anticipation of the filing of these Chapter 11 Cases, concurrently with negotiating the terms of the proposed DIP Facility, the Debtors—working closely with their advisors—conducted a competitive process for third-party DIP financing proposals by contacting 21 parties.  As a product of these efforts, which included providing marketing materials to prospective lenders, and entering into a confidentiality agreement with one (1) prospective lenders, no third parties submitted any actionable indication of interest, term sheets or definitive offers to provide alternative DIP financing.

8.     Accordingly, for these reasons, and for the reasons set forth below, in the Herman Declaration, the Boyko Declaration and the First Day Declarations, the Debtors firmly believe that entry into the DIP Facility, which provides the cash needed to consummate the transactions contemplated by the Restructuring Support Agreement, will avoid irreparable harm to operations (through immediate access to funding under the Interim Order), will maximize the value of the Debtors' estates for the benefit of their respective stakeholders, is a prudent exercise of the Debtors' business judgment, and should be approved by the Court.

## **Relief Requested**

9.     By this Motion, the Debtors seek entry of an interim order substantially in the form of the "Interim Order" delivered to the Court, and a final order (the "Final Order," and both such orders, the "DIP Orders"), pursuant to sections 105, 361, 362, 363, 364, 503, 506(c) and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri (the "Local Bankruptcy Rules"):

4

(a)    authorization for Foresight Energy LLC, in its capacity as borrower (the "Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "Guarantors"), on a joint and several basis, the Borrower's obligations in connection with a debtor-in-possession financing, comprising a superpriority senior secured multiple-draw term loan facility in an aggregate principal amount of up to $175,000,000.00 (the "DIP Facility"), which consists of, (i) new money multi-draw term loan facility in an aggregate principal amount of $100,000,000.00 (the commitments thereunder, the "New Money DIP Commitments" and the loans advanced thereunder, the "New Money DIP Loans") to be funded by certain Prepetition First Lien Lenders (as defined herein) and Prepetition Second Lien Noteholders (as defined herein), and (ii) a term loan facility in an aggregate principal amount of $75,000,000.00, which shall (A) roll-up the Prepetition First Lien Debt (as defined herein), as further described in the DIP Facility and the Restructuring Support Agreement (as defined below), held by the participating Prepetition First Lien Lenders (or one or more of their respective affiliates or any investment advisory client managed or advised by such participating Prepetition First Lien Lenders) into the DIP Facility on a *pro rata* basis based on each such participating Prepetition First Lien Lender's New Money DIP Commitments (such rolled-up debt, the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans"), (C) be issued under the DIP Facility on a *pari passu* basis with the New Money DIP Loans, and (D) be approved in its entirety upon entry of and pursuant to the Final Order;

(b)    authorization for the Debtors to enter into that certain *Senior Secured Superpriority Debtor-In-Possession Credit and Guaranty Agreement* among the Borrower, the Guarantors, the lenders from time to time party thereto (collectively, the "DIP Lenders"), and Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, together with the DIP Lenders, the "DIP Parties") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement," together with all agreements, documents, and instruments delivered or executed in connection therewith, including, without limitation, that certain Restructuring Support Agreement, dated as of March 10, 2020 (the "Restructuring Support Agreement"), as it relates to the commitments of the Backstop Parties (as defined herein) to fund the New Money DIP Commitments, the "DIP Documents"), which shall be in substantially the same form attached hereto as **Exhibit A**, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(c)    authorization for the Debtors (x) to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the Cash Flow Forecast (as defined herein) as further described herein, to pay fees and interest under the DIP Facility, to cash collateralize certain letters of credit issued and outstanding under the Prepetition First Lien Credit Documents (as defined herein) to provide working capital for, and for other general corporate

Doc#: US1:13410878v13

purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein) and (y) to effectuate the Roll-Up Loans;

(d)     the granting of adequate protection to (x) the term lenders (the "Prepetition First Lien Term Loan Lenders") and revolving lenders (the "Prepetition First Lien Revolving Lenders" and, collectively with the Prepetition First Lien Term Loan Lenders, the "Prepetition First Lien Lenders") under the Credit and Guaranty Agreement, dated as of March 28, 2017 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Prepetition First Lien Credit Agreement" and all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified, the "Prepetition First Lien Credit Documents"), by and among Foresight Energy LLC, as borrower, the guarantors party thereto, (collectively with the borrower, the "Obligors"), The Huntington National Bank, as facilities administrative agent (in such capacity, the "Prepetition First Lien Administrative Agent"), Lord Securities Corporation, as term administrative agent (in such capacity, the "Prepetition First Lien Term Loan Agent," and together with Lord Securities Corporation in its capacity as collateral trustee under the Collateral Trust Agreement (as defined below), the "Prepetition Collateral Trustee" and the Prepetition First Lien Administrative Agent, the "Prepetition First Lien Agents"; and the Prepetition First Lien Agents, together with the Prepetition First Lien Lenders, the "Prepetition First Lien Parties"), and the Prepetition First Lien Lenders and (y) the noteholders (collectively, the "Prepetition Second Lien Noteholders") under the Indenture, dated as of March 28, 2017 (as amended, supplemented or otherwise modified, the "Prepetition Second Lien Indenture" and, together with all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified, the "Prepetition Second Lien Documents" and, together with the First Lien Credit Documents, the "Prepetition Credit Documents") among Foresight Energy LLC and Foresight Energy Finance Corporation, as co-issuers, the guarantors party thereto and Wilmington Trust, National Association as trustee for the Prepetition Second Lien Noteholders (together with the collateral agent for the Prepetition Second Lien Noteholders, the "Prepetition Second Lien Indenture Trustee" and together with the Prepetition Second Lien Noteholders, the "Prepetition Second Lien Parties," and the Prepetition Second Lien Indenture Trustee, together with the Prepetition First Lien Agents, the "Prepetition Agents"; and the Prepetition Agents collectively with the Prepetition First Lien Lenders, and the Prepetition Second Lien Noteholders, the "Prepetition Secured Parties");

(e)     granting of adequate protection to the Prepetition Secured Parties with respect to, among other things, the use of their Cash Collateral and the Prepetition Collateral (as defined below);

(f)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without

6

limitation, the Upfront Fee (as defined herein), the Put Option Premium (as defined herein), the Exit Premium (as defined herein), the Delayed Draw Term Loan Commitment Fee (as defined herein), letter of credit fees, agency fees, audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees, and the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(g)    the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors that is not subject to a valid and perfected lien on the Petition Date (such property and assets, the "Unencumbered Assets"), except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including, upon entry of the Final Order, the proceeds of Avoidance Actions (as defined herein), subject only to the Carve Out (as defined herein) and, if any, the Permitted Liens (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

(h)    the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein,  whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(i)    the granting of valid, enforceable, non-avoidable and fully perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition Liens, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

Doc#: US1:13410878v13

(j)     the granting of superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(k)     the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Petition Date);

(l)     authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined herein);

(m)     the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(n)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of this Interim Order, among other things, (1) authorizing the Borrower, on an interim basis, to borrow from the DIP Lenders under the DIP Documents in a single draw up to an aggregate principal amount not to exceed $55,000,000.00 in New Money DIP Loans (subject to any limitations of borrowing under the DIP Documents) (the "Initial DIP Term Loans"); (2) upon entry of the Final Order (as defined below), to borrow from the DIP Lenders under the DIP Documents (x) in a single draw New Money DIP Loans, in an aggregate principal amount, not to exceed $100,000,000.00  (less the Initial DIP Loans) (the "Delayed Draw DIP Term Loans"), and (y) the Roll-Up Loans for a total aggregate principal amount not to exceed $175,000,000.00; (3) authorizing the Guarantors to guaranty the DIP Obligations, (4) authorizing the Debtors' use of Cash Collateral, and (5) granting the adequate protection described in this Interim Order; and

(o)     that this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, among other things, the Borrower's borrowing from the DIP Lenders under the DIP Documents up to an aggregate principal amount of $100,000,000.00 in New Money DIP Loans, the Roll-Up Loans and the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and set forth in the DIP Documents.

(p)     granting related relief.

10.    In support of this Motion, the Debtors have filed contemporaneously herewith (a) the Declaration of Seth Herman in support of this Motion (the "Herman

Declaration"), a copy of which is attached hereto as **Exhibit C**, and (b) the First Day Declarations (as defined below, and together with the Herman Declaration, the "Declarations"), filed contemporaneously herewith.

### Jurisdiction and Venue

11.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. §157(b).  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.     The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506(c) and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and the Local Bankruptcy Rules.

### Background

**A.     General**

13.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are a leading producer of thermal coal, with four mining complexes and nearly 2.1 billion tons of proven and probable coal reserves strategically located near multiple rail and river transportation access points in the Illinois Basin.  The Debtors also own a barge-loading river terminal on the Ohio River.  From this strategic position, the Debtors sell their coal primarily to electric utility and industrial companies located in the eastern half of the United States and across the international market.

14. The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. Contemporaneously herewith, the Debtors filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). No trustee, examiner or official committee has been appointed in the Chapter 11 Cases.

15. Information regarding the Debtors' businesses, their capital and debt structure, and the events leading to the filing of these cases is set forth in the *Declaration of Robert D. Moore, President and Chief Executive Officer of Foresight Energy LP, in Support of Chapter 11 Petitions* (the "Moore Declaration") and the *Declaration of Alan Boyko, Senior Managing Director of FTI Consulting, Inc., in Support of Chapter 11 Petitions and First Day Relief* (the "Boyko Declaration," and together with the Moore Declaration, the "First Day Declarations"),[3] filed contemporaneously herewith.

