**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| ) | |
| FORESIGHT ENERGY LP, *et al.*, ) | Case No. 20-41308-659 |
| ) | |
| Debtors.[1] ) | (Joint Administration Requested) |
| ) | |

**DECLARATION OF SETH HERMAN IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING,
(B) GRANT SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING FINAL
HEARING; AND (V) GRANTING RELATED RELIEF**

I, Seth Herman, make this declaration pursuant to 28 U.S.C. § 1746:

1. I am a Senior Vice President at Jefferies LLC ("Jefferies"), a financial advisory and investment banking firm, which is the proposed financial advisor and investment banker to the debtors and debtors in possession (collectively, the "Debtors" or "Foresight") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I am authorized to make this declaration (the "Declaration") on behalf of the Debtors. I submit this Declaration in support of

---

[1] The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are: Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251). The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (the "DIP Motion")[2] filed by Debtors on the date hereof (the "Petition Date")

### Qualifications

2. Since 2014, I have been employed by Jefferies where I am a Senior Vice President in the Debt Advisory and Restructuring Group. Previously, I was employed by Moelis and Company, an independent investment bank, beginning in 2009, where I was most recently a Vice President in the restructuring group. In 2009, I earned a Masters of Business Administration with High Honors from the University of Chicago Booth School of Business, and in 2003, I earned a Bachelor of Arts in Economics with Highest Honors from Emory University.

3. Jefferies is a global, full-service financial advisory and investment banking firm focused on serving clients for nearly sixty years. The Jefferies Debt Advisory and Restructuring Group has assisted and advised numerous chapter 11 debtors in the development of plans of reorganization and we are experienced in analyzing restructuring and chapter 11-related issues. Since 2007, Jefferies has been involved in more than 125 restructurings representing more than $300 billion in restructured liabilities.

4. During my career, I have gained considerable experience advising debtors, creditors and other key stakeholders in chapter 11 cases and in out-of-court restructuring transactions. My experience has included advising debtors and creditors in financial

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

restructuring transactions and distressed mergers and acquisitions; raising capital for troubled companies both in and out-of-court; and representing debtors and creditor constituencies in bankruptcy cases. Some of the representative bankruptcy cases I have been involved in include: Mission Coal, BCBG Max Azria, La Paloma Generating Company, Sundevil Power Holdings, Energy Future Holdings, Logan's Roadhouse, Patriot Coal, Edison Mission Energy, and Reader's Digest. Through my experience in bankruptcy cases, I have extensive experience in procuring, structuring, and negotiating debtor-in-possession financing. In addition, as a finance and restructuring professional, I closely follow developments in the financial markets and, in particular, the credit markets, and keep abreast of the terms of current financing transactions in other distressed and bankruptcy situations.

5. Except as otherwise indicated, all facts in this Declaration are based on my personal knowledge of the Debtors' operations and finances, my experience, my review of relevant documents, information provided to me by Jefferies employees working with me, or information provided to me by members of the Debtors' management or their other advisors.

6. I am not being compensated specifically for this testimony. Jefferies, as a professional proposed to be retained by the Debtors, will receive payments in its capacity as financial advisor to the Debtors (including certain financing fees). If called upon to testify, I would testify competently to the facts set forth herein.

### The Retention of Jefferies

7. The Debtors retained Jefferies in September 2019 as the Debtors' investment banker to assist them in their efforts to explore a variety of strategic alternatives to address Debtors' capital structure. Working closely with the Debtors, members of my team and I have, among other advisory services: (a) analyzed the Debtors' current liquidity and projected cash flow; (b) assisted the Debtors in evaluating restructuring and other strategic alternatives; (c)

helped the Debtors prepare for a potential chapter 11 filing; and (d) as part of such preparation, conducted a diligent search to obtain postpetition financing for the Debtors on the most competitive terms and conditions available to them.  I also have participated in (i) negotiations between the Debtors and their creditors and other interested parties and (ii) meetings with the Debtors' Board of Directors to keep the Board apprised of the restructuring process and provide advice regarding strategic alternatives, including a chapter 11 process.

8. Jefferies, moreover, has worked closely with the Debtors' senior management team and have become knowledgeable about the Debtors' business, finances, and operations.

## The Debtors' Business and Capital Structure

9. As is described in further detail in the *Declaration of Robert D. Moore, President and Chief Executive Officer of Foresight Energy LP, in Support of Chapter 11 Petitions* filed substantially contemporaneously herewith (the "First Day Declaration"), the Debtors' businesses have reached a point of unsustainability.  This is due to a number of factors, but I understand that principal among them is the meaningful challenges to domestic and international thermal coal markets over the last decade.  The coal industry has been impacted by demand and pricing pressures in the face of abundant low-cost natural gas production, and a challenging regulatory and legislative atmosphere.  These pressures have adversely impacted Foresight's profitability.  In turn, this has limited Foresight's (a) ability to service its substantial outstanding indebtedness and other ongoing payment obligations and (b) operational liquidity and cash flexibility with which to maintain ordinary course operations.

