UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| FORESIGHT ENERGY LP, et al., | ) | |
| | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Related to Docket No. 63 |

**DECLARATION OF PATRICK CLOUD IN SUPPORT OF
MT. OLIVE'S RESPONSE TO DEBTORS' SECTION 365 MOTION**

I, Patrick Cloud, provide the following declaration pursuant to 28 U.S.C. § 1746:

1. I am a member in good standing of the State Bar of Missouri and a partner at the law firm of Heyl, Royster, Voelker & Allen.  I am counsel for the Mt. Olive & Staunton Coal Company Trust in the above-captioned matter.

2. I have personal knowledge of the matters set forth herein, and would testify competently thereto if called upon to do so.

3. **Exhibit A** is a true and correct copy of the Purchase and Sale Agreement by and between Macoupin Energy LLC and the Mt. Olive & Staunton Coal Company Trust, dated May 5, 2017, including Exhibits A-D thereto.

4. **Group Exhibit B** constitutes true and correct copies of the following:

   a. Quit Claim Deed executed by Grantor Mt. Olive and Staunton Coal Company Trust and Grantee Macoupin Energy LLC;

   b. Plat Act Affidavit executed May 5, 2017;

    c.   PTAX-203 Illinois Real Estate Transfer Declaration;

    d.   PTAX-203-A Illinois Real Estate Transfer Declaration – Supplemental Form A; and

    e.   W-9 for the Mt. Olive & Staunton Coal Company Trust (redacted).

I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 26, 2020.                 By: _____

                                           Patrick Cloud

# EXHIBIT A

## PURCHASE AND SALE AGREEMENT

**by and between**

## MACOUPIN ENERGY LLC

**as Buyer**

**and**

## THE MT. OLIVE AND STAUNTON COAL COMPANY TRUST

**as Seller**

_May 5_ , 2017

# TABLE OF CONTENTS

## EXHIBITS

Exhibit A:    Definitions

Exhibit B:    Form of Mineral Deed

Exhibit C:    Form of Mineral Bill of Sale (Mineral Records)

Exhibit D:    Guaranty

## SCHEDULES

Schedule 2.1(a):    Mineral Properties

Schedule 3.1(d)    Required Consents

Schedule 7.7    Allocation of Purchase Price

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") dated as of
_____, 2017 is by and between Macoupin Energy LLC, a Delaware
limited liability company ("**Macoupin**" or "**Buyer**") and The Mt. Olive and Staunton Coal
Company Trust ("**Seller**"). Buyer and Seller are sometimes referred to collectively herein as the
"**Parties**" and individually as a "**Party**."

RECITALS

**WHEREAS**, Seller is the owner of the Assets; and

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller,
the Assets in exchange for the Purchase Price, subject to and in accordance with the terms and
conditions of this Agreement and the other Transaction Documents.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein, the
benefits to be derived by each Party hereunder and other good and valuable consideration, the
receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1
### DEFINITIONS AND INTERPRETATIONS

1.1    **Definitions**. Unless otherwise provided to the contrary in this Agreement,
capitalized terms in this Agreement shall have the meanings set forth in **Exhibit A**.

1.2    **Interpretations**. Unless expressly provided for elsewhere in this Agreement, this
Agreement shall be interpreted in accordance with the following provisions:

(a)    Whenever the context may require, any pronoun used in this Agreement
shall include the corresponding masculine, feminine, or neuter forms, and the singular form of
nouns, pronouns and verbs shall include the plural and vice versa.

(b)    If a word or phrase is defined, its other grammatical forms have a
corresponding meaning.

(c)    The headings contained in this Agreement are for reference purposes only
and shall not affect the meaning or interpretation of this Agreement. All references in this
Agreement to articles, sections or subdivisions hereof shall refer to the corresponding article,
section or subdivision of this Agreement unless specific reference is made to such articles,
sections, or subdivisions of another document or instrument.

(d)    A reference to any agreement or document (including a reference to this
Agreement) is to the agreement or document as amended, varied, supplemented, novated or
replaced. The words "hereof," "herein" and "hereunder" and words of similar import when used
in this Agreement shall refer to this Agreement as a whole and not to any particular provision of
this Agreement.

(e)      A reference to legislation or to a provision of legislation includes a modification or reenactment of it, a legislative provision substituted for it and a regulation or statutory instrument issued under it.

(f)      The word "including" shall mean including without limitation.

(g)      The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS

2.1      **Purchase and Sale of Assets**.  Subject to the terms and conditions of this Agreement, Seller agrees to sell to Buyer and Buyer agrees to purchase from Seller, all of Seller's right, title and interest in the following (collectively, the **"Assets"**):

(a)      the Mineral Properties described in Schedule 2.1(a); and

(b)      the Mineral Records.

2.2      **Purchase Price**.  The **"Purchase Price"** to be delivered by Buyer for the Assets shall be Two Million Five Hundred and no/100 ($2,500,000.00) payable in immediately available funds as follows:

(a)      One Million and No/100 Dollars ($1,000,000.00) at Closing by wire transfer to Seller to an account to be provided by Seller;

(b)      Five Hundred Thousand and No/100 Dollars ($500,000.00) on the first business day after January 1, 2020, by wire transfer to Seller to an account to be provided by Seller;

(c)      Five Hundred Thousand and No/100 Dollars ($500,000.00) on the first business day after January 1, 2021, by wire transfer to Seller to an account to be provided by Seller; and

(d)      Five Hundred Thousand and No/100 ($500,000.00) on the first business day after January 1, 2022, by wire transfer to Seller to an account to be provided by Seller.

2.3      **Closing**.  The closing of the transactions contemplated by Sections 2.1 and 2.2 hereof (the **"Closing"**) shall take place on or before __May 5_____, 2017 (the **"Closing Date"**), and at such place as agreed by Seller and Buyer.    All of the deliveries of documents that are contemplated by this Agreement to be made at the Closing shall be delivered to the applicable Party or Parties by (i) in person delivery, (ii) overnight courier service for delivery on the Closing Date or (iii) if delivery by overnight courier service on the Closing Date is not practicable, then by electronic transmission on the Closing Date, with original executed documents delivered on the next succeeding business day.  Any documents to be delivered to a

2

Party on the Closing Date will be delivered and held in escrow until the Parties communicate via telephone to confirm delivery of all documents and consummation of all other actions contemplated by this Article 2.

2.4    **Deliveries at the Closing**. At the Closing:

(a)    Seller will:

(i)    execute and deliver to Buyer the Mineral Deed in substantially the form of **Exhibit B** (the **"Mineral Deed"**), conveying to Buyer the Mineral Properties and related mineral rights, together with any transfer Tax declarations required by applicable Law;

(ii)    execute and deliver to Buyer the Mineral Bill of Sale in substantially the form of **Exhibit C** (the **"Mineral Bill of Sale"**), transferring to Buyer title to the Mineral Records related to the Mineral Properties;

(iii)    execute and deliver to Buyer Seller's executed counterpart to any other Transaction Document to which Seller is a party related to transfer of the Mineral Properties and the Mineral Records;

(iv)    deliver to Buyer possession of the Assets;

(v)    deliver to Buyer the certificate required by Section 7.8 hereof; and

(vi)    deliver to Buyer copies of the Required Consents, which shall be on terms reasonably acceptable to Buyer.

(b)    Buyer will:

(i)    have executed by Foresight Energy LP and deliver to Seller the Guaranty in the form of **Exhibit D** (the **"Guaranty"**), guaranteeing Buyer's obligations to pay the Purchase Price related to the Assets in accordance with Section 2.2;

(ii)    execute and deliver to Seller Buyer's executed counterpart to any other Transaction Document to which Buyer is a party; and

(iii)    deliver the Purchase Price payable to Seller in accordance with Section 2.2.

2.5    **Seller's Conditions to Closing**. The obligation of the Seller to close the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions, any of which may be waived by Seller in writing in its sole discretion:

(a)    The Buyer Representations shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date, except to the extent that any such representation or warranty is made as of a specified date, in which case such

3

representation or warranty shall have been true and correct in all material respects as of such specified date.

(b)     Buyer shall have performed in all material respects the obligations, covenants and agreements of it contained herein and in the other Transaction Documents to which it is a party and required to be performed by it before the Closing.

(c)     No temporary restraining order, preliminary or permanent injunction or other judgment, order, decree, ruling or charge issued by any court of competent jurisdiction that restrains, enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement shall be effective as of the  Closing Date.

(d)     Buyer shall have delivered the items required to be delivered by Buyer pursuant to Section 2.4(b).

2.6     **Buyer's Conditions to Closing**.  The obligation of Buyer to close the transactions contemplated by this Agreement at the Closing is subject to the satisfaction of the following conditions, any of which may be waived by Buyer in writing in its sole discretion:

(a)     The Seller Representations shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date, except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such specified date.

(b)     Seller shall have performed in all material respects the obligations, covenants and agreements of it contained herein and in the other Transaction Documents to which it is a party and required to be performed by it before the Closing.

(c)     No temporary restraining order, preliminary or permanent injunction or other judgment, order, decree, ruling or charge issued by any court of competent jurisdiction that restrains, enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement shall be effective as of the Closing.

(d)     Seller shall have delivered the items required to be delivered by Seller pursuant to Section 2.4(a).

(e)     Each of the Required Consents shall have been obtained.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

3.1     **Representations as to Seller and Transaction**.  Seller represents and warrants to Buyer, as follows (such representations and warranties being deemed to be made as of the date hereof and as of the Closing Date):

4

(a)     <u>Organization; Qualification</u>.  Seller is a trust which is in full force and effect and has all requisite power and authority to own, lease, and dispose of trust assets.

(b)     <u>Authorization of Transaction</u>.  Seller has full power and authority, as granted by the Probate Court of Saint Louis County, Missouri on October 8, 2008, to execute and deliver this Agreement and the other Transaction Documents, to consummate the transactions contemplated by this Agreement and such Transaction Documents and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and such other Transaction Documents and the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action of Seller.  This Agreement and all such other Transaction Documents required hereunder to be executed and delivered by Seller have been duly executed and delivered by Seller.  This Agreement and such other Transaction Documents constitute the valid and legally binding obligations of Seller enforceable against Seller in accordance with their respective terms and conditions, subject, however, to the effects of bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally, and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     <u>Noncontravention</u>.  Assuming the Required Consents have been given, made or obtained, neither the execution and delivery of this Agreement or any of the other Transaction Documents, nor the consummation of the transactions contemplated hereby or thereby at the Closing by Seller, will, with or without the passage of time or the giving of notice or both (i) violate or conflict with any law, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Authority to which Seller or any of the Assets is subject, (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which Seller or any of its assets (including the Assets) is subject or bound except where the violation, conflict, breach, default, right to accelerate, terminate, modify or cancel or failure to give notice would not reasonably be expected to have a Material Adverse Effect on Seller, or (iii) result in the creation or imposition of any Encumbrance.

(d)     <u>Consents</u>.  Seller is not required to give notice to, make any filing with, or obtain any authorization, consent, or approval of any Person for Seller to execute and deliver this Agreement and the other Transaction Documents or to consummate the transactions contemplated hereby or thereby at the Closing, other than those that have been given, made or obtained as of the date of this Agreement, all of which are identified on **Schedule 3.1(d)** ("**Required Consents**").

(e)     <u>Brokers' Fees</u>.  Neither Seller nor any of its Affiliates has any liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement including any for which the Buyer or its Affiliates could become liable or obligated, other than any fees or commissions owed to Resultant Management Group, for which Seller shall be solely responsible, and Seller shall indemnify,

5

defend and hold Buyer and its Affiliates harmless from and against any such fees or commissions.

        (f)    <u>Solvency</u>.  As of the date of this Agreement and the Closing Date, Seller is not insolvent or unable to pay its debts as they become due nor has it made a general assignment with or for the benefit of its creditors, and no proceeding under any bankruptcy, insolvency or reorganization Law has been commenced by or with respect to Seller.

    3.2    Representations and Warranties Concerning the Assets.

    (a)    <u>Tax Matters</u>

Seller warrants that within Seller's Knowledge (as defined herein):

    (i)    There is no dispute or claim concerning any Tax liability with respect to the Assets claimed or raised by any Taxing Authority.

    (ii)    There are no outstanding agreements or waivers extending the statutory period of limitations applicable to any Tax Returns required to be filed by or with respect to the Assets or for which Buyer or its Affiliates may be responsible.

    (iii)    Seller has filed all Tax Returns with respect to the Assets of Seller that were required to be filed and such Tax Returns (with respect to such Assets) are accurate. All Taxes shown as due with respect to the Assets on any such Tax Returns have been paid and no penalty, interest or other charge is or will become due with respect to the late filing of any such Tax Return or late payment of any such Tax. No Tax Return is now under audit or examination by any Taxing Authority.

    (iv)    All of the Assets that are subject to property Tax have been properly listed and described on the property Tax rolls for the taxing units in which the Assets are located for all periods prior to and including the Closing Date and no portion of the Assets constitutes omitted property for property Tax purposes.

    (b)    <u>Litigation.</u>

Seller warrants that within Seller's Knowledge (as defined herein) none of the Assets:

    (i)    is subject to any outstanding  injunction, judgment, order, decree, ruling, or charge;

    (ii)    is the subject of any pending or threatened claim or demand by notice of violation or liability from, or action, suit, proceeding, hearing or investigation of, in, or before, any Person.