## B.    Capital Structure

16. As of the Petition Date, Debtors had approximately $1,325.3 million in total secured funded debt obligations, consisting of approximately: (a) $157,000,000 in principal amount outstanding under a First Lien Revolver (as defined below), (b) $743,285,564.62 in principal amount outstanding under a First Lien Term Loan (as defined below), and (c) $425,000,000 in principal amount remains outstanding under the Prepetition Second Lien Notes (as defined below).

## C.    Prepetition Indebtedness

17. Prepetition First Lien Credit Agreement. As of the Petition Date, Debtors had approximately $900,285,564.62 in total secured bank debt obligations, consisting of

---

[3]    The First Day Declarations are being filed in support of this Motion and are incorporated herein by reference. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declarations.

Doc#: US1:13410878v13

approximately: (a) $157,000,000 in principal amount outstanding under a First Lien Revolver (as defined below) and (b) $743,285,564.62 in principal amount outstanding under a First Lien Term Loan (as defined below).

18.    The Obligors are each a party to the Prepetition First Lien Credit Agreement, which provides for both a revolving credit facility, including participation in letter of credit obligations and swing-line loans (collectively, the "First Lien Revolver") and a term loan facility (the "First Lien Term Loan").    As of the Petition Date, the Obligors are liable to the Prepetition First Lien Parties under the Prepetition First Lien Credit Documents in the aggregate amount of approximately $900,285,564.62, which, together with certain other amounts described in the Interim Order constitute the "Prepetition First Lien Obligations."    The obligations in respect of the First Lien Revolver and First Lien Term Loan rank *pari passu* and are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "Prepetition First Liens") the "Collateral" (as defined in the Prepetition First Lien Credit Documents) (the "Prepetition Collateral"), subject only to certain Permitted Liens as permitted under the Prepetition First Lien Credit Documents.

19.    The First Lien Revolver bears interest at the London Interbank Offered Rate ("LIBOR") plus 5.25% per annum, with a 1.0% LIBOR floor.    The First Lien Term Loan bears interest at a rate of LIBOR plus 5.75%.    The First Lien Revolver matures on March 28, 2021 and the First Lien Term Loan matures on March 28, 2022, though both are subject to earlier prepayment of outstanding borrowings based on excess cash flow, determined on an annual basis.    The First Lien Credit Agreement contains a financial maintenance covenant solely for the benefit of the First Lien Revolver, requiring compliance on a quarterly basis with a maximum net first lien secured leverage ratio.

Doc#: US1:13410878v13

20.     _Prepetition Second Lien Indenture_.  FELLC and Foresight Finance co-issued the 11.50% Second Lien Senior Secured Notes due 2023 (the "Prepetition Second Lien Notes") pursuant to the Prepetition Second Lien Indenture, by and among FELLC and Foresight Finance, as Issuers, the guarantors a party thereto, and the Prepetition Second Lien Indenture Trustee.  The guarantors of the Prepetition Second Lien Notes are the same as the guarantors of the Prepetition First Lien Obligations, with the exclusion of FELP, who is not a guarantor of the Prepetition Second Lien Notes, and Foresight Finance, who is only an issuer of the Prepetition Second Lien Notes.

21.     The obligations under Prepetition Second Lien Indenture are secured by second priority liens on and security interests in the Prepetition Collateral (the "Prepetition Second Liens" and, together with the Prepetition First Liens, the "Prepetition Liens"), which Prepetition Second Liens are subject and subordinate only to the Prepetition First Liens and certain Permitted Liens.  The Prepetition Second Lien Indenture and the Prepetition Second Lien Notes are governed by New York law.  The Prepetition Second Lien Notes bear interest of 11.50% per annum, and mature on April 1, 2023.  As of the Petition Date, approximately $425 million in principal amount remains outstanding under the Prepetition Second Lien Notes.

i.     Collateral Trust Agreement

22.     The respective rights and interests of the Prepetition Secured Parties under the First Lien Credit Documents and Prepetition Second Lien Documents, respectively, are governed by that certain Collateral Trust Agreement, dated as of March 28, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time prior to the date of the Interim Order, the "Collateral Trust Agreement") among the Prepetition First Lien Revolver Agent, the Prepetition First Lien Term Loan Agent and the Prepetition Second Lien Indenture Trustee.  Specifically, the Collateral Trust Agreement governs the lenders' respective rights and

12

interests relating to, among other things, the Prepetition Secured Parties with respect to the Prepetition Collateral. Pursuant to the Collateral Trust Agreement, the liens covering the Prepetition Second Lien Notes and their related obligations under the Prepetition Second Lien Indenture are subordinate to any liens covering the Prepetition First Lien Obligations and their related obligations under the First Lien Credit Agreement. The Collateral Trust Agreement also addresses the Prepetition Secured Parties' rights in the event of a bankruptcy proceeding, including with respect to the enforcement of remedies, debtor in possession financing and the provision of adequate protection.

### **Summary Terms of DIP Facility**[4]

23.     The chart below contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), and by the United States Bankruptcy Court for the Easter District of Missouri's *Chapter 11 Guidelines – Cash Collateral and Financing Orders* (the "Financing Guidelines").

| Applicable Rule | Summary of Material Terms |
|---|---|
| **Borrower**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Foresight Energy LLC ("FELLC"), as a debtor and debtor-in-possession in the Chapter 11 Cases, is the Borrower under the DIP Facility.<br><br>***See* DIP Credit Agreement at preamble; Interim Order ¶ (a)** |
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Foresight Energy LP; Adena Resources, LLC; Akin Energy LLC; American Century Mineral LLC; American Century Transport LLC; Coal Field Construction Company LLC; Coal Field Repair Services LLC; Foresight Coal Sales LLC; Foresight Energy Employee Services Corporation; Foresight Energy Finance Corporation; Foresight Energy Labor LLC; Foresight Energy Services LLC; Foresight Receivables LLC; Hillsboro Energy LLC; Hillsboro Transport LLC; LD Labor Company LLC; Logan Mining LLC; Mach Mining, LLC; Macoupin Energy LLC; MaRyan Mining LLC; M-Class Mining, LLC; Oeneus LLC  (d/b/a/ Savatran LLC); Patton Mining LLC; Seneca Rebuild LLC; Sitran LLC; Sugar Camp Energy, LLC; Tanner Energy LLC; Viking Mining LLC; and |

---

[4]    The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in the following summary chart but not otherwise defined have the meanings given to them in the Interim Order and DIP Documents, as applicable.

Doc#: US1:13410878v13

| Applicable Rule | Summary of Material Terms |
|---|---|
| | Williamson Energy, LLC.<br><br>*See* **DIP Credit Agreement at preamble; definition of "Guarantors"; Interim Order ¶ (a)** |
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Cortland Capital Market Services LLC<br><br>*See* **DIP Credit Agreement at Preamble; Interim Order ¶ (b)** |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each lender from time to time party to the DIP Credit Agreement.<br><br>*See* **DIP Credit Agreement at preamble; Interim Order ¶ (b)** |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Financing Guidelines (1)(b) | The Borrower shall deliver to the Administrative Agent and the DIP Lenders:<br><br>• Within 90 days after the end of each fiscal year of the Borrower (commencing with the fiscal year in which the Closing Date occurs) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with a Narrative Report), and prepared in accordance with GAAP; such consolidated statements shall be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and which may contain a "going concern" qualification.<br><br>• Within 45 days after the end of each fiscal quarter of each fiscal year of the Borrower (commencing with the fiscal quarter ended March 31, 2020), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail (together with a Narrative Report) and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, changes in shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.<br><br>• Within 30 days after the end of each month (commencing with the month ending March 31, 2020), the Monthly Consolidated Financial Report, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition as at the dates indicated and the results of their operations and their cash flows for the periods indicated.<br><br>• Within 30 days after the end of each month (commencing with the month ending March 31, 2020), the Monthly Mine-Level Financial Report, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial information reported therein.<br><br>• No later than 12:00 p.m. on the Thursday following the end of every fourth calendar week, commencing with the Thursday of the fourth calendar week following the week in which the Petition Date occurs, a Cash Flow Forecast (as defined below), |