10. Compounding these negative secular pressures is the Debtors' highly leveraged capital structure.  As set forth in the First Day Declaration, as of the Petition Date, the Debtors had approximately $1.33 billion in total secured funded debt obligations, consisting of

4

(a) a term loan credit facility (the "First Lien Credit Agreement" and the lenders thereunder, the "First Lien Lenders") consisting of (x) $157 million in principal amount outstanding under a First Lien Revolver, and (y) $743.3 million in principal amount outstanding under a First Lien Term Loan ((x) and (y) together, the "First Lien Loans," and (b) $425 million in principal amount outstanding under that certain Indenture, dated as of March 28, 2017 (as amended, modified, restated, or supplemented from time to time, the "Second Lien Notes Indenture" and the notes issued thereunder, the "Second Lien Notes" and the holders thereof, the "Second Lien Noteholders").[3] In addition, I understand that Foresight had, as of the Petition Date, among other liabilities, approximately (i) $56.5 million in asset retirement and mine reclamation obligations, (ii) $99.4 million in outstanding surety bonds for performance and other bonding obligations, (iii) $11.3 million in workers' compensation and "black lung" obligations (including estimates for obligations incurred but not reported), and (iv) $109.7 in general accounts payable and trade payable.

## Foresight's Prepetition Financing Efforts

11. When Jefferies was initially retained, Foresight was facing near-term liquidity constraints and upcoming technical defaults in the fourth quarter of 2019 that would be reportable in March 2020. Jefferies's initial assignment was to explore strategic alternatives, including, potentially, an out-of-court restructuring to address these challenges. In close consultation with the Debtors and their advisors, Jefferies developed and pursued two potential out-of-court financing transactions, each of which proved unsuccessful.

12. *First*, Jefferies pursued a potential financing transaction in which Foresight could obtain new financing secured by its receivables. In consultation with Foresight

---

[3] The Second Lien Notes and First Lien Loans are collectively referred to as the "Prepetition Secured Debt" and the First Lien Lenders and Second Lien Noteholders are collectively referred to as the "Prepetition Secured Creditors."

5

and its advisors, Jefferies compiled a list of potential lenders that Jefferies and Foresight believed might be willing to engage in such a transaction. Jefferies contacted nine potential lenders, consisting of asset based lenders and specialty lenders. Based on feedback from potential lenders, Foresight decided not to move forward in seeking a receivables financing transaction.

13. *Second*, Foresight, together with its advisors, engaged in negotiations with an ad hoc group of certain First Lien Lenders and Second Lien Noteholders (the "Crossover Ad Hoc Group") for a potential financing transaction, which would have provided Foresight with up to one year of liquidity during which time it could renegotiate various contracts. The financing transaction would have involved the Hillsboro mining complex and related assets, which are neither obligors under any of its Prepetition Secured Debt nor subject to the requirements of the First Lien Credit Agreement or Second Lien Notes Indenture and related documents. These negotiations ended in late January/early February when it became clear that certain conditions to the deal could not be satisfied.

**Foresight's Need for DIP Financing**

14. On October 1, 2019, the Debtors did not make a scheduled interest payment on their Second Lien Notes, which I understand triggered the thirty (30) day grace period before such missed payment became an Event of Default under the terms of the indenture governing the Second Lien Notes. Foresight was subsequently able to obtain three (3) extensions of this grace period, the last to March 29, 2020. These extensions prevented defaults under the Second Lien Notes Indenture from becoming Events of Default (as defined in the Second Lien Notes Indenture) and thereby triggering cross-defaults under the First Lien Credit Agreement. During this time, the Debtors' liquidity needs—evidenced by their inability to

6

continue to service the Second Lien Notes—were exacerbated by continually declining market conditions.

15. Additionally, on February 28, 2020, the Debtors missed an interest payment under their First Lien Credit Agreement, which I understand triggered the five (5) business day grace period before such missed payment would become an Event of Default on March 7, 2020. As a result of the Debtors' inability to service its funded debt and market conditions that have persistently declined, the Debtors have an urgent and immediate need to obtain financing, and I believe such financing could not be executed on an out-of-court basis.