(c)    <u>Environmental Laws.</u>

Seller warrants that within Seller's Knowledge (as defined herein) none of the Assets:

    (i)    is or has been in material violation of any Environmental Law (as defined herein) that could reasonably be expected to have a Material Adverse Effect on Seller or the Assets;

    (ii)    is or has been subject to a notice of any claim, liability, loss, cost, damage, or expense (including attorney's fees) arising under any Environmental Law;

    (iii)    is subject to pending or threatened claims, demands, notices of violation or liability, actions, suits, proceedings, hearings or investigations with respect to the Assets under any Environmental Laws;

    (iv)    is subject to any outstanding injunction, judgment, order, decree, ruling or charge under any Environmental Laws;

    (v)    is subject to any notice that Seller or its Affiliates or its predecessors in title with respect to the Assets is or may be a potentially responsible party under CERCLA or any analogous state law in connection with any site actually or allegedly containing or used for the treatment, storage or disposal of Hazardous Substances

(d)    EXCEPT AS MAY BE EXPRESSLY PROVIDED IN OTHER SECTIONS OF THIS AGREEMENT, SELLER AND ITS AGENTS HEREBY SPECIFICALLY DISCLAIM ANY WARRANTY, GUARANTEE OR REPRESENTATION, ORAL OR WRITTEN, EXPRESS OR IMPLIED, PAST, PRESENT OR FUTURE, OF, AS TO OR CONCERNING; (i) THE NATURE AND CONDITION OF THE ASSETS, INCLUDING, WITHOUT LIMITATION, SPECIFIED SUBSTANCES, HAZARDOUS MATERIALS AND GEOLOGICAL CONDITIONS, AND THE SUITABILITY OF THE ASSETS FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY ELECT TO CONDUCT THEREON; OR (ii) THE COMPLIANCE OF THE ASSETS OR THEIR OPERATION WITH ANY LAWS, ORDINANCES OR REGULATIONS OF ANY GOVERNMENTAL BODY, INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LAWS. Buyer acknowledges that having been given a full and complete opportunity to inspect the Assets, Buyer is relying solely on its own investigation of the Assets. The sale of the Assets provided for herein is made on an "AS IS", "WHERE IS" and "WITH ALL FAULTS" basis, and except as may be expressly provided

in other sections of this Agreement, SELLER MAKES NO WARRANTY OR
REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW,
INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION,
HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE,
WITH RESPECT TO THE ASSETS. In addition to, and not by way of limitation of, the sale of
the Assets on an "AS IS", "WHERE IS" and "WITH ALL FAULTS" basis, Buyer acknowledges
that if it elects to consummate the purchase of the Assets, it will have done so after making such
independent studies and investigations, commissioning such tests and surveys, and engaging
such specialists on its behalf as Buyer deems necessary to fairly evaluate the Assets from a title,
an Environmental Law and Hazardous Substance standpoint. Buyer acknowledges that it has not
and will not rely on any information regarding the Assets' compliance with Environmental Laws
or the existence or non-existence of Hazardous Substances on the Assets provided to Buyer or its
agents, contractors and/or insurers by Seller. The provisions of this Paragraph shall survive the
Closing.

### ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF BUYER

4.1    **Representations and Warranties of Buyer**. Buyer hereby represents and
warrants to Seller as follows (such representations and warranties being deemed to be made as of
the date hereof and as of the Closing Date):

(a)    Organization.  Buyer is a limited liability company duly organized or
formed, validly existing and in good standing under the laws of its jurisdiction of incorporation,
organization or formation, has all requisite power and authority to own, lease and operate its
properties and to carry on its business as now being conducted, and is duly qualified and
licensed, as may be required, and in good standing to do business in each jurisdiction in which
the business it is conducting, or the operation, ownership or leasing of its properties, makes such
qualification and licensing necessary, other than in such jurisdictions where the failure so to be
qualified and licensed would not, individually or in the aggregate, reasonably be expected to
result in a Material Adverse Effect on Buyer.

(b)    Authorization of Transaction.  Buyer has full power and authority to
execute and deliver this Agreement and the other Transaction Documents to which Buyer is a
party, to consummate the transactions contemplated by this Agreement and such Transaction
Documents and to perform its obligations hereunder and thereunder. The execution and delivery
of this Agreement and such other Transaction Documents to which Buyer is a party and the
transactions contemplated hereby and thereby have been duly and validly authorized by all
requisite action, limited liability company and otherwise, on the part of Buyer. This Agreement
and all such other Transaction Documents required hereunder to be executed and delivered by
Buyer have been duly executed and delivered by Buyer. This Agreement and such other
Transaction Documents to which Buyer is a party constitute the valid and legally binding
obligations of Buyer, enforceable against Buyer in accordance with their respective terms and
conditions, subject, however, to the effects of bankruptcy, insolvency, reorganization,
moratorium or similar Laws affecting creditors' rights generally, and to general principles of

8

equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     Noncontravention.  Assuming the Required Consents have been given, made or obtained, neither the execution and delivery of this Agreement or any of the other Transaction Documents to which Buyer is a party, nor the consummation of the transactions contemplated hereby or thereby by Buyer at the Closing, will (i) violate or conflict with any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Authority to which Buyer is subject or any provision of Buyer's Organizational Documents or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which Buyer or any of its assets is subject or bound, except where the violation, conflict, breach, default, right to accelerate, terminate, modify or cancel or failure to give notice would not reasonably be expected to have a Material Adverse Effect on Buyer.

(d)     Consents.  Buyer is not required to give notice to, make any filing with, or obtain any authorization, consent, or approval of any Person for Buyer to execute and deliver this Agreement and the other Transaction Documents to which Buyer is a party or to consummate the transactions contemplated hereby or thereby at the Closing.

(e)     Brokers' Fees.  Neither Buyer nor any of its Affiliates has any liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement, including any for which Seller or its Affiliates could become liable or obligated and Buyer shall indemnify, defend and hold Seller and its Affiliates harmless from and against any such fees or commissions.

(f)     Solvency.  As of the date of this Agreement and as of the Closing Date, and after consummation of the transactions contemplated by this Agreement at the Closing Date, Buyer is not insolvent or unable to pay its debts and Buyer has not made a general assignment with or for the benefit of its creditors, and no proceeding under any bankruptcy, insolvency or reorganization Law has been, or will have been, commenced by or with respect to Buyer.

## ARTICLE 5
## COVENANTS

5.1     **Cooperation and Reasonable Efforts**.  The Parties agree that from time to time after the Closing Date (a) they will execute and deliver (or cause their respective Affiliates to execute and deliver) such further instruments, and take (or cause their respective Affiliates to take) such other action, as may be reasonably necessary to carry out the purposes and intents of this Agreement and the other Transaction Documents and (b) they will (or will cause their respective Affiliates to) pay over to or reimburse any other Party for any revenue received, tax paid or refunded or other expense paid or amount received that is properly payable to such other Party based upon the ownership of the Assets at the time such payment, right or obligation

9

accrued or was received.  Any such further action described in clause (a) shall be made at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefore under Article 6).

5.2    **Possession and Retention of and Access to the Records**.  At the Closing Date, Buyer will take possession of the Mineral Records relating to the Mineral Properties.  Buyer agrees (a) to hold such Mineral Records and not to destroy or dispose of any portion thereof for a period of five years from such Closing or such longer period as may be required by Law, provided that at any time after such period, if it desires to destroy or dispose of such Mineral Records, it will first offer in writing at least 60 days before such destruction or disposition to surrender them to Seller and if Seller or its successors and permitted assigns do not accept such offer within 60 days after receipt of such offer, Buyer may take such action, and (b) following the Closing Date, to afford Seller and its successors and permitted assigns and any of their employees, accountants, and counsel, at Seller's own expense, during normal business hours, upon reasonable request, full access to such Mineral Records; provided that such access will not be construed to require the disclosure of such Mineral Records that would cause the waiver of any attorney-client, work product or like privilege; and provided, further, that in the event of any litigation nothing herein shall limit any Party's rights of discovery under applicable Law.  Nothing herein shall impose any liability upon Buyer in the event of destruction or loss of any Mineral Records as a result of casualty.

5.3    **Satisfaction of Conditions Precedent.**  From the date of this Agreement until the Closing Date, each Party will use all commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement, including without limitation the satisfaction of the conditions precedent set forth in Section 2.5 and Section 2.6.

5.4    **Notices and Consents**.  From the date of this Agreement until the Closing Date, each of the Parties will give any notices to, make any filings with, and use all commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities.

5.5    **Operation of Business.**  From the date of this Agreement until the Closing Date, the Seller will not without the consent of the Buyer (i) engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business of Seller or the Assets which would adversely impact the Assets or Seller's ability to consummate the transactions contemplated herein or (ii) offer, sell, transfer, dispose of or grant, or authorize the offer, sale, transfer, disposition or grant of, any of the Assets or (iii) grant or authorize the grant of any Encumbrances on the Assets other than Permitted Encumbrances.

5.6    **Access to Information.**  At all times prior to the Closing Date, the Seller will permit representatives of the Buyer to have reasonable access at all reasonable times, and in a manner so as not to interfere with the normal business operations of Seller, to all premises, properties, personnel, books, records, contracts, and documents of or pertaining to the Assets.

## ARTICLE 6
## REMEDIES FOR BREACHES OF AGREEMENT

6.1     **Survival of Representations, Warranties and Covenants**.  The representations and warranties of Seller contained in Article 3 or in any other Transaction Document delivered by Seller pursuant hereto and the representations and warranties of Buyer contained in Article 4 or in any other Transaction Document delivered by Buyer pursuant hereto shall survive Closing by one (1) year.  The covenants contained in this Agreement or the other Transaction Documents to be performed after the Closing shall survive the Closing by one (1) year.  The right to make claims for indemnification or reimbursement based upon any covenant to be performed or completed after the Closing Date will survive the Closing until one (1) year after the Closing Date or until 60 days after the expiration of the term of such covenant, whichever is later. This Article 6 is intended to be the sole and exclusive remedy for any Adverse Consequences under or related to this Agreement whether asserted as a claim for indemnity, or as a claim for damages directly sustained by a Party, provided that for any such direct Adverse Consequences, neither Party may recover incidental or consequential damages.  Notwithstanding the foregoing, neither party shall have an obligation to indemnify the other party pursuant to this Article 6 until the other Party has suffered Adverse Consequences by reason of any and all breaches in excess of Fifty Thousand Dollars ($50,000.00), either individually or in the aggregate, without reimbursement for all such amounts up to that sum.  Recovery by an Indemnified Party under this Article 6 shall be limited, in the aggregate, to no more than One Million and No/100 Dollars ($1,000,000.00).  Notwithstanding the foregoing, this Article 6 in no way limits Buyer's obligation to pay or Seller's right to receive the Purchase Price in accordance with Section 2.2.

6.2     **Indemnification Provisions for Benefit of Buyer**.  Seller shall indemnify and hold Buyer Indemnitees harmless from and against any and all Adverse Consequences whatsoever arising out of or resulting from:

(i)     Any breach of a warranty or representation by Seller contained herein;

(ii)     The nonperformance by Seller of any covenant or obligation to be performed by Seller hereunder, other than with respect to Adverse Consequences arising as a result of a breach by Buyer of any warranty, representation, covenant or obligation contained herein or in any other Transaction Documents; and

(iii)     Any liability or claim arising out of the ownership, conduct or operation of the Assets prior to the Closing Date other than with respect to Adverse Consequences arising as a result of a breach by Buyer of any warranty, representation, covenant or obligation contained herein or in any other Transaction Documents.

6.3     **Indemnification Provisions for Benefit of Seller**.  Buyer shall indemnify and hold Seller harmless from and against all Adverse Consequences whatsoever arising out of or resulting from:

11

(i)     Any breach of a warranty or representation by Buyer contained herein or in any other Transaction Document;

(ii)    The nonperformance by Buyer of any covenant or obligation to be performed by Buyer hereunder, other than with respect to Adverse Consequences arising as a result of a breach by Seller of any warranty, representation, covenant or obligation contained herein or in any other Transaction Documents; and

(iii)   Any liability arising out of the ownership, conduct or operation of the Assets from and after the Closing Date other than with respect to Adverse Consequences arising as a result of a breach by Seller of any warranty, representation, covenant or obligation contained herein or in any other Transaction Documents.

6.4     **Determination of Adverse Consequences**.  Notwithstanding anything to the contrary in this Agreement:

(a)     Seller may not assert, and Seller shall be deemed to have waived in full, any claim with respect to a breach of a representation, warranty, covenant or agreement contained herein if, to Seller's Knowledge, such breach existed prior to the Closing Date but such Party nevertheless proceeded with the Closing;

(b)     Buyer may not assert, and Buyer shall be deemed to have waived in full, any claim with respect to a breach of a representation, warranty, covenant or agreement contained herein if, to Buyer's Knowledge, such breach existed prior to the Closing Date but such Party nevertheless proceeded with the Closing; and

(c)     The provisions of this Article 6 shall apply in such a manner as not to give duplicative effect to any item of adjustment.

6.5     **Notice of Asserted Liability; Opportunity to Defend**.

(a)     All claims for indemnification hereunder shall be asserted and handled pursuant to this Section 6.5.  Any Person claiming indemnification hereunder is referred to herein as the "**Indemnified Party**" and any Person against whom such claims are asserted hereunder is referred to herein as the "**Indemnifying Party**."

(b)     If any claim is asserted against, or any Adverse Consequence is sought to be collected from, an Indemnifying Party, the Indemnified Party shall with reasonable promptness provide to the Indemnifying Party a Claim Notice.  The failure to notify the Indemnifying Party with reasonable promptness shall not relieve it of any liability that it may have to any Indemnified Party with respect to such claim or Adverse Consequence except to the extent the Indemnifying Party was materially prejudiced by such failure.