| Applicable Rule | Summary of Material Terms |
|---|---|
| | substantially in the form of the initial Cash Flow Forecast provided pursuant to Section 4.01(g) of the DIP Credit Agreement or as otherwise reasonably satisfactory to the Financial Advisor. |
| | • No later than 7:00 p.m. on Thursday of each week after each Reporting Period (as defined below) (commencing with the Thursday of the first full week following the Petition Date), a Budget Variance Report (as defined below) for the immediately preceding Reporting Period.  Each such report shall be certified by a Responsible Officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein. |
| | • No later than 7:00 p.m. on the Thursday of every other week (commencing with the Thursday of the first full week following the Petition Date), a Critical Vendor Report. Each such report shall be certified by a Responsible Officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein. |
| | ***See* DIP Credit Agreement § 6.01; Interim Order ¶ 8(b)** |
| **Term and Maturity**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Financing Guidelines (1)(b) | The earliest of: (a) the date that is 180 days following the Petition Date (the "Stated Maturity Date"); provided, that, if such date is not a Business Day, the Maturity Date shall be the preceding Business Day, (b) the date of the substantial consummation of one or more plans of reorganization confirmed pursuant to a final order entered by the Bankruptcy Court, (c) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code, and (d) the date on which the Obligations under the DIP Credit Agreement are accelerated in accordance with the provisions thereunder.<br><br>***See* DIP Credit Agreement at definition of "Maturity Date"; § 2.07; Interim Order ¶ 23** |
| **Commitment and Roll-Up**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Financing Guidelines (1)(a)(v), (1)(b) | <u>New Money Term Loans</u>:<br><br>(i) <u>Initial Term Loan Commitment</u>: $55,000,000 (upon entry of the Interim Order)<br><br>(ii) <u>Delayed Draw Term Loan Commitment</u>: $45,000,000 (upon entry of the Final Order)<br><br><u>Roll-Up Loan</u>: $75,000,000 (upon entry of the Final Order)<br><br>***See* DIP Credit Agreement § 2.01; Schedules 2.01; Interim Order ¶ (a)** |
| **Conditions of Borrowing and Milestones / "Benchmarks"**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Financing Guidelines (1)(b) | <u>Conditions precedent to the Closing Date including, but not limited to</u>:<br><br>• Receipt of DIP Credit Agreement, Administrative Agency Fee Letter, Notes (if requested), Secretary's Certificate, Officer's Certificate, Cash Flow Forecast, the DIP Budget (as defined below), Historical Financial Statements and documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations<br><br>• Satisfaction of collateral requirement and delivery of Collateral Questionnaire<br><br>• All necessary governmental and third party approvals<br><br>• Entry of the Interim Order no later than five days following the Petition Date<br><br>• "First day" orders in form and substance acceptable to the Required Lenders<br><br>• Payment of fees and expenses |

Doc#: US1:13410878v13

| Applicable Rule | Summary of Material Terms |
|---|---|
| | • No occurrence of Material Adverse Effect since December 31, 2018 |
| | • No outstanding Indebtedness other than Indebtedness permitted under the DIP Credit Agreement |
| | Conditions precedent to each Term Loan (including Delayed Draw Term Loan) including, but not limited to: |
| | • No Default or Event of Default |
| | • Satisfaction of Representations and Warranties |
| | • Interim Order is in full force and effect prior to the Final Order Entry Date |
| | • Final Order is in full force and effect after Final Order Entry Date |
| | • Restructuring Support Agreement is in full force and effect |
| | • Receipt of Notice of Borrowing |
| | • No trustee, receiver or examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors has been appointed or designated in the Cases |
| | • None of the Chapter 11 Cases of any Debtors has been dismissed or converted to a Chapter 7 case |
| | *See* **DIP Credit Agreement §§ 4.01 and 4.02; Interim Order ¶ 23** |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Financing Guidelines (1)(b) | Borrower may access any Loans at either the Eurocurrency Rate or the Base Rate.<br><br>Eurocurrency Rate Loan: Eurocurrency Rate + 11.00% (1% floor)<br><br>Base Rate Loan: Base Rate + 10.00% (2% floor)<br><br>*See* **DIP Credit Agreement at definition of "Applicable Rate"; § 2.08** |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Generally - Cash Collateral and Prepetition Collateral.  Debtors shall be authorized to provide adequate protection to the Prepetition Secured Parties with respect to, among other things, the use of their Cash Collateral and the Prepetition Collateral<br><br>Prepetition First Lien Lenders - First  Lien Adequate Protection Obligations<br><br>*(a)  First Lien Adequate Protection Liens.*  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of the Interim Order (the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral.<br><br>Subject to the terms of the Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens and (C) the Permitted Liens (if any).<br><br>The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition Liens, the Second Lien |

16

| Applicable Rule | Summary of Material Terms |
|---|---|
| | Adequate Protection Liens and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551). *See* **Interim Order ¶ 17(a)**<br><br>(b) *First Lien Adequate Protection Superpriority Claim.* An allowed administrative expense claim in the Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Cases, except the Carve Out and the DIP Superpriority Claims.<br><br>The First Lien Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, the Avoidance Proceeds).<br><br>Subject to the Carve Out and the DIP Superpriority Claims in all respects, the First Lien Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code (subject to entry of the Final Order).<br><br>The Prepetition First Lien Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents. *See* **Interim Order ¶ 17(b)**<br><br>(c) *Fees and Expenses.* As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses, whether incurred before or after the Petition Date, of the Prepetition First Lien Agents, and the [Ad Hoc First Lien Group and the Ad Hoc Crossover Group], including, without limitation, the reasonable and documented fees and expenses of (a) Sullivan & Worcester LLP, counsel to the Prepetition First Lien Term Loan Agent and the Prepetition Collateral Trustee, (b) Buchanan Ingersoll & Rooney PC, counsel to the Prepetition First Lien Administrative Agent, together with one local counsel to the Prepetition First Lien Agents, (c) in accordance with its engagement letter, Conway McKenzie, Inc., as financial advisor to the Prepetition First Lien Administrative Agent, (d) one local counsel, Thompson Coburn LLP, and one lead counsel, Akin Gump, as counsel to the ad hoc group of certain Prepetition First Lien Lenders (the "Ad Hoc First Lien Group"), (e) in accordance with its engagement letter, one financial advisor, Lazard, as financial advisors to Ad Hoc First Lien Group, (f) one local counsel, [Bryan Cave Leighton Paisner LLP], and one lead counsel, Milbank LLP, as counsel to the ad hoc group of certain Prepetition First Lien Lenders and Prepetition Second Lien Noteholders (the "Ad Hoc Crossover Group"), and (g) in accordance with its engagement letter, one financial advisor, Perella Weinberg Partners LP, as financial advisor Ad Hoc Crossover Group. *See* **Interim Order ¶ 17(c)** |

Doc#: US1:13410878v13

| Applicable Rule | Summary of Material Terms |
|---|---|
| | (d) *First Lien Accrued Adequate Protection Payments.* As further adequate protection, the Prepetition First Lien Agents, on behalf of the Prepetition First Lien Lenders, shall receive, upon entry of the Interim Order, monthly adequate protection payments (the "First Lien Accrued Adequate Protection Payments") payable in-kind on the thirtieth day of each month equal to the interest at the Applicable Rate (as defined in the Prepetition First Lien Credit Agreement) that would otherwise be owed to the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement during such monthly period in respect of the Prepetition First Lien Obligations that are not Roll-Up Loans, until such time as the full Prepetition First Lien Obligations Amount is paid in full, in cash. *See* Interim Order ¶ 17(d) |
| | (e) *Information Rights.* The Debtors shall promptly provide the Prepetition First Lien Agents and the Ad Hoc First Lien Advisors, respectively, as well as the Ad Hoc Crossover Advisors, with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agent or the DIP Lenders under the DIP Documents. *See* Interim Order ¶ 17(e) |
| | Adequate Protection for the Prepetition Second Lien Noteholders. |
| | (a) *Second Lien Adequate Protection Liens.* As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of the Interim Order. Subject to the terms of the Interim Order, the Second Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, (C) the First Lien Adequate Protection Liens, (D) the Prepetition First Liens and (E) the Permitted Liens (if any).  The Second Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral. *See* Interim Order ¶ 18(a) |
| | (b) *Second Lien Adequate Protection Superpriority Claim.*<br>• As further adequate protection, an allowed administrative expense claim in the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value, except the Carve Out, the DIP Superpriority Claims and the First Lien Adequate Protection Superpriority Claim.<br><br>• Subject to the Carve Out, the DIP Superpriority Claims, the First Lien Adequate Protection Superpriority Claims, and the Prepetition First Lien Obligations in all respects, the Second Lien Adequate Protection Superpriority Claim will not be junior to any other claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code (subject to entry of the Final Order).<br><br>*See* Interim Order ¶ 18(b) |
| **Budget**<br><br>Bankruptcy Rule 4001 (c)(1)(B) | Deliver to Administrative Agent and each Lender a **Budget Variance Report** no later than 7:00 p.m. on Thursday of each week after each Reporting Period (commencing with the Thursday of the first full week following the Petition Date). The Budget Variance Report is a weekly variance report, commencing with a variance report for the one week period following the Closing Date, the two week period following the Closing Date, the |