16. As set forth in the DIP Motion, the Debtors do not have sufficient funds on hand and do not generate sufficient funds from operations to fund their businesses in chapter 11. The budget forecasting projected cash flows for the thirteen (13) week period following the Petition Date, attached to the DIP Motion as Exhibit C (the "Approved Budget"), was prepared by the Debtors with the assistance of FTI Consulting, Inc. ("FTI"). As described in the DIP Motion, the Approved Budget reflects the Debtors' determination as to the cash required over the specified period to keep the Debtors' businesses operational.

17. Under the Approved Budget, cash collateral alone is insufficient to fund the Chapter 11 Cases. As the Approved Budget demonstrates, absent DIP financing and the use of cash collateral, the Debtors would run out of the liquidity required to operate their businesses in the first week of the Chapter 11 Cases. The Debtors thus require access to the funding provided under the DIP Facility (as defined in the DIP Motion) and use of cash collateral so they can continue to operate their business operations in the ordinary course. Without access to the liquidity provided by the DIP Facility, moreover, the Debtors could be forced to idle or shut down facilities, lose valuable customer accounts, or liquidate on an expedited basis, potentially

7

to the material detriment of the Debtors' creditors, customers, vendors, employees, and other parties in interest.

## The Debtors' Negotiations for DIP Financing

18. As set forth in the First Day Declaration, the Debtors' management team has worked diligently in recent months to address the risks presented by the continued deterioration of Foresight's liquidity position. In connection with these efforts, Foresight identified the Prepetition Secured Creditors as the most likely sources of postpetition financing that could be obtained given (a) Foresight's then-current liquidity position, (b) how rapidly Foresight's already limited liquidity was deteriorating, and (c) the Prepetition Secured Creditors' liens on substantially all of Foresight's assets other than Hillsboro[4] and their history with, and understanding of Foresight.

19. As a result of these factors, the prospect of obtaining postpetition financing from a third-party lender other than the Prepetition Secured Creditors would have contemplated one of five alternatives: (a) a lender willing to extend postpetition financing on an unsecured basis, (b) a lender willing to extend postpetition financing with priority junior to that of the obligations under the First Lien Credit Agreement and Second Lien Notes Indenture, (c) postpetition financing that primed the liens of the Prepetition Secured Creditors without their consent, (d) a complete refinancing of Foresight's First Lien Credit Agreement, or (e) a financing secured solely by Foresight's unencumbered assets at Hillsboro.

---

[4] I understand that, as noted in the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of the Debtors' Existing Cash Management System; (B) Authorizing Use of Existing Bank Accounts and Business Forms; (C) Granting A Limited Waiver of Requirements of Section 345(b) of the Bankruptcy Code; (D) Authorizing Continuation of Ordinary Course Intercompany Transactions; (E) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims; and (F) Granting Related Relief*, the Debtors receive coal sale proceeds into an account maintained by Foresight Receivables LLC with the Prepetition First Lien Administrative Agent, which proceeds are then swept into a concentration account on a daily basis.

20. In my experience as a restructuring professional, under the facts and circumstances of the Chapter 11 Cases, obtaining necessary financing under any one of the alternatives described above would have been very unlikely. I understand that the First Lien Loans are secured by substantially all of the Debtors' assets (aside from Hillsboro), and the First Lien Loans trade at a significant discount to face value, suggesting that the value of the Debtors' collateral assets is not sufficient to repay the Debtors' First Lien Loans in full, and thus would not support additional junior or unsecured debt. Moreover, when we asked the First Lien Lenders holding a majority of First Lien Loans whether they would consent to a financing that primed their liens, they said they would not. Nevertheless, to ensure Foresight obtained financing on the best possible terms, the Debtors, with the assistance of Jefferies and their other professional advisors, determined to move forward on two concurrent paths.

21. *First*, the Debtors engaged in negotiations with an ad hoc group of First Lien Lenders and an ad hoc group consisting of both First Lien Lenders and Second Lien Noteholders (collectively, the "Ad Hoc Groups") with respect to DIP financing beginning in February 2020. On February 20, 2020, the Ad Hoc Groups presented the Debtors with an initial term sheet outlining proposed terms of the DIP Facility.

22. The Debtors, with the assistance of Jefferies and the Debtors' other advisors, engaged in negotiations over the DIP financing proposal. These negotiations continued over the course of several weeks among the Debtors, the Ad Hoc Groups, and each of their respective advisors. These negotiations were extensive, in good faith, and arm's-length in nature. Each of the parties was represented by experienced counsel and financial advisors, and these negotiations continued into the days leading up to the Petition Date. The Debtors' management team was extensively involved. Ultimately, the Debtors, in consultation with their

9

advisors (including myself) concluded that the proposal from the Ad Hoc Groups was in the best interests of the Debtors and their stakeholders.