(c)     The Indemnifying Party shall have 20 days from receipt of the Claim Notice (the "**Notice Period**") to notify the Indemnified Party in writing (i) whether or not the Indemnifying Party disputes the liability to the Indemnified Party hereunder with respect to the

claim or Adverse Consequence, (ii) in any case in which Adverse Consequences are asserted against or sought to be collected from an Indemnifying Party by an Indemnified Party, whether or not the Indemnifying Party desires at its own sole cost and expense to attempt to remedy such Adverse Consequences or (iii) in any case in which claims are asserted against or sought to be collected from an Indemnified Party by a third Person ("**Third Person Claim**"), whether or not the Indemnifying Party desires at its own sole cost and expense to defend the Indemnified Party against such Third Person Claim.

(d)    If the Indemnifying Party notifies the Indemnified Party within the Notice Period that it desires to defend the Indemnified Party against a Third Person Claim, the Indemnifying Party shall have the right to defend all appropriate proceedings with counsel of its own choosing (but reasonably satisfactory to the Indemnified Party) and such proceedings shall be diligently prosecuted by it to settlement or a final conclusion. If the Indemnified Party desires to participate in any such defense or settlement, other than at the request of the Indemnifying Party, it may do so at its sole cost and expense. If the Indemnified Party joins in defending any such Third Person Claim, the Indemnifying Party shall have full authority to determine all action to be taken with respect thereto. If the Indemnifying Party elects not to defend the Indemnified Party against a Third Person Claim or does not provide an answer within the Notice Period, the Indemnified Party shall be entitled to assume the defense of all appropriate proceedings related thereto with counsel of its choosing. If a proceeding is asserted against both the Indemnifying Party and the Indemnified Party and there are one or more defenses available to the Indemnified Party that are not available to the Indemnifying Party or there is a conflict of interest that renders it inappropriate for the same counsel to represent both the Indemnifying Party and the Indemnified Party, the Indemnifying Party shall be responsible for paying for separate counsel for the Indemnified Party. No compromise or settlement of any proceeding or Third Person Claim may be effected by the Indemnifying Party without the Indemnified Party's written consent, which consent shall not be unreasonably withheld, unless the sole relief provided is monetary damages that are paid in full by the Indemnifying Party and such settlement includes the granting by each claimant or plaintiff to each Indemnified Party of an unconditional release from all liability in respect of such Third Person Claim and the related proceeding, in which case the Indemnifying Party may compromise or settle such proceeding without the Indemnified Party's consent.

(e)    If requested by the Indemnifying Party, the Indemnified Party agrees to cooperate with the Indemnifying Party and its counsel, at the cost and expense (it being understood that nominal internal costs and expenses and reasonable time expenditures of internal staff shall not be charged) of the Indemnifying Party, in contesting any Third Person Claim, in making any counterclaim against the third Person asserting the Third Person Claim or in making any cross complaint against any Person.

(f)    The costs and expenses of an Indemnified Party, including the fees, costs and expenses of its separate counsel, experts (including expert witnesses), consultants and any other representatives engaged by it, incurred in connection with the defense and settlement or final resolution of any Third Person Claim as to which such Indemnified Party has the right to control shall be treated as "Adverse Consequences" for all purposes hereunder.

13

## ARTICLE 7
## TAX MATTERS

7.1    **Cooperation on Tax Matters**.

(a)    The Parties shall cooperate fully, as and to the extent reasonably requested by the other, in connection with the filing of Tax Returns and any audit, litigation or other administrative or judicial proceeding relating to liability for Taxes and shall make their employees available on a mutually convenient basis to provide additional information and explanation of any materials related to Taxes. The Parties shall (i) retain all books and records that are in its possession with respect to Tax matters pertinent to the Assets relating to any whole or partial taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Taxing Authority, and (ii) give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, the requested Party shall allow the requesting Party to take possession of such books and records.

(b)    The Parties further agree, upon request, to use their commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed upon the Assets (including, but not limited to, with respect to the transactions contemplated hereby).

7.2    **Certain Taxes**. Seller shall pay, indemnify and hold harmless the Buyer Indemnitees for any applicable transfer, recording, documentary, sales, use, stamp, registration taxes or other transaction taxes, duties or similar charges payable in connection with the transfer of Assets from Seller to the Buyer contemplated hereby, whether or not such taxes are imposed upon Seller or the Buyer by Law.

7.3    **Audits**. The Parties shall provide prompt written notice to the others of any pending or threatened Tax audit, assessment or proceeding that it becomes aware of related to the Assets for whole or partial periods for which it may be indemnified by any other party hereunder or for which any other party may be responsible. Such notice shall contain factual information (to the extent known) describing the asserted Tax liability in reasonable detail and shall be accompanied by copies of any notice or other document received from any Taxing Authority in respect of any such matters. If an Indemnified Party has knowledge of an asserted Tax liability with respect to a matter for which it may be indemnified hereunder and such party fails to give the Indemnifying Party prompt notice of such asserted Tax liability, then (a) if the Indemnifying Party is precluded by the failure to give prompt notice from contesting the asserted Tax liability in any forum, the Indemnifying Party shall have no obligation to indemnify the Indemnified Party for any Taxes arising out of such asserted Tax liability, and (b) if the Indemnifying Party is not so precluded from contesting, but such failure to give prompt notice results in a detriment to the Indemnifying Party, then any amount which the Indemnifying Party is otherwise required to pay the Indemnified Party pursuant to this Section shall be reduced by the amount of such

14

detriment, provided, the Indemnified Party shall nevertheless be entitled to full indemnification hereunder to the extent, and only to the extent, that such party can establish that the Indemnifying Party was not prejudiced by such failure. This Section 7.3 shall control the procedure for Tax indemnification matters to the extent it is inconsistent with any other provision of this Agreement.

7.4    **Control of Proceedings**. The Party responsible for the Tax under this Agreement shall control audits and disputes related to such Taxes (including action taken to pay, compromise or settle such Taxes). Reasonable out of pocket expenses with respect to such contests shall be borne by Seller, on the one hand, and by Buyer, on the other hand, in proportion to their responsibility for such Taxes as set forth in this Agreement. Except as otherwise provided by this Agreement, the non-controlling Party shall be afforded a reasonable opportunity to participate in such proceedings at its own expense.

7.5    **Powers of Attorney**. Buyer shall provide Seller and its Affiliates with such powers of attorney or other authorizing documentation as are reasonably necessary to empower them to execute and file Tax Returns they are responsible for hereunder, file refund and equivalent claims for Taxes they are responsible for, and contest, settle, and resolve any audits and disputes that they have control over under Section 7.4 (including any refund claims which turn into audits or disputes).

7.6    **Remittance of Refunds**. If Buyer or any of its Affiliates receives a refund of any Taxes attributable to a Pre- Closing Tax Period that Seller is responsible for hereunder, or if Seller or any Affiliate of Seller receives a refund of any Taxes attributable to a Post Closing Tax Period that Buyer is responsible for hereunder, the Party receiving such refund shall, within 15 days after receipt of such refund, remit it (net of all out-of-pocket expenses reasonably incurred to obtain such refund) to the party who has responsibility for such Taxes hereunder. For the purpose of this Section 7.6, the term "refund" shall include a reduction in Tax and the use of an overpayment as a credit or other tax offset, and receipt of a refund shall occur upon the filing of a return or an adjustment thereto using such reduction, overpayment or offset or upon the receipt of cash.

7.7    **Allocation of Purchase Price**. The Parties shall use the allocation of the Purchase Price payable with respect to the Assets as set forth on Schedule 7.7 for all purposes (including Tax and financial accounting purposes). The Parties and their applicable respective Affiliates will file all Tax Returns (including amended Tax Returns and claims for refund) and information reports in a manner consistent with such agreed upon allocation (including Internal Revenue Service Form 8594).

7.8    **Closing Tax Certificate**. At Closing, Seller shall deliver to Buyer a certificate signed under penalties of perjury (i) stating that it is not a foreign corporation, foreign partnership, foreign trust or foreign estate, (ii) providing its U.S. Employer Identification Number and (iii) providing its address, all pursuant to Section 1445 of the Code.

7.9    **Property Taxes.**  All property Taxes relating to the Assets which are due and payable on or prior to the Closing Date shall be paid by Seller; any such property Taxes which are due and payable after the Closing Date shall be paid by Buyer.  In the case of property Taxes that are payable with respect to a taxable period that begins before the Closing Date and ends after the Closing Date, the portion of any such property Tax that is allocable to the portion of the taxable period ending on the Closing Date shall be deemed to be the amount of such property Taxes for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the total number of days in the taxable period.  The portion of any such property Tax that is allocable to the portion of the taxable period beginning the day following the Closing Date shall be deemed to be the amount of such property Tax not allocated to the portion of the taxable period ending on the Closing Date.  With respect to such property Taxes paid by Seller, Buyer shall reimburse Seller within thirty (30) days of notice thereof for the portion of such property Taxes paid that is allocable to the portion of the taxable period which begins the first day following the Closing Date.  With respect to such property Taxes paid by Buyer, Seller shall reimburse Buyer within thirty (30) days of notice thereof for the portion of such property Taxes paid that is allocable to the portion of the taxable period ending on the Closing Date.  Any Tax Returns that must be filed in connection with property Taxes shall be prepared and filed when due by the party primarily or customarily responsible under the applicable local Law for filing such Tax Returns, and such party shall provide such Tax Returns to the other party for its review and approval at least ten (10) days prior to the due date for such Tax Returns.

## ARTICLE 8
## TERMINATION

8.1    **Termination**.  The Parties shall have the right to terminate this Agreement as follows:

(a)    Buyer and Seller shall have the right to terminate this Agreement upon mutual written consent at any time prior to the Closing.

(b)    Buyer shall have the right to terminate this Agreement by giving written notice to the Seller at any time prior to the Closing if: (i) Seller has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Buyer has notified the Seller of the breach, and the breach has continued without cure for a period of thirty (30) days after the notice of breach; or (ii) the Closing shall not have occurred on or before ____May 31_____, 2017 through no fault of Buyer; or (iii) any of the conditions provided for in Section 2.6 hereof are not satisfied or waived by Buyer.

(c)    Seller shall have the right to terminate this Agreement by giving written notice to Buyer at any time prior to the Closing if: (i) Buyer has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of thirty (30) days after the notice of breach; or (ii) the Closing shall not have occurred on or before

16

_____May 31_____, 2017 through no fault of the Seller or (iii) any of the conditions provided for in Section 2.5 hereof are not satisfied or waived by Seller.

8.2    **Effect of Termination.** If any party terminates this Agreement pursuant to its terms, all rights and obligations of the parties hereunder shall terminate without any liability of any party to the other party, except for any liability arising from a breach hereof.

## ARTICLE 9
## MISCELLANEOUS

9.1    **Press Releases and Public Announcements.** No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party; provided that a Party may make any public disclosure it believes in good faith is required by applicable Law or any listing or trading agreement concerning its publicly traded securities (in which case the disclosing Party will advise the other Party before making the disclosure).

9.2    No Third Party Beneficiaries. Except as otherwise specifically provided in this Agreement, nothing in this Agreement shall confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

9.3    Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other Party; provided, however, that Buyer may assign this Agreement and any of its rights, interests and obligations hereunder to Affiliates without the approval of the other Party provided the Buyer shall provide Seller with notice of the assignment and remain liable for all obligations of Buyer under this Agreement as if this Agreement had not been assigned.

9.4    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but which together will constitute one and the same instrument.

9.5    Notices. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given one business day after it is sent by overnight expedited courier or two business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

17

**With copy to:**

If to Seller:

BNY Mellon Trust Company, N. A.
Global Client Services
911 Washington Avenue, 3rd Floor
St. Louis, MO  63101

Heyl, Royster, Voelker & Allen
Mark Twain Plaza III, Suite 100
105 West Vandalia Street
PO Box 467
Edwardsville, IL 62025
Attention: Patrick Cloud

If to Buyer:

**With a copy not constituting notice to:**

c/o Foresight Energy
211 North Broadway
Suite 2600
St. Louis, Missouri  63102
Telephone: (314) 932-6103
Attention: Legal

Murray Energy Corporation
46226 National Road
St. Clairsville, OH  43950
Telephone:  (740) 338-3100

Attention:  Legal

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the addresses set forth above using any other means (including personal delivery, expedited overnight courier, messenger service, telecopy, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

9.6    **Governing Law**.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Illinois without giving effect to any choice or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Illinois.

9.7    **Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process**.  EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN CHICAGO, ILLINOIS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, OR ANY BUSINESS OR OTHER DISPUTES BETWEEN THE PARTIES (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), SHALL BE LITIGATED IN SUCH COURTS.  EACH PARTY (A) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH ACTIONS

18

OR PROCEEDINGS, (B) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (C) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS AND AGREES THAT ANY SUCH JUDGMENT MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES SHALL BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL, RETURN RECEIPT REQUESTED, SHALL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

9.8   **Waiver of Jury Trial**. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS. EACH PARTY WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

9.9   **Entire Agreement**. This Agreement and the other Transaction Documents constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they have related in any way to the subject matter of this Agreement. Neither this Agreement nor any amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Buyer and Seller.

9.10   **Severability**. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

9.11 **Transaction Expenses**. Except as otherwise set forth in this Agreement, each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby or thereby.

9.12 **Waiver**. No waiver by either Party of any default by the other Party in the performance of any provision, condition or requirement herein shall be deemed to be a waiver of, or in any manner release the other Party from, performance of any other provision, condition or requirement herein, nor shall such waiver be deemed to be a waiver of, or in any manner a release of, the other Party from future performance of the same provision, condition or requirement. Any delay or omission of either Party to exercise any right hereunder shall not impair the exercise of any such right, or any like right, accruing to it thereafter. The failure of either Party to perform its obligations hereunder shall not release the other Party from the performance of such obligations.

9.13 **Drafting**. The Parties have participated jointly in the negotiation and drafting of this Agreement and the other Transaction Documents. In the event an ambiguity or question of intent or interpretation arises, this Agreement and the other Transaction Documents shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement or the other Transaction Documents.