Doc#: US1:13410878v13

| Applicable Rule | Summary of Material Terms |
|---|---|
| | three week period following the Closing Date and the four week period following the Closing Date, and thereafter a weekly variance report for the one week period following the most recently delivered Cash Flow Forecast, the two week period following the most recently delivered Cash Flow Forecast, the three week period following the most recently delivered Cash Flow Forecast and the four week period following the most recently delivered Cash Flow Forecast, with the report for each week in a four week period including an individual report for such week and a cumulative report to date for such four week period (each such one week, two week, three week or four week cumulative period, a "Reporting Period"), in each case, setting forth for the applicable Reporting Period ended on the immediately preceding Friday prior to the delivery thereof: |
| | (1) the negative variance (as compared to the applicable Cash Flow Forecast and the DIP Budget) of the operating cash receipts (on a line item by line item basis and an aggregate basis for all line items) of the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period, |
| | (2) the positive variance (as compared to the applicable Cash Flow Forecast and the DIP Budget) of the disbursements (on a line item by line item basis and an aggregate basis for all line items) made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) for the applicable Reporting Period and for the last week of the applicable Reporting Period, |
| | (3) the positive variance (as compared to the applicable Cash Flow Forecast and the DIP Budget) of the total disbursements (on a line item by line item basis and an aggregate basis for all line items) (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period and |
| | (4) an explanation, in reasonable detail, for any material negative variance (in the case of receipts) or material positive variance (in the case of disbursements) set forth in such variance report, certified by an Authorized Officer of the Borrower. |
| | **Cash Flow Forecast** is a projected statement of sources and uses of cash for the Loan Parties, prepared in accordance with the DIP Credit Agreement, for the current and following 13 calendar weeks (but not any preceding weeks), including the anticipated uses of the proceeds of any Borrowing for each week during such period. Cash Flow Forecast initially refers to the 13-week cash flow forecast most recently delivered on or prior to the Petition Date and, thereafter, the most recent Cash Flow Forecast delivered by the Borrower. Each Cash Flow Forecast shall be in form and substance satisfactory to the Required Lenders in their sole discretion. |
| | **DIP Budget** is a budget setting forth weekly operating and cash flow projections for the Debtors for the period commencing on the Petition Date and ending on July 11, 2020. |
| | *See* DIP Credit Agreement at definitions of "Budget Variance Report", "Cash Flow Forecast" and "DIP Budget"; §§ 4.01(g) and 6.01(e); *See* Interim Order ¶ 8 |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(l)(B) | Variance is permitted if:<br><br>(a) as of the last day of each applicable Two-Week Test Period commencing with the last day of the first Two-Week Test Period ending after the Closing Date, for such Two-Week Test Period (i) the negative variance (as compared to the Cash Flow Forecast) of the actual aggregate operating cash receipts of the Debtors shall not exceed 15%, (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements  (excluding professional fees, interest payments and disbursements made by |

| Applicable Rule | Summary of Material Terms |
|---|---|
| | the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors shall not exceed 15% and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) shall not exceed 15%, and<br><br>(b) beginning with the delivery of the third Budget Variance Report, as of the last day of each applicable Four-Week Test Period commencing with the last day of the first Four-Week Test Period ending after the Closing Date, for such Four-Week Test Period, (i) the negative variance (as compared to the applicable Cash Flow Forecast) of the actual aggregate operating cash receipts of the Debtors shall not exceed 10%, (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) made by the Debtors shall not exceed 10% and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) shall not exceed 10%.<br><br>*See* **DIP Credit Agreement § 7.18** |
| **Maximum Capital Expenditure**<br><br>[Bankruptcy Rule 4001(c)(l)(B)] | The Company shall not make or incur Capital Expenditures in excess of the amounts set forth below for the applicable period:<br><br><table><tr><th>Period</th><th>Maximum Capital Expenditures</th></tr><tr><td>Petition Date through March 31, 2020</td><td>$16,200,000</td></tr><tr><td>Petition Date through April 30, 2020</td><td>$19,410,000</td></tr><tr><td>Petition Date through May 31, 2020</td><td>$20,540,000</td></tr><tr><td>Petition Date through June 30, 2020</td><td>$27,490,000</td></tr><tr><td>Petition Date through July 31, 2020</td><td>$28,500,000</td></tr></table><br>*See* **DIP Credit Agreement § 7.14** |
| **Minimum Liquidity**<br><br>[Bankruptcy Rule 4001(c)(l)(B)] | Liquidity (as defined below) shall not at any time be less than (i) prior to the Delayed Draw Funding Date, $20,000,000, and (ii) on or after the Delayed Draw Funding Date, $40,000,000.<br><br>**Liquidity** is the sum of (i) the aggregate amount of cash and Cash Equivalents on the consolidated balance sheet of the Borrower and its Subsidiaries that is "unrestricted" in accordance with GAAP and (ii) at all times prior to the borrowing of the Delayed Draw Term Loans, the Delayed Draw Term Loan Commitment.<br><br>*See* **DIP Credit Agreement at definition of "Liquidity"; § 7.19** |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B) | **Events of Default**: Usual and customary for financings of this type, including:<br><br>• Non-payment of interest and fees, subject to grace period; non-payment of principal (no grace period) |

20

| Applicable Rule | Summary of Material Terms |
|---|---|
| | • Defaults under specific affirmative and negative covenants (no grace period) |
| | • Defaults under any Loan Documents (other than provisions covered above) that is not cured within 30 days |
| | • Representations and Warranties are incorrect or misleading in any material respect |
| | • Cross-Default for other indebtedness in excess of $5,000,000 |
| | • Insolvency proceedings with respect to any Loan Party or Subsidiary that is not a Debtor (subject, in the case of involuntary proceedings, to a grace period) |
| | • An unstayed final judgment or order entered against Holdings, the Borrower or any Subsidiary in an aggregate amount of $5,000,000 or more, subject to grace period |
| | • Failure to comply with certain ERISA regulations that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect |
| | • Loan Documents cease to be in full force and effect, any Loan Party contests validity or enforceability of any Loan Document, any Loan Party denies liability or obligation under any Loan Document or any Security Document ceases to create a valid Lien |
| | • Change of Control |
| | • Action to terminate or the termination of the Restructuring Support Agreement, the Backstop Commitment Agreement or the Management Services Agreement |
| | • Guaranty ceases to be in full force and effect, subject to certain carve-outs |
| | • Any Security Document ceases to create a valid and perfected Lien, subject to certain exceptions |
| | • Any Loan Party contests the validity or enforceability of any Loan Document or any Order in writing or repudiates or rescinds or denies in writing that it has any further liability |
| | • Occurrence of certain events in the Chapter 11 Cases, including, but not limited to: |
| |     o Appointment of a trustee, receiver or an examiner (other than a fee examiner) in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors |
| |     o Sale without the Required Lenders' consent of any material portion of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in Payment in Full in cash of all of the Obligations under the DIP Credit Agreement |
| |     o Dismissal, conversion or the filing of motion or other pleading seeking the dismissal or the conversion of the Chapter 11 Case |
| | ***See* DIP Credit Agreement § 8.01; Interim Order ¶ 23** |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Credit Agreement contains customary indemnification provisions (including Environmental Liability) by the Borrower in favor of the Agents (and any sub-agent thereof) and each Lender, and each Related Party of any of the foregoing Persons.<br>***See* DIP Credit Agreement § 10.04(b)** |
| **Entities with Interests in, and Use of, Cash** | The following prepetition secured parties have an interest in Cash Collateral:<br><br>• Prepetition First Lien Parties |

| Applicable Rule | Summary of Material Terms |
|---|---|
| **Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i)<br><br>Financing Guidelines (1)(b) | • Prepetition Second Lien Parties<br><br>***See* Interim Order ¶ (e)**<br><br><u>Use of Cash Collateral</u><br><br>• to maintain business relationships with their vendors, suppliers, customers, and other parties;<br><br>• make payroll;<br><br>• make capital expenditures;<br><br>• make adequate protection payments;<br><br>• pay the costs of the administration of the Cases; and<br><br>• satisfy other working capital and general corporate purposes of the Debtors.<br><br>***See* Interim Order ¶ (5)(b)** |
| **Carve Out and Capped Committee Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Financing Guidelines (1)(a)(vi) | <u>The Interim Order provides a Carve Out for:</u><br><br>(i) court and U.S. Trustee fees,<br><br>(ii) estate trustee fees, if any, up to $20,000,<br><br>(iii) allowed professional fees of the Debtors, and allowed fees of **any official committee** of unsecured creditors appointed in the chapter 11 cases subject to the DIP Budget, **shall not exceed an aggregate amount to be agreed prior to the Final Hearing between the Debtors and Required Lenders (as defined the DIP Credit Agreement),** upon the happening of certain events of default.<br><br>***See* Interim Order ¶ 12**<br><br><u>Committee Monthly Cap</u>. The Interim Order prohibits the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, to be used to pay fees or expenses in excess of $150,000.00 per month in the aggregate on account of all Committee Professionals, <u>provided</u> that any unused amounts may be carried forward to a subsequent month.<br><br>All fees and expenses of the Committee Professionals in excess of (i) the Committee Monthly Cap and/or (ii) the Challenge Budget, as applicable, shall not be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code or otherwise.<br><br>***See* Interim Order ¶ 29(a), (c)**<br><br><u>Investigation Budget</u>. The Interim Order provides that no more than $25,000.00 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, to investigate certain matters with respect to the Prepetition Secured Obligations, and the Prepetition Liens within the Challenge Period (as defined in the Interim Order).<br><br>***See* Interim Order ¶ 29(b)** |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | <u>Upfront Fee</u>: nonrefundable upfront payment equal to 3.00% of the aggregate principal amount of the New Money DIP Commitments, which shall be structured as an original issue discount against the New Money DIP Loans when advanced;<br><br>***See* DIP Credit Agreement § 2.09(b); Interim Order ¶ 6(d)(iii)** |