23. As set forth in detail in the DIP Motion, the Debtors were able to obtain an agreement for postpetition financing in the aggregate amount of $175 million, consisting of $100 million in new money term loans and $75 million of term loans which will convert or refinance claims of certain First Lien Lenders. In addition to providing Foresight with necessary liquidity, the DIP Facility avoids the possibility of a lengthy, costly, and challenging priming dispute. The DIP Facility also requires that the Debtors satisfy certain milestones for progress in the Chapter 11 Cases, including obtaining expeditious confirmation of a chapter 11 plan that already enjoys broad creditor support, and providing for adequate protection for the Prepetition Secured Creditors in exchange for their consent to the use of their collateral, including cash collateral.

24. *Second*, and concurrently with Foresight's negotiations with the Ad Hoc Groups over the terms of the DIP Facility, I was actively involved in the solicitation of alternative proposals to provide postpetition financing. I and my team assembled a list of likely DIP financing providers based on Jefferies's mining industry experience and experience in bankruptcy cases. This list included certain of the potential financing sources contacted in Foresight's pre-petition financing efforts, parties actively involved in lending in the restructuring and mining spaces, and parties who had previously expressed interest in the coal sector. Ultimately, Jefferies identified twenty-one (21) financial institutions ("Third-Party Lenders"), each of which is experienced in distressed lending and DIP financings, to gauge their interest in providing such alternative financing to the Debtors. The potential Third-Party Lenders included five commercial banks and sixteen specialty lenders and credit funds.

10

25. After Jefferies's initial outreach, one (1) potential Third-Party Lender expressed preliminary interest in providing DIP financing, but wanted more information before making a proposal. While that Third-Party Lender executed a non-disclosure agreement and received confidential marketing materials, it ultimately declined to make a proposal regarding the terms of any potential DIP financing or to seek further information regarding potential DIP financing. The other Third-Party Lenders that I and members of my team contacted indicated that they were not interested in providing any DIP financing to Foresight. To date, none of the Third-Party Lenders has indicated any interest in providing DIP financing to the Debtors on a non-priming basis or, for that matter, on a priming basis, absent the consent of the Prepetition Secured Creditors, which they indicated they were unwilling to give. Nor has any Third-Party Lender indicated an interest in providing financing secured only by Foresight's unencumbered collateral at Hillsboro.

26. Based on the results of this marketing process and my conversations with potential lenders, I do not believe that there are any alternative sources of DIP financing available to Foresight.

### The Terms of the DIP Financing

27. Based on my experience as a restructuring professional, my discussions with potential alternative sources of financing, and my specific involvement in the negotiation of the proposed DIP Facility, I believe that the financing process the Debtors ran was appropriate under the circumstances. I also believe that under the facts and circumstances of the Chapter 11 Cases, the terms of the DIP Facility are the best—and only—terms on which the Debtors can obtain postpetition financing. Moreover, as previously discussed, the Debtors believe that they have a critical and immediate need for committed postpetition financing to finance their businesses, retain the confidence of the Debtors' customers, employees and vendors, and to

11

enable the Debtors to prosecute confirmation of a chapter 11 plan and emerge as a competitively positioned and de-levered enterprise poised for future success.

28. *First*, as discussed above, the negotiations with the Ad Hoc Groups were at arm's-length and in good faith. Foresight's management team and legal and financial advisors were actively involved throughout the process. The negotiations amongst the Debtors and the Ad Hoc Group involved significant back and forth between the parties. Ultimately, both the Ad Hoc Groups who agreed to enter into the proposed DIP Facility and Foresight agreed to accommodations that allowed both sides to become more comfortable with the financing.

29. *Second*, I believe that the proposed DIP Facility is the best and only financing available to the Debtors under the circumstances. In my opinion, based on my experience in the current DIP financing market and based on the facts and circumstances of the Chapter 11 Cases, the pricing, fees, interest rates and other terms and conditions of the DIP Facility are the best terms available to the Debtors. Given the Debtors' circumstances, the Ad Hoc Groups' refusal to consent to a priming loan, and the lack of any alternative financing, I believe that the terms of the DIP Facility represent the best terms available to the Debtors.

30. *Third*, and finally, the proposed DIP Facility provides the Debtors with liquidity that the Debtors believe is essential to enable them to continue operating their businesses during the estimated course of these Chapter 11 Cases and will ensure that the Debtors have a means to seek confirmation of a value-maximizing chapter 11 plan that already enjoys broad stakeholder support.

31. Based on the foregoing and the facts and circumstances of these Chapter 11 Cases, I believe that the proposed DIP Facility is the best and only financing that is currently available to the Debtors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: March 10, 2020  
New York, New York

*/s/ Seth Herman*  
Name: Seth Herman  
Title:   Senior Vice President  
           Jefferies LLC