[*Signature page follows.*]

20

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**BUYER:**

**MACOUPIN ENERGY LLC**, a Delaware limited liability company

By: _____

Name:  Robert D. Moore

Title:   President & Chief Executive Officer

**SELLER:**

**THE MT. OLIVE AND STAUNTON COAL COMPANY TRUST**

By: _Jerome M. Rubenstein_

Name: _Jerome M. Rubenstein_

Title:  Authorized Person

*Signature Page to Purchase and Sale Agreement*

## Exhibit A

## DEFINITIONS

Definitions.  Unless otherwise provided to the contrary in this Agreement, capitalized terms in this Agreement shall have the following meanings:

"**Adverse Consequences**" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses, but excluding lost profits, punitive, exemplary, special or consequential damages.

"**Affiliate**" means, with respect to any specified Person, any other person which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this Agreement, the Buyer shall not be deemed to be an Affiliate of Seller, and Seller shall not be deemed to be an Affiliate of Buyer.

"**Agreement**" has the meaning set forth in the preface.

"**Assets**" has the meaning set forth in Section 2.1.

"**Buyer**" has the meaning set forth in the preface.

"**Buyer Indemnitees**" means, collectively, Buyer and each Affiliate of Buyer and their respective members, managers, officers, directors, employees, agents and representatives.

"**Buyer's Knowledge**" or other references to the knowledge of Buyer, as and when used in this Agreement, shall be limited to the actual knowledge of Christopher Moravec, Bill Govern, Jason Witt, James Turner, Chad Fuson, Environmental Manager or Mine Superintendent, after due inquiry.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. section 1906 et seq.

"**Claim Notice**" means a written notice of a claim for indemnification pursuant to this Agreement specifying in reasonable detail the specific nature of the claim for which indemnification is sought.

"**Closing**" has the meaning set forth in Section 2.3.

"**Closing Date**" has the meaning set forth in Section 2.3.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Encumbrance**" means any mortgage, pledge, lien, encumbrance, servitude, restriction, reservation, easement, right-of-way, charge, other security interest, including any and all coal or mineral leases or surface leases on any and including rights or obligations under any collective bargaining agreement.

"**Environmental Law**" or "**Environmental Laws**" means all applicable federal, state and local Laws (including common law) relating to the protection of the environment as in effect on or before the date of this Agreement, including SMCRA, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. section 1906, et seq. ("**CERCLA**"), the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. section 6901, et seq., the Clean Air Act, as amended, 42 U.S.C. section 7401, et seq., the Federal Water Pollution Control Act, as amended, 33 U.S.C. section 1251, et seq., and the Oil Pollution Act of 1990, 33 U.S.C. section 2701, et seq. and the statutes, regulations, rules and orders of all agencies responsible for supervision and enforcement of environmental and mining laws of Illinois.

"**Environmental Manager**" means the person primarily responsible for the environmental compliance at Shay No. 1 Mine.

"**Governmental Authority**" means the United States and any foreign, state, county, city, local or other political subdivision, agency, court, quasi-judicial body or instrumentality.

"**Hazardous Substance**" means any material defined as a "hazardous substance" under any Environmental Law.

"**Indemnified Party**" has the meaning set forth in Section 6.5(a).

"**Indemnifying Party**" has the meaning set forth in Section 6.5(a).

"**Insurance Policies**" means those material policies of insurance that Seller or any of its Affiliates maintained with respect to the Assets prior to the Closing.

"**Laws**" means any statute, code, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any applicable Governmental Authority.

"**Material Adverse Effect**" means, with respect to the Buyer, Seller, or the Assets, as applicable, any result, occurrence, event or circumstance (each, an "**Effect**") (whether or not foreseeable as of the date of this Agreement or covered by insurance) that, individually or in the aggregate with any such other Effects (whether or not such Effect has, during the period or at any time in question, manifested itself in, as applicable, the financial statements of Seller and its subsidiaries or the Buyer and its subsidiaries) has had or has a material adverse effect on (x) the condition (financial or otherwise), business, properties or results of operations of, as applicable,

A-2

Seller and its subsidiaries, taken as a whole, or the Buyer and its subsidiaries, taken as a whole, (y) in the case of Seller, the condition (financial or otherwise) of the Assets or the ability of Seller to own and operate the Assets in the Ordinary Course of Business, including the ability to lease the coal reserves included in the Assets to third Persons for the purpose of mining such coal reserves, or (z) the ability of, as applicable, Seller or the Buyer to perform its obligations under or consummate the transactions contemplated by the Transaction Documents to which it is a party at the Closing; provided, however, that a Material Adverse Effect shall not be deemed to occur pursuant to clause (x) solely as a result of (1) any Effect that is generally applicable to the industry and markets in which, as applicable, Seller and its subsidiaries, taken as a whole, or the Buyer and their subsidiaries, taken as a whole, operate or (2) any Effect that is generally applicable to the United States economy or securities markets, provided that the Effects in the case of clauses (1) or (2) of this sentence do not disproportionately affect, as applicable, Seller and its subsidiaries, taken as a whole, or the Buyer and its subsidiaries, taken as a whole.

**"Mine Superintendent"** means the person with ultimate responsibility for oversight of operations at Shay No. 1 Mine.

**"Mineral Bill of Sale"** has the meaning set forth in Section 2.4(a)(ii).

**"Mineral Deed"** means a special warranty mineral in substantially the form attached hereto as **Exhibit B** conveying the Mineral Properties from Seller to Buyer.

**"Mineral Properties"** means certain coal reserves located in Macoupin County, Illinois, as more particularly identified in the Mineral Deed and set forth on **Schedule 2.1(a)**, including any coal-bed methane, oil, gas and other hydrocarbons and any substances necessarily produced in association with such oil, gas and other hydrocarbons.

**"Mineral Records"** means all originals or, if the originals are not in Seller's possession, true and correct copies of all contracts, land, title, engineering, environmental, regulatory, operating, accounting, business, marketing, and other data, files, documents, instruments, notes, papers, ledgers, journals, reports, abstracts, surveys, title opinions, maps, drawings, books, records and studies that relate to the ownership, operation or maintenance of the Assets and that are in Seller's possession, custody or control.

**"Notice Period"** has the meaning set forth in Section 6.5(c).

**"Ordinary Course of Business"** means the ordinary course of business in all material respects consistent with the affected Party's past custom and practice (including with respect to quantity and frequency).

**"Organizational Documents"** means the articles of incorporation, certificate of incorporation, charter, bylaws, articles or certificate of formation, regulations, operating agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

**"Party"** or **"Parties"** has the meanings set forth in the preface.

**"Permitted Encumbrances"** means any of the following: (i) any liens for Taxes and assessments not yet due and payable or, if due and payable, that are being contested in good faith by appropriate proceedings; (ii) any obligations or duties vested in any municipality or other Governmental Authority to regulate any Asset under zoning, building and land use Laws; (iii) liens of mechanics, materialmen, carriers, workmen, warehousemen, repairmen arising or incurred in the Ordinary Course of Business and securing obligations that are not delinquent or, if delinquent, that are being contested in good faith by appropriate proceedings and have been properly bonded over; (iv) Encumbrances and other conveyances (including deeds, easements, leases and licenses) of record in the chain of title of Seller and its Affiliates and their predecessors-in-title that, singularly or in the aggregate, do not cause a Material Adverse Effect to the value of the Assets or materially interfere with the ownership or operation of the Assets; (v) easements, rights-of-way, restrictions and other similar encumbrances existing and of record that, singularly or in the aggregate, do not cause a Material Adverse Effect to the value of the Assets or materially interfere with the ownership or operation of the Assets; (vi) encroachments, overlaps, and any other matters which would be disclosed by an accurate survey and inspection of the Assets that, singularly or in the aggregate, do not cause a Material Adverse Effect to the value of the Assets or materially interfere with the ownership or operation of the Assets; and (vii) any portion of the Assets which is within the bounds of any public roads, railroads, streets and/or highways which would be disclosed by an inspection of the Assets. Notwithstanding the above, paragraph (iv) above does not include mortgages, deeds of trust, pledges, liens or security interests.

**"Person"** means an individual or entity, including any corporation, association, joint stock company, trust, joint venture, limited liability company or unincorporated organization, or Governmental Authority.

**"Post-Closing Tax Period"** means any Tax period ending after the Closing Date.

**"Pre-Closing Tax Period"** means, with respect to any Closing, any Tax periods ending on or before the Closing Date.

**"Purchase Price"** has the meaning set forth in Section 2.2.

**"Required Consents"** has the meaning set forth in Section 3.1(d).

**"Seller"** has the meaning set forth in the preface.

**"Seller Indemnitees"** means, collectively, Seller and its Affiliates and their respective members, managers, officers, directors, employees, agents, and representatives.

**"Seller's Knowledge"** or other references to the knowledge of Seller, as and when used in this Agreement, shall be limited to the actual knowledge of Jerome M. Rubenstein, Terry Allen Kramer, James P. Agnew, Dennis M. Blair and Herbert A. Allen (collectively, the "Trustees") and

shall not be construed to include or impose a duty on the part of the Trustees to perform any investigations.

"**SMCRA**" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. section 1201 et seq.

"**Tax**" or "**Taxes**" means all net income or profits taxes, alternative or add-on minimum tax, built-in gain, environmental (Code section 59A), gross income, gross receipts, sales, use, goods and services, ad valorem, earnings, franchise, capital profits, license, withholding (including all obligations to withhold or collect for taxes imposed on others), payroll, employment, unemployment insurance, social security, workers' compensation, excise, severance, stamp, occupation, premium, real and personal property, excess profit or windfall profit tax, custom duty, value added or other tax, or any payment for unclaimed property, escheatment or similar common law principles, fee or other like assessment or charge of any kind whatsoever, together with any interest and any penalty, addition to tax, or additional amount (whether payable directly, by withholding or otherwise).

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxing Authority**" means any entity, body, instrumentality, division, bureau or department of any federal, state, local or foreign Governmental Authority, or any agent thereof (third-party or otherwise), legally authorized to assess, lien, levy or otherwise collect, litigate or administer Taxes.

"**Third Person Claim**" has the meaning set forth in Section 6.5(c).

"**Transaction Documents**" means this Agreement, the Mineral Deed, the Bill of Sale and any other documents and instruments to be delivered at the Closing and any other contract among the Parties that is expressly agreed by the Parties to constitute a Transaction Document for purposes of this Agreement.

**Exhibit B**

**FORM OF MINERAL DEED**

PREPARED BY:

Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301

AFTER RECORDING
 RETURN TO AND SEND TAX
STATEMENTS TO:

Macoupin Energy LLC
c/o Foresight Energy
211 North Broadway
Suite 2600
St. Louis, Missouri  63102
Telephone:  (314) 932-6103
Attention:  Legal

RECORDER'S STAMP

STATE OF ILLINOIS            §
                             §
COUNTY OF [          ]       §

QUIT CLAIM DEED

That THE MT. OLIVE AND STAUNTON COAL COMPANY TRUST (hereinafter "Grantor"),
for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable
consideration in hand paid to it by MACOUPIN ENERGY LLC (hereinafter "Grantee"), the
receipt of which is hereby acknowledged, hereby conveys and quit claims to said Grantee, and to
Grantee's successors and assigns forever, all right, title, and interest of Grantor in the coal and
other mineral interests of every kind and character, whether mixed with coal or not, and
specifically including all of Grantor's interest in coalbed methane gas underlying the real property
located in Macoupin County, in the State of Illinois described on Exhibit 1 (the "Property"), which
are located, situate or lying in, on, and/or under the Property or otherwise pertaining to it, now
known or hereafter discovered (collectively "Minerals").

It is the intent and effect of this Quit Claim Deed to convey and quit claim to Grantee, its
successors and assigns, insofar as Grantor's underlying title permits and insofar as it relates to
the Minerals being conveyed herein including, without limitation, surface access to the Minerals,
all subsidence rights associated or connected with the Minerals and their full mining, extraction,
and removal; and insofar as Grantor's underlying title permits, all rights and privileges to enter
upon and use the surface of the Property in connection with exploring for, analyzing (including

B-1

core drilling), mining, removing, developing, producing, and marketing the Minerals including (i) the right of mining and removing by any legally permissible mining method, including without limitation longwall mining and any other full extraction method now used or becoming available in the future, except strip and open pit methods; (ii) the right to mine and remove all or any part of the Minerals or strata without leaving lateral or subjacent support for the surface or any overlying strata on, in or under the Property or any adjoining property and thereby causing subsidence; (iii) the right to use any strata, openings, passageways, voids and spaces created by the mining and/or removal of the Minerals or existing prior to such mining and removal for the purpose of transporting people or equipment or Minerals mined and/or removed from the Property or other lands and for any other purpose whatsoever including without limitation the disposal of slurry, coal combustion materials, or any other substances; (iv) the right to use any and all voids, geologic formations, coal or other Mineral seams or strata for all lawful purposes including without limitation carbon dioxide sequestration; (v) insofar as Grantor's underlying title permits, the right of ingress, egress, and regress and the right to enter onto the Property at all times and for all lawful purposes related in any way to the mining and/or development of the Minerals, whether by longwall mining methods or any other means or methods, including without limitation, environmental mitigation or remediation, testing, or emergency measures, fully exercising and enjoying those rights and privileges herein excepted and reserved, conducting subsidence mitigation and restoration work, reconstructing drainage patterns which may be necessary to correct any material damage resulting from subsidence to the Property and nearby or adjacent lands, and engineering, reclaiming, surveying, inspecting, drilling, exploring, and performing such other operations or activities as may be required by law or regulation (either now existing or hereafter imposed); (vi) all mining, removal, development, production and transportation rights, easements, privileges, and insofar as Grantor's underlying title permits, options appurtenant to the title of the surface and/or the Minerals and owned by Grantor, whether express or implied, as the same may apply to the mineral estate and the overlying surface and strata; and (vii) the right to vent, flare, collect, harvest, develop, produce, remove and market methane, gob gas, coal seam gas and/or horizontal borehole gas.