| Applicable Rule | Summary of Material Terms |
|---|---|
| | <u>Put Option Premium</u>: 5.0% of the aggregate principal amount of the New Money DIP Commitments of the Backstop Lenders (as listed on schedule 2.2 of the DIP Credit Agreement and as in effect immediately prior to the funding of the Initial Term Loans), payable in the form of equity in the reorganized FELP at a 35% discount upon the Plan Effective Date pursuant to the terms and conditions set forth in the DIP Credit Agreement, the Restructuring Support Agreement and related backstop commitment arrangements; provided, however, that upon the occurrence of an Event of Default under the DIP Credit Agreement or upon repayment of the DIP Loans in full and termination of all New Money DIP Commitments without the occurrence of the Plan Effective Date, the Put Option Premium shall be immediately payable in cash in an amount equal to $10,000,000.00;<br><br>*See* **DIP Credit Agreement § 2.09(c); Interim Order ¶ 6(d)(iii)** |
| | <u>Exit Fee</u>: 1.0% of the aggregate principal amount of the New Money DIP Commitments (prior to funding of the Term Loans), payable in the form of equity in the reorganized FELP at a 35% discount upon the Plan Effective Date pursuant to the terms and conditions set forth in the DIP Credit Agreement; provided, however, that upon the occurrence of an Event of Default under the DIP Credit Agreement or upon repayment of the DIP Loans in full and termination of all New Money DIP Commitments without the occurrence of the Plan Effective Date, the Exit Fee shall be immediately payable in cash in an amount equal to $2,000,000.00;<br><br>*See* **DIP Credit Agreement § 2.09(d); Interim Order ¶ 6(d)(iii)** |
| | <u>Commitment Fee</u>: a commitment fee on each DIP Lender's commitment to fund the Delayed Draw DIP Term Loans (the "Delayed Draw Term Loan Commitment Fee") at a rate per annum equal to 1.00%, payable pursuant to the terms and conditions set forth in the DIP Credit Agreement.<br><br>*See* **DIP Credit Agreement § 2.09(e); Interim Order ¶ 6(d)(iii)** |
| **Credit Bidding**<br><br>Financing Guidelines (1)(a)(x) | (a) The DIP Agent, or any assignee of the DIP Agent, acting at the direction of the Required Lenders and on behalf of the DIP Parties, shall have the unqualified right to credit bid up to the full amount of any DIP Obligations in the sale of any of the Debtors' assets, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, and<br><br>(b) subject to the indefeasible payment in full in cash of the DIP Obligations, the Prepetition First Lien Agents (on behalf of the Prepetition First Lien Lenders) shall have the right to credit bid (x) up to the full amount of the Prepetition First Lien Obligations and (y) the First Lien Adequate Protection Obligations in the sale of any of the Debtors' assets, including, but not limited to, pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725. The DIP Agent, at the direction of the Required Lenders, and on behalf of the DIP Parties, shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Parties or any acquisition entity or joint venture formed in connection with such bid.<br><br>*See* **Interim Order ¶ 33** |
| **506(c) Waiver**<br><br>Bankruptcy Rule 4001(c)(l)(B)(x) | Subject to entry of the Final Order (but retroactive to the Petition Date), the Debtors and their estates waive their right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c).<br><br>*See* **Interim Order ¶ (13)** |

Doc#: US1:13410878v13

| Applicable Rule | Summary of Material Terms |
|---|---|
| Financing Guidelines (1)(a)(iii) | |
| **Section 552(b) and "equities of the case"**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Financing Guidelines (1)(a)(viii) | Subject to entry of the Final Order (but retroactive to the Petition Date), (i) the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.<br><br>*See* **Interim Order ¶ 15** |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>EDMO Financing Procedures (1)(a)(iv) | DIP Collateral means all property subject to the DIP Liens.<br><br>DIP Liens means Liens created and perfected to secure the DIP Commitments.<br><br>(a) **First Lien on Unencumbered Property.**  Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action (including, upon entry of the Final Order, the proceeds of Avoidance Actions), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located.<br><br>(b) **Liens Priming the Prepetition Liens.**  Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, |

Doc#: US1:13410878v13

| Applicable Rule | Summary of Material Terms |
|---|---|
| | investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition Liens securing the Prepetition Secured Obligations. |
| | (c) **Liens Junior to Certain Other Liens.**  Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of paragraph [11] of the Interim Order, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the liens securing the Prepetition First Lien Obligations or to valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition First Lien Obligations, which security interests and liens in favor of the DIP Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable liens (collectively, the "Permitted Liens"). |
| | ***See*** DIP Credit Agreement § 2.19; Interim Order ¶ 11 |
| **Challenge Period**  Bankruptcy Rule 4001(c)(l)(B)(viii)  Financing Guidelines 1(a)(ii) | The Debtors' acknowledgments, stipulations, admissions, waivers, and releases set forth in the Interim Order shall be binding on the Debtors upon entry of the Interim Order.  The acknowledgments, stipulations, admissions, waivers, and releases contained in the Interim Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Creditors' Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee") and any other representative, successor or assign of any of the Debtors, **unless**: |
| | **Challenge Period** |
| | (a) such party with requisite standing, has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Secured Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens or the Prepetition Secured Obligations by **no later than**: (i) with respect to any Creditors' Committee, the date that is **60 days** after the Creditors' Committee's formation or **(ii)** with respect to other parties in interest, no later than the date that is **75 days after the entry of the Interim Order** (the time period established by the later of the foregoing clauses (i) and (ii), the **"Challenge Period"**); provided that in the event that, prior to the expiration of the Challenge Period, (x) these chapter 11 cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these chapter 11 cases, then, in each such case, the Challenge Period shall be extended for a period of 60 days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and |
| | **(b)** an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding.  If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of this Court: (x) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, |

Doc#: US1:13410878v13

| Applicable Rule | Summary of Material Terms |
|---|---|
| | reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraphs [4(b) and 4(d)], not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Secured Obligations, the Prepetition Liens on the Prepetition Collateral and the Prepetition Secured Parties (in their capacities as such) shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).

If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in the Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding and (b) any Claims and Defenses not brought in such adversary proceeding shall be forever barred; provided that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

***See* Interim Order at ¶ 30** |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Financing Guidelines (1)(a)(ix) | The Interim Order provides for the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of the Interim Order and all obligations under the DIP Facility and pursuant to the DIP Credit Agreement, including without limitation the payment of any fees, execution of any agreements, and granting of any liens.

***See*  Interim Order ¶ (n), 6(d)**

Upon Termination Event

The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Parties after having given not less than three business days' advance written notice (which may be by email) (the "Notice Period"), without further notice or order of the Court, unless the DIP Agent, the DIP Lenders, the Prepetition First Lien Agents, and the Prepetition First Lien Lenders elect otherwise in a written notice to the Debtors, which may be by email. Upon termination of the automatic stay, the DIP Agent, the DIP Lenders, and the Prepetition First Lien Parties shall be permitted to exercise all rights and remedies set forth herein, in the DIP Documents, and the Prepetition First Lien Credit Documents, as applicable, and as otherwise available at law against the DIP Collateral and/or Prepetition Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral or the Prepetition Collateral, or (y) the pursuit of any other rights and remedies granted to the DIP Agent, the DIP Lenders, or the Prepetition First Lien Parties pursuant to the DIP Documents, the Prepetition First Lien Credit Documents, or the Interim Order; provided that during the Notice Period the Debtors may use the proceeds of the DIP Facility |

Doc#: US1:13410878v13

| Applicable Rule | Summary of Material Terms |
|---|---|
| | (to the extent drawn prior to the occurrence of a Termination Event) or Cash Collateral only to (i) fund operations in accordance with the DIP Credit Agreement and the Budget and (ii) to fund the Carve Out Reserves; provided further that during the Notice Period the Debtors, the DIP Lenders, and the DIP Agent consent to a hearing on an expedited basis to consider whether a Termination Event has occurred; provided further, that if a hearing to consider the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five business days after delivery of the Enforcement Notice; provided further that any fees and expenses incurred by the Debtors or the Committee during the Notice Period shall permanently reduce the Post-Carve Out Trigger Notice Cap. <br><br> *See* **Interim Order ¶ 24** |
| **Release/ Waiver of Estate Actions** <br><br> Bankruptcy Rule 4001(c)(l)(B)(viii) <br><br> Financing Guidelines 1(a)(ii) | Subject to any rights and limitations set forth in the Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Secured Parties, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations or the Prepetition Liens, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties. <br><br> *See* **Interim Order ¶ 31** |

## **Efforts to Obtain Post-Petition Financing and the Debtors' Liquidity Needs**

24.     As described in the First Day Declaration and the Herman Declaration, the

Debtors' chapter 11 filing is the result of a number of factors, chiefly heavy competition among

coal suppliers for a shrinking customer base, against the backdrop of a challenging regulatory

and legislative atmosphere.  To attempt to stem the losses caused by these factors, the Debtors

implemented a series of coal production efficiency improvements and cost-cutting initiatives

both within their mining operations and along their transportation and logistics routes.  Despite

Doc#: US1:13410878v13

these efforts, the Debtors still faced extremely challenging market conditions and substantial funded debt obligations.

25.     As described in the Herman Declaration, the Debtors' efforts included attempts, pre-petition, to obtain financing to give them the opportunity to implement an operational restructuring on an out-of-court basis.  The Debtors pursued a potential financing transaction in which Foresight could obtain new financing secured by its receivables.  Based on feedback from potential lenders, the Debtors determined not to move forward on such a transaction.  In addition, the Debtors engaged in negotiations with an ad hoc group of certain Prepetition Secured Lenders and Second Lien Noteholders (the "Crossover Ad Hoc Group") relating to a potential financing transaction which would have provided the Debtors with up to one year of liquidity in which to renegotiate key contracts.  Ultimately, the Debtors abandoned these negotiations when it became clear that certain conditions to such a deal could not be met, namely obtaining the necessary consents from the Debtors' existing secured creditors.

26.     In recent months, the Debtors and their advisors have worked diligently to address the risks presented by the continued deterioration of their liquidity position, including preparing for a chapter 11 filing.  Ultimately, the Debtors agreed to the framework of a restructuring that would be consensual as between the Debtors, an ad hoc group of certain Prepetition First Lien Lenders (the "First Lien Ad Hoc Group" and, with the Crossover Ad Hoc Group, the "Ad Hoc Groups"), the Crossover Ad Hoc Group and certain other of the Debtors' counterparties.  In preparation to execute on that restructuring, the Debtors identified the Ad Hoc Groups as the most likely sources of postpetition financing that could be obtained given (a) the Debtors' liquidity position, (b) how rapidly the Debtors' already limited liquidity was

deteriorating, and (c) such creditors liens on substantially all of Foresight's assets other than Hillsboro and their history with, and understanding of the Debtors.