[Signature Page and Acknowledgements Follow]

**GRANTOR:**

**GRANTEE:**

**THE MT. OLIVE AND STAUNTON COAL COMPANY TRUST**

**MACOUPIN ENERGY LLC**

By: _____
Name:

By: _____

Name:    Robert D. Moore

Title: _____

Title:    President & Chief Executive
Officer

Date: _____

Date: _____

B-3

ACKNOWLEDGEMENTS

STATE OF *Missouri*  )
         ) SS:
COUNTY OF *St Louis* )

  I, *Julia Wire Benson*, a Notary Public in and for the County and State aforesaid, do hereby certify that *Robert D. Moore*, the Authorized Representative of MACOUPIN ENERGY LLC, a Delaware limited liability company, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company for the uses and purposes therein set forth.

  GIVEN under my hand and notarial seal this *4th* day of *May*, 20*17*.

> **JULIA WIRE BENSON**
> Notary Public – Notary Seal
> State of Missouri, County of St Louis City
> Commission # 15567790
> My Commission Expires Dec 29, 2019

        *Julia Wire Benson*
        Notary Public

        My Commission Expires: *Dec. 29, 2019*

STATE OF    )
        ) SS:
COUNTY OF   )

  I, _____, a Notary Public in and for the County and State aforesaid, do hereby certify that _____, the _____ of THE MT. OLIVE AND STAUNTON COAL COMPANY TRUST, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company for the uses and purposes therein set forth.

  GIVEN under my hand and notarial seal this _____ day of _____, 20__.

        _____
        Notary Public

        My Commission Expires: _____

B-4

## Exhibit 1

### TOWNSHIP 8 NORTH, RANGE 7 WEST

SECTION 4:  S ½ NE ¼;  SE ¼;  SE ¼ SW ¼, containing 280 acres+/-.

SECTION 7:  E ½ NW ¼;  South 60 acres of W ½ NW ¼;  SW ¼;  E ½ W ½ NW ¼ SE ¼;  E ½ NW ¼ SE ¼;  W ½ NE ¼ SE ¼;  S ½ SE ¼ except that part thereof lying East of the public road, containing 444.90 acres+/-.

SECTION 8:  W ½ NW ¼;  S ½ NE ¼ NE ¼;  SE ¼;  NE ¼;  NE ¼ SE ¼, containing 180 acres+/-

SECTION 9:  A part of the N ½ described as follows:  SW ¼ SE ¼ NW ¼;  S ½ NW ¼ SE ¼ NW ¼;  S ½ SE ¼ SW ¼ NW ¼;  N ½ NW ¼ SE ¼ NW 1/4;  E ½ SE ¼ NE ¼;  S ½ SW ¼ SE ¼ NE ¼;  S ½ S ½ SE ¼ SW ¼ NE ¼;  West 2 ½ acres of the S ½ NW ¼ NW ¼;  (also described as W ½ W ½ SW ¼ NW ¼ NW ¼);  West 2 ½ acres of the NE ¼ SE ¼ NW ¼ (also described as W ½ W ½ NE ¼ SE ¼ NW ¼);  N ½ S ½ SE ¼ SW ¼ NE ¼,  all in Section 9, and containing 60 acres+/-.

SECTION 17:  SW ¼;  W ½ SE ¼;  4 acres in the Southwest Corner of the E ½ SE ¼;  S ½ NE ¼;  S ½ SW ¼ NW ¼, containing 344 acres+/-.

SECTION 18:  All, containing 640 acres+/-.

SECTION 19:  North 6 acres of W ½ NW ¼ NE ¼, containing 6 acres.

SECTION 20:  NW ¼;  W ½ NE ¼, containing 240 acres+/-.

### TOWNSHIP 8 NORTH, RANGE 8 WEST

SECTION 12:  SE ¼;  That part of the SW ¼ NE ¼ described as beginning at the Southwest Corner thereof, running thence North 48 rods, thence East 40 rods, thence South 48 rods, thence West 40 rods to the place of beginning, containing 172 acres+/-.

SECTION 13:  SE ¼, containing 160 acres+/-.

PROPERTY NUMBERS:    10-190-649-D;  10-190-649-F;  10-190-649-E;  10-190-619-;  10-190-649-P;  10-190-649-Q;  10-190-649-R;  10-190-649-L;  10-190-649-M;  10-190-649-N;  10-190-644-;  10-190-643-;  10-190-640-;  10-190-639-;  10-190-638-;  10-190-637-;  10-190-620-;  10-190-649-A;  10-190-649-C;  10-190-649-B;  10-190-647-;  10-190-646-;  10-190-645-;  10-190-633-;  10-190-634-;  10-190-635-;  10-190-636-;  10-190-641-;  10-190-642-;  16-190-416-;  16-190-417-;  16-190-413-.

## Exhibit C

## FORM OF MINERAL BILL OF SALE (MINERAL RECORDS)

### Quit Claim Assignment and Bill of Sale

KNOW ALL MEN BY THESE PRESENTS that effective as of the closing (the "Closing")

of the transactions contemplated by that certain Purchase and Sale Agreement dated as of

_May 5_ , 2017 (the "Purchase and Sale Agreement),  pursuant to the terms and

conditions of the Purchase and Sale Agreement, The Mt. Olive and Staunton Coal Company Trust,

with an address of

_BNY Mellon Trust Company, 911 Washington Ave. 3rd Fl. St Louis MO 63101_ ("Assignor") for

and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration

paid to Macoupin Energy LLC, a Delaware limited liability company with an address of 3801 PGA

Boulevard, Suite 903, Palm Beach Gardens, Florida 33410 ("Assignee"), the receipt and sufficiency

of which is hereby acknowledged, Assignor does hereby assign, transfer, convey, quit claim and

deliver to Assignee, its successors and assigns, without any warranty of title, all rights, interests,

and titles of Assignor in and to the Mineral Records related to the Mineral Properties purchased by

Assignee from Assignor at the Closing as such terms are defined in the Purchase and Sale

Agreement on an "As Is" and "with all faults" basis.  Assignor hereby sells and transfers only such

right, title and interest as Assignor may hold and the Mineral Records related to the Mineral

Properties transferred herein are transferred subject to such prior liens, encumbrances and adverse

claims, if any, that may exist, and Assignor disclaims any and all warranties thereto, including, but

not limited to, the implied warranty of merchantability and implied warranty of fitness for a

particular purpose.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, forever, from and after the date hereinabove written.

[Signatures and acknowledgements appear on following pages]

IN WITNESS WHEREOF, Assignor has executed this Quit Claim Assignment and Bill of Sale on the dates indicated below but effective as of Closing.

**ASSIGNOR:**

**THE MT. OLIVE AND STAUNTON COAL COMPANY TRUST**

By:
Name:     *Jerome M. Rubenstein*

Title:     *Trustee*

Date:     *May 5, 2017*

**ASSIGNEE:**

**MACOUPIN ENERGY LLC**

By:
Name:     Robert D. Moore
Title:     President & Chief Executive Officer

Date:     *5/5/17*

C-3

ACKNOWLEDGEMENTS

STATE OF _Missouri_      )
                                    )      SS:
COUNTY OF _St Louis_   )

I, _Julia Wire Benson_ , a Notary Public in and for the County and State aforesaid, do hereby certify that _Robert D. Moore_ , the Authorized Representative of MACOUPIN ENERGY LLC, a Delaware limited liability company, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _4th_ day of _May_ , 20_17_.

> JULIA WIRE BENSON
> Notary Public – Notary Seal
> State of Missouri, County of St Louis City
> Commission # 15567790
> My Commission Expires Dec 29, 2019

_Julia Wire Benson_
Notary Public

My Commission Expires:  _Dec. 29, 2019_

STATE OF _Illinois_     )
                                    )      SS:
COUNTY OF _Madison_  )

I, _Debra Stegall_ , a Notary Public in and for the County and State aforesaid, do hereby certify that _Jerome M. Rubenstein_, the _Trustee_ of THE MT. OLIVE AND STAUNTON COAL COMPANY TRUST, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _5th_ day of _May_ , 20_17_.

> OFFICIAL SEAL
> DEBRA L. STEGALL
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES 7-6-2017

_Debra Stegall_
Notary Public

My Commission Expires:  _7/6/17_

C-4

THIS INSTRUMENT PREPARED BY:

Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301

AFTER RECORDING, RETURN TO
AND SEND TAX STATEMENT TO:

Macoupin Energy LLC
c/o Foresight Energy
211 North Broadway
Suite 2600
St. Louis, Missouri  63102
Telephone:  (314) 932-6103
Attention:  Legal

### Exhibit D

### GUARANTY

This GUARANTY, effective the 5th day of May, 2017, is executed by Foreight Energy LP, a Delaware limited partnership (collectively, "GUARANTOR") on behalf of Macoupin Energy LLC ("OBLIGOR") in favor of and to The Mt. Olive and Staunton Coal Company Trust (collectively, "BENEFICIARY").

WHEREAS, BENEFICIARY and OBLIGOR have entered into a purchase and sale agreement for the purchase and sale of certain assets of BENEFICIARY on May 5, 2017 (the "Agreement");

WHEREAS, BENEFICIARY is willing to enter into the Agreement only if the GUARANTOR makes and delivers this GUARANTY wherein GUARANTOR guarantees OBLIGOR'S obligations and duties under the Agreement ( said duties and obligations hereinafter collectively referred to as the "OBLIGATIONS"); and

WHEREAS, GUARANTOR is managed and operated by Foresight Energy GP LLC, a Delaware limited liability company; and

WHEREAS, in consideration of the mutual benefits received by GUARANTOR and OBLIGOR pursuant to the Agreement, GUARANTOR desires to and has all power and authority to GUARANTY all the OBLIGATIONS.

NOW, THEREFORE, in order to induce the BENEFICIARY to enter into the Agreement, and in consideration of the benefits to accrue to the GUARANTOR under the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, GUARANTOR agrees as follows:

1.    **GUARANTY of Payment**.    GUARANTOR hereby unconditionally and irrevocably guarantees to the BENEFICIARY the punctual payment and performance when due, of the OBLIGATIONS. This GUARANTY is a present and continuing GUARANTY of payment and not of collectibility, and the BENEFICIARY shall not be required to prosecute collection, enforcement or other remedies against OBLIGOR or any other guarantor of the OBLIGATIONS. If for any reason OBLIGOR shall fail or be unable to pay, punctually and fully, any of the OBLIGATIONS, GUARANTOR shall pay such OBLIGATIONS to the BENEFICIARY in full immediately upon demand. One or more successive actions may be brought against GUARANTOR, as often as the BENEFICIARY deem advisable, until all of the OBLIGATIONS are paid and performed in full.

2.    **Reinstatement**.    The obligations of GUARANTOR pursuant to this GUARANTY shall continue to be effective or automatically be reinstated, as the case may be, if at any time payment of any of the OBLIGATIONS or GUARANTOR'S obligations under this GUARANTY is rescinded or otherwise must be restored or returned by BENEFICIARY upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of GUARANTOR or OBLIGOR or otherwise, all as though such payment had not been made.

D-1

3.     **Termination; Default; Remedies.**   GUARANTOR shall be responsible for all costs of enforcement of this GUARANTY by the BENEFICIARY, including all legal costs, and if: (a) this GUARANTY, is placed in the hands of one or more attorneys for collection or is collected through any legal proceeding; (b) one or more attorneys is retained to represent the BENEFICIARY in any bankruptcy, reorganization, receivership or other proceedings affecting creditors' rights and involving a claim under this GUARANTY, or (c) one or more attorneys is retained to represent the BENEFICIARY in any other proceedings whatsoever in connection with this GUARANTY, then GUARANTOR shall pay to the BENEFICIARY upon demand all reasonable fees, costs and expenses incurred by the BENEFICIARY in connection therewith, including, without limitation, reasonable attorney's fees, court costs and filing fees, in addition to all other amounts due hereunder.

4.     **Successors and Assigns**.   This GUARANTY shall inure to the benefit of the BENEFICIARY and its affiliates, successors and assigns provided such assignment was approved pursuant to the assignment provisions in the Purchase and Sale Agreement.  This GUARANTY shall be binding on GUARANTOR and the successors and permitted assigns of GUARANTOR provided such assignment was approved pursuant to the assignment provisions in the Purchase and Sale Agreement. GUARANTOR agrees and acknowledges that the liability of GUARANTOR hereunder is independent of any other guarantees or other obligations at any time in effect with respect to the OBLIGATIONS or any part thereof and that GUARANTOR'S liability hereunder may be enforced regardless of the existence, validity, enforcement or non-enforcement of any such other guarantees or other obligations.

5.     **No Waiver of Rights**.  No delay or failure on the part of the BENEFICIARY to exercise any right, power or privilege under this GUARANTY shall operate as a waiver thereof, and no single or partial exercise of any right, power or privilege shall preclude any other or further exercise thereof or the exercise of any other power or right, or be deemed to establish a custom or course of dealing or performance between the parties hereto.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.  No notice to or demand on GUARANTOR in any case shall entitle GUARANTOR to any other or further notice or demand in the same, similar or other circumstance.

6.     **Modification**.  The terms of this GUARANTY may be waived, discharged, or terminated only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.  No amendment, modification, waiver or other change of any of the terms of this GUARANTY shall be effective without the prior written consent of the BENEFICIARY and GUARANTOR in each instance.