27.    The Debtors also determined that the prospect of obtaining postpetition financing from a third-party lender other than the Prepetition Secured Lenders would have contemplated one of five alternatives:  (a) a lender willing to extend postpetition financing on an unsecured basis, (b) a lender willing to extend postpetition financing with priority junior to that of the obligations under the First Lien Credit Agreement and Second Lien Notes Indenture, (c) postpetition financing that primed the liens of the Prepetition Secured Creditors without their consent, (d) a complete refinancing of Foresight's First Lien Credit Agreement, or (e) a financing secured solely by Foresight's unencumbered assets at Hillsboro.  Nevertheless, the Debtors, with the assistance of their advisors, determined to move forward on two concurrent paths.

28.    *First*, beginning in February 2020, the Debtors engaged in negotiations with the Ad Hoc Groups regarding the terms of potential DIP financing.  These negotiations continued over the course of several weeks among the Debtors, the Ad Hoc Groups, and each of their respective advisors.  The negotiations were extensive, in good faith, and at arm's-length. Each of the parties was represented by experienced counsel and financial advisors, and the negotiations continued into the days leading up to the Petition Date, with extensive involvement from all of the Debtors professionals and management.  Ultimately, the Debtors, in consultation with their advisors concluded that the proposal from the Ad Hoc Groups was in the best interests of the Debtors and their stakeholders.

29.    *Second*, and concurrently with the negotiations described above, the Debtors conducted a market-test to determine whether any third party would be willing to provide alternative DIP financing on terms that were better and executable by the Debtors under

Doc#: US1:13410878v13

the circumstances.  The Debtors, in cooperation with their advisors, assembled a list of twenty-one (21) financial institutions (five commercial banks and sixteen specialty lenders and credit funds that have historical interest in financing in the coal sector), each of which is experienced in distressed lending and DIP financings, to gauge their interest in providing such alternative financing to the Debtors.

30.     As described in the Herman Declaration, after the initial outreach by the Debtors' professionals, only one (1) potential financing source expressed interest in providing DIP financing.  While that party executed a confidentiality agreement and received confidential marketing materials, it ultimately declined to make a proposal regarding the terms of any potential DIP financing or to seek further information regarding potential DIP financing.  Based on the results of this process, the Debtors do not believe there are any alternative sources of financing, let alone any alternative source of financing who would be willing to provide financing on the same or better terms currently available to the Debtors.

31.     As described in the Boyko Declaration, the debtors have an urgent and immediate need for the DIP Facility.  Without the funds provided under the DIP Facility, the Debtors would run out of the liquidity required to operate their businesses within the first week of the Chapter 11 Cases.  Accordingly, without the cash and stability provided by the DIP Facility, I believe that immediate and irreparable harm would occur as a result of the Debtors' inability to continue ordinary course operations.

32.     Under the circumstances, the Debtors submit that the terms of the DIP Facility are fair and reasonable to the Debtors.  The DIP Facility provides the Debtors with the money they urgently need to fund the Chapter 11 Cases and pursue confirmation of a value-maximizing and deleveraging chapter 11 plan while the Debtors could not obtain such financing

from any other third party.  Accordingly, the Debtors respectfully request the Court approve the Debtors' entry into the DIP Facility.

**Basis for Relief Requested**

33.     For the reasons set forth herein, the First Day Declaration, the Herman Declaration and the Boyko Declaration, the Debtors believe that entry into the DIP Facility is the best and only option available to the Debtors to finance the Chapter 11 Cases and will maximize the value of the Debtors' estates by allowing the Debtors to operate in the ordinary course while pursuing consummation of the restructuring set forth in the Restructuring Support Agreement, and therefore is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court enter the DIP Orders.

**A.      The Debtors Should be Authorized to Obtain the Post-Petition Financing Under Section 364 of the Bankruptcy Code**

34.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain postpetition financing and, in return, to grant superpriority administrative claim status and liens on their property.   Section 364 of the Bankruptcy Code "provides bankruptcy courts with the power to authorize postpetition financing for a Chapter 11 debtor-in-possession."  *In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991).  "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend postpetition credit.'"  *Id.*   In particular, section 364(c) of the Bankruptcy Code establishes the conditions under which a debtor may obtain certain types of secured credit and provides, in pertinent part, as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

31

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).  Furthermore, section 364(d) of the Bankruptcy Code provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

35.     As long as a debtor's business judgment does not run afoul of the letter and spirit of the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit.  *See, e.g.*, *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re*

Doc#: US1:13410878v13

*Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment"); *see also In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").

36.    Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

37.    Here, given all the facts and circumstances present in these cases, the Debtors have amply satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Facility. The Debtors exercised proper business judgment in securing the DIP Facility on terms that are fair and reasonable and the best available to them under the circumstances. Given the circumstances, the Debtors could not

33

obtain credit on an unsecured or administrative expense basis.  Moreover, the requisite Prepetition Secured Parties have agreed in principle to the use of Cash Collateral to the extent it constitutes their respective priority collateral under the terms of the Collateral Trust Agreement, and the Debtors have provided the Prepetition Secured Parties with adequate protection against any potential diminution in value of their interests.  For all the reasons discussed further below, therefore, the Court should grant the Debtors' request to enter into the DIP Facility pursuant to sections 364(c) and (d) of the Bankruptcy Code.

        i.      The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Facility

38.    Based on the circumstances of the Chapter 11 Cases, the DIP Facility represents a proper exercise of the Debtors' business judgment.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including decisions about whether and how to borrow money.  *Grp. of Institutional Investors* v. *Chi., Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 550 (1943); *In re Farmland Indus., Inc.*, 294 B.R. at 882 ("Business judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985)); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983).  "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

39.    In general, bankruptcy courts defer to a debtor's business judgment regarding the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages the bankruptcy process or its purpose is not so much to benefit the estate as it is to

benefit a party in interest.  *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).

40.     Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "'as long as the proposed action *appears* to enhance the debtor's estate.'"  *Crystalin, LLC* v. *Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp.* v. *Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis original, internal alterations and quotations omitted)); *see also In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (business judgment standard is "not a difficult standard to satisfy").   Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code."  *In re Farmland Indus., Inc.*, 294 B.R. at 881 (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003), *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985), and *In re Defender Drug Stores, Inc.*, 145 B.R. at 317); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 567 n. 16 (8th Cir. 1997) ("Where the [debtor's] request is not manifestly unreasonable or made in bad faith, the court should normally grant approval as long as the proposed action appears to enhance the debtor's estate'" (citing *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)).

41.     Here, the Debtors have exercised sound business judgment in determining that the DIP Facility is appropriate.  The Debtors' effort to secure DIP Facility was guided by the

Debtors' current financial and operational needs.  *First*, without access to the DIP Facility and Cash Collateral, the Debtors would not be able to pay expenses necessary to sustain ongoing operations, which would irreparably impair the value of the estate.  *Second*, the DIP Facility is the only available sources of funding with which to make such payments.  Third, the terms of the DIP Facility were extensively negotiated at arm's length and in good faith by the Debtors and their advisors to ensure that they contained the most favorable terms possible given the relative bargaining power of the Debtors and their lenders.  *Finally*, the DIP Facility is a key component enabling the Debtors to pursue and, within the Chapter 11 Cases, swiftly confirm and consummate a chapter 11 plan on terms consistent with the Restructuring Support Agreement, thus maximizing the value of their estate for the benefit of all stakeholders.

42.    For all of these reasons, the Debtors determined that entry into the DIP Facility is in the best interests of the Debtors, their estates, and creditors.  The DIP Facility will provide the Debtors with access to the liquidity needed to preserve the value of their assets through ongoing operations and ultimately, achieve a successful outcome through the Restructuring Support Agreement.  Accordingly, the Debtors' decision to enter into the proposed DIP Facility is an exercise of their sound judgment that warrants approval by the Court.

ii.    <u>The Debtors Meet the Conditions Necessary Under Section 364(c) and (d) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis</u>

43.    Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . ."  11 U.S.C. § 364(c).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364 of the Bankruptcy Code, considering whether (a) unencumbered credit or alternative

36

financing without superpriority status is available to the debtor, (b) the proposed transaction is necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate. *See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. at 312; *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549–51 (Bankr. E.D. Pa. 1987); *see also In re Ames Dep't Stores*, 115 B.R. at 37–40.

> (a)    *The Debtors are Unable to Obtain Financing On More Favorable Terms than the DIP Facility*

44.    The Debtors, working in close consultation with their restructuring advisors, have diligently assessed their financing options and concluded that they cannot obtain alternate financing, let alone any financing on better terms. A debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray* v. *Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *accord In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (debtor must show that it has made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc.*, 71 B.R. at 549 (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd.* v. *Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). This is true especially when time is of the essence. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

Doc#: US1:13410878v13

45. Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB* v. *Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected most favorable of two offers it received); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

46. As detailed in the Herman Declaration, notwithstanding the practical difficulties of arranging financing from any third-party lender, the Debtors conducted a search for such financing by contacting twenty-one potential third party lenders. While one executed a confidentiality agreement, that potential lender declined to submit an indication of interest or a term sheet, and each of the other potential lenders the Debtors' advisors contacted indicated they were not interested in providing the needed financing.