7.     **Severability**.  If any provision of this GUARANTY is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, GUARANTOR and the BENEFICIARY shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this GUARANTY and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

8.     **Applicable Law**.  This GUARANTY is governed as to validity, interpretation, effect and in all other respects by laws and decisions of the State of Illinois.

9.     **Notice**.  Any notice, request, waiver, instruction or other document required or permitted to be given under this Agreement after the date hereof by any party hereto shall be in writing and shall

be delivered personally or sent by registered or certified mail postage prepaid, and addressed to each parties principal office, or such other address or person as either party may designate by written notice to the other party. Notice shall be deemed given, when received, if delivered personally or, when mailed, if sent by registered or certified mail.

10. **CONSENT TO JURISDICTION. TO INDUCE THE BENEFICIARY TO ACCEPT THIS GUARANTY, GUARANTOR IRREVOCABLY AGREES THAT, SUBJECT TO THE BENEFICIARY'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS GUARANTY WILL BE LITIGATED IN STATE OR FEDERAL COURTS IN THE STATE OF ILLINOIS. GUARANTOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN THE STATE OF ILLINOIS, WAIVES PERSONAL SERVICE OF PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO GUARANTOR AT THE ADDRESS STATED HEREIN AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.**

11. **WAIVER OF JURY TRIAL. GUARANTOR AND THE BENEFICIARY (BY ACCEPTANCE HEREOF), HAVING BEEN REPRESENTED BY COUNSEL, KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS GUARANTY OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. GUARANTOR AGREES THAT  GUARANTOR WILL NOT ASSERT ANY CLAIM AGAINST THE BENEFICIARY ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.**

12. Facsimile Signatures. Receipt of an executed signature page to this GUARANTY by facsimile or other electronic transmission shall constitute effective delivery thereof.

**(Signature Page to Follow)**

D-3

**IN WITNESS WHEREOF**, GUARANTOR has executed this GUARANTY for the benefit of the BENEFICIARY, as of the date first above written.

**GUARANTOR:**

Foresight Energy LP, a Delaware limited partnership

By:  Its General Partner, Foresight Energy GP LLC

By: _____

Robert D. Moore, President and CEO of
Foresight Energy GP LLC, a Delaware
limited liability company

Attest:

By: _____

Rashda M. Buttar, Corporate Secretary of
Foresight Energy GP, LLC

**BENEFICIARY:**

The Mt. Olive and Staunton Coal Company Trust

By: _____

Its: _____

STATE OF Missouri        )
                         ) SS.
COUNTY OF St. Louis      )

I, the undersigned, a Notary Public in and for said County and State aforesaid, DO HEREBY CERTIFY that Robert D. Moore and Rashda M. Buttar  personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such President  and Secretary, respectively, of Foresight Energy GP LLC, a Delaware limited liability company, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such President and Secretary, respectively, appeared before me this date in person and severally acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act as such President and Secretary, respectively, and as the free and voluntary act of said limited liability company for the uses and purposes therein set forth; and on their respective oaths stated that they were duly authorized to execute said instrument and that the seal affixed thereto is the seal of said limited liability company.

D-4

Given under my hand and notarial seal this ___4th___ day of May A.D., 2017.

_____ Julia Wire Benson
NOTARY PUBLIC

JULIA WIRE BENSON
Notary Public – Notary Seal
State of Missouri, County of St Louis City
Commission # 15567790
My Commission Expires Dec 29, 2019

D-5

## Schedule 2.1
## Mineral Properties

### TOWNSHIP 8 NORTH, RANGE 7 WEST

SECTION 4:  S ½ NE ¼;  SE ¼;  SE ¼ SW ¼, containing 280 acres+/-.

SECTION 7:  E ½ NW ¼;  South 60 acres of W ½ NW ¼;  SW ¼;  E ½ W ½ NW ¼ SE ¼;  E ½ NW ¼ SE ¼;  W ½ NE ¼ SE ¼;  S ½ SE ¼ except that part thereof lying East of the public road, containing 444.90 acres+/-.

SECTION 8:  W ½ NW ¼;  S ½ NE ¼ NE ¼;  SE ¼; NE ¼;  NE ¼ SE ¼, containing 180 acres+/-

SECTION 9:  A part of the N ½ described as follows:  SW ¼ SE ¼ NW ¼;  S ½ NW ¼ SE ¼ NW ¼;  S ½ SE ¼ SW ¼ NW ¼;  N ½ NW ¼ SE ¼ NW 1/4;  E ½ SE ¼ NE ¼;  S ½ SW ¼ SE ¼ NE ¼;  S ½ S ½ SE ¼ SW ¼ NE ¼;  West 2 ½ acres of the S ½ NW ¼ NW ¼;  (also described as W ½ W ½ SW ¼ NW ¼ NW ¼);  West 2 ½ acres of the NE ¼ SE ¼ NW ¼ (also described as W ½ W ½ NE ¼ SE ¼ NW ¼);  N ½ S ½ SE ¼ SW ¼ NE ¼,  all in Section 9, and containing 60 acres+/-.

SECTION 17: SW ¼;  W ½ SE ¼;  4 acres in the Southwest Corner of the E ½ SE ¼;  S ½ NE ¼;  S ½ SW ¼ NW ¼, containing 344 acres+/-.

SECTION 18: All, containing 640 acres+/-.

SECTION 19: North 6 acres of W ½ NW ¼ NE ¼, containing 6 acres.

SECTION 20: NW ¼;  W ½ NE ¼, containing 240 acres+/-.

### TOWNSHIP 8 NORTH, RANGE 8 WEST

SECTION 12: SE ¼;  That part of the SW ¼ NE ¼ described as beginning at the Southwest Corner thereof, running thence North 48 rods, thence East 40 rods, thence South 48 rods, thence West 40 rods to the place of beginning, containing 172 acres+/-.

SECTION 13: SE ¼, containing 160 acres+/-.

PROPERTY NUMBERS:    10-190-649-D;  10-190-649-F;  10-190-649-E;  10-190-619-;  10-190-649-P;  10-190-649-Q;  10-190-649-R;  10-190-649-L;  10-190-649-M;  10-190-649-N;  10-190-644-;  10-190-643-;  10-190-640-;  10-190-639-;  10-190-638-;  10-190-637-;  10-190-620-;  10-190-649-A;  10-190-649-C;  10-190-649-B;  10-190-647-;  10-190-646-;  10-190-645-;  10-190-633-;  10-190-634-;  10-190-635-;  10-190-636-;  10-190-641-;  10-190-642-;  16-190-416-;  16-190-417-;  16-190-413-.

**Schedule 3.1(d)**
**Required Consents**

**Schedule 7.7**
**Allocation of Purchase Price**

# GROUP EXHIBIT B

05/05/2017 12:11:58 PM    Total Pages: 7
Receipt #: 17-2655    Total Fees:  3820.00
    RHSP Fee:    $9.00
Pete Duncan, Clerk & Recorder, Macoupin County IL

## FORM OF MINERAL DEED

PREPARED BY:

Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301

AFTER RECORDING
RETURN TO AND SEND
TAX STATEMENTS TO:

Macoupin Energy LLC
c/o Foresight Energy GP
211 North Broadway
Suite 2600
St. Louis, Missouri 63102

STATE OF ILLINOIS

COUNTY OF MACOUPIN

QUIT CLAIM DEED

That THE MT. OLIVE AND STAUNTON COAL COMPANY TRUST (hereinafter "Grantor"), for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration in hand paid to it by MACOUPIN ENERGY LLC (hereinafter "Grantee"), the receipt of which is hereby acknowledged, hereby conveys and quit claims to said Grantee, and to Grantee's successors and assigns forever, all right, title, and interest of Grantor in the coal and other mineral interests of every kind and character, whether mixed with coal or not, and specifically including all of Grantor's interest in coalbed methane gas underlying the real property located in Macoupin County, in the State of Illinois described on Exhibit 1 (the "Property"), which are located, situate or lying in, on, and/or under the Property or otherwise pertaining to it, now known or hereafter discovered (collectively "Minerals").



It is the intent and effect of this Quit Claim Deed to convey and quit claim to Grantee, its successors and assigns, insofar as Grantor's underlying title permits and insofar as it relates to the Minerals being conveyed herein including, without limitation, surface access to the Minerals, all subsidence rights associated or connected with the Minerals and their full mining, extraction, and removal; and insofar as Grantor's underlying title permits, all rights and privileges to enter upon and use the surface of the Property in connection with exploring for, analyzing (including core drilling), mining, removing, developing, producing, and marketing the Minerals including (i) the right of mining and removing by any legally permissible mining method, including without limitation longwall mining and any other full extraction method now used or becoming available in the future, except strip and open pit methods; (ii) the right to mine and remove all or any part of the Minerals or strata without leaving lateral or subjacent support for the surface or any overlying strata on, in or under the Property or any adjoining property and thereby causing subsidence; (iii) the right to use any strata, openings, passageways, voids and spaces created by the mining and/or removal of the Minerals or existing prior to such mining and removal for the purpose of transporting people or equipment or Minerals mined and/or removed from the Property or other lands and for any other purpose whatsoever including without limitation the disposal of slurry, coal combustion materials, or any other substances; (iv) the right to use any and all voids, geologic formations, coal or other Mineral seams or strata for all lawful purposes including without limitation carbon dioxide sequestration; (v) insofar as Grantor's underlying title permits, the right of ingress, egress, and regress and the right to enter onto the Property at all times and for all lawful purposes related in any way to the mining and/or development of the Minerals, whether by longwall mining methods or any other means or methods, including without limitation, environmental mitigation or remediation, testing, or emergency measures, fully exercising and enjoying those rights and privileges herein excepted and reserved, conducting subsidence mitigation and restoration work, reconstructing drainage patterns which may be necessary to correct any material damage resulting from subsidence to the Property and nearby or adjacent lands, and engineering, reclaiming, surveying, inspecting, drilling, exploring, and performing such other operations or activities as may be required by law or regulation (either now existing or hereafter imposed); (vi) all mining, removal, development, production and transportation rights, easements, privileges, and insofar as Grantor's underlying title permits, options appurtenant to the title of the surface and/or the Minerals and owned by Grantor, whether express or implied, as the same may apply to the mineral estate and the overlying surface and strata; and (vii) the right to vent, flare, collect, harvest, develop, produce, remove and market methane, gob gas, coal seam gas and/or horizontal borehole gas.

[Signature Page and Acknowledgements Follow]

GRANTOR:                                    GRANTEE:

**THE MT. OLIVE AND STAUNTON**              **MACOUPIN ENERGY LLC**
**COAL COMPANY TRUST**

By: _Jerome M. Rubenstein_                  By: _____

Print Name: _Jerome M. Rubenstein_          Print Name: __Robert D. Moore__

Title: _Trustee_                            Title: __President and CEO__

Date: _May 5, 2017_                         Date: __May 4, 2017__

## ACKNOWLEDGEMENTS

STATE OF _Illinois_ )
                    )  SS:
COUNTY OF _Saline_  )

    I, _Janet A. Stevens_, a Notary Public in and for the County and State aforesaid, do hereby certify that _Robert D. Moore_, the Authorized Representative of MACOUPIN ENERGY LLC, a Delaware limited liability company, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company for the uses and purposes therein set forth.

    GIVEN under my hand and notarial seal this 4th day of _May_ 2017.

> "OFFICIAL SEAL"
> Janet A Stevens
> Notary Public, State of Illinois
> My Commission Expires 12/2/2018

_Janet A Stevens_
Notary Public

My Commission Expires: _12/02/2018_

STATE OF _____ )
                      )  SS:
COUNTY OF _____ )

    I, _Debra L. Stjull_, a Notary Public in and for the County and State aforesaid, do hereby certify that Jerome Rubenstein, a Trustee of THE MT. OLIVE AND

STAUNTON COAL COMPANY TRUST, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered said instrument as his own free and voluntary act and as the free and voluntary act of said limited liability company for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 5th day of May_____, 2017.

_____
Notary Public

OFFICIAL SEAL
DEBRA L. STEGALL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-6-2017

My Commission Expires: 7/6/17

## Exhibit 1
### Mineral Rights Only

### TOWNSHIP 8 NORTH, RANGE 7 WEST

SECTION 4: S ½ NE ¼; SE ¼; SE ¼ SW ¼, containing 280 acres+/-.

SECTION 7: E ½ NW ¼; South 60 acres of W ½ NW ¼; SW ¼; E ½ W ½ NW ¼ SE ¼; E ½ NW ¼ SE ¼; W ½ NE ¼ SE ¼; S ½ SE ¼ except that part thereof lying East of the public road, containing 444.90 acres+/-.

SECTION 8: W ½ NW ¼; S ½ NE ¼ NE ¼; SE ¼; NE ¼; NE ¼ SE ¼, containing 180 acres+/-.

SECTION 9: A part of the N ½ described as follows: SW ¼ SE ¼ NW ¼; S ½ NW ¼ SE ¼ NW ¼; S ½ SE ¼ SW ¼ NW ¼; N ½ NW ¼ SE ¼ NW 1/4; E ½ SE ¼ NE ¼; S ½ SW ¼ SE ¼ NE ¼; S ½ S ½ SE ¼ SW ¼ NE ¼; West 2 ½ acres of the S ½ NW ¼ NW ¼; (also described as W ½ W ½ SW ¼ NW ¼ NW ¼); West 2 ½ acres of the NE ¼ SE ¼ NW ¼ (also described as W ½ W ½ NE ¼ SE ¼ NW ¼); N ½ S ½ SE ¼ SW ¼ NE ¼, all in Section 9, and containing 60 acres+/-.

SECTION 17: SW ¼; W ½ SE ¼; 4 acres in the Southwest Corner of the E ½ SE ¼; S ½ NE ¼; S ½ SW ¼ NW ¼, containing 344 acres+/-.