47. Notwithstanding the Debtors' lack of alternative financing options, the DIP Facility is the product of extensive good faith negotiations between the Debtors and the DIP Lenders, each of whom was represented by experienced counsel and financial advisors. Through these negotiations, the Debtors were able to secure the best terms possible under the circumstances. Simply put, the DIP Facility provides the Debtors with the liquidity they need on the best and only terms available to them. Based on the negotiation history of the DIP Facility,

and the marketing efforts undertaken by the Debtors and Jefferies, the DIP Facility represent the Debtors' best and only available postpetition financing option.

(b)       *The DIP Facility is Necessary to Preserve Value of the Estates*

48.    As described in the First Day Declaration, the Herman Declaration and the Boyko Declaration, it is essential that the Debtors obtain the proposed DIP Facility to continue the orderly operation of their businesses, facilitate the confirmation and consummation of the chapter 11 plan contemplated by the Restructuring Support Agreement, and otherwise support the Debtors' restructuring activities.  Moreover, as discussed above, absent the financing provided by the DIP Facility, the Debtors would be unable to fund necessary expenditures, including employee payroll and vendor payments in the ordinary course of business that are essential to the Debtors' operational viability.  Accordingly, the circumstances of the Chapter 11 Cases necessitate postpetition financing under section 364(c) of the Bankruptcy Code.

(c)       *The Terms of the DIP Facility is Fair, Reasonable, and Appropriate Under the Circumstances*

49.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp.* v. *First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr S.D.N.Y. Feb. 27, 2009), Hr'g Tr. 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

39

50.     Here, the terms of the DIP Facility are fair, appropriate, reasonable, and in the best interests of the Debtors, their estates, and their creditors.   As detailed in the Herman Declaration, the Debtors sought financing from alternative sources, but were unable to generate any interest.  Nevertheless, the agreement between the Debtors and the DIP Lenders is the result of good faith and arm's-length negotiating which resulted in give and take on both sides.  As is customary, the DIP Facility contains certain case controls (*e.g.*, milestones) and other bankruptcy-related terms, but the Debtors believe that these terms provide sufficient flexibility to ensure the Chapter 11 Cases are administered in a manner that is fair and transparent, but that ensures the Debtors pursue confirmation of a chapter 11 plan that reflects the reality of the Debtors' current financial position.

51.     Finally, without the financing provided by the DIP Facility, the Debtors would not be able to realize the full value of their assets through the confirmation and consummation of the chapter 11 plan contemplated by the Restructuring Support Agreement, to the detriment of all stakeholders.  Accordingly, the terms of the DIP Facility are fair, reasonable and appropriate, and should be approved.

       iii.      <u>The Debtors Should Be Authorized to Obtain Post-Petition Financing Secured by Liens that are Senior to the Liens Securing the Prepetition First Lien Loans and Prepetition Second Lien Notes</u>

52.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained.  *See* 11 U.S.C. § 364(d)(1).  When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien under section 364(d), courts consider a number of factors, including, among others:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's businesses;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland* v. *Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *Barbara K. Enters.*, 2008 WL 2439649, at *10; *see also* 3 COLLIER ON BANKRUPTCY ¶ 364.04[1] (16th ed.).

53.    The DIP Facility satisfies each of these factors. *First*, as described above, the Debtors and their advisors undertook a focused process appropriate to the circumstances and explored financing proposals with various participants both in and outside the capital structure of the Debtors. The Debtors conducted arm's length negotiations with the DIP Lenders, and the ultimate forms of agreement reflect the most favorable terms the Debtors were able to obtain. The Debtors are not able to obtain alternative financing from any party other than from the DIP Lenders, let alone financing on equal or better terms or without granting liens senior in priority to those securing the Prepetition Secured Parties as described herein. As described in the Herman Declaration, and the Prepetition Secured Parties were unwilling to consent to any such priming except in connection with the DIP Facility.

54.    *Second*, as discussed above, the Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of creditors and other parties in interest, to facilitate prosecution of the chapter 11 plan contemplated by the Restructuring Support Agreement, and to otherwise support the Debtors' restructuring activities.

41

55.     *Third*, as discussed above, the terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring and sale activities through the pendency of the Chapter 11 Cases.

56.     *Finally*, as described in greater detail above and in the Herman Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arm's length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment.  The DIP Facility represents the most favorable terms available to the Debtors under current market conditions and in light of the Debtors' financial condition.  Taking into account all of these factors, therefore, it is clear that the Debtors should be authorized to secure the DIP Facility with superpriority priming liens.

> (a)     *The Interests of the Prepetition First Lien Parties and Prepetition Second Lien Parties Are Adequately Protected*

57.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B).  What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *See, e.g.*, *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters 'are [to be] left to case-by-case interpretation and development.'") (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 339, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5963, 6295); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (application of adequate protection "is left to

42

the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

58.     The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession.  *See Martin*, 761 F.2d at 474; *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (holding that secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); *495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

59.     Courts in this district and others have approved similar forms of adequate protection to that being provided to the Prepetition First Lien Parties and the Prepetition Second Lien Parties   *See, e.g.*, *In re Arch Coal, Inc.*, No. 16-40120 (CER) (Bankr. E.D. Mo. Jan. 15, 2016) (approving grant of replacement liens as adequate protection for the use of cash collateral an interim basis); *In re Bakers Footwear Grp., Inc.*, No. 12-49658-705 (CER) (Bankr. E.D. Mo. Nov. 5, 2012) (same).

60.     The Prepetition First and Second Lien Parties are entitled to adequate protection for, among other things, the use of Cash Collateral and other Prepetition Collateral and the limited consensual priming of their liens by the DIP Facility, to the extent of any aggregate diminution in value of their interest in the Prepetition Collateral, including Cash Collateral, from and after the Petition Date.   Such adequate protection will consist of replacement liens and claims on all DIP Collateral to the extent of any Diminution in Value,

professional fees and expenses and, solely with respect to the Prepetition First Lien Parties, monthly in-kind payments of interest to the Prepetition First lien Agents, on behalf of the Prepetition First Lien Lenders.  Finally, the Prepetition Secured Parties will also receive the same financial reporting that the Debtors provide to the DIP Parties and reasonable access to the Debtors' facilities, management, books, and records as required under the Prepetition Documents.

iv. The First Lien Term Loan "Roll-Up" Feature is Appropriate

61. As part of the DIP Facility and subject to entry of the Final Order, the Debtors have agreed to refinance (or "roll up") a $75,000,000.00 portion of the Prepetition First Lien Term Loan (the "Roll-Up Loans").  Because the DIP Facility was necessary to provide funding to enable the Debtors and their creditors to pursue an expeditious and value-maximizing chapter 11 plan, as contemplated by the Restructuring Support Agreement, the Roll-Up Loans are appropriate under the circumstances and substantially beneficial to the Debtors and their stakeholders.

62. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A court may authorize non-ordinary course transactions using property of the estate pursuant to section 363(b) "when a sound business purpose dictates such action."  *Stephens Indus. Inc.* v. *McClung*, 789 F. 2d 386, 390 (6th Cir. 1986) (approving a sale of assets pursuant to section 363(b)).  Courts have authorized payment of certain prepetition claims pursuant to section 363(b) where there is a sound business purpose for doing so.  *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *Armstrong World Indus., Inc.* v. *James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 to allow

44

contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages).

63.    Roll-ups are a common feature in debtor in possession financing arrangements. Courts in this jurisdiction and others have approved similar features in the context of debtor in possession financing. *See, e.g.*, *In re Payless Holdings LLC*, No. 17-42267-659 (Bankr. E.D. Mo. Apr. 5, 2017); *In re Arch Coal, Inc.*, No. 16-40120-705 (Bankr. E.D. Mo. Jan. 15, 2016); *In re Bakers Footwear Group, Inc.*, No. 12-49658 (Bankr. E.D. Mo Oct. 5, 2012); *In re Milacron Inc.*, No. 09-11235 (JVA) (Bankr. S.D. Ohio Mar. 11, 2009) [Docket No. 47] (authorizing approximately $55 million DIP and a roll-up of approximately $20 million); *see also In re Mattress Firm, Inc.*, No. 18-12241 (Bankr. D. Del. Oct.  9, 2018) [Docket No. 184] (approving in interim order the roll-up of all outstanding prepetition revolving obligations); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (Bankr. D. Del. Feb.  6, 2018) [Docket No. 120] (approving in interim order the roll-up of all outstanding prepetition revolving obligations); *In re Charming Charlie LLC*, No. 17-12906 (Bankr. D. Del. Dec 13, 2017) [Docket No. 93] (approving in interim order the roll-up of all outstanding prepetition revolving obligations; *In re rue21, Inc.*, No. 17-22045 (Bankr. W.D. Pa. May 18, 2017) [Docket No. 141] (approving in interim order the roll-up of all outstanding prepetition revolving obligations and $100 million of prepetition term loan obligations); *In re Gymboree Corp.*, No. 17-32986 (Bankr. E.D. Va. June 12, 2017) [Docket No. 86] (approving in interim order the roll-up of all outstanding prepetition revolving obligations and $70 million of prepetition term loan obligations).