SECTION 18: All, containing 640 acres+/-.

SECTION 19: North 6 acres of W ½ NW ¼ NE ¼, containing 6 acres.

SECTION 20: NW ¼; W ½ NE ¼, containing 240 acres+/-.

### TOWNSHIP 8 NORTH, RANGE 8 WEST

SECTION 12: SE ¼; That part of the SW ¼ NE ¼ described as beginning at the Southwest Corner thereof, running thence North 48 rods, thence East 40 rods, thence South 48 rods, thence West 40 rods to the place of beginning, containing 172 acres+/-.

SECTION 13: SE ¼, containing 160 acres+/-.

PROPERTY NUMBERS:   10-190-649-D; 10-190-649-F; 10-190-649-E; 10-190-619-; 10-190-649-P; 10-190-649-Q; 10-190-649-R; 10-190-649-L; 10-190-649-M; 10-190-644-; 10-190-643-; 10-190-640-; 10-190-639-; 10-190-638-; 10-190-637-; 10-190-620-; 10-190-649-A; 10-190-649-C; 10-190-649-B; 10-190-647-; 10-190-646-; 10-190-645-; 10-190-633-; 10-190-634-; 10-190-635-; 10-190-636-; 10-190-641-; 10-190-642-; 16-190-416-; 16-190-417-; 16-190-413-.

## PLAT ACT AFFIDAVIT

**STATE OF ILLINOIS**                )

                                                      ) SS

**COUNTY OF** *Madison*              )

Jerome Rubenstein, being duly sworn on oath, states that the attached deed is not in violation of Section 1 of the Plat Act (765 ILCS 205/1) (the "Act") for one of the following reasons:

**Section A.  Not a division of land.  Conveyance of mineral rights of entire parcels:** 10-190-649-D; 10-190-649-F; 10-190-649-E; 10-190-619-; 10-190-649-P; 10-190-649-Q; 10-190-649-R; 10-190-649-L; 10-190-649-M; 10-190-649-N; 10-190-644-; 10-190-643-; 10-190-640-; 10-190-639-; 10-190-638-; 10-190-637-; 10-190-620-; 10-190-649-A; 10-190-649-C; 10-190-649-B; 10-190-647-; 10-190-646-; 10-190-645-; 10-190-633-; 10-190-634-; 10-190-635-; 10-190-636-; 10-190-641-; 10-190-642-; 16-190-416-; 16-190-417-; 16-190-413-.

### OR

**Section B.  The conveyance falls within one of the following exemptions set forth in the Act at paragraph (b) of 1:**

1. The division or subdivision of land into parcels or tracts of 5 acres or more in size which does not involve any new streets or easements of access;
2. The division of lots or blocks of less than 1 acre in any recorded subdivision which does not involve any new streets or easements of access;
3. The sale or exchange of parcels of land between owners of adjoining and contiguous land;
4. The conveyance of parcels of land or interests therein for use as a right of way for railroads or other public utility facilities and other pipe lines which does not involve any new streets or easements of access;
5. The conveyance of land owned by a railroad or other public utility which does not involve any new streets or easements of access;
6. The conveyance of land for highway or other public purposes or grants or conveyances relating to the dedication of land for public use or instruments relating to the vacation of land impressed with a public use;
7. Conveyances made to correct descriptions in prior conveyances;
8. The sale or exchange of parcels or tracts of land following the division into no more than 2 parts of a particular parcel or tract of land existing on July 17, 1959 and not involving any new streets or easements of access;
9. The sale of a single lot of less than 5 acres from a larger tract when a survey is made by an Illinois Registered Land Surveyor; provided, that this exemption shall not apply to the sale of any subsequent lots from the same larger tract of land, as determined by the dimensions and configurations of the larger tract on October 1, 1973, and provided also that this exemption does not invalidate any local requirements applicable to the subdivision of land.

10. The preparation of a plat for wind energy devices under Section 10-620 of the Property Tax
Code.

*CIRCLE LETTER OR NUMBER WHICH IS APPLICABLE TO ATTACHED DEED.*

Affiant further states that he makes this affidavit for the purpose of inducing the Recorder of
Deeds of Macoupin County, Illinois to accept the attached deed for recording.

THE MT. OLIVE AND STAUNTON COAL
COMPANY TRUST

By: _____
Jerome Rubenstein, Trustee

SUBSCRIBED AND SWORN to before me
this 5th day of May , 2017

_____
NOTARY PUBLIC

(Seal)

32353278_1

```
┌─────────────────────────────────────┐
│          OFFICIAL SEAL               │
│        DEBRA L. STEGALL              │
│ NOTARY PUBLIC - STATE OF ILLINOIS    │
│ MY COMMISSION EXPIRES 7-6-2017       │
└─────────────────────────────────────┘
```

## PLAT ACT AFFIDAVIT

**STATE OF ILLINOIS**                                  )
                                                       ) SS
**COUNTY OF** *Madison*                                )

Jerome Rubenstein, being duly sworn on oath, states that the attached deed is not in violation of Section 1 of the Plat Act (765 ILCS 205/1) (the "Act") for one of the following reasons:

**Section A.  Not a division of land.  Conveyance of mineral rights of entire parcels:** 10-190-649-D; 10-190-649-F; 10-190-649-E; 10-190-619-; 10-190-649-P; 10-190-649-Q; 10-190-649-R; 10-190-649-L; 10-190-649-M; 10-190-649-N; 10-190-644-; 10-190-643-; 10-190-640-; 10-190-639-; 10-190-638-; 10-190-637-; 10-190-620-; 10-190-649-A; 10-190-649-C; 10-190-649-B; 10-190-647-; 10-190-646-; 10-190-645-; 10-190-633-; 10-190-634-; 10-190-635-; 10-190-636-; 10-190-641-; 10-190-642-; 16-190-416-; 16-190-417-; 16-190-413-.

### OR

### Section B.  The conveyance falls within one of the following exemptions set forth in the Act at paragraph (b) of 1:

1. The division or subdivision of land into parcels or tracts of 5 acres or more in size which does not involve any new streets or easements of access;
2. The division of lots or blocks of less than 1 acre in any recorded subdivision which does not involve any new streets or easements of access;
3. The sale or exchange of parcels of land between owners of adjoining and contiguous land;
4. The conveyance of parcels of land or interests therein for use as a right of way for railroads or other public utility facilities and other pipe lines which does not involve any new streets or easements of access;
5. The conveyance of land owned by a railroad or other public utility which does not involve any new streets or easements of access;
6. The conveyance of land for highway or other public purposes or grants or conveyances relating to the dedication of land for public use or instruments relating to the vacation of land impressed with a public use;
7. Conveyances made to correct descriptions in prior conveyances;
8. The sale or exchange of parcels or tracts of land following the division into no more than 2 parts of a particular parcel or tract of land existing on July 17, 1959 and not involving any new streets or easements of access;
9. The sale of a single lot of less than 5 acres from a larger tract when a survey is made by an Illinois Registered Land Surveyor; provided, that this exemption shall not apply to the sale of any subsequent lots from the same larger tract of land, as determined by the dimensions and configurations of the larger tract on October 1, 1973, and provided also that this exemption does not invalidate any local requirements applicable to the subdivision of land.

10. The preparation of a plat for wind energy devices under Section 10-620 of the Property Tax
Code.

### CIRCLE LETTER OR NUMBER WHICH IS APPLICABLE TO ATTACHED DEED.

Affiant further states that he makes this affidavit for the purpose of inducing the Recorder of
Deeds of Macoupin County, Illinois to accept the attached deed for recording.

THE MT. OLIVE AND STAUNTON COAL
COMPANY TRUST

By: _Jerome M. Rubenstein_
Jerome Rubenstein, Trustee
M.

SUBSCRIBED AND SWORN to before me

this 5th day of _May_, 2017

_Debra L. Stegall_
NOTARY PUBLIC

(Seal)

```
OFFICIAL SEAL
DEBRA L. STEGALL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-6-2017
```

32353278_1

# PTAX-203
# Illinois Real Estate
# Transfer Declaration

**Please read the instructions before completing this form.**
This form can be completed electronically at tax.illinois.gov/retd.

*Do not write in this area.*
*County Recorder's Office use.*

## Step 1: Identify the property and sale information.

**1** N/A
Street address of property (or 911 address, if available)

N/A
City or village                                          ZIP

GILLESPIE
Township

**2** Write the total number of parcels to be transferred. ___32___

**3** Write the parcel identifying numbers and lot sizes or acreage.

| Property index number (PIN) | Lot size or acreage |
|---|---|
| a SEE ATTACHED LIST | |
| b | |
| c | |
| d | |

Write additional property index numbers, lot sizes or acreage in Step 3.

**4** Date of instrument: _0_ _5_ / _2_ _0_ _1_ _7_
Month    Year

**5** Type of instrument (Mark with an "X."):  _____ Warranty deed
_X_ Quit claim deed  _____ Executor deed  _____ Trustee deed
_____ Beneficial interest  _____ Other (specify):_____

**6** _____ Yes _X_ No  Will the property be the buyer's principal residence?

**7** _____ Yes _X_ No  Was the property advertised for sale?
(i.e., media, sign, newspaper, realtor)

**8** Identify the property's current and intended primary use.
Current  Intended    (Mark **only one item per column** with an "X.")
**a** _____ _____ Land/lot only
**b** _____ _____ Residence (single-family, condominium, townhome, or duplex)
**c** _____ _____ Mobile home residence
**d** _____ _____ Apartment building (6 units or less)  No. of units: _____
**e** _____ _____ Apartment building (over 6 units)  No. of units: _____
**f** _____ _____ Office
**g** _____ _____ Retail establishment
**h** _____ _____ Commercial building (specify): _____
**i** _____ _____ Industrial building
**j** _____ _____ Farm
**k** _X_ _X_ Other (specify): MINERAL RIGHTS, MINERAL

**9** Identify any significant physical changes in the property since January 1 of the previous year and **write the date of the change.**
Date of significant change: _____ / _____ _____ _____ _____
                            Month    Year
(Mark with an "X.")
_____ Demolition/damage  _____ Additions  _____ Major remodeling
_____ New construction  _____ Other (specify): _____

**10** Identify only the items that apply to this sale. (Mark with an "X.")
**a** _____ Fulfillment of installment contract —
year contract initiated : _____ _____ _____ _____
**b** _____ Sale between related individuals or corporate affiliates
**c** _____ Transfer of less than 100 percent interest
**d** _____ Court-ordered sale
**e** _____ Sale in lieu of foreclosure
**f** _____ Condemnation
**g** _____ Short sale
**h** _____ Bank REO (real estate owned)
**i** _____ Auction sale
**j** _____ Seller/buyer is a relocation company
**k** _____ Seller/buyer is a financial institution or government agency
**l** _____ Buyer is a real estate investment trust
**m** _____ Buyer is a pension fund
**n** _____ Buyer is an adjacent property owner
**o** _____ Buyer is exercising an option to purchase
**p** _____ Trade of property (simultaneous)
**q** _____ Sale-leaseback
**r** _____ Other (specify): _____
_____
**s** _____ Homestead exemptions on most recent tax bill:
**1** General/Alternative        $_____0.00
**2** Senior Citizens             $_____0.00
**3** Senior Citizens Assessment Freeze $_____0.00

## Step 2: Calculate the amount of transfer tax due.

**Note:** Round Lines 11 through 18 to the next highest whole dollar. If the amount on Line 11 is over $1 million and the property's current use on Line 8 above is marked "e," "f," "g," "h," "i," or "k," complete Form PTAX-203-A, Illinois Real Estate Transfer Declaration Supplemental Form A. If you are recording a beneficial interest transfer, do not complete this step. Complete Form PTAX-203-B, Illinois Real Estate Transfer Declaration Supplemental Form B.

| | | | |
|---|---|---|---|
| **11** | Full actual consideration | **11** | $ 2,500,000.00 |
| **12a** | Amount of personal property included in the purchase | **12a** | $ 0.00 |
| **12b** | Was the value of a mobile home included on Line 12a? | **12b** | _____ Yes _X_ No |
| **13** | Subtract Line 12a from Line 11. This is the net consideration for real property. | **13** | $ 2,500,000.00 |
| **14** | Amount for other real property transferred to the seller (in a simultaneous exchange) as part of the full actual consideration on Line 11 | **14** | $ 0.00 |
| **15** | Outstanding mortgage amount to which the transferred real property remains subject | **15** | $ 0.00 |
| **16** | If this transfer is exempt, use an "X" to identify the provision. | **16** | _____b _____k _____m |
| **17** | Subtract Line 14 and 15 from Line 13. **This is the net consideration subject to transfer tax.** | **17** | $ 2,500,000.00 |
| **18** | Divide Line 17 by 500. Round the result to the next highest whole number (e.g., 61.002 rounds to 62). | **18** | 5,000.00 |
| **19** | Illinois tax stamps — multiply Line 18 by 0.50. | **19** | $ 2,500.00 |
| **20** | County tax stamps — multiply Line 18 by 0.25. | **20** | $ 1,250.00 |
| **21** | Add Lines 19 and 20. **This is the total amount of transfer tax due.** | **21** | $ 3,750.00 |

This form is authorized in accordance with 35 ILCS 200/31-1 et seq. Disclosure of this information is REQUIRED. This form has been approved by the Forms Management Center.    IL-492-0227

PTAX-203 (R-9/10)                                          Page 1 of 4

MINERAL RIGHTS ONLY

| PARCEL ID | LOT SIZE |
|-----------|----------|
| 10-190-649-D | 80.0 acres |
| 10-190-649-F | 160.0 acres |
| 10-190-649-E | 80.0 acres |
| 10-190-619- | 319.9 acres |
| 10-190-649-P | 30.0 acres |
| 10-190-649-Q | 20.0 acres |
| 10-190-649-R | 75.0 acres |
| 10-190-649-L | 320.0 acres |
| 10-190-649-M | 40.0 acres |
| 10-190-649-N | 320.0 acres |
| 10-190-644- | 20.0 acres |
| 10-190-643- | 40.0 acres |
| 10-190-640- | 40.0 acres |
| 10-190-639- | 80.0 acres |
| 10-190-638- | 80.0 acres |
| 10-190-637- | 40.0 acres |
| 10-190-620- | 40.0 acres |
| 10-190-649-A | 4.0 acres |
| 10-190-649-C | 160.0 acres |
| 10-190-649-B | 40.0 acres |
| 10-190-647- | 40.0 acres |
| 10-190-646- | 40.0 acres |
| 10-190-645- | 80.0 acres |
| 10-190-633- | 160.0 acres |
| 10-190-634- | 80.0 acres |
| 10-190-635- | 40.0 acres |
| 10-190-636- | 6.0 acres |
| 10-190-641- | 160.0 acres |
| 10-190-642- | 80.0 acres |
| 16-190-416- | 160.0 acres |
| 16-190-417- | 12.0 acres |
| 16-190-413- | 160.0 acres |

**Step 3: Write the legal description from** the deed. Write (or type (minimum 10-point font required), or attach the legal description from the deed. If you prefer, submit an 8½" x 11" copy of the extended legal description with this form. You may also use the space below to write additional property index numbers, lots sizes or acreage from Step 1, Line 3.