64.     The Roll-Up Loans are a sound exercise of the Debtors' business judgment and are a material component of the DIP Facility. As described in the First Day Declaration, the Boyko Declaration and the Herman Declaration, negotiations surrounding the DIP Facility were hard fought and involved give and take on both sides.  The Roll-Up Loans were an essential component of the DIP Facility, however, and the Debtors understood them to be a condition to the DIP Lenders' willingness to extend credit to the Debtors.  Accordingly, as an indispensable component to a financing package for which the Debtors have a demonstrated and immediate need, the Debtors submit that the Roll-Up Loans should be approved.

**B.      The Debtors Should Be Authorized to Use the Cash Collateral**

65.     Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)     each entity that has an interest in such cash collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

66.     Here, the DIP Lenders and the Prepetition Secured Parties consent or, under the Collateral Trust Agreement, are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.  Furthermore, as set forth above, the proposed adequate protection is appropriate, fair and customary for debtor-in-

possession financings of this type.  Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the Interim Order.

**C.      The Debtors Should Be Authorized to Pay the Fees in Connection with the DIP Facility**

67.      As described above, the Debtors have agreed, subject to Court approval and the effectiveness of the DIP Loan Agreements, to pay certain fees to the DIP Agents and the DIP Lenders in connection with the DIP Facility.  The fees payable to the DIP Agents and the DIP Lenders and other obligations under the DIP Loan Agreements represent the most favorable terms on which the DIP Lenders would agree to make the DIP Facility available.  The Debtors considered these fees when determining in the exercise of their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute these Chapter 11 Cases.  Consequently, paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates and creditors and other parties in interest.

**D.      The Scope of the Carve Out Is Appropriate**

68.      The DIP Facility subjects the security interests and administrative expense claims of the DIP Lenders to the Carve Out.  Such carve-outs for professional fees under the terms of the debtor's postpetition financing have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their professionals in certain circumstances, including during an event of default.  *See Ames*, 115 B.R. at 40.  Neither the Interim Order nor the DIP Facility directly or indirectly deprives the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  Additionally, the Carve Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for

47

payment of the U.S. Trustee's fees and professional fees of the Debtors and any appointed statutory committee, notwithstanding the grant of superpriority claims, priming liens, and adequate protection liens and claims.

69.    Courts in this district and others routinely approve carve-outs agreed to by the debtors and their DIP financing lenders, and the Debtors request that the proposed Carve Out in the Chapter 11 Cases be approved.  *See, e.g.*, *In re Payless Holdings LLC*, No. 19-40883-659 (Bankr. E.D. Mo. Apr. 4, 2019); *In re Payless Holdings LLC*, No. 17-42267-659 (Bankr. E.D. Mo. May 17, 2017); *In re Peabody Energy Corp.*, No. 16-42529-399 (Bankr. E.D. Mo. May 18, 2016); *In re Noranda Aluminum, Inc.*, No. 16-10083 (Bankr. S.D. Mo. March 11, 2016); *In re Arch Coal, Inc.*, No. 16-40120 (Bankr. E.D. Mo. Jan. 15, 2016); *In re US Fidelis, Inc.*, 2010 Bankr. LEXIS 5837, at *18 (Bankr. E.D. Mo. May 28, 2010).

**E.    The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e)**

70.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

71.    As explained in detail herein and in the Herman Declaration, the DIP Facility offer the best and only terms on which to obtain needed postpetition financing and are

the result of arm's length, good faith negotiations between the Debtors and the DIP Parties.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Furthermore, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**F.      The Section 506(c) and "Equities of the Case" Waivers are Appropriate**

72.     In connection with consenting to priming liens or the use of cash collateral, prepetition secured parties commonly request a waiver of (a) section 506(c) of the Bankruptcy Code, which permits the Debtors to surcharge collateral and (b) the "equities of the case" exception from the general rule of section 552 of the Bankruptcy Code that prepetition liens that attach to proceeds of collateral will continue to attach to postpetition proceeds.  Here, subject to entry of the Final Order, the requisite Prepetition Secured Parties are consenting to have their liens primed by the DIP Liens as well as to the Debtors' continued use of Cash Collateral, thereby providing the Debtors with sufficient funds with which to continue their business operations.  Absent such consent, the Debtors would be forced to seek non-consensual use of Cash Collateral and priming of the Prepetition Secured Parties' liens, which would require costly litigation, the outcome of which would be highly uncertain, with devastating consequences if the Debtors did not prevail.

73.     As a condition to providing consent, the requisite Prepetition Secured Parties require the Debtors to waive their rights under section 506(c) and the "equities of the case" exception under Bankruptcy Code section 552(b), subject to and effective upon entry of the Final Order.  In addition, as the section 506(c) and "equities of the case" waivers would only

be approved pursuant to the Final Order, parties in interest (including any Committee that may

be appointed) will have an opportunity to be heard in connection with the approval of such

waiver.  Accordingly, the Debtors submit that the proposed section 506(c) and "equities of the

case" waivers are appropriate.

### G.    The Automatic Stay Should Be Modified on a Limited Basis

74.    The proposed Interim Order provides that the automatic stay provisions of section

362 of the Bankruptcy Code will be modified to allow:

(i)    the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents  (in each case in accordance with the terms of the DIP Documents and in such form as the Debtors, the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement) may agree), it being understood that no further approval of the Court shall be required for any amendments, waivers, consents or other modifications to and under the DIP Documents or the Budget, except that any modifications or amendments to the DIP Documents that shorten the maturity thereof or increase the aggregate commitments thereunder or the rate of interest payable with respect thereto shall be on notice and subject to a hearing and Court approval, as necessary;

(iii)    the non-refundable and, upon entry of the Interim Order, irrevocable payment to each of the DIP Lenders or the DIP Agent, as applicable, of the fees referred to in the DIP Documents (which fees, in each case, shall be, and shall be deemed to have been, approved upon entry of the Interim Order, and which fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of any indemnification obligations under the DIP Documents;

(iv)    make the payments on account of the First Lien Adequate Protection Obligations provided for in the Interim Order; and

(v)    the performance of all other acts required under or in connection with the DIP Documents.

75.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.  *See, e.g.*, *In re Milacron Inc.*, No. 09-11235 (JVA) (Bankr. S.D. Ohio Apr. 10, 2009) (modifying automatic stay to permit DIP lender to exercise rights under the DIP Documents); *see also In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Sept.  29, 2019) (terminating automatic stay after an event of default on an interim basis); *In re Charming Charlie LLC*, No. 19-11534 (CSS) (Bankr. D. Del. July 12, 2019) (terminating automatic stay after a default or event of default and a notice period); *In re Oreck Corporation, No.* 13-04006 (KML) (Bankr. M.D.  Tenn. June 12, 2013) (terminating automatic stay after a default or event of default and a notice period); *In re James River Coal Co.*, No. 03-04095 (MFH) (Bankr. M.D. Tenn. Mar. 26, 2003) (same).

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

76.     By this Motion, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause for a waiver of any stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 6004(h).  For the reasons set forth herein and in the First Day Declarations, the Debtors submit that notice of the relief requested herein is appropriate under the circumstances and that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## Notice

77.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for Region (b) counsel to the Ad Hoc First Lien Group; (c) counsel to the Ad Hoc Crossover Group; (d) counsel to the Facilities Agent; (e) counsel to the Term Agent; (f) counsel to the Indenture Trustee; (g) counsel to the collateral trustee under the Debtors' secured debt

facilities; (h) counsel to the DIP Agent; (i) counsel to DIP Lenders; (j) counsel to Murray Energy Corporation; (k) counsel to Reserves; (*l*) counsel to Javelin; (m) counsel to Uniper Global Commodities UK Limited; (n) the Internal Revenue Service; (o) the Securities and Exchange Commission; (p) the United States Attorney's Office for the Eastern District of Missouri; (q) the state attorneys general for all states in which the Debtors conduct business; (r) the holders of the thirty (30) largest unsecured claims against the Debtors, on a consolidated basis; (s) counsel to the Committee; and (t) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-3(A)(1) of the Local Bankruptcy Rules.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

Doc#: US1:13410878v13

WHEREFORE, the Debtors respectfully request entry of the DIP Orders, granting the relief requested herein and such other relief as is just and proper.

Dated:   March 10, 2020            Respectfully submitted,
         St. Louis, Missouri
                                   ARMSTRONG TEASDALE LLP


                                    /s/  Richard W. Engel
                                   Richard W. Engel, Jr. (MO 34641)
                                   John G. Willard (MO 67049)
                                   Kathryn R. Redmond (MO 72087)
                                   7700 Forsyth Boulevard, Suite 1800
                                   St. Louis, Missouri  63105
                                   Tel:    (314) 621-5070
                                   Fax:    (314) 621-5065
                                   Email:  rengel@atllp.com
                                           jwillard@atllp.com
                                           kredmond@atllp.com

                                          - and -

                                   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                                   Paul M. Basta (*pro hac vice* admission pending)
                                   Alice Belisle Eaton (*pro hac vice* admission pending)
                                   Alexander Woolverton (*pro hac vice* admission pending)
                                   1285 Avenue of the Americas
                                   New York, New York  10019
                                   Tel:    (212) 373-3000
                                   Fax:    (212) 757-3990
                                   Email:  pbasta@paulweiss.com
                                           aeaton@paulweiss.com
                                           awoolverton@paulweiss.com

                                   *Proposed Counsel to the Debtors and*
                                   *Debtors in Possession*

Doc#: US1:13410878v13

## **Exhibit A**

**DIP Credit Agreement**

## <u>Exhibit B</u>

**Herman Declaration**

**<u>Exhibit C</u>**

**Summary of DIP Budget**