See Legal Description Attachment

---

## Step 4: Complete the requested information.

The buyer and seller (or their agents) hereby verify that to the best of their knowledge and belief, the full actual consideration and facts stated in this declaration are true and correct. If this transaction involves any real estate located in Cook County, the buyer and seller (or their agents) hereby verify that to the best of their knowledge, the name of the buyer shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire and hold title to real estate under the laws of the State of Illinois. Any person who willfully falsifies or omits any information required in this declaration shall be guilty of a Class B misdemeanor for the first offense and a Class A misdemeanor for subsequent offenses. Any person who knowingly submits a false statement concerning the identity of a grantee shall be guilty of a Class C misdemeanor for the first offense and of a Class A misdemeanor for subsequent offenses.

### Seller Information (Please print.)

THE MT. OLIVE AND STAUNTON COAL COMPANY TRUST
Seller's or trustee's name | Seller's trust number (if applicable - **not** an SSN or FEIN)

911 WASHINGTON AVE., 3RD FLOOR | ST. LOUIS | MO 63101
Street address (after sale) | City | State  ZIP

_Jerome M. Nuheastein, Trustee_ | ( 314 ) 436-9211   Ext.
Seller's or agent's signature | Seller's daytime phone

### Buyer Information (Please print.)

MACOUPIN ENERGY LLC
Buyer's or trustee's name | Buyer's trust number (if applicable - **not** an SSN or FEIN)

211 NORTH BROADWAY, STE. 2600 | ST. LOUIS | MO 63102
Street address (after sale) | City | State  ZIP

_Lee M. Landon, Authorized Person_ | ( 314 ) 932-6103   Ext.
Buyer's or agent's signature | Buyer's daytime phone

**Mail tax bill to:**

MACOUPIN ENERGY LLC | 211 NORTH BROADWAY, STE. 2600 | ST. LOUIS | MO 63102
Name or company | Street address | City | State  ZIP

### Preparer Information (Please print.)

D.STEGALL, HEYL ROYSTER VOELKER & ALLEN | U4632
Preparer's and company's name | Preparer's file number (if applicable)

300 HAMILTON BLVD. | PEORIA | IL 61602
Street address | City | State  ZIP

_signature_ | ( 309 ) 676-0400   Ext. 1255
Preparer's signature | Preparer's daytime phone

dstegall@heylroyster.com
Preparer's e-mail address (if available)

**Identify any required documents submitted with this form.** (Mark with an "X.")  _X_ Extended legal description     _X_ Form PTAX-203-A
                                                                    ___ Itemized list of personal property   ___ Form PTAX-203-B

| To be completed by the Chief County Assessment Officer | | | | | | **3** Year prior to sale ___ ___ ___ ___ |
|---|---|---|---|---|---|---|
| **1** ___ ___ ___ ___ ___ ___ | | | | | | **4** Does the sale involve a mobile home assessed as |
| County | Township | Class | Cook-Minor | Code 1 | Code 2 | real estate? ___ Yes ___ No |
| **2** Board of Review's final assessed value for the assessment year | | | | | | **5** Comments |
| prior to the year of sale. | | | | | | |
| Land ___ , ___ ___ ___ , ___ ___ ___ , ___ ___ ___ | | | | | | |
| Buildings ___ , ___ ___ ___ , ___ ___ ___ , ___ ___ ___ | | | | | | |
| Total ___ , ___ ___ ___ , ___ ___ ___ , ___ ___ ___ | | | | | | |

| **Illinois Department of Revenue Use** | **Tab number** |
|---|---|
| | |

TOWNSHIP 8 NORTH, RANGE 7 WEST SECTION 4: S ½ NE ¼; SE ¼; SE ¼ SW ¼, CONTAINING 280 ACRES+/-. SECTION 7: E ½ NW ¼; SOUTH 60 ACRES OF W ½ NW ¼; SW ¼; E ½ W ½ NW ¼ SE ¼; E ½ NW ¼ SE ¼; W ½ NE ¼ SE ¼; S ½ SE ¼ EXCEPT THAT PART THEREOF LYING EAST OF THE PUBLIC ROAD, CONTAINING 444.90 ACRES+/-. SECTION 8: W ½ NW ¼; S ½ NE ¼ NE ¼; SE ¼; NE ¼; NE ¼ SE ¼, CONTAINING 180 ACRES+/-. SECTION 9: A PART OF THE N ½ DESCRIBED AS FOLLOWS: SW ¼ SE ¼ NW ¼; S ½ NW ¼ SE ¼ NW ¼; S ½ SE ¼ SW ¼ NW ¼; N ½ NW ¼ SE ¼ NW 1/4; E ½ SE ¼ NE ¼; S ½ SW ¼ SE ¼ NE ¼; S ½ S ½ SE ¼ SW ¼ NE ¼; WEST 2 ½ ACRES OF THE S ½ NW ¼ NW ¼; (ALSO DESCRIBED AS W ½ W ½ SW ¼ NW ¼ NW ¼); WEST 2 ½ ACRES OF THE NE ¼ SE ¼ NW ¼ (ALSO DESCRIBED AS W ½ W ½ NE ¼ SE ¼ NW ¼); N ½ S ½ SE ¼ SW ¼ NE ¼, ALL IN SECTION 9, AND CONTAINING 60 ACRES+/-. SECTION 17: SW ¼; W ½ SE ¼; 4 ACRES IN THE SOUTHWEST CORNER OF THE E ½ SE ¼; S ½ NE ¼; S ½ SW ¼ NW ¼, CONTAINING 344 ACRES+/-. SECTION 18: ALL, CONTAINING 640 ACRES+/-. SECTION 19: NORTH 6 ACRES OF W ½ NW ¼ NE ¼, CONTAINING 6 ACRES. SECTION 20: NW ¼; W ½ NE ¼, CONTAINING 240 ACRES+/-. TOWNSHIP 8 NORTH, RANGE 8 WEST SECTION 12: SE ¼; THAT PART OF THE SW ¼ NE ¼ DESCRIBED AS BEGINNING AT THE SOUTHWEST CORNER THEREOF, RUNNING THENCE NORTH 48 RODS, THENCE EAST 40 RODS, THENCE SOUTH 48 RODS, THENCE WEST 40 RODS TO THE PLACE OF BEGINNING, CONTAINING 172 ACRES+/-. SECTION 13: SE ¼, CONTAINING 160 ACRES+/-.

# PTAX-203-A

### Illinois Real Estate Transfer Declaration
### Supplemental Form A
### (Non-residential: sale price over $1 million)

Do not write in this area.
This space is reserved for the County Recorder's Office.

File this form with Form PTAX-203, Illinois Real Estate Transfer Declaration, and the original deed or trust document at the County Recorder's office within the county where the property is located if the following conditions are met:
- On Form PTAX-203, Line 11 the sale price is over $1 million, **and**
- On Form PTAX-203, Line 8 the property's **current** use is marked "Apartment building (over 6 units)," "Office," "Retail establishment," "Commercial building," "Industrial building," or "Other."

Please read the instructions on the back of this form.

## Step 1: Identify the property and sale information.

**1** Write the property's street address, city or village, and township. (From Line 1 of Form PTAX-203)

| N/A | N/A | GILLESPIE |
|---|---|---|
| Street address of property (or 911 address, if available) | City or village | Township |

**2** Write the parcel identifying number from Line 3a of Form PTAX-203.   Parcel Identifier: SEE ATTACHED LIST

**3** Write the total number of months the property was for sale on the market.*   9 9 Months

**4a** Was the improvement occupied on the sale date?* A "No" response means that **all** improvements were totally unoccupied.   ___ Yes _X_ No
   If the answer is "No," write the total number of months all improvements were unoccupied before the sale date. Go to Line 5.   9 9 Months

**4b** Write the approximate percentage of total square footage of improvements occupied or leased on the sale date. Include **all** improvements.   0 Percent

**4c** Did the buyer occupy the property on the sale date?   ___ Yes ___ No
   If the answer is "No," go to Line 5.

**4d** Will the buyer continue to occupy part or all of the property after the sale?   ___ Yes ___ No

**4e** Write the beginning and ending dates of the buyer's lease agreement.   Lease dates: ___/___ to ___/___
   Month   Year   Month   Year
   Briefly describe any renewal options.

**5** If the buyer owns other properties within an approximate one-half mile radius of the property, complete the following information for the two closest properties owned by the buyer.

| | Street address | City or village | Parcel identifying number |
|---|---|---|---|
| Property 1 | N/a | Near Gillispie | 19-04-713-001 |
| Property 2 | N/a | Near Gillispie | 19-04-713-002 |

**6** Did Line 12a of Form PTAX-203 include an amount for a transfer of personal property?   ___ Yes _X_ No
   If the answer is "Yes," submit a list of personal property transferred.*

**7** Did the seller's financing arrangements affect the sale price on Line 11 of Form PTAX-203?*   ___ Yes _X_ No
   If the answer is "Yes," please explain how the financing affected the sale price.

**8** In your opinion, is the net consideration for real property entered on Line 13 of Form PTAX-203 a fair reflection of the market value on the sale date?   _X_ Yes ___ No
   If the answer is "No," please explain.

## Step 2: Complete the requested information.

The buyer and seller (or their agents) hereby verify that to the best of their knowledge and belief, the facts stated in this form are true and correct. Any person who wilfully falsifies or omits any information required in this form shall be guilty of a Class B misdemeanor for the first offense and a Class A misdemeanor for subsequent offenses.

Seller's or trustee's name: THE MT. OLIVE AND STAUNTON COAL COMP   Seller's daytime phone: ( 314 ) 436-9211
Address: 911 WASHINGTON AVE., 3RD FLOOR   ST. LOUIS   MO   63101
Street address   City   State   ZIP
Seller's or agent's signature: _Yvonne M. Hubenstein Trustee_   Date: _May 5, 2017_

Buyer's or trustee's name: MACOUPIN ENERGY LLC   Buyer's daytime phone: ( 314 ) 932-6103
Address: 211 NORTH BROADWAY, STE. 2600   ST. LOUIS   MO   63102
Street address   City   State   ZIP
Buyer's or agent's signature: _Lu M. Lauder, AUTHORIZED PERSON_   Date: _5/5/17_

*See Instructions.
PTAX-203-A (N-9/99)

This form is authorized in accordance with 35 ILCS 200/31-1 *et seq.* Disclosure of this information is REQUIRED. This form has been approved by the Forms Management Center.   IL-492-0227

**ID:INT**

Page 1 of 1

Form **W-9**
(Rev. December 2000)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give form to the
requester. Do not
send to the IRS.

Name (See Specific Instructions on page 2.)
MT. OLIVE & STAUNTON COAL COMPANY TRUST

Business name, if different from above. (See Specific Instructions on page 2.)

Check appropriate box: ☐ Individual/Sole proprietor ☐ Corporation ☐ Partnership ☑ Other ▶ *TRUST*

Address (number, street, and apt. or suite no.)
C/O BNY TRUST COMPANY OF MISSOURI, 911 WASH. AVE

Requester's name and address (optional)

City, state, and ZIP code
ST. LOUIS MO 63101

**Part I   Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 2. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 2.

Note: If the account is in more than one name, see the chart on page 2 for guidelines on whose number to enter.

Social security number

or

**Part II**   For U.S. Payees Exempt From Backup Withholding (See the instructions on page 2.)

▶

**Part III   Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 2.)

Sign Here | Signature of U.S. person ▶ *Jerome M. Rubinstein Trustee*   Date ▶ 4/25/01

**Purpose of Form**

A person who is required to file an information return with the IRS must get your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to give your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

If you are a foreign person, use the appropriate Form W-8. See Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Corporations.

Note: If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

What is backup withholding? Persons making certain payments to you must withhold and pay to the IRS 31% of such payments under certain conditions. This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

If you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return, payments you receive will not be subject to backup withholding. Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester, or

2. You do not certify your TIN when required (see the Part III instructions on page 2 for details), or

3. The IRS tells the requester that you furnished an incorrect TIN, or

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the Part II instructions and the separate instructions for the Requester of Form W-9.

**Penalties**

Failure to furnish TIN. If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

Civil penalty for false information with respect to withholding. If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

Criminal penalty for falsifying information. Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

Misuse of TINs. If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.

Cat. No. 10231X                Form **W-9** (Rev. 12-2000)