**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>FORESIGHT ENERGY LP, *et al.*,<br><br>              Debtors. | Chapter 11<br><br>Case No. 20-41308-659<br><br>Jointly Administered |

## CERTIFICATE OF SERVICE

I, Alex Orchowski, depose and say that I am employed by Prime Clerk LLC ("***Prime Clerk***"), the claims and noticing agent for the Debtors in the above-captioned chapter 11 cases.

On March 23, 2020, at my direction and under my supervision, employees of Prime Clerk caused the following document to be served via overnight mail or next day business service on the banks, brokers, dealers agents, nominees or their agents (collectively, the "***Nominees***") identified on the service list attached hereto as **Exhibit A**. The Nominees were provided with instructions and sufficient quantities to distribute the following document to the beneficial holders of the Debtors' public securities:

- Notice and Instruction Form to the Holders of the 11.50% Second Priority Senior Secured Notes Due 2023 Issued Under that Certain Indenture, dated as of March 28, 2017, a copy of which is attached hereto as **Exhibit B** (the "***DIP Syndication Notice and Instruction Form***")

In addition to the hard copy service detailed above, on March 23, 2020, at my direction and under my supervision, employees of Prime Clerk caused the DIP Syndication Notice and Instruction Form to be served via Email on the service list attached hereto as **Exhibit C**.

On March 24, 2020, at my direction and under my supervision, employees of Prime Clerk caused the DIP Syndication Notice and Instruction Form to be served via first class mail on the parties identified on the service list attached hereto as **Exhibit D**.

On March 25, 2020, at my direction and under my supervision, employees of Prime Clerk caused the following documents to be served via overnight mail or next day business service on the banks, brokers, dealers agents, nominees or their agents (collectively, the "***Nominees***") identified on the service list attached hereto as **Exhibit A**. The Nominees were provided with instructions and sufficient quantities to distribute the documents to the beneficial holders of the Debtors' public securities:

- Important Notice of Update to the Notice and Instruction Form, a copy of which is attached hereto as **Exhibit E** (the "***Notice of Amended DIP Syndication and Instruction Form***")

- Notice and Instruction Form to the Holders of the 11.50% Second Priority Senior Secured Notes Due 2023 Issued Under that Certain Indenture, dated as of March 28, 2017, a copy of which is attached hereto as **Exhibit F** (the " *Amended DIP Syndication Notice and Instruction Form*")

In addition to the hard copy service detailed above, on March 25, 2020, at my direction and under my supervision, employees of Prime Clerk caused the Notice of Amended DIP Syndication and Instruction Form and Amended DIP Syndication Notice and Instruction Form to be served via Email on the Nominees identified on the service list attached hereto as **Exhibit G**.

On March 25, 2020, at my direction and under my supervision, employees of Prime Clerk caused the Notice of Amended DIP Syndication and Instruction Form and Amended DIP Syndication Notice and Instruction Form to be served via first class mail on the parties identified on the service list attached hereto as **Exhibit D**.

In addition to the hard copy service detailed above, on March 25, 2020, at my direction and under my supervision, employees of Prime Clerk caused the Notice of Amended DIP Syndication and Instruction Form and Amended DIP Syndication Notice and Instruction Form to be served via Email on the service list attached hereto as **Exhibit H .**

Dated: April 1, 2020

Alex Orchowski

State of New York
County of New York

Subscribed and sworn to (or affirmed) before me on April 1, 2020, by Alex Orchowski proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature:    */s/ Liz Santodomingo*
Notary Public, State of New York
No. 01SA6301250
Qualified in New York County
Commission Expires April 14, 2022

2                                    SRF  40946 40947 40861 40900

**<u>Exhibit A</u>**

Exhibit A

Nominees Service List

Served via Overnight Mail or Next Day Business Service

| Name | Address 1 | Address 2 | Address 3 | City | State | Postal Code | Country |
|---|---|---|---|---|---|---|---|
| BROADRIDGE | JOBS: E18264, E18265 | 51 MERCEDES WAY | | EDGEWOOD | NY | 11717 | |
| MEDIANT COMMUNICATIONS | ATTN: STEPHANIE FITZHENRY/PROXY CENTER | 100 DEMAREST DRIVE | | WAYNE | NJ | 07470 | |
| DEPOSITORY TRUST CO. | ATTN: ED HAIDUK | 55 WATER STREET | 25TH FLOOR | NEW YORK | NY | 10041 | |
| DEPOSITORY TRUST CO. | ATTN: HORACE DALEY | 55 WATER STREET | 25TH FLOOR | NEW YORK | NY | 10041 | |
| BANC OF AMERICA SECURITIES (0773) | ATTN: JOHN DOLAN OR REORG MGR | 100 W. 33RD STREET | 3RD FLOOR | NEW YORK | NY | 10001 | |
| BNY MELLON/ NE TRUST (0954) | ATTN: BETH STIFFLER OR REORG MGR | 525 WILLIAM PENN PLACE | SUITE 300 | PITTSBURGH | PA | 15259 | |
| BROWN BROTHERS HARRIMAN & CO. (0010) | ATTN: PAUL NONNON OR REORG MGR. | 525 WASHINGTON BLVD. | NEW PORT TOWERS | JERSEY CITY | NJ | 07310-1607 | |
| CHARLES SCHWAB & CO., INC. (0164) | ATTN: DEBORAH JUNG OR REORG MGR. | 2423 EAST LINCOLN DRIVE | 1ST FLOOR | PHOENIX | AZ | 85016-1215 | |
| CHARLES SCHWAB & CO., INC. (0164) | ATTN: NANCY BRIM OR REORG MGR. | 2423 EAST LINCOLN DRIVE | PHX PEAK 02 K130 | PHOENIX | AZ | 85016-1215 | |
| CHARLES SCHWAB & CO., INC. (0164) | ATTN: CHRISTINA YOUNG OR REORG MGR. | 2423 EAST LINCOLN DRIVE | | PHOENIX | AZ | 85016-1215 | |
| CITIBANK, N.A. (0908) | ATTN: CAROLYN TREBUS OR REORG MGR. | 3800 CITIBANK CENTER B3-12 | | TAMPA | FL | 33610 | |
| CITIBANK, N.A. (0908) | ATTN: EVENTS CREATION OR REORG MGR | 3800 CITIBANK CENTER B3-12 | | TAMPA | FL | 33610 | |
| CITIBANK, N.A. (0908) | ATTN: SANDRA HERNANDEZ OR REORG MGR | 3800 CITIBANK CENTER B3-12 | | TAMPA | FL | 33610 | |
| CITIBANK, N.A. (0908) | ATTN: SHERIDA SINANAN OR REORG MGR | 3800 CITIBANK CENTER | B/3RD FLOOR/ZONE 12 | TAMPA | FL | 33610 | |
| CITIGROUP GLOBAL MARKETS INC SALOMON (0418/0505 | ATTN: MANETH CHAP OR REORG MGR | 3800 CITIBANK CENTER B3-12 | | TAMPA | FL | 33610 | |
| CITIGROUP GLOBAL MARKETS INC. (0418/0505) | ATTN: ROSE MARIE YODICE OR REORG MGR | 388 GREENWHICH STREET 11TH FLOOR | | NEW YORK | NY | 10013 | |
| CREDIT SUISSE SECURITIES (0355) | ATTN: ASHWINEE SAWH OR REORG MGR | 11 MADISON AVENUE | 23RD FLOOR | NEW YORK | NY | 10010 | |
| CREDIT SUISSE SECURITIES USA LLC - (0355) | ATTN: TIM JOHNSON OR REORG MGR. | 7033 LOUIS STEPHENS DRIVE | | RESEARCH TRIANGLE PA | NC | 27709 | |
| CREDIT SUISSE SECURITIES USA LLC - (0355) | ATTN: ANTHONY MILO OR REORG MGR. | 7033 LOUIS STEPHENS DRIVE | GLOBAL PROXY SERVICES | SEARCH TRIANGLE PA | NC | 27709 | |
| CREDIT SUISSE SECURITIES USA LLC - (0355) | ATTN: SARAH CHANDRIKA OR REORG MGR. | ONE MADISON AVE | | NEW YORK | NY | 10010 | |
| DEUTSCHE BANK SECURITIES (0573) | ATTN: REORG MGR. | 5022 GATE PARKWAY | SUITE 200 | JACKSONVILLE | FL | 32256 | |
| GOLDMAN, SACHS & CO. (0005) | ATTN: ALEX MUCHNIK OR REORG MGR | 30 HUDSON ST. | PROXY DEPARTMENT | JERSEY CITY | NJ | 07302-0000 | |
| HSBC BANK USA, N.A.-IPB (2122) | ATTN: REORG OR CORP ACTIONS MGR | 452 5TH AVENUE | 6TH FLOOR | NEW YORK | NY | 10018 | |
| INTERACTIVE BROKERS RETAIL EQUITY CL -534 | MARIA TARDIO OR REORG DEPT. | 1 PICKWICK PLAZA | | GREENWICH | CT | 06830 | |
| INTERACTIVE BROKERS/TH (0534) | ATTN: KARIN MCCARTHY OR REORG MGR | 8 GREENWICH OFFICE PARK | | GREENWICH | CT | 06831 | |
| J.P. MORGAN CLEARING CORP. (0352) | ATTN: ERIC OSZUSTOQICZ OR REORG MGR | 3 CHASE METROTECH CENTER | PROXY DEPT./NY1-H034 | BROOKLYN | NY | 11245-0001 | |
| J.P. MORGAN CLEARING CORP. (0352) | ATTN: ABHISHEK KUMAR OR REORG MGR | 500 STANTON CHRISTIANA ROAD | 3RD FLOOR | NEWARK | DE | 19713 | |
| J.P. MORGAN CLEARING CORP. (0352) | ATTN: BRODERICK WALKER OR REORG MGR | DEPT. C, CASHIERS DEPARTMENT ONE METROT | CENTER NORTH REORG DEPT 41 | BROOKLYN | NY | 11201-3862 | |
| MERRILL LYNCH (0161/5198) | ATTN: KASIA BANACH OR CORP ACTIONS NOTIFICATION | 4804 DEAR LAKE DR E | | JACKSONVILLE | FL | 32246 | |
| MORGAN STANLEY & CO. (0050) | ATTN: IRVING CORUJO OR REORG MGR | ONE NEW YORK PLAZA | 7TH FLOOR | NEW YORK | NY | 10004 | |
| MORGAN STANLEY & CO. INCORPORATED-50 | ATTN: RAQUEL DEL MONTE OR REORG | ONE NEW YORK PLAZA 7TH FLOOR | | NEW YORK | NY | 10004 | |
| MORGAN STANLEY SMITH BARNEY LLC (0015) | ATTN: JOHN BARRY OR REORG MGR | 1300 THAMES STREET WHARF | | BALTIMORE | MD | 21231 | |
| NATIONAL FINANCIAL SERVICES LLC (0226) | ATTN: SEAN COLE OR REORG MGR | 499 WASHINGTON BLVD | 5TH FLOOR | JERSEY CITY | NJ | 07310 | |
| NATIONAL FINANCIAL SERVICES LLC (0226) | ATTN: KARL BAKER OR REORG MGR | 499 WASHINGTON BLVD | 5TH FLOOR | JERSEY CITY | NJ | 07310 | |
| NORTHERN TRUST CO (2669) | ATTN: ROBERT VALENTIN OR REORG MGR | 801 S CANAL STREET | FLOOR C1N | CHICAGO | IL | 60607 | |
| NORTHERN TRUST CO (2669) | ATTN: ANDREW LUSSEN OR REORG MGR | 801 S CANAL STREET | FLOOR C1N | CHICAGO | IL | 60607 | |
| PERSHING LLC (0443) | ATTN: SILVY RODRIGUEZ OR REORG MGR | SECURITIES CORPORATION | 1 PERSHING PLAZA 7TH FLOOR | JERSEY CITY | NJ | 07399 | |
| PERSHING LLC (0443) | ATTN: AL HERNANDEZ OR REORG MGR | SECURITIES CORPORATION 1 PERSHING PLAZA | 7TH FLOOR -REORG. | JERSEY CITY | NJ | 07399 | |
| PERSHING LLC (0443) | ATTN: JOSEPH LAVARA OR REORG MGR | 1 PERSHING PLAZA | | JERSEY CITY | NJ | 07399 | |
| SOUTHWEST SECURITIES, INC. (0279) | ATTN: DORIS KRAJC OR REORG MGR | 1201 ELM STREET | SUITE 3700 | DALLAS | TX | 75270 | |
| SOUTHWEST SECURITIES, INC. (0279) | ATTN: CHRISTINA FINZEN OR REORG MGR | 1201 ELM STREET | SUITE 3700 | DALLAS | TX | 75270 | |
| SOUTHWEST SECURITIES, INC. (0279) | ATTN: RHONDA JACKSON OR REORG MGR | 1201 ELM STREET | SUITE 3500 | DALLAS | TX | 75270 | |
| SSB - BLACKROCK TRUST (2767) | ATTN: TRINA ESTREMERA OR REORG MGR | 1776 HERITAGE DRIVE NORTH | | QUINCY | MA | 02171 | |
| SSB- IBT/BGI (2767) | ATTN: TOM BRODERICK OR REORG MGR | 1776 HERITAGE DRIVE NORTH | | QUINCY | MA | 02171 | |
| STATE STREET (0997) | ATTN: MIKE FEELEY/ROB RAY OR REORG MGR | CORP ACTIONS - JAB5E | 1776 HERITAGE DRIVE | NORTH QUINCY | MA | 02171 | |
| STATE STREET BANK & TRUST/STATE STREET TOTAL ETF (2 | ATTN: MIKE FEELEY/ROB RAY OR PROXY MGR | CORP ACTIONS - JAB5E 1776 HERITAGE DRIVE NORTH | | QUINCY | MA | 2171 | |
| STATE STREET BANK AND TRUST (0997/2319) | ATTN: CHRISTINE SULLIVAN OR REORG MGR | CORP ACTIONS - JAB5E | 1776 HERITAGE DRIVE | NORTH QUINCY | MA | 02171 | |
| STIFEL, NICOLAUS & CO (0793) | ATTN: CHRIS WIEGAND OR REORG MGR | 501 N. BROADWAY | 7TH FLOOR STOCK RECORD DEF | ST. LOUIS | MO | 63102 | |
| STIFEL, NICOLAUS & CO (0793) | ATTN: CRAIG MCINTOSH OR REORG MGR | 501 N. BROADWAY | REORG DEPT | ST. LOUIS | MO | 63102 | |
| TD AMERITRADE CLEARING, INC. (0188) | ATTN: MANDI FOSTER OR REORG MGR | 1005 NORTH AMERITRADE PLACE | | BELLEVUE | NE | 68005 | |
| TD AMERITRADE CLEARING, INC. (0188) | ATTN: GARY SWAIN OR REORG MGR | 1005 NORTH AMERITRADE PLACE | | BELLEVUE | NE | 68005 | |
| THE BANK OF NEW YORK MELLON (0901) | ATTN: JENNIFER MAY OR REORG MGR | 525 WILLIAM PENN PLACE | SUITE 153-0400 | PITTSBURGH | PA | 15259 | |
| U.S. BANK N.A. (2803) | ATTN: PAUL KUXHAUS OR REORG MGR | 1555 N. RIVER CENTER DRIVE SUITE 302 | | MILWAUKEE | WI | 53212 | |
| US BANK (2803) | ATTN: PAUL KUXHAUS REORG MGR | 1555 N RIVERCENTER DR | STE 302 | MILWAUKEE | WI | 53212 | |
| VANGUARD (0062) | ATTN: CORPORATE ACTION | 100 VANGUARD BLVD | | MALVERN | PA | 19355 | |
| VANGUARD (0062) | ATTN: BRANDON R MITCHAM | OR CORPORATE ACTION | 14321 N. NORTHSIGHT BLVD | SCOTTSDALE | AZ | 85260 | |
| WELLS BANK (2027) | ATTN: LORA DAHLE OR REORG MGR | 733 MARQUETTE AVE | MAC N9306-057 5TH FLOOR | MINNEAPOLIS | MN | 55479 | |
| WELLS FARGO SECURITIES, LLC (0250) | ATTN: SCOTT NELLIS OR REORG MGR | CORP ACTIONS - MAC D109-010 1525 WEST W.T. HARRRIS BLVD, 1B1 | | CHARLOTTE | NC | 28262 | |

Exhibit A
Nominees Service List
Served via Overnight Mail or Next Day Business Service

| Name | Address 1 | Address 2 | Address 3 | City | State | Postal Code | Country |
|------|-----------|-----------|-----------|------|-------|-------------|---------|
| WELLS FARGO SECURITIES, LLC (0250) | ATTN: STEVE TURNER OR REORG MGR | CORP ACTIONS - NC0675 1525 WEST W.T. HARRIS BLVD, 1B1 | | CHARLOTTE | NC | 28262 | |
| WELLS FARGO SECURITIES, LLC (0250) | ATTN: ROBERT MATERA OR REORG MGR | CORP ACTIONS - NC0675 1525 WEST W.T. HARRIS BLVD, 1B1 | | CHARLOTTE | NC | 28262 | |

**<u>Exhibit B</u>**

**EXECUTION VERSION**

**NOTICE AND INSTRUCTION FORM**

**to the Holders (the "<u>Prepetition Second Lien Holders</u>") of the
11.50% Second Priority Senior Secured Notes due 2023
(CUSIP Nos. 345525 AE9, 345525 AF6 or U34550 AE0) ("<u>Prepetition Second Lien Notes</u>")
issued under that certain Indenture, dated as of March 28, 2017
(as amended, modified, restated or supplemented, the "<u>Prepetition Second Lien Indenture</u>")**

**of**

**FORESIGHT ENERGY LLC and FORESIGHT ENERGY FINANCE CORPORATION**

**and**

**to the Lenders (the "<u>Prepetition First Lien Lenders</u>") under that certain Credit and Guaranty
Agreement , dated as of March 28, 2017**

**with**

**FORESIGHT ENERGY LLC, as Borrower**

**and the other parties thereto (as amended, modified, restated or supplemented, the "<u>Prepetition First
Lien Credit Agreement</u>" and the obligations thereunder, the "<u>Prepetition First Lien Obligations</u>")**

**with respect to the Opportunity to participate as a DIP Lender in the
DIP Facility**

**IMPORTANT NOTICE**
**REGARDING THE OPPORTUNITY TO PARTICIPATE**
**AS A DIP LENDER IN THE DIP FACILITY**

IF YOU ELECT TO PARTICIPATE AS A DIP LENDER IN THE DIP FACILITY, YOU WILL BE ENTERING INTO A BINDING LEGAL COMMITMENT WITH FORESIGHT ENERGY LLC (THE "*COMPANY*").  IF YOU SUBMIT A COMMITMENT TO PARTICIPATE IN THE DIP FACILITY PURSUANT TO THIS NOTICE AND INSTRUCTION FORM BUT FAIL TO FUND YOUR SUBSCRIPTION FUNDING AMOUNT (AS SPECIFIED IN ITEM 2B OF THE SUBSCRIPTION FORM) ON OR PRIOR TO THE APPLICABLE EXPIRATION TIME AS DESCRIBED BELOW, YOU WILL NOT BE PERMITTED TO PARTICIPATE AS A LENDER IN THE DIP FACILITY PURSUANT TO THIS OPPORTUNITY.

THE OPPORTUNITY IS NOT BEING GIVEN TO HOLDERS IN ANY JURISDICTION IN WHICH THE ACCEPTANCE OF THE OPPORTUNITY OR MAKING AN OFFER IN CONNECTION THEREWITH WOULD NOT BE IN COMPLIANCE WITH THE LAWS OF SUCH JURISDICTION.

**THE OPPORTUNITY IS BEING GIVEN ONLY TO AN ELIGIBLE HOLDER, WHICH IS AN ENTITY THAT IS (I) EITHER (A) A "QUALIFIED INSTITUTIONAL BUYER," AS SUCH TERM IS DEFINED IN RULE 144A UNDER THE SECURITIES ACT, OR (B) AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT OR AN ENTITY IN WHICH ALL OF THE EQUITY INVESTORS ARE SUCH INSTITUTIONAL "ACCREDITED INVESTORS" UNDER THE SECURITIES ACT, (II) A PREPETITION FIRST LIEN LENDER AND/OR A BENEFICIAL HOLDER OF PREPETITION SECOND LIEN NOTES ON THE RECORD DATE, (III) NOT A BACKSTOP PARTY, AND (IV) NOT THE COMPANY OR AN AFFILIATE OF THE COMPANY.**

**EXPIRATION TIME**

**YOUR OPPORTUNITY TO ELECT TO BECOME A LENDER IN THE DIP FACILITY WILL EXPIRE (I) AT 5:00 P.M., NEW YORK CITY TIME, ON APRIL 1, 2020 (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED OR EARLIER TERMINATED, THE "*SUBSCRIPTION DEADLINE*")) TO THE EXTENT EACH OF THE SUBSCRIPTION DOCUMENTS (AS DEFINED BELOW) IS NOT DELIVERED TO THE INFORMATION AGENT ON OR PRIOR TO THE SUBSCRIPTION DEADLINE, OR (II) AT 5:00 P.M., NEW YORK CITY TIME, ON APRIL 3, 2020 (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED OR EARLIER TERMINATED, THE "*FUNDING DEADLINE*", AND TOGETHER WITH THE SUBSCRIPTION DEADLINE, THE "*EXPIRATION TIME*") TO THE EXTENT THE SUBSCRIPTION FUNDING AMOUNT (AS DEFINED BELOW) IS NOT FUNDED TO THE ESCROW ACCOUNT (AS DEFINED BELOW) ON OR PRIOR TO THE FUNDING DEADLINE, UNLESS THE APPLICABLE EXPIRATION TIME IS EXTENDED OR EARLIER TERMINATED BY MUTUAL AGREEMENT OF THE REQUIRED BACKSTOP PARTIES, THE DIP AGENT AND THE COMPANY. THERE ARE NO WITHDRAWAL RIGHTS ONCE THE SUBSCRIPTION FORM ATTACHED TO THIS NOTICE AND INSTRUCTION FORM IS VALIDLY DELIVERED.**

**IF THE COMPANY AND THE REQUIRED BACKSTOP PARTIES DETERMINE TO ALLOW YOU TO WITHDRAW YOUR COMMITMENT, INCLUDING IN THE EVENT A MATERIAL CHANGE CAUSES THE COMPANY TO UPDATE THE INFORMATION RELATING TO THIS OPPORTUNITY TO PARTICIPATE AND EXTEND THE APPLICABLE EXPIRATION TIME, ANY SUCH WITHDRAWAL WILL BE LIMITED AS SET FORTH IN ANY NOTICE THEREOF.**

**IMPORTANT NOTE FOR PREPETITION SECOND LIEN NOTEHOLDERS: YOUR SUBSCRIPTION DOCUMENTS MUST BE RECEIVED BY YOUR NOMINEE WITH SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO COMPLETE THE NOMINEE CERTIFICATION ON YOUR BEHALF AND DELIVER IT TO THE INFORMATION AGENT BY THE SUBSCRIPTION DEADLINE.**

**NO SUBSCRIPTION FORM SUBMISSIONS WILL BE VALID IF DELIVERED AFTER THE SUBSCRIPTION DEADLINE. THE COMPANY, THE DIP AGENT AND THE REQUIRED BACKSTOP PARTIES WILL DETERMINE WHETHER A SUBSCRIPTION FORM TRANSMITTING AN ELIGIBLE HOLDER'S COMMITMENT TO PARTICIPATE HAS BEEN VALIDLY SUBMITTED AND WHETHER TO ACCEPT ANY SUBSCRIPTION FORM THAT HAS NOT BEEN VALIDLY EXECUTED AND**

---

**DELIVERED.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE REQUIRED BACKSTOP PARTIES, THE DIP AGENT AND THE COMPANY MAY AMEND THE TERMS OF THE OPPORTUNITY, INCLUDING THIS SUBSCRIPTION FORM AND THE OTHER SUBSCRIPTION DOCUMENTS, AT ANY TIME UPON THEIR MUTUAL AGREEMENT.**

**YOUR PARTICIPATION IN THE OPPORTUNITY IS SUBJECT TO YOU PROVIDING THE ADMINISTRATIVE QUESTIONNAIRE AND ALL KNOW-YOUR-CUSTOMER INFORMATION, TAX FORMS, AND OTHER DOCUMENTS REQUIRED BY THE DIP AGENT AND THE DIP AGENT'S SATISFACTORY REVIEW OF SUCH INFORMATION AND DOCUMENTS (AS DETERMINED IN THE SOLE DISCRETION OF THE DIP AGENT).**

**TERMS USED IN THIS BOX SHALL HAVE THE MEANINGS SET FORTH IN THIS NOTICE AND INSTRUCTION FORM.**

---

Attachments to this Notice and Instruction Form:

| | |
|---|---|
| Annex I | Subscription Form |
| Annex I-A | Instructions for Completing the Subscription Form |
| Annex I-B | Nominee Certification (for Prepetition Second Lien Noteholders Only) |
| Annex II | Master Joinder to the DIP Credit Agreement |
| Annex III | Administrative Questionnaire |
| Annex IV | Description of Required KYC Information |
| Annex V | Description of Required Tax Forms |
| Annex VI | Designation Notice |
| Annex VII | RSA Joinder |
| Exhibit A | Credit Agreement |

To the Prepetition First Lien Lenders and the Prepetition Second Lien Noteholders:

On March 10, 2020, Foresight Energy GP LLC, a Delaware limited liability company (the "**General Partner**"), Foresight Energy LP, a Delaware limited partnership ("**Holdings**"), Foresight Energy LLC, a Delaware limited liability company (the "**Company**"), and certain of their direct and indirect subsidiaries (together with the General Partner, Holdings and the Company, the "**Debtors**") filed voluntary petitions (the "**Chapter 11 Petitions**") for relief under the provisions of chapter 11 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**"). In connection with the foregoing, on March 10, 2020, the Company entered into that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**" and the commitments and extension of credit thereunder, the "**DIP Facility**"), by and among the Debtors, the Backstop Parties (as defined below) and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent (in such capacities, the "**DIP Agent**"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the DIP Credit Agreement, a copy of which is attached as Exhibit A to this Notice and Instruction Form.

On March 10, 2020, the Debtors, certain Prepetition First Lien Lenders and certain Prepetition Second Lien Holders (collectively, the "**Backstop Parties**", and the Backstop Parties holding backstop commitments of more than 60% of the Initial Term Loans and the Delayed Draw Term Loans shall be referred to herein as the "**Required Backstop Parties**") executed that certain Restructuring Support Agreement, dated as of March 10, 2020 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**RSA**")[1], which annexes a term sheet that provides for the Opportunity (as defined below) for each Eligible Holder (as defined below) that is not a Backstop Party to participate in the DIP Facility in the aggregate principal amount of the Delayed Draw Term Loan Commitment not to exceed $15,099,979.91 (the "**Syndicated DIP Term Loans**"), subject to the procedures and documentation detailed herein.

You have received this Notice and Instruction Form because you were a Prepetition Second Lien Noteholder and/or a Prepetition First Lien Lender as of March 23, 2020 (the "**Record Date**"). Pursuant to and subject to the terms hereof, you are being given notice of your opportunity (the "**Opportunity**") to be a lender under the DIP Facility (a "**DIP Lender**"). ***Importantly, to the extent that you choose to participate in the Opportunity, you must also execute the enclosed RSA Joinder (as defined below), making you a party thereto, both in your capacity as a DIP Lender and a Prepetition Second Lien Noteholder and/or a Prepetition First Lien Lender (and in any other capacity in which you hold debt of the Debtors).***

The Opportunity provides Eligible Holders (which shall exclude, for the avoidance of doubt, the Backstop Parties), as of the Record Date, who are (i) Prepetition First Lien Lenders with the opportunity to (a) assume up to their pro rata portion of 32.1489% of the principal amount of the Delayed Draw Term Loan Commitment not to exceed $45,000,000 (the "**Prepetition First Lien Allocation**") based on such Prepetition First Lien Lender's outstanding principal amount of the Prepetition First Lien Obligations under the Prepetition First Lien Credit Agreement as of the Record Date, and (b) subject to the terms and conditions set forth in the DIP Credit Agreement and the Orders, substitute and exchange the Prepetition First Lien Obligations held by such Eligible Holder for loans under the DIP Credit Agreement (the "**Roll-Up Loans**") in a principal amount equal to 0.808625 times the sum of (i) the aggregate principal amount of Initial Term Loans funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Closing Date, if any, on account of its Prepetition First Lien Obligations, and (ii) the aggregate principal amount of Delayed Draw Term Loans funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Delayed Draw Funding Date on account of its Prepetition First Lien Obligations (the "**Roll-Up Amount**"); provided that the aggregate principal amount of the Roll-Up Loans of all DIP Lenders shall not exceed $75,000,000, and/or (ii) Prepetition Second Lien Holders with the opportunity to purchase up to their pro rata portion of 1.4066% of the principal amount of the Delayed Draw Term Loan Commitment not to exceed $45,000,000 (the "**Prepetition Second Lien Allocation**") based on such Prepetition Second Lien Holder's outstanding principal amount of the Prepetition Second Lien Notes under the Prepetition Second Lien Indenture as of the Record Date. For the

---

[1] Foresight Energy LP, Current Report (Form 8-K/A) (March 10, 2020), Ex. 10.1.

avoidance of doubt, Eligible Holders will not receive the Put Option Premium as set forth in Section 2.09(c) of the DIP Credit Agreement.

Notwithstanding the foregoing, only entities that are (i) either (a) "qualified institutional buyers" ("***QIBs***"), as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "***Securities Act***"), or (b) institutional "accredited investors" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act ("***IAIs***") or an entity in which all of the equity investors are IAIs, (ii) a beneficial Holder of Prepetition Second Lien Notes and/or Prepetition First Lien Loans on the Record Date, (iii) not a Backstop Party and (iv) not the Company or an affiliate of the Company (all such entities, collectively, that meet the foregoing are referred to herein as "***Eligible Holders***") may participate in the Opportunity. For the avoidance of doubt, natural persons shall not be Eligible Holders. If you are not an Eligible Holder, you may not participate in the Opportunity. The Company and the Required Backstop Parties shall mutually determine, in their absolute discretion, whether any entity is an Eligible Holder for purposes of participation in the Opportunity. Each Eligible Holder has the right to designate, using the Designation Notice attached as Annex VI (the "***Designation Notice***"), that one or more of its affiliates or funds or accounts that are managed, advised or sub-advised by such Eligible Holder or its affiliates (each, a "***Related Lender***") participate as a DIP Lender for some or all of its pro rata portion of the Syndicated DIP Term Loans.

In addition, to be able to participate in the Opportunity, the minimum participation amount of any Eligible Holder (together with any Eligible Holder under common control through common investment management and/or advisement with such Eligible Holder) is $350,000 (the "***Minimum Amount***").

Please use the subscription form attached hereto as Annex I (the "***Subscription Form***") to transmit your election, if any. To participate in the Opportunity, you must (i) complete and duly execute (a) the Subscription Form, (b) the Master Joinder to the DIP Credit Agreement attached hereto as Annex II (the "***DIP Joinder***"), (c) an Administrative Questionnaire attached hereto as Annex III, (d) all know-your-customer information and other documents required by the DIP Agent as described in Annex IV hereto (the "***KYC Information***"), (e) the applicable tax forms as described in Annex V hereto, (f) a joinder to the RSA attached hereto as Annex VII (the "***RSA Joinder***"), and (g) such other documents as the DIP Agent may reasonably require (collectively, the "***Subscription Documents***"), (ii) deliver (or cause to be delivered) such Subscription Documents to Prime Clerk LLC (the "***Information Agent***") on or before the Subscription Deadline as instructed below, and (iii) prior to the Funding Deadline, fund your entire Desired Participation Amount, as indicated in Item 2b of the Subscription Form (the "***Subscription Funding Amount***"), in each case as further described herein. If you are a Prepetition Second Lien Noteholder, you must provide the nominee holding your Prepetition Second Lien Notes with sufficient time to allow your nominee to complete the nominee certification attached hereto as Annex I-B (the "***Nominee Certification***") on your behalf and deliver it to the Information Agent on or prior to the Subscription Deadline. If your Prepetition Second Lien Notes are held through more than one nominee, please have each nominee complete a Nominee Certification for the respective Prepetition Second Lien Notes held.

The DIP Facility consists of (i) the Initial Term Loans in an aggregate principal amount not to exceed $55,000,000, (ii) the Delayed Draw Term Loans in an aggregate principal amount not to exceed $45,000,000 and (iii) the Roll-Up Loans in an aggregate amount not to exceed $75,000,000 (collectively, the "***DIP Loans***"). On March 11, 2020, the Backstop Parties funded $55,000,000 of the Initial Term Loans pursuant to the DIP Credit Agreement and the RSA. Subject to the satisfaction or waiver of all applicable conditions precedent set forth in the DIP Credit Agreement, including entry by the Bankruptcy Court of the Final Order, (x) the Delayed Draw Term Lenders are obligated to fund the Delayed Draw Term Loans and (y) the aggregate amount of Prepetition First Lien Obligations held by each DIP Lender will be substituted and exchanged for (and prepaid by) and deemed to be the Roll-Up Loans issued and outstanding under the DIP Credit Agreement in an aggregate principal amount not to exceed $75,000,000. The DIP Credit Agreement is attached hereto as Exhibit A and also available at https://cases.primeclerk.com/foresight (by clicking on the link for "Syndication Materials").

The DIP Facility will mature on the date that is the earliest to occur of (i) the date that is 180 days following the Petition Date; provided, that, if such date is not a Business Day, such preceding Business Day, (ii) the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date) of one or more plans of reorganization confirmed pursuant to a final order entered by the Bankruptcy Court (the "***Plan Effective Date***"), (iii) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under the section 363 of the Bankruptcy Code, and (iv) the date on which the Obligations shall be accelerated in accordance with the provisions of the DIP Credit Agreement.

Interest on the DIP Loans will accrue at a rate of the Eurocurrency Rate plus 11.0% per annum or the Base Rate plus 10.0% per annum, and shall be payable in cash on (i) in the case of Eurocurrency Rate Loans, on the last day of each Interest Period applicable to such DIP Loans, and the Maturity Date and (ii) in the case of Base Rate Loans, the last Business Day of each March, June, September and December, and the Maturity Date. With respect to the DIP Facility, there is also a LIBOR floor of 1.00%, and a default interest of an additional 2.00% per annum during the continuance of an Event of Default.

Pursuant to the DIP Credit Agreement, each DIP Lender funding the Delayed Draw Term Loans shall receive (i) an upfront fee in an amount equal to 3.00% of the principal amount of such DIP Lender's Delayed Draw Term Loans, and (ii) a commitment fee on the Delayed Draw Term Loan Commitment (whether or not then available) of such DIP Lender accruing, during the period commencing from the Closing Date to the Delayed Draw Funding Date, at a rate per annum equal to the 1.00%, in each case, payable on the Delayed Draw Funding Date. Each Eligible Holder shall fund (or cause to be funded) its Subscription Funding Amount to the Escrow Account net of the upfront fee (but inclusive of the commitment fee), and the applicable commitment fee shall be paid by the DIP Agent to each Delayed Draw Term Lender on the Delayed Draw Funding Date. Therefore, the Subscription Funding Amount to be paid into the Escrow Account by each Eligible Holder will be equal to 97% of the principal amount of its pro rata portion of the Delayed Draw Term Loans.

On the Plan Effective Date, the Company will pay to each DIP Lender (or any affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such DIP Lender or such affiliate, in each case, designated by such DIP Lender in writing to the DIP Agent) an exit fee (the "*Exit Fee*") in an aggregate amount equal to 1.0% of the aggregate principal amount of the Initial Term Loan Commitment existing immediately prior to any funding of the Initial Term Loans and the Delayed Draw Term Loan Commitment existing immediately prior to any funding of the Delayed Draw Term Loans, respectively, on a pro rata basis in accordance with the DIP Loans and any unfunded commitments under the DIP Credit Agreement then outstanding. The Exit Fee will be payable in the form of New Common Equity at a 35% discount to the Stated Equity Value, subject to dilution for the Management Incentive Plan; provided, however, that, after the exercise of remedies provided for in Section 8.02 of the DIP Credit Agreement (or after the DIP Loans have automatically become immediately due and payable) upon the occurrence of any Event of Default or upon repayment of the DIP Loans in full and termination of all commitments thereunder without the occurrence of the Plan Effective Date, the Borrower will pay to each DIP Lender (or any affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such DIP Lender or such affiliate, in each case, designated by such DIP Lender in writing to the DIP Agent) the Exit Fee in cash in an amount equal to $2,000,000, on a pro rata basis in accordance with the DIP Loans and any unfunded commitments under the DIP Credit Agreement then outstanding.

*The foregoing description of the DIP Facility is a summary only and does not purport to be complete. It is subject to and qualified in its entirety by reference to the DIP Credit Agreement and the Orders.*

Each Eligible Holder may fund the Syndicated DIP Term Loans in an amount equal to (i) (a) in the case of Prepetition First Lien Lenders, (x) the Prepetition First Lien Allocation, multiplied by (y) in a fraction, the numerator of which is the outstanding principal amount of the First Lien Obligations held by such Eligible Holder as of the Record Date and the denominator of which is the aggregate outstanding principal amount of all First Lien Obligations as of the Record Date, and (b) in the case of Prepetition Second Lien Noteholders, (x) the Prepetition Second Lien Allocation, multiplied by (y) a fraction, the numerator of which is the outstanding principal amount of the Second Lien Notes held by such Eligible Holder as of the Record Date and the denominator of which is the aggregate outstanding principal amount of all Second Lien Notes as of the Record Date, less (ii) the upfront fee described above in an amount equal to 3.0% of the aggregate principal of such Eligible Holder's Syndicated DIP Term Loans; provided that the amount set forth in clause (i) is not less than the Minimum Amount.

Eligible Holders will not have oversubscription rights. From the Record Date until the Delayed Draw Funding Date, no Eligible Holder may transfer, sell or assign any of its Prepetition First Lien Obligations or Prepetition Second Lien Notes, and any such transfer, sale or assignment shall be deemed null and void. Nothing in this paragraph shall be construed to permit any person other than an Eligible Holder to participate as a DIP Lender in the DIP Facility.

**Your commitment to participate may not be withdrawn, unless otherwise mutually determined by the Company, the DIP Agent and the Required Backstop Parties.** Additionally, the Company, the DIP Agent and the Required Backstop Parties will determine whether any Holder is an Eligible Holder, has made the representations in

the Subscription Form, has properly executed and delivered the required documentation and funded its Subscription Funding Amount, and whether to reject or accept any subscription to participate that has not been properly completed and delivered.

Your participation in the Opportunity is subject to you (or, if applicable, your designee) providing the administrative questionnaire, all know-your-customer information, tax forms and other documents required by the DIP Agent and the DIP Agent's satisfactory review of such information and documents (as determined in the sole discretion of the DIP Agent).

Each Eligible Holder that intends to participate in the Opportunity as a DIP Lender in the DIP Facility must, (i) on or prior to Subscription Deadline, deliver (or cause the delivery of) the duly executed Subscription Documents to the Information Agent and (ii) on or prior to the Funding Deadline, cause the Subscription Funding Amount to be funded by such Eligible Holder to be sent by wire transfer of immediately available federal funds to an escrow account (the "***Escrow Account***") established by Cortland Capital Market Services LLC as escrow agent (in such capacity, the "***Escrow Agent***"), according to the wire instructions to be provided by the Information Agent to Eligible Holders (and made available at https://cases.primeclerk.com/foresight) at least one (1) business day prior to the Funding Deadline (or such earlier time, to the extent any Eligible Holder has submitted all Subscription Documents satisfactory to the DIP Agent). Funds held in the Escrow Account will not accrue interest. Subject to the terms of the escrow agreement, the Escrow Agent assumes no responsibility for the funds delivered to the Escrow Account and shall be entitled to rely solely on the direction of the Company and the Required Backstop Parties with respect to the disposition of such funds. Upon closing of the Opportunity and syndication, the Escrow Agent will promptly disburse the funds in the Escrow Account funded by participating Eligible Holders to the DIP Agent or the Company, as directed by the Company and the Required Backstop Parties, and the DIP Agent will update the register to reflect the consummation of the Delayed Draw Term Loans and the Roll-Up Loans.

Although the Expiration Time occurs prior to the Delayed Draw Funding Date, it is important to note that the closing of the Opportunity and this syndication will occur on the Delayed Draw Funding Date, which is expected to occur within five (5) Business Days following entry of the Final DIP Order (as such date may be extended by the Company, the DIP Agent and the Required Backstop Parties). Accordingly, your Subscription Funding Amount, representing your pro rata share of the Delayed Draw Term Loans, will be held in escrow for an undetermined period of time and there can be no assurances as to when closing of the Opportunity and this syndication will occur. Funds held in escrow will not accrue interest, nor will you accrue any interest on account of your pro rata share of the Delayed Draw Term Loans until closing of the Opportunity and this syndication.

The Bankruptcy Court has not yet approved the Roll-Up Loans. It is an Event of Default under the DIP Credit Agreement if, among other things, the Bankruptcy Court does not approve the "roll-up" of the Prepetition First Lien Loans in an aggregate principal amount equal to $75,000,000 and in a manner and on terms satisfactory to the Required Backstop Parties. There can be no assurances that the Bankruptcy Court will approve the Roll-Up Loans on the terms set forth herein and in the DIP Credit Agreement, including in the aggregate amount of $75,000,000, or at all. If the Bankruptcy Court does not approve the Roll-Up Loans, or approves such loans in an aggregate amount less than $75,000,000, you may still be required to purchase the Syndicated DIP Term Loans in the amounts specified in your Subscription Form if you choose to participate in this Opportunity because the Required Lenders have the ability to waive any such Event of Default under the DIP Credit Agreement. If this were to occur, your participation in the Opportunity and this syndication would not include the ability to "roll up" your existing Prepetition First Lien Obligations in the amounts specified herein, or at all. For the avoidance of doubt, your commitment to participate in the Opportunity may not be withdrawn by you for any reason, including if the Bankruptcy Court does not approve the Roll-Up Loans on the terms set forth herein and in the DIP Credit Agreement, or at all. Amendments, or modifications to, and/or waivers or consents under, the DIP Credit Agreement and the other Loan Documents may be made from time to time in accordance with the terms thereof without the consent or approval of any Eligible Holder electing to participate in the Opportunity. Provided that the Bankruptcy Court approves the Roll-Up Loans, it is expected that closing of the Roll-Up Loans will occur on the date on the Delayed Draw Funding Date.

If the syndication process is terminated for any reason, the Subscription Documents submitted by participating Eligible Holders will terminate and the Escrow Agent will promptly return by wire, funds (without interest) transferred by such Eligible Holders to the Escrow Account. If an Eligible Holder is not permitted to participate in the Opportunity and has wired funds to the Escrow Account, the Escrow Agent will return by wire funds (without interest) transferred by such Eligible Holder to the Escrow Account. The Escrow Agent shall be authorized

to close the Escrow Account following the transfer of all funds held therein.  All funds in the Escrow Account shall be held as cash on deposit and will not accrue interest.

Before you deliver the executed Subscription Documents and wire funds to the Escrow Account, please carefully review (i) the filings on the Debtors' docket with the Bankruptcy Court related to their Chapter 11 Cases, available at https://cases.primeclerk.com/foresight (the "***Bankruptcy Filings***"), (ii) the RSA, the Orders, and the DIP Credit Agreement and (iii) the Company's current and periodic reports, including those listed below (the "***Exchange Act Reports***"), which were filed by the Company with the Securities and Exchange Commission (the "***SEC***") pursuant to the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, and which are available on the SEC's website at www.sec.gov.

Participating as a DIP Term Lender in the DIP Term Facility entails risks, including, but not limited to, the risk that the Company may be liquidated or may be unsuccessful executing its business plan, and as a result may be unable to repay all or part of your DIP Loans.  The Debtors are operating as debtors-in-possession under bankruptcy protection under chapter 11 of the Bankruptcy Code.  The continuation of the Company as a going concern is contingent upon, among other things, the Company's ability to develop a plan of reorganization, to obtain approval of such plan under the applicable provisions of the Bankruptcy Code and to successfully execute its business plan upon its emergence from chapter 11, if any.  The risks inherent in lending to a company operating under chapter 11 of the Bankruptcy Code are materially higher than normal and there is no assurance that any of the conditions described above will be met.  There is a risk that the Company will not be able to develop a feasible plan of reorganization or obtain the necessary approvals thereof, in which case it may be unable to reorganize under chapter 11, and it may be liquidated.  In addition, if the Company is unable to successfully execute its business plan, it may be unable to meet its obligations under the DIP Facility.  In either case, the Company may be unable to repay loan amounts borrowed from you and you may lose all or part of your DIP Loans.

This Notice and Instruction Form relates only to the Opportunity to participate as a DIP Lender in the DIP Facility (which, as noted above, will also require Holders to become a party to the RSA).

**Notwithstanding anything to the contrary herein, the Required Backstop Parties, the DIP Agent and the Company may amend or modify the terms of the Opportunity, including the Subscription Form and the other Subscription Documents, at any time, by filing a notice of such amendment or modification on the Debtors' docket with the Bankruptcy Court related to the Company's Chapter 11 Cases; provided that nothing in this Notice and Instruction Form shall be construed to supersede the amendment and modification requirements set forth in the DIP Credit Agreement.**

**Annex I to**
**Notice and Instruction Form**

**SUBSCRIPTION FORM**

---

**IMPORTANT**

**PLEASE READ AND FOLLOW THE ATTACHED INSTRUCTIONS CAREFULLY. YOU MUST (I) COMPLETE, SIGN, DATE AND DELIVER THIS SUBSCRIPTION FORM AND THE OTHER SUBSCRIPTION DOCUMENTS TO YOUR NOMINEE WITH SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO COMPLETE THE NOMINEE CERTIFICATION ON YOUR BEHALF AND DELIVER IT TO THE INFORMATION AGENT BEFORE THE SUBSCRIPTION DEADLINE, WHICH DELIVERY WILL CONSTITUTE YOUR COMMITMENT AS A DIP LENDER AND (II) FUND YOUR SUBSCRIPTION FUNDING AMOUNT BY WIRING FUNDS TO THE ESCROW ACCOUNT BEFORE THE FUNDING DEADLINE.**

**EACH ELIGIBLE HOLDER HAS THE RIGHT TO DESIGNATE, USING THE DESIGNATION NOTICE, THAT ONE OR MORE RELATED ENTITIES PARTICIPATE AS A DIP LENDER FOR SOME OR ALL OF ITS PRO RATA SHARE OF THE LOANS AND/OR COMMITMENTS UNDER THE DIP CREDIT AGREEMENT.**

**IF SUCH SUBSCRIPTION DOCUMENTS ARE NOT COMPLETED, DULY EXECUTED AND RECEIVED BY THE INFORMATION AGENT AT OR BEFORE THE SUBSCRIPTION DEADLINE, AND/OR THE SUBSCRIPTION FUNDING AMOUNT IS NOT RECEIVED IN THE ESCROW ACCOUNT AT OR BEFORE THE FUNDING DEADLINE, THE INSTRUCTION TRANSMITTED BY THIS SUBSCRIPTION FORM WILL NOT BE COUNTED.**

**YOU SHOULD REVIEW THE EXCHANGE ACT REPORTS, BANKRUPTCY FILINGS, NOTICE AND INSTRUCTION FORM AND THE INSTRUCTIONS CONTAINED HEREIN BEFORE YOU ELECT TO PARTICIPATE IN THE OPPORTUNITY. YOU MAY WISH TO SEEK LEGAL AND/OR FINANCIAL ADVICE CONCERNING THE OPPORTUNITY.**

---

Capitalized terms used herein but not defined herein have the meanings ascribed to them in the Notice and Instruction Form to which this Subscription Form is attached.

**Item 1. Representations of the Holder.** The undersigned hereby represents and warrants that it:

- Is (i) either a "qualified institutional buyer" or an institutional "accredited investor" as such terms are defined under Rules 144A and 501(a)(1), (2), (3) and (7) under the Securities Act of 1933, as amended, respectively, or is an entity in which all of the equity investors are institutional "accredited investors" and (ii) not the Company or an affiliate of the Company;

- is not a natural person;

- is an "Eligible Assignee" as defined in the DIP Credit Agreement;

- is sophisticated with respect to the decision to participate as a lender in a commercial loan of the type represented by the DIP Loans and is, or the entity exercising discretion in making this decision to participate in the funding of the DIP Loans on behalf of such participant is, experienced in participating as a lender in such commercial loans;

- has received, or has been accorded the opportunity to receive or have access to, copies of the Final Order, the DIP Credit Agreement, the DIP Joinder, the RSA and the RSA Joinder, and has received, or has been accorded the opportunity to receive or have access to, to the extent available, copies of the most recent annual and quarterly financial statements of the Debtors and such other documents and information as it deems appropriate to make its own credit analysis and decision to participate in the funding of such DIP Facility and become a party to the RSA (including access to the docket of the Company's Chapter 11 Cases); and

- has (i) independently and without reliance on the DIP Agent, any other DIP Lender or potential DIP Lender, the Backstop Parties, any of the Debtors, any agent or trustee under the Prepetition First Lien Credit Agreement or the Prepetition Second Lien Notes, and (ii) based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to participate in the funding of the DIP Facility and become a party to the RSA.

Each Holder further authorizes the DIP Agent to act and rely upon (and acknowledges and agrees that the DIP Agent shall be fully protected in acting and relying upon) instructions and/or information from the Company, the Information Agent and/or the Required Backstop Parties and their counsel and advisors in effectuating the transactions contemplated by this Subscription Form.

**Item 2. Participation in the Opportunity.** The undersigned certifies that, as of the Record Date, the undersigned (a) was an Eligible Holder of Prepetition First Lien Obligations and/or Prepetition Second Lien Notes in the following principal amounts (insert principal amount in the boxes below) and (b) wishes to make the following commitment (i.e., the "Desired Participation Amount", as listed below in Item 2b, and as computed as set forth below) to participate in the Facility with regard to the Opportunity:

| Name / Address | Total Principal Amount of Prepetition First Lien Obligations as of the Record Date[2] (P1) | Prepetition Second Lien Notes CUSIP (345525 AE9, 345525 AF6 or U34550 AE0) ** please only include one CUSIP in each box below** | Total Principal Amount of Prepetition Second Lien Notes as of the Record Date (P2) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

---

[2] For purposes of determining beneficial ownership on the Record Date for participation in the Opportunity, such ownership shall be determined on the basis of both settled and unsettled trades, provided that, with respect to any unsettled trade of loans, the assignee shall provide evidence (such as a trade confirmation) reasonably satisfactory to counsel to the Company and the Required Backstop Parties, which evidence reasonably establishes ownership of such loans (subject to recordation of assignment by the agent under the Prepetition First Lien Credit Agreement).

**Item 2a. Calculation of the Maximum Participation Amount**.  You are entitled to participate up to your full pro rata portion of the Syndicated DIP Term Loans, or some smaller portion thereof.  In order for you to understand the maximum for which you are entitled to participate, your maximum pro rata share of the Syndicated DIP Term Loans is calculated as follows:

Each Eligible Holder may participate up to the following amount (round to nearest Dollar, which is the principal amount of Syndicated DIP Term Loans an Eligible Holder will receive (which includes the upfront fee and commitment fee payable in original issue discount; provided however, if such amount is less than the Minimum Amount, you may not participate in the Opportunity)

**With respect to your Prepetition First Lien Obligations**:

$$\text{(Line 1)} \qquad (S * (P1 / N)) = \$\underline{\hspace{2cm}}$$

*where*

S = $14,467,012.26 (the aggregate principal amount of Syndicated DIP Term Loans ($45,000,000), multiplied by Prepetition First Lien Allocation (32.1489%)

P1 = your Total Principal Amount of Prepetition First Lien Obligations set forth in Item 2(a) above

N = the aggregate outstanding amount of all Prepetition First Lien Obligations ($918,930,135.46)

**With respect to your Prepetition Second Lien Notes**:

$$\text{(Line 2)} \qquad (S * (P2 / N)) = \$\underline{\hspace{2cm}}$$

*where*

S = $632,967.65 (the aggregate amount of Syndicated DIP Term Loans ($45,000,000), multiplied by Prepetition Second Lien Allocation (1.4066%))

P2 = your Total Principal Amount of Prepetition Second Lien Notes set forth in Item 2(a) above

N = the aggregate outstanding principal amount of all Second Lien Notes ($425,000,000)

**Max Participation Amount**

Line 1 + Line 2

$\underline{\hspace{5cm}}$

**Item 2b. Calculation of the Subscription Amount and Subscription Funding Amount**.  Please specify your commitment to participate and the Subscription Funding Amount, as applicable in the spaces below:

Each Eligible Holder is entitled to commit to participate for up to its pro rata portion of the Syndicated DIP Term Loans.  Your commitment to participate, taken together with the commitment of other Eligible Holders under common control through common investment management and/or advisement with you, cannot be less than the Minimum Amount.  Your commitment to participate cannot exceed the individual limit included in Line 1 above with respect to your Prepetition First Lien Obligations (if any), *plus* Line 2 above with respect to your Prepetition Second Lien Notes (if any).  Please enter on the following Line 3 the principal amount of your commitment to participate in the Syndicated DIP Term Loan (which includes the upfront fee and commitment fee) (the "***Subscription Amount***"):

**Subscription Amount (including the upfront fee and commitment fee)**:

(Line 3)            $_____

To calculate your Subscription Funding Amount, take the Subscription Amount from Line 3 ("C") and subtract the upfront fee (3%) using the following formula and enter it on Line 4 below (round to nearest Dollar).

**Subscription Funding Amount**:

$$C – (0.03 * C)$$

(Line 4)            $_____

**With respect to your Roll-Up Loans**

Subject to the terms and conditions set forth in the DIP Credit Agreement and the Orders, each Eligible Holder who are Prepetition First Lien Lenders as of the Record Date shall be entitled to "roll up" any Prepetition First Lien Obligations held by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) equal to 0.808625 times the sum of (i) the aggregate principal amount of Initial Term Loans funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Closing Date on account of its Prepetition First Lien Obligations, if any, and (ii) the aggregate principal amount of Delayed Draw Term Loan funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Delayed Draw Funding Date, if any, on account of its Prepetition First Lien Obligations; provided that the aggregate principal amount of the Roll-Up Loans cannot exceed $75,000,000.

**To illustrate:**

In the case of an Eligible Holder owning $50,000,000 in aggregate principal amount of the Prepetition First Lien Loans and $25,000,000 of Prepetition Second Lien Notes, such Eligible Holder would be entitled to participate as a DIP Lender in the DIP Facility in the maximum principal amount (Item 2a) of:

1. On account of such Eligible Holder's Prepetition First Lien Loans:

   a. $14,467,012.26 * ($50,000,000 / $918,930,135.46), or the maximum principal of $787,166.06 of Delayed Draw Term Loans.

   b. Subject to approval by the Bankruptcy Court, $787,166.06 * 0.808625, or the principal of $636,522.15 of the Prepetition First Lien Obligations will be substituted and exchanged for (and prepaid by) and deemed to be the Roll-Up Loans issued and outstanding under the DIP Facility.

2. On account of such Eligible Holder's Prepetition Second Lien Notes:

   a. $632,967.65 * ($25,000,000 / $425,000,000), or the maximum principal of $372,333.91 of Delayed Draw Term Loans.

3. Maximum Participation Amount = $787,166.06 + $372,333.91 = $1,159,499.97

If the Subscription Amount specified in Line 3 above is less than $350,000 and you are under common control through common investment management and/or advisement with other Eligible Holders that have submitted Subscription Forms, list such other Eligible Holders:

_____

_____

_____

The undersigned certifies that it is under common control through common investment management and/or advisement with the Eligible Holders listed above.

**Item 3.  Certification**.  By signing this Subscription Form, the undersigned certifies that it understands that the right to participate in the Opportunity is subject to all the terms and conditions set forth in the Notice and Instruction Form, and agrees that the commitment to participate in the DIP Facility in an amount equal to the Subscription Amount specified in Line 3 of Item 2(b) above, constitutes an irrevocable offer by the undersigned to fund the Syndicated DIP Term Loans equal to the amount specified as the Subscription Funding Amount in Line 4 of Item 2(b) above.

Name of Eligible Holder:

_____
(Print or Type)

Federal Tax I.D.  No.:_____
(If Applicable)

Signature:_____

Print Name:_____

Title:_____

Facsimile Number:_____

E-mail Address:_____

Street Address:_____

City, State, Zip Code:_____

Telephone: (__)_____

Date Completed:_____

**THE SUBSCRIPTION DOCUMENTS MUST BE RECEIVED BY THE INFORMATION AGENT AT ITS EMAIL ADDRESS AT FORESIGHTDIP@PRIMECLERK.COM MUST BE RECEIVED BY THE INFORMATION AGENT BEFORE 5:00 P.M., NEW YORK CITY TIME, ON APRIL 1, 2020, OR THE INSTRUCTIONS TRANSMITTED HEREBY WILL NOT BE COUNTED.**

**FORESIGHT DIP Syndication Processing**
**c/o Prime Clerk LLC**
**One Grand Central Place**
**60 East 42nd Street**
**Suite 1440**
**New York, NY 10165**
**Telephone: 877-720-6580 (domestic) or 646-998-7132 (international)**

## INSTRUCTIONS FOR COMPLETING THE SUBSCRIPTION FORM

**EXPIRATION TIME/INFORMATION AGENT:**

The Subscription Deadline for the receipt of instructions is 5:00 p.m., New York City Time, on April 3, 2020, unless extended or earlier terminated. To elect to participate in the Opportunity, you must complete, sign, and return this Subscription Form and the other Subscription Documents to your nominee with sufficient time to allow your nominee to complete the Nominee Certification on your behalf so that it is received by the Information Agent at its email address at email address at foresightDIP@primeclerk.com, or at the following address, for receipt by the Information Agent no later than the Subscription Deadline:

FORESIGHT DIP Syndication Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165
Telephone: 877-720-6580 (domestic) or 646-998-7132 (international)

To effect a subscription, you must take the following steps:

a. Review the representations in Item 1 of the Subscription Form;

b. In Item 2 of the Subscription Form, specify the amount of Prepetition First Lien Obligations and Prepetition Second Lien Notes you held as of the Record Date;

c. In Item 2(b) of the Subscription Form, (i) specify the Subscription Amount, the Subscription Funding Amount and the total amount to be wired and (ii) if the amount of the DIP Term Facility commitment specified in Line 1 of Item 2(b) is less than $350,000 and you are under common control through common investment management and/or advisement with other Eligible Holders that have submitted Subscription Forms, specify such other Eligible Holders;

d. Review the certification in Item 3 of the Subscription Form;

e. In Item 3, sign and date the Subscription Form, and provide the remaining information requested;

f. Complete, execute and deliver to the Information Agent before the Subscription Deadline (i) the DIP Joinder attached as Annex II to the Notice and Instruction Form, (ii) the Administrative Questionnaire attached as Annex III to the Notice and Instruction Form, (iii) relevant tax forms as described in Annex V to the Notice and Instruction Form, (iv) the Designation Notice attached as Annex VI to the Notice and Instruction Form to the extent you wish to designate a Related Lender to participate as a DIP Lender for some or all of the Subscription Amount, (v) the RSA Joinder attached as Annex VII to the Notice and Instruction Form, and
(vi) such other documents as the DIP Agent reasonably requires;

g. Complete, execute (as necessary) and deliver to the Information Agent before the Subscription Deadline each of the documents specified in Annex IV to the Notice and Instruction Form as the KYC Information;

h. If you are a Prepetition Second Lien Noteholder, coordinate with the nominee holding your Prepetition Second Lien Notes to arrange for delivery of the completed Subscription Documents to its offices and instruct your nominee to complete the Nominee Certification attached as Annex I-B to the Notice and Instruction Form and deliver the completed, executed Subscription Documents so as to be received by the Information Agent before the Subscription Deadline;

i. Cause the Subscription Funding Amount as set forth in Item 2b to be funded to the Escrow Account on or before the Funding Deadline.

S-6

PLEASE NOTE:

> **IF YOU HAVE ANY QUESTIONS REGARDING THIS SUBSCRIPTION FORM, ANY OTHER SUBSCRIPTION DOCUMENTS OR THE PROCEDURES RELATED HERETO, PLEASE CALL THE INFORMATION AGENT AT 877-720-6580 (DOMESTIC) or 646-998-7132 (INTERNATIONAL).**

**Your participation in the Opportunity is subject to you providing the administrative questionnaire, all know-your-customer information, tax forms and other documents required by the DIP Agent and the DIP Agent's satisfactory review of such information and documents (as determined in the sole discretion of the DIP Agent).**

**Foresight Energy LLC and certain of its affiliates have filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and are operating their businesses and managing their property as debtors-in-possession pursuant to the Bankruptcy Code.**

**Nothing herein, nor in any of the accompanying forms and letters, shall constitute or be deemed to constitute a solicitation by any party of votes to approve or reject a chapter 11 plan for any debtor.  A solicitation with respect to votes to approve or reject a chapter 11 plan only may be commenced once a disclosure statement that complies with section 1125 of the Bankruptcy Code has been approved by the Bankruptcy Court.**

## NOMINEE'S CERTIFICATION OF RECORD DATE HOLDINGS

<u>Your ownership of Prepetition Second Lien Notes must be confirmed to participate in the Opportunity</u>

The nominee holding your Prepetition Second Lien Notes as of the Record Date, must complete Box A on your behalf.  Box B is only required if any of your Prepetition Second Lien Notes were on loan as of the Record Date (as determined by your nominee).  Please attach a separate Nominee Certification if your Prepetition Second Lien Notes are held through more than one nominee.  Please also attach an authorized signatory list confirming that the beneficial holder listed below owned the position(s) listed in Box A and/or Box B as of the Record Date.

| **Box A**<br>**For Use Only by the Nominee** | **Box B**<br>**Nominee Proxy - <u>Only if Needed</u>** |
|---|---|
| DTC Participant Name:  _____ | DTC Participant Name:  _____ |
| DTC Participant Number:  _____ | DTC Participant Number:  _____ |
| Principal Amount of Prepetition Second Lien Notes (CUSIP Nos. 345525 AE9, 345525 AF6 or U34550 AE0) held by this account as of the Record Date: | Principal Amount of Prepetition Second Lien Notes (CUSIP Nos. 345525 AE9, 345525 AF6 or U34550 AE0) held on behalf of, and hereby assigned to, the Nominee listed in Box A as of the Record Date: |
| $_____ principal amount in CUSIP 345525 AE9 | $_____ principal amount in CUSIP 345525 AE9 |
| $_____ principal amount in CUSIP 345525 AF6 | $_____ principal amount in CUSIP 345525 AF6 |
| $_____ principal amount in CUSIP U34550 AE0 | $_____ principal amount in CUSIP U34550 AE0 |
| Nominee authorized signatory:_____ | Nominee authorized signatory:_____ |
| Nominee contact name:_____ | Nominee contact name:_____ |
| Nominee contact email:_____ | Nominee contact email:_____ |
| Contact telephone number: _____ _____ | Contact telephone number:  _____ |
| Beneficial holder name:_____ | Beneficial holder name:_____ |

**Annex II to**
**Notice and Instruction Form**

**MASTER JOINDER TO DIP CREDIT AGREEMENT**

[See attached]

EXECUTION VERSION

## MASTER JOINDER TO DIP CREDIT AGREEMENT

JOINDER TO DIP CREDIT AGREEMENT, dated as of [  ], 2020 (this "<u>Agreement</u>"), by and among the undersigned lenders (collectively, the "<u>Additional Lenders</u>" and each, an "<u>Additional Lender</u>"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "<u>General Partner</u>"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("<u>Holdings</u>"), FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "<u>Borrower</u>"), and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "<u>Administrative Agent</u>") and collateral agent (in such capacity, the "<u>Collateral Agent</u>") under the Credit Agreement (as defined below).

## RECITALS:

WHEREAS, reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among the General Partner, Holdings, the Borrower, certain subsidiaries of the Borrower, the lenders from time to time party thereto and the Administrative Agent and Collateral Agent (capitalized terms used but not defined herein having the meaning provided in the Credit Agreement);

WHEREAS, pursuant to the syndication of Loans in accordance with the Restructuring Support Agreement and Section 10.06 of the Credit Agreement, the parties hereto desire that the Additional Lenders be joined as a party to the Credit Agreement;

NOW, THEREFORE, in consideration of the premises and agreements, provisions and covenants herein contained, the parties hereto agree as follows:

On and as of the date of this Agreement, each Additional Lender hereby agrees to join the Credit Agreement as a Lender and to provide Delayed Draw Term Loan Commitments pursuant to the terms of the DIP Credit Agreement, and to the extent applicable under the terms thereof, be deemed to have issued the Roll-Up Loans allocated to such Additional Lender in accordance with Section 2.01(b). Each Additional Lender, the Loan Parties and the Administrative Agent acknowledge and agree that the Delayed Draw Term Loan Commitments and, when issued or deemed issued, the Delayed Draw Term Loans and, if applicable, the Roll-Up Loans of such Additional Lender shall <u>(i)</u> constitute Delayed Draw Term Loan Commitments, and when issued or deemed issued, the Delayed Draw Term Loans and, if applicable, Roll-Up Loans, for all purposes of the Credit Agreement and the other Loan Documents and <u>(ii)</u> be bound by and subject to all of the terms and conditions in the Credit Agreement and the other Loan Documents, including the entry by the Bankruptcy Court of the Final Order in form and substance satisfactory to the Required Lenders. Each Additional Lender shall be entitled to all the benefits afforded by the Credit Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Guaranty and security interests created by the Security Documents.

Each Additional Lender <u>(i)</u> confirms that it has received a copy of the Credit Agreement and the other Loan Documents, together with such other documents and information as it has

deemed appropriate to make its own credit analysis and decision to enter into this Agreement; (ii) agrees that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent, any Backstop Lender, or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) appoints and authorizes the Administrative Agent and Collateral Agent to take such action as administrative agent and collateral agent on its behalf and to exercise such powers and discretion under the Credit Agreement and the other Loan Documents as are delegated to the Administrative Agent and Collateral Agent by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; and (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

Upon the execution of a counterpart of this Agreement by each Additional Lender, the Administrative Agent, the Collateral Agent, and the Loan Parties (including by way of telecopy or other electronic transmission), such Additional Lender shall become a Lender under the Credit Agreement and the other Loan Documents as of the date of this Agreement.

Each Additional Lender represents and warrants to the Administrative Agent, the Collateral Agent, the other Lenders and the Loan Parties that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement and the other Loan Documents; and (ii) it has delivered herewith to the Administrative Agent (x) an Administrative Questionnaire completed by such Additional Lender, and (y) such documentation and other information under applicable "know your customer" and anti-money laundering rules and regulations that has been requested by the Administrative Agent and such documentation and other information required under Section 4.01(l) of the Credit Agreement.

This Agreement may not be amended, modified or waived except by an instrument or instruments in writing signed and delivered on behalf of each of the parties hereto.

This Agreement, the Credit Agreement and the other Loan Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and verbal, among the parties or any of them with respect to the subject matter hereof.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.**

Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of

this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as would be enforceable.

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

[signature pages follow]

IN WITNESS WHEREOF, each of the undersigned has caused its duly authorized officer to execute and deliver this Agreement as of the date first written above.

[•]

By: _____
      Name:
      Title:

If a second signature is necessary:

By: _____
      Name:
      Title:

FORESIGHT ENERGY LLC


By:     _____
        Name: Robert D. Moore
        Title: President and Chief Executive Officer



FORESIGHT ENERGY LP
By


Foresight Energy GP LLC, its general partner


By:     _____
        Name: Robert D. Moore
        Title: President and Chief Executive Officer


[Signature Page to Joinder to DIP Credit Agreement]

FORESIGHT ENERGY GP, LLC
ADENA RESOURCES, LLC
AKIN ENERGY LLC
AMERICAN CENTURY MINERAL LLC
AMERICAN CENTURY TRANSPORT LLC
COAL FIELD CONSTRUCTION COMPANY LLC
COAL FIELD REPAIR SERVICES LLC
FORESIGHT COAL SALES LLC
FORESIGHT ENERGY EMPLOYEE SERVICES
CORPORATION
FORESIGHT ENERGY FINANCE CORPORATION
FORESIGHT ENERGY LABOR LLC
FORESIGHT ENERGY SERVICES LLC
HILLSBORO TRANSPORT LLC
LD LABOR COMPANY LLC
LOGAN MINING LLC
M-CLASS MINING, LLC
MACH MINING, LLC
MACOUPIN ENERGY LLC
MARYAN MINING LLC
OENEUS LLC (D/B/A SAVATRAN LLC)
SENECA REBUILD LLC
SITRAN LLC
SUGAR CAMP ENERGY, LLC
TANNER ENERGY LLC
VIKING MINING LLC
WILLIAMSON ENERGY, LLC
HILLSBORO ENERGY LLC
PATTON MINING LLC
FORESIGHT RECEIVABLES LLC

By: _____
    Name: Robert D. Moore
    Title: President and Chief Executive Officer

[Signature Page to Joinder to DIP Credit Agreement]

Accepted:

CORTLAND CAPITAL MARKET SERVICES LLC
as Administrative Agent and Collateral Agent,


By:   _____
         Name:
         Title:

[Signature Page to Joinder to DIP Credit Agreement]

**Annex III to
Notice and Instruction Form**

### ADMINISTRATIVE QUESTIONNAIRE

[See attached]

# [Fund Name]

[Fund Address]
Tax Payer ID:

# Administrative Details

## Payment Instructions

**USD:**

Bank Name:
ABA:
Account Name:
Account Number:
Attn:

## Signature Block

[Fund Name:]

By: _____

## Contacts

**Operations (Agent Notices):**

[Fund Name]
Address:

Attn:
Phone:
Fax:
E-mail:

**Credit/Legal (Public/Private):**

[Fund Name]
Address:

Attn:
Phone:
Fax:
E-mail:

### DESCRIPTION OF REQUIRED KYC INFORMATION

The DIP Agent will be afforded sufficient time before closing of the syndication and in advance of any monies being funded to the Escrow Account to complete customary know-your-customer and tax withholding analyses, confirmation of wiring instructions, and other related administrative matters, including:

1. Administrative Questionnaire attached as Annex III (Operations/Credit Contact & Wire Instructions)

2. Formation Documents

   a. **Limited Liability Company**: Recorded Articles of Organization
   b. **Limited Partnership**: Certificate of Limited Partnership
   c. **Corporation**: Recorded Articles of Incorporation
   d. **Trust**: Trust Agreement and Trustee Certificate

3. Tax Forms described in Annex V

**Annex V to**
**Notice and Instruction Form**

### DESCRIPTION OF REQUIRED TAX FORMS

Tax Form W-9 or W-8

**Annex VI to**
**Notice and Instruction Form**

**DESIGNATION FORM**

[See attached]

EXECUTION VERSION

## DESIGNATION NOTICE

Date:      __, 2020

To:        Prime Clerk LLC, as Information Agent

           Cortland Capital Market Services LLC as Administrative Agent

cc:        FORESIGHT ENERGY LLC

**Re:      Designation by [ELIGIBLE HOLDER] (the "Eligible Holder") of [RELATED LENDER] (the "Designee")**

Reference is made to the Notice and Instruction Form, dated March 23, 2020 (the "**Notice and Instruction Form**"), sent to Eligible Holders by Foresight Energy LLC, a Delaware limited liability company (the "**Company**").  Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Notice and Instruction Form.

This constitutes notice that the Eligible Holder is designating the Designee as a Related Lender entitled to participate as a DIP Lender in the DIP Facility, and therefore the Syndicated DIP Term Loans (up to the Designated Participation Amount, as defined below) shall be registered in the name of the Designee, subject to the Designee completing and executing the Subscription Documents (other than the Subscription Form, which shall be completed by the Eligible Holder) and this Designation Notice, delivering such documents to the Information Agent prior to the Subscription Document Deadline, and funding the Subscription Funding Amount to the Escrow Account prior to the Funding Deadline.  The designation to the Designee as provided hereunder is subject in all respects to the Designee providing the administrative questionnaire, all know-your-customer information, tax forms, and other documents required by the DIP Agent (including the documents described in Annex IV of the Notice and Instruction Form) and the DIP Agent's satisfactory review of such information and documents.

The Eligible Holder represents and warrants that its Desired Participation Amount is $[●].  Eligible Holder hereby designates $[●] of its Desired Participation Amount (the "**Designated Participation Amount**") to Designee (with the remaining allocated to Eligible Holder to the extent applicable). If the Eligible Holder is entitled to receive Roll-Up Loans on account of its Desired Participation Amount, the Eligible Holder designates $[●] of such Roll-Up Loans (the "**Designated Roll-Up Amount**") to Designee (with the remaining allocated to Eligible Holder to the extent applicable). The Eligible Holder and the Designee acknowledge and agree that the Designee shall participate as a DIP Lender in the DIP Facility in the Designated Participation Amount and the Designated Roll-Up Amount.

Furthermore, the Designee hereby confirms that, as of the date hereof, each of the representations set forth in the Notice and Instruction Form (including those set forth in the Subscription Form) are accurate as applied to the Designee in the place of the Eligible Holder.  Designee hereby agrees to be bound by the terms of the Notice and Instruction Form (including those set forth in the Subscription Form) as though Designee were an Eligible Holder, including, without limitation, the obligations to (i) deliver completed and executed Subscription Documents (other than the Subscription Form) and this Designation Notice to the Information Agent prior to Subscription Document Deadline and (ii) fund the Subscription Funding Amount to the Escrow Account prior to the Funding Deadline.

Designee further confirms that it is (i) either (A) "qualified institutional buyers," as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**"), or (B) institutional "accredited investors" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act ("**IAIs**") or an entity in which all of the equity investors are IAIs, and (ii) an "Eligible Assignee" as defined in the DIP Credit Agreement.

[Signature page follows]

Sincerely,

**[ELIGIBLE HOLDER]**


By:_____
     Name:
     Title:



**[DESIGNEE]**



By:_____
     Name:
     Title:


Federal Tax I.D.  No.:_____
                    (If Applicable)

Facsimile Number:_____

E-mail Address:_____

Street Address:_____

City, State, Zip Code:_____

Telephone: (___)_____

Date Completed:_____

**Annex VII to**
**Notice and Instruction Form**

## JOINDER TO RSA

[See attached]

**Form of Joinder**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of March 10, 2020 (the "**Agreement**"),[1] by and among Foresight Energy LP and its affiliates bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" and, as applicable, a "Consenting First Lien Lender" and/or "Consenting Second Lien Noteholder" under the terms of the Agreement.

1.      The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

2.      <u>DIP Commitment Election</u>.  The Joinder Party hereby represents and warrants that it holds Company Claims/Interests in the amount set forth below, and hereby commits to provide a share of the DIP Facility up to the Joinder Party's *pro rata* percentage of 46.375% of the DIP Facility (with respect to all Consenting First Lien Lenders) and/or 3.625% (with respect to all Consenting Second Lien Lenders), and otherwise on the terms and conditions agreed to in the Agreement and/or the DIP Credit Agreement, as applicable.

3.      <u>Representations and Warranties</u>.  The Joinder Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joinder Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the Company Claims/Interests identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in <u>Section 10</u> and <u>Section 11</u> of the Agreement to each other Party.

4.      <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

5.      <u>Notice</u>.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joinder Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

---

[1] Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

Date Executed:

**[JOINDER PARTY]**

By: _____

    Name: _____

    Title: _____

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Facility Claims (Principal Amount) | |
| Second Lien Notes Claims (Principal Amount) | |
| Subordinated LP Units | |
| Common LP Units | |
| IDRs | |

[*Joinder to the FELP Restructuring Support Agreement*]

**Exhibit A to
Notice and Instruction Form**

**DIP CREDIT AGREEMENT**

[See attached]

*Execution Version*

---

### SENIOR SECURED SUPERPRIORITY

### DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

among

### FORESIGHT ENERGY LLC,

as Borrower,

### FORESIGHT ENERGY LP AND CERTAIN SUBSIDIARIES OF FORESIGHT ENERGY LLC,

as Guarantors,

### CORTLAND CAPITAL MARKET SERVICES LLC,

as Administrative Agent and Collateral Agent,

and

The Other Lenders Party Hereto

Dated as of March 11, 2020

---

# TABLE OF CONTENTS

| Section | Page |
|---|---|

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ........................................................ 1
    1.01    Defined Terms ............................................................................................. 1
    1.02    Other Interpretive Provisions .................................................................. 29
    1.03    Accounting Terms. .................................................................................. 30
    1.04    Times of Day ........................................................................................... 30
    1.05    LLC Division ........................................................................................... 30

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ................................... 30
    2.01    The Loans. ............................................................................................... 30
    2.02    Borrowings, Conversions and Continuations of the Loans. .................. 31
    2.03    [Reserved]. ............................................................................................... 32
    2.04    [Reserved]. ............................................................................................... 32
    2.05    Prepayments. ............................................................................................ 32
    2.06    [Reserved]. ............................................................................................... 34
    2.07    Repayment of Loans .............................................................................. 34
    2.08    Interest. .................................................................................................... 34
    2.09    Fees ......................................................................................................... 34
    2.10    Computation of Interest and Fees. ......................................................... 35
    2.11    Evidence of Debt. ................................................................................... 36
    2.12    Payments Generally; Administrative Agent's Clawback. ...................... 36
    2.13    Pro Rata; Sharing of Payments by Lenders ........................................... 37
    2.14    [Reserved]. ............................................................................................... 38
    2.15    [Reserved]. ............................................................................................... 38
    2.16    [Reserved]. ............................................................................................... 38
    2.17    [Reserved]. ............................................................................................... 38
    2.18    Defaulting Lenders ................................................................................. 38
    2.19    Priority and Liens; No Discharge. ......................................................... 39

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY .................................. 40
    3.01    Taxes. ...................................................................................................... 41
    3.02    Illegality ................................................................................................. 43
    3.03    Inability to Determine Rates ................................................................... 43
    3.04    Increased Costs; Reserves on Eurocurrency Rate Loans. ...................... 44
    3.05    Compensation for Losses ....................................................................... 46
    3.06    Mitigation Obligations; Replacement of Lenders. ................................ 46
    3.07    Survival. .................................................................................................. 46

ARTICLE IV CONDITIONS PRECEDENT ....................................................................... 47
    4.01    Conditions Precedent to the Closing Date .............................................. 47
    4.02    Conditions Precedent to Each Term Loan. ............................................. 49

ARTICLE V REPRESENTATIONS AND WARRANTIES ................................................ 49
    5.01    Existence, Qualification and Power ....................................................... 50
    5.02    Authorization; No Contravention. .......................................................... 50
    5.03    Governmental Authorization. ................................................................. 50
    5.04    Binding Effect. ........................................................................................ 50
    5.05    Financial Conditions; No Material Adverse Effect. .............................. 50
    5.06    Litigation. ................................................................................................ 51
    5.07    No Default. .............................................................................................. 51
    5.08    Ownership and Identification of Property. ............................................. 51
    5.09    Environmental Compliance. ................................................................... 52
    5.10    Insurance. ................................................................................................ 52
    5.11    Taxes. ...................................................................................................... 52
    5.12    ERISA Compliance ................................................................................ 53
    5.13    Subsidiaries ............................................................................................. 53

5.14     Margin Regulations; Investment Company Act. ................................................53
5.15     Disclosure ........................................................................................................53
5.16     Compliance with Laws......................................................................................53
5.17     Anti-Corruption; Sanctions; Terrorism Laws...................................................53
5.18     Intellectual Property; Licenses, Etc..................................................................54
5.19     Security Interest in Collateral. ..........................................................................54
5.20     Mines ................................................................................................................54
5.21     [Reserved]. ........................................................................................................54
5.22     Labor Relations ................................................................................................54
5.23     Bankruptcy Related Matters. ............................................................................55
ARTICLE VI AFFIRMATIVE COVENANTS ............................................................55
6.01     Financial Statements .........................................................................................55
6.02     Certificates; Other Information .........................................................................56
6.03     Notices ..............................................................................................................57
6.04     Payment of Tax Obligations. ............................................................................58
6.05     Preservation of Existence, Etc..........................................................................58
6.06     Maintenance of Properties. ...............................................................................58
6.07     Maintenance of Insurance. ................................................................................58
6.08     Compliance with Laws......................................................................................58
6.09     Books and Records. ...........................................................................................59
6.10     Inspection Rights ..............................................................................................59
6.11     Use of Proceeds.................................................................................................59
6.12     Additional Guarantors.......................................................................................59
6.13     [Reserved]. ........................................................................................................59
6.14     Preparation of Environmental Reports ..............................................................59
6.15     Certain Long Term Liabilities and Environmental Reserves ..............................59
6.16     Covenant to Give Security. ...............................................................................60
6.17     [Reserved] .........................................................................................................61
6.18     Post Closing Covenants ....................................................................................61
6.19     ERISA ...............................................................................................................61
6.20     Lender Calls ......................................................................................................61
6.21     First and Second Day Orders ............................................................................61
6.22     Milestones .........................................................................................................62
6.23     Bankruptcy Notices ..........................................................................................62
6.24     Bankruptcy Related Matters .............................................................................62
6.25     Chief Executive Officer ....................................................................................63
ARTICLE VII NEGATIVE COVENANTS ................................................................63
7.01     Liens. ................................................................................................................63
7.02     Investments .......................................................................................................66
7.03     Indebtedness......................................................................................................67
7.04     Fundamental Changes. ......................................................................................69
7.05     Dispositions. ......................................................................................................70
7.06     Restricted Payments ..........................................................................................71
7.07     Change in Nature of Business ...........................................................................71
7.08     Transactions with Affiliates ..............................................................................72
7.09     Permitted Activities of General Partner and Holdings .......................................72
7.10     Use of Proceeds.................................................................................................72
7.11     [Reserved]. ........................................................................................................72
7.12     Burdensome Agreements ...................................................................................73
7.13     [Reserved]. ........................................................................................................74
7.14     Maximum Capital Expenditure .........................................................................74
7.15     Fiscal Year ........................................................................................................74
7.16     Sale and Lease-Backs. .......................................................................................74
7.17     Amendments or Waivers of Organizational Documents ....................................74
7.18     Budget Variance................................................................................................74

7.19       Minimum Liquidity................................................................................................75
7.20       [Reserved ..............................................................................................................75
7.21       Additional Bankruptcy Matters.............................................................................75

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES.................................................76
8.01       Events of Default ...................................................................................................76
8.02       Remedies Upon Event of Default ..........................................................................79
8.03       [Reserved]...............................................................................................................80
8.04       Application of Funds...............................................................................................80

ARTICLE IX AGENTS ...........................................................................................................80
9.01       Appointment and Authority ...................................................................................81
9.02       Rights as a Lender ..................................................................................................81
9.03       Exculpatory Provisions ..........................................................................................81
9.04       Reliance by Agents .................................................................................................82
9.05       Delegation of Duties ...............................................................................................83
9.06       Resignation of Agent ..............................................................................................83
9.07       Non-Reliance on Agents and Other Lenders..........................................................84
9.08       No Other Duties, Etc ..............................................................................................84
9.09       [Reserved]...............................................................................................................84
9.10       Guaranty and Collateral Matters............................................................................84
9.11       Withholding Tax .....................................................................................................85
9.12       Concerning the Collateral and Related Loan Documents ......................................85
9.13       Survival ...................................................................................................................85

ARTICLE X MISCELLANEOUS ............................................................................................85
10.01      Amendments, Etc ....................................................................................................85
10.02      Notices; Effectiveness; Electronic Communication...............................................87
10.03      No Waiver; Cumulative Remedies..........................................................................88
10.04      Expenses; Indemnity; Damage Waiver...................................................................89
10.05      Marshalling; Payments Set Aside ..........................................................................90
10.06      Successors and Assigns...........................................................................................91
10.07      Treatment of Certain Information; Confidentiality ................................................94
10.08      Right of Setoff.........................................................................................................95
10.09      Usury Savings Clause .............................................................................................95
10.10      Counterparts; Integration .......................................................................................95
10.11      Survival of Representations, Warranties and Agreements .....................................95
10.12      Severability .............................................................................................................96
10.13      Replacement of Lenders..........................................................................................96
10.14      Governing Law; Jurisdiction; Etc. .........................................................................97
10.15      Waiver of Jury Trial ...............................................................................................97
10.16      USA PATRIOT Act Notice ....................................................................................98
10.17      Time of the Essence ................................................................................................98
10.18      [Reserved]...............................................................................................................98
10.19      No Advisory or Fiduciary Responsibility ..............................................................98
10.20      [Reserved]...............................................................................................................98
10.21      Release of Liens and Release from Guaranty. ........................................................98
10.22      Independence of Covenants ....................................................................................99
10.23      Independent Nature of Lenders' Rights ..................................................................99
10.24      Acknowledgment and Consent to Bail-In of EEA Financial Institutions..............100

ARTICLE XI GUARANTY........................................................................................................100
11.01      Guaranty of the Obligations ...................................................................................100
11.02      [Reserved]...............................................................................................................100
11.03      Payment by Guarantors ..........................................................................................100
11.04      Liability of Guarantors Absolute ...........................................................................100
11.05      Waivers by Guarantors............................................................................................102
11.06      Guarantors' Rights of Subrogation, Contribution, Etc...........................................102

| 11.07 | Subordination of Other Obligations | 103 |
| 11.08 | Continuing Guaranty | 103 |
| 11.09 | Authority of Guarantors or Borrower | 103 |
| 11.10 | Financial Condition of Borrower | 103 |

**SCHEDULES**

| | |
|---|---|
| 1.01(a) | Guarantors |
| 2.01 | Commitments, Roll-Up Loans, Applicable Percentages |
| 2.02 | Backstop Commitments |
| 5.08(b) | Fee Owned Material Real Property |
| 5.08(c) | Leased Material Real Property |
| 5.09 | Environmental Matters |
| 5.13 | Subsidiaries |
| 5.18 | Intellectual Property |
| 5.20 | Mines |
| 6.18 | Post Closing Covenants |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.05 | Specified Dispositions |
| 7.08 | Transactions with Affiliates |
| 7.12 | Burdensome Agreements |
| 10.02 | Administrative Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

**Form of:**

| | |
|---|---|
| A | Borrowing Notice |
| B | Collateral Questionnaire |
| C-1 | Term Loan Note |
| C-2 | Roll-Up Loan Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |
| F | [Reserved] |
| G | [Reserved] |
| H | Critical Vendor Report |
| I | Monthly Mine-Level Financial Report |
| J | Monthly Consolidated Financial Report |
| K | Interim Order |
| L | [Reserved] |
| M-1 | U.S. Tax Compliance Certificate |
| M-2 | U.S. Tax Compliance Certificate |
| M-3 | U.S. Tax Compliance Certificate |
| M-4 | U.S. Tax Compliance Certificate |

## SENIOR SECURED SUPERPRIORITY
## DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT (as amended, supplemented or otherwise modified, the "Agreement") is entered into as of March 11, 2020, among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

<u>PRELIMINARY STATEMENTS</u>

WHEREAS, on March 10, 2020 (the "Petition Date"), the General Partner, Holdings, the Borrower and certain Subsidiaries of Borrower (collectively, the "Debtors" and each individually, a "Debtor") have commenced cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (as defined below) and the Debtors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operations of their businesses as debtors-in-possession;

WHEREAS, the Debtors have asked the Lenders to make post-petition term loans and provide other financial or credit accommodations to the Borrower, and the Lenders have agreed, subject to the conditions set forth herein, to extend a senior secured multi-draw credit facility to the Borrower with all of the obligations with respect to the foregoing to be guaranteed by each Guarantor; and

WHEREAS, the Lenders have severally, and not jointly, agreed to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01 Defined Terms**. As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Plan" means a Reorganization Plan of the Debtors that is consistent with the Restructuring Support Agreement or otherwise satisfactory to the Required Lenders (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders).

"Accounting Change" means changes in accounting principles after the Closing Date required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board or, if applicable, the SEC.

"Acceptable Disclosure Statement" means the Disclosure Statement relating to the Acceptable Plan in form and substance satisfactory to the Required Lenders (as the same may be amended, supplemented, or modified from time to time after the initial filing thereof with the consent of the Required Lenders).

"Administrative Agent" means Cortland Capital Market Services LLC, in its capacity as the administrative agent, together with its successors and assigns.

1

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 10.02</u>, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Affiliated Lender</u>" means any Lender that is an Affiliate of any Loan Party.

"<u>Agency Fee Letter</u>" means a fee agreement separately agreed to by the Borrower and the Agents.

"<u>Agent Parties</u>" has the meaning specified in <u>Section 10.02(c)</u>.

"<u>Agents</u>" means the Administrative Agent and the Collateral Agent.

"<u>Aggregate Commitments</u>" means the Commitments of all of the Lenders.

"<u>Agreement</u>" has the meaning specified in the introductory paragraph to this Agreement.

"<u>Anti-Corruption Laws</u>" has the meaning specified in <u>Section 5.17(c)</u>.

"<u>Applicable Percentage</u>" means (i) (a) in respect of the Initial Term Loan Facility, with respect to any Term Lender at any time, the percentage (carried out to the tenth decimal place) of the aggregate principal amount of the Term Loan Facility represented by the principal amount of such Term Lender's Initial Term Loan Commitment and/or Initial Term Loans outstanding at such time and (b) in respect of the Delayed Draw Term Loan Facility, with respect to any Term Lender at any time, the percentage (carried out to the tenth decimal place) of the aggregate principal amount of the Delayed Draw Term Loan Facility represented by the principal amount of such Term Lender's Delayed Draw Term Loan Commitment and/or the Delayed Draw Term Loans outstanding at such time; <u>provided</u> <u>that</u>, if the commitment of each Term Lender to make Delayed Draw Term Loans have been terminated pursuant to <u>Section 8.02</u>, or if the Delayed Draw Term Loan Commitments have expired, then the Applicable Percentage of each Term Lender in respect of the Delayed Draw Term Loan Facility shall be determined based on the Applicable Percentage of such Lender in respect of the Delayed Draw Term Loan Facility most recently in effect, giving effect to any subsequent assignments, (ii) in respect of the Roll-Up Facility, with respect to any Roll-Up Lender, at any time, the percentage (carried out to the tenth decimal place) of the aggregate principal amount of the Roll-Up Facility represented by the principal amount of such Roll-Up Lender's Roll-Up Loans at such time (the initial Applicable Percentage of each Roll-Up Lender as of the Closing Date in respect of the Roll-Up Facility is set forth on <u>Schedule 2.01(a)</u> and, thereafter, in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable), and (iii) with respect to each Lender, the percentage (carried out to the tenth decimal place) of the aggregate principal amount of all Facilities represented by the principal amount of such Lender's Loans and/or Commitment at such time.

"<u>Applicable Rate</u>" means, in the case of any Loans, (i) 11.00% per annum for Eurocurrency Rate Loans and (ii) 10.00% per annum for Base Rate Loans.

"<u>Applicable Reserve Requirement</u>" means, at any time, for any Eurocurrency Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Eurocurrency Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurocurrency Rate Loans. A Eurocurrency Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to

reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender.  The rate of interest on Eurocurrency Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent) in substantially the form of Exhibit E (with such modifications as are necessary to reflect any effective amendment, amendment and restatement or other modification of this Agreement at the time of delivery thereof) or any other form approved by the Administrative Agent, in accordance with Section 10.06(b).

"Attributable Indebtedness" means, on any date, in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Automatic Rejection Date" means with respect to any particular lease, the last day of the assumption period for the Loan Parties in the Chapter 11 Cases provided for in Section 365(d)(4) of the Bankruptcy Code, to the extent applicable (including as may have been extended in accordance with Section 365(d)(4) of the Bankruptcy Code).

"Avoidance Action" has the meaning specified in Section 5.23(c).

"Backstop Commitment" means, with respect to any Backstop Lender, the commitment to provide loans in an amount set forth opposite its name on Schedule 2.02.

"Backstop Commitment Agreement" means "Backstop Commitment Agreement" as defined in the Restructuring Support Agreement.

"Backstop Lenders" means the Lenders listed on Schedule 2.02 (collectively, on behalf of themselves or certain (i) of their affiliates or their affiliated investment funds, or (ii) investment funds, accounts, vehicles or other entities that are managed, advised or sub-advised by a member of the Backstop Lenders or their affiliate).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor thereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Missouri, or any other court having jurisdiction over the Chapter 11 Cases from time to time.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the Eurocurrency Rate (after giving effect to any Eurocurrency Rate "floor") that would be payable on such day for a Eurocurrency Rate Loan with a one month Interest Period plus 1%, and (c) the Prime Rate in effect on such day.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Rate, respectively.  In no event, notwithstanding the rate determined pursuant to the foregoing, shall the Base Rate be less than 2.00%.

"Base Rate Loan" means any Loan that bears interest based on the Base Rate.

"Beneficiary" means each Agent and Lender.

"Board of Directors" means, (a) with respect to the Borrower, the board of directors of the General Partner and (b) with respect to any other Person, (i) if the Person is a corporation, the board of directors of the corporation, (ii) if the Person is a partnership, the board of directors of the general partner of the partnership and (iii) with respect to any other Person, the board, committee or other group or entity of such Person serving a similar function.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowing" means a borrowing consisting of Term Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period.

"Borrowing Notice" means a written notice of a Borrowing in the form of Exhibit A attached hereto.

"Budget Variance Report" means a weekly variance report, commencing with a variance report for the one week period following the Closing Date, the two week period following the Closing Date, the three week period following the Closing Date and the four week period following the Closing Date, and thereafter a weekly variance report for the one week period following the most recently delivered Cash Flow Forecast, the two week period following the most recently delivered Cash Flow Forecast, the three week period following the most recently delivered Cash Flow Forecast and the four week period following the most recently delivered Cash Flow Forecast, with the report for each week in a four week period including an individual report for such week and a cumulative report to date for such four week period (each such one week, two week, three week or four week cumulative period, a "Reporting Period"), in each case, setting forth for the applicable Reporting Period ended on the immediately preceding Friday prior to the delivery thereof (1) the negative variance (as compared to the applicable Cash Flow Forecast and the DIP Budget) of the operating cash receipts (on a line item by line item basis and an aggregate basis for all line items) of the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period, (2) the positive variance (as compared to the applicable Cash Flow Forecast and the DIP Budget) of the disbursements (on a line item by line item basis and an aggregate basis for all line items) made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) for the applicable Reporting Period and for the last week of the applicable Reporting Period, (3) the positive variance (as compared to the applicable Cash Flow Forecast and the DIP Budget) of the total disbursements (on a line item by line item basis and an aggregate basis for all line items) (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period and (4) an explanation, in reasonable detail, for any material negative variance (in the case of receipts) or material positive variance (in the case of disbursements) set forth in such variance report, certified by a Responsible Officer of the Borrower.

"Building" means a Building as defined in 12 CFR Chapter III, Section 339.2.

"Business" has the meaning specified in Section 5.09(b).

"Business Day" means (i) any day excluding Saturday, Sunday and any day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Eurocurrency Rate or any Eurocurrency Rate Loans, the term "Business Day" means any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"Capital Expenditures" means, for any Person for any period, the sum of, without duplication, all expenditures made by such Person during such period that, in accordance with GAAP as in effect on March 28, 2017,

4

are or should be included in "purchase of property and equipment" or similar items, or which should otherwise be capitalized, reflected in the statement of cash flows of such Person; provided that Capital Expenditures shall not include any expenditure for replacements and substitutions for fixed assets, capital assets or equipment to the extent made with Net Insurance/Condemnation Proceeds invested pursuant to Section 2.05(h) or with Net Proceeds invested pursuant to Section 2.05(e) or the substantially concurrent trade-in of existing equipment (solely to the extent of the value of the trade-in).

"Capital Lease" means, with respect to any Person, any lease of any property, which in conformity with GAAP as in effect on March 28, 2017, is required to be capitalized on the balance sheet of such Person; provided that the obligations of the Borrower or its Subsidiaries, or of a special purpose or other entity not consolidated with the Borrower and its Subsidiaries, either existing on the date hereof or created thereafter that (a) initially were not included on the consolidated balance sheet of the Borrower as a Capital Lease and were subsequently recharacterized as a Capital Lease or, in the case of such a special purpose or other entity becoming consolidated with the Borrower and its Subsidiaries were required to be characterized as a Capital Lease upon such consolidation, in either case, due to a change in accounting treatment or otherwise, or (b) did not exist on the date hereof and were required to be characterized as a Capital Lease but would not have been required to be treated as capital lease obligations on the date hereof had they existed at that time, shall for all purposes not be treated as a Capital Lease, Capital Lease Obligations or Indebtedness.

"Capital Lease Obligations" means, with respect to any Person as of any date of determination, the aggregate liability of such Person under Capital Leases reflected on a balance sheet of such Person under GAAP as in effect on March 28, 2017; provided that the obligations of the Borrower or its Subsidiaries, or of a special purpose or other entity not consolidated with the Borrower and its Subsidiaries, either existing on the date hereof or created thereafter that (a) initially were not included on the consolidated balance sheet of the Borrower as a capital lease obligations and were subsequently recharacterized as capital lease obligations or, in the case of such a special purpose or other entity becoming consolidated with the Borrower and its Subsidiaries were required to be characterized as capital lease obligations upon such consolidation, in either case, due to a change in accounting treatment or otherwise, or (b) did not exist on the date hereof and were required to be characterized as capital lease obligations but would not have been required to be treated as capital lease obligations on the date hereof had they existed at that time, shall for all purposes not be treated as Capital Leases, Capital Lease Obligations or Indebtedness.

"Capital Stock" means (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests, and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Carve Out" means the Carve Out as defined in the Interim Order or the Final Order, as applicable.

"Cash Equivalents" means

(a)     U.S. Government Obligations or certificates representing an ownership interest in U.S. Government Obligations with maturities not exceeding two years from the date of acquisition,

(b)     (i) demand deposits, (ii) time deposits and certificates of deposit with maturities of two years or less from the date of acquisition, (iii) bankers' acceptances with maturities not exceeding two years from the date of acquisition, and (iv) overnight bank deposits, in each case with any bank or trust company organized or licensed under the Laws of the United States or any state thereof (including any branch of a foreign bank licensed under any such Laws) having capital, surplus and undivided profits in excess of $250,000,000 (or the foreign currency equivalent thereof) whose short-term debt is rated A-2 or higher by S&P or P-2 or higher by Moody's,

(c)     commercial paper maturing within 364 days from the date of acquisition thereof and having, at such date of acquisition, ratings of at least A-1 by S&P or P-1 by Moody's,

(d)     readily marketable direct obligations issued by any state, commonwealth or territory of the U.S. or any political subdivision thereof, in each case rated at least A-1 by S&P or P-1 by Moody's with maturities not exceeding one year from the date of acquisition,

(e)     bonds, debentures, notes or other obligations with maturities not exceeding two years from the date of acquisition issued by any corporation, partnership, limited liability company or similar entity whose long-term unsecured debt has a credit rating of A2 or better by Moody's and A or better by S&P;

(f)     investment funds at least 95% of the assets of which consist of investments of the type described in clauses (a) through (e) above (determined without regard to the maturity and duration limits for such investments set forth in such clauses, provided that the weighted average maturity of all investments held by any such fund is two years or less),

(g)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (b) above and

(h)     in the case of a Subsidiary that is a Foreign Subsidiary, substantially similar investments, of comparable credit quality, denominated in the currency of any jurisdiction in which such Person conducts business.

"Cash Flow Forecast" means a projected statement of sources and uses of cash for the Loan Parties, prepared in accordance with Section 6.01(d), for the current and following 13 calendar weeks (but not any preceding weeks), including the anticipated uses of the proceeds of any Borrowing for each week during such period. As used herein, "Cash Flow Forecast" shall initially refer to the 13-week cash flow forecast most recently delivered on or prior to the Petition Date and, thereafter, the most recent Cash Flow Forecast delivered by the Borrower in accordance with Section 6.01(d).

"Cash Management Agreement" has the meaning specified in the definition of "Cash Management Obligations".

"Cash Management Motion" means the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of the Debtors' Existing Cash Management System; (B) Authorizing Use of Existing Bank Accounts And Business Forms; (C) Granting a Limited Waiver of Requirements of Section 345(B) of the Bankruptcy Code; (D) Authorizing Continuation of Ordinary Course Intercompany Transactions; (E) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims; and (F) Granting Related Relief Docket No.4.

"Cash Management Obligations" means any and all obligations of the Borrower or any Subsidiary arising out of (a) the execution or processing of electronic transfers of funds by automated clearing house transfer, wire transfer or otherwise to or from the deposit accounts of the Borrower and/or any Subsidiary now or hereafter maintained with any financial institution or affiliate thereof, (b) the acceptance for deposit or the honoring for payment of any check, draft or other item with respect to any such deposit accounts, (c) any other treasury, deposit, disbursement, overdraft, and cash management services afforded to the Borrower or any Subsidiary by any such financial institution or affiliate thereof, and (d) stored value card, commercial credit card and merchant card services (any agreement to provide services described in clause (a), (b), (c) and/or (d), a "Cash Management Agreement") or otherwise arising under a Cash Management Obligations.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request or directive (whether or not having the force of law) by any Governmental Authority required to be complied with by any Lender. For purposes of this definition, (x) the Dodd-Frank Act and any rules, regulations, orders, requests, guidelines and directives adopted, promulgated or implemented in connection therewith, and (y) all

6

requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to have been adopted, issued, promulgated or implemented after the Closing Date, but shall be included as a Change in Law only to the extent a Lender is imposing applicable increased costs or costs in connection with capital adequacy and other requirements similar to those described in Sections 3.04(a) and 3.04(b) generally on other similarly situated borrowers of loans under United States credit facilities.

"Change of Control" means

(a)        the first day on which (i) 100% of the outstanding Capital Stock of Borrower ceases to be owned directly by Holdings, (ii) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger of consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Borrower and its Subsidiaries, taken as a whole, to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)), or (iii) the adoption of a plan relating to the liquidation or dissolution of the Borrower; or

(b)        the Borrower becomes aware (by way of a report or any other filings pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) that any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than any of the Permitted Holders, is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Borrower or the General Partner.

"Chapter 11 Cases" shall have the meaning assigned to such term in the recitals to this Agreement.

"Closing Date" means the date on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01 and the Initial Term Loans are made.

"Coal Liens" means:

(1)        Liens incurred in the ordinary course of business on any specific coal producing property or any interest therein, construction thereon or improvement thereto to secure all or any part of the costs incurred for surveying, exploration, drilling, extraction, development, operation, production, construction, alteration, repair or improvement of, in, under or on such property and the plugging and abandonment of coal mines located thereon (it being understood that costs incurred for "development" shall include costs incurred for all facilities relating to such coal producing properties or to projects, ventures or other arrangements of which such forms a part or which relate to such coal producing properties or interests) as long as such Liens do not secure obligations for the payment of borrowed money or other Indebtedness;

(2)        Liens incurred in the ordinary course of business on a coal producing property to secure obligations incurred or guarantees of obligations incurred in connection with or necessarily incidental to commitments for the purchase or sale of, or the transportation or distribution of, the products derived from such coal producing property as long as such Liens do not secure obligations for the payment of borrowed money or other Indebtedness;

(3)        Liens arising in the ordinary course of business under partnership agreements, coal leases, overriding royalty agreements, joint operating agreements or similar agreements, net profits agreements, production payment agreements, royalty trust agreements, incentive compensation programs on terms that are reasonably customary in the coal business for geologists, geophysicists and other providers of technical services to any of the Borrower or any of its Subsidiaries, master limited partnership agreements, farm-out agreements, farm-in agreements, division orders, contracts for the sale, purchase, exchange, transportation, gathering or processing of coal, unitizations and pooling designations, declarations, orders and agreements, development agreements, operating agreements, production sales contracts, area of mutual interest agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or geophysical permits or agreements, and other agreements which are customary in the coal business as long as such Liens do not

7

secure obligations for the payment of borrowed money or other Indebtedness and attach solely to the proceeds of sales of the products derived from such coal producing property; and

(4)     Liens pursuant to contract mining agreements and leases granted in the ordinary course of business to others that do not interfere with the ordinary conduct of business of the Borrower or its Subsidiaries and do not secure obligations for the payment of borrowed money or other Indebtedness.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (unless as indicated otherwise).

"Collateral" means, collectively, (i) all of the real, personal and mixed property and assets (including Equity Interests) in which Liens are purported to be granted pursuant to the Security Documents as security for all or any part of the Obligations (subject to exceptions contained in the Security Documents), in each case excluding any Excluded Assets, and (ii) "DIP Collateral" or words of similar intent, as defined in any Order.

"Collateral Agent" means Cortland Capital Market Services LLC, in its capacity as the collateral agent, together with its successors and assigns.

"Collateral Questionnaire" means a certificate in the form of Exhibit B that provides information with respect to the personal or mixed property of each Loan Party.

"Commitment" means, with respect to any Lender, such Lender's (i) Initial Term Loan Commitment and/or (ii) Delayed Draw Term Loan Commitment, as the context shall require.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D (with such modifications as are necessary to reflect any effective amendment, amendment and restatement or other modification of this Agreement at the time of delivery thereof).

"Consenting First Lien Lender" means "Consenting First Lien Lender" as defined in the Restructuring Support Agreement.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contract" has the meaning specified in the definition of Excluded Assets.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Subsidiary" means, with respect to any consent, waiver or right to terminate or accelerate the obligations under a Contract, any Subsidiary that the Borrower directly or indirectly Controls for purposes of the provision of such consent, waiver or exercise of such right to terminate or accelerate the obligations under such Contract.

"Credit Extension" means the making of a Loan.

"<u>Critical Vendor Report</u>" means a report, in a form acceptable to the Financial Advisor (it being agreed that the form previously provided to the Financial Advisor prior to the Closing Date is acceptable), describing in reasonable detail the matter set forth in <u>Exhibit H</u>.

"<u>Debtor Relief Laws</u>" means (i) the Bankruptcy Code, (ii) any domestic or foreign law relating to liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally, and (iii) any order made by a court of competent jurisdiction in respect of any of the foregoing.

"<u>Debtors</u>" shall have the meaning assigned to such term in the recitals to this Agreement.

"<u>Declined Proceeds</u>" has the meaning specified in <u>Section 2.05(l)</u>.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" means, with respect to Obligations, an interest rate equal to (i) the Base Rate <u>plus</u> (ii) the Applicable Rate applicable to Base Rate Loans, <u>plus</u> (iii) 2% per annum; <u>provided</u>, <u>however</u>, that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to (i) the Eurocurrency Rate otherwise applicable to such Eurocurrency Rate Loan <u>plus</u> (ii) the Applicable Rate applicable to Eurocurrency Rate Loans <u>plus</u> (iii) 2% per annum.

"<u>Defaulting Lender</u>" means, subject to the last paragraph of <u>Section 2.18</u>, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to any Agent, or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to the last paragraph of <u>Section 2.18</u>) as of the date established therefor by the Administrative Agent in a written notice of such determination to the Borrower and each other Lender promptly following such determination.

"<u>Delayed Draw Funding Date</u>" means the date on which all the conditions precedent in <u>Section 4.02</u> are satisfied or waived in accordance with <u>Section 10.01</u> and the Delayed Draw Term Loans are made.

"Delayed Draw Term Lender" means any Term Lender holding Delayed Draw Term Loan Commitment and/or Delayed Draw Term Loans.

"Delayed Draw Term Loan" has the meaning set forth in Section 2.01(a).

"Delayed Draw Term Loan Commitment" means, as to each Lender, its obligation to make Delayed Draw Term Loans to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Delayed Draw Term Loan Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate amount of Delayed Draw Term Loan Commitments as of the Closing Date is $45,000,000.

"Delayed Draw Term Loan Commitment Fee" has the meaning set forth in Section 2.09(e).

"Delayed Draw Term Loan Facility" means, at any time (a) prior to the funding of the Delayed Draw Term Loans on the Delayed Draw Funding Date, the aggregate Delayed Draw Term Loan Commitments at such time and (b) on and after the funding of the Delayed Draw Term Loans on the Delayed Draw Funding Date, the aggregate principal amount of the Delayed Draw Term Loans of all Lenders outstanding at such time.

"Designated Letters of Credit" means letters of credit issued in the ordinary course of business with respect to Mine reclamation, workers' compensation and other employee benefit liabilities.

"DIP Budget" has the meaning specified in Section 4.01(g).

"DIP Collateral" means the "DIP Collateral" as defined in the Orders.

"Direct Debt Placement" means "Direct Debt Placement" as defined in the Restructuring Support Agreement.

"Disclosure Statement" means "Disclosure Statement" as defined in the Restructuring Support Agreement.

"Disposition" or "Dispose" means the sale, transfer or other disposition of any assets by any Person outside the ordinary course of business, including by means of a merger, consolidation or similar transaction and including any sale or issuance of the Equity Interests of any Subsidiary.

"Disqualified Equity Interest" means Equity Interests that by their terms (or by the terms of any security into which such Equity Interests are convertible, or for which such Equity Interests are exchangeable, in each case at the option of the holder thereof) or upon the happening of any event (i) mature or are mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or are required to be redeemed or redeemable at the option of the holder for consideration other than Qualified Equity Interests, or (ii) are convertible at the option of the holder into Disqualified Equity Interests or exchangeable for Indebtedness, in each case of clauses (i) and (ii) prior to the date that is 91 days after the Stated Maturity Date hereunder, except, in the case of clauses (i) and (ii), if as a result of a change of control or asset sale, so long as the relevant provisions specifically state that such repurchase, payment or redemption upon the occurrence of such a change of control or asset sale event is subject to the prior payment in full of all Obligations and the termination of Commitments.

"Disqualified Institution" means (i) any banks, financial institutions and institutional investors and competitors of the Borrower identified by the Borrower to the Administrative Agent by name in writing from time to time on or prior to the Petition Date or as the Borrower and the Administrative Agent shall from time to time mutually agree after such date, (ii) any affiliates of the foregoing that are (A) identified by the Borrower from time to time in writing or (B) readily identifiable solely on the basis of similarity of their names; provided that (x) "Disqualified Institutions" shall not include any bona fide diversified debt fund or a diversified investment vehicle that is engaged in the making, purchasing, holding or otherwise investing in, acquiring or trading commercial loans, bonds and similar extensions of credit in the ordinary course; (y) the Administrative Agent shall not have any responsibility for monitoring compliance with any provisions of this Agreement with respect to Disqualified Institutions and (z) updates

10

to the Disqualified Institution schedule shall not retroactively invalidate or otherwise affect any (1) assignments or participations made to, (2) any trades entered into with or (3) information provided to any Person before it was designated as a Disqualified Institution. A schedule of the Disqualified Institutions shall be made available on the Closing Date (and updated from time to time) by the Borrower to all Lenders by delivering such schedule (and such updates) to the Administrative Agent; provided, that any additional Person identified pursuant to an updated schedule shall not be deemed a Disqualified Institution until such time as such update to the schedule is provided to the Lenders.

"Disqualified Stock" means Capital Stock constituting Disqualified Equity Interests.

"Dodd-Frank Act" means the Dodd—Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203, H.R. 4173) signed into law on July 21, 2010, as amended from time to time.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the Laws of the United States or any State thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (i) a Lender, (ii) an Affiliate of a Lender and (iii) an Approved Fund (any two or more Approved Funds being treated as a single Eligible Assignee for all purposes hereof), and (iv) any other Person (other than a natural person) approved by (x) the Borrower unless an Event of Default has occurred and is continuing (such approval not to be unreasonably withheld or delayed); provided that the Borrower shall be deemed to have approved an assignment of Loans to a Person pursuant to this clause (iv) unless it shall have objected thereto by written notice to the Administrative Agent within three (3) Business Days after having received notice thereof and (y) the Administrative Agent; provided, that no Defaulting Lender, Disqualified Institution, any Loan Party or Affiliated Lender shall be an Eligible Assignee.

"Environmental Laws" means any and all applicable current and future federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions or common law causes of action relating to (a) protection of the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment including ambient air, surface, water, ground water, or land, (b) human health as affected by Hazardous Materials, and (c) mining operations and activities to the extent relating to environmental protection or reclamation, including the Surface Mining Control and Reclamation Act, provided that "Environmental Laws" do not include any Laws relating to worker or retiree benefits, including benefits arising out of occupational diseases.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

11

"Environmental Permits" means any and all permits, licenses, registrations, notifications, exemptions and any other authorization required under any applicable Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of Capital Stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of Capital Stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination (but excluding any debt security that is convertible into, or exchangeable for, Equity Interests).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the failure to meet the minimum funding standards of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA) or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) a determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (d) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (e) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (f) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (h) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (j) receipt from the IRS of notice of the failure of any Pension Plan (or any other Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (k) the imposition of a Lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Pension Plan; or (l) the occurrence of any Foreign Plan Event.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurocurrency Rate" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurocurrency Rate Loan, the rate per annum obtained by dividing (i) (a) the rate per annum equal to the rate determined by the Administrative Agent, to be the London interbank offered rate administered by the ICE Benchmark Administration (or any other person which takes over the administration of that rate) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars displayed on the ICE LIBOR USD page of the Bloomberg Screen (or any replacement page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Bloomberg, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, (b) in the event the rate referenced in the preceding clause (a) is not available, the rate per annum based on a substitute index reasonably selected by the Administrative Agent for Dollar deposits comparable to the principal amount of the applicable Loan for which the Eurocurrency Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m.

12

(London, England time) on such Interest Rate Determination Date, or (c) in the event that such rate is not ascertainable pursuant to the preceding clauses (a) or (b), the "Eurocurrency Rate" shall be the rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period, by (ii) an amount equal to (a) one minus (b) the Applicable Reserve Requirement.  In no event, notwithstanding the rate determined pursuant to the foregoing, shall the Eurocurrency Rate be less than 1.00%.

"Eurocurrency Rate Loan" means a Loan that bears interest at a rate based on the Eurocurrency Rate.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Proceeds" has the meaning specified in Section 2.05(e).

"Excluded Assets" means

(a)    (i) those assets over which the pledging or granting of a security interest in such assets (x) would be prohibited by any applicable law (other than any organizational document), rule or regulation (except to the extent such prohibition is unenforceable after giving effect to applicable anti-assignment provisions of the UCC, other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibitions), (y) would be prohibited by, or cause a default under or result in a breach, violation or invalidation of, any lease, license or other written agreement or written obligation (each, a "Contract") to which such assets are subject, or would give another Person (other than the Borrower or any Controlled Subsidiary) a right to terminate or accelerate the obligations under such Contract or to obtain a Lien to secure obligations owing to such Person (other than the Borrower or any Controlled Subsidiary) under such Contract (but only to the extent such assets are subject to such Contract and such Contract is not entered into for purposes of circumventing or avoiding the collateral requirements of the indenture), unless the Borrower or any Guarantor may unilaterally waive it (in each case, except to the extent any such prohibition is unenforceable after giving effect to applicable anti-assignment provisions of the UCC) or (z) would require obtaining the consent, approval, license or authorization of any Person (other than the Borrower or any Guarantor) or applicable Governmental Authority, except to the extent that such consent, approval, license or authorization has already been obtained, and (ii) any Contract or any property or other asset subject to Liens securing a purchase money security interest, Capital Lease Obligation or similar arrangement or sale and leaseback transaction to the extent that a grant of a security interest therein requires the consent of any Person (other than the Borrower or any Controlled Subsidiary) as a condition to the creating of another security interest, would violate or invalidate such Contract or purchase money, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than the Borrower or a Controlled Subsidiary) after giving effect to the applicable anti-assignment provisions of the UCC), other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code notwithstanding such prohibition; provided, however, that the Collateral shall include (and such security interest shall attach) (x) immediately at such time as the contractual or legal prohibition shall no longer be applicable, (y) immediately at such time as such contractual or legal prohibition would be unenforceable due to applicable Debtor Relief Laws and (z) to the extent severable,  immediately at such time to any portion of such lease, license, contract or agreement not subject to the prohibitions specified above;

(b)    any "intent-to-use" application for registration of a trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, and

(c)    (i) margin stock, and (ii) any Equity Interests in any Subsidiary that is not a Wholly Owned Domestic Subsidiary (provided, that such term shall not include any FSHCO) by the Borrower or any Subsidiary or in a Joint Venture, if the granting of a security interest therein (A) would be prohibited by, cause a default under or result in a breach of, or would give another Person (other than the Borrower or any Controlled Subsidiary) a right to terminate, under any Organizational Document, shareholders, joint venture or similar agreement applicable to such Subsidiary or Joint Venture, or (B) would require obtaining the consent of any Person (other than the Borrower or any Controlled Subsidiary); provided, however, that the Collateral shall include (and such security interest shall attach) (x) immediately at such time as any such contractual limitations shall no longer be applicable, (y) immediately at such

13

time as such contractual limitations would be unenforceable due to applicable Debtor Relief Laws and (z) to the extent severable, immediately at such time to any portion of any Equity Interests not subject to the limitations specified above;

provided that the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing unless such replacements, substitutions or proceeds also constitute Excluded Assets.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the Laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 10.13) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure or inability to comply with Section 3.01(e) and (d) any Taxes imposed under FATCA.

"Facility" means any Term Loan Facility and the Roll-Up Facility.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty, or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) received from three federal funds brokers on such day on such transactions as determined by the Administrative Agent.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Required Lenders (and with respect to modifications to the rights and duties of any Agent, such Agent)), and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless the Required Lenders waive such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Advisor" means, collectively, Lazard and Perella Weinberg Partners L.P., in their capacities as financial advisors to certain Backstop Lenders.

"Flood Certificate" means a "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"<u>Flood Hazard Property</u>" means any Real Property that constitutes Collateral in favor of Collateral Agent, for the benefit of Secured Parties, with buildings or mobile homes located in a Flood Zone.

"<u>Flood Program</u>" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, in each case as amended from time to time, and any successor statutes.

"<u>Flood Zone</u>" means areas having special flood hazards as described in the National Flood Insurance Act of 1968, as amended from time to time, and any successor statute.

"<u>Foreign Lender</u>" means any Lender that is not a "United States Person" as defined in Section 7701 (a)(30) of the Code.

"<u>Foreign Plan</u>" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or any of their respective Subsidiaries with respect to employees employed outside the United States and paid through a non-United States payroll.

"<u>Foreign Plan Event</u>" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make the required contributions or payments, under any applicable law, within the time permitted by Law for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, in each case, which could reasonably be expected to have a Material Adverse Effect, or (e) the occurrence of any transaction with respect to a Foreign Plan that is prohibited under any applicable law and that could reasonably be expected to result in the incurrence of any liability by any Loan Party, or the imposition on any Loan Party of any fine, excise tax or penalty with respect to a Foreign Plan resulting from any noncompliance with any applicable law, in each case which could reasonably be expected to have a Material Adverse Effect.

"<u>Foreign Subsidiary</u>" means a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any State thereof or the District of Columbia and any Subsidiary thereof.

"<u>Four-Week Test Period</u>" means, at any time, the four-week period ended on the immediately preceding Friday; provided that only periods ending on the fourth Friday following the Closing Date and each fourth Friday thereafter shall constitute Four-Week Test Periods.

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the United States.

"<u>FSHCO</u>" means any Domestic Subsidiary that has no material assets other than Equity Interests of (x) a Foreign Subsidiary or (y) any other FSHCO.

"<u>Fund</u>" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"<u>Funded Debt</u>" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent, (i) in respect of borrowed money or advances or (ii) evidenced by loan agreements, bonds, notes or debentures or similar instruments or letters of credit (solely to the extent such letters of credit or other similar instruments have been drawn and remain unreimbursed) or, without duplication, reimbursement agreements in respect thereof.

"GAAP" means generally accepted accounting principles in the United States, which are applicable to the circumstances as of the date of determination. The sources of accounting principles and the framework for selecting the principles used in the preparation of financial statements of nongovernmental entities that are presented in conformity with GAAP in the United States, are set forth in the Financial Accounting Standards Board's Accounting Standards Codification.

"General Partner" has the meaning specified in the introductory paragraph hereto, or any successor general partner of Holdings.

"Governmental Authority" means the government of the United States or any other nation, or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit) to the extent the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation in order to induce the creation of such obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, reimbursement obligations under letters of credit and any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee obligation shall not include (i) indemnification or reimbursement obligations under or in respect of Surety Bonds or Designated Letters of Credit, (ii) ordinary course performance guarantees by any Loan Party of the obligations (other than for the payment of borrowed money) of any other Loan Party and (iii) endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning specified in Section 11.01.

"Guarantors" means each of the General Partner, Holdings and any Subsidiary that is a Wholly Owned Domestic Subsidiary; provided, that such term shall not include any FSHCO. As of the Closing Date, each of the Debtors (other than the Borrower) is a Guarantor. For the avoidance of doubt, no Foreign Subsidiary now owned or hereafter formed or acquired shall be a Guarantor.

"Guaranty" means the guaranty of each Guarantor set forth in Article XI.

"Hazardous Materials" means (i) any explosive or radioactive substances or wastes and (ii) any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under, or that could reasonably be expected to give rise to liability under, any applicable Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls, urea-formaldehyde insulation, gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any coal ash, coal combustion by-products or waste, boiler slag, scrubber residue or flue desulphurization residue.

"Hedging Agreement" means any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement (regardless of whether such agreement or instrument is classified as a "derivative" pursuant to FASB ASC Topic No. 815 and required to be marked-to-market) and any other agreements or arrangements designed to manage interest rates or interest rate risk and other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

For the avoidance of doubt, Hedging Agreements do not include coal sales contracts requiring the delivery of coal that is priced pursuant to an established index created for the purposes of establishing a market price for the underlying commodity.

"Hedging Termination Value" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any valid netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark- to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender, an Agent or any Affiliate of a Lender or an Agent) (it being understood that any such termination values and marked-to-market values shall take into account any assets posted as collateral or security for the benefit of a party to the Hedging Agreement).

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"Historical Financial Statements" means as of the Closing Date, (i) the audited financial statements of Borrower and its Subsidiaries for the immediately preceding three fiscal years, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such fiscal years, (ii) the unaudited financial statements of Borrower and its Subsidiaries for each of the first three fiscal quarters ended after the date of the most recent audited financial statements and at least 45 days prior to the Closing Date, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three-, six- or nine-month period, as applicable, ending on such date.

"Holdings" has the meaning specified in the introductory paragraph hereto and includes any successor to Holdings as contemplated by Section 7.09.

"Huntington Cash Management Obligations" all of Huntington National Bank's customary service charges, overdraft and returned item fees, transfer fees, account maintenance fees, reasonable and documented legal fees, and expenses relating to any account under any account agreements, including without limitation the prepetition and post-petition Bank Fees (as defined in the Cash Management Motion) and any chargebacks or other amounts owing to the Huntington National Bank from (i) any checks or other items or receipts deposited in any account are returned unpaid or otherwise dishonored for any reason, (ii) any overdrafts on any account, (iii) any automated clearing house, wire transfer or other electronic entries for deposit into any account that are returned or otherwise dishonored, or (iv) claims of breach of the UCC's transfer or presentment warranties made against Huntington National Bank in connection with items deposited to any account.

"Increased Amount" has the meaning specified in Section 7.03.

"Incur" means, with respect to any Indebtedness, to incur, create, issue, assume or Guarantee such Indebtedness.

17

"Indebtedness" means, as to any Person, without duplication:

(a)        all indebtedness of such Person for borrowed money;

(b)        all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments (other than any obligations in respect of performance bonds, bid bonds, appeal bonds, surety bonds, reclamation bonds and completion guarantees, bank guarantees and similar obligations under any Mining Law or Environmental Law or with respect to worker's compensation benefits);

(c)        all obligations of such Person arising under letters of credit, bankers' acceptances or other similar instruments (solely to the extent such letters of credit, bankers' acceptances or other similar instruments have been drawn and remain unreimbursed);

(d)        all obligations of such Person to pay the deferred purchase price of property or services;

(e)        the Attributable Indebtedness of such Person in respect of Capital Leases;

(f)        all Indebtedness of other Persons Guaranteed by such Person to the extent so Guaranteed;

(g)        all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; and

(h)        all obligations of such Person under Hedging Agreements;

if and to the extent any of the preceding items (other than Guarantees referred to in clause (e)) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP;

provided that in no event shall Indebtedness include (i) asset retirement obligations, (ii) obligations (other than obligations with respect to Indebtedness for borrowed money or other Funded Debt) related to surface rights under an agreement for the acquisition of surface rights for the production of coal reserves in the ordinary course of business in a manner consistent with historical practice of the Borrower and its Subsidiaries, (iii) obligations under coal purchase and sale contracts, (iv) trade accounts payable and accrued expenses incurred in the ordinary course of business, (v) obligations under federal coal leases, (vi) obligations under coal leases which may be terminated at the discretion of the lessee, (vii) obligations for take-or-pay arrangements or (viii) royalties, the dedication of reserves under supply agreements or similar rights or interests granted, taken subject to, or otherwise imposed on properties consistent with customary practices in the mining industry.

The amount of any obligation under any Hedging Agreement on any date shall be deemed to be the Hedging Termination Value thereof as of such date.  The amount of any Indebtedness issued with original issue discount shall be deemed to be the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness.  The amount of any Indebtedness secured by a Lien on an asset of such Person but not otherwise the obligation, contingent or otherwise of such Person, shall be deemed to be the lesser of (x) the fair market value (as reasonably determined by the Borrower in good faith)of such asset on the date the Lien attached as determined in good faith by the Borrower and (y) the amount of such Indebtedness.  The amount of any other Indebtedness shall be the outstanding principal amount thereof.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial Term Lender" means any Term Lender holding Initial Term Loans.

18

"Initial Term Loan" has the meaning set forth in Section 2.01(a).

"Initial Term Loan Commitment" means, as to each Lender, its obligation to make Initial Term Loans to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Initial Term Loan Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of Initial Term Loan Commitments as of the Closing Date is $55,000,000.

"Initial Term Loan Facility" means, at any time (a) prior to the funding of the Initial Term Loans on the Closing Date, the aggregate Initial Term Loan Commitments at such time and (b) on and after the funding of the Initial Term Loans on the Closing Date, the aggregate principal amount of the Initial Term Loans of all Lenders outstanding at such time.

"Interest Payment Date" means, (a) as to any Eurocurrency Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date (or, if sooner, the date on which the Obligations become due and payable pursuant to Section 8.02), and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"Interest Period" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one month thereafter; provided that:

(i)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(ii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (iii) below, end on the last Business Day of a calendar month; and

(iii)    with respect to each Facility, no Interest Period shall extend beyond its applicable Maturity Date.

"Interest Rate Determination Date" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Bankruptcy Rule 4001 and other applicable law) substantially in the form of Exhibit K hereto or otherwise in form and substance satisfactory to the Required Lenders (and with respect to the rights and duties of each Agent, such Agent), which among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower and the Guarantors to execute and perform under the terms of this Agreement and the other Loan Documents.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Capital Stock or other securities of another Person, (b) a loan, advance (excluding intercompany liabilities incurred in the ordinary course of business in connection with the cash management operations of the Borrower and its Subsidiaries) or capital contribution to, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.  For purposes of covenant compliance, the amount of any Investment shall be (i) the amount actually invested, as determined immediately prior to the time of each such Investment, without adjustment for subsequent increases or decreases in the value of such Investment minus (ii) the amount of dividends or distributions received in connection with such Investment and any return of capital and

any payment of principal received in respect of such Investment that in each case is received in cash or Cash Equivalents.

"IP Rights" has the meaning specified in Section 5.18.

"IRS" means the United States Internal Revenue Service.

"Joint Venture" means any Person (a) other than a Subsidiary in which the Borrower or its Subsidiaries hold an ownership interest or (b) which is an unincorporated joint venture of the Borrower or any Subsidiary.

"Junior Lien Indebtedness" means any other Indebtedness that is secured by a Lien on the Collateral (or any portion thereof) that is junior to the Liens on the Collateral securing the Obligations and that was permitted to be incurred and so secured hereunder.

"Laws" means, as to any Person, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes, and determinations of arbitrators or courts or other Governmental Authorities, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Leasehold Property" means any interest of any Loan Party as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lender" has the meaning specified in the introductory paragraph hereto and shall include any Lender that may become a party hereto pursuant to an Assignment and Assumption or an amendment to this Agreement.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing).

"Liquidity" means, the sum of (i) the aggregate amount of cash and Cash Equivalents on the consolidated balance sheet of the Borrower and its Subsidiaries that is "unrestricted" in accordance with GAAP and (ii) at all times prior to the Delayed Draw Funding Date, the Delayed Draw Term Loan Commitment.

"LLC Division" means the statutory division of any limited liability company into two or more limited liability companies pursuant to Section 18.217 of the Delaware Limited Liability Company Act or a comparable provision of a different jurisdiction's laws, as applicable.

"Loan" or "Loans" means, individually or collectively as the context requires, a Term Loan and the Roll-Up Loans.

"Loan Documents" means this Agreement, each Note, the Agency Fee Letter, each Security Document, any fee letter or other document relating to the fees referred to in Section 2.08, and all other documents, certificates, instruments or agreements executed and delivered by a Loan Party for the benefit of the Agent or any Lender in connection herewith.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Management Services Agreement" means the Second Amended and Restated Services Agreement entered into as of April 30, 2015 by and between Foresight Energy GP LLC and Murray American Coal, Inc. (or their

respective successors), as amended, amended and restated, modified or replaced from time to time pursuant to one or more agreements.

"Management Incentive Plan" means the "Management Incentive Plan" as defined in the Restructuring Support Agreement.

"Material Adverse Effect" means any material adverse effect on (i) the business, condition (financial or otherwise), operations, performance, properties or contingent liabilities of the Debtors, taken as a whole (other than by virtue of the commencement and continuation of the Chapter 11 Cases and the events and circumstances giving rise thereto); (ii) the ability of the Loan Parties, taken as a whole, to fully and timely perform their respective material obligations under this Agreement and the Loan Documents; (iii) the legality, validity, binding effect or enforceability against a Loan Party of a Loan Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Loan Document.

"Material Indebtedness" has the meaning specified in Section 8.01(e).

"Material Real Property" means (a) any fee owned or leased real property interest held by a Loan Party on the Closing Date that has a fair market value (as reasonably determined by the Borrower in good faith) in excess of $5,000,000 on the Closing Date, (b) any fee owned real property acquired by a Loan Party after the Closing Date that has a total fair market value (as reasonably determined by the Borrower in good faith) in excess of $5,000,000 as of the date acquired and (c) any leasehold interest in real property leased by a Loan Party after the Closing Date with a total fair market value (as reasonably determined by the Borrower in good faith) in excess of $5,000,000 as of the date of the lease thereof.

"Maturity Date" means the first to occur of: (a) the date that is 180 days following the Petition Date (the "Stated Maturity Date"); provided, that, if such date is not a Business Day, the Maturity Date shall be the preceding Business Day, (b) the Plan Effective Date, (c) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under the section 363 of the Bankruptcy Code, and (d) the date on which the Obligations hereunder shall be accelerated in accordance with the provisions of this Agreement.

"Mine" means any excavation or opening into the earth in the United States now and hereafter made from which coal or other minerals are or can be extracted on or from any of the real properties in which any Loan Party holds an ownership, leasehold or other interest.

"Mining Financial Assurances" means letters of credit or performance bonds for reclamation or otherwise, surety bonds or escrow agreements and any payment or prepayment made with respect to, or certificates of deposit or other sums or assets required to be posted by the Borrower under Mining Laws for reclamation or otherwise.

"Mining Laws" means any and all current or future applicable federal, state, local and foreign statutes, laws, regulations, legally-binding guidance, ordinances, rules, judgments, orders, decrees or common law causes of action relating to mining operations and activities, including, but not be limited to, the Federal Coal Leasing Amendments Act; the Surface Mining Control and Reclamation Act; all other applicable land reclamation and use statutes and regulations; the Mineral Leasing Act of 1920; the Federal Mine Safety Act of 1977; the Black Lung Act; and the Coal Act; each as amended, and any comparable state and local laws or regulations.

"Mining Lease" means a lease, license or other use agreement which provides the Borrower or any Subsidiary the real property and water rights, other interests in land, including coal, mining and surface rights, easements, rights of way and options, and rights to timber and natural gas (including coalbed methane and gob gas) necessary or integral in order to recover coal from any Mine.  Leases (other than Capital Leases or operating leases of personal property even if such personal property would become fixtures) which provide the Borrower or any other Subsidiary the right to construct and operate a conveyor, crusher plant, silo, load out facility, rail spur, shops, offices and related facilities on the surface of the Real Property containing such reserves shall also be deemed a Mining Lease.

"Monthly Mine-Level Financial Reports" means financial reports with respect to the Borrower and its Subsidiaries, substantially in the form that has been previously provided to the Financial Advisor or in the form of

21

Exhibit I for any fiscal month that set forth mine-level operational financial information and operating statistics delivered in accordance with Section 6.01(c).

"Monthly Consolidated Financial Reports" means financial reports with respect to the Borrower and its Subsidiaries, substantially in the form of Exhibit J hereto for any fiscal month that set forth consolidated information and operating statistics delivered in accordance with Section 6.01(c).

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means a mortgage, deed to secure debt, deed of trust or similar instrument in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders.

"Mortgaged Property" means all Real Property that constitutes Collateral.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Murray Energy" means Murray Energy Corporation, an Ohio corporation.

"Murray Energy Group" has the meaning specified in the definition of "Permitted Holders".

"Narrative Report" means, with respect to the financial statements for which such narrative report is required, a management's summary describing the operations of the Borrower and its Subsidiaries for the applicable fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such period to which such financial statements relate.

"Net Insurance/Condemnation Proceeds" means an amount equal to: (i) any cash payments or proceeds received by the Borrower or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of the Borrower or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with the adjustment or settlement of any claims of the Borrower or such Subsidiary in respect thereof, (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including Taxes paid or payable as a result of any gain recognized or otherwise in connection therewith and (c) any payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness that is secured by a Lien on the assets subject to the relevant event described in clause (i)(a) or (b) above that is required that to be repaid as a result of such event.

"Net Proceeds" means, with respect to any Disposition pursuant to Sections 7.05(b) or 7.05(c), the sum of (a) cash payments or proceeds actually received by the Borrower or any of its Subsidiaries in connection with such Disposition (including any cash received by way of deferred payment (excluding, for avoidance of doubt, royalty payments customary in the mining industry) pursuant to, or by monetization of, Cash Equivalents or a note receivable or otherwise, but only as and when so received) minus (b) the sum of (i) (A) the principal amount, premium or penalty, if any, interest and other amounts of any Indebtedness that is secured by (1) a Lien on an asset that is not Collateral or by a Lien on an asset that is Collateral which Lien is senior in priority to the Lien on such Collateral that secures the Obligations and, in each case, that is required to be repaid in connection with such Disposition (other than Indebtedness under the Loan Documents) or (B) any other required debt payments or required payments of other obligations relating to the Disposition, in each case, with the proceeds thereof, (ii) the reasonable or customary out-of- pocket fees and expenses incurred by the Borrower or its Subsidiaries in connection with such Disposition (including attorneys' fees, accountants' fees, investment banking fees, real property related fees and charges and brokerage and consultant fees), (iii) all Taxes required to be paid or accrued or reasonably estimated to be required to be paid or accrued as a result thereof, (iv) in the case of any Disposition by a non-Wholly Owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority or other third party interests and not available for distribution to or for the account of the Borrower or a Wholly Owned Subsidiary as a result thereof and

(v) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (x) related to any of the applicable assets and (y) retained by the Borrower or any Subsidiary including, without limitation, pension and other post- employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition occurring on the date of such reduction).

"New Common Equity" means the equity securities of Reorganized Foresight to be issued upon consummation of the Acceptable Plan in accordance with the Restructuring Support Agreement.

"Note" means a Term Loan Note and/or a Roll-Up Loan Note, as the context may require.

"Obligations" means all advances to, and debts, liabilities and obligations of every nature of each Loan Party, including obligations from the time to time owed to any Agent (including any former Agent), Lenders or any other Secured Party, under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"Obligee Guarantor" has the meaning specified in Section 11.07.

"OPEB" means post-employment benefits other than pension benefits, including, as applicable, medical, dental, vision, life and accidental death and dismemberment.

"Orders" means, collectively, the Interim Order and the Final Order.

"Organizational Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-US jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.13).

"Overnight Rate" means, for any day, the greater of (a) the Federal Funds Rate in the case of any amount denominated in Dollars and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"Parent" means any direct or indirect parent of the Borrower.

"Participant" has the meaning specified in Section 10.06(e).

"Participant Register" has the meaning specified in Section 10.06(e).

"PATRIOT Act" has the meaning specified in Section 5.17(b).

"Payment in Full" means, the time at which no Lender shall have any Commitments, any Loan or other Obligations unpaid, unsatisfied or outstanding (other than in respect of contingent obligations, indemnities and expenses related thereto that are not then payable or in existence).

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA, or any successor thereto.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Holders" means, collectively, (a) (i) Chris Cline and his children and other lineal descendants, Robert E. Murray, Brenda L. Murray, Robert Edward Murray (son), Jonathan Robert Murray, Ryan Michael Murray (or any of their estates, or heirs or beneficiaries by will) and any Related Party of a Permitted Holder; (ii) the spouses or former spouses, widows or widowers and estates of any of the Persons referred to in clause (i) above; (iii) any trust having as its sole beneficiaries one or more of the persons listed in clauses (i) and (ii) above; and (iv) any Person a majority of the voting power of the outstanding Equity Interest of which is owned by one or more of the Persons referred to in clauses (i), (ii) or (iii) above, (b) Murray Energy Corporation, an Ohio corporation, and its Subsidiaries ("Murray Energy Group"), (c) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing are members; provided that, in the case of such group and without giving effect to the existence of such group or any other group, such Persons referenced in clauses (a) through (b) above, collectively, have beneficial ownership of more than 50% of the total voting power of the voting units or stock of the Borrower or Holdings (or any Parent), (d) Foresight Reserves L.P., (e) Holdings and any Parent and (f) the General Partner.

"Permitted Liens" means each of the Liens permitted pursuant to Section 7.01.

"Permitted Payments to Parent" means, without duplication as to amounts, dividends, distributions or the making of loans to Holdings or the General Partner, in each case, to the extent paid in accordance with the Cash Flow Forecast (subject to Permitted Variance):

(1)     in amounts required for such entity to pay (i) general corporate overhead expenses (including, but not limited to, franchise taxes, legal expenses, accounting expenses, expenses to maintain their corporate existence and administrative expenses) and (ii) directors' fees and expense reimbursements under its charter or by-laws or pursuant to written agreements entered into prior to the Closing Date with any such Person to the extent relating to the Borrower and its Subsidiaries, in each case, when due; provided the aggregate amount set forth in this clause (1) shall not exceed $50,000 in any fiscal month;

(2)     to pay customary indemnification obligations of Holdings' or the General Partner's owing to directors, officers, employees or other Persons under its charter or by-laws or pursuant to written agreements entered into prior to the Closing Date with any such Person to the extent relating to the Borrower and its Subsidiaries; and

(3)     to pay obligations of Holdings or the General Partner in respect of director and officer insurance (including premiums therefor) to the extent relating to the Borrower and its Subsidiaries.

"Permitted Real Estate Encumbrances" means the following encumbrances which do not, in any case, individually or in the aggregate, materially detract from the value of any Mine subject thereto or interfere with the ordinary conduct of the business or operations of the Borrower and its Subsidiaries as presently conducted on, at or with respect to such Mine and as to be conducted following the Closing Date: (a) encumbrances customarily found

upon real property used for mining purposes in the applicable jurisdiction in which the applicable real property is located to the extent such encumbrances would be permitted or granted by a prudent operator of mining property similar in use and configuration to such real property (e.g., surface rights agreements, wheelage agreements and reconveyance agreements); (b) rights and easements of (i) owners of undivided interests in any of the real property where the Borrower and its Subsidiaries own less than 100% of the fee interest, (ii) owners of interests in the surface of any real property where the applicable party does not own or lease such surface interest, (iii) lessees, if any, of coal or other minerals (including oil, gas and coal bed methane) where the Borrower and its Subsidiaries do not own such coal or other minerals, and (iv) lessees of other coal seams and other minerals (including oil, gas and coal bed methane) not owned or leased by such party; (c) with respect to any real property in which the Borrower or any Subsidiary holds a leasehold interest, terms, agreements, provisions, conditions, and limitations (other than royalty and other payment obligations which are otherwise permitted hereunder) contained in the leases granting such leasehold interest and the rights of lessors thereunder (and their heirs, executors, administrators, successors, and assigns), subject to any amendments or modifications set forth in any landlord consent delivered in connection with a Mortgage; (d) farm, grazing, hunting, recreational and residential leases with respect to which the Borrower or any Subsidiary is the lessor encumbering portions of the real properties to the extent such leases would be granted or permitted by, and contain terms and provisions that would be acceptable to, a prudent operator of mining properties similar in use and configuration to such real properties; (e) royalty and other payment obligations to sellers or transferors of fee coal or lease properties to the extent such obligations constitute a lien not yet delinquent; (f) rights of others to subjacent or lateral support and absence of subsidence rights or to the maintenance of barrier pillars or restrictions on mining within certain areas as <u>provided</u> by any mining lease, unless in each case waived by such other person; and (g) rights of repurchase or reversion when mining and reclamation are completed.

"<u>Permitted Variance</u>" has the meaning specified in <u>Section 7.18</u>.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Petition Date</u>" has the meaning specified in the recitals to this Agreement

"<u>Plan</u>" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, by any ERISA Affiliate.

"<u>Plan Effective Date</u>" means the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date) of one or more plans of reorganization confirmed pursuant to a final order entered by the Bankruptcy Court.

"<u>Platform</u>" has the meaning specified in <u>Section 6.02</u>.

"<u>Prepetition Agent</u>" means the "Administrative Agent" as defined in the Prepetition First Lien Credit Agreement.

"<u>Prepetition Debt</u>" means, collectively, the Indebtedness of each Debtor outstanding and unpaid on the date on which such Person becomes a Debtor.

"<u>Prepetition First Lien Credit Agreement</u>" means the Credit and Guaranty Agreement, dated as of March 28 2017, by and among the Borrower, Holdings and the other guarantors party thereto, The Huntington National Bank, as facilities administrative agent, Lord Securities Corporation, as term administrative agent, and the other lenders party thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Prepetition First Lien Lender</u>" means a "Lender" as defined in the Prepetition First Lien Credit Agreement.

"<u>Prepetition First Lien Obligations</u>" means the "Obligations" as defined in the Prepetition First Lien Credit Agreement.

"Prepetition Second Lien Indenture" means the Indenture, dated as of March 28, 2017 among Foresight Energy, LLC, Foresight Energy Finance Corporation, the guarantors party thereto and Wilmington Trust, National Association, as trustee.

"Prime Rate" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  Any Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"Production Payments" means with respect to any Person, all production payment obligations and other similar obligations with respect to coal and other natural resources of such Person that are recorded as a liability or deferred revenue on the financial statements of such Person in accordance with GAAP.

"Properties" has the meaning specified in Section 5.09(a).

"Public Lender" has the meaning specified in Section 6.02.

"Qualified Equity Interests" means all Equity Interests of a Person other than Disqualified Equity Interests.

"Qualified Stock" means all Capital Stock of a Person other than Disqualified Stock.

"Real Properties" means, collectively, all right, title and interest of the Borrower or any Subsidiary (including any leasehold or mineral estate) in and to any and all parcels of real property owned or operated by the Borrower or any Subsidiary, whether by lease, license or other use agreement, including but not limited to, coal leases and surface use agreements, together with, in each case, all improvements and appurtenant fixtures (including all conveyors, preparation plants or other coal processing facilities, silos, shops and load out and other transportation facilities), easements and other property and rights incidental to the ownership, lease or operation thereof, including but not limited to, access rights, water rights and extraction rights for minerals.

"Recipient" means any Agent or any Lender, as applicable.

"Register" has the meaning specified in Section 10.06(d).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, members, directors, officers, employees, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, agents, representatives, attorneys, advisors or controlling persons of such Person and of such Person's Affiliates.

"Related Party of a Permitted Holder" means:

(a)        any immediate family member of any Permitted Holder; or

(b)        any trust, corporation, partnership, limited liability company or other entity, the beneficiaries, stockholders, partners, members, owners or Persons beneficially holding a majority (and controlling) interest of which consist of any one or more Permitted Holders and/or such other Persons referred to in the immediately preceding clause (a).

"Reorganization Plan" means a plan of reorganization in any or all of the Chapter 11 Cases of the Debtors.

"Reorganized Foresight" means Holdings (or any other holding company or ultimate parent entity) immediately after consummation of the Reorganization Plan.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

26

"Reporting Period" as defined in the definition of "Budget Variance Report".

"Required Lenders" means, as of any date of determination, Lenders having more than 60% of the aggregate outstanding principal amount of the Loans and unused Commitment of all Lenders; provided that Loans and unused Commitments held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Required Prepayment Date" has the meaning specified in Section 2.05(l).

"Requirement of Law" means as to any Person, the Organizational Documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" means the chief executive officer, president or any vice president of the Borrower, General Partner or Holdings or any applicable Subsidiary and, in addition, any Person holding a similar position or acting as a director or managing director with respect to any Foreign Subsidiary of the Borrower or, with respect to financial matters, the chief financial officer, treasurer or assistant treasurer of the Borrower, General Partner or Holdings.

"Restricted Payment" means (a) any dividend or other distribution (whether in cash, securities or other property) by the Borrower or any Subsidiary with respect to its Capital Stock, or any payment (whether in cash, securities or other property) by the Borrower or any Subsidiary, including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any of its Equity Interests, or on account of any return of capital to its stockholders, partners or members (or the equivalent Person thereof) and (b) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including covenant or legal defeasance), sinking fund or similar payment with respect to, any unsecured Indebtedness for borrowed money, Subordinated Indebtedness or Junior Lien Indebtedness.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement dated as of March 10, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Roll-Up Amount" means, with respect to each Roll-Up Lender, the amount, if any, of the Prepetition First Lien Obligations held by such Roll-Up Lender (or one or more of its affiliates or any investment advisory client managed or advised by such Roll-Up Lender) equal to 0.808625 times the sum of (x) the amount of Initial Term Loans funded by such Roll-Up Lender (or one or more of its affiliates or any investment advisory client managed or advised by such Roll-Up Lender) on the Closing Date and (y) the amount of Delayed Draw Term Loan funded by such Roll-Up Lender (or one or more of its affiliates or any investment advisory client managed or advised by such Roll-Up Lender) on the Delayed Draw Funding Date. The aggregate Roll-Up Amount of all Roll-Up Lenders shall not exceed $75,000,000.

"Roll-Up Facility" as defined in the recitals hereto.

"Roll-Up Lender" means a Consenting First Lien Lender that is a Term Lender (or whose affiliates or whose affiliated investment funds, investment vehicles, investment advisory clients or other entities that are managed or advised by such Consenting First Lien Lender is a Term Lender), and any other Person that becomes a Roll-Up Lender pursuant to an Assignment and Assumption Agreement.

"Roll-Up Loan Note" means a promissory note in the form of Exhibit C-2, as it may be amended, restated, supplemented or otherwise modified from time to time.

"Roll-Up Loans" as defined in Section 2.01(b)(iii).

"Roll-Up Notice" as defined in Section 2.01(b)(iii).

27

"Sale and Lease-Backs" has the meaning assigned to such term in Section 7.16.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Same Day Funds" means immediately available funds.

"Sanctions" has the meaning specified in Section 5.17(a).

"Sanctions Laws" has the meaning specified in Section 5.17(a).

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions. "Secured Parties" means, collectively, the Agents and the Lenders.

"Security Documents" means (i) the Orders, and (ii) to the extent requested by the Collateral Agent or the Required Lenders, any security agreement, pledge agreement, intellectual property security agreements, the Mortgages (if any), each of the supplements thereto and any other documents, agreements or instruments, in each case, in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders, delivered to the Collateral Agent and/or the Lenders pursuant to this Agreement or any other Loan Documents or the Orders in order to grant or purport to grant a Lien on any assets of the Borrower or any other Loan Party to secure the Obligations.

"Similar Business" means any of the following, whether domestic or foreign: the mining, production, marketing, sale, trading and transportation (including, without limitation, any business related to terminals) of natural resources including coal, ancillary natural resources and mineral products, exploration of natural resources, any acquired business activity so long as a material portion of such acquired business was otherwise a Similar Business, and any business that is ancillary or complementary to the foregoing.

"Stated Equity Value" means the "Stated Equity Value" as defined in the Restructuring Support Agreement.

"Stated Maturity Date" has the meaning in clause (a) of the definition of "Maturity Date."

"Subordinated Indebtedness" means any Indebtedness of the Borrower or any Guarantor that is expressly subordinated in right of payment to the Indebtedness under the Loan Documents pursuant to a written agreement to that effect.

"Subsidiary" means, with respect to any Person, any corporation, association, limited liability company or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by, or, in the case of a partnership, the sole general partner or the managing partner or the only general partners of which are, such Person and one or more Subsidiaries of such Person (or a combination thereof).  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim" means the "DIP Superpriority Claim" as defined in the Orders.

"Surety Bonds" means surety bonds obtained by the Borrower or any Subsidiary consistent with market practice and the indemnification or reimbursement obligations of the Borrower or such Subsidiary in connection therewith.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Lender" means each financial institution listed on the signature pages hereto as a Lender (other than a Roll-Up Lender) and any other Person that becomes a party hereto pursuant to an Assignment and Assumption Agreement, in each case, that has a Term Loan Commitment or is a holder of a Term Loan.

"Term Loan" means the Initial Term Loan and the Delayed Draw Term Loan.

"Term Loan Commitment" means the Initial Term Loan Commitment and the Delayed Draw Term Loan Commitment.

"Term Loan Facility" means the Initial Term Loan Facility and/or the Delayed Draw Term Loan Facility.

"Term Loan Note" means a promissory note in the form of Exhibit C-1, as it may be amended, restated, supplemented or otherwise modified from time to time.

"Threshold Amount" means $5,000,000.

"Transactions" means the transactions contemplated herein to occur on the Closing Date, including the funding of the Initial Term Loan Facility, the provision of the Delayed Draw Term Loan Facility, the deemed funding of the Roll-Up Loans, and the commencement of the Chapter 11 Cases.

"Two-Week Test Period" means, at any time, the two-week period ended on the immediately preceding Friday; provided that only periods ending on the second Friday following the Closing Date and each second Friday thereafter shall constitute Two-Week Test Periods.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"UCC" means the Uniform Commercial Code as in effect in the applicable state of jurisdiction.

"Unfunded Pension Liability" means the excess of a Pension Plan's accrued benefit liabilities under Section 4001 (a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the actuarial assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agency or instrumentality thereof, provided that the full faith and credit of the United States of America is pledged in support thereof.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(e).

"Voting Stock" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Waivable Mandatory Prepayment" has the meaning specified in Section 2.05(l).

"Wholly Owned" means, with respect to any Subsidiary, a Subsidiary all of the outstanding Capital Stock of which (other than any director's qualifying shares) is owned by the Borrower and one or more Wholly Owned Subsidiaries (or a combination thereof).

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

    **1.02    Other Interpretive Provisions**. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organizational Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof", "hereto" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)      Section headings herein and in the other Loan Documents are included for convenience of reference only, shall not constitute a part hereof, shall not be given any substantive effect and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.03      Accounting Terms.**

(a)      <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP applied on a consistent basis.

(b)      <u>Changes in GAAP</u>.  If at any time any Accounting Change would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Required Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such Accounting Change as if such Accounting Change has not been made (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.

**1.04      Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

**1.05      LLC Division**.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware Law (including any LLC Division, or any comparable event under a different jurisdiction's laws, as applicable): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

**2.01      The Loans.**

(a)     Term Loans.

(i)     Subject to the terms and conditions set forth herein, each Term Lender agrees, severally and not jointly, to make a loan ("Initial Term Loan") to the Borrower in Dollars, on the Closing Date in an aggregate principal amount not to exceed such Term Lender's Initial Term Loan Commitment.  Initial Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(ii)     Subject to the terms and conditions set forth herein, each Term Lender agrees, severally and not jointly, to make a loan ("Delayed Draw Term Loans") to the Borrower in Dollars, on the Delayed Draw Funding Date in an aggregate principal amount not to exceed such Term Lender's Delayed Draw Term Loan Commitment.  Delayed Draw Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(iii)     Borrower may make only one Borrowing under the Initial Term Loan Commitment on the Closing Date, and Borrower may make only one Borrowing under the Delayed Draw Term Loan Commitment on the Delayed Draw Funding Date.  Any amount borrowed under this Section 2.01(a) and subsequently repaid or prepaid may not be reborrowed.  Each Term Lender's Initial Term Loan Commitment or the Delayed Draw Term Loan Commitment shall terminate immediately and without any further action on the Closing Date or the Delayed Draw Funding Date, as applicable, after giving effect to the funding of such Term Lender's Commitment on such date.  Notwithstanding anything to the contrary, unless the Administrative Agent and the Borrower shall otherwise agree, the initial Interest Period of any Delayed Draw Term Loans that are Eurocurrency Rate Loans shall commence on the date of funding and shall end on the last day of the then-current Interest Period for all Eurocurrency Rate Loans that are Initial Term Loans then outstanding.

(b)     Roll-Up Loan.

(i)     Subject to the terms and conditions set forth herein and the Orders, the Prepetition First Lien Obligations held by each Consenting First Lien Lender shall be automatically substituted and exchanged for (and prepaid by) loans hereunder (the "Roll-Up Loans") in a principal amount equal to such Roll-Up Lender's Roll-Up Amount on the Final Order Entry Date. Such Roll-Up Loans shall be deemed funded on the Final Order Entry, and shall constitute, and shall be deemed to be, Loans hereunder.

(ii)     No later than three (3) Business Days prior to the Final Order Entry, the Administrative Agent shall have received a written notice, in form and substance satisfactory to the Administrative Agent and the Required Lenders (the "Roll-Up Notice"), which shall (A) attach a schedule identifying each Roll-Up Lender and the principal amount of such Roll-Up Lender's Roll-Up Loans deemed issued hereunder, (B) attach a joinder to this Agreement executed by such Roll-Up Lender, pursuant to which, inter alia, such Roll-Up Lender shall represent and warrant that it has delivered to the Administrative Agent a completed Administrative Questionnaire, such documentation and other information under applicable "know your customer" and anti-money laundering rules and regulations requested by the Administrative Agent and such documentation and other information required under Section 3.01, and (C) include a certification from the Borrower as to the accuracy of the information set forth in such schedule delivered pursuant to clause (A) of this Section 2.01(b)(ii).

(iii)     The parties hereto agree that the Administrative Agent and the Prepetition Agent may each conclusively rely on the Roll-Up Notice and this Section 2.01(b) in adjusting the Register and the Register (as defined in the Prepetition First Lien Credit Agreement) to reflect the cancellation of the Prepetition First Lien Obligations and the Roll-Up Loans to be received by the Roll-Up Lender on the Final Order Entry Date.

**2.02     Borrowings, Conversions and Continuations of the Loans.**

(a)     Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurocurrency Rate Loans shall be made by delivery by Borrower of an irrevocable Borrowing Notice, appropriately completed and signed by a Responsible Officer of the Borrower, to the Administrative Agent.  Each Borrowing Notice must be received by the Administrative Agent, not later than 11:00 a.m., New York City time, (i) three Business Days (or, such shorter period as may be acceptable to the Administrative Agent) prior to the requested date of any Borrowing

of, conversion to or continuation of Eurocurrency Rate Loans or of any conversion of Eurocurrency Rate Loans, and (ii) one (1) Business Day prior to the requested date of any Borrowing of Base Rate Loans. Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof. Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $250,000 in excess thereof. Each Borrowing Notice shall specify (i) whether the requested Borrowing is to be a Base Rate Loan or Eurocurrency Rate Loan, (ii) the requested date of the Borrowing, a conversion of Loans from one Type to the other, or a continuation of Eurocurrency Rate Loans, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted and (v) wire instructions for where Loan funds should be sent. If the Borrower fails to specify a Type of Loan in a Borrowing Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation of Eurocurrency Rate Loans, then the Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans.

(b)     Following receipt of a Borrowing Notice, the Administrative Agent shall promptly notify each applicable Lender of the amount of its Applicable Percentage under the applicable Facility of the Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each applicable Lender of the details of any automatic conversion to Base Rate Loans as described in the preceding subsection. In the case of a Borrowing of any Term Loans, each applicable Lender shall make the amount of its Term Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office, not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), and receipt of all requested Loan funds, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)     Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan. During the existence of an Event of Default, no Loans of any Facility may be requested as, converted to or continued as Eurocurrency Rate Loans if the Required Lenders or the Administrative Agent so notify the Borrower.

(d)     Promptly on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurocurrency Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Prime Rate used in determining the Base Rate promptly following the public announcement of such change.

(e)     After giving effect to all Borrowings, all conversions of Loans from one type to the other, and all continuations of Loans as the same Type, there shall not be more than four (4) Interest Periods in effect hereunder in respect of the Loans.

**2.03     [Reserved].**

**2.04     [Reserved].**

**2.05     Prepayments.**

(a)     <u>Voluntary Prepayments</u>. The Borrower may, upon written notice to the Administrative Agent at any time or from time to time voluntarily prepay Loans, in each case, in whole or in part, subject to Section 2.09(c) and Section 2.09(d); <u>provided</u> that (i) such notice must be received by the Administrative Agent not later than 11:00 a.m., New York City time (or such other later date and time which is acceptable to the Administrative Agent), (A) three Business Days prior to any date of prepayment of Eurocurrency Rate Loans, and (B) one Business Day prior to the date of prepayment of Base Rate Loans; (ii) any prepayment of Eurocurrency Rate Loans shall be in a principal

amount of $1,000,000 or a whole multiple of $500,000 in excess thereof; and (iii) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $250,000 in excess thereof or, in each case, the entire amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Facility(ies) and Type(s) of Loans to be prepaid and, if Eurocurrency Rate Loans are to be prepaid, the Interest Period(s) of such Loans.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage in respect of the applicable Facility).  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; provided that any such notice may be contingent upon the consummation of a refinancing or other transactions and such notice may otherwise be extended or revoked by the Borrower by notice to the Administrative Agent prior to the specified effective date if such condition is not satisfied, in each case, with the requirements of Section 3.05 to apply to any failure of the contingency to occur and any such extension or revocation.  Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.  Each prepayment of the outstanding Loans pursuant to this Section 2.05(a) shall be applied as specified in Section 2.05(j), and each prepayment of Loans shall be paid to the Lenders in accordance with their respective Applicable Percentages.

(b)    [Reserved].

(c)    [Reserved].

(d)    [Reserved].

(e)    Asset Sales.  No later than five Business Days following the consummation of any Disposition by the Borrower or a Subsidiary pursuant to Sections 7.05(b) or 7.05(c) that results in the amount of Net Proceeds (as of the date of such receipt) exceeding $250,000 in an aggregate amount of all Net Proceeds received since the Closing Date (such excess amount, the "Excess Proceeds"), the Borrower shall prepay the Loans in an aggregate amount equal to 100% of the Excess Proceeds.  Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with additional amounts required pursuant to Section 3.05.

(f)    Issuance of Debt.  On the first Business Day following receipt by Borrower or any of its Subsidiaries of any cash proceeds from the incurrence of any Indebtedness of Borrower or any of its Subsidiaries (other than with respect to Indebtedness permitted to be incurred pursuant to Section 7.03), Borrower shall prepay the Loans in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(g)    [Reserved].

(h)    Insurance/Condemnation Proceeds.  No later than five Business Days following the date of receipt by the Borrower or any of its Subsidiaries, or the Collateral Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Borrower shall prepay the Loans in an aggregate amount equal to such Net Insurance/Condemnation Proceeds.

(i)    [Reserved].

(j)    Application of Prepayments.  Each prepayment of the outstanding Loans (including all Base Rate Loans and all Eurocurrency Rate Loans) pursuant to this Section 2.05 shall be accompanied by accrued interest to the extent required by Section 2.08.  Subject to the Carve Out, each prepayment of Loans pursuant to Section 2.05 shall be, subject to the Orders, remitted by the Borrower to the Administrative Agent and applied by the Administrative Agent in accordance with Section 8.04.

(k)    [Reserved].

(l)    Waivable Mandatory Prepayment.  Anything contained herein to the contrary notwithstanding, in the event the Borrower is required to make any mandatory prepayment (a "Waivable Mandatory Prepayment") not

less than five Business Days prior to the date (the "Required Prepayment Date") on which the Borrower is required to make such Waivable Mandatory Prepayment, the Borrower shall notify the Administrative Agent in writing of the amount of such prepayment, and the Administrative Agent will promptly thereafter notify each Lender of the amount of such Lender's Applicable Percentage of such Waivable Mandatory Prepayment. Each such Lender may exercise such option by giving written notice to the Borrower and the Administrative Agent of its election to do so on or before 5:00 p.m., New York City time, on the third Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify the Borrower and the Administrative Agent of its election to exercise such option on or before the third Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option). On the Required Prepayment Date, (i) the Borrower shall pay to the Administrative Agent an amount equal to that portion of the Waivable Mandatory Prepayment that is payable to those Lenders that have elected not to exercise such option, to prepay the Loans of such Lenders (which prepayment shall be applied in accordance with the terms of this Section 2.05), and (ii) the portion of the Waivable Mandatory Prepayment otherwise payable to Lenders that have elected to exercise such option ("Declined Proceeds") may be retained by the Borrower to be used for any purpose not prohibited hereunder.

2.06    **[Reserved].**

2.07    **Repayment of Loans**. The Borrower hereby unconditionally agrees to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of such Lender's Loans, together with all other amounts owed hereunder with respect thereto, including all applicable fees in accordance with Section 2.09 on the Maturity Date.

2.08    **Interest.**

(a)    Subject to the provisions of subsection (b) below, (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)    If any amount of principal or interest of any Loan (or any other Obligations) is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

2.09    **Fees**.

(a)    Agency Fee. The Borrower shall pay to each Agent for its own account, in Dollars, fees in the amounts and at the times specified in the Agency Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(b)    Upfront Fee. The Borrower shall pay to the Administrative Agent (i) on the Closing Date for the account of each Initial Term Lender, as fee compensation for the funding of such Initial Term Lender's Initial Term Loan, an upfront fee in an amount equal to 3.00% of the aggregate principal amount of such Initial Term Lender's Initial Term Loan Commitment, payable to such Initial Term Lender from the proceeds of its Initial Term Loan on the Closing Date, and (ii) on the Delayed Draw Funding Date for the account of each Delayed Draw Term Lender, as fee compensation for the funding of such Delayed Draw Term Lender's Delayed Draw Term Loan, an upfront fee in an amount equal to 3.00% of the aggregate principal amount of such Delayed Draw Term Lender's Delayed Draw Term Loan Commitment, payable to such Delayed Draw Term Lender from the proceeds of its Delayed Draw Term

Loan on the Delayed Draw Funding Date. Such upfront fees will be in all respects fully earned, due and payable upon the funding of the Initial Term Loans or the Delayed Draw Term Loans, as the case may be, and shall be non-refundable and non-creditable thereafter.

(c)    <u>Put Option Premium</u>. The Borrower shall pay to each Backstop Lender (or any Affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such Backstop Lender or such Affiliate, in each case, designated by such Backstop Lender in writing to the Administrative Agent) a put option premium in an amount equal to 5.0% of the aggregate principal amount of such Backstop Lender's Backstop Commitments (as in effect immediately prior to the funding of Initial Term Loans), which shall be due on the Plan Effective Date and payable in the form of New Common Equity at a 35% discount to the Stated Equity Value, subject to dilution for the Management Incentive Plan; <u>provided</u>, however, that, after the exercise of remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable) upon the occurrence of any Event of Default under this Agreement or upon repayment of the Loans in full and termination of all Commitments without the occurrence of the Plan Effective Date, the Borrower shall pay to each Backstop Lender (or any Affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such Backstop Lender or such Affiliate, in each case, designated by such Backstop Lender in writing to the Administrative Agent) in cash a put option premium in an amount equal to $10,000,000, ratably in accordance with their Backstop Commitments (as in effect immediately prior to the funding of the Initial Term Loans). Such put option premium will be fully earned in all respects on the Closing Date, and shall be non-refundable and non-creditable thereafter. The Agents shall have no responsibility for the distribution of any New Common Equity to the Backstop Lenders.

(d)    <u>Exit Fee</u>. The Borrower shall pay to each Term Lender (or any Affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such Term Lender or such Affiliate, in each case, designated by such Term Lender in writing to the Administrative Agent) an exit fee in an aggregate amount equal to 1.0% of the aggregate principal amount of the Term Loan Commitment (prior to any funding of Term Loans), which shall be due on the Plan Effective Date, ratably in accordance with Term Loans then outstanding and any unfunded Term Loan Commitments then outstanding, and payable in the form of New Common Equity at a 35% discount to the Stated Equity Value, subject to dilution for the Management Incentive Plan; <u>provided</u>, however, that, after the exercise of remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable) upon the occurrence of any Event of Default under this Agreement or upon repayment of the Loans in full and termination of all Commitments without the occurrence of the Plan Effective Date, the Borrower shall pay to each Term Lender (or any Affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such Term Lender or such Affiliate, in each case, designated by such Term Lender in writing to the Administrative Agent) in cash an exit fee in an amount equal to $2,000,000, ratably in accordance with their Term Loans outstanding at such time. Such exit fees will be fully earned in all respects on the Closing Date, and shall be non-refundable and non-creditable thereafter. The Agents shall have no responsibility for the distribution of any New Common Equity to the Term Lenders.

(e)    <u>Delayed Draw Term Loan Commitment Fee</u>. The Borrower shall pay to the Administrative Agent, for the account of each Delayed Draw Term Lender, as fee compensation for such Term Lender's Delayed Draw Term Loan Commitment, a commitment fee (the "<u>Delayed Draw Term Loan Commitment Fee</u>") on the Delayed Draw Term Loan Commitment (whether or not then available) of such Term Lender accruing, during the period commencing from the Closing Date to the Delayed Draw Funding Date, at a rate per annum equal to the 1.00%, payable to such Term Lender from the proceeds of its Delayed Draw Term Loan on the Delayed Draw Funding Date. Such Delayed Draw Term Loan Commitment Fee will be in all respects fully earned, due and payable upon the funding of the Delayed Draw Term Loans, and shall be non-refundable and non-creditable thereafter.

**2.10    Computation of Interest and Fees.**

(a)    All computations of interest for Base Rate Loans, where the rate of interest is calculated on the basis of the Prime Rate, shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; <u>provided</u> that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by an

35

Administrative Agent, of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Evidence of Debt.**

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender to the Borrower, the Borrower shall execute and deliver a Note to such Lender, which shall evidence such Lender's Loans to the Borrower in addition to such accounts or records.  Each Lender may attach schedules to a Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

**2.12    Payments Generally; Administrative Agent's Clawback.**

(a)    <u>General</u>.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent for the account of the Lenders, to which such payment is owed, at the Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m., New York City time, on the date specified herein.  The Administrative Agent will promptly distribute to each applicable Lender its Applicable Percentage of such payment in like funds as received by wire transfer to such applicable Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m., New York City time, may, in Administrative Agent's discretion, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    <u>Funding by Lenders; Presumption by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Eurocurrency Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon., New York City time, on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by <u>Section 2.02</u>) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if an applicable Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in Same Day Funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the Overnight Rate <u>plus</u> any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans of the Facility and Type comprising such Borrowing.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Term Loan, included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    <u>Payments by Borrower; Presumptions by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the

Administrative Agent for the account of the applicable Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lenders, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the applicable Lenders, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent at the Overnight Rate.

A notice of the Administrative Agent to any applicable Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender to the Borrower as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to Section 10.04(c) are several and not joint.  The failure of any Lender to make any Term Loan or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Term Loan or to make its payment under Section 10.04(c).

(e)    Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13    Pro Rata; Sharing of Payments by Lenders**.  Except as otherwise expressly provided in this Agreement, each payment (including each prepayment) by the Borrower on account of principal of and interest on any Loans shall be allocated by the Administrative Agent pro rata according to the respective outstanding principal amounts of such Loans then held by the respective Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payment on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be; provided that:

(a)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)    the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall

apply), (iii) any payments pursuant to the Agency Fee Letter, or (iv) any payments made pursuant to <u>Article III</u> or <u>Section 10.13</u>.

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

**2.14**   **[Reserved].**

**2.15**   **[Reserved].**

**2.16**   **[Reserved].**

**2.17**   **[Reserved].**

**2.18**   **Defaulting Lenders**.  Notwithstanding anything contained in this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(a)      <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VIII</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 10.08</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to any Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders, as a result of any judgment of a court of competent jurisdiction obtained by any Lender, against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

A Lender that has become a Defaulting Lender because of an event referenced in the definition of Defaulting Lender may cure such status and shall no longer constitute a Defaulting Lender as a result of such event when (i) such Defaulting Lender shall have fully funded or paid, as applicable, all Loans or other amounts required to be funded or paid by it hereunder as to which it is delinquent (together, in each case, with such interest thereon as shall be required to any Person as otherwise provided in this Agreement), (ii) the Administrative Agent and each of the Borrower shall have received a certification by such Defaulting Lender of its ability and intent to comply with the provisions of this Agreement going forward, and (iii) each of the Administrative Agent and the Borrower shall have determined (and notified the Administrative Agent) that they are satisfied, in their sole discretion, that such Defaulting Lender intends to continue to perform its obligations as a Lender hereunder and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder.  No reference in this subsection to an event being "cured" shall by itself preclude any claim by any Person against any Lender that becomes a Defaulting Lender for such damages as may otherwise be available to such Person arising from any failure to fund or pay any amount when due hereunder or from any other event that gave rise to such Lender's status as a Defaulting Lender.

**2.19    Priority and Liens; No Discharge.**

(a)    The relative priorities of the Liens with respect to the Collateral shall be as set forth in the Interim Order (and, when entered, the Final Order). Notwithstanding anything to the contrary in this Agreement or in any Loan Document, all of the Liens described herein shall be effective and perfected upon entry of the Interim Order without the necessity of the execution or recordation of filings by the Debtors of security agreements, mortgages, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Collateral Agent, as applicable, of, or over, any Collateral, as set forth in the Interim Order and, when entered, the Final Order.

(b)

(i)    Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Collateral Agent on behalf of and for the benefit of the Secured Parties in all of the Collateral and the proceeds thereof, which includes, without limitation, all of such Debtor's Real Properties (other than Excluded Assets), now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

(ii)    Further to Section 2.19(b)(i) and the Interim Order (and, when entered, the Final Order), subject to Section 2.19(b)(iv) below, to secure the full and timely payment and performance of the Obligations, each Loan Party that is a Debtor hereby MORTGAGES, GRANTS, BARGAINS, ASSIGNS, SELLS, CONVEYS and CONFIRMS, to the Collateral Agent, for the ratable benefit of the Secured Parties, all or any Real Properties (in any case, excluding any Real Properties that are Excluded Assets), but which, for the avoidance of doubt, shall include all of such Loan Party's right, title and interest now or hereafter acquired in and to (a) any and all easements, rights-of-way, reversions, sidewalks, strips and gores of land, drives, roads, curbs, streets, ways, alleys, passages, passageways, sewer rights, waters, water courses, water rights, mineral, gas and oil rights, as-extracted collateral and all power, air, light and other rights, estates, titles, interests, privileges, liberties, servitudes, licenses, tenements, hereditaments and appurtenances whatsoever, in any way belonging, relating or appertaining thereto, or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto; (b) the lessee's interest and estate in, to and under any leases and subleases to which such Loan Party is a party (as such leases and subleases may be extended, amended, supplemented, modified or restated), together with any and all easements, rights-of-way, reversions, sidewalks, strips and gores of land, drives, roads, curbs, streets, ways, alleys, passages, passageways, sewer rights, waters, water courses, water rights, mineral, gas and oil rights, as-extracted collateral and all power, air, light and other rights, estates, titles, interests, privileges, liberties, servitudes, licenses, tenements, hereditaments and appurtenances whatsoever, in any way demised under such leases and subleases; (c) any and all tipples, loading and coal washing facilities, railroad tracks, buildings, foundations, structures and other fixtures and improvements and any and all alterations and all materials now or hereafter intended for construction, reconstruction or repair thereof; (d) any and all permits, certificates, authorizations, consents, approvals, licenses, franchises, waivers or other instruments now or hereafter required by any Governmental Authority to operate or use and occupy the Real Properties and related assets for its intended uses; (e) all materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by such Loan Party, and water, gas, electrical, telephone, storm and sanitary sewer facilities and all other utilities whether or not situated in easements or used or useful in connection with mining coal or other minerals or in connection with any related activities or the maintenance or preservation thereof; (f) all goods, accounts, general intangibles, instruments, documents, chattel paper, as-extracted collateral and all other personal property of any kind or character, including such items of personal property as defined in the UCC; (g) all reserves, escrows or impounds and all deposit accounts; (h) such Loan Party's right, title and interest as lessor, landlord, sublessor, sublandlord, franchisor, licensor or grantor, in all leases and subleases (including, without limitation, intercompany leases) of land or improvements, leases and subleases of space, oil, gas and mineral leases, franchise agreements, licenses, occupancy or concession agreements or other agreements which grant to any Person (other than such Loan Party) a possessory interest in, or the right to use any Real Properties, including, all rents, additional rents, royalties, cash, guaranties, letters of credit, bonds, sureties or securities deposited thereunder to secure performance of the lessee's, sublessee's, franchisee's, licensee's or obligee's obligations thereunder, revenues, earnings, profits and income, advance rental or royalties, payments, payments incident to assignment, sublease or surrender of a lease, claims for forfeited deposits and claims for damages, now due or hereafter to become due, with respect to any lease, any indemnification against, or reimbursement for, sums paid and costs and expenses incurred by such Loan Party

under any lease or otherwise, and any award in the event of the bankruptcy of any tenant or lessee under or guarantor of a lease; (i) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of any Real Properties; (j) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing; (k) all property tax refunds payable to such Loan Party; (l) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof; (m) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by such Loan Party; and (n) any awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made by any Governmental Authority pertaining to the Real Properties (BUT EXCLUDING from the foregoing grants, Excluded Assets), TO HAVE AND TO HOLD to the Collateral Agent, and such Loan Party does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets and interests unto the Collateral Agent.

(iii)    Each Loan Party that is a Debtor further agrees that upon the request of the Collateral Agent (acting at the direction of the Required Lenders), such Loan Party shall execute and deliver to the Collateral Agent, as soon as reasonably practicable following such request but in any event within 45 days following such request (or such later date as may be extended by the Collateral Agent), with respect to Real Properties owned or leased by such Loan Party (in any case, excluding any Real Properties that are Excluded Assets) and identified by the Collateral Agent, the applicable Loan Party shall deliver:

1.    fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each such Real Properties, and any ancillary deliverables as reasonably requested by the Collateral Agent (including, without limitation, memoranda of leases in recordable form, duly executed by the applicable landlord and Loan Party);

2.    an opinion of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) in each state in which each such Real Property is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent; and

3.    (A) a completed Flood Certificate with respect to any Real Property that constitutes Collateral and that is improved with structures eligible for flood insurance under the Flood Program, which Flood Certificate shall (x) be addressed to the Collateral Agent and (y) otherwise comply with the Flood Program; (B) if the Flood Certificate states that such Real Property is located in a Flood Zone, Debtor's written acknowledgment of receipt of written notification from the Collateral Agent (x) as to the existence of each such Real Property and (y) as to whether the community in which such Real Property is located is participating in the Flood Program; and (C) if such Real Property is located in a Flood Zone and is located in a community that participates in the Flood Program, evidence that Debtor has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program.

(iv)    Each of the Loan Parties agrees that to the extent that its Obligations have not been Paid in Full, (i) its obligations shall not be discharged by any order confirming a Reorganization Plan (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Secured Parties pursuant to the Orders and the Liens granted to the Secured Parties pursuant to the Orders shall not be affected in any manner by any order confirming a Reorganization Plan; *provided* that such Obligations shall be discharged upon such Payment in Full, and such Obligations may be otherwise treated in accordance with an Acceptable Plan and such treatment will provide for the discharge of the Obligations arising hereunder if so provided by such Acceptable Plan.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

**3.01    Taxes.**

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any Loan Party hereunder or under any other Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law.  If any applicable Law (as determined in the good faith discretion of the applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 3.01(a)</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    <u>Payment of Other Taxes by the Borrower</u>.  Without duplication of any obligation set forth in subsection (a) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of any Other Taxes.

(c)    <u>Indemnification by the Borrower</u>.  The Loan Parties shall jointly and severally indemnify each Recipient within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient, or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of an applicable Lender, shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.01, the applicable Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    <u>Status of Lenders</u>.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to any payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by applicable Law and from time to time when reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is not a Foreign Lender shall deliver to the Borrower and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable Law or upon the reasonable request of the Borrower or the Administrative Agent), duly completed and executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender, to the extent it is legally entitled to do so, shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior

41

to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of any Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, duly completed and executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      duly completed and executed copies of IRS Form W-8ECI or IRS Form W-8EXP;

(3)      in the case of any Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit M-1 to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" related to a Loan Party as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) duly completed and executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable;

(4)      to the extent any Foreign Lender is not the beneficial owner, duly completed and executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8EXP, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-2 or Exhibit M-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-4 on behalf of each such direct and indirect partner;

(C)      in addition, any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), duly completed and executed copies of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States federal withholding Tax duly completed and executed together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or Administrative Agent to determine the withholding or deduction required to be made; provided, that notwithstanding anything to the contrary in this Section 3.01(e); the completion, execution and submission of the documentation described in this subclause 3.01(e)(ii)(C) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender; and

(D)      if a payment made to a Lender under any Loan Document would be subject to Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or Section 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Law and at such time or times as reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such

Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for the purposes of this subclause 3.01(e)(ii)(D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     <u>Treatment of Certain Refunds</u>. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this <u>Section 3.01</u>), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (<u>plus</u> any penalties, interest or other charges imposed by the relevant Governmental Authority), in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying or any other Person.

(g)     <u>Survival</u>. Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

**3.02     Illegality**. If any Lender determines that as a result of any Change in Law it becomes unlawful, or that any Governmental Authority asserts that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, or to determine or charge interest rates based upon the Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the applicable interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (a) any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loan to Eurocurrency Rate Loans, shall be suspended and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurocurrency Rate component of the Base Rate, the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate, in each case, until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or convert all such Eurocurrency Rate Loans of such Lender to Base Rate Loans (the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurocurrency Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurocurrency Rate component thereof until the Administrative Agent is advised in writing by such Lender, which it shall do as promptly as possible, that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurocurrency Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**3.03     Inability to Determine Rates**

(a)        If the Administrative Agent determines that for any reason in connection with any request for a Eurocurrency Rate Loan or a conversion to or continuation thereof that (i) adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or (ii) the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans in the affected currency or currencies shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders, who agree to so instruct the Administrative Agent once the circumstances giving rise to the inability to determine rates no longer exist) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(b)        If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Section 3.03(a)(i) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Section 3.03(a)(i) have not arisen but the supervisor for the administrator of the Eurocurrency Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Eurocurrency Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the Eurocurrency Rate that (x) gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans of similar type in the United States at such time, and (y) is a rate that the Administrative Agent is able to calculate and administer, and the Borrower and the Administrative Agent shall enter into an amendment to this Agreement to effectuate such alternate rate of interest and such other changes to this Agreement as may be necessary or desirable in connection therewith.  Notwithstanding anything to the contrary in Section 10.01, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five Business Days of the date that notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment. Until an alternate rate of interest shall be determined in accordance with this paragraph (b) (but in the case of the circumstances described in Section 3.03(b)(ii), only to the extent the Eurocurrency Rate is not available or published at such time on a current basis), Sections 3.03(a)(i) and (ii) shall be applicable.

**3.04    Increased Costs; Reserves on Eurocurrency Rate Loans.**

(a)        <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)        impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Eurocurrency Rate contemplated by <u>Section 3.04(e)</u>);

(ii)        subject any Recipient to Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)        impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurocurrency Rate Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurocurrency Rate Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon written request of such Lender setting forth in reasonable detail such increased costs, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such

additional costs incurred or reduction suffered; provided that before making any such demand, each Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be materially disadvantageous to it, in its reasonable discretion, in any legal, economic or regulatory manner) to designate a different Eurocurrency lending office if the making of such designation would allow the Lender or its Eurocurrency lending office to continue to perform its obligation to make Eurocurrency Rate Loans or to continue to fund or maintain Eurocurrency Rate Loans and avoid the need for, or reduce the amount of, such increased cost.

(b)      _Capital Requirements_.  If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time, after submission to the Borrower (with a copy to the Administrative Agent) of a written request therefor setting forth in reasonable detail the change and the calculation of such reduced rate of return, the Borrower will pay to such Lender, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      _Certificates for Reimbursement_.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section, describing the basis therefor and showing the calculation thereof in reasonable detail, and delivered to the Borrower shall be conclusive, absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)      _Delay in Requests_.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than 90 days prior to the date that such Lender, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 90-day period referred to above shall be extended to include the period of retroactive effect thereof).

(e)      _Additional Reserve Requirements_.  The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "_Eurocurrency liabilities_"), additional interest on the unpaid principal amount of each Eurocurrency Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as reasonably determined by such Lender in good faith, which determination shall be conclusive, absent manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Eurocurrency Rate Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive, absent manifest error), which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least 10 Business Days' prior notice (with a copy to the Administrative Agent) of such additional interest or costs from such Lender describing the basis therefor and showing the calculation thereof, in each case, in reasonable detail.  If a Lender fails to give notice 10 Business Days prior to the relevant Interest Payment Date, such additional interest or costs shall be due and payable within 30 days from receipt of such notice.

(f)      _Certain Rules Relating to the Payment of Additional Amounts_.  If any Lender requests compensation pursuant to this Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, such Lender shall either (A) forego payment of such additional amount from the Borrower or (B) reasonably afford the Borrower the opportunity to contest, and reasonably cooperate with the Borrower in

45

contesting, the imposition of any Indemnified Taxes or other amounts giving rise to such payment; provided that the Borrower shall reimburse such Lender for its reasonable and documented out-of-pocket costs, including reasonable and documented attorneys' and accountants' fees and disbursements incurred in so cooperating with the Borrower in contesting the imposition of such Indemnified Taxes or other amounts.

3.05    **Compensation for Losses**.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower;

(c)    [reserved]; or

(d)    any assignment of a Eurocurrency Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 10.13;

including any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan, from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract, but excluding any loss of anticipated profits.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate used in determining the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the offshore interbank market for such currency for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

3.06    **Mitigation Obligations; Replacement of Lenders.**

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall (i) use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (A) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (B) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, as applicable, and (ii) promptly inform the Borrower and the Administrative Agent when the circumstances giving rise to the applicability of such Sections no longer exists. The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 3.04, if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, if any Lender gives a notice pursuant to Section 3.02 or if any Lender is at such time a Defaulting Lender, then the Borrower may replace such Lender in accordance with Section 10.13.

3.07    **Survival**.  The parties' obligations under this Article III shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments,

the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

## ARTICLE IV
## CONDITIONS PRECEDENT

**4.01    Conditions Precedent to the Closing Date**.  The effectiveness of this Agreement is subject to satisfaction of the following conditions precedent:

(a)    <u>Petition Date</u>. The Petition Date shall have occurred and the Borrower and each Guarantor shall be a debtor and debtor-in-possession in the Chapter 11 Cases.

(b)    <u>Loan Documents</u>. The Administrative Agent shall have received each Loan Document required to be delivered on the Closing Date, each of which shall be in form and substance reasonably acceptable to the Required Lenders, including:

(i)    this Agreement, executed and delivered by the Administrative Agent, the Borrower, each Guarantor and each Person that is a Lender as of the Closing Date;

(ii)    [reserved];

(iii)    the Agency Fee Letter, executed and delivered by the Agents and the Borrower;

(iv)    [reserved];

(v)    Notes, executed and delivered by the Borrower in favor of each Lender requesting any Note;

(vi)    a certificate of each Loan Party signed on behalf of such Loan Party by a Responsible Officer, dated the Closing Date (the statements made in which certificate shall be true on and as of the Closing Date), certifying as to (A) the Organizational Documents of each Loan Party, certified, to the extent applicable, by the applicable Governmental Authority, and the absence of any amendments to the Organizational Documents of such Loan Party since the date certified by such Governmental Authority, including a true and correct copy of the bylaws, limited liability company agreement, or partnership agreement of such Loan Party as in effect on the date on which the resolutions referred to in Section 4.01(b)(vi)(B) were adopted and on the Closing Date, (B) copies of resolutions of the board of directors and/or similar governing bodies of each Loan Party approving and authorizing the Transactions and the execution, delivery and performance of the Loan Documents to which it is a party, (C) the good standing or valid existence of such Loan Party as a corporation, limited liability company or partnership organized or formed under the laws of the jurisdiction of its incorporation or formation and the absence of any proceeding for the dissolution or liquidation of such Loan Party; and (D) the signatures and incumbency of each Responsible Officer of each Loan Party executing the Loan Documents to which it is a party; and

(vii)    a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.01 and 4.02 have been satisfied, and (B) that there has not occurred since December 31, 2018, any Material Adverse Effect.

(c)    <u>Personal Property Collateral</u>. Each Loan Party shall have delivered to the Collateral Agent:

(i)    evidence reasonably satisfactory to the Collateral Agent of the compliance by each Loan Party of their obligations under the Security Documents (including their obligations to execute or authorize, as applicable, and deliver UCC financing statements (including, without limitation, as-extracted financing statements), originals of securities, instruments and chattel paper, in each case, constituting Collateral, as provided therein);

(ii)    a completed Collateral Questionnaire dated the Closing Date and executed by a Responsible Officer of each Loan Party, together with all attachments contemplated thereby;

(iii)    [reserved]; and

(iv)    evidence that each Loan Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument (including any intercompany notes evidencing Indebtedness permitted to be incurred pursuant to Section 7.03) and made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by the Collateral Agent or the Required Lenders.

(d)    Approvals; No Restrictions. All governmental and third party approvals necessary or required in connection with the Transactions and the continuing operations of the Borrower and its Subsidiaries (including shareholder approvals, if any) shall have been obtained and be in full force and effect. The Loan Parties and their Affiliates shall not be subject to contractual or other restrictions that would be violated by the execution and delivery of the Loan Documents or the initial extension of credit hereunder and there shall not exist any action, suit, investigation, litigation, proceeding or hearing, pending or threatened in any court or before any arbitrator or Governmental Authority that affects the Transactions or otherwise impairs the ability of the Loan Parties to consummate the Transactions and no preliminary or permanent injunction or order by a state or federal court shall have been entered, in each case that would be material and adverse to the Agents or the Lenders.

(e)    Fees; Expenses. Any fees required to be paid on or before the Closing Date to the Agents and/or the Lenders under this Agreement, the Agency Fee Letter, or otherwise in connection with the Facilities shall have been paid and, unless waived by the Agents and/or the Lenders, as applicable, the Borrower shall have paid all reasonable and documented costs and expenses of the Agents and the Lenders (including the reasonable and documented fees and expenses of (i) Akin Gump Strauss Hauer & Feld LLP, Milbank LLP, and Bryan Cave Leighton Paisner LLP, counsel to the Lenders, (ii) Lazard and Perella Weinberg Partners L.P., financial advisors to the Lenders, and (iii) Ropes & Gray LLP, counsel to the Agents).

(f)    No Material Adverse Effect. Since December 31 2018, no Material Adverse Effect (after giving effect to the qualifications set forth in such definition) shall have occurred.

(g)    Budget and Cash Flow Forecast. The Administrative Agent shall have received (x) weekly operating and cash flow projections for the Debtors for the period commencing on the Petition Date and ending on July 11, 2020, in form and substance satisfactory to the Financial Advisor (the "DIP Budget"), and (y) the Cash Flow Forecast; provided that such Cash Flow Forecast may be amended, replaced, supplemented or otherwise modified from time to time to the extent such amended, replaced, supplemented or modified Cash Flow Forecast is in form and substance satisfactory to the Required Lenders in their sole discretion.

(h)    Existing Indebtedness.  Borrower and its Subsidiaries shall have no outstanding Indebtedness other than Indebtedness permitted under this Agreement.

(i)    Financial Statements. Administrative Agent shall have received from Borrower (i) the Historical Financial Statements, (ii) a pro forma consolidated balance sheet of Borrower and its Subsidiaries on a consolidated basis as of the last day of the most recently completely four-fiscal quarter period for which financial statements were delivered under clause (i) of the definition of the term "Historical Financial Statements", reflecting the related financings and the other transactions contemplated by the Loan Documents to occur on or prior to the Closing Date as if such transactions occurred as of such date.

(j)    Interim Order.  No later than five (5) days following the Petition Date (or such later date as the Required Lenders may agree), the Interim Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Required Lenders and the Administrative Agent shall have received a certified copy thereof; provided that the Interim Order shall not have been vacated, reversed, modified, amended or stayed in any respect without the prior written consent of the Required Lenders.

(k)    First Day Orders. All "first day" orders intended to be entered by the Bankruptcy Court at or immediately after the Debtors' "first day" shall have been entered by the Bankruptcy Court in form and substance acceptable to the Required Lenders.

(l)     Patriot Act. The Lenders and the Administrative Agent shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act (which shall include, but not be limited to, a duly executed IRS Form W-9, or other applicable tax form); provided that such information is requested at least 3 Business Days prior to the Closing Date.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01 or Section 4.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender specifying its objection thereto.

**4.02     Conditions Precedent to Each Term Loan**. The agreement of each Lender to make any extension of credit requested to be made by it on any date (including, without limitation, any Loans on the Closing Date) is subject to satisfaction of the following conditions precedent:

(a)     No Default. There shall exist no Default or Event of Default under the Loan Documents.

(b)     Representations and Warranties. The representations and warranties of the Borrower and each Guarantor herein and in the other Loan Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding of the applicable Loans to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case, such representations and warranties shall have been true and correct in all materials respects on and as of such earlier date; provided that in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof. .

(c)     Interim Order.  At any time prior to the Final Order Entry Date, the Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the prior written consent of the Required Lenders.

(d)     Final Order. With respect to any Credit Extension on or after the Final Order Entry Date, the Final Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders.

(e)     Restructuring Support Agreement.  The Restructuring Support Agreement (i) shall be in full force and effect, (ii) shall not have been amended or modified without the prior written consent of the Required Lenders, and (iii) no breach that would, after the expiration of any applicable notice or cure period, give rise to a right to terminate the Restructuring Support Agreement shall exist.

(f)     Notice of Borrowing. The Administrative Agent shall have received a duly executed Borrowing Notice from the Borrower pursuant to and in accordance with Section 2.02(a).

(g)     No Trustee.  No trustee, receiver or examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties shall have been appointed or designated.

(h)     Dismissal; Conversion. None of the Chapter 11 Cases of any Debtors shall have been dismissed. The Chapter 11 Cases shall not have been converted to Chapter 7 of the Bankruptcy Code.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES**

In order to induce the Agents and the Lenders to enter into this Agreement and to make each Credit Extension to be made hereby, each Loan Party represents and warrants to the Agents and the Lenders that the following statements are true and correct:

49

**5.01    Existence, Qualification and Power**.  Each Loan Party and its Subsidiaries (a) (i) is duly organized or formed and validly existing and (ii) is in good standing under the Laws of the jurisdiction of its incorporation or organization, if such legal concept is applicable in such jurisdiction, (b) subject to any restriction arising on account of Borrower's or each of its Subsidiaries' status as a "debtor" under the Bankruptcy Code, has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) subject to entry of the Orders and the terms thereof, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified, licensed, and in good standing (to the extent good standing is an applicable legal concept in the relevant jurisdiction), under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; where the failure to so qualify or be in good standing could not reasonably be expected to have a Material Adverse Effect.

**5.02    Authorization; No Contravention**.  Subject to entry of the Orders and the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, (a) have been duly authorized by all necessary corporate or other organizational action and (b) do not and will not (i) contravene the terms of any of such Person's Organizational Documents; (ii) except to the extent excused as a result of the Chapter 11 Cases, conflict with or result in any breach or contravention of, or the creation of, any Lien (other than Permitted Liens) under, or require any payment to be made under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority to which such Person or its property is subject or (C) any arbitral award to which such Person or its property is subject; or (iii) violate any Law binding on such Loan Party, except in each case referred to in <u>clauses (b)(ii)</u> or <u>(b)(iii)</u> to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.03    Governmental Authorization**.  Except for the entry of the Orders, (a) no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority and (b) no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with any other Person, in each case, is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for those approvals, consents, exemptions, authorizations or other actions which have already been obtained, taken, given or made and are in full force and effect.

**5.04    Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the Orders and the terms thereof, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other Laws relating to or affecting creditors' rights generally, general principles of equity, regardless of whether considered in a proceeding in equity or at law and an implied covenant of good faith and fair dealing.

**5.05    Financial Conditions; No Material Adverse Effect.**

(a)    The Historical Financial Statements were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of such dates and their results of operations for the period covered thereby, subject, in the case of any unaudited financial statements, to the absence of footnotes and to normal year end adjustments.

(b)    Since December 31, 2018, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect (after giving effect to the qualifications set forth in such definition).

(c)    The financial projections and estimates and information of a general economic nature prepared, or as directed by, the Loan Parties or any of their representatives and that have been made available to any Lender or its Related Parties in connection with the Transactions or the other transactions contemplated by this Agreement as of

the date delivered in connection with this Agreement have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable in light of the conditions existing at the time of delivery of such forecasts (it being understood that any such information is subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurance can be given that the future developments addressed in such information can be realized).

        **5.06**     **Litigation.**

        (a)     There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower threatened, at law, in equity, by or before any Governmental Authority, by or against the Borrower or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in public filings prior to the date hereof, as to which there is a reasonable possibility of an adverse determination and that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

        (b)     None of Borrower or any of its Subsidiaries or their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any currently applicable Law (including any zoning, building or environmental law, mine safety law, ordinance, code or approval or any building permit) or any restriction of record or agreement affecting any Mortgaged Property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

        **5.07**     **No Default**.  .  Other than as a result of the commencement of the Chapter 11 Cases and the effects thereof, none of the Borrower or any of its Subsidiaries is in default under or with respect to any Contractual Obligation that could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the Transactions or any other transactions contemplated by this Agreement or any other Loan Document.

        **5.08**     **Ownership and Identification of Property.**

        (a)     The Borrower and its Subsidiaries have good record and marketable title in fee simple to, or valid leasehold interests in, all Real Property necessary or used in the ordinary conduct of its business, except for minor defects in title as could not reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, with respect to all real property listed on Schedule 5.08(c): (i) the Borrower and its Subsidiaries possess all leasehold interests necessary for the operation of the Mines currently being operated by each of them and included or purported to be included in the Collateral pursuant to the Security Documents, except where the failure to possess such leasehold interests could not reasonably be expected to have a Material Adverse Effect, (ii) each of their respective rights under the leases, contracts, rights-of-way and easements necessary for the operation of such Mines are in full force and effect, except to the extent that failure to maintain such leases, contracts, rights of way and easements in full force and effect could not reasonably be expected to have a Material Adverse Effect; and (iii) each of the Borrower and its Subsidiaries possesses all licenses, permits or franchises which are necessary to carry out its business as presently conducted at any Mine included or purported to be included in the Collateral pursuant to the Security Documents, except where failure to possess such licenses, permits or franchises could not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

        (b)     Schedule 5.08(b) lists completely and correctly as of the Closing Date all Material Real Property fee owned by the Borrower and the other Loan Parties.

        (c)     Schedule 5.08(c) lists completely and correctly as of the Closing Date all Leasehold Properties constituting Material Real Property leased by the Borrower and the other Loan Parties and the lessors thereof.

        (d)     Except as could not be expected to have a Material Adverse Effect, there are no pending or, to the knowledge of any Loan Party, proposed special or other assessments for public improvements or otherwise affecting any material portion of any owned Real Property of the Loan parties, nor are there contemplated improvements to such owned Real Property of the Loan Parties that may result in such special or other assessments.

**5.09   Environmental Compliance**.  Except as disclosed on Schedule 5.09, or as otherwise could not reasonably be expected to have a Material Adverse Effect:

(a)      The facilities and properties currently or formerly owned, leased or operated by the Borrower, or any of its respective Subsidiaries (the "Properties") do not contain any Hazardous Materials in amounts or concentrations which (i) constitute a violation of, or (ii) could reasonably be expected to give rise to liability under, any applicable Environmental Law.

(b)      None of the Borrower, nor any of its respective Subsidiaries has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding compliance with or liability under Environmental Laws with regard to any of the Properties or the business operated by the Borrower, or any of its Subsidiaries (the "Business"), or any prior business for which the Borrower has retained liability under any Environmental Law.

(c)      Hazardous Materials have not been transported or disposed of from the Properties in violation of, or in a manner or to a location which could reasonably be expected to give rise to liability under, any applicable Environmental Law, nor have any Hazardous Materials been generated, treated, stored or disposed of at, or under any of the Properties in violation of, or in a manner that could reasonably be expected to give rise to liability under, any applicable Environmental Law.

(d)      No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened under any Environmental Law to which the Borrower, or any of its Subsidiaries is or, to the knowledge of the Borrower, will be named as a party or with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other similar administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business.

(e)      There has been no release or threat of release of Hazardous Materials at or from the Properties, or arising from or related to the operations of the Borrower, or any of its Subsidiaries in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that could reasonably be expected to give rise to liability under any applicable Environmental Laws.

(f)      The Properties and all operations at the Properties are in compliance with all applicable Environmental Laws.

(g)      The Borrower and each of its Subsidiaries has obtained, and is in compliance with, all Environmental Permits required for the conduct of its businesses and operations, and the ownership, occupation, operation and use of its Property, and all such Environmental Permits are in full force and effect.

**5.10   Insurance.**

(a)      The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies which may be Affiliates of the Borrower, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates.

(b)      As to any Building located on Material Real Property and constituting Collateral, all flood hazard insurance policies required hereunder have been obtained and remain in full force and effect, and the premiums thereon have been paid in full.

**5.11   Taxes**.  The Borrower and its Subsidiaries have filed or caused to be filed all applicable U.S. federal, state, foreign and other material Tax returns and reports required to be filed, and have paid or caused to be paid all U.S. federal, state, foreign and other Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, in each case, except as otherwise permitted

under Section 6.04. No Tax Lien has been filed which would not be permitted under Section 7.01 and, to the knowledge of the Borrower, no claim is being asserted, with respect to any Tax, fee or other charge which could reasonably be expected to result in a Material Adverse Effect. As of the Closing Date, neither Borrower nor any Subsidiary thereof is party to any tax sharing agreement.

5.12    **ERISA Compliance**. Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:

(a)    Each Plan is in material compliance in all respects with the applicable provisions of ERISA, the Code and other Federal or state Laws (except that with respect to any Multiemployer Plan which is a Plan, such representation is deemed made only to the knowledge of the Borrower), and each Foreign Plan is in material compliance in all respects with the applicable provisions of Laws applicable to such Foreign Plan.

(b)    There has been no nonexempt "prohibited transaction" (as defined in Section 406 of ERISA) or violation of the fiduciary responsibility rules with respect to any Plan.

(c)    (i) As of the Closing Date, no ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; and (iii) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

5.13    **Subsidiaries**. As of the Closing Date, the Borrower has no Subsidiaries other than those specifically disclosed in Schedule 5.13.

5.14    **Margin Regulations; Investment Company Act.**

(a)    The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)    None of the Borrower, any Person Controlling the Borrower, nor any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.15    **Disclosure**. No report, financial statement, certificate or other information furnished in writing by any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document, taken as whole with any other information furnished or publicly available, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading as of the date when made or delivered; provided that, with respect to any forecast, projection or other statement regarding future performance, future financial results or other future developments, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of delivery of such information (it being understood that any such information is subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurance can be given that the future developments addressed in such information can be realized).

5.16    **Compliance with Laws**. Each of Holdings and its Subsidiaries is in compliance in all material respects with the requirements of all Laws (including any zoning, building, ordinance, code or approval or any building or mining permits and all orders, writs, injunctions and decrees applicable to it or to its properties), except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

5.17    **Anti-Corruption; Sanctions; Terrorism Laws.**

(a)    None of the Borrower, any Subsidiary nor, to the knowledge of the Borrower, any director, officer, agent, employee or Affiliate of the Borrower or any Subsidiary is (i) a person on the list of "Specially Designated

Nationals and Blocked Persons" or (ii) subject of any active sanctions administered or enforced by the U.S. Department of State or the U.S. Department of Treasury (including the Office of Foreign Assets Control) or any other applicable Governmental Authority (collectively, "Sanctions", and the associated laws, rules, regulations and orders, collectively, "Sanctions Laws"); and the Borrower will not directly or, to the knowledge of the Borrower, indirectly use the proceeds of the Loans for the purpose of financing the activities of any Person that is the subject of, or in any country or territory that at such time is the subject of, any Sanctions.

(b)      The Borrower and each Subsidiary is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the USA PATRIOT Act (Title III of Pub. L. 107-56), as amended (the "PATRIOT Act"), (iii) Sanctions Laws and (iv) Anti-Corruption Laws.

(c)      No part of the proceeds of any Loan will be used, directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "Anti-Corruption Laws").

**5.18    Intellectual Property; Licenses, Etc**.  The Borrower and its Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, except where the failure to own or possess the right to use such IP Rights could not reasonably be expected to have a Material Adverse Effect.  To the best knowledge of the Borrower, the use of such IP Rights by the Borrower or any Subsidiary does not infringe upon any rights held by any other Person except for any infringement that could not reasonably be expected to have a Material Adverse Effect.  Except as specifically disclosed in Schedule 5.18, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which could reasonably be expected to have a Material Adverse Effect.

**5.19    Security Interest in Collateral**.  Subject to the entry of the Order and the terms thereof, the provisions of the Orders, this Agreement and the other Loan Documents create legal and valid Liens on all Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, and upon entry of the Orders, such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable (except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law)) against the applicable Loan Party and all third parties, and having priority with respect to other Liens on the Collateral as contemplated by the Orders.

**5.20    Mines**.  Schedule 5.20 sets forth a complete and accurate list of all Mines (including addresses and the owner thereof) owned or operated by the Borrower or any of its Subsidiaries as of the Closing Date and included or purported to be included in the Collateral.

**5.21    [Reserved].**

**5.22    Labor Relations**.  Neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries, or to the best knowledge of the Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against the Borrower or any of its Subsidiaries or to the best knowledge of the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving the Borrower or any of its Subsidiaries, and (c) to the best knowledge of the Borrower, no union representation question existing with respect to the employees of the Borrower or any of its Subsidiaries and, to the best knowledge of the Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

**5.23    Bankruptcy Related Matters.**

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (provided that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled).

(b)    After the entry of the Interim Order, and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral subject, as to priority, to the extent set forth in the Interim Order or the Final Order, and in any case, (i) subject to Permitted Liens and (ii) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (collectively, "Avoidance Actions") (but including, upon entry of the Final Order, the proceeds thereof).

(d)    The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order, as the case may be), is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or without the Required Lenders' (and with respect to any provision that affects the rights or duties of any Agent, such Agent's) consent, modified or amended.  The Loan Parties are in compliance in all material respects with the Orders.

(e)    The DIP Budget, the Cash Flow Forecast, and all other projected consolidated balance sheets, income statements and cash flow statements of Borrower and its Subsidiaries delivered to the Administrative Agent were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be fair in light of the conditions existing at the time of delivery of such report or projections (it being understood that any projections or estimates made in the items described in this subsection (e) are not to be viewed as facts and are subject to significant uncertainties and contingencies, that no assurance can be given that any such projections or estimates will be realized, that actual results may differ from projected results and such differences may be material).

## ARTICLE VI
## AFFIRMATIVE COVENANTS

Until Payment in Full of all Obligations, the Borrower shall, and shall cause each of its Subsidiaries to:

**6.01    Financial Statements**.  Deliver to the Administrative Agent and each Lender, in form and detail reasonably satisfactory to the Financial Advisor (which shall be entitled to deliver such information to the Lenders in its sole discretion):

(a)    Annual Financial Statements. Within 90 days after the end of each fiscal year of the Borrower (commencing with the fiscal year in which the Closing Date occurs) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with a Narrative Report), and prepared in accordance with GAAP; such consolidated statements shall be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall be

prepared in accordance with generally accepted auditing standards and which may contain a "going concern" qualification.

(b)    Quarterly Financial Statements. Within 45 days after the end of each fiscal quarter of each fiscal year of the Borrower (commencing with the fiscal quarter ended March 31, 2020), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail (together with a Narrative Report) and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, changes in shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

(c)    Monthly Financial Statements. (i) Within 30 days after the end of each month (commencing with the month ending March 31, 2020), the Monthly Consolidated Financial Report, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition as at the dates indicated and the results of their operations and their cash flows for the periods indicated, and (ii) within 30 days after the end of each month (commencing with the month ending March 31, 2020), the Monthly Mine-Level Financial Report, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial information reported therein.

(d)    Cash Flow Forecast.  No later than 12:00 p.m. on the Thursday following the end of every fourth calendar week, commencing with the Thursday of the fourth calendar week following the week in which the Petition Date occurs, a Cash Flow Forecast, substantially in the form of the initial Cash Flow Forecast provided pursuant to Section 4.01(g) or as otherwise reasonably satisfactory to the Financial Advisor.

(e)    Budget Variance Report.  No later than 7:00 p.m. on Thursday of each week after each Reporting Period (commencing with the Thursday of the first full week following the Petition Date), a Budget Variance Report for the immediately preceding Reporting Period.  Each such report shall be certified by a Responsible Officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

(f)    Critical Vendor Report.  No later than 7:00 p.m. on the Thursday of every other week (commencing with the Thursday of the first full week following the Petition Date), a Critical Vendor Report.  Each such report shall be certified by a Responsible Officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

**6.02    Certificates; Other Information**.  Deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Financial Advisor:

(a)    concurrently with the delivery of the financial statements referred to in Section 6.01(a) and (b) (commencing with the delivery of the financial statements for the first full fiscal quarter ending March 31, 2019), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report sent to the holders of Equity Interests in Holdings or Borrower, and copies of all annual, regular, periodic and special reports and registration statements which Holdings or Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act, and not otherwise required to be delivered to the Administrative Agent pursuant hereto; and

(c)    promptly, such additional information regarding the business, financial or corporate affairs of Holdings, the Borrower or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender (through the Administrative Agent) may from time to time reasonably request that is reasonably available without undue cost or burden.

Documents required to be delivered pursuant to Section 6.01(a) or 6.01(b) or Section 6.02(b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which Holdings or the Borrower posts such documents, or provides a link thereto on Holdings' or the Borrower's website on the Internet at the website address listed on Schedule 10.02; (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); or (iii) on which such documents are filed for public availability on the SEC's Electronic Data Gathering and Retrieval system.

In the event that Holdings or any Parent reports on a consolidated basis, such consolidated reporting at Holdings or such Parent's level in a manner consistent with that described in clauses 6.01(a) and 6.01(b) of this Section 6.01 for the Borrower will satisfy the requirements of such clauses.

The Borrower hereby acknowledges that (a) the Administrative Agent may make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender").  The Borrower hereby agrees that (a) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (b) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat the Borrower Materials as not containing any material non- public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent the Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); and (c) all Borrower Materials marked "PUBLIC" or not marked as containing material non-public information are permitted to be made available through a portion of the Platform designated "Public Investor." Notwithstanding the foregoing, the Borrower shall not be under any obligation to mark the Borrower Materials "PUBLIC" or as containing material non-public information; provided, however, that the following Borrower Materials shall be deemed to be marked "PUBLIC" unless the Borrower notifies the Administrative Agent prior to posting that any such document contains material non-public information: (1) the Loan Documents, and (2) any notification of changes in the terms of the Facilities. The Borrower acknowledges and agrees that the list of Disqualified Institutions does not constitute non-public information and shall be posted to all Lenders by the Administrative Agent.   In connection with the foregoing, each party hereto acknowledges and agrees that the foregoing provisions are not in derogation of their confidentiality obligations under Section 10.07.

**6.03**    **Notices**.  Notify the Administrative Agent:

(a)    Promptly upon any Responsible Officer of the Borrower obtaining knowledge thereof, of the occurrence of any Default or Event of Default hereunder;

(b)    Promptly upon any Responsible Officer of the Borrower obtaining knowledge thereof, of any event which could reasonably be expected to have a Material Adverse Effect;

(c)    of the occurrence of any ERISA Event that, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect, promptly and in any event within 30 days after any Responsible Officer of the Borrower knows or has obtained notice thereof;

(d)    within 15 days of the Borrower or any Guarantor changing its legal name, jurisdiction of organization or the location of its chief executive office or sole place of business; and

(e)    promptly, as to any Building located on Material Real Property and constituting Collateral, of any redesignation of any such property on which such Building is located into or out of a special flood hazard area.

Each notice pursuant to Sections 6.03(a)-(c) shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

**6.04    Payment of Tax Obligations**.  Subject to the Bankruptcy Code, the terms of the applicable Orders and any required approval by the Bankruptcy Court, except where failure to do so could not reasonably be expected to result in a Material Adverse Effect, with respect to the Borrower and each of its Subsidiaries, pay and discharge all Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary.

**6.05    Preservation of Existence, Etc.; Activities of Foresight Energy Finance Corporation**.  Subject to the Bankruptcy Code, the terms of the applicable Orders and any required approval by the Bankruptcy Court,

(a)    Preserve, renew and maintain in full force and effect its legal existence except in a transaction permitted by Section 7.04.

(b)    With respect to Foresight Energy Finance Corporation, a Delaware corporation, cause such Subsidiary not to hold any material assets and not engage in any material business or activity other than maintaining its corporate existence.

**6.06    Maintenance of Properties.**

(a)    Maintain, preserve and protect all of its material properties and material equipment, including Collateral, necessary in the operation of its business in good working order and condition (ordinary wear and tear and damage by fire or other casualty or taking by condemnation excepted), except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)    Keep in full force and effect all of its material leases and other material contract rights, and all material rights of way, easements and privileges necessary or appropriate for the proper operation of the Mines being operated by the Borrower or a Subsidiary and included or purported to be included in the Collateral by the Security Documents, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance.**

(a)    Maintain with financially sound and reputable insurance companies which may be Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)    With respect to any Building located on Material Real Property and constituting Collateral, the Borrower shall and shall cause each appropriate Loan Party to (i) maintain fully paid flood hazard insurance on any such Building that is located in a special flood hazard area, on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 and (ii) furnish to the Collateral Agent an insurance certificate evidencing the renewal (and payment of renewal premiums therefor) of all such policies prior to the expiration or lapse thereof (or at such other time acceptable to the Collateral Agent).  The Borrower shall cooperate with the Collateral Agent's reasonable request for any information reasonably required by the Collateral Agent to comply with The National Flood Insurance Reform Act of 1994, as amended.

**6.08    Compliance with Laws**.  Except as otherwise excused by the Bankruptcy Code, comply in all respects with the requirements of all Laws (including the PATRIOT Act, Sanctions Laws, the Anti-Corruption Laws and Environmental Laws) and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (or, in the case of compliance with the PATRIOT Act, Sanctions Laws and the Anti-Corruption Laws, the failure to comply therewith is not material).

**6.09    Books and Records**.  (a) Maintain proper books of record and account, in which in all material respects full, true and correct entries in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all material requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Subsidiary, as the case may be.

**6.10    Inspection Rights**.  Permit representatives and independent contractors of the Administrative Agent and each Lender (provided that, subject to no Event of Default having occurred or be continuing, such Lender to be accompanied by the Administrative Agent) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom (except to the extent (a) any such access is restricted by a Requirement of Law or (b) any such agreements, contracts or the like are subject to a written confidentiality agreement with a non-Affiliate that prohibits the Borrower or any of its Subsidiaries from granting such access to the Administrative Agent or the Lenders; provided that, with respect to such confidentiality restrictions affecting the Borrower or any of its Subsidiaries, a Responsible Officer is made available to the Administrative Agent and such Lender (provided that, subject to no Event of Default having occurred or be continuing, such Lender to be accompanied by the Administrative Agent) to discuss such confidential information to the extent permitted), and to discuss the business, finances and accounts with its officers and independent public accountants at such reasonable times during normal business hours and as often as may be reasonably desired, provided that the Administrative Agent or such Lender shall give the Borrower reasonable advance notice prior to any contact with such accountants and give the Borrower the opportunity to participate in such discussions, provided further that the costs of one such visit per calendar year (or an unlimited amount if an Event of Default has occurred and is continuing) for the Administrative Agent, the Lenders and their representatives as a group shall be the responsibility of the Borrower. In no event shall the Administrative Agent be required to bear any cost or expense hereunder.

**6.11    Use of Proceeds**.  The proceeds of the Loans shall be used in accordance with the terms of the Cash Flow Forecast (subject to Permitted Variances), including to (i) pay for the fees, costs and expenses incurred in connection with the Transactions and the Chapter 11 Cases and (ii) to fund working capital of the Loan Parties (including, without limitation, payments of fees and expenses to professionals under Section 328 and 331 of the Bankruptcy Code and administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business of the Loan Parties or otherwise approved by the Bankruptcy Court (and not otherwise prohibited under this Agreement)).

**6.12    Additional Guarantors**.  Within 10 days (or such longer period as the Administrative Agent may agree in its sole discretion) of a Person becoming a Subsidiary that is required to be a Guarantor by virtue of the definition of a Guarantor, the Borrower shall cause any such Subsidiary to become a Guarantor by executing and delivering to the Administrative Agent a counterpart of the Guaranty or such other documents as the Administrative Agent shall deem appropriate for such purpose.

**6.13    [Reserved].**

**6.14    Preparation of Environmental Reports**.  If an Event of Default caused by reason of a breach under Sections 6.08 or 5.09 with respect to compliance with Environmental Laws shall have occurred and be continuing, at the reasonable request of the Required Lenders through the Administrative Agent, provide, in the case of the Borrower, to the Lenders within 60 days after such request, at the expense of the Borrower, an environmental or mining site assessment or audit report for the Properties which are the subject of such breach prepared by an environmental or mining consulting firm reasonably acceptable to the Required Lenders and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or remedial action in connection with such Properties and the estimated cost of curing any violation or non-compliance of any Environmental Law.

**6.15    Certain Long Term Liabilities and Environmental Reserves**.  To the extent required by GAAP, maintain adequate reserves for (a) future costs associated with any lung disease claim alleging pneumoconiosis or silicosis or arising out of exposure or alleged exposure to coal dust or the coal mining environment, (b) future costs associated with retiree and health care benefits, (c) future costs associated with reclamation of disturbed acreage, removal of facilities and other closing costs in connection with closing its mining operations and (d) future costs associated with other potential environmental liabilities.

**6.16**     **Covenant to Give Security.**

(a)     Personal Property including IP of New Guarantors.  Concurrently with any Subsidiary becoming a Guarantor pursuant to Section 6.12 (or a later date to which the Collateral Agent agrees), any property of such Subsidiary constituting Collateral shall automatically become subject to the Lien securing the Obligations pursuant to the Orders, and the Borrower shall, or cause such Subsidiary to, deliver any Security Document as the Collateral Agent or the Required Lenders may request, including the delivery of stock certificates, if any, representing the Capital Stock of such Subsidiary accompanied by undated stock powers or instruments of transfer executed in blank.

(b)     Real Property of New Guarantors.

(i)     New Real Property Identification.  With respect to any Subsidiary becoming a Guarantor pursuant to Section 6.12, concurrently with such Subsidiary becoming a Guarantor (or a later date to which the Collateral Agent agrees), furnish to the Collateral Agent a description of all Material Real Property fee owned or leased by such Subsidiary.

(ii)     Real Property.  With respect to any Subsidiary becoming a Guarantor pursuant to Section 6.12, any Real Property of such Subsidiary shall automatically become subject to the Lien securing the Obligations as provided in Section 2.19, and Section 2.19(b)(iii) shall apply to such Real Property.  In addition to the foregoing, Borrower shall, at the reasonable request of the Collateral Agent or the Required Lenders, deliver to the Collateral Agent such appraisals as are required by law or regulation of Real Property with respect to which Collateral Agent has been granted a Lien, evidence of the filing of as-extracted UCC-1 financing statements in the appropriate jurisdiction, and such other instruments in connection therewith as the Collateral Agent or the Required Lenders shall reasonably require.

(iii)     Consents Related to Leaseholds Concerning Material Real Property.  With respect to any leasehold interest of any Subsidiary becoming a Guarantor pursuant to Section 6.12 that would constitute Material Real Property but for the need to obtain the consent of another Person (other than the Borrower or any Controlled Subsidiary) in order to grant a security interest therein, upon the request of Collateral Agent or the Required Lenders, the Borrower and its Subsidiaries shall use commercially reasonable efforts to obtain such consent for the 120 day period commencing after such entity becomes a Guarantor, provided that there shall be no requirement to pay any sums to the applicable lessor other than customary legal fees and administrative expenses (it is understood, for avoidance of doubt, that, without limiting the foregoing obligations of the Borrower set forth in this Section 6.16(b)(iii), any failure to grant a security interest in any such leasehold interest as a result of a failure to obtain a consent shall not be a Default hereunder, and, for avoidance of doubt, the Borrower and its Subsidiaries shall no longer be required to use commercially reasonable efforts to obtain any such consent after such above-mentioned time period to obtain a consent has elapsed).

(c)     Personal Property (including IP) Acquired by Borrower or Guarantors.  If requested by the Collateral Agent or the Required Lenders, the Borrower shall, or shall cause any Subsidiary, (i) to the extent that any Capital Stock in, or owned by, a Loan Party constitutes Collateral, promptly deliver stock certificates, if any, representing such Capital Stock accompanied by undated stock powers or instruments of transfer executed in blank to the Collateral Agent and/or execute and deliver to the Collateral Agent any Security Document as any Agent or the Required Lenders may request to pledge any such Capital Stock and (ii) to the extent that any intellectual property owned by a Loan Party constitutes Collateral, promptly deliver any Security Document or supplements thereto as may be requested by the Collateral Agent or the Required Lenders.

(d)     Real Property Acquired by Borrower and Guarantors.

(i)     New Real Property Identification.  Within 10 days (or such longer period as the Collateral Agent may agree in its sole discretion) of any acquisition of a new Real Property by any Loan Party, such Loan Party shall notify the Collateral Agent of the acquisition of any such Real Property (fee owned or leased by such Loan Party).

(ii)     Real Property.  Any Real Property acquired by the Borrower or any Guarantor shall automatically become subject to the Lien as *provided* in Section 2.19, and Section 2.19(b)(iii) shall apply to such Real

Property.  In addition to the foregoing, Borrower shall, at the reasonable request of the Collateral Agent or the Required Lenders, deliver to the Collateral Agent such appraisals as are required by law or regulation of Real Property with respect to which Collateral Agent has been granted a Lien, evidence of the filing of as-extracted UCC-1 financing statements in the appropriate jurisdiction, and such other instruments in connection therewith as the Collateral Agent or the Required Lenders shall reasonably require.

(iii)    <u>Consents Related to Leaseholds Concerning Material Real Property</u>.  With respect to the acquisition of any leasehold interest by any Subsidiary that would constitute Material Real Property but for the need to obtain the consent of another Person (other than the Borrower or any Controlled Subsidiary) in order to grant a security interest therein, upon the request of Collateral Agent or the Required Lenders, the Borrower and its Subsidiaries shall use commercially reasonable efforts to obtain such consent for the 120 day period commencing on the date of the notification provided pursuant to <u>Section 6.16(d)(i)</u>, provided that there shall be no requirement to pay any sums to the applicable lessor other than customary legal fees and administrative expenses (it is understood, for avoidance of doubt, that, without limiting the foregoing obligations of the Borrower set forth in this <u>Section 6.16(d)(iii)</u>, any failure to grant a security interest in any such leasehold interest as a result of a failure to obtain a consent shall not be a Default hereunder, and, for avoidance of doubt, the Borrower and its Subsidiaries shall no longer be required to use commercially reasonable efforts to obtain any such consent after such above-mentioned time period to obtain a consent has elapsed).

(e)    <u>Further Assurances</u>.    Subject to any applicable limitation in any Security Document and subparagraph (f) below, upon request of the Collateral Agent or the Required Lenders, at the expense of the Borrower, promptly execute and deliver any and all further instruments and documents and take all such other action as the Collateral Agent or the Required Lenders may deem necessary or desirable in order to effect fully the purposes of the Orders and the Loan Documents, including the filing of financing statements necessary or advisable in the opinion of the Collateral Agent or the Required Lenders to perfect any security interests created under the Orders or any other Security Document.

(f)    <u>Collateral Principles</u>.  Notwithstanding anything to the contrary in any Loan Document, (i) no actions in any non-U.S. jurisdiction or required by the Requirement of Law of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction), (ii) the Collateral Agent in its discretion may grant extensions of time for the creation or perfection of security interests in, and Mortgages on, or taking other actions with respect to, particular assets where it reasonably determines in consultation with the Borrower, that the creation or perfection of security interests and Mortgages on, or taking other actions, cannot be accomplished without undue delay, burden or expense by the time or times at which it would otherwise be required by this Agreement or the Security Documents, and (iii) any Liens required to be granted from time to time pursuant to Security Documents and this Agreement on assets of the Loan Parties to secure to the Obligations shall exclude the Excluded Assets.

**6.17**    **[Reserved]**.

**6.18**    **Post Closing Covenants**.  Cause to be delivered or performed the documents and other agreements and actions set forth on Schedule 6.18 within the time frame specified on such Schedule 6.18.

**6.19**    **ERISA**.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect, comply with the provisions of ERISA, the Code, and other Laws applicable to the Plans.

**6.20**    **Lender Calls**.  Borrower will participate in a telephonic conference call with (x) the Administrative Agent and the Lenders once during each two-week period at such time as may be agreed to by Borrower and Administrative Agent and (y) the Financial Advisor once during each week at such time as may be agreed to by Borrower and Financial Advisor, in each case, to discuss cash flows and operations of the Borrower and its Subsidiaries; it being understood and agreed that the calls in clauses (x) and (y) shall be conducted separately.

**6.21**    **First and Second Day Orders**.  The Borrower shall cause all proposed "first day" orders, "second day" orders and all other orders establishing procedures for administration of the Chapter 11 Cases or approving

significant or outside the ordinary course of business transactions submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and acceptable to the Required Lenders in all material respects, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects and are acceptable.

**6.22    Milestones**.  Comply with the following milestones (unless extended or waived by the Required Lenders):

(a)    no later than thirty-five (35) calendar days after the Petition Date, (i) the Bankruptcy Court shall have entered the Final Order, and (ii) the Loan Parties shall have filed the Reorganization Plan and the Disclosure Statement (which shall include the Valuation Analysis (as defined in the Restructuring Support Agreement), which shall be acceptable to the Required Lenders in their sole and absolute discretion) with the Bankruptcy Court;

(b)    no later than fifty (50) calendar days after the Petition Date, the Loan Parties shall have entered into each of Renegotiated Contracts/Leases (as defined in the Restructuring Support Agreement), in form and substance acceptable to the Loan Parties and the Required First Lien Lenders (as defined in the Restructuring Support Agreement);

(c)    no later than seventy (70) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement in form and substance reasonably acceptable to the Loan Parties and the Required First Lien Lenders (as defined in the Restructuring Support Agreement) and, solely with respect to the economic treatment provided on account of the Second Lien Claims (as defined in the Restructuring Support Agreement), reasonably acceptable to the Required Second Lien Lenders (as defined in the Restructuring Support Agreement);

(d)    no later than one hundred fifteen (115) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order (as defined in the Restructuring Support Agreement) in form and substance acceptable to the Loan Parties and the Required First Lien Lenders (as defined in the Restructuring Support Agreement) and, solely with respect to the economic treatment provided on account of the Second Lien Claims (as defined in the Restructuring Support Agreement), reasonably acceptable to the Required Second Lien Lenders (as defined in the Restructuring Support Agreement); and

(e)    no later than one hundred thirty (130) calendar days after the Petition Date, the Plan Effective Date shall have occurred.

**6.23    Bankruptcy Notices**.  The Borrower will furnish to the Financial Advisor, the Administrative Agent, and Akin Gump Strauss Hauer & Feld LLP and Milbank LLP, as counsel to the Backstop Lenders:

(a)    copies of any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports, and updated information related to the sale or any other transaction and copies of any such bids and any updates, modifications or supplements to such information and materials; and

(b)    use commercially reasonable efforts to provide draft copies of all definitive documents and any other material motions or applications or other material documents to be filed in the Chapter 11 Cases to counsel to the Consenting Stakeholders, if reasonably practicable at least two (2) Business Days in advance of when the Loan Parties intend to file such documents, and, without limiting any approval rights set forth in this Agreement or the Restructuring Support Agreement, consult in good faith with counsel to the Consenting Stakeholders regarding the form and substance of any such proposed filing.

**6.24    Bankruptcy Related Matters.**  The Borrower will and will cause each of the other Loan Parties to:

(a)    cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Loans and other Obligations, the Prepetition Debt and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto, (iv) orders concerning the

financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363,364 or 365 of the Bankruptcy Code or rule 9019 of the Federal Rules of Bankruptcy Procedure, (v) orders authorizing additional payments to critical vendors (outside of the relief approved in the "first day" and "second day" orders) and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors to be in accordance with and permitted by the terms of this Agreement and acceptable to the Required Lenders (and (i) with respect to any provision that affects the rights or duties of any Agent, such Agent and (ii) with respect to any orders described in clause (v) above, acceptable to the Required Lenders in their reasonable discretion) in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights or duties of any Agent, such Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are acceptable in all respects;

(b)       comply in all material respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; and

(c)       comply in a timely manner with their obligations and responsibilities as debtors in possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order and the Final Order, as applicable, and any other order of the Bankruptcy Court.

**6.25    Chief Executive Officer**.  At all times following the Closing Date, the Borrower shall cause Robert D. Moore to hold the position of chief executive officer of the Borrower.

## ARTICLE VII
## NEGATIVE COVENANTS

Until Payment in Full, the Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens**.  Create, incur, assume or permit to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)       (i) Liens in favor of the Collateral Agent for the benefit of the Secured Parties granted pursuant to any Loan Document and (ii) Liens securing obligations in respect of Huntington Cash Management Obligations;

(b)       (i) Liens existing on the Petition Date and set forth on Schedule 7.01 and (ii) any Lien in favor of non-affiliated third party existing on the Petition Date that is not set forth on Schedule 7.01 to the extent (x) the amount of obligations secured by such Liens do not exceed $2,000,000 individually or $5,000,000 in the aggregate, and (y) a revised Schedule 7.01 including such Lien is delivered to the Administrative Agent for distribution to the Lenders;

(c)       Liens for Taxes or for pre-petition utilities, assessments or governmental charges or levies on the property of the Borrower or any Subsidiary if the same shall not at the time be delinquent as of the Petition Date and can be paid without penalty, or are being contested in good faith and by appropriate proceedings, provided that any reserve or appropriate provision that shall be required in conformity with GAAP shall have been made therefor;

(d)       Liens imposed by law, such as landlord's, carriers', warehousemen's, materialmen's, construction and repairmen's, vendors' and mechanics' Liens and other similar Liens, with respect to amounts which are not yet overdue for a period of more than 60 days or are being contested in good faith and by appropriate proceedings;

(e)       [reserved];

(f)       (i) Liens incurred, or pledges or deposits under or to secure the performance of bids, trade contracts and leases (other than Indebtedness), reclamation bonds, return of money bonds, insurance bonds, Mining Financial Assurances, statutory obligations or bonds, government contracts, health or social security benefits, unemployment or other insurance obligations, workers' compensation claims, water treatment obligations, insurance obligations, reclamation obligations, obligations under Mining Laws or similar legislation, stay bonds, utility bonds, surety and appeal bonds (including surety bonds obtained as required in connection with federal coal leases), performance bonds,

bid bonds, performance guarantees (including, without limitation, performance guarantees pursuant to coal supply agreements or equipment leases), bankers acceptances, completion guarantees, bank guarantees and letters of credit, customs duties and other obligations, including self-bonding arrangements, of a like nature incurred in the ordinary course of business, or (ii) Liens on assets to secure obligations under surety bonds obtained as required in connection with entering into of federal coal leases; provided that no more than $7,500,000 of cash may be posted following the Petition Date under this Section 7.01(f)

(g)     survey exceptions, easements, rights-of-way, zoning restrictions, leases, subleases, licenses, other restrictions and other similar encumbrances which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person, Liens set forth as exceptions to the Borrower's or any Subsidiary's title insurance policies and Liens as set forth as exceptions to the title opinions delivered;

(h)     Liens granted to provide adequate protection pursuant to the Interim Order or the Final Order;

(i)     Liens (including the interest of a lessor under a Capital Lease) on property and improvements that secure Indebtedness incurred pursuant to Section 7.03(j) for the purpose of financing all or any part of the purchase price or cost of construction or improvement of such property; provided that the Lien does not (i) extend to any additional property and (ii) secure any additional obligations, in each case other than the initial property so subject to such Lien and the Indebtedness and other obligations originally so secured (other than improvements on and accessions to such property, proceeds and products thereof, customary security deposits and any other assets pursuant to after-acquired property clauses in effect with respect to such Lien at the time of acquisition on property of the type that would have been subject to such Lien notwithstanding the occurrence of such acquisition);

(j)     [reserved];

(k)     [reserved];

(l)     Liens as a result of the filing of UCC financing statements as precautionary measure in connection with leases, operating leases or consignment arrangements;

(m)     [reserved];

(n)     [reserved];

(o)     [reserved];

(p)     Liens in favor of collecting or payor banks having a right of setoff, revocation, refund or chargeback with respect to money or instruments of the Borrower or any Subsidiary on deposit with or in possession of such bank;

(q)     [reserved];

(r)     [reserved];

(s)     customary Liens in favor of trustees, paying agents and escrow agents, and netting and setoff rights, bankers' liens and the like in favor of financial institutions and counterparties to financial obligations and instruments, including Hedging Agreements;

(t)     [reserved];

(u)     Permitted Real Estate Encumbrances;

(v)     [reserved];

(w)     [reserved];

64

(x)      Coal Liens;

(y)      [reserved];

(z)      Liens on insurance policies and proceeds thereof, or other deposits, to secure insurance premium financings;

(aa)      (x) Production Payments, royalties, dedication of reserves under supply agreements or similar or related rights or interests granted, taken subject to, or otherwise imposed on properties or (y) cross charges, Liens or security arrangements entered into in respect of a Joint Venture for the benefit of a participant, manager or operator of such Joint Venture, in each case, consistent with normal practices in the mining industry;

(bb)      other Liens securing Indebtedness or obligations in an aggregate principal amount at any time outstanding not to exceed $500,000;

(cc)      [reserved];

(dd)      [reserved];

(ee)      Liens in the ordinary course of business securing obligations in respect of trade-related letters of credit permitted under Section 7.03(p) covering only the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(ff)      Liens incurred or assumed in connection with the issuance of revenue bonds the interest on which is tax-exempt under the Code;

(gg)      Liens in the ordinary course of business on specific items of inventory, equipment or other goods and proceeds of any Person securing such Person's obligations in respect thereof or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(hh)      deposits made in the ordinary course of business to secure reclamation liabilities, insurance liabilities and/or surety liabilities;

(ii)      (x) surface use agreements, easements, zoning restrictions, rights of way, encroachments, pipelines, leases (other than Capital Lease Obligations), subleases, rights of use, licenses, special assessments, trackage rights, transmission and transportation lines related to Mining Leases or mineral rights or constructed coal mine assets or other Real Property including re-conveyance obligations to a surface owner following mining, royalty payments and other obligations under surface owner purchase or leasehold arrangements necessary to obtain surface disturbance rights to access the subsurface coal deposits and similar encumbrances on Real Property imposed by law or arising in the ordinary course of business that do not secure any monetary obligation and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary and (y) Liens on the property of the Borrower or any Subsidiary, as tenant under a lease or sublease entered into in the ordinary course of business by such Person, in favor of the landlord under such lease or sublease, securing the tenant's performance under such lease or sublease, as such Liens are provided to the landlord under applicable law and not waived by the landlord; and

(jj)      Liens on deposits made to cash collateralize obligations in respect of letters of credit existing on the Closing Date.

For purposes of determining compliance with this Section 7.01, (A) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of permitted Liens (or any portion thereof) described in Sections 7.01(a) through (jj) but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens (or any portion thereof) described in Sections 7.01(a) through (jj), the Borrower may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such Lien

securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 7.01 and at the time of incurrence, classification or reclassification will be entitled to only include the amount and type of such Lien or such item of Indebtedness secured by such Lien (or any portion thereof) in one of the above clauses (or any portion thereof). In addition, with respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.

       **7.02**    **Investments**.  Make any Investments, except:

       (a)      Investments held by the Borrower or any Subsidiary in cash or Cash Equivalents;

       (b)      to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), loans or advances, payroll, travel and other loans or advances to current or former officers, directors, employees, managers, directors or consultants of the Borrower or Holdings in an aggregate amount not to exceed $100,000 at any time outstanding, made in the ordinary course of business;

       (c)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

       (d)      Investments (including debt obligations and Capital Stock) received in satisfaction of judgments or in connection with the bankruptcy or reorganization of suppliers and customers of the Borrower and its Subsidiaries and in settlement of delinquent obligations of, and other disputes with, such customers and suppliers arising in the ordinary course of business;

       (e)      Investments in the nature of Production Payments, royalties, dedication of reserves under supply agreements or similar or related rights or interests granted, taken subject to, or otherwise imposed on properties;

       (f)      (i) Investments in existence on the Petition Date or made pursuant to a legally binding written commitment in existence on the Petition Date and listed on Schedule 7.02, and (ii) any Investment existing on the Petition Date that is not set forth on Schedule 7.02 to the extent (x) the amount of such Investment does not exceed $2,000,000 individually or $5,000,000 in the aggregate, and (y) a revised Schedule 7.02 including such Investment is delivered to the Administrative Agent for distribution to the Lenders; provided that the amount of any such Investment set forth in Schedule 7.02 may be increased (x) as required by the terms of such Investment as in existence on the date hereof or (y) as otherwise permitted hereunder;

       (g)      Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Borrower and its Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer, (B) litigation, arbitration or other disputes or (C) the foreclosure with respect to any secured investment or other transfer of title with respect to any secured investment;

       (h)      [reserved];

       (i)      Hedging Agreements or Cash Management Obligations permitted under this Agreement;

       (j)      Investments acquired solely in exchange for management services provided by the Borrower or a Subsidiary;

       (k)      Investments by the Borrower or any Subsidiary in any Debtor, and Investments by any Debtor in the Borrower;

       (l)      [reserved];

(m)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), additional Investments by the Borrower or any Debtor in an aggregate amount not to exceed $1,000,000, but without duplication, the cash return thereon received after the date hereof as a result of any sale for cash, repayment, return, redemption, liquidating distribution or other cash realization not to exceed the amount of such Investments in such Person made after the date hereof in reliance on this Section 7.02(m) shall be deducted in determining the amount of Investments outstanding pursuant to this Section 7.02(m);

(n)    [reserved];

(o)    [reserved];

(p)    (i) receivables owing to the Borrower or any Subsidiary if created or acquired in the ordinary course of business, (ii) endorsements for collection or deposit in the ordinary course of business and (iii) securities, instruments or other obligations received in compromise or settlement of debts created in the ordinary course of business, or by reason of a composition or readjustment of debts or reorganization of another Person, or in satisfaction of claims or judgments;

(q)    Investments made pursuant to surety bonds, reclamation bonds, performance bonds, bid bonds, appeal bonds and related letters of credit or similar obligations, in each case, to the extent such surety bonds, reclamation bonds, performance bonds, bid bonds, substituting appeal bonds, related letters of credit and similar obligations are permitted under this Agreement;

(r)    Investments consisting of indemnification obligations in respect of performance bonds, bid bonds, appeal bonds, surety bonds, reclamation bonds and completion guarantees and similar obligations in respect of coal sales contracts (and extensions or renewals thereof on similar terms), under any Mining Law, Environmental Law or other applicable law or with respect to workers' compensation benefits, unemployment insurance and other social security laws or regulations or similar legislation, or to secure liabilities to insurance carriers under insurance arrangements in respect of such obligations, or good faith deposits, prepayments or cash payments in connection with bids, tenders, contracts or leases or to secure public or statutory obligations, customs duties and the like, or for payment of rent, in each case entered into in the ordinary course of business, and pledges or deposits made in the ordinary course of business in support of obligations under coal sales contracts (and extensions or renewals thereof on similar terms) or any other Indebtedness, or Liens securing Indebtedness, of the type referred to in Section 7.03(p);

(s)    [reserved];

(t)    [reserved];

(u)    to the extent substituting an Investment, purchases and acquisitions, in the ordinary course of business, of inventory, supplies, material or equipment;

(v)    Investments resulting from liens, pledges and deposits permitted under Section 7.01;

(w)    [reserved]; and

(x)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), any Permitted Payments to Parent, to the extent constituting an Investment.

**7.03**    **Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness except:

(a)    Indebtedness arising under the Loan Documents;

(b)    (i) Indebtedness outstanding on the Petition Date and listed on <u>Schedule 7.03</u>, and (ii) any Indebtedness outstanding on the Petition Date that is not set forth on <u>Schedule 7.03</u> to the extent (x) the aggregate principal amount of such Indebtedness does not exceed $2,000,000 individually or $5,000,000 in the aggregate, and

(y) a revised Schedule 7.03 including such Indebtedness is delivered to the Administrative Agent for distribution to the Lenders;

      (c)     [reserved];

      (d)     (i) Indebtedness of the Borrower or any Subsidiary consisting of Guarantees of Indebtedness of any Subsidiary otherwise permitted under this Section 7.03 and (ii) Indebtedness of any Subsidiary consisting of Guarantees of Indebtedness of the Borrower otherwise permitted under this Section 7.03; provided that (i) if the Indebtedness being guaranteed is subordinated to or pari passu with the Obligations, then the guarantee must be subordinated or pari passu, as applicable, to the same extent as the Indebtedness guaranteed and (ii) if incurred by the Borrower or a Subsidiary, such guarantee shall be permitted as an Investment pursuant to Section 7.02;

      (e)     Indebtedness in respect of (i) Cash Management Obligations incurred in the ordinary course of business and consistent with past practice and (ii) Hedging Agreements that are not speculative in nature and incurred in the ordinary course of business and consistent with past practice, in each case of the Borrower or any Subsidiary;

      (f)     Indebtedness of the Borrower and any Debtor owed to any other Debtor and of any Debtor owed to the Borrower;

      (g)     [reserved];

      (h)     [reserved];

      (i)     [reserved];

      (j)     to the extent incurred in accordance with the Cash Flow Forecast (subject to Permitted Variance), Indebtedness of the Borrower or any Subsidiary incurred to finance all or any part of the acquisition, construction, development or improvement of any property or assets, including purchase money obligations, Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets before the acquisition thereof, provided that the aggregate principal amount of any Indebtedness Incurred pursuant to this Section 7.03(j) and outstanding at the time of Incurrence, may not exceed $1,000,000;

      (k)     [reserved];

      (l)     [reserved];

      (m)     [reserved];

      (n)     [reserved];

      (o)     additional Indebtedness of the Loan Parties in an aggregate principal amount outstanding at the time of Incurrence, not to exceed $500,000;

      (p)     Indebtedness of the Borrower or any Subsidiary in connection with one or more standby or trade-related letters of credit, performance bonds, bid bonds, stay bonds, appeal bonds, bankers acceptances, Mining Financial Assurances, statutory obligations or bonds, health or social security benefits, unemployment or other insurance obligations, workers' compensation claims, water treatment obligations, insurance obligations, reclamation obligations, bank guarantees, surety bonds, utility bonds, performance guarantees (including, without limitation, performance guarantees pursuant to coal supply agreements or equipment leases) completion guarantees or other similar bonds and obligations, including self-bonding arrangements, issued by or on behalf of the Borrower or a Subsidiary, in each case, in the ordinary course of business or pursuant to self- insurance obligations and not in connection with the borrowing of money or the obtaining of advances;

      (q)     [reserved];

(r)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; and

(s)      Indebtedness of the Borrower or any Subsidiary consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply or other arrangements.

For purposes of determining compliance with this Section 7.03 or Section 7.01, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date on which such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided, that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of fees, underwriting discounts, premiums (including tender premiums), accrued interest, defeasance costs and other costs and expenses incurred in connection with such refinancing.

Further, for purposes of determining compliance with this Section 7.03, in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the categories set forth in Sections 7.03 (a) through (u), the Borrower will be permitted to divide and classify such item of Indebtedness (or any portion thereof) on the date of its Incurrence, or later re-divide and reclassify all or a portion of such item of Indebtedness in any manner that complies with this Section 7.03.

In addition, with respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence.  "Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness, the accretion of original issue discount, or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured and (2) senior Indebtedness as subordinated Indebtedness or junior to any other senior Indebtedness merely because it has junior priority with respect to the same collateral.

**7.04      Fundamental Changes.**  Subject to Section 10.21, merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of the assets (whether now owned or hereafter acquired) of the Borrower and its Subsidiaries, taken as a whole, to or in favor of any Person, except if no Default exists or would immediately result therefrom:

(a)      any Subsidiary may merge or consolidate with (i) the Borrower, provided that the Borrower shall be the continuing or surviving Person or (ii) any one or more other Subsidiaries, provided that (A) when any Wholly Owned Subsidiary is merging with another Subsidiary, a Wholly Owned Subsidiary shall be the continuing or surviving Person, (B) when any Subsidiary is merging with any other Subsidiary, the continuing or surviving Person shall be a Subsidiary, (C) when any Foreign Subsidiary is merging with any Domestic Subsidiary, the continuing or surviving Person shall be the Domestic Subsidiary and (D) when any Guarantor is merging with any other Subsidiary, the continuing or surviving Person shall be a Guarantor;

(b)      any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution or otherwise) to the Borrower or to another Subsidiary; provided that (i) if the transferor in such a transaction is a Subsidiary, then the transferee must either be the Borrower or another Subsidiary, (ii) if the transferor

is a Domestic Subsidiary, then the transferee must either be the Borrower or another Domestic Subsidiary and (iii) if the transferor is a Guarantor, then the transferee must either be the Borrower or another Guarantor;

(c)    the Borrower may Dispose of all or a portion of the Equity Interests of any of its Subsidiaries to a Guarantor (other than Holdings or General Partner);

(d)    the Borrower and any Subsidiary may merge or consolidate with any other Person in a transaction in which the Borrower or the Subsidiary, as applicable, is the surviving or continuing Person; provided that, the Borrower may not merge or consolidate with any Subsidiary unless the Borrower is the surviving or continuing Person; and

(e)    any Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and the assets, if any, of any Subsidiary so liquidated or dissolved are transferred (x) to another Subsidiary or the Borrower and (y) to a Guarantor or the Borrower if such liquidated or dissolved Subsidiary is a Guarantor.

**7.05    Dispositions**.  Make any Disposition (other than Dispositions permitted pursuant to Sections 7.01, 7.02, 7.04 and 7.06), except:

(a)    (i) the sale or Disposition of damaged, obsolete, unusable or worn out equipment or equipment that is no longer needed in the conduct of the business of the Borrower and its Subsidiaries, (ii) sales or Dispositions of inventory, used or surplus equipment or reserves and Dispositions related to the burn-off of mines or (iii) the abandonment or allowance to lapse or expire or other disposition of intellectual property by the Borrower and its Subsidiaries in the ordinary course of business;

(b)    sales, transfers or other dispositions of assets with respect to any Debtor pursuant to any order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Required Lenders, permitting a de minimis asset disposition without further order of the Bankruptcy Court, so long as the proceeds thereof are applied in accordance with Section 2.05, if applicable;

(c)    [reserved];

(d)    Dispositions of cash and Cash Equivalents;

(e)    [reserved];

(f)    (A) the sale of defaulted receivables in the ordinary course of business and (B) Dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceeding;

(g)    any transfer of property or assets that consists of grants by the Borrower or its Subsidiaries in the ordinary course of business of licenses or sub-licenses, including with respect to intellectual property rights;

(h)    [reserved];

(i)    (A) the grant in the ordinary course of business of any non-exclusive easements, permits, licenses, rights of way, surface leases or other surface rights or interests and (B) any lease, sublease or license of assets (with a Loan Party as the lessor, sublessor or licensor) in the ordinary course of business;

(j)    Dispositions of assets resulting from condemnation or casualty events;

(k)    [reserved];

(l)    [reserved];

(m)      [reserved];

(n)      [reserved];

(o)      (i) any surrender or waiver of contractual rights or the settlement, release, or surrender of contractual, tort or other claims of any kind or (ii) any settlement, discount, write off, forgiveness, or cancellation of any Indebtedness owing by any present or former directors, officers, or employees of the Borrower or` any Subsidiary or any of their successors or assigns;

(p)      the unwinding or termination of any Hedging Agreements;

(q)      [reserved];

(r)      [reserved];

(s)      [reserved];

(t)      exchanges or relocations of easements for pipelines, oil and gas infrastructure and similar arrangements in the ordinary course of business; and

(u)      Dispositions of assets acquired in connection with an acquisition by the Borrower or any Subsidiary that are Disposed of for fair market value (as reasonably determined by the Borrower in good faith) within 90 days of such acquisition.

**7.06    Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contributions, except that:

(a)      dividends or distributions by a Subsidiary payable, on a pro rata basis or on a basis more favorable to the Borrower or a Subsidiary, to all holders of any class of Equity Interests of such Subsidiary a majority of which is held, directly or indirectly through Subsidiaries, by the Borrower;

(b)      the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other Equity Interests of such Person or another Subsidiary;

(c)      to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), Permitted Payments to Parent;

(d)      to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), so long as no Event of Default shall have occurred and is continuing or would result therefrom, Restricted Payments made pursuant to this Section 7.06(d) in an amount not to exceed $100,000 in the aggregate; and

(e)      to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), Restricted Payments made to Holdings (or any Parent) to enable Holdings (or any Parent) to pay (i) operating costs and expenses and other administrative fees and costs, in each case, to the extent expressly required to be paid pursuant to the Management Services Agreement, and (ii) after the entry of an order by the Bankruptcy Court (which order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the prior written consent of the Required Lenders), authorizing the Debtors' entry into, or an assumption of, an amendment to the Management Services Agreement, in form and substance satisfactory to the Required Lenders, (x) management fees, to the extent expressly required to be paid pursuant to such amended terms of the Management Services Agreement, and (y) minimum royalty payments to Murray Energy Group on account of any Debtor's coal mine leases with Colt LLC.

**7.07    Change in Nature of Business**.  Engage in any business other than a Similar Business.

**7.08** **Transactions with Affiliates**.  Enter into, renew or extend any transaction or arrangement, including the purchase, sale, lease or exchange of property or assets or the rendering of any service, with any Affiliate of the Borrower or any Subsidiary.  Notwithstanding the foregoing, the foregoing restrictions shall not apply to the following:

(A)    transactions between or among the Borrower and any of its Subsidiaries or a Person that becomes a Subsidiary;

(B)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), the payment of reasonable and customary (as determined in good faith by the Borrower) regular fees, compensation, indemnification and other benefits to current, former and future directors of the Borrower, a Subsidiary, or Holdings, who are not employees of the Borrower, such Subsidiary or Holdings, including reimbursement or advancement of reasonable and documented out-of-pocket expenses and provisions of liability insurance;

(C)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), loans or advances to officers, directors or employees of the Borrower or Holdings in the ordinary course of business of the Borrower or its Subsidiaries or Holdings or Guarantees in respect thereof or otherwise made on their behalf (including payment on such Guarantees) but only to the extent permitted by applicable law and Section 7.02(b);

(D)    transactions arising under any contract, agreement, instrument or other arrangement in effect on the Closing Date and set forth on Schedule 7.08;

(E)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), intercompany Investments permitted by Section 7.02 and Restricted Payments permitted by Section 7.06;

(F)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), after the entry of an order by the Bankruptcy Court (which order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the prior written consent of the Required Lenders), authorizing the Debtors' entry into, or an assumption of, an amendment to the Management Services Agreement, in form and substance satisfactory to the Required Lenders, minimum royalty payments to Murray Energy Group on account of any Debtor's coal mine leases with Colt LLC;

(G)    the Management Services Agreement (and transactions arising pursuant to the terms thereof) as in effect on the Closing Date; provided that any payment or distribution by any Debtor to any of its Affiliates pursuant to the Management Services Agreement shall only be made pursuant to Section 7.06(d); and

(H)    any agreements entered into in connection with the Transactions.

**7.09** **Permitted Activities of General Partner and Holdings**.  (a) General Partner and Holdings shall not incur or permit to exist any Lien other than (i) Liens created under the Loan Documents and (ii) Liens not prohibited by Section 7.01 on any of the Equity Interests issued by the Borrower held by General Partner or Holdings and (b) General Partner and Holdings shall do or cause to be done all thing necessary to preserve, renew and keep in full force and effect its legal existence; provided, that so long as no Default has occurred and is continuing or would result therefrom, Holdings may merge with any other Person (and if it is not the survivor of such merger, the survivor shall assume Holdings' obligations, as applicable, under the Loan Documents).

**7.10** **Use of Proceeds**.  Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of any regulation of the FRB, including Regulations T, U and X.

**7.11** **[Reserved].**

72

**7.12    Burdensome Agreements**.  Enter into any Contractual Obligation (other than any Loan Document) that (x) limits the ability of the Borrower or any Guarantor to create, incur, assume or suffer to exist any Lien upon any of its property to secure the Obligations hereunder or (y) limits the ability of any Subsidiary to make Restricted Payments to the Borrower or any Guarantor or to otherwise transfer property to the Borrower or any Guarantor; provided, however, that the foregoing clause shall not apply to Contractual Obligations which:

(a)    exist as of the Petition Date and are set forth on Schedule 7.12;

(b)    are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary of the Borrower, so long as such Contractual Obligations were not entered into solely in contemplation of such Person becoming a Subsidiary of the Borrower;

(c)    customary restrictions and conditions contained in the document relating to any Lien, so long as (i) such Lien is permitted by Section 7.01 and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 7.12;

(d)    [reserved];

(e)    restrictions imposed by applicable law;

(f)    any restriction on a Subsidiary imposed pursuant to an agreement entered into for the sale or Disposition of the Equity Interests or assets of a Subsidiary pending the closing of such sale or Disposition to the extent relating to the Equity Interests or assets that are then subject to such sale or Disposition;

(g)    are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures or the Equity Interests therein;

(h)    are customary restrictions contained in leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto;

(i)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary;

(j)    are customary limitations (including financial maintenance covenants) existing under or by reason of leases entered into in the ordinary course of business;

(k)    are restrictions on cash or other deposits imposed under contracts entered into in the ordinary course of business;

(l)    are customary provisions restricting assignment of any agreements;

(m)    [reserved];

(n)    any restrictions imposed by any agreement relating to secured Indebtedness permitted by Section 7.03 of this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(o)    [reserved];

(p)    customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations; or

(q)    are set forth in any agreement evidencing an amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of the Contractual Obligations referred to in Sections 7.12(a) through 7.12(p) above; provided, that such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Borrower, not materially less favorable to the Loan Party with respect to such limitations than those applicable pursuant to such Contractual Obligations prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing (it being understood that the introduction of any such limitation in a Contractual Obligation that did not previously contain any such limitation shall be deemed to be adverse in a material respect to the interest of the Lenders unless otherwise of the type permitted by this Section 7.12).

7.13    **[Reserved].**

7.14    **Maximum Capital Expenditure**.  Make or incur Capital Expenditures, in any period indicated below in an aggregate amount for Borrower and its Subsidiaries in excess of the amount set forth below opposite such period:

| Period | Maximum Capital Expenditures |
|---|---|
| Petition Date through March 31, 2020 | $16,200,000 |
| Petition Date through April 30, 2020 | $19,410,000 |
| Petition Date through May 31, 2020 | $20,540,000 |
| Petition Date through June 30, 2020 | $27,490,000 |
| Petition Date through July 31, 2020 | $28,500,000 |

7.15    **Fiscal Year**.  Change its fiscal year-end from December 31.

7.16    **Sale and Lease-Backs**.  Other than in respect of Sale and Lease-Backs in existence on the Closing Date, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which the Borrower or such Subsidiary (a) has sold or transferred to any other Person (other than the Borrower or any of its Subsidiaries) and (b) thereafter rents or leases such property that it intends to use for substantially the same purpose as the property which has been sold or transferred (collectively, the "Sale and Lease- Backs").

7.17    **Amendments or Waivers of Organizational Documents**.  Amend, restate, supplement, modify or waive any provision of any of its Organizational Documents after the Closing Date, in each case, to the extent the same, taken as a whole, would be material and adverse to any Secured Party (in the good faith determination of the Borrower).

7.18    **Budget Variance**.  (a) As of the last day of each applicable Two-Week Test Period commencing with the last day of the first Two-Week Test Period ending after the Closing Date, for such Two-Week Test Period (i) the negative variance (as compared to the Cash Flow Forecast) of the actual aggregate operating cash receipts  of the Debtors shall not exceed 15%, (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements  (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors shall not exceed 15% and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements  made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) shall not exceed 15%, and (b) beginning with the delivery of the third Budget Variance Report, as of the last day of each applicable Four-Week Test Period commencing with the last day of the first Four-Week Test Period ending after the Closing Date, for such Four-Week Test Period, (i) the negative variance (as compared to the applicable Cash Flow Forecast) of the actual aggregate operating cash receipts  of the Debtors shall not exceed 10%, (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements  (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) made by the Debtors shall not exceed 10% and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements

made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) shall not exceed 10% (such variance that does not breach this covenant, the "Permitted Variance").

7.19    **Minimum Liquidity**.  Permit Liquidity at any time to be less than (i) prior to the Delayed Draw Funding Date, $20,000,000, and (ii) on or after the Delayed Draw Funding Date, $40,000,000.

7.20    **[Reserved]**.

7.21    **Additional Bankruptcy Matters**.  Permit any of its Subsidiaries to, without the Required Lenders' prior written consent, do any of the following:

(a)    use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Cash Flow Forecast, for payments or purposes that would violate the terms of the Interim Order or the Final Order;

(b)    incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claim of the Secured Parties against any Loan Party, except for the Carve Out or as otherwise expressly permitted by the Orders;

(c)    subject to the Orders, assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Secured Parties;

(d)    other than as provided in any "first day" order, enter into any agreement to return any of its inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $250,000;

(e)    seek, consent to, or permit to exist, without the prior written consent of the Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Interim Order, the Final Order or any of the other Loan Documents;

(f)    subject to the terms of the Orders and subject to Article VIII, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents, the Lenders or other Secured Parties with respect to the Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any Secured Party to lift an applicable stay of proceedings to do the foregoing (*provided* that any Loan Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the Orders);

(g)    except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any "first day" or "second day" orders complying with the terms of this Agreement) or, with the prior consent of the Required Lenders, make any payment or distribution to any non-Debtor Affiliate or insider of any Debtor unless otherwise contemplated in the Cash Flow Forecast (subject to Permitted Variances);

(h)    except for the Carve Out or as otherwise expressly permitted by the Orders, incur, create, assume, suffer to exist or permit (or file an application for the approval of) any other Superpriority Claim which is pari passu with or senior to the claims of the Administrative Agent, the Collateral Agent and Lenders against the Loan Parties or the adequate protection Liens or claims; or

(i)         make or permit to be made any change to the Final Order without the consent of the Required Lenders.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01     Events of Default**.  Any of the following shall constitute an Event of Default (each, an "Event of Default"):

(a)     Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within five Business Days after the same becomes due and payable, any interest on any Loan, , or any fee due hereunder, any other amount payable hereunder or under any other Loan Document; or

(b)     Specific Covenants.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 6.01(a), 6.01(b), 6.01(c), 6.01(d), 6.01(e), 6.01(f), 6.02(a), 6.03(a), 6.05, 6.11, 6.18  6.21  6.22, 6.23 or Article VII; or

(c)     Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days; or

(d)     Representations and Warranties.  Any representation, warranty, certification or statement of fact made by or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     Cross-Default.  Unless the enforcement thereof is stayed by operation of the Chapter 11 Cases, any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness under the Loan Documents) in each case having an aggregate principal amount of more than the Threshold Amount ("Material Indebtedness"), beyond the period of grace, if any, provided in the instrument or agreement under which such Material Indebtedness was created or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness, or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause or to permit the holder or holders of such Material Indebtedness, or the beneficiary or beneficiaries of such Material Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity, or such Guarantee to become due or payable; provided, that this clause 8.01(e) shall not apply to any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if (i) such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness, (ii) such Indebtedness becomes due substantially contemporaneously with the completion and closing of such voluntary sale and transfer (and not upon entry into the purchase or transfer agreement related thereto) and (iii) the process of such voluntary sale or transfer are applied to pay in full such Indebtedness substantially contemporaneously with such sale or transfer; or

(f)     Insolvency Proceedings, Etc.  Any Loan Party or Subsidiary that is not a Debtor institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 30 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 30 calendar days, or an order for relief is entered in any such proceeding; or

(g)        [Reserved].

(h)        Judgments.  There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third party insurance), and such judgments or orders shall not have been vacated, discharged, waived, stayed or bonded pending appeal within 60 days from the entry thereof; or

(i)        ERISA.  The occurrence of any of the following events that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect: (i) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in an actual obligation to pay money of the Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; or

(j)        Invalidity of Loan Documents.  Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or Payment in Full, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document, or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or any Security Document ceases to create a valid Lien with the priority required thereby on the Collateral covered thereby (other than (x) as to any immaterial portion of the Collateral or (y) as expressly permitted thereunder or solely as a result of the acts or omissions of any Agent); or

(k)        Change of Control.  There occurs any Change of Control; or

(l)        Restructuring Support Agreement or Backstop Commitment Agreement Termination.  (i) The bringing of a motion or taking of any action by any of the Loan Parties or any Subsidiary to terminate the Restructuring Support Agreement and/or the Backstop Commitment Agreement, or (ii) the Restructuring Support Agreement  and/or the Backstop Commitment Agreement is terminated for any reason, or modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders; or

(m)        Management Services Agreement Termination.  (i) The bringing of a motion or taking of any action by any of the Loan Parties or any Subsidiary to terminate the Management Services Agreement or (ii) the Management Services Agreement is terminated for any reason, or modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders; or

(n)        Guarantees, Security Documents and Loan Documents.  At any time after the execution and delivery thereof, the Guaranty for any reason, other than the Payment in Full of all Obligations (other than contingent indemnity obligations), shall cease to be in full force and effect (other than in accordance with its terms or in connection with a transaction permitted by Section 7.04) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) any Security Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected Lien (subject to Permitted Liens) on the Collateral purported to be covered thereby and with the priority contemplated by the Orders, and (iii) any Loan Party shall contest the validity or enforceability of any Loan Document or any Order in writing or repudiate or rescind (or purport to repudiate or rescind) or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any provision of any Loan Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by any Order or any other Security Document; or

(o)        Chapter 11 Cases.  There occurs any of the following in the Chapter 11 Cases:

(i)        the bringing of a motion or taking of any action by any of the Loan Parties or any Subsidiary (A) to grant any Lien other than Liens permitted pursuant to Section 7.01 upon or affecting any Collateral, or (B) to use cash collateral of the Agents and the other Secured Parties under section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders, except as provided in the Interim Order or Final Order;

(ii)    the entry of an order in any of the Chapter 11 Cases confirming a Reorganization Plan that is not an Acceptable Plan;

(iii)    (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Final Order in any material respect without the written consent of the Required Lenders, or the Interim Order or the Final Order shall otherwise not be in full force and effect or (B) any Loan Party or any Subsidiary shall fail to comply with the Orders in any material respect;

(iv)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against, any Agent, any Lender, any other Secured Party or any of the Collateral;

(v)     (A) the appointment of a trustee, receiver or an examiner (other than a fee examiner) in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties, or (B) the sale without the Required Lenders' consent of any material portion of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in Payment in Full in cash of all of the Obligations under this Agreement at the closing of such sale or initial payment of the purchase price or effectiveness of such plan of reorganization, as applicable;

(vi)    the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code;

(vii)   any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting relief from or modifying the automatic stay under Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Agents) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Required Lenders (which approval shall not be unreasonably withheld) with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral to any federal, state or local environmental or regulatory agency or authority or (D) to permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(viii)  [reserved];

(ix)    the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement;

(x)     the entry of an order in the Chapter 11 Cases terminating or modifying the exclusive right of any Loan Party to file a Reorganization Plan pursuant to Section 1121 of the Bankruptcy Code;

(xi)    the failure of any Loan Party to perform in all material respects any of its obligations under the Orders;

(xii)   the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than the Obligations in, or as otherwise permitted under the applicable Loan Documents or permitted under the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Agents and the Secured Parties under this Agreement and the other Loan Documents, or there shall arise or be granted by the Bankruptcy Court (A) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 of the Bankruptcy Code or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve Out) or (B) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly *provided* in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Administrative Agent (at the direction of the Required Lenders)), whichever is in effect;

(xiii)    the Interim Order (prior to the Final Order Entry Date) or, on and after entry thereof, the Final Order shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required Lenders);

(xiv)    an order in the Chapter 11 Cases shall be entered limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition Debt on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date;

(xv)    an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties;

(xvi)    an order materially adversely impacting the legal rights and interests of the Agents and the Lenders under the Loan Documents shall have been entered by the Bankruptcy Court or any other court of competent jurisdiction;

(xvii)    any Loan Party shall challenge, support or encourage a challenge of any payments made to any Agent, any Lender, or any Secured Party with respect to the Obligations, or without the consent of the Required Lenders and, if required by Section 10.01, any other Secured Party, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any holder of Prepetition Debt that is inconsistent with an Order;

(xviii)    without the Required Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral or to obtain any financing under Section 364 of the Bankruptcy Code other than the Loan Documents or any other financing that results in the Payment in Full of the Obligations;

(xix)    any Loan Party or any person on behalf of any Loan Party shall file any motion seeking authority to (A) consummate a sale of assets (constituting Collateral or otherwise) outside the ordinary course of business or (B) reject any executory contract or unexpired lease (relating to property that constitutes Collateral or otherwise) without the consent of the Required Lenders, and in each case not otherwise permitted hereunder;

(xx)    any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Debt or payables other than payments permitted under this Agreement to the extent authorized or required by one or more "first day" or "second day" orders or any of the Orders (or other orders with the consent of Required Lenders) and consistent with the Cash Flow Forecast (subject to Permitted Variances);

(xxi)    without the Required Lenders' consent or as otherwise permitted by the Orders, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (A) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Collateral Agent's liens and security interests; or (B) to modify or affect any of the rights of the Agents, the Lenders or the Secured Parties under the Orders or the Loan Documents and related documents by any Reorganization Plan confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases; and

(xxii)    the filing by any of the Loan Parties of any Reorganization Plan other than an Acceptable Plan.

**8.02    Remedies Upon Event of Default**.    If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, subject to the terms of the Orders, take any or all of the following actions:

79

(a)     declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)     [reserved]; and

(d)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents, any Order or applicable Law (including, but not limited to, the Bankruptcy Code and the UCC), including the right to set off any amounts held as cash collateral (including, without limitation, in any cash collateral account held for the benefit of the Secured Parties);

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under Debtor Relief Laws of the United States or any other Event of Default under Section 8.01(f) or (g) hereof, the obligation of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.

**8.03    [Reserved].**

**8.04    Application of Funds**.  Subject to the Orders, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable, any amounts received on account of the Obligations (including proceeds of Collateral) shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including reasonable fees, charges and disbursements of counsel to the Agents and amounts payable under Article III) payable to the Agents in their capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders (including fees and time charges for attorneys who may be employees of any Lender) and amounts payable under Article III, ratably among the Lenders in accordance with their respective Applicable Percentages;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest in respect of the Loans and other Obligations, ratably among the Lenders in accordance with their respective Applicable Percentages;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in accordance with their respective Applicable Percentages;

Fifth, to payment of any remaining Obligations, ratably among the Lenders and the other Secured Parties, ratably among the Lenders in accordance with their respective Applicable Percentages; and

Last, the balance, if any, after all of the Obligations have been indefeasibly Paid in Full, to the Borrower or as otherwise required by Law;

provided, that the application to the Obligations of amounts received in respect of the Collateral is expressly subject to the priorities set forth in the Interim Order (and, when entered, the Final Order), and all such amounts shall first be allocated in accordance with such priorities.

**ARTICLE IX**
**AGENTS**

**9.01    Appointment and Authority**.

(a)    Each of the Lenders hereby irrevocably appoints Cortland Capital Market Services LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents, and irrevocably authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers, rights and remedies as are delegated or granted to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Except with respect to Section 9.06 and Section 9.10, the provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower, nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.  In performing its functions and duties hereunder, the Administrative Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries.

(b)    Each of the Lenders hereby irrevocably appoints Cortland Capital Market Services LLC to act on its behalf as the Collateral Agent hereunder and under the other Loan Documents for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Lenders, and by accepting the benefits of the Loan Documents the other Secured Parties, hereby expressly authorize the Collateral Agent to (i) execute any and all documents with respect to the Collateral (including any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Loan Documents and acknowledge and agree that any such action by the Collateral Agent shall bind the Secured Parties and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

**9.02    Rights as a Lender**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans, the Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder, and may accept fees and other considerations from the Borrower for service in connection herewith and otherwise without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**.  No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, no Agent:

(a)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.01), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including, for the avoidance of doubt, any action that, in its opinion or the opinion of its counsel, may violate the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; provided, further, that if any Agent so requests, it shall first be indemnified and provided with adequate security to its sole satisfaction (including reasonable advances as may be requested by such Agent) by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action;

81

(c)    shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity;

(d)    shall be responsible or have any liability for or in connection with, or have any duty to ascertain, inquire into, monitor, maintain, update or enforce, compliance with the provisions hereof relating to Disqualified Institutions; and without limiting the generality of the foregoing, no Agent shall (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution;

(e)    neither any Agent nor any of its Related Parties shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.01) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction (which shall not include any action taken or omitted to be taken in accordance with clause (i), for which such Agent shall have no liability);

(f)    shall be deemed to have knowledge of any Default or Event of Default unless and until written notice describing such Default and is labeled a "Notice of Default" is given to such Agent by the Borrower or a Lender; or

(g)    shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document or made in any written or oral statements made in connection with the Loan Documents and the transactions contemplated thereby, (ii) the contents of any financial or other statements, instruments, certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, whether made by such Agent to the Lenders or by or on behalf of any Loan Party to such Agent or any Lender in connection with the Loan Documents and the transactions contemplated thereby, (iii) the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations, (iv) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the use of proceeds of the Loans or the occurrence or possible occurrence of any Default or Event of Default or to make any disclosures with respect to the foregoing, (v) the execution, validity, enforceability, effectiveness, genuineness, collectability or sufficiency of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, preservation, perfection, maintenance of perfection, or priority of any Lien purported to be created by the Loan Documents, (vi) the value or the sufficiency of any Collateral, (vii) whether the Collateral exists, is owned by Borrower or its Subsidiaries, is cared for, protected, or insured or has been encumbered, or meets the eligibility criteria applicable in respect thereof, or (viii) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

Anything contained herein to the contrary notwithstanding, no Agent shall have any liability arising from confirmation of the amount of outstanding Loans or the component amounts thereof.

For the avoidance of doubt, and without limiting the other protections set forth in this Article 9, with respect to any determination, designation, or judgment to be made by the Administrative Agent or the Collateral Agent herein or in the other Loan Documents, the Administrative Agent or the Collateral Agent, as applicable, shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.01) make or confirm such determination, designation, or judgment.

**9.04    Reliance by Agents**. Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by

82

its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan and such Lender shall have not made its ratable portion of such Loan available to the Administrative Agent. Each Agent shall be entitled to rely on and may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

        **9.05**    **Delegation of Duties**.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more co-agents, sub-agents and attorneys-in-fact appointed by such Agent.  Each Agent and any such co-agent, sub-agent and attorney-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The rights, privileges, protections, immunities, and indemnities of this Article and Section 10.04 shall apply to any such co-agent, sub-agent or attorney-in-fact and to the Related Parties of such Agent and any such co-agent, sub-agent or attorney-in-fact, and shall apply to each of their respective activities in such capacities as if such co-agent, sub-agent or attorney-in-fact and Related Parties were named herein.  Notwithstanding anything herein to the contrary, with respect to each co-agent, sub-agent or attorney-in-fact appointed by any Agent, (i) such co-agent, sub-agent or attorney-in-fact shall be a third party beneficiary under this Agreement with respect to all rights, privileges, protections, immunities, and indemnities of this Article and Section 10.04 and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, privileges, protections, immunities, and indemnities of this Article and Section 10.04 directly, without the consent or joinder of any other Person, against any or all Loan Parties and the Lenders, (ii) rights, privileges, protections, immunities, and indemnities of this Article and Section 10.04 shall not be modified or amended without the consent of such co-agent, sub-agent or attorney-in-fact, and (iii) such co-agent, sub-agent or attorney-in-fact shall only have obligations to such Agent and not to any Loan Party, Lender or any other Person, and no Loan Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such co-agent, sub-agent or attorney-in-fact.  No Agent shall be responsible for the negligence or misconduct of any such co-agents, sub-agents and attorneys-in-fact except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such co-agents, sub-agents and attorneys-in-fact.

        **9.06**    **Resignation of Agent**.  Each Agent may at any time give notice of its resignation to the applicable Lenders, and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the approval of the Borrower unless an Event of Default under Section 8.01(f) or (g) has occurred or is continuing (such approval not to be unreasonably withheld), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; provided that (x) in no event shall any successor Agent be a Defaulting Lender, a Disqualified Institution or an Affiliated Lender and (y) if such Agent shall notify the Borrower and the applicable Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the retiring Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each applicable Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as an Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its applicable predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Section 10.04, and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder or the other Loan Documents shall continue in effect for the benefit of such retiring Agent, its co-agents, sub-agents and attorneys-in-fact and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

**9.07      Non-Reliance on Agents and Other Lenders.**

(a)      Each Lender acknowledges represents and warrants that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)      Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such analysis on behalf of the Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders.  Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Required Lenders, or Lenders, as applicable, on the Closing Date. Each Lender acknowledges that none of the Agents or their Related Parties have made any representation or warranty to it, and that no act by any Agent or its Related Parties hereinafter taken shall be deemed to constitute any representation or warranty by any Agent or its Related Parties to any Lender. Except for notices, reports, and other documents expressly required to be furnished to the Lenders by an Agent, no Agent or any of its Related Parties shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Borrower or any other Person party to a Loan Document that may come into the possession or control of such Agent or its Related Parties.

**9.08      No Other Duties, Etc.**  Each Agent shall have only those duties and responsibilities that are expressly specified herein for such Agent and the other Loan Documents.  Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  The duties of each Agent shall be mechanical and administrative in nature; and no Agent shall have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon such Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties.

**9.09      [Reserved].**

**9.10      Guaranty and Collateral Matters.**

(a)      Each Secured Party hereby and/or by accepting the benefits of the Collateral authorizes each Agent, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of Secured Parties with respect to the Guaranty, the Collateral and the Security Documents, as applicable.  Subject to Section 10.01, without further written consent or authorization from any Secured Party, each Agent may execute any documents or instruments necessary to (i) under the circumstances described in clause (A) of Section 10.21(a), confirm or acknowledge that the Liens on the Collateral no longer secure the Obligations, (ii) in connection with a sale or disposition of assets permitted by this Agreement, release any Liens encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 10.01) have otherwise consented, (iii) release any Guarantor from the Guaranty pursuant to Section 10.21 or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 10.01) have otherwise consented or (iv) acknowledge and confirm that specified assets of the Loan Parties are Excluded Assets.

(b)     The Lenders irrevocably authorize the Administrative Agent to release any Guarantor from its obligations under the Guaranty in accordance with the terms of <u>Section 10.21</u>.  Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release any Guarantor from its obligations under the Guaranty pursuant to this <u>Section 9.10</u>.

(c)     The Lenders irrevocably authorize the Collateral Agent to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document in accordance with the terms of <u>Section 10.21</u>.  Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property in accordance with this Section.

**9.11     Withholding Tax**.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  Without limiting the provisions of <u>Section 3.01 or 3.04</u>, each Lender shall, and does hereby, indemnify the Administrative Agent, and shall make payable in respect thereof within 30 days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of such Administrative Agent to properly withhold tax from amounts paid to or for the account of any applicable Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective), whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any applicable Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this <u>Section 9.11</u>.  The agreements in this <u>Section 9.11</u> shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

**9.12     Concerning the Collateral and Related Loan Documents**. Each Lender authorizes and directs each Agent to enter into, and agrees to be bound by, this Agreement (and to make all representations, warranties, covenants, and agreements on behalf of the Lenders as set forth therein), the Security Documents, and the other Loan Documents, including, without limitation, each Loan Document to be executed by such Agent and set forth on Schedule 6.18 hereto. Each Lender hereby acknowledges and agrees that (x) the foregoing instructed actions constitute an instruction from all the Lenders under this Section and (y) this Article 9 and Section 10.04 and any other rights, privileges, protections, immunities, and indemnities in favor of any Agent hereunder apply to any and all actions taken or not taken by such Agent in accordance with such instruction. Each Lender agrees that any action taken by the Collateral Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by the Collateral Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

**9.13     Survival**. The agreements in this Article 9 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

**ARTICLE X**
**MISCELLANEOUS**

**10.01     Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower, or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower, or the applicable Loan Party (in each case with a copy to the Agents), as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

(a)     extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 8.02</u>) without the written consent of such Lender;

85

(b)        postpone any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees or other amounts due to the Lenders (or any of them) (it being understood that the waiver of, or amendment to the terms of, any mandatory prepayment shall not constitute such a postponement) without the written consent of each Lender directly affected thereby;

(c)        waive, reduce or postpone the principal of, or the stated rate of interest specified herein on, any Loan, or (subject to clause (y) of the first *proviso* after clause 10.01(h) below) any fees or premiums or other amounts payable hereunder without the written consent of each Lender directly affected thereby; provided, however, that, without limiting the effect of clauses 10.01(h) below or the proviso directly below, only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)        change Section 2.13 or Section 8.04 in a manner that would alter the pro rata sharing of payments required thereby in a manner that by its terms modifies the application of such payments required thereby to be on a non- pro rata basis without the written consent of each Lender adversely affected thereby;

(e)        [reserved];

(f)        change any provision of this Section 10.01 or the definitions of "Required Lenders," or "Applicable Percentage" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender affected thereby; provided, with the consent of the applicable Required Lenders, additional extensions of credit pursuant hereto may be included in the determination of "Required Lenders" or "Applicable Percentage" on substantially the same basis as the Term Loans and the Roll-Up Loans, as applicable, are included on the Closing Date.

(g)        other than as permitted by Section 9.10 and Section 10.21, release (i) all or substantially all of the Guarantors from the Guaranty (as measured by value, not by number) or all or substantially all of the Collateral, except as expressly provided in the Loan Documents and except in connection with a "credit bid" undertaken by the Collateral Agent at the direction of the Required Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code or other sale or disposition of assets in connection with an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents (in which case only the consent of the Required Lenders will be needed for such release) or (ii) all or substantially all of the Collateral covered by the Security Documents without the written consent of each Lender, in each case unless the release is permitted hereunder pursuant to Section 10.21; or

(h)        [reserved];

provided, that (x) no amendment, waiver or consent shall, unless in writing and signed by the applicable Agent in addition to the Lenders required above, affect the rights or duties of such Agent under this Agreement or any other Loan Document; and (y) any Agency Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties to such Agency Fee Letter.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (i) the Commitment of such Lender may not be increased or extended and (ii) the principal of any Loan owed to such Lender may not be reduced without the consent of such Lender.

Notwithstanding the foregoing, the Borrower and the Agents may amend this Agreement and the other Loan Documents without the consent of any Lender (a) to cure any ambiguity, omission, mistake, error, defect or inconsistency (as reasonably determined by the Borrower in consultation with the Agents), so long as such amendment, modification or supplement does not adversely affect the rights of any Lender or the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment, (b) to add a Guarantor with respect to the Loans or collateral to secure the Loans, (c) to make administrative changes that do not adversely affect the rights of any Lender, (d) to integrate any other Funded Debt of the Borrower and its Subsidiaries that is secured by Liens on the Collateral (or any portion thereof) that rank pari passu in right of security with the Liens on the Collateral securing the Obligations or

86

(e) to make technical, administrative or other changes that do not adversely affect the rights of any Lender in respect of provisions relating to the respective rights, roles or responsibilities of the Agents.

The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances.

Any such waiver and any such amendment or modification pursuant to this Section 10.01 shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Agents and all future holders of the Loans.  In the case of any waiver, the Borrower, the Lenders and the Agents shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Default or Event of Default that is waived pursuant to this Section 10.01 shall be deemed to be cured and not continuing during the period of such waiver.

**10.02   Notices; Effectiveness; Electronic Communication.**

(a)   Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by telecopier (except for any notices sent to any Agent) as follows or sent by electronic communication as provided in subsection (b) below, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)   if to the Borrower or any Agent to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)   if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified on Schedule 10.02 or in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not sent during normal business hours for the recipient, shall be deemed to have been sent at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).  Notwithstanding the foregoing, (a) no notice to any Agent shall be effective until received by such Agent and (b) any such notice or other communication shall at the request of such Agent be provided to any co-agent, sub-agent or attorney-in-fact appointed pursuant to Section 9.03(c) as designated by such Agent from time to time.

(b)   Electronic Communications.  Notices and other communications to any Agent and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, including the Platform) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agents or the Borrower may, in their discretion, agree to accept notices and other communications to the Agents or the Borrower hereunder by electronic communications pursuant to procedures approved by the Administrative Agent or the Borrower, as applicable, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received

upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)   The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  Each Loan Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution.  In no event shall any Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the such Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses have resulted from the gross negligence or willful misconduct of such Agent Party, as determined by a final non- appealable judgment of a court of competent jurisdiction; provided, however, that in no event shall the Borrower or any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); provided that such waiver shall not limit any Loan Party's reimbursement or indemnification obligations under Sections 10.04(a) or 10.04(b), respectively.  Each Loan Party, each Lender, and each Agent agrees that any Agent may, but shall not be obligated to, store any electronic communication on the Platform in accordance with such Agent's customary document retention procedures and policies.

(d)   Defaults.  Any notice of Default or Event of Default may be provided by telephone if confirmed promptly thereafter by delivery of written notice thereof.

(e)   Change of Address, Etc.  The Borrower and any Agent may change its address, electronic mail address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, electronic mail address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(f)   Reliance by Agents and Lenders.  The Agents and the Lenders shall be entitled to rely and act upon any notices (including telephonic Borrowing Notices) purportedly given by or on behalf of the Borrower, even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic notices to and other telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.

(g)   Private Side Information Contacts.  Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to information that is not made available through the "Public-Side Information" portion of the Platform and that may contain Private-Side Information.  In the event that any Public Lender has determined for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other Lenders may have availed themselves of such information and (ii) neither the Borrower nor any Agent has any responsibility for such Public Lender's decision to limit the scope of the information it has obtained in connection with this Agreement and the other Loan Documents.

10.03   No Waiver; Cumulative Remedies.  No failure by any Lender or any Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan

88

Document shall impair such right, remedy, power or privilege or be construed to be a waiver of any default or acquiescence therein; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.04    Expenses; Indemnity; Damage Waiver.**

(a)    Costs and Expenses. The Borrower shall pay (i) all reasonable and documented out-of-pocket legal and other expenses incurred by the Agents and their respective Affiliates (including the reasonable and documented fees, charges and disbursements of (x) Ropes & Gray LLP, as primary counsel for the Agents and their Affiliates, (x) Akin Gump Strauss Hauer & Feld LLP and Milbank LLP and  Bryan Cave Leighton Paisner LLP, as counsel to the Backstop Lenders, (y) a single local counsel in each relevant jurisdiction and any special counsel reasonably deemed necessary by the Agents, and (z) a single local counsel in each relevant jurisdiction and any special counsel reasonably deemed necessary by the Lenders), in each case, in connection with the preparation, due diligence, negotiation, execution, delivery, administration and enforcement of this Agreement and the other Loan Documents or any amendments, modifications, consents, or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) [reserved] and (iii) all reasonable and documented out-of-pocket legal and other expenses (including the cost of any investigation or preparation) incurred by any Agent or any Lender (including the reasonable fees, charges and disbursements of (x) Ropes & Gray LLP, as primary counsel for the Agents and their Affiliates, (y) Akin Gump Strauss Hauer & Feld LLP and Milbank LLP, as counsel to the Backstop Lenders, (y) a single local counsel in each relevant jurisdiction and any special counsel reasonably deemed necessary by the Agents, and (z) a single local counsel in each relevant jurisdiction and any special counsel reasonably deemed necessary by the Lenders (and, in the case of an actual or perceived conflict of interest where the Indemnitees affected by such conflict notifies the Borrower of the existence of such conflict, of another firm of counsel for such affected Indemnitees and local counsel for the conflicted party)), in each case, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    Indemnification by the Borrower. The Borrower shall indemnify the Agents (and any co-agent, sub-agent or attorney-in-fact thereof) and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities (including any Environmental Liability), obligations, penalties, actions, judgments, and related reasonable and documented out-of-pocket costs, fees and expenses (including the reasonable documented out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee (whether or not such investigation, litigation, claim or proceeding is brought by the Borrower, the Borrower's equity holders, affiliates or creditors or an Indemnitee and whether or not any such Indemnitee is otherwise a party thereto and without regard to the exclusive or contributory negligence of such Indemnitee) or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of any Agent (and any co-agent, sub-agent or attorney-in-fact thereof) and its Related Parties only, the administration and enforcement of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom and (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto and without regard to the exclusive or contributory negligence of such Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are found in a final, non-appealable judgment by a court of competent jurisdiction to (x) have resulted from the gross negligence or willful misconduct of such Indemnitee (or any of such Indemnitee's controlled affiliates or any of its or their respective officers, directors, employees, agents, controlling persons or members of any of the foregoing) or (y) have arisen out of or in connection with any claim, litigation, loss

89

or proceeding not involving an act or omission of the Borrower or any of its Related Parties and that is brought by an Indemnitee against another Indemnitee (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an Agent or arranger or any similar role under this Agreement or any claims arising out of any act or omission of the Borrower or any of its Affiliates).  The Borrower also agrees that no Indemnitee shall have any liability (whether direct or indirect, in contract, tort or whether based on such Indemnitee's exclusive or contributory negligence or otherwise) to the Borrower for or in connection with this Agreement or the other Loan Documents, any transactions contemplated hereby or thereby or such Indemnitees' role or services in connection herewith or therewith, except to the extent that any liability for losses, claims, demands, damages, liabilities or expenses incurred by the Borrower resulted from the  gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final, non-appealable judgment.  This Section 10.04(b) shall not apply with respect to Taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)      Reimbursement and Indemnification by Lenders.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Agents (or any such co-agent, sub-agent or attorney-in-fact thereof) or any Related Party (and without limiting its obligation to do so), each Lender severally agrees to reimburse and indemnify the Agents (or any such co-agent, sub-agent or attorney-in-fact) or such Related Party, as the case may be, with respect to such Lender's Applicable Percentage (determined as of the time that such reimbursement or indemnity is sought), for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by any Agent (or any Affiliate thereof) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's (or such Affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)      Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against the Borrower and its Affiliates or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof; provided that such waiver shall not limit any Loan Party's reimbursement or indemnification obligations under Sections 10.04(a) or 10.04(b), respectively.  No Indemnitee referred to in subsection (b) above or the Borrower and its Affiliates shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent such damages result from the gross negligence or willful misconduct of such Indemnitee.

(e)      Payments.  All amounts due under this Section shall be payable not later than ten Business Days after written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(f)      Survival.  The agreements in this Section shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement. The reimbursement, indemnity and contribution obligations of the Borrower under this Section 10.04 will be in addition to any liability which the Borrower may otherwise have, will extend upon the same terms and conditions to any affiliate of any Indemnitee and the partners, members, directors, agents, employees, and controlling persons (if any), as the case may be, of, any Indemnitee and any such affiliate, and will be binding upon and inure to the benefit of any successors and assigns of the Borrower, any Indemnitee, any such affiliate, and any such Person.

**10.05    Marshalling; Payments Set Aside**.  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any payment by or on behalf of the Borrower is made to the Agents or any Lender, or the Agents or any Lender enforces any security interests or exercises its right of setoff, and such payment

or the proceeds of such enforcement or setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Agents or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to each Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by such Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment. The obligations of the Lenders under clause (b) of the preceding sentence shall survive Payment in Full and the termination of this Agreement.

**10.06    Successors and Assigns.**

(a)      Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder, except through a transaction permitted hereunder, without the prior written consent of the Agents and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (e) of this Section, (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section or (iv) pursuant to the syndication of Loans in accordance with the Restructuring Support Agreement.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (e) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      Assignments by Lenders. Any Lender may at any time sell, assign or transfer to one or more Eligible Assignees (and any assignee pursuant to syndication of Loans in accordance with the Restructuring Support Agreement), upon the giving of notice to the Borrower and the Administrative Agent, all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it or other Obligations); provided that:

(i)      except (a) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it, which such amount is less than the applicable minimum transfer amount set forth below, (b) in the case of an assignment of Loans in connection with the syndication of Loans contemplated in the Restructuring Support Agreement, or (c) in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent, shall not be less than $1,000,000 in the case of an assignment of Loans and, unless each of the Administrative Agent and, so long as no Event of Default under Section 8.01(a), (f) or (g) has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided that the Borrower shall be deemed to have consented to an assignment of Loans unless it shall have objected thereto by written notice to the Administrative Agent within seven (7) Business Days after having received notice thereof; provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)      [reserved];

(iv)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500 (provided however, that (i) the Administrative Agent may in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and (ii) the Administrative Agent does hereby waive such processing and recordation fee in connection with an assignment to an assignee which is already a Lender or is an affiliate or Approved Fund of a Lender or a Person under common management with a Lender) and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and to the Administrative Agent and the Borrower any such know-your-customer documents, forms, certificate or other evidence, if any, as the assignee under such Assignment and Assumption, including that as may be required to deliver pursuant to Section 3.01;

(v)       in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to any Agent and any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Laws without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs; and

(vi)      pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and related Commitments.

Subject to acceptance and recording thereof in the applicable Register by the Administrative Agent pursuant to subsection (d) of this Section, from and after the closing date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 3.01 (subject to the requirements and limitations therein, including the requirements of Section 3.01(e)), 3.04, 3.05 and 10.04 with respect to facts and circumstances occurring prior to the closing date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the effective date of such Assignment and Assumption that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.06, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(c)       [Reserved].

(d)       Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and

principal amounts of (and stated interest on) the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide). The Register shall be available for inspection by the Borrower and each Lender (solely as to the amount of Loans of such Lender) at any reasonable time and from time to time upon reasonable prior written notice.

(e)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or any Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender, to the extent that it has a consent right hereunder, will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a), (b), (c), (g) and (h) of the first proviso to Section 10.01 that affects such Participant (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof). Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment, provided, that in the case of Section 3.01, such Participant shall have complied with the requirements of such section (it being understood that the documentation required under Section 3.01(e) shall be delivered to the participating Lender). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; such Participant agrees to be subject to Section 2.13 as though it were a Lender.

Each Lender that sells a participation, acting for this purpose as a non-fiduciary agent (solely for tax purposes) of the Borrower, shall maintain a register for the recordation of the names and addresses of the Participants and principal amount of (and stated interest on) each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender and each Loan Party shall treat each Person whose name is recorded in the Participant Register pursuant to the terms hereof as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

(f)    Limitation upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(g)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note(s), if any) to secure obligations of such Lender to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such

pledgee or assignee for such Lender as a party hereto; provided further, that in no event shall the applicable Federal Reserve Bank, pledgee or trustee, be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

(h)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

**10.07    Treatment of Certain Information; Confidentiality**.  Each of the Agents and the Lenders agrees that it will treat as confidential (to the extent clearly identified at the time of delivery as confidential) all information provided to it hereunder or under any other Loan Document by or on behalf of the Borrower or any of its Subsidiaries or Affiliates (collectively, "Information") in accordance with the Agents' and the Lenders' applicable customary procedures for handling confidential information of such nature, except to the extent such Information (a) is publicly available or becomes publicly available other than by reason of disclosure by the Agents or the Lenders, any of their respective affiliates or representatives in violation of this Agreement or the other Loan Documents, (b) was received by the Agents and the Lenders from a source (other than the Borrower or any of its affiliates, advisors, members, directors, employees, agents or other representatives) not known by the Agents and the Lenders to be prohibited from disclosing such Information to such Person by a legal, contractual or fiduciary obligation to the Borrower or (c) was already in the Agents' and the Lenders' possession from a source other than the Borrower or any of its affiliates, advisors, members, directors, employees, agents or other representatives or is independently developed by such Person without the use of or reference to any such confidential information; provided, however, that nothing herein will prevent the Agents and the Lenders from disclosing any such Information (including Information regarding Disqualified Institutions) (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable Law or compulsory legal process (in which case such Person agrees to inform the Borrower promptly thereof to the extent not prohibited by law), (b) upon the request or demand of any regulatory authority or any self-regulatory authority having jurisdiction over such Person or any of its affiliates, (c) to such Person's affiliates and such Person's and affiliates' respective officers, directors, partners, members, employees, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, legal counsel, independent auditors and other experts or agents who need to know such Information and on a confidential basis and who are informed of the confidential nature of the Information, (d) to existing Lenders and to potential and prospective Agents, Lenders, assignees, participants and any direct or indirect contractual counterparties to any Hedging Agreement relating to the Borrower or its obligations under this Agreement, in each case, subject to such recipient's agreement (which agreement (other than Disqualified Institutions) may be in writing or by "click through" agreement or other affirmative action on the part of the recipient to access such Information and acknowledge its confidentiality obligations in respect thereof pursuant to customary practice) to keep such Information confidential on substantially the terms set forth in this Section 10.07, (e) to ratings agencies who have agreed to keep such Information confidential on terms no less restrictive than this Section 10.07 in any material respect or otherwise on terms acceptable to the Borrower in connection with obtaining ratings of the Loans, (f) for purposes of establishing a "due diligence" defense, (g) on a confidential basis, to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (h) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder or (i) upon Borrower's prior written consent (which may be by email). In addition, the Agents may disclose the existence of this Agreement and Information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents in connection with the administration and management of this Agreement and the other Loan Documents.

Each of the Agents and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Laws, including Federal and state securities laws.

**10.08    Right of Setoff**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, subject to the Orders, upon the occurrence of any Event of Default or at maturity each Lender and its Affiliates is hereby authorized by each Loan Party at any time or from time to time subject to the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Loan Party or to any other Person (other than the Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Loan Party against and on account of the obligations and liabilities of any Loan Party to such Lender hereunder, including all claims of any nature or description arising out of or connected hereto, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to <u>Article II</u> and although such obligations and liabilities, or any of them, may be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Sections <u>2.18</u> and <u>8.04</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its Affiliates under this <u>Section 10.08</u> are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09    Usury Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and the Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall, at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

**10.10    Counterparts; Integration**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.11    Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof and the funding of any Borrowing.  Such representations, warranties and agreements have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Loan Party

95

set forth in Sections 3.01, 3.04, 3.05, 10.04(a), 10.04(b) and 10.08 and the agreements of Lenders set forth in Sections 2.13, 9.03, 9.12, 10.04(c), and 10.05 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

      **10.12**    **Severability**.  If any provision of this Agreement or the other Loan Documents or any obligation hereunder or under any other Loan Document is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions or obligations of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions or obligations with valid provisions or obligations the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions or obligations.  The invalidity of a provision or obligation in a particular jurisdiction shall not invalidate or render unenforceable such provision or obligation in any other jurisdiction.

      **10.13**    **Replacement of Lenders**.  If (a) any Lender requests compensation under Section 3.04, (b) the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (c) any Lender is at such time a Defaulting Lender or has given notice pursuant to Section 3.02 or (d) any Lender becomes a "Nonconsenting Lender" (hereinafter defined), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to (and such Lender shall) assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interest, rights (other than its existing rights to payments pursuant to Section 3.01 or 3.04) and obligations under this Agreement and the related Loan Documents to an assignee selected by the Borrower that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

      (a)      the Administrative Agent shall have received the assignment fee specified in Section 10.06(b) from the Borrower (provided however, that the Administrative Agent may in its sole discretion elect to waive such processing and recordation fee in the case of any assignment);

      (b)      such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

      (c)      in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

      (d)      such assignment does not conflict with applicable Laws,

      (e)      neither any Agent nor any Lender shall be obligated to be or to find the assignee; and

      (f)      in the case of an assignment resulting from a Lender becoming a Nonconsenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

      A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.  In the event that (x) the Borrower or the Administrative Agent has requested the Lenders to consent to a departure or waiver of any provisions of the Loan Documents or to agree to any amendment thereto and (y) the Required Lenders or Required Facility Lenders, as applicable, have agreed to such consent, waiver or amendment, then any such Lender, who does not agree to such consent, waiver or amendment and whose consent would otherwise be required for such departure, waiver or amendment, shall be deemed a "Nonconsenting Lender." Any such replacement shall not be deemed a waiver of any rights that the Borrower shall have against the replaced Lender.

Each Lender agrees that if the Borrower exercises its option hereunder to cause an assignment by such Lender as a Nonconsenting Lender or otherwise pursuant to this Section 10.13, such Lender shall, promptly after receipt of written notice of such election, execute and deliver all documentation necessary to effectuate such assignment in accordance with Section 10.06. In the event that a Lender does not comply with the requirements of the immediately preceding sentence within one Business Day after receipt of such notice, each Lender hereby authorizes and directs the Borrower to execute and deliver such documentation as may be required to give effect to an assignment in accordance with Section 10.06 on behalf of a Nonconsenting Lender or Lender replaced pursuant to this Section 10.13, and any such documentation so executed by the Borrower shall be effective for purposes of documenting an assignment pursuant to Section 10.06.

**10.14    Governing Law; Jurisdiction; Etc.**

(a)    GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

(b)    CONSENT TO JURISDICTION.  SUBJECT TO CLAUSE (E) OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER LOAN DOCUMENTS, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND, IF THAT COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, ANY FEDERAL COURT OF THE UNITED STATES SITTING IN THE BOROUGH OF MANHATTAN OR, IF THAT COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, IN ANY STATE COURT LOCATED IN THE CITY AND COUNTY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH LOAN PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE (SUBJECT TO CLAUSE (E) BELOW) JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE LOAN PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.02; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE LOAN PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY LOAN DOCUMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT.

**10.15    Waiver of Jury Trial**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS

AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.15 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**10.16    USA PATRIOT Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined) and each Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or such Agent, as applicable, to identify such Loan Party in accordance with the PATRIOT Act.

**10.17    Time of the Essence**.  Time is of the essence of the Loan Documents.

**10.18    [Reserved]**.

**10.19    No Advisory or Fiduciary Responsibility**.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Agent or Lender, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents and the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Borrower and their Affiliates, on the one hand, and the Agents, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent, and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party, its management, stockholders, creditors or any of its affiliates or any other Person with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (B) neither any of the Agents nor any Lender has any obligation to the Borrower or any of its respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that conflict with those of the Borrower and its respective Affiliates, and neither any of the Agents nor any Lender has any obligation to disclose any of such interests to the Borrower or its respective Affiliates.  Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.20    [Reserved]**

**10.21    Release of Liens and Release from Guaranty.**

(a)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, but subject to the Orders, the Collateral Agent is hereby irrevocably authorized by each Lender to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document or otherwise encumbering any item of Collateral (and to execute any documents or instruments necessary, advisable or otherwise required or reasonably requested by any Loan Party to do so) (A) after Payment in Full, (B) (i) upon any sale or other transfer by any Loan Party of any Collateral that is permitted under this Agreement (other than a sale or other transfer to a Loan Party or any other Person that is required to become a Loan Party) or (ii) upon effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral pursuant to Section 10.01, (C) upon the approval, authorization or ratification in writing by the Required Lenders (or such other percentage of the Lenders whose consent is required by Section 10.01) with respect to the release of such Collateral, (D) upon a Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder, with respect to the Collateral owned by such Guarantor or (E) if an asset becomes an Excluded Asset.  After any of (v) Payment in Full, (w) upon any sale or other transfer of a Loan Party that is permitted under this Agreement (other than a sale or other transfer to a Loan Party or any other Person that is required to become a Loan Party), (x) upon the approval, authorization or ratification in writing by the Required Lenders (or such other percentage of the Lenders whose consent is required by Section 10.01) with respect to the release of any Guarantor under the terms of the Guaranty or (y) upon a Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder, each applicable Guarantor (or, in the case of clause (w) above, the applicable Guarantor so sold or transferred) shall automatically be released from the Guaranty, all without delivery of any instrument or performance of any act by any Person; provided that any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(b)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, subject to the Orders, in connection with any termination or release pursuant to this Section 10.21, the Administrative Agent and/or the Collateral Agent, as applicable, shall be, and are hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender) to execute and deliver, and shall promptly execute and deliver to the applicable Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release (including (1) UCC termination statements and (2) in the case of a release of Mortgages, a partial release) or to confirm that an asset of a Loan Party is not Collateral (including returning to the Borrower any possessory Collateral that is in the possession of the Collateral Agent and is the subject of such release); provided, that (1) neither Agent shall be required to execute any document or take any action necessary to evidence such termination or release on terms that, in its opinion or the opinion of its counsel, could expose such Agent to liability or create any obligation or entail any consequence other than such termination or release without recourse, representation, or warranty, and (2) the Loan Parties shall have provided such Agent with such certifications or documents as such Agent shall reasonably request in order to demonstrate that the requested termination or release is permitted under this Section 10.21.

(c)      Any execution and delivery of documents, or the taking of any other action, by any Agent pursuant to this Section 10.21 shall be without recourse to or representation or warranty by such Agent.

**10.22    Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.23    Independent Nature of Lenders' Rights**.  Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.24    Acknowledgment and Consent to Bail-In of EEA Financial Institutions**.   Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**ARTICLE XI**
**GUARANTY**

**11.01    Guaranty of the Obligations**.   Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Administrative Agent, for the ratable benefit of the Beneficiaries, the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "Guaranteed Obligations").

**11.02    [Reserved]**.

**11.03    Payment by Guarantors**.  Subject to Section 11.01, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**11.04    Liability of Guarantors Absolute**.   Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)     Administrative Agent may enforce this Guaranty upon the occurrence, but only during the continuance, of an Event of Default notwithstanding the existence of any dispute between Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrower or any of such other guarantors and whether or not Borrower is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Loan Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)     this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations (other than contingent indemnity obligations not then due and payable), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents, any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document, or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents, or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the

101

corporate structure or existence of General Partner, Holdings (or any Parent) or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations (subject to the limitations set forth in the Security Documents); (vii) any defenses, set-offs or counterclaims which Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

       **11.05    Waivers by Guarantors**. Each Guarantor hereby waives, to the extent permitted by applicable law, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Beneficiary in favor of any Loan Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, notices under any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrower and notices of any of the matters referred to in Section 11.04 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

       **11.06    Guarantors' Rights of Subrogation, Contribution, Etc**. Until the Payment in Full of the Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending), each Guarantor hereby waives, to the extent permitted by law, any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until Payment in Full of the Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending), each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at

any time when the Payment in Full of all Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending) shall not have occurred, such amount shall, to the extent possible under applicable law, be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**11.07    Subordination of Other Obligations**.  Any Indebtedness of Borrower or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall, to the extent permitted by applicable law, be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**11.08    Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until the Payment in Full of all of the Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending).  Each Guarantor hereby irrevocably waives, to the extent permitted by applicable law, any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**11.09    Authority of Guarantors or Borrower**.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**11.10    Financial Condition of Borrower**.  Any Credit Extension may be made to Borrower or continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrower at the time of any such grant or continuation.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrower.  Each Guarantor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of Borrower and its ability to perform its obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives, to the extent permitted by applicable law, and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by any Beneficiary.

*[Signature pages follow]*

**Schedule 1.01(a)**

**Guarantors**

| Guarantor | Type of Entity | Jurisdiction of Organization |
|---|---|---|
| Adena Resources, LLC | Limited liability company | Delaware |
| Akin Energy LLC | Limited liability company | Delaware |
| American Century Mineral LLC | Limited liability company | Delaware |
| American Century Transport LLC | Limited liability company | Delaware |
| Coal Field Construction Company LLC | Limited liability company | Delaware |
| Coal Field Repair Services LLC | Limited liability company | Delaware |
| Foresight Coal Sales LLC | Limited liability company | Delaware |
| Foresight Energy Employee Services Corporation | Corporation | Delaware |
| Foresight Energy GP LLC | Limited liability company | Delaware |
| Foresight Energy Finance Corporation | Corporation | Delaware |
| Foresight Energy Labor LLC | Limited liability company | Delaware |
| Foresight Energy LP | Limited partnership | Delaware |
| Foresight Energy Services LLC | Limited liability company | Delaware |
| Foresight Receivables LLC | Limited Liability Company | Delaware |
| Hillsboro Energy LLC | Limited liability company | Delaware |
| Hillsboro Transport LLC | Limited liability company | Delaware |
| LD Labor Company LLC | Limited liability company | Delaware |
| Logan Mining LLC | Limited liability company | Delaware |
| M-Class Mining, LLC | Limited liability company | Delaware |
| Mach Mining, LLC | Limited liability company | Delaware |
| Macoupin Energy LLC | Limited liability company | Delaware |
| MaRyan Mining LLC | Limited liability company | Delaware |
| Oeneus LLC (d/b/a/ Savatran LLC) | Limited liability company | Delaware |
| Patton Mining LLC | Limited liability company | Delaware |
| Seneca Rebuild LLC | Limited liability company | Delaware |

Case 20-33948 Document 04 Filed in TXSB on 01/23/04 Page 151 of 34 Main Docu

| Guarantor | Type of Entity | Jurisdiction of Organization |
|---|---|---|
| Sitran LLC | Limited liability company | Delaware |
| Sugar Camp Energy, LLC | Limited liability company | Delaware |
| Tanner Energy LLC | Limited liability company | Delaware |
| Viking Mining LLC | Limited liability company | Delaware |
| Williamson Energy, LLC | Limited liability company | Delaware |

**Schedule 2.01**

**Commitments, Roll-Up Loans, Applicable Percentages**

[On file with the Administrative Agent]

**Schedule 2.02**

**<u>Backstop Commitments</u>**

[On File with the Administrative Agent]

**Schedule 5.08(b)**

**Fee Owned Material Real Property**

<u>DEBTOR/GRANTOR</u>:

MACOUPIN ENERGY LLC
14300 Brushy Mound Road
Carlinville, Illinois  62626

**Macoupin County, Illinois**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/22/2009 | ExxonMobil Coal USA, Inc. to Macoupin Energy LLC | Various tracts of surface and coal reserves. The coal reserves were sold to WPP or Colt and leased back. The surface not required for operations has been conveyed to New River Royalty LLC | MA-0019 493145 | Owned | Yes |

<u>DEBTOR/GRANTOR</u>:

WILLIAMSON ENERGY, LLC
16468 Liberty School Road
Marion, IL 62959

**Williamson County, Illinois**

**Franklin County, Illinois (Coal Reserves only)**

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed | 8/12/2010 | Williamson Development Company, LLC and Williamson Energy, LLC | Surface required for Williamson Energy, LLC Operations[2] | NOT RECORDED | Owned | Yes |
| Easement | 8/12/2010 | Williamson Development Company, LLC and Williamson Energy, LLC | "Snake areas" required for Williamson Energy, LLC Operations | WC 325-899 | Owned | Yes |

---

[2] This excludes the real property released pursuant to that certain Fifth Amendment and Partial Release of Fee and Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of September 26, 2016, by and between Williamson Energy, LLC, as Mortgagor, and Citibank, N.A., in its capacity as Agent, consisting of approximately 28.55 acres of surface land.

<u>DEBTOR/GRANTOR</u>:

SUGAR CAMP ENERGY, LLC
11351 N. Thompsonville Road
Macedonia, Illinois  62860

**Franklin County, Illinois**

**Hamilton County, Illinois (Coal Reserves only)**

**Saline County, Illinois (Coal Reserves only)**

| <u>Description/Title of Document</u> | <u>Date</u> | <u>Parties</u> | <u>Brief Legal Description</u> | <u>Recording Information</u> | <u>Owned or Leased</u> | <u>Subject to Mortgage</u> |
|---|---|---|---|---|---|---|
| Warranty Deed | 1/15/2009 | Rodney Smith and Marta Smith to Sugar Camp Energy, LLC | Pt. Lot 121 and Pt. Lot 122 in Kokopelli Estates | Surface WC-0252, WC481-7 | Owned | Yes |
| Easement | 3/4/2010 | Glendall E Johnston a.k.a Glen Johnston and Carolyn S. Johnston, a.k.a Carolyn Johnston, husband and Wife to Sugar Camp Energy, LLC | NW NW Sec 1-6-4 and NWNE Sec 1-6-4 Franklin County, Illinois | FC-0253 1050-1056 | Owned | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 3/4/2010 | Morris R Clark and Karan S. Clark to Sugar Camp Energy, LLC | NWNE and W2E2NE Sec 2-6-4 Franklin, Illinois | FC-0254 2010-1057 | Owned | Yes |
| Easement | 3/1/2010 | David Blood and Melanie Blood, husband and wife to Sugar Camp Energy, LLC | Pt. E2NENE Sec 2-6-4 Franklin County, Illinois 2010-1058 | FC-0255 | Owned | Yes |
| Easement | 6/5/2010 | Roger L. Sanders and Mary Ellen Sanders to Sugar Camp Energy, LLC | W 10 ac N3/4 of NESE Sec 6-6-5 Hamilton County, Illinois | HC-0078 22-17 | Owned | Yes |
| Warranty Deed | 6/1/2010 | Patrick G. Mascal and Lori S. Mascal to Sugar Camp Energy, LLC | W2NESW and E2S2NWSW Sec 6-6-5 Hamilton Illinois | HC-0075 277-311 | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface in Hamilton County required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |

Case 20-41308   Doc 128   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 158 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface at former Akin site required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 159 of 1005

<u>DEBTOR/GRANTOR</u>:

SITRAN, LLC

| <u>Description/Title of Document</u> | <u>Date</u> | <u>Parties</u> | <u>Brief Legal Description</u> | <u>Recording Information</u> | <u>Owned or Leased</u> | <u>Subject to Mortgage</u> |
|---|---|---|---|---|---|---|
| **MOORAGE OPTIONS/LEASES KENTUCKY** | | | | | | |
| Deed of Correction | 10/22/2009 | Norberta Belle Williams, Harold Alvin Williams and Sitran LLC | An undivided l/4th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Owned | No |
| Deed of Correction | 10/22/2009 | Joyce Mae Hurley and Deon H. Hurley and Sitran LLC | An undivided l/4th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Owned | No |
| Deed of Conveyance | 10/22/2009 | Lisa Michelle Karr Hughes & Darrell C. Hughes and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in | NOT RECORDED | Owned | No |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 160 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | the Henderson Co Bk 202 Pg 266 | | | |
| Deed of Conveyance | 10/22/2009 | Rise Karr and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Owned | No |
| Deed of Conveyance | 11/20/2009 | Scott A. Peck & City Peck, his wife and Sitran LLC | An undivided 1/20th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | HC-0051 (Ky) Book 572 Pg 2006 | Owned | No |
| Deed of Conveyance | 11/20/2009 | Stephen K. Peck and Sitran LLC | An undivided 1/20th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | HC-0012 (Ky) Book 572 Pg 1010 | Owned | No |
| **EASEMENTS INDIANA** | | | | | | |
| Easement | 3/4/2009 | Kenneth W. Burgdorf, as Trustee of the Kenneth W. | 4.99 acres located in part of Northeast Quarter of Section 11, | PC-0008 | Owned | No |

Case 20-41308 Doc 28 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 161 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Burgdorf Revocable Trust and Marilyn T. Burgdorf, Trustee of the Marilyn T. Burgdorf Revocable Trust and Sitran LLC | Township 7 South, Range 12 West in Posey County Indiana. | (IN) | | |
| Temporary Easement | 11/20/2008 | Pauline Burgdorf and Sitran LLC | 4.99 acres located in part of the Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-00 (IN) 200804978 | Owned | No |
| Contract To Acquire Easement | 11/20/2008 | Pauline Burgdorf and Sitran LLC | 4.99 acres located in part of the Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-00 (IN) 200804978 closing date 01/15/2012 | Owned | No |
| Non-Exclusive Easement and Temporary Construction Easement | 10/20/2009 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | Part of Southeast Quarter of the Southwest Quarter of Section 22 and part of the Northeast Quarter of the Northwest Quarter of Section 27 all being in Township 6 South, Range 12 West in Posey County, Indiana | PC-00 (IN) 200952340 | Owned | No |
| Quit Claim Deed | | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and | Part of the West Half of Section 23, Township 7 South, Range 12 West in Posey County Indiana | PC-00 (IN) | Owned | No |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 162 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | | | | |

DEBTOR/GRANTOR:

OENEUS LLC D/B/A SAVATRAN LLC

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **INDIANA RAIL LOOP AND DOCK** | | | | | | |
| Personal Representatives Deed | 1/9/2009 | Alfred A. Mohr, as Personal Representative of the Estate of Aurelia F. Mohr, deceased and SAVATRAN LLC | Undivided 1/2 interest in: SE NW 14-7-12 except 5 feet on north side; NESW 14-7-12 81.742 acres Posey Co. IN | PC-0001 (IN) 200900228 | Owned | Yes |
| Warranty Deed | 1/9/2009 | Alfred A. Mohr and SAVATRAN LLC | Undivided 1/2 interest in: SE NW 14-7-12 except 5 feet on north side; NESW 14-7-12 81.742 acres Posey Co. IN | PC-0001 (IN) 200900227 | Owned | Yes |
| Warranty Deed | 1/8/2010 | Catherine B. Elbert, Linda Kay Elbert and Catherine Charlene Elbert as General Partners of the Charles R. Elbert Family Limited | 45.949 acres As part of the W/2 23-7-12 Posey Co. IN | PC-0002 (IN) 201000222 | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Partnership and SAVATRAN LLC | | | | |
| Corrective Warranty Deed | 1/8/2010 | Catherine B. Elbert, Linda Kay Elbert and Catherine Charlene Elbert as General Partners of the Charles R. Elbert Family Limited Partnership and SAVATRAN LLC | Pt. SE SW 14-7-12 23 acres & Pt. NW/4 23-7-12 16.30 acres Posey Co. IN | PC-0002 (IN) 201000226. This deed replaces WD 200900675 because of surveyor's error in description. | Owned | Yes |
| Trustee's Deed | 12/17/2008 | Old National Trust Company as Successor Trustee under the James L. Boerner Revocable Trust Agreement and SAVATRAN LLC | Pt. W/2 Section 23-7-12 70 acres Posey Co. IN | PC-0003 (IN) 200805144 | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 12/15/2008 | Kenneth J. Juncker Mary L. Juncker Emily A Moore Robert E Moore Jr. Joseph T. Yount, Beth Ann Folz, as Guardian ad Litem for Alexander A. Moore, Dana M Junker, Rebecca A. Wildeman, Anna L Blankenbaker (each afore mentioned signing as an individual and as a partner in JARD Group, Allyn Simpson, Ronald Simpson, Edward L. Thompson, as personal Representative of the Estate of Marilyn Thompson, Nathalie A. Elderkin, Charles A. Thompson, L. David Allyn, Jennifer L. Velasquez, Matthew D. Allyn and Michael L. Allyn and SAVATRAN LLC | Pt. NWNW & NENW 14-7-12 72.741 acres & 27.986 acres off N side NWNW & Pt. N/2 14-7-12 Posey Co. Indiana | PC-0007-200804978 | Owned | Yes |

Case 20-41308  Doc 228  Filed 04/01/20  Entered 04/01/20 23:45:34  Main Document  Pg 166 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Quitclaim Deed | 12/15/2008 | Kenneth J. Juncker Mary L. Juncker Emily A Moore Robert E Moore Jr. Joseph T. Yount, Beth Ann Folz, as Guardian ad Litem for Alexander A. Moore, Dana M Junker, Rebecca A. Wildeman, Anna L Blankenbaker (each afore mentioned signing as an individual and as a | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0007 (In) 200804975 This was an access road at the top of the Allyn Property | Owned | Yes |
| Correction Quitclaim Deed | 12/17/2009 | Edward l. Thompson, Individually and SAVATRAN LLC | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0007 (In) 200805015 Edward Thompson inadvertently signed as Personal Representative of the Estate of Marilyn K Thompson by PRD dated 10/31/2008 | Owned | Yes |

Case 1:08-bk-01108 Doc 228 Filed 04/01/20 17:05 of 1005 Entered 04/01/20 23:45:34 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Correction Warranty Deed | 12/17/2009 | Edward l. Thompson, Individually and SAVATRAN LLC | Pt. NWNW & NENW 14-7-12 72.741 acres & 27.986 acres off N side NWNW & Pt. N/2 14-7-12 Posey Co. Indiana | PC-0007 (IN) 200805012 Edward Thompson inadvertently signed as Personal Representative of the Estate of Marilyn K. Thompson by PRD dated 10/31/2008 | Owned | Yes |
| Rec Memo & Option to Purchase | 7/16/2008 | Gerald G. Mohr and Esther R. Mohr and Oeneus LLC d/b/a SAVATAN LLC | 6.89 acres within SW/4 south of Old State Rd. Section 11-7-12 Posey Co. IN | PC-0008 (IN)200803765 Option Expires 07/16/2010. We do not believe we will close on this. | Owned | Yes |
| Warranty Deed | 3/26/2009 | Orval Ungethum and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW/4 Section 14-7-12 29.302 acres Posey Co. IN | PC-0009 (IN) 200901388 | Owned | Yes |

Case:2:09-41308 Doc:2-28 filed 04/01/20 entered 04/01/20 23:45:34 Page 168 of 1005 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 12/18/2008 | Raymond W. Boerner, Evelyn Staples, Ronald Lee Boerner & Ruben F. Roehr as Personal Rep. of the Estate of Dorothy Mae Roehr and SAVATRAN LLC | E/2 SWNW & NENWSW Section 14-7-12 & 1/2 interest to 5 feet on S Line N/2 NW/4 14-7-2 a distance of 68 1/2 rods and 5 feet in width. Posey Co. IN.30.675 acres | PC-0010 (IN) 200805155 | Owned | Yes |
| Rec Memo & Option to Purchase | 10/14/2008 | Margie J. Angermeier (Life Estate), Glenda S. Elpers(1/3 remainder); Paul L. Angermeier (1/3 remainder); Glenn V. Angermeier (1/3 remainder) and Oeneus LLC d/b/a SAVATRAN LLC | 8 acres as pt of S/2 SW/4 Section 10-7-12 Posey Co IN | PC-0012 (IN) 200804528 Expires 10/14/2010 We do not believe we will close on this. | Owned | Yes |
| Warranty Deed | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (IN) 200901302 Arthur reserves life estate in house and 1ac tract B. Reserves road easement for access to house; right to farm for | Owned | Yes |

Case 20-41308    Doc 228    Filed 01/20    Entered 01/20 13:15:34    Main Docu Pg 169 of

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | $1.00 any portion left after construction. | | |
| Quitclaim Deed | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0014 (152) 2009-01504 this is an access road across the top of the Alyn heirs property. | Owned | Yes |
| Non-Penetration Agreement | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (152) Boerner Heirs own minerals would not sell this keeps them from having any development of the minerals. | Owned | Yes |
| Easement | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (152) 20090150 Access easement to house and 3ac and access to 30 | Owned | Yes |

Case 20-41308 Doc 242 Filed 04/11/20 Entered 04/11/20 23:15:34 Main Document

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Bauman and Oenues LLC d/b/a SAVATRAN LLC | | acres that is land locked after construction. | | |
| Real Estate Mortgage, Security Agreement, Collateral Assignment of Rents and Leases, and Fixture Filing | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (IN) 200901507 Promissory note to Elizabeth Howery and Sharon L. Bauman 1,075,000. paid as follows 287,500 yr1 275,000 yr2 262500 yr3 107500yr1 | Owned | Yes |
| Rec Memo & Option to Purchase | 2/27/2009 | Larry E. Orth 5/12 int. Agnes L. York as Trustee of the Agnes L. York Revocable Trust Agreement 5/12 interest; Vickie L. Orth 2/12 interest and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SWSE 11-7-12 containing 0.90 acres | PC-0015 200900926 | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **EASEMENTS INDIANA** | | | | | | |
| Easement | 9/16/2009 | Oeneus LLC to Southern Indiana Gas and Electric Company and Indiana corp d/b/a Vectren Energy Delivery of Indiana, Inc. | Pt. NE/4 14-7-12 Posey Co IN containing 0.28 acres more or less. | PC-0017 (IN) Electric power line easement Gibson to Brown 345 line. | Owned | No |
| Non-Exclusive Easement and Temporary Construction Easement | 10/20/2009 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | Part of Southeast Quarter of the Southwest Quarter of Section 22 and part of the Northeast Quarter of the Northwest Quarter of Section 27 all being in Township 6 South, Range 12 West in Posey County, Indiana | PC-0018 (IN) 200904548 | Owned | No |
| Electric Distribution Line Easement | 7/13/2010 | Savatran LLC, to Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. | Pt N2 of NW Section 14, Township 7 South, Range 12 West Posey County, Indiana | PC-0021 (IN) Need Recorded Copy | Owned | No |

Case 20-23408 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 172 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Electric Distribution Line Easement | 7/13/2010 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W2 NE Section 14, Township 7 South, Range 12 West. Posey County, Indiana | PC-0022 (18) Need Recorded Copy | Owned | No |
| **SUGAR CAMP TO McLEANSBORO RAIL LINE ILLINOIS** | | | | | | |
| Easement | 10/17/2008 | Kelly Markus & Gina Markus to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 BK 216 Pg 156 Rail Road Easement | Owned | Yes |
| Easement | 10/17/2008 | Gerald Spihlman & Judith Spihlman to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres 273-252 | HC-0001 Bk 216 Pg 147 Rail Road Easement | Owned | Yes |
| Easement | 10/24/2008 | Thomas Markus & Jeanete Markus to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 Bk 216 Pg 163 Rail Road Easement | Owned | Yes |

Case 20-41308 Doc 228 Filed 04/10/20 Entered 04/10/20 23:45:34 Main Document Pg 173 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 7/24/2008 | White Oak Resources Land, LLC to Oeneus LLC d/b/a SAVATRAN | Pt. SW/4 & SE/4 6-5-5 Hamilton County IL containing 11.45 acres | HC-0002 Bk 217 Pg 732 Initial Option was with Larry Myers who sold to White Oak. | Owned | Yes |
| Warranty Deed | 2/4/2008 | Charles R. Moore & Nani Sue Moore to Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW/4 28-5-5 containing 3 acres more or Less Pt. SWNE 29-5-5 containing 13 acres more or less. | HC-0004 Traded 65.63 acres and 8.73 acres of the W/2 NW/4 28-5-5 to Clark. Traded 137 acres in NE/4 29-5-5 Hamilton Co. IL to Burris. Remaining property for wet lands mitigation. | Owned | Yes |
| Easement | 9/24/2009 | David Bert Lemke & Shirley K. Lemke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. N/2 SE/4 1-T5S-R5E Hamilton Co. IL containing 10.16 ac | HC-0005 Bk 215 Pg 801 | Owned | Yes |

Case 24-41309 Filed 04/01/24 Entered 04/01/24 23:45:34 Main Document Page 174 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 12/19/2007 | Terri S. Irvin, Successor Trustee to the Kenneth C. Myers and Eula P. Myers Revocable Trust to Oeneus LLC d/b/a SAVATRAN LLC | SW NW; NW SW 1-T5S-R5E; 40 acres within E/2 NE/4 and E/2 NE/4 11-T5S-R5E Hamilton Co IL | HC-0006 Bk 273 Pg 22 Traded part of this property to Kenneth Willis. | Owned | Yes |
| Warranty Deed | 5/28/2008 | Grover C. Galloway and Mildred F. Galloway to Oeneus LLC d/b/a SAVATRAN LLC | W/2 SWSE; and E/2 SW/4 3-T5S-R5E Hamilton Co IL containing 100 acres | HC-0008 Bk 273 Pg 812 6.10 acres used for rail. Farming agreement Kenny Waier. | Owned | Yes |
| Special Warranty Deed | 4/21/2008 | Kenneth P. Willis & Wilma June Willis to Oeneus LLC d/b/a SAVATRAN | South 5 acres of NESE 2-T5S-R5E Hamilton Co. IL | HC-0011 Bk 273 Pg 61 | Owned | Yes |
| Warranty Deed | 2/28/2008 | Wilma June Willis to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SE 3-T5S-R5E Hamilton County IL containing 7.02 acres | HC-0012 Bk 273 Pg 325 | Owned | Yes |
| Easement | 11/3/2008 | Garry R. Heil & Karla Heil to Oeneus LLC d/b/a SAVATRAN | Pt. W/2 SW 16-T5S-R5E Hamilton Co. IL containing 10.08 acres | HC-0014 Bk 316 Pg 221 | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 9/15/2009 | David Willett & Robin Willett to Oeneus LLC d/b/a SAVATRAN | Undivided 1/2 interest pt SE/4 9-T5S-R5E Hamilton Co. IL containing 40 acres | HC-0015 Bk 274 Pg 445 Willett retained first right of refusal. | Owned | Yes |
| Warranty Deed | 9/30/2008 | Rickey L. Denham to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE/4 9-T5S-R5E Hamilton Co. IL containing 3.36 acres | HC-0016 Bk 274 Pg 535 The oil line goes through Mr. Denham's residence we had to replace the residence and barn. | Owned | Yes |
| Warranty Deed | 2/5/2008 | Melinda Hunter to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0017 Bk 273 Pg 290 Bennett Heirs | Owned | Yes |
| Warranty Deed | 2/4/2008 | Joyce Annette Medley to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0018 Bk 273 Pg 293 Bennett Heirs. We optioned her oil and gas back Quitclaim Deed 273/478 We did not option the oil and gas. | Owned | Yes |

Filed 01/20/08 Entered 01/20/08 23:45:34 Main Document Pg 176 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/7/2009 | Hobart J. Campbell & Helen B. Campbell to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 31-5-5 & pt NW/4 6-T5S-R5E containing 9.27 acres; Pt. SW/4 31-T5S-R5E containing 1.84 acres; Pt NW/4 6-T5S-R5E containing 1.28 acres Hamilton Co. IL | HC-0019 Bk 275 Pg 506 Both rail right of way and extra footage at Macedonia road crossing. | Owned | Yes |
| Warranty Deed | 10/10/2006 | Daniel R. Tennyson to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSE 6-T5S-R6E 3.21 acres Hamilton Co. IL  270-595 | HC-0020 Retained only rail right of way traded remainder to Kirsch. | Owned | Yes |
| Special Warranty Deed | 05/052009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. NEWS 6-T5S-R6E 13.003 acres Hamilton Co. IL | HC-0020 Bk 270 Pg 595 Portion traded to Kirsch. | Owned | Yes |
| Easement | 2/17/2009 | Wendell Myers & Judith Myers to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESW 1-T5S-R5E Hamilton Co. IL containing 5.37 | HC-0021 Bk 216 Pg 654 Rail right of way easement | Owned | Yes |
| Warranty Deed | 2/5/2008 | Marilyn Ann Lynn to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0022 Bk 273 Pg 287 Bennett Heirs | Owned | Yes |

Case 12-04130 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Docu... Pg 177 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 10/25/2008 | Roy Dean Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0023 Bk 274 Pg 667 Bennett Heirs; Mr. Bennett refused to close we filed Specific Performance Complaint Mr. Bennett then decided to close. | Owned | Yes |
| Warranty Deed | 2/20/2008 | Mary Ellen Tennyson to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0024 Bk 273 Pg. 342 Bennett Heirs/ Mrs. Bennett has the option to repurchase | Owned | Yes |
| Warranty Deed | 2/20/2008 | Robert L Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0025 Bk 273 Pg. 318 Bennett Heirs/ Mr. Bennett has the option to repurchase | Owned | Yes |
| Warranty Deed | 12/11/2009 | Joseph Rexing & Liudmyla Rexing to | 22.68 acres all in Township 5 S. Range 5 E Hamilton Co IL | HC-0027 Bk 276 Pg 628  Mr. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Oeneus LLC d/b/a SAVATRAN LLC | | Rexing Refused to close filed suit forced to close etc. | | |
| Special Warranty Deed | 12/11/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Joseph Rexing | Pt. E/2 SW & pt. SENW of 20-T5S-R5E Hamilton Co. IL containing 112.13 acres | HC-0027 Bk. Pg Remainder of Judith Gregory traded to Rexing. | Owned | Yes |
| Warranty Deed | 2/14/2007 | Betty Gibbs to Oeneus LLC d/b/a SAVATRAN LLC | Surface only pt W/2 NW and N 10 Ac NWSW 10-T5S-R5E Hamilton Co. IL containing 11.83 acres | HC-0028 Bk. 271 Pg 93 Retained only rail right of way traded remaining to Alan Kirsch Special Warranty Deed Bk. 272 Pg 503 | Owned | Yes |
| Easement | 11/28/2006 | Jim Holms & Ruth Holms to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 & pt. W/2 SE/ 2-T5S-R5E Hamilton Co. IL containing 13.17 acres | HC-0029 Bk. 212 Pg 209 Holms has the right to put portion of his property to its | Owned | Yes |

Case 20-41308 Doc 22 Filed 01/29/20 Entered 01/29/20 23:45:34 Page 179 of 1005 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | upon completion of the rail | | |
| Warranty Deed | 9/5/2009 | Judith A. Peters and Charles W. Peters to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in South 28.25 acres of W/2 SW 3-T5S-R5E Hamilton Co. IL | HC-0030 Bk 274 Pg 401 Kenny Waier has 10 year farming lease. Must relocate RLC water main | Owned | Yes |
| Warranty Deed | 9/3/2009 | Jerry L. Stiverson; Paula J. Stiverson as individuals and as co-trustees of the Paula J Stiverson Trust to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in South 28.25 acres of W/2 SW 3-T5S-R5E Hamilton Co. IL | HC-0032 Bk 274 Pg 463 Kenny Waier has 10 yr farming lease. Must relocate RLC water main. | Owned | Yes |
| Corrected Warranty Deed | 9/5/2008 | Michael Hutchcraft and Melissa Hutchcraft to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in pt SE/4 of 9-T5S-R5E containing 40 acres Hamilton Co IL | HC-0033 Bk 274 Pg 412 Deed Corrected to waive homestead rights. | Owned | Yes |

Case 2010-00228 Filed 04/01/20 23:45:34 DOC ID 180 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/17/2007 | Laura Dennis f/k/a Laura Lane to Oeneus LLC d/b/a SAVATRAN | Pt NW NW 21-T5s-R5E being 300ft x 160ft. Hamilton Co. IL | HC-0034 Bk 271 Pg 494 Rail design went through Ms. Dennis house; house purchased and moved by Garry Heil. 0.17 acres of the property was conveyed to Dennis Smith by Special Warranty Deed 275/537 | Owned | Yes |
| Warranty Deed | 5/8/2009 | Katherine McRoy f/k/a Katherine Smith; Donald McRoy; Dennis L. Smith and Judy A. Smith to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW NW & Pt. NENW 21-T5S-R5E 3.37 acres Hamilton Co. IL | HC-0035 Bk 275 Pg 541 | Owned | Yes |
| Warranty Deed | 7/30/2008 | Michael D. Burris & Tina Burris to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 21 & Pt. SW NW 21-T5S-R5E Hamilton County IL containing 15.72 acres | HC-0039 Bk 274 Pg237 | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 7/30/2008 | Oeneus LLC d/b/a SAVATRAN LLC to Michael D. Burris & Tina Burris | Pt. NE/4 29-T5S-R5E Hamilton Co. IL containing 136.17 acres | HC-0039 Bk 274 Pg234 Traded pt Charlie Moore property HC-0004 | Owned | Yes |
| Warranty Deed | 11/6/2008 | Robert J. Gray & Denise Gray to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE/4 9-T5S-R5E Hamilton Co. IL containing 51.93 | HC-0040 274 Pg 715 Deed restriction of single family residence and grain farming only Mr. Gray's son has a first right of refusal. | Owned | Yes |
| Warranty Deed | 7/26/2007 | Charles M. Bowers & Tammy Bowers to Oeneus LLC d/b/a SAVATRAN LLC | NE SE; W/2 SE NE 30-T5S-R5E Hamilton Co. IL containing 60 acres. | HC-0041 Bk 272 Pg | Owned | Yes |
| Warranty Deed | 10/2/2008 | Jeffrey A. Lueke and Michele L. Lueke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW/4 16-T5S-R5E 2.65 acres; PT SWSE 9-T5S-R5E 0.02 acre Hamilton Co. IL | HC-0042 Bk 274 Pg 587 | Owned | Yes |

Case 20-41308   Doc 1   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 182 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/6/2007 | Jeffrey A. Lueke and Michele L. Lueke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW/4 16-T5S-R5E 8.64 acres Hamilton Co. IL | HC-0042 Bk 272/7105 | Owned | Yes |
| Warranty Deed | 5/5/2009 | Alan Kirsch & Denise Kirsch to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE/4 6-T5S-R6E & PT SESE 31-T4S-R6E 2.61 acres Hamilton Co. IL | HC-0043 Bk275/536 | Owned | Yes |
| Easement | 5/5/2009 | Alan Kirsch & Denise Kirsch to Oeneus LLC d/b/a SAVATRAN LLC | 8.33 acres pt SESE and E/2 SWSE 9-T5S-R5E; 7.36 acres pt NE/4 6-T5S-R6E & SESE 31-T4S-R6E; 2.70 ac pt NE 6-T5S-R6E Hamilton Co. IL | HC-0043 Bk 217/300 | Owned | No |
| Special Warranty Deed | 5/5/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. W/2 NW/4 10-T5S-R5E Hamilton Co. IL containing 11.51 & Pt W/2 NW/4 10-T5S-R5E containing 66.12 acres Hamilton Co. IL | HC-0043 Bk 275/503 (Traded the Betty Gibbs property less rail to Kirsch) | Owned | Yes |
| Special Warranty Deed | 5/5/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. NW SE 6-T5S-R6E Hamilton County IL containing 13.03 acres; | HC-0043 Bk 275/499 (Traded the remainder of the Tennyson property to Kirsch) | Owned | Yes |

Case 20-41308    Doc 248    Filed 04/20/20    Entered 04/20/20 23:45:34    Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/6/2008 | Kenneth A. Waier a/k/a Kenneth Waier to Oeneus LLC d/b/a SAVATRAN LLC | Pt SWSW & NWSW 32-T4S-R6E Hamilton Co IL containing 18.17 acres | HC-0044 274/711 (Kenny Waier has 10 yr farming agreement Galloway property) | Owned | Yes |
| Warranty Deed | 4/26/2009 | James Lee Maller to Oeneus LLC d/b/a SAVATRAN LLC | Pt SW/4 31-T5S-R5E Hamilton Co IL containing 5.11 acres | HC-0045 275/462 Railline went through Mr. Mallers house and barn both have been removed. | Owned | Yes |
| Special Warranty Deed | 4/26/2009 | Oeneus LLC d/b/a SAVATRAN LLC to James Lee Maller | Pt. NE SE 36-T5S-R5E Franklin Co IL containing 5 acres | HC-0046 BK 2009-1998 Property to purchase by SAVATRAN 2009-1206 to replace Mr. Mallers homesite. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/25/2009 | Norman D. Melvin & Patricia K. Melvin to Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 SE/4 20-T5S-R5E Hamilton Co IL containing 12.14 acres | HC-0046 Bk 275/3108 | Owned | Yes |
| Warranty Deed | 4/3/2009 | Gary Kearnery a/k/a Gary W. Kearnery to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SWSW 20-T5S-R5E & pt NWNW 29-T5S-R5E Hamilton Co. IL containing 5acres | HC-0047 Bk275/362 | Owned | Yes |
| Warranty Deed | 12/8/2008 | Dale Miller & Denise Miller to Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 NW/4 31-T5S-R5E Hamilton Co. IL containing 7.51 acres | HC-0049 Bk274/873 We agreed by letter to relocate Mr. Millers water line. | Owned | Yes |
| Warranty Deed | 2/6/2009 | John M. Zelhart to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE/4 30-T5S-R5E Hamilton Co IL containing 1.0 acre | HC-0050 Bk 275/1095 We agreed to build him an access road and gave him perpetual access to his property. | Owned | Yes |

Case 20-41308 Doc 22 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 185 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/6/2009 | Donald G. Zelhart & Margaret R. Zelhart as co-Trustees of Donald G. Zelhart Living Trust to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest to pt NE/4 30-T5S-R5E Hamilton Co IL containing 4.11 acres | HC-0051 Bk 275/663 Agreed to gravel access road & repurchase rights | Owned | Yes |
| Warranty Deed | 6/24/2008 | Judith G. Gregory to Oeneus LLC d/b/a SAVATRAN LLC | 6 acres pt SESW 20-T5S-R5E Hamilton Co IL | HC-0053 Bk 274/52 Traded 112 acres of this property to Joe Rexing. | Owned | Yes |
| Warranty Deed | 7/16/2008 | David Williams & Brandee Williams to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWNW 29-T5S-R5E Hamilton Co IL 0.65 acres | HC-0056 Bk274/147 Purchased house rail going through garage. House rented. | Owned | Yes |
| Warranty Deed | 10/24/2008 | Alva James Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20th Pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0058 Bk 274/664 Bennett would not close. Filed partition suit to force closing. | Owned | Yes |

Case 20-01303-MB Doc 128 Filed 01/01/20 Entered 01/01/20 13:45:34 Main Document Pg 186 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/7/2009 | Wanda G. Downs & Cecil L Downs to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest pt NE/4 30-T5S-R5E Hamilton Co IL containing 4.11 acres | HC-0059 Bk 275/667 Agreed to gravel access road & repurchase rights. | Owned | Yes |
| Corrected Warranty Deed | 11/17/2008 | Robert A. Williams & Barbara A. Williams to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SENE 1-T6S-R4E Franklin Co IL containing 4.474 | FC-0023 2008-6300 purchased house; house has been removed. | Owned | Yes |
| Warranty Deed | 10/10/2008 | James Gregory Payne, as trustee of James Gregory Payne Trust to Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 NE 11-T6S-R4E & pt W/2 NW 12-T6S-R4E Franklin Co. IL containing 15.33 acres | FC-0024 2008-5818 | Owned | Yes |
| Warranty Deed | 10/10/2008 | James Gregory Payne, as trustee of Zulene Payne Trust to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NE 11-T6S-R4E Franklin Co. IL containing 6.44 acres | FC-0025 2008-5811 | Owned | Yes |
| Warranty Deed | 1/11/2008 | Reba L. Stokes Revocable Living Trust by Reba L. Stokes & Kenneth D. Stokes to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NE;  NWSE;SWSE & SESW 1-T6S-R4E NWNE; NENW; N3/4 SE NW 12-T6S-R4E Franklin County IL | FC-0029 2008-0603 | Owned | Yes |

Case 2:11-bk-21008 Doc 228 Filed 04/01/20 Pg 187 of 1005 Entered 04/01/20 23:45:34 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/6/2008 | Morris R. Clark & Karan S. Clark to Oeneus LLC d/b/a SAVATRAN LLC | NE NE 1-T6S-R4E Franklin Co IL 40 acres | FC-0031 2008-1248 | Owned | Yes |
| Easement | 3/6/2008 | Morris R. Clark & Karan S. Clark to Oeneus LLC d/b/a SAVATRAN LLC | 0.685 of the SE SE 36 T5S-R4E Franklin Co IL | FC-0031 2008-1249 | Owned | Yes |
| Special Warranty Deed | 3/6/2008 | Oeneus LLC d/b/a/ SAVATRAN LLC to Morris R. Clark & Karan S. Clark | Pt. W/2 NW/4 28 T5S-R5E Hamilton Co. IL containing 74.36 acres | FC-0031 Bk273/369 Traded remained of Charlie Moore HC-0004 to Clarks. | Owned | Yes |
| Quit Claim Deed | 4/7/2008 | Louise Harrison to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW corner SE NE 1-T6S-R4E Franklin Co IL containing 1.26 | FC-0134 #2008-13 Rec. 4/8/2008 | Owned | Yes |
| Quit Claim Deed | 10/28/2009 | Louise Harrison to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE NE 1-T6S-R4E Franklin Co IL | FC-0134 #2009-55 Rec. 11/2/2009 | Owned | Yes |

**POND CREEK TO SUGAR CAMP CONNECTOR ROUTE**

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 9/14/2007 | John H. Wiegand and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NE 10; Pt. NE NE10 T7S; R4E Franklin Co. IL | FC-0086 Purchase rail right of way. #2007-5358 Rec. 9/21/2007 | Owned | No |
| Recording Memo and Option to Purchase | 1/15/2008 | John H. Wiegand and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NE 10; Pt. NE NE10 T7S; R4E Franklin Co. IL | FC-0086 Purchase rail right of way lot 2 or plan B #2008-0338 Rec. 1/17/2008 | Owned | No |
| Recording Memo and Option to Purchase | 9/18/2007 | Donald L. Bennett and Sharla Bennett and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 14; Pt NW SW 14 T6S R4E Franklin Co. IL | FC-0077 Purchase rail right of way. #2007-5296 Rec. 9/19/2007 | Owned | No |
| Recording Memo and Option to Purchase | 10/8/2007 | Daniel E. Harmon & Terri J. Harmon and Oeneus | Pt. W/2 NW 2 T7S R4E Franklin Co. IL | FC-0106 Purchase rail right of way. | Owned | No |

Case 20-43597 Doc 28 Filed 04/01/20 Entered 04/01/20 03:45:34 Main Document Pg 188 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | LLC d/b/a SAVATRAN LLC | | #2007-5836 <br><br> Rec.10/11/2007 | | |
| Recording Memo and Option to Purchase | 10/10/2007 | Olen Max Harmon & Becky J Harmon and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 35 T6S R4E Franklin Co IL | FC-0108 Purchase rail right of way <br><br> #2007-5930 <br><br> Rec. 10/16/2007 | Owned | No |
| Recording Memo and Option to Purchase | 10/11/2007 | Michael Pike & Brenda Pike and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE NE 27 T7S R4E Franklin Co. IL | FC-0109 Purchase rail right of way | Owned | No |
| Recording Memo and Option to Purchase | 10/12/2007 | Marion Tow, George M. Tow & Karen L Tow and Oeneus LLC SAVATRAN LLC | Pt. SESE 27 T7S R4E Franklin Co. IL | FC-110 Purchase rail right of way. <br><br> #2007-5931 <br><br> Rec. 10/16/2007 | Owned | No |
| Recording Memo and Option to Purchase | 7/2/2008 | Marion Tow, George M. Tow & Karen L Tow and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE SE 22 T7S R4E Franklin Co. IL | FC-110 Purchase of 12.1 acres in addition to right of way. | Owned | No |

Case 20-11008 Doc 228 Filed 03/12/20 Entered 03/12/20 23:45:34 Main Docu... of 00...

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | #2008-3632 Rec. 7/3/2008 | | |
| Warranty Deed | 10/26/2007 | Carlton Heifner and Dixie Heifner and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW SW 22-T7S-R4E Franklin Co. IL 6 acres | FC-0111 Purchase of old rail bed. Hunting Lease to Marion Tow along rail bed. FC 2007-6290 Rec. 10/29/07 | Owned | Yes |
| Warranty Deed | 4/25/2008 | Andrew C. Julian & Susan E. Julian and Oeneus LLC d/b/a SAVATRAN LLC | Pt.SW SE 10- T7S-R4E Franklin Co. IL 27.72 acres | FC-0112 Purchased house and rail right of way. House Rented to Eric Smith | Owned | Yes |
| Recording Memo and Option to Purchase | 10/15/2007 | Gary L. Manis and Sharon L. Manis and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NW 26-T6S-R4E Franklin Co. IL 4.65 acres | FC-0113 Purchased right of way. FC 2007-5992 Rec. 10/16/07 | Owned | No |

Case 2:08-cv... Doc ... Filed 04/01/20 ... Entered 04/01/20 23:45:34 ... PP 191 of 1005 ... Main Docu...

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 10/19/2007 | Eddie Essary and Eliane Essary and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSW 2-T7S-R4E Franklin Co. IL 2.25 acres | FC-0114 Purchase rail right of way. FC 2007-6078 Rec. 10/23/07 | Owned | No |
| Recording Memo and Option to Purchase | 10/22/2007 | Cora Jane Taylor & Beth Benns and Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 NW 1; Pt.NWSW 11-T6S-R4E Franklin Co IL 24.86 acres | FC-0115 Purchase rail right of way and additional acres. FC 2007-6232 Rec. 10/31/07 | Owned | No |
| Recording Memo and Option to Purchase | 11/9/2007 | David R. Payne & Rhonda Payne and Oeneus d/b/a SAVATRAN LLC | Pt.NWNE 15 T7S-R4E containing 9 ac; Pt. NW NW 26 T7S-R4E containing 4.64 acres Franklin Co. IL | FC-0122 Purchase rail right of way. FC 2007-6524 Rec. 11/14/07 | Owned | No |
| Warranty Deed | 4/14/2008 | Robert G. Buntin and Marjorie A. Buntin as Trustees of the Robert G. Buntin and Marjorie A. Buntin Joint Living Trust, and Michael M. Buntin and Brenda Buntin as Trustees of the Michael M. | Pt. SW/4 23-6-4 Franklin County IL 7.07 acres; Pt. NW/4 23 and Pt. SW/14 T64-R4E Franklin Co 16.14 acres | FC-0125 Purchase rail right of way. FC-2008-2024 Rec. 4/17/2008 | Owned | Yes |

Filed 04/24/13 08:38:11 Doc 192 Pg 132 of 1605 Entered 04/24/13 23:45:34 Main Document

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Buntin and Brenda Buntin Joint Living Trust and Oeneus LLC d/b/a SAVATRAN | | | | |
| Recording Memo and Option to Purchase | 11/12/2007 | Ruth E. Sweet & Danny Sweet and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 35 T7S R4E Franklin Co. IL 7.48 acres | FC-0125 Purchase of rail right of way. Will plant trees along right of way FC-2007-6532 Rec. 11/14/07 | Owned | No |
| Recording Memo and Option to Purchase | 11/12/2007 | Ruth E. Sweet and Oeneus LLC d/b/a SAVATRAN LLC | Pt.SWNW 35 T7S R4E Franklin Co. IL 0.63 acres | FC-0126 Purchase of rail right of way. Purchased modular home and then sold and had moved FC 2007-6533 Rec. 11/14/07 | Owned | No |

Case 20-41308    Doc 288    Filed 04/01/21    Entered 04/01/21 23:45:34    Main Document    Pg 193 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 4/23/2009 | James Gregory Payne, as trustee James Gregory Payne Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 SE NW & SW/4 11 T6S-R4E Franklin Co. Il 5.83 acres | FC-0130 Purchase of rail right of way. FC 2009-2110 Rec. 5/4/09 | Owned | Yes |
| Recording Memo and Option to Purchase | 11/28/2007 | Ted Lawrence as Trustee of the Lawrence Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 2 T7S-R4E Franklin Co. IL 9.52 acres | FC-0131 Purchase of rail right of way and isolated land. Must plant trees along rail FC 2007-6806 Rec. 11/28/07 | Owned | No |
| Recording Memo and Option to Purchase | 11/30/2007 | Robert Leon McClerren & Cynthia McClerren and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSW 35 1.34 acres & Pt. W/2 NW 35 T7S-R4E Franklin Co. IL | FC-0132 Purchase of rail right of way FC 2007-6905 Rec.12/4/07 | Owned | No |
| Recording Memo and Option to Purchase | 9/5/2008 | Robert Leon McClerren & Robert G. McClerren and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 & Pt. NW SE 15 T7S R4E Franklin Co. IL 8.17 acres | FC-0132 Purchase rail right of way need to go around Jason Knight. FC 2008-5188 | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | Rec. 9/18/08 | | |
| Recording Memo and Option to Purchase | 11/28/2007 | Robert Shane Croslin and Jodi Croslin and Oeneus LLC d/b/a SAVATRAN LLC | pt. NWNW 35 4.53 acres; Pt. SWSW 26; Pt. NESE 27 4.71 acres T7S-R4E Franklin Co IL | FC-01335 Purchase rail right of way FC 2007-6984 Rec. 12/4/07 | Owned | No |
| Warranty Deed | 8/13/2008 | Anita Miller, Trustee Anita Miller Revocable Living Trust, and Oneida Ann Murphy as Trustee of the John Robert Miller Revocable Living Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 SW 11-T6S-R4E Franklin Co IL containing 57.31 acres. | FC-01365 Purchase of rail right of way and DESIGNATED WET LANDS BANK FC 2008-5466 Rec. 8/14/08 | Owned | Yes |
| Warranty Deed | 2/27/2009 | Stewart B Hungate and Oeneus LLC d/b/a SAVATRAN LLC | N/2 NE 27-T7S-4E Franklin Co IL containing 80 acres & a perpetual access easement | FC-01367 Purchase of rail right of way FC 2009-1017 Rec. 2/27/09 | Owned | Yes |
| Recording Memo and Option to | 1/18/2008 | R. Ernest Payne & Dorothy M. Payne and | Pt. W/2 E/2 Section 15 T7S-R4E containing 12 acres; Pt. | FC-01391 Purchase of rail right of way and rail right of way | Owned | No |

Case 2:14-cv-41281 Doc 2293 Filed 04/01/20 Entered 04/01/20 19:05:34 Main Document

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Purchase and Amendment One | | Oeneus LLC d/b/a SAVATRAN LLC | NE/4 of 22 T7S-R4E containing 23.33 acres | around Jason Knight. FC-2017-0389 Rec. 1/18/08 | | |
| Recording Memo and Option to Purchase | 2/19/2008 | Amos Clay Ing & Jo Ann Ing and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SE 10 T7S-R4E Franklin Co. IL containing 4.64 acres | FC-01425 Purchase of rail right of way. FC 2008-1101 Rec. 2/28/08 | Owned | No |
| Recording Memo and Option to Purchase | 3/5/2008 | Donald W. Manis & Delores J. Manis and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 35; Pt. W/2 SW 26 T6S-R4E Franklin Co IL 18.36 acres. | FC-01458 Purchase of rail right of way. FC 2008-1225 Rec. 3/5/08 | Owned | No |
| Warranty Deed | 5/28/2008 | Dale Wes Williford & Melissa R Williford to Oeneus LLC d/b/a SAVATRAN LLC | N/2 NWNE 20 ac ±; N 10 ac NE NE T6S-R4E Franklin Co IL | FC-01527 Purchased for rail loop at Scott Camp. FC 2008-3947 Rec. 5/28/08 | Owned | Yes |

Case 20-41308 Filed 04/01/20 23:45:34 Doc 228 Pg 196 of 1005 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/6/2009 | Mauris D Kern a/k/a Mauris Kern and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SW 22-T7S-R4E 4.60 ac; Pt. NW SW 22 T7S-R4E 3.86 ac; Pt. S/2 S/2 22 T7S-R4E 39.01 ac; Pt. S/2 S/2 22 & NE NW 27 T7S-R4E 57.69 acres Franklin Co IL | FC-0159 Purchased rail right of way around Jason Knight. FC 2009-5435 Rec. 11/6/09 | Owned | Yes |
| Warranty Deed | 11/3/2009 | Louis S Ison & Rose Ison and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 22 T7S-R4E Franklin Co IL  9.26 acres | FC-0160 Purchased rail right of way around Jason Knight. FC 2009-6059 Rec. 12/14/09 | Owned | Yes |
| Recording Memo and Option to Purchase | 9/8/2008 | Kenneth D. Summers  & Shelia K Summers and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE SE 22; Pt. NWSW 23 T6S-R4E Franklin Co IL 9.31 acres | FC-016 Purchased right of way and isolated land. | Owned | No |
| Recording Memo and Option to Purchase | 10/25/2007 | Irene Wilkas and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 2-T8S-R4E; Pt. NW SW 2 T8S-R4E; Pt. NESE 3 T8S-R4E Williamson County IL 15.73 acres. | WC-0106 Purchase rail right of way and isolated land. FC 308-50 | Owned | No |

Case 20-33948   Doc 2288   Filed 04/01/21   Entered 04/01/21 23:45:34   Main Document   Pg 197 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 6/30/2008 | Central Illinois Public Service d/b/a Ameren CIPS and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW NW 2 T8S-R4E Williamson Co IL 0.36 ac | WC-0142 rail easement. FC 312-800 Rec. 7/22/08 | Owned | Yes |
| **SHAWNEETOWN RAIL LINE** | | | | | | |
| Warranty Deed | 3/1/2007 | Jeffrey J. Drone & Toni L. Drone to Oeneus LLC d/b/a SAVATAN LLC | Pt. S/2 NE & Pt. N/2 SE 20 T9S-R7E; W/2 NW 28; E/2 NE 29 & access road T9S- R7E Saline Co. IL containing 227 acres. | SC-0009 Farm Leased to Jeff Drone. FC 1900-423 Rec. 3/2/07 | Owned | Yes |
| Warranty Deed | 11/20/2007 | Jimmie G. Rodgers & Billie Rodgers to Oeneus LLC d/b/a SAVATRAN LLC | E/2 NW 4 T9S-R6E Saline Co IL 80 acres | SC-0017 Farm Leased to Jeff Drone. FC 1927-505 Rec. 11/27/07 | Owned | Yes |
| Warranty Deed | 11/20/2007 | Oeneus LLC d/b/a SAVATRAN to Jimmie G. Rodgers & Billie Rodgers | Pt. SE 20 T9S-R7E Saline Co IL 89.864 acres | SC-0017 Farm Leased to Jeff Drone. FC 1927-509 Rec. 11/27/07 | Owned | Yes |
| Warranty Deed | 8/29/2007 | James D. Kuhlman and Andrew M. Freebourn to | NW NE 3 T9S-R6E Saline Co IL 40 acres | SC-0018 All woods no farm | Owned | Yes |

Case 20-41308 Filed 04/01/20 Entered 04/01/20 23:15:34 Main Docu Page 198 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Oeneus LLC d/b/a SAVATRAN LLC | | lease. FC 1921-423 Rec. 8/30/07 | | |
| Quit Claim Deed | 5/23/2007 | CST Transportation Inc and SAVATRAN LLC | six parcels lying in Gallatin County beginning at Equality and ending at Shawneetown individually referred to as Tracts 1,4,5A,6,8,and 42 containing 21.809 acres | GC-0004 Abandoned Rail Line across Gallatin County. 501-111 Rec. 5/24/07 | Owned | Yes |

Debtor Grantor:

ADENA RESOURCES, LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 5/6/2009 | Mason, Marilyn Trustee & Adena Resources | Pt. SW Sec 31-5-3 & Pt. NW Sec 6-6-3 as described | Water & power lines, Complete, FC-0213, FC2000-2758 | Owned | No |

Debtor/ Grantor:

AMERICAN CENTURY TRANSPORT LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/8/2016 | American Energy Corporation to American Century Transport LLC | See legal description set forth in the deed. | 2016000042 7 | Owned | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 200 of 1005

**Schedule 5.08(c)**

**Leased Material Real Property**

DEBTOR/GRANTOR:

HILLSBORO ENERGY LLC
12051 N. 9th Avenue
Hillsboro, IL  62049

**Montgomery County, Illinois**

**Bond County, Illinois (Coal Reserves only)**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease Agreement | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Short Form of Lease (Hillsboro) | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1346-428 | Leased | |
| Amendment No. 1 to the Coal Mining Lease and Sublease Agreement | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease (Hillsboro) | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1367-226 | Leased | |
| Amendment No. 2 to the Coal Mining Lease and Sublease Agreement | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Amended and Restated Short Form of Lease After Closing 4 and Closing 5 (Hillsboro) | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1412-134 BC 917-329 | Leased | |
| Amendment No. 3 to the Coal Mining Lease and Sublease Agreement | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Amended and Restated Short Form of Lease After Closing 3 (Hillsboro) | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1426-275 | Leased | |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Short Form of Lease After Closing 6 (Hillsboro) | 2/2/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1477-459  BC 964-143 | Leased | |
| Amended and Restated Short Form of Lease After Closing 7 & 8 (Hillsboro) | 8/21/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Coal Mining Lease Agreement | 9/21/2007 | Montgomery Mineral LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| First Partial Termination of Lease | 9/9/2009 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | NOT RECORDED | Leased | |
| Second Partial Termination of Lease | 1/8/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | NOT RECORDED | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Third Partial Termination of Lease | 10/4/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | NOT RECORDED | Leased | |
| Fourth Partial Termination of Lease | 1/13/2011 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | NOT RECORDED | Leased | |
| Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-176  BC 910-257 | Leased | |
| Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 204 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-135<br><br>BC 910-286 | Leased | |
| First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Short Form or Memorandum of First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1508-455 | Leased | |
| Deed | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Mine Site<br><br>RDA 1 & 2<br><br>Farmland & Bleeder Site #1 | 201000059726 | Owned | |
| Easement | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201000059723 | Owned | |
| Easement | 5/9/2011 | George & Martha Spinner to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201100063970 | Owned | |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu
Pg 205 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed | 8/23/2013 | Hillsboro Energy LLC to Hillsboro Transport, LLC | Loadout | 201300003499 | Owned | |

DEBTOR/GRANTOR:

MACOUPIN ENERGY LLC
14300 Brushy Mound Road
Carlinville, Illinois  62626

**Macoupin County, Illinois**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin South Mine Assignment | NOT RECORDED | Leased | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu
Pg 206 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | MA 503863 | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | NOT RECORDED | Leased | Yes |
| First Amendment to Coal Mining Lease | 2/13/2013 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | NOT RECORDED | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | East Hornsby Mine Assignment | NOT RECORDED | Leased | Yes |
| Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | MA 506329 | Leased | Yes |
| Amendment to Lease Agreement | 12/29/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | NOT RECORDED | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document
Pg 207 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | MA 506330 | Leased | Yes |
| Amendment to Lease Agreement | 12/29/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | NOT RECORDED | Leased | Yes |
| Option and Lease Agreement | 2/28/1967 | Jet Oil Company and Macoupin Energy LLC | Coal Reserves | Volume 628, Page 456 | Leased | Yes |
| Assignment of Leases | 1/27/2009 | Macoupin Energy LLC, as assignor, and WPP LLC, as assignee | Coal Reserves | NOT RECORDED | Leased | Yes |
| Coal Mining Lease and Sublease Agreement | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | NOT RECORDED | Leased | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu
Pg 208 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form or Memorandum of Coal Mining Lease and Sublease Agreement | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | MA 506328 | Leased | Yes |
| First Amendment to Coal Mining Lease and Sublease Agreement | 11/03/2010 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | NOT RECORDED | Leased | Yes |
| Second Amendment to Coal Mining Lease and Sublease Agreement | 03/28/2010 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | NOT RECORDED | Leased | Yes |
| Assignment of Leases | 1/22/2009 | ExxonMobil Coal USA, Inc. and Macoupin Energy LLC | Monterey Coal Company No. 1 Mine | MA 487734 | Leased | Yes |

**Clinton County, Illinois**

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 209 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 6/1/2012 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Coal Mining Lease | 6/1/2012 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | CC 2012R04931 | Leased | Yes |
| First Amendment to Coal Mining Lease | 2/13/2013 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | NOT RECORDED | Leased | Yes |

| | | | | | |
|---|---|---|---|---|---|
| Lease | 2/7/2019 | Foresight Energy, LLC/Macoupin to Keyrock, LLC | Methane Gas lease | Document NOT RECORDED | Leased |

DEBTOR/GRANTOR:

WILLIAMSON ENERGY, LLC
16468 Liberty School Road
Marion, IL  62959

**Williamson County, Illinois**

**Franklin County, Illinois (Coal Reserves only)**

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Coal Mining Lease Agreement | 8/14/2006 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form of Amended and Restated Coal Mining Lease Agreement | 8/14/2006 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 301-480 FC #2006-6571 | Leased | Yes |
| First Amendment to Amended and Restated Coal Mining Lease Agreement | 5/19/2008 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Amendment to Amended and Restated Coal Mining Lease Agreement | 12/18/2009 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Third Amendment to Amended and Restated Coal Mining Lease Agreement | 08/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of First, Second and Third Amendment to Amended and Restated Coal Mining Lease Agreement | 08/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 327-780  2010-6467 | Leased | Yes |
| Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form of Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 331-312 | Leased | Yes |
| Fifth Amendment to Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form of Fifth Amendment to Amended and | 3/20/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 341-659 | Leased | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 212 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Restated Coal Mining Lease Agreement | | | | | | |
| First Amendment to Amended and Coal Mining Lease Agreement | 5/19/2008 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Amendment to Amended and Restated Coal Mining Lease Agreement | 12/18/2009 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | NOT RECORDED | Leased | Yes |
| Third Amendment to Amended and Restated Coal Mining Lease Agreement | 8/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of First Amendment, Second Amendment and Third Amendment to Amended and Restated Coal Mining Lease Agreement | 8/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 327-780  FC #2010-5467 | Leased | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu
Pg 213 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | WC Misc 331-312 | Leased | Yes |
| Partial Release of Leased Premises from Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2011-3006 | Leased | Yes |
| Partial Release of Leased Premises from Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 9/1/2011) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2013-1637 | Leased | Yes |
| Corrective Partial Release of Leased Premises from Amended and | 4/5/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2013-2765 | Leased | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Docu

Pg 214 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Restated Coal Mining Lease Agreement | | | | | | |
| Short Form of Lease and Sublease | 5/1/2005 | Williamson Development Company LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | WC Misc 291-461 | Leased | Yes |
| Coal Mining Lease Agreement | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | NOT RECORDED | Leased | Yes |
| Short Form of Lease | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Misc 301Page 479 | Leased | Yes |
| Lease (Coal Prep Plant) | 5/1/2005 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | WC Misc 291-463 | Leased | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu
Pg 215 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | NOT RECORDED | Leased | Yes |
| Short Form of First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Misc 313 Page 620 | Leased | Yes |
| Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC to Williamson Energy, LLC | Coal Reserves in Williamson, Franklin, and Saline Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC to Williamson Energy, LLC | Coal Reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 325-897  FC #2010-3874  SC 1981-610 | Leased | Yes |
| Partial Release of Premises from Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Releases certain coal reserves in Williamson County, IL | WC Misc 331-310 | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| First Amendment to Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum after First Amendment to Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 331-311<br><br>FC #2011-3008<br><br>SC 2003-978 | Leased | Yes |
| Partial Release of Premises from Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 341-658 | Leased | Yes |
| Second Amendment to Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum after Second Amendment to Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | FC 2013-1639 | Leased | Yes |
| Lease | 5/1/2005 | Williamson Development | Pond Creek Rail Load Out | WC Misc 291-462 | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 217 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Company, LLC (fka Steelhead Development Company LLC) and Williamson Energy, LLC | | | | |
| First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | NOT RECORDED | Leased | Yes |
| Short Form of First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Misc 313 Page 619 | Leased | Yes |
| Ground Lease | 1/1/2006 | Eberhart to Williamson Transport, LLC | Ground lease required for Williamson Energy, LLC Operations | NOT RECORDED | Leased | Yes |
| Memorandum of the Eberhart Lease | 1/20/2006 | Eberhart to Williamson Transport, LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 296-404 | Leased | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu
Pg 218 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Assignment of Rights | 8/24/2007 | Williamson Transport LLC to Williamson Development Company LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 306-996 | Leased | Yes |
| Assignment of Rights | 8/24/2007 | Williamson Development Company LLC to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 325-900 | Leased | Yes |
| Ground Lease | 8/12/2010 | Eberhart to Williamson Development Company, LLC assigned to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | NOT RECORDED | Leased | Yes |
| Surface Lease | 3/22/2006 | Clara Summers and Independence Land Company LLC | Surface Lease | WC Misc 297-626 | Leased | Yes |
| Assignment of Lease | 8/12/2010 | Independence Land Company LLC to | Surface Lease | WC Misc 327-750 | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 219 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Williamson Energy LLC | | | | |
| Surface Lease | 3/22/2006 | Clara Summers and Independence Land Company LLC | Surface Lease | WC Misc 297-626 | | |
| Grant of Surface Easement | 8/12/2010 | Williamson Development Company LLC and Williamson Energy LLC | Surface Easement | WC Misc 325-899 | Leased | Yes |

| Warranty Deed | 6/14/2018 | Diana S. Dulle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-4356 | Owned | |
|---|---|---|---|---|---|---|
| Warranty Deed | 7/13/2018 | Linda Duncan to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5209 | Owned | |
| Warranty Deed | 7/20/2018 | Jeremy W. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5434 | Owned | |
| Warranty Deed | 8/20/2018 | Lora L. Jones to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6259 | Owned | |
| Warranty Deed | 8/20/2018 | Shirley N. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6258 | Owned | |
| Warranty Deed | 9/4/2018 | Debra Ellen Moser to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6707 | Owned | |
| Warranty Deed | 9/4/2018 | Larry Dean Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6706 | Owned | |
| Warranty Deed | 9/4/2018 | Jerry R. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6705 | Owned | |
| Warranty Deed | 9/4/2018 | Wilma K. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6704 | Owned | |
| Warranty Deed | 9/4/2018 | Kimberly A. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6703 | Owned | |
| Warranty Deed | 9/4/2018 | Gerald Lee Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6702 | Owned | |
| Warranty Deed | 9/4/2018 | Wendall Ray Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6701 | Owned | |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 221 of 1005

| Warranty Deed | 9/24/2018 | Edward W. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7338 | Owned | |
| Warranty Deed | 9/24/2018 | Barbara Jean Newton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7337 | Owned | |
| Warranty Deed | 9/24/2018 | Debra L. Caplick to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7336 | Owned | |
| Warranty Deed | 9/24/2018 | Don N. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7335 | Owned | |
| Warranty Deed | 9/24/2018 | Jim D. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7334 | Owned | |
| Warranty Deed | 9/24/2018 | Susan Elaine Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7333 | Owned | |
| Warranty Deed | 9/24/2018 | Jerry D. Brookman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7332 | Owned | |
| Warranty Deed | 9/24/2018 | Linda E. Rector to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7331 | Owned | |
| Warranty Deed | 9/24/2018 | Marion E. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7330 | Owned | |
| Warranty Deed | 9/24/2018 | Sarah J. Glazebrook Perry to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7329 | Owned | |
| Warranty Deed | 10/16/2018 | Michelle McCabe-Doyle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7977 | Owned | |

Case 20-41308  Doc 228  Filed 04/01/20  Entered 04/01/20 23:45:34  Main Docu  Pg 222 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 10/16/2018 | Richard R. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7976 | Owned | |
| Warranty Deed | 10/16/2018 | Robert Shon Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7975 | Owned | |
| Warranty Deed | 10/16/2018 | Elizabeth Jeanne Culli to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7974 | Owned | |
| Warranty Deed | 10/23/2018 | Kathy Scott to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8178 | Owned | |
| Warranty Deed | 11/07/2018 | Roger W. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8581 | Owned | |
| Warranty Deed | 11/27/2018 | Tommy R. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9311 | Owned | |
| Warranty Deed | 12/03/2018 | Allen E. Heinbokel to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9490 | Owned | |
| Warranty Deed | 12/18/2018 | Jeremiah Wesley Seaman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9920 | Owned | |
| Warranty Deed | 12/18/2018 | Alexandra Lewis DeMarino to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9919 | Owned | |
| Warranty Deed | 1/07/2019 | Shannon Lee Brand to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-147 | Owned | |
| Warranty Deed | 1/31/2019 | Michael James Lewis to | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-727 | Owned | |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Pg 223 of 1005   Main Docu

| | | Williamson Energy, LLC | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 1/31/2019 | Karolyn Kay Fullerton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-726 | Owned | |
| Mining Lease | 3/5/2019 | Susan E. Denton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1569 | Leased | |
| Warranty Deed | 3/18/2019 | Ronald L. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1877 | Owned | |
| Warranty Deed | 8/27/2019 | Deloris J. Hoehn to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-6215 | Owned | |
| Warranty Deed | 1/26/2018 | James Walter Hoyt to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-407 | Owned | |
| Warranty Deed | 2/13/2018 | Brenda Dora Spencer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-633 | Owned | |
| Warranty Deed | 3/21/2018 | Patricia K. Dyer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1127 | Owned | |
| Warranty Deed | 3/21/2018 | Diana L. Bischler to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1126 | Owned | |
| Mining Lease | 3/23/2018 | Lisa M. Engeling to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1177 | Leased | |
| Warranty Deed | 4/19/2018 | Jeanette Fortney to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1539 | Owned | |
| Mining Lease | 7/13/2018 | Jerry K. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-2781 | Leased | |

| Warranty Deed | 8/1/2018 | Lorna Lynn Hines to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3095 | Owned | |
|---|---|---|---|---|---|---|
| Warranty Deed | 8/1/2018 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3094 | Owned | |
| Warranty Deed | 8/10/2018 | Brian M. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3251 | Owned | |
| Mining Lease | 8/29/2018 | Paula T. Hartzel, et al to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3551 | Leased | |
| Warranty Deed | 9/5/2018 | Janet J. Griffin to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3642 | Owned | |
| Warranty Deed | 9/5/2018 | Gary P. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3641 | Owned | |
| Warranty Deed | 9/5/2018 | Barbara Giles to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3640 | Owned | |
| Warranty Deed | 9/18/2018 | Katherine Ann Bradley to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3870 | Owned | |
| Warranty Deed | 10/17/2018 | Shirley Whitehead to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4400 | Owned | |
| Warranty Deed | 10/23/2018 | Barbara Faye Sharkey to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4481 | Owned | |
| Warranty Deed | 2/1/2019 | Emma L. Stetson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-335 | Owned | |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Docu Pg 225 of 1005

| Warranty Deed | 3/26/2019 | Ronald L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1004 | Owned | |
|---|---|---|---|---|---|---|
| Warranty Deed | 4/2/2019 | Sarah Greenwade to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1134 | Owned | |
| Warranty Deed | 4/2/2019 | Susan L. Naucke to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1154 | Owned | |
| Warranty Deed | 4/17/2019 | Brock D. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1351 | Owned | |
| Warranty Deed | 4/17/2019 | James Keith Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1352 | Owned | |
| Warranty Deed | 4/23/2019 | Marilyn S. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1419 | Owned | |
| Warranty Deed | 5/14/2019 | Miranda B. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1752 | Owned | |
| Warranty Deed | 5/14/2019 | Charlotte Jean to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1751 | Owned | |
| Warranty Deed | 7/1/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2388 | Owned | |
| Mining Lease | 7/17/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2618 | Owned | |
| Warranty Deed | 7/17/2019 | Judith A. Woodard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2617 | Owned | |
| Warranty Deed | 7/17/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2616 | Owned | |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 226 of 1005

| Warranty Deed | 7/24/2019 | Norma Adams Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2732 | Owned | |
|---|---|---|---|---|---|---|
| Warranty Deed | 7/30/2019 | Phillip R. Erthall to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2832 | Owned | |
| Warranty Deed | 7/30/2019 | Robert H. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2833 | Owned | |
| Warranty Deed | 8/13/2019 | Kenneth L. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3062 | Owned | |
| Warranty Deed | 8/13/2019 | William Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3061 | Owned | |
| Warranty Deed | 9/4/2019 | Linda S. Lear to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3389 | Owned | |
| Deed | 9/16/2019 | Steven H. Machura to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3554 | Owned | |
| Warranty Deed | 10/17/2019 | Sharon A. Aiken-Peterson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3990 | Owned | |
| Warranty Deed | 10/30/2019 | Raven N. Fager to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4153 | Owned | |
| Mining Lease | 11/05/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4251 | Leased | |
| Warranty Deed | 11/14/2019 | Daniel L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4371 | Owned | |
| Warranty Deed | 11/26/2019 | Colleen L. Taylor to Williamson Energy, | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4559 | Owned | |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Pg 227 of 1005 Main Docu

| | | | | | | |
|---|---|---|---|---|---|---|
| | | LLC | | | | |
| Warranty Deed | 2/25/2020 | Paula Kay Osteen-Cortez to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-728 | Owned | |
| Warranty Deed | 2/25/2020 | Monta Ray Jennings to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-726 | Owned | |
| Warranty Deed | 2/25/2020 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-727 | Owned | |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 228 of 1005

DEBTOR/GRANTOR:

SUGAR CAMP ENERGY, LLC
11351 N. Thompsonville Road
Macedonia, Illinois  62860

**Franklin County, Illinois**

**Hamilton County, Illinois (Coal Reserves only)**

**Saline County, Illinois (Coal Reserves only)**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| TVA Illinois Coal Lease | 7/1/2002 | USA through TVA & Illinois Fuel Company LLC (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | #2007-5827 Rec. 10/19/2007 | Leased | Yes |
| Assignment of TVA Illinois Coal Lease | 8/4/2009 | USA through TVA & Illinois Fuel Company LLC (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | #2009-4745 Rec. 9/10/2009 | Leased | Yes |

Case 20-41308   Doc 2236   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 229 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amendment One to TVA Illinois Coal Lease | 4/17/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0027 | Leased | Yes |
| Amendment Two to TVA Illinois Coal Lease | 8/30/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | NOT RECORDED | Leased | Yes |
| Letter Agreement regarding TVA Illinois Coal Lease | 8/30/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | NOT RECORDED | Leased | Yes |
| Franklin County Coal Lease | 7/1/2002 | USA through TVA & Ruger Coal Company, Inc. (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | NOT RECORDED FC-0027 | Leased | Yes |
| Assignment of Lease | 9/10/2007 | USA through TVA & Ruger Coal Company, Inc. (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | #2007-15005 Rec. 9/12/2007 | Leased | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 230 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0083 FC 2006-6918 | Leased | Yes |
| Memorandum of Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2006-6919 | Leased | Yes |
| Supplemental Memorandum of Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2008-4441 | Leased | Yes |
| Sublease | 3/6/2012 | Sugar Camp Energy, LLC & HOD LLC | Properties located in Franklin County IL as described in Exhibit A | #2012-6228 Rec. 12/11/2012 | Leased | Yes |
| First Amendment to Coal Mining Lease | 8/11/2008 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | #2008-4440 Rec. 8/12/2008 | Leased | Yes |
| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & Sugar Camp Energy, LLC | Consent with respect to Illinois Fuels Lease | FC-0233 | Leased | Yes |

Case 20-41308    Doc 28    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 331 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Illinois Fuels TVA Lease | NOT RECORDED | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Franklin County TVA Lease | NOT RECORDED | Leased | No |
| Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Memorandum of Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | FC 2010-3825 | Leased | Yes |
| First Amendment to Coal Mining Lease` | 11/4/2011 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Second Amendment to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 232 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Memorandum after First and Second Amendments to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | NOT RECORDED | Leased | Yes |
| Memorandum of Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | FC 2012-6228 | Leased | Yes |
| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & Sugar Camp Energy, LLC | Consent with respect to Illinois Fuels Lease | FC-0283 | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Illinois Fuels TVA Lease | N/A | Leased | Yes |

Case 20-41308   Doc 239   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 233 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Franklin County TVA Lease | N/A | Leased | No |
| Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Memorandum of Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | FC 2010-3825 | Leased | Yes |
| First Amendment to Coal Mining Lease` | 11/4/2011 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Second Amendment to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Memorandum after First and Second Amendments to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 234 of 1005

| Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | NOT RECORDED | Leased | Yes |
| Memorandum of Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | FC 2012-6228 | Leased | Yes |

| Mining Lease | 01/04/18 | Roberts, Carol Ann Trustee to SCELLC | Sugar Camp Mine Plan | HC 2018-0008 | Leased | |
| Mining Lease | 01/04/18 | Engstrom, Amy to SCELLC | Sugar Camp Mine Plan | HC 2018-0021 | Leased | |
| Mining Lease | 01/04/18 | Hayes, Marshall Jr. to SCELLC | Sugar Camp Mine Plan | HC 2018-0023 | Leased | |
| Mining Lease | 01/04/18 | Blanchard, Bonnie M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0026 | Leased | |
| Mining Lease | 01/04/18 | Palmer, James to SCELLC | Sugar Camp Mine Plan | HC 2018-0027 | Leased | |
| Mining Lease | 01/04/18 | Moxley, Linda to SCELLC | Sugar Camp Mine Plan | HC 2018-0028 | Leased | |
| Coal Deed | 01/04/18 | Johnson, Susan L. to SCELLC | Sugar Camp Mine Plan | HC 2018-0029 | Owned | |
| Mining Lease | 01/30/18 | McFarland, Carol A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0130 | Leased | |
| Mining Lease | 01/30/18 | Bowman, Debra Kate to SCELLC | Sugar Camp Mine Plan | HC 2018-0131 | Leased | |
| Mining Lease | 01/30/18 | Diaz, Donna J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0132 | Leased | |

Case 20-41308    Doc 22    Filed 04/16/20    Entered 04/16/20 23:45:34    Main Document    Pg 235 of 1005

| Mining Lease | 01/30/18 | Flannigan, James T.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0113 | Leased | |
| Mining Lease | 01/30/18 | Leslie, Janet E.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0114 | Leased | |
| Mining Lease | 01/30/18 | Reid, Jon M.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0115 | Leased | |
| Mining Lease | 01/30/18 | Webster, Linda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0116 | Leased | |
| Mining Lease | 01/30/18 | Henson, William  to SCELLC | Sugar Camp Mine Plan | HC 2018-0119 | Leased | |
| Coal Deed | 01/30/18 | Wake, Amanda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0120 | Owned | |
| Coal Deed | 01/30/18 | Trabant, Megan  to SCELLC | Sugar Camp Mine Plan | HC 2018-0121 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Pamela S.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0122 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Rochelle  to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Owned | |
| Mining Lease | 01/30/18 | Bloomfield, Dora  to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Leased | |
| Mining Lease | 01/30/18 | Flannigan, Donald  to SCELLC | Sugar Camp Mine Plan | HC 2018-0124 | Leased | |
| Mining Lease | 01/30/18 | Smith, Sharon  to SCELLC | Sugar Camp Mine Plan | HC 2018-0126 | Leased | |
| Mining Lease | 02/08/18 | Wood, Betty A.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0161 | Leased | |
| Mining Lease | 02/08/18 | Irish, Carol V.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0172 | Leased | |
| Mining Lease | 02/08/18 | Wicker, Darrell  to SCELLC | Sugar Camp Mine Plan | HC 2018-0173 | Leased | |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 236 of 1005

| Mining Lease | 02/08/18 | Kathleen M. Wright to SCELLC | Sugar Camp Mine Plan | HC 2018-0174 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 02/08/18 | Irish, Lloyd Paul to SCELLC | Sugar Camp Mine Plan | HC 2018-0175 | Leased | |
| Mining Lease | 02/08/18 | Patterson, Paul J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0176 | Leased | |
| Mining Lease | 02/08/18 | Wicker, Paul R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0177 | Leased | |
| Mining Lease | 02/28/18 | Krois, Bonnie C. to SCELLC | Sugar Camp Mine Plan | HC 2018-0270 | Leased | |
| Coal Deed | 02/28/18 | Tabor, Stephanie to SCELLC | Sugar Camp Mine Plan | HC 2018-0271 | Owned | |
| Mining Lease | 02/28/18 | Petitte, Clyda to SCELLC | Sugar Camp Mine Plan | HC 2018-0272 | Leased | |
| Mining Lease | 02/28/18 | Patterson, Emily Jo to SCELLC | Sugar Camp Mine Plan | HC 2018-0273 | Leased | |
| Mining Lease | 02/28/18 | Allen, Jane to SCELLC | Sugar Camp Mine Plan | HC 2018-0274 | Leased | |
| Coal Deed | 02/28/18 | Spaven, Laverne to SCELLC | Sugar Camp Mine Plan | HC 2018-0276 | Owned | |
| Mining Lease | 02/28/18 | Jackson, Patricia Snyder to SCELLC | Sugar Camp Mine Plan | HC 2018-0277 | Leased | |
| Mining Lease | 02/28/18 | Gioia, Virginia M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0278 | Leased | |
| Mining Lease | 02/28/18 | Moffett, William R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0279 | Leased | |
| Mining Lease | 02/28/18 | O'Dell, William to SCELLC | Sugar Camp Mine Plan | HC 2018-0280 | Leased | |
| Mining Lease | 02/28/18 | Reid, Dennis P. to SCELLC | Sugar Camp Mine Plan | HC 2018-0281 | Leased | |

Case 18-41208 Doc 28 Filed 04/20/20 Entered 04/20/20 18:45:34 Main Document Pg 237 of 1005

| Coal Deed | 02/28/18 | Griffith, Janice Sue to SCELLC | Sugar Camp Mine Plan | HC 2018-0284 | Owned | |
| Mining Lease | 02/28/18 | Knight, Kenneth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0287 | Leased | |
| Coal Deed | 02/28/18 | Metheney, Rickie W. to SCELLC | Sugar Camp Mine Plan | HC 2018-0289 | Owned | |
| Mining Lease | 02/28/18 | Olson, Ruth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0291 | Leased | |
| Mining Lease | 02/28/18 | Sandy, Susan E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0293 | Leased | |
| Coal Deed | 02/28/18 | Miller, Micah A. & Marietta to SCELLC | Sugar Camp Mine Plan | HC 2019-2023 | Owned | |
| Mining Lease | 04/06/18 | Mudge, Evelyn M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0806 | Leased | |
| Mining Lease | 04/12/18 | Higginson, Leslie K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0527 | Leased | |
| Coal Deed | 04/12/18 | Farris, Brenda K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0528 | Owned | |
| Mining Lease | 04/12/18 | Cook, Becky Lynn to SCELLC | Sugar Camp Mine Plan | HC 2018-0529 | Leased | |
| Mining Lease | 04/12/18 | Snyder, Diane M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0530 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Kevin J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0531 | Leased | |
| Mining Lease | 04/12/18 | Wohlers, Karen J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0532 | Leased | |
| Mining Lease | 04/12/18 | Heckert, Lauri to SCELLC | Sugar Camp Mine Plan | HC 2018-0533 | Leased | |

Case 4:20-413308 Doc 28 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 238 of 1005

| Mining Lease | 04/12/18 | Page, Mary Jane by Sidney Bennett III AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-0534 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 04/12/18 | Comp ton, Paulette N. to SCELLC | Sugar Camp Mine Plan | HC 2018-0535 | Leased | |
| Mining Lease | 04/12/18 | Taylor, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2018-0536 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Carol Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-0537 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Casey Joel to SCELLC | Sugar Camp Mine Plan | HC 2018-0538 | Leased | |
| Mining Lease | 05/08/18 | Lowman, Timothy A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0548 | Leased | |
| Mining Lease | 05/08/18 | Neal, Douglas Allen to SCELLC | Sugar Camp Mine Plan | HC 2018-0734 | Leased | |
| Mining Lease | 05/08/18 | Williams, J. Mark to SCELLC | Sugar Camp Mine Plan | HC 2018-0735 | Leased | |
| Mining Lease | 05/08/18 | Barker, Lynne E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0736 | Leased | |
| Mining Lease | 05/08/18 | Knight, Stephen L. to SCELLC | Sugar Camp Mine Plan | HC 2018-0737 | Leased | |
| Mining Lease | 05/08/18 | Neal, Walter Blake to SCELLC | Sugar Camp Mine Plan | HC 2018-0759 | Leased | |
| Coal Deed | 05/11/18 | Noma, Inc to SCELLC | Sugar Camp Mine Plan | HC 2018-0806 | Owned | |
| Mining Lease | 05/16/18 | Hake, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0807 | Leased | |
| Mining Lease | 05/16/18 | Hosner, Irene Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0808 | Leased | |

Case 20-11030 Doc 226 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 239 of 1005

| Mining Lease | 05/16/18 | Duckworth, Nina Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0811 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 05/16/18 | Bailey, Velma Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0812 | Leased | |
| Mining Lease | 05/16/18 | Lovan, W. Robert to SCELLC | Sugar Camp Mine Plan | HC 2018-0813 | Leased | |
| Mining Lease | 05/16/18 | Neal, William Jerry to SCELLC | Sugar Camp Mine Plan | HC 2018-0824 | Leased | |
| Coal Deed | 06/27/18 | Bow ton, Barbara G. to SCELLC | Sugar Camp Mine Plan | HC 2018-1027 | Owned | |
| Coal Deed | 06/27/18 | Whets tone, Dennis W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1028 | Owned | |
| Coal Deed | 06/27/18 | Whets tone, William R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1029 | Owned | |
| Coal Deed | 06/27/18 | Smith, Bernice to SCELLC | Sugar Camp Mine Plan | HC 2018-1030 | Owned | |
| Coal Deed | 06/27/18 | Thompson, Beatrice % Billy E. Walker AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-1031 | Owned | |
| Coal Deed | 06/27/18 | First Church of the Nazarene to SCELLC | Sugar Camp Mine Plan | HC 2018-1032 | Owned | |
| Coal Deed | 06/27/18 | Linn, Karen R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1034 | Owned | |
| Mining Lease | 06/27/18 | Seibert, Charles Ellis to SCELLC | Sugar Camp Mine Plan | HC 2018-1037 | Leased | |
| Mining Lease | 06/27/18 | Seibert, James Thomas to SCELLC | Sugar Camp Mine Plan | HC 2018-1038 | Leased | |
| Mining Lease | 06/27/18 | Drake, Terry W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1041 | Leased | |

Case 24-41208    Doc 28    Filed 04/01/24    Entered 04/01/24 23:45:34    Main Document    Pg 240 of 1005

| Mining Lease | 06/27/18 | Scott, Betsy Dawn to SCELLC | Sugar Camp Mine Plan | HC 2018-1042 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 06/27/18 | Lane, John Bradley to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |
| Mining Lease | 06/27/18 | Drake, Mark W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |
| Coal Deed | 06/27/18 | Mendyk, Julie to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Joyce Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1086 | Leased | |
| Mining Lease | 07/05/18 | Metheney, Donald W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1084 | Leased | |
| Coal Deed | 07/05/18 | Sandidge, Joyce to SCELLC | Sugar Camp Mine Plan | HC 2018-1085 | Owned | |
| Coal Deed | 07/05/18 | Smith, Leon to SCELLC | Sugar Camp Mine Plan | HC 2018-1087 | Owned | |
| Coal Deed | 07/05/18 | Smith, Richard H. to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Ronald M. to SCELLC | Sugar Camp Mine Plan | HC 2018-1089 | Leased | |
| Mining Lease | 07/18/18 | Martin, Marianne B. to SCELLC | Sugar Camp Mine Plan | HC 2018-1157 | Leased | |
| Mining Lease | 07/18/18 | Wilkie, Mary Jean to SCELLC | Sugar Camp Mine Plan | HC 2018-1158 | Leased | |
| Mining Lease | 07/18/18 | Jones, Michael J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1159 | Leased | |
| Mining Lease | 07/18/18 | Martin, Janet J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1160 | Leased | |
| Mining Lease | 07/30/18 | Kleber, LLC to SCELLC | Sugar Camp Mine Plan | HC 2018-1232 | Leased | |

| Mining Lease | 08/08/18 | Vickers, Rhonda Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1271 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 08/08/18 | Pike, Brenda L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1272 | Leased | |
| Mining Lease | 08/08/18 | Schwenn, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1273 | Leased | |
| Mining Lease | 08/14/18 | Lane, Juanita Dare to SCELLC | Sugar Camp Mine Plan | HC 2018-1302 | Leased | |
| Coal Deed | 08/14/18 | Metheney, Miranda to SCELLC | Sugar Camp Mine Plan | HC 2018-1301 | Owned | |
| Mining Lease | 08/14/18 | Yancey, George to SCELLC | Sugar Camp Mine Plan | HC 2018-1303 | Leased | |
| Mining Lease | 08/28/18 | Knob Prairie Baptist Cemetery Association to SCELLC | Sugar Camp Mine Plan | HC 2018-1040 | Leased | |
| Coal Deed | 09/12/18 | Buchanan, Cynthia E. to SCELLC | Sugar Camp Mine Plan | HC 2018-1449 | Owned | |
| Coal Deed | 09/12/18 | Brophy, Romaine widow of James Brophy to SCELLC | Sugar Camp Mine Plan | HC 2018-1450 | Owned | |
| Mining Lease | 09/12/18 | Wright, Donald L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1441 | Leased | |
| Mining Lease | 09/12/18 | Dorion, Rhona to SCELLC | Sugar Camp Mine Plan | HC 2018-1442 | Leased | |
| Mining Lease | 09/12/18 | Wright, Laura to SCELLC | Sugar Camp Mine Plan | HC 2018-1443 | Leased | |
| Mining Lease | 10/03/18 | Simmons, Gavin T. to SCELLC | Sugar Camp Mine Plan | HC 2018-1523 | Leased | |
| Mining Lease | 10/03/18 | Wright, Curtis D. to SCELLC | Sugar Camp Mine Plan | HC 2018-1524 | Leased | |

Case 4:18-08 Doc 210 Filed 04/01/20 Entered 04/07/20 15:45:34 Pg 242 of 1005 Main Docu

| Mining Lease | 10/03/18 | Lane, Riley Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1525 | Leased | |
| Mining Lease | 10/24/18 | Winter, Carrie L Trust to SCELLC | Sugar Camp Mine Plan | HC 2018-1662 | Leased | |
| Mining Lease | 10/24/18 | Smith, Brett to SCELLC | Sugar Camp Mine Plan | HC 2018-1663 | Leased | |
| Mining Lease | 10/24/18 | Johnson, Flora Wymond to SCELLC | Sugar Camp Mine Plan | HC 2018-1665 | Leased | |
| Mining Lease | 10/24/18 | Collins, Sandra Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1666 | Leased | |
| Mining Lease | 10/24/18 | Koptez, Steven Gerald to SCELLC | Sugar Camp Mine Plan | HC 2018-1667 | Leased | |
| Mining Lease | 10/24/18 | Decker, Mary Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1783 | Leased | |
| Coal Deed | 10/30/18 | Jenkins, Thomas R to SCELLC | Sugar Camp Mine Plan | HC 2018-1692 | Owned | |
| Mining Lease | 10/30/18 | Dry, Margaret Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1693 | Leased | |
| Mining Lease | 10/30/18 | Lane, Sydney Drew to SCELLC | Sugar Camp Mine Plan | HC 2018-1694 | Leased | |
| Mining Lease | 10/30/18 | touma, Elizabeth Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1695 | Leased | |
| Mining Lease | 10/30/18 | Myers, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1696 | Leased | |
| Mining Lease | 11/19/18 | Palmer, Gary to SCELLC | Sugar Camp Mine Plan | HC 2018-1785 | Leased | |
| Mining Lease | 11/19/18 | Jordon, Flora Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 11/20/18 | Waggoner, Amanda J to SCELLC | Sugar Camp Mine Plan | FC 2018-4821 | Leased | |

Case 20-41308 Doc 28 Filed 04/21/20 Entered 04/21/20 23:45:34 Main Document Pg 243 of 1005

| Mining Lease | 11/20/18 | Bohannon, Barbara Ann to SCELLC | Sugar Camp Mine Plan | FC 2018-4822 | Leased | |
| Mining Lease | 11/20/18 | Otterson, Lloyd L. to SCELLC | Sugar Camp Mine Plan | FC 2018-4823 | Leased | |
| Mining Lease | 12/11/18 | Goforth, Heather J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1905 | Leased | |
| Mining Lease | 12/11/18 | Goforth, Matthew R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1906 | Leased | |
| Mining Lease | 12/11/18 | Smith, Kerry to SCELLC | Sugar Camp Mine Plan | HC 2018-1907 | Leased | |
| Mining Lease | 12/11/18 | Johnson, Katherine Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 12/18/18 | Wright, Shelia P. to SCELLC | Sugar Camp Mine Plan | HC 2018-1974 | Leased | |
| Mining Lease | 12/18/18 | Wright, Richard A. to SCELLC | Sugar Camp Mine Plan | HC 2018-1975 | Leased | |
| Mining Lease | 12/18/18 | Wright, Michael S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1976 | Leased | |
| Mining Lease | 12/18/18 | Brown, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1977 | Leased | |
| Coal Deed | 01/09/19 | Jenkins, Mike to SCELLC | Sugar Camp Mine Plan | HC 2019-0057 | Owned | |
| Mining Lease | 01/09/19 | Jenkins, Hellen to SCELLC | Sugar Camp Mine Plan | HC 2019-0058 | Leased | |
| Mining Lease | 01/09/19 | Bayne, Janet Jenkins to SCELLC | Sugar Camp Mine Plan | HC 2019-0059 | Leased | |
| Mining Lease | 01/09/19 | Jenkins, James J. to SCELLC | Sugar Camp Mine Plan | HC 2019-0060 | Leased | |
| Mining Lease | 01/16/19 | Wright, Steven Ray to SCELLC | Sugar Camp Mine Plan | HC 2019-0087 | Leased | |

| Mining Lease | 01/16/19 | Wright, Ida Louise to SCELLC | Sugar Camp Mine Plan | HC 2019-0098 | Leased | |
|---|---|---|---|---|---|---|
| Coal Deed | 01/29/19 | The Bonnie Camp Meeting to SCELLC | Sugar Camp Mine Plan | HC 2019-0150 | Owned | |
| Coal Deed | 02/01/19 | Barnhill, Ruth Eloise Short to SCELLC | Sugar Camp Mine Plan | HC 2019-0168 | Owned | |
| Coal Deed | 02/01/19 | Rappe, John James to SCELLC | Sugar Camp Mine Plan | HC 2019-0169 | Owned | |
| Mining Lease | 02/01/19 | Willis, Bruce E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0172 | Leased | |
| Mining Lease | 02/01/19 | Knott, Elaine Mae to SCELLC | Sugar Camp Mine Plan | HC 2019-0173 | Leased | |
| Mining Lease | 02/01/19 | Seibert, John Walter to SCELLC | Sugar Camp Mine Plan | HC 2019-0174 | Leased | |
| Coal Deed | 02/08/19 | Short, Leon to SCELLC | Sugar Camp Mine Plan | HC 2019-0210 | Owned | |
| Coal Deed | 02/08/19 | Avolt, Kathleen Eagan to SCELLC | Sugar Camp Mine Plan | HC 2019-0248 | Owned | |
| Coal Deed | 02/08/19 | Avolt, Donna H. to SCELLC | Sugar Camp Mine Plan | HC 2019-0249 | Owned | |
| Mining Lease | 02/13/19 | Wall, Letitia to SCELLC | Sugar Camp Mine Plan | HC 2019-0223 | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 02/19/19 | Hoffman, Elaine W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0245 | Leased | |
| Coal Deed | 03/12/19 | Banning, David W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0368 | Owned | |

Case 20-41308    Doc 28    Filed 04/21/20    Entered 04/21/20 03:45:34    Main Document    Pg 245 of 1005

| Mining Lease | 03/22/19 | Kinsey, Frances E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0416 | Leased | |
| Mining Lease | 03/22/19 | Willis, George Darin to SCELLC | Sugar Camp Mine Plan | HC 2019-0417 | Leased | |
| Mining Lease | 03/22/19 | Burns, Lenore E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0418 | Leased | |
| Mining Lease | 03/22/19 | Gill, Lorella E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0419 | Leased | |
| Mining Lease | 03/22/19 | Oberreiter, Jean Ann (Evans) to SCELLC | Sugar Camp Mine Plan | HC 2019-0420 | Leased | |
| Coal Deed | 03/22/19 | Doyle, Kymbra Drasil to SCELLC | Sugar Camp Mine Plan | HC 2019-0421 | Owned | |
| Coal Deed | 03/27/19 | Higgins, Cynthia Ann to Elaine May Knott | Sugar Camp Mine Plan | HC 2019-0446 | Owned | |
| Coal Deed | 03/28/19 | Short, Dian to SCELLC | Sugar Camp Mine Plan | HC 2019-0463 | Owned | |
| Coal Deed | 03/28/19 | Short, Richard to SCELLC | Sugar Camp Mine Plan | HC 2019-0464 | Owned | |
| Coal Deed | 04/03/19 | South Side Christian Church to SCELLC | Sugar Camp Mine Plan | HC 2019-0507 | Owned | |
| Mining Lease | 04/10/19 | Yorgan, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2019-0558 | Leased | |
| Mining Lease | 04/10/19 | Edmonds, James G. to SCELLC | Sugar Camp Mine Plan | HC 2019-0559 | Leased | |
| Mining Lease | 04/23/19 | Crowder, Nancee L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0669 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Patrick L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0671 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Scott L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0672 | Leased | |

| Mining Lease | 04/23/19 | Gunn, Kenneth to SCELLC | Sugar Camp Mine Plan | HC 2019-0673 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 05/01/19 | Foresight Energy LP to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 05/08/19 | Camden, Randy to SCELLC | Sugar Camp Mine Plan | HC 2019-0730 | Leased | |
| Mining Lease | 05/08/19 | Davis, Tamera L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0731 | Leased | |
| Mining Lease | 05/30/19 | Fitts, David F. to SCELLC | Sugar Camp Mine Plan | HC 2019-0851 | Leased | |
| Coal Deed | 06/03/19 | Avolt, Geoffrey Barth to SCELLC | Sugar Camp Mine Plan | HC 2019-0870 | Owned | |
| Mining Lease | 06/10/19 | Buchman, Diana Sue Wright to SCELLC | Sugar Camp Mine Plan | HC 2019-0896 | Leased | |
| Mining Lease | 06/10/19 | Willis, Robert James to SCELLC | Sugar Camp Mine Plan | HC 2019-0897 | Leased | |
| Mining Lease | 06/10/19 | Sears, James R. & Gloria to SCELLC | Sugar Camp Mine Plan | HC 2019-0898 | Leased | |
| Mining Lease | 06/19/19 | Wise, Melodie Lea to SCELLC | Sugar Camp Mine Plan | HC 2019-0962 | Leased | |
| Mining Lease | 06/19/19 | Walker, Edwin N. to SCELLC | Sugar Camp Mine Plan | HC 2019-0963 | Leased | |
| Mining Lease | 07/17/19 | O'Dell, Paula J. to SCELLC | Sugar Camp Mine Plan | HC 2019-1079 | Leased | |
| Mining Lease | 07/17/19 | Walker, Ivan W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1080 | Leased | |
| Mining Lease | 07/25/19 | Hut ton, Catherine Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1118 | Leased | |
| Coal Deed | 07/25/19 | Nuss, Richard E. Sr. to SCELLC | Sugar Camp Mine Plan | HC 2019-1120 | Owned | |

| Mining Lease | 08/01/19 | Miltenberger, Cheryl G. to SCELLC | Sugar Camp Mine Plan | HC 2019-1162 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 08/01/19 | Lohman, Sandra E. to SCELLC | Sugar Camp Mine Plan | HC 2019-1163 | Leased | |
| Mining Lease | 08/01/19 | Entwistle, Craig W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1164 | Leased | |
| Coal Deed | 08/28/19 | Society of St. Vincent de Paul Archdiocesan Council toSCELLC | Sugar Camp Mine Plan | HC 2019-1327 | Owned | |
| Mining Lease | 08/28/19 | Entwistle, Jacquelyn Marie to SCELLC | Sugar Camp Mine Plan | HC 2019-1348 | Leased | |
| Mining Lease | 08/28/19 | Oliver, Mil ton Donald to SCELLC | Sugar Camp Mine Plan | HC 2019-1358 | Leased | |
| Mining Lease | 09/24/19 | Prusha, Thomas M. to SCELLC | Sugar Camp Mine Plan | HC 2019-1584 | Leased | |
| Coal Deed | 10/09/19 | Lowe, Debra Short to SCELLC | Sugar Camp Mine Plan | HC 2019-1687 | Owned | |
| Coal Deed | 11/14/19 | Lewis, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1869 | Owned | |
| Coal Deed | 11/14/19 | Duncan, Barbara Joan to SCELLC | Sugar Camp Mine Plan | HC 2019-1870 | Owned | |
| Coal Deed | 11/14/2019 | McKinney, Marsha to SCELLC | Sugar Camp Mine Plan | HC 2019-1871 | Owned | |
| Coal Deed | 11/14/2019 | Kniffen, Susan to SCELLC | Sugar Camp Mine Plan | HC 2019-1872 | Owned | |
| Coal Deed | 11/14/19 | Blackwell, William Loyd to SCELLC | Sugar Camp Mine Plan | HC 2019-1873 | Owned | |
| Mining Lease | 11/14/19 | Flannigan, Monty D. to SCELLC | Sugar Camp Mine Plan | HC 2019-1874 | Leased | |

Case 20-41308 Doc 224 Filed 04/01/20 Entered 04/01/20 23:45:34 Pg 248 of 1005 Main Document

| Mining Lease | 11/20/19 | Irish, Wilmot Wheeler to SCELLC | Sugar Camp Mine Plan | HC 2019-1903 | Leased | |
|---|---|---|---|---|---|---|
| Coal Deed | 11/26/19 | McIntosh, Mark E. to SCELLC | Sugar Camp Mine Plan | HC 2019-1945 | Owned | |
| Mining Lease | 12/10/19 | Bergen County Animal Shelter to SCELLC | Sugar Camp Mine Plan | FC 2019-4869 | Leased | |
| Mining Lease | 01/16/20 | Moore, Carolyn F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0098 | Leased | |
| Mining Lease | 01/16/20 | Rucker, Lezlie J. to SCELLC | Sugar Camp Mine Plan | HC 2020-0099 | Leased | |
| Mining Lease | 01/16/20 | Cooper, Rene F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0100 | Leased | |
| Coal Deed | 01/21/20 | Drake, Roger to SCELLC | Sugar Camp Mine Plan | HC 2020-0109 | Owned | |
| Mining Lease | 01/21/20 | Debow, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2020-0110 | Leased | |
| Mining Lease | 01/21/20 | Drake, Daphne to SCELLC | Sugar Camp Mine Plan | HC 2020-0111 | Leased | |
| Mining Lease | 02/18/20 | Rocky Mountain Lions Eye Institute Foundation, Inc. to SCELLC | Sugar Camp Mine Plan | HC 2020-0329 | Leased | |
| Mining Lease | 02/18/20 | Hoppe, Judy H. to SCELLC | Sugar Camp Mine Plan | HC 2020-0330 | Leased | |
| Mining Lease | 02/27/20 | Musselman, James Jay to SCELLC | Sugar Camp Mine Plan | HC 2020-0358 | Leased | |

DEBTOR/GRANTOR:

SITRAN, LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **MOORAGE OPTIONS/LEASES KENTUCKY** | | | | | | |
| Option To Lease | 4/10/2009 | Kay Karr Brooks and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Lease | No |
| Option To Lease | 4/10/2009 | Robert Karr & Rebecca S. Karr, his wife, and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Lease | No |

Case 20-11308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 250 of 1005

DEBTOR/GRANTOR:

OENEUS LLC D/B/A SAVATRAN LLC

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **SUGAR CAMP TO McLEANSBORO RAIL LINE ILLINOIS** | | | | | | |
| Rental Agreement | 9/12/2008 | SAVATRAN LLC to William Webb | Pt. NWNW 29-T5S-R5E Hamilton Co IL 0.65 acres | HC-57 Rented house. | Leased | |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 251 of 1005

**Schedule 5.09**

**Environmental Matters**

1. Macoupin Energy, Inc. entered into a Consent Order with the Illinois Environmental Protection Agency on September 14, 2015 requiring the implementation of a Groundwater Monitoring Zone to address groundwater contamination caused by the previous owner.  This work is ongoing.

2. Except as set out in the chart attached hereto as <u>Annex I</u>, none of the Borrower, nor any of its respective Subsidiaries has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding compliance with or liability under Environmental Laws with regard to any of the Properties or the business operated by the Borrower, or any of its Subsidiaries, or any prior business for which the Borrower has retained liability under any Environmental Law.

3. Except as set out in the list attached hereto as <u>Annex II</u>, no judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened under any Environmental Law to which the Borrower, or any of its Subsidiaries is or, to the knowledge of the Borrower, will be named as a party or with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other similar administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business.

4. Except as set out in the list attached hereto as <u>Annex II</u>, the Properties and all operations at the Properties are in compliance with all applicable Environmental Laws.

5. Except as set out in the chart attached hereto as <u>Annex III</u>, the Borrower and each of its Subsidiaries has obtained, and is in compliance with, all Environmental Permits required for the conduct of its businesses and operations, and the ownership, occupation, operation and use of its Property, and all such Environmental Permits are in full force and effect.

**Schedule 5.09 (2)**
FORESIGHT ENERGY
As of 3/6/20

| State | Company | Permit Number | Agency | Type | NOV Number | Issued | Status | NOV Description |
|---|---|---|---|---|---|---|---|---|
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 78-02-20 | 2/20/2020 | Issued | Permittee constructed a concrete foundation for a back-up ventilation fan and concrete pilings with prior approval |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 85-03-20 | 2/18/2020 | Issued | The permitted conducted surface coal mining operations without requesting or obtaining approval from the Department authorized such operations to be conducted. The Permittee is disposing underground mine water into the sealed Viking District #1. The underground mine water is only approved to be disposed at Pond No. 1, RDA No. 1, and/or the RO plant from Permit 382. |
| IL | Williamson Energy, LLC. | IL0077666 | IEPA | NOV | W-2019-50223 | 2/6/2020 | Issued | On August 29, 2019, IEPA conducted compliance sampling inspection at Pond Creek #1 Mine. At the time of inspection, water quality standard violations were noted |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 85-02-20 | 2/5/2020 | Issued | Water pumped from underground works escaped from Sugar Camp support facilities at three separate locations. The mine water flows off-permit, contaminated nearby water and soils resources. |
| IL | Macoupin Energy, LLC | 56 and 209 | IDNR | NOV | 38-04-2019 | 9/9/2019 | Abated | Failure to remove and segregate topsoil prior to disturbance. Topsoil was not removed prior to placement of road construction material for the trencher platform road. Failure to protect topsoil from contamination. Operator's amd commutator's trucks were allowed to drive across topsoil stockpile. Failure to follow the approved operations plan. Alternate sediment control measures were not used during installation of the groundwater migration control system. Failure to conduct surface mining and reclamation operations only within the approved permit area. Surface disturbance occurred approximately sixty (60) feet outside of the approved permit area (IBR No. 14). |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-04-2019 | 9/4/2019 | Abated | Failure to follow the correct procedures for stockpiling and storing topsoil, failure to protect a topsoil stockpile from contamination, and failure to follow the permitted plan in the placement of a topsoil stockpile. Specifically, the operator placed a topsoil stockpile in an unapproved location on the south side of the IBR No 83; then, improperly moved a portion of the stockpile to complete installation of a utility borehole, and spilled concrete associated with the borehole construction on the topsoil stockpile. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | Show Cause | 2019-02 | 8/6/2019 | Settled | Pattern of Violations |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-03-2019 | 8/2/2019 | Abated | Failure to notify Dept of the following surface water discharge excursions within five days of receiving analytical results of water sample: a) Outfall 002: Cl 690 mg/L; b) Outfall 002: SO4 1040 mg/L. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-06-2019 | 8/8/2019 | Abated | Water pumped from underground works escaped from a buried pipeline and contaminated soil resources. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-05-2019 | 7/9/2019 | Abated | FAILURE TO INSTALL PIPELINE ON PERMITTED AREA. SECTIONS OF UNDERGROUND, BURIED PIPELINE, IBR38 WERE INSTALLED OUTSIDE APPROVED PERMIT AREA. |
| IL | Sugar Camp Energy, LLC | 434 | IDNR | NOV | 63-04-2019 | 7/1/2019 | Abated | Non-compliant water was discharged from Outfall 013 into Middle Fork Big Muddy River. Lab analysis of the discharge indicated pH reading of 4.68. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-03-2019 | 6/21/2019 | Abated | Water pumped from underground works escaped from Sugar Camp support facilities at three separate locations. The mine water flowed off-permit, contaminating nearby water and soil resources. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-02-2019 | 6/4/2019 | Abated | Water pumped from underground works escaped from a buried pipeline and contaminated soil resources. |
| IL | Macoupin Energy, LLC | 56 | IDNR | NOV | 38-03-19 | 4/16/2019 | Abated | Failure to report a surface water discharge excursion within five days of receiving analytical results of the water sample from the Shay No. 1 Mine, as outlined in 62 Ill. Adm. Code 1817.41K(2). |
| IL | Macoupin Energy, LLC | 56 | IDNR | NOV | 38-03-2019 | 4/16/2019 | Abated | Failure to report surface water discharge excursion within five days of receiving analytical results of the water sample. |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | NOV | W-2019-50002 | 3/25/2019 | Issued | IEPA site investigation regarding a spill of high chloride water. A transmission line to RDA ruptured. Several violations noted during investigation. |
| IL | Williamson Energy, LLC. | 417 | IDNR | NOV | 67-01-2019 | 3/13/2019 | Abated | Failed to follow the approved plan. Operator failed to remove saturated clay prior to placement of coarse refuse material as specified in Permit No. 471. |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-02-2019 | 2/11/2019 | Abated | The Operator failed to publish a renewal application public notice within the time frame to conduct an informal conference and allow time for issuance of the renewal decision prior to permit expiration. |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-01-2019 | 1/16/2019 | Abated | Failure to report surface water discharge excursion within five days of receiving analytical results of the water sample. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-07-2018 | 10/24/2018 | Abated | Water from underground works escaped from a buried pipeline, flowed off-permit and into a drainage ditch. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-05-2018 | 10/18/2018 | Abated | Water pumped from underground works escaped from a buried pipeline, flowed off-permit and into a stream, contaminating downstream water and soil resources. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-06-2018 | 10/18/2018 | Abated | Water pumped from underground works escaped from a buried pipeline, flowed off-permit and into a stream, contaminating downstream water and soil resources. |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-01-2018 | 10/15/2018 | Abated | Failure to report surface water discharge excursion within five days of receiving analytical results of the water sample. |
| IL | Macoupin Energy, LLC | 209 | IDNR | NOV | 78-01-2018 | 8/13/2018 | Abated | Failure to submit the required ownership and control information for the permit renewal application to Permit No. 209 in a timely manner. |

1

**Schedule 5.09 (2)**
FORESIGHT ENERGY
As of 3/6/20

| State | Company | Permit Number | Agency | Type | NOV Number | Issued | Status | NOV Description |
|-------|---------|---------------|--------|------|------------|--------|--------|-----------------|
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-03-2018 | 8/10/2018 | Abated | The permittee conducted surface coal mining operations without first obtaining a permit from the Department authorizing such operations to be conducted upon the acreage involved. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-02-2018 | 3/20/2018 | Abated | High chloride mine water flowed approximately 200 feet down grade from the source of the spill and off permit. (pipeline leak) |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-01-2018 | 2/20/2018 | Abated | FAILED TO PROTECT SURFACE WATER AND FAILED TO MAINTAIN SUPPORT FACILITIES. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-01-2018 | 2/5/2018 | Abated | Failure to follow approved plan for IBR No. 80 of Permit No. 382 by affecting stream buffer zone with vehicular traffic. |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-04-2017 | 12/15/2017 | Abated | Failure to notify the surface owner with a description of measures that would be taken to prevent subsidence and/or to mitigate subsidence damages which may occur. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-05-2017 | 10/30/2017 | Abated | Mining related materials (sodium silicate) were deposited within and outside the permitted area in an uncontrolled manner, impacting an adjacent road side drainage ditch and unnamed tributaries to Akin Creek. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-04-2017 | 10/3/2017 | Abated | The permittee failed to properly plug and abandon groundwater monitoring well MW-I as required and described under Condition I(a) of the Department's June 8,2017 approval letter for IPR #50. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-03-2017 | 9/11/2017 | Abated | The permittee failed to follow the approved plan (IPR No. 50, Condition 5(a)) by plugging groundwater monitoring wells MW-3 and MW-47 without first obtaining Department approval to do so. |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-03-2017 | 9/6/2017 | Abated | Failure to follow the approved plan; specifically, the operator implemented a relocation of the specific areas where planned subsidence was approved to occur prior to that plan change being submitted to and approved by the Department. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-02-2017 | 7/11/2017 | Abated | Unauthorized surface area disturbance within 100' (in disaccord with IBR No. 66) of the top of the bank of the normal channel of the stream. |
| IL | Sugar Camp Energy, LLC | 434 | IDNR | NOV | 63-01-2017 | 5/5/2017 | Abated | Failure to submit ground water monitoring data from wells MW-31 through MW-38R. |
| IL | Macoupin Energy, LLC | 56 | IDNR | NOV | 72-01-2017 | 3/7/2017 | Abated | Failure to report flow from Smith Reservoir (NPDES Outfall 007) for the month of November 2016 in the quarterly discharge monitoring reports.  (The Department documented flow during the Nov. 7, 2016 inspection.) |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-01-17 | 3/3/2017 | Abated | Failure to report flow from Sediment Basin 002 (NPDES Outfall 002) for the month of November 2016 in the quarterly discharge monitoring reports.  (The Department documented flow during the Nov. 10, 2016 inspection.) |
| IL | Williamson Energy, LLC. | IL0077666 | IEPA | NOV | W-2016-50022 | 8/18/2016 | Abated | 2016 regarding discharge of contaminants that "cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-3-16 | 5/3/2016 | Abated | failure to follow approved drainage control plan |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-2-16 | 4/18/2016 | Abated | discharge at NPDES point 002 and 007 exceeding the daily maximum of 500 mg/L for Sulfate and Chloride |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-2-16 | 2/9/2016 | Abated | failure to follow approved pre-plan |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-1-16 | 1/26/2016 | Abated | failure to notify department within five (5) days of surface water sample noncompliance |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-1-16 | 1/7/2016 | Abated | failure to pass affected area through a siltation structure before leaving the permit area |
| IL | Hillsboro Energy, LLC | IL0078727 | IEPA | Show Cause | A-2014-00319 | 1/14/2015 | Abated | violations of permit conditions and failure to apply for and obtain construction permit to allow for modification of crushing and screening operations |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | Show Cause | M-2014-02002 | 10/23/2014 | Abated | failure to comply with effluent conditions of NPDES permit, discharge of contaminants and offensive conditions |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-04-14 | 9/12/2014 | Abated | discharging water in excess of NPDES limits for chlorides and sulfates – corrective action was taken |
| IL | Hillsboro Energy, LLC | 424 | IDNR | NOV | 38-03-14 | 8/28/2014 | Abated | failure to remove topsoil prior to disturbance |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-04-14 | 8/23/2014 | Abated | |
| IL | Hillsboro Energy, LLC | 424 | IDNR | NOV | 68-02-14 | 8/5/2014 | Abated | failure to pass drainage through a sediment pond |
| IL | Hillsboro Energy, LLC | 424 | IDNR | NOV | 68-02-14 | 8/5/2014 | Abated | failure to remove topsoil prior to disturbance |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | Show Cause | A-2014-00284 | 7/31/2014 | Abated | failure to submit an Annual Emissions Report for calendar year 2013 |
| IL | Williamson Energy, LLC. | IL0077666 | IEPA | NOV | A214-00285 | 7/31/2014 | Abated | failure to submit an Annual Emissions Report ("AER") to the Illinois Environmental Protection Agency for calendar year 2013 |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-02-14 | 7/9/2014 | Abated | failure to follow approved plan, placement of coal slurry in experimental Geotubes in an unapproved location |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-2-14 | 5/1/2014 | Abated | failure to report a non-compliant discharge |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-02-14 | 4/28/2014 | Abated | failure to follow approved plan, failure to protect topsoil from contamination and route all drainage to a sediment pond |

2

**Schedule 5.09 (2)**
FORESIGHT ENERGY
As of 3/6/20

| State | Company | Permit Number | Agency | Type | NOV Number | Issued | Status | NOV Description |
|---|---|---|---|---|---|---|---|---|
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-1-14 | 3/20/2014 | Abated | failure to report discharge excursions to the Department and failure to submit DMR's and groundwater reports for the 3rd and 4th quarters of 2013 |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | NOV | W-2014-50014 | 3/14/2014 | Abated | violation of Chloride water quality standards on September 18, 2013 and November 26, 2013 |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-01-14 | 2/21/2014 | Abated | failure to file renewal application within time frame required by the regulations |
| IL | Sugar Camp Energy, LLC | UIC-016-SCM | IEPA | NOV | L-2014-01003 | 1/29/2014 | Abated | Failure to get an approved UIC Permit prior to installation of injection boreholes. |
| IL | Hillsboro Energy, LLC | IL0078727 | IEPA | NOV | W-2014-50061 | 1/1/2014 | Abated | Discharge of contaminants, offensive conditions, unauthorized discharge, creating a water pollution hazard, failure to apply for a construction permit  and failure to comply with NPDES permit – all water based issues have been  corrected. |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-07-13 | 11/1/2013 | Abated | failed to report surface water discharge excursions within five days of receiving analytical results |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-03-13 | 7/25/2013 | Abated | failure to notify Department of noncompliance surface water sample with five-day reporting period. Required letter submitted |
| IL | Macoupin Energy, LLC | ? | IDNR | NOV | 38-06-13 | 7/1/2013 | Abated | failure to conduct surface coal mining and reclamation operation as described in the approved application. The operator installed an access road on the permit area without obtaining approval from the Department |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-06-11 | 6/12/2013 | Abated | failed to maintain adequate freeboard in a sediment  basin |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | NOV | W-2013-50008 | 4/25/2013 | Abated | exceeding effluent limits and  unpermitted mixing, dilution and discharge |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | NOV | W-2013-50133 | 4/5/2013 | Abated | exceeding effluent limits and  unpermitted mixing, dilution and discharge |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-01-13 | 3/5/2013 | Abated | – discharging water from Outfall 008 with a chloride excursion of 874.6 mg/L |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 34-01-13 | 2/27/2013 | Abated | failure to follow approved plan – clean coal stockpile expanded beyond approved protective base |
| IL | Macoupin Energy, LLC | ? | IDNR | NOV | 38-05-12 | 7/2/2012 | Abated | failed to conduct non-MSHA quarterly exam for sediment pond 003 |
| IL | Macoupin Energy, LLC | ? | IDNR | NOV | 38-03-12 | 4/16/2012 | Abated | failed to file renewal application public notice within  the timeframe to conduct a hearing and allow for issuance of renewal decision |
| IL | Macoupin Energy, LLC | IL0056022 | IEPA | NOV | W-2011-00040 | 9/12/2011 | Abated | Exceed ground water standards |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-03-11 | 8/25/2011 | Abated | failed to follow approved plan |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-02-11 | 7/27/2011 | Abated | failed to notify IDNR of non-compliant surface water  samples |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-12-11 | 6/30/2011 | Abated | Fail to construct and maintain sediment control |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-2-11 | 4/27/2011 | Abated | petroleum based contaminant observed on water surface in sediment basin 004 |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 43-3-11 | 4/27/2011 | Abated | failed to maintain adequate freeboard in a sediment  basin 004 |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 19-1-11 | 3/9/2011 | Abated | failed to comply with required surface water  sampling parameters |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 19-2-11 | 3/9/2011 | Abated | failed to comply with required ground water sampling parameters |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-04-11 | 2/10/2011 | Abated | failed to follow approved mining plan |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-05-11 | 2/10/2011 | Abated | Failed to report impoundment exam report |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-06-11 | 2/10/2011 | Abated | Failed to complete field density testing |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-03-11 | 2/10/2011 | Abated | Failed to maintain ditch 7b |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-6-10 | 11/8/2010 | Abated | surface drainage flowing off permit without  reporting to a sediment control structure |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-5-10 | 5/13/2010 | Abated | failed to maintain freeboard in sediment basin |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-4-10 | 5/13/2010 | Abated | discharge from disturbed area did not pass through a siltation structure before leaving the permit |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-2-10 | 3/9/2010 | Abated | disturbed within 100 feet of cemetery |
| IL | Hillsboro Energy, LLC | IL0078727 | IEPA | NOV | W-2010-30248 | 1/1/2010 | Abated | failed to submit DMR's at the required frequency |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-04-09 | 9/14/2009 | Abated | failed to follow approved mining plan |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 28-01-09 | 9/9/2009 | Abated | drainage leaving permit without passing through  a sediment control structure |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 19-02-09 | 6/2/2009 | Abated | failed to follow approved operations plan |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 19-01-09 | 4/27/2009 | Abated | failed to construct siltation structure prior to  disturbance |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 26-3-09 | 4/17/2009 | Abated | failed to provide survey for buildings greater than 40  years old |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 26-2-09 | 4/8/2009 | Abated | failed to submit fourth quarter subsidence control plan  report |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 26-1-09 | 4/8/2009 | Abated | failed to follow approve plan |
| IL | Williamson Energy, LLC. | 375 | IDNR | Show Cause | 2009-01 | 1/16/2009 | Dismissed | |

**SCHEDULE 5.09(4)
ENVIRONMENTAL MATTERS**

**Consent Orders (Show Cause Orders):**

1.    IDNR – Office of Mines and Minerals – Williamson Energy, LLC Pond Creek Mine Permit No. 375 – Show Cause Order No. 2009-01 dated Jan. 16, 2009; Order dismissing Show Cause Order entered by Hearing Officer Michael O'Hara on June 8, 2009

2.    People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Macoupin Energy LLC, Circuit Court of the Seventh Judicial Circuit, Macoupin County, Illinois – Consent Order was signed and entered on September 14, 2015

3.    IDNR – Office of Mines & Minerals, Land Reclamation Division, In Re Sugar Camp Energy, LLC Permit No. 382 – Show Cause Order No. 2019-02 dated August 6, 2019; Settlement Agreement was entered into on Dec. 10, 2019; Agreed Order Approving Settlement Agreement with Modifications was entered on December 17, 2019 by ALJ Schuering

4.    Pollution Control Board re Sugar Camp Energy PCB 2016-095 – Consent Order resolving allegations related to Underground Injection Control.

**Active Cases:**

1.    Mitchell/Roberts Partnership v. Williamson Energy, LLC, Case No. 14-MR-285; Circuit Court of the First Judicial District, Williamson County, IL

2.    Jackson, et al. v. Williamson Energy, LLC, at al. Case No. 2016-CH-50, in the Circuit Court of the First Judicial District, Williamson County, IL

3.    Williamson Energy and Mach Mining LLC/Noise Complaints – 15 separate Complaints, all pending in the Circuit Court of the First Judicial Circuit, Williamson County, IL:

    1.    James Turner v. Williamson Energy, LLC, et al., 2016-C-108;
    2.    Wayne Thompson v. Williamson Energy, LLC, et al., 2016-C-109;
    3.    Michael Ladd v. Williamson Energy, LLC, et al., 2016-C-110;
    4.    John Kibodeaux v. Williamson Energy, LLC, et al., 2016-C-111;
    5.    Allen Brown v. Williamson Energy, LLC, et al., 2016-C-112;
    6.    Tina Franklin v. Williamson Energy, LLC, et al., 2016-C-113;
    7.    Brenda Fleming v. Williamson Energy, LLC, et al., 2016-C-114;
    8.    John Howat v. Williamson Energy, LLC, et al., 2016-C-115;
    9.    Yuba Hunt v. Williamson Energy, LLC, et al., 2016-C-116;
    10.   Betty Jacobs v. Williamson Energy, LLC, et al., 2016-C-117;
    11.   Richard Jordan v. Williamson Energy, LLC, et al., 2016-C-118;
    12.   Scott Lee v. Williamson Energy, LLC, et al., 2016-C-119;

13.    Claude Vodrazka v. Williamson Energy, LLC, et al., 2016-C-120;
14.    Brian Wolfe v. Williamson Energy, LLC, et al., 2016-C-121; and
15.    Danny York v. Williamson Energy, LLC, et al., 2016-C-122

4.    Reba L. Mitchell v. Williamson Energy, LLC, Case No. 2019-L-00030, Circuit Court of the First Judicial Circuit, Williamson County, IL

5.    The Estate of Russell J. Inman, Deceased, by Carl R. Inman, Independent Executor v. Williamson Energy, LLC, Case No. 2018-L-129, Circuit Court of the First Judicial Circuit, Williamson County, IL

**FELP Permit List**
Schedule 5.09(7)
as of 3/1/2020

| Company | Mine/Operation | State | Permit # | Permit Type | Issuance Date | Expiration Date |
|---|---|---|---|---|---|---|
| Foresight Energy | Hillsboro | IL | IL0078727 | NPDES | 12/13/14 | 05/13/23 |
| Foresight Energy | Hillsboro | IL | 399 | UG | 02/10/09 | 02/10/24 |
| Foresight Energy | Hillsboro | IL | 424 | CRDA | 05/19/14 | 05/19/24 |
| Foresight Energy | Hillsboro | IL | 8020066 | Air Quality | 02/25/09 | Lifetime |
| Foresight Energy | Hillsboro | IL | C-0080-08 | 401 | 12/12/09 | NA |
| Foresight Energy | Hillsboro | IL | P-2664 | 404 | 09/02/09 | NA |
| Foresight Energy | Hillsboro | IL | DS2012025 | Dam | 04/18/12 | NA |
| Foresight Energy | Hillsboro | IL | DS2013085 | Dam | 11/06/13 | NA |
| Foresight Energy | Hillsboro | IL | ID#1211IL08 | Dam | 01/30/12 | NA |
| Foresight Energy | Hillsboro | IL | IL08-03216-03 | Dam | 01/15/14 | NA |
| Foresight Energy | Hillsboro | IL | IL0080039 | NPDES | 02/05/15 | pending |
| Foresight Energy | Hillsboro | IL | IL0080039 | CRDA | 02/03/15 | pending |
| Foresight Energy | Macoupin | IL | IL0056022 | NPDES | 08/18/15 | 09/30/21 |
| Foresight Energy | Macoupin | IL | 209 | CRDA | 07/09/09 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 419 | SMCRA | 05/16/17 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 265 | SMCRA | 07/18/17 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 291 | SMCRA | 07/18/17 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 56 | UG and CRDA | 07/19/09 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 117803-AAA | Air Quality | 06/17/09 | Lifetime |
| Foresight Energy | Macoupin | IL | DS2010040 | Dam | 04/29/10 | NA |
| Foresight Energy | Sitran | IN | IN0063738 | NPDES | 03/15/11 | 03/09/24 |
| Foresight Energy | Sitran | IN | 129-29270-000 | Air Quality | 08/13/10 | Lifetime |
| Foresight Energy | Sugar Camp | IL | IL0078565 | NPDES | 05/24/16 | 04/30/21 |
| Foresight Energy | Sugar Camp | IL | P-2866 | 404 | 12/04/14 | 12/31/25 |
| Foresight Energy | Sugar Camp | IL | 18050018 | Air Quality | 10/23/18 | Lifetime |
| Foresight Energy | Sugar Camp | IL | 17110053 | Air Quality | 09/30/08 | Lifetime |
| Foresight Energy | Sugar Camp | IL | C-0222-08 | 401 | 12/12/09 | NA |
| Foresight Energy | Sugar Camp | IL | C-0719-13 | 401 | 09/03/15 | NA |
| Foresight Energy | Sugar Camp | IL | P-2674 | 404 | 12/15/09 | NA |
| Foresight Energy | Sugar Camp | IL | DS2012018 | Dam | 03/13/12 | NA |
| Foresight Energy | Sugar Camp | IL | 03189-03 | Dam | 01/06/12 | NA |
| Foresight Energy | Sugar Camp | IL | 460 | SMCRA | pending | NA |
| Foresight Energy | Sugar Camp | IL | UIC-012-SCM | UIC | 05/20/14 | NA |
| Foresight Energy | Sugar Camp | IL | UIC-06-15EE | UIC | 05/20/14 | NA |
| Foresight Energy | Sugar Camp | IL | 434 | UG | 08/26/15 | pending |
| Foresight Energy | Sugar Camp | IL | 382 | UG | 09/09/08 | pending |
| Foresight Energy | Williamson | IL | P-2905 | 404 | 12/14/15 | 12/31/26 |
| Foresight Energy | Williamson | IL | 1790048 | Air Quality | 04/07/05 | Lifetime |
| Foresight Energy | Williamson | IL | C-0202-13 | 401 | 01/19/16 | NA |
| Foresight Energy | Williamson | IL | MVS-2005-4660 | 404 | 07/21/06 | NA |
| Foresight Energy | Williamson | IL | DS2008111 | Dam | 11/25/08 | NA |
| Foresight Energy | Williamson | IL | DS2010047 | Dam | 01/21/14 | NA |
| Foresight Energy | Williamson | IL | IL08-03141-01 | Dam | 06/26/07 | NA |
| Foresight Energy | Williamson | IL | IL08-03141-02 | Dam | 12/03/10 | NA |
| Foresight Energy | Williamson | IL | IL08-03141-02 | Dam | 01/03/14 | NA |
| Foresight Energy | Williamson | IL | 456 | SMCRA | 12/05/19 | 12/04/24 |
| Foresight Energy | Williamson | IL | 375 | UG | 07/07/05 | pending |
| Foresight Energy | Williamson | IL | 417 | CRDA | 12/09/15 | pending |
| Foresight Energy | Williamson | IL | IL0077666 | NPDES | 12/13/71 | pending |

Schedule 5.13

Subsidiaries

(*)= indicates which Subsidiaries are Loan Parties as of the Closing Date.

| Issuer | Juris. of Org./Form. | Address of Chief Executive Office | Taxpayer ID Number | Type of Organization | % of Interest Owned by Loan Parties |
|---|---|---|---|---|---|
| Adena Resources, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5004649 | Limited Liability Company | 100 |
| Akin Energy LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5231648 | Limited Liability Company | 100 |
| American Century Mineral LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | N/A | Limited Liability Company | 100 |
| American Century Transport LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | N/A | Limited Liability Company | 100 |
| Coal Field Construction Company LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-3795694 | Limited Liability Company | 100 |
| Coal Field Repair Services LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-2249179 | Limited Liability Company | 100 |
| Foresight Coal Sales LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-3318620 | Limited Liability Company | 100 |

| Issuer | Juris. of Org./Form. | Address of Chief Executive Office | Taxpayer ID Number | Type of Organization | % of Interest Owned by Loan Parties |
|---|---|---|---|---|---|
| Foresight Energy Employee Services Corporation * | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3957023 | Corporation | 100 |
| Foresight Energy Finance Corporation * | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 27-3135321 | Corporation | 100 |
| Foresight Energy Labor LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 32-0504176 | Limited Liability Company | 100 |
| Foresight Energy Services LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 90-0776204 | Limited Liability Company | 100 |
| Foresight Receivables LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3952250 | Limited Liability Company | 100 |
| Hillsboro Energy LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5231639 | Limited Liability Company | 100 |
| Hillsboro Transport LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3916881 | Limited Liability Company | 100 |
| LD Labor Company LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 45-3848454 | Limited Liability Company | 100 |

| Issuer | Juris. of Org./Form. | Address of Chief Executive Office | Taxpayer ID Number | Type of Organization | % of Interest Owned by Loan Parties |
|---|---|---|---|---|---|
| Logan Mining LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 47-1762361 | Limited Liability Company | 100 |
| M-Class Mining, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-0645272 | Limited Liability Company | 100 |
| Mach Mining LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 73-1734826 | Limited Liability Company | 100 |
| Macoupin Energy LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-2809005 | Limited Liability Company | 100 |
| MaRyan Mining, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-4027085 | Limited Liability Company | 100 |
| Oeneus LLC d/b/a Savatran LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 30-0306007 | Limited Liability Company | 100 |
| Patton Mining LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-4027251 | Limited Liability Company | 100 |
| Seneca Rebuild LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-3150958 | Limited Liability Company | 100 |

| Issuer | Juris. of Org./Form. | Address of Chief Executive Office | Taxpayer ID Number | Type of Organization | % of Interest Owned by Loan Parties |
|---|---|---|---|---|---|
| Sitran LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-1369962 | Limited Liability Company | 100 |
| Sugar Camp Energy, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 41-2178049 | Limited Liability Company | 100 |
| Tanner Energy LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3940409 | Limited Liability Company | 100 |
| Viking Mining LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-1264981 | Limited Liability Company | 100 |
| Williamson Energy, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 81-0669143 | Limited Liability Company | 100 |

### Schedule 5.18

### **<u>Intellectual Property</u>**

None.

**Schedule 5.20**

**Mines**

**Hillsboro Energy LLC**

Deer Run Mine
12051 County Road 900 N.
Hillsboro, Illinois  62049

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease Agreement | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Short Form of Lease (Hillsboro) | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1346-428 | Leased | NO |
| Amendment No. 1 to the Coal Mining Lease and Sublease Agreement | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu

Pg 264 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease (Hillsboro) | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1367-226 | Leased | NO |
| Amendment No. 2 to the Coal Mining Lease and Sublease Agreement | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Amended and Restated Short Form of Lease After Closing 4 and Closing 5 (Hillsboro) | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1412-134<br><br>BC 917-329 | Leased | NO |
| Amendment No. 3 to the Coal Mining Lease and Sublease Agreement | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Amended and Restated Short Form of Lease After Closing 3 (Hillsboro) | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1426-275 | Leased | NO |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Short Form of Lease After Closing 6 (Hillsboro) | 2/2/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1477-459 BC 964-143 | Leased | NO |
| Amended and Restated Short Form of Lease After Closing 7 & 8 (Hillsboro) | 8/21/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded Not recorded | Leased | NO |
| Coal Mining Lease Agreement | 9/21/2007 | Montgomery Mineral LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| First Partial Termination of Lease | 9/9/2009 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | NO |
| Second Partial Termination of Lease | 1/8/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | NO |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Third Partial Termination of Lease | 10/4/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | NO |
| Fourth Partial Termination of Lease | 1/13/2011 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | NO |
| Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-176 BC 910-257 | Leased | NO |
| Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |

Case 20-41308  Doc 228  Filed 04/01/20  Entered 04/01/20 23:45:34  Main Docu

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-135<br><br>BC 910-286 | Leased | NO |
| First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Short Form or Memorandum of First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1508-455 | Leased | NO |
| Deed | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Mine Site<br><br>RDA 1 & 2<br><br>Farmland & Bleeder Site #1 | 201000059726 | Owned | NO |
| Easement | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201000059723 | Owned | NO |
| Easement | 5/9/2011 | George & Martha Spinner to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201100063970 | Owned | NO |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed | 8/23/2013 | Hillsboro Energy LLC to Hillsboro Transport, LLC | Loadout | 201300003499 | Owned | NO |

## Macoupin Energy LLC

Shay No. 1 Mine
14300 Brushy Mound Road
Carlinville, Illinois 62626

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease | 1/27/10 | WPP LLC and Macoupin Energy LLC | Macoupin South Mine Assignment | NOT RECORDED | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | NOT RECORDED | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | East Hornsby Mine Assignment | NOT RECORDED | Leased | Yes |
| Special Warranty Deed | 1/22/2009 | ExxonMobil Coal USA, Inc and Macoupin Energy LLC | Various tracts of surface and coal reserves. The coal reserves were sold to WPP or Colt and leased back. The surface not required for operations has been conveyed to New River Royalty LLC | MA-0849 49319 | Owned | Yes |
| Lease | 1/27/10 | HOD LLC and Macoupin Energy LLC | Rail Loop | NOT RECORDED | Leased | Yes |

Case 20-41308  Doc 228  Filed 01/30/20  Entered 01/30/20 15:34  Main Docu

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Lease | 1/27/10 | HOD LLC and Macoupin Energy LLC | Rail Load Out | NOT RECORDED | Leased | Yes |
| Option and Lease Agreement | 2/28/1967 | Jet Oil Company and Macoupin Energy LLC | Coal Reserves | Volume 628, Page 436 | Leased | Yes |

## Sugar Camp Energy, LLC

M-Class Mine
11351 N Thompsonville Road
Macedonia, Illinois 62860

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0883 FC 2006-6919 | Leased | Yes |
| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & Sugar Camp Energy, LLC | Consent with respect to Illinois Fuels Lease | FC-8233 | Leased | Yes |
| Warranty Deed | 1/15/2009 | Rodney Smith and Marta Smith to Sugar Camp Energy, LLC | PT Lot 121 and PT Lot 122 in Kokopelli Estates | Surface WC-9652, WC-481-772 | Leased | Yes |
| Easement | 3/4/2010 | Glendall E Johnston a.k.a. Glen Johnston and Carolyn S. Johnston, a.k.a. Carolyn Johnston, husband and Wife to Sugar Camp Energy, LLC | NW NW Sec 1-6-4 and NWNE Sec 1-6-4 Franklin County, Illinois | FC-8253 2010-1056 | Owned | Yes |
| Easement | 3/4/2010 | Morris R. Clark and Karan S. Clark to Sugar Camp Energy, LLC | NWNE and W2E2NE Sec 2-6-4 Franklin, Illinois | FC-8254 2010-1057 | Owned | Yes |

Case 20-41308 Doc 228-11 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Page 270 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 3/1/2010 | David Blood and Melanie Blood, husband and wife to Sugar Camp Energy, LLC | Pt E2NENE Sec 2-6-4 Franklin County, Illinois 2010-1058 | FC-0255 | Owned | Yes |
| Easement | 6/5/2010 | Roger L. Sanders and Mary Ellen Sanders to Sugar Camp Energy, LLC | W 10 ac N3/4 of NESE Sec 6-6-5 Hamilton County, Illinois | HC-0078 | Owned | Yes |
| Warranty Deed | 6/1/2010 | Patrick G Mascal and Lori S. Mascal to Sugar Camp Energy, LLC | W2NESW and E2S2NWSW Sec 6-6-5 Hamilton Illinois | HC-0075 | Owned | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Illinois Fuels TVA Lease | N/A | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to Mine on Franklin County TVA Lease | N/A | Leased | No |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface in Hamilton County required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface at former Akin site required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |
| Coal Mining Lease | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |

| Mining Lease | 01/04/18 | Roberts, Carol Ann Trustee to SCELLC | Sugar Camp Mine Plan | HC 2018-0008 | Leased | |
| Mining Lease | 01/04/18 | Engstrom, Amy to SCELLC | Sugar Camp Mine Plan | HC 2018-0011 | Leased | |
| Mining Lease | 01/04/18 | Hayes, Marshall Jr. to SCELLC | Sugar Camp Mine Plan | HC 2018-0013 | Leased | |
| Mining Lease | 01/04/18 | Blanchard, Bonnie M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0016 | Leased | |

Case 19-30532 Doc 6 Filed 04/02/19 Entered 04/02/19 02:45:34 Main Document Pg 271 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Mining Lease | 01/04/18 | Palmer, James  to SCELLC | Sugar Camp Mine Plan | HC 2018-0017 | Leased | |
| Mining Lease | 01/04/18 | Moxley, Linda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0018 | Leased | |
| Coal Deed | 01/04/18 | Johnson, Susan L.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0019 | Owned | |
| Mining Lease | 01/30/18 | McFarland, Carol A.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0110 | Leased | |
| Mining Lease | 01/30/18 | Bowman, Debra Kate  to SCELLC | Sugar Camp Mine Plan | HC 2018-0111 | Leased | |
| Mining Lease | 01/30/18 | Diaz, Donna J.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0112 | Leased | |
| Mining Lease | 01/30/18 | Flannigan, James T.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0113 | Leased | |
| Mining Lease | 01/30/18 | Leslie, Janet E.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0114 | Leased | |
| Mining Lease | 01/30/18 | Reid, Jon M.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0115 | Leased | |
| Mining Lease | 01/30/18 | Webster, Linda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0116 | Leased | |
| Mining Lease | 01/30/18 | Henson, William  to SCELLC | Sugar Camp Mine Plan | HC 2018-0119 | Leased | |
| Coal Deed | 01/30/18 | Wake, Amanda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0120 | Owned | |
| Coal Deed | 01/30/18 | Trabant, Megan  to SCELLC | Sugar Camp Mine Plan | HC 2018-0121 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Pamela S.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0122 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Rochelle  to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Owned | |
| Mining Lease | 01/30/18 | Bloomfield, Dora  to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Leased | |
| Mining Lease | 01/30/18 | Flannigan, Donald  to SCELLC | Sugar Camp Mine Plan | HC 2018-0124 | Leased | |
| Mining Lease | 01/30/18 | Smith, Sharon  to SCELLC | Sugar Camp Mine Plan | HC 2018-0126 | Leased | |

| | | | | | |
|---|---|---|---|---|---|
| Mining Lease | 02/08/18 | Wood, Betty A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0171 | Leased |
| Mining Lease | 02/08/18 | Irish, Carol V. to SCELLC | Sugar Camp Mine Plan | HC 2018-0172 | Leased |
| Mining Lease | 02/08/18 | Wicker, Darrell to SCELLC | Sugar Camp Mine Plan | HC 2018-0173 | Leased |
| Mining Lease | 02/08/18 | Kathleen M. Wright to SCELLC | Sugar Camp Mine Plan | HC 2018-0174 | Leased |
| Mining Lease | 02/08/18 | Irish, Lloyd Paul to SCELLC | Sugar Camp Mine Plan | HC 2018-0175 | Leased |
| Mining Lease | 02/08/18 | Patterson, Paul J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0176 | Leased |
| Mining Lease | 02/08/18 | Wicker, Paul R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0177 | Leased |
| Mining Lease | 02/28/18 | Krois, Bonnie C. to SCELLC | Sugar Camp Mine Plan | HC 2018-0270 | Leased |
| Coal Deed | 02/28/18 | Tabor, Stephanie to SCELLC | Sugar Camp Mine Plan | HC 2018-0271 | Owned |
| Mining Lease | 02/28/18 | Petitte, Clyda to SCELLC | Sugar Camp Mine Plan | HC 2018-0272 | Leased |
| Mining Lease | 02/28/18 | Patterson, Emily Jo to SCELLC | Sugar Camp Mine Plan | HC 2018-0273 | Leased |
| Mining Lease | 02/28/18 | Allen, Jane to SCELLC | Sugar Camp Mine Plan | HC 2018-0274 | Leased |
| Coal Deed | 02/28/18 | Spaven, Laverne to SCELLC | Sugar Camp Mine Plan | HC 2018-0276 | Owned |
| Mining Lease | 02/28/18 | Jackson, Patricia Snyder to SCELLC | Sugar Camp Mine Plan | HC 2018-0277 | Leased |
| Mining Lease | 02/28/18 | Gioia, Virginia M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0278 | Leased |
| Mining Lease | 02/28/18 | Moffett, William R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0279 | Leased |
| Mining Lease | 02/28/18 | O'Dell, William to SCELLC | Sugar Camp Mine Plan | HC 2018-0280 | Leased |
| Mining Lease | 02/28/18 | Reid, Dennis P. to SCELLC | Sugar Camp Mine Plan | HC 2018-0281 | Leased |

| | | | | | |
|---|---|---|---|---|---|
| Coal Deed | 02/28/18 | Griffith, Janice Sue to SCELLC | Sugar Camp Mine Plan | HC 2018-0284 | Owned |
| Mining Lease | 02/28/18 | Knight, Kenneth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0287 | Leased |
| Coal Deed | 02/28/18 | Metheney, Rickie W. to SCELLC | Sugar Camp Mine Plan | HC 2018-0289 | Owned |
| Mining Lease | 02/28/18 | Olson, Ruth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0291 | Leased |
| Mining Lease | 02/28/18 | Sandy, Susan E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0293 | Leased |
| Coal Deed | 02/28/18 | Miller, Micah A. & Marietta to SCELLC | Sugar Camp Mine Plan | HC 2019-2023 | Owned |
| Mining Lease | 04/06/18 | Mudge, Evelyn M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0806 | Leased |
| Mining Lease | 04/12/18 | Higginson, Leslie K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0527 | Leased |
| Coal Deed | 04/12/18 | Farris, Brenda K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0528 | Owned |
| Mining Lease | 04/12/18 | Cook, Becky Lynn to SCELLC | Sugar Camp Mine Plan | HC 2018-0529 | Leased |
| Mining Lease | 04/12/18 | Snyder, Diane M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0530 | Leased |
| Mining Lease | 04/12/18 | O'Dell, Kevin J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0531 | Leased |
| Mining Lease | 04/12/18 | Wohlers, Karen J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0532 | Leased |
| Mining Lease | 04/12/18 | Heckert, Lauri to SCELLC | Sugar Camp Mine Plan | HC 2018-0533 | Leased |
| Mining Lease | 04/12/18 | Page, Mary Jane by Sidney Bennett III AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-0534 | Leased |
| Mining Lease | 04/12/18 | Comp ton, Paulette N. to SCELLC | Sugar Camp Mine Plan | HC 2018-0535 | Leased |
| Mining Lease | 04/12/18 | Taylor, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2018-0536 | Leased |
| Mining Lease | 04/12/18 | O'Dell, Carol Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-0537 | Leased |

Case 18-50378 Doc 242 Filed 04/12/18 Entered 04/12/18 13:45:34 Main Docu

| | | | | | |
|---|---|---|---|---|---|
| Mining Lease | 04/12/18 | O'Dell, Casey Joel to SCELLC | Sugar Camp Mine Plan | HC 2018-0538 | Leased |
| Mining Lease | 05/08/18 | Lowman, Timothy A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0548 | Leased |
| Mining Lease | 05/08/18 | Neal, Douglas Allen to SCELLC | Sugar Camp Mine Plan | HC 2018-0754 | Leased |
| Mining Lease | 05/08/18 | Williams, J. Mark to SCELLC | Sugar Camp Mine Plan | HC 2018-0755 | Leased |
| Mining Lease | 05/08/18 | Barker, Lynne E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0756 | Leased |
| Mining Lease | 05/08/18 | Knight, Stephen L. to SCELLC | Sugar Camp Mine Plan | HC 2018-0757 | Leased |
| Mining Lease | 05/08/18 | Neal, Walter Blake to SCELLC | Sugar Camp Mine Plan | HC 2018-0759 | Leased |
| Coal Deed | 05/11/18 | Noma, Inc to SCELLC | Sugar Camp Mine Plan | HC 2018-1036 | Owned |
| Mining Lease | 05/16/18 | Hake, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0807 | Leased |
| Mining Lease | 05/16/18 | Hosner, Irene Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0808 | Leased |
| Mining Lease | 05/16/18 | Duckworth, Nina Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0811 | Leased |
| Mining Lease | 05/16/18 | Bailey, Velma Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-081? | Leased |
| Mining Lease | 05/16/18 | Lovan, W. Robert to SCELLC | Sugar Camp Mine Plan | HC 2018-081? | Leased |
| Mining Lease | 05/16/18 | Neal, William Jerry to SCELLC | Sugar Camp Mine Plan | HC 2018-081? | Leased |
| Coal Deed | 06/27/18 | Bow ton, Barbara G. to SCELLC | Sugar Camp Mine Plan | HC 2018-1027 | Owned |
| Coal Deed | 06/27/18 | Whets tone, Dennis W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1028 | Owned |
| Coal Deed | 06/27/18 | Whets tone, William R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1029 | Owned |
| Coal Deed | 06/27/18 | Smith, Bernice to SCELLC | Sugar Camp Mine Plan | HC 2018-1030 | Owned |

| Coal Deed | 06/27/18 | Thompson, Beatrice % Billy E. Walker AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-1031 | Owned | |
|---|---|---|---|---|---|---|
| Coal Deed | 06/27/18 | First Church of the Nazarene to SCELLC | Sugar Camp Mine Plan | HC 2018-1032 | Owned | |
| Coal Deed | 06/27/18 | Linn, Karen R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1034 | Owned | |
| Mining Lease | 06/27/18 | Seibert, Charles Ellis to SCELLC | Sugar Camp Mine Plan | HC 2018-1037 | Leased | |
| Mining Lease | 06/27/18 | Seibert, James Thomas to SCELLC | Sugar Camp Mine Plan | HC 2018-1038 | Leased | |
| Mining Lease | 06/27/18 | Drake, Terry W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1041 | Leased | |
| Mining Lease | 06/27/18 | Scott, Betsy Dawn to SCELLC | Sugar Camp Mine Plan | HC 2018-1042 | Leased | |
| Mining Lease | 06/27/18 | Lane, John Bradley to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |
| Mining Lease | 06/27/18 | Drake, Mark W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |
| Coal Deed | 06/27/18 | Mendyk, Julie to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Joyce Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1086 | Leased | |
| Mining Lease | 07/05/18 | Metheney, Donald W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1087 | Leased | |
| Coal Deed | 07/05/18 | Sandidge, Joyce to SCELLC | Sugar Camp Mine Plan | HC 2018-1087 | Owned | |
| Coal Deed | 07/05/18 | Smith, Leon to SCELLC | Sugar Camp Mine Plan | HC 2018-1087 | Owned | |
| Coal Deed | 07/05/18 | Smith, Richard H. to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Ronald M. to SCELLC | Sugar Camp Mine Plan | HC 2018-1089 | Leased | |
| Mining Lease | 07/18/18 | Martin, Marianne B. to SCELLC | Sugar Camp Mine Plan | HC 2018-1157 | Leased | |
| Mining Lease | 07/18/18 | Wilkie, Mary Jean to SCELLC | Sugar Camp Mine Plan | HC 2018-1158 | Leased | |

Case 4:18-bk-50214 Doc 2 Filed 04/12/18 Entered 04/12/18 03:45:34 Main Docu

| Mining Lease | 07/18/18 | Jones, Michael J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1159 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 07/18/18 | Martin, Janet J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1160 | Leased | |
| Mining Lease | 07/30/18 | Kleber, LLC to SCELLC | Sugar Camp Mine Plan | HC 2018-1222 | Leased | |
| Mining Lease | 08/08/18 | Vickers, Rhonda Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1271 | Leased | |
| Mining Lease | 08/08/18 | Pike, Brenda L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1272 | Leased | |
| Mining Lease | 08/08/18 | Schwenn, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1273 | Leased | |
| Mining Lease | 08/14/18 | Lane, Juanita Dare to SCELLC | Sugar Camp Mine Plan | HC 2018-1302 | Leased | |
| Coal Deed | 08/14/18 | Metheney, Miranda to SCELLC | Sugar Camp Mine Plan | HC 2018-1301 | Owned | |
| Mining Lease | 08/14/18 | Yancey, George to SCELLC | Sugar Camp Mine Plan | HC 2018-1303 | Leased | |
| Mining Lease | 08/28/18 | Knob Prairie Baptist Cemetery Association to SCELLC | Sugar Camp Mine Plan | HC 2018-1040 | Leased | |
| Coal Deed | 09/12/18 | Buchanan, Cynthia E. to SCELLC | Sugar Camp Mine Plan | HC 2018-1439 | Owned | |
| Coal Deed | 09/12/18 | Brophy, Romaine widow of James Brophy to SCELLC | Sugar Camp Mine Plan | HC 2018-1440 | Owned | |
| Mining Lease | 09/12/18 | Wright, Donald L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1441 | Leased | |
| Mining Lease | 09/12/18 | Dorion, Rhona to SCELLC | Sugar Camp Mine Plan | HC 2018-1442 | Leased | |
| Mining Lease | 09/12/18 | Wright, Laura to SCELLC | Sugar Camp Mine Plan | HC 2018-1443 | Leased | |
| Mining Lease | 10/03/18 | Simmons, Gavin T. to SCELLC | Sugar Camp Mine Plan | HC 2018-1523 | Leased | |
| Mining Lease | 10/03/18 | Wright, Curtis D. to SCELLC | Sugar Camp Mine Plan | HC 2018-1524 | Leased | |
| Mining Lease | 10/03/18 | Lane, Riley Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1525 | Leased | |

Case 18-30241 Doc 2 Filed 10/12/18 Entered 10/12/18 03:45:34 Main Docu

| Mining Lease | 10/24/18 | Winter, Carrie L Trust to SCELLC | Sugar Camp Mine Plan | HC 2018-1662 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 10/24/18 | Smith, Brett to SCELLC | Sugar Camp Mine Plan | HC 2018-1663 | Leased | |
| Mining Lease | 10/24/18 | Johnson, Flora Wymond to SCELLC | Sugar Camp Mine Plan | HC 2018-1665 | Leased | |
| Mining Lease | 10/24/18 | Collins, Sandra Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1666 | Leased | |
| Mining Lease | 10/24/18 | Koptez, Steven Gerald to SCELLC | Sugar Camp Mine Plan | HC 2018-1667 | Leased | |
| Mining Lease | 10/24/18 | Decker, Mary Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1783 | Leased | |
| Coal Deed | 10/30/18 | Jenkins, Thomas R to SCELLC | Sugar Camp Mine Plan | HC 2018-1692 | Owned | |
| Mining Lease | 10/30/18 | Dry, Margaret Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1693 | Leased | |
| Mining Lease | 10/30/18 | Lane, Sydney Drew to SCELLC | Sugar Camp Mine Plan | HC 2018-1694 | Leased | |
| Mining Lease | 10/30/18 | touma, Elizabeth Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1695 | Leased | |
| Mining Lease | 10/30/18 | Myers, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1696 | Leased | |
| Mining Lease | 11/19/18 | Palmer, Gary to SCELLC | Sugar Camp Mine Plan | HC 2018-1783 | Leased | |
| Mining Lease | 11/19/18 | Jordon, Flora Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 11/20/18 | Waggoner, Amanda J to SCELLC | Sugar Camp Mine Plan | FC 2018-4821 | Leased | |
| Mining Lease | 11/20/18 | Bohannon, Barbara Ann to SCELLC | Sugar Camp Mine Plan | FC 2018-4822 | Leased | |
| Mining Lease | 11/20/18 | Otterson, Lloyd L. to SCELLC | Sugar Camp Mine Plan | FC 2018-4823 | Leased | |
| Mining Lease | 12/11/18 | Goforth, Heather J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1905 | Leased | |
| Mining Lease | 12/11/18 | Goforth, Matthew R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1906 | Leased | |

| | | | | | |
|---|---|---|---|---|---|
| Mining Lease | 12/11/18 | Smith, Kerry to SCELLC | Sugar Camp Mine Plan | HC 2018-1907 | Leased |
| Mining Lease | 12/11/18 | Johnson, Katherine Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased |
| Mining Lease | 12/18/18 | Wright, Shelia P. to SCELLC | Sugar Camp Mine Plan | HC 2018-1974 | Leased |
| Mining Lease | 12/18/18 | Wright, Richard A. to SCELLC | Sugar Camp Mine Plan | HC 2018-1975 | Leased |
| Mining Lease | 12/18/18 | Wright, Michael S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1976 | Leased |
| Mining Lease | 12/18/18 | Brown, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1977 | Leased |
| Coal Deed | 01/09/19 | Jenkins, Mike to SCELLC | Sugar Camp Mine Plan | HC 2019-0057 | Owned |
| Mining Lease | 01/09/19 | Jenkins, Hellen to SCELLC | Sugar Camp Mine Plan | HC 2019-0058 | Leased |
| Mining Lease | 01/09/19 | Bayne, Janet Jenkins to SCELLC | Sugar Camp Mine Plan | HC 2019-0059 | Leased |
| Mining Lease | 01/09/19 | Jenkins, James J. to SCELLC | Sugar Camp Mine Plan | HC 2019-0060 | Leased |
| Mining Lease | 01/16/19 | Wright, Steven Ray to SCELLC | Sugar Camp Mine Plan | HC 2019-0097 | Leased |
| Mining Lease | 01/16/19 | Wright, Ida Louise to SCELLC | Sugar Camp Mine Plan | HC 2019-0098 | Leased |
| Coal Deed | 01/29/19 | The Bonnie Camp Meeting to SCELLC | Sugar Camp Mine Plan | HC 2019-0150 | Owned |
| Coal Deed | 02/01/19 | Barnhill, Ruth Eloise Short to SCELLC | Sugar Camp Mine Plan | HC 2019-0168 | Owned |
| Coal Deed | 02/01/19 | Rappe, John James to SCELLC | Sugar Camp Mine Plan | HC 2019-0169 | Owned |
| Mining Lease | 02/01/19 | Willis, Bruce E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0172 | Leased |
| Mining Lease | 02/01/19 | Knott, Elaine Mae to SCELLC | Sugar Camp Mine Plan | HC 2019-0173 | Leased |
| Mining Lease | 02/01/19 | Seibert, John Walter to SCELLC | Sugar Camp Mine Plan | HC 2019-0174 | Leased |

| Coal Deed | 02/08/19 | Short, Leon to SCELLC | Sugar Camp Mine Plan | HC 2019-0210 | Owned | |
|---|---|---|---|---|---|---|
| Coal Deed | 02/08/19 | Avolt, Kathleen Eagan to SCELLC | Sugar Camp Mine Plan | HC 2019-0218 | Owned | |
| Coal Deed | 02/08/19 | Avolt, Donna H. to SCELLC | Sugar Camp Mine Plan | HC 2019-0219 | Owned | |
| Mining Lease | 02/13/19 | Wall, Letitia to SCELLC | Sugar Camp Mine Plan | HC 2019-0223 | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 02/19/19 | Hoffman, Elaine W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0245 | Leased | |
| Coal Deed | 03/12/19 | Banning, David W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0368 | Owned | |
| Mining Lease | 03/22/19 | Kinsey, Frances E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0416 | Leased | |
| Mining Lease | 03/22/19 | Willis, George Darin to SCELLC | Sugar Camp Mine Plan | HC 2019-0417 | Leased | |
| Mining Lease | 03/22/19 | Burns, Lenore E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0418 | Leased | |
| Mining Lease | 03/22/19 | Gill, Lorella E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0419 | Leased | |
| Mining Lease | 03/22/19 | Oberreiter, Jean Ann (Evans) to SCELLC | Sugar Camp Mine Plan | HC 2019-0420 | Leased | |
| Coal Deed | 03/22/19 | Doyle, Kymbra Drasil to SCELLC | Sugar Camp Mine Plan | HC 2019-0445 | Owned | |
| Coal Deed | 03/27/19 | Higgins, Cynthia Ann to Elaine May Knott | Sugar Camp Mine Plan | HC 2019-0446 | Owned | |
| Coal Deed | 03/28/19 | Short, Dian to SCELLC | Sugar Camp Mine Plan | HC 2019-0463 | Owned | |
| Coal Deed | 03/28/19 | Short, Richard to SCELLC | Sugar Camp Mine Plan | HC 2019-0464 | Owned | |
| Coal Deed | 04/03/19 | South Side Christian Church to SCELLC | Sugar Camp Mine Plan | HC 2019-0507 | Owned | |

Case 20-13-2 Doc 2 Filed 04/12/20 Entered 04/01/20 23:45:34 Main Docum

| Mining Lease | 04/10/19 | Yorgan, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2019-0558 | Leased | |
| Mining Lease | 04/10/19 | Edmonds, James G. to SCELLC | Sugar Camp Mine Plan | HC 2019-0559 | Leased | |
| Mining Lease | 04/23/19 | Crowder, Nancee L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0669 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Patrick L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0671 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Scott L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0672 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Kenneth to SCELLC | Sugar Camp Mine Plan | HC 2019-0673 | Leased | |
| Mining Lease | 05/01/19 | Foresight Energy LP to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 05/08/19 | Camden, Randy to SCELLC | Sugar Camp Mine Plan | HC 2019-0750 | Leased | |
| Mining Lease | 05/08/19 | Davis, Tamera L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0751 | Leased | |
| Mining Lease | 05/30/19 | Fitts, David F. to SCELLC | Sugar Camp Mine Plan | HC 2019-0851 | Leased | |
| Coal Deed | 06/03/19 | Avolt, Geoffrey Barth to SCELLC | Sugar Camp Mine Plan | HC 2019-0870 | Owned | |
| Mining Lease | 06/10/19 | Buchman, Diana Sue Wright to SCELLC | Sugar Camp Mine Plan | HC 2019-0896 | Leased | |
| Mining Lease | 06/10/19 | Willis, Robert James to SCELLC | Sugar Camp Mine Plan | HC 2019-0897 | Leased | |
| Mining Lease | 06/10/19 | Sears, James R. & Gloria to SCELLC | Sugar Camp Mine Plan | HC 2019-0898 | Leased | |
| Mining Lease | 06/19/19 | Wise, Melodie Lea to SCELLC | Sugar Camp Mine Plan | HC 2019-0962 | Leased | |
| Mining Lease | 06/19/19 | Walker, Edwin N. to SCELLC | Sugar Camp Mine Plan | HC 2019-0963 | Leased | |
| Mining Lease | 07/17/19 | O'Dell, Paula J. to SCELLC | Sugar Camp Mine Plan | HC 2019-1079 | Leased | |
| Mining Lease | 07/17/19 | Walker, Ivan W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1080 | Leased | |

| Mining Lease | 07/25/19 | Hut ton, Catherine Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1118 | Leased | |
| Coal Deed | 07/25/19 | Nuss, Richard E. Sr. to SCELLC | Sugar Camp Mine Plan | HC 2019-1120 | Owned | |
| Mining Lease | 08/01/19 | Miltenberger, Cheryl G. to SCELLC | Sugar Camp Mine Plan | HC 2019-1162 | Leased | |
| Mining Lease | 08/01/19 | Lohman, Sandra E. to SCELLC | Sugar Camp Mine Plan | HC 2019-1163 | Leased | |
| Mining Lease | 08/01/19 | Entwistle, Craig W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1164 | Leased | |
| Coal Deed | 08/28/19 | Society of St. Vincent de Paul Archdiocesan Council toSCELLC | Sugar Camp Mine Plan | HC 2019-1317 | Owned | |
| Mining Lease | 08/28/19 | Entwistle, Jacquelyn Marie to SCELLC | Sugar Camp Mine Plan | HC 2019-1318 | Leased | |
| Mining Lease | 08/28/19 | Oliver, Mil ton Donald to SCELLC | Sugar Camp Mine Plan | HC 2019-1318 | Leased | |
| Mining Lease | 09/24/19 | Prusha, Thomas M. to SCELLC | Sugar Camp Mine Plan | HC 2019-1584 | Leased | |
| Coal Deed | 10/09/19 | Lowe, Debra Short to SCELLC | Sugar Camp Mine Plan | HC 2019-1697 | Owned | |
| Coal Deed | 11/14/19 | Lewis, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1860 | Owned | |
| Coal Deed | 11/14/19 | Duncan, Barbara Joan to SCELLC | Sugar Camp Mine Plan | HC 2019-1882 | Owned | |
| Coal Deed | 11/14/2019 | McKinney, Marsha to SCELLC | Sugar Camp Mine Plan | HC 2019-1871 | Owned | |
| Coal Deed | 11/14/2019 | Kniffen, Susan to SCELLC | Sugar Camp Mine Plan | HC 2019-1872 | Owned | |
| Coal Deed | 11/14/19 | Blackwell, William Loyd to SCELLC | Sugar Camp Mine Plan | HC 2019-1873 | Owned | |
| Mining Lease | 11/14/19 | Flannigan, Monty D. to SCELLC | Sugar Camp Mine Plan | HC 2019-1874 | Leased | |
| Mining Lease | 11/20/19 | Irish, Wilmot Wheeler to SCELLC | Sugar Camp Mine Plan | HC 2019-1903 | Leased | |

Case 4-08 Doc 28 Filed 00/01/20 Entered 04/1/20 23:45:34 Main Docum

| | | | | | | |
|---|---|---|---|---|---|---|
| Coal Deed | 11/26/19 | McIntosh, Mark E.  to SCELLC | Sugar Camp Mine Plan | HC 2019-1945 | Owned | |
| Mining Lease | 12/10/19 | Bergen County Animal Shelter to SCELLC | Sugar Camp Mine Plan | FC 2019-4869 | Leased | |
| Mining Lease | 01/16/20 | Moore, Carolyn F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0098 | Leased | |
| Mining Lease | 01/16/20 | Rucker, Lezlie J. to SCELLC | Sugar Camp Mine Plan | HC 2020-0099 | Leased | |
| Mining Lease | 01/16/20 | Cooper, Rene F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0100 | Leased | |
| Coal Deed | 01/21/20 | Drake, Roger  to SCELLC | Sugar Camp Mine Plan | HC 2020-0109 | Owned | |
| Mining Lease | 01/21/20 | Debow, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2020-0110 | Leased | |
| Mining Lease | 01/21/20 | Drake, Daphne to SCELLC | Sugar Camp Mine Plan | HC 2020-0111 | Leased | |
| Mining Lease | 02/18/20 | Rocky Mountain Lions Eye Institute Foundation, Inc. to SCELLC | Sugar Camp Mine Plan | HC 2020-0319 | Leased | |
| Mining Lease | 02/18/20 | Hoppe, Judy H. to SCELLC | Sugar Camp Mine Plan | HC 2020-0320 | Leased | |
| Mining Lease | 02/27/20 | Musselman, James Jay to SCELLC | Sugar Camp Mine Plan | HC 2020-0376 | Leased | |

Case 20-40208  Doc 2  Filed 04/01/20  Entered 04/01/20 23:45:34  Main Document  Pg 283 of 1005

**Williamson Energy, LLC**

Pond Creek No. 1 Mine
16468 Liberty School Road
Marion, IL 62959

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease as amended | 8/14/2006 | WPP LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Franklin County Doc 2006-6571<br><br>Williamson County: Misc. 301 page 480 | Leased | Yes |
| Short Form of Lease and Sublease | 5/1/2005 | Williamson Development Company LLC and Williamson Energy LLC | Coal Reserves in Williamson County, Illinois | Misc 291 page 461 | Leased | Yes |
| Short Form of Lease | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Misc 301 Page 479 | Leased | Yes |
| First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Misc 313 Page 620 | Leased | Yes |
| Coal Mining Lease and Sublease | 8/12/10 | Colt LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Il | 325-897 | Leased | Yes |
| First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Misc 313 Page 629 | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed | 8/12/10 | Williamson Development Company, LLC and Williamson Energy, LLC | Surface required for Williamson Energy, LLC Operations[3] | WC 486-333 | Owned | Yes |
| Easement | 8/12/10 | Williamson Development Company, LLC and Williamson Energy, LLC | "Snake areas" required for Williamson Energy, LLC Operations | WC 325-899 | Owned | Yes |
| Ground Lease | 8/12/10 | Eberhart to Williamson Development Company, LLC assigned to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 325-900 | Leased | Yes |
| Ground Lease | 8/12/10 | Summers to Independence Land Company, LLC to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 327-750 | Leased | Yes |

| | | | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 6/14/2018 | Diana S. Dulle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-4356 | Owned | |
| Warranty Deed | 7/13/2018 | Linda Duncan to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5209 | Owned | |
| Warranty Deed | 7/20/2018 | Jeremy W. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5444 | Owned | |
| Warranty Deed | 8/20/2018 | Lora L. Jones to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6259 | Owned | |
| Warranty Deed | 8/20/2018 | Shirley N. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6258 | Owned | |
| Warranty Deed | 9/4/2018 | Debra Ellen Moser to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6677 | Owned | |
| Warranty Deed | 9/4/2018 | Larry Dean Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6706 | Owned | |

---

[3] This excludes the real property released pursuant to that certain Fifth Amendment and Partial Release of Fee and Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of September 26, 2016, by and between Williamson Energy, LLC, as Mortgagor, and Citibank, N.A., in its capacity as Agent, consisting of approximately 28.55 acres of surface land.

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 15:45:34 Main Document Pg 285 of 1005

| Warranty Deed | 9/4/2018 | Jerry R. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6705 | Owned | |
| Warranty Deed | 9/4/2018 | Wilma K. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6704 | Owned | |
| Warranty Deed | 9/4/2018 | Kimberly A. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6703 | Owned | |
| Warranty Deed | 9/4/2018 | Gerald Lee Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6702 | Owned | |
| Warranty Deed | 9/4/2018 | Wendall Ray Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6701 | Owned | |
| Warranty Deed | 9/24/2018 | Edward W. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7338 | Owned | |
| Warranty Deed | 9/24/2018 | Barbara Jean Newton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7337 | Owned | |
| Warranty Deed | 9/24/2018 | Debra L. Caplick to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7336 | Owned | |
| Warranty Deed | 9/24/2018 | Don N. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7335 | Owned | |
| Warranty Deed | 9/24/2018 | Jim D. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7334 | Owned | |
| Warranty Deed | 9/24/2018 | Susan Elaine Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7333 | Owned | |
| Warranty Deed | 9/24/2018 | Jerry D. Brookman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7332 | Owned | |
| Warranty Deed | 9/24/2018 | Linda E. Rector to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7331 | Owned | |
| Warranty Deed | 9/24/2018 | Marion E. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7330 | Owned | |
| Warranty Deed | 9/24/2018 | Sarah J. Glazebrook Perry to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7329 | Owned | |
| Warranty Deed | 10/16/2018 | Michelle McCabe-Doyle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7927 | Owned | |
| Warranty Deed | 10/16/2018 | Richard R. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7926 | Owned | |
| Warranty Deed | 10/16/2018 | Robert Shon Smith to | Coal Reserves for Williamson | WC 2018-7925 | Owned | |

| | | Williamson Energy, LLC | Energy, LLC Operations | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 10/16/2018 | Elizabeth Jeanne Culli to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7974 | Owned | |
| Warranty Deed | 10/23/2018 | Kathy Scott to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8178 | Owned | |
| Warranty Deed | 11/07/2018 | Roger W. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8561 | Owned | |
| Warranty Deed | 11/27/2018 | Tommy R. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9371 | Owned | |
| Warranty Deed | 12/03/2018 | Allen E. Heinbokel to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9499 | Owned | |
| Warranty Deed | 12/18/2018 | Jeremiah Wesley Seaman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9920 | Owned | |
| Warranty Deed | 12/18/2018 | Alexandra Lewis DeMarino to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9919 | Owned | |
| Warranty Deed | 1/07/2019 | Shannon Lee Brand to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-148 | Owned | |
| Warranty Deed | 1/31/2019 | Michael James Lewis to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-720 | Owned | |
| Warranty Deed | 1/31/2019 | Karolyn Kay Fullerton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-725 | Owned | |
| Mining Lease | 3/5/2019 | Susan E. Denton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1569 | Leased | |
| Warranty Deed | 3/18/2019 | Ronald L. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1897 | Owned | |
| Warranty Deed | 8/27/2019 | Deloris J. Hoehn to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-6243 | Owned | |
| Warranty Deed | 1/26/2018 | James Walter Hoyt to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-303 | Owned | |
| Warranty Deed | 2/13/2018 | Brenda Dora Spencer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-634 | Owned | |
| Warranty Deed | 3/21/2018 | Patricia K. Dyer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1125 | Owned | |
| Warranty Deed | 3/21/2018 | Diana L. Bischler to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1128 | Owned | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mining Lease | 3/23/2018 | Lisa M. Engeling to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1177 | Leased | |
| Warranty Deed | 4/19/2018 | Jeanette Fortney to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1539 | Owned | |
| Mining Lease | 7/13/2018 | Jerry K. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-2781 | Leased | |
| Warranty Deed | 8/1/2018 | Lorna Lynn Hines to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3092 | Owned | |
| Warranty Deed | 8/1/2018 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3093 | Owned | |
| Warranty Deed | 8/10/2018 | Brian M. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3235 | Owned | |
| Mining Lease | 8/29/2018 | Paula T. Hartzel, et al to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3551 | Leased | |
| Warranty Deed | 9/5/2018 | Janet J. Griffin to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3642 | Owned | |
| Warranty Deed | 9/5/2018 | Gary P. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3643 | Owned | |
| Warranty Deed | 9/5/2018 | Barbara Giles to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3640 | Owned | |
| Warranty Deed | 9/18/2018 | Katherine Ann Bradley to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3871 | Owned | |
| Warranty Deed | 10/17/2018 | Shirley Whitehead to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4100 | Owned | |
| Warranty Deed | 10/23/2018 | Barbara Faye Sharkey to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3830 | Owned | |
| Warranty Deed | 2/1/2019 | Emma L. Stetson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-335 | Owned | |
| Warranty Deed | 3/26/2019 | Ronald L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-909 | Owned | |
| Warranty Deed | 4/2/2019 | Sarah Greenwade to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1134 | Owned | |
| Warranty Deed | 4/2/2019 | Susan L. Naucke to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1132 | Owned | |
| Warranty Deed | 4/17/2019 | Brock D. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1338 | Owned | |

Case 4:24-cv-41108 Doc 2-28 filed 04/21/20 pg 288 of 1005 Entered 04/01/20 22:45:34 Main Document

| | | | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 4/17/2019 | James Keith Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1352 | Owned | |
| Warranty Deed | 4/23/2019 | Marilyn S. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1419 | Owned | |
| Warranty Deed | 5/14/2019 | Miranda B. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1752 | Owned | |
| Warranty Deed | 5/14/2019 | Charlotte Jean to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-175 | Owned | |
| Warranty Deed | 7/1/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-238 | Owned | |
| Mining Lease | 7/17/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-261 | Owned | |
| Warranty Deed | 7/17/2019 | Judith A. Woodard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2617 | Owned | |
| Warranty Deed | 7/17/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-261 | Owned | |
| Warranty Deed | 7/24/2019 | Norma Adams Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-273 | Owned | |
| Warranty Deed | 7/30/2019 | Phillip R. Erthall to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-283 | Owned | |
| Warranty Deed | 7/30/2019 | Robert H. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-283 | Owned | |
| Warranty Deed | 8/13/2019 | Kenneth L. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-30 | Owned | |
| Warranty Deed | 8/13/2019 | William Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-30 | Owned | |
| Warranty Deed | 9/4/2019 | Linda S. Lear to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-38 | Owned | |
| Deed | 9/16/2019 | Steven H. Machura to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-39 | Owned | |
| Warranty Deed | 10/17/2019 | Sharon A. Aiken-Peterson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-399 | Owned | |
| Warranty Deed | 10/30/2019 | Raven N. Fager to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-415 | Owned | |
| Mining Lease | 11/05/2019 | Mary Lou Zech to | Coal Reserves for Williamson | FC 2019-425 | Leased | |

Case 3:25-08-34208 Doc 228 Filed 04/21/25 Page 289 of 1005 Entered 04/01/25 23:15:34 Main Document

| | | Williamson Energy, LLC | Energy, LLC Operations | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/14/2019 | Daniel L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4371 | Owned | |
| Warranty Deed | 11/26/2019 | Colleen L. Taylor to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4559 | Owned | |
| Warranty Deed | 2/25/2020 | Paula Kay Osteen-Cortez to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-720 | Owned | |
| Warranty Deed | 2/25/2020 | Monta Ray Jennings to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-722 | Owned | |
| Warranty Deed | 2/25/2020 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-724 | Owned | |

**Schedule 6.18**

**<u>Post-Closing Covenants</u>**

None.

**Schedule 7.01**

**Existing Liens**

1.   Liens pursuant to items 1 and 2 on Schedule 7.03.

2.   Liens as set forth in the below chart:

| FILING OFFICE | TYPE | FILE DATE | FILE # | DEBTOR (as found) | SECURED PARTY |
|---|---|---|---|---|---|
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 11/4/2019 | 11042019-0184 | COAL FIELD CONSTRUCTION COMPANY LLC | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 3/25/2019 | 03252019-0090 | COAL FIELD CONSTRUCTION COMPANY LLC | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| DE SOS | UCC-1 Initial | 6/3/2014 | 2014 2161685 | FORESIGHT ENERGY LLC | U.S. BANK EQUIPMENT FINANCE |
| DE SOS | UCC-1 Initial | 6/3/2014 | 2014 2161685 | FORESIGHT ENERGY LLC | U.S. BANK EQUIPMENT FINANCE |
| DE SOS | UCC-1 Initial | 6/3/2014 | 2014 2161685 | FORESIGHT ENERGY LLC | U.S. BANK EQUIPMENT FINANCE |
| DE SOS | UCC-1 Initial | 11/7/2014 | 2014 4513891 | FORESIGHT ENERGY SERVICES LLC | CATERPILLAR FINANCIAL SERVICES CORPORATION |
| DE SOS | UCC-1 Initial | 11/13/2014 | 2014 4575627 | FORESIGHT ENERGY SERVICES LLC | PNC EQUIPMENT FINANCE, LLC |
| DE SOS | UCC-1 Initial | 11/18/2014 | 2014 4648655 | FORESIGHT ENERGY SERVICES LLC | FIRSTMERIT EQUIPMENT FINANCE INC |
| DE SOS | UCC-1 Initial | 3/29/2012 | 2012 1213901 | HILLSBORO ENERGY LLC; WILLIAMSON ENERGY, LLC; SUGAR CAMP ENERGY, LLC | WELLS FARGO EQUIPMENT FINANCE, INC. |
| DE SOS | UCC-1 Initial | 3/29/2012 | 2012 1213943 | HILLSBORO ENERGY LLC; WILLIAMSON ENERGY, LLC; SUGAR CAMP ENERGY, LLC | WELLS FARGO EQUIPMENT FINANCE, INC. |
| DE SOS | UCC-1 Initial | 9/13/2012 | 2012 3528744 | HILLSBORO ENERGY LLC | CATERPILLAR FINANCIAL |

| FILING OFFICE | TYPE | FILE DATE | FILE # | DEBTOR (as found) | SECURED PARTY |
|---|---|---|---|---|---|
| | | | | | SERVICES CORPORATION |
| DE SOS | UCC-1 Initial | 4/11/2013 | 2013 1400705 | HILLSBORO ENERGY LLC; PATTON MINING LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 4/11/2013 | 2013 1401034 | HILLSBORO ENERGY LLC; PATTON MINING LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 4/11/2013 | 2013 1401661 | HILLSBORO ENERGY LLC; PATTON MINING LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 7/17/2019 | 07172019-0125 (Amount owed $55,530.03) | MACH MINING, LLC; CLINE CHRISTOPHER MBR | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| DE SOS | UCC-1 Initial | 11/5/2018 | 2018 7646793 | MACOUPIN ENERGY LLC | STRATA SAFETY PRODUCTS, LLC |
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 12/6/2019 | 12062019-0063 (Amount owed $38,2441.13) | M-CLASS MINING LLC; DAVID JUDE SOLE MBR | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 1/14/2020 | 01142020-0113 (Amount owed $60,037.65) | M-CLASS MINING LLC; DAVID JUDE SOLE MBR | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| DE SOS | UCC-1 Initial | 5/18/2015 | 2015 2109279 | SUGAR CAMP ENERGY, LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 5/18/2015 | 2015 2109378 | SUGAR CAMP ENERGY, LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 5/18/2015 | 2015 2109584 | SUGAR CAMP ENERGY, LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 11/16/2017 | 2017 7614433 | SUGAR CAMP ENERGY, LLC | MOTION INDUSTRIES, INC. |
| DE SOS | UCC-1 Initial | 8/3/2016 | 2016 4714489 | WILLIAMSON ENERGY, LLC | MOTION INDUSTRIES, INC. |

| FILING OFFICE | TYPE | FILE DATE | FILE # | DEBTOR (as found) | SECURED PARTY |
|---|---|---|---|---|---|
| DE SOS | UCC-1 Initial | 9/27/2016 | 2016 5932171 | WILLIAMSON ENERGY, LLC | MOTION INDUSTRIES, INC. |

**Schedule 7.02**

**<u>Existing Investments</u>**

1.  Investments in the entities listed on <u>Schedule 5.13</u>.

2.  Financing provided by American Century Transport LLC and American Century Minerals LLC pursuant to (i) the Lease Agreement between American Century Transport LLC and American Energy Corporation dated as of April 16, 2015 and (ii) the Overriding Royalty Agreement among American Century Minerals LLC, American Energy Corporation and Consolidated Land Company dated as of April 16, 2015.

**Schedule 7.03**

**Existing Indebtedness**

1. Indebtedness in respect of the Prepetition First Lien Credit Agreement.

2. Indebtedness in respect of the Indenture, dated as of March 28, 2017 (as amended, supplemented or otherwise modified), among Foresight Energy LLC (the "Company") and Foresight Energy Finance Corporation, the guarantors from time to time parties thereto and Wilmington Trust, National Association, as trustee (the "Trustee"), governing the 11.50% Second Lien Senior Secured Notes due 2023.

3. All surety bonds with third parties to secure reclamation and other performance commitments by Foresight Energy LLC set out in the chart attached hereto as Annex I.

4. Indebtedness in respect of the sale-leaseback financing arrangements in connection with (1) the sales agreement entered into by Macoupin Energy, WPP, LLC and HOD, LLC (subsidiaries of Natural Resource Partners LP) and (2) the sales agreement entered into by Sugar Camp Energy, LLC and HOD, LLC.

5. Indebtedness in respect of the commercial insurance premium finance and security agreement with BankDirect Capital Finance with an outstanding balance of $2,543,480.

| | | | | **Bond** | | **Effective** | **Expiration** | |
|---|---|---|---|---|---|---|---|---|
| *Foreight Company* | *Obligee* | *Bond Type* | *Grouped As:* | **Amount** | **Premium** | **Date** | **Date** | **Permit #** |
| Hillsboro Energy, LLC | IL DOT | Road | Reclamation | $157,150.00 | $3,929 | 12/10/2019 | 12/10/2020 | |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $6,701,424.00 | $167,536 | 12/10/2019 | 12/10/2020 | 424 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,500.00 | $613 | 12/10/2019 | 12/10/2020 | 399 Revision #7 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $80,750.00 | $2,019 | 12/10/2019 | 12/10/2020 | 399 Revision #8 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $16,150.00 | $404 | 12/10/2019 | 12/10/2020 | 399 Revision #9 |
| Hillsboro Energy, LLC | IL DOT | Road | Reclamation | $408,590.00 | $10,215 | 12/10/2019 | 12/10/2020 | |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,500.00 | $138 | 12/10/2019 | 12/10/2020 | 399 Revision #11 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,330.00 | $125 | 12/10/2019 | 12/10/2020 | 399 Revision #10 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,200.00 | $830 | 12/10/2019 | 12/10/2020 | 399 Revision #14 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $25,200.00 | $630 | 12/10/2019 | 12/10/2020 | 399 Revision #16 |
| Hillsboro Energy, LLC | IL DOT | Reclamation | Reclamation | $5,000.00 | $125 | 12/10/2019 | 12/10/2020 | 6-33621 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,900.00 | $848 | 12/10/2019 | 12/10/2020 | 382 Revision #35 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,125,800.00 | $178,145 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,015,423.00 | $25,386 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $40,600.00 | $1,015 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $161,900.00 | $4,048 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL EPA | Financial Guarantee | | $462,786.00 | $11,570 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL EPA | Financial Guarantee | | $462,786.00 | $9,256 | 8/25/2019 | 8/25/2020 | |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $70,200.00 | $1,755 | 12/10/2019 | 12/10/2020 | 382 IBR #33 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $70,400.00 | $1,760 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $19,760.00 | $494 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $57,800.00 | $1,445 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $49,003.00 | $1,225 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,460,400.00 | $36,510 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL EPA | Financial Guarantee | | $462,786.00 | $11,570 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL EPA | Financial Guarantee | | $462,786.00 | $9,256 | 1/21/2019 | 1/21/2020 | |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $17,300.00 | $433 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,400.00 | $135 | 12/10/2019 | 12/10/2020 | 382 Revision #41 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,670.00 | $842 | 12/10/2019 | 12/10/2020 | 382 IBR #42 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $26,200.00 | $655 | 12/10/2019 | 12/10/2020 | 382 IPR #43 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $38,800.00 | $970 | 12/10/2019 | 12/10/2020 | 382 IBR #43 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $11,340.00 | $284 | 12/10/2019 | 12/10/2020 | 382 IBR #35 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $46,300.00 | $1,158 | 12/10/2019 | 12/10/2020 | 382 IBR #36 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $35,800.00 | $895 | 12/10/2019 | 12/10/2020 | 382 IBR #37 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $39,600.00 | $990 | 12/10/2019 | 12/10/2020 | 382 IPR #39 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $233,380.00 | $5,835 | 12/10/2019 | 12/10/2020 | 382 Revision #44 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $50,600.00 | $1,265 | 12/10/2019 | 12/10/2020 | 382 IBR #45 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $15,600.00 | $390 | 12/10/2019 | 12/10/2020 | 382 IBR #46 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $16,481,266.08 | $412,032 | 12/10/2019 | 12/10/2020 | 434 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $251,200.00 | $6,280 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,800.00 | $595 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | Dept of the Army, St. Louis District Corps of Engineers | Reclamation | Reclamation | $467,485.00 | $11,687 | 12/10/2019 | 12/10/2020 | P-2866 MVS-2013-724 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,000.00 | $175 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $50,100.00 | $1,253 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $101,470.00 | $2,537 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $13,300.00 | $333 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $288,377.00 | $7,209 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $43,100.00 | $1,078 | 12/10/2019 | 12/10/2020 | 382 |

**FORESIGHT ENERGY LP**
**ARGO SURETY rewritten to INIC 12/10/2019**
**Bond List as 2/26/2020**

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main

| Foresight Company | Obligee | Bond Type | Grouped As: | Bond Amount | Premium | Effective Date | Expiration Date | Permit # |
|---|---|---|---|---|---|---|---|---|
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $46,200.00 | $1,155 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $80,240.00 | $2,006 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $58,500.00 | $1,463 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,500.00 | $588 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $69,840.00 | $1,746 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $68,860.00 | $1,722 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $22,800.00 | $570 | 12/10/2019 | 12/10/2020 | 434 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $66,420.00 | $1,661 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,900.00 | $198 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $49,000.00 | $1,225 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $48,080.00 | $1,202 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $12,900.00 | $323 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $147,800.00 | $3,695 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $38,600.00 | $965 | 12/10/2019 | 12/10/2020 | 382 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $4,623,100.00 | $115,578 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,858,337.00 | $46,458 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,220.00 | $706 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,690.00 | $125 | 12/10/2019 | 12/10/2020 | 375 Revision #56 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $37,600.00 | $940 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $368,992.00 | $9,225 | 12/10/2019 | 12/10/2020 | 375 Revision #47 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $53,600.00 | $1,340 | 12/10/2019 | 12/10/2020 | 375 Revision #45 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $26,800.00 | $670 | 12/10/2019 | 12/10/2020 | 375 Revision #58 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,300.00 | $133 | 12/10/2019 | 12/10/2020 | 375 Revision #48 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,300.00 | $208 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $10,620.00 | $266 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $21,700.00 | $543 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $6,013,494.00 | $150,337 | 12/10/2019 | 12/10/2020 | 417 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $95,840.00 | $2,396 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,100.00 | $828 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,300.00 | $208 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $19,400.00 | $485 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $72,500.00 | $1,813 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,500.00 | $138 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | Dept of the Army, St. Louis District Corps of Engineers | Performance Bond | | $274,898.00 | $6,872 | 12/10/2019 | 12/10/2020 | P-2905-MVS-2013-315 |
| Williamson Energy, LLC | IL DOT | Utility Bond | | $175,000.00 | $4,375 | 12/10/2019 | 12/10/2020 | 9U-2609-17 |
| Williamson Energy, LLC | IL DOT | Utility Bond | | $75,000.00 | $1,875 | 12/10/2019 | 12/10/2020 | 9U-2610-17 |
| Adena Resources, LLC | IL DOT | Individual Utility Permit Bond | | $50,000.00 | $1,250 | 12/10/2019 | 12/10/2020 | 9U-1751-11 |
| Adena Resources, LLC | IL DOT | Individual Utility Permit Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | 9U-1738-11 |
| Adena Resources, LLC | IL DOT | Individual Utility Permit Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | 9U-1737-11 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $10,375,000.00 | $259,375 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $251,440.00 | $6,286 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $503,500.00 | $12,588 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $92,350.00 | $2,309 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $29,800.00 | $745 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $65,340.00 | $1,634 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $694,458.00 | $17,361 | 12/10/2019 | 12/10/2020 | 424 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $218,340.00 | $5,459 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,900.00 | $148 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR | Financial Security Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | City of Hillsboro, IL | Performance Bond | | $100,000.00 | $2,500 | 12/10/2019 | 12/10/2020 | |
| Hillsboro Energy, LLC | East Fork Township, IL | Performance Bond | | $100,000.00 | $2,500 | 12/10/2019 | 12/10/2020 | |
| Hillsboro Energy, LLC | East Fork Township, IL | Performance Bond | | $100,000.00 | $2,000 | 6/5/2019 | 6/5/2020 | |
| Hillsboro Energy, LLC | EJ Water Company, LLC | Performance Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | |

Case 20-41308    Doc 228    Filed 04/21/20    Entered 04/21/20 23:45:34    Main

| Foresight Company | Obligee | Bond Type | Grouped As: | Bond Amount | Premium | Effective Date | Expiration Date | Permit # |
|---|---|---|---|---|---|---|---|---|
| Hillsboro Energy, LLC | IL DNR | Reclamation | Reclamation | $2,617,318.00 | $65,433 | 12/10/2019 | 12/10/2020 | 424 |
| Hillsboro Energy, LLC | IL DNR | Reclamation | Reclamation | $1,723,050.00 | $43,076 | 12/10/2019 | 12/10/2020 | 399 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $57,600.00 | $1,440 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,256,500.00 | $131,413 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,932,800.00 | $148,320 | 12/10/2019 | 12/10/2020 | 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $36,310.00 | $908 | 12/10/2019 | 12/10/2020 | 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,860.00 | $597 | 12/10/2019 | 12/10/2020 | 291 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,600.00 | $215 | 12/10/2019 | 12/10/2020 | 302 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $339,910.00 | $8,498 | 12/10/2019 | 12/10/2020 | 419 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $22,580.00 | $565 | 12/10/2019 | 12/10/2020 | 291 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,680.00 | $217 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,833,850.00 | $45,846 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $356,280.00 | $8,907 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $13,900.00 | $348 | 12/10/2019 | 12/10/2020 | 56 & 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $36,100.00 | $903 | 12/10/2019 | 12/10/2020 | 291 |
| Macoupin Energy, LLC | IL DNR | Financial Security Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Surety Bond | | $55,160.00 | $1,379 | 12/10/2019 | 12/10/2020 | 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,346,260.00 | $58,657 | 12/10/2019 | 12/10/2020 | 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $68,916.00 | $1,723 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $48,600.00 | $1,215 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $50,400.00 | $1,260 | 12/10/2019 | 12/10/2020 | |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $64,080.00 | $1,602 | 12/10/2019 | 12/10/2020 | 56 |
| Savatran, LLC | Eastern Township | Performance Bond | | $160,000.00 | $4,000 | 12/10/2019 | 12/10/2020 | |
| Savatran, LLC | IL DOT | Individual Utility Permit Bond | | $50,000.00 | $1,250 | 12/10/2019 | 12/10/2020 | 6-31336 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,700.00 | $593 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $17,700.00 | $443 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,500.00 | $713 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $40,600.00 | $1,015 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,600.00 | $140 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,100.00 | $203 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,100.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $22,900.00 | $573 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,218.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,500.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $353,180.00 | $8,830 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,200.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,879.00 | $147 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $107,632.00 | $2,691 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,200.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,200.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $12,120.00 | $303 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,500.00 | $213 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $25,500.00 | $638 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $26,820.00 | $671 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $24,370.00 | $609 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $49,870.00 | $1,247 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,800.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $71,400.00 | $1,785 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $135,200.00 | $3,380 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $25,180.00 | $630 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $62,960.00 | $1,574 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $13,670.00 | $342 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,880.00 | $722 | 12/10/2019 | 12/10/2020 | 382 |

Case 20-41308 Doc 228 Filed 04/11/20 Entered 04/01/20 23:45:34 Main

| Foresight Company | Obligee | Bond Type | Grouped As: | Bond Amount | Premium | Effective Date | Expiration Date | Permit # |
|---|---|---|---|---|---|---|---|---|
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $161,900.00 | $4,048 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $6,180.00 | $155 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,960.00 | $849 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $11,700.00 | $293 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $48,200.00 | $1,205 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $15,040.00 | $376 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $78,800.00 | $1,970 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,320.00 | $183 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $29,650.00 | $741 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $139,420.00 | $3,486 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $66,100.00 | $1,653 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $377,000.00 | $9,425 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $65,600.00 | $1,640 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $70,800.00 | $1,770 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $19,700.00 | $493 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $72,620.00 | $1,816 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Division of Oil and Gas | Financial Security Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL DOT | Continuous Highway Permit Bond | | $50,000.00 | $1,250 | 12/10/2019 | 12/10/2020 | RR-D9-09-001 |
| Sugar Camp Energy, LLC | IL DOT | Continuous Highway Permit Bond | | $50,000.00 | $1,250 | 12/10/2019 | 12/10/2020 | RR-D9-09-002 |
| Sugar Camp Energy, LLC | Hamilton County Highway Department | Highway | | $100,000.00 | $2,500 | 12/10/2019 | 12/10/2020 | N/A |
| Sugar Camp Energy, LLC | People of the State of Illinois | Reclamation | Reclamation | $252,930.00 | $6,323 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $12,200.00 | $305 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $361,600.00 | $9,040 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $95,500.00 | $2,388 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,100.00 | $578 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,369.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $15,800.00 | $395 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $100,470.00 | $2,512 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $105,720.00 | $2,643 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $44,280.00 | $1,107 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $21,330.00 | $533 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,600.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $147,800.00 | $3,695 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,290.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $77,280.00 | $1,932 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DOT | Subsidence | Subsidence | $250,000.00 | $6,250 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $78,860.00 | $1,972 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $99,905.00 | $2,498 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $49,300.00 | $1,233 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $267,348.00 | $6,684 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,600.00 | $590 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $10,960.00 | $274 | 10/4/2019 | 10/04/20 | 382 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,090,379.00 | $77,259 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $4,200.00 | $125 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,908.00 | $125 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $35,449.00 | $886 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $55,387.00 | $1,385 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $287,500.00 | $7,188 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $9,900.00 | $248 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $17,754.00 | $444 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $31,384.00 | $785 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $11,548.00 | $289 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $27,595.00 | $690 | 12/10/2019 | 12/10/2020 | 375 |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main

| Foresight Company | Obligee | Bond Type | Grouped As: | Bond Amount | Premium | Effective Date | Expiration Date | Permit # |
|---|---|---|---|---|---|---|---|---|
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $46,000.00 | $1,150 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $6,128.00 | $153 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,440.00 | $186 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,807.00 | $125 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $10,080.00 | $252 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $32,760.00 | $819 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,264.00 | $707 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $25,840.00 | $646 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,300.00 | $133 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $15,960.00 | $399 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $37,537.00 | $938 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR | Financial Security Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | |
| Williamson Energy, LLC | County of Williamson, State of Illinois | Performance Bond | | $150,000.00 | $3,750 | 12/10/2019 | 12/10/2020 | |
| Williamson Energy, LLC | County of Williamson, State of Illinois | Performance Bond | | $1,050,000.00 | $26,250 | 12/10/2019 | 12/10/2020 | |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $87,200.00 | $2,180 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $11,000.00 | $275 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,100.00 | $203 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $79,430.00 | $1,986 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $26,500.00 | $663 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $258,830.00 | $6,471 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,100.00 | $125 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $21,200.00 | $530 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $29,630.00 | $741 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $19,316.00 | $483 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $253,500.00 | $6,338 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,876.00 | $222 | 12/10/2019 | 12/10/2020 | 375 |
| M Class Mining Health Protecti | Jeffrey Watkins and Katelyn Watkins | Appeal Bond | Other | $1,310,958.00 | $32,774 | 12/10/2019 | 12/10/2020 | |
| M Class Mining Health Protecti | Jeffrey Watkins and Katelyn Watkins | Appeal Bond | Other | $1,310,958.00 | $32,774 | 8/10/2019 | 8/10/2020 | |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $13,300.00 | $333 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $79,540.00 | $1,989 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $488,440.00 | $12,211 | 12/4/2019 | 12/4/2020 | 456 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $29,910.00 | $748 | 12/4/2019 | 12/4/2020 | 382 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | $99,729,644 | $2,488,963 | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main

**Schedule 7.05**

**Specified Dispositions**

None.

**Schedule 7.08**

**Transactions With Affiliates**

1. Coal Mining Lease and Sublease (Unassigned Reserves) dated August 12, 2010 by and between Colt LLC as lessor and Macoupin Energy LLC as lessee, as amended.

2. Coal Mining Lease and Sublease (Macoupin North Mine Assignment) dated August 12, 2010 by and between Colt LLC as lessor and Macoupin Energy LLC as lessee, as amended.

3. Coal Mining Lease and Sublease dated August 12, 2010 by and between Colt LLC as lessor and Williamson Energy, LLC as lessee, as amended.

4. Coal Mining Lease (New Memphis/Monterey 2 Reserves) between Colt LLC and Macoupin Energy LLC dated June 1, 2012, as amended.

5. Coal Mining Lease dated August 12, 2010 by and between Ruger Coal Company LLC as lessor and Sugar Camp Energy, LLC as lessee.

6. Contract Mining and Overriding Royalty Agreement dated August 12, 2010 by and between Ruger Coal Company LLC and Sugar Camp Energy, LLC, as amended.

7. Coal Mining Lease (For "Reserve 2") dated August 12, 2010 by and between Colt LLC as lessor and Hillsboro Energy LLC as lessee, as amended.

8. Coal Mining Lease (For "Reserve 1" and "Reserve 3") dated August 12, 2010 by and between Colt LLC as lessor and Hillsboro Energy LLC as lessee, as amended.

9. Amended and Restated Coal Mining Lease Agreement dated August 14, 2006 between WPP LLC, Lessor and Williamson Energy, LLC, Lessee, as amended.

10. Partial Release of Premises from Coal Mining Lease and Sublease dated March 20, 2013 between Williamson Energy, LLC and Colt LLC.

11. Coal Mining Lease Agreement between Independence Land Company, LLC and Williamson Energy, LLC (5000-Foot Extension) dated March 13, 2006, as amended.

12. First Amended and Restated Lease (Rail Load Out Lease) dated October 15, 2006 between Williamson Development Company LLC, Lessor and Williamson Transport LLC, Lessee.

13. First Amended and Restated Lease (Coal Prep Plant) dated October 15, 2006 between Williamson Energy, LLC and Williamson Development Company LLC.

14. Amended and Restated Surface Sublease and Operation Agreement dated October 15, 2006 between Williamson Energy, LLC and Williamson Transport, LLC.

15. Amended and Restated Surface Sublease and Operation Agreement dated October 15, 2006 between Williamson Energy, LLC and Williamson Track LLC.

16. Overriding Royalty Agreement (except 5000-Foot Extension) between Independence Land Co. and Williamson Energy, LLC dated March 13, 2006, as amended.

17. Coal Mining Lease and Sublease Agreement dated January 27, 2009 between WPP, LLC, Lessor and Macoupin Energy LLC, Lessee.

18. Lease Agreement dated January 27, 2009 between HOD, LLC, Lessor and Macoupin Energy LLC (Macoupin Rail Loop Lease), as amended.

19. Lease Agreement dated January 27, 2009 between HOD, LLC, Lessor and Macoupin Energy LLC, Lessee (Macoupin Rail Loadout), as amended.

20. Coal Mining Lease and Sublease Agreement dated September 10, 2009 between WPP LLC, Lessor and Hillsboro Energy LLC, Lessee, as amended.

21. Assignment of Service Agreement by and among Foresight Reserves, LP, Foresight Energy LLC and FRLP No. 2 LLC dated January 14, 2013.

22. Mitigation Agreement between Hillsboro Energy LLC and New River Royalty, LLC dated August 12, 2010.

23. Mitigation Agreement between New River Royalty, LLC and Sugar Camp Energy, LLC dated August 12, 2010.

24. Mitigation Agreement between Williamson Energy, LLC and New River Royalty, LLC dated August 12, 2010.

25. Surface Lease and Operation Agreement between Oeneus LLC d/b/a Savatran LLC and Sitran LLC dated January 1, 2011.

26. Lease Agreement between HOD LLC and Sugar Camp Energy, LLC dated March 6, 2012, as amended.

27. Surface Sublease between HOD LLC and Sugar Camp Energy, LLC dated March 6, 2012.

28. Overriding Royalty Agreement between Sugar Camp Energy, LLC and Ruger Coal Company, LLC (TVA Franklin County) dated August 12, 2010.

29. Overriding Royalty Agreement between Sugar Camp Energy, LLC and Ruger Coal Company, LLC (TVA Illinois) dated August 12, 2010.

30. Development Agreement between Hillsboro Energy LLC and Colt LLC dated as of August 23, 2013.

31. Development Agreement between Macoupin Energy LLC and Colt LLC dated as of August 23, 2013.

32. Development Agreement between Sugar Camp Energy, LLC and Ruger Coal Company, LLC dated as of August 23, 2013.

33. Lease Agreement between American Century Transport LLC and American Energy Corporation dated as of April 16, 2015.

34. Overriding Royalty Agreement among American Century Minerals LLC, American Energy Corporation and Consolidated Land Company dated as of April 16, 2015.

**Schedule 7.12**

**<u>Burdensome Agreements</u>**

Agreements relating to items disclosed on Schedules 7.01 and 7.03.

**Schedule 10.02**

**Administrative Agent's Office; Certain Addresses for Notices**

| Party: | Address: | Payment Instructions (if applicable) |
|---|---|---|
| Borrower | Foresight Energy LLC<br>211 North Broadway, Suite 2600<br>St. Louis, Missouri 63102<br>Attention:  Cody E. Nett<br>Telephone:  (314) 932-6103<br>codynett@coalsource.com | N/A |

Borrower's website:   www.foresight.com

| Party: | Address: | Payment Instructions (if applicable) |
|---|---|---|
| Administrative Agent and Collateral Agent | Cortland Capital Market Services LLC<br>225 W Washington Street, 9th Floor<br>Chicago, IL  60606<br>Attn:  Legal Department & CPC Agency<br>E-mail:  legal@cortlandglobal.com;<br>cpcagency@cortlandglobal.com<br>Telephone:  312-564-5100<br>Telecopier:  312-376-0751 | N/A |

EXECUTION VERSION

*EXHIBIT A*

## FORM OF BORROWING NOTICE

Date:      ,

To:      Cortland Capital Market Services LLC, as Administrative Agent

Ladies and Gentlemen:

        Reference is made to that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent

        The Borrower hereby requests (select one):

☐ A Borrowing of [Initial Term Loan][Delayed Draw Term Loan].

☐ Initial election of Type of Loan with respect to Roll-Up Loans.

☐ A continuation of Eurocurrency Rate Loans.

☐ A conversion of [Term Loans] [Roll-Up Loans].

1.      On                  (a Business Day).

2.      In the principal amount of        .[1]

3.      Comprised of                .
          [Type of Loan requested[2]]

4.      For Eurocurrency Rate Loans: with an Interest Period of      one (1) month

5.      Wire instructions for the account into which funds are to be disbursed (if applicable):

      [      ]

      [The representations and warranties of the Borrower and each Guarantor herein and in the other Loan Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding of the applicable Loans to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case, such representations and warranties shall have been true and correct in all materials respects on and as of such earlier date; provided that in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified

---

    [1]       Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof.  Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $250,000 in excess thereof.

    [2]       "Eurocurrency Rate Loan" or "Base Rate Loan."

by materiality in the text thereof. No Default or Event of Default exists, or would result immediately, from the proposed Borrowing or the application of proceeds thereof.][3]

**[*Signature page to follow*]**

---

[3]    Each Request for Borrowing (other than a Borrowing Notice requesting only a conversion of Loans to the other Type or a continuation of Eurocurrency Rate Loans) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) of the Credit Agreement have been satisfied on and as of the date of the applicable Borrowing.

A - 2

FORESIGHT ENERGY LLC

By: _____
Name: _____
Title: _____

*EXHIBIT B*

**COLLATERAL QUESTIONNAIRE**

[See attached]

**EXECUTION VERSION**

# <u>COLLATERAL QUESTIONNAIRE</u>

Dated: March 11, 2020

Reference is made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of the date hereof (the "<u>Credit Agreement</u>"), among Foresight Energy LLC, a Delaware limited liability company (the "<u>Company</u>"), Foresight Energy GP LLC, a Delaware limited liability company ("<u>General Partner</u>"), Foresight Energy LP, a Delaware limited partnership ("<u>Holdings</u>"), each subsidiary guarantor party thereto (collectively, the "<u>Guarantors</u>" and, together with the Company, the "<u>Grantors</u>"), each lender party thereto (collectively, the "<u>Lenders</u>" and, individually, a "<u>Lender</u>"), and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.  Capitalized terms used but not defined herein shall have the meanings set forth in the Credit Agreement.

Unless otherwise defined in this Certificate or in the Credit Agreement, terms defined in Article 8 or 9 of the Uniform Commercial Code as in effect in the State of New York are used in this Certificate as such terms are defined in such Article 8 or 9.

Each Grantor hereby certifies as follows as of the date hereof:

1.     <u>Investment Property</u>.  Set forth on <u>Schedule I</u> hereto is a true and correct list of all shares of stock and other Pledged Equity Interests owned by such Grantor, all Pledged Debt owed to such Grantor and all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements and commodity contracts having a value in excess of $100,000 that are not held in securities accounts or commodity accounts, (C) securities accounts having a value in excess of $100,000 and (D) commodity accounts having a value in excess of $100,000 of such Grantor), setting forth (i) in <u>Part I</u> of <u>Schedule I</u> all shares of stock or other Pledged Equity Interests owned by such Grantor, the issuer thereof, class of equity interest and percentage of the issued and outstanding Pledged Equity Interests of the issuers thereof, (ii) in <u>Part II</u> of <u>Schedule I</u> all such indebtedness having a value in excess of (x) $500,000 individually and (y) $5,000,000 in the aggregate owed to such Grantor, the issuer thereof, description thereof, debt certificate number(s), final maturity and outstanding principal amount of such indebtedness, (iii) in <u>Part III</u> of <u>Schedule I,</u> all other investment property having a value in excess of (x) $500,000 individually and (y) $5,000,000 in the aggregate owned by such Grantor, the issuer thereof, name of investment, certificate number(s), amount and other identification of such investment property and (iv) in <u>Part IV</u> of <u>Schedule I,</u> a true and correct list of all securities accounts and commodities accounts, in each case, having a value in excess of $100,000 (consistent with clauses (C) and (D) above).

2.     <u>Deposit Accounts</u>.  Set forth on <u>Schedule II</u> hereto is a true and correct list of all deposit accounts of such Grantor existing on the date hereof setting forth for each such deposit account the type of account, name and address of the depositary bank and the account number.

3.     <u>Intellectual Property</u>.  Set forth on <u>Schedule III</u> hereto is a true and correct list of:

(i)     all registered patents and patent applications of such Grantor;

(ii)     all registered trademarks and trademark applications of such Grantor;

(iii)     all registered copyrights and copyright applications of such Grantor; and

(iv)     all material agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any intellectual property to which such Grantor is a party or a beneficiary.

4.     <u>Commercial Tort Claims</u>.  Set forth on <u>Schedule IV</u> hereto is a true and correct description of all commercial tort claims with a value in excess of $1,000,000 of such Grantor.

5.     <u>Identity, Etc. of Grantors</u>.  Set forth on <u>Schedule V</u> hereto is a true and correct list showing such Grantor's exact legal name (as it appears in its certificate or articles of incorporation, limited liability membership agreement or similar organizational document, in each case as amended to the date hereof), location, address of chief executive office (and, if different, principal place of business), type of organization, jurisdiction of organization and organizational I.D. number (including taxpayer identification number).

6.     <u>Changes in Name, Location Etc</u>.  Set forth on <u>Schedule VI</u> hereto is a true and correct description of any changes in the name of such Grantor, changes in location or jurisdiction, changes in corporate structure (including by way of merger or consolidation) or in any other information as to such Grantor reflected on <u>Schedule VI</u> hereto during the five years preceding the date hereof.

7.     <u>Location of Equipment and Inventory</u>.  Set forth on <u>Schedule VII</u> hereto is a true and correct list of the locations of such Grantor's equipment and inventory with a value in excess of $1,000,000 individually and $3,000,000 in the aggregate, other than such Grantor's equipment or inventory that may be in transit, with a third party in connection with preparation for shipment or for rehabilitation or refurbishment.

8.     <u>Letters of Credit</u>.  Set forth on <u>Schedule VIII</u> hereto is a true and correct list of all letters of credit with a value in excess of $1,000,000 individually and $3,000,000 in the aggregate of which such Grantor is a beneficiary or assignee, showing for each such letter of credit the issuer thereof, nominated person (if any), account party, number, maximum available amount and date.

9.     <u>Warehousemen and Bailees</u>.  Set forth on <u>Schedule IX</u> hereto is a true and correct list of all warehousemen and bailees that have possession of any assets with a fair market value in excess of $1,000,000 individually and $3,000,000 in the aggregate of such Grantor, showing as to each warehouseman and bailee the assets so held, fair market value and address.

10.     <u>Location of Books and Records</u>.  Set forth on <u>Schedule X</u> hereto is a list of all locations where the Grantors maintain any books or records relating to Accounts Receivable (with each location at which chattel paper, if any, is kept being indicated by an "*").

11.     <u>Real Property</u>.  Set forth on <u>Schedule XI</u> hereto is a true and correct list of all interests in material owned real property of such Grantor or any of its subsidiaries, showing as to each such real property the record owner, record information, acquisition date, brief legal description of the property and mortgagee (if any) and lessee (if any).

12.     <u>Leaseholds</u>.  Set forth on <u>Schedule XII</u> hereto is a true and correct list of all interests in material leased real property of such Grantor as lessee, showing as to each such leasehold a description of the lease and premises, date of and parties to the lease, record information and mortgage (if any).

13.     <u>Mining Facilities; Mining Leases</u>.  Set forth on <u>Schedule XIII-A</u> hereto is a true and correct list of (a) the locations of such Grantor's Mining Facilities owned, leased or operated by such Grantor and (b) all material related or ancillary properties that are required for the business and operations of such Grantor, including a brief legal description of the lease, record information and mortgage (if any).  <u>Schedule XIII-B</u> hereto sets forth a true and correct list of all Mining Leases to which Grantor is a party.

14.     <u>Schedule of Filings</u>.  Attached as <u>Schedule XIV</u> hereto is a true and correct list of each Uniform Commercial Code filing office in the jurisdiction in which each Grantor is located and, to the extent any of the collateral located at Material Owned Real Property, Material Leased Real Property or Mining Facility is comprised of fixtures, timber to be cut or as extracted collateral from the wellhead or minehead, the appropriate local jurisdiction in which financing statements with respect to such collateral comprised of fixtures, timber to cut or as extracted collateral that is not covered by the applicable mortgage that serves as a fixture filing should be filed.

15.     <u>Railcars</u>.  Set forth on <u>Schedule XV</u> hereto is a true and correct list of all railcars owned by such Grantor and registered or to be registered with any Governmental Authority, showing as to each such item a description thereof, fair market value and mortgagee (if any) and mortgage description (if any) (including mortgage amount) thereof.

16.     <u>Unusual Transactions</u>.  Except as set forth on Schedule XVI, no unusual transactions have occurred in the past five years, all Accounts have been originated by such Grantor and all Inventory or Equipment has been acquired by Grantor in the ordinary course of business.

3

IN WITNESS WHEREOF, the undersigned have caused this Collateral Questionnaire to be executed by their officers thereunto duly authorized.

FORESIGHT ENERGY LLC
FORESIGHT ENERGY FINANCE CORPORATION
FORESIGHT ENERGY GP LLC
ADENA RESOURCES, LLC
AKIN ENERGY LLC
AMERICAN CENTURY MINERAL LLC
AMERICAN CENTURY TRANSPORT LLC COAL
FIELD CONSTRUCTION COMP ANY LLC COAL
FIELD REPAIR SERVICES LLC FORESIGHT
COAL SALES LLC
FORESIGHT ENERGY EMPLOYEE SERVICES
CORPORATION
FORESIGHT ENERGY LABOR LLC FORESIGHT
ENERGY SERVICES LLC FORESIGHT
RECEIVABLES LLC HILLSBORO ENERGY LLC
HILLSBORO TRANSPORT LLC
LD LABOR COMPANY LLC
LOGAN MINING LLC
M-CLASS MINING, LLC
MACH MINING, LLC
MACOUPIN ENERGY LLC
MARY AN MINING LLC
OENEUS LLC d/b/a SAVA TRAN LLC PATTON
MINING LLC
SENECA REBUILD LLC
SITRAN LLC
SUGAR CAMP ENERGY, LLC
TANNER ENERGY LLC
VIKING MINING LLC
WILLIAMSON ENERGY, LLC

By: _____

Name: Robert D. Moore
Title: President and Chief Executive Officer

[Signature Page to Collateral Questionnaire]

Schedule I to
Collateral Questionnaire

## INVESTMENT PROPERTY

### Part I

### Initial Pledged Equity Interests

| Grantor | Issuer | Juris. of Org/ Formation | Address of Chief Executive Office | Taxpayer ID Number | Type of Org.[1] | % of Interest |
|---|---|---|---|---|---|---|
| Foresight Energy LLC | Adena Resources, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5004649 | Limited Liability Company | 100 |
| Foresight Energy LLC | Akin Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5231648 | Limited Liability Company | 100 |
| Foresight Energy LLC | American Century Mineral LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | N/A | Limited Liability Company | 100 |
| Foresight Energy LLC | American Century Transport LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | N/A | Limited Liability Company | 100 |
| Foresight Energy LLC | Foresight Coal Sales LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-3318620 | Limited Liability Company | 100 |
| Foresight Energy LLC | Foresight Energy Employee Services Corporation | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3957023 | Corporation | 100 |
| Foresight Energy LLC | Foresight Energy Finance Corporation | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 27-3135321 | Corporation | 100 |
| Foresight Energy LP | Foresight Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5917685 | Limited Liability Company | 100 |

---

[1] Indicate each limited liability company or limited partnership that has opted into Article 8 of the UCC with an asterisk ("*")

| Grantor | Issuer | Juris. of Org/ Formation | Address of Chief Executive Office | Taxpayer ID Number | Type of Org.[1] | % of Interest |
|---|---|---|---|---|---|---|
| Foresight Energy LLC | Foresight Energy Labor LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 32-0504176 | Limited Liability Company | 99.99 |
| Foresight Energy Employee Services Corporation | | | | | | 0.01 |
| Foresight Energy LLC | Foresight Energy Services LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 90-0776204 | Limited Liability Company | 99.99 |
| Foresight Energy Employee Services Corporation | | | | | | 0.01 |
| Foresight Energy LLC | Hillsboro Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5231639 | Limited Liability Company | 100 |
| Foresight Energy LLC | Hillsboro Transport LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3916881 | Limited Liability Company | 100 |
| Foresight Energy LLC | Macoupin Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-2809005 | Limited Liability Company | 100 |
| Foresight Energy LLC | Oeneus LLC d/b/a Savatran LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 30-0306007 | Limited Liability Company | 100 |
| Foresight Energy LLC | Seneca Rebuild LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-3150958 | Limited Liability Company | 100 |
| Foresight Energy LLC | Sitran LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-1369962 | Limited Liability Company | 100 |
| Foresight Energy LLC | Sugar Camp Energy, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 41-2178049 | Limited Liability Company | 100 |
| Foresight Energy LLC | Tanner Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3940409 | Limited Liability Company | 100 |
| Foresight Energy LLC | Williamson Energy, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 81-0669143 | Limited Liability Company | 100 |

| Grantor | Issuer | Juris. of Org/ Formation | Address of Chief Executive Office | Taxpayer ID Number | Type of Org.[1] | % of Interest |
|---|---|---|---|---|---|---|
| Foresight Energy LLC | Foresight Receivables LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3952250 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Coal Field Construction Company LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-3795694 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Coal Field Repair Services LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-2249179 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | LD Labor Company LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 45-3848454 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Logan Mining LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 47-1762361 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | M-Class Mining, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-0645272 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Mach Mining, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 73-1734826 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | MaRyan Mining LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-4027085 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Patton Mining LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-4027251 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Viking Mining LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-1264981 | Limited Liability Company | 100 |

## Part II

### Initial Pledged Debt

None.

## Part III

### Other Investment Property

None.

**Part IV**

**SECURITY ACCOUNTS AND COMMODITY ACCOUNTS**

**Security Accounts:**
None.

**Commodity Accounts:**
None.

**Schedule II to**
**Collateral Questionnaire**

## DEPOSIT ACCOUNTS

| No. | Entity | Bank Name | Account Type | Account No. (Ending) |
|---|---|---|---|---|
| 1. | Foresight Energy LLC | The Huntington National Bank | Concentration | 9601 |
| 2. | Foresight Receivables LLC | The Huntington National Bank | Receipts | 6973 |
| 3. | Foresight Energy LLC | The Huntington National Bank | Receipts | 6694 |
| 4. | Foresight Energy LLC | The Huntington National Bank | Disbursements – Accounts Payable | 6681 |
| 5. | Foresight Energy LLC | The Huntington National Bank | Disbursements – Payroll | 8214 |
| 6. | Foresight Energy Services LLC | The Huntington National Bank | Disbursements – Payroll | 6539 |
| 7. | MaRyan Mining LLC | CNB Bank & Trust, N.A. | Petty Cash | 4605 |
| 8. | Mach Mining LLC | First Southern Bank | Petty Cash | 4129 |
| 9. | Hillsboro Energy LLC | The Huntington National Bank | Operating | 5031 |
| 10. | Patton Mining LLC | CNB Bank & Trust, N.A. | Petty Cash | 6394 |
| 11. | Foresight Energy LP | F.N.B. Wealth Management | Collateral | 7011 |

**Schedule III to
Collateral Questionnaire**

## INTELLECTUAL PROPERTY

### I. Patents

None.

### II. Domain Names and Trademarks

None.

### III. Trade Names

None.

### IV. Copyrights

None.

### V. IP Agreements

None.

**Schedule IV to**
**Collateral Questionnaire**

## COMMERCIAL TORT CLAIMS

None.

Schedule V to
Collateral Questionnaire

## LOCATION, CHIEF EXECUTIVE OFFICE, TYPE OF ORGANIZATION, JURISDICATION OF ORGANIZATION AND ORGANIZATIONAL IDENTIFICATION NUMBER[2]

| Grantor | Jurisdiction of Organization | Type of Organization | Organizational I.D. | Chief Executive Office |
|---|---|---|---|---|
| Foresight Energy LLC | Delaware | Limited Liability Company | 4214815 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy GP LLC | Delaware | Limited Liability Company | 5100772 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Adena Resources, LLC | Delaware | Limited Liability Company | 4113123 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Akin Energy LLC | Delaware | Limited Liability Company | 4191654 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| American Century Mineral LLC | Delaware | Limited Liability Company | 5725788 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| American Century Transport LLC | Delaware | Limited Liability Company | 5725786 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Coal Field Construction Company LLC | Delaware | Limited Liability Company | 4628487 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Coal Field Repair Services LLC | Delaware | Limited Liability Company | 5299754 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Coal Sales LLC | Delaware | Limited Liability Company | 4591069 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy Employee Services Corporation | Delaware | Corporation | 5528848 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |

---

[2]    The taxpayer identification number of (i) Foresight Energy LLC is 20-5917685 (ii) Foresight Energy GP LLC is 90-0788332, and (ii) each other Grantor, if any, is set forth on Schedule I.

| Grantor | Jurisdiction of Organization | Type of Organization | Organizational I.D. | Chief Executive Office |
|---|---|---|---|---|
| Foresight Energy Finance Corporation | Delaware | Corporation | 4853884 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy Labor LLC | Delaware | Limited Liability Company | 5810632 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy LP | Delaware | Limited Partnership | 5100773 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy Services LLC | Delaware | Limited Liability Company | 5065292 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Receivables LLC | Delaware | Limited Liability Company | 5665546 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Hillsboro Energy LLC | Delaware | Limited Liability Company | 4191652 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Hillsboro Transport LLC | Delaware | Limited Liability Company | 5373240 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| LD Labor Company LLC | Delaware | Limited Liability Company | 5068132 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Logan Mining LLC | Delaware | Limited Liability Company | 5582699 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| M-Class Mining, LLC | Delaware | Limited Liability Company | 4388185 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Mach Mining, LLC | Delaware | Limited Liability Company | 3960666 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Macoupin Energy LLC | Delaware | Limited Liability Company | 4562185 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| MaRyan Mining LLC | Delaware | Limited Liability Company | 4642527 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |

| Grantor | Jurisdiction of Organization | Type of Organization | Organizational I.D. | Chief Executive Office |
|---------|------------------------------|----------------------|---------------------|------------------------|
| Oeneus LLC d/b/a Savatran LLC | Delaware | Limited Liability Company | 3943786 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Patton Mining LLC | Delaware | Limited Liability Company | 4643432 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Seneca Rebuild LLC | Delaware | Limited Liability Company | 5354365 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Sitran LLC | Delaware | Limited Liability Company | 4450382 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Sugar Camp Energy, LLC | Delaware | Limited Liability Company | 3982892 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Tanner Energy LLC | Delaware | Limited Liability Company | 5582701 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Viking Mining LLC | Delaware | Limited Liability Company | 5153856 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Williamson Energy, LLC | Delaware | Limited Liability Company | 3953041 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |

**Schedule VI to
Collateral Questionnaire**

**CHANGES IN NAME, LOCATION, ETC.**

| Grantor | Nature of Change | Issue Date |
|---------|-----------------|------------|
| Akin Energy LLC | Akin Energy LLC merged with and into FRLP 2008 No. 1 LLC and Locust Grove Energy LLC, each a Delaware limited liability company, with Akin Energy LLC as the surviving company | February 8, 2013 |
| Foresight Energy Services LLC | Foresight Energy Supply LLC merged with and into Foresight Energy Services LLC with Foresight Energy Services LLC as the surviving company | December 31, 2013 |
| Patton Mining LLC | Principal place of business changed from Beckley, West Virginia to St. Louis, Missouri | August 1, 2016 |
| Foresight Receivables LLC | Corporation Structure. Per terms of the LLC Agreement, which required one Independent Director until the Final Payment under the Financing Agreement was made.<br><br>Mr. Burns resigned September 27, 2019. | December 2017 / September 27, 2019 |
| Viking Mining LLC | • Viking Coal Mining LLC changed its name to Drott Mining Company LLC<br>• Drott Mining Company LLC changed its name to Viking Coal Mining LLC<br>• Viking Coal Mining LLC changed its name to Viking Mining LLC<br>• Principal place of business changed from Beckley, West Virginia to St. Louis, Missouri | • November 13, 2012<br><br>• February 14, 2013<br><br>• May 8, 2013<br><br>• August 1, 2016 |

**Schedule VII to
Collateral Questionnaire**

## LOCATION OF EQUIPMENT AND COLLATERAL

| Name of Grantor | Location of Inventory, Equipment, Other Collateral |
|---|---|
| Adena Resources, LLC | 211 North Broadway, Suite 2600<br>St. Louis, MO 63102 |
| Akin Energy LLC | 211 North Broadway, Suite 2600<br>St. Louis, MO 63102 |
| Coal Field Construction Company LLC | 11351 N. Thompsonville Road<br>Macedonia, IL 62860 |
| Foresight Energy Services LLC | 211 North Broadway, Suite 2600<br>St. Louis, MO 63102 |
| Hillsboro Energy LLC | 12051 County Road 900 N.<br>Hillsboro, IL 62049<br><br>Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 |
| Hillsboro Transport LLC | 12051 County Road 900 N.<br>Hillsboro, IL 62049 |
| Macoupin Energy LLC | 14300 Brushy Mound Road<br>Carlinville, IL 62626<br><br>Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 |
| Oeneus LLC d/b/a Savatran LLC | 211 North Broadway, Suite 2600<br>St. Louis, MO 63102 |
| Seneca Rebuild LLC | 11550 N. Thompsonville Road<br>Macedonia, IL 62860 |
| Sitran LLC | 10016 Darnell School Rd<br>Mount Vernon, IN 47620 |
| Sugar Camp Energy, LLC | 11351 N. Thompsonville Road<br>Macedonia, IL 62860<br><br>13643 N. Thompsonville Road<br>Macedonia, IL 62860<br><br>Sitran LLC<br>10016 Darnell School Rd |

| Name of Grantor | Location of Inventory, Equipment, Other Collateral |
| --- | --- |
| | Mount Vernon, IN 47620 |
| Williamson Energy, LLC | 16468 Liberty School Road<br>Marion, IL 62959<br><br>Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620<br><br>Convent Marine Terminal<br>7790 LA Highway 44<br>Convent, Louisiana 70723 |

**Schedule VIII to
Collateral Questionnaire**

### LETTERS OF CREDIT

| Beneficiary | LC Number | Amount | Purpose | Location | Issue Date | Original Expiry Date | Renewals | Notification |
|---|---|---|---|---|---|---|---|---|
| Rockwood Casualty | OSB.009726 | $ 4,500,000.00 | Workers Compensation | Credit Facility | 4/18/2017 | 6/30/2018 | Automatic successive one year periods | 60 days |
| Argonaut Insurance Co. | OSB.009853 | $ 4,500,000.00 | Surety Bonds | Credit Facility | 7/28/2017 | 7/31/2018 | Automatic successive one year periods | 60 days |
| Argonaut Insurance Co. | OSB.010277 | $ 1,310,958.39 | Appeal Bond | Credit Facility | 8/10/2018 | 8/10/2019 | Automatic successive one year periods | 60 days |
| Canadian National Railway | OSB.010199-1 | $ 2,000,000.00 | Transportation | Credit Facility | 5/29/2018 | 6/1/2019 | Amendment needed to extend | 15 days |
| | Total | $ 12,310,958.39 | | | | | | |

**Schedule IX to**
**Collateral Questionnaire**

## WAREHOUSEMEN AND BAILEES

| **Grantor** | **Warehouseman/Bailee and Location** | **Assets and Value (as of1/31/2020)** |
|---|---|---|
| Hillsboro Energy LLC | Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 | Clean Coal $106,655 |
| Macoupin Energy LLC | Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 | Clean Coal $1,621,205 |
| Sugar Camp Energy, LLC | Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 | Clean Coal $26,372,171 |

**Schedule X to
Collateral Questionnaire**

## LOCATION OF BOOKS AND RECORDS

## RELATING TO ACCOUNTS RECEIVABLE

| Name of Grantor | Location of Books and Records Relating to Accounts Receivable |
|---|---|
| All Grantors | 211 North Broadway, Suite 2600<br>St. Louis, Missouri 63102 |

**Schedule XI and XII to**
**Collateral Questionnaire**

DEBTOR/GRANTOR:

MACOUPIN ENERGY LLC
14300 Brushy Mound Road
Carlinville, Illinois  62626

**Macoupin County, Illinois**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin South Mine Assignment | Not Recorded | Leased | Yes |
| Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | MA 503863 | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | Not Recorded | Leased | Yes |
| First Amendment to Coal Mining Lease | 2/13/2013 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | Not Recorded | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | East Hornsby Mine Assignment | Not Recorded | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/22/2009 | ExxonMobil Coal USA, Inc. to Macoupin Energy LLC | Various tracts of surface and coal reserves. The coal reserves were sold to WPP or Colt and leased back. The surface not required for operations has been conveyed to New River Royalty LLC | MA-0019 493145 | Owned | Yes |
| Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | Not Recorded | Leased | Yes |
| Short Form or Memorandum of Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | MA 506329 | Leased | Yes |
| Amendment to Lease Agreement | 12/29/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | Not Recorded | Leased | Yes |
| Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | Not Recorded | Leased | Yes |
| Short Form or Memorandum of Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | MA 506330 | Leased | Yes |
| Amendment to Lease Agreement | 12/29/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | Not Recorded | Leased | Yes |
| Option and Lease Agreement | 2/28/1967 | Jet Oil Company and Macoupin Energy LLC | Coal Reserves | Volume 628, Page 456 | Leased | Yes |
| Assignment of Leases | 1/27/2009 | Macoupin Energy LLC, as assignor, and WPP LLC, as assignee | Coal Reserves | Not Recorded | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease Agreement | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | Not Recorded | Leased | Yes |
| Short Form or Memorandum of Coal Mining Lease and Sublease Agreement | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | MA 506328 | Leased | Yes |
| First Amendment to Coal Mining Lease and Sublease Agreement | 11/03/2010 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | Not Recorded | Leased | Yes |
| Second Amendment to Coal Mining Lease and Sublease Agreement | 03/28/2010 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | Not Recorded | Leased | Yes |
| Assignment of Leases | 1/22/2009 | ExxonMobil Coal USA, Inc. and Macoupin Energy LLC | Monterey Coal Company No. 1 Mine | MA 487734 | Leased | Yes |

## Clinton County, Illinois

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 6/1/2012 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | Not Recorded | Leased | Yes |
| Short Form or Memorandum of Coal Mining Lease | 6/1/2012 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | CC 2012R04931 | Leased | Yes |
| First Amendment to Coal Mining Lease | 2/13/2013 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | Not Recorded | Leased | Yes |

DEBTOR/GRANTOR:

WILLIAMSON ENERGY, LLC
16468 Liberty School Road
Marion, IL  62959
**Williamson County, Illinois**
**Franklin County, Illinois (Coal Reserves only)**

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Coal Mining Lease Agreement | 8/14/2006 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| | | | | | | |
| Short Form of Amended and Restated Coal Mining Lease Agreement | 8/14/2006 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 301-480 FC #2006-6571 | Leased | Yes |
| First Amendment to Amended and Restated Coal Mining Lease Agreement | 5/19/2008 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Amendment to Amended and Restated Coal Mining Lease Agreement | 12/18/2009 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Third Amendment to Amended and Restated Coal Mining Lease Agreement | 08/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Short Form of First, Second and Third Amendment to Amended and Restated Coal Mining Lease Agreement | 08/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 327-780 2010-6467 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Short Form of Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 331-312 | Leased | Yes |
| Fifth Amendment to Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Short Form of Fifth Amendment to Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 341-659 | Leased | Yes |
| First Amendment to Amended and Coal Mining Lease Agreement | 5/19/2008 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
|  |  |  |  |  |  |  |
| Amendment to Amended and Restated Coal Mining Lease Agreement | 12/18/2009 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | Not recorded | Leased | Yes |
|  |  |  |  |  |  |  |
| Third Amendment to Amended and Restated Coal Mining Lease Agreement | 8/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
|  |  |  |  |  |  |  |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form or Memorandum of First Amendment, Second Amendment and Third Amendment to Amended and Restated Coal Mining Lease Agreement | 8/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 327-780 FC #2010-5467 | Leased | Yes |
| | | | | | | |
| Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | Not recorded | Leased | Yes |
| | | | | | | |
| Short Form or Memorandum of Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | WC Misc 331-312 | Leased | Yes |
| | | | | | | |
| Partial Release of Leased Premises from Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2011-3006 | Leased | Yes |
| Partial Release of Leased Premises from Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 9/1/2011) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2013-1637 | Leased | Yes |
| Corrective Partial Release of Leased Premises from Amended and Restated | 4/5/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2013-2765 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease Agreement | | | | | | |
| | | | | | | |
| Short Form of Lease and Sublease | 5/1/2005 | Williamson Development Company LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | WC Misc 291-461 | Leased | Yes |
| | | | | | | |
| Coal Mining Lease Agreement | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Not recorded | Leased | Yes |
| Short Form of Lease | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Misc 301Page 479 | Leased | Yes |
| | | | | | | |
| Lease (Coal Prep Plant) | 5/1/2005 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | WC Misc 291-463 | Leased | Yes |
| First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Not recorded | Leased | Yes |
| Short Form of First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Misc 313 Page 620 | Leased | Yes |
| | | | | | | |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC to Williamson Energy, LLC | Coal Reserves in Williamson, Franklin, and Saline Counties, IL | WC 325-897 | Leased | Yes |
| | | | | | | |
| Short Form or Memorandum of Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC to Williamson Energy, LLC | Coal Reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 325-897 FC #2010-3874 SC 1981-610 | Leased | Yes |
| | | | | | | |
| Partial Release of Premises from Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Releases certain coal reserves in Williamson County, IL | WC Misc 331-310 | Leased | Yes |
| | | | | | | |
| First Amendment to Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | Not recorded | Leased | Yes |
| | | | | | | |
| Short Form or Memorandum after First Amendment to Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 331-311 FC #2011-3008 SC 2003-978 | Leased | Yes |
| Partial Release of Premises from Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 341-658 | Leased | Yes |
| Second Amendment to Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | Not recorded | Leased | Yes |
| Short Form or Memorandum after Second Amendment to | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | FC 2013-1639 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease | | | | | | |
| Lease | 5/1/2005 | Williamson Development Company, LLC (fka Steelhead Development Company LLC) and Williamson Energy, LLC | Pond Creek Rail Load Out | WC Misc 291-462 | Leased | Yes |
| | | | | | | |
| First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Not recorded | Leased | Yes |
| Short Form of First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Misc 313 Page 619 | Leased | Yes |
| | | | | | | |
| Deed | 8/12/2010 | Williamson Development Company, LLC and Williamson Energy, LLC | Surface required for Williamson Energy, LLC Operations[3] | WC 486-333 | Owned | Yes |
| | | | | | | |

---

[3]     This excludes the real property released pursuant to that certain Fifth Amendment and Partial Release of Fee and Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of September 26, 2016, by and between Williamson Energy, LLC, as Mortgagor, and Citibank, N.A., in its capacity as Agent, consisting of approximately 28.55 acres of surface land.

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 8/12/2010 | Williamson Development Company, LLC and Williamson Energy, LLC | "Snake areas" required for Williamson Energy, LLC Operations | WC 325-899 | Owned | Yes |
|  |  |  |  |  |  |  |
| Ground Lease | 1/1/2006 | Eberhardt to Williamson Transport, LLC | Ground lease required for Williamson Energy, LLC Operations | Not Recorded | Leased | Yes |
| Memorandum of the Eberhardt Lease | 1/20/2006 | Eberhart to Williamson Transport, LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 296-404 | Leased | Yes |
| Assignment of Rights | 8/24/2007 | Williamson Transport LLC to Williamson Development Company LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 306-996 | Leased | Yes |
| Assignment of Rights | 8/24/2007 | Williamson Development Company LLC to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc | Leased | Yes |
| Ground Lease | 8/12/2010 | Eberhart to Williamson Development Company, LLC assigned to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 325-900 | Leased | Yes |
|  |  |  |  |  |  |  |
| Surface Lease | 3/22/2006 | Clara Summers and Independence Land Company LLC | Surface Lease | WC Misc 297-626 | Leased | Yes |
| Assignment of Lease | 8/12/2010 | Independence Land Company LLC to | Surface Lease | WC Misc 327-750 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Williamson Energy LLC | | | | |
| Surface Lease | 3/22/2006 | Clara Summers and Independence Land Company LLC | Surface Lease | WC Misc 297-626 | | |
| Grant of Surface Easement | 8/12/2010 | Williamson Development Company LLC and Williamson Energy LLC | Surface Easement | WC Misc 325-899 | Leased | Yes |

DEBTOR/GRANTOR:

SUGAR CAMP ENERGY, LLC
11351 N. Thompsonville Road
Macedonia, Illinois  62860
**Franklin County, Illinois**
**Hamilton County, Illinois (Coal Reserves only)**
**Saline County, Illinois (Coal Reserves only)**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| TVA Illinois Coal Lease | 7/1/2002 | USA through TVA & Illinois Fuel Company LLC (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2007-5822 | Leased | Yes |
| Assignment of TVA Illinois Coal Lease | 8/4/2009 | USA through TVA & Illinois Fuel Company LLC (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2009-4445 | Leased | Yes |
| Amendment One to TVA Illinois Coal Lease | 4/17/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0027 | Leased | Yes |
| Amendment Two to TVA Illinois Coal Lease | 8/30/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | Not recorded | Leased | Yes |
| Letter Agreement regarding TVA Illinois Coal Lease | 8/30/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | Not recorded | Leased | Yes |
| Franklin County Coal Lease | 7/1/2002 | USA through TVA & Ruger Coal Company, Inc. (as assigned to Ruger Coal | Properties located in Franklin County IL as described in Exhibit A | Not recorded | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Company, LLC), Sugar Camp Energy, LLC | | | | |
| Assignment of Lease | 9/10/2007 | USA through TVA & Ruger Coal Company, Inc. (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2007-5132 | Leased | Yes |
| Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0083 | Leased | Yes |
| Memorandum of Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2006-6919 | Leased | Yes |
| Supplemental Memorandum of Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2008-4441 | Leased | Yes |
| Sublease | 3/6/2012 | Sugar Camp Energy, LLC & HOD LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2012-6228 | Leased | Yes |
| First Amendment to Coal Mining Lease | 8/11/2008 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2008-4441 | Leased | Yes |
| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & Sugar Camp Energy, LLC | Consent with respect to Illinois Fuels Lease | FC-0233 | Leased | Yes |
| Warranty Deed | 1/15/2009 | Rodney Smith and Marta Smith to Sugar Camp Energy, LLC | Pt. Lot 121 and Pt. Lot 122 in Kokopelli Estates | Surface WC-0152, WC481-772 | Owned | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 3/4/2010 | Glendall E Johnston a.k.a Glen Johnston and Carolyn S. Johnston, a.k.a Carolyn Johnston, husband and Wife to Sugar Camp Energy, LLC | NW NW Sec 1-6-4 and NWNE Sec 1-6-4 Franklin County, Illinois | FC-0253 2010-1056 | Owned | Yes |
| Easement | 3/4/2010 | Morris R Clark and Karan S. Clark to Sugar Camp Energy, LLC | NWNE and W2E2NE Sec 2-6-4 Franklin, Illinois | FC-0254 2010-1057 | Owned | Yes |
| Easement | 3/1/2010 | David Blood and Melanie Blood, husband and wife to Sugar Camp Energy, LLC | Pt. E2NENE Sec 2-6-4 Franklin County, Illinois  2010-1058 | FC-0255 | Owned | Yes |
| Easement | 6/5/2010 | Roger L. Sanders and Mary Ellen Sanders to Sugar Camp Energy, LLC | W 10 ac N3/4 of NESE Sec 6-6-5 Hamilton County, Illinois | HC-0078 221-117 | Owned | Yes |
| Warranty Deed | 6/1/2010 | Patrick G. Mascal and Lori S. Mascal to Sugar Camp Energy, LLC | W2NESW and E2S2NWSW Sec 6-6-5 Hamilton Illinois | HC-0075 277/311 | Owned | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Illinois Fuels TVA Lease | Not Recorded | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Franklin County TVA Lease | Not Recorded | Leased | No |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface required for Sugar Camp Energy, LLC Operations | Not Recorded | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface in Hamilton County required for Sugar Camp Energy, LLC Operations | Not Recorded | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface at former Akin site required for Sugar Camp Energy, LLC Operations | Not Recorded | Owned | Yes |
| Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | Not Recorded | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Memorandum of Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | FC 2010-3825 | Leased | Yes |
| First Amendment to Coal Mining Lease` | 11/4/2011 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | Not Recorded | Leased | Yes |
| Second Amendment to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | Not Recorded | Leased | Yes |
| Memorandum after First and Second Amendments to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | Not Recorded | Leased | Yes |
| Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | Not Recorded | Leased | Yes |
| Memorandum of Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | FC 2012-6228 | Leased | Yes |

DEBTOR/GRANTOR:

SITRAN, LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **MOORAGE OPTIONS/LEASES KENTUCKY** | | | | | | |
| | | | | | | |
| Deed of Correction | 10/22/2009 | Norberta Belle Williams, Harold Alvin Williams and Sitran LLC | An undivided l/4th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Owned | No |
| Deed of Correction | 10/22/2009 | Joyce Mae Hurley and Deon H. Hurley and Sitran LLC | An undivided  1/4th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Owned | No |
| Deed of Conveyance | 10/22/2009 | Lisa Michelle Karr Hughes & Darrell C. Hughes and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Owned | No |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed of Conveyance | 10/22/2009 | Rise Karr and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Owned | No |
| Option To Lease | 4/10/2009 | Kay Karr Brooks and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Lease | No |
| Option To Lease | 4/10/2009 | Robert Karr & Rebecca S. Karr, his wife, and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Lease | No |
| Deed of Conveyance | 11/20/2009 | Scott A. Peck & City Peck, his wife and Sitran LLC | An undivided 1/20th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | HC-0011 (Ky) Book 572 Pg 1006 | Owned | No |
| Deed of Conveyance | 11/20/2009 | Stephen K. Peck and Sitran LLC | An undivided 1/20th: Certain property in the Ohio River known as Karr Island, which property was | HC-0012 (Ky) Book | Owned | No |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | 572 Pg 1010 | | |
| | | | | | | |
| **EASEMENTS INDIANA** | | | | | | |
| | | | | | | |
| Easement | 3/4/2009 | Kenneth W. Burgdorf, as Trustee of the Kenneth W. Burgdorf Revocable Trust and Marilyn T. Burgdorf, Trustee of the Marilyn T. Burgdorf Revocable Trust and Sitran LLC | 4.99 acres located in part of Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-0005 (IN) | Owned | No |
| Temporary Easement | 11/20/2008 | Pauline Burgdorf and Sitran LLC | 4.99 acres located in part of the Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-0011 (IN) 200804978 | Owned | No |
| Contract To Acquire Easement | 11/20/2008 | Pauline Burgdorf and Sitran LLC | 4.99 acres located in part of the Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-0011 (IN) 200804978 Closing date 01/15/2012 | Owned | No |
| Non-Exclusive Easement and Temporary Construction Easement | 10/20/2009 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and | Part of Southeast Quarter of the Southwest Quarter of Section 22 and part of the Northeast Quarter of the Northwest Quarter of Section 27 all being in Township 6 South, Range 12 West in Posey County, Indiana | PC-0018 (IN) 200904540 | Owned | No |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Sitran LLC | | | | |
| Quit Claim Deed | | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | Part of the West Half of Section 23, Township 7 South, Range 12 West in Posey County Indiana | PC-00 | Owned | No |

DEBTOR/GRANTOR:

OENEUS LLC D/B/A SAVATRAN LLC

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **INDIANA RAIL LOOP AND DOCK** | | | | | | |
| | | | | | | |
| Personal Representatives Deed | 1/9/2009 | Alfred A. Mohr, as Personal Representative of the Estate of Aurelia F. Mohr, deceased and SAVATRAN LLC | Undivided 1/2 interest in: SE NW 14-7-12 except 5 feet on north side; NESW 14-7-12 81.742 acres Posey Co. IN | PC-0001 (IN) 200900228 | Owned | Yes |
| Warranty Deed | 1/9/2009 | Alfred A. Mohr and SAVATRAN LLC | Undivided 1/2 interest in: SE NW 14-7-12 except 5 feet on north side; NESW 14-7-12 81.742 acres Posey Co. IN | PC-0001 (IN) 200900227 | Owned | Yes |
| Warranty Deed | 1/8/2010 | Catherine B. Elbert, Linda Kay Elbert and Catherine Charlene Elbert as General Partners of the Charles R. Elbert Family Limited Partnership and SAVATRAN LLC | 45.949 acres As part of the W/2 23-7-12 Posey Co. IN | PC-0002 (IN) 201000225 | Owned | Yes |
| Corrective Warranty Deed | 1/8/2010 | Catherine B. Elbert, Linda Kay Elbert and Catherine Charlene Elbert as General Partners of the Charles R. Elbert Family Limited Partnership and SAVATRAN LLC | Pt. SE SW 14-7-12 23 acres & Pt. NW/4 23-7-12 16.30 acres Posey Co. IN | PC-0002 (IN) 201000226. This deed replaces WD 200900675 because of surveyor's error in description. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Trustee's Deed | 12/17/2008 | Old National Trust Company as Successor Trustee under the James L. Boerner Revocable Trust Agreement and SAVATRAN LLC | Pt. W/2 Section 23-7-12 70 acres Posey Co. IN | PC-0003 (IN) 200805149 | Owned | Yes |
| Warranty Deed | 12/15/2008 | Kenneth J. Juncker Mary L. Juncker Emily A Moore Robert E Moore Jr. Joseph T. Yount, Beth Ann Folz, as Guardian ad Litem for Alexander A. Moore, Dana M Junker, Rebecca A. Wildeman, Anna L Blankenbaker (each afore mentioned signing as an individual and as a partner in JARD Group, Allyn Simpson, Ronald Simpson, Edward L. Thompson, as personal Representative of the Estate of Marilyn Thompson, Nathalie A. Elderkin, Charles A. Thompson, L. David Allyn, Jennifer L. Velasquez, Matthew D. Allyn and Michael L. Allyn and SAVATRAN LLC | Pt. NWNW  & NENW 14-7-12 72.741 acres & 27.986 acres off N side  NWNW & Pt. N/2 14-7-12 Posey Co. Indiana | PC-0007 200804974 | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Quitclaim Deed | 12/15/2008 | Kenneth J. Juncker Mary L. Juncker Emily A Moore Robert E Moore Jr. Joseph T. Yount, Beth Ann Folz, as Guardian ad Litem for Alexander A. Moore, Dana M Junker, Rebecca A. Wildeman, Anna L Blankenbaker (each afore mentioned signing as an individual and as a | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0007 (IN) 200804975 This was an access road at the top of the Allyn Property. | Owned | Yes |
| Correction Quitclaim Deed | 12/17/2009 | Edward l. Thompson, Individually and SAVATRAN LLC | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0007 (IN) 200805013 Edward Thompson inadvertently signed as Personal Representative of the Estate of Marilyn K. Thompson by PRD dated 10/31/2008 | Owned | Yes |
| Correction Warranty Deed | 12/17/2009 | Edward l. Thompson, Individually and SAVATRAN LLC | Pt. NWNW  & NENW 14-7-12 72.741 acres & 27.986 acres off N side  NWNW & Pt. N/2 14-7-12 Posey Co. Indiana | PC-0007 (IN) 200805012 Edward Thompson inadvertently signed as Personal Representative of the Estate of Marilyn K. Thompson by PRD dated 10/31/2008 | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Rec Memo & Option to Purchase | 7/16/2008 | Gerald G. Mohr and Esther R. Mohr and Oeneus LLC d/b/a SAVATAN LLC | 6.89 acres within SW/4 south of Old State Rd. Section 11-7-12 Posey Co. IN | PC-0008 (IN)200803305 Option Expires 07/16/2010. We do not believe we will close on this. | Owned | Yes |
| Warranty Deed | 3/26/2009 | Orval Ungethum and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW/4 Section 14-7-12 29.302 acres Posey Co. IN | PC-0009 (IN) 200901384 | Owned | Yes |
| Warranty Deed | 12/18/2008 | Raymond W. Boerner, Evelyn Staples, Ronald Lee Boerner & Ruben F. Roehr as Personal Rep. of the Estate of Dorothy Mae Roehr and SAVATRAN LLC | E/2 SWNW & NENWSW Section 14-7-12 & 1/2 interest to 5 feet on S Line N/2 NW/4 14-7-2 a distance of 68 1/2 rods and 5 feet in width. Posey Co. IN.30.675 acres | PC-0010 (IN) 200805150 | Owned | Yes |
| Rec Memo & Option to Purchase | 10/14/2008 | Margie J. Angermeier (Life Estate), Glenda S. Elpers(1/3 remainder); Paul L. Angermeier (1/3 remainder); Glenn V. Angermeier (1/3 remainder) and Oeneus LLC d/b/a SAVATRAN LLC | 8 acres as pt of S/2 SW/4 Section 10-7-12 Posey Co IN | PC-0012 (IN) 200804520 Expires 10/14/2010 We do not believe we will close on this. | Owned | Yes |
| Warranty Deed | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-00014 (IN) 200901505 Arthur reserves life estate in house and 1 ac tract B. Reserves road easement for access to house; right to farm for $1.00 any portion | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | left after construction. | | |
| Quitclaim Deed | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0014 (IN) 2009-01504 this is an access road across the top of the Alyn heirs property. | Owned | Yes |
| Non-Penetration Agreement | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (IN) Boerner Heirs own minerals would not sell this keeps them from having any development of the minerals. | Owned | Yes |
| Easement | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (IN) 200901506 Access easement to house and 1 ac and access to 30 acres that is land locked after construction. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Real Estate Mortgage, Security Agreement, Collateral Assignment of Rents and Leases, and Fixture Filing | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (IN) 200901507 Promissory note to Elizabeth Howery and Sharon L Bauman 1,075,000. paid as follows 287,500 yr1, 275,000 yr 2 262500 yr 3 1075000 | Owned | Yes |
| Rec Memo & Option to Purchase | 2/27/2009 | Larry E. Orth 5/12 int. Agnes L. York as Trustee of the Agnes L. York Revocable Trust Agreement 5/12 interest; Vickie L. Orth 2/12 interest and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SWSE 11-7-12 containing 0.90 acres | PC-0015 200900926 | Owned | Yes |
| | | | | | | |
| **EASEMENTS INDIANA** | | | | | | |
| | | | | | | |
| Easement | 9/16/2009 | Oeneus LLC to Southern Indiana Gas and Electric Company and Indiana corp d/b/a Vectren Energy Delivery of Indiana, Inc. | Pt. NE/4 14-7-12 Posey Co IN containing 0.28 acres more or less. | PC-0017 (IN) Electric power line easement Gibson to Brown 345 line. | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Non-Exclusive Easement and Temporary Construction Easement | 10/20/2009 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | Part of Southeast Quarter of the Southwest Quarter of Section 22 and part of the Northeast Quarter of the Northwest Quarter of Section 27 all being in Township 6 South, Range 12 West in Posey County, Indiana | PC-0018 (IN) 200904540 | Owned | No |
| Electric Distribution Line Easement | 7/13/2010 | Savatran LLC, to Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. | Pt N2 of NW Section 14, Township 7 South, Range 12 West Posey County, Indiana | PC-0021 (IN) Need Recorded Copy | Owned | No |
| Electric Distribution Line Easement | 7/13/2010 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W2 NE Section 14, Township 7 South, Range 12 West. Posey County, Indiana | PC-0022 (IN) Need Recorded Copy | Owned | No |
| | | | | | | |
| **SUGAR CAMP TO McLEANSBORO RAIL LINE ILLINOIS** | | | | | | |
| | | | | | | |
| Easement | 10/17/2008 | Kelly Markus & Gina Markus to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 BK 216 Pg 156 Rail Road Easement. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 10/17/2008 | Gerald Spihlman & Judith Spihlman to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 BK 216 Pg 147 Rail Road Easement. | Owned | Yes |
| Easement | 10/24/2008 | Thomas Markus & Jeanete Markus to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 Bk 216 Pg 163 Rail Road Easement | Owned | Yes |
| Easement | 7/24/2008 | White Oak Resources Land, LLC to Oeneus LLC d/b/a SAVATRAN | Pt. SW/4 & SE/4 6-5-5 Hamilton County IL containing 11.45 acres | HC-0002 Bk 217 Pg 732 Initial Option was with Larry Myers who sold to White Oak. | Owned | Yes |
| Warranty Deed | 2/4/2008 | Charles R. Moore & Nani Sue Moore to Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW/4 28-5-5 containing 3 acres more or Less Pt. SWNE 29-5-5 containing 13 acres more or less. | HC-0004 Traded 65.63 acres and 8.73 acres of the W/2 NW/4 28-5-5 to Clark. Traded 137 acres in NE/4 29-5-5 Hamilton Co. IL to Burris. Remaining property for wet lands mitigation 273-252 | Owned | Yes |
| Easement | 9/24/2009 | David Bert Lemke & Shirley K. Lemke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. N/2 SE/4 1-T5S-R5E Hamilton Co. IL containing 10.16 ac | HC-0005 Bk 215 Pg 801 | Owned | Yes |
| Warranty Deed | 12/19/2007 | Terri S. Irvin, Successor Trustee to the Kenneth C. Myers and Eula P. Myers Revocable Trust to Oeneus LLC d/b/a SAVATRAN LLC | SW NW; NW SW 1-T5S-R5E; 40 acres within E/2 NE/4 and E/2 NE/4 11-T5S-R5E Hamilton Co IL | HC-0006 Bk 273 Pg 22 Traded part of this property to Kenneth Willis. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/28/2008 | Grover C. Galloway and Mildred F. Galloway to Oeneus LLC d/b/a SAVATRAN LLC | W/2 SWSE; and E/2 SW/4 3-T5S-R5E Hamilton Co IL containing 100 acres | HC-0008 Bk 273 Pg 812 6.10 acres used for rail. Farming agreement Kenny Waier. | Owned | Yes |
| Special Warranty Deed | 4/21/2008 | Kenneth P. Willis & Wilma June Willis to Oeneus LLC d/b/a SAVATRAN | South 5 acres of NESE 2-T5S-R5E Hamilton Co. IL | HC-0011 Bk 273 Pg614 | Owned | Yes |
| Warranty Deed | 2/28/2008 | Wilma June Willis to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SE 3-T5S-R5E Hamilton County IL containing 7.02 acres | HC-0012 Bk 273 Pg 321 | Owned | Yes |
| Easement | 11/3/2008 | Garry R. Heil & Karla Heil to Oeneus LLC d/b/a SAVATRAN | Pt. W/2 SW 16-T5S-R5E Hamilton Co. IL containing 10.08 acres | HC-0014 Bk216 Pg 221 | Owned | Yes |
| Warranty Deed | 9/15/2009 | David Willett & Robin Willett to Oeneus LLC d/b/a SAVATRAN | Undivided 1/2 interest pt SE/4 9-T5S-R5E Hamilton Co. IL containing 40 acres | HC-0015 Bk 274 Pg 445 Willett retained first right of refusal. | Owned | Yes |
| Warranty Deed | 9/30/2008 | Rickey L. Denham to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE/4 9-T5S-R5E Hamilton Co. IL containing 3.36 acres | HC-0016 Bk 274 Pg 535 The rail line goes through Mr. Denham's residence we had to replace the residence and barn. | Owned | Yes |
| Warranty Deed | 2/5/2008 | Melinda Hunter to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0017 Bk 273 Pg 290 Bennett Heirs. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 2/4/2008 | Joyce Annette Medley to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0018 Bk 273 Pg 293 Bennett Heirs. We deed her oil and gas back Quitclaim Deed 273/478 We did not option the oil and gas. | Owned | Yes |
| Warranty Deed | 5/7/2009 | Hobart J. Campbell & Helen B. Campbell to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 31-5-5 & pt NW/4 6-T5S-R5E containing 9.27 acres; Pt. SW/4 31-T5S-R5E containing 1.84 acres; Pt NW/4 6-T5S-R5E containing 1.28 acres Hamilton Co. IL | HC-0019 Bk 275 Pg 506 Both rail right of way and extra footage at Macedonia road crossing. | Owned | Yes |
| Warranty Deed | 10/10/2006 | Daniel R. Tennyson to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SE 6-T5S-R6E 3.21 acres Hamilton Co. IL 270-595 | HC-0020 Retained only rail right of way traded remainder to Kirsch. | Owned | Yes |
| Special Warranty Deed | 05/052009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. NEWS 6-T5S-R6E 13.003 acres Hamilton Co. IL | HC-0020 Bk 270 Pg 595 Portion traded to Kirsch. | Owned | Yes |
| Easement | 2/17/2009 | Wendell Myers & Judith Myers to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESW 1-T5S-R5E Hamilton Co. IL containing 5.37 | HC-0021 Bk 216 Pg 654 Rail right of way easement | Owned | Yes |
| Warranty Deed | 2/5/2008 | Marilyn Ann Lynn to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0022 Bk 273 Pg 287 Bennett Heirs | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 10/25/2008 | Roy Dean Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0023 Bk 274 Pg 667 Bennett Heirs; Mr. Bennett refused to close we filed Specific Performance Complaint Mr. Bennett then decided to close. | Owned | Yes |
| Warranty Deed | 2/20/2008 | Mary Ellen Tennyson to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0024 Bk 273 Pg. 342 Bennett Heirs/ Mrs. Bennett has the option to repurchase. | Owned | Yes |
| Warranty Deed | 2/20/2008 | Robert L Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0025 Bk 273 Pg. 318 Bennett Heirs/ Mr. Bennett has the option to repurchase. | Owned | Yes |
| Warranty Deed | 12/11/2009 | Joseph Rexing & Liudmyla Rexing to Oeneus LLC d/b/a SAVATRAN LLC | 22.68 acres all in Township 5 S. Range 5 E Hamilton Co IL | HC-0027 Bk 276 Pg 628  Mr. Rexing Refused to close filed suit forced to close etc. | Owned | Yes |
| Special Warranty Deed | 12/11/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Joseph Rexing | Pt. E/2 SW & pt. SENW of 20-T5S-R5E Hamilton Co. IL containing 112.13 acres | HC-0027 Bk  Pg Remainder of Judith Gregory traded to Rexing. | Owned | Yes |
| Warranty Deed | 2/14/2007 | Betty Gibbs to Oeneus LLC d/b/a SAVATRAN LLC | Surface only pt W/2 NW and N 10 Ac NWSW 10-T5S-R5E Hamilton Co. IL containing 11.83 acres | HC-0028 Bk 271 Pg 93 Retained only rail right of way traded remaining to Alan Kirsch Special | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | Warranty Deed Bk. 275 Pg 503 | | |
| Easement | 11/28/2006 | Jim Holms & Ruth Holms to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 & pt. W/2 SE/ 2-T5S-R5E Hamilton Co. IL containing 13.17 acres | HC-0029 Bk 212 Pg 209 Mr. Holms has the right to put a portion of his property to us upon completion of the rail. | Owned | Yes |
| Warranty Deed | 9/5/2009 | Judith A. Peters and Charles W. Peters to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in South 28.25 acres of W/2 SW 3-T5S-R5E Hamilton Co. IL | HC-0030 Bk 274 Pg 401 Kenny Waier has 10 year farming lease. Must relocate RLC water main. | Owned | Yes |
| Warranty Deed | 9/3/2009 | Jerry L. Stiverson; Paula J. Stiverson as individuals and as co-trustees of the Paula J Stiverson Trust to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in South 28.25 acres of W/2 SW 3-T5S-R5E Hamilton Co. IL | HC-0032 Bk 274 Pg 463 Kenny Waier has 10 yr farming lease. Must relocate RLC water main. | Owned | Yes |
| Corrected Warranty Deed | 9/5/2008 | Michael Hutchcraft and Melissa Hutchcraft to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in pt SE/4 of 9-T5S-R5E containing 40 acres Hamilton Co IL | HC-0033 Bk 274 Pg 412 Deed Corrected to waive homestead rights. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/17/2007 | Laura Dennis f/k/a Laura Lane to Oeneus LLC d/b/a SAVATRAN | Pt NW NW 21-T5s-R5E being 300ft x 160ft. Hamilton Co. IL | HC-0034 Bk 271 Pg 494 Rail design went through Ms. Dennis house; house purchased and moved by Garry Heil. 0.17 acres of this property was conveyed to Dennis Smith by Special Warranty Deed 275/537 | Owned | Yes |
| Warranty Deed | 5/8/2009 | Katherine McRoy f/k/a Katherine Smith; Donald McRoy; Dennis L. Smith and Judy A. Smith to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW NW & Pt. NENW 21-T5S-R5E 3.37 acres Hamilton Co. IL | HC-0035 Bk275 Pg 541 | Owned | Yes |
| Warranty Deed | 7/30/2008 | Michael D. Burris & Tina Burris to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 21 & Pt. SW NW 21-T5S-R5E Hamilton County IL containing 15.72 acres | HC-0039 Bk 274 Pg237 | Owned | Yes |
| Special Warranty Deed | 7/30/2008 | Oeneus LLC d/b/a SAVATRAN LLC to Michael D. Burris & Tina Burris | Pt. NE/4 29-T5S-R5E Hamilton Co. IL containing 136.17 acres | HC-0039 Bk 274 Pg234 Traded pt Charlie Moore property HC-0004 | Owned | Yes |
| Warranty Deed | 11/6/2008 | Robert J. Gray & Denise Gray to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE/4 9-T5S-R5E Hamilton Co. IL containing 51.93 | HC-0040 274 Pg 715 Deed restriction of single family residence and grain farming only Mr. Gray's | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | son has a first right of refusal. | | | |
| Warranty Deed | 7/26/2007 | Charles M. Bowers & Tammy Bowers to Oeneus LLC d/b/a SAVATRAN LLC | NE SE; W/2 SE NE 30-T5S-R5E Hamilton Co. IL containing 60 acres. | HC-0041 Bk 272 Pg 1 | Owned | Yes |
| Warranty Deed | 10/2/2008 | Jeffrey A. Lueke and Michele L. Lueke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW/4 16-T5S-R5E 2.65 acres; PT SWSE 9-T5S-R5E 0.02 acre Hamilton Co. IL | HC-0042 Bk 274 Pg 587 | Owned | Yes |
| Warranty Deed | 11/6/2007 | Jeffrey A. Lueke and Michele L. Lueke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW/4 16-T5S-R5E 8.64 acres Hamilton Co. IL | HC-0042 Bk 272/710 | Owned | Yes |
| Warranty Deed | 5/5/2009 | Alan Kirsch & Denise Kirsch to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE/4 6-T5S-R6E & PT SESE 31-T4S-R6E 2.61 acres Hamilton Co. IL | HC-0043 Bk275/534 | Owned | Yes |
| Easement | 5/5/2009 | Alan Kirsch & Denise Kirsch to Oeneus LLC d/b/a SAVATRAN LLC | 8.33 acres pt SESE and E/2 SWSE 9-T5S-R5E; 7.36 acres pt NE/4 6-T5S-R6E & SESE 31-T4S-R6E; 2.70 ac pt NE 6-T5S-R6E Hamilton Co. IL | HC-0043 Bk 217/300 | Owned | No |
| Special Warranty Deed | 5/5/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. W/2 NW/4 10-T5S-R5E Hamilton Co. IL containing 11.51 & Pt W/2 NW/4 10-T5S-R5E containing 66.12 acres Hamilton Co. IL | HC-0043 Bk 275/503 (Traded the Betty Gibbs property less rail to Kirsch) | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 5/5/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. NW SE 6-T5S-R6E Hamilton County IL containing 13.03 acres; | HC-0043 Bk 275/499 (Traded the remainder of the Tennyson property to Kirsch) | Owned | Yes |
| Warranty Deed | 11/6/2008 | Kenneth A. Waier a/k/a Kenneth Waier to Oeneus LLC d/b/a SAVATRAN LLC | Pt SWSW & NWSW 32-T4S-R6E Hamilton Co IL containing 18.17 acres | HC-0044 274/711 (Kenny Waier has 10 yr farming agreement Galloway property) | Owned | Yes |
| Warranty Deed | 4/26/2009 | James Lee Maller to Oeneus LLC d/b/a SAVATRAN LLC | Pt SW/4 31-T5S-R5E Hamilton Co IL containing 5.11 acres | HC-0045 Bk 275/462 Rail line went through Mr. Mallers house and barn both have been removed. | Owned | Yes |
| Special Warranty Deed | 4/26/2009 | Oeneus LLC d/b/a SAVATRAN LLC to James Lee Maller | Pt. NE SE 36-T5S-R5E Franklin Co IL containing 5 acres | HC-0045 Bk 2009-1998 Property to purchase by SAVATAN 2009-1206 to replace Mr. Mallers homesite. | Owned | Yes |
| Warranty Deed | 3/25/2009 | Norman D. Melvin & Patricia K. Melvin to Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 SE/4 20-T5S-R5E Hamilton Co IL containing 12.14 acres | HC-0046 Bk 275/310 | Owned | Yes |
| Warranty Deed | 4/3/2009 | Gary Kearnery a/k/a Gary W. Kearney to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SWSW 20-T5S-R5E & pt NWNW 29-T5S-R5E Hamilton Co. IL containing 5acres | HC-0047 Bk275/362 | Owned | Yes |
| Warranty Deed | 12/8/2008 | Dale Miller & Denise Miller to Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 NW/4 31-T5S-R5E Hamilton Co. IL containing 7.51 acres | HC-0049 Bk274/873  We agreed by letter to relocate Mr. Millers water line. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 2/6/2009 | John M. Zelhart to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE/4 30-T5S-R5E Hamilton Co IL containing 1.0 acre | HC-0050 Bk 275/109 We agreed to build him an access road and gave him perpetual access to his property. | Owned | Yes |
| Warranty Deed | 3/6/2009 | Donald G. Zelhart & Margaret R. Zelhart as co-Trustees of Donald G. Zelhart Living Trust to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest to pt NE/4 30-T5S-R5E Hamilton Co IL containing 4.11 acres | HC-0051 Bk 275/663 Agreed to gravel access road & repurchase rights | Owned | Yes |
| Warranty Deed | 6/24/2008 | Judith G. Gregory to Oeneus LLC d/b/a SAVATRAN LLC | 6 acres pt SESW 20-T5S-R5E Hamilton Co IL | HC-0053 Bk 274/52 Traded 112 acres of this property to Joe Rexing. | Owned | Yes |
| Warranty Deed | 7/16/2008 | David Williams & Brandee Williams to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWNW 29-T5S-R5E Hamilton Co IL 0.65 acres | HC-0056 Bk274/141 Purchased house rail going through garage. House rented. | Owned | Yes |
| Rental Agreement | 9/12/2008 | SAVATRAN LLC to William Webb | Pt. NWNW 29-T5S-R5E Hamilton Co IL 0.65 acres | HC-57 Rented house. | Leased | No |
| Warranty Deed | 10/24/2008 | Alva James Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20th Pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0058 Bk 274/664 Mr. Bennett would not close. Filed partition suite to force closing. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/7/2009 | Wanda G. Downs & Cecil L Downs to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest pt NE/4 30-T5S-R5E Hamilton Co IL containing 4.11 acres | HC-0059 Bk 275/667 Agreed to gravel access road & repurchase rights. | Owned | Yes |
| Corrected Warranty Deed | 11/17/2008 | Robert A. Williams & Barbara A. Williams to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SENE 1-T6S-R4E Franklin Co IL containing 4.474 | FC-0023 2008-6300 purchased house; house has been removed. | Owned | Yes |
| Warranty Deed | 10/10/2008 | James Gregory Payne, as trustee of James Gregory Payne Trust to Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 NE 11-T6S-R4E & pt W/2 NW 12-T6S-R4E Franklin Co. IL containing 15.33 acres | FC-0024 2008-5818 | Owned | Yes |
| Warranty Deed | 10/10/2008 | James Gregory Payne, as trustee of Zulene Payne Trust to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NE 11-T6S-R4E Franklin Co. IL containing 6.44 acres | FC-0025  2008-5817 | Owned | Yes |
| Warranty Deed | 1/11/2008 | Reba L. Stokes Revocable Living Trust by Reba L. Stokes & Kenneth D. Stokes to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NE;  NWSE;SWSE & SESW 1-T6S-R4E NWNE; NENW; N3/4 SE NW 12-T6S-R4E Franklin County IL | FC-0029 2008-0603 | Owned | Yes |
| Warranty Deed | 3/6/2008 | Morris R. Clark & Karan S. Clark to Oeneus LLC d/b/a SAVATRAN LLC | NE NE 1-T6S-R4E Franklin Co IL 40 acres | FC-0031 2008-1248 | Owned | Yes |
| Easement | 3/6/2008 | Morris R. Clark & Karan S. Clark to Oeneus LLC d/b/a SAVATRAN LLC | 0.685 of the SE SE 36 T5S-R4E Franklin Co IL | FC-0031 2008-1249 | Owned | Yes |
| Special Warranty Deed | 3/6/2008 | Oeneus LLC d/b/a/ SAVATRAN LLC to Morris R. Clark & Karan S. Clark | Pt. W/2 NW/4  28 T5S-R5E Hamilton Co. IL containing 74.36 acres | FC-0031 Bk273/361 Traded remained of Charlie Moore HC-0004 to Clarks. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Quit Claim Deed | 4/7/2008 | Louise Harrison to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW corner SE NE 1-T6S-R4E Franklin Co IL containing 1.26 | FC 2008-1877 | Owned | Yes |
| Quit Claim Deed | | Louise Harrison to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE NE 1-T6S-R4E Franklin Co IL | FC 2009-5371 | Owned | Yes |
| | | | | | | |
| | | | | | | |
| **POND CREEK TO SUGAR CAMP CONNECTOR ROUTE** | | | | | | |
| | | | | | | |
| Recording Memo and Option to Purchase | 9/14/2007 | John H. Wiegand and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NE 10; Pt. NE NE10 T7S; R4E Franklin Co. IL | FC-0086 Purchase rail right of way. 2007-5356 | Owned | No |
| Recording Memo and Option to Purchase | 1/15/2008 | John H. Wiegand and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NE 10; Pt. NE NE10 T7S; R4E Franklin Co. IL | FC-0086 Purchase rail right of way opt 2 or plan B. 2008-0338 | Owned | No |
| Recording Memo and Option to Purchase | 9/18/2007 | Donald L. Bennett and Sharla Bennett and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 14; Pt NW SW 14 T6S R4E Franklin Co. IL | FC-0087 Purchase rail right of way. 2007-5293 | Owned | No |
| Recording Memo and Option to Purchase | 10/8/2007 | Daniel E. Harmon & Terri J. Harmon and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 2 T7S R4E Franklin Co. IL | FC-0106 Purchase rail right of way. 2007-5836 | Owned | No |
| Recording Memo and Option to Purchase | 10/10/2007 | Olen Max Harmon & Becky J Harmon and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 35 T6S R6E Franklin Co IL | FC-0108 Purchase rail right of way. 2007-5930 | Owned | No |
| Recording Memo and Option to Purchase | 10/11/2007 | Michael Pike & Brenda Pike and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE NE 27 T7S R4E Franklin Co. IL | FC-0109 Purchase rail right of way. | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 10/12/2007 | Marion Tow, George M. Tow & Karen L Tow and Oeneus LLC SAVATRAN LLC | Pt. SESE 22 T7S R4E Franklin Co. IL | FC-110 Purchase rail right of way. 2007-5931 | Owned | No |
| Recording Memo and Option to Purchase | 7/2/2008 | Marion Tow, George M. Tow & Karen L Tow and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE SE 22 T7S R4E Franklin Co. IL | FC-110 Purchase of 12.1 acres in addition to right of way. 2008-3632 | Owned | No |
| Warranty Deed | 10/26/2007 | Carlton Heifner and Dixie Heifner and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW SW 22-T7S-R4E Franklin Co. IL 6 acres | FC-0111 Purchase of old rail bed. Hunting Lease to Marion Tow along rail bed. 2007-6200 | Owned | Yes |
| Warranty Deed | 4/25/2008 | Andrew C. Julian & Susan E. Julian and Oeneus LLC d/b/a SAVATRAN LLC | Pt.SW SE 10- T7S-R4E Franklin Co. IL 27.72 acres | FC-0112 Purchased house and rail right of way. House Rented to Eric Smith. | Owned | Yes |
| Recording Memo and Option to Purchase | 10/15/2007 | Gary L. Manis and Sharon L. Manis and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NW 26-T6S-R4E Franklin Co. IL 4.65 acres | FC-0113 Purchase rail right of way. 2007-5932 | Owned | No |
| Recording Memo and Option to Purchase | 10/19/2007 | Eddie Essary and Eliane Essary and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSW 2-T7S-R4E Franklin Co. IL 2.25 acres | FC-0114 Purchase rail right of way. 2007-6073 | Owned | No |
| Recording Memo and Option to Purchase | 10/22/2007 | Cora Jane Taylor & Beth Benns and Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 NW 1; Pt.NWSW 11-T6S-R4E Franklin Co IL 24.86 acres | FC-0115 Purchase rail right of way and additional acres. 2007-6252 | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 11/9/2007 | David R. Payne & Rhonda Payne and Oeneus d/b/a SAVATRAN LLC | Pt.NWNE 15 T7S-R4E containing 9 ac; Pt. NW NW 26 T7S-R4E containing 4.64 acres Franklin Co. IL | FC-0122 Purchase rail right of way. 2007-6524 | Owned | No |
| Warranty Deed | 4/14/2008 | Robert G. Buntin and Marjorie A. Buntin as Trustees of the Robert G. Buntin and Marjorie A. Buntin Joint Living Trust, and Michael M. Buntin and Brenda Buntin as Trustees of the Michael M. Buntin and Brenda Buntin Joint Living Trust and Oeneus LLC d/b/a SAVATRAN | Pt. SW/4 23-6-4 Franklin County IL 7.07 acres; Pt. NW/4 23 and Pt. SW/14 T64-R4E Franklin Co 16.14 acres | FC-0123 Purchase rail right of way. 2008-2074 | Owned | Yes |
| Recording Memo and Option to Purchase | 11/12/2007 | Ruth E. Sweet & Danny Sweet and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 35 T7S R4E Franklin Co. IL 7.48 acres | FC-0125 Purchase of rail right of way. Will plant trees along right of way 2007-6522 | Owned | No |
| Recording Memo and Option to Purchase | 11/12/2007 | Ruth E. Sweet and Oeneus LLC d/b/a SAVATRAN LLC | Pt.SWNW 35 T7S R4E Franklin Co. IL 0.63 acres | FC-0126 Purchase of rail right of way. Purchased modular home and then sold and had moved. 2007-6523 | Owned | No |
| Warranty Deed | 4/23/2009 | James Gregory Payne, as trustee James Gregory Payne Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 SE NW & SW/4 11 T6S-R4E Franklin Co. Il 5.83 acres | FC-0130 Purchase of rail right of way. 2009-2110 | Owned | Yes |
| Recording Memo and Option to Purchase | 11/28/2007 | Ted Lawrence as Trustee of the Lawrence Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 2 T7S-R4E Franklin Co. IL 9.52 acres | FC-0131 Purchase of rail right of way and isolated land. Must plant trees | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | along rail 2007-6806 | | |
| Recording Memo and Option to Purchase | 11/30/2007 | Robert Leon McClerren & Cynthia McClerren and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSW 35 1.34 acres & Pt. W/2 NW 35 T7S-R4E Franklin Co. IL | FC-0132 Purchase of rail right of way. 2007-6905 | Owned | No |
| Recording Memo and Option to Purchase | 9/5/2008 | Robert Leon McClerren & Robert G. McClerren and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 & Pt. NW SE 15 T7S R4E Franklin Co. IL 7.42 acres | FC-0132 Purchase rail right of way need to go around Jason Knight. 2008-5188 | Owned | No |
| Recording Memo and Option to Purchase | 11/28/2007 | Robert Shane Croslin and Jodi Croslin and Oeneus LLC d/b/a SAVATRAN LLC | pt. NWNW 35 4.53 acres; Pt. SWSW 26; Pt. NESE 27 4.71 acres T7S-R4E Franklin Co IL | FC-0133 Purchase rail right of way. 2007-6904 | Owned | No |
| Warranty Deed | 8/13/2008 | Anita Miller, Trustee Anita Miller Revocable Living Trust, and Oneida Ann Murphy as Trustee of the John Robert Miller Revocable Living Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 SW 11-T6S-R4E Franklin Co IL containing 57.31 acres. | FC-0136 Purchase of rail right of way and DESIGNATED WET LANDS BANK 2008-5406 | Owned | Yes |
| Warranty Deed | 2/27/2009 | Stewart B Hungate and Oeneus LLC d/b/a SAVATRAN LLC | N/2 NE 27-T7S-4E Franklin Co IL containing 80 acres & a perpetual access easement | FC-0137 Purchase of rail right of way. 2009-1017 | Owned | Yes |
| Recording Memo and Option to Purchase and Amendment One | 1/18/2008 | R. Ernest Payne & Dorothy M. Payne and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 E/2 Section 15 T7S-R4E containing 12 acres; Pt. NE/4 of 22 T7S-R4E containing 23.33 acres | FC-0139 Purchase of rail right of way and rail right of way around Jason Knight. 2008-0389 | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 2/19/2008 | Amos Clay Ing & Jo Ann Ing and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SE 10 T7S-R4E Franklin Co. IL containing 4.64 acres | FC-0142 Purchase of rail right of way. FC 2008-1101 | Owned | No |
| Recording Memo and Option to Purchase | 3/5/2008 | Donald W. Manis & Delores J. Manis and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 35; Pt.  W/2 SW 26 T6S-R4E Franklin Co IL 18.36 acres. | FC-0145 Purchase of rail right of way. FC 2008-1225 | Owned | No |
| Warranty Deed | 5/28/2008 | Dale Wes Williford & Melissa R Williford to Oeneus LLC d/b/a SAVATRAN LLC | N/2 NWNE 20 ac ±; N 10 ac NE NE T6S-R4E Franklin Co IL | FC-0152 Purchased for rail loop at Sugar Camp. FC 2008-2907 | Owned | Yes |
| Warranty Deed | 11/6/2009 | Mauris D Kern a/k/a Mauris Kern and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SW 22-T7S-R4E 4.60 ac; Pt. NW SW 22 T7S-R4E 3.86 ac; Pt. S/2 S/2 22 T7S-R4E 39.01 ac; Pt. S/2 S/2 22 & NE NW 27 T7S-R4E 57.69 acres Franklin Co IL | FC-0159 Purchased rail right of way around Jason Knight. FC 2009-5485 | Owned | Yes |
| Warranty Deed | 11/3/2009 | Louis S Ison & Rose Ison and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 22 T7S-R4E Franklin Co IL  9.26 acres | FC-0160 Purchased rail right of way around Jason Knight. FC 2009-6069 | Owned | Yes |
| Recording Memo and Option to Purchase | 9/8/2008 | Kenneth D. Summers  & Shelia K Summers and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE SE 22; Pt. NWSW 23 T6S-R4E Franklin Co IL 9.31 acres | FC-0161 Purchase rail right of way and isolated land. FC 2008-5187 | Owned | No |
| Recording Memo and Option to Purchase | 10/25/2007 | Irene Wilkas and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 2-T8S-R4E; Pt. NW SW 2 T8S-R4E; Pt. NESE 3 T8S-R4E Williamson County IL 15.73 acres. | WC-0106 Purchase rail right of way and isolated land. 308-59 | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 6/30/2008 | Central Illinois Public Service d/b/a Ameren CIPS and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW NW 2 T8S-R4E Williamson Co IL 0.28 ac | WC-0142 rail easement. 312-800 | Owned | Yes |
| | | | | | | |
| **SHAWNEETOWN RAIL LINE** | | | | | | |
| | | | | | | |
| Warranty Deed | 3/1/2007 | Jeffrey J. Drone & Toni L. Drone to Oeneus LLC d/b/a SAVATAN LLC | Pt. S/2 NE & Pt. N/2 SE 20 T9S-R7E; W/2 NW 28; E/2 NE 29 & access road T9S- R7E Saline Co. IL containing 227 acres. | SC-0009 Farm Leased to Jeff Drone. 1900-923 | Owned | Yes |
| Warranty Deed | 11/20/2007 | Jimmie G. Rodgers & Billie Rodgers to Oeneus LLC d/b/a SAVATRAN LLC | E/2 NW 4 T9S-R6E Saline Co IL 80 acres | SC-0017 Farm Leased to Jeff Drone. 1927-505 | Owned | Yes |
| Warranty Deed | 11/20/2007 | Oeneus LLC d/b/a SAVATRAN to Jimmie G. Rodgers & Billie Rodgers | Pt. SE 20 T9S-R7E Saline Co IL 89.864 acres | SC-0017 Farm Leased to Jeff Drone. 1927-508 | Owned | Yes |
| Warranty Deed | 8/29/2007 | James D. Kuhlman and Andrew M. Freebourn to Oeneus LLC d/b/a SAVATRAN LLC | NW NE 3 T9S-R6E Saline Co IL 40 acres | SC-0018 All woods no farm lease. 1921-463 | Owned | Yes |
| Quit Claim Deed | 5/23/2007 | CSX Transportation Inc and SAVATRAN LLC | six parcels lying in Gallatin County beginning at Equality and ending at Shawneetown individually referred to as Tracts 1,4,5A,6,8,and 42 containing 21.809 acres | GC-0004 Abandoned Rail Line across Gallatin County. 501-111 | Owned | Yes |

Debtor Grantor:

ADENA RESOURCES, LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 5/6/2009 | Mason, Marilyn Trustee & Adena Resources | Pt. SW Sec 31-5-3 & Pt. NW Sec 6-6-3 as described | Water & power lines, Complete, FC-0213, FC2009-2758 | Owned | No |

Debtor/ Grantor:

AMERICAN CENTURY TRANSPORT LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/8/2016 | American Energy Corporation to American Century Transport LLC | See legal description set forth in the deed. | 201600000427 | Owned | Yes |

DEBTOR/GRANTOR:

HILLSBORO ENERGY LLC
12051 N. 9th Avenue
Hillsboro, IL  62049

**Montgomery County, Illinois**

**Bond County, Illinois (Coal Reserves only)**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease Agreement | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Short Form of Lease (Hillsboro) | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1346-428 | Leased | |
| Amendment No. 1 to the Coal Mining Lease and Sublease Agreement | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Short Form of Lease (Hillsboro) | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1367-226 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amendment No. 2 to the Coal Mining Lease and Sublease Agreement | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Amended and Restated Short Form of Lease After Closing 4 and Closing 5 (Hillsboro) | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1412-134<br><br>BC 917-329 | Leased | |
| Amendment No. 3 to the Coal Mining Lease and Sublease Agreement | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Amended and Restated Short Form of Lease After Closing 3 (Hillsboro) | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1426-275 | Leased | |
| Amended and Restated Short Form of Lease After Closing 6 (Hillsboro) | 2/2/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1477-459<br><br>BC 964-143 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Short Form of Lease After Closing 7 & 8 (Hillsboro) | 8/21/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Coal Mining Lease Agreement | 9/21/2007 | Montgomery Mineral LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| First Partial Termination of Lease | 9/9/2009 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | |
| Second Partial Termination of Lease | 1/8/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | |
| Third Partial Termination of Lease | 10/4/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Fourth Partial Termination of Lease | 1/13/2011 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | |
| Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-176 BC 910-257 | Leased | |
| Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-135 BC 910-286 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | | Leased | |
| Short Form or Memorandum of First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1508-455 | Leased | |
| Deed | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Mine Site RDA 1 & 2 Farmland & Bleeder Site #1 | 201000059726 | Owned | |
| Easement | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201000059723 | Owned | |
| Easement | 5/9/2011 | George & Martha Spinner to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201100063970 | Owned | |
| Deed | 8/23/2013 | Hillsboro Energy LLC to Hillsboro Transport, LLC | Loadout | 201300003499 | Owned | |

Schedule XIII-A to
Collateral Questionnaire

## LOCATIONS OF MINES AND MINING FACILITIES

**ALL MATERIAL RENTS ARE DISCLOSED IN COMBINED SCHEDULES XI AND XII**

**Macoupin Energy LLC**

Say No. 1 Mine
14300 Brushy Mound Road
Carlinville, Illinois  62626

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease | 1/27/10 | WPP LLC and Macoupin Energy LLC | Macoupin South Mine Assignment | | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | Not Recorded | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | East Hornsby Mine Assignment | Not Recorded | Leased | Yes |
| Special Warranty Deed | 1/22/2009 | ExxonMobil Coal USA, Inc and Macoupin Energy LLC | Various tracts of surface and coal reserves.  The coal reserves were sold to WPP or Colt and leased back.  The surface not required for operations has been conveyed to New River Royalty LLC | MA-0019 493145 | Owned | Yes |
| Lease | 1/27/10 | HOD LLC and Macoupin Energy LLC | Rail Loop | Not Recorded | Leased | Yes |
| Lease | 1/27/10 | HOD LLC and Macoupin Energy LLC | Rail Load Out | Not | Leased | Yes |
| Option and Lease Agreement | 2/28/1967 | Jet Oil Company and Macoupin Energy LLC | Coal Reserves | Volume 628, Page 456 | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Lease | 2/7/2019 | Foresight Energy, LLC/Macoupin to Keyrock, LLC | Methane Gas lease | Document not recorded | Leased | |

**Sugar Camp Energy, LLC**

M-Class Mine
11351 N Thompsonville Road
Macedonia, Illinois 62860

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & SCELLC | Properties located in Franklin County IL as described in Exhibit A | 2006-6919 | Leased | Yes |
| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & SCELLC | Consent with respect to Illinois Fuels Lease | FC-0233 | Leased | Yes |
| Warranty Deed | 1/15/2009 | Rodney Smith and Marta Smith to SCELLC | PT Lot 121 and PT Lot 122 in Kokopelli Estates | Surface WC-0152, WC481-772 | Leased | Yes |
| Easement | 3/4/2010 | Glendall E Johnston a.k.a. Glen Johnston and Carolyn S. Johnston, a.k.a. Carolyn Johnston, husband and Wife to SCELLC | NW NW Sec 1-6-4 and NWNE Sec 1-6-4 Franklin County, Illinois | FC-0253 2010-1056 | Owned | Yes |
| Easement | 3/4/2010 | Morris R. Clark and Karan S. Clark to SCELLC | NWNE and W2E2NE Sec 2-6-4 Franklin, Illinois | FC-0254 2010-1057 | Owned | Yes |
| Easement | 3/1/2010 | David Blood and Melanie Blood, husband and wife to SCELLC | Pt E2NENE Sec 2-6-4 Franklin County, Illinois 2010-1058 | FC-0255 | Owned | Yes |
| Easement | 6/5/2010 | Roger L. Sanders and Mary Ellen Sanders to SCELLC | W 10 ac N3/4 of NESE Sec 6-6-5 Hamilton County, Illinois | HC-0078 221-117 | Owned | Yes |
| Warranty Deed | 6/1/2010 | Patrick G Mascal and Lori S. Mascal to SCELLC | W2NESW and E2S2NWSW Sec 6-6-5 Hamilton Illinois | HC-0075 277/311 | Owned | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to SCELLC | Right to mine on Illinois Fuels TVA Lease | Not Recorded | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to SCELLC | Right to Mine on Franklin County TVA Lease | Not Recorded | Leased | No |
| Deed | 8/12/2010 | Williamson Development Company LLC to SCELLC | Surface required for SCELLC Operations | Not Recorded | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to SCELLC | Surface in Hamilton County required for SCELLC Operations | Not Recorded | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to SCELLC | Surface at former Akin site required for SCELLC Operations | Not Recorded | Owned | Yes |
| Coal Mining Lease | 8/12/2010 | Ruger Coal Company LLC to SCELLC | Coal Reserves | Not Recorded | Leased | Yes |
|  |  |  |  |  |  |  |
| Mining Lease | 01/04/18 | Roberts, Carol Ann Trustee  to SCELLC | Sugar Camp Mine Plan | HC 2018-0008 | Leased |  |
| Mining Lease | 01/04/18 | Engstrom, Amy  to SCELLC | Sugar Camp Mine Plan | HC 2018-0011 | Leased |  |
| Mining Lease | 01/04/18 | Hayes, Marshall Jr.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0013 | Leased |  |
| Mining Lease | 01/04/18 | Blanchard, Bonnie M.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0016 | Leased |  |
| Mining Lease | 01/04/18 | Palmer, James  to SCELLC | Sugar Camp Mine Plan | HC 2018-0017 | Leased |  |
| Mining Lease | 01/04/18 | Moxley, Linda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0018 | Leased |  |
| Coal Deed | 01/04/18 | Johnson, Susan L.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0019 | Owned |  |
| Mining Lease | 01/30/18 | McFarland, Carol A.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0110 | Leased |  |
| Mining Lease | 01/30/18 | Bowman, Debra Kate  to SCELLC | Sugar Camp Mine Plan | HC 2018-0111 | Leased |  |
| Mining Lease | 01/30/18 | Diaz, Donna J.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0112 | Leased |  |
| Mining Lease | 01/30/18 | Flannigan, James T.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0113 | Leased |  |
| Mining Lease | 01/30/18 | Leslie, Janet E.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0114 | Leased |  |
| Mining Lease | 01/30/18 | Reid, Jon M.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0115 | Leased |  |
| Mining Lease | 01/30/18 | Webster, Linda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0116 | Leased |  |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 01/30/18 | Henson, William  to SCELLC | Sugar Camp Mine Plan | HC 2018-0119 | Leased | |
| Coal Deed | 01/30/18 | Wake, Amanda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0120 | Owned | |
| Coal Deed | 01/30/18 | Trabant, Megan  to SCELLC | Sugar Camp Mine Plan | HC 2018-0121 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Pamela S.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0122 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Rochelle  to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Owned | |
| Mining Lease | 01/30/18 | Bloomfield, Dora  to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Leased | |
| Mining Lease | 01/30/18 | Flannigan, Donald  to SCELLC | Sugar Camp Mine Plan | HC 2018-0124 | Leased | |
| Mining Lease | 01/30/18 | Smith, Sharon  to SCELLC | Sugar Camp Mine Plan | HC 2018-0126 | Leased | |
| Mining Lease | 02/08/18 | Wood, Betty A.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0171 | Leased | |
| Mining Lease | 02/08/18 | Irish, Carol V.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0172 | Leased | |
| Mining Lease | 02/08/18 | Wicker, Darrell  to SCELLC | Sugar Camp Mine Plan | HC 2018-0173 | Leased | |
| Mining Lease | 02/08/18 | Kathleen M. Wright  to SCELLC | Sugar Camp Mine Plan | HC 2018-0174 | Leased | |
| Mining Lease | 02/08/18 | Irish, Lloyd Paul  to SCELLC | Sugar Camp Mine Plan | HC 2018-0175 | Leased | |
| Mining Lease | 02/08/18 | Patterson, Paul J.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0176 | Leased | |
| Mining Lease | 02/08/18 | Wicker, Paul R.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0177 | Leased | |
| Mining Lease | 02/28/18 | Krois, Bonnie C.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0270 | Leased | |
| Coal Deed | 02/28/18 | Tabor, Stephanie  to SCELLC | Sugar Camp Mine Plan | HC 2018-0271 | Owned | |
| Mining Lease | 02/28/18 | Petitte, Clyda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0272 | Leased | |
| Mining Lease | 02/28/18 | Patterson, Emily Jo to SCELLC | Sugar Camp Mine Plan | HC 2018-0273 | Leased | |
| Mining Lease | 02/28/18 | Allen, Jane to SCELLC | Sugar Camp Mine Plan | HC 2018-0274 | Leased | |
| Coal Deed | 02/28/18 | Spaven, Laverne  to SCELLC | Sugar Camp Mine Plan | HC 2018-0276 | Owned | |
| Mining Lease | 02/28/18 | Jackson, Patricia Snyder to SCELLC | Sugar Camp Mine Plan | HC 2018-0277 | Leased | |
| Mining Lease | 02/28/18 | Gioia, Virginia M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0278 | Leased | |
| Mining Lease | 02/28/18 | Moffett, William R.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0279 | Leased | |
| Mining Lease | 02/28/18 | O'Dell, William to SCELLC | Sugar Camp Mine Plan | HC 2018-0280 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 02/28/18 | Reid, Dennis P. to SCELLC | Sugar Camp Mine Plan | HC 2018-0281 | Leased | |
| Coal Deed | 02/28/18 | Griffith, Janice Sue to SCELLC | Sugar Camp Mine Plan | HC 2018-0284 | Owned | |
| Mining Lease | 02/28/18 | Knight, Kenneth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0287 | Leased | |
| Coal Deed | 02/28/18 | Metheney, Rickie W. to SCELLC | Sugar Camp Mine Plan | HC 2018-0289 | Owned | |
| Mining Lease | 02/28/18 | Olson, Ruth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0291 | Leased | |
| Mining Lease | 02/28/18 | Sandy, Susan E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0293 | Leased | |
| Coal Deed | 02/28/18 | Miller, Micah A. & Marietta to SCELLC | Sugar Camp Mine Plan | HC 2019-2023 | Owned | |
| Mining Lease | 04/06/18 | Mudge, Evelyn M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0806 | Leased | |
| Mining Lease | 04/12/18 | Higginson, Leslie K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0527 | Leased | |
| Coal Deed | 04/12/18 | Farris, Brenda K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0528 | Owned | |
| Mining Lease | 04/12/18 | Cook, Becky Lynn to SCELLC | Sugar Camp Mine Plan | HC 2018-0529 | Leased | |
| Mining Lease | 04/12/18 | Snyder, Diane M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0530 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Kevin J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0531 | Leased | |
| Mining Lease | 04/12/18 | Wohlers, Karen J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0532 | Leased | |
| Mining Lease | 04/12/18 | Heckert, Lauri to SCELLC | Sugar Camp Mine Plan | HC 2018-0533 | Leased | |
| Mining Lease | 04/12/18 | Page, Mary Jane by Sidney Bennett III AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-0534 | Leased | |
| Mining Lease | 04/12/18 | Comp ton, Paulette N. to SCELLC | Sugar Camp Mine Plan | HC 2018-0535 | Leased | |
| Mining Lease | 04/12/18 | Taylor, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2018-0536 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Carol Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-0537 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Casey Joel to SCELLC | Sugar Camp Mine Plan | HC 2018-0538 | Leased | |
| Mining Lease | 05/08/18 | Lowman, Timothy A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0548 | Leased | |
| Mining Lease | 05/08/18 | Neal, Douglas Allen to SCELLC | Sugar Camp Mine Plan | HC 2018-0754 | Leased | |
| Mining Lease | 05/08/18 | Williams, J. Mark to SCELLC | Sugar Camp Mine Plan | HC 2018-0755 | Leased | |
| Mining Lease | 05/08/18 | Barker, Lynne E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0756 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 05/08/18 | Knight, Stephen L. to SCELLC | Sugar Camp Mine Plan | HC 2018-0757 | Leased | |
| Mining Lease | 05/08/18 | Neal, Walter Blake to SCELLC | Sugar Camp Mine Plan | HC 2018-0759 | Leased | |
| Coal Deed | 05/11/18 | Noma, Inc to SCELLC | Sugar Camp Mine Plan | HC 2018-1036 | Owned | |
| Mining Lease | 05/16/18 | Hake, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0807 | Leased | |
| Mining Lease | 05/16/18 | Hosner, Irene Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0808 | Leased | |
| Mining Lease | 05/16/18 | Duckworth, Nina Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0811 | Leased | |
| Mining Lease | 05/16/18 | Bailey, Velma Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0812 | Leased | |
| Mining Lease | 05/16/18 | Lovan, W. Robert to SCELLC | Sugar Camp Mine Plan | HC 2018-0813 | Leased | |
| Mining Lease | 05/16/18 | Neal, William Jerry to SCELLC | Sugar Camp Mine Plan | HC 2018-0814 | Leased | |
| Coal Deed | 06/27/18 | Bow ton, Barbara G. to SCELLC | Sugar Camp Mine Plan | HC 2018-1027 | Owned | |
| Coal Deed | 06/27/18 | Whets tone, Dennis W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1028 | Owned | |
| Coal Deed | 06/27/18 | Whets tone, William R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1029 | Owned | |
| Coal Deed | 06/27/18 | Smith, Bernice to SCELLC | Sugar Camp Mine Plan | HC 2018-1030 | Owned | |
| Coal Deed | 06/27/18 | Thompson, Beatrice % Billy E. Walker AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-1031 | Owned | |
| Coal Deed | 06/27/18 | First Church of the Nazarene to SCELLC | Sugar Camp Mine Plan | HC 2018-1032 | Owned | |
| Coal Deed | 06/27/18 | Linn, Karen R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1034 | Owned | |
| Mining Lease | 06/27/18 | Seibert, Charles Ellis to SCELLC | Sugar Camp Mine Plan | HC 2018-1037 | Leased | |
| Mining Lease | 06/27/18 | Seibert, James Thomas to SCELLC | Sugar Camp Mine Plan | HC 2018-1038 | Leased | |
| Mining Lease | 06/27/18 | Drake, Terry W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1041 | Leased | |
| Mining Lease | 06/27/18 | Scott, Betsy Dawn to SCELLC | Sugar Camp Mine Plan | HC 2018-1042 | Leased | |
| Mining Lease | 06/27/18 | Lane, John Bradley to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 06/27/18 | Drake, Mark W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |
| Coal Deed | 06/27/18 | Mendyk, Julie to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Joyce Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1086 | Leased | |
| Mining Lease | 07/05/18 | Metheney, Donald W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1084 | Leased | |
| Coal Deed | 07/05/18 | Sandidge, Joyce to SCELLC | Sugar Camp Mine Plan | HC 2018-1085 | Owned | |
| Coal Deed | 07/05/18 | Smith, Leon to SCELLC | Sugar Camp Mine Plan | HC 2018-1087 | Owned | |
| Coal Deed | 07/05/18 | Smith, Richard H. to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Ronald M. to SCELLC | Sugar Camp Mine Plan | HC 2018-1089 | Leased | |
| Mining Lease | 07/18/18 | Martin, Marianne B. to SCELLC | Sugar Camp Mine Plan | HC 2018-1157 | Leased | |
| Mining Lease | 07/18/18 | Wilkie, Mary Jean to SCELLC | Sugar Camp Mine Plan | HC 2018-1158 | Leased | |
| Mining Lease | 07/18/18 | Jones, Michael J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1159 | Leased | |
| Mining Lease | 07/18/18 | Martin, Janet J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1160 | Leased | |
| Mining Lease | 07/30/18 | Kleber, LLC to SCELLC | Sugar Camp Mine Plan | HC 2018-1222 | Leased | |
| Mining Lease | 08/08/18 | Vickers, Rhonda Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1271 | Leased | |
| Mining Lease | 08/08/18 | Pike, Brenda L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1272 | Leased | |
| Mining Lease | 08/08/18 | Schwenn, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1273 | Leased | |
| Mining Lease | 08/14/18 | Lane, Juanita Dare to SCELLC | Sugar Camp Mine Plan | HC 2018-1302 | Leased | |
| Coal Deed | 08/14/18 | Metheney, Miranda to SCELLC | Sugar Camp Mine Plan | HC 2018-1301 | Owned | |
| Mining Lease | 08/14/18 | Yancey, George to SCELLC | Sugar Camp Mine Plan | HC 2018-1303 | Leased | |
| Mining Lease | 08/28/18 | Knob Prairie Baptist Cemetery Association to SCELLC | Sugar Camp Mine Plan | HC 2018-1040 | Leased | |
| Coal Deed | 09/12/18 | Buchanan, Cynthia E. to SCELLC | Sugar Camp Mine Plan | HC 2018-1439 | Owned | |
| Coal Deed | 09/12/18 | Brophy, Romaine widow of James Brophy to SCELLC | Sugar Camp Mine Plan | HC 2018-1440 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 09/12/18 | Wright, Donald L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1441 | Leased | |
| Mining Lease | 09/12/18 | Dorion, Rhona to SCELLC | Sugar Camp Mine Plan | HC 2018-1442 | Leased | |
| Mining Lease | 09/12/18 | Wright, Laura to SCELLC | Sugar Camp Mine Plan | HC 2018-1443 | Leased | |
| Mining Lease | 10/03/18 | Simmons, Gavin T. to SCELLC | Sugar Camp Mine Plan | HC 2018-1523 | Leased | |
| Mining Lease | 10/03/18 | Wright, Curtis D. to SCELLC | Sugar Camp Mine Plan | HC 2018-1524 | Leased | |
| Mining Lease | 10/03/18 | Lane, Riley Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1525 | Leased | |
| Mining Lease | 10/24/18 | Winter, Carrie L Trust to SCELLC | Sugar Camp Mine Plan | HC 2018-1662 | Leased | |
| Mining Lease | 10/24/18 | Smith, Brett to SCELLC | Sugar Camp Mine Plan | HC 2018-1663 | Leased | |
| Mining Lease | 10/24/18 | Johnson, Flora Wymond to SCELLC | Sugar Camp Mine Plan | HC 2018-1665 | Leased | |
| Mining Lease | 10/24/18 | Collins, Sandra Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1666 | Leased | |
| Mining Lease | 10/24/18 | Koptez, Steven Gerald to SCELLC | Sugar Camp Mine Plan | HC 2018-1667 | Leased | |
| Mining Lease | 10/24/18 | Decker, Mary Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1783 | Leased | |
| Coal Deed | 10/30/18 | Jenkins, Thomas R  to SCELLC | Sugar Camp Mine Plan | HC 2018-1692 | Owned | |
| Mining Lease | 10/30/18 | Dry, Margaret Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1693 | Leased | |
| Mining Lease | 10/30/18 | Lane, Sydney Drew to SCELLC | Sugar Camp Mine Plan | HC 2018-1694 | Leased | |
| Mining Lease | 10/30/18 | touma, Elizabeth Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1695 | Leased | |
| Mining Lease | 10/30/18 | Myers, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1696 | Leased | |
| Mining Lease | 11/19/18 | Palmer, Gary to SCELLC | Sugar Camp Mine Plan | HC 2018-1785 | Leased | |
| Mining Lease | 11/19/18 | Jordon, Flora Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 11/20/18 | Waggoner, Amanda J to SCELLC | Sugar Camp Mine Plan | FC 2018-4821 | Leased | |
| Mining Lease | 11/20/18 | Bohannon, Barbara Ann to SCELLC | Sugar Camp Mine Plan | FC 2018-4822 | Leased | |
| Mining Lease | 11/20/18 | Otterson, Lloyd L. to SCELLC | Sugar Camp Mine Plan | FC 2018-4823 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 12/11/18 | Goforth, Heather J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1905 | Leased | |
| Mining Lease | 12/11/18 | Goforth,  Matthew R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1906 | Leased | |
| Mining Lease | 12/11/18 | Smith, Kerry to SCELLC | Sugar Camp Mine Plan | HC 2018-1907 | Leased | |
| Mining Lease | 12/11/18 | Johnson, Katherine Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 12/18/18 | Wright, Shelia P. to SCELLC | Sugar Camp Mine Plan | HC 2018-1974 | Leased | |
| Mining Lease | 12/18/18 | Wright, Richard A. to SCELLC | Sugar Camp Mine Plan | HC 2018-1975 | Leased | |
| Mining Lease | 12/18/18 | Wright, Michael S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1976 | Leased | |
| Mining Lease | 12/18/18 | Brown, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1977 | Leased | |
| Coal Deed | 01/09/19 | Jenkins, Mike  to SCELLC | Sugar Camp Mine Plan | HC 2019-0057 | Owned | |
| Mining Lease | 01/09/19 | Jenkins, Hellen to SCELLC | Sugar Camp Mine Plan | HC 2019-0058 | Leased | |
| Mining Lease | 01/09/19 | Bayne, Janet Jenkins to SCELLC | Sugar Camp Mine Plan | HC 2019-0059 | Leased | |
| Mining Lease | 01/09/19 | Jenkins, James J. to SCELLC | Sugar Camp Mine Plan | HC 2019-0060 | Leased | |
| Mining Lease | 01/16/19 | Wright, Steven Ray to SCELLC | Sugar Camp Mine Plan | HC 2019-0097 | Leased | |
| Mining Lease | 01/16/19 | Wright, Ida Louise to SCELLC | Sugar Camp Mine Plan | HC 2019-0098 | Leased | |
| Coal Deed | 01/29/19 | The Bonnie Camp Meeting  to SCELLC | Sugar Camp Mine Plan | HC 2019-0150 | Owned | |
| Coal Deed | 02/01/19 | Barnhill, Ruth Eloise Short  to SCELLC | Sugar Camp Mine Plan | HC 2019-0168 | Owned | |
| Coal Deed | 02/01/19 | Rappe, John James  to SCELLC | Sugar Camp Mine Plan | HC 2019-0169 | Owned | |
| Mining Lease | 02/01/19 | Willis, Bruce E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0172 | Leased | |
| Mining Lease | 02/01/19 | Knott, Elaine Mae to SCELLC | Sugar Camp Mine Plan | HC 2019-0173 | Leased | |
| Mining Lease | 02/01/19 | Seibert, John Walter to SCELLC | Sugar Camp Mine Plan | HC 2019-0174 | Leased | |
| Coal Deed | 02/08/19 | Short, Leon  to SCELLC | Sugar Camp Mine Plan | HC 2019-0210 | Owned | |
| Coal Deed | 02/08/19 | Avolt, Kathleen Eagan  to SCELLC | Sugar Camp Mine Plan | HC 2019-0218 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Deed | 02/08/19 | Avolt, Donna H.  to SCELLC | Sugar Camp Mine Plan | HC 2019-0219 | Owned | |
| Mining Lease | 02/13/19 | Wall, Letitia to SCELLC | Sugar Camp Mine Plan | HC 2019-0223 | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | not recorded | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | not recorded | Leased | |
| Mining Lease | 02/19/19 | Hoffman, Elaine W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0245 | Leased | |
| Coal Deed | 03/12/19 | Banning, David W.  to SCELLC | Sugar Camp Mine Plan | HC 2019-0368 | Owned | |
| Mining Lease | 03/22/19 | Kinsey, Frances E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0416 | Leased | |
| Mining Lease | 03/22/19 | Willis, George Darin to SCELLC | Sugar Camp Mine Plan | HC 2019-0417 | Leased | |
| Mining Lease | 03/22/19 | Burns, Lenore E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0418 | Leased | |
| Mining Lease | 03/22/19 | Gill, Lorella E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0419 | Leased | |
| Mining Lease | 03/22/19 | Oberreiter, Jean Ann (Evans) to SCELLC | Sugar Camp Mine Plan | HC 2019-0420 | Leased | |
| Coal Deed | 03/22/19 | Doyle, Kymbra Drasil  to SCELLC | Sugar Camp Mine Plan | HC 2019-0421 | Owned | |
| Coal Deed | 03/27/19 | Higgins, Cynthia Ann  to Elaine May Knott | Sugar Camp Mine Plan | HC 2019-0446 | Owned | |
| Coal Deed | 03/28/19 | Short, Dian  to SCELLC | Sugar Camp Mine Plan | HC 2019-0463 | Owned | |
| Coal Deed | 03/28/19 | Short, Richard  to SCELLC | Sugar Camp Mine Plan | HC 2019-0464 | Owned | |
| Coal Deed | 04/03/19 | South Side Christian Church  to SCELLC | Sugar Camp Mine Plan | HC 2019-0507 | Owned | |
| Mining Lease | 04/10/19 | Yorgan, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2019-0558 | Leased | |
| Mining Lease | 04/10/19 | Edmonds, James G. to SCELLC | Sugar Camp Mine Plan | HC 2019-0559 | Leased | |
| Mining Lease | 04/23/19 | Crowder, Nancee L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0669 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Patrick L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0671 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Scott L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0672 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Kenneth to SCELLC | Sugar Camp Mine Plan | HC 2019-0673 | Leased | |
| Mining Lease | 05/01/19 | Foresight Energy LP to SCELLC | Sugar Camp Mine Plan | not recorded | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 05/08/19 | Camden, Randy to SCELLC | Sugar Camp Mine Plan | HC 2019-0750 | Leased | |
| Mining Lease | 05/08/19 | Davis, Tamera L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0751 | Leased | |
| Mining Lease | 05/30/19 | Fitts, David F. to SCELLC | Sugar Camp Mine Plan | HC 2019-0851 | Leased | |
| Coal Deed | 06/03/19 | Avolt, Geoffrey Barth to SCELLC | Sugar Camp Mine Plan | HC 2019-0870 | Owned | |
| Mining Lease | 06/10/19 | Buchman, Diana Sue Wright to SCELLC | Sugar Camp Mine Plan | HC 2019-0896 | Leased | |
| Mining Lease | 06/10/19 | Willis, Robert James to SCELLC | Sugar Camp Mine Plan | HC 2019-0897 | Leased | |
| Mining Lease | 06/10/19 | Sears, James R. & Gloria to SCELLC | Sugar Camp Mine Plan | HC 2019-0898 | Leased | |
| Mining Lease | 06/19/19 | Wise, Melodie Lea to SCELLC | Sugar Camp Mine Plan | HC 2019-0962 | Leased | |
| Mining Lease | 06/19/19 | Walker, Edwin N. to SCELLC | Sugar Camp Mine Plan | HC 2019-0963 | Leased | |
| Mining Lease | 07/17/19 | O'Dell, Paula J. to SCELLC | Sugar Camp Mine Plan | HC 2019-1079 | Leased | |
| Mining Lease | 07/17/19 | Walker, Ivan W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1080 | Leased | |
| Mining Lease | 07/25/19 | Hut ton, Catherine Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1118 | Leased | |
| Coal Deed | 07/25/19 | Nuss, Richard E. Sr. to SCELLC | Sugar Camp Mine Plan | HC 2019-1120 | Owned | |
| Mining Lease | 08/01/19 | Miltenberger, Cheryl G. to SCELLC | Sugar Camp Mine Plan | HC 2019-1162 | Leased | |
| Mining Lease | 08/01/19 | Lohman, Sandra E. to SCELLC | Sugar Camp Mine Plan | HC 2019-1163 | Leased | |
| Mining Lease | 08/01/19 | Entwistle, Craig W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1164 | Leased | |
| Coal Deed | 08/28/19 | Society of St. Vincent de Paul Archdiocesan Council toSCELLC | Sugar Camp Mine Plan | HC 2019-1317 | Owned | |
| Mining Lease | 08/28/19 | Entwistle, Jacquelyn Marie to SCELLC | Sugar Camp Mine Plan | HC 2019-1318 | Leased | |
| Mining Lease | 08/28/19 | Oliver, Mil ton Donald to SCELLC | Sugar Camp Mine Plan | HC 2019-1318 | Leased | |
| Mining Lease | 09/24/19 | Prusha, Thomas M. to SCELLC | Sugar Camp Mine Plan | HC 2019-1584 | Leased | |
| Coal Deed | 10/09/19 | Lowe, Debra Short to SCELLC | Sugar Camp Mine Plan | HC 2019-1697 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Deed | 11/14/19 | Lewis, Phyllis Ann  to SCELLC | Sugar Camp Mine Plan | HC 2019-1869 | Owned | |
| Coal Deed | 11/14/19 | Duncan, Barbara Joan  to SCELLC | Sugar Camp Mine Plan | HC 2019-1870 | Owned | |
| Coal Deed | 11/14/2019 | McKinney, Marsha  to SCELLC | Sugar Camp Mine Plan | HC 2019-1871 | Owned | |
| Coal Deed | 11/14/2019 | Kniffen, Susan  to SCELLC | Sugar Camp Mine Plan | HC 2019-1872 | Owned | |
| Coal Deed | 11/14/19 | Blackwell, William Loyd  to SCELLC | Sugar Camp Mine Plan | HC 2019-1873 | Owned | |
| Mining Lease | 11/14/19 | Flannigan, Monty D. to SCELLC | Sugar Camp Mine Plan | HC 2019-1874 | Leased | |
| Mining Lease | 11/20/19 | Irish, Wilmot Wheeler to SCELLC | Sugar Camp Mine Plan | HC 2019-1903 | Leased | |
| Coal Deed | 11/26/19 | McIntosh, Mark E.  to SCELLC | Sugar Camp Mine Plan | HC 2019-1945 | Owned | |
| Mining Lease | 12/10/19 | Bergen County Animal Shelter to SCELLC | Sugar Camp Mine Plan | FC 2019-4869 | Leased | |
| Mining Lease | 01/16/20 | Moore, Carolyn F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0098 | Leased | |
| Mining Lease | 01/16/20 | Rucker, Lezlie J. to SCELLC | Sugar Camp Mine Plan | HC 2020-0099 | Leased | |
| Mining Lease | 01/16/20 | Cooper, Rene F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0100 | Leased | |
| Coal Deed | 01/21/20 | Drake, Roger  to SCELLC | Sugar Camp Mine Plan | HC 2020-0109 | Owned | |
| Mining Lease | 01/21/20 | Debow, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2020-0110 | Leased | |
| Mining Lease | 01/21/20 | Drake, Daphne to SCELLC | Sugar Camp Mine Plan | HC 2020-0111 | Leased | |
| Mining Lease | 02/18/20 | Rocky Mountain Lions Eye Institute Foundation, Inc. to SCELLC | Sugar Camp Mine Plan | HC 2020-0319 | Leased | |
| Mining Lease | 02/18/20 | Hoppe, Judy H. to SCELLC | Sugar Camp Mine Plan | HC 2020-0320 | Leased | |
| Mining Lease | 02/27/20 | Musselman, James Jay to SCELLC | Sugar Camp Mine Plan | HC 2020-0378 | Leased | |

**Williamson Energy, LLC**

Pond Creek No. 1 Mine
16468 Liberty School Road
Marion, IL 62959

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease as amended | 8/14/2006 | WPP LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Franklin County: Doc 2006-6571<br><br>Williamson County: Misc. 301 page 480 | Leased | Yes |
| Short Form of Lease and Sublease | 5/1/2005 | Williamson Development Company LLC and Williamson Energy LLC | Coal Reserves in Williamson County, Illinois | Misc 291 page 461 | Leased | Yes |
| Short Form of Lease | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Misc 301 Page 479 | Leased | Yes |
| First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Misc 313 Page 620 | Leased | Yes |
| Coal Mining Lease and Sublease | 8/12/10 | Colt LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Il | TBD | Leased | Yes |
| First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Misc 313 Page 619 | Leased | Yes |
| Deed | 8/12/10 | Williamson Development Company, LLC and Williamson Energy, LLC | Surface required for Williamson Energy, LLC Operations[4] | TBD | Owned | Yes |

[4] This excludes the real property released pursuant to that certain Fifth Amendment and Partial Release of Fee and Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of September 26, 2016, by and between Williamson Energy, LLC, as Mortgagor, and Citibank, N.A., in its capacity as Agent, consisting of approximately 28.55 acres of surface land.

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 8/12/10 | Williamson Development Company, LLC and Williamson Energy, LLC | "Snake areas" required for Williamson Energy, LLC Operations | Not Recorded | Owned | Yes |
| Ground Lease | 8/12/10 | Eberhart to Williamson Development Company, LLC assigned to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 325-900 | Leased | Yes |
| Ground Lease | 8/12/10 | Summers to Independence Land Company, LLC to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 327-750 | Leased | Yes |
| Warranty Deed | 6/14/2018 | Diana S. Dulle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-4356 | Owned | |
| Warranty Deed | 7/13/2018 | Linda Duncan to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5209 | Owned | |
| Warranty Deed | 7/20/2018 | Jeremy W. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5434 | Owned | |
| Warranty Deed | 8/20/2018 | Lora L. Jones to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6259 | Owned | |
| Warranty Deed | 8/20/2018 | Shirley N. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6258 | Owned | |
| Warranty Deed | 9/4/2018 | Debra Ellen Moser to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6707 | Owned | |
| Warranty Deed | 9/4/2018 | Larry Dean Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6706 | Owned | |
| Warranty Deed | 9/4/2018 | Jerry R. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6705 | Owned | |
| Warranty Deed | 9/4/2018 | Wilma K. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6704 | Owned | |
| Warranty Deed | 9/4/2018 | Kimberly A. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6703 | Owned | |
| Warranty Deed | 9/4/2018 | Gerald Lee Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6702 | Owned | |
| Warranty Deed | 9/4/2018 | Wendall Ray Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6701 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 9/24/2018 | Edward W. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7338 | Owned | |
| Warranty Deed | 9/24/2018 | Barbara Jean Newton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7337 | Owned | |
| Warranty Deed | 9/24/2018 | Debra L. Caplick to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7336 | Owned | |
| Warranty Deed | 9/24/2018 | Don N. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7335 | Owned | |
| Warranty Deed | 9/24/2018 | Jim D. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7334 | Owned | |
| Warranty Deed | 9/24/2018 | Susan Elaine Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7333 | Owned | |
| Warranty Deed | 9/24/2018 | Jerry D. Brookman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7332 | Owned | |
| Warranty Deed | 9/24/2018 | Linda E. Rector to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7331 | Owned | |
| Warranty Deed | 9/24/2018 | Marion E. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7330 | Owned | |
| Warranty Deed | 9/24/2018 | Sarah J. Glazebrook Perry to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7329 | Owned | |
| Warranty Deed | 10/16/2018 | Michelle McCabe-Doyle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7977 | Owned | |
| Warranty Deed | 10/16/2018 | Richard R. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7976 | Owned | |
| Warranty Deed | 10/16/2018 | Robert Shon Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7975 | Owned | |
| Warranty Deed | 10/16/2018 | Elizabeth Jeanne Culli to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7974 | Owned | |
| Warranty Deed | 10/23/2018 | Kathy Scott to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8178 | Owned | |
| Warranty Deed | 11/07/2018 | Roger W. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8581 | Owned | |
| Warranty Deed | 11/27/2018 | Tommy R. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9311 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 12/03/2018 | Allen E. Heinbokel to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9490 | Owned | |
| Warranty Deed | 12/18/2018 | Jeremiah Wesley Seaman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9920 | Owned | |
| Warranty Deed | 12/18/2018 | Alexandra Lewis DeMarino to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9919 | Owned | |
| Warranty Deed | 1/07/2019 | Shannon Lee Brand to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-147 | Owned | |
| Warranty Deed | 1/31/2019 | Michael James Lewis to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-727 | Owned | |
| Warranty Deed | 1/31/2019 | Karolyn Kay Fullerton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-726 | Owned | |
| Mining Lease | 3/5/2019 | Susan E. Denton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1569 | Leased | |
| Warranty Deed | 3/18/2019 | Ronald L. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1877 | Owned | |
| Warranty Deed | 8/27/2019 | Deloris J. Hoehn to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-6215 | Owned | |
| Warranty Deed | 1/26/2018 | James Walter Hoyt to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-407 | Owned | |
| Warranty Deed | 2/13/2018 | Brenda Dora Spencer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-633 | Owned | |
| Warranty Deed | 3/21/2018 | Patricia K. Dyer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1127 | Owned | |
| Warranty Deed | 3/21/2018 | Diana L. Bischler to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1126 | Owned | |
| Mining Lease | 3/23/2018 | Lisa M. Engeling to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1177 | Leased | |
| Warranty Deed | 4/19/2018 | Jeanette Fortney to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1539 | Owned | |
| Mining Lease | 7/13/2018 | Jerry K. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-2781 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 8/1/2018 | Lorna Lynn Hines to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3095 | Owned | |
| Warranty Deed | 8/1/2018 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3094 | Owned | |
| Warranty Deed | 8/10/2018 | Brian M. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3251 | Owned | |
| Mining Lease | 8/29/2018 | Paula T. Hartzel, et al to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3551 | Leased | |
| Warranty Deed | 9/5/2018 | Janet J. Griffin to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3642 | Owned | |
| Warranty Deed | 9/5/2018 | Gary P. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3641 | Owned | |
| Warranty Deed | 9/5/2018 | Barbara Giles to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3640 | Owned | |
| Warranty Deed | 9/18/2018 | Katherine Ann Bradley to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3870 | Owned | |
| Warranty Deed | 10/17/2018 | Shirley Whitehead to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4400 | Owned | |
| Warranty Deed | 10/23/2018 | Barbara Faye Sharkey to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4481 | Owned | |
| Warranty Deed | 2/1/2019 | Emma L. Stetson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-335 | Owned | |
| Warranty Deed | 3/26/2019 | Ronald L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1004 | Owned | |
| Warranty Deed | 4/2/2019 | Sarah Greenwade to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1134 | Owned | |
| Warranty Deed | 4/2/2019 | Susan L. Naucke to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1154 | Owned | |
| Warranty Deed | 4/17/2019 | Brock D. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1351 | Owned | |
| Warranty Deed | 4/17/2019 | James Keith Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1352 | Owned | |
| Warranty Deed | 4/23/2019 | Marilyn S. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1419 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/14/2019 | Miranda B. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1752 | Owned | |
| Warranty Deed | 5/14/2019 | Charlotte Jean to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1751 | Owned | |
| Warranty Deed | 7/1/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2388 | Owned | |
| Mining Lease | 7/17/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2618 | Owned | |
| Warranty Deed | 7/17/2019 | Judith A. Woodard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2617 | Owned | |
| Warranty Deed | 7/17/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2616 | Owned | |
| Warranty Deed | 7/24/2019 | Norma Adams Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2732 | Owned | |
| Warranty Deed | 7/30/2019 | Phillip R. Erthall to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2832 | Owned | |
| Warranty Deed | 7/30/2019 | Robert H. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2833 | Owned | |
| Warranty Deed | 8/13/2019 | Kenneth L. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3062 | Owned | |
| Warranty Deed | 8/13/2019 | William Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3061 | Owned | |
| Warranty Deed | 9/4/2019 | Linda S. Lear to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3389 | Owned | |
| Deed | 9/16/2019 | Steven H. Machura to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3554 | Owned | |
| Warranty Deed | 10/17/2019 | Sharon A. Aiken-Peterson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3990 | Owned | |
| Warranty Deed | 10/30/2019 | Raven N. Fager to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4153 | Owned | |
| Mining Lease | 11/05/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4251 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/14/2019 | Daniel L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4371 | Owned | |
| Warranty Deed | 11/26/2019 | Colleen L. Taylor to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4559 | Owned | |
| Warranty Deed | 2/25/2020 | Paula Kay Osteen-Cortez to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-728 | Owned | |
| Warranty Deed | 2/25/2020 | Monta Ray Jennings to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-726 | Owned | |
| Warranty Deed | 2/25/2020 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-727 | Owned | |

**American Century Transport LLC**

Preparation Plant
43521 Mayhugh Hill Rd, Beallsville
OH 43716

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/8/2016 | American Energy Corporation to American Century Transport LLC | See legal description set forth in the deed. | 201600000427 | Owned | Yes |

Schedule XIII-B to Collateral Questionnaire

## MINING LEASES

### WILLIAMSON ENERGY, LLC:

1. Amended and Restated Coal Mining Lease Agreement dated August 14, 2006 between WPP LLC, Lessor and Williamson Energy, LLC, Lessee, as amended.

2. Coal Mining Lease and Sublease between Steelhead Development Company LLC (n/k/a Williamson Development Company LLC) and Williamson Energy, LLC dated May 1, 2005, as amended.

3. Coal Mining Lease Agreement between Independence Land Company, LLC and Williamson Energy, LLC (5000-Foot Extension) dated March 13, 2006, as amended.

4. First Amended and Restated Lease (Coal Prep Plant) dated October 15, 2006 between Williamson Energy, LLC and Williamson Development Company LLC.

5. Amended and Restated Surface Sublease and Operation Agreement dated October 15, 2006 between Williamson Energy, LLC and Williamson Transport, LLC.

6. Amended and Restated Surface Sublease and Operation Agreement dated October 15, 2006 between Williamson Energy, LLC and Williamson Track LLC.

7. Coal Mining Lease and Sublease dated August 12, 2010 by and between Colt LLC as lessor and Williamson Energy, LLC as lessee, as amended.

### SUGAR CAMP ENERGY, LLC:

1. Coal Mining Lease dated July 29, 2005 between RGGS Land & Minerals LTD., L.P., Lessor and Sugar Camp Energy, LLC, Lessee, as amended. FC 2006-6919

2. First Amendment to Coal Mining Lease dated August 11, 2008 between RGGS Land & Minerals, LTD, L.P. and Sugar Camp Energy, LLC. FC 2008-4441

3. Illinois Coal Lease dated July 1, 2002 between United States of America, acting through its legal agent, the Tennessee Valley Authority, Lessor, and Illinois Fuel Company, LLC, Lessee (as assigned to Ruger Coal Company, LLC under that Assignment and Assumption Agreement dated August 4, 2009 by and among the United States of America, acting through its legal agent, the Tennessee Valley Authority, Lessor, Illinois Fuel Company, LLC, Assignor, and Ruger Coal Company, LLC, Assignee, and expressly granting Sugar Camp Energy LLC the right to mine the reserves subject to the Lease). FC 2007-5822

4. Coal Mining Lease dated August 12, 2010 by and between Ruger Coal Company LLC as lessor and Sugar Camp Energy, LLC as lessee. FC 0283

5. Contract Mining and Overriding Royalty Agreement dated August 12, 2010 by and between Ruger Coal Company LLC and Sugar Camp Energy, LLC (related to Illinois Fuels lease). FC 0290

6. Contract Mining and Overriding Royalty Agreement dated August 12, 2010 by and between Ruger Coal Company LLC and Sugar Camp Energy, LLC, as amended (related to Franklin County lease).  FC 0283

7. Franklin County Coal Lease dated July 1, 2002 between United States of America, acting through its legal agent, the Tennessee Valley Authority, Lessor, and Ruger Coal Company, Inc., Lessee, as assigned by Ruger Coal Company, Inc. to Ruger Coal Company, LLC, as amended. FC 2007-5132

**MACOUPIN ENERGY LLC**:

1. Coal Mining Lease and Sublease Agreement dated January 27, 2009 between WPP, LLC, Lessor and Macoupin Energy LLC, Lessee.

2. Lease Agreement dated January 27, 2009 between HOD, LLC, Lessor and Macoupin Energy LLC (Macoupin Rail Loop Lease), as amended.

3. Lease Agreement dated January 27, 2009 between HOD, LLC, Lessor and Macoupin Energy LLC, Lessee (Macoupin Rail Loadout), as amended.

4. Option and Lease Agreement made and entered into as of February 28, 1967, by and between Jet Oil Company, as Lessor, and James F. Gatewood, Trustee, under trust established by an agreement dated January 13, 1967 and known as the Gatewood-J Trust, as Lessee, a short form of which was recorded in Volume 628, Page 456 of the Macoupin County, Illinois Miscellaneous Records, as amended and/or assigned (the "SEIP Lease" or "Jet Lease").

5. Assignment of Leases dated January 27, 2009 between Macoupin Energy LLC, Assignor and WPP LLC, Assignee.

6. Corrective Assignment of Leases dated August 12, 2010 between Macoupin Energy LLC, Assignor and WPP LLC, Assignee.

7. Coal Mining Lease and Sublease (Unassigned Reserves) dated August 12, 2010 by and between Colt LLC as lessor and Macoupin Energy LLC as lessee, as amended.

8. Coal Mining Lease and Sublease (Macoupin North Mine Assignment) dated August 12, 2010 by and between Colt LLC as lessor and Macoupin Energy LLC as lessee.

**Schedule XIV to**
**Collateral Questionnaire**

## FILINGS AND JURISDICTION

| Grantor | Collateral | Instrument | Filing Jurisdiction |
|---|---|---|---|
| Foresight Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Energy GP LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Adena Resources, LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Franklin County, Illinois |
| Adena Resources, LLC | As-Extracted Collateral | UCC-1 Fixture Filing | Franklin County, Illinois |
| Adena Resources, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Akin Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| American Century Mineral LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| American Century Transport LLC | Owned Real Property | Fee Mortgage/Deed of Trust and Fixture Filing | Belmont County, Ohio |
| American Century Transport LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Coal Field Construction Company LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Coal Field Repair Services LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Coal Sales LLC | Personal Property. | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Energy Employee Services Corporation | Personal Property. | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Energy Finance Corporation | Personal Property. | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Energy Labor LLC | Personal Property. | UCC-1 Financing Statement | Delaware Secretary of State |

| Grantor | Collateral | Instrument | Filing Jurisdiction |
|---|---|---|---|
| Foresight Energy Services LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Receivables LLC | Personal Property | UCC-1 Financing Statement | Secretary of State |
| Hillsboro Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Hillsboro Transport LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| LD Labor Company LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Logan Mining LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| M-Class Mining, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Mach Mining, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Macoupin Energy LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Macoupin County, Illinois |
| Macoupin Energy LLC | As-Extracted Collateral | UCC-1 Fixture Filing | Macoupin County, Illinois |
| Macoupin Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| MaRyan Mining LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Oeneus LLC d/b/a Savatran LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Hamilton, Franklin, Williamson, Gallatin and Saline Counties, Illinois |
| Oeneus LLC d/b/a Savatran LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Patton Mining LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Seneca Rebuild LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Sitran LLC | Personal Property | UCC-1 Financing | Delaware |

| Grantor | Collateral | Instrument | Filing Jurisdiction |
|---|---|---|---|
|  |  | Statement | Secretary of State |
| Sugar Camp Energy, LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Franklin and Saline Counties, Illinois |
| Sugar Camp Energy, LLC | As-Extracted Collateral | UCC-1 Fixture Filing | Franklin and Saline Counties, Illinois |
| Sugar Camp Energy, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Tanner Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Viking Mining LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Williamson Energy, LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Williamson Franklin and Saline Counties, Illinois |
| Williamson Energy, LLC | As-Extracted Collateral | UCC-1 Fixture Filing | Williamson Franklin and Saline Counties, Illinois |
| Williamson Energy, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |

Schedule XV
to Collateral Questionnaire

**RAILCARS**

| Description/ Title of Document | Parties | Brief Legal Description | Owned or Leased |
|---|---|---|---|
| Rental Agreement | THE AMERICAN COAL COMPANY to SAVATRAN LLC | 220 railcars | Leased |
| Rental Agreement | RLH1LLC to OENEUS LLC d/b/a SAVATRAN LLC | 98 railcars - expired/returning | Leased |
| Rental Agreement | ALF P-I, Inc.  to OENEUS LLC d/b/a SAVATRAN LLC | 113 railcars | Leased |
| Rental Agreement - Schedule No. 2 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 296 railcars - expired/returning | Leased |
| Rental Agreement - Schedule No. 3 | INFINITY TRANSPORT 2018-1, LLC to SAVATRAN LLC | 90 railcars | Leased |
| Rental Agreement - Schedule No. 5 | THE CIT GROUP/EQUIPMENT FINANCING, INC to SAVATRAN LLC | 115 railcars | Leased |
| Rental Agreement - Schedule No. 6 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 11 railcars | Leased |
| Rental Agreement - Schedule No. 7 | CIT BANK, N.A. to SAVATRAN LLC | 27 railcars | Leased |
| Rental Agreement - Schedule No. 8 | THE CIT GROUP/EQUIPMENT FINANCING, INC to SAVATRAN LLC | 40 railcars | Leased |
| Rental Agreement - Schedule No. 9 | THE CIT GROUP/EQUIPMENT FINANCING, INC to SAVATRAN LLC | 25 railcars | Leased |
| Rental Agreement - Schedule No. 10 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 80 railcars | Leased |
| Rental Agreement - Schedule No. 13 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 150 railcars | Leased |
| Rental Agreement - Schedule No. 14 | THE CIT GROUP/EQUIPMENT FINANCING, INC to SAVATRAN LLC | 108 railcars | Leased |
| Rental Agreement - Schedule No. 15 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 42 railcars | Leased |
| Rental Agreement | Riverside Rail ILLC, as ultimate assignee of BBRX Five LLC to Savatan LLC | 119 railcars | Leased |
| Rental Agreement | NBinv Riverside Cars 1, LLC, CCIX LLC and DCM RAIL LLC and Riverside Rail I LLC to Savatran LLC | 124 railcars | Leased |

**Schedule XVI**
**To Collateral Questionnaire**

**UNUSUAL TRANSACTIONS**

1. On August 23, 2013, the Company distributed 100% of its ownership interest in Adena Resources, LLC, Sitran LLC and Hillsboro Energy LLC to its members.  During the first quarter of 2015, Foresight Reserves, LP and a member of the Company's management contributed their 100% equity interest in Adena Resources, LLC, Akin Energy LLC, Hillsboro Transport LLC and Sitran LLC to the Company.

*EXHIBIT C-1*

## FORM OF TERM LOAN NOTE

FOR VALUE RECEIVED, FORESIGHT ENERGY LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to [  ]  or registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of $[ ] or so much thereof as shall constitute the aggregate principal amount of Term Loans made by the Lender to the Borrower under that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

The Borrower promises to pay interest on the unpaid principal amount of each Term Loan from the date of such Term Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement.  All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender in Dollars and in Same Day Funds at the Administrative Agent's Office.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Note is one of the Term Loan Notes (as defined in the Credit Agreement) referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein.  This Note is also entitled to the benefits of the Guaranty.  Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note may either become or be declared to be immediately due and payable all as provided in the Credit Agreement. Term Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business.  The Lender may also attach schedules to this Note and endorse thereon the date, amount, currency and maturity of its Term Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

**FORESIGHT ENERGY LLC**

By: _____

Name: _____

Title: _____

**LOANS AND PAYMENTS WITH RESPECT THERETO**

| Date | Type of Loan Made | Amount of Loan Made | End of Interest Period | Amount of Principal or Interest Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|-------------------|---------------------|------------------------|------------------------------------------------|------------------------------------------|------------------|

*EXHIBIT C-2*

### FORM OF ROLL-UP LOAN NOTE

FOR VALUE RECEIVED, FORESIGHT ENERGY LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to [  ]  or registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of $[ ] or so much thereof as shall constitute the aggregate principal amount of Roll-Up Loans made by the Lender to the Borrower under that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

The Borrower promises to pay interest on the unpaid principal amount of each Roll-Up Loan from the date of such Roll-Up Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement.  All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender in Dollars and in Same Day Funds at the Administrative Agent's Office.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Note is one of the Roll-Up Loan Notes (as defined in the Credit Agreement) referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein.  This Note is also entitled to the benefits of the Guaranty.  Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note may either become or be declared to be immediately due and payable all as provided in the Credit Agreement. Roll-Up Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business.  The Lender may also attach schedules to this Note and endorse thereon the date, amount, currency and maturity of its Roll-Up Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

**FORESIGHT ENERGY LLC**

By: _____

Name: _____

Title: _____

**LOANS AND PAYMENTS WITH RESPECT THERETO**

| Date | Type of Loan Made | Amount of Loan Made | End of Interest Period | Amount of Principal or Interest Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|-------------------|---------------------|------------------------|-----------------------------------------------|-----------------------------------------|------------------|

*EXHIBIT D*

## FORM OF COMPLIANCE CERTIFICATE

To:    Cortland Capital Market Services LLC, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

The undersigned Responsible Officer hereby certifies as of the date hereof that he/she is the          of    the Borrower, and that, as such, he/she is authorized to execute and deliver this Certificate to the Administrative Agent on the behalf of the Borrower, and that:

*[Use following paragraph 1 for fiscal **year-end** financial statements]*

1.    Attached hereto as <u>Schedule 1</u> are the year-end audited financial statements required by <u>Section 6.01(a)</u> of the Credit Agreement for the fiscal year of the Borrower ended as of the above date, together with the report and opinion of an independent certified public accountant required by such section.[4]

*[Use following paragraph 1 for fiscal **quarter-end** financial statements]*

2.    Attached hereto as <u>Schedule 1</u> are the unaudited financial statements required by <u>Section 6.01(b)</u> of the Credit Agreement for the fiscal quarter of the Borrower ended as of the above date.  Such financial statements fairly present in all material respects the financial condition, results of operations, changes in shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP as at such date and for such period, subject only to normal year-end audit adjustments and the absence of footnotes.

3.    The undersigned has reviewed and is familiar with the terms of the Credit Agreement and has made, or has caused to be made under his/her supervision, a review of the financial condition of the Borrower during the accounting period covered by the attached financial statements.

4.    A review of the activities of the Borrower during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Borrower performed and observed all of its Obligations under the Loan Documents, and

*[select one:]*

---

[4]    In the event that Holdings or any Parent reports on a consolidated basis, such consolidated reporting at Holdings or such Parent's level in a manner consistent with that described in clauses (a) and (b) of this Section 6.01 for the Borrower will satisfy the requirements of such clauses.

**[to the best knowledge of the undersigned during such fiscal period, the Borrower performed and observed each covenant of the Loan Documents applicable to it and no Default or Event of Default has occurred and is continuing.]**

*—or—*

**[the following covenants have not been performed or observed and the following is a list of each such Default or Event of Default and its nature and status:]**

[5.     Except for the following Subsidiaries which are in the process of complying with the requirements of Section 6.12 of the Credit Agreement, as of the date hereof, there is no Subsidiary that is required to be a Guarantor, by virtue of the definition of Guarantor.][5]

[[6].     Since the [Closing Date][date of the last Compliance Certificate delivered by the Borrower pursuant to Section 6.02(a)], the Loan Parties have acquired the following Material Real Property:][6]

[7].     Unless as stated otherwise in a certificate of a Responsible Officer attached hereto, there has been no material change in accounting policies or financial reporting practices by the Borrower or any Subsidiary.

---

[5]     To include only if any Subsidiary that is not a Guarantor is required to become a Guarantor by virtue of the definition thereof as of the date of the Compliance Certificate.

[6]     To be included if any Material Real Property is acquired during the period specified, listing applicable Loan Party, nature of interest, location and, if leased, name and address of lessor.

D - 2

*IN WITNESS WHEREOF*, the undersigned has executed this Certificate as of      ,        .

**FORESIGHT ENERGY LLC**

By: _____

Name: _____

Title: _____

For the Quarter/Year ended _____ ("Statement Date")

**SCHEDULE 1**
to the Compliance Certificate

[See attached]

*EXHIBIT E*

**FORM OF ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption Agreement (this "Assignment") is dated as of the Closing Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Closing Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of the outstanding rights and obligations of the Assignor under the respective facilities identified below (including, without limitation, guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "Assigned Interest").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1.    Assignor:

2.    Assignee:                     [and is an Affiliate/Approved Fund of [*identify Lender*][7]]

3.    Borrower:                     FORESIGHT ENERGY LLC

4.    Administrative Agent: Cortland Capital Market Services LLC, as the Administrative Agent under the Credit Agreement

5.    Credit Agreement:                     Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March [  ], 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party

_____
[7]         Select as applicable.

E - 1

hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

    1.        Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[8] |
|---|---|---|---|
| [9] | $ | $ | $ % |
|  | $ | $ | $ % |
|  | $ | $ | $ % |

[7.    Trade Date:             ][10]

Closing Date:    , 20    [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE CLOSING DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

    The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]
By: _____
    Title:

ASSIGNEE
[NAME OF ASSIGNEE]
By: _____
    Title:

[Consented to and][11] Accepted:

Cortland Capital Market Services LLC, as the Administrative Agent under the Credit Agreement]

By: _____
    Title:

[Consented to:

FORESIGHT ENERGY LLC


By:
Title: ][12]

---

[8]    Set forth, to at least 10 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[9]    Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Initial Term Loan", "Delayed Draw Term Loan Commitment", "Delayed Draw Term Loan", "Roll-Up Loan", etc.)

[10]    To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

[11]    To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[12]    To be added only if the consent of the Borrower is required by the terms of the Credit Agreement. Note that the Borrower shall be deemed to have consented to an assignment unless it shall have objected thereto by written notice to the Administrative Agent within three (3) Business Days after having received notice thereof.

*ANNEX 1 TO ASSIGNMENT AND ASSUMPTION*

**CREDIT AGREEMENT**

**STANDARD TERMS AND CONDITIONS FOR**

**ASSIGNMENT AND ASSUMPTION**

1.        Representations and Warranties.

1.1.        Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.        Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement (subject to receipt of such consents as may be required under the Credit Agreement) and is not a Defaulting Lender, Disqualified Institution, a Loan Party or Affiliated Lender, (iii) from and after the Closing Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 6.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on any Agent or any other Lender, and (v) if it is not an existing Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee (including an Administrative Questionnaire, all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, and all applicable tax forms); and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.        Payments.  From and after the Closing Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Closing Date and to the Assignee for amounts which have accrued from and after the Closing Date.

3.        General Provisions.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

*EXHIBIT F*

**[RESERVED]**

*EXHIBIT G*

**[RESERVED]**

*EXHIBIT H*

**FORM OF CRITICAL VENDOR REPORT**

[See Attached]

**Foresight Energy LP**
**Postpetition Payments of Prepetition Liabilities**
**Summary**

| FDM Categories | Amount Paid Week Ending | | | | | | | | Cumulative Total | Estimated Prepetition Liability | Motion Cap |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | | | |
| Employee Wage & Benefits | - | - | - | - | - | - | - | - | - | 17,065,000 | N/A |
| Customer Obligations | - | - | - | - | - | - | - | - | - | 360,000 | N/A |
| | | | | | | | | | | | |
| Shippers, Warehousemen and Service Providers | - | - | - | - | - | - | - | - | - | 12,800,000 | N/A |
| Critical Vendor | - | - | - | - | - | - | - | - | - | 27,400,000 | N/A |
| 503(b)(9) | - | - | - | - | - | - | - | - | - | 2,900,000 | N/A |
| Trade | | | | | | | | | - | 43,100,000 | 43,100,000 |
| | | | | | | | | | | | |
| Royalty and Leasehold Claims | - | - | - | - | - | - | - | - | - | 14,500,000 | 14,500,000 |
| Taxes | - | - | - | - | - | - | - | - | - | 13,085,000 | 13,085,000 |
| Insurance Programs | - | - | - | - | - | - | - | - | - | N/A | N/A |
| Cash Management | - | - | - | - | - | - | - | - | - | N/A | N/A |
| Executory Contracts | - | - | - | - | - | - | - | - | - | - | |
| Surety Bonds - Premiums / Fees | - | - | - | - | - | - | - | - | - | N/A | N/A |
| Surety Bonds - Collateral | - | - | - | - | - | - | - | - | - | 2,000,000 | 2,000,000 |
| Total | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 90,110,000 | $ 72,685,000 |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Docu Pg 423 of 1005

*EXHIBIT I*

**FORM OF MONTHLY MINE-LEVEL FINANCIAL REPORT**

[See Attached]

**[TBD] Mine** [1]
**Statement of Operations / Operating Cash Flow**
**March 31, 2020**

| | MONTH-TO-DATE | |
|---|---|---|
| | DOLLARS | PER TON |
| **Operational Statistics** | | |
| Ton produced | - | NA |
| Tons sold | - | NA |
| **Revenues** | | |
| Coal sales | $ - | $ - |
| Other revenue | - | - |
| **Total revenues** | - | - |
| **Operating Expenses** | | |
| Cost of coal sales | | |
| Labor - salary | - | - |
| Labor - hourly | - | - |
| Supplies | - | - |
| Repairs & maintenance | - | - |
| Power & utilities | - | - |
| Property & subsidence | - | - |
| Temporary mine closure costs | - | - |
| Longwall panel amortization | - | - |
| Allocations and Other Expenses | - | - |
| Overhead | - | - |
| Inventory change | - | - |
| Capitalized costs - cost of coal sales | - | - |
| **Total cost of coal sales** | - | - |
| Cost of coal purchased | - | - |
| Depreciation, depletion & amortization | - | - |
| Accretion on asset retirement obligations | - | - |
| Amortization of sales contracts, net | - | - |
| Transportation expense | - | - |
| Other (income) / expense | - | - |
| Selling, general & administrative expenses | - | - |
| **Total Operating Expenses** | - | - |
| **Operating income** | - | |
| Interest expense, net | - | |
| **Net income (loss)** | - | |
| Add: | | |
| DD&A | - | - |
| Amortization of sales contracts, net | - | - |
| Accretion on AROs | - | - |
| **Operating cash flow** | - | - |
| Less: | | |
| Capital expenditures | - | - |
| **Operating cash flow less capital** | - | - |
| Debt service (principal) | - | |
| **Net cash flow** | - | |
| **Adjusted EBITDA** | | |
| Net income (loss) | - | - |
| DD&A | - | - |
| Accretion on AROs | - | - |
| Amortization of sales contracts, net | - | - |
| Equity-based compensation-salary | - | - |
| Non-controlling interest | - | - |
| Interest expense, net | - | - |
| **Adjusted EBITDA** | $ - | $ - |

[1] Represents Statement of Operations / Operating Cash Flow template that will be provided monthly for the following six locations: (i) Williamson Mine, (ii) Sugar Camp Complex - M Class Mine, (iii) Sugar Camp Complex - Viking Mine, (iv) Hillsboro Mine, (v) Macoupin Mine, and  (vi) the Sitran Dock/Terminal.

*EXHIBIT J*

**FORM OF MONTHLY CONSOLIDATED FINANCIAL REPORT**

[See Attached]

**Foresight Energy LP**

**Unaudited Consolidated Balance Sheets**

**(In Thousands)**

| | March 31, 2020 |
|---|---|
| **Assets** | |
| Current assets: | |
| Cash and cash equivalents | $ — |
| Accounts receivable | — |
| Due from affiliates | — |
| Financing receivables - affiliate | — |
| Inventories, net | — |
| Prepaid royalties | — |
| Deferred longwall costs | — |
| Other prepaid expenses and current assets | — |
| Contract-based intangibles | — |
| Total current assets | — |
| Property, plant, equipment, and development, net | — |
| Due from affiliates | — |
| Financing receivables - affiliate | — |
| Prepaid royalties | — |
| Other assets | — |
| Contract-based intangibles | — |
| Total assets | $ — |
| **Liabilities and partners' capital** | |
| Current liabilities: | |
| Current portion of long-term debt and finance lease obligations | $ — |
| Current portion of sale-leaseback financing arrangements | — |
| Accrued interest | — |
| Accounts payable | — |
| Accrued expenses and other current liabilities | — |
| Asset retirement obligations | — |
| Due to affiliates | — |
| Contract-based intangibles | — |
| Total current liabilities | — |
| Long-term debt and finance lease obligations | — |
| Sale-leaseback financing arrangements | — |
| Asset retirement obligations | — |
| Other long-term liabilities | — |
| Contract-based intangibles | — |
| Total liabilities not subject to compromise | — |
| Liabilities subject to compromise | — |
| Total liabilities | — |
| Limited partners' capital: | |
| Total limited partners' capital | — |
| Total liabilities and partners' capital | $ — |

**Foresight Energy LP**

**Unaudited Consolidated Statements of Operations**

**(In Thousands)**

| | Month Ended March 31, 2020 |
|---|---|
| Revenues | |
| Coal sales | $ — |
| Other revenues | — |
| Total revenues | — |
| | |
| Costs and expenses | |
| Cost of coal produced (excluding depreciation, depletion and amortization | — |
| Cost of coal purchased | — |
| Transportation | — |
| Depreciation, depletion and amortization | — |
| Contract amortization | — |
| Accretion and changes in estimates on asset retirement obligations | — |
| Selling, general and administrative | — |
| Long-lived asset impairments | — |
| Other operating (income) expense, net | — |
| Operating income | — |
| Other expenses | |
| Interest expense, net | — |
| Interest (benefit) expense, net - sale-leaseback financing arrangements | — |
| Reorganization items, net | — |
| Net loss | $ — |

*EXHIBIT K*

**INTERIM ORDER**

[See attached]

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-
PETITION FINANCING, (B) GRANT SENIOR SECURED PRIMING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH
COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; (IV)
SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion, dated March 10, 2020 (the "Motion"), of Foresight Energy L.P.

("FELP") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the

above-captioned chapter 11 cases (the "Cases") commenced on March 10, 2020 (the "Petition

Date") for interim (this "Interim Order") and final orders under sections 105, 361, 362, 363, 364,

503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended,

the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and the Local Bankruptcy Rules for

---

[1]    The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are:  Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Mirepossouri 63102.

the United States Bankruptcy Court for the Eastern District of Missouri (this "Court") seeking, among other things,

    (a)    authorization for Foresight Energy LLC, in its capacity as borrower (the "Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "Guarantors"), on a joint and several basis, the Borrower's obligations in connection with a debtor-in-possession financing, comprising a superpriority senior secured multiple-draw term loan facility in an aggregate principal amount of up to $175,000,000.00 (the "DIP Facility"), which consists of, (i) new money multi-draw term loan facility in an aggregate principal amount of $100,000,000.00 (the commitments thereunder, the "New Money DIP Commitments" and the loans advanced thereunder, the "New Money DIP Loans") to be funded by certain Prepetition First Lien Lenders (as defined herein) and Prepetition Second Lien Noteholders (as defined herein), and (ii) a term loan facility in an aggregate principal amount of $75,000,000.00, which shall (A) roll-up the Prepetition First Lien Debt (as defined herein), as further described in the DIP Facility and the Restructuring Support Agreement (as defined below), held by the participating Prepetition First Lien Lenders (or one or more of their respective affiliates or any investment advisory client managed or advised by such participating Prepetition First Lien Lenders) into the DIP Facility on a *pro rata* basis based on each such participating Prepetition First Lien Lender's New Money DIP Commitments (such rolled-up debt, the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans"), (C) be issued under the DIP Facility on a *pari passu* basis with the New Money DIP Loans, and (D) be approved in its entirety upon entry of and pursuant to the Final Order;

    (b)    authorization for the Debtors to enter into that certain *Senior Secured Superpriority Debtor-In-Possession Credit and Guaranty Agreement* among the Borrower, the Guarantors, the lenders from time to time party thereto (collectively, the "DIP Lenders"), and Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, together with the DIP Lenders, the "DIP Parties") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement," together with all agreements, documents, and instruments delivered or executed in connection therewith, including, without limitation, that certain Restructuring Support Agreement, dated as of March 10, 2020 (the "Restructuring Support Agreement"), as it relates to the commitments of the Backstop Parties (as defined herein) to fund the New Money DIP Commitments, the "DIP Documents"), which shall be in substantially the same form attached hereto as Exhibit 2, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

    (c)    authorization for the Debtors (x) to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the Cash Flow Forecast (as defined herein) as further described herein, to pay fees and

interest under the DIP Facility, to cash collateralize certain letters of credit issued and outstanding under the Prepetition First Lien Credit Documents (as defined herein) to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein) and (y) to effectuate the Roll-Up Loans;

(d)    the granting of adequate protection to (x) the term lenders (the "Prepetition First Lien Term Loan Lenders") and revolving lenders (the "Prepetition First Lien Revolving Lenders" and, collectively with the Prepetition First Lien Term Loan Lenders, the "Prepetition First Lien Lenders") under the Credit and Guaranty Agreement, dated as of March 28, 2017 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Prepetition First Lien Credit Agreement" and, all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified, the "Prepetition First Lien Credit Documents"), by and among Foresight Energy LLC, as borrower, the guarantors party thereto, (collectively with the borrower, the "Obligors"), The Huntington National Bank, as facilities administrative agent (in such capacity, the "Prepetition First Lien Administrative Agent"), Lord Securities Corporation, as term administrative agent (in such capacity, the "Prepetition First Lien Term Loan Agent," and together with Lord Securities Corporation in its capacity as collateral trustee under the Collateral Trust Agreement (as defined below), the "Prepetition Collateral Trustee" and the Prepetition First Lien Administrative Agent, the "Prepetition First Lien Agents"; and the Prepetition First Lien Agents, together with the Prepetition First Lien Lenders, the "Prepetition First Lien Parties"), and the Prepetition First Lien Lenders and (y) the noteholders (collectively, the "Prepetition Second Lien Noteholders") under the Indenture, dated as of March 28, 2017 (as amended, supplemented or otherwise modified, the "Prepetition Second Lien Indenture" and, together with all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified, the "Prepetition Second Lien Documents" and, together with the First Lien Credit Documents, the "Prepetition Credit Documents") among Foresight Energy LLC and Foresight Energy Finance Corporation, as co-issuers, the guarantors party thereto and Wilmington Trust, National Association as trustee for the Prepetition Second Lien Noteholders (together with the collateral agent for the Prepetition Second Lien Noteholders, the "Prepetition Second Lien Indenture Trustee" and together with the Prepetition Second Lien Noteholders, the "Prepetition Second Lien Parties," and the Prepetition Second Lien Indenture Trustee, together with the Prepetition First Lien Agents, the "Prepetition Agents"; and the Prepetition Agents collectively with the Prepetition First Lien Lenders, and the Prepetition Second Lien Noteholders, the "Prepetition Secured Parties");

(e)    granting of adequate protection to the Prepetition Secured Parties with respect to, among other things, the use of their Cash Collateral and the Prepetition Collateral (as defined below);

(f)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Upfront Fee (as defined herein), the Put Option Premium (as defined herein), the Exit Premium (as defined herein), the Delayed Draw Term Loan Commitment Fee (as defined herein), letter of credit fees, agency fees, audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees, and the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(g)     the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors that is not subject to a valid and perfected lien on the Petition Date (such property and assets, the "Unencumbered Assets"), except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including, upon entry of the Final Order, the proceeds of Avoidance Actions (as defined herein), subject only to the Carve Out (as defined herein) and, if any, the Permitted Liens (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

(h)     the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein,  whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(i)     the granting of valid, enforceable, non-avoidable and fully perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition Liens, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

4

(j) the granting of superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(k) the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Petition Date);

(l) authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined herein);

(m) the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(n) pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of this Interim Order, among other things, (1) authorizing the Borrower, on an interim basis, to borrow from the DIP Lenders under the DIP Documents in a single draw up to an aggregate principal amount not to exceed $55,000,000.00 in New Money DIP Loans (subject to any limitations of borrowing under the DIP Documents) (the "Initial DIP Term Loans"); (2) upon entry of the Final Order (as defined below), to borrow from the DIP Lenders under the DIP Documents (x) in a single draw New Money DIP Loans, in an aggregate principal amount, not to exceed $100,000,000.00 (less the Initial DIP Loans) (the "Delayed Draw DIP Term Loans"), and (y) the Roll-Up Loans for a total aggregate principal amount not to exceed $175,000,000.00; (3) authorizing the Guarantors to guaranty the DIP Obligations, (4) authorizing the Debtors' use of Cash Collateral, and (5) granting the adequate protection described in this Interim Order; and

(o) that this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, among other things, the Borrower's borrowing from the DIP Lenders under the DIP Documents up to an aggregate principal amount of $100,000,000.00 in New Money DIP Loans, the Roll-Up Loans and the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and set forth in the DIP Documents.

The Court having considered the Motion, the Herman Declaration,[2] the evidence submitted

or proffered and the arguments of counsel made at Interim Hearing; and proper and sufficient

---

[2] Declaration of Seth Herman in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority

notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Order having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:[3]

1.      *Disposition*.  The Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction*.  This Court has core jurisdiction over the Cases commenced on Petition Date, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice*.  Under the circumstances, the notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

---

Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief (the "Herman Declaration")

[3]  Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact.

4.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 29 and 30 of this Interim Order, the Debtors represent, admit, stipulate, and agree as follows:

(a)    Prepetition First Lien Obligations.  As of the Petition Date, the Obligors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Prepetition First Lien Parties under the Prepetition First Lien Credit Documents in the aggregate amount of not less than $900,285,564.62, which consists of (x) approximately $157,000,000  in principal amount of revolving loans and $743,285,564.62 in principal amounts of term loans advanced under the Prepetition First Lien Credit Agreement, *plus* (y) no less than approximately $18,644,570.84 on account of accrued and unpaid interest thereon as of the Petition Date ((x) and (y) together, the "Prepetition First Lien Obligations Amount"), plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations (including on account of issued and undrawn letters of credit), charges, premiums, if any, additional interest, any other "Obligations" (as defined on the Prepetition First Lien Credit Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition First Lien Credit Documents (collectively, including the Prepetition First Lien Obligations Amount, the "Prepetition First Lien Obligations").  The Prepetition First Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition First Lien Agents or Prepetition First Lien Parties by or on behalf of any of the Debtors

prior to the Petition Date under or in connection with any of the Petition First Lien Credit Documents is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(b)      <u>Prepetition First Liens</u>.  Pursuant to the Prepetition First Lien Credit Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "<u>Prepetition First Liens</u>") the "Collateral" (as defined in the Prepetition First Lien Credit Documents) (the "<u>Prepetition Collateral</u>"), subject only to certain Permitted Liens as permitted under the Prepetition First Lien Credit Documents.  The Prepetition First Liens (i) are valid, binding, perfected, and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or subordinate only to certain Permitted Liens (if any) as permitted by the terms of the Prepetition First Lien Credit Documents and (iv) constitute the legal, valid, and binding obligation of the Loan Parties (as defined in the Prepetition First Lien Credit Documents), enforceable in accordance with the terms of the applicable Prepetition First Lien Credit Documents.

(c)      <u>Prepetition Second Lien Obligations</u>.  As of the Petition Date, the Obligors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Prepetition Second Lien Parties under the Prepetition Second Lien Documents in the aggregate amount of not less than approximately $472,121,609.38, which consists of (x) $425,000,000 in principal amount outstanding under the Prepetition Second Lien Indenture, *plus* (y) no less than

approximately $47,121,609.38 on account of accrued and unpaid interest thereon as of the Petition Date ((x) and (y) together, the "Prepetition Second Lien Obligations Amount"), plus all other fees, costs, expenses, indemnification obligations, charges, premiums, if any, additional interest, any other "Obligations" as defined in the Prepetition Second Lien Indenture and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Second Lien Documents (collectively, including the Prepetition Second Lien Obligations Amount, the "Prepetition Second Lien Obligations" and, together with the Prepetition First Lien Obligations, the "Prepetition Secured Obligations").  The Prepetition Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Obligors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Second Lien Indenture Trustee or Prepetition Second Lien Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Second Lien Documents is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(d)     Prepetition Second Liens.  Pursuant to the Prepetition Second Lien Documents, the Prepetition Second Lien Obligations are secured by valid, binding, perfected and enforceable second priority liens on and security interests in the Prepetition Collateral (the "Prepetition Second Liens" and, together with the Prepetition First Liens, the "Prepetition Liens"), which Prepetition Second Liens are subject and subordinate only to the Prepetition First Liens and certain Permitted

Liens.  The Prepetition Second Liens (i) are valid, binding, perfected, and enforceable second priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or subordinate only to the Prepetition First Liens and certain Permitted Liens (if any) as permitted by the terms of the Prepetition Second Lien Documents and (iv) constitute the legal, valid, and binding obligation of the Grantors (as defined in the Prepetition Second Lien Documents), enforceable in accordance with the terms of the applicable Prepetition Second Lien Documents.

(e)    <u>Collateral Trust Agreement</u>.  As of the Petition Date, the Borrower was party to that certain Collateral Trust Agreement, dated as of March 28, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time prior to the date of this Interim Order, the "<u>Collateral Trust Agreement</u>") among the Prepetition First Lien Administrative Agent, the Prepetition Collateral Trustee and the Prepetition Second Lien Indenture Trustee.  The Collateral Trust Agreement governs the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the Prepetition Collateral.  The Obligors have acknowledged and agreed to, and are bound by, the Collateral Trust Agreement.

(f)    <u>Cash Collateral</u>.  Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral (as defined herein) existing as of the Petition Date or from time to time, and the proceeds of any

of the foregoing, is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").[4]

     5.     *Findings Regarding the DIP Facility and Use of Cash Collateral.*

(a)     Good cause has been shown for the entry of this Interim Order.

(b)     As set forth in the Herman Declaration, the Debtors have an immediate need to obtain the DIP Facility and to use the Cash Collateral in each case on an interim basis, in order to, among other things: (i) permit the orderly continuation of their respective businesses; (ii) maintain business relationships with their vendors, suppliers, customers, and other parties; (iii) make payroll; (iv) make capital expenditures; (v) make adequate protection payments; and (vi) pay the costs of the administration of the Cases and satisfy other working capital and general corporate purposes of the Debtors.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' business.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Cases without the DIP Facility and authorized use of Cash Collateral.

(c)     As set forth in the Herman Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and

---

[4]   As noted in the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of the Debtors' Existing Cash Management System; (B) Authorizing Use of Existing Bank Accounts and Business Forms; (C) Granting A Limited Waiver of Requirements of Section 345(b) of the Bankruptcy Code; (D) Authorizing Continuation of Ordinary Course Intercompany Transactions; (E) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims; and (F) Granting Related Relief* (the "Cash Management Motion"), the Debtors receive coal sale proceeds into an account maintained by Foresight Receivable LLC with the Prepetition First Lien Administrative Agent, which proceeds are then swept into a concentration account on a daily basis.

are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. Other than with respect to the Unencumbered Assets, the Debtors are also unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Agent, for the benefit of itself and the DIP Lenders, subject to the Carve Out as provided for herein and the Permitted Liens (if any), the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and, subject to the Carve Out, incurring the Adequate Protection Obligations (as defined herein), in each case, under the terms and conditions set forth in this Interim Order and the DIP Documents. For the avoidance of doubt, the DIP Liens include liens on and security interests in the Unencumbered Assets pursuant to Bankruptcy Code section 364(c)(2).

(d)     The terms of the DIP Facility, the DIP Documents, and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders (including the Backstop Parties (as defined herein)), and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans (including, upon entry of the Final Order, the Roll-Up Loans) made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other Obligations (as defined in the DIP Credit Agreement) (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e). The DIP Obligations,

the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise and any liens or claims granted to the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)     Subject to entry of the Final Order, the Roll-Up Loans as provided for under the DIP Facility are appropriate and the DIP Lenders would not be willing to provide the New Money DIP Loans or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Facility.

(g)     The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  For the reasons set forth in the Motion, the declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing, absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Interim Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

(h)     Pursuant to section 2.8 of the Collateral Trust Agreement and as set forth in the Restructuring Support Agreement, (x) the Prepetition Second Lien Noteholders have consented or are deemed to have consented to the terms of the DIP Facility and this Interim Order, (y) the Prepetition Second Liens and the Second Lien Adequate Protection Liens are subordinate to the

Carve Out, the Permitted Liens, the DIP Liens, the First Lien Adequate Protection Liens (as defined herein) and Prepetition First Liens, and (z) the Prepetition Second Lien Obligations are subject to the Carve Out and the Permitted Liens and the prior payment in full of the DIP Obligations, the First Lien Adequate Protection Obligations and, solely as provided in the Collateral Trust Agreement, the Prepetition First Lien Obligations.

6.    *Authorization of the DIP Facility and the DIP Documents.*

(a)    The Debtors are hereby expressly authorized and empowered to execute and deliver and, on such execution and delivery, directed to perform under the DIP Documents, including the DIP Credit Agreement, which is hereby approved and incorporated herein by reference.

(b)    Upon entry of this Interim Order, the Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $55,000,000.00 in New Money DIP Loans (plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP Credit Agreement), subject to and in accordance with this Interim Order and the DIP Documents.

(c)    Proceeds of the DIP Loans and Cash Collateral shall be used solely for the purposes permitted under the DIP Credit Agreement, this Interim Order and in accordance with the Cash Flow Forecast (as defined below), the DIP Documents, and this Interim Order.

(d)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary and applicable, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby), and to pay all fees, expenses, indemnities, and other

amounts contemplated thereby or that may be reasonably required or necessary for the Debtors'
performance of their obligations under the DIP Facility including, without limitation:

(i)      the execution, delivery, and performance of the DIP Documents, including, without
limitation, the DIP Credit Agreement and any collateral documents contemplated
thereby;

(ii)     the execution, delivery and performance of one or more amendments, waivers,
consents or other modifications to and under the DIP Documents  (in each case in
accordance with the terms of the DIP Documents and in such form as the Debtors,
the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement)
may agree), it being understood that no further approval of the Court shall be
required for any amendments, waivers, consents or other modifications to and under
the DIP Documents or the Cash Flow Forecast, except that any modifications or
amendments to the DIP Documents that shorten the maturity thereof or increase the
aggregate commitments thereunder or the rate of interest payable with respect
thereto shall be on notice and subject to a hearing and Court approval, as necessary;

(iii)    the non-refundable and, upon entry of this Interim Order, irrevocable payment to
each of the DIP Lenders or the DIP Agent, as applicable, of the fees referred to in
the DIP Documents (which fees, in each case, shall be, and shall be deemed to have
been, approved upon entry of this Interim Order, and which fees shall not be subject
to any challenge, contest, attack, rejection, recoupment, reduction, defense,
counterclaim, offset, subordination, recharacterization, avoidance or other claim,
cause of action or other challenge of any nature under the Bankruptcy Code, under
applicable non-bankruptcy law or otherwise) and any amounts due (or that may

15

become due) in respect of any indemnification obligations under the DIP

Documents, including:

- an upfront fee of 3.0% of the aggregate principal amount of New Money DIP Commitments (the "Upfront Fee"), which shall be structured as original issue discount against the New Money DIP Loans when advanced;

- an exit premium of 1.0% of the aggregate principal amount of the New Money DIP Commitments (the "Exit Premium"), payable in the form of equity in reorganized FELP upon the Plan Effective Date (as defined in the DIP Credit Agreement) pursuant to the terms and conditions set forth in the DIP Credit Agreement and the Restructuring Support Agreement; provided, however, that upon the occurrence of an Event of Default under the DIP Credit Agreement or upon repayment of the DIP Loans in full and termination of all New Money DIP Commitments without the occurrence of the Plan Effective Date, the Exit Premium shall be immediately payable in cash in an amount equal to $2,000,000.00;

- a put option premium of 5.0% of the aggregate principal amount of the New Money DIP Commitments of the Backstop Parties (as defined herein) (the "Put Option Premium"), payable in the form of equity in the reorganized FELP upon the Plan Effective Date pursuant to the terms and conditions set forth in the DIP Credit Agreement, the Restructuring Support Agreement and related backstop commitment arrangements; provided, however, that upon the occurrence of an Event of Default under the DIP Credit Agreement or upon repayment of the DIP Loans in full and termination of all New Money DIP Commitments without the occurrence of the Plan Effective Date, the Put Option Premium shall be immediately payable in cash in an amount equal to $10,000,000.00;

- a commitment fee on each DIP Lender's commitment to fund the Delayed Draw DIP Term Loans (the "Delayed Draw Term Loan Commitment Fee") at a rate per annum equal to 1.00%, payable pursuant to the terms and conditions set forth in the DIP Credit Agreement; and

- all reasonable costs and expenses as may be due from time to time under the DIP Documents, the Restructuring Support Agreement and this Interim Order, including, without limitation, fees and expenses of counsel, financial advisors and other professionals retained by the DIP Agent and the DIP Lenders as provided for in the DIP Documents and this Interim Order, subject to the provisions of paragraph 28 hereof;

(iv)  make the payments on account of the First Lien Adequate Protection Obligations provided for in this Interim Order; and

(v)  the performance of all other acts required under or in connection with the DIP Documents.

(e)  Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such DIP Documents shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code, or after the dismissal of any Case.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(f)  The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the DIP Obligations of the Borrower and to incur any DIP Obligations and DIP Liens in connection therewith.

7.  *The Backstop DIP Parties and Syndication Procedures*.

(a)  Funds and/or accounts affiliated with, or managed and/or advised by, Benefit Street Partners, LLC, DoubleLine Capital LP, GoldenTree Asset Management LP, Ivy Investments Management Company, KKR Credit Advisors (US) LLC, and Davidson Kempner Capital

Management LP (together with their respective successors and permitted assignees, each a "Backstop Party" and collectively, the "Backstop Parties") will, severally and not jointly, backstop the DIP Facility in the amounts set forth in the DIP Documents and the Restructuring Support Agreement.  Subject to entry of this Interim Order, (i) all eligible Prepetition First Lien Lenders (which, for the avoidance of doubt, includes any Backstop Party) shall be offered the right to participate in funding up to 46.375% of the New Money DIP Commitments based ratably on each such lender's holdings of Prepetition First Lien Debt and (ii) all eligible Prepetition Second Lien Noteholders (which, for the avoidance of doubt, includes any Backstop Party) shall be offered the right to participate in funding up to 3.625% of the New Money DIP Commitments based ratably on such noteholder's holdings of Prepetition Second Lien Debt, all as further set forth in the DIP Documents, the Restructuring Support Agreement and procedures satisfactory to the DIP Agent and the Backstop Parties, which shall include, among other things, a provision that any such participating Prepetition First Lien Lender or Prepetition Second Lien Noteholder agree to be bound by the Restructuring Support Agreement.

8.    *Budget*.

(a)    Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facility in accordance with a projected statement of sources and uses of cash for the Debtors for the current and following 13 calendar weeks (but not any preceding weeks) attached hereto as Exhibit 1 (as may be amended, replaced, supplemented or otherwise modified in accordance with the terms of this Interim Order and the DIP Documents, the "Cash Flow Forecast"), including without limitation, for: (A) working capital requirements; (B) general corporate purposes; (C) to cash collateralize existing letters of credit; and (D) the costs and expenses (including making payments on account of the Adequate Protection Obligations hereunder and payment of the allowed fees and expenses of professionals retained by the Debtors' estates) of administering the Cases (including payments under the Carve Out as provided herein).  On the Thursday of the fourth calendar week following the week in which the Petition Date occurs, and thereafter on the Thursday following the end of every fourth calendar week, the Debtors shall deliver an updated Cash Flow Forecast, in each case substantially in the form attached hereto as Exhibit 1 (with only such

changes thereto as the Required Lenders shall agree in their sole discretion) or is otherwise in form and substance satisfactory to the Required Lenders in their sole discretion.

(b)     On the first Thursday of the first full week following the Petition Date, and every Thursday thereafter, the Debtors shall deliver to (i) the DIP Agent, (ii) Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and Lazard Frères & Co. LLC ("Lazard" and, together with Akin Gump, the "Ad Hoc First Lien Advisors"), and (iii) Milbank LLP ("Milbank") and Perella Weinberg Partners L.P. ("Perella" and, together with Milbank, the "Ad Hoc Crossover Advisors"), a weekly variance report for the one week period following the Closing Date, the two week period following the Closing Date, the three week period following the Closing Date and the four week period following the Closing Date, and thereafter, a weekly variance report for the one week period following the most recently delivered Cash Flow Forecast, the two week period following the most recently delivered Cash Flow Forecast, the three week period following the most recently delivered Cash Flow Forecast and the four week period following the most recently delivered Cash Flow Forecast, with the report for each week in a four week period including an individual report for such week and a cumulative report to date for such four week period (each such one week, two week, three week or four week cumulative period, a "Reporting Period"), in each case, setting forth for the applicable Reporting Period, ended on the immediately preceding Friday prior to the delivery thereof, (i) the negative variance (as compared to the applicable Cash Flow Forecast and the Budget[5]) of the operating cash receipts (on a line item by line item basis and an aggregate basis for all line items) of the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period, (2) the positive variance (as compared to the applicable Cash Flow Forecast and the Budget) of the disbursements (on a line item by line item basis and an aggregate basis for all line items) made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement (as defined in the DIP Credit Agreement)) for the applicable Reporting Period and for the last week of the applicable Reporting Period, (3) the positive variance (as compared to the applicable Cash Flow Forecast and the Budget) of the total disbursements (on a line item by line item basis and an aggregate basis for all line items) (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period and (4) an explanation, in reasonable detail, for any material negative variance (in the case of receipts) or material positive variance (in the case of disbursements) set forth in such variance report, certified by an Authorized Officer of the Borrower (the "Budget Variance Report").  Without giving effect to the making of DIP Loans or the repayments or prepayments of DIP Loans, in no

---

[5]     As used herein, the term "Budget" shall have the meaning assigned to the term "DIP Budget" in the DIP Credit Agreement

event shall (a) beginning with the delivery of the initial Budget Variance Report and tested, as of the last day of each applicable two-week period commencing with the last day of the first two-week period ending after the Closing Date, for such two-week period (i) the negative variance (as compared to the applicable Cash Flow Forecast) of the actual aggregate operating cash receipts of the Debtors exceed 15% and (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors shall exceed 15%, and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements  made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) exceed 15%, and (b) beginning with the delivery of the third Budget Variance Report, as of the last day of each applicable four-week period commencing with the last day of the first four-week period ending after the Closing Date, for such four-week period, (i) the negative variance (as compared to the applicable Cash Flow Forecast) of the actual aggregate operating cash receipts of the Debtors exceed 10%, (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) made by the Debtors exceed 10%, and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements  made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) exceed 10%.

(c)     The consent of the DIP Lenders to the Budget or any applicable Cash Flow Forecast shall not be construed as consent to the use of any Cash Collateral or DIP Loans after the occurrence of an Event of Default (as defined in the DIP Credit Agreement), regardless of whether the aggregate funds shown on the Budget or any applicable Cash Flow Forecast have been expended.

9.      *Reporting Requirements/Access to Records*.  The Debtors shall provide the DIP Lenders, the Ad Hoc First Lien Advisors, and the Ad Hoc Crossover Advisors with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Agent and the DIP Lenders have under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Agent

and the DIP Lenders to: (i) have access to and inspect the Debtors' assets; (ii) examine the Debtors' books and records; and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors.

10.     *DIP Superpriority Claims*.  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Agent and the DIP Lenders, against each of the Debtors' estates (the "DIP Superpriority Claims"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, upon entry of the Final Order, the proceeds of any claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), subject only to the payment of the Carve Out to the extent specifically provided for herein.  Except as set forth in, or permitted by, this Interim Order, no other superpriority claims shall be granted or allowed in these Cases.

11.     *DIP Liens*.  As security for the DIP Obligations, effective and automatically perfected upon the date of this Interim Order, and without the necessity of the execution,

recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined herein), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject only to the payment of the Carve Out to the extent specifically provided for herein and the Permitted Liens (if any) (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)    First Lien on Unencumbered Property.  Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and

outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action (including, upon entry of the Final Order, the proceeds of Avoidance Actions), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located.

(b)    <u>Liens Priming the Prepetition Liens</u>.    Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition Liens securing the Prepetition Secured Obligations.

(c)    <u>Liens Junior to Certain Other Liens</u>.    Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 11, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the liens securing the Prepetition First Lien Obligations or to valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition First Lien Obligations, which security interests and liens in favor of the DIP Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable liens (collectively, the "<u>Permitted Liens</u>").[6]

12.    *Carve Out.*

(a)    <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000.00 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor</u>

---

[6]    For the avoidance of doubt, "Permitted Liens" shall also include liens securing all pre and postpetition Cash Management Obligations (as defined in the DIP Credit Agreement) of the Debtors.

Professionals") and, subject to the Committee Monthly Cap, an official committee of unsecured creditors (the "Creditors' Committee") pursuant to Bankruptcy Code section 328 or 1103 (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent or the Required Lenders of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons, in an aggregate amount not to exceed an amount to be agreed prior to the Final Hearing between the Debtors and the Required Lenders, incurred after the first business day following delivery by the DIP Agent or the Required Lenders of the Carve Out Trigger Notice, to the extent allowed, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Required Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee providing that a Termination Event (as defined herein) has occurred and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is delivered (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of (i) the Allowed Professional Fees of Debtor Professionals, (ii) subject to the Committee Monthly Cap, the Allowed Professionals Fees of the Committee Professionals, and (iii) the obligations accrued as of the Termination Declaration Date with respect to clauses (i) and (ii) of the definition of Carve Out set

25

forth in paragraph 12(a) (the "Additional Carve Out Obligations").  The Debtors shall deposit and hold such amounts in a segregated account in a manner reasonably acceptable to the Required Lenders in trust to pay such then unpaid Allowed Professional Fees and Additional Carve Out Obligations (the "Pre-Carve Out Trigger Notice Reserve") prior to the use of such reserve to pay any other claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to the use of such reserve to pay any other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above in paragraph 12(a) (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of itself and the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as provided in the Prepetition Credit Documents, the Collateral Trust Agreement, and this Interim Order.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of itself and the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been

terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as provided in the Prepetition Credit Documents, the Collateral Trust Agreement, and this Interim Order.  Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 12, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 12, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First Lien Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents and this Interim Order.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not increase or reduce the DIP Obligations, or constitute additional DIP Loans (unless, for the avoidance of doubt, additional DIP Loans are used to fund the Carve Out Reserves), (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Cash Flow Forecast, Carve Out, Post-Carve Out Trigger Notice Cap or the Carve Out Reserves, or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors to the Debtors' Professionals.  For the avoidance of doubt and notwithstanding anything to the

contrary in this Interim Order, the DIP Facility or in any Prepetition Credit Document, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the First Lien Adequate Protection Liens, the Second Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claim, the Second Lien Adequate Protection Superpriority Claim, the Prepetition Liens, the Prepetition Secured Obligations and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(c)      _Payment of Allowed Professional Fees Prior to the Termination Declaration Date_.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)      _No Direct Obligation To Pay Allowed Professional Fees_.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)      _Payment of Carve Out On or After the Termination Declaration Date_.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out under the DIP Facility shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the

protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

13.      *Limitation on Charging Expenses Against Collateral*.  Subject to entry of the Final Order (but retroactive to the Petition Date), no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties pursuant to Bankruptcy Code sections 105(a) or 506(c) or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.   Notwithstanding the foregoing, nothing contained in this paragraph shall affect or otherwise impact the charging lien available to the Prepetition First Lien Agents with respect to the Prepetition Collateral or any additional collateral subject to First Lien Adequate Protection Liens (as defined below) or funds or other property otherwise subject to distribution to recover payment of any unpaid fees, expenses or other amounts to which it is entitled under the Prepetition First Lien Credit Documents or the Collateral Trust Agreement, subject to the priority of the DIP Liens and DIP Claims in accordance with this Order.

14.      *No Marshaling/Application of Proceeds*.  Subject to entry of the Final Order (but retroactive to the Petition Date), the DIP Agent and the Prepetition Agents shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of the Interim Order or Final Order, as applicable, the DIP Documents and the Prepetition Credit Documents, as applicable, and in no event shall the DIP Agent, the DIP Lenders,

or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

15. *Equities of the Case.* Subject to entry of the Final Order (but retroactive to the Petition Date), (i) the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

16. *Use of Cash Collateral.* The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order, the DIP Documents and the Cash Flow Forecast including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of the Final Hearing. Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

17. *Adequate Protection for the Prepetition First Lien Parties.* Subject only to the Carve Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e), and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition First Lien Agents,

for the benefit of themselves and the Prepetition First Lien Lenders, are hereby granted the following (collectively, the "First Lien Adequate Protection Obligations"):

(a)      First Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral.  Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens and (C) the Permitted Liens (if any).  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition Liens, the Second Lien Adequate Protection Liens and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(b)      First Lien Adequate Protection Superpriority Claim.   As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Cases, except the Carve Out and the DIP Superpriority Claims (the "First Lien Adequate Protection Superpriority Claim").  The First Lien Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, the Avoidance

Proceeds). Subject to the Carve Out and the DIP Superpriority Claims in all respects, the First Lien Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114. The Prepetition First Lien Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.

(c)    <u>Fees and Expenses</u>. As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "<u>First Lien Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition First Lien Agents, and the Ad Hoc First Lien Group (as defined below), and the Ad Hoc Crossover Group (as defined below), including, without limitation, the reasonable and documented fees and expenses of (a) Sullivan & Worcester LLP, counsel to the Prepetition First Lien Term Loan Agent and the Prepetition Collateral Trustee, (b) Buchanan Ingersoll & Rooney PC, counsel to the Prepetition First Lien Administrative Agent, together with one local counsel to the Prepetition First Lien Agents, (c) in accordance with its engagement letter, Conway McKenzie, Inc., as financial advisor to the Prepetition First Lien Administrative Agent, (d) one local counsel, Thompson Coburn LLP, and one lead counsel, Akin Gump, as counsel to the ad hoc group of certain Prepetition First Lien Lenders (the "<u>Ad Hoc First Lien Group</u>"), (e) in accordance with its

engagement letter, one financial advisor, Lazard, as financial advisors to Ad Hoc First Lien Group, (f) one local counsel, Bryan Cave Leighton Paisner LLP, and one lead counsel, Milbank LLP, as counsel to the ad hoc group of certain Prepetition First Lien Lenders and Prepetition Second Lien Noteholders (the "Ad Hoc Crossover Group"), and (g) in accordance with its engagement letter, one financial advisor, Perella Weinberg Partners LP, as financial advisor Ad Hoc Crossover Group. The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions. The applicable professional shall serve copies of the invoices supporting the First Lien Adequate Protection Fees on counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if any), and any First Lien Adequate Protection Fees shall be subject to prior ten day review by the Debtors, the U.S. Trustee and the Creditors' Committee (if any), and in the event the Debtors, the U.S. Trustee or the Creditors' Committee shall file with this Court an objection to any such legal invoice, the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Court. If no objection is filed within such ten day review period, such invoice shall be paid without further order of the Court within five days following the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement. For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.

(d)    First Lien Accrued Adequate Protection Payments. As further adequate protection, the Prepetition First Lien Agents, on behalf of the Prepetition First Lien Lenders, shall receive, upon entry of this Interim Order, monthly adequate protection payments (the "First Lien Accrued Adequate Protection Payments") payable in-kind on the thirtieth day of each month equal to the interest at the Applicable Rate (as defined in the Prepetition First Lien Credit Agreement) that

would otherwise be owed to the Prepetition First Lien Lenders under the Prepetition First Lien
Credit Agreement during such monthly period in respect of the Prepetition First Lien Obligations
that are not Roll-Up Loans, until such time as the full Prepetition First Lien Obligations Amount
is paid in full, in cash.

(e)     Information Rights.  The Debtors shall promptly provide the Prepetition First Lien
Agents and the Ad Hoc First Lien Advisors, respectively, as well as the Ad Hoc Crossover
Advisors, with all required financial reporting and other periodic reporting that is required to be
provided to the DIP Agent or the DIP Lenders under the DIP Documents.

18.     *Adequate Protection for the Prepetition Second Lien Noteholders*.  Subject only to
the Carve Out, the Permitted Liens, the DIP Liens, the Prepetition First Liens, the First Lien
Adequate Protection Liens, and the terms of this Interim Order, pursuant to Bankruptcy Code
sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein,
as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral),
for and equal in amount to the aggregate postpetition Diminution in Value of such interests,
resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve
Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the
imposition of the automatic stay and/or any other reason for which adequate protection may be
granted under the Bankruptcy Code, the Prepetition Second Lien Noteholders are hereby granted
the following (collectively, the "Second Lien Adequate Protection Obligations" and, together with
the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)     Second Lien Adequate Protection Liens.  As security for and solely to the extent of
any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable,
and effective and automatically perfected postpetition security interests in, and liens on, as of the

34

date of this Interim Order (the "Second Lien Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral.  Subject to the terms of this Interim Order, the Second Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, (C) the First Lien Adequate Protection Liens, (D) the Prepetition First Liens and (E) the Permitted Liens (if any). The Second Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(b)    Second Lien Adequate Protection Superpriority Claim.    As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "Second Lien Adequate Protection Superpriority Claim" and, together with the First Lien Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims"), except the Carve Out, the DIP Superpriority Claims and the First Lien Adequate Protection Superpriority Claim.  Subject to the Carve Out, the DIP Superpriority Claims, the First Lien Adequate Protection Superpriority Claims, and the Prepetition First Lien Obligations in all respects, the Second Lien Adequate Protection Superpriority Claim will not be junior to any other claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b),

546(d), 726, 1113 and 1114.  The Prepetition Second Lien Noteholders shall not receive or retain any payments, property or other amounts in respect of the Second Lien Adequate Protection Superpriority Claim under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations, the Prepetition First Lien Obligations and the First Lien Adequate Protection Obligations have been indefeasibly paid in full, in cash, in each case as provided in the DIP Documents.

19.    *Section 507(b) Reservation*.  Subject in all respects to the terms of the Collateral Trust Agreement, nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

20.    *Restrictions on Disposition of Material Assets Outside the Ordinary Course of Business*.  Except as expressly permitted under the "first day" pleadings or the DIP Documents, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the Required Lenders at least five days (or such shorter period as the DIP Agent, at the direction of the Required Lenders, may agree) prior to the date on which the Debtors seek the Court's authority for such use, sale, or lease.  Except as otherwise provided under the DIP Documents, subject to the Carve Out and Permitted Liens, in the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes

DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order), the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the DIP Agent, for the benefit of the DIP Parties, 100% of the net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds.  Upon payment in full of the DIP Obligations, subject to the Carve Out and Permitted Liens, the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the Prepetition First Lien Agents, for the benefit of the Prepetition First Lien Lenders, 100% of the net cash proceeds resulting from any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order) no later than the second business day following receipt of such proceeds.  Except as otherwise provided under the DIP Documents, subject to the Carve Out and Permitted Liens, in the event of any casualty, condemnation, or similar event with respect to property that constitutes DIP Collateral, the Debtors are authorized and shall promptly pay to the DIP Agent, for the benefit of the DIP Parties, any insurance proceeds, condemnation award, or similar payment (excluding any amounts on account of any D&O policies) no later than the second business day following receipt of payment by the Debtors, unless the Required Lenders consent, each in its sole discretion, in writing, to the funds being reinvested by the Debtors.

21.     *Insurance.*  At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.  Upon entry of this Interim Order, the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as additional insured and

lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

22.      *Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition Secured Parties*.  Notwithstanding any other provision in this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection in all respects subject to the Collateral Trust Agreement; <u>provided</u> that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under this Interim Order and the DIP Documents; (b) any of the rights of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agent, the DIP Lenders, or the Prepetition First Lien Parties to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (in the case of the Prepetition Secured Parties, in all respects subject to the Collateral Trust Agreement).  The delay in or failure of the DIP Agent, the DIP Lenders and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agent's, the DIP Lenders' or the Prepetition First Lien Parties' rights and remedies.

23. *Termination Event.* Subject to paragraph 24, the Debtors' authorization to use Cash Collateral and the proceeds of the DIP Facility pursuant to this Interim Order shall automatically terminate, and the DIP Obligations shall become due and payable, without further notice or action by the Court following the earliest to occur of any of the following (each a "Termination Event"): (a) the occurrence of an Event of Default (as defined in the DIP Credit Agreement), which are explicitly incorporated by reference into this Interim Order; (b) the Debtors' failure to (i) comply with any provision of this Interim Order, (ii) comply with any other covenant or agreement specified in this Interim Order or the DIP Credit Agreement (which covenants and agreements, together with any applicable grace periods, are explicitly incorporated by reference into this Interim Order), or (iii) comply with any of the Milestones (as defined in, and as set forth in, the DIP Credit Agreement); (c) termination of the Restructuring Support Agreement or the Backstop Commitment Agreement (as defined in the DIP Credit Agreement), in either case, other than as a result of a breach by the DIP Lenders thereunder; or (d) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement).

24. *Remedies Upon a Termination Event.* The Debtors shall immediately provide notice to counsel to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agents, the Ad Hoc First Lien Group, and the Ad Hoc Crossover Group (with a copy to counsel to the Creditors' Committee (if any)), of the occurrence of any Termination Event, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this paragraph 24) and the DIP Obligations shall become due and payable. Upon the occurrence of a Termination Event and following the giving of not less than three business days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee (if any) (the "Notice Period"), (a) the DIP Agent

and the DIP Lenders may exercise any rights and remedies against the DIP Collateral available to them under this Interim Order, the DIP Documents, and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility and (b) the Prepetition First Lien Parties may exercise any rights and remedies to satisfy the Prepetition First Lien Obligations, the First Lien Adequate Protection Superpriority Claims and any other First Lien Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, Permitted Liens and, in each case, the Carve Out.  The only permissible basis for the Debtors, the Prepetition Second Lien Noteholders, the Creditors' Committee (if any), or any other party to contest, challenge or object to an Enforcement Notice shall be solely with respect to the validity of the Termination Event(s) giving rise to such Enforcement Notice (*i.e*., whether such Termination Event validly occurred and has not been cured or waived in accordance with this Interim Order).  The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Parties at the end of the Notice Period, without further notice or order of the Court, unless the DIP Agent, the DIP Lenders, the Prepetition First Lien Agents, and the Prepetition First Lien Lenders elect otherwise in a written notice to the Debtors, which may be by email.  Upon termination of the automatic stay, the DIP Agent, the DIP Lenders, and the Prepetition First Lien Parties shall be permitted to exercise all rights and remedies set forth herein, in the DIP Documents, and the Prepetition First Lien Credit Documents, as applicable, and as otherwise available at law against the DIP Collateral and/or Prepetition Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral or the Prepetition Collateral, or (y) the pursuit of any other rights

and remedies granted to the DIP Agent, the DIP Lenders, or the Prepetition First Lien Parties pursuant to the DIP Documents, the Prepetition First Lien Credit Documents, or this Interim Order; <u>provided</u> that during the Notice Period the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of a Termination Event) or Cash Collateral only to (i) fund operations in accordance with the DIP Credit Agreement and the Cash Flow Forecast and (ii) to fund the Carve Out Reserves; <u>provided</u> <u>further</u> that during the Notice Period the Debtors, the DIP Lenders, and the DIP Agent consent to a hearing on an expedited basis to consider whether a Termination Event has occurred; <u>provided</u> <u>further</u>, that if a hearing to consider the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five business days after delivery of the Enforcement Notice; <u>provided</u> <u>further</u> that any fees and expenses incurred by the Debtors or the Committee during the Notice Period shall permanently reduce the Post-Carve Out Trigger Notice Cap.  Any party in interest shall be entitled to seek an emergency hearing for the purpose of contesting whether assets constitute assets of the Debtors' estates and nothing in this Interim Order shall affect any party in interest's rights or positions at such hearing.

25.    *No Waiver for Failure to Seek Relief*.  The failure or delay of the DIP Agent, the DIP Lenders or any of the Prepetition Secured Parties to exercise rights and remedies under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents, the Prepetition Second Lien Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

26.    *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)      Subject to the limitations in paragraph 27(a) of this Interim Order, the DIP Agent and the Prepetition Agents are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Agent or the Prepetition Agents shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agent, the Prepetition Collateral Trustee, or the Prepetition Second Lien Indenture Trustee, as applicable, each of the Prepetition Secured Parties and the Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file such instruments (in the case of the Prepetition Secured Parties, without representation or warranty of any kind) to enable the DIP Agent, the Prepetition Collateral Trustee, or the Prepetition Second Lien Indenture Trustee to further validate, perfect, preserve, and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)      A certified copy of this Interim Order may, in the discretion of the DIP Agent or the applicable Prepetition Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing

and recording; provided, however, that notwithstanding the date of any such filing, the date of such

perfection shall be the date of this Interim Order.

(c)     Effective upon entry of the Final Order, any provision of any lease or other license,

contract or other agreement that requires (i) the consent or approval of one or more landlords or

other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for

any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the

proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the

applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force

and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such

leasehold interest or the proceeds of any assignment, and/or sale thereof by any Debtor in

accordance with the terms of the DIP Credit Agreement or this Interim Order.

27.     *Preservation of Rights Granted Under this Interim Order.*

(a)     Unless and until all DIP Obligations, Prepetition First Lien Obligations, and First

Lien Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments

to extend credit under the DIP Facility are terminated, the Prepetition Second Lien Noteholders

shall, in each case solely to the extent provided for in the Collateral Trust Agreement and

applicable law: (i) take no action to foreclose upon, or recover in connection with, the liens granted

thereto pursuant to the Prepetition Second Lien Documents or this Interim Order, or otherwise

seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) be restricted

from exercising any rights and remedies or taking any other actions in respect of the DIP Collateral

to the extent provided by the Collateral Trust Agreement and applicable law.

(b)     Subject to the Carve Out, other than as set forth in this Interim Order, neither the

DIP Liens nor the First Lien Adequate Protection Liens shall be made subject to or *pari passu* with

any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the First Lien Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(c)　　In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 363(m) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(d)　　Subject to the Carve Out, unless and until all DIP Obligations, Prepetition First Lien Obligations, Prepetition Second Lien Obligations, and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents and with the prior written consent of the DIP Agent and the Required Lenders (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the Prepetition First Lien

Obligations, and the Prepetition Second Lien Obligations (or the liens and security interests securing such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, the Prepetition First Liens, or the Prepetition Second Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases.

(e)    Notwithstanding any order dismissing any of the Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(f)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agents, and the Prepetition First Lien Lenders granted by the provisions of this Interim Order and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required Lenders).

28.    *Expenses and Indemnification.*

(a)    All (i) reasonable and documented out-of-pocket fees and expenses incurred by professionals or consultants retained by the DIP Agent and the DIP Lenders, including (x) the Ad

Hoc First Lien Advisors and (z) the Ad Hoc Crossover Group Advisors (collectively, the "DIP Professionals"), incurred in connection with the Cases (in any capacity) and the DIP Facility, whether or not the DIP Facility is successfully consummated, and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Agent and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby, are to be paid by the Debtors.  All fees and expenses described above shall be payable by the Debtors (whether accrued or incurred prior to, on, or after the Petition Date) within ten calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information) to the Debtors, the U.S. Trustee, and the Creditors' Committee (if any), without the necessity of filing motions or fee applications and such fees and expenses shall not be subject to any further review, challenge, or disgorgement following the expiration of such period.

(b)    As set forth in the DIP Facility, the Debtors will, jointly and severally, indemnify the DIP Lenders, the DIP Agent, and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement and other DIP Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable

47

judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence, or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in an final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's actual fraud, gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

29.     *Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral*

(a)     Notwithstanding anything to the contrary set forth in this Interim Order or in any other order of this Court to the contrary, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, shall be used to pay fees or expenses in excess of $150,000.00 per month in the aggregate on account of all Committee Professionals (the "Committee Monthly Cap"); provided that any unused amounts may be carried forward to a subsequent month.

(b)     Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used: (a) to investigate (except as expressly provided herein), initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (i) against any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (each in their capacities as such) or seeking relief that would impair the rights and remedies of the

DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (each in their capacities as such) under the DIP Documents, this Interim Order, or the Prepetition Credit Documents to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, as provided for herein, or seeking affirmative relief against any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties related to the DIP Obligations, or the Prepetition Secured Obligations, (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Agent's and the DIP Lenders' liens or security interests in the DIP Collateral, the Prepetition Secured Obligations or the Prepetition Liens, or (iii) for monetary, injunctive, or other affirmative relief against the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (each in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority Claims, that would impair the ability of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or by or on behalf

of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as defined herein) related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations, or the Prepetition Liens; (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations or the Prepetition Liens; and (e) assert any claims, defenses, or any other causes of action any non-Debtor affiliates with respect to prepetition relationships with the Debtors; provided that (i) no more than $25,000.00 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate the foregoing matters with respect to the Prepetition Secured Obligations, and the Prepetition Liens within the Challenge Period (as defined herein); and (ii) no more than $25,000.00 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate the any claims or causes of action against

non-Debtor affiliates within the Challenge Period (clauses (i) and (ii), collectively, the "Challenge Budget").

(c)    All fees and expenses of the Committee Professionals in excess of (i) the Committee Monthly Cap and/or (ii) the Challenge Budget, as applicable, shall not be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code or otherwise.

30.    *Effect of Stipulations on Third Parties*.

(a)    The Debtors' acknowledgments, stipulations, admissions, waivers, and releases set forth in this Interim Order shall be binding on the Debtors, their respective representatives, successors and assigns upon entry of this Interim Order.  The acknowledgments, stipulations, admissions, waivers, and releases contained in this Interim Order shall also be binding upon the Debtors' estate and all other parties in interest, including the Creditors' Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (a) such party with requisite standing, has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Secured Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens or the Prepetition Secured Obligations by no later than (i) with respect to any Creditors' Committee, the date that is 60 days after the Creditors' Committee's formation or (ii) with respect to other parties in interest, no later than the date that is 75 days after the entry of this Interim Order (the time period established by the later of the foregoing clauses (i) and (ii), the "Challenge Period"); provided that in the event that, prior to the expiration of the Challenge Period, (x) these chapter 11 cases are converted to chapter 7 or (y) a

chapter 11 trustee is appointed in these chapter 11 cases, then, in each such case, the Challenge

Period shall be extended for a period of 60 days solely with respect to any Trustee, commencing

on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (b) an

order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor

of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding.

If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period,

without further order of this Court: (x) the Prepetition Secured Obligations shall constitute allowed

claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff,

subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment,

reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined

by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual

or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-

bankruptcy law), for all purposes in these Cases and any subsequent chapter 7 cases, if any; (y) the

Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding,

perfected and of the priority specified in paragraphs 4(b) and 4(d), not subject to setoff,

subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction,

recoupment, or recovery; and (z) the Prepetition Secured Obligations, the Prepetition Liens on the

Prepetition Collateral and the Prepetition Secured Parties (in their capacities as such) shall not be

subject to any other or further challenge and any party in interest shall be forever enjoined and

barred from seeking to exercise the rights of the Debtors' estates or taking any such action,

including any successor thereto (including any estate representative or a Trustee, whether such

Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If

any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, (a)

the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding and (b) any Claims and Defenses not brought in such adversary proceeding shall be forever barred; provided that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)     Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Credit Documents or the Prepetition Secured Obligations.

31.     *Release*.  Subject to the rights and limitations set forth in paragraphs 29 and 30 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Secured Parties, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions,

suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations or the Prepetition Liens, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties.

32.    *Collateral Trust Agreement.*  The rights of the Prepetition Secured Parties shall at all times remain subject to the Collateral Trust Agreement.

33.    *Credit Bidding.*  (a) The DIP Agent, or any assignee or designee of the DIP Agent, acting at the direction of the Required Lenders and on behalf of the DIP Parties, shall have the unqualified right to credit bid up to the full amount of any DIP Obligations in the sale of any of the Debtors' assets, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, and (b) subject to the indefeasible payment in full in cash of the DIP Obligations, the Prepetition First Lien Agents (on behalf of the Prepetition First Lien Lenders) shall have the right to credit bid (x) up to the full amount of the Prepetition First Lien Obligations and (y) the First Lien Adequate Protection Obligations in the sale of any of the Debtors' assets, including, but not limited to, pursuant to (i)

Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725. The DIP Agent, at the direction of the Required Lenders, and on behalf of the DIP Parties, shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Parties to any acquisition entity or joint venture formed in connection with such bid.

34.     *Prepetition Undrawn Letter of Credit*.  Subject to the Cash Flow Forecast in all respects, (i) within ten (10) days from entry of this Interim Order, the Debtors shall (i) post cash collateral with the Prepetition First Lien Administrative Agent equal to 103% of the face amount of that issued and undrawn letter of credit in favor of Rockwood Insurance (relating to the Debtors' workers' compensation program) (the "Prepetition Undrawn Letter of Credit") and (ii) within thirty (30) days from entry of this Interim Order, provide the Prepetition First Lien Administrative Agent with evidence of the release and/or cancellation of all other issued and undrawn letters of credit in existence as of the Petition Date.  Notwithstanding anything to the contrary set forth in this Interim Order or in the Final Order, the Prepetition First Lien Administrative Agent (for the benefit of the Prepetition First Lien Revolving Lenders) shall have a first priority lien and security interest in and to such cash collateral as security for any unreimbursed obligations owing to the Prepetition First Lien Revolving Lenders on account of any draws or presentments on such letters of credit.  In the event of any presentment of the Prepetition Undrawn Letter of Credit which are not immediately reimbursed by the Debtors pursuant to the terms of the Prepetition First Lien Credit Agreement, the Prepetition First Lien Administrative Agent is authorized to apply such cash collateral to the payment of such unreimbursed obligations.

35.    *Interim Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order or the DIP Documents, the provisions of this Interim Order shall govern.

36.    *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any Creditors' Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, and the Prepetition First Lien Parties, <u>provided</u> that, except to the extent expressly set forth in this Interim Order, the Prepetition First Lien Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

37.    *Limitation of Liability.*  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents, or the Prepetition Second Lien Documents, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary

duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

38.      *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

39.      *Final Hearing*.  The Final Hearing is scheduled for [___] at [___], prevailing Central time, before this Court.  The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to any Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file a written objection thereto, which shall be served upon the Notice Parties, and shall also be filed with the Clerk of the United States Bankruptcy Court, Eastern District of Missouri, in each case to allow actual receipt by the foregoing no later than [___] at [___], prevailing Central Time.

Dated: _____, 2020

_____
THE HONORABLE KATHY SURRATT-STATES
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Cash Flow Forecast**

## Exhibit 2

**DIP Credit Agreement**

*EXHIBIT L*

**[RESERVED]**

*EXHIBIT M-1*

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BENE-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By: _____
   Name:
   Title:

Date:    , 20[ ]

*EXHIBIT M-2*

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as amended, restated, supplemented or otherwise modified from time to time) (the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By: _____
    Name:
    Title:

Date:   , 20[ ]

*EXHIBIT M-3*

### FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as amended, restated, supplemented or otherwise modified from time to time) (the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By: _____
   Name:
   Title:

Date:  , 20[ ]

*EXHIBIT M-4*

### FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as amended, restated, supplemented or otherwise modified from time to time) (the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881 (c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS

Form W-8BEN or W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By: _____
Name:
Title:

Date:    , 20[ ]

**<u>Exhibit C</u>**

Exhibit G

Depository Service List

Served via Email

| Name | Email |
|------|-------|
| Broadridge | SpecialProcessing@broadridge.com; BankruptcyJobs@broadridge.com |
| Clearstream | nathalie.chataigner@clearstream.com; cherifa.maameri@clearstream.com; CA_Luxembourg@clearstream.com; david.mccauley@clearstream.com; ca_mandatory.events@clearstream.com; hulya.din@clearstream.com |
| DTC | MandatoryReorgAnnouncements@dtcc.com; voluntaryreorgannouncements@dtcc.com; LegalAndTaxNotices@dtcc.com; rgiordano@dtcc.com; |
| Euro Clear | drit@euroclear.com; 'JPMorganInformation.Services@jpmorgan.com'; eb.ca@euroclear.com |
| Mediant | darchangel@mediantonline.com'; mtaylor@mediantonline.com; mdickens@mediantonline.com; 'mhamdan@mediantonline.com' 'mkoester@mediantonline.com'; 'documents@mediantonline.com' |
| SIS | ca.notices@six-securities-services.com |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**<u>Exhibit D</u>**

Exhibit D

Lenders Service List

Served via First Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|
| BANK OF AMERICA N.A | ATTN:Austin Penland, Pete Gross, Alexander Watts, Kevin Brown, Lauren Lountzis, Peter Gross, Alejandro Agudelo, Loryanna Shand, Margaret Sang | 214 North Tryon St., NC1-027-14-01 | Charlotte | NC | 28255 | |
| BARCLAYS BANK PLC NY | ATTN:Neil Hanson, David Keogh John Parsons | 700 Prides Crossing | Newark | DE | 19713 | |
| BLUEMOUNTAIN CLO 2013-1 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2014-2 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2015-1 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2015-2 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2015-3 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2015-4 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2016-1 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2016-3 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2018-1 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2018-2 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN CLO 2018-3 LTD | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| BLUEMOUNTAIN FUJI US CLO II | ATTN:Andrew Lask, David Mew, Barry Rosenthal, Eric Albert, Joshua Moskow | 280 Park Avenue | New York | NY | 10020 | |
| VENTURE XXVIII CLO | ATTN:Joanna Palmer, Maria Giannavola, Sadia Thavarajan, Jakub Dec | Queensgate House, South Church Street | George Town | Grand Cayman | KY1-1102 | |
| CENT CLO 19 LIMITED | ATTN:Angela J. Jarasunas | 100 N. Pacific Coast Highway, Suite 650 | El Segundo | CA | 90245 | |
| CENT CLO 21 LIMITED | ATTN:Angela J. Jarasunas | 100 N. Pacific Coast Highway, Suite 650 | El Segundo | CA | 90245 | |
| CENT CLO 24 LIMITED | ATTN:Angela J. Jarasunas | 100 N. Pacific Coast Highway, Suite 650 | El Segundo | CA | 90245 | |
| COLUMBIA CENT CLO 27 LTD | ATTN:Angela J. Jarasunas | 100 N. Pacific Coast Highway, Suite 650 | El Segundo | CA | 90245 | |
| COLUMBIA CENT CLO 28 LIMITED | ATTN:Angela J. Jarasunas | 100 N. Pacific Coast Highway, Suite 650 | El Segundo | CA | 90245 | |

Exhibit D

Lenders Service List

Served via First Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|------|-----------|-----------|------|-------|-----|---------|
| COLUMBIA FLOATING RATE FUND | ATTN:Angela J. Jarasunas | 100 N. Pacific Coast Highway, Suite 650 | El Segundo | CA | 90245 | |
| CORBIN ERISA OPPORTUNITY FUND | ATTN:Daniel Friedman, Zachary Bader | 590 Madison Avenue, 31st Floor | New York | NY | 10022 | |
| CORBIN OPPORTUNITY FUND LP | ATTN:Daniel Friedman, Zachary Bader | 590 Madison Avenue, 31st Floor | New York | NY | 10022 | |
| CREDIT SUISSE LOAN FUNDING LLC | Eleven Madison Avenue | | New York | NY | 10010 | |
| CVP CLO 2017-2 LTD | ATTN:CVP CLO, Joseph Cambareri | Clifton House, 75 Fort Street | George Town | Grand Cayman | KY1-1108 | |
| CVP CLO 2017-1 LTD | ATTN:CVP CLO, Joseph Cambareri | Clifton House, 75 Fort Street | George Town | Grand Cayman | KY1-1108 | |
| DEUTSCHE BANK AG CAYMAN ISLAND | ATTN:Edward Schaffer; Howard Lee | 60 WALL STREET, 2ND FLOOR | | New York | NY | 10005 | |
| ELLINGTON CLO I | ATTN:Eamon Trebilcock, Hilary Langworthy, Hekeani Mathieu, Jake Gomolinski-Ekel, Rich Daley | 53 Forest Avenue | Greenwich | CT | 06870 | |
| ELLINGTON CLO II LTD | ATTN:Eamon Trebilcock, Hilary Langworthy, Hekeani Mathieu, Jake Gomolinski-Ekel, Rich Daley | 53 Forest Avenue | Greenwich | CT | 06870 | |
| ELLINGTON CLO III LTD | ATTN:Eamon Trebilcock, Hilary Langworthy, Hekeani Mathieu, Jake Gomolinski-Ekel, Rich Daley | 53 Forest Avenue | Greenwich | CT | 06870 | |
| ELLINGTON CLO IV LTD | ATTN:Eamon Trebilcock, Hilary Langworthy, Hekeani Mathieu, Jake Gomolinski-Ekel, Rich Daley | 53 Forest Avenue | Greenwich | CT | 06870 | |
| NEWSTAR FAIRFIELD FUND CLO LTD | ATTN:Brian A. Senatore, Justin P. Connolly | 800 Connecticut Avenue, Suite 1W05 | Norwalk | CT | 06854 | |
| NEWSTAR EXETER FUND CLO LLC | ATTN:Brian A. Senatore, Justin P. Connolly | 800 Connecticut Avenue, Suite 1W05 | Norwalk | CT | 06854 | |
| GOLDMAN SACHS LENDING PTNRS | 200 West Street - Tax Dept. | | New York | NY | 10282 | |
| MARATHON CLO IX LTD | ATTN:Richard Hom, Ronny Sirizzotti, Peter Chin | One Bryant Park, 38th Floor | New York | NY | 10036 | |
| MARATHON CLO V LTD | ATTN:Richard Hom, Ronny Sirizzotti, Peter Chin | One Bryant Park, 38th Floor | New York | NY | 10036 | |
| MARATHON CLO VI, LTD | ATTN:Richard Hom, Ronny Sirizzotti, Peter Chin | One Bryant Park, 38th Floor | New York | NY | 10036 | |
| MARATHON CLO VII, LTD | ATTN:Richard Hom, Ronny Sirizzotti, Peter Chin | One Bryant Park, 38th Floor | New York | NY | 10036 | |
| MARATHON CLO VIII, LTD | ATTN:Richard Hom, Ronny Sirizzotti, Peter Chin | One Bryant Park, 38th Floor | New York | NY | 10036 | |
| MARATHON CLO X LTD | ATTN:Richard Hom, Ronny Sirizzotti, Peter Chin | One Bryant Park, 38th Floor | New York | NY | 10036 | |
| MARATHON CLO XI LTD | ATTN:Richard Hom, Ronny Sirizzotti, Peter Chin | One Bryant Park, 38th Floor | New York | NY | 10036 | |
| QUAMVIS SCA SICAV-FIS: CMAB | ATTN:Richard Hom, Ronny Sirizzotti, Peter Chin | One Bryant Park, 38th Floor | New York | NY | 10036 | |
| MEADOWVEST FUNDING LLC | 5400 Westheimer Court, Ste 760 | | Houston | TX | 77056 | |
| VENTURE 28A CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | New York | NY | 10017 | |
| VENTURE 35 CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | New York | NY | 10017 | |
| VENTURE 36 CLO | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | New York | NY | 10017 | |
| VENTURE XII CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | New York | NY | 10017 | |
| VENTURE XIII CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | New York | NY | 10017 | |
| VENTURE XIV CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | New York | NY | 10017 | |

In re: Foresight Energy LLC, et al.
Case No. 20-41308-659

Page 2 of 5

Exhibit D

Lenders Service List

Served via First Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|
| VENTURE XIX CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XV CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XVI CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XVII CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XVIII CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XX CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XXI CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XXII CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XXIII CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XXIV CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XXIX CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XXV CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XXVI CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| VENTURE XXVII CLO LIMITED | ATTN:Atha Baugh | 12 E. 49th Street 29th Floor | | New York | NY | 10017 | |
| OAKTREE CLO 2014-1 LTD. | ATTN:Andrew Park; Armen Panossian; Cisco Salomon; Lin Tien; Lindsay Berz; Peter Deschner; Ronnie Kaplan; Timothy Fairty | 333 South Grand Avenue, 28th Floor | Los Angeles | CA | 90071 | |
| OAKTREE CLO 2015-1 LTD | ATTN:Andrew Park; Armen Panossian; Cisco Salomon; Lin Tien; Lindsay Berz; Peter Deschner; Ronnie Kaplan; Timothy Fairty | 333 South Grand Avenue, 28th Floor | Los Angeles | CA | 90071 | |
| OAKTREE CLO 2018-1 LTD | ATTN:Andrew Park; Armen Panossian; Cisco Salomon; Lin Tien; Lindsay Berz; Peter Deschner; Ronnie Kaplan; Timothy Fairty | 333 South Grand Avenue, 28th Floor | Los Angeles | CA | 90071 | |
| OAKTREE CLO 2019-1 LTD | ATTN:Andrew Park; Armen Panossian; Cisco Salomon; Lin Tien; Lindsay Berz; Peter Deschner; Ronnie Kaplan; Timothy Fairty | 333 South Grand Avenue, 28th Floor | Los Angeles | CA | 90071 | |
| OAKTREE EIF III SERIES I, LTD | ATTN:Andrew Park; Armen Panossian; Cisco Salomon; Lin Tien; Lindsay Berz; Peter Deschner; Ronnie Kaplan; Timothy Fairty | 333 South Grand Avenue, 28th Floor | Los Angeles | CA | 90071 | |
| OAKTREE EIF III SERIES II | ATTN:Andrew Park; Armen Panossian; Cisco Salomon; Lin Tien; Lindsay Berz; Peter Deschner; Ronnie Kaplan; Timothy Fairty | 333 South Grand Avenue, 28th Floor | Los Angeles | CA | 90071 | |
| OAKTREE SENIOR LOAN FUND | ATTN:Andrew Park; Armen Panossian; Cisco Salomon; Lin Tien; Lindsay Berz; Peter Deschner; Ronnie Kaplan; Timothy Fairty | 333 South Grand Avenue, 28th Floor | Los Angeles | CA | 90071 | |
| OAKTREE CLO 2019-2 LTD | ATTN:Andrew Park; Armen Panossian; Cisco Salomon; Lin Tien; Lindsay Berz; Peter Deschner; Ronnie Kaplan; Timothy Fairty | 333 South Grand Avenue, 28th Floor | Los Angeles | CA | 90071 | |
| THE MANGROVE PARTNERS MST FD | 645 Madison Ave, 14th Floor | | | New York | NY | 10022 | |
| B&M CLO 2014-1 LTD | ATTN:John Heitkemper | 555 W. 5th Street, Suite 3700 | | Los Angeles | CA | 90013 | |
| TICP CLO VI 2016-2 FUNDING LTD | 5400 Westheimer Court, Ste 760 | | | Houston | TX | 77056 | |

In re: Foresight Energy LLC, et al.
Case No. 20-41308-659

Page 3 of 5

Exhibit D

Lenders Service List

Served via First Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|
| AIG SENIOR FLOAT RATE | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| BRITISH COAL STAFF SUP ANN SCH | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| HARTFORD TOTAL RETURN BOND ETF | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| HARTFORD TOTAL RETURN BOND HLS | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| METROPOLITAN SERIES FUND - MET | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| MINEWORKERS PENSION SCHEME | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| SAEV MASTERFONDS WELLINGTON GL | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| SAFETY INSURANCE COMPANY | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| SEASONS SERIES TRUST-SA MULTI | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| THE HARTFORD FLOAT RATE FUND | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| THE HARTFORD FLOAT RATE HIGH | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| THE HARTFORD STRATEGIC INC FD | ATTN:Dania Piscetta, David Marshak, Jeffrey Heuer, Richard T. Crawford, Matt Stafford, Chuck Goring, Emily Babalas, Matthew Burrows | 280 Congress Street | | Boston | MA | 02210 |
| THE HARTFORD TOTAL RETURN BOND | ATTN:THE HARTFORD TOTAL RETURN BONDATTN: | 280 Congress Street | | Boston | MA | 02210 |
| WCF MUTUAL INSURANCE COMPANY | ATTN:WCF MUTUAL INSURANCE COMPANYATTN: | 280 Congress Street | | Boston | MA | 02210 |
| WELLINGTON MULTI-SECTOR CR FD | ATTN:WELLINGTON MULTI-SECTOR CR FDATTN: | 280 Congress Street | | Boston | MA | 02210 |
| WELLINGTON TS CO MULSEC CRD II | ATTN:WELLINGTON TS CO MULSEC CRD IIATTN: | 280 Congress Street | | Boston | MA | 02210 |

In re: Foresight Energy LLC, et al.
Case No. 20-41308-659

Exhibit D

Lenders Service List

Served via First Class Mail

| NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|------|-----------|-----------|------|-------|-----|---------|
| WELLINGTON TST CO NAMCIF TSTII | ATTN:WELLINGTON TST CO NAMCIF TSTIIATTN: | 280 Congress Street | | Boston | MA | 02210 |
| WELLINGTON TST CO NAMCTFT CBP | ATTN:WELLINGTON TST CO NAMCTFT CBPATTN: | 280 Congress Street | | Boston | MA | 02210 |
| WELLINGTON TST CO NAMCTFT OFIA | ATTN:WELLINGTON TST CO NAMCTFT OFIAATTN: | 280 Congress Street | | Boston | MA | 02210 |
| WELLINGTON TST CO NAMCTFT OISB | ATTN:WELLINGTON TST CO NAMCTFT OISBATTN: | 280 Congress Street | | Boston | MA | 02210 |
| WELLINGTON WORLD BOND FUND | ATTN:WELLINGTON WORLD BOND FUNDATTN: | 280 Congress Street | | Boston | MA | 02210 |
| JOHN HANCOCK VARIABLE INS TST | ATTN:JOHN HANCOCK VARIABLE INS TSTATTN: | 280 Congress Street | | Boston | MA | 02210 |
| ZAIS CLO 1 LTD | ATTN:ZAIS CLO 1 LTDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |
| ZAIS CLO 11 LTD | ATTN:ZAIS CLO 11 LTDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |
| ZAIS CLO 13 LTD | ATTN:ZAIS CLO 13 LTDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |
| ZAIS CLO 2 LTD | ATTN:ZAIS CLO 2 LTDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |
| ZAIS CLO 3 LTD | ATTN:ZAIS CLO 3 LTDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |
| ZAIS CLO 5 LTD | ATTN:ZAIS CLO 5 LTDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |
| ZAIS CLO 6 LTD | ATTN:ZAIS CLO 6 LTDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |
| ZAIS CLO 7 LTD | ATTN:ZAIS CLO 7 LTDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |
| ZAIS CLO 8 LIMITED | ATTN:ZAIS CLO 8 LIMITEDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |
| ZAIS CLO 9 LTD | ATTN:ZAIS CLO 9 LTDATTN: | 101 Crawfords Corner Road, Suite 1206 | | Holmdel | NJ | 07733 |

In re: Foresight Energy LLC, et al.
Case No. 20-41308-659

Page 5 of 5

**<u>Exhibit E</u>**

March 25, 2020

**IMPORTANT NOTICE OF**

**UPDATE TO THE NOTICE AND INSTRUCTION FORM**

To: the Holders (the "Prepetition Second Lien Holders") of the 11.50% Second Priority Senior Secured Notes due 2023 (CUSIP Nos. 345525 AE9, 345525 AF6 or U34550 AE0) ("Prepetition Second Lien Notes") of FORESIGHT ENERGY LLC and FORESIGHT ENERGY FINANCE CORPORATION

To: Lenders (the "Prepetition First Lien Lenders") under that certain Credit and Guaranty Agreement , dated as of March 28, 2017, by and among FORESIGHT ENERGY LLC, as Borrower and the other parties thereto (as amended, modified, restated or supplemented, the "Prepetition First Lien Credit Agreement")

Re: Clerical Error in the Notice and Instruction Form

Please be advised that the Notice and Instruction Form contained a clerical error in Item 2a of the Subscription Form attached thereto as Annex I.

In light of the foregoing, please be advised that the Subscription Form is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: stricken text) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the pages attached hereto as Exhibit A.

An updated version of the Notice and Instruction Form, correcting the clerical error referenced in Exhibit A has been made available at https://cases.primeclerk.com/foresightenergy.

## Exhibit A

[see attached]

**Item 2a. Calculation of the Maximum Participation Amount**.  You are entitled to participate up to your full pro rata portion of the Syndicated DIP Term Loans, or some smaller portion thereof.  In order for you to understand the maximum for which you are entitled to participate, your maximum pro rata share of the Syndicated DIP Term Loans is calculated as follows:

Each Eligible Holder may participate up to the following amount (round to nearest Dollar, which is the principal amount of Syndicated DIP Term Loans an Eligible Holder will receive (which includes the upfront fee and commitment fee payable in original issue discount; provided however, if such amount is less than the Minimum Amount, you may not participate in the Opportunity)

**With respect to your Prepetition First Lien Obligations**:

$$(\text{Line 1}) \qquad (S * (P1 / N)) = \$_____$$

*where*

$S$ = $14,467,012.26 (the aggregate principal amount of Syndicated DIP Term Loans ($45,000,000), multiplied by Prepetition First Lien Allocation (32.1489%)

$P1$ = your Total Principal Amount of Prepetition First Lien Obligations set forth in Item 2(a) above

$N$ = the aggregate outstanding amount of all Prepetition First Lien Obligations (~~($918,930,135.46~~ held by all Eligible Holders ($286,666,814.79)

**With respect to your Prepetition Second Lien Notes**:

$$(\text{Line 2}) \qquad (S * (P2 / N)) = \$_____$$

*where*

$S$ = $632,967.65 (the aggregate amount of Syndicated DIP Term Loans ($45,000,000), multiplied by Prepetition Second Lien Allocation (1.4066%))

$P2$ = your Total Principal Amount of Prepetition Second Lien Notes set forth in Item 2(a) above

$N$ = the aggregate outstanding principal amount of all Second Lien Notes (~~($425,000,000~~ held by all Eligible Holders ($82,437,987.37)

**Max Participation Amount**

Line 1 + Line 2

$_____

**Item 2b. Calculation of the Subscription Amount and Subscription Funding Amount**.  Please specify your commitment to participate and the Subscription Funding Amount, as applicable in the spaces below:

Each Eligible Holder is entitled to commit to participate for up to its pro rata portion of the Syndicated DIP Term Loans.  Your commitment to participate, taken together with the commitment of other Eligible Holders under common control through common investment management and/or advisement with you, cannot be less than the Minimum Amount.  Your commitment to participate cannot exceed the individual limit included in Line 1 above with respect to your Prepetition First Lien Obligations (if any), *plus* Line 2 above with respect to your Prepetition Second Lien Notes (if any).  Please enter on the following Line 3 the principal amount of your commitment to participate in the Syndicated DIP Term Loan (which includes the upfront fee and commitment fee) (the "***Subscription Amount***"):

**Subscription Amount (including the upfront fee and commitment fee):**

(Line 3)          $ _____

To calculate your Subscription Funding Amount, take the Subscription Amount from Line 3 ("C") and subtract the upfront fee (3%) using the following formula and enter it on Line 4 below (round to nearest Dollar).

**Subscription Funding Amount:**

$$C - (0.03 * C)$$

(Line 4)          $ _____

**With respect to your Roll-Up Loans**

Subject to the terms and conditions set forth in the DIP Credit Agreement and the Orders, each Eligible Holder who are Prepetition First Lien Lenders as of the Record Date shall be entitled to "roll up" any Prepetition First Lien Obligations held by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) equal to 0.808625 times the sum of (i) the aggregate principal amount of Initial Term Loans funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Closing Date on account of its Prepetition First Lien Obligations, if any, and (ii) the aggregate principal amount of Delayed Draw Term Loan funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Delayed Draw Funding Date, if any, on account of its Prepetition First Lien Obligations; provided that the aggregate principal amount of the Roll-Up Loans cannot exceed $75,000,000.

**To illustrate:**

In the case of an Eligible Holder owning $50,000,000 in aggregate principal amount of the Prepetition First Lien Loans and $25,000,000 of Prepetition Second Lien Notes, such Eligible Holder would be entitled to participate as a DIP Lender in the DIP Facility in the maximum principal amount (Item 2a) of:

1. On account of such Eligible Holder's Prepetition First Lien Loans:

   a. $14,467,012.26 * ($50,000,000 / $~~918,930,135.46~~286,666,814.79), or the maximum principal of $~~787,166.06~~2,523,314.79 of Delayed Draw Term Loans.

   b. Subject to approval by the Bankruptcy Court, $~~787,166.06~~2,523,314.79 * 0.808625, or the principal of $~~636,522.15~~2,040,415.42 of the Prepetition First Lien Obligations will be substituted and exchanged for (and prepaid by) and deemed to be the Roll-Up Loans issued and outstanding under the DIP Facility.

2. On account of such Eligible Holder's Prepetition Second Lien Notes:

   a. $632,967.65 * ($25,000,000 / $~~425,000,000~~82,437,987.37), or the maximum principal of $~~372,333.91~~191,952.66 of Delayed Draw Term Loans.

3. Maximum Participation Amount = $~~787,166.06 + $372,333.91 = $1,159,499.97~~2,523,314.79 + $191,952.66 = $2,715,267.45

**Exhibit F**

EXECUTION VERSION

# NOTICE AND INSTRUCTION FORM

**to the Holders (the "<u>Prepetition Second Lien Holders</u>") of the
11.50% Second Priority Senior Secured Notes due 2023
(CUSIP Nos. 345525 AE9, 345525 AF6 or U34550 AE0) ("<u>Prepetition Second Lien Notes</u>")
issued under that certain Indenture, dated as of March 28, 2017
(as amended, modified, restated or supplemented, the "<u>Prepetition Second Lien Indenture</u>")**

**of**

## FORESIGHT ENERGY LLC and FORESIGHT ENERGY FINANCE CORPORATION

**and**

**to the Lenders (the "<u>Prepetition First Lien Lenders</u>") under that certain Credit and Guaranty
Agreement , dated as of March 28, 2017**

**with**

## FORESIGHT ENERGY LLC, as Borrower

**and the other parties thereto (as amended, modified, restated or supplemented, the "<u>Prepetition First
Lien Credit Agreement</u>" and the obligations thereunder, the "<u>Prepetition First Lien Obligations</u>")**

**with respect to the Opportunity to participate as a DIP Lender in the
DIP Facility**

**IMPORTANT NOTICE**
**REGARDING THE OPPORTUNITY TO PARTICIPATE**
**AS A DIP LENDER IN THE DIP FACILITY**

IF YOU ELECT TO PARTICIPATE AS A DIP LENDER IN THE DIP FACILITY, YOU WILL BE ENTERING INTO A BINDING LEGAL COMMITMENT WITH FORESIGHT ENERGY LLC (THE "*COMPANY*"). IF YOU SUBMIT A COMMITMENT TO PARTICIPATE IN THE DIP FACILITY PURSUANT TO THIS NOTICE AND INSTRUCTION FORM BUT FAIL TO FUND YOUR SUBSCRIPTION FUNDING AMOUNT (AS SPECIFIED IN ITEM 2B OF THE SUBSCRIPTION FORM) ON OR PRIOR TO THE APPLICABLE EXPIRATION TIME AS DESCRIBED BELOW, YOU WILL NOT BE PERMITTED TO PARTICIPATE AS A LENDER IN THE DIP FACILITY PURSUANT TO THIS OPPORTUNITY.

THE OPPORTUNITY IS NOT BEING GIVEN TO HOLDERS IN ANY JURISDICTION IN WHICH THE ACCEPTANCE OF THE OPPORTUNITY OR MAKING AN OFFER IN CONNECTION THEREWITH WOULD NOT BE IN COMPLIANCE WITH THE LAWS OF SUCH JURISDICTION.

**THE OPPORTUNITY IS BEING GIVEN ONLY TO AN ELIGIBLE HOLDER, WHICH IS AN ENTITY THAT IS (I) EITHER (A) A "QUALIFIED INSTITUTIONAL BUYER," AS SUCH TERM IS DEFINED IN RULE 144A UNDER THE SECURITIES ACT, OR (B) AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT OR AN ENTITY IN WHICH ALL OF THE EQUITY INVESTORS ARE SUCH INSTITUTIONAL "ACCREDITED INVESTORS" UNDER THE SECURITIES ACT, (II) A PREPETITION FIRST LIEN LENDER AND/OR A BENEFICIAL HOLDER OF PREPETITION SECOND LIEN NOTES ON THE RECORD DATE, (III) NOT A BACKSTOP PARTY, AND (IV) NOT THE COMPANY OR AN AFFILIATE OF THE COMPANY.**

**EXPIRATION TIME**

**YOUR OPPORTUNITY TO ELECT TO BECOME A LENDER IN THE DIP FACILITY WILL EXPIRE (I) AT 5:00 P.M., NEW YORK CITY TIME, ON APRIL 1, 2020 (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED OR EARLIER TERMINATED, THE "*SUBSCRIPTION DEADLINE*")) TO THE EXTENT EACH OF THE SUBSCRIPTION DOCUMENTS (AS DEFINED BELOW) IS NOT DELIVERED TO THE INFORMATION AGENT ON OR PRIOR TO THE SUBSCRIPTION DEADLINE, OR (II) AT 5:00 P.M., NEW YORK CITY TIME, ON APRIL 3, 2020 (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED OR EARLIER TERMINATED, THE "*FUNDING DEADLINE*", AND TOGETHER WITH THE SUBSCRIPTION DEADLINE, THE "*EXPIRATION TIME*") TO THE EXTENT THE SUBSCRIPTION FUNDING AMOUNT (AS DEFINED BELOW) IS NOT FUNDED TO THE ESCROW ACCOUNT (AS DEFINED BELOW) ON OR PRIOR TO THE FUNDING DEADLINE, UNLESS THE APPLICABLE EXPIRATION TIME IS EXTENDED OR EARLIER TERMINATED BY MUTUAL AGREEMENT OF THE REQUIRED BACKSTOP PARTIES, THE DIP AGENT AND THE COMPANY. THERE ARE NO WITHDRAWAL RIGHTS ONCE THE SUBSCRIPTION FORM ATTACHED TO THIS NOTICE AND INSTRUCTION FORM IS VALIDLY DELIVERED.**

**IF THE COMPANY AND THE REQUIRED BACKSTOP PARTIES DETERMINE TO ALLOW YOU TO WITHDRAW YOUR COMMITMENT, INCLUDING IN THE EVENT A MATERIAL CHANGE CAUSES THE COMPANY TO UPDATE THE INFORMATION RELATING TO THIS OPPORTUNITY TO PARTICIPATE AND EXTEND THE APPLICABLE EXPIRATION TIME, ANY SUCH WITHDRAWAL WILL BE LIMITED AS SET FORTH IN ANY NOTICE THEREOF.**

**IMPORTANT NOTE FOR PREPETITION SECOND LIEN NOTEHOLDERS: YOUR SUBSCRIPTION DOCUMENTS MUST BE RECEIVED BY YOUR NOMINEE WITH SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO COMPLETE THE NOMINEE CERTIFICATION ON YOUR BEHALF AND DELIVER IT TO THE INFORMATION AGENT BY THE SUBSCRIPTION DEADLINE.**

**NO SUBSCRIPTION FORM SUBMISSIONS WILL BE VALID IF DELIVERED AFTER THE SUBSCRIPTION DEADLINE. THE COMPANY, THE DIP AGENT AND THE REQUIRED BACKSTOP PARTIES WILL DETERMINE WHETHER A SUBSCRIPTION FORM TRANSMITTING AN ELIGIBLE HOLDER'S COMMITMENT TO PARTICIPATE HAS BEEN VALIDLY SUBMITTED AND WHETHER TO ACCEPT ANY SUBSCRIPTION FORM THAT HAS NOT BEEN VALIDLY EXECUTED AND**

> **DELIVERED.**
>
> **NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE REQUIRED BACKSTOP PARTIES, THE DIP AGENT AND THE COMPANY MAY AMEND THE TERMS OF THE OPPORTUNITY, INCLUDING THIS SUBSCRIPTION FORM AND THE OTHER SUBSCRIPTION DOCUMENTS, AT ANY TIME UPON THEIR MUTUAL AGREEMENT.**
>
> **YOUR PARTICIPATION IN THE OPPORTUNITY IS SUBJECT TO YOU PROVIDING THE ADMINISTRATIVE QUESTIONNAIRE AND ALL KNOW-YOUR-CUSTOMER INFORMATION, TAX FORMS, AND OTHER DOCUMENTS REQUIRED BY THE DIP AGENT AND THE DIP AGENT'S SATISFACTORY REVIEW OF SUCH INFORMATION AND DOCUMENTS (AS DETERMINED IN THE SOLE DISCRETION OF THE DIP AGENT).**
>
> **TERMS USED IN THIS BOX SHALL HAVE THE MEANINGS SET FORTH IN THIS NOTICE AND INSTRUCTION FORM.**

Attachments to this Notice and Instruction Form:

| | |
|---|---|
| Annex I | Subscription Form |
| Annex I-A | Instructions for Completing the Subscription Form |
| Annex I-B | Nominee Certification (for Prepetition Second Lien Noteholders Only) |
| Annex II | Master Joinder to the DIP Credit Agreement |
| Annex III | Administrative Questionnaire |
| Annex IV | Description of Required KYC Information |
| Annex V | Description of Required Tax Forms |
| Annex VI | Designation Notice |
| Annex VII | RSA Joinder |
| Exhibit A | Credit Agreement |

To the Prepetition First Lien Lenders and the Prepetition Second Lien Noteholders:

On March 10, 2020, Foresight Energy GP LLC, a Delaware limited liability company (the "***General Partner***"), Foresight Energy LP, a Delaware limited partnership ("***Holdings***"), Foresight Energy LLC, a Delaware limited liability company (the "***Company***"), and certain of their direct and indirect subsidiaries (together with the General Partner, Holdings and the Company, the "***Debtors***") filed voluntary petitions (the "***Chapter 11 Petitions***") for relief under the provisions of chapter 11 of title 11 of the United States Code ("***Bankruptcy Code***") in the United States Bankruptcy Court for the Eastern District of Missouri (the "***Bankruptcy Court***").  In connection with the foregoing, on March 10, 2020, the Company entered into that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "***DIP Credit Agreement***" and the commitments and extension of credit thereunder, the "***DIP Facility***"), by and among the Debtors, the Backstop Parties (as defined below) and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent (in such capacities, the "***DIP Agent***"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the DIP Credit Agreement, a copy of which is attached as Exhibit A to this Notice and Instruction Form.

On March 10, 2020, the Debtors, certain Prepetition First Lien Lenders and certain Prepetition Second Lien Holders (collectively, the "***Backstop Parties***", and the Backstop Parties holding backstop commitments of more than 60% of the Initial Term Loans and the Delayed Draw Term Loans shall be referred to herein as the "***Required Backstop Parties***") executed that certain Restructuring Support Agreement, dated as of March 10, 2020 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "***RSA***")[1], which annexes a term sheet that provides for the Opportunity (as defined below) for each Eligible Holder (as defined below) that is not a Backstop Party to participate in the DIP Facility in the aggregate principal amount of the Delayed Draw Term Loan Commitment not to exceed $15,099,979.91 (the "***Syndicated DIP Term Loans***"), subject to the procedures and documentation detailed herein.

You have received this Notice and Instruction Form because you were a Prepetition Second Lien Noteholder and/or a Prepetition First Lien Lender as of March 23, 2020 (the "***Record Date***"). Pursuant to and subject to the terms hereof, you are being given notice of your opportunity (the "***Opportunity***") to be a lender under the DIP Facility (a "***DIP Lender***"). ***Importantly, to the extent that you choose to participate in the Opportunity, you must also execute the enclosed RSA Joinder (as defined below), making you a party thereto, both in your capacity as a DIP Lender and a Prepetition Second Lien Noteholder and/or a Prepetition First Lien Lender (and in any other capacity in which you hold debt of the Debtors).***

The Opportunity provides Eligible Holders (which shall exclude, for the avoidance of doubt, the Backstop Parties), as of the Record Date, who are (i) Prepetition First Lien Lenders with the opportunity to (a) assume up to their pro rata portion of 32.1489% of the principal amount of the Delayed Draw Term Loan Commitment not to exceed $45,000,000 (the "***Prepetition First Lien Allocation***") based on such Prepetition First Lien Lender's outstanding principal amount of the Prepetition First Lien Obligations under the Prepetition First Lien Credit Agreement as of the Record Date, and (b) subject to the terms and conditions set forth in the DIP Credit Agreement and the Orders, substitute and exchange the Prepetition First Lien Obligations held by such Eligible Holder for loans under the DIP Credit Agreement (the "***Roll-Up Loans***") in a principal amount equal to 0.808625 times the sum of (i) the aggregate principal amount of Initial Term Loans funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Closing Date, if any, on account of its Prepetition First Lien Obligations, and (ii) the aggregate principal amount of Delayed Draw Term Loans funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Delayed Draw Funding Date on account of its Prepetition First Lien Obligations (the "***Roll-Up Amount***"); provided that the aggregate principal amount of the Roll-Up Loans of all DIP Lenders shall not exceed $75,000,000, and/or (ii) Prepetition Second Lien Holders with the opportunity to purchase up to their pro rata portion of 1.4066% of the principal amount of the Delayed Draw Term Loan Commitment not to exceed $45,000,000 (the "***Prepetition Second Lien Allocation***") based on such Prepetition Second Lien Holder's outstanding principal amount of the Prepetition Second Lien Notes under the Prepetition Second Lien Indenture as of the Record Date.  For the

---

[1] Foresight Energy LP, Current Report (Form 8-K/A) (March 10, 2020), Ex. 10.1.

avoidance of doubt, Eligible Holders will not receive the Put Option Premium as set forth in Section 2.09(c) of the DIP Credit Agreement.

Notwithstanding the foregoing, only entities that are (i) either (a) "qualified institutional buyers" ("*QIBs*"), as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*"), or (b) institutional "accredited investors" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act ("*IAIs*") or an entity in which all of the equity investors are IAIs, (ii) a beneficial Holder of Prepetition Second Lien Notes and/or Prepetition First Lien Loans on the Record Date, (iii) not a Backstop Party and (iv) not the Company or an affiliate of the Company (all such entities, collectively, that meet the foregoing are referred to herein as "*Eligible Holders*") may participate in the Opportunity. For the avoidance of doubt, natural persons shall not be Eligible Holders. If you are not an Eligible Holder, you may not participate in the Opportunity.  The Company and the Required Backstop Parties shall mutually determine, in their absolute discretion, whether any entity is an Eligible Holder for purposes of participation in the Opportunity. Each Eligible Holder has the right to designate, using the Designation Notice attached as Annex VI (the "*Designation Notice*"), that one or more of its affiliates or funds or accounts that are managed, advised or sub-advised by such Eligible Holder or its affiliates (each, a "*Related Lender*") participate as a DIP Lender for some or all of its pro rata portion of the Syndicated DIP Term Loans.

In addition, to be able to participate in the Opportunity, the minimum participation amount of any Eligible Holder (together with any Eligible Holder under common control through common investment management and/or advisement with such Eligible Holder) is $350,000 (the "*Minimum Amount*").

Please use the subscription form attached hereto as Annex I (the "*Subscription Form*") to transmit your election, if any.  To participate in the Opportunity, you must (i) complete and duly execute (a) the Subscription Form, (b) the Master Joinder to the DIP Credit Agreement attached hereto as Annex II (the "*DIP Joinder*"), (c) an Administrative Questionnaire attached hereto as Annex III, (d) all know-your-customer information and other documents required by the DIP Agent as described in Annex IV hereto (the "*KYC Information*"), (e) the applicable tax forms as described in Annex V hereto, (f) a joinder to the RSA attached hereto as Annex VII (the "*RSA Joinder*"), and (g) such other documents as the DIP Agent may reasonably require (collectively, the "*Subscription Documents*"), (ii) deliver (or cause to be delivered) such Subscription Documents to Prime Clerk LLC (the "*Information Agent*") on or before the Subscription Deadline as instructed below, and (iii) prior to the Funding Deadline, fund your entire Desired Participation Amount, as indicated in Item 2b of the Subscription Form (the "*Subscription Funding Amount*"), in each case as further described herein.  If you are a Prepetition Second Lien Noteholder, you must provide the nominee holding your Prepetition Second Lien Notes with sufficient time to allow your nominee to complete the nominee certification attached hereto as Annex I-B (the "*Nominee Certification*") on your behalf and deliver it to the Information Agent on or prior to the Subscription Deadline.  If your Prepetition Second Lien Notes are held through more than one nominee, please have each nominee complete a Nominee Certification for the respective Prepetition Second Lien Notes held.

The DIP Facility consists of (i) the Initial Term Loans in an aggregate principal amount not to exceed $55,000,000, (ii) the Delayed Draw Term Loans in an aggregate principal amount not to exceed $45,000,000 and (iii) the Roll-Up Loans in an aggregate amount not to exceed $75,000,000 (collectively, the "*DIP Loans*").  On March 11, 2020, the Backstop Parties funded $55,000,000 of the Initial Term Loans pursuant to the DIP Credit Agreement and the RSA. Subject to the satisfaction or waiver of all applicable conditions precedent set forth in the DIP Credit Agreement, including entry by the Bankruptcy Court of the Final Order, (x) the Delayed Draw Term Lenders are obligated to fund the Delayed Draw Term Loans and (y) the aggregate amount of Prepetition First Lien Obligations held by each DIP Lender will be substituted and exchanged for (and prepaid by) and deemed to be the Roll-Up Loans issued and outstanding under the DIP Credit Agreement in an aggregate principal amount not to exceed $75,000,000. The DIP Credit Agreement is attached hereto as Exhibit A and also available at https://cases.primeclerk.com/ foresightenergy (by clicking on the link for "Syndication Materials").

The DIP Facility will mature on the date that is the earliest to occur of (i) the date that is 180 days following the Petition Date; provided, that, if such date is not a Business Day, such preceding Business Day, (ii) the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date) of one or more plans of reorganization confirmed pursuant to a final order entered by the Bankruptcy Court (the "*Plan Effective Date*"), (iii) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under the section 363 of the Bankruptcy Code, and (iv) the date on which the Obligations shall be accelerated in accordance with the provisions of the DIP Credit Agreement.

Interest on the DIP Loans will accrue at a rate of the Eurocurrency Rate plus 11.0% per annum or the Base Rate plus 10.0% per annum, and shall be payable in cash on (i) in the case of Eurocurrency Rate Loans, on the last day of each Interest Period applicable to such DIP Loans, and the Maturity Date and (ii) in the case of Base Rate Loans, the last Business Day of each March, June, September and December, and the Maturity Date. With respect to the DIP Facility, there is also a LIBOR floor of 1.00%, and a default interest of an additional 2.00% per annum during the continuance of an Event of Default.

Pursuant to the DIP Credit Agreement, each DIP Lender funding the Delayed Draw Term Loans shall receive (i) an upfront fee in an amount equal to 3.00% of the principal amount of such DIP Lender's Delayed Draw Term Loans, and (ii) a commitment fee on the Delayed Draw Term Loan Commitment (whether or not then available) of such DIP Lender accruing, during the period commencing from the Closing Date to the Delayed Draw Funding Date, at a rate per annum equal to the 1.00%, in each case, payable on the Delayed Draw Funding Date. Each Eligible Holder shall fund (or cause to be funded) its Subscription Funding Amount to the Escrow Account net of the upfront fee (but inclusive of the commitment fee), and the applicable commitment fee shall be paid by the DIP Agent to each Delayed Draw Term Lender on the Delayed Draw Funding Date. Therefore, the Subscription Funding Amount to be paid into the Escrow Account by each Eligible Holder will be equal to 97% of the principal amount of its pro rata portion of the Delayed Draw Term Loans.

On the Plan Effective Date, the Company will pay to each DIP Lender (or any affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such DIP Lender or such affiliate, in each case, designated by such DIP Lender in writing to the DIP Agent) an exit fee (the "*Exit Fee*") in an aggregate amount equal to 1.0% of the aggregate principal amount of the Initial Term Loan Commitment existing immediately prior to any funding of the Initial Term Loans and the Delayed Draw Term Loan Commitment existing immediately prior to any funding of the Delayed Draw Term Loans, respectively, on a pro rata basis in accordance with the DIP Loans and any unfunded commitments under the DIP Credit Agreement then outstanding. The Exit Fee will be payable in the form of New Common Equity at a 35% discount to the Stated Equity Value, subject to dilution for the Management Incentive Plan; provided, however, that, after the exercise of remedies provided for in Section 8.02 of the DIP Credit Agreement (or after the DIP Loans have automatically become immediately due and payable) upon the occurrence of any Event of Default or upon repayment of the DIP Loans in full and termination of all commitments thereunder without the occurrence of the Plan Effective Date, the Borrower will pay to each DIP Lender (or any affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such DIP Lender or such affiliate, in each case, designated by such DIP Lender in writing to the DIP Agent) the Exit Fee in cash in an amount equal to $2,000,000, on a pro rata basis in accordance with the DIP Loans and any unfunded commitments under the DIP Credit Agreement then outstanding.

*The foregoing description of the DIP Facility is a summary only and does not purport to be complete. It is subject to and qualified in its entirety by reference to the DIP Credit Agreement and the Orders.*

Each Eligible Holder may fund the Syndicated DIP Term Loans in an amount equal to (i) (a) in the case of Prepetition First Lien Lenders, (x) the Prepetition First Lien Allocation, multiplied by (y) in a fraction, the numerator of which is the outstanding principal amount of the First Lien Obligations held by such Eligible Holder as of the Record Date and the denominator of which is the aggregate outstanding principal amount of all First Lien Obligations as of the Record Date, and (b) in the case of Prepetition Second Lien Noteholders, (x) the Prepetition Second Lien Allocation, multiplied by (y) a fraction, the numerator of which is the outstanding principal amount of the Second Lien Notes held by such Eligible Holder as of the Record Date and the denominator of which is the aggregate outstanding principal amount of all Second Lien Notes as of the Record Date, less (ii) the upfront fee described above in an amount equal to 3.0% of the aggregate principal of such Eligible Holder's Syndicated DIP Term Loans; provided that the amount set forth in clause (i) is not less than the Minimum Amount.

Eligible Holders will not have oversubscription rights. From the Record Date until the Delayed Draw Funding Date, no Eligible Holder may transfer, sell or assign any of its Prepetition First Lien Obligations or Prepetition Second Lien Notes, and any such transfer, sale or assignment shall be deemed null and void. Nothing in this paragraph shall be construed to permit any person other than an Eligible Holder to participate as a DIP Lender in the DIP Facility.

**Your commitment to participate may not be withdrawn, unless otherwise mutually determined by the Company, the DIP Agent and the Required Backstop Parties.** Additionally, the Company, the DIP Agent and the Required Backstop Parties will determine whether any Holder is an Eligible Holder, has made the representations in

6

the Subscription Form, has properly executed and delivered the required documentation and funded its Subscription Funding Amount, and whether to reject or accept any subscription to participate that has not been properly completed and delivered.

Your participation in the Opportunity is subject to you (or, if applicable, your designee) providing the administrative questionnaire, all know-your-customer information, tax forms and other documents required by the DIP Agent and the DIP Agent's satisfactory review of such information and documents (as determined in the sole discretion of the DIP Agent).

Each Eligible Holder that intends to participate in the Opportunity as a DIP Lender in the DIP Facility must, (i) on or prior to Subscription Deadline, deliver (or cause the delivery of) the duly executed Subscription Documents to the Information Agent and (ii) on or prior to the Funding Deadline, cause the Subscription Funding Amount to be funded by such Eligible Holder to be sent by wire transfer of immediately available federal funds to an escrow account (the "***Escrow Account***") established by Cortland Capital Market Services LLC as escrow agent (in such capacity, the "***Escrow Agent***"), according to the wire instructions to be provided by the Information Agent to Eligible Holders (and made available at https://cases.primeclerk.com/foresightenergy) at least one (1) business day prior to the Funding Deadline (or such earlier time, to the extent any Eligible Holder has submitted all Subscription Documents satisfactory to the DIP Agent). Funds held in the Escrow Account will not accrue interest. Subject to the terms of the escrow agreement, the Escrow Agent assumes no responsibility for the funds delivered to the Escrow Account and shall be entitled to rely solely on the direction of the Company and the Required Backstop Parties with respect to the disposition of such funds. Upon closing of the Opportunity and syndication, the Escrow Agent will promptly disburse the funds in the Escrow Account funded by participating Eligible Holders to the DIP Agent or the Company, as directed by the Company and the Required Backstop Parties, and the DIP Agent will update the register to reflect the consummation of the Delayed Draw Term Loans and the Roll-Up Loans.

Although the Expiration Time occurs prior to the Delayed Draw Funding Date, it is important to note that the closing of the Opportunity and this syndication will occur on the Delayed Draw Funding Date, which is expected to occur within five (5) Business Days following entry of the Final DIP Order (as such date may be extended by the Company, the DIP Agent and the Required Backstop Parties). Accordingly, your Subscription Funding Amount, representing your pro rata share of the Delayed Draw Term Loans, will be held in escrow for an undetermined period of time and there can be no assurances as to when closing of the Opportunity and this syndication will occur. Funds held in escrow will not accrue interest, nor will you accrue any interest on account of your pro rata share of the Delayed Draw Term Loans until closing of the Opportunity and this syndication.

The Bankruptcy Court has not yet approved the Roll-Up Loans. It is an Event of Default under the DIP Credit Agreement if, among other things, the Bankruptcy Court does not approve the "roll-up" of the Prepetition First Lien Loans in an aggregate principal amount equal to $75,000,000 and in a manner and on terms satisfactory to the Required Backstop Parties. There can be no assurances that the Bankruptcy Court will approve the Roll-Up Loans on the terms set forth herein and in the DIP Credit Agreement, including in the aggregate amount of $75,000,000, or at all. If the Bankruptcy Court does not approve the Roll-Up Loans, or approves such loans in an aggregate amount less than $75,000,000, you may still be required to purchase the Syndicated DIP Term Loans in the amounts specified in your Subscription Form if you choose to participate in this Opportunity because the Required Lenders have the ability to waive any such Event of Default under the DIP Credit Agreement. If this were to occur, your participation in the Opportunity and this syndication would not include the ability to "roll up" your existing Prepetition First Lien Obligations in the amounts specified herein, or at all. For the avoidance of doubt, your commitment to participate in the Opportunity may not be withdrawn by you for any reason, including if the Bankruptcy Court does not approve the Roll-Up Loans on the terms set forth herein and in the DIP Credit Agreement, or at all. Amendments, or modifications to, and/or waivers or consents under, the DIP Credit Agreement and the other Loan Documents may be made from time to time in accordance with the terms thereof without the consent or approval of any Eligible Holder electing to participate in the Opportunity. Provided that the Bankruptcy Court approves the Roll-Up Loans, it is expected that closing of the Roll-Up Loans will occur on the date on the Delayed Draw Funding Date.

If the syndication process is terminated for any reason, the Subscription Documents submitted by participating Eligible Holders will terminate and the Escrow Agent will promptly return by wire, funds (without interest) transferred by such Eligible Holders to the Escrow Account. If an Eligible Holder is not permitted to participate in the Opportunity and has wired funds to the Escrow Account, the Escrow Agent will return by wire funds (without interest) transferred by such Eligible Holder to the Escrow Account. The Escrow Agent shall be authorized

to close the Escrow Account following the transfer of all funds held therein.  All funds in the Escrow Account shall be held as cash on deposit and will not accrue interest.

Before you deliver the executed Subscription Documents and wire funds to the Escrow Account, please carefully review (i) the filings on the Debtors' docket with the Bankruptcy Court related to their Chapter 11 Cases, available at https://cases.primeclerk.com/foresightenergy (the "**Bankruptcy Filings**"), (ii) the RSA, the Orders, and the DIP Credit Agreement and (iii) the Company's current and periodic reports, including those listed below (the "**Exchange Act Reports**"), which were filed by the Company with the Securities and Exchange Commission (the "**SEC**") pursuant to the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, and which are available on the SEC's website at www.sec.gov.

Participating as a DIP Term Lender in the DIP Term Facility entails risks, including, but not limited to, the risk that the Company may be liquidated or may be unsuccessful executing its business plan, and as a result may be unable to repay all or part of your DIP Loans.  The Debtors are operating as debtors-in-possession under bankruptcy protection under chapter 11 of the Bankruptcy Code.  The continuation of the Company as a going concern is contingent upon, among other things, the Company's ability to develop a plan of reorganization, to obtain approval of such plan under the applicable provisions of the Bankruptcy Code and to successfully execute its business plan upon its emergence from chapter 11, if any.  The risks inherent in lending to a company operating under chapter 11 of the Bankruptcy Code are materially higher than normal and there is no assurance that any of the conditions described above will be met.  There is a risk that the Company will not be able to develop a feasible plan of reorganization or obtain the necessary approvals thereof, in which case it may be unable to reorganize under chapter 11, and it may be liquidated.  In addition, if the Company is unable to successfully execute its business plan, it may be unable to meet its obligations under the DIP Facility.  In either case, the Company may be unable to repay loan amounts borrowed from you and you may lose all or part of your DIP Loans.

This Notice and Instruction Form relates only to the Opportunity to participate as a DIP Lender in the DIP Facility (which, as noted above, will also require Holders to become a party to the RSA).

**Notwithstanding anything to the contrary herein, the Required Backstop Parties, the DIP Agent and the Company may amend or modify the terms of the Opportunity, including the Subscription Form and the other Subscription Documents, at any time, by filing a notice of such amendment or modification on the Debtors' docket with the Bankruptcy Court related to the Company's Chapter 11 Cases; provided that nothing in this Notice and Instruction Form shall be construed to supersede the amendment and modification requirements set forth in the DIP Credit Agreement.**

## SUBSCRIPTION FORM

---

### IMPORTANT

**PLEASE READ AND FOLLOW THE ATTACHED INSTRUCTIONS CAREFULLY. YOU MUST (I) COMPLETE, SIGN, DATE AND DELIVER THIS SUBSCRIPTION FORM AND THE OTHER SUBSCRIPTION DOCUMENTS TO YOUR NOMINEE WITH SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO COMPLETE THE NOMINEE CERTIFICATION ON YOUR BEHALF AND DELIVER IT TO THE INFORMATION AGENT BEFORE THE SUBSCRIPTION DEADLINE, WHICH DELIVERY WILL CONSTITUTE YOUR COMMITMENT AS A DIP LENDER AND (II) FUND YOUR SUBSCRIPTION FUNDING AMOUNT BY WIRING FUNDS TO THE ESCROW ACCOUNT BEFORE THE FUNDING DEADLINE.**

**EACH ELIGIBLE HOLDER HAS THE RIGHT TO DESIGNATE, USING THE DESIGNATION NOTICE, THAT ONE OR MORE RELATED ENTITIES PARTICIPATE AS A DIP LENDER FOR SOME OR ALL OF ITS PRO RATA SHARE OF THE LOANS AND/OR COMMITMENTS UNDER THE DIP CREDIT AGREEMENT.**

**IF SUCH SUBSCRIPTION DOCUMENTS ARE NOT COMPLETED, DULY EXECUTED AND RECEIVED BY THE INFORMATION AGENT AT OR BEFORE THE SUBSCRIPTION DEADLINE, AND/OR THE SUBSCRIPTION FUNDING AMOUNT IS NOT RECEIVED IN THE ESCROW ACCOUNT AT OR BEFORE THE FUNDING DEADLINE, THE INSTRUCTION TRANSMITTED BY THIS SUBSCRIPTION FORM WILL NOT BE COUNTED.**

**YOU SHOULD REVIEW THE EXCHANGE ACT REPORTS, BANKRUPTCY FILINGS, NOTICE AND INSTRUCTION FORM AND THE INSTRUCTIONS CONTAINED HEREIN BEFORE YOU ELECT TO PARTICIPATE IN THE OPPORTUNITY. YOU MAY WISH TO SEEK LEGAL AND/OR FINANCIAL ADVICE CONCERNING THE OPPORTUNITY.**

---

Capitalized terms used herein but not defined herein have the meanings ascribed to them in the Notice and Instruction Form to which this Subscription Form is attached.

**Item 1. Representations of the Holder.** The undersigned hereby represents and warrants that it:

- Is (i) either a "qualified institutional buyer" or an institutional "accredited investor" as such terms are defined under Rules 144A and 501(a)(1), (2), (3) and (7) under the Securities Act of 1933, as amended, respectively, or is an entity in which all of the equity investors are institutional "accredited investors" and (ii) not the Company or an affiliate of the Company;

- is not a natural person;

- is an "Eligible Assignee" as defined in the DIP Credit Agreement;

- is sophisticated with respect to the decision to participate as a lender in a commercial loan of the type represented by the DIP Loans and is, or the entity exercising discretion in making this decision to participate in the funding of the DIP Loans on behalf of such participant is, experienced in participating as a lender in such commercial loans;

- has received, or has been accorded the opportunity to receive or have access to, copies of the Final Order, the DIP Credit Agreement, the DIP Joinder, the RSA and the RSA Joinder, and has received, or has been accorded the opportunity to receive or have access to, to the extent available, copies of the most recent annual and quarterly financial statements of the Debtors and such other documents and information as it deems appropriate to make its own credit analysis and decision to participate in the funding of such DIP Facility and become a party to the RSA (including access to the docket of the Company's Chapter 11 Cases); and

- has (i) independently and without reliance on the DIP Agent, any other DIP Lender or potential DIP Lender, the Backstop Parties, any of the Debtors, any agent or trustee under the Prepetition First Lien Credit Agreement or the Prepetition Second Lien Notes, and (ii) based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to participate in the funding of the DIP Facility and become a party to the RSA.

Each Holder further authorizes the DIP Agent to act and rely upon (and acknowledges and agrees that the DIP Agent shall be fully protected in acting and relying upon) instructions and/or information from the Company, the Information Agent and/or the Required Backstop Parties and their counsel and advisors in effectuating the transactions contemplated by this Subscription Form.

**Item 2.  Participation in the Opportunity.**  The undersigned certifies that, as of the Record Date, the undersigned (a) was an Eligible Holder of Prepetition First Lien Obligations and/or Prepetition Second Lien Notes in the following principal amounts (insert principal amount in the boxes below) and (b) wishes to make the following commitment (i.e., the "Desired Participation Amount", as listed below in Item 2b, and as computed as set forth below) to participate in the Facility with regard to the Opportunity:

| Name / Address | Total Principal Amount of Prepetition First Lien Obligations as of the Record Date[2] (P1) | Prepetition Second Lien Notes CUSIP (345525 AE9, 345525 AF6 or U34550 AE0) ** please only include one CUSIP in each box below** | Total Principal Amount of Prepetition Second Lien Notes as of the Record Date (P2) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

---

[2] For purposes of determining beneficial ownership on the Record Date for participation in the Opportunity, such ownership shall be determined on the basis of both settled and unsettled trades, provided that, with respect to any unsettled trade of loans, the assignee shall provide evidence (such as a trade confirmation) reasonably satisfactory to counsel to the Company and the Required Backstop Parties, which evidence reasonably establishes ownership of such loans (subject to recordation of assignment by the agent under the Prepetition First Lien Credit Agreement).

**Item 2a. Calculation of the Maximum Participation Amount**.  You are entitled to participate up to your full pro rata portion of the Syndicated DIP Term Loans, or some smaller portion thereof.  In order for you to understand the maximum for which you are entitled to participate, your maximum pro rata share of the Syndicated DIP Term Loans is calculated as follows:

Each Eligible Holder may participate up to the following amount (round to nearest Dollar, which is the principal amount of Syndicated DIP Term Loans an Eligible Holder will receive (which includes the upfront fee and commitment fee payable in original issue discount; provided however, if such amount is less than the Minimum Amount, you may not participate in the Opportunity)

**With respect to your Prepetition First Lien Obligations**:

(Line 1)        $(S * (P1 / N)) = \$\underline{\hspace{3cm}}$

*where*

S = \$14,467,012.26 (the aggregate principal amount of Syndicated DIP Term Loans (\$45,000,000), multiplied by Prepetition First Lien Allocation 32.1489%)

P1 = your Total Principal Amount of Prepetition First Lien Obligations set forth in Item 2(a) above

N = the aggregate outstanding amount of all Prepetition First Lien Obligations held by all Eligible Holders (\$286,666,814.79)

**With respect to your Prepetition Second Lien Notes**:

(Line 2)        $(S * (P2 / N)) = \$\underline{\hspace{3cm}}$

*where*

S = \$632,967.65 (the aggregate amount of Syndicated DIP Term Loans (\$45,000,000), multiplied by Prepetition Second Lien Allocation (1.4066%))

P2 = your Total Principal Amount of Prepetition Second Lien Notes set forth in Item 2(a) above

N = the aggregate outstanding principal amount of all Second Lien Notes held by all Eligible Holders (\$82,437,987.37)

**Max Participation Amount**

Line 1 + Line 2

$\$\underline{\hspace{6cm}}$

**Item 2b. Calculation of the Subscription Amount and Subscription Funding Amount**.  Please specify your commitment to participate and the Subscription Funding Amount, as applicable in the spaces below:

Each Eligible Holder is entitled to commit to participate for up to its pro rata portion of the Syndicated DIP Term Loans.  Your commitment to participate, taken together with the commitment of other Eligible Holders under common control through common investment management and/or advisement with you, cannot be less than the Minimum Amount.  Your commitment to participate cannot exceed the individual limit included in Line 1 above with respect to your Prepetition First Lien Obligations (if any), *plus* Line 2 above with respect to your Prepetition Second Lien Notes (if any).  Please enter on the following Line 3 the principal amount of your commitment to participate in the Syndicated DIP Term Loan (which includes the upfront fee and commitment fee) (the "***Subscription Amount***"):

**Subscription Amount (including the upfront fee and commitment fee)**:

(Line 3)          $_____

To calculate your Subscription Funding Amount, take the Subscription Amount from Line 3 ("C") and subtract the upfront fee (3%) using the following formula and enter it on Line 4 below (round to nearest Dollar).

**Subscription Funding Amount**:

$$C - (0.03 * C)$$

(Line 4)          $_____

**With respect to your Roll-Up Loans**

Subject to the terms and conditions set forth in the DIP Credit Agreement and the Orders, each Eligible Holder who are Prepetition First Lien Lenders as of the Record Date shall be entitled to "roll up" any Prepetition First Lien Obligations held by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) equal to 0.808625 times the sum of (i) the aggregate principal amount of Initial Term Loans funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Closing Date on account of its Prepetition First Lien Obligations, if any, and (ii) the aggregate principal amount of Delayed Draw Term Loan funded by such Eligible Holder (or one or more of its affiliates or any investment advisory client managed or advised by such Eligible Holder) on the Delayed Draw Funding Date, if any, on account of its Prepetition First Lien Obligations; provided that the aggregate principal amount of the Roll-Up Loans cannot exceed $75,000,000.

**To illustrate:**

In the case of an Eligible Holder owning $50,000,000 in aggregate principal amount of the Prepetition First Lien Loans and $25,000,000 of Prepetition Second Lien Notes, such Eligible Holder would be entitled to participate as a DIP Lender in the DIP Facility in the maximum principal amount (Item 2a) of:

1. On account of such Eligible Holder's Prepetition First Lien Loans:

    a. $14,467,012.26 * ($50,000,000 / $286,666,814.79), or the maximum principal of $2,523,314.79 of Delayed Draw Term Loans.

    b. Subject to approval by the Bankruptcy Court, $2,523,314.79 * 0.808625, or the principal of $2,040,415.42 of the Prepetition First Lien Obligations will be substituted and exchanged for (and prepaid by) and deemed to be the Roll-Up Loans issued and outstanding under the DIP Facility.

2. On account of such Eligible Holder's Prepetition Second Lien Notes:

    a. $632,967.65 * ($25,000,000 / $82,437,987.37), or the maximum principal of $191,952.66 of Delayed Draw Term Loans.

3. Maximum Participation Amount = $2,523,314.79 + $191,952.66 = $2,715,267.45

If the Subscription Amount specified in Line 3 above is less than $350,000 and you are under common control through common investment management and/or advisement with other Eligible Holders that have submitted Subscription Forms, list such other Eligible Holders:

_____

_____

_____

The undersigned certifies that it is under common control through common investment management and/or advisement with the Eligible Holders listed above.

**Item 3.  Certification**.  By signing this Subscription Form, the undersigned certifies that it understands that the right to participate in the Opportunity is subject to all the terms and conditions set forth in the Notice and Instruction Form, and agrees that the commitment to participate in the DIP Facility in an amount equal to the Subscription Amount specified in Line 3 of Item 2(b) above, constitutes an irrevocable offer by the undersigned to fund the Syndicated DIP Term Loans equal to the amount specified as the Subscription Funding Amount in Line 4 of Item 2(b) above.

Name of Eligible Holder:

_____
(Print or Type)

Federal Tax I.D.  No.:_____
(If Applicable)

Signature:_____

Print Name:_____

Title:_____

Facsimile Number:_____

E-mail Address:_____

Street Address:_____

City, State, Zip Code:_____

Telephone: (___)_____

Date Completed:_____

**THE SUBSCRIPTION DOCUMENTS MUST BE RECEIVED BY THE INFORMATION AGENT AT ITS EMAIL ADDRESS AT FORESIGHTDIP@PRIMECLERK.COM MUST BE RECEIVED BY THE INFORMATION AGENT BEFORE 5:00 P.M., NEW YORK CITY TIME, ON APRIL 1, 2020, OR THE INSTRUCTIONS TRANSMITTED HEREBY WILL NOT BE COUNTED.**

**FORESIGHT DIP Syndication Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165
Telephone: 877-720-6580 (domestic) or 646-998-7132 (international)**

## INSTRUCTIONS FOR COMPLETING THE SUBSCRIPTION FORM

**EXPIRATION TIME/INFORMATION AGENT:**

The Subscription Deadline for the receipt of instructions is 5:00 p.m., New York City Time, on April 3, 2020, unless extended or earlier terminated. To elect to participate in the Opportunity, you must complete, sign, and return this Subscription Form and the other Subscription Documents to your nominee with sufficient time to allow your nominee to complete the Nominee Certification on your behalf so that it is received by the Information Agent at its email address at email address at foresightDIP@primeclerk.com, or at the following address, for receipt by the Information Agent no later than the Subscription Deadline:

FORESIGHT DIP Syndication Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165
Telephone: 877-720-6580 (domestic) or 646-998-7132 (international)

To effect a subscription, you must take the following steps:

a.  Review the representations in Item 1 of the Subscription Form;

b.  In Item 2 of the Subscription Form, specify the amount of Prepetition First Lien Obligations and Prepetition Second Lien Notes you held as of the Record Date;

c.  In Item 2(b) of the Subscription Form, (i) specify the Subscription Amount, the Subscription Funding Amount and the total amount to be wired and (ii) if the amount of the DIP Term Facility commitment specified in Line 1 of Item 2(b) is less than $350,000 and you are under common control through common investment management and/or advisement with other Eligible Holders that have submitted Subscription Forms, specify such other Eligible Holders;

d.  Review the certification in Item 3 of the Subscription Form;

e.  In Item 3, sign and date the Subscription Form, and provide the remaining information requested;

f.  Complete, execute and deliver to the Information Agent before the Subscription Deadline (i) the DIP Joinder attached as Annex II to the Notice and Instruction Form, (ii) the Administrative Questionnaire attached as Annex III to the Notice and Instruction Form, (iii) relevant tax forms as described in Annex V to the Notice and Instruction Form, (iv) the Designation Notice attached as Annex VI to the Notice and Instruction Form to the extent you wish to designate a Related Lender to participate as a DIP Lender for some or all of the Subscription Amount, (v) RSA Joinder attached as Annex VII to the Notice and Instruction Form, and (vi) such other documents as the DIP Agent reasonably requires;

g.  Complete, execute (as necessary) and deliver to the Information Agent before the Subscription Deadline each of the documents specified in Annex IV to the Notice and Instruction Form as the KYC Information;

h.  If you are a Prepetition Second Lien Noteholder, coordinate with the nominee holding your Prepetition Second Lien Notes to arrange for delivery of the completed Subscription Documents to its offices and instruct your nominee to complete the Nominee Certification attached as Annex I-B to the Notice and Instruction Form and deliver the completed, executed Subscription Documents so as to be received by the Information Agent before the Subscription Deadline;

i.  Cause the Subscription Funding Amount as set forth in Item 2b to be funded to the Escrow Account on or before the Subscription Deadline.

PLEASE NOTE:

> **IF YOU HAVE ANY QUESTIONS REGARDING THIS SUBSCRIPTION FORM, ANY OTHER SUBSCRIPTION DOCUMENTS OR THE PROCEDURES RELATED HERETO, PLEASE CALL THE INFORMATION AGENT AT 877-720-6580 (DOMESTIC) or 646-998-7132 (INTERNATIONAL).**

**Your participation in the Opportunity is subject to you providing the administrative questionnaire, all know-your-customer information, tax forms and other documents required by the DIP Agent and the DIP Agent's satisfactory review of such information and documents (as determined in the sole discretion of the DIP Agent).**

**Foresight Energy LLC and certain of its affiliates have filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and are operating their businesses and managing their property as debtors-in-possession pursuant to the Bankruptcy Code.**

**Nothing herein, nor in any of the accompanying forms and letters, shall constitute or be deemed to constitute a solicitation by any party of votes to approve or reject a chapter 11 plan for any debtor. A solicitation with respect to votes to approve or reject a chapter 11 plan only may be commenced once a disclosure statement that complies with section 1125 of the Bankruptcy Code has been approved by the Bankruptcy Court.**

**Annex I-B to**
**Notice and Instruction Form**

## <u>NOMINEE'S CERTIFICATION OF RECORD DATE HOLDINGS</u>

<u>Your ownership of Prepetition Second Lien Notes must be confirmed to participate in the Opportunity</u>

The nominee holding your Prepetition Second Lien Notes as of the Record Date, must complete Box A on your behalf. Box B is only required if any or all of your Prepetition Second Lien Notes were on loan as of the Record Date (as determined by your nominee). Please attach a separate Nominee Certification if your Prepetition Second Lien Notes are held through more than one nominee. Please also attach an authorized signatory list confirming that the beneficial holder listed below owned the position(s) listed in Box A and/or Box B as of the Record Date.

| **Box A**<br>**For Use Only by the Nominee** | **Box B**<br>**Nominee Proxy - <u>Only if Needed</u>** |
|---|---|
| DTC Participant Name: _____ | DTC Participant Name: _____ |
| DTC Participant Number: _____ | DTC Participant Number: _____ |
| Principal Amount of Prepetition Second Lien Notes (CUSIP Nos. 345525 AE9, 345525 AF6 or U34550 AE0) held by this account as of the Record Date: | Principal Amount of Prepetition Second Lien Notes (CUSIP Nos. 345525 AE9, 345525 AF6 or U34550 AE0) held on behalf of, and hereby assigned to, the Nominee listed in Box A as of the Record Date: |
| $_____ principal amount in CUSIP 345525 AE9 | $_____ principal amount in CUSIP 345525 AE9 |
| $_____ principal amount in CUSIP 345525 AF6 | $_____ principal amount in CUSIP 345525 AF6 |
| $_____ principal amount in CUSIP U34550 AE0 | $_____ principal amount in CUSIP U34550 AE0 |
| Nominee authorized signatory:_____ | Nominee authorized signatory:_____ |
| Nominee contact name:_____ | Nominee contact name:_____ |
| Nominee contact email:_____ | Nominee contact email:_____ |
| Contact telephone number: _____ _____ | Contact telephone number: _____ |
| Beneficial holder name:_____ | Beneficial holder name:_____ |

**Annex II to
Notice and Instruction Form**

**MASTER JOINDER TO DIP CREDIT AGREEMENT**

[See attached]

EXECUTION VERSION

## MASTER JOINDER TO DIP CREDIT AGREEMENT

JOINDER TO DIP CREDIT AGREEMENT, dated as of [  ], 2020 (this "<u>Agreement</u>"), by and among the undersigned lenders (collectively, the "<u>Additional Lenders</u>" and each, an "<u>Additional Lender</u>"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "<u>General Partner</u>"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("<u>Holdings</u>"),  FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "<u>Borrower</u>"), and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "<u>Administrative Agent</u>") and collateral agent (in such capacity, the "<u>Collateral Agent</u>") under the Credit Agreement (as defined below).

### RECITALS:

WHEREAS, reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among the General Partner, Holdings, the Borrower, certain subsidiaries of the Borrower, the lenders from time to time party thereto and the Administrative Agent and Collateral Agent (capitalized terms used but not defined herein having the meaning provided in the Credit Agreement);

WHEREAS, pursuant to the syndication of Loans in accordance with the Restructuring Support Agreement and Section 10.06 of the Credit Agreement, the parties hereto desire that the Additional Lenders be joined as a party to the Credit Agreement;

NOW, THEREFORE, in consideration of the premises and agreements, provisions and covenants herein contained, the parties hereto agree as follows:

On and as of the date of this Agreement, each Additional Lender hereby agrees to join the Credit Agreement as a Lender and to provide Delayed Draw Term Loan Commitments pursuant to the terms of the DIP Credit Agreement, and to the extent applicable under the terms thereof, be deemed to have issued the Roll-Up Loans allocated to such Additional Lender in accordance with Section 2.01(b). Each Additional Lender, the Loan Parties and the Administrative Agent acknowledge and agree that the Delayed Draw Term Loan Commitments and, when issued or deemed issued, the Delayed Draw Term Loans and, if applicable, the Roll-Up Loans of such Additional Lender shall <u>(i)</u> constitute Delayed Draw Term Loan Commitments, and when issued or deemed issued, the Delayed Draw Term Loans and, if applicable, Roll-Up Loans, for all purposes of the Credit Agreement and the other Loan Documents and <u>(ii)</u> be bound by and subject to all of the terms and conditions in the Credit Agreement and the other Loan Documents, including the entry by the Bankruptcy Court of the Final Order in form and substance satisfactory to the Required Lenders.  Each Additional Lender shall be entitled to all the benefits afforded by the Credit Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Guaranty and security interests created by the Security Documents.

Each Additional Lender (<u>i</u>) confirms that it has received a copy of the Credit Agreement and the other Loan Documents, together with such other documents and information as it has

deemed appropriate to make its own credit analysis and decision to enter into this Agreement; (ii) agrees that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent, any Backstop Lender, or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) appoints and authorizes the Administrative Agent and Collateral Agent to take such action as administrative agent and collateral agent on its behalf and to exercise such powers and discretion under the Credit Agreement and the other Loan Documents as are delegated to the Administrative Agent and Collateral Agent by the terms thereof, together with such powers and discretion as are reasonably incidental thereto; and (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

Upon the execution of a counterpart of this Agreement by each Additional Lender, the Administrative Agent, the Collateral Agent, and the Loan Parties (including by way of telecopy or other electronic transmission), such Additional Lender shall become a Lender under the Credit Agreement and the other Loan Documents as of the date of this Agreement.

Each Additional Lender represents and warrants to the Administrative Agent, the Collateral Agent, the other Lenders and the Loan Parties that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement and the other Loan Documents; and (ii) it has delivered herewith to the Administrative Agent (x) an Administrative Questionnaire completed by such Additional Lender, and (y) such documentation and other information under applicable "know your customer" and anti-money laundering rules and regulations that has been requested by the Administrative Agent and such documentation and other information required under Section 4.01(l) of the Credit Agreement.

This Agreement may not be amended, modified or waived except by an instrument or instruments in writing signed and delivered on behalf of each of the parties hereto.

This Agreement, the Credit Agreement and the other Loan Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and verbal, among the parties or any of them with respect to the subject matter hereof.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.**

Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of

this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as would be enforceable.

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

[signature pages follow]

IN WITNESS WHEREOF, each of the undersigned has caused its duly authorized officer to execute and deliver this Agreement as of the date first written above.

[•]

By: _____
      Name:
      Title:

If a second signature is necessary:

By: _____
      Name:
      Title:

FORESIGHT ENERGY LLC


By: _____
     Name: Robert D. Moore
     Title: President and Chief Executive Officer


FORESIGHT ENERGY LP
By

Foresight Energy GP LLC, its general partner


By: _____
     Name: Robert D. Moore
     Title: President and Chief Executive Officer


[Signature Page to Joinder to DIP Credit Agreement]

FORESIGHT ENERGY GP, LLC
ADENA RESOURCES, LLC
AKIN ENERGY LLC
AMERICAN CENTURY MINERAL LLC
AMERICAN CENTURY TRANSPORT LLC
COAL FIELD CONSTRUCTION COMPANY LLC
COAL FIELD REPAIR SERVICES LLC
FORESIGHT COAL SALES LLC
FORESIGHT ENERGY EMPLOYEE SERVICES
CORPORATION
FORESIGHT ENERGY FINANCE CORPORATION
FORESIGHT ENERGY LABOR LLC
FORESIGHT ENERGY SERVICES LLC
HILLSBORO TRANSPORT LLC
LD LABOR COMPANY LLC
LOGAN MINING LLC
M-CLASS MINING, LLC
MACH MINING, LLC
MACOUPIN ENERGY LLC
MARYAN MINING LLC
OENEUS LLC (D/B/A SAVATRAN LLC)
SENECA REBUILD LLC
SITRAN LLC
SUGAR CAMP ENERGY, LLC
TANNER ENERGY LLC
VIKING MINING LLC
WILLIAMSON ENERGY, LLC
HILLSBORO ENERGY LLC
PATTON MINING LLC
FORESIGHT RECEIVABLES LLC


By: _____
       Name: Robert D. Moore
       Title: President and Chief Executive Officer


[Signature Page to Joinder to DIP Credit Agreement]

Accepted:

CORTLAND CAPITAL MARKET SERVICES LLC
as Administrative Agent and Collateral Agent,

By: _____
    Name:
    Title:

[Signature Page to Joinder to DIP Credit Agreement]

**Annex III to**
**Notice and Instruction Form**

**ADMINISTRATIVE QUESTIONNAIRE**

[See attached]

# [Fund Name]

[Fund Address]
Tax Payer ID:

# Administrative Details

## Payment Instructions

**USD:**

Bank Name:
ABA:
Account Name:
Account Number:
Attn:

## Signature Block

[Fund Name:]

By: _____

## Contacts

**Operations (Agent Notices):**

[Fund Name]
Address:

Attn:
Phone:
Fax:
E-mail:

**Credit/Legal (Public/Private):**

[Fund Name]
Address:

Attn:
Phone:
Fax:
E-mail:

**Annex IV to**
**Notice and Instruction Form**

## DESCRIPTION OF REQUIRED KYC INFORMATION

The DIP Agent will be afforded sufficient time before closing of the syndication and in advance of any monies being funded to the Escrow Account to complete customary know-your-customer and tax withholding analyses, confirmation of wiring instructions, and other related administrative matters, including:

1. Administrative Questionnaire attached as Annex III (Operations/Credit Contact & Wire Instructions)

2. Formation Documents

   a. **Limited Liability Company**: Recorded Articles of Organization
   b. **Limited Partnership**: Certificate of Limited Partnership
   c. **Corporation**: Recorded Articles of Incorporation
   d. **Trust**: Trust Agreement and Trustee Certificate

3. Tax Forms described in Annex V

**Annex V to**
**Notice and Instruction Form**

### DESCRIPTION OF REQUIRED TAX FORMS

Tax Form W-9 or W-8

**Annex VI to
Notice and Instruction Form**

**DESIGNATION FORM**

[See attached]

EXECUTION VERSION

## DESIGNATION NOTICE

Date:    __, 2020

To:    Prime Clerk LLC, as Information Agent

       Cortland Capital Market Services LLC as Administrative Agent

cc:    FORESIGHT ENERGY LLC

**Re:    Designation by [ELIGIBLE HOLDER] (the "Eligible Holder") of [RELATED LENDER] (the "Designee")**

Reference is made to the Notice and Instruction Form, dated March 23, 2020 (the "**Notice and Instruction Form**"), sent to Eligible Holders by Foresight Energy LLC, a Delaware limited liability company (the "**Company**"). Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Notice and Instruction Form.

This constitutes notice that the Eligible Holder is designating the Designee as a Related Lender entitled to participate as a DIP Lender in the DIP Facility, and therefore the Syndicated DIP Term Loans (up to the Designated Participation Amount, as defined below) shall be registered in the name of the Designee, subject to the Designee completing and executing the Subscription Documents (other than the Subscription Form, which shall be completed by the Eligible Holder) and this Designation Notice, delivering such documents to the Information Agent prior to the Subscription Document Deadline, and funding the Subscription Funding Amount to the Escrow Account prior to the Funding Deadline. The designation to the Designee as provided hereunder is subject in all respects to the Designee providing the administrative questionnaire, all know-your-customer information, tax forms, and other documents required by the DIP Agent (including the documents described in Annex IV of the Notice and Instruction Form) and the DIP Agent's satisfactory review of such information and documents.

The Eligible Holder represents and warrants that its Desired Participation Amount is $[●]. Eligible Holder hereby designates $[●] of its Desired Participation Amount (the "**Designated Participation Amount**") to Designee (with the remaining allocated to Eligible Holder to the extent applicable). If the Eligible Holder is entitled to receive Roll-Up Loans on account of its Desired Participation Amount, the Eligible Holder designates $[●] of such Roll-Up Loans (the "**Designated Roll-Up Amount**") to Designee (with the remaining allocated to Eligible Holder to the extent applicable). The Eligible Holder and the Designee acknowledge and agree that the Designee shall participate as a DIP Lender in the DIP Facility in the Designated Participation Amount and the Designated Roll-Up Amount.

Furthermore, the Designee hereby confirms that, as of the date hereof, each of the representations set forth in the Notice and Instruction Form (including those set forth in the Subscription Form) are accurate as applied to the Designee in the place of the Eligible Holder. Designee hereby agrees to be bound by the terms of the Notice and Instruction Form (including those set forth in the Subscription Form) as though Designee were an Eligible Holder, including, without limitation, the obligations to (i) deliver completed and executed Subscription Documents (other than the Subscription Form) and this Designation Notice to the Information Agent prior to Subscription Document Deadline and (ii) fund the Subscription Funding Amount to the Escrow Account prior to the Funding Deadline.

Designee further confirms that it is (i) either (A) "qualified institutional buyers," as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**"), or (B) institutional "accredited investors" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act ("**IAIs**") or an entity in which all of the equity investors are IAIs, and (ii) an "Eligible Assignee" as defined in the DIP Credit Agreement.

[Signature page follows]

Sincerely,

**[ELIGIBLE HOLDER]**


By:_____
      Name:
      Title:



**[DESIGNEE]**



By:_____
      Name:
      Title:


Federal Tax I.D.  No.:_____
                   (If Applicable)

Facsimile Number:_____

E-mail Address:_____

Street Address:_____

City, State, Zip Code:_____

Telephone: (___)_____

Date Completed:_____

**Annex VII to**
**Notice and Instruction Form**

### JOINDER TO RSA

[See attached]

**Form of Joinder**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of March 10, 2020 (the "**Agreement**"),[1] by and among Foresight Energy LP and its affiliates bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" and, as applicable, a "Consenting First Lien Lender" and/or "Consenting Second Lien Noteholder" under the terms of the Agreement.

1.      The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

2.      <u>DIP Commitment Election</u>.  The Joinder Party hereby represents and warrants that it holds Company Claims/Interests in the amount set forth below, and hereby commits to provide a share of the DIP Facility up to the Joinder Party's *pro rata* percentage of 46.375% of the DIP Facility (with respect to all Consenting First Lien Lenders) and/or 3.625% (with respect to all Consenting Second Lien Lenders), and otherwise on the terms and conditions agreed to in the Agreement and/or the DIP Credit Agreement, as applicable.

3.      <u>Representations and Warranties</u>.  The Joinder Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joinder Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the Company Claims/Interests identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in <u>Section 10</u> and <u>Section 11</u> of the Agreement to each other Party.

4.      <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

5.      <u>Notice</u>.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

> To the Joinder Party at:
>
> [JOINING PARTY]
> [ADDRESS]
> Attn:
> Facsimile: [FAX]
> EMAIL:

---

[1] Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

*[Joinder to the FELP Restructuring Support Agreement]*

Date Executed:

**[JOINDER PARTY]**

By: _____

    Name: _____

    Title: _____

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| First Lien Facility Claims (Principal Amount) | |
| Second Lien Notes Claims (Principal Amount) | |
| Subordinated LP Units | |
| Common LP Units | |
| IDRs | |

[*Joinder to the FELP Restructuring Support Agreement*]

**Exhibit A to**
**Notice and Instruction Form**

**DIP CREDIT AGREEMENT**

[See attached]

*Execution Version*

# SENIOR SECURED SUPERPRIORITY

# DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

among

## FORESIGHT ENERGY LLC,

as Borrower,

## FORESIGHT ENERGY LP AND CERTAIN SUBSIDIARIES OF FORESIGHT ENERGY LLC,

as Guarantors,

## CORTLAND CAPITAL MARKET SERVICES LLC,

as Administrative Agent and Collateral Agent,

and

The Other Lenders Party Hereto

Dated as of March 11, 2020

# TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS AND ACCOUNTING TERMS | | 1 |
| 1.01 | Defined Terms | 1 |
| 1.02 | Other Interpretive Provisions | 29 |
| 1.03 | Accounting Terms | 30 |
| 1.04 | Times of Day | 30 |
| 1.05 | LLC Division | 30 |
| ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS | | 30 |
| 2.01 | The Loans | 30 |
| 2.02 | Borrowings, Conversions and Continuations of the Loans. | 31 |
| 2.03 | [Reserved]. | 32 |
| 2.04 | [Reserved]. | 32 |
| 2.05 | Prepayments. | 32 |
| 2.06 | [Reserved]. | 34 |
| 2.07 | Repayment of Loans | 34 |
| 2.08 | Interest. | 34 |
| 2.09 | Fees | 34 |
| 2.10 | Computation of Interest and Fees. | 35 |
| 2.11 | Evidence of Debt. | 36 |
| 2.12 | Payments Generally; Administrative Agent's Clawback. | 36 |
| 2.13 | Pro Rata; Sharing of Payments by Lenders | 37 |
| 2.14 | [Reserved]. | 38 |
| 2.15 | [Reserved]. | 38 |
| 2.16 | [Reserved]. | 38 |
| 2.17 | [Reserved]. | 38 |
| 2.18 | Defaulting Lenders | 38 |
| 2.19 | Priority and Liens; No Discharge. | 39 |
| ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY | | 40 |
| 3.01 | Taxes. | 41 |
| 3.02 | Illegality | 43 |
| 3.03 | Inability to Determine Rates | 43 |
| 3.04 | Increased Costs; Reserves on Eurocurrency Rate Loans. | 44 |
| 3.05 | Compensation for Losses | 46 |
| 3.06 | Mitigation Obligations; Replacement of Lenders. | 46 |
| 3.07 | Survival | 46 |
| ARTICLE IV CONDITIONS PRECEDENT | | 47 |
| 4.01 | Conditions Precedent to the Closing Date | 47 |
| 4.02 | Conditions Precedent to Each Term Loan. | 49 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES | | 49 |
| 5.01 | Existence, Qualification and Power | 50 |
| 5.02 | Authorization; No Contravention | 50 |
| 5.03 | Governmental Authorization. | 50 |
| 5.04 | Binding Effect | 50 |
| 5.05 | Financial Conditions; No Material Adverse Effect. | 50 |
| 5.06 | Litigation. | 51 |
| 5.07 | No Default | 51 |
| 5.08 | Ownership and Identification of Property. | 51 |
| 5.09 | Environmental Compliance. | 52 |
| 5.10 | Insurance. | 52 |
| 5.11 | Taxes | 52 |
| 5.12 | ERISA Compliance | 53 |
| 5.13 | Subsidiaries | 53 |

| | | |
|---|---|---|
| 5.14 | Margin Regulations; Investment Company Act. | 53 |
| 5.15 | Disclosure | 53 |
| 5.16 | Compliance with Laws | 53 |
| 5.17 | Anti-Corruption; Sanctions; Terrorism Laws. | 53 |
| 5.18 | Intellectual Property; Licenses, Etc. | 54 |
| 5.19 | Security Interest in Collateral. | 54 |
| 5.20 | Mines | 54 |
| 5.21 | [Reserved]. | 54 |
| 5.22 | Labor Relations | 54 |
| 5.23 | Bankruptcy Related Matters. | 55 |

**ARTICLE VI AFFIRMATIVE COVENANTS** ........................................................... 55

| | | |
|---|---|---|
| 6.01 | Financial Statements | 55 |
| 6.02 | Certificates; Other Information | 56 |
| 6.03 | Notices | 57 |
| 6.04 | Payment of Tax Obligations. | 58 |
| 6.05 | Preservation of Existence, Etc. | 58 |
| 6.06 | Maintenance of Properties. | 58 |
| 6.07 | Maintenance of Insurance. | 58 |
| 6.08 | Compliance with Laws. | 58 |
| 6.09 | Books and Records. | 59 |
| 6.10 | Inspection Rights | 59 |
| 6.11 | Use of Proceeds. | 59 |
| 6.12 | Additional Guarantors | 59 |
| 6.13 | [Reserved]. | 59 |
| 6.14 | Preparation of Environmental Reports | 59 |
| 6.15 | Certain Long Term Liabilities and Environmental Reserves | 59 |
| 6.16 | Covenant to Give Security. | 60 |
| 6.17 | [Reserved] | 61 |
| 6.18 | Post Closing Covenants | 61 |
| 6.19 | ERISA | 61 |
| 6.20 | Lender Calls | 61 |
| 6.21 | First and Second Day Orders | 61 |
| 6.22 | Milestones | 62 |
| 6.23 | Bankruptcy Notices | 62 |
| 6.24 | Bankruptcy Related Matters | 62 |
| 6.25 | Chief Executive Officer | 63 |

**ARTICLE VII NEGATIVE COVENANTS** ................................................................. 63

| | | |
|---|---|---|
| 7.01 | Liens. | 63 |
| 7.02 | Investments | 66 |
| 7.03 | Indebtedness. | 67 |
| 7.04 | Fundamental Changes | 69 |
| 7.05 | Dispositions. | 70 |
| 7.06 | Restricted Payments | 71 |
| 7.07 | Change in Nature of Business | 71 |
| 7.08 | Transactions with Affiliates | 72 |
| 7.09 | Permitted Activities of General Partner and Holdings | 72 |
| 7.10 | Use of Proceeds. | 72 |
| 7.11 | [Reserved]. | 72 |
| 7.12 | Burdensome Agreements | 73 |
| 7.13 | [Reserved]. | 74 |
| 7.14 | Maximum Capital Expenditure | 74 |
| 7.15 | Fiscal Year | 74 |
| 7.16 | Sale and Lease-Backs. | 74 |
| 7.17 | Amendments or Waivers of Organizational Documents | 74 |
| 7.18 | Budget Variance. | 74 |

7.19    Minimum Liquidity.................................................................................................75
7.20    [Reserved .............................................................................................................75
7.21    Additional Bankruptcy Matters ..........................................................................75

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES........................................................76
8.01    Events of Default ..................................................................................................76
8.02    Remedies Upon Event of Default ........................................................................79
8.03    [Reserved]..............................................................................................................80
8.04    Application of Funds.............................................................................................80

ARTICLE IX AGENTS ..............................................................................................................80
9.01    Appointment and Authority ..................................................................................81
9.02    Rights as a Lender .................................................................................................81
9.03    Exculpatory Provisions .........................................................................................81
9.04    Reliance by Agents ...............................................................................................82
9.05    Delegation of Duties .............................................................................................83
9.06    Resignation of Agent ............................................................................................83
9.07    Non-Reliance on Agents and Other Lenders........................................................84
9.08    No Other Duties, Etc ............................................................................................84
9.09    [Reserved]..............................................................................................................84
9.10    Guaranty and Collateral Matters. .........................................................................84
9.11    Withholding Tax ....................................................................................................85
9.12    Concerning the Collateral and Related Loan Documents .....................................85
9.13    Survival .................................................................................................................85

ARTICLE X MISCELLANEOUS .............................................................................................85
10.01    Amendments, Etc ..................................................................................................85
10.02    Notices; Effectiveness; Electronic Communication.............................................87
10.03    No Waiver; Cumulative Remedies........................................................................88
10.04    Expenses; Indemnity; Damage Waiver.................................................................89
10.05    Marshalling; Payments Set Aside .........................................................................90
10.06    Successors and Assigns.........................................................................................91
10.07    Treatment of Certain Information; Confidentiality ...............................................94
10.08    Right of Setoff.......................................................................................................95
10.09    Usury Savings Clause ...........................................................................................95
10.10    Counterparts; Integration ......................................................................................95
10.11    Survival of Representations, Warranties and Agreements ....................................95
10.12    Severability ...........................................................................................................96
10.13    Replacement of Lenders........................................................................................96
10.14    Governing Law; Jurisdiction; Etc. .......................................................................97
10.15    Waiver of Jury Trial..............................................................................................97
10.16    USA PATRIOT Act Notice ..................................................................................98
10.17    Time of the Essence ..............................................................................................98
10.18    [Reserved]..............................................................................................................98
10.19    No Advisory or Fiduciary Responsibility .............................................................98
10.20    [Reserved]..............................................................................................................98
10.21    Release of Liens and Release from Guaranty. ......................................................98
10.22    Independence of Covenants ..................................................................................99
10.23    Independent Nature of Lenders' Rights ................................................................99
10.24    Acknowledgment and Consent to Bail-In of EEA Financial Institutions...........100

ARTICLE XI GUARANTY.......................................................................................................100
11.01    Guaranty of the Obligations ...............................................................................100
11.02    [Reserved] ...........................................................................................................100
11.03    Payment by Guarantors.......................................................................................100
11.04    Liability of Guarantors Absolute ........................................................................100
11.05    Waivers by Guarantors........................................................................................102
11.06    Guarantors' Rights of Subrogation, Contribution, Etc.......................................102

11.07   Subordination of Other Obligations ........................................................................ 103
11.08   Continuing Guaranty .................................................................................................. 103
11.09   Authority of Guarantors or Borrower ....................................................................... 103
11.10   Financial Condition of Borrower .............................................................................. 103

**SCHEDULES**

| | |
|---|---|
| 1.01(a) | Guarantors |
| 2.01 | Commitments, Roll-Up Loans, Applicable Percentages |
| 2.02 | Backstop Commitments |
| 5.08(b) | Fee Owned Material Real Property |
| 5.08(c) | Leased Material Real Property |
| 5.09 | Environmental Matters |
| 5.13 | Subsidiaries |
| 5.18 | Intellectual Property |
| 5.20 | Mines |
| 6.18 | Post Closing Covenants |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.05 | Specified Dispositions |
| 7.08 | Transactions with Affiliates |
| 7.12 | Burdensome Agreements |
| 10.02 | Administrative Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

**Form of:**

| | |
|---|---|
| A | Borrowing Notice |
| B | Collateral Questionnaire |
| C-1 | Term Loan Note |
| C-2 | Roll-Up Loan Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |
| F | [Reserved] |
| G | [Reserved] |
| H | Critical Vendor Report |
| I | Monthly Mine-Level Financial Report |
| J | Monthly Consolidated Financial Report |
| K | Interim Order |
| L | [Reserved] |
| M-1 | U.S. Tax Compliance Certificate |
| M-2 | U.S. Tax Compliance Certificate |
| M-3 | U.S. Tax Compliance Certificate |
| M-4 | U.S. Tax Compliance Certificate |

**SENIOR SECURED SUPERPRIORITY**
**DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT**

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT (as amended, supplemented or otherwise modified, the "Agreement") is entered into as of March 11, 2020, among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

PRELIMINARY STATEMENTS

WHEREAS, on March 10, 2020 (the "Petition Date"), the General Partner, Holdings, the Borrower and certain Subsidiaries of Borrower (collectively, the "Debtors" and each individually, a "Debtor") have commenced cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (as defined below) and the Debtors have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operations of their businesses as debtors-in-possession;

WHEREAS, the Debtors have asked the Lenders to make post-petition term loans and provide other financial or credit accommodations to the Borrower, and the Lenders have agreed, subject to the conditions set forth herein, to extend a senior secured multi-draw credit facility to the Borrower with all of the obligations with respect to the foregoing to be guaranteed by each Guarantor; and

WHEREAS, the Lenders have severally, and not jointly, agreed to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE I**
**DEFINITIONS AND ACCOUNTING TERMS**

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Plan" means a Reorganization Plan of the Debtors that is consistent with the Restructuring Support Agreement or otherwise satisfactory to the Required Lenders (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders).

"Accounting Change" means changes in accounting principles after the Closing Date required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board or, if applicable, the SEC.

"Acceptable Disclosure Statement" means the Disclosure Statement relating to the Acceptable Plan in form and substance satisfactory to the Required Lenders (as the same may be amended, supplemented, or modified from time to time after the initial filing thereof with the consent of the Required Lenders).

"Administrative Agent" means Cortland Capital Market Services LLC, in its capacity as the administrative agent, together with its successors and assigns.

1

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 10.02</u>, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Affiliated Lender</u>" means any Lender that is an Affiliate of any Loan Party.

"<u>Agency Fee Letter</u>" means a fee agreement separately agreed to by the Borrower and the Agents.

"<u>Agent Parties</u>" has the meaning specified in <u>Section 10.02(c)</u>.

"<u>Agents</u>" means the Administrative Agent and the Collateral Agent.

"<u>Aggregate Commitments</u>" means the Commitments of all of the Lenders.

"<u>Agreement</u>" has the meaning specified in the introductory paragraph to this Agreement.

"<u>Anti-Corruption Laws</u>" has the meaning specified in <u>Section 5.17(c)</u>.

"<u>Applicable Percentage</u>" means (i) (a) in respect of the Initial Term Loan Facility, with respect to any Term Lender at any time, the percentage (carried out to the tenth decimal place) of the aggregate principal amount of the Term Loan Facility represented by the principal amount of such Term Lender's Initial Term Loan Commitment and/or Initial Term Loans outstanding at such time and (b) in respect of the Delayed Draw Term Loan Facility, with respect to any Term Lender at any time, the percentage (carried out to the tenth decimal place) of the aggregate principal amount of the Delayed Draw Term Loan Facility represented by the principal amount of such Term Lender's Delayed Draw Term Loan Commitment and/or the Delayed Draw Term Loans outstanding at such time; <u>provided</u> <u>that</u>, if the commitment of each Term Lender to make Delayed Draw Term Loans have been terminated pursuant to <u>Section 8.02</u>, or if the Delayed Draw Term Loan Commitments have expired, then the Applicable Percentage of each Term Lender in respect of the Delayed Draw Term Loan Facility shall be determined based on the Applicable Percentage of such Lender in respect of the Delayed Draw Term Loan Facility most recently in effect, giving effect to any subsequent assignments, (ii) in respect of the Roll-Up Facility, with respect to any Roll-Up Lender, at any time, the percentage (carried out to the tenth decimal place) of the aggregate principal amount of the Roll-Up Facility represented by the principal amount of such Roll-Up Lender's Roll-Up Loans at such time (the initial Applicable Percentage of each Roll-Up Lender as of the Closing Date in respect of the Roll-Up Facility is set forth on <u>Schedule 2.01(a)</u> and, thereafter, in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable), and (iii) with respect to each Lender, the percentage (carried out to the tenth decimal place) of the aggregate principal amount of all Facilities represented by the principal amount of such Lender's Loans and/or Commitment at such time.

"<u>Applicable Rate</u>" means, in the case of any Loans, (i) 11.00% per annum for Eurocurrency Rate Loans and (ii) 10.00% per annum for Base Rate Loans.

"<u>Applicable Reserve Requirement</u>" means, at any time, for any Eurocurrency Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Eurocurrency Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurocurrency Rate Loans. A Eurocurrency Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to

reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender.  The rate of interest on Eurocurrency Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent) in substantially the form of Exhibit E (with such modifications as are necessary to reflect any effective amendment, amendment and restatement or other modification of this Agreement at the time of delivery thereof) or any other form approved by the Administrative Agent, in accordance with Section 10.06(b).

"Attributable Indebtedness" means, on any date, in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Automatic Rejection Date" means with respect to any particular lease, the last day of the assumption period for the Loan Parties in the Chapter 11 Cases provided for in Section 365(d)(4) of the Bankruptcy Code, to the extent applicable (including as may have been extended in accordance with Section 365(d)(4) of the Bankruptcy Code).

"Avoidance Action" has the meaning specified in Section 5.23(c).

"Backstop Commitment" means, with respect to any Backstop Lender, the commitment to provide loans in an amount set forth opposite its name on Schedule 2.02.

"Backstop Commitment Agreement" means "Backstop Commitment Agreement" as defined in the Restructuring Support Agreement.

"Backstop Lenders" means the Lenders listed on Schedule 2.02 (collectively, on behalf of themselves or certain (i) of their affiliates or their affiliated investment funds, or (ii) investment funds, accounts, vehicles or other entities that are managed, advised or sub-advised by a member of the Backstop Lenders or their affiliate).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor thereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Missouri, or any other court having jurisdiction over the Chapter 11 Cases from time to time.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the Eurocurrency Rate (after giving effect to any Eurocurrency Rate "floor") that would be payable on such day for a Eurocurrency Rate Loan with a one month Interest Period plus 1%, and (c) the Prime Rate in effect on such day.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Rate, respectively.  In no event, notwithstanding the rate determined pursuant to the foregoing, shall the Base Rate be less than 2.00%.

"Base Rate Loan" means any Loan that bears interest based on the Base Rate.

"Beneficiary" means each Agent and Lender.

"Board of Directors" means, (a) with respect to the Borrower, the board of directors of the General Partner and (b) with respect to any other Person, (i) if the Person is a corporation, the board of directors of the corporation, (ii) if the Person is a partnership, the board of directors of the general partner of the partnership and (iii) with respect to any other Person, the board, committee or other group or entity of such Person serving a similar function.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowing" means a borrowing consisting of Term Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period.

"Borrowing Notice" means a written notice of a Borrowing in the form of Exhibit A attached hereto.

"Budget Variance Report" means a weekly variance report, commencing with a variance report for the one week period following the Closing Date, the two week period following the Closing Date, the three week period following the Closing Date and the four week period following the Closing Date, and thereafter a weekly variance report for the one week period following the most recently delivered Cash Flow Forecast, the two week period following the most recently delivered Cash Flow Forecast, the three week period following the most recently delivered Cash Flow Forecast and the four week period following the most recently delivered Cash Flow Forecast, with the report for each week in a four week period including an individual report for such week and a cumulative report to date for such four week period (each such one week, two week, three week or four week cumulative period, a "Reporting Period"), in each case, setting forth for the applicable Reporting Period ended on the immediately preceding Friday prior to the delivery thereof (1) the negative variance (as compared to the applicable Cash Flow Forecast and the DIP Budget) of the operating cash receipts (on a line item by line item basis and an aggregate basis for all line items) of the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period, (2) the positive variance (as compared to the applicable Cash Flow Forecast and the DIP Budget) of the disbursements (on a line item by line item basis and an aggregate basis for all line items) made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) for the applicable Reporting Period and for the last week of the applicable Reporting Period, (3) the positive variance (as compared to the applicable Cash Flow Forecast and the DIP Budget) of the total disbursements (on a line item by line item basis and an aggregate basis for all line items) (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period and (4) an explanation, in reasonable detail, for any material negative variance (in the case of receipts) or material positive variance (in the case of disbursements) set forth in such variance report, certified by a Responsible Officer of the Borrower.

"Building" means a Building as defined in 12 CFR Chapter III, Section 339.2.

"Business" has the meaning specified in Section 5.09(b).

"Business Day" means (i) any day excluding Saturday, Sunday and any day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Eurocurrency Rate or any Eurocurrency Rate Loans, the term "Business Day" means any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"Capital Expenditures" means, for any Person for any period, the sum of, without duplication, all expenditures made by such Person during such period that, in accordance with GAAP as in effect on March 28, 2017,

4

are or should be included in "purchase of property and equipment" or similar items, or which should otherwise be capitalized, reflected in the statement of cash flows of such Person; provided that Capital Expenditures shall not include any expenditure for replacements and substitutions for fixed assets, capital assets or equipment to the extent made with Net Insurance/Condemnation Proceeds invested pursuant to Section 2.05(h) or with Net Proceeds invested pursuant to Section 2.05(e) or the substantially concurrent trade-in of existing equipment (solely to the extent of the value of the trade-in).

"Capital Lease" means, with respect to any Person, any lease of any property, which in conformity with GAAP as in effect on March 28, 2017, is required to be capitalized on the balance sheet of such Person; provided that the obligations of the Borrower or its Subsidiaries, or of a special purpose or other entity not consolidated with the Borrower and its Subsidiaries, either existing on the date hereof or created thereafter that (a) initially were not included on the consolidated balance sheet of the Borrower as a Capital Lease and were subsequently recharacterized as a Capital Lease or, in the case of such a special purpose or other entity becoming consolidated with the Borrower and its Subsidiaries were required to be characterized as a Capital Lease upon such consolidation, in either case, due to a change in accounting treatment or otherwise, or (b) did not exist on the date hereof and were required to be characterized as a Capital Lease but would not have been required to be treated as capital lease obligations on the date hereof had they existed at that time, shall for all purposes not be treated as a Capital Lease, Capital Lease Obligations or Indebtedness.

"Capital Lease Obligations" means, with respect to any Person as of any date of determination, the aggregate liability of such Person under Capital Leases reflected on a balance sheet of such Person under GAAP as in effect on March 28, 2017; provided that the obligations of the Borrower or its Subsidiaries, or of a special purpose or other entity not consolidated with the Borrower and its Subsidiaries, either existing on the date hereof or created thereafter that (a) initially were not included on the consolidated balance sheet of the Borrower as a capital lease obligations and were subsequently recharacterized as capital lease obligations or, in the case of such a special purpose or other entity becoming consolidated with the Borrower and its Subsidiaries were required to be characterized as capital lease obligations upon such consolidation, in either case, due to a change in accounting treatment or otherwise, or (b) did not exist on the date hereof and were required to be characterized as capital lease obligations but would not have been required to be treated as capital lease obligations on the date hereof had they existed at that time, shall for all purposes not be treated as Capital Leases, Capital Lease Obligations or Indebtedness.

"Capital Stock" means (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests, and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Carve Out" means the Carve Out as defined in the Interim Order or the Final Order, as applicable.

"Cash Equivalents" means

(a)    U.S. Government Obligations or certificates representing an ownership interest in U.S. Government Obligations with maturities not exceeding two years from the date of acquisition,

(b)    (i) demand deposits, (ii) time deposits and certificates of deposit with maturities of two years or less from the date of acquisition, (iii) bankers' acceptances with maturities not exceeding two years from the date of acquisition, and (iv) overnight bank deposits, in each case with any bank or trust company organized or licensed under the Laws of the United States or any state thereof (including any branch of a foreign bank licensed under any such Laws) having capital, surplus and undivided profits in excess of $250,000,000 (or the foreign currency equivalent thereof) whose short-term debt is rated A-2 or higher by S&P or P-2 or higher by Moody's,

(c)    commercial paper maturing within 364 days from the date of acquisition thereof and having, at such date of acquisition, ratings of at least A-1 by S&P or P-1 by Moody's,

(d)     readily marketable direct obligations issued by any state, commonwealth or territory of the U.S. or any political subdivision thereof, in each case rated at least A-1 by S&P or P-1 by Moody's with maturities not exceeding one year from the date of acquisition,

(e)     bonds, debentures, notes or other obligations with maturities not exceeding two years from the date of acquisition issued by any corporation, partnership, limited liability company or similar entity whose long-term unsecured debt has a credit rating of A2 or better by Moody's and A or better by S&P;

(f)     investment funds at least 95% of the assets of which consist of investments of the type described in clauses (a) through (e) above (determined without regard to the maturity and duration limits for such investments set forth in such clauses, provided that the weighted average maturity of all investments held by any such fund is two years or less),

(g)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (b) above and

(h)     in the case of a Subsidiary that is a Foreign Subsidiary, substantially similar investments, of comparable credit quality, denominated in the currency of any jurisdiction in which such Person conducts business.

"Cash Flow Forecast" means a projected statement of sources and uses of cash for the Loan Parties, prepared in accordance with Section 6.01(d), for the current and following 13 calendar weeks (but not any preceding weeks), including the anticipated uses of the proceeds of any Borrowing for each week during such period. As used herein, "Cash Flow Forecast" shall initially refer to the 13-week cash flow forecast most recently delivered on or prior to the Petition Date and, thereafter, the most recent Cash Flow Forecast delivered by the Borrower in accordance with Section 6.01(d).

"Cash Management Agreement" has the meaning specified in the definition of "Cash Management Obligations".

"Cash Management Motion" means the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of the Debtors' Existing Cash Management System; (B) Authorizing Use of Existing Bank Accounts And Business Forms; (C) Granting a Limited Waiver of Requirements of Section 345(B) of the Bankruptcy Code; (D) Authorizing Continuation of Ordinary Course Intercompany Transactions; (E) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims; and (F) Granting Related Relief Docket No.4.

"Cash Management Obligations" means any and all obligations of the Borrower or any Subsidiary arising out of (a) the execution or processing of electronic transfers of funds by automated clearing house transfer, wire transfer or otherwise to or from the deposit accounts of the Borrower and/or any Subsidiary now or hereafter maintained with any financial institution or affiliate thereof, (b) the acceptance for deposit or the honoring for payment of any check, draft or other item with respect to any such deposit accounts, (c) any other treasury, deposit, disbursement, overdraft, and cash management services afforded to the Borrower or any Subsidiary by any such financial institution or affiliate thereof, and (d) stored value card, commercial credit card and merchant card services (any agreement to provide services described in clause (a), (b), (c) and/or (d), a "Cash Management Agreement") or otherwise arising under a Cash Management Obligations.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request or directive (whether or not having the force of law) by any Governmental Authority required to be complied with by any Lender. For purposes of this definition, (x) the Dodd-Frank Act and any rules, regulations, orders, requests, guidelines and directives adopted, promulgated or implemented in connection therewith, and (y) all

6

requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to have been adopted, issued, promulgated or implemented after the Closing Date, but shall be included as a Change in Law only to the extent a Lender is imposing applicable increased costs or costs in connection with capital adequacy and other requirements similar to those described in Sections 3.04(a) and 3.04(b) generally on other similarly situated borrowers of loans under United States credit facilities.

"Change of Control" means

(a)      the first day on which (i) 100% of the outstanding Capital Stock of Borrower ceases to be owned directly by Holdings, (ii) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger of consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Borrower and its Subsidiaries, taken as a whole, to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)), or (iii) the adoption of a plan relating to the liquidation or dissolution of the Borrower; or

(b)      the Borrower becomes aware (by way of a report or any other filings pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) that any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than any of the Permitted Holders, is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Borrower or the General Partner.

"Chapter 11 Cases" shall have the meaning assigned to such term in the recitals to this Agreement.

"Closing Date" means the date on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01 and the Initial Term Loans are made.

"Coal Liens" means:

(1)      Liens incurred in the ordinary course of business on any specific coal producing property or any interest therein, construction thereon or improvement thereto to secure all or any part of the costs incurred for surveying, exploration, drilling, extraction, development, operation, production, construction, alteration, repair or improvement of, in, under or on such property and the plugging and abandonment of coal mines located thereon (it being understood that costs incurred for "development" shall include costs incurred for all facilities relating to such coal producing properties or to projects, ventures or other arrangements of which such form a part or which relate to such coal producing properties or interests) as long as such Liens do not secure obligations for the payment of borrowed money or other Indebtedness;

(2)      Liens incurred in the ordinary course of business on a coal producing property to secure obligations incurred or guarantees of obligations incurred in connection with or necessarily incidental to commitments for the purchase or sale of, or the transportation or distribution of, the products derived from such coal producing property as long as such Liens do not secure obligations for the payment of borrowed money or other Indebtedness;

(3)      Liens arising in the ordinary course of business under partnership agreements, coal leases, overriding royalty agreements, joint operating agreements or similar agreements, net profits agreements, production payment agreements, royalty trust agreements, incentive compensation programs on terms that are reasonably customary in the coal business for geologists, geophysicists and other providers of technical services to any of the Borrower or any of its Subsidiaries, master limited partnership agreements, farm-out agreements, farm-in agreements, division orders, contracts for the sale, purchase, exchange, transportation, gathering or processing of coal, unitizations and pooling designations, declarations, orders and agreements, development agreements, operating agreements, production sales contracts, area of mutual interest agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or geophysical permits or agreements, and other agreements which are customary in the coal business as long as such Liens do not

7

secure obligations for the payment of borrowed money or other Indebtedness and attach solely to the proceeds of sales of the products derived from such coal producing property; and

(4)      Liens pursuant to contract mining agreements and leases granted in the ordinary course of business to others that do not interfere with the ordinary conduct of business of the Borrower or its Subsidiaries and do not secure obligations for the payment of borrowed money or other Indebtedness.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (unless as indicated otherwise).

"Collateral" means, collectively, (i) all of the real, personal and mixed property and assets (including Equity Interests) in which Liens are purported to be granted pursuant to the Security Documents as security for all or any part of the Obligations (subject to exceptions contained in the Security Documents), in each case excluding any Excluded Assets, and (ii) "DIP Collateral" or words of similar intent, as defined in any Order.

"Collateral Agent" means Cortland Capital Market Services LLC, in its capacity as the collateral agent, together with its successors and assigns.

"Collateral Questionnaire" means a certificate in the form of Exhibit B that provides information with respect to the personal or mixed property of each Loan Party.

"Commitment" means, with respect to any Lender, such Lender's (i) Initial Term Loan Commitment and/or (ii) Delayed Draw Term Loan Commitment, as the context shall require.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D (with such modifications as are necessary to reflect any effective amendment, amendment and restatement or other modification of this Agreement at the time of delivery thereof).

"Consenting First Lien Lender" means "Consenting First Lien Lender" as defined in the Restructuring Support Agreement.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contract" has the meaning specified in the definition of Excluded Assets.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Subsidiary" means, with respect to any consent, waiver or right to terminate or accelerate the obligations under a Contract, any Subsidiary that the Borrower directly or indirectly Controls for purposes of the provision of such consent, waiver or exercise of such right to terminate or accelerate the obligations under such Contract.

"Credit Extension" means the making of a Loan.

8

"Critical Vendor Report" means a report, in a form acceptable to the Financial Advisor (it being agreed that the form previously provided to the Financial Advisor prior to the Closing Date is acceptable), describing in reasonable detail the matter set forth in Exhibit H.

"Debtor Relief Laws" means (i) the Bankruptcy Code, (ii) any domestic or foreign law relating to liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally, and (iii) any order made by a court of competent jurisdiction in respect of any of the foregoing.

"Debtors" shall have the meaning assigned to such term in the recitals to this Agreement.

"Declined Proceeds" has the meaning specified in Section 2.05(l).

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means, with respect to Obligations, an interest rate equal to (i) the Base Rate plus (ii) the Applicable Rate applicable to Base Rate Loans, plus (iii) 2% per annum; provided, however, that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to (i) the Eurocurrency Rate otherwise applicable to such Eurocurrency Rate Loan plus (ii) the Applicable Rate applicable to Eurocurrency Rate Loans plus (iii) 2% per annum.

"Defaulting Lender" means, subject to the last paragraph of Section 2.18, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to any Agent, or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to the last paragraph of Section 2.18) as of the date established therefor by the Administrative Agent in a written notice of such determination to the Borrower and each other Lender promptly following such determination.

"Delayed Draw Funding Date" means the date on which all the conditions precedent in Section 4.02 are satisfied or waived in accordance with Section 10.01 and the Delayed Draw Term Loans are made.

"Delayed Draw Term Lender" means any Term Lender holding Delayed Draw Term Loan Commitment and/or Delayed Draw Term Loans.

"Delayed Draw Term Loan" has the meaning set forth in Section 2.01(a).

"Delayed Draw Term Loan Commitment" means, as to each Lender, its obligation to make Delayed Draw Term Loans to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Delayed Draw Term Loan Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of Delayed Draw Term Loan Commitments as of the Closing Date is $45,000,000.

"Delayed Draw Term Loan Commitment Fee" has the meaning set forth in Section 2.09(e).

"Delayed Draw Term Loan Facility" means, at any time (a) prior to the funding of the Delayed Draw Term Loans on the Delayed Draw Funding Date, the aggregate Delayed Draw Term Loan Commitments at such time and (b) on and after the funding of the Delayed Draw Term Loans on the Delayed Draw Funding Date, the aggregate principal amount of the Delayed Draw Term Loans of all Lenders outstanding at such time.

"Designated Letters of Credit" means letters of credit issued in the ordinary course of business with respect to Mine reclamation, workers' compensation and other employee benefit liabilities.

"DIP Budget" has the meaning specified in Section 4.01(g).

"DIP Collateral" means the "DIP Collateral" as defined in the Orders.

"Direct Debt Placement" means "Direct Debt Placement" as defined in the Restructuring Support Agreement.

"Disclosure Statement" means "Disclosure Statement" as defined in the Restructuring Support Agreement.

"Disposition" or "Dispose" means the sale, transfer or other disposition of any assets by any Person outside the ordinary course of business, including by means of a merger, consolidation or similar transaction and including any sale or issuance of the Equity Interests of any Subsidiary.

"Disqualified Equity Interest" means Equity Interests that by their terms (or by the terms of any security into which such Equity Interests are convertible, or for which such Equity Interests are exchangeable, in each case at the option of the holder thereof) or upon the happening of any event (i) mature or are mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or are required to be redeemed or redeemable at the option of the holder for consideration other than Qualified Equity Interests, or (ii) are convertible at the option of the holder into Disqualified Equity Interests or exchangeable for Indebtedness, in each case of clauses (i) and (ii) prior to the date that is 91 days after the Stated Maturity Date hereunder, except, in the case of clauses (i) and (ii), if as a result of a change of control or asset sale, so long as the relevant provisions specifically state that such repurchase, payment or redemption upon the occurrence of such a change of control or asset sale event is subject to the prior payment in full of all Obligations and the termination of Commitments.

"Disqualified Institution" means (i) any banks, financial institutions and institutional investors and competitors of the Borrower identified by the Borrower to the Administrative Agent by name in writing from time to time on or prior to the Petition Date or as the Borrower and the Administrative Agent shall from time to time mutually agree after such date, (ii) any affiliates of the foregoing that are (A) identified by the Borrower from time to time in writing or (B) readily identifiable solely on the basis of similarity of their names; provided that (x) "Disqualified Institutions" shall not include any bona fide diversified debt fund or a diversified investment vehicle that is engaged in the making, purchasing, holding or otherwise investing in, acquiring or trading commercial loans, bonds and similar extensions of credit in the ordinary course; (y) the Administrative Agent shall not have any responsibility for monitoring compliance with any provisions of this Agreement with respect to Disqualified Institutions and (z) updates

10

to the Disqualified Institution schedule shall not retroactively invalidate or otherwise affect any (1) assignments or participations made to, (2) any trades entered into with or (3) information provided to any Person before it was designated as a Disqualified Institution. A schedule of the Disqualified Institutions shall be made available on the Closing Date (and updated from time to time) by the Borrower to all Lenders by delivering such schedule (and such updates) to the Administrative Agent; provided, that any additional Person identified pursuant to an updated schedule shall not be deemed a Disqualified Institution until such time as such update to the schedule is provided to the Lenders.

"Disqualified Stock" means Capital Stock constituting Disqualified Equity Interests.

"Dodd-Frank Act" means the Dodd—Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203, H.R. 4173) signed into law on July 21, 2010, as amended from time to time.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the Laws of the United States or any State thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (i) a Lender, (ii) an Affiliate of a Lender and (iii) an Approved Fund (any two or more Approved Funds being treated as a single Eligible Assignee for all purposes hereof), and (iv) any other Person (other than a natural person) approved by (x) the Borrower unless an Event of Default has occurred and is continuing (such approval not to be unreasonably withheld or delayed); provided that the Borrower shall be deemed to have approved an assignment of Loans to a Person pursuant to this clause (iv) unless it shall have objected thereto by written notice to the Administrative Agent within three (3) Business Days after having received notice thereof and (y) the Administrative Agent; provided, that no Defaulting Lender, Disqualified Institution, any Loan Party or Affiliated Lender shall be an Eligible Assignee.

"Environmental Laws" means any and all applicable current and future federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions or common law causes of action relating to (a) protection of the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment including ambient air, surface, water, ground water, or land, (b) human health as affected by Hazardous Materials, and (c) mining operations and activities to the extent relating to environmental protection or reclamation, including the Surface Mining Control and Reclamation Act, provided that "Environmental Laws" do not include any Laws relating to worker or retiree benefits, including benefits arising out of occupational diseases.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

11

"Environmental Permits" means any and all permits, licenses, registrations, notifications, exemptions and any other authorization required under any applicable Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of Capital Stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of Capital Stock of (or other ownership or profit interests in) such Person, and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination (but excluding any debt security that is convertible into, or exchangeable for, Equity Interests).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the failure to meet the minimum funding standards of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA) or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) a determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (d) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (e) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (f) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (h) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (j) receipt from the IRS of notice of the failure of any Pension Plan (or any other Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (k) the imposition of a Lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Pension Plan; or (l) the occurrence of any Foreign Plan Event.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurocurrency Rate" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurocurrency Rate Loan, the rate per annum obtained by dividing (i) (a) the rate per annum equal to the rate determined by the Administrative Agent, to be the London interbank offered rate administered by the ICE Benchmark Administration (or any other person which takes over the administration of that rate) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars displayed on the ICE LIBOR USD page of the Bloomberg Screen (or any replacement page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Bloomberg, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, (b) in the event the rate referenced in the preceding clause (a) is not available, the rate per annum based on a substitute index reasonably selected by the Administrative Agent for Dollar deposits comparable to the principal amount of the applicable Loan for which the Eurocurrency Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m.

12

(London, England time) on such Interest Rate Determination Date, or (c) in the event that such rate is not ascertainable pursuant to the preceding clauses (a) or (b), the "Eurocurrency Rate" shall be the rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period, by (ii) an amount equal to (a) one minus (b) the Applicable Reserve Requirement.  In no event, notwithstanding the rate determined pursuant to the foregoing, shall the Eurocurrency Rate be less than 1.00%.

"Eurocurrency Rate Loan" means a Loan that bears interest at a rate based on the Eurocurrency Rate.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Proceeds" has the meaning specified in Section 2.05(e).

"Excluded Assets" means

(a)    (i) those assets over which the pledging or granting of a security interest in such assets (x) would be prohibited by any applicable law (other than any organizational document), rule or regulation (except to the extent such prohibition is unenforceable after giving effect to applicable anti-assignment provisions of the UCC, other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibitions), (y) would be prohibited by, or cause a default under or result in a breach, violation or invalidation of, any lease, license or other written agreement or written obligation (each, a "Contract") to which such assets are subject, or would give another Person (other than the Borrower or any Controlled Subsidiary) a right to terminate or accelerate the obligations under such Contract or to obtain a Lien to secure obligations owing to such Person (other than the Borrower or any Controlled Subsidiary) under such Contract (but only to the extent such assets are subject to such Contract and such Contract is not entered into for purposes of circumventing or avoiding the collateral requirements of the indenture), unless the Borrower or any Guarantor may unilaterally waive it (in each case, except to the extent any such prohibition is unenforceable after giving effect to applicable anti-assignment provisions of the UCC) or (z) would require obtaining the consent, approval, license or authorization of any Person (other than the Borrower or any Guarantor) or applicable Governmental Authority, except to the extent that such consent, approval, license or authorization has already been obtained, and (ii) any Contract or any property or other asset subject to Liens securing a purchase money security interest, Capital Lease Obligation or similar arrangement or sale and leaseback transaction to the extent that a grant of a security interest therein requires the consent of any Person (other than the Borrower or any Controlled Subsidiary) as a condition to the creating of another security interest, would violate or invalidate such Contract or purchase money, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than the Borrower or a Controlled Subsidiary) after giving effect to the applicable anti-assignment provisions of the UCC), other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code notwithstanding such prohibition; provided, however, that the Collateral shall include (and such security interest shall attach) (x) immediately at such time as the contractual or legal prohibition shall no longer be applicable, (y) immediately at such time as such contractual or legal prohibition would be unenforceable due to applicable Debtor Relief Laws and (z) to the extent severable,  immediately at such time to any portion of such lease, license, contract or agreement not subject to the prohibitions specified above;

(b)    any "intent-to-use" application for registration of a trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, and

(c)    (i) margin stock, and (ii) any Equity Interests in any Subsidiary that is not a Wholly Owned Domestic Subsidiary (provided, that such term shall not include any FSHCO) by the Borrower or any Subsidiary or in a Joint Venture, if the granting of a security interest therein (A) would be prohibited by, cause a default under or result in a breach of, or would give another Person (other than the Borrower or any Controlled Subsidiary) a right to terminate, under any Organizational Document, shareholders, joint venture or similar agreement applicable to such Subsidiary or Joint Venture, or (B) would require obtaining the consent of any Person (other than the Borrower or any Controlled Subsidiary); provided, however, that the Collateral shall include (and such security interest shall attach) (x) immediately at such time as any such contractual limitations shall no longer be applicable, (y) immediately at such

13

time as such contractual limitations would be unenforceable due to applicable Debtor Relief Laws and (z) to the extent severable, immediately at such time to any portion of any Equity Interests not subject to the limitations specified above;

provided that the Collateral shall include the replacements, substitutions and proceeds of any of the foregoing unless such replacements, substitutions or proceeds also constitute Excluded Assets.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the Laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 10.13) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure or inability to comply with Section 3.01(e) and (d) any Taxes imposed under FATCA.

"Facility" means any Term Loan Facility and the Roll-Up Facility.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty, or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) received from three federal funds brokers on such day on such transactions as determined by the Administrative Agent.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Required Lenders (and with respect to modifications to the rights and duties of any Agent, such Agent)), and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless the Required Lenders waive such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Advisor" means, collectively, Lazard and Perella Weinberg Partners L.P., in their capacities as financial advisors to certain Backstop Lenders.

"Flood Certificate" means a "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"Flood Hazard Property" means any Real Property that constitutes Collateral in favor of Collateral Agent, for the benefit of Secured Parties, with buildings or mobile homes located in a Flood Zone.

"Flood Program" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, in each case as amended from time to time, and any successor statutes.

"Flood Zone" means areas having special flood hazards as described in the National Flood Insurance Act of 1968, as amended from time to time, and any successor statute.

"Foreign Lender" means any Lender that is not a "United States Person" as defined in Section 7701 (a)(30) of the Code.

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Loan Party or any of their respective Subsidiaries with respect to employees employed outside the United States and paid through a non-United States payroll.

"Foreign Plan Event" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make the required contributions or payments, under any applicable law, within the time permitted by Law for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, in each case, which could reasonably be expected to have a Material Adverse Effect, or (e) the occurrence of any transaction with respect to a Foreign Plan that is prohibited under any applicable law and that could reasonably be expected to result in the incurrence of any liability by any Loan Party, or the imposition on any Loan Party of any fine, excise tax or penalty with respect to a Foreign Plan resulting from any noncompliance with any applicable law, in each case which could reasonably be expected to have a Material Adverse Effect.

"Foreign Subsidiary" means a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any State thereof or the District of Columbia and any Subsidiary thereof.

"Four-Week Test Period" means, at any time, the four-week period ended on the immediately preceding Friday; provided that only periods ending on the fourth Friday following the Closing Date and each fourth Friday thereafter shall constitute Four-Week Test Periods.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"FSHCO" means any Domestic Subsidiary that has no material assets other than Equity Interests of (x) a Foreign Subsidiary or (y) any other FSHCO.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Funded Debt" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent, (i) in respect of borrowed money or advances or (ii) evidenced by loan agreements, bonds, notes or debentures or similar instruments or letters of credit (solely to the extent such letters of credit or other similar instruments have been drawn and remain unreimbursed) or, without duplication, reimbursement agreements in respect thereof.

15

"GAAP" means generally accepted accounting principles in the United States, which are applicable to the circumstances as of the date of determination.  The sources of accounting principles and the framework for selecting the principles used in the preparation of financial statements of nongovernmental entities that are presented in conformity with GAAP in the United States, are set forth in the Financial Accounting Standards Board's Accounting Standards Codification.

"General Partner" has the meaning specified in the introductory paragraph hereto, or any successor general partner of Holdings.

"Governmental Authority" means the government of the United States or any other nation, or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit) to the extent the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation in order to induce the creation of such obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, reimbursement obligations under letters of credit and any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee obligation shall not include (i) indemnification or reimbursement obligations under or in respect of Surety Bonds or Designated Letters of Credit, (ii) ordinary course performance guarantees by any Loan Party of the obligations (other than for the payment of borrowed money) of any other Loan Party and (iii) endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning specified in Section 11.01.

"Guarantors" means each of the General Partner, Holdings and any Subsidiary that is a Wholly Owned Domestic Subsidiary; provided, that such term shall not include any FSHCO.  As of the Closing Date, each of the Debtors (other than the Borrower) is a Guarantor.  For the avoidance of doubt, no Foreign Subsidiary now owned or hereafter formed or acquired shall be a Guarantor.

"Guaranty" means the guaranty of each Guarantor set forth in Article XI.

"Hazardous Materials" means (i) any explosive or radioactive substances or wastes and (ii) any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under, or that could reasonably be expected to give rise to liability under, any applicable Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls, urea-formaldehyde insulation, gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any coal ash, coal combustion by-products or waste, boiler slag, scrubber residue or flue desulphurization residue.

"Hedging Agreement" means any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement (regardless of whether such agreement or instrument is classified as a "derivative" pursuant to FASB ASC Topic No. 815 and required to be marked-to-market) and any other agreements or arrangements designed to manage interest rates or interest rate risk and other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

For the avoidance of doubt, Hedging Agreements do not include coal sales contracts requiring the delivery of coal that is priced pursuant to an established index created for the purposes of establishing a market price for the underlying commodity.

"Hedging Termination Value" means, in respect of any one or more Hedging Agreement, after taking into account the effect of any valid netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark- to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender, an Agent or any Affiliate of a Lender or an Agent) (it being understood that any such termination values and marked-to-market values shall take into account any assets posted as collateral or security for the benefit of a party to the Hedging Agreement).

"Highest Lawful Rate" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"Historical Financial Statements" means as of the Closing Date, (i) the audited financial statements of Borrower and its Subsidiaries for the immediately preceding three fiscal years, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such fiscal years, (ii) the unaudited financial statements of Borrower and its Subsidiaries for each of the first three fiscal quarters ended after the date of the most recent audited financial statements and at least 45 days prior to the Closing Date, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three-, six- or nine-month period, as applicable, ending on such date.

"Holdings" has the meaning specified in the introductory paragraph hereto and includes any successor to Holdings as contemplated by Section 7.09.

"Huntington Cash Management Obligations" all of Huntington National Bank's customary service charges, overdraft and returned item fees, transfer fees, account maintenance fees, reasonable and documented legal fees, and expenses relating to any account under any account agreements, including without limitation the prepetition and post-petition Bank Fees (as defined in the Cash Management Motion) and any chargebacks or other amounts owing to the Huntington National Bank from (i) any checks or other items or receipts deposited in any account are returned unpaid or otherwise dishonored for any reason, (ii) any overdrafts on any account, (iii) any automated clearing house, wire transfer or other electronic entries for deposit into any account that are returned or otherwise dishonored, or (iv) claims of breach of the UCC's transfer or presentment warranties made against Huntington National Bank in connection with items deposited to any account.

"Increased Amount" has the meaning specified in Section 7.03.

"Incur" means, with respect to any Indebtedness, to incur, create, issue, assume or Guarantee such Indebtedness.

17

"Indebtedness" means, as to any Person, without duplication:

(a)        all indebtedness of such Person for borrowed money;

(b)        all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments (other than any obligations in respect of performance bonds, bid bonds, appeal bonds, surety bonds, reclamation bonds and completion guarantees, bank guarantees and similar obligations under any Mining Law or Environmental Law or with respect to worker's compensation benefits);

(c)        all obligations of such Person arising under letters of credit, bankers' acceptances or other similar instruments (solely to the extent such letters of credit, bankers' acceptances or other similar instruments have been drawn and remain unreimbursed);

(d)        all obligations of such Person to pay the deferred purchase price of property or services;

(e)        the Attributable Indebtedness of such Person in respect of Capital Leases;

(f)        all Indebtedness of other Persons Guaranteed by such Person to the extent so Guaranteed;

(g)        all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; and

(h)        all obligations of such Person under Hedging Agreements;

if and to the extent any of the preceding items (other than Guarantees referred to in clause (e)) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP;

provided that in no event shall Indebtedness include (i) asset retirement obligations, (ii) obligations (other than obligations with respect to Indebtedness for borrowed money or other Funded Debt) related to surface rights under an agreement for the acquisition of surface rights for the production of coal reserves in the ordinary course of business in a manner consistent with historical practice of the Borrower and its Subsidiaries, (iii) obligations under coal purchase and sale contracts, (iv) trade accounts payable and accrued expenses incurred in the ordinary course of business, (v) obligations under federal coal leases, (vi) obligations under coal leases which may be terminated at the discretion of the lessee, (vii) obligations for take-or-pay arrangements or (viii) royalties, the dedication of reserves under supply agreements or similar rights or interests granted, taken subject to, or otherwise imposed on properties consistent with customary practices in the mining industry.

The amount of any obligation under any Hedging Agreement on any date shall be deemed to be the Hedging Termination Value thereof as of such date.  The amount of any Indebtedness issued with original issue discount shall be deemed to be the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness.  The amount of any Indebtedness secured by a Lien on an asset of such Person but not otherwise the obligation, contingent or otherwise of such Person, shall be deemed to be the lesser of (x) the fair market value (as reasonably determined by the Borrower in good faith) of such asset on the date the Lien attached as determined in good faith by the Borrower and (y) the amount of such Indebtedness.  The amount of any other Indebtedness shall be the outstanding principal amount thereof.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial Term Lender" means any Term Lender holding Initial Term Loans.

"Initial Term Loan" has the meaning set forth in Section 2.01(a).

"Initial Term Loan Commitment" means, as to each Lender, its obligation to make Initial Term Loans to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Initial Term Loan Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of Initial Term Loan Commitments as of the Closing Date is $55,000,000.

"Initial Term Loan Facility" means, at any time (a) prior to the funding of the Initial Term Loans on the Closing Date, the aggregate Initial Term Loan Commitments at such time and (b) on and after the funding of the Initial Term Loans on the Closing Date, the aggregate principal amount of the Initial Term Loans of all Lenders outstanding at such time.

"Interest Payment Date" means, (a) as to any Eurocurrency Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date (or, if sooner, the date on which the Obligations become due and payable pursuant to Section 8.02), and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date.

"Interest Period" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one month thereafter; provided that:

> (i)        any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

> (ii)       any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (iii) below, end on the last Business Day of a calendar month; and

> (iii)      with respect to each Facility, no Interest Period shall extend beyond its applicable Maturity Date.

"Interest Rate Determination Date" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Bankruptcy Rule 4001 and other applicable law) substantially in the form of Exhibit K hereto or otherwise in form and substance satisfactory to the Required Lenders (and with respect to the rights and duties of each Agent, such Agent), which among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower and the Guarantors to execute and perform under the terms of this Agreement and the other Loan Documents.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Capital Stock or other securities of another Person, (b) a loan, advance (excluding intercompany liabilities incurred in the ordinary course of business in connection with the cash management operations of the Borrower and its Subsidiaries) or capital contribution to, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.  For purposes of covenant compliance, the amount of any Investment shall be (i) the amount actually invested, as determined immediately prior to the time of each such Investment, without adjustment for subsequent increases or decreases in the value of such Investment minus (ii) the amount of dividends or distributions received in connection with such Investment and any return of capital and

any payment of principal received in respect of such Investment that in each case is received in cash or Cash Equivalents.

"IP Rights" has the meaning specified in Section 5.18.

"IRS" means the United States Internal Revenue Service.

"Joint Venture" means any Person (a) other than a Subsidiary in which the Borrower or its Subsidiaries hold an ownership interest or (b) which is an unincorporated joint venture of the Borrower or any Subsidiary.

"Junior Lien Indebtedness" means any other Indebtedness that is secured by a Lien on the Collateral (or any portion thereof) that is junior to the Liens on the Collateral securing the Obligations and that was permitted to be incurred and so secured hereunder.

"Laws" means, as to any Person, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes, and determinations of arbitrators or courts or other Governmental Authorities, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Leasehold Property" means any interest of any Loan Party as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Lender" has the meaning specified in the introductory paragraph hereto and shall include any Lender that may become a party hereto pursuant to an Assignment and Assumption or an amendment to this Agreement.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing).

"Liquidity" means, the sum of (i) the aggregate amount of cash and Cash Equivalents on the consolidated balance sheet of the Borrower and its Subsidiaries that is "unrestricted" in accordance with GAAP and (ii) at all times prior to the Delayed Draw Funding Date, the Delayed Draw Term Loan Commitment.

"LLC Division" means the statutory division of any limited liability company into two or more limited liability companies pursuant to Section 18.217 of the Delaware Limited Liability Company Act or a comparable provision of a different jurisdiction's laws, as applicable.

"Loan" or "Loans" means, individually or collectively as the context requires, a Term Loan and the Roll-Up Loans.

"Loan Documents" means this Agreement, each Note, the Agency Fee Letter, each Security Document, any fee letter or other document relating to the fees referred to in Section 2.08, and all other documents, certificates, instruments or agreements executed and delivered by a Loan Party for the benefit of the Agent or any Lender in connection herewith.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Management Services Agreement" means the Second Amended and Restated Services Agreement entered into as of April 30, 2015 by and between Foresight Energy GP LLC and Murray American Coal, Inc. (or their

20

respective successors), as amended, amended and restated, modified or replaced from time to time pursuant to one or more agreements.

"Management Incentive Plan" means the "Management Incentive Plan" as defined in the Restructuring Support Agreement.

"Material Adverse Effect" means any material adverse effect on (i) the business, condition (financial or otherwise), operations, performance, properties or contingent liabilities of the Debtors, taken as a whole (other than by virtue of the commencement and continuation of the Chapter 11 Cases and the events and circumstances giving rise thereto); (ii) the ability of the Loan Parties, taken as a whole, to fully and timely perform their respective material obligations under this Agreement and the Loan Documents; (iii) the legality, validity, binding effect or enforceability against a Loan Party of a Loan Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Loan Document.

"Material Indebtedness" has the meaning specified in Section 8.01(e).

"Material Real Property" means (a) any fee owned or leased real property interest held by a Loan Party on the Closing Date that has a fair market value (as reasonably determined by the Borrower in good faith) in excess of $5,000,000 on the Closing Date, (b) any fee owned real property acquired by a Loan Party after the Closing Date that has a total fair market value (as reasonably determined by the Borrower in good faith) in excess of $5,000,000 as of the date acquired and (c) any leasehold interest in real property leased by a Loan Party after the Closing Date with a total fair market value (as reasonably determined by the Borrower in good faith) in excess of $5,000,000 as of the date of the lease thereof.

"Maturity Date" means the first to occur of: (a) the date that is 180 days following the Petition Date (the "Stated Maturity Date"); provided, that, if such date is not a Business Day, the Maturity Date shall be the preceding Business Day, (b) the Plan Effective Date, (c) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under the section 363 of the Bankruptcy Code, and (d) the date on which the Obligations hereunder shall be accelerated in accordance with the provisions of this Agreement.

"Mine" means any excavation or opening into the earth in the United States now and hereafter made from which coal or other minerals are or can be extracted on or from any of the real properties in which any Loan Party holds an ownership, leasehold or other interest.

"Mining Financial Assurances" means letters of credit or performance bonds for reclamation or otherwise, surety bonds or escrow agreements and any payment or prepayment made with respect to, or certificates of deposit or other sums or assets required to be posted by the Borrower under Mining Laws for reclamation or otherwise.

"Mining Laws" means any and all current or future applicable federal, state, local and foreign statutes, laws, regulations, legally-binding guidance, ordinances, rules, judgments, orders, decrees or common law causes of action relating to mining operations and activities, including, but not be limited to, the Federal Coal Leasing Amendments Act; the Surface Mining Control and Reclamation Act; all other applicable land reclamation and use statutes and regulations; the Mineral Leasing Act of 1920; the Federal Mine Safety Act of 1977; the Black Lung Act; and the Coal Act; each as amended, and any comparable state and local laws or regulations.

"Mining Lease" means a lease, license or other use agreement which provides the Borrower or any Subsidiary the real property and water rights, other interests in land, including coal, mining and surface rights, easements, rights of way and options, and rights to timber and natural gas (including coalbed methane and gob gas) necessary or integral in order to recover coal from any Mine. Leases (other than Capital Leases or operating leases of personal property even if such personal property would become fixtures) which provide the Borrower or any other Subsidiary the right to construct and operate a conveyor, crusher plant, silo, load out facility, rail spur, shops, offices and related facilities on the surface of the Real Property containing such reserves shall also be deemed a Mining Lease.

"Monthly Mine-Level Financial Reports" means financial reports with respect to the Borrower and its Subsidiaries, substantially in the form that has been previously provided to the Financial Advisor or in the form of

21

Exhibit I for any fiscal month that set forth mine-level operational financial information and operating statistics delivered in accordance with <u>Section 6.01(c)</u>.

"<u>Monthly Consolidated Financial Reports</u>" means financial reports with respect to the Borrower and its Subsidiaries, substantially in the form of Exhibit J hereto for any fiscal  month that set forth consolidated information and operating statistics delivered in accordance with <u>Section 6.01(c)</u>.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor thereto.

"<u>Mortgage</u>" means a mortgage, deed to secure debt, deed of trust or similar instrument in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders.

"<u>Mortgaged Property</u>" means all Real Property that constitutes Collateral.

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"<u>Murray Energy</u>" means Murray Energy Corporation, an Ohio corporation.

"<u>Murray Energy Group</u>" has the meaning specified in the definition of "Permitted Holders".

"<u>Narrative Report</u>" means, with respect to the financial statements for which such narrative report is required, a management's summary describing the operations of the Borrower and its Subsidiaries for the applicable fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such period to which such financial statements relate.

"<u>Net Insurance/Condemnation Proceeds</u>" means an amount equal to: (i) any cash payments or proceeds received by the Borrower or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of the Borrower or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, <u>minus</u> (ii) (a) any actual and reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with the adjustment or settlement of any claims of the Borrower or such Subsidiary in respect thereof, (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including Taxes paid or payable as a result of any gain recognized or otherwise in connection therewith and (c) any payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness that is secured by a Lien on the assets subject to the relevant event described in clause (i)(a) or (b) above that is required that to be repaid as a result of such event.

"<u>Net Proceeds</u>" means, with respect to any Disposition pursuant to Sections 7.05(b) or <u>7.05(c)</u>, the sum of (a) cash payments or proceeds actually received by the Borrower or any of its Subsidiaries in connection with such Disposition (including any cash received by way of deferred payment (excluding, for avoidance of doubt, royalty payments customary in the mining industry) pursuant to, or by monetization of, Cash Equivalents or a note receivable or otherwise, but only as and when so received) <u>minus</u> (b) the sum of (i) (A) the principal amount, premium or penalty, if any, interest and other amounts of any Indebtedness that is secured by (1) a Lien on an asset that is not Collateral or by a Lien on an asset that is Collateral which Lien is senior in priority to the Lien on such Collateral that secures the Obligations and, in each case, that is required to be repaid in connection with such Disposition (other than Indebtedness under the Loan Documents) or (B) any other required debt payments or required payments of other obligations relating to the Disposition, in each case, with the proceeds thereof, (ii) the reasonable or customary out-of- pocket fees and expenses incurred by the Borrower or its Subsidiaries in connection with such Disposition (including attorneys' fees, accountants' fees, investment banking fees, real property related fees and charges and brokerage and consultant fees), (iii) all Taxes required to be paid or accrued or reasonably estimated to be required to be paid or accrued as a result thereof, (iv) in the case of any Disposition by a non-Wholly Owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority or other third party interests and not available for distribution to or for the account of the Borrower or a Wholly Owned Subsidiary as a result thereof and

22

(v) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (x) related to any of the applicable assets and (y) retained by the Borrower or any Subsidiary including, without limitation, pension and other post- employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition occurring on the date of such reduction).

"New Common Equity" means the equity securities of Reorganized Foresight to be issued upon consummation of the Acceptable Plan in accordance with the Restructuring Support Agreement.

"Note" means a Term Loan Note and/or a Roll-Up Loan Note, as the context may require.

"Obligations" means all advances to, and debts, liabilities and obligations of every nature of each Loan Party, including obligations from the time to time owed to any Agent (including any former Agent), Lenders or any other Secured Party, under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"Obligee Guarantor" has the meaning specified in Section 11.07.

"OPEB" means post-employment benefits other than pension benefits, including, as applicable, medical, dental, vision, life and accidental death and dismemberment.

"Orders" means, collectively, the Interim Order and the Final Order.

"Organizational Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-US jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.13).

"Overnight Rate" means, for any day, the greater of (a) the Federal Funds Rate in the case of any amount denominated in Dollars and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"Parent" means any direct or indirect parent of the Borrower.

"Participant" has the meaning specified in Section 10.06(e).

"Participant Register" has the meaning specified in Section 10.06(e).

"PATRIOT Act" has the meaning specified in Section 5.17(b).

"Payment in Full" means, the time at which no Lender shall have any Commitments, any Loan or other Obligations unpaid, unsatisfied or outstanding (other than in respect of contingent obligations, indemnities and expenses related thereto that are not then payable or in existence).

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA, or any successor thereto.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Holders" means, collectively, (a) (i) Chris Cline and his children and other lineal descendants, Robert E. Murray, Brenda L. Murray, Robert Edward Murray (son), Jonathan Robert Murray, Ryan Michael Murray (or any of their estates, or heirs or beneficiaries by will) and any Related Party of a Permitted Holder; (ii) the spouses or former spouses, widows or widowers and estates of any of the Persons referred to in clause (i) above; (iii) any trust having as its sole beneficiaries one or more of the persons listed in clauses (i) and (ii) above; and (iv) any Person a majority of the voting power of the outstanding Equity Interest of which is owned by one or more of the Persons referred to in clauses (i), (ii) or (iii) above, (b) Murray Energy Corporation, an Ohio corporation, and its Subsidiaries ("Murray Energy Group"), (c) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing are members; provided that, in the case of such group and without giving effect to the existence of such group or any other group, such Persons referenced in clauses (a) through (b) above, collectively, have beneficial ownership of more than 50% of the total voting power of the voting units or stock of the Borrower or Holdings (or any Parent), (d) Foresight Reserves L.P., (e) Holdings and any Parent and (f) the General Partner.

"Permitted Liens" means each of the Liens permitted pursuant to Section 7.01.

"Permitted Payments to Parent" means, without duplication as to amounts, dividends, distributions or the making of loans to Holdings or the General Partner, in each case, to the extent paid in accordance with the Cash Flow Forecast (subject to Permitted Variance):

(1)      in amounts required for such entity to pay (i) general corporate overhead expenses (including, but not limited to, franchise taxes, legal expenses, accounting expenses, expenses to maintain their corporate existence and administrative expenses) and (ii) directors' fees and expense reimbursements under its charter or by-laws or pursuant to written agreements entered into prior to the Closing Date with any such Person to the extent relating to the Borrower and its Subsidiaries, in each case, when due; provided the aggregate amount set forth in this clause (1) shall not exceed $50,000 in any fiscal month;

(2)      to pay customary indemnification obligations of Holdings' or the General Partner's owing to directors, officers, employees or other Persons under its charter or by-laws or pursuant to written agreements entered into prior to the Closing Date with any such Person to the extent relating to the Borrower and its Subsidiaries; and

(3)      to pay obligations of Holdings or the General Partner in respect of director and officer insurance (including premiums therefor) to the extent relating to the Borrower and its Subsidiaries.

"Permitted Real Estate Encumbrances" means the following encumbrances which do not, in any case, individually or in the aggregate, materially detract from the value of any Mine subject thereto or interfere with the ordinary conduct of the business or operations of the Borrower and its Subsidiaries as presently conducted on, at or with respect to such Mine and as to be conducted following the Closing Date: (a) encumbrances customarily found

24

upon real property used for mining purposes in the applicable jurisdiction in which the applicable real property is located to the extent such encumbrances would be permitted or granted by a prudent operator of mining property similar in use and configuration to such real property (e.g., surface rights agreements, wheelage agreements and reconveyance agreements); (b) rights and easements of (i) owners of undivided interests in any of the real property where the Borrower and its Subsidiaries own less than 100% of the fee interest, (ii) owners of interests in the surface of any real property where the applicable party does not own or lease such surface interest, (iii) lessees, if any, of coal or other minerals (including oil, gas and coal bed methane) where the Borrower and its Subsidiaries do not own such coal or other minerals, and (iv) lessees of other coal seams and other minerals (including oil, gas and coal bed methane) not owned or leased by such party; (c) with respect to any real property in which the Borrower or any Subsidiary holds a leasehold interest, terms, agreements, provisions, conditions, and limitations (other than royalty and other payment obligations which are otherwise permitted hereunder) contained in the leases granting such leasehold interest and the rights of lessors thereunder (and their heirs, executors, administrators, successors, and assigns), subject to any amendments or modifications set forth in any landlord consent delivered in connection with a Mortgage; (d) farm, grazing, hunting, recreational and residential leases with respect to which the Borrower or any Subsidiary is the lessor encumbering portions of the real properties to the extent such leases would be granted or permitted by, and contain terms and provisions that would be acceptable to, a prudent operator of mining properties similar in use and configuration to such real properties; (e) royalty and other payment obligations to sellers or transferors of fee coal or lease properties to the extent such obligations constitute a lien not yet delinquent; (f) rights of others to subjacent or lateral support and absence of subsidence rights or to the maintenance of barrier pillars or restrictions on mining within certain areas as provided by any mining lease, unless in each case waived by such other person; and (g) rights of repurchase or reversion when mining and reclamation are completed.

"Permitted Variance" has the meaning specified in Section 7.18.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals to this Agreement

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, by any ERISA Affiliate.

"Plan Effective Date" means the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date) of one or more plans of reorganization confirmed pursuant to a final order entered by the Bankruptcy Court.

"Platform" has the meaning specified in Section 6.02.

"Prepetition Agent" means the "Administrative Agent" as defined in the Prepetition First Lien Credit Agreement.

"Prepetition Debt" means, collectively, the Indebtedness of each Debtor outstanding and unpaid on the date on which such Person becomes a Debtor.

"Prepetition First Lien Credit Agreement" means the Credit and Guaranty Agreement, dated as of March 28 2017, by and among the Borrower, Holdings and the other guarantors party thereto, The Huntington National Bank, as facilities administrative agent, Lord Securities Corporation, as term administrative agent, and the other lenders party thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time.

"Prepetition First Lien Lender" means a "Lender" as defined in the Prepetition First Lien Credit Agreement.

"Prepetition First Lien Obligations" means the "Obligations" as defined in the Prepetition First Lien Credit Agreement.

"Prepetition Second Lien Indenture" means the Indenture, dated as of March 28, 2017 among Foresight Energy, LLC, Foresight Energy Finance Corporation, the guarantors party thereto and Wilmington Trust, National Association, as trustee.

"Prime Rate" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  Any Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"Production Payments" means with respect to any Person, all production payment obligations and other similar obligations with respect to coal and other natural resources of such Person that are recorded as a liability or deferred revenue on the financial statements of such Person in accordance with GAAP.

"Properties" has the meaning specified in Section 5.09(a).

"Public Lender" has the meaning specified in Section 6.02.

"Qualified Equity Interests" means all Equity Interests of a Person other than Disqualified Equity Interests.

"Qualified Stock" means all Capital Stock of a Person other than Disqualified Stock.

"Real Properties" means, collectively, all right, title and interest of the Borrower or any Subsidiary (including any leasehold or mineral estate) in and to any and all parcels of real property owned or operated by the Borrower or any Subsidiary, whether by lease, license or other use agreement, including but not limited to, coal leases and surface use agreements, together with, in each case, all improvements and appurtenant fixtures (including all conveyors, preparation plants or other coal processing facilities, silos, shops and load out and other transportation facilities), easements and other property and rights incidental to the ownership, lease or operation thereof, including but not limited to, access rights, water rights and extraction rights for minerals.

"Recipient" means any Agent or any Lender, as applicable.

"Register" has the meaning specified in Section 10.06(d).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, members, directors, officers, employees, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, agents, representatives, attorneys, advisors or controlling persons of such Person and of such Person's Affiliates.

"Related Party of a Permitted Holder" means:

(a)       any immediate family member of any Permitted Holder; or

(b)       any trust, corporation, partnership, limited liability company or other entity, the beneficiaries, stockholders, partners, members, owners or Persons beneficially holding a majority (and controlling) interest of which consist of any one or more Permitted Holders and/or such other Persons referred to in the immediately preceding clause (a).

"Reorganization Plan" means a plan of reorganization in any or all of the Chapter 11 Cases of the Debtors.

"Reorganized Foresight" means Holdings (or any other holding company or ultimate parent entity) immediately after consummation of the Reorganization Plan.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

26

"<u>Reporting Period</u>" as defined in the definition of "Budget Variance Report".

"<u>Required Lenders</u>" means, as of any date of determination, Lenders having more than 60% of the aggregate outstanding principal amount of the Loans and unused Commitment of all Lenders; provided that Loans and unused Commitments held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"<u>Required Prepayment Date</u>" has the meaning specified in <u>Section 2.05(l)</u>.

"<u>Requirement of Law</u>" means as to any Person, the Organizational Documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Responsible Officer</u>" means the chief executive officer, president or any vice president of the Borrower, General Partner or Holdings or any applicable Subsidiary and, in addition, any Person holding a similar position or acting as a director or managing director with respect to any Foreign Subsidiary of the Borrower or, with respect to financial matters, the chief financial officer, treasurer or assistant treasurer of the Borrower, General Partner or Holdings.

"<u>Restricted Payment</u>" means (a) any dividend or other distribution (whether in cash, securities or other property) by the Borrower or any Subsidiary with respect to its Capital Stock, or any payment (whether in cash, securities or other property) by the Borrower or any Subsidiary, including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any of its Equity Interests, or on account of any return of capital to its stockholders, partners or members (or the equivalent Person thereof) and (b) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including covenant or legal defeasance), sinking fund or similar payment with respect to, any unsecured Indebtedness for borrowed money, Subordinated Indebtedness or Junior Lien Indebtedness.

"<u>Restructuring Support Agreement</u>" means that certain Restructuring Support Agreement dated as of March 10, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"<u>Roll-Up Amount</u>" means, with respect to each Roll-Up Lender, the amount, if any, of the Prepetition First Lien Obligations held by such Roll-Up Lender (or one or more of its affiliates or any investment advisory client managed or advised by such Roll-Up Lender) equal to 0.808625 times the sum of (x) the amount of Initial Term Loans funded by such Roll-Up Lender (or one or more of its affiliates or any investment advisory client managed or advised by such Roll-Up Lender) on the Closing Date and (y) the amount of Delayed Draw Term Loan funded by such Roll-Up Lender (or one or more of its affiliates or any investment advisory client managed or advised by such Roll-Up Lender) on the Delayed Draw Funding Date. The aggregate Roll-Up Amount of all Roll-Up Lenders shall not exceed $75,000,000.

"<u>Roll-Up Facility</u>" as defined in the recitals hereto.

"<u>Roll-Up Lender</u>" means a Consenting First Lien Lender that is a Term Lender (or whose affiliates or whose affiliated investment funds, investment vehicles, investment advisory clients or other entities that are managed or advised by such Consenting First Lien Lender is a Term Lender), and any other Person that becomes a Roll-Up Lender pursuant to an Assignment and Assumption Agreement.

"<u>Roll-Up Loan Note</u>" means a promissory note in the form of Exhibit C-2, as it may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Roll-Up Loans</u>" as defined in <u>Section 2.01(b)(iii)</u>.

"<u>Roll-Up Notice</u>" as defined in <u>Section 2.01(b)(iii)</u>.

"Sale and Lease-Backs" has the meaning assigned to such term in Section 7.16.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Same Day Funds" means immediately available funds.

"Sanctions" has the meaning specified in Section 5.17(a).

"Sanctions Laws" has the meaning specified in Section 5.17(a).

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions. "Secured Parties" means, collectively, the Agents and the Lenders.

"Security Documents" means (i) the Orders, and (ii) to the extent requested by the Collateral Agent or the Required Lenders, any security agreement, pledge agreement, intellectual property security agreements, the Mortgages (if any), each of the supplements thereto and any other documents, agreements or instruments, in each case, in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders, delivered to the Collateral Agent and/or the Lenders pursuant to this Agreement or any other Loan Documents or the Orders in order to grant or purport to grant a Lien on any assets of the Borrower or any other Loan Party to secure the Obligations.

"Similar Business" means any of the following, whether domestic or foreign: the mining, production, marketing, sale, trading and transportation (including, without limitation, any business related to terminals) of natural resources including coal, ancillary natural resources and mineral products, exploration of natural resources, any acquired business activity so long as a material portion of such acquired business was otherwise a Similar Business, and any business that is ancillary or complementary to the foregoing.

"Stated Equity Value" means the "Stated Equity Value" as defined in the Restructuring Support Agreement.

"Stated Maturity Date" has the meaning in clause (a) of the definition of "Maturity Date."

"Subordinated Indebtedness" means any Indebtedness of the Borrower or any Guarantor that is expressly subordinated in right of payment to the Indebtedness under the Loan Documents pursuant to a written agreement to that effect.

"Subsidiary" means, with respect to any Person, any corporation, association, limited liability company or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by, or, in the case of a partnership, the sole general partner or the managing partner or the only general partners of which are, such Person and one or more Subsidiaries of such Person (or a combination thereof). Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim" means the "DIP Superpriority Claim" as defined in the Orders.

"Surety Bonds" means surety bonds obtained by the Borrower or any Subsidiary consistent with market practice and the indemnification or reimbursement obligations of the Borrower or such Subsidiary in connection therewith.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Lender" means each financial institution listed on the signature pages hereto as a Lender (other than a Roll-Up Lender) and any other Person that becomes a party hereto pursuant to an Assignment and Assumption Agreement, in each case, that has a Term Loan Commitment or is a holder of a Term Loan.

"Term Loan" means the Initial Term Loan and the Delayed Draw Term Loan.

"Term Loan Commitment" means the Initial Term Loan Commitment and the Delayed Draw Term Loan Commitment.

"Term Loan Facility" means the Initial Term Loan Facility and/or the Delayed Draw Term Loan Facility.

"Term Loan Note" means a promissory note in the form of Exhibit C-1, as it may be amended, restated, supplemented or otherwise modified from time to time.

"Threshold Amount" means $5,000,000.

"Transactions" means the transactions contemplated herein to occur on the Closing Date, including the funding of the Initial Term Loan Facility, the provision of the Delayed Draw Term Loan Facility, the deemed funding of the Roll-Up Loans, and the commencement of the Chapter 11 Cases.

"Two-Week Test Period" means, at any time, the two-week period ended on the immediately preceding Friday; provided that only periods ending on the second Friday following the Closing Date and each second Friday thereafter shall constitute Two-Week Test Periods.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"UCC" means the Uniform Commercial Code as in effect in the applicable state of jurisdiction.

"Unfunded Pension Liability" means the excess of a Pension Plan's accrued benefit liabilities under Section 4001 (a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the actuarial assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agency or instrumentality thereof, provided that the full faith and credit of the United States of America is pledged in support thereof.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(e).

"Voting Stock" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Waivable Mandatory Prepayment" has the meaning specified in Section 2.05(l).

"Wholly Owned" means, with respect to any Subsidiary, a Subsidiary all of the outstanding Capital Stock of which (other than any director's qualifying shares) is owned by the Borrower and one or more Wholly Owned Subsidiaries (or a combination thereof).

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organizational Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof", "hereto" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)      Section headings herein and in the other Loan Documents are included for convenience of reference only, shall not constitute a part hereof, shall not be given any substantive effect and shall not affect the interpretation of this Agreement or any other Loan Document.

### 1.03    Accounting Terms.

(a)      Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP applied on a consistent basis.

(b)      Changes in GAAP.  If at any time any Accounting Change would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Required Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such Accounting Change as if such Accounting Change has not been made (subject to the approval of the Required Lenders); provided that, until so amended, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.

### 1.04    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

### 1.05    LLC Division.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware Law (including any LLC Division, or any comparable event under a different jurisdiction's laws, as applicable): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests.

### ARTICLE II
### THE COMMITMENTS AND CREDIT EXTENSIONS

### 2.01    The Loans.

(a)    <u>Term Loans</u>.

(i)    Subject to the terms and conditions set forth herein, each Term Lender agrees, severally and not jointly, to make a loan ("<u>Initial Term Loan</u>") to the Borrower in Dollars, on the Closing Date in an aggregate principal amount not to exceed such Term Lender's Initial Term Loan Commitment.  Initial Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(ii)    Subject to the terms and conditions set forth herein, each Term Lender agrees, severally and not jointly, to make a loan ("<u>Delayed Draw Term Loans</u>") to the Borrower in Dollars, on the Delayed Draw Funding Date in an aggregate principal amount not to exceed such Term Lender's Delayed Draw Term Loan Commitment.  Delayed Draw Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(iii)    Borrower may make only one Borrowing under the Initial Term Loan Commitment on the Closing Date, and Borrower may make only one Borrowing under the Delayed Draw Term Loan Commitment on the Delayed Draw Funding Date.  Any amount borrowed under this Section 2.01(a) and subsequently repaid or prepaid may not be reborrowed.  Each Term Lender's Initial Term Loan Commitment or the Delayed Draw Term Loan Commitment shall terminate immediately and without any further action on the Closing Date or the Delayed Draw Funding Date, as applicable, after giving effect to the funding of such Term Lender's Commitment on such date. Notwithstanding anything to the contrary, unless the Administrative Agent and the Borrower shall otherwise agree, the initial Interest Period of any Delayed Draw Term Loans that are Eurocurrency Rate Loans shall commence on the date of funding and shall end on the last day of the then-current Interest Period for all Eurocurrency Rate Loans that are Initial Term Loans then outstanding.

(b)    <u>Roll-Up Loan</u>.

(i)    Subject to the terms and conditions set forth herein and the Orders, the Prepetition First Lien Obligations held by each Consenting First Lien Lender shall be automatically substituted and exchanged for (and prepaid by) loans hereunder (the "<u>Roll-Up Loans</u>") in a principal amount equal to such Roll-Up Lender's Roll-Up Amount on the Final Order Entry Date. Such Roll-Up Loans shall be deemed funded on the Final Order Entry, and shall constitute, and shall be deemed to be, Loans hereunder.

(ii)    No later than three (3) Business Days prior to the Final Order Entry, the Administrative Agent shall have received a written notice, in form and substance satisfactory to the Administrative Agent and the Required Lenders (the "<u>Roll-Up Notice</u>"), which shall (A) attach a schedule identifying each Roll-Up Lender and the principal amount of such Roll-Up Lender's Roll-Up Loans deemed issued hereunder, (B) attach a joinder to this Agreement executed by such Roll-Up Lender, pursuant to which, inter alia, such Roll-Up Lender shall represent and warrant that it has delivered to the Administrative Agent a completed Administrative Questionnaire, such documentation and other information under applicable "know your customer" and anti-money laundering rules and regulations requested by the Administrative Agent and such documentation and other information required under Section 3.01, and (C) include a certification from the Borrower as to the accuracy of the information set forth in such schedule delivered pursuant to clause (A) of this Section 2.01(b)(ii).

(iii)    The parties hereto agree that the Administrative Agent and the Prepetition Agent may each conclusively rely on the Roll-Up Notice and this Section 2.01(b) in adjusting the Register and the Register (as defined in the Prepetition First Lien Credit Agreement) to reflect the cancellation of the Prepetition First Lien Obligations and the Roll-Up Loans to be received by the Roll-Up Lender on the Final Order Entry Date.

**2.02    Borrowings, Conversions and Continuations of the Loans.**

(a)    Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurocurrency Rate Loans shall be made by delivery by Borrower of an irrevocable Borrowing Notice, appropriately completed and signed by a Responsible Officer of the Borrower, to the Administrative Agent.  Each Borrowing Notice must be received by the Administrative Agent, not later than 11:00 a.m., New York City time, (i) three Business Days (or, such shorter period as may be acceptable to the Administrative Agent) prior to the requested date of any Borrowing

of, conversion to or continuation of Eurocurrency Rate Loans or of any conversion of Eurocurrency Rate Loans, and (ii) one (1) Business Day prior to the requested date of any Borrowing of Base Rate Loans. Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof. Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $250,000 in excess thereof. Each Borrowing Notice shall specify (i) whether the requested Borrowing is to be a Base Rate Loan or Eurocurrency Rate Loan, (ii) the requested date of the Borrowing, a conversion of Loans from one Type to the other, or a continuation of Eurocurrency Rate Loans, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted and (v) wire instructions for where Loan funds should be sent. If the Borrower fails to specify a Type of Loan in a Borrowing Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation of Eurocurrency Rate Loans, then the Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans.

(b)     Following receipt of a Borrowing Notice, the Administrative Agent shall promptly notify each applicable Lender of the amount of its Applicable Percentage under the applicable Facility of the Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each applicable Lender of the details of any automatic conversion to Base Rate Loans as described in the preceding subsection. In the case of a Borrowing of any Term Loans, each applicable Lender shall make the amount of its Term Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office, not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), and receipt of all requested Loan funds, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)     Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan. During the existence of an Event of Default, no Loans of any Facility may be requested as, converted to or continued as Eurocurrency Rate Loans if the Required Lenders or the Administrative Agent so notify the Borrower.

(d)     Promptly on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurocurrency Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Prime Rate used in determining the Base Rate promptly following the public announcement of such change.

(e)     After giving effect to all Borrowings, all conversions of Loans from one type to the other, and all continuations of Loans as the same Type, there shall not be more than four (4) Interest Periods in effect hereunder in respect of the Loans.

**2.03     [Reserved].**

**2.04     [Reserved].**

**2.05     Prepayments.**

(a)     Voluntary Prepayments. The Borrower may, upon written notice to the Administrative Agent at any time or from time to time voluntarily prepay Loans, in each case, in whole or in part, subject to Section 2.09(c) and Section 2.09(d); provided that (i) such notice must be received by the Administrative Agent not later than 11:00 a.m., New York City time (or such other later date and time which is acceptable to the Administrative Agent), (A) three Business Days prior to any date of prepayment of Eurocurrency Rate Loans, and (B) one Business Day prior to the date of prepayment of Base Rate Loans; (ii) any prepayment of Eurocurrency Rate Loans shall be in a principal

amount of $1,000,000 or a whole multiple of $500,000 in excess thereof; and (iii) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $250,000 in excess thereof or, in each case, the entire amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Facility(ies) and Type(s) of Loans to be prepaid and, if Eurocurrency Rate Loans are to be prepaid, the Interest Period(s) of such Loans.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage in respect of the applicable Facility).  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; provided that any such notice may be contingent upon the consummation of a refinancing or other transactions and such notice may otherwise be extended or revoked by the Borrower by notice to the Administrative Agent prior to the specified effective date if such condition is not satisfied, in each case, with the requirements of Section 3.05 to apply to any failure of the contingency to occur and any such extension or revocation.  Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05.  Each prepayment of the outstanding Loans pursuant to this Section 2.05(a) shall be applied as specified in Section 2.05(j), and each prepayment of Loans shall be paid to the Lenders in accordance with their respective Applicable Percentages.

(b)    [Reserved].

(c)    [Reserved].

(d)    [Reserved].

(e)    Asset Sales.  No later than five Business Days following the consummation of any Disposition by the Borrower or a Subsidiary pursuant to Sections 7.05(b) or 7.05(c) that results in the amount of Net Proceeds (as of the date of such receipt) exceeding $250,000 in an aggregate amount of all Net Proceeds received since the Closing Date (such excess amount, the "Excess Proceeds"), the Borrower shall prepay the Loans in an aggregate amount equal to 100% of the Excess Proceeds.  Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with additional amounts required pursuant to Section 3.05.

(f)    Issuance of Debt.  On the first Business Day following receipt by Borrower or any of its Subsidiaries of any cash proceeds from the incurrence of any Indebtedness of Borrower or any of its Subsidiaries (other than with respect to Indebtedness permitted to be incurred pursuant to Section 7.03), Borrower shall prepay the Loans in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(g)    [Reserved].

(h)    Insurance/Condemnation Proceeds.  No later than five Business Days following the date of receipt by the Borrower or any of its Subsidiaries, or the Collateral Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Borrower shall prepay the Loans in an aggregate amount equal to such Net Insurance/Condemnation Proceeds.

(i)    [Reserved].

(j)    Application of Prepayments.  Each prepayment of the outstanding Loans (including all Base Rate Loans and all Eurocurrency Rate Loans) pursuant to this Section 2.05 shall be accompanied by accrued interest to the extent required by Section 2.08.  Subject to the Carve Out, each prepayment of Loans pursuant to Section 2.05 shall be, subject to the Orders, remitted by the Borrower to the Administrative Agent and applied by the Administrative Agent in accordance with Section 8.04.

(k)    [Reserved].

(l)    Waivable Mandatory Prepayment.  Anything contained herein to the contrary notwithstanding, in the event the Borrower is required to make any mandatory prepayment (a "Waivable Mandatory Prepayment") not

less than five Business Days prior to the date (the "Required Prepayment Date") on which the Borrower is required to make such Waivable Mandatory Prepayment, the Borrower shall notify the Administrative Agent in writing of the amount of such prepayment, and the Administrative Agent will promptly thereafter notify each Lender of the amount of such Lender's Applicable Percentage of such Waivable Mandatory Prepayment.  Each such Lender may exercise such option by giving written notice to the Borrower and the Administrative Agent of its election to do so on or before 5:00 p.m., New York City time, on the third Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify the Borrower and the Administrative Agent of its election to exercise such option on or before the third Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option).  On the Required Prepayment Date, (i) the Borrower shall pay to the Administrative Agent an amount equal to that portion of the Waivable Mandatory Prepayment that is payable to those Lenders that have elected not to exercise such option, to prepay the Loans of such Lenders (which prepayment shall be applied in accordance with the terms of this Section 2.05), and (ii) the portion of the Waivable Mandatory Prepayment otherwise payable to Lenders that have elected to exercise such option ("Declined Proceeds") may be retained by the Borrower to be used for any purpose not prohibited hereunder.

2.06     **[Reserved].**

2.07     **Repayment of Loans**.  The Borrower hereby unconditionally agrees to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of such Lender's Loans, together with all other amounts owed hereunder with respect thereto, including all applicable fees in accordance with Section 2.09 on the Maturity Date.

2.08     **Interest.**

(a)     Subject to the provisions of subsection (b) below, (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)     If any amount of principal or interest of any Loan (or any other Obligations) is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

2.09     **Fees**.

(a)     Agency Fee.  The Borrower shall pay to each Agent for its own account, in Dollars, fees in the amounts and at the times specified in the Agency Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(b)     Upfront Fee.  The Borrower shall pay to the Administrative Agent (i) on the Closing Date for the account of each Initial Term Lender, as fee compensation for the funding of such Initial Term Lender's Initial Term Loan, an upfront fee in an amount equal to 3.00% of the aggregate principal amount of such Initial Term Lender's Initial Term Loan Commitment, payable to such Initial Term Lender from the proceeds of its Initial Term Loan on the Closing Date, and (ii) on the Delayed Draw Funding Date for the account of each Delayed Draw Term Lender, as fee compensation for the funding of such Delayed Draw Term Lender's Delayed Draw Term Loan, an upfront fee in an amount equal to 3.00% of the aggregate principal amount of such Delayed Draw Term Lender's Delayed Draw Term Loan Commitment, payable to such Delayed Draw Term Lender from the proceeds of its Delayed Draw Term

34

Loan on the Delayed Draw Funding Date. Such upfront fees will be in all respects fully earned, due and payable upon the funding of the Initial Term Loans or the Delayed Draw Term Loans, as the case may be, and shall be non-refundable and non-creditable thereafter.

(c)    Put Option Premium. The Borrower shall pay to each Backstop Lender (or any Affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such Backstop Lender or such Affiliate, in each case, designated by such Backstop Lender in writing to the Administrative Agent) a put option premium in an amount equal to 5.0% of the aggregate principal amount of such Backstop Lender's Backstop Commitments (as in effect immediately prior to the funding of Initial Term Loans), which shall be due on the Plan Effective Date and payable in the form of New Common Equity at a 35% discount to the Stated Equity Value, subject to dilution for the Management Incentive Plan; provided, however, that, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable) upon the occurrence of any Event of Default under this Agreement or upon repayment of the Loans in full and termination of all Commitments without the occurrence of the Plan Effective Date, the Borrower shall pay to each Backstop Lender (or any Affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such Backstop Lender or such Affiliate, in each case, designated by such Backstop Lender in writing to the Administrative Agent) in cash a put option premium in an amount equal to $10,000,000, ratably in accordance with their Backstop Commitments (as in effect immediately prior to the funding of the Initial Term Loans). Such put option premium will be fully earned in all respects on the Closing Date, and shall be non-refundable and non-creditable thereafter. The Agents shall have no responsibility for the distribution of any New Common Equity to the Backstop Lenders.

(d)    Exit Fee. The Borrower shall pay to each Term Lender (or any Affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such Term Lender or such Affiliate, in each case, designated by such Term Lender in writing to the Administrative Agent) an exit fee in an aggregate amount equal to 1.0% of the aggregate principal amount of the Term Loan Commitment (prior to any funding of Term Loans), which shall be due on the Plan Effective Date, ratably in accordance with Term Loans then outstanding and any unfunded Term Loan Commitments then outstanding, and payable in the form of New Common Equity at a 35% discount to the Stated Equity Value, subject to dilution for the Management Incentive Plan; provided, however, that, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable) upon the occurrence of any Event of Default under this Agreement or upon repayment of the Loans in full and termination of all Commitments without the occurrence of the Plan Effective Date, the Borrower shall pay to each Term Lender (or any Affiliate, or any affiliated investment fund, investment vehicle or entity that is managed, advised or sub-advised by such Term Lender or such Affiliate, in each case, designated by such Term Lender in writing to the Administrative Agent) in cash an exit fee in an amount equal to $2,000,000, ratably in accordance with their Term Loans outstanding at such time. Such exit fees will be fully earned in all respects on the Closing Date, and shall be non-refundable and non-creditable thereafter. The Agents shall have no responsibility for the distribution of any New Common Equity to the Term Lenders.

(e)    Delayed Draw Term Loan Commitment Fee. The Borrower shall pay to the Administrative Agent, for the account of each Delayed Draw Term Lender, as fee compensation for such Term Lender's Delayed Draw Term Loan Commitment, a commitment fee (the "Delayed Draw Term Loan Commitment Fee") on the Delayed Draw Term Loan Commitment (whether or not then available) of such Term Lender accruing, during the period commencing from the Closing Date to the Delayed Draw Funding Date, at a rate per annum equal to the 1.00%, payable to such Term Lender from the proceeds of its Delayed Draw Term Loan on the Delayed Draw Funding Date. Such Delayed Draw Term Loan Commitment Fee will be in all respects fully earned, due and payable upon the funding of the Delayed Draw Term Loans, and shall be non-refundable and non-creditable thereafter.

2.10    **Computation of Interest and Fees.**

(a)    All computations of interest for Base Rate Loans, where the rate of interest is calculated on the basis of the Prime Rate, shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by an

35

Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

### 2.11    Evidence of Debt.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender to the Borrower, the Borrower shall execute and deliver a Note to such Lender, which shall evidence such Lender's Loans to the Borrower in addition to such accounts or records.  Each Lender may attach schedules to a Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

### 2.12    Payments Generally; Administrative Agent's Clawback.

(a)    <u>General</u>.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent for the account of the Lenders, to which such payment is owed, at the Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m., New York City time, on the date specified herein.  The Administrative Agent will promptly distribute to each applicable Lender its Applicable Percentage of such payment in like funds as received by wire transfer to such applicable Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m., New York City time, may, in Administrative Agent's discretion, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    <u>Funding by Lenders; Presumption by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Eurocurrency Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon., New York City time, on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by <u>Section 2.02</u>) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if an applicable Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in Same Day Funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the Overnight Rate <u>plus</u> any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans of the Facility and Type comprising such Borrowing.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Term Loan, included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    <u>Payments by Borrower; Presumptions by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the

Administrative Agent for the account of the applicable Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lenders, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the applicable Lenders, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent at the Overnight Rate.

A notice of the Administrative Agent to any applicable Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)      Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender to the Borrower as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)      Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to Section 10.04(c) are several and not joint.  The failure of any Lender to make any Term Loan or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Term Loan or to make its payment under Section 10.04(c).

(e)      Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13     Pro Rata; Sharing of Payments by Lenders**.  Except as otherwise expressly provided in this Agreement, each payment (including each prepayment) by the Borrower on account of principal of and interest on any Loans shall be allocated by the Administrative Agent pro rata according to the respective outstanding principal amounts of such Loans then held by the respective Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payment on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be; provided that:

(a)      if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)      the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall

37

apply), (iii) any payments pursuant to the Agency Fee Letter, or (iv) any payments made pursuant to <u>Article III</u> or <u>Section 10.13</u>.

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

    **2.14**    **[Reserved].**

    **2.15**    **[Reserved].**

    **2.16**    **[Reserved].**

    **2.17**    **[Reserved].**

    **2.18**    **Defaulting Lenders**.  Notwithstanding anything contained in this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

    (a)    <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VIII</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 10.08</u> shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to any Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders, as a result of any judgment of a court of competent jurisdiction obtained by any Lender, against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

A Lender that has become a Defaulting Lender because of an event referenced in the definition of Defaulting Lender may cure such status and shall no longer constitute a Defaulting Lender as a result of such event when (i) such Defaulting Lender shall have fully funded or paid, as applicable, all Loans or other amounts required to be funded or paid by it hereunder as to which it is delinquent (together, in each case, with such interest thereon as shall be required to any Person as otherwise provided in this Agreement), (ii) the Administrative Agent and each of the Borrower shall have received a certification by such Defaulting Lender of its ability and intent to comply with the provisions of this Agreement going forward, and (iii) each of the Administrative Agent and the Borrower shall have determined (and notified the Administrative Agent) that they are satisfied, in their sole discretion, that such Defaulting Lender intends to continue to perform its obligations as a Lender hereunder and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder.  No reference in this subsection to an event being "cured" shall by itself preclude any claim by any Person against any Lender that becomes a Defaulting Lender for such damages as may otherwise be available to such Person arising from any failure to fund or pay any amount when due hereunder or from any other event that gave rise to such Lender's status as a Defaulting Lender.

**2.19    Priority and Liens; No Discharge.**

(a)    The relative priorities of the Liens with respect to the Collateral shall be as set forth in the Interim Order (and, when entered, the Final Order). Notwithstanding anything to the contrary in this Agreement or in any Loan Document, all of the Liens described herein shall be effective and perfected upon entry of the Interim Order without the necessity of the execution or recordation of filings by the Debtors of security agreements, mortgages, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Collateral Agent, as applicable, of, or over, any Collateral, as set forth in the Interim Order and, when entered, the Final Order.

(b)

(i)    Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Collateral Agent on behalf of and for the benefit of the Secured Parties in all of the Collateral and the proceeds thereof, which includes, without limitation, all of such Debtor's Real Properties (other than Excluded Assets), now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

(ii)    Further to Section 2.19(b)(i) and the Interim Order (and, when entered, the Final Order), subject to Section 2.19(b)(iv) below, to secure the full and timely payment and performance of the Obligations, each Loan Party that is a Debtor hereby MORTGAGES, GRANTS, BARGAINS, ASSIGNS, SELLS, CONVEYS and CONFIRMS, to the Collateral Agent, for the ratable benefit of the Secured Parties, all or any Real Properties (in any case, excluding any Real Properties that are Excluded Assets), but which, for the avoidance of doubt, shall include all of such Loan Party's right, title and interest now or hereafter acquired in and to (a) any and all easements, rights-of-way, reversions, sidewalks, strips and gores of land, drives, roads, curbs, streets, ways, alleys, passages, passageways, sewer rights, waters, water courses, water rights, mineral, gas and oil rights, as-extracted collateral and all power, air, light and other rights, estates, titles, interests, privileges, liberties, servitudes, licenses, tenements, hereditaments and appurtenances whatsoever, in any way belonging, relating or appertaining thereto, or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto; (b) the lessee's interest and estate in, to and under any leases and subleases to which such Loan Party is a party (as such leases and subleases may be extended, amended, supplemented, modified or restated), together with any and all easements, rights-of-way, reversions, sidewalks, strips and gores of land, drives, roads, curbs, streets, ways, alleys, passages, passageways, sewer rights, waters, water courses, water rights, mineral, gas and oil rights, as-extracted collateral and all power, air, light and other rights, estates, titles, interests, privileges, liberties, servitudes, licenses, tenements, hereditaments and appurtenances whatsoever, in any way demised under such leases and subleases; (c) any and all tipples, loading and coal washing facilities, railroad tracks, buildings, foundations, structures and other fixtures and improvements and any and all alterations and all materials now or hereafter intended for construction, reconstruction or repair thereof; (d) any and all permits, certificates, authorizations, consents, approvals, licenses, franchises, waivers or other instruments now or hereafter required by any Governmental Authority to operate or use and occupy the Real Properties and related assets for its intended uses; (e) all materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by such Loan Party, and water, gas, electrical, telephone, storm and sanitary sewer facilities and all other utilities whether or not situated in easements or used or useful in connection with mining coal or other minerals or in connection with any related activities or the maintenance or preservation thereof; (f) all goods, accounts, general intangibles, instruments, documents, chattel paper, as-extracted collateral and all other personal property of any kind or character, including such items of personal property as defined in the UCC; (g) all reserves, escrows or impounds and all deposit accounts; (h) such Loan Party's right, title and interest as lessor, landlord, sublessor, sublandlord, franchisor, licensor or grantor, in all leases and subleases (including, without limitation, intercompany leases) of land or improvements, leases and subleases of space, oil, gas and mineral leases, franchise agreements, licenses, occupancy or concession agreements or other agreements which grant to any Person (other than such Loan Party) a possessory interest in, or the right to use any Real Properties, including, all rents, additional rents, royalties, cash, guaranties, letters of credit, bonds, sureties or securities deposited thereunder to secure performance of the lessee's, sublessee's, franchisee's, licensee's or obligee's obligations thereunder, revenues, earnings, profits and income, advance rental or royalties, payments, payments incident to assignment, sublease or surrender of a lease, claims for forfeited deposits and claims for damages, now due or hereafter to become due, with respect to any lease, any indemnification against, or reimbursement for, sums paid and costs and expenses incurred by such Loan Party

under any lease or otherwise, and any award in the event of the bankruptcy of any tenant or lessee under or guarantor of a lease; (i) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of any Real Properties; (j) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing; (k) all property tax refunds payable to such Loan Party; (l) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof; (m) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by such Loan Party; and (n) any awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made by any Governmental Authority pertaining to the Real Properties (BUT EXCLUDING from the foregoing grants, Excluded Assets), TO HAVE AND TO HOLD to the Collateral Agent, and such Loan Party does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets and interests unto the Collateral Agent.

(iii)    Each Loan Party that is a Debtor further agrees that upon the request of the Collateral Agent (acting at the direction of the Required Lenders), such Loan Party shall execute and deliver to the Collateral Agent, as soon as reasonably practicable following such request but in any event within 45 days following such request (or such later date as may be extended by the Collateral Agent), with respect to Real Properties owned or leased by such Loan Party (in any case, excluding any Real Properties that are Excluded Assets) and identified by the Collateral Agent, the applicable Loan Party shall deliver:

1.    fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each such Real Properties, and any ancillary deliverables as reasonably requested by the Collateral Agent (including, without limitation, memoranda of leases in recordable form, duly executed by the applicable landlord and Loan Party);

2.    an opinion of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) in each state in which each such Real Property is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent; and

3.    (A) a completed Flood Certificate with respect to any Real Property that constitutes Collateral and that is improved with structures eligible for flood insurance under the Flood Program, which Flood Certificate shall (x) be addressed to the Collateral Agent and (y) otherwise comply with the Flood Program; (B) if the Flood Certificate states that such Real Property is located in a Flood Zone, Debtor's written acknowledgment of receipt of written notification from the Collateral Agent (x) as to the existence of each such Real Property and (y) as to whether the community in which such Real Property is located is participating in the Flood Program; and (C) if such Real Property is located in a Flood Zone and is located in a community that participates in the Flood Program, evidence that Debtor has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program.

(iv)    Each of the Loan Parties agrees that to the extent that its Obligations have not been Paid in Full, (i) its obligations shall not be discharged by any order confirming a Reorganization Plan (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Secured Parties pursuant to the Orders and the Liens granted to the Secured Parties pursuant to the Orders shall not be affected in any manner by any order confirming a Reorganization Plan; *provided* that such Obligations shall be discharged upon such Payment in Full, and such Obligations may be otherwise treated in accordance with an Acceptable Plan and such treatment will provide for the discharge of the Obligations arising hereunder if so provided by such Acceptable Plan.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

40

**3.01    Taxes.**

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any Loan Party hereunder or under any other Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law.  If any applicable Law (as determined in the good faith discretion of the applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 3.01(a)</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    <u>Payment of Other Taxes by the Borrower</u>.  Without duplication of any obligation set forth in subsection (a) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of any Other Taxes.

(c)    <u>Indemnification by the Borrower</u>.  The Loan Parties shall jointly and severally indemnify each Recipient within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient, or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of an applicable Lender, shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.01, the applicable Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    <u>Status of Lenders</u>.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to any payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by applicable Law and from time to time when reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is not a Foreign Lender shall deliver to the Borrower and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable Law or upon the reasonable request of the Borrower or the Administrative Agent), duly completed and executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender, to the extent it is legally entitled to do so, shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior

41

to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of any Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, duly completed and executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    duly completed and executed copies of IRS Form W-8ECI or IRS Form W-8EXP;

(3)    in the case of any Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit M-1 to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" related to a Loan Party as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) duly completed and executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable;

(4)    to the extent any Foreign Lender is not the beneficial owner, duly completed and executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8EXP, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-2 or Exhibit M-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit M-4 on behalf of each such direct and indirect partner;

(C)    in addition, any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), duly completed and executed copies of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States federal withholding Tax duly completed and executed together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or Administrative Agent to determine the withholding or deduction required to be made; provided, that notwithstanding anything to the contrary in this Section 3.01(e); the completion, execution and submission of the documentation described in this subclause 3.01(e)(ii)(C) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender; and

(D)    if a payment made to a Lender under any Loan Document would be subject to Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or Section 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Law and at such time or times as reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such

Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for the purposes of this subclause 3.01(e)(ii)(D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    <u>Treatment of Certain Refunds</u>. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.01 (including by the payment of additional amounts pursuant to this <u>Section 3.01</u>), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (<u>plus</u> any penalties, interest or other charges imposed by the relevant Governmental Authority), in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying or any other Person.

(g)    <u>Survival</u>. Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

**3.02    Illegality**. If any Lender determines that as a result of any Change in Law it becomes unlawful, or that any Governmental Authority asserts that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, or to determine or charge interest rates based upon the Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the applicable interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (a) any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loan to Eurocurrency Rate Loans, shall be suspended and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurocurrency Rate component of the Base Rate, the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate, in each case, until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (i) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or convert all such Eurocurrency Rate Loans of such Lender to Base Rate Loans (the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans and (ii) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurocurrency Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurocurrency Rate component thereof until the Administrative Agent is advised in writing by such Lender, which it shall do as promptly as possible, that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurocurrency Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**3.03    Inability to Determine Rates**

43

(a)    If the Administrative Agent determines that for any reason in connection with any request for a Eurocurrency Rate Loan or a conversion to or continuation thereof that (i) adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or (ii) the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans in the affected currency or currencies shall be suspended and (y) in the event of a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case, until the Administrative Agent (upon the instruction of the Required Lenders, who agree to so instruct the Administrative Agent once the circumstances giving rise to the inability to determine rates no longer exist) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

(b)    If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Section 3.03(a)(i) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Section 3.03(a)(i) have not arisen but the supervisor for the administrator of the Eurocurrency Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Eurocurrency Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the Eurocurrency Rate that (x) gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans of similar type in the United States at such time, and (y) is a rate that the Administrative Agent is able to calculate and administer, and the Borrower and the Administrative Agent shall enter into an amendment to this Agreement to effectuate such alternate rate of interest and such other changes to this Agreement as may be necessary or desirable in connection therewith.  Notwithstanding anything to the contrary in Section 10.01, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five Business Days of the date that notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment. Until an alternate rate of interest shall be determined in accordance with this paragraph (b) (but in the case of the circumstances described in Section 3.03(b)(ii), only to the extent the Eurocurrency Rate is not available or published at such time on a current basis), Sections 3.03(a)(i) and (ii) shall be applicable.

**3.04    Increased Costs; Reserves on Eurocurrency Rate Loans.**

(a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Eurocurrency Rate contemplated by <u>Section 3.04(e)</u>);

(ii)    subject any Recipient to Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurocurrency Rate Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurocurrency Rate Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon written request of such Lender setting forth in reasonable detail such increased costs, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such

additional costs incurred or reduction suffered; provided that before making any such demand, each Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be materially disadvantageous to it, in its reasonable discretion, in any legal, economic or regulatory manner) to designate a different Eurocurrency lending office if the making of such designation would allow the Lender or its Eurocurrency lending office to continue to perform its obligation to make Eurocurrency Rate Loans or to continue to fund or maintain Eurocurrency Rate Loans and avoid the need for, or reduce the amount of, such increased cost.

(b)    _Capital Requirements_.  If any Lender reasonably determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time, after submission to the Borrower (with a copy to the Administrative Agent) of a written request therefor setting forth in reasonable detail the change and the calculation of such reduced rate of return, the Borrower will pay to such Lender, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    _Certificates for Reimbursement_.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section, describing the basis therefor and showing the calculation thereof in reasonable detail, and delivered to the Borrower shall be conclusive, absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)    _Delay in Requests_.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than 90 days prior to the date that such Lender, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 90-day period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    _Additional Reserve Requirements_.  The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "_Eurocurrency liabilities_"), additional interest on the unpaid principal amount of each Eurocurrency Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as reasonably determined by such Lender in good faith, which determination shall be conclusive, absent manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Eurocurrency Rate Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive, absent manifest error), which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least 10 Business Days' prior notice (with a copy to the Administrative Agent) of such additional interest or costs from such Lender describing the basis therefor and showing the calculation thereof, in each case, in reasonable detail.  If a Lender fails to give notice 10 Business Days prior to the relevant Interest Payment Date, such additional interest or costs shall be due and payable within 30 days from receipt of such notice.

(f)    _Certain Rules Relating to the Payment of Additional Amounts_.  If any Lender requests compensation pursuant to this _Section 3.04_, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to _Section 3.01_, or if any Lender gives a notice pursuant to _Section 3.02_, such Lender shall either (A) forego payment of such additional amount from the Borrower or (B) reasonably afford the Borrower the opportunity to contest, and reasonably cooperate with the Borrower in

45

contesting, the imposition of any Indemnified Taxes or other amounts giving rise to such payment; provided that the Borrower shall reimburse such Lender for its reasonable and documented out-of-pocket costs, including reasonable and documented attorneys' and accountants' fees and disbursements incurred in so cooperating with the Borrower in contesting the imposition of such Indemnified Taxes or other amounts.

3.05    **Compensation for Losses**.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower;

(c)    [reserved]; or

(d)    any assignment of a Eurocurrency Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 10.13;

including any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan, from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract, but excluding any loss of anticipated profits.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate used in determining the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the offshore interbank market for such currency for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

3.06    **Mitigation Obligations; Replacement of Lenders.**

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall (i) use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (A) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (B) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, as applicable, and (ii) promptly inform the Borrower and the Administrative Agent when the circumstances giving rise to the applicability of such Sections no longer exists. The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 3.04, if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, if any Lender gives a notice pursuant to Section 3.02 or if any Lender is at such time a Defaulting Lender, then the Borrower may replace such Lender in accordance with Section 10.13.

3.07    **Survival**.  The parties' obligations under this Article III shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments,

the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

## ARTICLE IV
## CONDITIONS PRECEDENT

**4.01    Conditions Precedent to the Closing Date**.  The effectiveness of this Agreement is subject to satisfaction of the following conditions precedent:

(a)    Petition Date. The Petition Date shall have occurred and the Borrower and each Guarantor shall be a debtor and debtor-in-possession in the Chapter 11 Cases.

(b)    Loan Documents. The Administrative Agent shall have received each Loan Document required to be delivered on the Closing Date, each of which shall be in form and substance reasonably acceptable to the Required Lenders, including:

(i)    this Agreement, executed and delivered by the Administrative Agent, the Borrower, each Guarantor and each Person that is a Lender as of the Closing Date;

(ii)    [reserved];

(iii)    the Agency Fee Letter, executed and delivered by the Agents and the Borrower;

(iv)    [reserved];

(v)    Notes, executed and delivered by the Borrower in favor of each Lender requesting any Note;

(vi)    a certificate of each Loan Party signed on behalf of such Loan Party by a Responsible Officer, dated the Closing Date (the statements made in which certificate shall be true on and as of the Closing Date), certifying as to (A) the Organizational Documents of each Loan Party, certified, to the extent applicable, by the applicable Governmental Authority, and the absence of any amendments to the Organizational Documents of such Loan Party since the date certified by such Governmental Authority, including a true and correct copy of the bylaws, limited liability company agreement, or partnership agreement of such Loan Party as in effect on the date on which the resolutions referred to in Section 4.01(b)(vi)(B) were adopted and on the Closing Date, (B) copies of resolutions of the board of directors and/or similar governing bodies of each Loan Party approving and authorizing the Transactions and the execution, delivery and performance of the Loan Documents to which it is a party, (C) the good standing or valid existence of such Loan Party as a corporation, limited liability company or partnership organized or formed under the laws of the jurisdiction of its incorporation or formation and the absence of any proceeding for the dissolution or liquidation of such Loan Party; and (D) the signatures and incumbency of each Responsible Officer of each Loan Party executing the Loan Documents to which it is a party; and

(vii)    a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.01 and 4.02 have been satisfied, and (B) that there has not occurred since December 31, 2018, any Material Adverse Effect.

(c)    Personal Property Collateral. Each Loan Party shall have delivered to the Collateral Agent:

(i)    evidence reasonably satisfactory to the Collateral Agent of the compliance by each Loan Party of their obligations under the Security Documents (including their obligations to execute or authorize, as applicable, and deliver UCC financing statements (including, without limitation, as-extracted financing statements), originals of securities, instruments and chattel paper, in each case, constituting Collateral, as provided therein);

(ii)    a completed Collateral Questionnaire dated the Closing Date and executed by a Responsible Officer of each Loan Party, together with all attachments contemplated thereby;

(iii)　　[reserved]; and

(iv)　　evidence that each Loan Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument (including any intercompany notes evidencing Indebtedness permitted to be incurred pursuant to Section 7.03) and made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by the Collateral Agent or the Required Lenders.

(d)　　Approvals; No Restrictions. All governmental and third party approvals necessary or required in connection with the Transactions and the continuing operations of the Borrower and its Subsidiaries (including shareholder approvals, if any) shall have been obtained and be in full force and effect. The Loan Parties and their Affiliates shall not be subject to contractual or other restrictions that would be violated by the execution and delivery of the Loan Documents or the initial extension of credit hereunder and there shall not exist any action, suit, investigation, litigation, proceeding or hearing, pending or threatened in any court or before any arbitrator or Governmental Authority that affects the Transactions or otherwise impairs the ability of the Loan Parties to consummate the Transactions and no preliminary or permanent injunction or order by a state or federal court shall have been entered, in each case that would be material and adverse to the Agents or the Lenders.

(e)　　Fees; Expenses. Any fees required to be paid on or before the Closing Date to the Agents and/or the Lenders under this Agreement, the Agency Fee Letter, or otherwise in connection with the Facilities shall have been paid and, unless waived by the Agents and/or the Lenders, as applicable, the Borrower shall have paid all reasonable and documented costs and expenses of the Agents and the Lenders (including the reasonable and documented fees and expenses of (i) Akin Gump Strauss Hauer & Feld LLP, Milbank LLP, and Bryan Cave Leighton Paisner LLP, counsel to the Lenders, (ii) Lazard and Perella Weinberg Partners L.P., financial advisors to the Lenders, and (iii) Ropes & Gray LLP, counsel to the Agents).

(f)　　No Material Adverse Effect. Since December 31 2018, no Material Adverse Effect (after giving effect to the qualifications set forth in such definition) shall have occurred.

(g)　　Budget and Cash Flow Forecast. The Administrative Agent shall have received (x) weekly operating and cash flow projections for the Debtors for the period commencing on the Petition Date and ending on July 11, 2020, in form and substance satisfactory to the Financial Advisor (the "DIP Budget"), and (y) the Cash Flow Forecast; provided that such Cash Flow Forecast may be amended, replaced, supplemented or otherwise modified from time to time to the extent such amended, replaced, supplemented or modified Cash Flow Forecast is in form and substance satisfactory to the Required Lenders in their sole discretion.

(h)　　Existing Indebtedness. Borrower and its Subsidiaries shall have no outstanding Indebtedness other than Indebtedness permitted under this Agreement.

(i)　　Financial Statements. Administrative Agent shall have received from Borrower (i) the Historical Financial Statements, (ii) a pro forma consolidated balance sheet of Borrower and its Subsidiaries on a consolidated basis as of the last day of the most recently completely four-fiscal quarter period for which financial statements were delivered under clause (i) of the definition of the term "Historical Financial Statements", reflecting the related financings and the other transactions contemplated by the Loan Documents to occur on or prior to the Closing Date as if such transactions occurred as of such date.

(j)　　Interim Order. No later than five (5) days following the Petition Date (or such later date as the Required Lenders may agree), the Interim Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Required Lenders and the Administrative Agent shall have received a certified copy thereof; provided that the Interim Order shall not have been vacated, reversed, modified, amended or stayed in any respect without the prior written consent of the Required Lenders.

(k)　　First Day Orders. All "first day" orders intended to be entered by the Bankruptcy Court at or immediately after the Debtors' "first day" shall have been entered by the Bankruptcy Court in form and substance acceptable to the Required Lenders.

(l)      Patriot Act. The Lenders and the Administrative Agent shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act (which shall include, but not be limited to, a duly executed IRS Form W-9, or other applicable tax form); provided that such information is requested at least 3 Business Days prior to the Closing Date.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01 or Section 4.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender specifying its objection thereto.

**4.02     Conditions Precedent to Each Term Loan**.  The agreement of each Lender to make any extension of credit requested to be made by it on any date (including, without limitation, any Loans on the Closing Date) is subject to satisfaction of the following conditions precedent:

(a)      No Default. There shall exist no Default or Event of Default under the Loan Documents.

(b)      Representations and Warranties. The representations and warranties of the Borrower and each Guarantor herein and in the other Loan Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding of the applicable Loans to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case, such representations and warranties shall have been true and correct in all materials respects on and as of such earlier date; provided that in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof. .

(c)      Interim Order.  At any time prior to the Final Order Entry Date, the Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the prior written consent of the Required Lenders.

(d)      Final Order. With respect to any Credit Extension on or after the Final Order Entry Date, the Final Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders.

(e)      Restructuring Support Agreement.  The Restructuring Support Agreement (i) shall be in full force and effect, (ii) shall not have been amended or modified without the prior written consent of the Required Lenders, and (iii) no breach that would, after the expiration of any applicable notice or cure period, give rise to a right to terminate the Restructuring Support Agreement shall exist.

(f)      Notice of Borrowing. The Administrative Agent shall have received a duly executed Borrowing Notice from the Borrower pursuant to and in accordance with Section 2.02(a).

(g)      No Trustee.  No trustee, receiver or examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties shall have been appointed or designated.

(h)      Dismissal; Conversion. None of the Chapter 11 Cases of any Debtors shall have been dismissed. The Chapter 11 Cases shall not have been converted to Chapter 7 of the Bankruptcy Code.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

In order to induce the Agents and the Lenders to enter into this Agreement and to make each Credit Extension to be made hereby, each Loan Party represents and warrants to the Agents and the Lenders that the following statements are true and correct:

**5.01** **Existence, Qualification and Power**.  Each Loan Party and its Subsidiaries (a) (i) is duly organized or formed and validly existing and (ii) is in good standing under the Laws of the jurisdiction of its incorporation or organization, if such legal concept is applicable in such jurisdiction, (b) subject to any restriction arising on account of Borrower's or each of its Subsidiaries' status as a "debtor" under the Bankruptcy Code, has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) subject to entry of the Orders and the terms thereof, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified, licensed, and in good standing (to the extent good standing is an applicable legal concept in the relevant jurisdiction), under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; where the failure to so qualify or be in good standing could not reasonably be expected to have a Material Adverse Effect.

**5.02** **Authorization; No Contravention**.  Subject to entry of the Orders and the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, (a) have been duly authorized by all necessary corporate or other organizational action and (b) do not and will not (i) contravene the terms of any of such Person's Organizational Documents; (ii) except to the extent excused as a result of the Chapter 11 Cases, conflict with or result in any breach or contravention of, or the creation of, any Lien (other than Permitted Liens) under, or require any payment to be made under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority to which such Person or its property is subject or (C) any arbitral award to which such Person or its property is subject; or (iii) violate any Law binding on such Loan Party, except in each case referred to in clauses (b)(ii) or (b)(iii) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.03** **Governmental Authorization**.  Except for the entry of the Orders, (a) no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority and (b) no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with any other Person, in each case, is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for those approvals, consents, exemptions, authorizations or other actions which have already been obtained, taken, given or made and are in full force and effect.

**5.04** **Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the Orders and the terms thereof, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other Laws relating to or affecting creditors' rights generally, general principles of equity, regardless of whether considered in a proceeding in equity or at law and an implied covenant of good faith and fair dealing.

**5.05** **Financial Conditions; No Material Adverse Effect**.

(a)    The Historical Financial Statements were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of such dates and their results of operations for the period covered thereby, subject, in the case of any unaudited financial statements, to the absence of footnotes and to normal year end adjustments.

(b)    Since December 31, 2018, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect (after giving effect to the qualifications set forth in such definition).

(c)    The financial projections and estimates and information of a general economic nature prepared, or as directed by, the Loan Parties or any of their representatives and that have been made available to any Lender or its Related Parties in connection with the Transactions or the other transactions contemplated by this Agreement as of

the date delivered in connection with this Agreement have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable in light of the conditions existing at the time of delivery of such forecasts (it being understood that any such information is subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurance can be given that the future developments addressed in such information can be realized).

        **5.06**     **Litigation.**

        (a)     There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower threatened, at law, in equity, by or before any Governmental Authority, by or against the Borrower or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) except as specifically disclosed in public filings prior to the date hereof, as to which there is a reasonable possibility of an adverse determination and that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

        (b)     None of Borrower or any of its Subsidiaries or their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any currently applicable Law (including any zoning, building or environmental law, mine safety law, ordinance, code or approval or any building permit) or any restriction of record or agreement affecting any Mortgaged Property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

        **5.07**     **No Default**.  .  Other than as a result of the commencement of the Chapter 11 Cases and the effects thereof, none of the Borrower or any of its Subsidiaries is in default under or with respect to any Contractual Obligation that could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the Transactions or any other transactions contemplated by this Agreement or any other Loan Document.

        **5.08**     **Ownership and Identification of Property.**

        (a)     The Borrower and its Subsidiaries have good record and marketable title in fee simple to, or valid leasehold interests in, all Real Property necessary or used in the ordinary conduct of its business, except for minor defects in title as could not reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, with respect to all real property listed on Schedule 5.08(c): (i) the Borrower and its Subsidiaries possess all leasehold interests necessary for the operation of the Mines currently being operated by each of them and included or purported to be included in the Collateral pursuant to the Security Documents, except where the failure to possess such leasehold interests could not reasonably be expected to have a Material Adverse Effect, (ii) each of their respective rights under the leases, contracts, rights-of-way and easements necessary for the operation of such Mines are in full force and effect, except to the extent that failure to maintain such leases, contracts, rights of way and easements in full force and effect could not reasonably be expected to have a Material Adverse Effect; and (iii) each of the Borrower and its Subsidiaries possesses all licenses, permits or franchises which are necessary to carry out its business as presently conducted at any Mine included or purported to be included in the Collateral pursuant to the Security Documents, except where failure to possess such licenses, permits or franchises could not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

        (b)     Schedule 5.08(b) lists completely and correctly as of the Closing Date all Material Real Property fee owned by the Borrower and the other Loan Parties.

        (c)     Schedule 5.08(c) lists completely and correctly as of the Closing Date all Leasehold Properties constituting Material Real Property leased by the Borrower and the other Loan Parties and the lessors thereof.

        (d)     Except as could not be expected to have a Material Adverse Effect, there are no pending or, to the knowledge of any Loan Party, proposed special or other assessments for public improvements or otherwise affecting any material portion of any owned Real Property of the Loan parties, nor are there contemplated improvements to such owned Real Property of the Loan Parties that may result in such special or other assessments.

**5.09    Environmental Compliance**.  Except as disclosed on Schedule 5.09, or as otherwise could not reasonably be expected to have a Material Adverse Effect:

(a)    The facilities and properties currently or formerly owned, leased or operated by the Borrower, or any of its respective Subsidiaries (the "Properties") do not contain any Hazardous Materials in amounts or concentrations which (i) constitute a violation of, or (ii) could reasonably be expected to give rise to liability under, any applicable Environmental Law.

(b)    None of the Borrower, nor any of its respective Subsidiaries has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding compliance with or liability under Environmental Laws with regard to any of the Properties or the business operated by the Borrower, or any of its Subsidiaries (the "Business"), or any prior business for which the Borrower has retained liability under any Environmental Law.

(c)    Hazardous Materials have not been transported or disposed of from the Properties in violation of, or in a manner or to a location which could reasonably be expected to give rise to liability under, any applicable Environmental Law, nor have any Hazardous Materials been generated, treated, stored or disposed of at, or under any of the Properties in violation of, or in a manner that could reasonably be expected to give rise to liability under, any applicable Environmental Law.

(d)    No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened under any Environmental Law to which the Borrower, or any of its Subsidiaries is or, to the knowledge of the Borrower, will be named as a party or with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other similar administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business.

(e)    There has been no release or threat of release of Hazardous Materials at or from the Properties, or arising from or related to the operations of the Borrower, or any of its Subsidiaries in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that could reasonably be expected to give rise to liability under any applicable Environmental Laws.

(f)    The Properties and all operations at the Properties are in compliance with all applicable Environmental Laws.

(g)    The Borrower and each of its Subsidiaries has obtained, and is in compliance with, all Environmental Permits required for the conduct of its businesses and operations, and the ownership, occupation, operation and use of its Property, and all such Environmental Permits are in full force and effect.

**5.10    Insurance.**

(a)    The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies which may be Affiliates of the Borrower, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates.

(b)    As to any Building located on Material Real Property and constituting Collateral, all flood hazard insurance policies required hereunder have been obtained and remain in full force and effect, and the premiums thereon have been paid in full.

**5.11    Taxes**.  The Borrower and its Subsidiaries have filed or caused to be filed all applicable U.S. federal, state, foreign and other material Tax returns and reports required to be filed, and have paid or caused to be paid all U.S. federal, state, foreign and other Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, in each case, except as otherwise permitted

52

under Section 6.04. No Tax Lien has been filed which would not be permitted under Section 7.01 and, to the knowledge of the Borrower, no claim is being asserted, with respect to any Tax, fee or other charge which could reasonably be expected to result in a Material Adverse Effect. As of the Closing Date, neither Borrower nor any Subsidiary thereof is party to any tax sharing agreement.

5.12    **ERISA Compliance**. Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:

(a)    Each Plan is in material compliance in all respects with the applicable provisions of ERISA, the Code and other Federal or state Laws (except that with respect to any Multiemployer Plan which is a Plan, such representation is deemed made only to the knowledge of the Borrower), and each Foreign Plan is in material compliance in all respects with the applicable provisions of Laws applicable to such Foreign Plan.

(b)    There has been no nonexempt "prohibited transaction" (as defined in Section 406 of ERISA) or violation of the fiduciary responsibility rules with respect to any Plan.

(c)    (i) As of the Closing Date, no ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; and (iii) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

5.13    **Subsidiaries**. As of the Closing Date, the Borrower has no Subsidiaries other than those specifically disclosed in Schedule 5.13.

5.14    **Margin Regulations; Investment Company Act.**

(a)    The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)    None of the Borrower, any Person Controlling the Borrower, nor any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.15    **Disclosure**. No report, financial statement, certificate or other information furnished in writing by any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document, taken as whole with any other information furnished or publicly available, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading as of the date when made or delivered; provided that, with respect to any forecast, projection or other statement regarding future performance, future financial results or other future developments, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of delivery of such information (it being understood that any such information is subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurance can be given that the future developments addressed in such information can be realized).

5.16    **Compliance with Laws**. Each of Holdings and its Subsidiaries is in compliance in all material respects with the requirements of all Laws (including any zoning, building, ordinance, code or approval or any building or mining permits and all orders, writs, injunctions and decrees applicable to it or to its properties), except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

5.17    **Anti-Corruption; Sanctions; Terrorism Laws.**

(a)    None of the Borrower, any Subsidiary nor, to the knowledge of the Borrower, any director, officer, agent, employee or Affiliate of the Borrower or any Subsidiary is (i) a person on the list of "Specially Designated

53

Nationals and Blocked Persons" or (ii) subject of any active sanctions administered or enforced by the U.S. Department of State or the U.S. Department of Treasury (including the Office of Foreign Assets Control) or any other applicable Governmental Authority (collectively, "Sanctions", and the associated laws, rules, regulations and orders, collectively, "Sanctions Laws"); and the Borrower will not directly or, to the knowledge of the Borrower, indirectly use the proceeds of the Loans for the purpose of financing the activities of any Person that is the subject of, or in any country or territory that at such time is the subject of, any Sanctions.

(b)       The Borrower and each Subsidiary is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the USA PATRIOT Act (Title III of Pub. L. 107-56), as amended (the "PATRIOT Act"), (iii) Sanctions Laws and (iv) Anti-Corruption Laws.

(c)       No part of the proceeds of any Loan will be used, directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "Anti-Corruption Laws").

**5.18    Intellectual Property; Licenses, Etc**.  The Borrower and its Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, except where the failure to own or possess the right to use such IP Rights could not reasonably be expected to have a Material Adverse Effect.  To the best knowledge of the Borrower, the use of such IP Rights by the Borrower or any Subsidiary does not infringe upon any rights held by any other Person except for any infringement that could not reasonably be expected to have a Material Adverse Effect.  Except as specifically disclosed in Schedule 5.18, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which could reasonably be expected to have a Material Adverse Effect.

**5.19    Security Interest in Collateral**.  Subject to the entry of the Order and the terms thereof, the provisions of the Orders, this Agreement and the other Loan Documents create legal and valid Liens on all Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, and upon entry of the Orders, such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable (except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law)) against the applicable Loan Party and all third parties, and having priority with respect to other Liens on the Collateral as contemplated by the Orders.

**5.20    Mines**.  Schedule 5.20 sets forth a complete and accurate list of all Mines (including addresses and the owner thereof) owned or operated by the Borrower or any of its Subsidiaries as of the Closing Date and included or purported to be included in the Collateral.

**5.21    [Reserved].**

**5.22    Labor Relations**.  Neither the Borrower nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against the Borrower or any of its Subsidiaries, or to the best knowledge of the Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against the Borrower or any of its Subsidiaries or to the best knowledge of the Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving the Borrower or any of its Subsidiaries, and (c) to the best knowledge of the Borrower, no union representation question existing with respect to the employees of the Borrower or any of its Subsidiaries and, to the best knowledge of the Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

**5.23    Bankruptcy Related Matters.**

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (provided that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled).

(b)    After the entry of the Interim Order, and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral subject, as to priority, to the extent set forth in the Interim Order or the Final Order, and in any case, (i) subject to Permitted Liens and (ii) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (collectively, "Avoidance Actions") (but including, upon entry of the Final Order, the proceeds thereof).

(d)    The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order, as the case may be), is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or without the Required Lenders' (and with respect to any provision that affects the rights or duties of any Agent, such Agent's) consent, modified or amended.  The Loan Parties are in compliance in all material respects with the Orders.

(e)    The DIP Budget, the Cash Flow Forecast, and all other projected consolidated balance sheets, income statements and cash flow statements of Borrower and its Subsidiaries delivered to the Administrative Agent were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by the Borrower to be fair in light of the conditions existing at the time of delivery of such report or projections (it being understood that any projections or estimates made in the items described in this subsection (e) are not to be viewed as facts and are subject to significant uncertainties and contingencies, that no assurance can be given that any such projections or estimates will be realized, that actual results may differ from projected results and such differences may be material).

## ARTICLE VI
## AFFIRMATIVE COVENANTS

Until Payment in Full of all Obligations, the Borrower shall, and shall cause each of its Subsidiaries to:

**6.01    Financial Statements**.  Deliver to the Administrative Agent and each Lender, in form and detail reasonably satisfactory to the Financial Advisor (which shall be entitled to deliver such information to the Lenders in its sole discretion):

(a)    Annual Financial Statements. Within 90 days after the end of each fiscal year of the Borrower (commencing with the fiscal year in which the Closing Date occurs) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail (together with a Narrative Report), and prepared in accordance with GAAP; such consolidated statements shall be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall be

prepared in accordance with generally accepted auditing standards and which may contain a "going concern" qualification.

(b)        Quarterly Financial Statements. Within 45 days after the end of each fiscal quarter of each fiscal year of the Borrower (commencing with the fiscal quarter ended March 31, 2020), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail (together with a Narrative Report) and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, changes in shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

(c)        Monthly Financial Statements. (i) Within 30 days after the end of each month (commencing with the month ending March 31, 2020), the Monthly Consolidated Financial Report, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition as at the dates indicated and the results of their operations and their cash flows for the periods indicated, and (ii) within 30 days after the end of each month (commencing with the month ending March 31, 2020), the Monthly Mine-Level Financial Report, certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial information reported therein.

(d)        Cash Flow Forecast.  No later than 12:00 p.m. on the Thursday following the end of every fourth calendar week, commencing with the Thursday of the fourth calendar week following the week in which the Petition Date occurs, a Cash Flow Forecast, substantially in the form of the initial Cash Flow Forecast provided pursuant to Section 4.01(g) or as otherwise reasonably satisfactory to the Financial Advisor.

(e)        Budget Variance Report.  No later than 7:00 p.m. on Thursday of each week after each Reporting Period (commencing with the Thursday of the first full week following the Petition Date), a Budget Variance Report for the immediately preceding Reporting Period. Each such report shall be certified by a Responsible Officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

(f)        Critical Vendor Report.  No later than 7:00 p.m. on the Thursday of every other week (commencing with the Thursday of the first full week following the Petition Date), a Critical Vendor Report.  Each such report shall be certified by a Responsible Officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

**6.02    Certificates; Other Information**.  Deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Financial Advisor:

(a)        concurrently with the delivery of the financial statements referred to in Section 6.01(a) and (b) (commencing with the delivery of the financial statements for the first full fiscal quarter ending March 31, 2019), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(b)        promptly after the same are available, copies of each annual report, proxy or financial statement or other report sent to the holders of Equity Interests in Holdings or Borrower, and copies of all annual, regular, periodic and special reports and registration statements which Holdings or Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act, and not otherwise required to be delivered to the Administrative Agent pursuant hereto; and

(c)        promptly, such additional information regarding the business, financial or corporate affairs of Holdings, the Borrower or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender (through the Administrative Agent) may from time to time reasonably request that is reasonably available without undue cost or burden.

Documents required to be delivered pursuant to Section 6.01(a) or 6.01(b) or Section 6.02(b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which Holdings or the Borrower posts such documents, or provides a link thereto on Holdings' or the Borrower's website on the Internet at the website address listed on Schedule 10.02; (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); or (iii) on which such documents are filed for public availability on the SEC's Electronic Data Gathering and Retrieval system.

In the event that Holdings or any Parent reports on a consolidated basis, such consolidated reporting at Holdings or such Parent's level in a manner consistent with that described in clauses 6.01(a) and 6.01(b) of this Section 6.01 for the Borrower will satisfy the requirements of such clauses.

The Borrower hereby acknowledges that (a) the Administrative Agent may make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender").  The Borrower hereby agrees that (a) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (b) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat the Borrower Materials as not containing any material non- public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent the Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); and (c) all Borrower Materials marked "PUBLIC" or not marked as containing material non-public information are permitted to be made available through a portion of the Platform designated "Public Investor." Notwithstanding the foregoing, the Borrower shall not be under any obligation to mark the Borrower Materials "PUBLIC" or as containing material non-public information; provided, however, that the following Borrower Materials shall be deemed to be marked "PUBLIC" unless the Borrower notifies the Administrative Agent prior to posting that any such document contains material non-public information: (1) the Loan Documents, and (2) any notification of changes in the terms of the Facilities. The Borrower acknowledges and agrees that the list of Disqualified Institutions does not constitute non-public information and shall be posted to all Lenders by the Administrative Agent.   In connection with the foregoing, each party hereto acknowledges and agrees that the foregoing provisions are not in derogation of their confidentiality obligations under Section 10.07.

6.03    **Notices**.  Notify the Administrative Agent:

(a)    Promptly upon any Responsible Officer of the Borrower obtaining knowledge thereof, of the occurrence of any Default or Event of Default hereunder;

(b)    Promptly upon any Responsible Officer of the Borrower obtaining knowledge thereof, of any event which could reasonably be expected to have a Material Adverse Effect;

(c)    of the occurrence of any ERISA Event that, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect, promptly and in any event within 30 days after any Responsible Officer of the Borrower knows or has obtained notice thereof;

(d)    within 15 days of the Borrower or any Guarantor changing its legal name, jurisdiction of organization or the location of its chief executive office or sole place of business; and

(e)    promptly, as to any Building located on Material Real Property and constituting Collateral, of any redesignation of any such property on which such Building is located into or out of a special flood hazard area.

Each notice pursuant to Sections 6.03(a)-(c) shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

**6.04**      **Payment of Tax Obligations**.  Subject to the Bankruptcy Code, the terms of the applicable Orders and any required approval by the Bankruptcy Court, except where failure to do so could not reasonably be expected to result in a Material Adverse Effect, with respect to the Borrower and each of its Subsidiaries, pay and discharge all Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary.

**6.05**      **Preservation of Existence, Etc.; Activities of Foresight Energy Finance Corporation**.  Subject to the Bankruptcy Code, the terms of the applicable Orders and any required approval by the Bankruptcy Court,

(a)      Preserve, renew and maintain in full force and effect its legal existence except in a transaction permitted by Section 7.04.

(b)      With respect to Foresight Energy Finance Corporation, a Delaware corporation, cause such Subsidiary not to hold any material assets and not engage in any material business or activity other than maintaining its corporate existence.

**6.06**      **Maintenance of Properties.**

(a)      Maintain, preserve and protect all of its material properties and material equipment, including Collateral, necessary in the operation of its business in good working order and condition (ordinary wear and tear and damage by fire or other casualty or taking by condemnation excepted), except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)      Keep in full force and effect all of its material leases and other material contract rights, and all material rights of way, easements and privileges necessary or appropriate for the proper operation of the Mines being operated by the Borrower or a Subsidiary and included or purported to be included in the Collateral by the Security Documents, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07**      **Maintenance of Insurance.**

(a)      Maintain with financially sound and reputable insurance companies which may be Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)      With respect to any Building located on Material Real Property and constituting Collateral, the Borrower shall and shall cause each appropriate Loan Party to (i) maintain fully paid flood hazard insurance on any such Building that is located in a special flood hazard area, on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 and (ii) furnish to the Collateral Agent an insurance certificate evidencing the renewal (and payment of renewal premiums therefor) of all such policies prior to the expiration or lapse thereof (or at such other time acceptable to the Collateral Agent).  The Borrower shall cooperate with the Collateral Agent's reasonable request for any information reasonably required by the Collateral Agent to comply with The National Flood Insurance Reform Act of 1994, as amended.

**6.08**      **Compliance with Laws**.  Except as otherwise excused by the Bankruptcy Code, comply in all respects with the requirements of all Laws (including the PATRIOT Act, Sanctions Laws, the Anti-Corruption Laws and Environmental Laws) and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (or, in the case of compliance with the PATRIOT Act, Sanctions Laws and the Anti-Corruption Laws, the failure to comply therewith is not material).

**6.09     Books and Records**.  (a) Maintain proper books of record and account, in which in all material respects full, true and correct entries in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all material requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Subsidiary, as the case may be.

**6.10     Inspection Rights**.  Permit representatives and independent contractors of the Administrative Agent and each Lender (provided that, subject to no Event of Default having occurred or be continuing, such Lender to be accompanied by the Administrative Agent) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom (except to the extent (a) any such access is restricted by a Requirement of Law or (b) any such agreements, contracts or the like are subject to a written confidentiality agreement with a non-Affiliate that prohibits the Borrower or any of its Subsidiaries from granting such access to the Administrative Agent or the Lenders; provided that, with respect to such confidentiality restrictions affecting the Borrower or any of its Subsidiaries, a Responsible Officer is made available to the Administrative Agent and such Lender (provided that, subject to no Event of Default having occurred or be continuing, such Lender to be accompanied by the Administrative Agent) to discuss such confidential information to the extent permitted), and to discuss the business, finances and accounts with its officers and independent public accountants at such reasonable times during normal business hours and as often as may be reasonably desired, provided that the Administrative Agent or such Lender shall give the Borrower reasonable advance notice prior to any contact with such accountants and give the Borrower the opportunity to participate in such discussions, provided further that the costs of one such visit per calendar year (or an unlimited amount if an Event of Default has occurred and is continuing) for the Administrative Agent, the Lenders and their representatives as a group shall be the responsibility of the Borrower. In no event shall the Administrative Agent be required to bear any cost or expense hereunder.

**6.11     Use of Proceeds**.  The proceeds of the Loans shall be used in accordance with the terms of the Cash Flow Forecast (subject to Permitted Variances), including to (i) pay for the fees, costs and expenses incurred in connection with the Transactions and the Chapter 11 Cases and (ii) to fund working capital of the Loan Parties (including, without limitation, payments of fees and expenses to professionals under Section 328 and 331 of the Bankruptcy Code and administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code incurred in the ordinary course of business of the Loan Parties or otherwise approved by the Bankruptcy Court (and not otherwise prohibited under this Agreement)).

**6.12     Additional Guarantors**.  Within 10 days (or such longer period as the Administrative Agent may agree in its sole discretion) of a Person becoming a Subsidiary that is required to be a Guarantor by virtue of the definition of a Guarantor, the Borrower shall cause any such Subsidiary to become a Guarantor by executing and delivering to the Administrative Agent a counterpart of the Guaranty or such other documents as the Administrative Agent shall deem appropriate for such purpose.

**6.13     [Reserved].**

**6.14     Preparation of Environmental Reports**.  If an Event of Default caused by reason of a breach under Sections 6.08 or 5.09 with respect to compliance with Environmental Laws shall have occurred and be continuing, at the reasonable request of the Required Lenders through the Administrative Agent, provide, in the case of the Borrower, to the Lenders within 60 days after such request, at the expense of the Borrower, an environmental or mining site assessment or audit report for the Properties which are the subject of such breach prepared by an environmental or mining consulting firm reasonably acceptable to the Required Lenders and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or remedial action in connection with such Properties and the estimated cost of curing any violation or non-compliance of any Environmental Law.

**6.15     Certain Long Term Liabilities and Environmental Reserves**.  To the extent required by GAAP, maintain adequate reserves for (a) future costs associated with any lung disease claim alleging pneumoconiosis or silicosis or arising out of exposure or alleged exposure to coal dust or the coal mining environment, (b) future costs associated with retiree and health care benefits, (c) future costs associated with reclamation of disturbed acreage, removal of facilities and other closing costs in connection with closing its mining operations and (d) future costs associated with other potential environmental liabilities.

59

**6.16**    **Covenant to Give Security.**

(a)    <u>Personal Property including IP of New Guarantors</u>.  Concurrently with any Subsidiary becoming a Guarantor pursuant to <u>Section 6.12</u> (or a later date to which the Collateral Agent agrees), any property of such Subsidiary constituting Collateral shall automatically become subject to the Lien securing the Obligations pursuant to the Orders, and the Borrower shall, or cause such Subsidiary to, deliver any Security Document as the Collateral Agent or the Required Lenders may request, including the delivery of stock certificates, if any, representing the Capital Stock of such Subsidiary accompanied by undated stock powers or instruments of transfer executed in blank.

(b)    <u>Real Property of New Guarantors</u>.

(i)    <u>New Real Property Identification</u>.  With respect to any Subsidiary becoming a Guarantor pursuant to <u>Section 6.12</u>, concurrently with such Subsidiary becoming a Guarantor (or a later date to which the Collateral Agent agrees), furnish to the Collateral Agent a description of all Material Real Property fee owned or leased by such Subsidiary.

(ii)    <u>Real Property</u>.  With respect to any Subsidiary becoming a Guarantor pursuant to <u>Section 6.12</u>, any Real Property of such Subsidiary shall automatically become subject to the Lien securing the Obligations as provided in Section 2.19, and Section 2.19(b)(iii) shall apply to such Real Property.  In addition to the foregoing, Borrower shall, at the reasonable request of the Collateral Agent or the Required Lenders, deliver to the Collateral Agent such appraisals as are required by law or regulation of Real Property with respect to which Collateral Agent has been granted a Lien, evidence of the filing of as-extracted UCC-1 financing statements in the appropriate jurisdiction, and such other instruments in connection therewith as the Collateral Agent or the Required Lenders shall reasonably require.

(iii)    <u>Consents Related to Leaseholds Concerning Material Real Property</u>.  With respect to any leasehold interest of any Subsidiary becoming a Guarantor pursuant to <u>Section 6.12</u> that would constitute Material Real Property but for the need to obtain the consent of another Person (other than the Borrower or any Controlled Subsidiary) in order to grant a security interest therein, upon the request of Collateral Agent or the Required Lenders, the Borrower and its Subsidiaries shall use commercially reasonable efforts to obtain such consent for the 120 day period commencing after such entity becomes a Guarantor, provided that there shall be no requirement to pay any sums to the applicable lessor other than customary legal fees and administrative expenses (it is understood, for avoidance of doubt, that, without limiting the foregoing obligations of the Borrower set forth in this <u>Section 6.16(b)(iii)</u>, any failure to grant a security interest in any such leasehold interest as a result of a failure to obtain a consent shall not be a Default hereunder, and, for avoidance of doubt, the Borrower and its Subsidiaries shall no longer be required to use commercially reasonable efforts to obtain any such consent after such above-mentioned time period to obtain a consent has elapsed).

(c)    <u>Personal Property (including IP) Acquired by Borrower or Guarantors</u>.  If requested by the Collateral Agent or the Required Lenders, the Borrower shall, or shall cause any Subsidiary, (i) to the extent that any Capital Stock in, or owned by, a Loan Party constitutes Collateral, promptly deliver stock certificates, if any, representing such Capital Stock accompanied by undated stock powers or instruments of transfer executed in blank to the Collateral Agent and/or execute and deliver to the Collateral Agent any Security Document as any Agent or the Required Lenders may request to pledge any such Capital Stock and (ii) to the extent that any intellectual property owned by a Loan Party constitutes Collateral, promptly deliver any Security Document or supplements thereto as may be requested by the Collateral Agent or the Required Lenders.

(d)    <u>Real Property Acquired by Borrower and Guarantors</u>.

(i)    <u>New Real Property Identification</u>.  Within 10 days (or such longer period as the Collateral Agent may agree in its sole discretion) of any acquisition of a new Real Property by any Loan Party, such Loan Party shall notify the Collateral Agent of the acquisition of any such Real Property (fee owned or leased by such Loan Party).

(ii)    <u>Real Property</u>.  Any Real Property acquired by the Borrower or any Guarantor shall automatically become subject to the Lien as *provided* in Section 2.19, and Section 2.19(b)(iii) shall apply to such Real

Property. In addition to the foregoing, Borrower shall, at the reasonable request of the Collateral Agent or the Required Lenders, deliver to the Collateral Agent such appraisals as are required by law or regulation of Real Property with respect to which Collateral Agent has been granted a Lien, evidence of the filing of as-extracted UCC-1 financing statements in the appropriate jurisdiction, and such other instruments in connection therewith as the Collateral Agent or the Required Lenders shall reasonably require.

(iii)    Consents Related to Leaseholds Concerning Material Real Property. With respect to the acquisition of any leasehold interest by any Subsidiary that would constitute Material Real Property but for the need to obtain the consent of another Person (other than the Borrower or any Controlled Subsidiary) in order to grant a security interest therein, upon the request of Collateral Agent or the Required Lenders, the Borrower and its Subsidiaries shall use commercially reasonable efforts to obtain such consent for the 120 day period commencing on the date of the notification provided pursuant to Section 6.16(d)(i), provided that there shall be no requirement to pay any sums to the applicable lessor other than customary legal fees and administrative expenses (it is understood, for avoidance of doubt, that, without limiting the foregoing obligations of the Borrower set forth in this Section 6.16(d)(iii), any failure to grant a security interest in any such leasehold interest as a result of a failure to obtain a consent shall not be a Default hereunder, and, for avoidance of doubt, the Borrower and its Subsidiaries shall no longer be required to use commercially reasonable efforts to obtain any such consent after such above-mentioned time period to obtain a consent has elapsed).

(e)    Further Assurances.    Subject to any applicable limitation in any Security Document and subparagraph (f) below, upon request of the Collateral Agent or the Required Lenders, at the expense of the Borrower, promptly execute and deliver any and all further instruments and documents and take all such other action as the Collateral Agent or the Required Lenders may deem necessary or desirable in order to effect fully the purposes of the Orders and the Loan Documents, including the filing of financing statements necessary or advisable in the opinion of the Collateral Agent or the Required Lenders to perfect any security interests created under the Orders or any other Security Document.

(f)    Collateral Principles.    Notwithstanding anything to the contrary in any Loan Document, (i) no actions in any non-U.S. jurisdiction or required by the Requirement of Law of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the U.S. (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction), (ii) the Collateral Agent in its discretion may grant extensions of time for the creation or perfection of security interests in, and Mortgages on, or taking other actions with respect to, particular assets where it reasonably determines in consultation with the Borrower, that the creation or perfection of security interests and Mortgages on, or taking other actions, cannot be accomplished without undue delay, burden or expense by the time or times at which it would otherwise be required by this Agreement or the Security Documents, and (iii) any Liens required to be granted from time to time pursuant to Security Documents and this Agreement on assets of the Loan Parties to secure to the Obligations shall exclude the Excluded Assets.

6.17    [Reserved].

6.18    Post Closing Covenants. Cause to be delivered or performed the documents and other agreements and actions set forth on Schedule 6.18 within the time frame specified on such Schedule 6.18.

6.19    ERISA. Except, in each case, to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect, comply with the provisions of ERISA, the Code, and other Laws applicable to the Plans.

6.20    Lender Calls. Borrower will participate in a telephonic conference call with (x) the Administrative Agent and the Lenders once during each two-week period at such time as may be agreed to by Borrower and Administrative Agent and (y) the Financial Advisor once during each week at such time as may be agreed to by Borrower and Financial Advisor, in each case, to discuss cash flows and operations of the Borrower and its Subsidiaries; it being understood and agreed that the calls in clauses (x) and (y) shall be conducted separately.

6.21    First and Second Day Orders. The Borrower shall cause all proposed "first day" orders, "second day" orders and all other orders establishing procedures for administration of the Chapter 11 Cases or approving

significant or outside the ordinary course of business transactions submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and acceptable to the Required Lenders in all material respects, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects and are acceptable.

**6.22    Milestones**.  Comply with the following milestones (unless extended or waived by the Required Lenders):

(a)     no later than thirty-five (35) calendar days after the Petition Date, (i) the Bankruptcy Court shall have entered the Final Order, and (ii) the Loan Parties shall have filed the Reorganization Plan and the Disclosure Statement (which shall include the Valuation Analysis (as defined in the Restructuring Support Agreement), which shall be acceptable to the Required Lenders in their sole and absolute discretion) with the Bankruptcy Court;

(b)     no later than fifty (50) calendar days after the Petition Date, the Loan Parties shall have entered into each of Renegotiated Contracts/Leases (as defined in the Restructuring Support Agreement), in form and substance acceptable to the Loan Parties and the Required First Lien Lenders (as defined in the Restructuring Support Agreement);

(c)     no later than seventy (70) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement in form and substance reasonably acceptable to the Loan Parties and the Required First Lien Lenders (as defined in the Restructuring Support Agreement) and, solely with respect to the economic treatment provided on account of the Second Lien Claims (as defined in the Restructuring Support Agreement), reasonably acceptable to the Required Second Lien Lenders (as defined in the Restructuring Support Agreement);

(d)     no later than one hundred fifteen (115) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order (as defined in the Restructuring Support Agreement) in form and substance acceptable to the Loan Parties and the Required First Lien Lenders (as defined in the Restructuring Support Agreement) and, solely with respect to the economic treatment provided on account of the Second Lien Claims (as defined in the Restructuring Support Agreement), reasonably acceptable to the Required Second Lien Lenders (as defined in the Restructuring Support Agreement); and

(e)     no later than one hundred thirty (130) calendar days after the Petition Date, the Plan Effective Date shall have occurred.

**6.23    Bankruptcy Notices**.  The Borrower will furnish to the Financial Advisor, the Administrative Agent, and Akin Gump Strauss Hauer & Feld LLP and Milbank LLP, as counsel to the Backstop Lenders:

(a)     copies of any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports, and updated information related to the sale or any other transaction and copies of any such bids and any updates, modifications or supplements to such information and materials; and

(b)     use commercially reasonable efforts to provide draft copies of all definitive documents and any other material motions or applications or other material documents to be filed in the Chapter 11 Cases to counsel to the Consenting Stakeholders, if reasonably practicable at least two (2) Business Days in advance of when the Loan Parties intend to file such documents, and, without limiting any approval rights set forth in this Agreement or the Restructuring Support Agreement, consult in good faith with counsel to the Consenting Stakeholders regarding the form and substance of any such proposed filing.

**6.24    Bankruptcy Related Matters.**  The Borrower will and will cause each of the other Loan Parties to:

(a)     cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Loans and other Obligations, the Prepetition Debt and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto, (iv) orders concerning the

financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363,364 or 365 of the Bankruptcy Code or rule 9019 of the Federal Rules of Bankruptcy Procedure, (v) orders authorizing additional payments to critical vendors (outside of the relief approved in the "first day" and "second day" orders) and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors to be in accordance with and permitted by the terms of this Agreement and acceptable to the Required Lenders (and (i) with respect to any provision that affects the rights or duties of any Agent, such Agent and (ii) with respect to any orders described in clause (v) above, acceptable to the Required Lenders in their reasonable discretion) in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights or duties of any Agent, such Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are acceptable in all respects;

(b)      comply in all material respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; and

(c)      comply in a timely manner with their obligations and responsibilities as debtors in possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order and the Final Order, as applicable, and any other order of the Bankruptcy Court.

**6.25      Chief Executive Officer**.  At all times following the Closing Date, the Borrower shall cause Robert D. Moore to hold the position of chief executive officer of the Borrower.

**ARTICLE VII**
**NEGATIVE COVENANTS**

Until Payment in Full, the Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01      Liens**.  Create, incur, assume or permit to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)      (i) Liens in favor of the Collateral Agent for the benefit of the Secured Parties granted pursuant to any Loan Document and (ii) Liens securing obligations in respect of Huntington Cash Management Obligations;

(b)      (i) Liens existing on the Petition Date and set forth on Schedule 7.01 and (ii) any Lien in favor of non-affiliated third party existing on the Petition Date that is not set forth on Schedule 7.01 to the extent (x) the amount of obligations secured by such Liens do not exceed $2,000,000 individually or $5,000,000 in the aggregate, and (y) a revised Schedule 7.01 including such Lien is delivered to the Administrative Agent for distribution to the Lenders;

(c)      Liens for Taxes or for pre-petition utilities, assessments or governmental charges or levies on the property of the Borrower or any Subsidiary if the same shall not at the time be delinquent as of the Petition Date and can be paid without penalty, or are being contested in good faith and by appropriate proceedings, provided that any reserve or appropriate provision that shall be required in conformity with GAAP shall have been made therefor;

(d)      Liens imposed by law, such as landlord's, carriers', warehousemen's, materialmen's, construction and repairmen's, vendors' and mechanics' Liens and other similar Liens, with respect to amounts which are not yet overdue for a period of more than 60 days or are being contested in good faith and by appropriate proceedings;

(e)      [reserved];

(f)      (i) Liens incurred, or pledges or deposits under or to secure the performance of bids, trade contracts and leases (other than Indebtedness), reclamation bonds, return of money bonds, insurance bonds, Mining Financial Assurances, statutory obligations or bonds, government contracts, health or social security benefits, unemployment or other insurance obligations, workers' compensation claims, water treatment obligations, insurance obligations, reclamation obligations, obligations under Mining Laws or similar legislation, stay bonds, utility bonds, surety and appeal bonds (including surety bonds obtained as required in connection with federal coal leases), performance bonds,

63

bid bonds, performance guarantees (including, without limitation, performance guarantees pursuant to coal supply agreements or equipment leases), bankers acceptances, completion guarantees, bank guarantees and letters of credit, customs duties and other obligations, including self-bonding arrangements, of a like nature incurred in the ordinary course of business, or (ii) Liens on assets to secure obligations under surety bonds obtained as required in connection with entering into of federal coal leases; provided that no more than $7,500,000 of cash may be posted following the Petition Date under this Section 7.01(f)

(g)    survey exceptions, easements, rights-of-way, zoning restrictions, leases, subleases, licenses, other restrictions and other similar encumbrances which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person, Liens set forth as exceptions to the Borrower's or any Subsidiary's title insurance policies and Liens as set forth as exceptions to the title opinions delivered;

(h)    Liens granted to provide adequate protection pursuant to the Interim Order or the Final Order;

(i)    Liens (including the interest of a lessor under a Capital Lease) on property and improvements that secure Indebtedness incurred pursuant to Section 7.03(j) for the purpose of financing all or any part of the purchase price or cost of construction or improvement of such property; provided that the Lien does not (i) extend to any additional property and (ii) secure any additional obligations, in each case other than the initial property so subject to such Lien and the Indebtedness and other obligations originally so secured (other than improvements on and accessions to such property, proceeds and products thereof, customary security deposits and any other assets pursuant to after-acquired property clauses in effect with respect to such Lien at the time of acquisition on property of the type that would have been subject to such Lien notwithstanding the occurrence of such acquisition);

(j)    [reserved];

(k)    [reserved];

(l)    Liens as a result of the filing of UCC financing statements as precautionary measure in connection with leases, operating leases or consignment arrangements;

(m)    [reserved];

(n)    [reserved];

(o)    [reserved];

(p)    Liens in favor of collecting or payor banks having a right of setoff, revocation, refund or chargeback with respect to money or instruments of the Borrower or any Subsidiary on deposit with or in possession of such bank;

(q)    [reserved];

(r)    [reserved];

(s)    customary Liens in favor of trustees, paying agents and escrow agents, and netting and setoff rights, bankers' liens and the like in favor of financial institutions and counterparties to financial obligations and instruments, including Hedging Agreements;

(t)    [reserved];

(u)    Permitted Real Estate Encumbrances;

(v)    [reserved];

(w)    [reserved];

(x)      Coal Liens;

(y)      [reserved];

(z)      Liens on insurance policies and proceeds thereof, or other deposits, to secure insurance premium financings;

(aa)      (x) Production Payments, royalties, dedication of reserves under supply agreements or similar or related rights or interests granted, taken subject to, or otherwise imposed on properties or (y) cross charges, Liens or security arrangements entered into in respect of a Joint Venture for the benefit of a participant, manager or operator of such Joint Venture, in each case, consistent with normal practices in the mining industry;

(bb)      other Liens securing Indebtedness or obligations in an aggregate principal amount at any time outstanding not to exceed $500,000;

(cc)      [reserved];

(dd)      [reserved];

(ee)      Liens in the ordinary course of business securing obligations in respect of trade-related letters of credit permitted under Section 7.03(p) covering only the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(ff)      Liens incurred or assumed in connection with the issuance of revenue bonds the interest on which is tax-exempt under the Code;

(gg)      Liens in the ordinary course of business on specific items of inventory, equipment or other goods and proceeds of any Person securing such Person's obligations in respect thereof or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(hh)      deposits made in the ordinary course of business to secure reclamation liabilities, insurance liabilities and/or surety liabilities;

(ii)      (x) surface use agreements, easements, zoning restrictions, rights of way, encroachments, pipelines, leases (other than Capital Lease Obligations), subleases, rights of use, licenses, special assessments, trackage rights, transmission and transportation lines related to Mining Leases or mineral rights or constructed coal mine assets or other Real Property including re-conveyance obligations to a surface owner following mining, royalty payments and other obligations under surface owner purchase or leasehold arrangements necessary to obtain surface disturbance rights to access the subsurface coal deposits and similar encumbrances on Real Property imposed by law or arising in the ordinary course of business that do not secure any monetary obligation and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary and (y) Liens on the property of the Borrower or any Subsidiary, as tenant under a lease or sublease entered into in the ordinary course of business by such Person, in favor of the landlord under such lease or sublease, securing the tenant's performance under such lease or sublease, as such Liens are provided to the landlord under applicable law and not waived by the landlord; and

(jj)      Liens on deposits made to cash collateralize obligations in respect of letters of credit existing on the Closing Date.

For purposes of determining compliance with this Section 7.01, (A) a Lien securing an item of Indebtedness need not be permitted solely by reference to one category of permitted Liens (or any portion thereof) described in Sections 7.01(a) through (jj) but may be permitted in part under any combination thereof and (B) in the event that a Lien securing an item of Indebtedness (or any portion thereof) meets the criteria of one or more of the categories of permitted Liens (or any portion thereof) described in Sections 7.01(a) through (jj), the Borrower may, in its sole discretion, classify or reclassify, or later divide, classify or reclassify (as if incurred at such later time), such Lien

65

securing such item of Indebtedness (or any portion thereof) in any manner that complies with this Section 7.01 and at the time of incurrence, classification or reclassification will be entitled to only include the amount and type of such Lien or such item of Indebtedness secured by such Lien (or any portion thereof) in one of the above clauses (or any portion thereof). In addition, with respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the incurrence of such Indebtedness, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness.

      **7.02    Investments**.  Make any Investments, except:

      (a)     Investments held by the Borrower or any Subsidiary in cash or Cash Equivalents;

      (b)     to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), loans or advances, payroll, travel and other loans or advances to current or former officers, directors, employees, managers, directors or consultants of the Borrower or Holdings in an aggregate amount not to exceed $100,000 at any time outstanding, made in the ordinary course of business;

      (c)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

      (d)     Investments (including debt obligations and Capital Stock) received in satisfaction of judgments or in connection with the bankruptcy or reorganization of suppliers and customers of the Borrower and its Subsidiaries and in settlement of delinquent obligations of, and other disputes with, such customers and suppliers arising in the ordinary course of business;

      (e)     Investments in the nature of Production Payments, royalties, dedication of reserves under supply agreements or similar or related rights or interests granted, taken subject to, or otherwise imposed on properties;

      (f)     (i) Investments in existence on the Petition Date or made pursuant to a legally binding written commitment in existence on the Petition Date and listed on Schedule 7.02, and (ii) any Investment existing on the Petition Date that is not set forth on Schedule 7.02 to the extent (x) the amount of such Investment does not exceed $2,000,000 individually or $5,000,000 in the aggregate, and (y) a revised Schedule 7.02 including such Investment is delivered to the Administrative Agent for distribution to the Lenders; provided that the amount of any such Investment set forth in Schedule 7.02 may be increased (x) as required by the terms of such Investment as in existence on the date hereof or (y) as otherwise permitted hereunder;

      (g)     Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Borrower and its Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer, (B) litigation, arbitration or other disputes or (C) the foreclosure with respect to any secured investment or other transfer of title with respect to any secured investment;

      (h)     [reserved];

      (i)     Hedging Agreements or Cash Management Obligations permitted under this Agreement;

      (j)     Investments acquired solely in exchange for management services provided by the Borrower or a Subsidiary;

      (k)     Investments by the Borrower or any Subsidiary in any Debtor, and Investments by any Debtor in the Borrower;

      (l)     [reserved];

(m)      to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), additional Investments by the Borrower or any Debtor in an aggregate amount not to exceed $1,000,000, but without duplication, the cash return thereon received after the date hereof as a result of any sale for cash, repayment, return, redemption, liquidating distribution or other cash realization not to exceed the amount of such Investments in such Person made after the date hereof in reliance on this Section 7.02(m) shall be deducted in determining the amount of Investments outstanding pursuant to this Section 7.02(m);

(n)      [reserved];

(o)      [reserved];

(p)      (i) receivables owing to the Borrower or any Subsidiary if created or acquired in the ordinary course of business, (ii) endorsements for collection or deposit in the ordinary course of business and (iii) securities, instruments or other obligations received in compromise or settlement of debts created in the ordinary course of business, or by reason of a composition or readjustment of debts or reorganization of another Person, or in satisfaction of claims or judgments;

(q)      Investments made pursuant to surety bonds, reclamation bonds, performance bonds, bid bonds, appeal bonds and related letters of credit or similar obligations, in each case, to the extent such surety bonds, reclamation bonds, performance bonds, bid bonds, substituting appeal bonds, related letters of credit and similar obligations are permitted under this Agreement;

(r)      Investments consisting of indemnification obligations in respect of performance bonds, bid bonds, appeal bonds, surety bonds, reclamation bonds and completion guarantees and similar obligations in respect of coal sales contracts (and extensions or renewals thereof on similar terms), under any Mining Law, Environmental Law or other applicable law or with respect to workers' compensation benefits, unemployment insurance and other social security laws or regulations or similar legislation, or to secure liabilities to insurance carriers under insurance arrangements in respect of such obligations, or good faith deposits, prepayments or cash payments in connection with bids, tenders, contracts or leases or to secure public or statutory obligations, customs duties and the like, or for payment of rent, in each case entered into in the ordinary course of business, and pledges or deposits made in the ordinary course of business in support of obligations under coal sales contracts (and extensions or renewals thereof on similar terms) or any other Indebtedness, or Liens securing Indebtedness, of the type referred to in Section 7.03(p);

(s)      [reserved];

(t)      [reserved];

(u)      to the extent substituting an Investment, purchases and acquisitions, in the ordinary course of business, of inventory, supplies, material or equipment;

(v)      Investments resulting from liens, pledges and deposits permitted under Section 7.01;

(w)      [reserved]; and

(x)      to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), any Permitted Payments to Parent, to the extent constituting an Investment.

**7.03    Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness except:

(a)      Indebtedness arising under the Loan Documents;

(b)      (i) Indebtedness outstanding on the Petition Date and listed on <u>Schedule 7.03</u>, and (ii) any Indebtedness outstanding on the Petition Date that is not set forth on <u>Schedule 7.03</u> to the extent (x) the aggregate principal amount of such Indebtedness does not exceed $2,000,000 individually or $5,000,000 in the aggregate, and

(y) a revised Schedule 7.03 including such Indebtedness is delivered to the Administrative Agent for distribution to the Lenders;

(c)        [reserved];

(d)        (i) Indebtedness of the Borrower or any Subsidiary consisting of Guarantees of Indebtedness of any Subsidiary otherwise permitted under this Section 7.03 and (ii) Indebtedness of any Subsidiary consisting of Guarantees of Indebtedness of the Borrower otherwise permitted under this Section 7.03; provided that (i) if the Indebtedness being guaranteed is subordinated to or pari passu with the Obligations, then the guarantee must be subordinated or pari passu, as applicable, to the same extent as the Indebtedness guaranteed and (ii) if incurred by the Borrower or a Subsidiary, such guarantee shall be permitted as an Investment pursuant to Section 7.02;

(e)        Indebtedness in respect of (i) Cash Management Obligations incurred in the ordinary course of business and consistent with past practice and (ii) Hedging Agreements that are not speculative in nature and incurred in the ordinary course of business and consistent with past practice, in each case of the Borrower or any Subsidiary;

(f)        Indebtedness of the Borrower and any Debtor owed to any other Debtor and of any Debtor owed to the Borrower;

(g)        [reserved];

(h)        [reserved];

(i)        [reserved];

(j)        to the extent incurred in accordance with the Cash Flow Forecast (subject to Permitted Variance), Indebtedness of the Borrower or any Subsidiary incurred to finance all or any part of the acquisition, construction, development or improvement of any property or assets, including purchase money obligations, Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets before the acquisition thereof, provided that the aggregate principal amount of any Indebtedness Incurred pursuant to this Section 7.03(j) and outstanding at the time of Incurrence, may not exceed $1,000,000;

(k)        [reserved];

(l)        [reserved];

(m)        [reserved];

(n)        [reserved];

(o)        additional Indebtedness of the Loan Parties in an aggregate principal amount outstanding at the time of Incurrence, not to exceed $500,000;

(p)        Indebtedness of the Borrower or any Subsidiary in connection with one or more standby or trade-related letters of credit, performance bonds, bid bonds, stay bonds, appeal bonds, bankers acceptances, Mining Financial Assurances, statutory obligations or bonds, health or social security benefits, unemployment or other insurance obligations, workers' compensation claims, water treatment obligations, insurance obligations, reclamation obligations, bank guarantees, surety bonds, utility bonds, performance guarantees (including, without limitation, performance guarantees pursuant to coal supply agreements or equipment leases) completion guarantees or other similar bonds and obligations, including self-bonding arrangements, issued by or on behalf of the Borrower or a Subsidiary, in each case, in the ordinary course of business or pursuant to self- insurance obligations and not in connection with the borrowing of money or the obtaining of advances;

(q)        [reserved];

(r)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; and

(s)     Indebtedness of the Borrower or any Subsidiary consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply or other arrangements.

For purposes of determining compliance with this Section 7.03 or Section 7.01, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date on which such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided, that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of fees, underwriting discounts, premiums (including tender premiums), accrued interest, defeasance costs and other costs and expenses incurred in connection with such refinancing.

Further, for purposes of determining compliance with this Section 7.03, in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the categories set forth in Sections 7.03 (a) through (u), the Borrower will be permitted to divide and classify such item of Indebtedness (or any portion thereof) on the date of its Incurrence, or later re-divide and reclassify all or a portion of such item of Indebtedness in any manner that complies with this Section 7.03.

In addition, with respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence. "Increased Amount" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness, the accretion of original issue discount, or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

This Agreement will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured and (2) senior Indebtedness as subordinated Indebtedness or junior to any other senior Indebtedness merely because it has junior priority with respect to the same collateral.

**7.04     Fundamental Changes.**  Subject to Section 10.21, merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of the assets (whether now owned or hereafter acquired) of the Borrower and its Subsidiaries, taken as a whole, to or in favor of any Person, except if no Default exists or would immediately result therefrom:

(a)     any Subsidiary may merge or consolidate with (i) the Borrower, provided that the Borrower shall be the continuing or surviving Person or (ii) any one or more other Subsidiaries, provided that (A) when any Wholly Owned Subsidiary is merging with another Subsidiary, a Wholly Owned Subsidiary shall be the continuing or surviving Person, (B) when any Subsidiary is merging with any other Subsidiary, the continuing or surviving Person shall be a Subsidiary, (C) when any Foreign Subsidiary is merging with any Domestic Subsidiary, the continuing or surviving Person shall be the Domestic Subsidiary and (D) when any Guarantor is merging with any other Subsidiary, the continuing or surviving Person shall be a Guarantor;

(b)     any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution or otherwise) to the Borrower or to another Subsidiary; provided that (i) if the transferor in such a transaction is a Subsidiary, then the transferee must either be the Borrower or another Subsidiary, (ii) if the transferor

is a Domestic Subsidiary, then the transferee must either be the Borrower or another Domestic Subsidiary and (iii) if the transferor is a Guarantor, then the transferee must either be the Borrower or another Guarantor;

(c)        the Borrower may Dispose of all or a portion of the Equity Interests of any of its Subsidiaries to a Guarantor (other than Holdings or General Partner);

(d)        the Borrower and any Subsidiary may merge or consolidate with any other Person in a transaction in which the Borrower or the Subsidiary, as applicable, is the surviving or continuing Person; provided that, the Borrower may not merge or consolidate with any Subsidiary unless the Borrower is the surviving or continuing Person; and

(e)        any Subsidiary may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and the assets, if any, of any Subsidiary so liquidated or dissolved are transferred (x) to another Subsidiary or the Borrower and (y) to a Guarantor or the Borrower if such liquidated or dissolved Subsidiary is a Guarantor.

**7.05    Dispositions**.  Make any Disposition (other than Dispositions permitted pursuant to Sections 7.01, 7.02, 7.04 and 7.06), except:

(a)        (i) the sale or Disposition of damaged, obsolete, unusable or worn out equipment or equipment that is no longer needed in the conduct of the business of the Borrower and its Subsidiaries, (ii) sales or Dispositions of inventory, used or surplus equipment or reserves and Dispositions related to the burn-off of mines or (iii) the abandonment or allowance to lapse or expire or other disposition of intellectual property by the Borrower and its Subsidiaries in the ordinary course of business;

(b)        sales, transfers or other dispositions of assets with respect to any Debtor pursuant to any order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Required Lenders, permitting a de minimis asset disposition without further order of the Bankruptcy Court, so long as the proceeds thereof are applied in accordance with Section 2.05, if applicable;

(c)        [reserved];

(d)        Dispositions of cash and Cash Equivalents;

(e)        [reserved];

(f)        (A) the sale of defaulted receivables in the ordinary course of business and (B) Dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceeding;

(g)        any transfer of property or assets that consists of grants by the Borrower or its Subsidiaries in the ordinary course of business of licenses or sub-licenses, including with respect to intellectual property rights;

(h)        [reserved];

(i)        (A) the grant in the ordinary course of business of any non-exclusive easements, permits, licenses, rights of way, surface leases or other surface rights or interests and (B) any lease, sublease or license of assets (with a Loan Party as the lessor, sublessor or licensor) in the ordinary course of business;

(j)        Dispositions of assets resulting from condemnation or casualty events;

(k)        [reserved];

(l)        [reserved];

(m)      [reserved];

(n)      [reserved];

(o)      (i) any surrender or waiver of contractual rights or the settlement, release, or surrender of contractual, tort or other claims of any kind or (ii) any settlement, discount, write off, forgiveness, or cancellation of any Indebtedness owing by any present or former directors, officers, or employees of the Borrower or` any Subsidiary or any of their successors or assigns;

(p)      the unwinding or termination of any Hedging Agreements;

(q)      [reserved];

(r)      [reserved];

(s)      [reserved];

(t)      exchanges or relocations of easements for pipelines, oil and gas infrastructure and similar arrangements in the ordinary course of business; and

(u)      Dispositions of assets acquired in connection with an acquisition by the Borrower or any Subsidiary that are Disposed of for fair market value (as reasonably determined by the Borrower in good faith) within 90 days of such acquisition.

**7.06      Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contributions, except that:

(a)      dividends or distributions by a Subsidiary payable, on a pro rata basis or on a basis more favorable to the Borrower or a Subsidiary, to all holders of any class of Equity Interests of such Subsidiary a majority of which is held, directly or indirectly through Subsidiaries, by the Borrower;

(b)      the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other Equity Interests of such Person or another Subsidiary;

(c)      to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), Permitted Payments to Parent;

(d)      to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), so long as no Event of Default shall have occurred and is continuing or would result therefrom, Restricted Payments made pursuant to this Section 7.06(d) in an amount not to exceed $100,000 in the aggregate; and

(e)      to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), Restricted Payments made to Holdings (or any Parent) to enable Holdings (or any Parent) to pay (i) operating costs and expenses and other administrative fees and costs, in each case, to the extent expressly required to be paid pursuant to the Management Services Agreement, and (ii) after the entry of an order by the Bankruptcy Court (which order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the prior written consent of the Required Lenders), authorizing the Debtors' entry into, or an assumption of, an amendment to the Management Services Agreement, in form and substance satisfactory to the Required Lenders, (x) management fees, to the extent expressly required to be paid pursuant to such amended terms of the Management Services Agreement, and (y) minimum royalty payments to Murray Energy Group on account of any Debtor's coal mine leases with Colt LLC.

**7.07      Change in Nature of Business**.  Engage in any business other than a Similar Business.

**7.08**    **Transactions with Affiliates**.  Enter into, renew or extend any transaction or arrangement, including the purchase, sale, lease or exchange of property or assets or the rendering of any service, with any Affiliate of the Borrower or any Subsidiary.  Notwithstanding the foregoing, the foregoing restrictions shall not apply to the following:

(A)    transactions between or among the Borrower and any of its Subsidiaries or a Person that becomes a Subsidiary;

(B)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), the payment of reasonable and customary (as determined in good faith by the Borrower) regular fees, compensation, indemnification and other benefits to current, former and future directors of the Borrower, a Subsidiary, or Holdings, who are not employees of the Borrower, such Subsidiary or Holdings, including reimbursement or advancement of reasonable and documented out-of-pocket expenses and provisions of liability insurance;

(C)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), loans or advances to officers, directors or employees of the Borrower or Holdings in the ordinary course of business of the Borrower or its Subsidiaries or Holdings or Guarantees in respect thereof or otherwise made on their behalf (including payment on such Guarantees) but only to the extent permitted by applicable law and Section 7.02(b);

(D)    transactions arising under any contract, agreement, instrument or other arrangement in effect on the Closing Date and set forth on Schedule 7.08;

(E)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), intercompany Investments permitted by Section 7.02 and Restricted Payments permitted by Section 7.06;

(F)    to the extent made in accordance with the Cash Flow Forecast (subject to Permitted Variance), after the entry of an order by the Bankruptcy Court (which order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the prior written consent of the Required Lenders), authorizing the Debtors' entry into, or an assumption of, an amendment to the Management Services Agreement, in form and substance satisfactory to the Required Lenders, minimum royalty payments to Murray Energy Group on account of any Debtor's coal mine leases with Colt LLC;

(G)    the Management Services Agreement (and transactions arising pursuant to the terms thereof) as in effect on the Closing Date; provided that any payment or distribution by any Debtor to any of its Affiliates pursuant to the Management Services Agreement shall only be made pursuant to Section 7.06(d); and

(H)    any agreements entered into in connection with the Transactions.

**7.09**    **Permitted Activities of General Partner and Holdings**.  (a) General Partner and Holdings shall not incur or permit to exist any Lien other than (i) Liens created under the Loan Documents and (ii) Liens not prohibited by Section 7.01 on any of the Equity Interests issued by the Borrower held by General Partner or Holdings and (b) General Partner and Holdings shall do or cause to be done all thing necessary to preserve, renew and keep in full force and effect its legal existence; provided, that so long as no Default has occurred and is continuing or would result therefrom, Holdings may merge with any other Person (and if it is not the survivor of such merger, the survivor shall assume Holdings' obligations, as applicable, under the Loan Documents).

**7.10**    **Use of Proceeds**.  Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of any regulation of the FRB, including Regulations T, U and X.

**7.11**    **[Reserved].**

       **7.12**     **Burdensome Agreements**.  Enter into any Contractual Obligation (other than any Loan Document) that (x) limits the ability of the Borrower or any Guarantor to create, incur, assume or suffer to exist any Lien upon any of its property to secure the Obligations hereunder or (y) limits the ability of any Subsidiary to make Restricted Payments to the Borrower or any Guarantor or to otherwise transfer property to the Borrower or any Guarantor; provided, however, that the foregoing clause shall not apply to Contractual Obligations which:

       (a)      exist as of the Petition Date and are set forth on Schedule 7.12;

       (b)      are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary of the Borrower, so long as such Contractual Obligations were not entered into solely in contemplation of such Person becoming a Subsidiary of the Borrower;

       (c)      customary restrictions and conditions contained in the document relating to any Lien, so long as (i) such Lien is permitted by Section 7.01 and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 7.12;

       (d)      [reserved];

       (e)      restrictions imposed by applicable law;

       (f)      any restriction on a Subsidiary imposed pursuant to an agreement entered into for the sale or Disposition of the Equity Interests or assets of a Subsidiary pending the closing of such sale or Disposition to the extent relating to the Equity Interests or assets that are then subject to such sale or Disposition;

       (g)      are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures or the Equity Interests therein;

       (h)      are customary restrictions contained in leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto;

       (i)      are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary;

       (j)      are customary limitations (including financial maintenance covenants) existing under or by reason of leases entered into in the ordinary course of business;

       (k)      are restrictions on cash or other deposits imposed under contracts entered into in the ordinary course of business;

       (l)      are customary provisions restricting assignment of any agreements;

       (m)      [reserved];

       (n)      any restrictions imposed by any agreement relating to secured Indebtedness permitted by Section 7.03 of this Agreement to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

       (o)      [reserved];

       (p)      customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations; or

(q)    are set forth in any agreement evidencing an amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of the Contractual Obligations referred to in Sections 7.12(a) through 7.12(p) above; provided, that such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Borrower, not materially less favorable to the Loan Party with respect to such limitations than those applicable pursuant to such Contractual Obligations prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing (it being understood that the introduction of any such limitation in a Contractual Obligation that did not previously contain any such limitation shall be deemed to be adverse in a material respect to the interest of the Lenders unless otherwise of the type permitted by this <u>Section 7.12</u>).

     **7.13**    **[Reserved].**

     **7.14**    **Maximum Capital Expenditure**.  Make or incur Capital Expenditures, in any period indicated below in an aggregate amount for Borrower and its Subsidiaries in excess of the amount set forth below opposite such period:

| Period | Maximum Capital Expenditures |
|---|---|
| Petition Date through March 31, 2020 | $16,200,000 |
| Petition Date through April 30, 2020 | $19,410,000 |
| Petition Date through May 31, 2020 | $20,540,000 |
| Petition Date through June 30, 2020 | $27,490,000 |
| Petition Date through July 31, 2020 | $28,500,000 |

     **7.15**    **Fiscal Year**.  Change its fiscal year-end from December 31.

     **7.16**    **Sale and Lease-Backs**.  Other than in respect of Sale and Lease-Backs in existence on the Closing Date, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which the Borrower or such Subsidiary (a) has sold or transferred to any other Person (other than the Borrower or any of its Subsidiaries) and (b) thereafter rents or leases such property that it intends to use for substantially the same purpose as the property which has been sold or transferred (collectively, the "<u>Sale and Lease- Backs</u>").

     **7.17**    **Amendments or Waivers of Organizational Documents**.  Amend, restate, supplement, modify or waive any provision of any of its Organizational Documents after the Closing Date, in each case, to the extent the same, taken as a whole, would be material and adverse to any Secured Party (in the good faith determination of the Borrower).

     **7.18**    **Budget Variance**.  (a) As of the last day of each applicable Two-Week Test Period commencing with the last day of the first Two-Week Test Period ending after the Closing Date, for such Two-Week Test Period (i) the negative variance (as compared to the Cash Flow Forecast) of the actual aggregate operating cash receipts  of the Debtors shall not exceed 15%, (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements  (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors shall not exceed 15% and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements  made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) shall not exceed 15%, and (b) beginning with the delivery of the third Budget Variance Report, as of the last day of each applicable Four-Week Test Period commencing with the last day of the first Four-Week Test Period ending after the Closing Date, for such Four-Week Test Period, (i) the negative variance (as compared to the applicable Cash Flow Forecast) of the actual aggregate operating cash receipts  of the Debtors shall not exceed 10%, (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements  (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) made by the Debtors shall not exceed 10% and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements

made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) shall not exceed 10% (such variance that does not breach this covenant, the "Permitted Variance").

7.19    **Minimum Liquidity**.  Permit Liquidity at any time to be less than (i) prior to the Delayed Draw Funding Date, $20,000,000, and (ii) on or after the Delayed Draw Funding Date, $40,000,000.

7.20    **[Reserved**].

7.21    **Additional Bankruptcy Matters**.  Permit any of its Subsidiaries to, without the Required Lenders' prior written consent, do any of the following:

(a)    use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Cash Flow Forecast, for payments or purposes that would violate the terms of the Interim Order or the Final Order;

(b)    incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claim of the Secured Parties against any Loan Party, except for the Carve Out or as otherwise expressly permitted by the Orders;

(c)    subject to the Orders, assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Secured Parties;

(d)    other than as provided in any "first day" order, enter into any agreement to return any of its inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $250,000;

(e)    seek, consent to, or permit to exist, without the prior written consent of the Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Interim Order, the Final Order or any of the other Loan Documents;

(f)    subject to the terms of the Orders and subject to Article VIII, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents, the Lenders or other Secured Parties with respect to the Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any Secured Party to lift an applicable stay of proceedings to do the foregoing (*provided* that any Loan Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the Orders);

(g)    except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any "first day" or "second day" orders complying with the terms of this Agreement) or, with the prior consent of the Required Lenders, make any payment or distribution to any non-Debtor Affiliate or insider of any Debtor unless otherwise contemplated in the Cash Flow Forecast (subject to Permitted Variances);

(h)    except for the Carve Out or as otherwise expressly permitted by the Orders, incur, create, assume, suffer to exist or permit (or file an application for the approval of) any other Superpriority Claim which is pari passu with or senior to the claims of the Administrative Agent, the Collateral Agent and Lenders against the Loan Parties or the adequate protection Liens or claims; or

(i)        make or permit to be made any change to the Final Order without the consent of the Required Lenders.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01     Events of Default**.  Any of the following shall constitute an Event of Default (each, an "Event of Default"):

(a)        Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within five Business Days after the same becomes due and payable, any interest on any Loan, , or any fee due hereunder, any other amount payable hereunder or under any other Loan Document; or

(b)        Specific Covenants.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 6.01(a), 6.01(b), 6.01(c), 6.01(d), 6.01(e), 6.01(f), 6.02(a), 6.03(a), 6.05, 6.11, 6.18  6.21 6.22, 6.23 or Article VII; or

(c)        Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days; or

(d)        Representations and Warranties.  Any representation, warranty, certification or statement of fact made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)        Cross-Default.  Unless the enforcement thereof is stayed by operation of the Chapter 11 Cases, any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness under the Loan Documents) in each case having an aggregate principal amount of more than the Threshold Amount ("Material Indebtedness"), beyond the period of grace, if any, provided in the instrument or agreement under which such Material Indebtedness was created or (B) fails to observe or perform any other agreement or condition relating to any such Material Indebtedness, or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause or to permit the holder or holders of such Material Indebtedness, or the beneficiary or beneficiaries of such Material Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity, or such Guarantee to become due or payable; provided, that this clause 8.01(e) shall not apply to any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if (i) such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness, (ii) such Indebtedness becomes due substantially contemporaneously with the completion and closing of such voluntary sale and transfer (and not upon entry into the purchase or transfer agreement related thereto) and (iii) the process of such voluntary sale or transfer are applied to pay in full such Indebtedness substantially contemporaneously with such sale or transfer; or

(f)        Insolvency Proceedings, Etc.  Any Loan Party or Subsidiary that is not a Debtor institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 30 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 30 calendar days, or an order for relief is entered in any such proceeding; or

(g)    [Reserved].

(h)    Judgments.  There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third party insurance), and such judgments or orders shall not have been vacated, discharged, waived, stayed or bonded pending appeal within 60 days from the entry thereof; or

(i)    ERISA.  The occurrence of any of the following events that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect: (i) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in an actual obligation to pay money of the Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; or

(j)    Invalidity of Loan Documents.  Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or Payment in Full, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or any Security Document ceases to create a valid Lien with the priority required thereby on the Collateral covered thereby (other than (x) as to any immaterial portion of the Collateral or (y) as expressly permitted thereunder or solely as a result of the acts or omissions of any Agent); or

(k)    Change of Control.  There occurs any Change of Control; or

(l)    Restructuring Support Agreement or Backstop Commitment Agreement Termination.  (i) The bringing of a motion or taking of any action by any of the Loan Parties or any Subsidiary to terminate the Restructuring Support Agreement and/or the Backstop Commitment Agreement, or (ii) the Restructuring Support Agreement and/or the Backstop Commitment Agreement is terminated for any reason, or modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders; or

(m)    Management Services Agreement Termination.  (i) The bringing of a motion or taking of any action by any of the Loan Parties or any Subsidiary to terminate the Management Services Agreement or (ii) the Management Services Agreement is terminated for any reason, or modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders; or

(n)    Guarantees, Security Documents and Loan Documents.  At any time after the execution and delivery thereof, the Guaranty for any reason, other than the Payment in Full of all Obligations (other than contingent indemnity obligations), shall cease to be in full force and effect (other than in accordance with its terms or in connection with a transaction permitted by Section 7.04) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) any Security Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected Lien (subject to Permitted Liens) on the Collateral purported to be covered thereby and with the priority contemplated by the Orders, and (iii) any Loan Party shall contest the validity or enforceability of any Loan Document or any Order in writing or repudiate or rescind (or purport to repudiate or rescind) or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any provision of any Loan Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by any Order or any other Security Document; or

(o)    Chapter 11 Cases.  There occurs any of the following in the Chapter 11 Cases:

(i)    the bringing of a motion or taking of any action by any of the Loan Parties or any Subsidiary (A) to grant any Lien other than Liens permitted pursuant to Section 7.01 upon or affecting any Collateral, or (B) to use cash collateral of the Agents and the other Secured Parties under section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders, except as provided in the Interim Order or Final Order;

(ii)      the entry of an order in any of the Chapter 11 Cases confirming a Reorganization Plan that is not an Acceptable Plan;

(iii)      (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Final Order in any material respect without the written consent of the Required Lenders, or the Interim Order or the Final Order shall otherwise not be in full force and effect or (B) any Loan Party or any Subsidiary shall fail to comply with the Orders in any material respect;

(iv)      the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against, any Agent, any Lender, any other Secured Party or any of the Collateral;

(v)      (A) the appointment of a trustee, receiver or an examiner (other than a fee examiner) in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties, or (B) the sale without the Required Lenders' consent of any material portion of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in Payment in Full in cash of all of the Obligations under this Agreement at the closing of such sale or initial payment of the purchase price or effectiveness of such plan of reorganization, as applicable;

(vi)      the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code;

(vii)      any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting relief from or modifying the automatic stay under Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Agents) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Required Lenders (which approval shall not be unreasonably withheld) with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral to any federal, state or local environmental or regulatory agency or authority or (D) to permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(viii)      [reserved];

(ix)      the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement;

(x)      the entry of an order in the Chapter 11 Cases terminating or modifying the exclusive right of any Loan Party to file a Reorganization Plan pursuant to Section 1121 of the Bankruptcy Code;

(xi)      the failure of any Loan Party to perform in all material respects any of its obligations under the Orders;

(xii)      the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than the Obligations in, or as otherwise permitted under the applicable Loan Documents or permitted under the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Agents and the Secured Parties under this Agreement and the other Loan Documents, or there shall arise or be granted by the Bankruptcy Court (A) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 of the Bankruptcy Code or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve Out) or (B) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly *provided* in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Administrative Agent (at the direction of the Required Lenders)), whichever is in effect;

78

(xiii)    the Interim Order (prior to the Final Order Entry Date) or, on and after entry thereof, the Final Order shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required Lenders);

(xiv)    an order in the Chapter 11 Cases shall be entered limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Prepetition Debt on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date;

(xv)    an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties;

(xvi)    an order materially adversely impacting the legal rights and interests of the Agents and the Lenders under the Loan Documents shall have been entered by the Bankruptcy Court or any other court of competent jurisdiction;

(xvii)    any Loan Party shall challenge, support or encourage a challenge of any payments made to any Agent, any Lender, or any Secured Party with respect to the Obligations, or without the consent of the Required Lenders and, if required by Section 10.01, any other Secured Party, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any holder of Prepetition Debt that is inconsistent with an Order;

(xviii)    without the Required Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral or to obtain any financing under Section 364 of the Bankruptcy Code other than the Loan Documents or any other financing that results in the Payment in Full of the Obligations;

(xix)    any Loan Party or any person on behalf of any Loan Party shall file any motion seeking authority to (A) consummate a sale of assets (constituting Collateral or otherwise) outside the ordinary course of business or (B) reject any executory contract or unexpired lease (relating to property that constitutes Collateral or otherwise) without the consent of the Required Lenders, and in each case not otherwise permitted hereunder;

(xx)    any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Debt or payables other than payments permitted under this Agreement to the extent authorized or required by one or more "first day" or "second day" orders or any of the Orders (or other orders with the consent of Required Lenders) and consistent with the Cash Flow Forecast (subject to Permitted Variances);

(xxi)    without the Required Lenders' consent or as otherwise permitted by the Orders, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (A) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Collateral Agent's liens and security interests; or (B) to modify or affect any of the rights of the Agents, the Lenders or the Secured Parties under the Orders or the Loan Documents and related documents by any Reorganization Plan confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases; and

(xxii)    the filing by any of the Loan Parties of any Reorganization Plan other than an Acceptable Plan.

**8.02    Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, subject to the terms of the Orders, take any or all of the following actions:

(a)        declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)        declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)        [reserved]; and

(d)        exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents, any Order or applicable Law (including, but not limited to, the Bankruptcy Code and the UCC), including the right to set off any amounts held as cash collateral (including, without limitation, in any cash collateral account held for the benefit of the Secured Parties);

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under Debtor Relief Laws of the United States or any other Event of Default under Section 8.01(f) or (g) hereof, the obligation of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.

**8.03        [Reserved].**

**8.04        Application of Funds**.  Subject to the Orders, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable, any amounts received on account of the Obligations (including proceeds of Collateral) shall be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including reasonable fees, charges and disbursements of counsel to the Agents and amounts payable under Article III) payable to the Agents in their capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders (including fees and time charges for attorneys who may be employees of any Lender) and amounts payable under Article III, ratably among the Lenders in accordance with their respective Applicable Percentages;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest in respect of the Loans and other Obligations, ratably among the Lenders in accordance with their respective Applicable Percentages;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in accordance with their respective Applicable Percentages;

Fifth, to payment of any remaining Obligations, ratably among the Lenders and the other Secured Parties, ratably among the Lenders in accordance with their respective Applicable Percentages; and

Last, the balance, if any, after all of the Obligations have been indefeasibly Paid in Full, to the Borrower or as otherwise required by Law;

provided, that the application to the Obligations of amounts received in respect of the Collateral is expressly subject to the priorities set forth in the Interim Order (and, when entered, the Final Order), and all such amounts shall first be allocated in accordance with such priorities.

**ARTICLE IX**
**AGENTS**

**9.01**     **Appointment and Authority**.

(a)     Each of the Lenders hereby irrevocably appoints Cortland Capital Market Services LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents, and irrevocably authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers, rights and remedies as are delegated or granted to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Except with respect to Section 9.06 and Section 9.10, the provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower, nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.  In performing its functions and duties hereunder, the Administrative Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries.

(b)     Each of the Lenders hereby irrevocably appoints Cortland Capital Market Services LLC to act on its behalf as the Collateral Agent hereunder and under the other Loan Documents for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Lenders, and by accepting the benefits of the Loan Documents the other Secured Parties, hereby expressly authorize the Collateral Agent to (i) execute any and all documents with respect to the Collateral (including any amendment, supplement, modification or joinder with respect thereto) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Loan Documents and acknowledge and agree that any such action by the Collateral Agent shall bind the Secured Parties and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

**9.02**     **Rights as a Lender**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder. With respect to its participation in the Loans, the Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder, and may accept fees and other considerations from the Borrower for service in connection herewith and otherwise without any duty to account therefor to the Lenders.

**9.03**     **Exculpatory Provisions**.  No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, no Agent:

(a)     shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)     shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.01), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including, for the avoidance of doubt, any action that, in its opinion or the opinion of its counsel, may violate the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; provided, further, that if any Agent so requests, it shall first be indemnified and provided with adequate security to its sole satisfaction (including reasonable advances as may be requested by such Agent) by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action;

(c)　　shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity;

(d)　　shall be responsible or have any liability for or in connection with, or have any duty to ascertain, inquire into, monitor, maintain, update or enforce, compliance with the provisions hereof relating to Disqualified Institutions; and without limiting the generality of the foregoing, no Agent shall (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution;

(e)　　neither any Agent nor any of its Related Parties shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.01) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction (which shall not include any action taken or omitted to be taken in accordance with clause (i), for which such Agent shall have no liability);

(f)　　shall be deemed to have knowledge of any Default or Event of Default unless and until written notice describing such Default and is labeled a "Notice of Default" is given to such Agent by the Borrower or a Lender; or

(g)　　shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation made in or in connection with this Agreement or any other Loan Document or made in any written or oral statements made in connection with the Loan Documents and the transactions contemplated thereby, (ii) the contents of any financial or other statements, instruments, certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, whether made by such Agent to the Lenders or by or on behalf of any Loan Party to such Agent or any Lender in connection with the Loan Documents and the transactions contemplated thereby, (iii) the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations, (iv) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the use of proceeds of the Loans or the occurrence or possible occurrence of any Default or Event of Default or to make any disclosures with respect to the foregoing, (v) the execution, validity, enforceability, effectiveness, genuineness, collectability or sufficiency of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, preservation, perfection, maintenance of perfection, or priority of any Lien purported to be created by the Loan Documents, (vi) the value or the sufficiency of any Collateral, (vii) whether the Collateral exists, is owned by Borrower or its Subsidiaries, is cared for, protected, or insured or has been encumbered, or meets the eligibility criteria applicable in respect thereof, or (viii) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

Anything contained herein to the contrary notwithstanding, no Agent shall have any liability arising from confirmation of the amount of outstanding Loans or the component amounts thereof.

For the avoidance of doubt, and without limiting the other protections set forth in this Article 9, with respect to any determination, designation, or judgment to be made by the Administrative Agent or the Collateral Agent herein or in the other Loan Documents, the Administrative Agent or the Collateral Agent, as applicable, shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.01) make or confirm such determination, designation, or judgment.

**9.04**　　**Reliance by Agents**. Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by

its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan and such Lender shall have not made its ratable portion of such Loan available to the Administrative Agent.  Each Agent shall be entitled to rely on and may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

       **9.05**     **Delegation of Duties**.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more co-agents, sub-agents and attorneys-in-fact appointed by such Agent.  Each Agent and any such co-agent, sub-agent and attorney-in-fact may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The rights, privileges, protections, immunities, and indemnities of this Article and Section 10.04 shall apply to any such co-agent, sub-agent or attorney-in-fact and to the Related Parties of such Agent and any such co-agent, sub-agent or attorney-in-fact, and shall apply to each of their respective activities in such capacities as if such co-agent, sub-agent or attorney-in-fact and Related Parties were named herein.  Notwithstanding anything herein to the contrary, with respect to each co-agent, sub-agent or attorney-in-fact appointed by any Agent, (i) such co-agent, sub-agent or attorney-in-fact shall be a third party beneficiary under this Agreement with respect to all rights, privileges, protections, immunities, and indemnities of this Article and Section 10.04 and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, privileges, protections, immunities, and indemnities of this Article and Section 10.04 directly, without the consent or joinder of any other Person, against any or all Loan Parties and the Lenders, (ii) rights, privileges, protections, immunities, and indemnities of this Article and Section 10.04 shall not be modified or amended without the consent of such co-agent, sub-agent or attorney-in-fact, and (iii) such co-agent, sub-agent or attorney-in-fact shall only have obligations to such Agent and not to any Loan Party, Lender or any other Person, and no Loan Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such co-agent, sub-agent or attorney-in-fact.  No Agent shall be responsible for the negligence or misconduct of any such co-agents, sub-agents and attorneys-in-fact except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such co-agents, sub-agents and attorneys-in-fact.

       **9.06**     **Resignation of Agent**.  Each Agent may at any time give notice of its resignation to the applicable Lenders, and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the approval of the Borrower unless an Event of Default under Section 8.01(f) or (g) has occurred or is continuing (such approval not to be unreasonably withheld), to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; provided that (x) in no event shall any successor Agent be a Defaulting Lender, a Disqualified Institution or an Affiliated Lender and (y) if such Agent shall notify the Borrower and the applicable Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the retiring Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each applicable Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as an Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its applicable predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Section 10.04, and all other rights, privileges, protections, immunities, and indemnities granted to such Agent hereunder or the other Loan Documents shall continue in effect for the benefit of such retiring Agent, its co-agents, sub-agents and attorneys-in-fact and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

**9.07**      **Non-Reliance on Agents and Other Lenders.**

(a)       Each Lender acknowledges represents and warrants that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

(b)       Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such analysis on behalf of the Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders. Each Lender, by delivering its signature page to this Agreement or an Assignment and Assumption, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Required Lenders, or Lenders, as applicable, on the Closing Date. Each Lender acknowledges that none of the Agents or their Related Parties have made any representation or warranty to it, and that no act by any Agent or its Related Parties hereinafter taken shall be deemed to constitute any representation or warranty by any Agent or its Related Parties to any Lender. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by an Agent, no Agent or any of its Related Parties shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Borrower or any other Person party to a Loan Document that may come into the possession or control of such Agent or its Related Parties.

**9.08**      **No Other Duties, Etc.** Each Agent shall have only those duties and responsibilities that are expressly specified herein for such Agent and the other Loan Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. The duties of each Agent shall be mechanical and administrative in nature; and no Agent shall have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon such Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties.

**9.09**      **[Reserved].**

**9.10**      **Guaranty and Collateral Matters.**

(a)       Each Secured Party hereby and/or by accepting the benefits of the Collateral authorizes each Agent, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of Secured Parties with respect to the Guaranty, the Collateral and the Security Documents, as applicable. Subject to Section 10.01, without further written consent or authorization from any Secured Party, each Agent may execute any documents or instruments necessary to (i) under the circumstances described in clause (A) of Section 10.21(a), confirm or acknowledge that the Liens on the Collateral no longer secure the Obligations, (ii) in connection with a sale or disposition of assets permitted by this Agreement, release any Liens encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 10.01) have otherwise consented, (iii) release any Guarantor from the Guaranty pursuant to Section 10.21 or with respect to which Required Lenders (or such other Lenders as may be required to give such consent under Section 10.01) have otherwise consented or (iv) acknowledge and confirm that specified assets of the Loan Parties are Excluded Assets.

84

(b)        The Lenders irrevocably authorize the Administrative Agent to release any Guarantor from its obligations under the Guaranty in accordance with the terms of Section 10.21. Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.10.

(c)        The Lenders irrevocably authorize the Collateral Agent to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document in accordance with the terms of Section 10.21. Upon request by the Collateral Agent at any time, the Required Lenders will confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property in accordance with this Section.

**9.11    Withholding Tax**. To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting the provisions of Section 3.01 or 3.04, each Lender shall, and does hereby, indemnify the Administrative Agent, and shall make payable in respect thereof within 30 days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of such Administrative Agent to properly withhold tax from amounts paid to or for the account of any applicable Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective), whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any applicable Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 9.11. The agreements in this Section 9.11 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

**9.12    Concerning the Collateral and Related Loan Documents**. Each Lender authorizes and directs each Agent to enter into, and agrees to be bound by, this Agreement (and to make all representations, warranties, covenants, and agreements on behalf of the Lenders as set forth therein), the Security Documents, and the other Loan Documents, including, without limitation, each Loan Document to be executed by such Agent and set forth on Schedule 6.18 hereto. Each Lender hereby acknowledges and agrees that (x) the foregoing instructed actions constitute an instruction from all the Lenders under this Section and (y) this Article 9 and Section 10.04 and any other rights, privileges, protections, immunities, and indemnities in favor of any Agent hereunder apply to any and all actions taken or not taken by such Agent in accordance with such instruction. Each Lender agrees that any action taken by the Collateral Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by the Collateral Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

**9.13    Survival**. The agreements in this Article 9 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

**ARTICLE X
MISCELLANEOUS**

**10.01    Amendments, Etc**. No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower, or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower, or the applicable Loan Party (in each case with a copy to the Agents), as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)        extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

85

(b)        postpone any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees or other amounts due to the Lenders (or any of them) (it being understood that the waiver of, or amendment to the terms of, any mandatory prepayment shall not constitute such a postponement) without the written consent of each Lender directly affected thereby;

(c)        waive, reduce or postpone the principal of, or the stated rate of interest specified herein on, any Loan, or (subject to clause (y) of the first *proviso* after clause 10.01(h) below) any fees or premiums or other amounts payable hereunder without the written consent of each Lender directly affected thereby; provided, however, that, without limiting the effect of clauses 10.01(h) below or the proviso directly below, only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)        change Section 2.13 or Section 8.04 in a manner that would alter the pro rata sharing of payments required thereby in a manner that by its terms modifies the application of such payments required thereby to be on a non- pro rata basis without the written consent of each Lender adversely affected thereby;

(e)        [reserved];

(f)        change any provision of this Section 10.01 or the definitions of "Required Lenders," or "Applicable Percentage" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender affected thereby; provided, with the consent of the applicable Required Lenders, additional extensions of credit pursuant hereto may be included in the determination of "Required Lenders" or "Applicable Percentage" on substantially the same basis as the Term Loans and the Roll-Up Loans, as applicable, are included on the Closing Date.

(g)        other than as permitted by Section 9.10 and Section 10.21, release (i) all or substantially all of the Guarantors from the Guaranty (as measured by value, not by number) or all or substantially all of the Collateral, except as expressly provided in the Loan Documents and except in connection with a "credit bid" undertaken by the Collateral Agent at the direction of the Required Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code or other sale or disposition of assets in connection with an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents (in which case only the consent of the Required Lenders will be needed for such release) or (ii) all or substantially all of the Collateral covered by the Security Documents without the written consent of each Lender, in each case unless the release is permitted hereunder pursuant to Section 10.21; or

(h)        [reserved];

provided, that (x) no amendment, waiver or consent shall, unless in writing and signed by the applicable Agent in addition to the Lenders required above, affect the rights or duties of such Agent under this Agreement or any other Loan Document; and (y) any Agency Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties to such Agency Fee Letter.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (i) the Commitment of such Lender may not be increased or extended and (ii) the principal of any Loan owed to such Lender may not be reduced without the consent of such Lender.

Notwithstanding the foregoing, the Borrower and the Agents may amend this Agreement and the other Loan Documents without the consent of any Lender (a) to cure any ambiguity, omission, mistake, error, defect or inconsistency (as reasonably determined by the Borrower in consultation with the Agents), so long as such amendment, modification or supplement does not adversely affect the rights of any Lender or the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment, (b) to add a Guarantor with respect to the Loans or collateral to secure the Loans, (c) to make administrative changes that do not adversely affect the rights of any Lender, (d) to integrate any other Funded Debt of the Borrower and its Subsidiaries that is secured by Liens on the Collateral (or any portion thereof) that rank pari passu in right of security with the Liens on the Collateral securing the Obligations or

86

(e) to make technical, administrative or other changes that do not adversely affect the rights of any Lender in respect of provisions relating to the respective rights, roles or responsibilities of the Agents.

The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances.

Any such waiver and any such amendment or modification pursuant to this Section 10.01 shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Agents and all future holders of the Loans.  In the case of any waiver, the Borrower, the Lenders and the Agents shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Default or Event of Default that is waived pursuant to this Section 10.01 shall be deemed to be cured and not continuing during the period of such waiver.

**10.02    Notices; Effectiveness; Electronic Communication.**

(a)    Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by telecopier (except for any notices sent to any Agent) as follows or sent by electronic communication as provided in subsection (b) below, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower or any Agent to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified on Schedule 10.02 or in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not sent during normal business hours for the recipient, shall be deemed to have been sent at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).  Notwithstanding the foregoing, (a) no notice to any Agent shall be effective until received by such Agent and (b) any such notice or other communication shall at the request of such Agent be provided to any co-agent, sub-agent or attorney-in-fact appointed pursuant to Section 9.03(c) as designated by such Agent from time to time.

(b)    Electronic Communications.  Notices and other communications to any Agent and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, including the Platform) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Agents or the Borrower may, in their discretion, agree to accept notices and other communications to the Agents or the Borrower hereunder by electronic communications pursuant to procedures approved by the Administrative Agent or the Borrower, as applicable, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received

upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  Each Loan Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution.  In no event shall any Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the such Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses have resulted from the gross negligence or willful misconduct of such Agent Party, as determined by a final non- appealable judgment of a court of competent jurisdiction; provided, however, that in no event shall the Borrower or any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages); provided that such waiver shall not limit any Loan Party's reimbursement or indemnification obligations under Sections 10.04(a) or 10.04(b), respectively.  Each Loan Party, each Lender, and each Agent agrees that any Agent may, but shall not be obligated to, store any electronic communication on the Platform in accordance with such Agent's customary document retention procedures and policies.

(d)      Defaults.  Any notice of Default or Event of Default may be provided by telephone if confirmed promptly thereafter by delivery of written notice thereof.

(e)      Change of Address, Etc.  The Borrower and any Agent may change its address, electronic mail address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, electronic mail address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(f)      Reliance by Agents and Lenders.  The Agents and the Lenders shall be entitled to rely and act upon any notices (including telephonic Borrowing Notices) purportedly given by or on behalf of the Borrower, even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic notices to and other telephonic communications with any Agent may be recorded by such Agent, and each of the parties hereto hereby consents to such recording.

(g)      Private Side Information Contacts.  Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to information that is not made available through the "Public-Side Information" portion of the Platform and that may contain Private-Side Information.  In the event that any Public Lender has determined for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other Lenders may have availed themselves of such information and (ii) neither the Borrower nor any Agent has any responsibility for such Public Lender's decision to limit the scope of the information it has obtained in connection with this Agreement and the other Loan Documents.

**10.03    No Waiver; Cumulative Remedies**.  No failure by any Lender or any Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan

Document shall impair such right, remedy, power or privilege or be construed to be a waiver of any default or acquiescence therein; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.04    Expenses; Indemnity; Damage Waiver.**

(a)    <u>Costs and Expenses</u>.  The Borrower shall pay (i) all reasonable and documented out-of-pocket legal and other expenses incurred by the Agents and their respective Affiliates (including the reasonable and documented fees, charges and disbursements of (x) Ropes & Gray LLP, as primary counsel for the Agents and their Affiliates, (x) Akin Gump Strauss Hauer & Feld LLP and Milbank LLP and  Bryan Cave Leighton Paisner LLP, as counsel to the Backstop Lenders, (y) a single local counsel in each relevant jurisdiction and any special counsel reasonably deemed necessary by the Agents, and (z) a single local counsel in each relevant jurisdiction and any special counsel reasonably deemed necessary by the Lenders), in each case, in connection with the preparation, due diligence, negotiation, execution, delivery, administration and enforcement of this Agreement and the other Loan Documents or any amendments, modifications, consents, or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) [reserved] and (iii) all reasonable and documented out-of-pocket legal and other expenses (including the cost of any investigation or preparation) incurred by any Agent or any Lender (including the reasonable fees, charges and disbursements of (x) Ropes & Gray LLP, as primary counsel for the Agents and their Affiliates, (y) Akin Gump Strauss Hauer & Feld LLP and Milbank LLP, as counsel to the Backstop Lenders, (y) a single local counsel in each relevant jurisdiction and any special counsel reasonably deemed necessary by the Agents, and (z) a single local counsel in each relevant jurisdiction and any special counsel reasonably deemed necessary by the Lenders (and, in the case of an actual or perceived conflict of interest where the Indemnitees affected by such conflict notifies the Borrower of the existence of such conflict, of another firm of counsel for such affected Indemnitees and local counsel for the conflicted party)), in each case, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    <u>Indemnification by the Borrower</u>.  The Borrower shall indemnify the Agents (and any co-agent, sub-agent or attorney-in-fact thereof) and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities (including any Environmental Liability), obligations, penalties, actions, judgments, and related reasonable and documented out-of-pocket costs, fees and expenses (including the reasonable documented out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee (whether or not such investigation, litigation, claim or proceeding is brought by the Borrower, the Borrower's equity holders, affiliates or creditors or an Indemnitee and whether or not any such Indemnitee is otherwise a party thereto and without regard to the exclusive or contributory negligence of such Indemnitee) or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of any Agent (and any co-agent, sub-agent or attorney-in-fact thereof) and its Related Parties only, the administration and enforcement of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom and (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto and without regard to the exclusive or contributory negligence of such Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are found in a final, non-appealable judgment by a court of competent jurisdiction to (x) have resulted from the gross negligence or willful misconduct of such Indemnitee (or any of such Indemnitee's controlled affiliates or any of its or their respective officers, directors, employees, agents, controlling persons or members of any of the foregoing) or (y) have arisen out of or in connection with any claim, litigation, loss

89

or proceeding not involving an act or omission of the Borrower or any of its Related Parties and that is brought by an Indemnitee against another Indemnitee (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an Agent or arranger or any similar role under this Agreement or any claims arising out of any act or omission of the Borrower or any of its Affiliates). The Borrower also agrees that no Indemnitee shall have any liability (whether direct or indirect, in contract, tort or whether based on such Indemnitee's exclusive or contributory negligence or otherwise) to the Borrower for or in connection with this Agreement or the other Loan Documents, any transactions contemplated hereby or thereby or such Indemnitees' role or services in connection herewith or therewith, except to the extent that any liability for losses, claims, demands, damages, liabilities or expenses incurred by the Borrower resulted from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final, non-appealable judgment. This Section 10.04(b) shall not apply with respect to Taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     Reimbursement and Indemnification by Lenders. To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Agents (or any such co-agent, sub-agent or attorney-in-fact thereof) or any Related Party (and without limiting its obligation to do so), each Lender severally agrees to reimburse and indemnify the Agents (or any such co-agent, sub-agent or attorney-in-fact) or such Related Party, as the case may be, with respect to such Lender's Applicable Percentage (determined as of the time that such reimbursement or indemnity is sought), for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by any Agent (or any Affiliate thereof) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's (or such Affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)     Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, no party hereto shall assert, and each hereby waives, any claim against the Borrower and its Affiliates or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof; provided that such waiver shall not limit any Loan Party's reimbursement or indemnification obligations under Sections 10.04(a) or 10.04(b), respectively. No Indemnitee referred to in subsection (b) above or the Borrower and its Affiliates shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent such damages result from the gross negligence or willful misconduct of such Indemnitee.

(e)     Payments. All amounts due under this Section shall be payable not later than ten Business Days after written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(f)     Survival. The agreements in this Section shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement. The reimbursement, indemnity and contribution obligations of the Borrower under this Section 10.04 will be in addition to any liability which the Borrower may otherwise have, will extend upon the same terms and conditions to any affiliate of any Indemnitee and the partners, members, directors, agents, employees, and controlling persons (if any), as the case may be, of any Indemnitee and any such affiliate, and will be binding upon and inure to the benefit of any successors and assigns of the Borrower, any Indemnitee, any such affiliate, and any such Person.

**10.05    Marshalling; Payments Set Aside**. Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any payment by or on behalf of the Borrower is made to the Agents or any Lender, or the Agents or any Lender enforces any security interests or exercises its right of setoff, and such payment

90

or the proceeds of such enforcement or setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Agents or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to each Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by such Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive Payment in Full and the termination of this Agreement.

**10.06    Successors and Assigns.**

(a)    <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder, except through a transaction permitted hereunder, without the prior written consent of the Agents and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (e) of this Section, (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section or (iv) pursuant to the syndication of Loans in accordance with the Restructuring Support Agreement.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (e) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.  Any Lender may at any time sell, assign or transfer to one or more Eligible Assignees (and any assignee pursuant to syndication of Loans in accordance with the Restructuring Agreement), upon the giving of notice to the Borrower and the Administrative Agent, all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it or other Obligations); provided that:

(i)    except (a) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it, which such amount is less than the applicable minimum transfer amount set forth below, (b) in the case of an assignment of Loans in connection with the syndication of Loans contemplated in the Restructuring Support Agreement, or (c) in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent, shall not be less than $1,000,000 in the case of an assignment of Loans and, unless each of the Administrative Agent and, so long as no Event of Default under Section 8.01(a), (f) or (g) has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided that the Borrower shall be deemed to have consented to an assignment of Loans unless it shall have objected thereto by written notice to the Administrative Agent within seven (7) Business Days after having received notice thereof; provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)    [reserved];

(iv)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500 (provided however, that (i) the Administrative Agent may in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and (ii) the Administrative Agent does hereby waive such processing and recordation fee in connection with an assignment to an assignee which is already a Lender or is an affiliate or Approved Fund of a Lender or a Person under common management with a Lender) and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and to the Administrative Agent and the Borrower any such know-your-customer documents, forms, certificate or other evidence, if any, as the assignee under such Assignment and Assumption, including that as may be required to deliver pursuant to Section 3.01;

(v)      in connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to any Agent and any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Laws without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs; and

(vi)      pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and related Commitments.

Subject to acceptance and recording thereof in the applicable Register by the Administrative Agent pursuant to subsection (d) of this Section, from and after the closing date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 3.01 (subject to the requirements and limitations therein, including the requirements of Section 3.01(e)), 3.04, 3.05 and 10.04 with respect to facts and circumstances occurring prior to the closing date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the effective date of such Assignment and Assumption that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.06, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(c)      [Reserved].

(d)      Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and

principal amounts of (and stated interest on) the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide).  The Register shall be available for inspection by the Borrower and each Lender (solely as to the amount of Loans of such Lender) at any reasonable time and from time to time upon reasonable prior written notice.

(e)      Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or any Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender, to the extent that it has a consent right hereunder, will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a), (b), (c), (g) and (h) of the first proviso to Section 10.01 that affects such Participant (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof).  Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Section 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment, provided, that in the case of Section 3.01, such Participant shall have complied with the requirements of such section (it being understood that the documentation required under Section 3.01(e) shall be delivered to the participating Lender).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; such Participant agrees to be subject to Section 2.13 as though it were a Lender.

Each Lender that sells a participation, acting for this purpose as a non-fiduciary agent (solely for tax purposes) of the Borrower, shall maintain a register for the recordation of the names and addresses of the Participants and principal amount of (and stated interest on) each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender and each Loan Party shall treat each Person whose name is recorded in the Participant Register pursuant to the terms hereof as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

(f)      Limitation upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(g)      Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note(s), if any) to secure obligations of such Lender to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such

pledgee or assignee for such Lender as a party hereto; provided further, that in no event shall the applicable Federal Reserve Bank, pledgee or trustee, be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

(h)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

**10.07    Treatment of Certain Information; Confidentiality**.  Each of the Agents and the Lenders agrees that it will treat as confidential (to the extent clearly identified at the time of delivery as confidential) all information provided to it hereunder or under any other Loan Document by or on behalf of the Borrower or any of its Subsidiaries or Affiliates (collectively, "Information") in accordance with the Agents' and the Lenders' applicable customary procedures for handling confidential information of such nature, except to the extent such Information (a) is publicly available or becomes publicly available other than by reason of disclosure by the Agents or the Lenders, any of their respective affiliates or representatives in violation of this Agreement or the other Loan Documents, (b) was received by the Agents and the Lenders from a source (other than the Borrower or any of its affiliates, advisors, members, directors, employees, agents or other representatives) not known by the Agents and the Lenders to be prohibited from disclosing such Information to such Person by a legal, contractual or fiduciary obligation to the Borrower or (c) was already in the Agents' and the Lenders' possession from a source other than the Borrower or any of its affiliates, advisors, members, directors, employees, agents or other representatives or is independently developed by such Person without the use of or reference to any such confidential information; provided, however, that nothing herein will prevent the Agents and the Lenders from disclosing any such Information (including Information regarding Disqualified Institutions) (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable Law or compulsory legal process (in which case such Person agrees to inform the Borrower promptly thereof to the extent not prohibited by law), (b) upon the request or demand of any regulatory authority or any self-regulatory authority having jurisdiction over such Person or any of its affiliates, (c) to such Person's affiliates and such Person's and affiliates' respective officers, directors, partners, members, employees, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, legal counsel, independent auditors and other experts or agents who need to know such Information and on a confidential basis and who are informed of the confidential nature of the Information, (d) to existing Lenders and to potential and prospective Agents, Lenders, assignees, participants and any direct or indirect contractual counterparties to any Hedging Agreement relating to the Borrower or its obligations under this Agreement, in each case, subject to such recipient's agreement (which agreement (other than Disqualified Institutions) may be in writing or by "click through" agreement or other affirmative action on the part of the recipient to access such Information and acknowledge its confidentiality obligations in respect thereof) pursuant to customary practice) to keep such Information confidential on substantially the terms set forth in this Section 10.07, (e) to ratings agencies who have agreed to keep such Information confidential on terms no less restrictive than this Section 10.07 in any material respect or otherwise on terms acceptable to the Borrower in connection with obtaining ratings of the Loans, (f) for purposes of establishing a "due diligence" defense, (g) on a confidential basis, to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (h) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder or (i) upon Borrower's prior written consent (which may be by email). In addition, the Agents may disclose the existence of this Agreement and Information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents in connection with the administration and management of this Agreement and the other Loan Documents.

Each of the Agents and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Laws, including Federal and state securities laws.

**10.08    Right of Setoff**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, subject to the Orders, upon the occurrence of any Event of Default or at maturity each Lender and its Affiliates is hereby authorized by each Loan Party at any time or from time to time subject to the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Loan Party or to any other Person (other than the Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Loan Party against and on account of the obligations and liabilities of any Loan Party to such Lender hereunder, including all claims of any nature or description arising out of or connected hereto, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Article II and although such obligations and liabilities, or any of them, may be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Sections 2.18 and 8.04 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and its Affiliates under this Section 10.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09    Usury Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to the Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and the Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

**10.10    Counterparts; Integration**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.11    Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof and the funding of any Borrowing.  Such representations, warranties and agreements have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Loan Party

set forth in Sections 3.01, 3.04, 3.05, 10.04(a), 10.04(b) and 10.08 and the agreements of Lenders set forth in Sections 2.13, 9.03, 9.12, 10.04(c), and 10.05 shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments, the repayment, satisfaction or discharge of all obligations under any Loan Document, and the termination of this Agreement.

**10.12    Severability**.  If any provision of this Agreement or the other Loan Documents or any obligation hereunder or under any other Loan Document is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions or obligations of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions or obligations with valid provisions or obligations the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions or obligations.  The invalidity of a provision or obligation in a particular jurisdiction shall not invalidate or render unenforceable such provision or obligation in any other jurisdiction.

**10.13    Replacement of Lenders**.  If (a) any Lender requests compensation under Section 3.04, (b) the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (c) any Lender is at such time a Defaulting Lender or has given notice pursuant to Section 3.02 or (d) any Lender becomes a "Nonconsenting Lender" (hereinafter defined), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to (and such Lender shall) assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interest, rights (other than its existing rights to payments pursuant to Section 3.01 or 3.04) and obligations under this Agreement and the related Loan Documents to an assignee selected by the Borrower that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)       the Administrative Agent shall have received the assignment fee specified in Section 10.06(b) from the Borrower (provided however, that the Administrative Agent may in its sole discretion elect to waive such processing and recordation fee in the case of any assignment);

(b)       such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)       in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(d)       such assignment does not conflict with applicable Laws,

(e)       neither any Agent nor any Lender shall be obligated to be or to find the assignee; and

(f)       in the case of an assignment resulting from a Lender becoming a Nonconsenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.  In the event that (x) the Borrower or the Administrative Agent has requested the Lenders to consent to a departure or waiver of any provisions of the Loan Documents or to agree to any amendment thereto and (y) the Required Lenders or Required Facility Lenders, as applicable, have agreed to such consent, waiver or amendment, then any such Lender, who does not agree to such consent, waiver or amendment and whose consent would otherwise be required for such departure, waiver or amendment, shall be deemed a "Nonconsenting Lender." Any such replacement shall not be deemed a waiver of any rights that the Borrower shall have against the replaced Lender.

Each Lender agrees that if the Borrower exercises its option hereunder to cause an assignment by such Lender as a Nonconsenting Lender or otherwise pursuant to this Section 10.13, such Lender shall, promptly after receipt of written notice of such election, execute and deliver all documentation necessary to effectuate such assignment in accordance with Section 10.06.  In the event that a Lender does not comply with the requirements of the immediately preceding sentence within one Business Day after receipt of such notice, each Lender hereby authorizes and directs the Borrower to execute and deliver such documentation as may be required to give effect to an assignment in accordance with Section 10.06 on behalf of a Nonconsenting Lender or Lender replaced pursuant to this Section 10.13, and any such documentation so executed by the Borrower shall be effective for purposes of documenting an assignment pursuant to Section 10.06.

**10.14    Governing Law; Jurisdiction; Etc.**

(a)    GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

(b)    CONSENT TO JURISDICTION.  SUBJECT TO CLAUSE (E) OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER LOAN DOCUMENTS, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND, IF THAT COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, ANY FEDERAL COURT OF THE UNITED STATES SITTING IN THE BOROUGH OF MANHATTAN OR, IF THAT COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, IN ANY STATE COURT LOCATED IN THE CITY AND COUNTY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH LOAN PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE (SUBJECT TO CLAUSE (E) BELOW) JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE LOAN PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.02; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE LOAN PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT THE AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY LOAN DOCUMENT OR AGAINST ANY COLLATERAL OR THE ENFORCEMENT OF ANY JUDGMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT.

**10.15    Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS

97

AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.15 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**10.16    USA PATRIOT Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined) and each Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or such Agent, as applicable, to identify such Loan Party in accordance with the PATRIOT Act.

**10.17    Time of the Essence**.  Time is of the essence of the Loan Documents.

**10.18    [Reserved]**.

**10.19    No Advisory or Fiduciary Responsibility**.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Agent or Lender, on the one hand, and such Loan Party, its stockholders or its affiliates, on the other.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Agents and the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Borrower and their Affiliates, on the one hand, and the Agents, on the other hand, (B) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent, and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party, its management, stockholders, creditors or any of its affiliates or any other Person with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its stockholders or its Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (B) neither any of the Agents nor any Lender has any obligation to the Borrower or any of its respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that conflict with those of the Borrower and its respective Affiliates, and neither any of the Agents nor any Lender has any obligation to disclose any of such interests to the Borrower or its respective Affiliates.  Each Loan Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto.  To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.20    [Reserved]**

**10.21    Release of Liens and Release from Guaranty.**

(a)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, but subject to the Orders, the Collateral Agent is hereby irrevocably authorized by each Lender to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document or otherwise encumbering any item of Collateral (and to execute any documents or instruments necessary, advisable or otherwise required or reasonably requested by any Loan Party to do so) (A) after Payment in Full, (B) (i) upon any sale or other transfer by any Loan Party of any Collateral that is permitted under this Agreement (other than a sale or other transfer to a Loan Party or any other Person that is required to become a Loan Party) or (ii) upon effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral pursuant to Section 10.01, (C) upon the approval, authorization or ratification in writing by the Required Lenders (or such other percentage of the Lenders whose consent is required by Section 10.01) with respect to the release of such Collateral, (D) upon a Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder, with respect to the Collateral owned by such Guarantor or (E) if an asset becomes an Excluded Asset. After any of (v) Payment in Full, (w) upon any sale or other transfer of a Loan Party that is permitted under this Agreement (other than a sale or other transfer to a Loan Party or any other Person that is required to become a Loan Party), (x) upon the approval, authorization or ratification in writing by the Required Lenders (or such other percentage of the Lenders whose consent is required by Section 10.01) with respect to the release of any Guarantor under the terms of the Guaranty or (y) upon a Guarantor no longer being a Guarantor by virtue of the definition thereof or a transaction permitted hereunder, each applicable Guarantor (or, in the case of clause (w) above, the applicable Guarantor so sold or transferred) shall automatically be released from the Guaranty, all without delivery of any instrument or performance of any act by any Person; provided that any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(b)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, subject to the Orders, in connection with any termination or release pursuant to this Section 10.21, the Administrative Agent and/or the Collateral Agent, as applicable, shall be, and are hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender) to execute and deliver, and shall promptly execute and deliver to the applicable Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release (including (1) UCC termination statements and (2) in the case of a release of Mortgages, a partial release) or to confirm that an asset of a Loan Party is not Collateral (including returning to the Borrower any possessory Collateral that is in the possession of the Collateral Agent and is the subject of such release); provided, that (1) neither Agent shall be required to execute any document or take any action necessary to evidence such termination or release on terms that, in its opinion or the opinion of its counsel, could expose such Agent to liability or create any obligation or entail any consequence other than such termination or release without recourse, representation, or warranty, and (2) the Loan Parties shall have provided such Agent with such certifications or documents as such Agent shall reasonably request in order to demonstrate that the requested termination or release is permitted under this Section 10.21.

(c)     Any execution and delivery of documents, or the taking of any other action, by any Agent pursuant to this Section 10.21 shall be without recourse to or representation or warranty by such Agent.

**10.22    Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.23    Independent Nature of Lenders' Rights**.  Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.24    Acknowledgment and Consent to Bail-In of EEA Financial Institutions**.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**ARTICLE XI**
**GUARANTY**

**11.01    Guaranty of the Obligations**.  Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to the Administrative Agent, for the ratable benefit of the Beneficiaries, the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "Guaranteed Obligations").

**11.02    [Reserved]**.

**11.03    Payment by Guarantors**.  Subject to Section 11.01, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**11.04    Liability of Guarantors Absolute**.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)  Administrative Agent may enforce this Guaranty upon the occurrence, but only during the continuance, of an Event of Default notwithstanding the existence of any dispute between Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)  the obligations of each Guarantor hereunder are independent of the obligations of Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrower or any of such other guarantors and whether or not Borrower is joined in any such action or actions;

(d)  payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)  any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Loan Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)  this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations (other than contingent indemnity obligations not then due and payable), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents, any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document, or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents, or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the

101

corporate structure or existence of General Partner, Holdings (or any Parent) or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations (subject to the limitations set forth in the Security Documents); (vii) any defenses, set-offs or counterclaims which Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

      **11.05    Waivers by Guarantors**.  Each Guarantor hereby waives, to the extent permitted by applicable law, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Beneficiary in favor of any Loan Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, notices under any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrower and notices of any of the matters referred to in Section 11.04 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

      **11.06    Guarantors' Rights of Subrogation, Contribution, Etc**.  Until the Payment in Full of the Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending), each Guarantor hereby waives, to the extent permitted by law, any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary.  In addition, until Payment in Full of the Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending), each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at

any time when the Payment in Full of all Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending) shall not have occurred, such amount shall, to the extent possible under applicable law, be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

11.07    **Subordination of Other Obligations**.  Any Indebtedness of Borrower or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall, to the extent permitted by applicable law, be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

11.08    **Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until the Payment in Full of all of the Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending).  Each Guarantor hereby irrevocably waives, to the extent permitted by applicable law, any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

11.09    **Authority of Guarantors or Borrower**.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

11.10    **Financial Condition of Borrower**.  Any Credit Extension may be made to Borrower or continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrower at the time of any such grant or continuation.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrower. Each Guarantor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of Borrower and its ability to perform its obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives, to the extent permitted by applicable law, and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by any Beneficiary.

*[Signature pages follow]*

103

**Schedule 1.01(a)**

**Guarantors**

| Guarantor | Type of Entity | Jurisdiction of Organization |
|---|---|---|
| Adena Resources, LLC | Limited liability company | Delaware |
| Akin Energy LLC | Limited liability company | Delaware |
| American Century Mineral LLC | Limited liability company | Delaware |
| American Century Transport LLC | Limited liability company | Delaware |
| Coal Field Construction Company LLC | Limited liability company | Delaware |
| Coal Field Repair Services LLC | Limited liability company | Delaware |
| Foresight Coal Sales LLC | Limited liability company | Delaware |
| Foresight Energy Employee Services Corporation | Corporation | Delaware |
| Foresight Energy GP LLC | Limited liability company | Delaware |
| Foresight Energy Finance Corporation | Corporation | Delaware |
| Foresight Energy Labor LLC | Limited liability company | Delaware |
| Foresight Energy LP | Limited partnership | Delaware |
| Foresight Energy Services LLC | Limited liability company | Delaware |
| Foresight Receivables LLC | Limited Liability Company | Delaware |
| Hillsboro Energy LLC | Limited liability company | Delaware |
| Hillsboro Transport LLC | Limited liability company | Delaware |
| LD Labor Company LLC | Limited liability company | Delaware |
| Logan Mining LLC | Limited liability company | Delaware |
| M-Class Mining, LLC | Limited liability company | Delaware |
| Mach Mining, LLC | Limited liability company | Delaware |
| Macoupin Energy LLC | Limited liability company | Delaware |
| MaRyan Mining LLC | Limited liability company | Delaware |
| Oeneus LLC (d/b/a/ Savatran LLC) | Limited liability company | Delaware |
| Patton Mining LLC | Limited liability company | Delaware |
| Seneca Rebuild LLC | Limited liability company | Delaware |

Case 20-33046 Document 04 Filed in TXSB on 04/23/20 Main Document

| Guarantor | Type of Entity | Jurisdiction of Organization |
|---|---|---|
| Sitran LLC | Limited liability company | Delaware |
| Sugar Camp Energy, LLC | Limited liability company | Delaware |
| Tanner Energy LLC | Limited liability company | Delaware |
| Viking Mining LLC | Limited liability company | Delaware |
| Williamson Energy, LLC | Limited liability company | Delaware |

**Schedule 2.01**

**<u>Commitments, Roll-Up Loans, Applicable Percentages</u>**

[On file with the Administrative Agent]

**Schedule 2.02**

**<u>Backstop Commitments</u>**

[On File with the Administrative Agent]

**Schedule 5.08(b)**

**Fee Owned Material Real Property**

<u>DEBTOR/GRANTOR</u>:

MACOUPIN ENERGY LLC
14300 Brushy Mound Road
Carlinville, Illinois  62626

**Macoupin County, Illinois**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/22/2009 | ExxonMobil Coal USA, Inc. to Macoupin Energy LLC | Various tracts of surface and coal reserves. The coal reserves were sold to WPP or Colt and leased back. The surface not required for operations has been conveyed to New River Royalty LLC | MA-0019 493145 | Owned | Yes |

<u>DEBTOR/GRANTOR</u>:

WILLIAMSON ENERGY, LLC
16468 Liberty School Road
Marion, IL  62959

**Williamson County, Illinois**

**Franklin County, Illinois (Coal Reserves only)**

| <u>Description/Title of</u> | <u>Date</u> | <u>Parties</u> | <u>Brief Legal Description</u> | <u>Recording Information</u> | <u>Owned or Leased</u> | <u>Subject to Mortgage</u> |
|---|---|---|---|---|---|---|
| Deed | 8/12/2010 | Williamson Development Company, LLC and Williamson Energy, LLC | Surface required for Williamson Energy, LLC Operations[2] | NOT RECORDED | Owned | Yes |
| Easement | 8/12/2010 | Williamson Development Company, LLC and Williamson Energy, LLC | "Snake areas" required for Williamson Energy, LLC Operations | WC 325-899 | Owned | Yes |

---

[2] This excludes the real property released pursuant to that certain Fifth Amendment and Partial Release of Fee and Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of September 26, 2016, by and between Williamson Energy, LLC, as Mortgagor, and Citibank, N.A., in its capacity as Agent, consisting of approximately 28.55 acres of surface land.

<u>DEBTOR/GRANTOR</u>:

SUGAR CAMP ENERGY, LLC
11351 N. Thompsonville Road
Macedonia, Illinois  62860

**Franklin County, Illinois**

**Hamilton County, Illinois (Coal Reserves only)**

**Saline County, Illinois (Coal Reserves only)**

| <u>Description/Title of Document</u> | <u>Date</u> | <u>Parties</u> | <u>Brief Legal Description</u> | <u>Recording Information</u> | <u>Owned or Leased</u> | <u>Subject to Mortgage</u> |
|---|---|---|---|---|---|---|
| Warranty Deed | 1/15/2009 | Rodney Smith and Marta Smith to Sugar Camp Energy, LLC | Pt. Lot 121 and Pt. Lot 122 in Kokopelli Estates | Surface WC-0152, WC481-7 | Owned | Yes |
| Easement | 3/4/2010 | Glendall E Johnston a.k.a Glen Johnston and Carolyn S. Johnston, a.k.a Carolyn Johnston, husband and Wife to Sugar Camp Energy, LLC | NW NW Sec 1-6-4 and NWNE Sec 1-6-4 Franklin County, Illinois | FC-0253-1050-1056 | Owned | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 3/4/2010 | Morris R Clark and Karan S. Clark to Sugar Camp Energy, LLC | NWNE and W2E2NE Sec 2-6-4 Franklin, Illinois | FC-0254 2010-1057 | Owned | Yes |
| Easement | 3/1/2010 | David Blood and Melanie Blood, husband and wife to Sugar Camp Energy, LLC | Pt. E2NENE Sec 2-6-4 Franklin County, Illinois 2010-1058 | FC-0255 | Owned | Yes |
| Easement | 6/5/2010 | Roger L. Sanders and Mary Ellen Sanders to Sugar Camp Energy, LLC | W 10 ac N3/4 of NESE Sec 6-6-5 Hamilton County, Illinois | HC-0078 22-17 | Owned | Yes |
| Warranty Deed | 6/1/2010 | Patrick G. Mascal and Lori S. Mascal to Sugar Camp Energy, LLC | W2NESW and E2S2NWSW Sec 6-6-5 Hamilton Illinois | HC-0075 277-311 | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface in Hamilton County required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |

Case 20-41308   Doc 728   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 660 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface at former Akin site required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |

<u>DEBTOR/GRANTOR</u>:

SITRAN, LLC

| <u>Description/Title of Document</u> | <u>Date</u> | <u>Parties</u> | <u>Brief Legal Description</u> | <u>Recording Information</u> | <u>Owned or Leased</u> | <u>Subject to Mortgage</u> |
|---|---|---|---|---|---|---|
| **MOORAGE OPTIONS/LEASES KENTUCKY** | | | | | | |
| Deed of Correction | 10/22/2009 | Norberta Belle Williams, Harold Alvin Williams and Sitran LLC | An undivided l/4th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Owned | No |
| Deed of Correction | 10/22/2009 | Joyce Mae Hurley and Deon H. Hurley and Sitran LLC | An undivided l/4th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Owned | No |
| Deed of Conveyance | 10/22/2009 | Lisa Michelle Karr Hughes & Darrell C. Hughes and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in | NOT RECORDED | Owned | No |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docum Pg 662 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | the Henderson Co Bk 202 Pg 266 | | | |
| Deed of Conveyance | 10/22/2009 | Rise Karr and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Owned | No |
| Deed of Conveyance | 11/20/2009 | Scott A. Peck & City Peck, his wife and Sitran LLC | An undivided 1/20th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | HC-0051 (Ky) Book 572 Pg 1006 | Owned | No |
| Deed of Conveyance | 11/20/2009 | Stephen K. Peck and Sitran LLC | An undivided 1/20th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | HC-0012 (Ky) Book 572 Pg 1010 | Owned | No |
| **EASEMENTS INDIANA** | | | | | | |
| Easement | 3/4/2009 | Kenneth W. Burgdorf, as Trustee of the Kenneth W. | 4.99 acres located in part of Northeast Quarter of Section 11, | PC-0064 | Owned | No |

Case 20-41308 Doc 28 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Page 663 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Burgdorf Revocable Trust and Marilyn T. Burgdorf, Trustee of the Marilyn T. Burgdorf Revocable Trust and Sitran LLC | Township 7 South, Range 12 West in Posey County Indiana. | (IN) | | |
| Temporary Easement | 11/20/2008 | Pauline Burgdorf and Sitran LLC | 4.99 acres located in part of the Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-00-1 (IN) 200804978 | Owned | No |
| Contract To Acquire Easement | 11/20/2008 | Pauline Burgdorf and Sitran LLC | 4.99 acres located in part of the Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-00-1 (IN) 200804978 closing date 01/15/2012 | Owned | No |
| Non-Exclusive Easement and Temporary Construction Easement | 10/20/2009 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | Part of Southeast Quarter of the Southwest Quarter of Section 22 and part of the Northeast Quarter of the Northwest Quarter of Section 27 all being in Township 6 South, Range 12 West in Posey County, Indiana | PC-00-1 (IN) 200925340 | Owned | No |
| Quit Claim Deed | | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and | Part of the West Half of Section 23, Township 7 South, Range 12 West in Posey County Indiana | PC-00-1 | Owned | No |

Case 20-43308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 664 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | | | | |

DEBTOR/GRANTOR:

OENEUS LLC D/B/A SAVATRAN LLC

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **INDIANA RAIL LOOP AND DOCK** | | | | | | |
| Personal Representatives Deed | 1/9/2009 | Alfred A. Mohr, as Personal Representative of the Estate of Aurelia F. Mohr, deceased and SAVATRAN LLC | Undivided 1/2 interest in: SE NW 14-7-12 except 5 feet on north side; NESW 14-7-12 81.742 acres Posey Co. IN | PC-0001 (IN) 200900228 | Owned | Yes |
| Warranty Deed | 1/9/2009 | Alfred A. Mohr and SAVATRAN LLC | Undivided 1/2 interest in: SE NW 14-7-12 except 5 feet on north side; NESW 14-7-12 81.742 acres Posey Co. IN | PC-0001 (IN) 200900227 | Owned | Yes |
| Warranty Deed | 1/8/2010 | Catherine B. Elbert, Linda Kay Elbert and Catherine Charlene Elbert as General Partners of the Charles R. Elbert Family Limited | 45.949 acres As part of the W/2 23-7-12 Posey Co. IN | PC-0002 (IN) 201000223 | Owned | Yes |

Case 20-41308    Doc 229    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 666 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Partnership and SAVATRAN LLC | | | | |
| Corrective Warranty Deed | 1/8/2010 | Catherine B. Elbert, Linda Kay Elbert and Catherine Charlene Elbert as General Partners of the Charles R. Elbert Family Limited Partnership and SAVATRAN LLC | Pt. SE SW 14-7-12 23 acres & Pt. NW/4 23-7-12 16.30 acres Posey Co. IN | PC-0002 (IN) 201000226. This deed replaces WD 200900675 because of surveyor's error in description. | Owned | Yes |
| Trustee's Deed | 12/17/2008 | Old National Trust Company as Successor Trustee under the James L. Boerner Revocable Trust Agreement and SAVATRAN LLC | Pt. W/2 Section 23-7-12 70 acres Posey Co. IN | PC-0003 (IN) 200805144 | Owned | Yes |

Case 20-10166-JMC Doc 220 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 667 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 12/15/2008 | Kenneth J. Juncker Mary L. Juncker Emily A Moore Robert E Moore Jr. Joseph T. Yount, Beth Ann Folz, as Guardian ad Litem for Alexander A. Moore, Dana M Junker, Rebecca A. Wildeman, Anna L Blankenbaker (each afore mentioned signing as an individual and as a partner in JARD Group, Allyn Simpson, Ronald Simpson, Edward L. Thompson, as personal Representative of the Estate of Marilyn Thompson, Nathalie A. Elderkin, Charles A. Thompson, L. David Allyn, Jennifer L. Velasquez, Matthew D. Allyn and Michael L. Allyn and SAVATRAN LLC | Pt. NWNW & NENW 14-7-12 72.741 acres & 27.986 acres off N side NWNW & Pt. N/2 14-7-12 Posey Co. Indiana | PC-0007-200804978 | Owned | Yes |

Case 20-41308  Doc 228  Filed 04/01/20  Entered 04/01/20 23:45:34  Main Document  Pg 668 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Quitclaim Deed | 12/15/2008 | Kenneth J. Juncker Mary L. Juncker Emily A Moore Robert E Moore Jr. Joseph T. Yount, Beth Ann Folz, as Guardian ad Litem for Alexander A. Moore, Dana M Junker, Rebecca A. Wildeman, Anna L Blankenbaker (each afore mentioned signing as an individual and as a | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0007 (In) 200804975 This was an access road at the top of the Allyn Property | Owned | Yes |
| Correction Quitclaim Deed | 12/17/2009 | Edward l. Thompson, Individually and SAVATRAN LLC | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0007 (In) 200805018 Edward Thompson inadvertently signed Personal Representative of the Estate of Marilyn K Thompson by PRD dated 10/31/2008 | Owned | Yes |

Case PC-0007 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Correction Warranty Deed | 12/17/2009 | Edward l. Thompson, Individually and SAVATRAN LLC | Pt. NWNW & NENW 14-7-12 72.741 acres & 27.986 acres off N side NWNW & Pt. N/2 14-7-12 Posey Co. Indiana | PC-0007 (IN) 200805012 Edward Thompson inadvertently signed as Personal Representative of the Estate of Marilyn K. Thompson by PRD dated 10/31/2003 | Owned | Yes |
| Rec Memo & Option to Purchase | 7/16/2008 | Gerald G. Mohr and Esther R. Mohr and Oeneus LLC d/b/a SAVATAN LLC | 6.89 acres within SW/4 south of Old State Rd. Section 11-7-12 Posey Co. IN | PC-0008 (IN)200803395 Option Expires 07/16/2011. We do not believe we will close on this. | Owned | Yes |
| Warranty Deed | 3/26/2009 | Orval Ungethum and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW/4 Section 14-7-12 29.302 acres Posey Co. IN | PC-0009 (IN) 200901388 | Owned | Yes |

Case 2:09-41308-jrc-228 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 605 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 12/18/2008 | Raymond W. Boerner, Evelyn Staples, Ronald Lee Boerner & Ruben F. Roehr as Personal Rep. of the Estate of Dorothy Mae Roehr and SAVATRAN LLC | E/2 SWNW & NENWSW Section 14-7-12 & 1/2 interest to 5 feet on S Line N/2 NW/4 14-7-2 a distance of 68 1/2 rods and 5 feet in width. Posey Co. IN.30.675 acres | PC-0010 (IN) 200805155 | Owned | Yes |
| Rec Memo & Option to Purchase | 10/14/2008 | Margie J. Angermeier (Life Estate), Glenda S. Elpers(1/3 remainder); Paul L. Angermeier (1/3 remainder); Glenn V. Angermeier (1/3 remainder) and Oeneus LLC d/b/a SAVATRAN LLC | 8 acres as pt of S/2 SW/4 Section 10-7-12 Posey Co IN | PC-0012 (IN) 200804528 Expires 10/14/2010 We do not believe we will close on this. | Owned | Yes |
| Warranty Deed | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0011 (IN) 200901302 Arthur reserves life estate in house and 1ac tract B. Reserves road easement for access to house; right to farm; for | Owned | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 13:35:34   Main Document   Pg 671

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | $1.00 any portion left after construction. | | |
| Quitclaim Deed | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0014 (12) 2009-01504 this is an access road across the top of the Alyn heirs property. | Owned | Yes |
| Non-Penetration Agreement | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (12) Boerner Heirs own minerals would not sell this keeps them from having any development of the minerals. | Owned | Yes |
| Easement | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (12) 20090150 Access easement to house and 2ac and access to 30 | Owned | Yes |

Case 20-41308  Doc 2-7  Filed 06/22/20  Entered 06/22/20 23:45:34  Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Bauman and Oenues LLC d/b/a SAVATRAN LLC | | acres that is land locked after construction. | | |
| Real Estate Mortgage, Security Agreement, Collateral Assignment of Rents and Leases, and Fixture Filing | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (IN) 200901507 Promissory note to Elizabeth Howery and Sharon L. Bauman 1,075,000. paid as follows 287,500 yr1 275,000 yr2 262500 yr3 107500yr3 | Owned | Yes |
| Rec Memo & Option to Purchase | 2/27/2009 | Larry E. Orth 5/12 int. Agnes L. York as Trustee of the Agnes L. York Revocable Trust Agreement 5/12 interest; Vickie L. Orth 2/12 interest and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SWSE 11-7-12 containing 0.90 acres | PC-0015 200900926 | Owned | Yes |

Case 20-13200 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Docu Pg 673 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **EASEMENTS INDIANA** | | | | | | |
| Easement | 9/16/2009 | Oeneus LLC to Southern Indiana Gas and Electric Company and Indiana corp d/b/a Vectren Energy Delivery of Indiana, Inc. | Pt. NE/4 14-7-12 Posey Co IN containing 0.28 acres more or less. | PC-0017 (IN) Electric power line easement Gibson to Brown 345 line. | Owned | No |
| Non-Exclusive Easement and Temporary Construction Easement | 10/20/2009 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | Part of Southeast Quarter of the Southwest Quarter of Section 22 and part of the Northeast Quarter of the Northwest Quarter of Section 27 all being in Township 6 South, Range 12 West in Posey County, Indiana | PC-0018 (IN) 200904548 | Owned | No |
| Electric Distribution Line Easement | 7/13/2010 | Savatran LLC, to Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. | Pt N2 of NW Section 14, Township 7 South, Range 12 West Posey County, Indiana | PC-0021 (IN) Need Recorded Copy | Owned | No |

Case 20-   Doc 228   Entered 04/01/20 23:45:34   Main Docu
Pg 674 of 1005   Entered 04/01/20

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Electric Distribution Line Easement | 7/13/2010 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W2 NE Section 14, Township 7 South, Range 12 West. Posey County, Indiana | PC-0022 (I18) Need Recorded Copy | Owned | No |
| **SUGAR CAMP TO McLEANSBORO RAIL LINE ILLINOIS** | | | | | | |
| Easement | 10/17/2008 | Kelly Markus & Gina Markus to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 BK 516 Pg 156 Rail Road Easement | Owned | Yes |
| Easement | 10/17/2008 | Gerald Spihlman & Judith Spihlman to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres 273-252 | HC-0001 Bk 516 Pg 147 Rail Road Easement | Owned | Yes |
| Easement | 10/24/2008 | Thomas Markus & Jeanete Markus to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 Bk 516 Pg 163 Rail Road Easement | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 7/24/2008 | White Oak Resources Land, LLC to Oeneus LLC d/b/a SAVATRAN | Pt. SW/4 & SE/4 6-5-5 Hamilton County IL containing 11.45 acres | HC-0002 Bk 217 Pg 732 Initial Option was with Larry Myers who sold to White Oak. | Owned | Yes |
| Warranty Deed | 2/4/2008 | Charles R. Moore & Nani Sue Moore to Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW/4 28-5-5 containing 3 acres more or Less Pt. SWNE 29-5-5 containing 13 acres more or less. | HC-0004 Traded 65.63 acres and 8.73 acres of the W/2 NW/4 28-5-5 to Clark. Traded 137 acres in NE/4 29-5-5 Hamilton Co IL to Burris. Remaining property for wet lands mitigation. | Owned | Yes |
| Easement | 9/24/2009 | David Bert Lemke & Shirley K. Lemke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. N/2 SE/4 1-T5S-R5E Hamilton Co. IL containing 10.16 ac | HC-0005 Bk 215 Pg 801 | Owned | Yes |

Docket #02-41130 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Page 676 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 12/19/2007 | Terri S. Irvin, Successor Trustee to the Kenneth C. Myers and Eula P. Myers Revocable Trust to Oeneus LLC d/b/a SAVATRAN LLC | SW NW; NW SW 1-T5S-R5E; 40 acres within E/2 NE/4 and E/2 NE/4 11-T5S-R5E Hamilton Co IL | HC-0006 Bk 273 Pg 22 Traded part of this property to Kenneth Willis. | Owned | Yes |
| Warranty Deed | 5/28/2008 | Grover C. Galloway and Mildred F. Galloway to Oeneus LLC d/b/a SAVATRAN LLC | W/2 SWSE; and E/2 SW/4 3-T5S-R5E Hamilton Co IL containing 100 acres | HC-0008 Bk 273 Pg 812 6.10 acres used for rail. Farming agreement Kenny Waier. | Owned | Yes |
| Special Warranty Deed | 4/21/2008 | Kenneth P. Willis & Wilma June Willis to Oeneus LLC d/b/a SAVATRAN | South 5 acres of NESE 2-T5S-R5E Hamilton Co. IL | HC-0011 Bk 273 Pg61a | Owned | Yes |
| Warranty Deed | 2/28/2008 | Wilma June Willis to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SE 3-T5S-R5E Hamilton County IL containing 7.02 acres | HC-0012 Bk 273 Pg 32a | Owned | Yes |
| Easement | 11/3/2008 | Garry R. Heil & Karla Heil to Oeneus LLC d/b/a SAVATRAN | Pt. W/2 SW 16-T5S-R5E Hamilton Co. IL containing 10.08 acres | HC-0014 Bk 316 Pg 221 | Owned | Yes |

Case 20-11035-JDG    Doc 2288    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Page 677 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 9/15/2009 | David Willett & Robin Willett to Oeneus LLC d/b/a SAVATRAN | Undivided 1/2 interest pt SE/4 9-T5S-R5E Hamilton Co. IL containing 40 acres | HC-0015 Bk 274 Pg 445 Willett retained first right of refusal. | Owned | Yes |
| Warranty Deed | 9/30/2008 | Rickey L. Denham to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE/4 9-T5S-R5E Hamilton Co. IL containing 3.36 acres | HC-0016 Bk 274 Pg 535 The oil line goes through Mr. Denham's residence we had to replace the residence and barn. | Owned | Yes |
| Warranty Deed | 2/5/2008 | Melinda Hunter to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0017 Bk 273 Pg 290 Bennett Heirs | Owned | Yes |
| Warranty Deed | 2/4/2008 | Joyce Annette Medley to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0018 Bk 273 Pg 293 Bennett Heirs. We deeded her oil and gas back Quitclaim Deed 273/458 We did not option the oil and gas. | Owned | Yes |

Filed 01/20/23 Entered 01/20/23 23:45:34 Doc 1620-28 Pg 678 of 1005 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/7/2009 | Hobart J. Campbell & Helen B. Campbell to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 31-5-5 & pt NW/4 6-T5S-R5E containing 9.27 acres; Pt. SW/4 31-T5S-R5E containing 1.84 acres; Pt NW/4 6-T5S-R5E containing 1.28 acres Hamilton Co. IL | HC-0019 Bk 275 Pg 506 Both rail right of way and extra footage at Macedonia road crossing. | Owned | Yes |
| Warranty Deed | 10/10/2006 | Daniel R. Tennyson to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSE 6-T5S-R6E 3.21 acres Hamilton Co. IL 270-595 | HC-0020 Retained only rail right of way traded remainder to Kirsch. | Owned | Yes |
| Special Warranty Deed | 05/052009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. NEWS 6-T5S-R6E 13.003 acres Hamilton Co. IL | HC-0020 Bk 270 Pg 595 Portion traded to Kirsch. | Owned | Yes |
| Easement | 2/17/2009 | Wendell Myers & Judith Myers to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESW 1-T5S-R5E Hamilton Co. IL containing 5.37 | HC-0021 Bk 216 Pg 654 Rail right of way easement | Owned | Yes |
| Warranty Deed | 2/5/2008 | Marilyn Ann Lynn to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0022 Bk 273 Pg 287 Bennett Heirs | Owned | Yes |

Case 12:04130R Doc 228 Filed 04/01/20 23:45:34 Main Docu Pg 679 of 1005 Printed 04/01/20

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 10/25/2008 | Roy Dean Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0023 Bk 274 Pg 667 Bennett Heirs; Mr. Bennett refused to close we filed Specific Performance Complaint Mr. Bennett then decided to close. | Owned | Yes |
| Warranty Deed | 2/20/2008 | Mary Ellen Tennyson to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0024 Bk 273 Pg. 342 Bennett Heirs/ Mrs. Bennett has the option to repurchase | Owned | Yes |
| Warranty Deed | 2/20/2008 | Robert L Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0025 Bk 273 Pg. 318 Bennett Heirs/ Mrs. Bennett has the option to repurchase | Owned | Yes |
| Warranty Deed | 12/11/2009 | Joseph Rexing & Liudmyla Rexing to | 22.68 acres all in Township 5 S. Range 5 E Hamilton Co IL | HC-0027 Bk 276 Pg 628  Mr. | Owned | Yes |

Case 2:14-13468 Filed 04/01/20 Doc 680 Entered 04/01/20 23:45:34 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Oeneus LLC d/b/a SAVATRAN LLC | | Rexing Refused to close filed suit forced to close etc. | | |
| Special Warranty Deed | 12/11/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Joseph Rexing | Pt. E/2 SW & pt. SENW of 20-T5S-R5E Hamilton Co. IL containing 112.13 acres | HC-0027 Bk. Pg Remainder of Judith Gregory traded to Rexing. | Owned | Yes |
| Warranty Deed | 2/14/2007 | Betty Gibbs to Oeneus LLC d/b/a SAVATRAN LLC | Surface only pt W/2 NW and N 10 Ac NWSW 10-T5S-R5E Hamilton Co. IL containing 11.83 acres | HC-0028 Bk. 271 Pg 93 Retained only rail right of way traded remaining Alan Kirsch Special Warranty Deed Bk. 272 Pg 503 | Owned | Yes |
| Easement | 11/28/2006 | Jim Holms & Ruth Holms to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 & pt. W/2 SE/ 2-T5S-R5E Hamilton Co. IL containing 13.17 acres | HC-0029 Bk. 212 Pg 209 Mr. Holms has the right to put a portion of his property to its | Owned | Yes |

Case 20-41308 Doc 22 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Page 681 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | upon completion of the rail | | |
| Warranty Deed | 9/5/2009 | Judith A. Peters and Charles W. Peters to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in South 28.25 acres of W/2 SW 3-T5S-R5E Hamilton Co. IL | HC-0030 Bk 274 Pg 401 Kenny Waier has 10 year farming lease. Must relocate RLC water main | Owned | Yes |
| Warranty Deed | 9/3/2009 | Jerry L. Stiverson; Paula J. Stiverson as individuals and as co-trustees of the Paula J Stiverson Trust to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in South 28.25 acres of W/2 SW 3-T5S-R5E Hamilton Co. IL | HC-0032 Bk 274 Pg 463 Kenny Waier has 10-yr farming lease. Must relocate RLC water main. | Owned | Yes |
| Corrected Warranty Deed | 9/5/2008 | Michael Hutchcraft and Melissa Hutchcraft to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in pt SE/4 of 9-T5S-R5E containing 40 acres Hamilton Co IL | HC-0033 Bk 274 Pg 412 Deed Corrected to waive homestead rights. | Owned | Yes |

Case 2019-01003-DG Filed 04/24/01/20 23:45:34 Main Document Doc 228 Pg 682

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/17/2007 | Laura Dennis f/k/a Laura Lane to Oeneus LLC d/b/a SAVATRAN | Pt NW NW 21-T5s-R5E being 300ft x 160ft. Hamilton Co. IL | HC-0034 Bk 271 Pg 494 Rail design went through Ms. Dennis house; house purchased and moved by Garry Heil. 0.17 acres of the property was conveyed to Dennis Smith by Special Warranty Deed 275/537 | Owned | Yes |
| Warranty Deed | 5/8/2009 | Katherine McRoy f/k/a Katherine Smith; Donald McRoy; Dennis L. Smith and Judy A. Smith to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW NW & Pt. NENW 21-T5S-R5E 3.37 acres Hamilton Co. IL | HC-0035 Bk 275 Pg 541 | Owned | Yes |
| Warranty Deed | 7/30/2008 | Michael D. Burris & Tina Burris to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 21 & Pt. SW NW 21-T5S-R5E Hamilton County IL containing 15.72 acres | HC-0039 Bk 274 Pg237 | Owned | Yes |

Case 20-43363 Doc 82-28 Entered 04/01/20 23:45:34 Main Document Pg 683 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 7/30/2008 | Oeneus LLC d/b/a SAVATRAN LLC to Michael D. Burris & Tina Burris | Pt. NE/4 29-T5S-R5E Hamilton Co. IL containing 136.17 acres | HC-0039 Bk 274 Pg234 Traded pt Charlie Moore property HC-0004 | Owned | Yes |
| Warranty Deed | 11/6/2008 | Robert J. Gray & Denise Gray to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE/4 9-T5S-R5E Hamilton Co. IL containing 51.93 | HC-0040 274 Pg 715 Deed restriction of single family residence and grain farming only Mr. Gray's son has a first right of refusal. | Owned | Yes |
| Warranty Deed | 7/26/2007 | Charles M. Bowers & Tammy Bowers to Oeneus LLC d/b/a SAVATRAN LLC | NE SE; W/2 SE NE 30-T5S-R5E Hamilton Co. IL containing 60 acres. | HC-0041 Bk 272 Pg | Owned | Yes |
| Warranty Deed | 10/2/2008 | Jeffrey A. Lueke and Michele L. Lueke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW/4 16-T5S-R5E 2.65 acres; PT SWSE 9-T5S-R5E 0.02 acre Hamilton Co. IL | HC-0042 Bk 274 Pg 587 | Owned | Yes |

Case 20-41308 Doc 04/01/20 Entered 04/01/20 23:45:34 Main Docu Pg 684 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/6/2007 | Jeffrey A. Lueke and Michele L. Lueke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW/4 16-T5S-R5E 8.64 acres Hamilton Co. IL | HC-0042 Bk 272/7102 | Owned | Yes |
| Warranty Deed | 5/5/2009 | Alan Kirsch & Denise Kirsch to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE/4 6-T5S-R6E & PT SESE 31-T4S-R6E 2.61 acres Hamilton Co. IL | HC-0043 Bk275/538 | Owned | Yes |
| Easement | 5/5/2009 | Alan Kirsch & Denise Kirsch to Oeneus LLC d/b/a SAVATRAN LLC | 8.33 acres pt SESE and E/2 SWSE 9-T5S-R5E; 7.36 acres pt NE/4 6-T5S-R6E & SESE 31-T4S-R6E; 2.70 ac pt NE 6-T5S-R6E Hamilton Co. IL | HC-0043 Bk 217/300 | Owned | No |
| Special Warranty Deed | 5/5/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. W/2 NW/4 10-T5S-R5E Hamilton Co. IL containing 11.51 & Pt W/2 NW/4 10-T5S-R5E containing 66.12 acres Hamilton Co. IL | HC-0043 Bk 275/503 (Traded the Betty Gibbs property less rail to Kirsch) | Owned | Yes |
| Special Warranty Deed | 5/5/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. NW SE 6-T5S-R6E Hamilton County IL containing 13.03 acres; | HC-0043 Bk 275/499 (Traded the remainder of the Tennyson property to Kirsch) | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/6/2008 | Kenneth A. Waier a/k/a Kenneth Waier to Oeneus LLC d/b/a SAVATRAN LLC | Pt SWSW & NWSW 32-T4S-R6E Hamilton Co IL containing 18.17 acres | HC-0044 274/711 (Kenny Waier has 10 yr farming agreement Galloway property) | Owned | Yes |
| Warranty Deed | 4/26/2009 | James Lee Maller to Oeneus LLC d/b/a SAVATRAN LLC | Pt SW/4 31-T5S-R5E Hamilton Co IL containing 5.11 acres | HC-0045 275/462 Railroad line went through Mr. Mallers house and barn both have been removed | Owned | Yes |
| Special Warranty Deed | 4/26/2009 | Oeneus LLC d/b/a SAVATRAN LLC to James Lee Maller | Pt. NE SE 36-T5S-R5E Franklin Co IL containing 5 acres | HC-0046 2009-1998 Property to purchase. SAVATRAN 2009-1206 to replace Mr. Mallers homesite. | Owned | Yes |

Case 20-41308 Doc 288 Filed 04/06/20 Entered 04/06/20 23:45:34 Main Document

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/25/2009 | Norman D. Melvin & Patricia K. Melvin to Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 SE/4 20-T5S-R5E Hamilton Co IL containing 12.14 acres | HC-0046 Bk 275/310 | Owned | Yes |
| Warranty Deed | 4/3/2009 | Gary Kearnery a/k/a Gary W. Kearnery to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SWSW 20-T5S-R5E & pt NWNW 29-T5S-R5E Hamilton Co. IL containing 5acres | HC-0047 Bk275/362 | Owned | Yes |
| Warranty Deed | 12/8/2008 | Dale Miller & Denise Miller to Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 NW/4 31-T5S-R5E Hamilton Co. IL containing 7.51 acres | HC-0049 Bk274/873 We agreed by letter to relocate Mr. Millers water line. | Owned | Yes |
| Warranty Deed | 2/6/2009 | John M. Zelhart to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE/4 30-T5S-R5E Hamilton Co IL containing 1.0 acre | HC-0050 Bk 275/109 We agreed to build him an access road and gave him perpetual access to his property. | Owned | Yes |

Case 20-41308 Doc 22-1 Filed 04/01/20 Entered 04/01/20 23:45:34 Pg 687 of 1005 Main Docu

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/6/2009 | Donald G. Zelhart & Margaret R. Zelhart as co-Trustees of Donald G. Zelhart Living Trust to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest to pt NE/4 30-T5S-R5E Hamilton Co IL containing 4.11 acres | HC-0051 Bk 275/663 Agreed to gravel access road & repurchase rights | Owned | Yes |
| Warranty Deed | 6/24/2008 | Judith G. Gregory to Oeneus LLC d/b/a SAVATRAN LLC | 6 acres pt SESW 20-T5S-R5E Hamilton Co IL | HC-0053 Bk 274/52 Traded 112 acres of this property to Joe Rexing. | Owned | Yes |
| Warranty Deed | 7/16/2008 | David Williams & Brandee Williams to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWNW 29-T5S-R5E Hamilton Co IL 0.65 acres | HC-0056 Bk274/14 Purchased house rail going through garage. House rented. | Owned | Yes |
| Warranty Deed | 10/24/2008 | Alva James Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20th Pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0058 Bk 274/664 Bennett would not close. Filed partition suit to force closing. | Owned | Yes |

Case 20-01303 Doc 28 Filed 01/01/21 Entered 01/01/21 23:45:34 Desc Main Document Page 688 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/7/2009 | Wanda G. Downs & Cecil L Downs to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest pt NE/4 30-T5S-R5E Hamilton Co IL containing 4.11 acres | HC-0059 Bk 275/667 Agreed to gravel access road & repurchase rights. | Owned | Yes |
| Corrected Warranty Deed | 11/17/2008 | Robert A. Williams & Barbara A. Williams to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SENE 1-T6S-R4E Franklin Co IL containing 4.474 | FC-0023 2008-6300 purchased house; house has been removed. | Owned | Yes |
| Warranty Deed | 10/10/2008 | James Gregory Payne, as trustee of James Gregory Payne Trust to Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 NE 11-T6S-R4E & pt W/2 NW 12-T6S-R4E Franklin Co. IL containing 15.33 acres | FC-0024 2008-5818 | Owned | Yes |
| Warranty Deed | 10/10/2008 | James Gregory Payne, as trustee of Zulene Payne Trust to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NE 11-T6S-R4E Franklin Co. IL containing 6.44 acres | FC-0025 2008-5817 | Owned | Yes |
| Warranty Deed | 1/11/2008 | Reba L. Stokes Revocable Living Trust by Reba L. Stokes & Kenneth D. Stokes to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NE; NWSE;SWSE & SESW 1-T6S-R4E NWNE; NENW; N3/4 SE NW 12-T6S-R4E Franklin County IL | FC-0029 2008-0603 | Owned | Yes |

Case 2041188 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Docu Pg 689 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/6/2008 | Morris R. Clark & Karan S. Clark to Oeneus LLC d/b/a SAVATRAN LLC | NE NE 1-T6S-R4E Franklin Co IL 40 acres | FC-0031 2008-1248 | Owned | Yes |
| Easement | 3/6/2008 | Morris R. Clark & Karan S. Clark to Oeneus LLC d/b/a SAVATRAN LLC | 0.685 of the SE SE 36 T5S-R4E Franklin Co IL | FC-0031 2008-1249 | Owned | Yes |
| Special Warranty Deed | 3/6/2008 | Oeneus LLC d/b/a/ SAVATRAN LLC to Morris R. Clark & Karan S. Clark | Pt. W/2 NW/4 28 T5S-R5E Hamilton Co. IL containing 74.36 acres | FC-0031 Bk273/360 Traded remainder of Charlie Moore HC-0004 to Clarks. | Owned | Yes |
| Quit Claim Deed | 4/7/2008 | Louise Harrison to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW corner SE NE 1-T6S-R4E Franklin Co IL containing 1.26 | FC-0134 #2008-1308 Rec. 4/8/2008 | Owned | Yes |
| Quit Claim Deed | 10/28/2009 | Louise Harrison to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE NE 1-T6S-R4E Franklin Co IL | FC-0134 #2009-055 Rec. 11/2/2009 | Owned | Yes |

**POND CREEK TO SUGAR CAMP CONNECTOR ROUTE**

Case 20-41308   Doc 21   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 690 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 9/14/2007 | John H. Wiegand and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NE 10; Pt. NE NE10 T7S; R4E Franklin Co. IL | FC-0086 Purchase rail right of way. #2007-5338 Rec. 9/21/2007 | Owned | No |
| Recording Memo and Option to Purchase | 1/15/2008 | John H. Wiegand and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NE 10; Pt. NE NE10 T7S; R4E Franklin Co. IL | FC-0086 Purchase rail right of way Opt 2 or plan B #2008-0338 Rec. 1/17/2008 | Owned | No |
| Recording Memo and Option to Purchase | 9/18/2007 | Donald L. Bennett and Sharla Bennett and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 14; Pt NW SW 14 T6S R4E Franklin Co. IL | FC-0087 Purchase rail right of way. #2007-5293 Rec. 9/19/2007 | Owned | No |
| Recording Memo and Option to Purchase | 10/8/2007 | Daniel E. Harmon & Terri J. Harmon and Oeneus | Pt. W/2 NW 2 T7S R4E Franklin Co. IL | FC-0106 Purchase rail right of way. | Owned | No |

Case 4:20-cv-41808    Doc 28    Filed 04/01/20    Entered 04/01/20 03:45:34    Main Document    Page 691 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | LLC d/b/a SAVATRAN LLC | | #2007-5836<br><br>Rec.10/11/2007 | | |
| Recording Memo and Option to Purchase | 10/10/2007 | Olen Max Harmon & Becky J Harmon and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 35 T6S R4E Franklin Co IL | FC-0108 Purchase rail right of way<br><br>#2007-5930<br><br>Rec. 10/16/2007 | Owned | No |
| Recording Memo and Option to Purchase | 10/11/2007 | Michael Pike & Brenda Pike and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE NE 27 T7S R4E Franklin Co. IL | FC-0109 Purchase rail right of way. | Owned | No |
| Recording Memo and Option to Purchase | 10/12/2007 | Marion Tow, George M. Tow & Karen L Tow and Oeneus LLC SAVATRAN LLC | Pt. SESE 27 T7S R4E Franklin Co. IL | FC-110 Purchase rail right of way.<br><br>#2007-5931<br><br>Rec. 10/16/2007 | Owned | No |
| Recording Memo and Option to Purchase | 7/2/2008 | Marion Tow, George M. Tow & Karen L Tow and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE SE 22 T7S R4E Franklin Co. IL | FC-110 Purchase of 12.1 acres in addition to right of way. | Owned | No |

Case 20-11032 Doc 228 Filed 01/12/20 Entered 01/12/20 23:45:34 Main Docu... Page 692 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | #2008-3632 Rec. 7/3/2008 | | |
| Warranty Deed | 10/26/2007 | Carlton Heifner and Dixie Heifner and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW SW 22-T7S-R4E Franklin Co. IL 6 acres | FC-0111 Purchase of old rail bed. Hunting Lease to Marion Tow along rail bed. FC 2007-6290 Rec. 10/29/07 | Owned | Yes |
| Warranty Deed | 4/25/2008 | Andrew C. Julian & Susan E. Julian and Oeneus LLC d/b/a SAVATRAN LLC | Pt.SW SE 10- T7S-R4E Franklin Co. IL 27.72 acres | FC-0112 Purchased house and rail right of way. House Rented to Eric Smith | Owned | Yes |
| Recording Memo and Option to Purchase | 10/15/2007 | Gary L. Manis and Sharon L. Manis and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NW 26-T6S-R4E Franklin Co. IL 4.65 acres | FC-0113 Purchased right of way. FC 2007-5922 Rec. 10/16/07 | Owned | No |

Case 08-40420 Doc 28 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 693 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 10/19/2007 | Eddie Essary and Eliane Essary and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSW 2-T7S-R4E Franklin Co. IL 2.25 acres | FC-0114 Purchase rail right of way. FC 2007-6078 Rec. 10/23/07 | Owned | No |
| Recording Memo and Option to Purchase | 10/22/2007 | Cora Jane Taylor & Beth Benns and Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 NW 1; Pt.NWSW 11-T6S-R4E Franklin Co IL 24.86 acres | FC-0115 Purchase rail right of way and additional acres. FC 2007-6232 Rec. 10/31/07 | Owned | No |
| Recording Memo and Option to Purchase | 11/9/2007 | David R. Payne & Rhonda Payne and Oeneus d/b/a SAVATRAN LLC | Pt.NWNE 15 T7S-R4E containing 9 ac; Pt. NW NW 26 T7S-R4E containing 4.64 acres Franklin Co. IL | FC-0122 Purchase rail right of way. FC 2007-6524 Rec. 11/13/07 | Owned | No |
| Warranty Deed | 4/14/2008 | Robert G. Buntin and Marjorie A. Buntin as Trustees of the Robert G. Buntin and Marjorie A. Buntin Joint Living Trust, and Michael M. Buntin and Brenda Buntin as Trustees of the Michael M. | Pt. SW/4 23-6-4 Franklin County IL 7.07 acres; Pt. NW/4 23 and Pt. SW/14 T64-R4E Franklin Co 16.14 acres | FC-0125 Purchase rail right of way. FC-2008-2024 Rec. 4/17/2008 | Owned | Yes |

Filed 04/24/13 08:08 Doc 2584 Pg. 694 of 1005 Entered 04/24/13 23:45:34 Main Document

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Buntin and Brenda Buntin Joint Living Trust and Oeneus LLC d/b/a SAVATRAN | | | | |
| Recording Memo and Option to Purchase | 11/12/2007 | Ruth E. Sweet & Danny Sweet and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 35 T7S R4E Franklin Co. IL 7.48 acres | FC-0125 Purchase of rail right of way. Will plant trees along right of way FC-2007-6522 Rec. 11/14/07 | Owned | No |
| Recording Memo and Option to Purchase | 11/12/2007 | Ruth E. Sweet and Oeneus LLC d/b/a SAVATRAN LLC | Pt.SWNW 35 T7S R4E Franklin Co. IL 0.63 acres | FC-0126 Purchase of rail right of way. Purchased modular home and then sold and had moved FC 2007-6523 Rec. 11/14/07 | Owned | No |

Case 20-41308 Doc 28-1 Filed 04/01/21 Entered 04/01/21 23:45:34 Main Document Pg 695 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 4/23/2009 | James Gregory Payne, as trustee James Gregory Payne Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 SE NW & SW/4 11 T6S-R4E Franklin Co. Il 5.83 acres | FC-0130 Purchase of rail right of way. FC 2009-2110 Rec. 5/4/09 | Owned | Yes |
| Recording Memo and Option to Purchase | 11/28/2007 | Ted Lawrence as Trustee of the Lawrence Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 2 T7S-R4E Franklin Co. IL 9.52 acres | FC-0131 Purchase of rail right of way and isolated land. Must plant trees along rail FC 2007-6806 Rec. 11/28/07 | Owned | No |
| Recording Memo and Option to Purchase | 11/30/2007 | Robert Leon McClerren & Cynthia McClerren and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSW 35 1.34 acres & Pt. W/2 NW 35 T7S-R4E Franklin Co. IL | FC-0132 Purchase of rail right of way FC 2007-6905 Rec.12/4/07 | Owned | No |
| Recording Memo and Option to Purchase | 9/5/2008 | Robert Leon McClerren & Robert G. McClerren and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 & Pt. NW SE 15 T7S R4E Franklin Co. IL 8.17 acres | FC-0132 Purchase rail right of way need to go around Jason Knight. FC 2008-5188 | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | Rec. 9/18/08 | | |
| Recording Memo and Option to Purchase | 11/28/2007 | Robert Shane Croslin and Jodi Croslin and Oeneus LLC d/b/a SAVATRAN LLC | pt. NWNW 35 4.53 acres; Pt. SWSW 26; Pt. NESE 27 4.71 acres T7S-R4E Franklin Co IL | FC-01335 Purchase rail right of way FC 2007-6984 Rec. 12/4/07 | Owned | No |
| Warranty Deed | 8/13/2008 | Anita Miller, Trustee Anita Miller Revocable Living Trust, and Oneida Ann Murphy as Trustee of the John Robert Miller Revocable Living Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 SW 11-T6S-R4E Franklin Co IL containing 57.31 acres. | FC-01366 Purchase of rail right of way and DESIGNATED WET LANDS BANK FC 2008-5456 Rec. 8/14/08 | Owned | Yes |
| Warranty Deed | 2/27/2009 | Stewart B Hungate and Oeneus LLC d/b/a SAVATRAN LLC | N/2 NE 27-T7S-4E Franklin Co IL containing 80 acres & a perpetual access easement | FC-0137 Purchase of rail right of way. FC 2009-1017 Rec. 2/27/09 | Owned | Yes |
| Recording Memo and Option to | 1/18/2008 | R. Ernest Payne & Dorothy M. Payne and | Pt. W/2 E/2 Section 15 T7S-R4E containing 12 acres; Pt. | FC-01391 Purchase of rail right of way and rail right of way | Owned | No |

Case 2:11-43108 Doc 221 Filed 04/01/20 Entered 04/01/20 16:45:34 Main Document Page 697 of 1005

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Purchase and Amendment One | | Oeneus LLC d/b/a SAVATRAN LLC | NE/4 of 22 T7S-R4E containing 23.33 acres | around Jason Knight. FC-2017-0389 Rec. 1/18/08 | | |
| Recording Memo and Option to Purchase | 2/19/2008 | Amos Clay Ing & Jo Ann Ing and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SE 10 T7S-R4E Franklin Co. IL containing 4.64 acres | FC-0142 Purchase of rail right of way. FC 2008-1101 Rec. 2/28/08 | Owned | No |
| Recording Memo and Option to Purchase | 3/5/2008 | Donald W. Manis & Delores J. Manis and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 35; Pt. W/2 SW 26 T6S-R4E Franklin Co IL 18.36 acres. | FC-0145 Purchase of rail right of way. FC 2008-1225 Rec. 3/5/08 | Owned | No |
| Warranty Deed | 5/28/2008 | Dale Wes Williford & Melissa R Williford to Oeneus LLC d/b/a SAVATRAN LLC | N/2 NWNE 20 ac ±; N 10 ac NE NE T6S-R4E Franklin Co IL | FC-0152 Purchased for rail loop at Shay Camp. FC 2008-3947 Rec. 5/28/08 | Owned | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 1009

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/6/2009 | Mauris D Kern a/k/a Mauris Kern and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SW 22-T7S-R4E 4.60 ac; Pt. NW SW 22 T7S-R4E 3.86 ac; Pt. S/2 S/2 22 T7S-R4E 39.01 ac; Pt. S/2 S/2 22 & NE NW 27 T7S-R4E 57.69 acres Franklin Co IL | FC-0159 Purchased rail right of way around Jason Knight. FC 2009-5435 Rec. 11/6/09 | Owned | Yes |
| Warranty Deed | 11/3/2009 | Louis S Ison & Rose Ison and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 22 T7S-R4E Franklin Co IL 9.26 acres | FC-0160 Purchased rail right of way around Jason Knight. FC 2009-6069 Rec. 12/14/09 | Owned | Yes |
| Recording Memo and Option to Purchase | 9/8/2008 | Kenneth D. Summers & Shelia K Summers and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE SE 22; Pt. NWSW 23 T6S-R4E Franklin Co IL 9.31 acres | FC-016 Purchased right of way and isolated land. | Owned | No |
| Recording Memo and Option to Purchase | 10/25/2007 | Irene Wilkas and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 2-T8S-R4E; Pt. NW SW 2 T8S-R4E; Pt. NESE 3 T8S-R4E Williamson County IL 15.73 acres. | WC-0106 Purchase rail right of way and isolated land. FC 308-5... | Owned | No |

Case 20-33948 Document 2288 Filed in TXSB on 04/01/21 Page 699 of 1005 Entered 04/12/21 23:45:34 Main Docu...

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 6/30/2008 | Central Illinois Public Service d/b/a Ameren CIPS and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW NW 2 T8S-R4E Williamson Co IL 0.36 ac | WC-0142 rail easement. FC 312-800 Rec. 7/22/08 | Owned | Yes |
| **SHAWNEETOWN RAIL LINE** | | | | | | |
| Warranty Deed | 3/1/2007 | Jeffrey J. Drone & Toni L. Drone to Oeneus LLC d/b/a SAVATAN LLC | Pt. S/2 NE & Pt. N/2 SE 20 T9S-R7E; W/2 NW 28; E/2 NE 29 & access road T9S- R7E Saline Co. IL containing 227 acres. | SC-0009 Farm Leased to Jeff Drone. FC 1900-423 Rec. 3/2007 | Owned | Yes |
| Warranty Deed | 11/20/2007 | Jimmie G. Rodgers & Billie Rodgers to Oeneus LLC d/b/a SAVATRAN LLC | E/2 NW 4 T9S-R6E Saline Co IL 80 acres | SC-0017 Farm Leased to Jeff Drone. FC 1927-505 Rec. 11/27/07 | Owned | Yes |
| Warranty Deed | 11/20/2007 | Oeneus LLC d/b/a SAVATRAN to Jimmie G. Rodgers & Billie Rodgers | Pt. SE 20 T9S-R7E Saline Co IL 89.864 acres | SC-0017 Farm Leased to Jeff Drone. FC 1927-509 Rec. 11/27/07 | Owned | Yes |
| Warranty Deed | 8/29/2007 | James D. Kuhlman and Andrew M. Freebourn to | NW NE 3 T9S-R6E Saline Co IL 40 acres | SC-0018 All woods no farm | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Oeneus LLC d/b/a SAVATRAN LLC | | lease. FC 1921-423 Rec. 8/30/07 | | |
| Quit Claim Deed | 5/23/2007 | CST Transportation Inc and SAVATRAN LLC | six parcels lying in Gallatin County beginning at Equality and ending at Shawneetown individually referred to as Tracts 1,4,5A,6,8,and 42 containing 21.809 acres | GC-0004 Abandoned Rail Line across Gallatin County. 501-111 Rec. 5/24/07 | Owned | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Docu Pg 701 of 1005

Debtor Grantor:

ADENA RESOURCES, LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 5/6/2009 | Mason, Marilyn Trustee & Adena Resources | Pt. SW Sec 31-5-3 & Pt. NW Sec 6-6-3 as described | Water & power lines, Complete, FC-0213, FC2000-2758 | Owned | No |

Debtor/ Grantor:

AMERICAN CENTURY TRANSPORT LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/8/2016 | American Energy Corporation to American Century Transport LLC | See legal description set forth in the deed. | 2016000042 7 | Owned | Yes |

Case 20-43597 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 702 of 1005

**Schedule 5.08(c)**

**Leased Material Real Property**

DEBTOR/GRANTOR:

HILLSBORO ENERGY LLC
12051 N. 9th Avenue
Hillsboro, IL  62049

**Montgomery County, Illinois**

**Bond County, Illinois (Coal Reserves only)**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease Agreement | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Short Form of Lease (Hillsboro) | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1346-428 | Leased | |
| Amendment No. 1 to the Coal Mining Lease and Sublease Agreement | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 703 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease (Hillsboro) | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1367-226 | Leased | |
| Amendment No. 2 to the Coal Mining Lease and Sublease Agreement | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Amended and Restated Short Form of Lease After Closing 4 and Closing 5 (Hillsboro) | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1412-134 BC 917-329 | Leased | |
| Amendment No. 3 to the Coal Mining Lease and Sublease Agreement | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Amended and Restated Short Form of Lease After Closing 3 (Hillsboro) | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1426-275 | Leased | |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Docu Pg 704 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Short Form of Lease After Closing 6 (Hillsboro) | 2/2/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1477-459  BC 964-143 | Leased | |
| Amended and Restated Short Form of Lease After Closing 7 & 8 (Hillsboro) | 8/21/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Coal Mining Lease Agreement | 9/21/2007 | Montgomery Mineral LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| First Partial Termination of Lease | 9/9/2009 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | NOT RECORDED | Leased | |
| Second Partial Termination of Lease | 1/8/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | NOT RECORDED | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Third Partial Termination of Lease | 10/4/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | NOT RECORDED | Leased | |
| Fourth Partial Termination of Lease | 1/13/2011 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | NOT RECORDED | Leased | |
| Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-176  BC 910-257 | Leased | |
| Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 706 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-135<br><br>BC 910-286 | Leased | |
| First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | NOT RECORDED | Leased | |
| Short Form or Memorandum of First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1508-455 | Leased | |
| Deed | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Mine Site<br><br>RDA 1 & 2<br><br>Farmland & Bleeder Site #1 | 201000059726 | Owned | |
| Easement | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201000059723 | Owned | |
| Easement | 5/9/2011 | George & Martha Spinner to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201100063970 | Owned | |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu<br>Pg 707 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed | 8/23/2013 | Hillsboro Energy LLC to Hillsboro Transport, LLC | Loadout | 201300003499 | Owned | |

DEBTOR/GRANTOR:

MACOUPIN ENERGY LLC
14300 Brushy Mound Road
Carlinville, Illinois 62626

**Macoupin County, Illinois**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin South Mine Assignment | NOT RECORDED | Leased | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | MA 503863 | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | NOT RECORDED | Leased | Yes |
| First Amendment to Coal Mining Lease | 2/13/2013 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | NOT RECORDED | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | East Hornsby Mine Assignment | NOT RECORDED | Leased | Yes |
| Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | MA 506329 | Leased | Yes |
| Amendment to Lease Agreement | 12/29/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | NOT RECORDED | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 709 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | MA 506330 | Leased | Yes |
| Amendment to Lease Agreement | 12/29/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | NOT RECORDED | Leased | Yes |
| Option and Lease Agreement | 2/28/1967 | Jet Oil Company and Macoupin Energy LLC | Coal Reserves | Volume 628, Page 456 | Leased | Yes |
| Assignment of Leases | 1/27/2009 | Macoupin Energy LLC, as assignor, and WPP LLC, as assignee | Coal Reserves | NOT RECORDED | Leased | Yes |
| Coal Mining Lease and Sublease Agreement | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | NOT RECORDED | Leased | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 710 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form or Memorandum of Coal Mining Lease and Sublease Agreement | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | MA 506328 | Leased | Yes |
| First Amendment to Coal Mining Lease and Sublease Agreement | 11/03/2010 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | NOT RECORDED | Leased | Yes |
| Second Amendment to Coal Mining Lease and Sublease Agreement | 03/28/2010 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | NOT RECORDED | Leased | Yes |
| Assignment of Leases | 1/22/2009 | ExxonMobil Coal USA, Inc. and Macoupin Energy LLC | Monterey Coal Company No. 1 Mine | MA 487734 | Leased | Yes |

**Clinton County, Illinois**

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 711 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 6/1/2012 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Coal Mining Lease | 6/1/2012 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | CC 2012R04931 | Leased | Yes |
| First Amendment to Coal Mining Lease | 2/13/2013 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | NOT RECORDED | Leased | Yes |

| | | | | | |
|---|---|---|---|---|---|
| Lease | 2/7/2019 | Foresight Energy, LLC/Macoupin to Keyrock, LLC | Methane Gas lease | Document NOT RECORDED | Leased |

DEBTOR/GRANTOR:

WILLIAMSON ENERGY, LLC
16468 Liberty School Road
Marion, IL  62959

**Williamson County, Illinois**

**Franklin County, Illinois (Coal Reserves only)**

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 712 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Coal Mining Lease Agreement | 8/14/2006 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form of Amended and Restated Coal Mining Lease Agreement | 8/14/2006 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 301-480  FC #2006-6571 | Leased | Yes |
| First Amendment to Amended and Restated Coal Mining Lease Agreement | 5/19/2008 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Amendment to Amended and Restated Coal Mining Lease Agreement | 12/18/2009 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Third Amendment to Amended and Restated Coal Mining Lease Agreement | 08/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 713 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of First, Second and Third Amendment to Amended and Restated Coal Mining Lease Agreement | 08/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 327-780<br><br>2010-6467 | Leased | Yes |
| Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form of Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 331-312 | Leased | Yes |
| Fifth Amendment to Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form of Fifth Amendment to Amended and | 3/20/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 341-659 | Leased | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Restated Coal Mining Lease Agreement | | | | | | |
| First Amendment to Amended and Coal Mining Lease Agreement | 5/19/2008 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Amendment to Amended and Restated Coal Mining Lease Agreement | 12/18/2009 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | NOT RECORDED | Leased | Yes |
| Third Amendment to Amended and Restated Coal Mining Lease Agreement | 8/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of First Amendment, Second Amendment and Third Amendment to Amended and Restated Coal Mining Lease Agreement | 8/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 327-780 FC #2010-5467 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | WC Misc 331-312 | Leased | Yes |
| Partial Release of Leased Premises from Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2011-3006 | Leased | Yes |
| Partial Release of Leased Premises from Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 9/1/2011) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2013-1637 | Leased | Yes |
| Corrective Partial Release of Leased Premises from Amended and | 4/5/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2013-2765 | Leased | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 716 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Restated Coal Mining Lease Agreement | | | | | | |
| Short Form of Lease and Sublease | 5/1/2005 | Williamson Development Company LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | WC Misc 291-461 | Leased | Yes |
| Coal Mining Lease Agreement | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | NOT RECORDED | Leased | Yes |
| Short Form of Lease | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Misc 301Page 479 | Leased | Yes |
| Lease (Coal Prep Plant) | 5/1/2005 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | WC Misc 291-463 | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 717 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | NOT RECORDED | Leased | Yes |
| Short Form of First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Misc 313 Page 620 | Leased | Yes |
| Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC to Williamson Energy, LLC | Coal Reserves in Williamson, Franklin, and Saline Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum of Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC to Williamson Energy, LLC | Coal Reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 325-897  FC #2010-3874  SC 1981-610 | Leased | Yes |
| Partial Release of Premises from Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Releases certain coal reserves in Williamson County, IL | WC Misc 331-310 | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu   Pg 718 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| First Amendment to Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum after First Amendment to Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 331-311 FC #2011-3008 SC 2003-978 | Leased | Yes |
| Partial Release of Premises from Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 341-658 | Leased | Yes |
| Second Amendment to Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | NOT RECORDED | Leased | Yes |
| Short Form or Memorandum after Second Amendment to Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | FC 2013-1639 | Leased | Yes |
| Lease | 5/1/2005 | Williamson Development | Pond Creek Rail Load Out | WC Misc 291-462 | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu

Pg 719 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Company, LLC (fka Steelhead Development Company LLC) and Williamson Energy, LLC | | | | |
| First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | NOT RECORDED | Leased | Yes |
| Short Form of First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Misc 313 Page 619 | Leased | Yes |
| Ground Lease | 1/1/2006 | Eberhart to Williamson Transport, LLC | Ground lease required for Williamson Energy, LLC Operations | NOT RECORDED | Leased | Yes |
| Memorandum of the Eberhart Lease | 1/20/2006 | Eberhart to Williamson Transport, LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 296-404 | Leased | Yes |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Docu
Pg 720 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Assignment of Rights | 8/24/2007 | Williamson Transport LLC to Williamson Development Company LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 306-996 | Leased | Yes |
| Assignment of Rights | 8/24/2007 | Williamson Development Company LLC to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 325-900 | Leased | Yes |
| Ground Lease | 8/12/2010 | Eberhart to Williamson Development Company, LLC assigned to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | NOT RECORDED | Leased | Yes |
| Surface Lease | 3/22/2006 | Clara Summers and Independence Land Company LLC | Surface Lease | WC Misc 297-626 | Leased | Yes |
| Assignment of Lease | 8/12/2010 | Independence Land Company LLC to | Surface Lease | WC Misc 327-750 | Leased | Yes |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 721 of 1005

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Williamson Energy LLC | | | | |
| Surface Lease | 3/22/2006 | Clara Summers and Independence Land Company LLC | Surface Lease | WC Misc 297-626 | | |
| Grant of Surface Easement | 8/12/2010 | Williamson Development Company LLC and Williamson Energy LLC | Surface Easement | WC Misc 325-899 | Leased | Yes |

| | | | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 6/14/2018 | Diana S. Dulle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-4356 | Owned | |
| Warranty Deed | 7/13/2018 | Linda Duncan to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5209 | Owned | |
| Warranty Deed | 7/20/2018 | Jeremy W. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5434 | Owned | |
| Warranty Deed | 8/20/2018 | Lora L. Jones to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6259 | Owned | |
| Warranty Deed | 8/20/2018 | Shirley N. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6258 | Owned | |
| Warranty Deed | 9/4/2018 | Debra Ellen Moser to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6707 | Owned | |
| Warranty Deed | 9/4/2018 | Larry Dean Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6706 | Owned | |
| Warranty Deed | 9/4/2018 | Jerry R. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6705 | Owned | |
| Warranty Deed | 9/4/2018 | Wilma K. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6704 | Owned | |
| Warranty Deed | 9/4/2018 | Kimberly A. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6703 | Owned | |
| Warranty Deed | 9/4/2018 | Gerald Lee Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6702 | Owned | |
| Warranty Deed | 9/4/2018 | Wendall Ray Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6701 | Owned | |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 723 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 9/24/2018 | Edward W. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7338 | Owned | |
| Warranty Deed | 9/24/2018 | Barbara Jean Newton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7337 | Owned | |
| Warranty Deed | 9/24/2018 | Debra L. Caplick to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7336 | Owned | |
| Warranty Deed | 9/24/2018 | Don N. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7335 | Owned | |
| Warranty Deed | 9/24/2018 | Jim D. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7334 | Owned | |
| Warranty Deed | 9/24/2018 | Susan Elaine Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7333 | Owned | |
| Warranty Deed | 9/24/2018 | Jerry D. Brookman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7332 | Owned | |
| Warranty Deed | 9/24/2018 | Linda E. Rector to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7331 | Owned | |
| Warranty Deed | 9/24/2018 | Marion E. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7330 | Owned | |
| Warranty Deed | 9/24/2018 | Sarah J. Glazebrook Perry to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7329 | Owned | |
| Warranty Deed | 10/16/2018 | Michelle McCabe-Doyle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7977 | Owned | |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 724 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 10/16/2018 | Richard R. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7976 | Owned | |
| Warranty Deed | 10/16/2018 | Robert Shon Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7975 | Owned | |
| Warranty Deed | 10/16/2018 | Elizabeth Jeanne Culli to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7974 | Owned | |
| Warranty Deed | 10/23/2018 | Kathy Scott to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8178 | Owned | |
| Warranty Deed | 11/07/2018 | Roger W. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8581 | Owned | |
| Warranty Deed | 11/27/2018 | Tommy R. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9311 | Owned | |
| Warranty Deed | 12/03/2018 | Allen E. Heinbokel to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9490 | Owned | |
| Warranty Deed | 12/18/2018 | Jeremiah Wesley Seaman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9920 | Owned | |
| Warranty Deed | 12/18/2018 | Alexandra Lewis DeMarino to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9919 | Owned | |
| Warranty Deed | 1/07/2019 | Shannon Lee Brand to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-147 | Owned | |
| Warranty Deed | 1/31/2019 | Michael James Lewis to | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-727 | Owned | |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 725 of 1005

| | | Williamson Energy, LLC | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 1/31/2019 | Karolyn Kay Fullerton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-726 | Owned | |
| Mining Lease | 3/5/2019 | Susan E. Denton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1569 | Leased | |
| Warranty Deed | 3/18/2019 | Ronald L. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1877 | Owned | |
| Warranty Deed | 8/27/2019 | Deloris J. Hoehn to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-6215 | Owned | |
| Warranty Deed | 1/26/2018 | James Walter Hoyt to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-407 | Owned | |
| Warranty Deed | 2/13/2018 | Brenda Dora Spencer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-633 | Owned | |
| Warranty Deed | 3/21/2018 | Patricia K. Dyer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1127 | Owned | |
| Warranty Deed | 3/21/2018 | Diana L. Bischler to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1126 | Owned | |
| Mining Lease | 3/23/2018 | Lisa M. Engeling to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1177 | Leased | |
| Warranty Deed | 4/19/2018 | Jeanette Fortney to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1539 | Owned | |
| Mining Lease | 7/13/2018 | Jerry K. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-2781 | Leased | |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 726 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 8/1/2018 | Lorna Lynn Hines to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3095 | Owned | |
| Warranty Deed | 8/1/2018 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3094 | Owned | |
| Warranty Deed | 8/10/2018 | Brian M. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3251 | Owned | |
| Mining Lease | 8/29/2018 | Paula T. Hartzel, et al to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3551 | Leased | |
| Warranty Deed | 9/5/2018 | Janet J. Griffin to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3642 | Owned | |
| Warranty Deed | 9/5/2018 | Gary P. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3641 | Owned | |
| Warranty Deed | 9/5/2018 | Barbara Giles to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3640 | Owned | |
| Warranty Deed | 9/18/2018 | Katherine Ann Bradley to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3870 | Owned | |
| Warranty Deed | 10/17/2018 | Shirley Whitehead to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4400 | Owned | |
| Warranty Deed | 10/23/2018 | Barbara Faye Sharkey to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4481 | Owned | |
| Warranty Deed | 2/1/2019 | Emma L. Stetson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-335 | Owned | |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 727 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/26/2019 | Ronald L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1004 | Owned | |
| Warranty Deed | 4/2/2019 | Sarah Greenwade to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1134 | Owned | |
| Warranty Deed | 4/2/2019 | Susan L. Naucke to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1154 | Owned | |
| Warranty Deed | 4/17/2019 | Brock D. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1351 | Owned | |
| Warranty Deed | 4/17/2019 | James Keith Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1352 | Owned | |
| Warranty Deed | 4/23/2019 | Marilyn S. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1419 | Owned | |
| Warranty Deed | 5/14/2019 | Miranda B. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1752 | Owned | |
| Warranty Deed | 5/14/2019 | Charlotte Jean to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1751 | Owned | |
| Warranty Deed | 7/1/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2388 | Owned | |
| Mining Lease | 7/17/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2618 | Owned | |
| Warranty Deed | 7/17/2019 | Judith A. Woodard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2617 | Owned | |
| Warranty Deed | 7/17/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2616 | Owned | |

| Warranty Deed | 7/24/2019 | Norma Adams Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2732 | Owned | |
|---|---|---|---|---|---|---|
| Warranty Deed | 7/30/2019 | Phillip R. Erthall to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2832 | Owned | |
| Warranty Deed | 7/30/2019 | Robert H. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2833 | Owned | |
| Warranty Deed | 8/13/2019 | Kenneth L. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3062 | Owned | |
| Warranty Deed | 8/13/2019 | William Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3061 | Owned | |
| Warranty Deed | 9/4/2019 | Linda S. Lear to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3389 | Owned | |
| Deed | 9/16/2019 | Steven H. Machura to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3554 | Owned | |
| Warranty Deed | 10/17/2019 | Sharon A. Aiken-Peterson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3990 | Owned | |
| Warranty Deed | 10/30/2019 | Raven N. Fager to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4153 | Owned | |
| Mining Lease | 11/05/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4251 | Leased | |
| Warranty Deed | 11/14/2019 | Daniel L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4371 | Owned | |
| Warranty Deed | 11/26/2019 | Colleen L. Taylor to Williamson Energy, | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4559 | Owned | |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main Document    Pg 729 of 1005

| | | LLC | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 2/25/2020 | Paula Kay Osteen-Cortez to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-728 | Owned | |
| Warranty Deed | 2/25/2020 | Monta Ray Jennings to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-726 | Owned | |
| Warranty Deed | 2/25/2020 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-727 | Owned | |

DEBTOR/GRANTOR:

SUGAR CAMP ENERGY, LLC
11351 N. Thompsonville Road
Macedonia, Illinois  62860

**Franklin County, Illinois**

**Hamilton County, Illinois (Coal Reserves only)**

**Saline County, Illinois (Coal Reserves only)**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| TVA Illinois Coal Lease | 7/1/2002 | USA through TVA & Illinois Fuel Company LLC (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | #2007-5820 Rec. 10/11/2007 | Leased | Yes |
| Assignment of TVA Illinois Coal Lease | 8/4/2009 | USA through TVA & Illinois Fuel Company LLC (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | #2009-4745 Rec. 9/10/2009 | Leased | Yes |

Case 20-41308   Doc 2236   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docum Pg 731 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amendment One to TVA Illinois Coal Lease | 4/17/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0027 | Leased | Yes |
| Amendment Two to TVA Illinois Coal Lease | 8/30/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | NOT RECORDED | Leased | Yes |
| Letter Agreement regarding TVA Illinois Coal Lease | 8/30/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | NOT RECORDED | Leased | Yes |
| Franklin County Coal Lease | 7/1/2002 | USA through TVA & Ruger Coal Company, Inc. (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | NOT RECORDED FC-0027 | Leased | Yes |
| Assignment of Lease | 9/10/2007 | USA through TVA & Ruger Coal Company, Inc. (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | #2007-15005 Rec. 9/12/2007 | Leased | Yes |

Case 20-41308 Doc 258 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 732 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0083 & 2006-6918 | Leased | Yes |
| Memorandum of Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2006-6919 | Leased | Yes |
| Supplemental Memorandum of Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2008-4441 | Leased | Yes |
| Sublease | 3/6/2012 | Sugar Camp Energy, LLC & HOD LLC | Properties located in Franklin County IL as described in Exhibit A | #2012-6228 Rec. 12/11/2012 | Leased | Yes |
| First Amendment to Coal Mining Lease | 8/11/2008 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | #2008-4440 Rec. 8/12/2008 | Leased | Yes |
| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & Sugar Camp Energy, LLC | Consent with respect to Illinois Fuels Lease | FC-0233 | Leased | Yes |

Case 20-41308   Doc 28   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Document   Pg 733 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Illinois Fuels TVA Lease | NOT RECORDED | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Franklin County TVA Lease | NOT RECORDED | Leased | No |
| Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Memorandum of Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | FC 2010-3825 | Leased | Yes |
| First Amendment to Coal Mining Lease` | 11/4/2011 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Second Amendment to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 734 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Memorandum after First and Second Amendments to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | NOT RECORDED | Leased | Yes |
| Memorandum of Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | FC 2012-6228 | Leased | Yes |

| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & Sugar Camp Energy, LLC | Consent with respect to Illinois Fuels Lease | FC-0283 | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Illinois Fuels TVA Lease | N/A | Leased | Yes |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 735 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Franklin County  TVA Lease | N/A | Leased | No |
| Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Memorandum of Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | FC 2010-3895 | Leased | Yes |
| First Amendment to Coal Mining Lease` | 11/4/2011 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Second Amendment to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |
| Memorandum after First and Second Amendments to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |

| Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | NOT RECORDED | Leased | Yes |
| Memorandum of Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | FC 2012-6228 | Leased | Yes |

| Mining Lease | 01/04/18 | Roberts, Carol Ann Trustee to SCELLC | Sugar Camp Mine Plan | HC 2018-0008 | Leased | |
| Mining Lease | 01/04/18 | Engstrom, Amy to SCELLC | Sugar Camp Mine Plan | HC 2018-0021 | Leased | |
| Mining Lease | 01/04/18 | Hayes, Marshall Jr. to SCELLC | Sugar Camp Mine Plan | HC 2018-0023 | Leased | |
| Mining Lease | 01/04/18 | Blanchard, Bonnie M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0056 | Leased | |
| Mining Lease | 01/04/18 | Palmer, James to SCELLC | Sugar Camp Mine Plan | HC 2018-0047 | Leased | |
| Mining Lease | 01/04/18 | Moxley, Linda to SCELLC | Sugar Camp Mine Plan | HC 2018-0008 | Leased | |
| Coal Deed | 01/04/18 | Johnson, Susan L. to SCELLC | Sugar Camp Mine Plan | HC 2018-0019 | Owned | |
| Mining Lease | 01/30/18 | McFarland, Carol A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0130 | Leased | |
| Mining Lease | 01/30/18 | Bowman, Debra Kate to SCELLC | Sugar Camp Mine Plan | HC 2018-0131 | Leased | |
| Mining Lease | 01/30/18 | Diaz, Donna J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0132 | Leased | |

Case 20-41308 Doc 22 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 737 of 1005

| Mining Lease | 01/30/18 | Flannigan, James T. to SCELLC | Sugar Camp Mine Plan | HC 2018-0113 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 01/30/18 | Leslie, Janet E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0114 | Leased | |
| Mining Lease | 01/30/18 | Reid, Jon M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0115 | Leased | |
| Mining Lease | 01/30/18 | Webster, Linda to SCELLC | Sugar Camp Mine Plan | HC 2018-0116 | Leased | |
| Mining Lease | 01/30/18 | Henson, William to SCELLC | Sugar Camp Mine Plan | HC 2018-0119 | Leased | |
| Coal Deed | 01/30/18 | Wake, Amanda to SCELLC | Sugar Camp Mine Plan | HC 2018-0120 | Owned | |
| Coal Deed | 01/30/18 | Trabant, Megan to SCELLC | Sugar Camp Mine Plan | HC 2018-0121 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Pamela S. to SCELLC | Sugar Camp Mine Plan | HC 2018-0122 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Rochelle to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Owned | |
| Mining Lease | 01/30/18 | Bloomfield, Dora to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Leased | |
| Mining Lease | 01/30/18 | Flannigan, Donald to SCELLC | Sugar Camp Mine Plan | HC 2018-0124 | Leased | |
| Mining Lease | 01/30/18 | Smith, Sharon to SCELLC | Sugar Camp Mine Plan | HC 2018-0126 | Leased | |
| Mining Lease | 02/08/18 | Wood, Betty A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0161 | Leased | |
| Mining Lease | 02/08/18 | Irish, Carol V. to SCELLC | Sugar Camp Mine Plan | HC 2018-0162 | Leased | |
| Mining Lease | 02/08/18 | Wicker, Darrell to SCELLC | Sugar Camp Mine Plan | HC 2018-0163 | Leased | |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 13:45:34 Main Document Pg 738 of 1005

| Mining Lease | 02/08/18 | Kathleen M. Wright to SCELLC | Sugar Camp Mine Plan | HC 2018-0174 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 02/08/18 | Irish, Lloyd Paul to SCELLC | Sugar Camp Mine Plan | HC 2018-0175 | Leased | |
| Mining Lease | 02/08/18 | Patterson, Paul J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0176 | Leased | |
| Mining Lease | 02/08/18 | Wicker, Paul R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0177 | Leased | |
| Mining Lease | 02/28/18 | Krois, Bonnie C. to SCELLC | Sugar Camp Mine Plan | HC 2018-0270 | Leased | |
| Coal Deed | 02/28/18 | Tabor, Stephanie to SCELLC | Sugar Camp Mine Plan | HC 2018-0271 | Owned | |
| Mining Lease | 02/28/18 | Petitte, Clyda to SCELLC | Sugar Camp Mine Plan | HC 2018-0272 | Leased | |
| Mining Lease | 02/28/18 | Patterson, Emily Jo to SCELLC | Sugar Camp Mine Plan | HC 2018-0273 | Leased | |
| Mining Lease | 02/28/18 | Allen, Jane to SCELLC | Sugar Camp Mine Plan | HC 2018-0274 | Leased | |
| Coal Deed | 02/28/18 | Spaven, Laverne to SCELLC | Sugar Camp Mine Plan | HC 2018-0276 | Owned | |
| Mining Lease | 02/28/18 | Jackson, Patricia Snyder to SCELLC | Sugar Camp Mine Plan | HC 2018-0277 | Leased | |
| Mining Lease | 02/28/18 | Gioia, Virginia M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0278 | Leased | |
| Mining Lease | 02/28/18 | Moffett, William R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0279 | Leased | |
| Mining Lease | 02/28/18 | O'Dell, William to SCELLC | Sugar Camp Mine Plan | HC 2018-0280 | Leased | |
| Mining Lease | 02/28/18 | Reid, Dennis P. to SCELLC | Sugar Camp Mine Plan | HC 2018-0281 | Leased | |

Case 18-41908   Doc 28   Filed 04/20/18   Entered 04/20/18 23:45:34   Main Document   Pg 739 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Coal Deed | 02/28/18 | Griffith, Janice Sue to SCELLC | Sugar Camp Mine Plan | HC 2018-0284 | Owned | |
| Mining Lease | 02/28/18 | Knight, Kenneth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0287 | Leased | |
| Coal Deed | 02/28/18 | Metheney, Rickie W. to SCELLC | Sugar Camp Mine Plan | HC 2018-0289 | Owned | |
| Mining Lease | 02/28/18 | Olson, Ruth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0291 | Leased | |
| Mining Lease | 02/28/18 | Sandy, Susan E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0293 | Leased | |
| Coal Deed | 02/28/18 | Miller, Micah A. & Marietta to SCELLC | Sugar Camp Mine Plan | HC 2019-2023 | Owned | |
| Mining Lease | 04/06/18 | Mudge, Evelyn M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0806 | Leased | |
| Mining Lease | 04/12/18 | Higginson, Leslie K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0527 | Leased | |
| Coal Deed | 04/12/18 | Farris, Brenda K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0528 | Owned | |
| Mining Lease | 04/12/18 | Cook, Becky Lynn to SCELLC | Sugar Camp Mine Plan | HC 2018-0529 | Leased | |
| Mining Lease | 04/12/18 | Snyder, Diane M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0530 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Kevin J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0531 | Leased | |
| Mining Lease | 04/12/18 | Wohlers, Karen J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0532 | Leased | |
| Mining Lease | 04/12/18 | Heckert, Lauri to SCELLC | Sugar Camp Mine Plan | HC 2018-0533 | Leased | |

Case 18-41108 Doc 28 Filed 04/12/20 Entered 04/12/20 23:45:34 Main Document Pg 740 of 1005

| Mining Lease | 04/12/18 | Page, Mary Jane by Sidney Bennett III AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-0534 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 04/12/18 | Comp ton, Paulette N. to SCELLC | Sugar Camp Mine Plan | HC 2018-0535 | Leased | |
| Mining Lease | 04/12/18 | Taylor, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2018-0536 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Carol Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-0537 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Casey Joel to SCELLC | Sugar Camp Mine Plan | HC 2018-0538 | Leased | |
| Mining Lease | 05/08/18 | Lowman, Timothy A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0548 | Leased | |
| Mining Lease | 05/08/18 | Neal, Douglas Allen to SCELLC | Sugar Camp Mine Plan | HC 2018-0784 | Leased | |
| Mining Lease | 05/08/18 | Williams, J. Mark to SCELLC | Sugar Camp Mine Plan | HC 2018-0785 | Leased | |
| Mining Lease | 05/08/18 | Barker, Lynne E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0786 | Leased | |
| Mining Lease | 05/08/18 | Knight, Stephen L. to SCELLC | Sugar Camp Mine Plan | HC 2018-0787 | Leased | |
| Mining Lease | 05/08/18 | Neal, Walter Blake to SCELLC | Sugar Camp Mine Plan | HC 2018-0759 | Leased | |
| Coal Deed | 05/11/18 | Noma, Inc to SCELLC | Sugar Camp Mine Plan | HC 2018-0916 | Owned | |
| Mining Lease | 05/16/18 | Hake, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0847 | Leased | |
| Mining Lease | 05/16/18 | Hosner, Irene Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0848 | Leased | |

Case 20-13018 Doc 226 Filed 01/20 Entered 04/01/20 23:45:34 Pg 741 of 1005 Main Docu

| Mining Lease | 05/16/18 | Duckworth, Nina Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0811 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 05/16/18 | Bailey, Velma Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0812 | Leased | |
| Mining Lease | 05/16/18 | Lovan, W. Robert to SCELLC | Sugar Camp Mine Plan | HC 2018-0813 | Leased | |
| Mining Lease | 05/16/18 | Neal, William Jerry to SCELLC | Sugar Camp Mine Plan | HC 2018-0834 | Leased | |
| Coal Deed | 06/27/18 | Bow ton, Barbara G. to SCELLC | Sugar Camp Mine Plan | HC 2018-1027 | Owned | |
| Coal Deed | 06/27/18 | Whets tone, Dennis W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1028 | Owned | |
| Coal Deed | 06/27/18 | Whets tone, William R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1029 | Owned | |
| Coal Deed | 06/27/18 | Smith, Bernice to SCELLC | Sugar Camp Mine Plan | HC 2018-1030 | Owned | |
| Coal Deed | 06/27/18 | Thompson, Beatrice % Billy E. Walker AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-1031 | Owned | |
| Coal Deed | 06/27/18 | First Church of the Nazarene to SCELLC | Sugar Camp Mine Plan | HC 2018-1032 | Owned | |
| Coal Deed | 06/27/18 | Linn, Karen R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1034 | Owned | |
| Mining Lease | 06/27/18 | Seibert, Charles Ellis to SCELLC | Sugar Camp Mine Plan | HC 2018-1037 | Leased | |
| Mining Lease | 06/27/18 | Seibert, James Thomas to SCELLC | Sugar Camp Mine Plan | HC 2018-1038 | Leased | |
| Mining Lease | 06/27/18 | Drake, Terry W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1041 | Leased | |

Case 21-41308 Doc 228 Filed 04/01/21 Entered 04/01/21 23:45:34 Pg 42 of 105 Main Document

| Mining Lease | 06/27/18 | Scott, Betsy Dawn to SCELLC | Sugar Camp Mine Plan | HC 2018-1042 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 06/27/18 | Lane, John Bradley to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |
| Mining Lease | 06/27/18 | Drake, Mark W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |
| Coal Deed | 06/27/18 | Mendyk, Julie to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Joyce Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1086 | Leased | |
| Mining Lease | 07/05/18 | Metheney, Donald W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1084 | Leased | |
| Coal Deed | 07/05/18 | Sandidge, Joyce to SCELLC | Sugar Camp Mine Plan | HC 2018-1085 | Owned | |
| Coal Deed | 07/05/18 | Smith, Leon to SCELLC | Sugar Camp Mine Plan | HC 2018-1087 | Owned | |
| Coal Deed | 07/05/18 | Smith, Richard H. to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Ronald M. to SCELLC | Sugar Camp Mine Plan | HC 2018-1089 | Leased | |
| Mining Lease | 07/18/18 | Martin, Marianne B. to SCELLC | Sugar Camp Mine Plan | HC 2018-1157 | Leased | |
| Mining Lease | 07/18/18 | Wilkie, Mary Jean to SCELLC | Sugar Camp Mine Plan | HC 2018-1158 | Leased | |
| Mining Lease | 07/18/18 | Jones, Michael J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1159 | Leased | |
| Mining Lease | 07/18/18 | Martin, Janet J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1160 | Leased | |
| Mining Lease | 07/30/18 | Kleber, LLC to SCELLC | Sugar Camp Mine Plan | HC 2018-1232 | Leased | |

| Mining Lease | 08/08/18 | Vickers, Rhonda Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1271 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 08/08/18 | Pike, Brenda L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1272 | Leased | |
| Mining Lease | 08/08/18 | Schwenn, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1273 | Leased | |
| Mining Lease | 08/14/18 | Lane, Juanita Dare to SCELLC | Sugar Camp Mine Plan | HC 2018-1302 | Leased | |
| Coal Deed | 08/14/18 | Metheney, Miranda to SCELLC | Sugar Camp Mine Plan | HC 2018-1301 | Owned | |
| Mining Lease | 08/14/18 | Yancey, George to SCELLC | Sugar Camp Mine Plan | HC 2018-1303 | Leased | |
| Mining Lease | 08/28/18 | Knob Prairie Baptist Cemetery Association to SCELLC | Sugar Camp Mine Plan | HC 2018-1040 | Leased | |
| Coal Deed | 09/12/18 | Buchanan, Cynthia E. to SCELLC | Sugar Camp Mine Plan | HC 2018-1439 | Owned | |
| Coal Deed | 09/12/18 | Brophy, Romaine widow of James Brophy to SCELLC | Sugar Camp Mine Plan | HC 2018-1440 | Owned | |
| Mining Lease | 09/12/18 | Wright, Donald L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1441 | Leased | |
| Mining Lease | 09/12/18 | Dorion, Rhona to SCELLC | Sugar Camp Mine Plan | HC 2018-1442 | Leased | |
| Mining Lease | 09/12/18 | Wright, Laura to SCELLC | Sugar Camp Mine Plan | HC 2018-1443 | Leased | |
| Mining Lease | 10/03/18 | Simmons, Gavin T. to SCELLC | Sugar Camp Mine Plan | HC 2018-1523 | Leased | |
| Mining Lease | 10/03/18 | Wright, Curtis D. to SCELLC | Sugar Camp Mine Plan | HC 2018-1524 | Leased | |

Case 20-41308   Doc 290   Filed 04/01/20   Entered 04/01/20 22:45:34   Main Document   Pg 744 of 1005

| Mining Lease | 10/03/18 | Lane, Riley Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1525 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 10/24/18 | Winter, Carrie L Trust to SCELLC | Sugar Camp Mine Plan | HC 2018-1662 | Leased | |
| Mining Lease | 10/24/18 | Smith, Brett to SCELLC | Sugar Camp Mine Plan | HC 2018-1663 | Leased | |
| Mining Lease | 10/24/18 | Johnson, Flora Wymond to SCELLC | Sugar Camp Mine Plan | HC 2018-1665 | Leased | |
| Mining Lease | 10/24/18 | Collins, Sandra Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1666 | Leased | |
| Mining Lease | 10/24/18 | Koptez, Steven Gerald to SCELLC | Sugar Camp Mine Plan | HC 2018-1667 | Leased | |
| Mining Lease | 10/24/18 | Decker, Mary Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1783 | Leased | |
| Coal Deed | 10/30/18 | Jenkins, Thomas R to SCELLC | Sugar Camp Mine Plan | HC 2018-1692 | Owned | |
| Mining Lease | 10/30/18 | Dry, Margaret Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1693 | Leased | |
| Mining Lease | 10/30/18 | Lane, Sydney Drew to SCELLC | Sugar Camp Mine Plan | HC 2018-1694 | Leased | |
| Mining Lease | 10/30/18 | touma, Elizabeth Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1695 | Leased | |
| Mining Lease | 10/30/18 | Myers, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1696 | Leased | |
| Mining Lease | 11/19/18 | Palmer, Gary to SCELLC | Sugar Camp Mine Plan | HC 2018-1785 | Leased | |
| Mining Lease | 11/19/18 | Jordon, Flora Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 11/20/18 | Waggoner, Amanda J to SCELLC | Sugar Camp Mine Plan | FC 2018-4821 | Leased | |

| Mining Lease | 11/20/18 | Bohannon, Barbara Ann to SCELLC | Sugar Camp Mine Plan | FC 2018-4822 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 11/20/18 | Otterson, Lloyd L. to SCELLC | Sugar Camp Mine Plan | FC 2018-4823 | Leased | |
| Mining Lease | 12/11/18 | Goforth, Heather J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1905 | Leased | |
| Mining Lease | 12/11/18 | Goforth, Matthew R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1906 | Leased | |
| Mining Lease | 12/11/18 | Smith, Kerry to SCELLC | Sugar Camp Mine Plan | HC 2018-1907 | Leased | |
| Mining Lease | 12/11/18 | Johnson, Katherine Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 12/18/18 | Wright, Shelia P. to SCELLC | Sugar Camp Mine Plan | HC 2018-1974 | Leased | |
| Mining Lease | 12/18/18 | Wright, Richard A. to SCELLC | Sugar Camp Mine Plan | HC 2018-1975 | Leased | |
| Mining Lease | 12/18/18 | Wright, Michael S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1976 | Leased | |
| Mining Lease | 12/18/18 | Brown, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1977 | Leased | |
| Coal Deed | 01/09/19 | Jenkins, Mike to SCELLC | Sugar Camp Mine Plan | HC 2019-0057 | Owned | |
| Mining Lease | 01/09/19 | Jenkins, Hellen to SCELLC | Sugar Camp Mine Plan | HC 2019-0058 | Leased | |
| Mining Lease | 01/09/19 | Bayne, Janet Jenkins to SCELLC | Sugar Camp Mine Plan | HC 2019-0059 | Leased | |
| Mining Lease | 01/09/19 | Jenkins, James J. to SCELLC | Sugar Camp Mine Plan | HC 2019-0060 | Leased | |
| Mining Lease | 01/16/19 | Wright, Steven Ray to SCELLC | Sugar Camp Mine Plan | HC 2019-0087 | Leased | |

Case 18-41308 Doc 28 Filed 04/12/20 Entered 04/12/20 18:45:34 Main Document Pg 746 of 1005

| Mining Lease | 01/16/19 | Wright, Ida Louise to SCELLC | Sugar Camp Mine Plan | HC 2019-0098 | Leased | |
|---|---|---|---|---|---|---|
| Coal Deed | 01/29/19 | The Bonnie Camp Meeting to SCELLC | Sugar Camp Mine Plan | HC 2019-0150 | Owned | |
| Coal Deed | 02/01/19 | Barnhill, Ruth Eloise Short to SCELLC | Sugar Camp Mine Plan | HC 2019-0168 | Owned | |
| Coal Deed | 02/01/19 | Rappe, John James to SCELLC | Sugar Camp Mine Plan | HC 2019-0169 | Owned | |
| Mining Lease | 02/01/19 | Willis, Bruce E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0172 | Leased | |
| Mining Lease | 02/01/19 | Knott, Elaine Mae to SCELLC | Sugar Camp Mine Plan | HC 2019-0173 | Leased | |
| Mining Lease | 02/01/19 | Seibert, John Walter to SCELLC | Sugar Camp Mine Plan | HC 2019-0174 | Leased | |
| Coal Deed | 02/08/19 | Short, Leon to SCELLC | Sugar Camp Mine Plan | HC 2019-0210 | Owned | |
| Coal Deed | 02/08/19 | Avolt, Kathleen Eagan to SCELLC | Sugar Camp Mine Plan | HC 2019-0218 | Owned | |
| Coal Deed | 02/08/19 | Avolt, Donna H. to SCELLC | Sugar Camp Mine Plan | HC 2019-0219 | Owned | |
| Mining Lease | 02/13/19 | Wall, Letitia to SCELLC | Sugar Camp Mine Plan | HC 2019-0223 | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 02/19/19 | Hoffman, Elaine W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0245 | Leased | |
| Coal Deed | 03/12/19 | Banning, David W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0368 | Owned | |

Case 20-41308    Doc 28    Filed 04/21/20    Entered 04/21/20 03:45:34    Main Document    Pg 747 of 1005

| Mining Lease | 03/22/19 | Kinsey, Frances E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0416 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 03/22/19 | Willis, George Darin to SCELLC | Sugar Camp Mine Plan | HC 2019-0417 | Leased | |
| Mining Lease | 03/22/19 | Burns, Lenore E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0418 | Leased | |
| Mining Lease | 03/22/19 | Gill, Lorella E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0419 | Leased | |
| Mining Lease | 03/22/19 | Oberreiter, Jean Ann (Evans) to SCELLC | Sugar Camp Mine Plan | HC 2019-0420 | Leased | |
| Coal Deed | 03/22/19 | Doyle, Kymbra Drasil to SCELLC | Sugar Camp Mine Plan | HC 2019-0421 | Owned | |
| Coal Deed | 03/27/19 | Higgins, Cynthia Ann to Elaine May Knott | Sugar Camp Mine Plan | HC 2019-0446 | Owned | |
| Coal Deed | 03/28/19 | Short, Dian to SCELLC | Sugar Camp Mine Plan | HC 2019-0463 | Owned | |
| Coal Deed | 03/28/19 | Short, Richard to SCELLC | Sugar Camp Mine Plan | HC 2019-0464 | Owned | |
| Coal Deed | 04/03/19 | South Side Christian Church to SCELLC | Sugar Camp Mine Plan | HC 2019-0507 | Owned | |
| Mining Lease | 04/10/19 | Yorgan, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2019-0558 | Leased | |
| Mining Lease | 04/10/19 | Edmonds, James G. to SCELLC | Sugar Camp Mine Plan | HC 2019-0559 | Leased | |
| Mining Lease | 04/23/19 | Crowder, Nancee L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0669 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Patrick L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0671 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Scott L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0672 | Leased | |

| Mining Lease | 04/23/19 | Gunn, Kenneth to SCELLC | Sugar Camp Mine Plan | HC 2019-0673 | Leased | |
| Mining Lease | 05/01/19 | Foresight Energy LP to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 05/08/19 | Camden, Randy to SCELLC | Sugar Camp Mine Plan | HC 2019-0730 | Leased | |
| Mining Lease | 05/08/19 | Davis, Tamera L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0731 | Leased | |
| Mining Lease | 05/30/19 | Fitts, David F. to SCELLC | Sugar Camp Mine Plan | HC 2019-0851 | Leased | |
| Coal Deed | 06/03/19 | Avolt, Geoffrey Barth to SCELLC | Sugar Camp Mine Plan | HC 2019-0870 | Owned | |
| Mining Lease | 06/10/19 | Buchman, Diana Sue Wright to SCELLC | Sugar Camp Mine Plan | HC 2019-0896 | Leased | |
| Mining Lease | 06/10/19 | Willis, Robert James to SCELLC | Sugar Camp Mine Plan | HC 2019-0897 | Leased | |
| Mining Lease | 06/10/19 | Sears, James R. & Gloria to SCELLC | Sugar Camp Mine Plan | HC 2019-0898 | Leased | |
| Mining Lease | 06/19/19 | Wise, Melodie Lea to SCELLC | Sugar Camp Mine Plan | HC 2019-0962 | Leased | |
| Mining Lease | 06/19/19 | Walker, Edwin N. to SCELLC | Sugar Camp Mine Plan | HC 2019-0963 | Leased | |
| Mining Lease | 07/17/19 | O'Dell, Paula J. to SCELLC | Sugar Camp Mine Plan | HC 2019-1079 | Leased | |
| Mining Lease | 07/17/19 | Walker, Ivan W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1080 | Leased | |
| Mining Lease | 07/25/19 | Hut ton, Catherine Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1118 | Leased | |
| Coal Deed | 07/25/19 | Nuss, Richard E. Sr. to SCELLC | Sugar Camp Mine Plan | HC 2019-1120 | Owned | |

| Mining Lease | 08/01/19 | Miltenberger, Cheryl G. to SCELLC | Sugar Camp Mine Plan | HC 2019-1162 | Leased | |
| Mining Lease | 08/01/19 | Lohman, Sandra E. to SCELLC | Sugar Camp Mine Plan | HC 2019-1163 | Leased | |
| Mining Lease | 08/01/19 | Entwistle, Craig W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1164 | Leased | |
| Coal Deed | 08/28/19 | Society of St. Vincent de Paul Archdiocesan Council toSCELLC | Sugar Camp Mine Plan | HC 2019-1347 | Owned | |
| Mining Lease | 08/28/19 | Entwistle, Jacquelyn Marie to SCELLC | Sugar Camp Mine Plan | HC 2019-1348 | Leased | |
| Mining Lease | 08/28/19 | Oliver, Mil ton Donald to SCELLC | Sugar Camp Mine Plan | HC 2019-1358 | Leased | |
| Mining Lease | 09/24/19 | Prusha, Thomas M. to SCELLC | Sugar Camp Mine Plan | HC 2019-1534 | Leased | |
| Coal Deed | 10/09/19 | Lowe, Debra Short to SCELLC | Sugar Camp Mine Plan | HC 2019-1637 | Owned | |
| Coal Deed | 11/14/19 | Lewis, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1869 | Owned | |
| Coal Deed | 11/14/19 | Duncan, Barbara Joan to SCELLC | Sugar Camp Mine Plan | HC 2019-1870 | Owned | |
| Coal Deed | 11/14/2019 | McKinney, Marsha to SCELLC | Sugar Camp Mine Plan | HC 2019-1871 | Owned | |
| Coal Deed | 11/14/2019 | Kniffen, Susan to SCELLC | Sugar Camp Mine Plan | HC 2019-1872 | Owned | |
| Coal Deed | 11/14/19 | Blackwell, William Loyd to SCELLC | Sugar Camp Mine Plan | HC 2019-1873 | Owned | |
| Mining Lease | 11/14/19 | Flannigan, Monty D. to SCELLC | Sugar Camp Mine Plan | HC 2019-1874 | Leased | |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 750 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Mining Lease | 11/20/19 | Irish, Wilmot Wheeler to SCELLC | Sugar Camp Mine Plan | HC 2019-1903 | Leased | |
| Coal Deed | 11/26/19 | McIntosh, Mark E. to SCELLC | Sugar Camp Mine Plan | HC 2019-1945 | Owned | |
| Mining Lease | 12/10/19 | Bergen County Animal Shelter to SCELLC | Sugar Camp Mine Plan | FC 2019-4869 | Leased | |
| Mining Lease | 01/16/20 | Moore, Carolyn F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0098 | Leased | |
| Mining Lease | 01/16/20 | Rucker, Lezlie J. to SCELLC | Sugar Camp Mine Plan | HC 2020-0099 | Leased | |
| Mining Lease | 01/16/20 | Cooper, Rene F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0100 | Leased | |
| Coal Deed | 01/21/20 | Drake, Roger to SCELLC | Sugar Camp Mine Plan | HC 2020-0109 | Owned | |
| Mining Lease | 01/21/20 | Debow, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2020-0110 | Leased | |
| Mining Lease | 01/21/20 | Drake, Daphne to SCELLC | Sugar Camp Mine Plan | HC 2020-0111 | Leased | |
| Mining Lease | 02/18/20 | Rocky Mountain Lions Eye Institute Foundation, Inc. to SCELLC | Sugar Camp Mine Plan | HC 2020-0329 | Leased | |
| Mining Lease | 02/18/20 | Hoppe, Judy H. to SCELLC | Sugar Camp Mine Plan | HC 2020-0330 | Leased | |
| Mining Lease | 02/27/20 | Musselman, James Jay to SCELLC | Sugar Camp Mine Plan | HC 2020-0378 | Leased | |

DEBTOR/GRANTOR:

SITRAN, LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **MOORAGE OPTIONS/LEASES KENTUCKY** | | | | | | |
| Option To Lease | 4/10/2009 | Kay Karr Brooks and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Lease | No |
| Option To Lease | 4/10/2009 | Robert Karr & Rebecca S. Karr, his wife, and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | NOT RECORDED | Lease | No |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 752 of 1005

DEBTOR/GRANTOR:

OENEUS LLC D/B/A SAVATRAN LLC

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **SUGAR CAMP TO McLEANSBORO RAIL LINE ILLINOIS** | | | | | | |
| Rental Agreement | 9/12/2008 | SAVATRAN LLC to William Webb | Pt. NWNW 29-T5S-R5E Hamilton Co IL 0.65 acres | HC-57 Rented house. | Leased | |

**Schedule 5.09**

<u>**Environmental Matters**</u>

1.  Macoupin Energy, Inc. entered into a Consent Order with the Illinois Environmental Protection Agency on September 14, 2015 requiring the implementation of a Groundwater Monitoring Zone to address groundwater contamination caused by the previous owner.  This work is ongoing.

2.  Except as set out in the chart attached hereto as <u>Annex I</u>, none of the Borrower, nor any of its respective Subsidiaries has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding compliance with or liability under Environmental Laws with regard to any of the Properties or the business operated by the Borrower, or any of its Subsidiaries, or any prior business for which the Borrower has retained liability under any Environmental Law.

3.  Except as set out in the list attached hereto as <u>Annex II</u>, no judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened under any Environmental Law to which the Borrower, or any of its Subsidiaries is or, to the knowledge of the Borrower, will be named as a party or with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other similar administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business.

4.  Except as set out in the list attached hereto as <u>Annex II</u>, the Properties and all operations at the Properties are in compliance with all applicable Environmental Laws.

5.  Except as set out in the chart attached hereto as <u>Annex III</u>, the Borrower and each of its Subsidiaries has obtained, and is in compliance with, all Environmental Permits required for the conduct of its businesses and operations, and the ownership, occupation, operation and use of its Property, and all such Environmental Permits are in full force and effect.

**Schedule 5.09 (2)**
FORESIGHT ENERGY
As of 3/6/20

| State | Company | Permit Number | Agency | Type | NOV Number | Issued | Status | NOV Description |
|-------|---------|---------------|--------|------|------------|--------|--------|-----------------|
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 78-02-20 | 2/20/2020 | Issued | Permittee constructed a concrete foundation for a back-up ventilation fan and concrete pilings with prior approval |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 85-03-20 | 2/18/2020 | Issued | The permitted conducted surface coal mining operations without requesting or obtaining approval from the Department authorized such operations to be conducted. The Permittee is disposing underground mine water into the sealed Viking District #1. The underground mine water is only approved to be disposed at Pond No. 1, RDA No. 1, and/or the RO plant on Permit 382. |
| IL | Williamson Energy, LLC. | IL0077666 | IEPA | NOV | W-2019-50223 | 2/6/2020 | Issued | On August 29, 2019, IEPA conducted compliance sampling inspection at Pond Creek #1 Mine. At the time of inspection, water quality standard violations were noted |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 85-02-20 | 2/5/2020 | Issued | Water pumped from underground works escaped from Sugar Camp support facilities at three separate locations. The mine water flows off-permit, contaminated nearby water and soils resources. |
| IL | Macoupin Energy, LLC | 56 and 209 | IDNR | NOV | 38-04-2019 | 9/9/2019 | Abated | Failure to remove and segregate topsoil prior to disturbance. Topsoil was not removed prior to placement of road construction material for the trencher platform road. Failure to protect topsoil from contamination. Operator's amd commutator's trucks were allowed to drive across topsoil stockpile. Failure to follow the approved operations plan. Alternate sediment control measures were not used during installation of the groundwater migration control system. Failure to conduct surface mining and reclamation operations only within the  approved permit area. Surface disturbance occurred approximately sixty (60) feet outside of the approved permit area (IBR No. 14). |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-04-2019 | 9/4/2019 | Abated | Failure to follow the correct procedures for stockpiling and storing topsoil, failure to protect a topsoil stockpile from contamination, and failure to follow the permitted plan in the placement of a topsoil stockpile. Specifically, the operator placed a topsoil stockpile in an unapproved location on the south side of the IBR No 83; then, improperly moved a portion of the stockpile to complete installation of a utility borehole, and spilled concrete associated with the borehole construction on the topsoil stockpile. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | Show Cause | 2019-02 | 8/6/2019 | Settled | Pattern of Violations |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-03-2019 | 8/2/2019 | Abated | Failure to notify Dept of the following surface water discharge excursions within five days of receiving analytical results of water sample: a) Outfall 002: Cl 690 mg/L; b) Outfall 002: SO4 1040 mg/L. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-06-2019 | 8/8/2019 | Abated | Water pumped from underground works escaped from a buried pipeline and contaminated soil resources. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-05-2019 | 7/9/2019 | Abated | FAILURE TO INSTALL PIPELINE ON PERMITTED AREA. SECTIONS OF UNDERGROUND, BURIED PIPELINE, IBR38 WERE INSTALLED OUTSIDE APPROVED PERMIT AREA. |
| IL | Sugar Camp Energy, LLC | 434 | IDNR | NOV | 63-04-2019 | 7/1/2019 | Abated | Non-compliant water was discharged from Outfall 013 into Middle Fork Big Muddy River. Lab analysis of the discharge indicated pH reading of 4.68. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-03-2019 | 6/21/2019 | Abated | Water pumped from underground works escaped from Sugar Camp support facilities at three separate locations. The mine water flowed off-permit, contaminating nearby water and soil resources. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-02-2019 | 6/4/2019 | Abated | Water pumped from underground works escaped from a buried pipeline and contaminated soil resources. |
| IL | Macoupin Energy, LLC | 56 | IDNR | NOV | 38-03-19 | 4/16/2019 | Abated | Failure to report a surface water discharge excursion within five days of receiving analytical results of the water sample from the Shay No. 1 Mine, as outlined in 62 Ill. Adm. Code 1817.41€(2). |
| IL | Macoupin Energy, LLC | 56 | IDNR | NOV | 38-03-2019 | 4/16/2019 | Abated | Failure to report surface water discharge excursion within five days of receiving analytical results of the water sample. |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | NOV | W-2019-50002 | 3/25/2019 | Issued | IEPA site investigation regarding a spill of high chloride water. A transmission line to RDA ruptured. Several violations noted during investigation. |
| IL | Williamson Energy, LLC. | 417 | IDNR | NOV | 67-01-2019 | 3/13/2019 | Abated | Failed to follow the approved plan. Operator failed to remove saturated clay prior to placement of coarse refuse material as specified in Permit No. 471. |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-02-2019 | 2/11/2019 | Abated | The Operator failed to publish a renewal application public notice within the time frame to conduct an informal conference and allow time for issuance of the renewal decision prior to permit expiration. |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-01-2019 | 1/16/2019 | Abated | Failure to report surface water discharge excursion within five days of receiving analytical results of the water sample. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-07-2018 | 10/24/2018 | Abated | Water from underground works escaped from a buried pipeline, flowed off-permit and into a drainage ditch. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-05-2018 | 10/18/2018 | Abated | Water pumped from underground works escaped from a buried pipeline, flowed off-permit and into a stream, contaminating downstream water and soil resources. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-06-2018 | 10/18/2018 | Abated | Water pumped from underground works escaped from a buried pipeline, flowed off-permit and into a stream, contaminating downstream water and soil resources. |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-01-2018 | 10/15/2018 | Abated | Failure to report surface water discharge excursion within five days of receiving analytical results of the water sample. |
| IL | Macoupin Energy, LLC | 209 | IDNR | NOV | 78-01-2018 | 8/13/2018 | Abated | Failure to submit the required ownership and control information for the permit renewal application to Permit  No. 209 in a timely manner. |

1

**Schedule 5.09 (2)**
FORESIGHT ENERGY
As of 3/6/20

| State | Company | Permit Number | Agency | Type | NOV Number | Issued | Status | NOV Description |
|---|---|---|---|---|---|---|---|---|
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-03-2018 | 8/10/2018 | Abated | The permittee conducted surface coal mining operations without first obtaining a permit from the Department authorizing such operations to be conducted upon the acreage involved. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-02-2018 | 3/20/2018 | Abated | High chloride mine water flowed approximately 200 feet down grade from the source of the spill and off permit. (pipeline leak) |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-01-2018 | 2/20/2018 | Abated | FAILED TO PROTECT SURFACE WATER AND FAILED TO MAINTAIN SUPPORT FACILITIES. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-01-2018 | 2/5/2018 | Abated | Failure to follow approved plan for IBR No. 80 of Permit No. 382 by affecting stream buffer zone with vehicular traffic. |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-04-2017 | 12/15/2017 | Abated | Failure to notify the surface owner with a description of measures that would be taken to prevent subsidence and/or to mitigate subsidence damages which may occur. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-05-2017 | 10/30/2017 | Abated | Mining related materials (sodium silicate) were deposited within and outside the permitted area in an uncontrolled manner, impacting an adjacent road side drainage ditch and unnamed tributaries to Akin Creek. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-04-2017 | 10/3/2017 | Abated | The permittee failed to properly plug and abandon groundwater monitoring well MW-I as required and described under Condition I(a) of the Department's June 8,2017 approval letter for IPR #50. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-03-2017 | 9/11/2017 | Abated | The permittee failed to follow the approved plan (IPR No. 50, Condition 5(a)) by plugging groundwater monitoring wells MW-3 and MW-47 without first obtaining Department approval to do so. |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 67-03-2017 | 9/6/2017 | Abated | Failure to follow the approved plan; specifically, the operator implemented a relocation of the specific areas where planned subsidence was approved to occur prior to that plan change being submitted to and approved by the Department. |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-02-2017 | 7/11/2017 | Abated | Unauthorized surface area disturbance within 100' (in disaccord with IBR No. 66) of the top of the bank of the normal channel of the stream. |
| IL | Sugar Camp Energy, LLC | 434 | IDNR | NOV | 63-01-2017 | 5/5/2017 | Abated | Failure to submit ground water monitoring data from wells MW-31 through MW-38R. |
| IL | Macoupin Energy, LLC | 56 | IDNR | NOV | 72-01-2017 | 3/7/2017 | Abated | Failure to report flow from Smith Reservoir (NPDES Outfall 007) for the month of November 2016 in the quarterly discharge monitoring reports. (The Department documented flow during the Nov. 7, 2016 inspection.) |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-01-17 | 3/3/2017 | Abated | Failure to report flow from Sediment Basin 002 (NPDES Outfall 002) for the month of November 2016 in the quarterly discharge monitoring reports. (The Department documented flow during the Nov. 10, 2016 inspection.) |
| IL | Williamson Energy, LLC. | IL0077666 | IEPA | NOV | W-2016-50022 | 8/18/2016 | Abated | 2016 regarding discharge of contaminants that "cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-3-16 | 5/3/2016 | Abated | failure to follow approved drainage control plan |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-2-16 | 4/18/2016 | Abated | discharge at NPDES point 002 and 007 exceeding the daily maximum of 500 mg/L for Sulfate and Chloride |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-2-16 | 2/9/2016 | Abated | failure to follow approved pre-plan |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-1-16 | 1/26/2016 | Abated | failure to notify department within five (5) days of surface water sample noncompliance |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 63-1-16 | 1/7/2016 | Abated | failure to pass affected area through a siltation structure before leaving the permit area |
| IL | Hillsboro Energy, LLC | IL0078727 | IEPA | Show Cause | A-2014-00319 | 1/14/2015 | Abated | violations of permit conditions and failure to apply for and obtain construction permit to allow for modification of crushing and screening operations |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | Show Cause | M-2014-02002 | 10/23/2014 | Abated | failure to comply with effluent conditions of NPDES permit, discharge of contaminants and offensive conditions |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-04-14 | 9/12/2014 | Abated | discharging water in excess of NPDES limits for chlorides and sulfates – corrective action was taken |
| IL | Hillsboro Energy, LLC | 424 | IDNR | NOV | 38-03-14 | 8/28/2014 | Abated | failure to remove topsoil prior to disturbance |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-04-14 | 8/23/2014 | Abated | |
| IL | Hillsboro Energy, LLC | 424 | IDNR | NOV | 68-02-14 | 8/5/2014 | Abated | failure to pass drainage through a sediment pond |
| IL | Hillsboro Energy, LLC | 424 | IDNR | NOV | 68-02-14 | 8/5/2014 | Abated | failure to remove topsoil prior to disturbance |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | Show Cause | A-2014-00284 | 7/31/2014 | Abated | failure to submit an Annual Emissions Report for calendar year 2013 |
| IL | Williamson Energy, LLC. | IL0077666 | IEPA | NOV | A214-00285 | 7/31/2014 | Abated | failure to submit an Annual Emissions Report ("AER") to the Illinois Environmental Protection Agency for calendar year 2013 |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-02-14 | 7/9/2014 | Abated | failure to follow approved plan, placement of coal slurry in experimental Geotubes in an unapproved location |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-2-14 | 5/1/2014 | Abated | failure to report a non-compliant discharge |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-02-14 | 4/28/2014 | Abated | failure to follow approved plan, failure to protect topsoil from contamination and route all drainage to a sediment pond |

**Schedule 5.09 (2)**
FORESIGHT ENERGY
As of 3/6/20

| State | Company | Permit Number | Agency | Type | NOV Number | Issued | Status | NOV Description |
|-------|---------|---------------|--------|------|------------|--------|--------|-----------------|
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 62-1-14 | 3/20/2014 | Abated | failure to report discharge excursions to the Department and failure to submit DMR's and groundwater reports for the 3rd and 4th quarters of 2013 |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | NOV | W-2014-50014 | 3/14/2014 | Abated | violation of Chloride water quality standards on September 18, 2013 and November 26, 2013 |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-01-14 | 2/21/2014 | Abated | failure to file renewal application within time  frame required by the regulations |
| IL | Sugar Camp Energy, LLC | UIC-016-SCM | IEPA | NOV | L-2014-01003 | 1/29/2014 | Abated | Failure to get an approved UIC Permit prior to installation of injection boreholes. |
| IL | Hillsboro Energy, LLC | IL0078727 | IEPA | NOV | W-2014-50161 | 1/1/2014 | Abated | Discharge of contaminants, offensive conditions, unauthorized discharge, creating a water pollution hazard, failure to apply for a construction permit  and failure to comply with NPDES permit – all water based issues have been  corrected. |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-07-13 | 11/1/2013 | Abated | failed to report surface water discharge excursions within five days of receiving analytical results |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-03-13 | 7/25/2013 | Abated | failure to notify Department of noncompliance surface water sample with five-day reporting period. Required letter submitted |
| IL | Macoupin Energy, LLC | ? | IDNR | NOV | 38-06-13 | 7/1/2013 | Abated | failure to conduct surface coal mining and reclamation operation as described in the approved application. The operator installed an access road on the permit area without obtaining approval from the Department |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-06-11 | 6/12/2013 | Abated | failed to maintain adequate freeboard in a sediment  basin |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | NOV | W-2013-50008 | 4/25/2013 | Abated | exceeding effluent limits and  unpermitted mixing, dilution and discharge |
| IL | Sugar Camp Energy, LLC | IL0078565 | IEPA | NOV | W-2013-50133 | 4/5/2013 | Abated | exceeding effluent limits and  unpermitted mixing, dilution and discharge |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-01-13 | 3/5/2013 | Abated | – discharging water from Outfall 008 with a chloride excursion of 874.6 mg/L |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 34-01-13 | 2/27/2013 | Abated | failure to follow approved plan – clean coal stockpile expanded beyond approved protective base |
| IL | Macoupin Energy, LLC | ? | IDNR | NOV | 38-05-12 | 7/2/2012 | Abated | failed to conduct non-MSHA quarterly exam for sediment pond 003 |
| IL | Macoupin Energy, LLC | ? | IDNR | NOV | 38-03-12 | 4/16/2012 | Abated | failed to file renewal application public notice within  the timeframe to conduct a hearing and allow for issuance of renewal decision |
| IL | Macoupin Energy, LLC | IL0056022 | IEPA | NOV | W-2011-00040 | 9/12/2011 | Abated | Exceed ground water standards |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-03-11 | 8/25/2011 | Abated | failed to follow approved plan |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 57-02-11 | 7/27/2011 | Abated | failed to notify IDNR of non-compliant surface water  samples |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-12-11 | 6/30/2011 | Abated | Fail to construct and maintain sediment control |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-2-11 | 4/27/2011 | Abated | petroleum based contaminant observed on water surface in sediment basin 004 |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 43-3-11 | 4/27/2011 | Abated | failed to maintain adequate freeboard in a sediment  basin 004 |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 19-1-11 | 3/9/2011 | Abated | failed to comply with required surface water  sampling parameters |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 19-2-11 | 3/9/2011 | Abated | failed to comply with required ground water sampling parameters |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-04-11 | 2/10/2011 | Abated | failed to follow approved mining plan |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-05-11 | 2/10/2011 | Abated | Failed to report impoundment exam report |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-06-11 | 2/10/2011 | Abated | Failed to complete field density testing |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-03-11 | 2/10/2011 | Abated | Failed to maintain ditch 7b |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-6-10 | 11/8/2010 | Abated | surface drainage flowing off permit without  reporting to a sediment control structure |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-5-10 | 5/13/2010 | Abated | failed to maintain freeboard in sediment basin |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-4-10 | 5/13/2010 | Abated | discharge from disturbed area did not pass through a siltation structure before leaving the permit |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 47-2-10 | 3/9/2010 | Abated | disturbed within 100 feet of cemetery |
| IL | Hillsboro Energy, LLC | IL0078727 | IEPA | NOV | W-2010-30248 | 1/1/2010 | Abated | failed to submit DMR's at the required frequency |
| IL | Hillsboro Energy, LLC | 399 | IDNR | NOV | 38-04-09 | 9/14/2009 | Abated | failed to follow approved mining plan |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 28-01-09 | 9/9/2009 | Abated | drainage leaving permit without passing through  a sediment control structure |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 19-02-09 | 6/2/2009 | Abated | failed to follow approved operations plan |
| IL | Sugar Camp Energy, LLC | 382 | IDNR | NOV | 19-01-09 | 4/27/2009 | Abated | failed to construct siltation structure prior to  disturbance |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 26-3-09 | 4/17/2009 | Abated | failed to provide survey for buildings greater than 40  years old |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 26-2-09 | 4/8/2009 | Abated | failed to submit fourth quarter subsidence control plan  report |
| IL | Williamson Energy, LLC. | 375 | IDNR | NOV | 26-1-09 | 4/3/2009 | Abated | failed to follow approve plan |
| IL | Williamson Energy, LLC. | 375 | IDNR | Show Cause | 2009-01 | 1/16/2009 | Dismissed | |

3

**SCHEDULE 5.09(4)**
**ENVIRONMENTAL MATTERS**

**Consent Orders (Show Cause Orders):**

1.      IDNR – Office of Mines and Minerals – Williamson Energy, LLC Pond Creek Mine Permit No. 375 – Show Cause Order No. 2009-01 dated Jan. 16, 2009; Order dismissing Show Cause Order entered by Hearing Officer Michael O'Hara on June 8, 2009

2.      People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Macoupin Energy LLC, Circuit Court of the Seventh Judicial Circuit, Macoupin County, Illinois – Consent Order was signed and entered on September 14, 2015

3.      IDNR – Office of Mines & Minerals, Land Reclamation Division, In Re Sugar Camp Energy, LLC Permit No. 382 – Show Cause Order No. 2019-02 dated August 6, 2019; Settlement Agreement was entered into on Dec. 10, 2019; Agreed Order Approving Settlement Agreement with Modifications was entered on December 17, 2019 by ALJ Schuering

4.      Pollution Control Board re Sugar Camp Energy PCB 2016-095 – Consent Order resolving allegations related to Underground Injection Control.

**Active Cases:**

1.      Mitchell/Roberts Partnership v. Williamson Energy, LLC, Case No. 14-MR-285; Circuit Court of the First Judicial District, Williamson County, IL

2.      Jackson, et al. v. Williamson Energy, LLC, at al. Case No. 2016-CH-50, in the Circuit Court of the First Judicial District, Williamson County, IL

3.      Williamson Energy and Mach Mining LLC/Noise Complaints – 15 separate Complaints, all pending in the Circuit Court of the First Judicial Circuit, Williamson County, IL:

        1.      James Turner v. Williamson Energy, LLC, et al., 2016-C-108;
        2.      Wayne Thompson v. Williamson Energy, LLC, et al., 2016-C-109;
        3.      Michael Ladd v. Williamson Energy, LLC, et al., 2016-C-110;
        4.      John Kibodeaux v. Williamson Energy, LLC, et al., 2016-C-111;
        5.      Allen Brown v. Williamson Energy, LLC, et al., 2016-C-112;
        6.      Tina Franklin v. Williamson Energy, LLC, et al., 2016-C-113;
        7.      Brenda Fleming v. Williamson Energy, LLC, et al., 2016-C-114;
        8.      John Howat v. Williamson Energy, LLC, et al., 2016-C-115;
        9.      Yuba Hunt v. Williamson Energy, LLC, et al., 2016-C-116;
        10.     Betty Jacobs v. Williamson Energy, LLC, et al., 2016-C-117;
        11.     Richard Jordan v. Williamson Energy, LLC, et al., 2016-C-118;
        12.     Scott Lee v. Williamson Energy, LLC, et al., 2016-C-119;

13.    Claude Vodrazka v. Williamson Energy, LLC, et al., 2016-C-120;
14.    Brian Wolfe v. Williamson Energy, LLC, et al., 2016-C-121; and
15.    Danny York v. Williamson Energy, LLC, et al., 2016-C-122

4.    Reba L. Mitchell v. Williamson Energy, LLC, Case No. 2019-L-00030, Circuit Court of the First Judicial Circuit, Williamson County, IL

5.    The Estate of Russell J. Inman, Deceased, by Carl R. Inman, Independent Executor v. Williamson Energy, LLC, Case No. 2018-L-129, Circuit Court of the First Judicial Circuit, Williamson County, IL

**FELP Permit List**
Schedule 5.09(7)
as of 3/1/2020

| Company | Mine/Operation | State | Permit # | Permit Type | Issuance Date | Expiration Date |
|---|---|---|---|---|---|---|
| Foresight Energy | Hillsboro | IL | IL0078727 | NPDES | 12/13/14 | 05/13/23 |
| Foresight Energy | Hillsboro | IL | 399 | UG | 02/10/09 | 02/10/24 |
| Foresight Energy | Hillsboro | IL | 424 | CRDA | 05/19/14 | 05/19/24 |
| Foresight Energy | Hillsboro | IL | 8020066 | Air Quality | 02/25/09 | Lifetime |
| Foresight Energy | Hillsboro | IL | C-0080-08 | 401 | 12/12/09 | NA |
| Foresight Energy | Hillsboro | IL | P-2664 | 404 | 09/02/09 | NA |
| Foresight Energy | Hillsboro | IL | DS2012025 | Dam | 04/18/12 | NA |
| Foresight Energy | Hillsboro | IL | DS2013085 | Dam | 11/06/13 | NA |
| Foresight Energy | Hillsboro | IL | ID#1211IL08 | Dam | 01/30/12 | NA |
| Foresight Energy | Hillsboro | IL | IL08-03216-03 | Dam | 01/15/14 | NA |
| Foresight Energy | Hillsboro | IL | IL0080039 | NPDES | 02/05/15 | pending |
| Foresight Energy | Hillsboro | IL | IL0080039 | CRDA | 02/03/15 | pending |
| Foresight Energy | Macoupin | IL | IL0056022 | NPDES | 08/18/15 | 09/30/21 |
| Foresight Energy | Macoupin | IL | 209 | CRDA | 07/09/09 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 419 | SMCRA | 05/16/17 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 265 | SMCRA | 07/18/17 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 291 | SMCRA | 07/18/17 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 56 | UG and CRDA | 07/19/09 | 03/05/25 |
| Foresight Energy | Macoupin | IL | 117803-AAA | Air Quality | 06/17/09 | Lifetime |
| Foresight Energy | Macoupin | IL | DS2010040 | Dam | 04/29/10 | NA |
| Foresight Energy | Sitran | IN | IN0063738 | NPDES | 03/15/11 | 03/09/24 |
| Foresight Energy | Sitran | IN | 129-29270-000 | Air Quality | 08/13/10 | Lifetime |
| Foresight Energy | Sugar Camp | IL | IL0078565 | NPDES | 05/24/16 | 04/30/21 |
| Foresight Energy | Sugar Camp | IL | P-2866 | 404 | 12/04/14 | 12/31/25 |
| Foresight Energy | Sugar Camp | IL | 18050018 | Air Quality | 10/23/18 | Lifetime |
| Foresight Energy | Sugar Camp | IL | 17110053 | Air Quality | 09/30/08 | Lifetime |
| Foresight Energy | Sugar Camp | IL | C-0222-08 | 401 | 12/12/09 | NA |
| Foresight Energy | Sugar Camp | IL | C-0719-13 | 401 | 09/03/15 | NA |
| Foresight Energy | Sugar Camp | IL | P-2674 | 404 | 12/15/09 | NA |
| Foresight Energy | Sugar Camp | IL | DS2012018 | Dam | 03/13/12 | NA |
| Foresight Energy | Sugar Camp | IL | 03189-03 | Dam | 01/06/12 | NA |
| Foresight Energy | Sugar Camp | IL | 460 | SMCRA | pending | NA |
| Foresight Energy | Sugar Camp | IL | UIC-012-SCM | UIC | 05/20/14 | NA |
| Foresight Energy | Sugar Camp | IL | UIC-06-15EE | UIC | 05/20/14 | NA |
| Foresight Energy | Sugar Camp | IL | 434 | UG | 08/26/15 | pending |
| Foresight Energy | Sugar Camp | IL | 382 | UG | 09/09/08 | pending |
| Foresight Energy | Williamson | IL | P-2905 | 404 | 12/14/15 | 12/31/26 |
| Foresight Energy | Williamson | IL | 1790048 | Air Quality | 04/07/05 | Lifetime |
| Foresight Energy | Williamson | IL | C-0202-13 | 401 | 01/19/16 | NA |
| Foresight Energy | Williamson | IL | MVS-2005-4660 | 404 | 07/21/06 | NA |
| Foresight Energy | Williamson | IL | DS2008111 | Dam | 11/25/08 | NA |
| Foresight Energy | Williamson | IL | DS2010047 | Dam | 01/21/14 | NA |
| Foresight Energy | Williamson | IL | IL08-03141-01 | Dam | 06/26/07 | NA |
| Foresight Energy | Williamson | IL | IL08-03141-02 | Dam | 12/03/10 | NA |
| Foresight Energy | Williamson | IL | IL08-03141-02 | Dam | 01/03/14 | NA |
| Foresight Energy | Williamson | IL | 456 | SMCRA | 12/05/19 | 12/04/24 |
| Foresight Energy | Williamson | IL | 375 | UG | 07/07/05 | pending |
| Foresight Energy | Williamson | IL | 417 | CRDA | 12/09/15 | pending |
| Foresight Energy | Williamson | IL | IL0077666 | NPDES | 12/13/71 | pending |

Schedule 5.13

**Subsidiaries**

(*)= indicates which Subsidiaries are Loan Parties as of the Closing Date.

| Issuer | Juris. of Org./Form. | Address of Chief Executive Office | Taxpayer ID Number | Type of Organization | % of Interest Owned by Loan Parties |
|---|---|---|---|---|---|
| Adena Resources, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5004649 | Limited Liability Company | 100 |
| Akin Energy LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5231648 | Limited Liability Company | 100 |
| American Century Mineral LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | N/A | Limited Liability Company | 100 |
| American Century Transport LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | N/A | Limited Liability Company | 100 |
| Coal Field Construction Company LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-3795694 | Limited Liability Company | 100 |
| Coal Field Repair Services LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-2249179 | Limited Liability Company | 100 |
| Foresight Coal Sales LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-3318620 | Limited Liability Company | 100 |

| Issuer | Juris. of Org./Form. | Address of Chief Executive Office | Taxpayer ID Number | Type of Organization | % of Interest Owned by Loan Parties |
|---|---|---|---|---|---|
| Foresight Energy Employee Services Corporation * | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3957023 | Corporation | 100 |
| Foresight Energy Finance Corporation * | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 27-3135321 | Corporation | 100 |
| Foresight Energy Labor LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 32-0504176 | Limited Liability Company | 100 |
| Foresight Energy Services LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 90-0776204 | Limited Liability Company | 100 |
| Foresight Receivables LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3952250 | Limited Liability Company | 100 |
| Hillsboro Energy LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5231639 | Limited Liability Company | 100 |
| Hillsboro Transport LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3916881 | Limited Liability Company | 100 |
| LD Labor Company LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 45-3848454 | Limited Liability Company | 100 |

| Issuer | Juris. of Org./Form. | Address of Chief Executive Office | Taxpayer ID Number | Type of Organization | % of Interest Owned by Loan Parties |
|---|---|---|---|---|---|
| Logan Mining LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 47-1762361 | Limited Liability Company | 100 |
| M-Class Mining, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-0645272 | Limited Liability Company | 100 |
| Mach Mining LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 73-1734826 | Limited Liability Company | 100 |
| Macoupin Energy LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-2809005 | Limited Liability Company | 100 |
| MaRyan Mining, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-4027085 | Limited Liability Company | 100 |
| Oeneus LLC d/b/a Savatran LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 30-0306007 | Limited Liability Company | 100 |
| Patton Mining LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-4027251 | Limited Liability Company | 100 |
| Seneca Rebuild LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-3150958 | Limited Liability Company | 100 |

| Issuer | Juris. of Org./Form. | Address of Chief Executive Office | Taxpayer ID Number | Type of Organization | % of Interest Owned by Loan Parties |
|---|---|---|---|---|---|
| Sitran LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-1369962 | Limited Liability Company | 100 |
| Sugar Camp Energy, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 41-2178049 | Limited Liability Company | 100 |
| Tanner Energy LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3940409 | Limited Liability Company | 100 |
| Viking Mining LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-1264981 | Limited Liability Company | 100 |
| Williamson Energy, LLC* | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 81-0669143 | Limited Liability Company | 100 |

**Schedule 5.18**

**<u>Intellectual Property</u>**

None.

**Schedule 5.20**

**Mines**

**Hillsboro Energy LLC**

Deer Run Mine
12051 County Road 900 N.
Hillsboro, Illinois  62049

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease Agreement | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Short Form of Lease (Hillsboro) | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1346-428 | Leased | NO |
| Amendment No. 1 to the Coal Mining Lease and Sublease Agreement | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu
Pg 766 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease (Hillsboro) | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1367-226 | Leased | NO |
| Amendment No. 2 to the Coal Mining Lease and Sublease Agreement | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Amended and Restated Short Form of Lease After Closing 4 and Closing 5 (Hillsboro) | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1412-134  BC 917-329 | Leased | NO |
| Amendment No. 3 to the Coal Mining Lease and Sublease Agreement | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Amended and Restated Short Form of Lease After Closing 3 (Hillsboro) | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1426-275 | Leased | NO |

Case 20-41308   Doc 228   Filed 04/01/20   Entered 04/01/20 23:45:34   Main Docu

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Short Form of Lease After Closing 6 (Hillsboro) | 2/2/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1477-459 BC 964-143 | Leased | NO |
| Amended and Restated Short Form of Lease After Closing 7 & 8 (Hillsboro) | 8/21/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded Not recorded | Leased | NO |
| Coal Mining Lease Agreement | 9/21/2007 | Montgomery Mineral LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| First Partial Termination of Lease | 9/9/2009 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | NO |
| Second Partial Termination of Lease | 1/8/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | NO |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Third Partial Termination of Lease | 10/4/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | NO |
| Fourth Partial Termination of Lease | 1/13/2011 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | NO |
| Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-176 BC 910-257 | Leased | NO |
| Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-135<br><br>BC 910-286 | Leased | NO |
| First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | NO |
| Short Form or Memorandum of First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1508-455 | Leased | NO |
| Deed | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Mine Site<br><br>RDA 1 & 2<br><br>Farmland & Bleeder Site #1 | 201000059726 | Owned | NO |
| Easement | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201000059723 | Owned | NO |
| Easement | 5/9/2011 | George & Martha Spinner to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201100063970 | Owned | NO |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed | 8/23/2013 | Hillsboro Energy LLC to Hillsboro Transport, LLC | Loadout | 201300003499 | Owned | NO |

**Macoupin Energy LLC**

Shay No. 1 Mine
14300 Brushy Mound Road
Carlinville, Illinois 62626

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease | 1/27/10 | WPP LLC and Macoupin Energy LLC | Macoupin South Mine Assignment | NOT RECORDED | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | NOT RECORDED | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | East Hornsby Mine Assignment | NOT RECORDED | Leased | Yes |
| Special Warranty Deed | 1/22/2009 | ExxonMobil Coal USA, Inc and Macoupin Energy LLC | Various tracts of surface and coal reserves. The coal reserves were sold to WPP or Colt and leased back. The surface not required for operations has been conveyed to New River Royalty LLC | MA-0849 493183 | Owned | Yes |
| Lease | 1/27/10 | HOD LLC and Macoupin Energy LLC | Rail Loop | NOT RECORDED | Leased | Yes |

Case 20-41308 Doc 228 Filed 01/05/21 Entered 01/05/21 15:34 Main Docu

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Lease | 1/27/10 | HOD LLC and Macoupin Energy LLC | Rail Load Out | NOT RECORDED | Leased | Yes |
| Option and Lease Agreement | 2/28/1967 | Jet Oil Company and Macoupin Energy LLC | Coal Reserves | Volume 628, Page 436 | Leased | Yes |

## Sugar Camp Energy, LLC

M-Class Mine
11351 N Thompsonville Road
Macedonia, Illinois  62860

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0633  FC 2006-6919 | Leased | Yes |
| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & Sugar Camp Energy, LLC | Consent with respect to Illinois Fuels Lease | FC-8233 | Leased | Yes |
| Warranty Deed | 1/15/2009 | Rodney Smith and Marta Smith to Sugar Camp Energy, LLC | PT Lot 121 and PT Lot 122 in Kokopelli Estates | Surface WC-0772, WC-481-772 | Leased | Yes |
| Easement | 3/4/2010 | Glendall E Johnston a.k.a. Glen Johnston and Carolyn S. Johnston, a.k.a. Carolyn Johnston, husband and Wife to Sugar Camp Energy, LLC | NW NW Sec 1-6-4 and NWNE Sec 1-6-4 Franklin County, Illinois | FC-8253 2010-1056 | Owned | Yes |
| Easement | 3/4/2010 | Morris R. Clark and Karan S. Clark to Sugar Camp Energy, LLC | NWNE and W2E2NE Sec 2-6-4 Franklin, Illinois | FC-8254 2010-1057 | Owned | Yes |

Case 20-41308   Doc 228   Filed 04/09/20   Entered 04/09/20 23:45:34   Main Document   Pg 772 of 1005

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 3/1/2010 | David Blood and Melanie Blood, husband and wife to Sugar Camp Energy, LLC | Pt E2NENE Sec 2-6-4 Franklin County, Illinois 2010-1058 | FC-0255 | Owned | Yes |
| Easement | 6/5/2010 | Roger L. Sanders and Mary Ellen Sanders to Sugar Camp Energy, LLC | W 10 ac N3/4 of NESE Sec 6-6-5 Hamilton County, Illinois | HC-0078 22-2117 | Owned | Yes |
| Warranty Deed | 6/1/2010 | Patrick G Mascal and Lori S. Mascal to Sugar Camp Energy, LLC | W2NESW and E2S2NWSW Sec 6-6-5 Hamilton Illinois | HC-0075 27-2311 | Owned | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Illinois Fuels TVA Lease | NA | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to Mine on Franklin County TVA Lease | NA | Leased | No |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface in Hamilton County required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface at former Akin site required for Sugar Camp Energy, LLC Operations | NOT RECORDED | Owned | Yes |
| Coal Mining Lease | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | NOT RECORDED | Leased | Yes |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mining Lease | 01/04/18 | Roberts, Carol Ann Trustee to SCELLC | Sugar Camp Mine Plan | HC 2018-0008 | Leased | |
| Mining Lease | 01/04/18 | Engstrom, Amy to SCELLC | Sugar Camp Mine Plan | HC 2018-0011 | Leased | |
| Mining Lease | 01/04/18 | Hayes, Marshall Jr. to SCELLC | Sugar Camp Mine Plan | HC 2018-0013 | Leased | |
| Mining Lease | 01/04/18 | Blanchard, Bonnie M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0016 | Leased | |

Case 19-30923 Doc 1 Filed 04/12/19 Entered 04/12/19 04:45:34 Main Document Page 773 of 1005

| Mining Lease | 01/04/18 | Palmer, James to SCELLC | Sugar Camp Mine Plan | HC 2018-0017 | Leased | |
| Mining Lease | 01/04/18 | Moxley, Linda to SCELLC | Sugar Camp Mine Plan | HC 2018-0018 | Leased | |
| Coal Deed | 01/04/18 | Johnson, Susan L. to SCELLC | Sugar Camp Mine Plan | HC 2018-0019 | Owned | |
| Mining Lease | 01/30/18 | McFarland, Carol A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0110 | Leased | |
| Mining Lease | 01/30/18 | Bowman, Debra Kate to SCELLC | Sugar Camp Mine Plan | HC 2018-0111 | Leased | |
| Mining Lease | 01/30/18 | Diaz, Donna J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0112 | Leased | |
| Mining Lease | 01/30/18 | Flannigan, James T. to SCELLC | Sugar Camp Mine Plan | HC 2018-0113 | Leased | |
| Mining Lease | 01/30/18 | Leslie, Janet E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0114 | Leased | |
| Mining Lease | 01/30/18 | Reid, Jon M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0115 | Leased | |
| Mining Lease | 01/30/18 | Webster, Linda to SCELLC | Sugar Camp Mine Plan | HC 2018-0116 | Leased | |
| Mining Lease | 01/30/18 | Henson, William to SCELLC | Sugar Camp Mine Plan | HC 2018-0119 | Leased | |
| Coal Deed | 01/30/18 | Wake, Amanda to SCELLC | Sugar Camp Mine Plan | HC 2018-0120 | Owned | |
| Coal Deed | 01/30/18 | Trabant, Megan to SCELLC | Sugar Camp Mine Plan | HC 2018-0121 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Pamela S. to SCELLC | Sugar Camp Mine Plan | HC 2018-0122 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Rochelle to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Owned | |
| Mining Lease | 01/30/18 | Bloomfield, Dora to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Leased | |
| Mining Lease | 01/30/18 | Flannigan, Donald to SCELLC | Sugar Camp Mine Plan | HC 2018-0124 | Leased | |
| Mining Lease | 01/30/18 | Smith, Sharon to SCELLC | Sugar Camp Mine Plan | HC 2018-0126 | Leased | |

| | | | | | |
|---|---|---|---|---|---|
| Mining Lease | 02/08/18 | Wood, Betty A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0171 | Leased |
| Mining Lease | 02/08/18 | Irish, Carol V. to SCELLC | Sugar Camp Mine Plan | HC 2018-0172 | Leased |
| Mining Lease | 02/08/18 | Wicker, Darrell to SCELLC | Sugar Camp Mine Plan | HC 2018-0173 | Leased |
| Mining Lease | 02/08/18 | Kathleen M. Wright to SCELLC | Sugar Camp Mine Plan | HC 2018-0174 | Leased |
| Mining Lease | 02/08/18 | Irish, Lloyd Paul to SCELLC | Sugar Camp Mine Plan | HC 2018-0175 | Leased |
| Mining Lease | 02/08/18 | Patterson, Paul J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0176 | Leased |
| Mining Lease | 02/08/18 | Wicker, Paul R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0177 | Leased |
| Mining Lease | 02/28/18 | Krois, Bonnie C. to SCELLC | Sugar Camp Mine Plan | HC 2018-0270 | Leased |
| Coal Deed | 02/28/18 | Tabor, Stephanie to SCELLC | Sugar Camp Mine Plan | HC 2018-0271 | Owned |
| Mining Lease | 02/28/18 | Petitte, Clyda to SCELLC | Sugar Camp Mine Plan | HC 2018-0272 | Leased |
| Mining Lease | 02/28/18 | Patterson, Emily Jo to SCELLC | Sugar Camp Mine Plan | HC 2018-0273 | Leased |
| Mining Lease | 02/28/18 | Allen, Jane to SCELLC | Sugar Camp Mine Plan | HC 2018-0274 | Leased |
| Coal Deed | 02/28/18 | Spaven, Laverne to SCELLC | Sugar Camp Mine Plan | HC 2018-0275 | Owned |
| Mining Lease | 02/28/18 | Jackson, Patricia Snyder to SCELLC | Sugar Camp Mine Plan | HC 2018-0277 | Leased |
| Mining Lease | 02/28/18 | Gioia, Virginia M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0278 | Leased |
| Mining Lease | 02/28/18 | Moffett, William R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0279 | Leased |
| Mining Lease | 02/28/18 | O'Dell, William to SCELLC | Sugar Camp Mine Plan | HC 2018-0280 | Leased |
| Mining Lease | 02/28/18 | Reid, Dennis P. to SCELLC | Sugar Camp Mine Plan | HC 2018-0281 | Leased |

Case 4:18-cv-04120 Filed 04/12/18 Entered 04/12/18 02:45:34 Main Document

| | | | | | | |
|---|---|---|---|---|---|---|
| Coal Deed | 02/28/18 | Griffith, Janice Sue to SCELLC | Sugar Camp Mine Plan | HC 2018-0284 | Owned | |
| Mining Lease | 02/28/18 | Knight, Kenneth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0287 | Leased | |
| Coal Deed | 02/28/18 | Metheney, Rickie W. to SCELLC | Sugar Camp Mine Plan | HC 2018-0289 | Owned | |
| Mining Lease | 02/28/18 | Olson, Ruth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0291 | Leased | |
| Mining Lease | 02/28/18 | Sandy, Susan E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0293 | Leased | |
| Coal Deed | 02/28/18 | Miller, Micah A. & Marietta to SCELLC | Sugar Camp Mine Plan | HC 2019-2023 | Owned | |
| Mining Lease | 04/06/18 | Mudge, Evelyn M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0806 | Leased | |
| Mining Lease | 04/12/18 | Higginson, Leslie K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0527 | Leased | |
| Coal Deed | 04/12/18 | Farris, Brenda K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0528 | Owned | |
| Mining Lease | 04/12/18 | Cook, Becky Lynn to SCELLC | Sugar Camp Mine Plan | HC 2018-0529 | Leased | |
| Mining Lease | 04/12/18 | Snyder, Diane M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0530 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Kevin J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0531 | Leased | |
| Mining Lease | 04/12/18 | Wohlers, Karen J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0532 | Leased | |
| Mining Lease | 04/12/18 | Heckert, Lauri to SCELLC | Sugar Camp Mine Plan | HC 2018-0533 | Leased | |
| Mining Lease | 04/12/18 | Page, Mary Jane by Sidney Bennett III AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-0534 | Leased | |
| Mining Lease | 04/12/18 | Comp ton, Paulette N. to SCELLC | Sugar Camp Mine Plan | HC 2018-0535 | Leased | |
| Mining Lease | 04/12/18 | Taylor, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2018-0536 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Carol Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-0537 | Leased | |

| | | | | | |
|---|---|---|---|---|---|
| Mining Lease | 04/12/18 | O'Dell, Casey Joel to SCELLC | Sugar Camp Mine Plan | HC 2018-0538 | Leased |
| Mining Lease | 05/08/18 | Lowman, Timothy A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0548 | Leased |
| Mining Lease | 05/08/18 | Neal, Douglas Allen to SCELLC | Sugar Camp Mine Plan | HC 2018-0754 | Leased |
| Mining Lease | 05/08/18 | Williams, J. Mark to SCELLC | Sugar Camp Mine Plan | HC 2018-0755 | Leased |
| Mining Lease | 05/08/18 | Barker, Lynne E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0756 | Leased |
| Mining Lease | 05/08/18 | Knight, Stephen L. to SCELLC | Sugar Camp Mine Plan | HC 2018-0757 | Leased |
| Mining Lease | 05/08/18 | Neal, Walter Blake to SCELLC | Sugar Camp Mine Plan | HC 2018-0759 | Leased |
| Coal Deed | 05/11/18 | Noma, Inc to SCELLC | Sugar Camp Mine Plan | HC 2018-1036 | Owned |
| Mining Lease | 05/16/18 | Hake, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0807 | Leased |
| Mining Lease | 05/16/18 | Hosner, Irene Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0808 | Leased |
| Mining Lease | 05/16/18 | Duckworth, Nina Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0811 | Leased |
| Mining Lease | 05/16/18 | Bailey, Velma Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0812 | Leased |
| Mining Lease | 05/16/18 | Lovan, W. Robert to SCELLC | Sugar Camp Mine Plan | HC 2018-0813 | Leased |
| Mining Lease | 05/16/18 | Neal, William Jerry to SCELLC | Sugar Camp Mine Plan | HC 2018-0813 | Leased |
| Coal Deed | 06/27/18 | Bow ton, Barbara G. to SCELLC | Sugar Camp Mine Plan | HC 2018-1027 | Owned |
| Coal Deed | 06/27/18 | Whets tone, Dennis W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1028 | Owned |
| Coal Deed | 06/27/18 | Whets tone, William R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1029 | Owned |
| Coal Deed | 06/27/18 | Smith, Bernice to SCELLC | Sugar Camp Mine Plan | HC 2018-1030 | Owned |

| | | | | | |
|---|---|---|---|---|---|
| Coal Deed | 06/27/18 | Thompson, Beatrice % Billy E. Walker AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-1031 | Owned |
| Coal Deed | 06/27/18 | First Church of the Nazarene to SCELLC | Sugar Camp Mine Plan | HC 2018-1032 | Owned |
| Coal Deed | 06/27/18 | Linn, Karen R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1034 | Owned |
| Mining Lease | 06/27/18 | Seibert, Charles Ellis to SCELLC | Sugar Camp Mine Plan | HC 2018-1037 | Leased |
| Mining Lease | 06/27/18 | Seibert, James Thomas to SCELLC | Sugar Camp Mine Plan | HC 2018-1038 | Leased |
| Mining Lease | 06/27/18 | Drake, Terry W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1041 | Leased |
| Mining Lease | 06/27/18 | Scott, Betsy Dawn to SCELLC | Sugar Camp Mine Plan | HC 2018-1042 | Leased |
| Mining Lease | 06/27/18 | Lane, John Bradley to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased |
| Mining Lease | 06/27/18 | Drake, Mark W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased |
| Coal Deed | 06/27/18 | Mendyk, Julie to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned |
| Mining Lease | 07/05/18 | Wall, Joyce Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1086 | Leased |
| Mining Lease | 07/05/18 | Metheney, Donald W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1087 | Leased |
| Coal Deed | 07/05/18 | Sandidge, Joyce to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned |
| Coal Deed | 07/05/18 | Smith, Leon to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned |
| Coal Deed | 07/05/18 | Smith, Richard H. to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned |
| Mining Lease | 07/05/18 | Wall, Ronald M. to SCELLC | Sugar Camp Mine Plan | HC 2018-1089 | Leased |
| Mining Lease | 07/18/18 | Martin, Marianne B. to SCELLC | Sugar Camp Mine Plan | HC 2018-1157 | Leased |
| Mining Lease | 07/18/18 | Wilkie, Mary Jean to SCELLC | Sugar Camp Mine Plan | HC 2018-1158 | Leased |

Case 18-50214 Doc 21 Filed 04/12/18 Entered 04/12/18 03:45:34 Main Document

| Mining Lease | 07/18/18 | Jones, Michael J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1159 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 07/18/18 | Martin, Janet J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1160 | Leased | |
| Mining Lease | 07/30/18 | Kleber, LLC to SCELLC | Sugar Camp Mine Plan | HC 2018-1222 | Leased | |
| Mining Lease | 08/08/18 | Vickers, Rhonda Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1271 | Leased | |
| Mining Lease | 08/08/18 | Pike, Brenda L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1272 | Leased | |
| Mining Lease | 08/08/18 | Schwenn, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1273 | Leased | |
| Mining Lease | 08/14/18 | Lane, Juanita Dare to SCELLC | Sugar Camp Mine Plan | HC 2018-1302 | Leased | |
| Coal Deed | 08/14/18 | Metheney, Miranda to SCELLC | Sugar Camp Mine Plan | HC 2018-1301 | Owned | |
| Mining Lease | 08/14/18 | Yancey, George to SCELLC | Sugar Camp Mine Plan | HC 2018-1303 | Leased | |
| Mining Lease | 08/28/18 | Knob Prairie Baptist Cemetery Association to SCELLC | Sugar Camp Mine Plan | HC 2018-1040 | Leased | |
| Coal Deed | 09/12/18 | Buchanan, Cynthia E. to SCELLC | Sugar Camp Mine Plan | HC 2018-1439 | Owned | |
| Coal Deed | 09/12/18 | Brophy, Romaine widow of James Brophy to SCELLC | Sugar Camp Mine Plan | HC 2018-1440 | Owned | |
| Mining Lease | 09/12/18 | Wright, Donald L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1441 | Leased | |
| Mining Lease | 09/12/18 | Dorion, Rhona to SCELLC | Sugar Camp Mine Plan | HC 2018-1442 | Leased | |
| Mining Lease | 09/12/18 | Wright, Laura to SCELLC | Sugar Camp Mine Plan | HC 2018-1443 | Leased | |
| Mining Lease | 10/03/18 | Simmons, Gavin T. to SCELLC | Sugar Camp Mine Plan | HC 2018-1523 | Leased | |
| Mining Lease | 10/03/18 | Wright, Curtis D. to SCELLC | Sugar Camp Mine Plan | HC 2018-1524 | Leased | |
| Mining Lease | 10/03/18 | Lane, Riley Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1525 | Leased | |

| Mining Lease | 10/24/18 | Winter, Carrie L Trust to SCELLC | Sugar Camp Mine Plan | HC 2018-1662 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 10/24/18 | Smith, Brett to SCELLC | Sugar Camp Mine Plan | HC 2018-1663 | Leased | |
| Mining Lease | 10/24/18 | Johnson, Flora Wymond to SCELLC | Sugar Camp Mine Plan | HC 2018-1665 | Leased | |
| Mining Lease | 10/24/18 | Collins, Sandra Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1666 | Leased | |
| Mining Lease | 10/24/18 | Koptez, Steven Gerald to SCELLC | Sugar Camp Mine Plan | HC 2018-1667 | Leased | |
| Mining Lease | 10/24/18 | Decker, Mary Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1783 | Leased | |
| Coal Deed | 10/30/18 | Jenkins, Thomas R to SCELLC | Sugar Camp Mine Plan | HC 2018-1692 | Owned | |
| Mining Lease | 10/30/18 | Dry, Margaret Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1693 | Leased | |
| Mining Lease | 10/30/18 | Lane, Sydney Drew to SCELLC | Sugar Camp Mine Plan | HC 2018-1694 | Leased | |
| Mining Lease | 10/30/18 | touma, Elizabeth Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1695 | Leased | |
| Mining Lease | 10/30/18 | Myers, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1696 | Leased | |
| Mining Lease | 11/19/18 | Palmer, Gary to SCELLC | Sugar Camp Mine Plan | HC 2018-1783 | Leased | |
| Mining Lease | 11/19/18 | Jordon, Flora Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 11/20/18 | Waggoner, Amanda J to SCELLC | Sugar Camp Mine Plan | FC 2018-4821 | Leased | |
| Mining Lease | 11/20/18 | Bohannon, Barbara Ann to SCELLC | Sugar Camp Mine Plan | FC 2018-4822 | Leased | |
| Mining Lease | 11/20/18 | Otterson, Lloyd L. to SCELLC | Sugar Camp Mine Plan | FC 2018-4823 | Leased | |
| Mining Lease | 12/11/18 | Goforth, Heather J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1905 | Leased | |
| Mining Lease | 12/11/18 | Goforth, Matthew R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1906 | Leased | |

| | | | | | |
|---|---|---|---|---|---|
| Mining Lease | 12/11/18 | Smith, Kerry to SCELLC | Sugar Camp Mine Plan | HC 2018-1907 | Leased |
| Mining Lease | 12/11/18 | Johnson, Katherine Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased |
| Mining Lease | 12/18/18 | Wright, Shelia P. to SCELLC | Sugar Camp Mine Plan | HC 2018-1974 | Leased |
| Mining Lease | 12/18/18 | Wright, Richard A. to SCELLC | Sugar Camp Mine Plan | HC 2018-1975 | Leased |
| Mining Lease | 12/18/18 | Wright, Michael S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1976 | Leased |
| Mining Lease | 12/18/18 | Brown, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1977 | Leased |
| Coal Deed | 01/09/19 | Jenkins, Mike  to SCELLC | Sugar Camp Mine Plan | HC 2019-0057 | Owned |
| Mining Lease | 01/09/19 | Jenkins, Hellen to SCELLC | Sugar Camp Mine Plan | HC 2019-0058 | Leased |
| Mining Lease | 01/09/19 | Bayne, Janet Jenkins to SCELLC | Sugar Camp Mine Plan | HC 2019-0059 | Leased |
| Mining Lease | 01/09/19 | Jenkins, James J. to SCELLC | Sugar Camp Mine Plan | HC 2019-0060 | Leased |
| Mining Lease | 01/16/19 | Wright, Steven Ray to SCELLC | Sugar Camp Mine Plan | HC 2019-0097 | Leased |
| Mining Lease | 01/16/19 | Wright, Ida Louise to SCELLC | Sugar Camp Mine Plan | HC 2019-0098 | Leased |
| Coal Deed | 01/29/19 | The Bonnie Camp Meeting  to SCELLC | Sugar Camp Mine Plan | HC 2019-0150 | Owned |
| Coal Deed | 02/01/19 | Barnhill, Ruth Eloise Short  to SCELLC | Sugar Camp Mine Plan | HC 2019-0168 | Owned |
| Coal Deed | 02/01/19 | Rappe, John James  to SCELLC | Sugar Camp Mine Plan | HC 2019-0169 | Owned |
| Mining Lease | 02/01/19 | Willis, Bruce E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0172 | Leased |
| Mining Lease | 02/01/19 | Knott, Elaine Mae to SCELLC | Sugar Camp Mine Plan | HC 2019-0173 | Leased |
| Mining Lease | 02/01/19 | Seibert, John Walter to SCELLC | Sugar Camp Mine Plan | HC 2019-0174 | Leased |

| Coal Deed | 02/08/19 | Short, Leon to SCELLC | Sugar Camp Mine Plan | HC 2019-0210 | Owned | |
|---|---|---|---|---|---|---|
| Coal Deed | 02/08/19 | Avolt, Kathleen Eagan to SCELLC | Sugar Camp Mine Plan | HC 2019-0218 | Owned | |
| Coal Deed | 02/08/19 | Avolt, Donna H. to SCELLC | Sugar Camp Mine Plan | HC 2019-0219 | Owned | |
| Mining Lease | 02/13/19 | Wall, Letitia to SCELLC | Sugar Camp Mine Plan | HC 2019-0223 | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 02/19/19 | Hoffman, Elaine W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0245 | Leased | |
| Coal Deed | 03/12/19 | Banning, David W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0368 | Owned | |
| Mining Lease | 03/22/19 | Kinsey, Frances E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0416 | Leased | |
| Mining Lease | 03/22/19 | Willis, George Darin to SCELLC | Sugar Camp Mine Plan | HC 2019-0417 | Leased | |
| Mining Lease | 03/22/19 | Burns, Lenore E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0418 | Leased | |
| Mining Lease | 03/22/19 | Gill, Lorella E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0419 | Leased | |
| Mining Lease | 03/22/19 | Oberreiter, Jean Ann (Evans) to SCELLC | Sugar Camp Mine Plan | HC 2019-0420 | Leased | |
| Coal Deed | 03/22/19 | Doyle, Kymbra Drasil to SCELLC | Sugar Camp Mine Plan | HC 2019-0445 | Owned | |
| Coal Deed | 03/27/19 | Higgins, Cynthia Ann to Elaine May Knott | Sugar Camp Mine Plan | HC 2019-0446 | Owned | |
| Coal Deed | 03/28/19 | Short, Dian to SCELLC | Sugar Camp Mine Plan | HC 2019-0463 | Owned | |
| Coal Deed | 03/28/19 | Short, Richard to SCELLC | Sugar Camp Mine Plan | HC 2019-0464 | Owned | |
| Coal Deed | 04/03/19 | South Side Christian Church to SCELLC | Sugar Camp Mine Plan | HC 2019-0507 | Owned | |

Case 20-13_D2 Filed 04/12/20 Entered 04/01/20 23:45:34 Main Docu

| Mining Lease | 04/10/19 | Yorgan, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2019-0558 | Leased | |
|---|---|---|---|---|---|---|
| Mining Lease | 04/10/19 | Edmonds, James G. to SCELLC | Sugar Camp Mine Plan | HC 2019-0559 | Leased | |
| Mining Lease | 04/23/19 | Crowder, Nancee L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0669 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Patrick L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0671 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Scott L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0672 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Kenneth to SCELLC | Sugar Camp Mine Plan | HC 2019-0673 | Leased | |
| Mining Lease | 05/01/19 | Foresight Energy LP to SCELLC | Sugar Camp Mine Plan | NOT RECORDED | Leased | |
| Mining Lease | 05/08/19 | Camden, Randy to SCELLC | Sugar Camp Mine Plan | HC 2019-0750 | Leased | |
| Mining Lease | 05/08/19 | Davis, Tamera L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0751 | Leased | |
| Mining Lease | 05/30/19 | Fitts, David F. to SCELLC | Sugar Camp Mine Plan | HC 2019-0851 | Leased | |
| Coal Deed | 06/03/19 | Avolt, Geoffrey Barth to SCELLC | Sugar Camp Mine Plan | HC 2019-0870 | Owned | |
| Mining Lease | 06/10/19 | Buchman, Diana Sue Wright to SCELLC | Sugar Camp Mine Plan | HC 2019-0896 | Leased | |
| Mining Lease | 06/10/19 | Willis, Robert James to SCELLC | Sugar Camp Mine Plan | HC 2019-0897 | Leased | |
| Mining Lease | 06/10/19 | Sears, James R. & Gloria to SCELLC | Sugar Camp Mine Plan | HC 2019-0898 | Leased | |
| Mining Lease | 06/19/19 | Wise, Melodie Lea to SCELLC | Sugar Camp Mine Plan | HC 2019-0962 | Leased | |
| Mining Lease | 06/19/19 | Walker, Edwin N. to SCELLC | Sugar Camp Mine Plan | HC 2019-0963 | Leased | |
| Mining Lease | 07/17/19 | O'Dell, Paula J. to SCELLC | Sugar Camp Mine Plan | HC 2019-1079 | Leased | |
| Mining Lease | 07/17/19 | Walker, Ivan W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1080 | Leased | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mining Lease | 07/25/19 | Hut ton, Catherine Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1118 | Leased | |
| Coal Deed | 07/25/19 | Nuss, Richard E. Sr. to SCELLC | Sugar Camp Mine Plan | HC 2019-1120 | Owned | |
| Mining Lease | 08/01/19 | Miltenberger, Cheryl G. to SCELLC | Sugar Camp Mine Plan | HC 2019-1162 | Leased | |
| Mining Lease | 08/01/19 | Lohman, Sandra E. to SCELLC | Sugar Camp Mine Plan | HC 2019-1163 | Leased | |
| Mining Lease | 08/01/19 | Entwistle, Craig W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1164 | Leased | |
| Coal Deed | 08/28/19 | Society of St. Vincent de Paul Archdiocesan Council toSCELLC | Sugar Camp Mine Plan | HC 2019-1317 | Owned | |
| Mining Lease | 08/28/19 | Entwistle, Jacquelyn Marie to SCELLC | Sugar Camp Mine Plan | HC 2019-1318 | Leased | |
| Mining Lease | 08/28/19 | Oliver, Mil ton Donald to SCELLC | Sugar Camp Mine Plan | HC 2019-1318 | Leased | |
| Mining Lease | 09/24/19 | Prusha, Thomas M. to SCELLC | Sugar Camp Mine Plan | HC 2019-1584 | Leased | |
| Coal Deed | 10/09/19 | Lowe, Debra Short to SCELLC | Sugar Camp Mine Plan | HC 2019-1697 | Owned | |
| Coal Deed | 11/14/19 | Lewis, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1860 | Owned | |
| Coal Deed | 11/14/19 | Duncan, Barbara Joan to SCELLC | Sugar Camp Mine Plan | HC 2019-1872 | Owned | |
| Coal Deed | 11/14/2019 | McKinney, Marsha to SCELLC | Sugar Camp Mine Plan | HC 2019-1871 | Owned | |
| Coal Deed | 11/14/2019 | Kniffen, Susan to SCELLC | Sugar Camp Mine Plan | HC 2019-1872 | Owned | |
| Coal Deed | 11/14/19 | Blackwell, William Loyd to SCELLC | Sugar Camp Mine Plan | HC 2019-1873 | Owned | |
| Mining Lease | 11/14/19 | Flannigan, Monty D. to SCELLC | Sugar Camp Mine Plan | HC 2019-1874 | Leased | |
| Mining Lease | 11/20/19 | Irish, Wilmot Wheeler to SCELLC | Sugar Camp Mine Plan | HC 2019-1903 | Leased | |

Case 4-08 Doc 28 Filed 04/10/20 Entered 04/10/20 23:45:34 Main Document

| | | | | | | |
|---|---|---|---|---|---|---|
| Coal Deed | 11/26/19 | McIntosh, Mark E.  to SCELLC | Sugar Camp Mine Plan | HC 2019-1945 | Owned | |
| Mining Lease | 12/10/19 | Bergen County Animal Shelter to SCELLC | Sugar Camp Mine Plan | FC 2019-4869 | Leased | |
| Mining Lease | 01/16/20 | Moore, Carolyn F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0098 | Leased | |
| Mining Lease | 01/16/20 | Rucker, Lezlie J. to SCELLC | Sugar Camp Mine Plan | HC 2020-0099 | Leased | |
| Mining Lease | 01/16/20 | Cooper, Rene F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0100 | Leased | |
| Coal Deed | 01/21/20 | Drake, Roger  to SCELLC | Sugar Camp Mine Plan | HC 2020-0109 | Owned | |
| Mining Lease | 01/21/20 | Debow, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2020-0110 | Leased | |
| Mining Lease | 01/21/20 | Drake, Daphne to SCELLC | Sugar Camp Mine Plan | HC 2020-0111 | Leased | |
| Mining Lease | 02/18/20 | Rocky Mountain Lions Eye Institute Foundation, Inc. to SCELLC | Sugar Camp Mine Plan | HC 2020-0319 | Leased | |
| Mining Lease | 02/18/20 | Hoppe, Judy H. to SCELLC | Sugar Camp Mine Plan | HC 2020-0320 | Leased | |
| Mining Lease | 02/27/20 | Musselman, James Jay to SCELLC | Sugar Camp Mine Plan | HC 2020-0376 | Leased | |

Case 20-40208 Doc 23 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 785 of 1005

**Williamson Energy, LLC**

Pond Creek No. 1 Mine
16468 Liberty School Road
Marion, IL 62959

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease as amended | 8/14/2006 | WPP LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Franklin County Doc 2006-6571<br><br>Williamson County: Misc. 301 page 480 | Leased | Yes |
| Short Form of Lease and Sublease | 5/1/2005 | Williamson Development Company LLC and Williamson Energy LLC | Coal Reserves in Williamson County, Illinois | Misc 291 page 461 | Leased | Yes |
| Short Form of Lease | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Misc 301 Page 479 | Leased | Yes |
| First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Misc 313 Page 620 | Leased | Yes |
| Coal Mining Lease and Sublease | 8/12/10 | Colt LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Il | 325-89 | Leased | Yes |
| First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Misc 313 Page 629 | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed | 8/12/10 | Williamson Development Company, LLC and Williamson Energy, LLC | Surface required for Williamson Energy, LLC Operations[3] | WC 486-333 | Owned | Yes |
| Easement | 8/12/10 | Williamson Development Company, LLC and Williamson Energy, LLC | "Snake areas" required for Williamson Energy, LLC Operations | WC 325-899 | Owned | Yes |
| Ground Lease | 8/12/10 | Eberhart to Williamson Development Company, LLC assigned to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 325-900 | Leased | Yes |
| Ground Lease | 8/12/10 | Summers to Independence Land Company, LLC to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 327-750 | Leased | Yes |

| Warranty Deed | 6/14/2018 | Diana S. Dulle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-4356 | Owned | |
| Warranty Deed | 7/13/2018 | Linda Duncan to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5209 | Owned | |
| Warranty Deed | 7/20/2018 | Jeremy W. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5444 | Owned | |
| Warranty Deed | 8/20/2018 | Lora L. Jones to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6259 | Owned | |
| Warranty Deed | 8/20/2018 | Shirley N. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6258 | Owned | |
| Warranty Deed | 9/4/2018 | Debra Ellen Moser to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6677 | Owned | |
| Warranty Deed | 9/4/2018 | Larry Dean Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6716 | Owned | |

[3] This excludes the real property released pursuant to that certain Fifth Amendment and Partial Release of Fee and Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of September 26, 2016, by and between Williamson Energy, LLC, as Mortgagor, and Citibank, N.A., in its capacity as Agent, consisting of approximately 28.55 acres of surface land.

| Warranty Deed | | Jerry R. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6705 | Owned | |
|---|---|---|---|---|---|---|
| Warranty Deed | 9/4/2018 | Wilma K. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6704 | Owned | |
| Warranty Deed | 9/4/2018 | Kimberly A. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6703 | Owned | |
| Warranty Deed | 9/4/2018 | Gerald Lee Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6702 | Owned | |
| Warranty Deed | 9/4/2018 | Wendall Ray Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6701 | Owned | |
| Warranty Deed | 9/24/2018 | Edward W. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7338 | Owned | |
| Warranty Deed | 9/24/2018 | Barbara Jean Newton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7337 | Owned | |
| Warranty Deed | 9/24/2018 | Debra L. Caplick to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7336 | Owned | |
| Warranty Deed | 9/24/2018 | Don N. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7335 | Owned | |
| Warranty Deed | 9/24/2018 | Jim D. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7334 | Owned | |
| Warranty Deed | 9/24/2018 | Susan Elaine Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7333 | Owned | |
| Warranty Deed | 9/24/2018 | Jerry D. Brookman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7332 | Owned | |
| Warranty Deed | 9/24/2018 | Linda E. Rector to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7331 | Owned | |
| Warranty Deed | 9/24/2018 | Marion E. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7330 | Owned | |
| Warranty Deed | 9/24/2018 | Sarah J. Glazebrook Perry to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7329 | Owned | |
| Warranty Deed | 10/16/2018 | Michelle McCabe-Doyle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7927 | Owned | |
| Warranty Deed | 10/16/2018 | Richard R. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7926 | Owned | |
| Warranty Deed | 10/16/2018 | Robert Shon Smith to | Coal Reserves for Williamson | WC 2018-7925 | Owned | |

Case 19-62393 Doc 234 Filed 04/12/19 Entered 04/12/19 23:05:34 Main Docu

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Williamson Energy, LLC | Energy, LLC Operations | | | |
| Warranty Deed | 10/16/2018 | Elizabeth Jeanne Culli to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7974 | Owned | |
| Warranty Deed | 10/23/2018 | Kathy Scott to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8178 | Owned | |
| Warranty Deed | 11/07/2018 | Roger W. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8561 | Owned | |
| Warranty Deed | 11/27/2018 | Tommy R. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9371 | Owned | |
| Warranty Deed | 12/03/2018 | Allen E. Heinbokel to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9499 | Owned | |
| Warranty Deed | 12/18/2018 | Jeremiah Wesley Seaman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9920 | Owned | |
| Warranty Deed | 12/18/2018 | Alexandra Lewis DeMarino to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9919 | Owned | |
| Warranty Deed | 1/07/2019 | Shannon Lee Brand to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-148 | Owned | |
| Warranty Deed | 1/31/2019 | Michael James Lewis to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-727 | Owned | |
| Warranty Deed | 1/31/2019 | Karolyn Kay Fullerton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-725 | Owned | |
| Mining Lease | 3/5/2019 | Susan E. Denton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1569 | Leased | |
| Warranty Deed | 3/18/2019 | Ronald L. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1897 | Owned | |
| Warranty Deed | 8/27/2019 | Deloris J. Hoehn to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-6243 | Owned | |
| Warranty Deed | 1/26/2018 | James Walter Hoyt to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-303 | Owned | |
| Warranty Deed | 2/13/2018 | Brenda Dora Spencer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-634 | Owned | |
| Warranty Deed | 3/21/2018 | Patricia K. Dyer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1120 | Owned | |
| Warranty Deed | 3/21/2018 | Diana L. Bischler to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1128 | Owned | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mining Lease | 3/23/2018 | Lisa M. Engeling to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1177 | Leased | |
| Warranty Deed | 4/19/2018 | Jeanette Fortney to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1539 | Owned | |
| Mining Lease | 7/13/2018 | Jerry K. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-2781 | Leased | |
| Warranty Deed | 8/1/2018 | Lorna Lynn Hines to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3098 | Owned | |
| Warranty Deed | 8/1/2018 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3093 | Owned | |
| Warranty Deed | 8/10/2018 | Brian M. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3233 | Owned | |
| Mining Lease | 8/29/2018 | Paula T. Hartzel, et al to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3551 | Leased | |
| Warranty Deed | 9/5/2018 | Janet J. Griffin to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3642 | Owned | |
| Warranty Deed | 9/5/2018 | Gary P. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3643 | Owned | |
| Warranty Deed | 9/5/2018 | Barbara Giles to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3640 | Owned | |
| Warranty Deed | 9/18/2018 | Katherine Ann Bradley to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3870 | Owned | |
| Warranty Deed | 10/17/2018 | Shirley Whitehead to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4300 | Owned | |
| Warranty Deed | 10/23/2018 | Barbara Faye Sharkey to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4340 | Owned | |
| Warranty Deed | 2/1/2019 | Emma L. Stetson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-333 | Owned | |
| Warranty Deed | 3/26/2019 | Ronald L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-908 | Owned | |
| Warranty Deed | 4/2/2019 | Sarah Greenwade to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1134 | Owned | |
| Warranty Deed | 4/2/2019 | Susan L. Naucke to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1132 | Owned | |
| Warranty Deed | 4/17/2019 | Brock D. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1333 | Owned | |

Case 4:20-cv-01208 Document 228 Filed 04/12/21 on 10/05 Entered 04/01/20 12:45:34 Main Document Page 790 of 1005

| | | | | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 4/17/2019 | James Keith Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1352 | Owned | |
| Warranty Deed | 4/23/2019 | Marilyn S. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1419 | Owned | |
| Warranty Deed | 5/14/2019 | Miranda B. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1752 | Owned | |
| Warranty Deed | 5/14/2019 | Charlotte Jean to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1751 | Owned | |
| Warranty Deed | 7/1/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2385 | Owned | |
| Mining Lease | 7/17/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2613 | Owned | |
| Warranty Deed | 7/17/2019 | Judith A. Woodard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2617 | Owned | |
| Warranty Deed | 7/17/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2616 | Owned | |
| Warranty Deed | 7/24/2019 | Norma Adams Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2728 | Owned | |
| Warranty Deed | 7/30/2019 | Phillip R. Erthall to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2830 | Owned | |
| Warranty Deed | 7/30/2019 | Robert H. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2835 | Owned | |
| Warranty Deed | 8/13/2019 | Kenneth L. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3002 | Owned | |
| Warranty Deed | 8/13/2019 | William Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3001 | Owned | |
| Warranty Deed | 9/4/2019 | Linda S. Lear to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3489 | Owned | |
| Deed | 9/16/2019 | Steven H. Machura to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3624 | Owned | |
| Warranty Deed | 10/17/2019 | Sharon A. Aiken-Peterson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3998 | Owned | |
| Warranty Deed | 10/30/2019 | Raven N. Fager to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4159 | Owned | |
| Mining Lease | 11/05/2019 | Mary Lou Zech to | Coal Reserves for Williamson | FC 2019-4251 | Leased | |

Case 24-40808    Doc 228    Filed 04/12/24    Entered 04/12/24 23:05:34    Main Document

| | | Williamson Energy, LLC | Energy, LLC Operations | | | |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/14/2019 | Daniel L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4371 | Owned | |
| Warranty Deed | 11/26/2019 | Colleen L. Taylor to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4559 | Owned | |
| Warranty Deed | 2/25/2020 | Paula Kay Osteen-Cortez to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-720 | Owned | |
| Warranty Deed | 2/25/2020 | Monta Ray Jennings to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-722 | Owned | |
| Warranty Deed | 2/25/2020 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-724 | Owned | |

**Schedule 6.18**

**<u>Post-Closing Covenants</u>**

None.

**Schedule 7.01**

**Existing Liens**

1. Liens pursuant to items 1 and 2 on Schedule 7.03.

2. Liens as set forth in the below chart:

| FILING OFFICE | TYPE | FILE DATE | FILE # | DEBTOR (as found) | SECURED PARTY |
|---|---|---|---|---|---|
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 11/4/2019 | 11042019-0184 | COAL FIELD CONSTRUCTION COMPANY LLC | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 3/25/2019 | 03252019-0090 | COAL FIELD CONSTRUCTION COMPANY LLC | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| DE SOS | UCC-1 Initial | 6/3/2014 | 2014 2161685 | FORESIGHT ENERGY LLC | U.S. BANK EQUIPMENT FINANCE |
| DE SOS | UCC-1 Initial | 6/3/2014 | 2014 2161685 | FORESIGHT ENERGY LLC | U.S. BANK EQUIPMENT FINANCE |
| DE SOS | UCC-1 Initial | 6/3/2014 | 2014 2161685 | FORESIGHT ENERGY LLC | U.S. BANK EQUIPMENT FINANCE |
| DE SOS | UCC-1 Initial | 11/7/2014 | 2014 4513891 | FORESIGHT ENERGY SERVICES LLC | CATERPILLAR FINANCIAL SERVICES CORPORATION |
| DE SOS | UCC-1 Initial | 11/13/2014 | 2014 4575627 | FORESIGHT ENERGY SERVICES LLC | PNC EQUIPMENT FINANCE, LLC |
| DE SOS | UCC-1 Initial | 11/18/2014 | 2014 4648655 | FORESIGHT ENERGY SERVICES LLC | FIRSTMERIT EQUIPMENT FINANCE INC |
| DE SOS | UCC-1 Initial | 3/29/2012 | 2012 1213901 | HILLSBORO ENERGY LLC; WILLIAMSON ENERGY, LLC; SUGAR CAMP ENERGY, LLC | WELLS FARGO EQUIPMENT FINANCE, INC. |
| DE SOS | UCC-1 Initial | 3/29/2012 | 2012 1213943 | HILLSBORO ENERGY LLC; WILLIAMSON ENERGY, LLC; SUGAR CAMP ENERGY, LLC | WELLS FARGO EQUIPMENT FINANCE, INC. |
| DE SOS | UCC-1 Initial | 9/13/2012 | 2012 3528744 | HILLSBORO ENERGY LLC | CATERPILLAR FINANCIAL |

| FILING OFFICE | TYPE | FILE DATE | FILE # | DEBTOR (as found) | SECURED PARTY |
|---|---|---|---|---|---|
| | | | | | SERVICES CORPORATION |
| DE SOS | UCC-1 Initial | 4/11/2013 | 2013 1400705 | HILLSBORO ENERGY LLC; PATTON MINING LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 4/11/2013 | 2013 1401034 | HILLSBORO ENERGY LLC; PATTON MINING LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 4/11/2013 | 2013 1401661 | HILLSBORO ENERGY LLC; PATTON MINING LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 7/17/2019 | 07172019-0125 (Amount owed $55,530.03) | MACH MINING, LLC; CLINE CHRISTOPHER MBR | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| DE SOS | UCC-1 Initial | 11/5/2018 | 2018 7646793 | MACOUPIN ENERGY LLC | STRATA SAFETY PRODUCTS, LLC |
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 12/6/2019 | 12062019-0063 (Amount owed $38,2441.13) | M-CLASS MINING LLC; DAVID JUDE SOLE MBR | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| St. Louis City Recorder of Deeds, MO | Federal Tax Lien | 1/14/2020 | 01142020-0113 (Amount owed $60,037.65) | M-CLASS MINING LLC; DAVID JUDE SOLE MBR | DEPARTMENT OF THE TREASURY - INTERNAL REVENUE SERVICE |
| DE SOS | UCC-1 Initial | 5/18/2015 | 2015 2109279 | SUGAR CAMP ENERGY, LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 5/18/2015 | 2015 2109378 | SUGAR CAMP ENERGY, LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 5/18/2015 | 2015 2109584 | SUGAR CAMP ENERGY, LLC | JOY GLOBAL UNDERGROUND MINING LLC |
| DE SOS | UCC-1 Initial | 11/16/2017 | 2017 7614433 | SUGAR CAMP ENERGY, LLC | MOTION INDUSTRIES, INC. |
| DE SOS | UCC-1 Initial | 8/3/2016 | 2016 4714489 | WILLIAMSON ENERGY, LLC | MOTION INDUSTRIES, INC. |

| FILING OFFICE | TYPE | FILE DATE | FILE # | DEBTOR (as found) | SECURED PARTY |
|---|---|---|---|---|---|
| DE SOS | UCC-1 Initial | 9/27/2016 | 2016 5932171 | WILLIAMSON ENERGY, LLC | MOTION INDUSTRIES, INC. |

**Schedule 7.02**

**Existing Investments**

1.  Investments in the entities listed on <u>Schedule 5.13</u>.

2.  Financing provided by American Century Transport LLC and American Century Minerals LLC pursuant to (i) the Lease Agreement between American Century Transport LLC and American Energy Corporation dated as of April 16, 2015 and (ii) the Overriding Royalty Agreement among American Century Minerals LLC, American Energy Corporation and Consolidated Land Company dated as of April 16, 2015.

**Schedule 7.03**

**Existing Indebtedness**

1. Indebtedness in respect of the Prepetition First Lien Credit Agreement.

2. Indebtedness in respect of the Indenture, dated as of March 28, 2017 (as amended, supplemented or otherwise modified), among Foresight Energy LLC (the "Company") and Foresight Energy Finance Corporation, the guarantors from time to time parties thereto and Wilmington Trust, National Association, as trustee (the "Trustee"), governing the 11.50% Second Lien Senior Secured Notes due 2023.

3. All surety bonds with third parties to secure reclamation and other performance commitments by Foresight Energy LLC set out in the chart attached hereto as <u>Annex I</u>.

4. Indebtedness in respect of the sale-leaseback financing arrangements in connection with (1) the sales agreement entered into by Macoupin Energy, WPP, LLC and HOD, LLC (subsidiaries of Natural Resource Partners LP) and (2) the sales agreement entered into by Sugar Camp Energy, LLC and HOD, LLC.

5. Indebtedness in respect of the commercial insurance premium finance and security agreement with BankDirect Capital Finance with an outstanding balance of $2,543,480.

| | | | | **Bond** | | **Effective** | **Expiration** | |
|---|---|---|---|---|---|---|---|---|
| **Foresight Company** | **Obligee** | **Bond Type** | **Grouped As:** | **Amount** | **Premium** | **Date** | **Date** | **Permit #** |
| Hillsboro Energy, LLC | IL DOT | Road | Reclamation | $157,150.00 | $3,929 | 12/10/2019 | 12/10/2020 | |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $6,701,424.00 | $167,536 | 12/10/2019 | 12/10/2020 | 424 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,500.00 | $613 | 12/10/2019 | 12/10/2020 | 399 Revision #7 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $80,750.00 | $2,019 | 12/10/2019 | 12/10/2020 | 399 Revision #8 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $16,150.00 | $404 | 12/10/2019 | 12/10/2020 | 399 Revision #9 |
| Hillsboro Energy, LLC | IL DOT | Road | Reclamation | $408,590.00 | $10,215 | 12/10/2019 | 12/10/2020 | |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,500.00 | $138 | 12/10/2019 | 12/10/2020 | 399 Revision #11 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,330.00 | $125 | 12/10/2019 | 12/10/2020 | 399 Revision #10 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,200.00 | $830 | 12/10/2019 | 12/10/2020 | 399 Revision #14 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $25,200.00 | $630 | 12/10/2019 | 12/10/2020 | 399 Revision #16 |
| Hillsboro Energy, LLC | IL DOT | Reclamation | Reclamation | $5,000.00 | $125 | 12/10/2019 | 12/10/2020 | 6-33621 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,900.00 | $848 | 12/10/2019 | 12/10/2020 | 382 Revision #35 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,125,800.00 | $178,145 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,015,423.00 | $25,386 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $40,600.00 | $1,015 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $161,900.00 | $4,048 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL EPA | Financial Guarantee | | $462,786.00 | $11,570 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL EPA | Financial Guarantee | | $462,786.00 | $9,256 | 8/25/2019 | 8/25/2020 | |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $70,200.00 | $1,755 | 12/10/2019 | 12/10/2020 | 382 IBR #33 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $70,400.00 | $1,760 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $19,760.00 | $494 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $57,800.00 | $1,445 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $49,003.00 | $1,225 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,460,400.00 | $36,510 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL EPA | Financial Guarantee | | $462,786.00 | $11,570 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL EPA | Financial Guarantee | | $462,786.00 | $9,256 | 1/21/2019 | 1/21/2020 | |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $17,300.00 | $433 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,400.00 | $135 | 12/10/2019 | 12/10/2020 | 382 Revision #41 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,670.00 | $842 | 12/10/2019 | 12/10/2020 | 382 IBR #42 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $26,200.00 | $655 | 12/10/2019 | 12/10/2020 | 382 IPR #43 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $38,800.00 | $970 | 12/10/2019 | 12/10/2020 | 382 IBR #43 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $11,340.00 | $284 | 12/10/2019 | 12/10/2020 | 382 IBR #35 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $46,300.00 | $1,158 | 12/10/2019 | 12/10/2020 | 382 IBR #36 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $35,800.00 | $895 | 12/10/2019 | 12/10/2020 | 382 IBR #37 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $39,600.00 | $990 | 12/10/2019 | 12/10/2020 | 382 IPR #39 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $233,380.00 | $5,835 | 12/10/2019 | 12/10/2020 | 382 Revision #44 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $50,600.00 | $1,265 | 12/10/2019 | 12/10/2020 | 382 IBR #45 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $15,600.00 | $390 | 12/10/2019 | 12/10/2020 | 382 IBR #46 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $16,481,266.00 | $412,032 | 12/10/2019 | 12/10/2020 | 434 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $251,200.00 | $6,280 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL, DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,800.00 | $595 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | Dept of the Army, St. Louis District Corps of Engineers | Reclamation | Reclamation | $467,485.00 | $11,687 | 12/10/2019 | 12/10/2020 | P-2866 MVS-2013-724 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,000.00 | $175 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $50,100.00 | $1,253 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $101,470.00 | $2,537 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $13,300.00 | $333 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $288,377.00 | $7,209 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $43,100.00 | $1,078 | 12/10/2019 | 12/10/2020 | 382 |

**FORESIGHT ENERGY LP**

**ARGO SURETY rewritten to INIC 12/10/2019**

**Bond List as 2/26/2020**

| Foresight Company | Obligee | Bond Type | Grouped As: | Bond Amount | Premium | Effective Date | Expiration Date | Permit # |
|---|---|---|---|---|---|---|---|---|
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $46,200.00 | $1,155 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $80,240.00 | $2,006 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $58,500.00 | $1,463 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,500.00 | $588 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $69,840.00 | $1,746 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $68,860.00 | $1,722 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $22,800.00 | $570 | 12/10/2019 | 12/10/2020 | 434 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $66,420.00 | $1,661 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,900.00 | $198 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $49,000.00 | $1,225 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $48,080.00 | $1,202 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $12,900.00 | $323 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $147,800.00 | $3,695 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $38,600.00 | $965 | 12/10/2019 | 12/10/2020 | 382 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $4,623,100.00 | $115,578 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,858,337.00 | $46,458 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,220.00 | $706 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,690.00 | $125 | 12/10/2019 | 12/10/2020 | 375 Revision #56 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $37,600.00 | $940 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $368,992.00 | $9,225 | 12/10/2019 | 12/10/2020 | 375 Revision #47 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $53,600.00 | $1,340 | 12/10/2019 | 12/10/2020 | 375 Revision #45 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $26,800.00 | $670 | 12/10/2019 | 12/10/2020 | 375 Revision #58 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,300.00 | $133 | 12/10/2019 | 12/10/2020 | 375 Revision #48 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,300.00 | $208 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $10,620.00 | $266 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $21,700.00 | $543 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $6,013,494.00 | $150,337 | 12/10/2019 | 12/10/2020 | 417 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $95,840.00 | $2,396 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,100.00 | $828 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,300.00 | $208 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $19,400.00 | $485 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $72,500.00 | $1,813 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,500.00 | $138 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | Dept of the Army, St. Louis District Corps of Engineers | Performance Bond | | $274,898.00 | $6,872 | 12/10/2019 | 12/10/2020 | P-2905-MVS-2013-315 |
| Williamson Energy, LLC | IL DOT | Utility Bond | | $175,000.00 | $4,375 | 12/10/2019 | 12/10/2020 | 9U-2609-17 |
| Williamson Energy, LLC | IL DOT | Utility Bond | | $75,000.00 | $1,875 | 12/10/2019 | 12/10/2020 | 9U-2610-17 |
| Adena Resources, LLC | IL DOT | Individual Utility Permit Bond | | $50,000.00 | $1,250 | 12/10/2019 | 12/10/2020 | 9U-1751-11 |
| Adena Resources, LLC | IL DOT | Individual Utility Permit Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | 9U-1738-11 |
| Adena Resources, LLC | IL DOT | Individual Utility Permit Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | 9U-1737-11 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $10,375,000.00 | $259,375 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $251,440.00 | $6,286 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $503,500.00 | $12,588 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $92,350.00 | $2,309 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $29,800.00 | $745 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $65,340.00 | $1,634 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $694,458.00 | $17,361 | 12/10/2019 | 12/10/2020 | 424 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $218,340.00 | $5,459 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,900.00 | $148 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | IL DNR | Financial Security Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | 399 |
| Hillsboro Energy, LLC | City of Hillsboro, IL | Performance Bond | | $100,000.00 | $2,500 | 12/10/2019 | 12/10/2020 | |
| Hillsboro Energy, LLC | East Fork Township, IL | Performance Bond | | $100,000.00 | $2,500 | 12/10/2019 | 12/10/2020 | |
| Hillsboro Energy, LLC | East Fork Township, IL | Performance Bond | | $100,000.00 | $2,000 | 6/5/2019 | 6/5/2020 | |
| Hillsboro Energy, LLC | EJ Water Company, LLC | Performance Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | |

Case 20-41308    Doc 228    Filed 04/01/20    Entered 04/01/20 23:45:34    Main

| Foresight Company | Obligee | Bond Type | Grouped As: | Bond Amount | Premium | Effective Date | Expiration Date | Permit # |
|---|---|---|---|---|---|---|---|---|
| Hillsboro Energy, LLC | IL DNR | Reclamation | Reclamation | $2,617,318.00 | $65,433 | 12/10/2019 | 12/10/2020 | 424 |
| Hillsboro Energy, LLC | IL DNR | Reclamation | Reclamation | $1,723,050.00 | $43,076 | 12/10/2019 | 12/10/2020 | 399 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $57,600.00 | $1,440 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,256,500.00 | $131,413 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,932,800.00 | $148,320 | 12/10/2019 | 12/10/2020 | 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $36,310.00 | $908 | 12/10/2019 | 12/10/2020 | 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,860.00 | $597 | 12/10/2019 | 12/10/2020 | 291 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,600.00 | $215 | 12/10/2019 | 12/10/2020 | 302 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $339,910.00 | $8,498 | 12/10/2019 | 12/10/2020 | 419 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $22,580.00 | $565 | 12/10/2019 | 12/10/2020 | 291 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,680.00 | $217 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,833,850.00 | $45,846 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $356,280.00 | $8,907 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $13,900.00 | $348 | 12/10/2019 | 12/10/2020 | 56 & 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $36,100.00 | $903 | 12/10/2019 | 12/10/2020 | 291 |
| Macoupin Energy, LLC | IL DNR | Financial Security Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Surety Bond | | $55,160.00 | $1,379 | 12/10/2019 | 12/10/2020 | 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,346,260.00 | $58,657 | 12/10/2019 | 12/10/2020 | 209 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $68,916.00 | $1,723 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $48,600.00 | $1,215 | 12/10/2019 | 12/10/2020 | 56 |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $50,400.00 | $1,260 | 12/10/2019 | 12/10/2020 | |
| Macoupin Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $64,080.00 | $1,602 | 12/10/2019 | 12/10/2020 | 56 |
| Savatran, LLC | Eastern Township | Performance Bond | | $160,000.00 | $4,000 | 12/10/2019 | 12/10/2020 | |
| Savatran, LLC | IL DOT | Individual Utility Permit Bond | | $50,000.00 | $1,250 | 12/10/2019 | 12/10/2020 | 6-31336 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,700.00 | $593 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $17,700.00 | $443 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,500.00 | $713 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $40,600.00 | $1,015 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,600.00 | $140 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,100.00 | $203 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,100.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $22,900.00 | $573 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,218.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,500.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $353,180.00 | $8,830 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,200.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,879.00 | $147 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $107,632.00 | $2,691 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,200.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,200.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $12,120.00 | $303 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,500.00 | $213 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $25,500.00 | $638 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $26,820.00 | $671 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $24,370.00 | $609 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $49,870.00 | $1,247 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,800.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $71,400.00 | $1,785 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $135,200.00 | $3,380 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $25,180.00 | $630 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $62,960.00 | $1,574 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $13,670.00 | $342 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,880.00 | $722 | 12/10/2019 | 12/10/2020 | 382 |

Case 20-43108 Doc 228 Filed 04/11/20 Entered 04/11/20 23:45:34 Main

| Foresight Company | Obligee | Bond Type | Grouped As: | Bond Amount | Premium | Effective Date | Expiration Date | Permit # |
|---|---|---|---|---|---|---|---|---|
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $161,900.00 | $4,048 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $6,180.00 | $155 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $33,960.00 | $849 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $11,700.00 | $293 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $48,200.00 | $1,205 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $15,040.00 | $376 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $78,800.00 | $1,970 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,320.00 | $183 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $29,650.00 | $741 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $139,420.00 | $3,486 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $66,100.00 | $1,653 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $377,000.00 | $9,425 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $65,600.00 | $1,640 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $70,800.00 | $1,770 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $19,700.00 | $493 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $72,620.00 | $1,816 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Division of Oil and Gas | Financial Security Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL DOT | Continuous Highway Permit Bond | | $50,000.00 | $1,250 | 12/10/2019 | 12/10/2020 | RR-D9-09-001 |
| Sugar Camp Energy, LLC | IL DOT | Continuous Highway Permit Bond | | $50,000.00 | $1,250 | 12/10/2019 | 12/10/2020 | RR-D9-09-002 |
| Sugar Camp Energy, LLC | Hamilton County Highway Department | Highway | | $100,000.00 | $2,500 | 12/10/2019 | 12/10/2020 | N/A |
| Sugar Camp Energy, LLC | People of the State of Illinois | Reclamation | Reclamation | $252,930.00 | $6,323 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $12,200.00 | $305 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $361,600.00 | $9,040 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $95,500.00 | $2,388 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,100.00 | $578 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,369.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $15,800.00 | $395 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $100,470.00 | $2,512 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $105,720.00 | $2,643 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $44,280.00 | $1,107 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $21,330.00 | $533 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,600.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $147,800.00 | $3,695 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,290.00 | $125 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $77,280.00 | $1,932 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DOT | Subsidence | Subsidence | $250,000.00 | $6,250 | 12/10/2019 | 12/10/2020 | |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $78,860.00 | $1,972 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $99,905.00 | $2,498 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $49,300.00 | $1,233 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $267,348.00 | $6,684 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $23,600.00 | $590 | 12/10/2019 | 12/10/2020 | 382 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $10,960.00 | $274 | 10/4/2019 | 10/04/20 | 382 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $3,090,379.00 | $77,259 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $4,200.00 | $125 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $1,908.00 | $125 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $35,449.00 | $886 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $55,387.00 | $1,385 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $287,500.00 | $7,188 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $9,900.00 | $248 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $17,754.00 | $444 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $31,384.00 | $785 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $11,548.00 | $289 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $27,595.00 | $690 | 12/10/2019 | 12/10/2020 | 375 |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main

| Foresight Company | Obligee | Bond Type | Grouped As: | Bond Amount | Premium | Effective Date | Expiration Date | Permit # |
|---|---|---|---|---|---|---|---|---|
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $46,000.00 | $1,150 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $6,128.00 | $153 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $7,440.00 | $186 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,807.00 | $125 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $10,080.00 | $252 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $32,760.00 | $819 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $28,264.00 | $707 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $25,840.00 | $646 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $5,300.00 | $133 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $15,960.00 | $399 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $37,537.00 | $938 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR | Financial Security Bond | | $25,000.00 | $625 | 12/10/2019 | 12/10/2020 | |
| Williamson Energy, LLC | County of Williamson, State of Illinois | Performance Bond | | $150,000.00 | $3,750 | 12/10/2019 | 12/10/2020 | |
| Williamson Energy, LLC | County of Williamson, State of Illinois | Performance Bond | | $1,050,000.00 | $26,250 | 12/10/2019 | 12/10/2020 | |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $87,200.00 | $2,180 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $11,000.00 | $275 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,100.00 | $203 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $79,430.00 | $1,986 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $26,500.00 | $663 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $258,830.00 | $6,471 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $2,100.00 | $125 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $21,200.00 | $530 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $29,630.00 | $741 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $19,316.00 | $483 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $253,500.00 | $6,338 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $8,876.00 | $222 | 12/10/2019 | 12/10/2020 | 375 |
| M Class Mining Health Protecti | Jeffrey Watkins and Katelynn Watkins | Appeal Bond | Other | $1,310,958.00 | $32,774 | 12/10/2019 | 12/10/2020 | |
| M Class Mining Health Protecti | Jeffrey Watkins and Katelynn Watkins | Appeal Bond | Other | $1,310,958.00 | $32,774 | 8/10/2019 | 8/10/2020 | |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $13,300.00 | $333 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $79,540.00 | $1,989 | 12/10/2019 | 12/10/2020 | 375 |
| Williamson Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $488,440.00 | $12,211 | 12/4/2019 | 12/4/2020 | 456 |
| Sugar Camp Energy, LLC | IL DNR, Office of Mines and Minerals | Reclamation | Reclamation | $29,910.00 | $748 | 12/4/2019 | 12/4/2020 | 382 |
| | | | | $99,729,644 | $2,488,963 | | | |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main

**Schedule 7.05**

**<u>Specified Dispositions</u>**

None.

## Schedule 7.08

### Transactions With Affiliates

1. Coal Mining Lease and Sublease (Unassigned Reserves) dated August 12, 2010 by and between Colt LLC as lessor and Macoupin Energy LLC as lessee, as amended.

2. Coal Mining Lease and Sublease (Macoupin North Mine Assignment) dated August 12, 2010 by and between Colt LLC as lessor and Macoupin Energy LLC as lessee, as amended.

3. Coal Mining Lease and Sublease dated August 12, 2010 by and between Colt LLC as lessor and Williamson Energy, LLC as lessee, as amended.

4. Coal Mining Lease (New Memphis/Monterey 2 Reserves) between Colt LLC and Macoupin Energy LLC dated June 1, 2012, as amended.

5. Coal Mining Lease dated August 12, 2010 by and between Ruger Coal Company LLC as lessor and Sugar Camp Energy, LLC as lessee.

6. Contract Mining and Overriding Royalty Agreement dated August 12, 2010 by and between Ruger Coal Company LLC and Sugar Camp Energy, LLC, as amended.

7. Coal Mining Lease (For "Reserve 2") dated August 12, 2010 by and between Colt LLC as lessor and Hillsboro Energy LLC as lessee, as amended.

8. Coal Mining Lease (For "Reserve 1" and "Reserve 3") dated August 12, 2010 by and between Colt LLC as lessor and Hillsboro Energy LLC as lessee, as amended.

9. Amended and Restated Coal Mining Lease Agreement dated August 14, 2006 between WPP LLC, Lessor and Williamson Energy, LLC, Lessee, as amended.

10. Partial Release of Premises from Coal Mining Lease and Sublease dated March 20, 2013 between Williamson Energy, LLC and Colt LLC.

11. Coal Mining Lease Agreement between Independence Land Company, LLC and Williamson Energy, LLC (5000-Foot Extension) dated March 13, 2006, as amended.

12. First Amended and Restated Lease (Rail Load Out Lease) dated October 15, 2006 between Williamson Development Company LLC, Lessor and Williamson Transport LLC, Lessee.

13. First Amended and Restated Lease (Coal Prep Plant) dated October 15, 2006 between Williamson Energy, LLC and Williamson Development Company LLC.

14. Amended and Restated Surface Sublease and Operation Agreement dated October 15, 2006 between Williamson Energy, LLC and Williamson Transport, LLC.

15. Amended and Restated Surface Sublease and Operation Agreement dated October 15, 2006 between Williamson Energy, LLC and Williamson Track LLC.

16. Overriding Royalty Agreement (except 5000-Foot Extension) between Independence Land Co. and Williamson Energy, LLC dated March 13, 2006, as amended.

17. Coal Mining Lease and Sublease Agreement dated January 27, 2009 between WPP, LLC, Lessor and Macoupin Energy LLC, Lessee.

18. Lease Agreement dated January 27, 2009 between HOD, LLC, Lessor and Macoupin Energy LLC (Macoupin Rail Loop Lease), as amended.

19. Lease Agreement dated January 27, 2009 between HOD, LLC, Lessor and Macoupin Energy LLC, Lessee (Macoupin Rail Loadout), as amended.

20. Coal Mining Lease and Sublease Agreement dated September 10, 2009 between WPP LLC, Lessor and Hillsboro Energy LLC, Lessee, as amended.

21. Assignment of Service Agreement by and among Foresight Reserves, LP, Foresight Energy LLC and FRLP No. 2 LLC dated January 14, 2013.

22. Mitigation Agreement between Hillsboro Energy LLC and New River Royalty, LLC dated August 12, 2010.

23. Mitigation Agreement between New River Royalty, LLC and Sugar Camp Energy, LLC dated August 12, 2010.

24. Mitigation Agreement between Williamson Energy, LLC and New River Royalty, LLC dated August 12, 2010.

25. Surface Lease and Operation Agreement between Oeneus LLC d/b/a Savatran LLC and Sitran LLC dated January 1, 2011.

26. Lease Agreement between HOD LLC and Sugar Camp Energy, LLC dated March 6, 2012, as amended.

27. Surface Sublease between HOD LLC and Sugar Camp Energy, LLC dated March 6, 2012.

28. Overriding Royalty Agreement between Sugar Camp Energy, LLC and Ruger Coal Company, LLC (TVA Franklin County) dated August 12, 2010.

29. Overriding Royalty Agreement between Sugar Camp Energy, LLC and Ruger Coal Company, LLC (TVA Illinois) dated August 12, 2010.

30. Development Agreement between Hillsboro Energy LLC and Colt LLC dated as of August 23, 2013.

31. Development Agreement between Macoupin Energy LLC and Colt LLC dated as of August 23, 2013.

32. Development Agreement between Sugar Camp Energy, LLC and Ruger Coal Company, LLC dated as of August 23, 2013.

33. Lease Agreement between American Century Transport LLC and American Energy Corporation dated as of April 16, 2015.

34. Overriding Royalty Agreement among American Century Minerals LLC, American Energy Corporation and Consolidated Land Company dated as of April 16, 2015.

**Schedule 7.12**

**<u>Burdensome Agreements</u>**

Agreements relating to items disclosed on Schedules 7.01 and 7.03.

**Schedule 10.02**

**Administrative Agent's Office; Certain Addresses for Notices**

| Party: | Address: | Payment Instructions (if applicable) |
|---|---|---|
| Borrower | Foresight Energy LLC<br>211 North Broadway, Suite 2600<br>St. Louis, Missouri 63102<br>Attention:  Cody E. Nett<br>Telephone:  (314) 932-6103<br>codynett@coalsource.com | N/A |

Borrower's website:   www.foresight.com

| Party: | Address: | Payment Instructions (if applicable) |
|---|---|---|
| Administrative Agent and Collateral Agent | Cortland Capital Market Services LLC<br>225 W Washington Street, 9th Floor<br>Chicago, IL  60606<br>Attn:  Legal Department & CPC Agency<br>E-mail:  legal@cortlandglobal.com;<br>cpcagency@cortlandglobal.com<br>Telephone:  312-564-5100<br>Telecopier:  312-376-0751 | N/A |

EXECUTION VERSION

*EXHIBIT A*

## FORM OF BORROWING NOTICE

Date:        ,
To:        Cortland Capital Market Services LLC, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent

The Borrower hereby requests (select one):

☐ A Borrowing of [Initial Term Loan][Delayed Draw Term Loan].

☐ Initial election of Type of Loan with respect to Roll-Up Loans.

☐ A continuation of Eurocurrency Rate Loans.

☐ A conversion of [Term Loans] [Roll-Up Loans].

1.        On                                                                          (a Business Day).

2.        In the principal amount of                                        .[1]

3.        Comprised of                                                        .
           [Type of Loan requested[2]]

4.        For Eurocurrency Rate Loans: with an Interest Period of                 one (1) month

5.        Wire instructions for the account into which funds are to be disbursed (if applicable):

           [            ]

[The representations and warranties of the Borrower and each Guarantor herein and in the other Loan Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding of the applicable Loans to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case, such representations and warranties shall have been true and correct in all materials respects on and as of such earlier date; provided that in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified

---

[1]        Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof.  Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $250,000 in excess thereof.

[2]        "Eurocurrency Rate Loan" or "Base Rate Loan."

by materiality in the text thereof. No Default or Event of Default exists, or would result immediately, from the proposed Borrowing or the application of proceeds thereof.]³

**[*Signature page to follow*]**

---

³      Each Request for Borrowing (other than a Borrowing Notice requesting only a conversion of Loans to the other Type or a continuation of Eurocurrency Rate Loans) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) of the Credit Agreement have been satisfied on and as of the date of the applicable Borrowing.

A - 2

FORESIGHT ENERGY LLC


By:      _____
Name:  _____
Title:    _____

*EXHIBIT B*

**COLLATERAL QUESTIONNAIRE**

[See attached]

EXECUTION VERSION

## <u>COLLATERAL QUESTIONNAIRE</u>

Dated: March 11, 2020

Reference is made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of the date hereof (the "<u>Credit Agreement</u>"), among Foresight Energy LLC, a Delaware limited liability company (the "<u>Company</u>"), Foresight Energy GP LLC, a Delaware limited liability company ("<u>General Partner</u>"), Foresight Energy LP, a Delaware limited partnership ("<u>Holdings</u>"), each subsidiary guarantor party thereto (collectively, the "<u>Guarantors</u>" and, together with the Company, the "<u>Grantors</u>"), each lender party thereto (collectively, the "<u>Lenders</u>" and, individually, a "<u>Lender</u>"), and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.  Capitalized terms used but not defined herein shall have the meanings set forth in the Credit Agreement.

Unless otherwise defined in this Certificate or in the Credit Agreement, terms defined in Article 8 or 9 of the Uniform Commercial Code as in effect in the State of New York are used in this Certificate as such terms are defined in such Article 8 or 9.

Each Grantor hereby certifies as follows as of the date hereof:

1.    <u>Investment Property</u>.  Set forth on <u>Schedule I</u> hereto is a true and correct list of all shares of stock and other Pledged Equity Interests owned by such Grantor, all Pledged Debt owed to such Grantor and all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements and commodity contracts having a value in excess of $100,000 that are not held in securities accounts or commodity accounts, (C) securities accounts having a value in excess of $100,000 and (D) commodity accounts having a value in excess of $100,000 of such Grantor), setting forth (i) in <u>Part I</u> of <u>Schedule I</u> all shares of stock or other Pledged Equity Interests owned by such Grantor, the issuer thereof, class of equity interest and percentage of the issued and outstanding Pledged Equity Interests of the issuers thereof, (ii) in <u>Part II</u> of <u>Schedule I</u> all such indebtedness having a value in excess of (x) $500,000 individually and (y) $5,000,000 in the aggregate owed to such Grantor, the issuer thereof, description thereof, debt certificate number(s), final maturity and outstanding principal amount of such indebtedness, (iii) in <u>Part III</u> of <u>Schedule I,</u> all other investment property having a value in excess of (x) $500,000 individually and (y) $5,000,000 in the aggregate owned by such Grantor, the issuer thereof, name of investment, certificate number(s), amount and other identification of such investment property and (iv) in <u>Part IV</u> of <u>Schedule I</u>, a true and correct list of all securities accounts and commodities accounts, in each case, having a value in excess of $100,000 (consistent with clauses (C) and (D) above).

2.    <u>Deposit Accounts</u>.  Set forth on <u>Schedule II</u> hereto is a true and correct list of all deposit accounts of such Grantor existing on the date hereof setting forth for each such deposit account the type of account, name and address of the depositary bank and the account number.

3.    <u>Intellectual Property</u>.  Set forth on <u>Schedule III</u> hereto is a true and correct list of:

(i)    all registered patents and patent applications of such Grantor;

(ii)    all registered trademarks and trademark applications of such Grantor;

(iii)    all registered copyrights and copyright applications of such Grantor; and

(iv)    all material agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any intellectual property to which such Grantor is a party or a beneficiary.

4.    <u>Commercial Tort Claims</u>.  Set forth on <u>Schedule IV</u> hereto is a true and correct description of all commercial tort claims with a value in excess of $1,000,000 of such Grantor.

5.    <u>Identity, Etc. of Grantors</u>.  Set forth on <u>Schedule V</u> hereto is a true and correct list showing such Grantor's exact legal name (as it appears in its certificate or articles of incorporation, limited liability membership agreement or similar organizational document, in each case as amended to the date hereof), location, address of chief executive office (and, if different, principal place of business), type of organization, jurisdiction of organization and organizational I.D. number (including taxpayer identification number).

6.    <u>Changes in Name, Location Etc</u>.  Set forth on <u>Schedule VI</u> hereto is a true and correct description of any changes in the name of such Grantor, changes in location or jurisdiction, changes in corporate structure (including by way of merger or consolidation) or in any other information as to such Grantor reflected on <u>Schedule VI</u> hereto during the five years preceding the date hereof.

7.    <u>Location of Equipment and Inventory</u>.  Set forth on <u>Schedule VII</u> hereto is a true and correct list of the locations of such Grantor's equipment and inventory with a value in excess of $1,000,000 individually and $3,000,000 in the aggregate, other than such Grantor's equipment or inventory that may be in transit, with a third party in connection with preparation for shipment or for rehabilitation or refurbishment.

8.    <u>Letters of Credit</u>.  Set forth on <u>Schedule VIII</u> hereto is a true and correct list of all letters of credit with a value in excess of $1,000,000 individually and $3,000,000 in the aggregate of which such Grantor is a beneficiary or assignee, showing for each such letter of credit the issuer thereof, nominated person (if any), account party, number, maximum available amount and date.

9.    <u>Warehousemen and Bailees</u>.  Set forth on <u>Schedule IX</u> hereto is a true and correct list of all warehousemen and bailees that have possession of any assets with a fair market value in excess of $1,000,000 individually and $3,000,000 in the aggregate of such Grantor, showing as to each warehouseman and bailee the assets so held, fair market value and address.

10.    <u>Location of Books and Records</u>.  Set forth on <u>Schedule X</u> hereto is a list of all locations where the Grantors maintain any books or records relating to Accounts Receivable (with each location at which chattel paper, if any, is kept being indicated by an "*").

2

11.    <u>Real Property</u>.  Set forth on <u>Schedule XI</u> hereto is a true and correct list of all interests in material owned real property of such Grantor or any of its subsidiaries, showing as to each such real property the record owner, record information, acquisition date, brief legal description of the property and mortgagee (if any) and lessee (if any).

12.    <u>Leaseholds</u>.  Set forth on <u>Schedule XII</u> hereto is a true and correct list of all interests in material leased real property of such Grantor as lessee, showing as to each such leasehold a description of the lease and premises, date of and parties to the lease, record information and mortgage (if any).

13.    <u>Mining Facilities; Mining Leases</u>.  Set forth on <u>Schedule XIII-A</u> hereto is a true and correct list of (a) the locations of such Grantor's Mining Facilities owned, leased or operated by such Grantor and (b) all material related or ancillary properties that are required for the business and operations of such Grantor, including a brief legal description of the lease, record information and mortgage (if any).  <u>Schedule XIII-B</u> hereto sets forth a true and correct list of all Mining Leases to which Grantor is a party.

14.    <u>Schedule of Filings</u>.  Attached as <u>Schedule XIV</u> hereto is a true and correct list of each Uniform Commercial Code filing office in the jurisdiction in which each Grantor is located and, to the extent any of the collateral located at Material Owned Real Property, Material Leased Real Property or Mining Facility is comprised of fixtures, timber to be cut or as extracted collateral from the wellhead or minehead, the appropriate local jurisdiction in which financing statements with respect to such collateral comprised of fixtures, timber to cut or as extracted collateral that is not covered by the applicable mortgage that serves as a fixture filing should be filed.

15.    <u>Railcars</u>.  Set forth on <u>Schedule XV</u> hereto is a true and correct list of all railcars owned by such Grantor and registered or to be registered with any Governmental Authority, showing as to each such item a description thereof, fair market value and mortgagee (if any) and mortgage description (if any) (including mortgage amount) thereof.

16.    <u>Unusual Transactions</u>.  Except as set forth on Schedule XVI, no unusual transactions have occurred in the past five years, all Accounts have been originated by such Grantor and all Inventory or Equipment has been acquired by Grantor in the ordinary course of business.

IN WITNESS WHEREOF, the undersigned have caused this Collateral Questionnaire to be executed by their officers thereunto duly authorized.

> FORESIGHT ENERGY LLC
> FORESIGHT ENERGY FINANCE CORPORATION
> FORESIGHT ENERGY GP LLC
> ADENA RESOURCES, LLC
> AKIN ENERGY LLC
> AMERICAN CENTURY MINERAL LLC
> AMERICAN CENTURY TRANSPORT LLC COAL
> FIELD CONSTRUCTION COMP ANY LLC COAL
> FIELD REPAIR SERVICES LLC FORESIGHT
> COAL SALES LLC
> FORESIGHT ENERGY EMPLOYEE SERVICES
> CORPORATION
> FORESIGHT ENERGY LABOR LLC FORESIGHT
> ENERGY SERVICES LLC FORESIGHT
> RECEIVABLES LLC HILLSBORO ENERGY LLC
> HILLSBORO TRANSPORT LLC
> LD LABOR COMPANY LLC
> LOGAN MINING LLC
> M-CLASS MINING, LLC
> MACH MINING, LLC
> MACOUPIN ENERGY LLC
> MARY AN MINING LLC
> OENEUS LLC d/b/a SAVA TRAN LLC PATTON
> MINING LLC
> SENECA REBUILD LLC
> SITRAN LLC
> SUGAR CAMP ENERGY, LLC
> TANNER ENERGY LLC
> VIKING MINING LLC
> WILLIAMSON ENERGY, LLC

By: _____

Name: Robert D. Moore
Title: President and Chief Executive Officer

[Signature Page to Collateral Questionnaire]

Schedule I to
Collateral Questionnaire

## INVESTMENT PROPERTY

### Part I

### Initial Pledged Equity Interests

| Grantor | Issuer | Juris. of Org/ Formation | Address of Chief Executive Office | Taxpayer ID Number | Type of Org.[1] | % of Interest |
|---|---|---|---|---|---|---|
| Foresight Energy LLC | Adena Resources, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5004649 | Limited Liability Company | 100 |
| Foresight Energy LLC | Akin Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5231648 | Limited Liability Company | 100 |
| Foresight Energy LLC | American Century Mineral LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | N/A | Limited Liability Company | 100 |
| Foresight Energy LLC | American Century Transport LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | N/A | Limited Liability Company | 100 |
| Foresight Energy LLC | Foresight Coal Sales LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-3318620 | Limited Liability Company | 100 |
| Foresight Energy LLC | Foresight Energy Employee Services Corporation | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3957023 | Corporation | 100 |
| Foresight Energy LLC | Foresight Energy Finance Corporation | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 27-3135321 | Corporation | 100 |
| Foresight Energy LP | Foresight Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5917685 | Limited Liability Company | 100 |

---

[1] Indicate each limited liability company or limited partnership that has opted into Article 8 of the UCC with an asterisk ("*")

| Grantor | Issuer | Juris. of Org/ Formation | Address of Chief Executive Office | Taxpayer ID Number | Type of Org.[1] | % of Interest |
|---|---|---|---|---|---|---|
| Foresight Energy LLC | Foresight Energy Labor LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 32-0504176 | Limited Liability Company | 99.99 |
| Foresight Energy Employee Services Corporation | | | | | | 0.01 |
| Foresight Energy LLC | Foresight Energy Services LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 90-0776204 | Limited Liability Company | 99.99 |
| Foresight Energy Employee Services Corporation | | | | | | 0.01 |
| Foresight Energy LLC | Hillsboro Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 20-5231639 | Limited Liability Company | 100 |
| Foresight Energy LLC | Hillsboro Transport LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3916881 | Limited Liability Company | 100 |
| Foresight Energy LLC | Macoupin Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-2809005 | Limited Liability Company | 100 |
| Foresight Energy LLC | Oeneus LLC d/b/a Savatran LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 30-0306007 | Limited Liability Company | 100 |
| Foresight Energy LLC | Seneca Rebuild LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-3150958 | Limited Liability Company | 100 |
| Foresight Energy LLC | Sitran LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-1369962 | Limited Liability Company | 100 |
| Foresight Energy LLC | Sugar Camp Energy, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 41-2178049 | Limited Liability Company | 100 |
| Foresight Energy LLC | Tanner Energy LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3940409 | Limited Liability Company | 100 |
| Foresight Energy LLC | Williamson Energy, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 81-0669143 | Limited Liability Company | 100 |

| Grantor | Issuer | Juris. of Org/ Formation | Address of Chief Executive Office | Taxpayer ID Number | Type of Org.[1] | % of Interest |
|---------|--------|--------------------------|-----------------------------------|--------------------|-----------------|---------------|
| Foresight Energy LLC | Foresight Receivables LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 38-3952250 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Coal Field Construction Company LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-3795694 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Coal Field Repair Services LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-2249179 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | LD Labor Company LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 45-3848454 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Logan Mining LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 47-1762361 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | M-Class Mining, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-0645272 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Mach Mining, LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 73-1734826 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | MaRyan Mining LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-4027085 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Patton Mining LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 26-4027251 | Limited Liability Company | 100 |
| Foresight Energy Labor LLC | Viking Mining LLC | Delaware | 211 North Broadway Suite 2600 St. Louis, MO 63102 | 46-1264981 | Limited Liability Company | 100 |

**Part II**

**Initial Pledged Debt**

None.

**Part III**

**Other Investment Property**

None.

**Part IV**

**SECURITY ACCOUNTS AND COMMODITY ACCOUNTS**

**Security Accounts:**
None.

**Commodity Accounts:**
None.

**Schedule II to**
**Collateral Questionnaire**

## DEPOSIT ACCOUNTS

| No. | Entity | Bank Name | Account Type | Account No. (Ending) |
|---|---|---|---|---|
| 1. | Foresight Energy LLC | The Huntington National Bank | Concentration | 9601 |
| 2. | Foresight Receivables LLC | The Huntington National Bank | Receipts | 6973 |
| 3. | Foresight Energy LLC | The Huntington National Bank | Receipts | 6694 |
| 4. | Foresight Energy LLC | The Huntington National Bank | Disbursements – Accounts Payable | 6681 |
| 5. | Foresight Energy LLC | The Huntington National Bank | Disbursements – Payroll | 8214 |
| 6. | Foresight Energy Services LLC | The Huntington National Bank | Disbursements – Payroll | 6539 |
| 7. | MaRyan Mining LLC | CNB Bank & Trust, N.A. | Petty Cash | 4605 |
| 8. | Mach Mining LLC | First Southern Bank | Petty Cash | 4129 |
| 9. | Hillsboro Energy LLC | The Huntington National Bank | Operating | 5031 |
| 10. | Patton Mining LLC | CNB Bank & Trust, N.A. | Petty Cash | 6394 |
| 11. | Foresight Energy LP | F.N.B. Wealth Management | Collateral | 7011 |

**Schedule III to**
**Collateral Questionnaire**

## INTELLECTUAL PROPERTY

**I. Patents**

None.

**II. Domain Names and Trademarks**

None.

**III. Trade Names**

None.

**IV. Copyrights**

None.

**V. IP Agreements**

None.

**Schedule IV to**
**Collateral Questionnaire**

## COMMERCIAL TORT CLAIMS

None.

**Schedule V to**
**Collateral Questionnaire**

**LOCATION, CHIEF EXECUTIVE OFFICE, TYPE OF ORGANIZATION, JURISDICATION OF ORGANIZATION AND ORGANIZATIONAL IDENTIFICATION NUMBER[2]**

| Grantor | Jurisdiction of Organization | Type of Organization | Organizational I.D. | Chief Executive Office |
|---|---|---|---|---|
| Foresight Energy LLC | Delaware | Limited Liability Company | 4214815 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy GP LLC | Delaware | Limited Liability Company | 5100772 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Adena Resources, LLC | Delaware | Limited Liability Company | 4113123 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Akin Energy LLC | Delaware | Limited Liability Company | 4191654 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| American Century Mineral LLC | Delaware | Limited Liability Company | 5725788 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| American Century Transport LLC | Delaware | Limited Liability Company | 5725786 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Coal Field Construction Company LLC | Delaware | Limited Liability Company | 4628487 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Coal Field Repair Services LLC | Delaware | Limited Liability Company | 5299754 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Coal Sales LLC | Delaware | Limited Liability Company | 4591069 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy Employee Services Corporation | Delaware | Corporation | 5528848 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |

---

[2]    The taxpayer identification number of (i) Foresight Energy LLC is 20-5917685 (ii) Foresight Energy GP LLC is 90-0788332, and (ii) each other Grantor, if any, is set forth on Schedule I.

| Grantor | Jurisdiction of Organization | Type of Organization | Organizational I.D. | Chief Executive Office |
|---|---|---|---|---|
| Foresight Energy Finance Corporation | Delaware | Corporation | 4853884 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy Labor LLC | Delaware | Limited Liability Company | 5810632 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy LP | Delaware | Limited Partnership | 5100773 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Energy Services LLC | Delaware | Limited Liability Company | 5065292 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Foresight Receivables LLC | Delaware | Limited Liability Company | 5665546 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Hillsboro Energy LLC | Delaware | Limited Liability Company | 4191652 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Hillsboro Transport LLC | Delaware | Limited Liability Company | 5373240 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| LD Labor Company LLC | Delaware | Limited Liability Company | 5068132 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Logan Mining LLC | Delaware | Limited Liability Company | 5582699 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| M-Class Mining, LLC | Delaware | Limited Liability Company | 4388185 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Mach Mining, LLC | Delaware | Limited Liability Company | 3960666 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Macoupin Energy LLC | Delaware | Limited Liability Company | 4562185 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| MaRyan Mining LLC | Delaware | Limited Liability Company | 4642527 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |

| Grantor | Jurisdiction of Organization | Type of Organization | Organizational I.D. | Chief Executive Office |
|---|---|---|---|---|
| Oeneus LLC d/b/a Savatran LLC | Delaware | Limited Liability Company | 3943786 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Patton Mining LLC | Delaware | Limited Liability Company | 4643432 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Seneca Rebuild LLC | Delaware | Limited Liability Company | 5354365 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Sitran LLC | Delaware | Limited Liability Company | 4450382 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Sugar Camp Energy, LLC | Delaware | Limited Liability Company | 3982892 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Tanner Energy LLC | Delaware | Limited Liability Company | 5582701 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Viking Mining LLC | Delaware | Limited Liability Company | 5153856 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |
| Williamson Energy, LLC | Delaware | Limited Liability Company | 3953041 | 211 North Broadway, Suite 2600 St. Louis, MO 63102 |

**Schedule VI to**
**Collateral Questionnaire**

**CHANGES IN NAME, LOCATION, ETC.**

| Grantor | Nature of Change | Issue Date |
|---|---|---|
| Akin Energy LLC | Akin Energy LLC merged with and into FRLP 2008 No. 1 LLC and Locust Grove Energy LLC, each a Delaware limited liability company, with Akin Energy LLC as the surviving company | February 8, 2013 |
| Foresight Energy Services LLC | Foresight Energy Supply LLC merged with and into Foresight Energy Services LLC with Foresight Energy Services LLC as the surviving company | December 31, 2013 |
| Patton Mining LLC | Principal place of business changed from Beckley, West Virginia to St. Louis, Missouri | August 1, 2016 |
| Foresight Receivables LLC | Corporation Structure. Per terms of the LLC Agreement, which required one Independent Director until the Final Payment under the Financing Agreement was made.<br><br>Mr. Burns resigned September 27, 2019. | December 2017 / September 27, 2019 |
| Viking Mining LLC | • Viking Coal Mining LLC changed its name to Drott Mining Company LLC<br>• Drott Mining Company LLC changed its name to Viking Coal Mining LLC<br>• Viking Coal Mining LLC changed its name to Viking Mining LLC<br>• Principal place of business changed from Beckley, West Virginia to St. Louis, Missouri | • November 13, 2012<br><br>• February 14, 2013<br><br>• May 8, 2013<br><br>• August 1, 2016 |

**Schedule VII to**
**Collateral Questionnaire**

## LOCATION OF EQUIPMENT AND COLLATERAL

| Name of Grantor | Location of Inventory, Equipment, Other Collateral |
|---|---|
| Adena Resources, LLC | 211 North Broadway, Suite 2600<br>St. Louis, MO 63102 |
| Akin Energy LLC | 211 North Broadway, Suite 2600<br>St. Louis, MO 63102 |
| Coal Field Construction Company LLC | 11351 N. Thompsonville Road<br>Macedonia, IL 62860 |
| Foresight Energy Services LLC | 211 North Broadway, Suite 2600<br>St. Louis, MO 63102 |
| Hillsboro Energy LLC | 12051 County Road 900 N.<br>Hillsboro, IL 62049<br><br>Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 |
| Hillsboro Transport LLC | 12051 County Road 900 N.<br>Hillsboro, IL 62049 |
| Macoupin Energy LLC | 14300 Brushy Mound Road<br>Carlinville, IL 62626<br><br>Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 |
| Oeneus LLC d/b/a  Savatran LLC | 211 North Broadway, Suite 2600<br>St. Louis, MO 63102 |
| Seneca Rebuild LLC | 11550 N. Thompsonville Road<br>Macedonia, IL 62860 |
| Sitran LLC | 10016 Darnell School Rd<br>Mount Vernon, IN 47620 |
| Sugar Camp Energy, LLC | 11351 N. Thompsonville Road<br>Macedonia, IL 62860<br><br>13643 N. Thompsonville Road<br>Macedonia, IL 62860<br><br>Sitran LLC<br>10016 Darnell School Rd |

| Name of Grantor | Location of Inventory, Equipment, Other Collateral |
|---|---|
| | Mount Vernon, IN 47620 |
| Williamson Energy, LLC | 16468 Liberty School Road<br>Marion, IL 62959<br><br>Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620<br><br>Convent Marine Terminal<br>7790 LA Highway 44<br>Convent, Louisiana 70723 |

**Schedule VIII to
Collateral Questionnaire**

**LETTERS OF CREDIT**

| Beneficiary | LC Number | Amount | Purpose | Location | Issue Date | Original Expiry Date | Renewals | Notification |
|---|---|---|---|---|---|---|---|---|
| Rockwood Casualty | OSB.009726 | $ 4,500,000.00 | Workers Compensation | Credit Facility | 4/18/2017 | 6/30/2018 | Automatic successive one year periods | 60 days |
| Argonaut Insurance Co. | OSB.009853 | $ 4,500,000.00 | Surety Bonds | Credit Facility | 7/28/2017 | 7/31/2018 | Automatic successive one year periods | 60 days |
| Argonaut Insurance Co. | OSB.010277 | $ 1,310,958.39 | Appeal Bond | Credit Facility | 8/10/2018 | 8/10/2019 | Automatic successive one year periods | 60 days |
| Canadian National Railway | OSB.010199-1 | $ 2,000,000.00 | Transportation | Credit Facility | 5/29/2018 | 6/1/2019 | Amendment needed to extend | 15 days |
| | Total | $ 12,310,958.39 | | | | | | |

**Schedule IX to
Collateral Questionnaire**

## WAREHOUSEMEN AND BAILEES

| Grantor | Warehouseman/Bailee and Location | Assets and Value (as of 1/31/2020) |
|---------|----------------------------------|-----------------------------------|
| Hillsboro Energy LLC | Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 | Clean Coal $106,655 |
| Macoupin Energy LLC | Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 | Clean Coal $1,621,205 |
| Sugar Camp Energy, LLC | Sitran LLC<br>10016 Darnell School Rd<br>Mount Vernon, IN 47620 | Clean Coal $26,372,171 |

**Schedule X to**
**Collateral Questionnaire**

## LOCATION OF BOOKS AND RECORDS

## RELATING TO ACCOUNTS RECEIVABLE

| Name of Grantor | Location of Books and Records Relating to Accounts Receivable |
|---|---|
| All Grantors | 211 North Broadway, Suite 2600<br>St. Louis, Missouri 63102 |

**Schedule XI and XII to**
**Collationnaire**

DEBTOR/GRANTOR:

MACOUPIN ENERGY LLC
14300 Brushy Mound Road
Carlinville, Illinois  62626

**Macoupin County, Illinois**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin South Mine Assignment | Not Recorded | Leased | Yes |
| Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | MA 503863 | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | Not Recorded | Leased | Yes |
| First Amendment to Coal Mining Lease | 2/13/2013 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | Not Recorded | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | East Hornsby Mine Assignment | Not Recorded | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/22/2009 | ExxonMobil Coal USA, Inc. to Macoupin Energy LLC | Various tracts of surface and coal reserves. The coal reserves were sold to WPP or Colt and leased back. The surface not required for operations has been conveyed to New River Royalty LLC | MA-0019 493145 | Owned | Yes |
| Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | Not Recorded | Leased | Yes |
| Short Form or Memorandum of Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | MA 506329 | Leased | Yes |
| Amendment to Lease Agreement | 12/29/2009 | HOD LLC and Macoupin Energy LLC | Rail Loop | Not Recorded | Leased | Yes |
| Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | Not Recorded | Leased | Yes |
| Short Form or Memorandum of Lease | 1/27/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | MA 506330 | Leased | Yes |
| Amendment to Lease Agreement | 12/29/2009 | HOD LLC and Macoupin Energy LLC | Rail Load Out | Not Recorded | Leased | Yes |
| Option and Lease Agreement | 2/28/1967 | Jet Oil Company and Macoupin Energy LLC | Coal Reserves | Volume 628, Page 456 | Leased | Yes |
| Assignment of Leases | 1/27/2009 | Macoupin Energy LLC, as assignor, and WPP LLC, as assignee | Coal Reserves | Not Recorded | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease Agreement | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | Not Recorded | Leased | Yes |
| Short Form or Memorandum of Coal Mining Lease and Sublease Agreement | 1/27/2009 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | MA 506328 | Leased | Yes |
| First Amendment to Coal Mining Lease and Sublease Agreement | 11/03/2010 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | Not Recorded | Leased | Yes |
| Second Amendment to Coal Mining Lease and Sublease Agreement | 03/28/2010 | WPP LLC and Macoupin Energy LLC | Macoupin Reserves | Not Recorded | Leased | Yes |
| Assignment of Leases | 1/22/2009 | ExxonMobil Coal USA, Inc. and Macoupin Energy LLC | Monterey Coal Company No. 1 Mine | MA 487734 | Leased | Yes |

## Clinton County, Illinois

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 6/1/2012 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | Not Recorded | Leased | Yes |
| Short Form or Memorandum of Coal Mining Lease | 6/1/2012 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | CC 2012R04931 | Leased | Yes |
| First Amendment to Coal Mining Lease | 2/13/2013 | Colt LLC and Macoupin Energy LLC | New Memphis /Monterey 2 Reserves | Not Recorded | Leased | Yes |

DEBTOR/GRANTOR:

WILLIAMSON ENERGY, LLC
16468 Liberty School Road
Marion, IL  62959
**Williamson County, Illinois**
**Franklin County, Illinois (Coal Reserves only)**

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Coal Mining Lease Agreement | 8/14/2006 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| | | | | | | |
| Short Form of Amended and Restated Coal Mining Lease Agreement | 8/14/2006 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 301-480 FC #2006-6571 | Leased | Yes |
| First Amendment to Amended and Restated Coal Mining Lease Agreement | 5/19/2008 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Amendment to Amended and Restated Coal Mining Lease Agreement | 12/18/2009 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Third Amendment to Amended and Restated Coal Mining Lease Agreement | 08/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Short Form of First, Second and Third Amendment to Amended and Restated Coal Mining Lease Agreement | 08/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 327-780 2010-6467 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Short Form of Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 331-312 | Leased | Yes |
| Fifth Amendment to Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
| Short Form of Fifth Amendment to Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 341-659 | Leased | Yes |
| First Amendment to Amended and Coal Mining Lease Agreement | 5/19/2008 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
|  |  |  |  |  |  |  |
| Amendment to Amended and Restated Coal Mining Lease Agreement | 12/18/2009 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | Not recorded | Leased | Yes |
|  |  |  |  |  |  |  |
| Third Amendment to Amended and Restated Coal Mining Lease Agreement | 8/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | Not recorded | Leased | Yes |
|  |  |  |  |  |  |  |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form or Memorandum of First Amendment, Second Amendment and Third Amendment to Amended and Restated Coal Mining Lease Agreement | 8/12/2010 | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson and Franklin Counties, IL | WC Misc 327-780 FC #2010-5467 | Leased | Yes |
| | | | | | | |
| Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | Not recorded | Leased | Yes |
| | | | | | | |
| Short Form or Memorandum of Fourth Amendment to Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | WC Misc 331-312 | Leased | Yes |
| | | | | | | |
| Partial Release of Leased Premises from Amended and Restated Coal Mining Lease Agreement | 6/30/2011 (effective 4/1/2011) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2011-3006 | Leased | Yes |
| Partial Release of Leased Premises from Amended and Restated Coal Mining Lease Agreement | 3/20/2013 (effective 9/1/2011) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2013-1637 | Leased | Yes |
| Corrective Partial Release of Leased Premises from Amended and Restated | 4/5/2013 (effective 3/1/2013) | WPP LLC to Williamson Energy, LLC | Releases certain coal reserves in Franklin County, IL | FC #2013-2765 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease Agreement | | | | | | |
| Short Form of Lease and Sublease | 5/1/2005 | Williamson Development Company LLC to Williamson Energy, LLC | Coal reserves in Williamson County, IL | WC Misc 291-461 | Leased | Yes |
| Coal Mining Lease Agreement | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Not recorded | Leased | Yes |
| Short Form of Lease | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Misc 301Page 479 | Leased | Yes |
| Lease (Coal Prep Plant) | 5/1/2005 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | WC Misc 291-463 | Leased | Yes |
| First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Not recorded | Leased | Yes |
| Short Form of First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Misc 313 Page 620 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC to Williamson Energy, LLC | Coal Reserves in Williamson, Franklin, and Saline Counties, IL | WC 325-897 | Leased | Yes |
| | | | | | | |
| Short Form or Memorandum of Coal Mining Lease and Sublease | 8/12/2010 | Colt LLC to Williamson Energy, LLC | Coal Reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 325-897 FC #2010-3874 SC 1981-610 | Leased | Yes |
| | | | | | | |
| Partial Release of Premises from Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Releases certain coal reserves in Williamson County, IL | WC Misc 331-310 | Leased | Yes |
| | | | | | | |
| First Amendment to Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | Not recorded | Leased | Yes |
| | | | | | | |
| Short Form or Memorandum after First Amendment to Coal Mining Lease and Sublease | 6/30/2011 (effective 4/1/2011) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 331-311 FC #2011-3008 SC 2003-978 | Leased | Yes |
| Partial Release of Premises from Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | WC Misc 341-658 | Leased | Yes |
| Second Amendment to Coal Mining Lease and Sublease | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | Not recorded | Leased | Yes |
| Short Form or Memorandum after Second Amendment to | 3/20/2013 (effective 3/1/2013) | Colt LLC and Williamson Energy, LLC | Coal reserves in Williamson, Franklin, and Saline Counties, IL | FC 2013-1639 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease | | | | | | |
| Lease | 5/1/2005 | Williamson Development Company, LLC (fka Steelhead Development Company LLC) and Williamson Energy, LLC | Pond Creek Rail Load Out | WC Misc 291-462 | Leased | Yes |
| | | | | | | |
| First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Not recorded | Leased | Yes |
| Short Form of First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Misc 313 Page 619 | Leased | Yes |
| | | | | | | |
| Deed | 8/12/2010 | Williamson Development Company, LLC and Williamson Energy, LLC | Surface required for Williamson Energy, LLC Operations[3] | WC 486-333 | Owned | Yes |
| | | | | | | |

---

[3]    This excludes the real property released pursuant to that certain Fifth Amendment and Partial Release of Fee and Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of September 26, 2016, by and between Williamson Energy, LLC, as Mortgagor, and Citibank, N.A., in its capacity as Agent, consisting of approximately 28.55 acres of surface land.

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 8/12/2010 | Williamson Development Company, LLC and Williamson Energy, LLC | "Snake areas" required for Williamson Energy, LLC Operations | WC 325-899 | Owned | Yes |
| | | | | | | |
| Ground Lease | 1/1/2006 | Eberhardt to Williamson Transport, LLC | Ground lease required for Williamson Energy, LLC Operations | Not Recorded | Leased | Yes |
| Memorandum of the Eberhardt Lease | 1/20/2006 | Eberhart to Williamson Transport, LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 296-404 | Leased | Yes |
| Assignment of Rights | 8/24/2007 | Williamson Transport LLC to Williamson Development Company LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc 306-996 | Leased | Yes |
| Assignment of Rights | 8/24/2007 | Williamson Development Company LLC to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC Misc | Leased | Yes |
| Ground Lease | 8/12/2010 | Eberhart to Williamson Development Company, LLC assigned to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 325-900 | Leased | Yes |
| | | | | | | |
| Surface Lease | 3/22/2006 | Clara Summers and Independence Land Company LLC | Surface Lease | WC Misc 297-626 | Leased | Yes |
| Assignment of Lease | 8/12/2010 | Independence Land Company LLC to | Surface Lease | WC Misc 327-750 | Leased | Yes |

| Description/Title of | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Williamson Energy LLC | | | | |
| Surface Lease | 3/22/2006 | Clara Summers and Independence Land Company LLC | Surface Lease | WC Misc 297-626 | | |
| Grant of Surface Easement | 8/12/2010 | Williamson Development Company LLC and Williamson Energy LLC | Surface Easement | WC Misc 325-899 | Leased | Yes |

DEBTOR/GRANTOR:

SUGAR CAMP ENERGY, LLC
11351 N. Thompsonville Road
Macedonia, Illinois  62860
**Franklin County, Illinois**
**Hamilton County, Illinois (Coal Reserves only)**
**Saline County, Illinois (Coal Reserves only)**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| TVA Illinois Coal Lease | 7/1/2002 | USA through TVA & Illinois Fuel Company LLC (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2007-5822 | Leased | Yes |
| Assignment of TVA Illinois Coal Lease | 8/4/2009 | USA through TVA & Illinois Fuel Company LLC (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2009-4445 | Leased | Yes |
| Amendment One to TVA Illinois Coal Lease | 4/17/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0027 | Leased | Yes |
| Amendment Two to TVA Illinois Coal Lease | 8/30/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | Not recorded | Leased | Yes |
| Letter Agreement regarding TVA Illinois Coal Lease | 8/30/2012 | USA through TVA & Ruger Coal Company LLC | Properties located in Franklin County IL as described in Exhibit A | Not recorded | Leased | Yes |
| Franklin County Coal Lease | 7/1/2002 | USA through TVA & Ruger Coal Company, Inc. (as assigned to Ruger Coal | Properties located in Franklin County IL as described in Exhibit A | Not recorded | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Company, LLC), Sugar Camp Energy, LLC | | | | |
| Assignment of Lease | 9/10/2007 | USA through TVA & Ruger Coal Company, Inc. (as assigned to Ruger Coal Company, LLC), Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2007-5132 | Leased | Yes |
| Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC-0083 | Leased | Yes |
| Memorandum of Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2006-6919 | Leased | Yes |
| Supplemental Memorandum of Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2008-4441 | Leased | Yes |
| Sublease | 3/6/2012 | Sugar Camp Energy, LLC & HOD LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2012-6228 | Leased | Yes |
| First Amendment to Coal Mining Lease | 8/11/2008 | RGGS Land & Minerals & Sugar Camp Energy, LLC | Properties located in Franklin County IL as described in Exhibit A | FC 2008-4441 | Leased | Yes |
| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & Sugar Camp Energy, LLC | Consent with respect to Illinois Fuels Lease | FC-0233 | Leased | Yes |
| Warranty Deed | 1/15/2009 | Rodney Smith and Marta Smith to Sugar Camp Energy, LLC | Pt. Lot 121 and Pt. Lot 122 in Kokopelli Estates | Surface WC-0152, WC481-772 | Owned | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 3/4/2010 | Glendall E Johnston a.k.a Glen Johnston and Carolyn S. Johnston, a.k.a Carolyn Johnston, husband and Wife to Sugar Camp Energy, LLC | NW NW Sec 1-6-4 and NWNE Sec 1-6-4 Franklin County, Illinois | FC-0253 2010-1056 | Owned | Yes |
| Easement | 3/4/2010 | Morris R Clark and Karan S. Clark to Sugar Camp Energy, LLC | NWNE and W2E2NE Sec 2-6-4 Franklin, Illinois | FC-0254 2010-1057 | Owned | Yes |
| Easement | 3/1/2010 | David Blood and Melanie Blood, husband and wife to Sugar Camp Energy, LLC | Pt. E2NENE Sec 2-6-4 Franklin County, Illinois  2010-1058 | FC-0255 | Owned | Yes |
| Easement | 6/5/2010 | Roger L. Sanders and Mary Ellen Sanders to Sugar Camp Energy, LLC | W 10 ac N3/4 of NESE Sec 6-6-5 Hamilton County, Illinois | HC-0078 221-117 | Owned | Yes |
| Warranty Deed | 6/1/2010 | Patrick G. Mascal and Lori S. Mascal to Sugar Camp Energy, LLC | W2NESW and E2S2NWSW Sec 6-6-5 Hamilton Illinois | HC-0075 277/311 | Owned | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Illinois Fuels TVA Lease | Not Recorded | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Right to mine on Franklin County TVA Lease | Not Recorded | Leased | No |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface required for Sugar Camp Energy, LLC Operations | Not Recorded | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface in Hamilton County required for Sugar Camp Energy, LLC Operations | Not Recorded | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to Sugar Camp Energy, LLC | Surface at former Akin site required for Sugar Camp Energy, LLC Operations | Not Recorded | Owned | Yes |
| Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | Not Recorded | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Memorandum of Coal Mining Lease` | 8/12/2010 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | FC 2010-3825 | Leased | Yes |
| First Amendment to Coal Mining Lease` | 11/4/2011 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | Not Recorded | Leased | Yes |
| Second Amendment to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | Not Recorded | Leased | Yes |
| Memorandum after First and Second Amendments to Coal Mining Lease` | 2012 | Ruger Coal Company LLC to Sugar Camp Energy, LLC | Coal Reserves | Not Recorded | Leased | Yes |
| Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | Not Recorded | Leased | Yes |
| Memorandum of Lease Agreement | 3/6/2012 | HOD LLC to Sugar Camp Energy, LLC | Sugar Camp Rail Load Out | FC 2012-6228 | Leased | Yes |

DEBTOR/GRANTOR:

SITRAN, LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **MOORAGE OPTIONS/LEASES KENTUCKY** | | | | | | |
| | | | | | | |
| Deed of Correction | 10/22/2009 | Norberta Belle Williams, Harold Alvin Williams and Sitran LLC | An undivided l/4th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Owned | No |
| Deed of Correction | 10/22/2009 | Joyce Mae Hurley and Deon H. Hurley and Sitran LLC | An undivided  1/4th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Owned | No |
| Deed of Conveyance | 10/22/2009 | Lisa Michelle Karr Hughes & Darrell C. Hughes and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Owned | No |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Deed of Conveyance | 10/22/2009 | Rise Karr and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Owned | No |
| Option To Lease | 4/10/2009 | Kay Karr Brooks and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Lease | No |
| Option To Lease | 4/10/2009 | Robert Karr & Rebecca S. Karr, his wife, and Sitran LLC | An undivided 2/15th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | Not Recorded | Lease | No |
| Deed of Conveyance | 11/20/2009 | Scott A. Peck & City Peck, his wife and Sitran LLC | An undivided 1/20th: Certain property in the Ohio River known as Karr Island, which property was granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | HC-0011 (Ky) Book 572 Pg 1006 | Owned | No |
| Deed of Conveyance | 11/20/2009 | Stephen K. Peck and Sitran LLC | An undivided 1/20th: Certain property in the Ohio River known as Karr Island, which property was | HC-0012 (Ky) Book | Owned | No |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | granted to Hopson Karr and N.S. Karr by a governor's patente on 12/21/1960 that is recorded in the Henderson Co Bk 202 Pg 266 | 572 Pg 1010 | | |
| | | | | | | |
| **EASEMENTS INDIANA** | | | | | | |
| | | | | | | |
| Easement | 3/4/2009 | Kenneth W. Burgdorf, as Trustee of the Kenneth W. Burgdorf Revocable Trust and Marilyn T. Burgdorf, Trustee of the Marilyn T. Burgdorf Revocable Trust and Sitran LLC | 4.99 acres located in part of Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-0005 (IN) | Owned | No |
| Temporary Easement | 11/20/2008 | Pauline Burgdorf and Sitran LLC | 4.99 acres located in part of the Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-0011 (IN) 200804978 | Owned | No |
| Contract To Acquire Easement | 11/20/2008 | Pauline Burgdorf and Sitran LLC | 4.99 acres located in part of the Northeast Quarter of Section 11, Township 7 South, Range 12 West in Posey County Indiana. | PC-0011 (IN) 200804978 Closing date 01/15/2012 | Owned | No |
| Non-Exclusive Easement and Temporary Construction Easement | 10/20/2009 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and | Part of Southeast Quarter of the Southwest Quarter of Section 22 and part of the Northeast Quarter of the Northwest Quarter of Section 27 all being in Township 6 South, Range 12 West in Posey County, Indiana | PC-0018 (IN) 200904540 | Owned | No |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | Sitran LLC | | | | |
| Quit Claim Deed | | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | Part of the West Half of Section 23, Township 7 South, Range 12 West in Posey County Indiana | PC-00 | Owned | No |

DEBTOR/GRANTOR:

OENEUS LLC D/B/A SAVATRAN LLC

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| **INDIANA RAIL LOOP AND DOCK** | | | | | | |
| | | | | | | |
| Personal Representatives Deed | 1/9/2009 | Alfred A. Mohr, as Personal Representative of the Estate of Aurelia F. Mohr, deceased and SAVATRAN LLC | Undivided 1/2 interest in: SE NW 14-7-12 except 5 feet on north side; NESW 14-7-12 81.742 acres Posey Co. IN | PC-0001 (IN) 200900228 | Owned | Yes |
| Warranty Deed | 1/9/2009 | Alfred A. Mohr and SAVATRAN LLC | Undivided 1/2 interest in: SE NW 14-7-12 except 5 feet on north side; NESW 14-7-12 81.742 acres Posey Co. IN | PC-0001 (IN) 200900227 | Owned | Yes |
| Warranty Deed | 1/8/2010 | Catherine B. Elbert, Linda Kay Elbert and Catherine Charlene Elbert as General Partners of the Charles R. Elbert Family Limited Partnership and SAVATRAN LLC | 45.949 acres As part of the W/2 23-7-12 Posey Co. IN | PC-0002 (IN) 201000225 | Owned | Yes |
| Corrective Warranty Deed | 1/8/2010 | Catherine B. Elbert, Linda Kay Elbert and Catherine Charlene Elbert as General Partners of the Charles R. Elbert Family Limited Partnership and SAVATRAN LLC | Pt. SE SW 14-7-12 23 acres & Pt. NW/4 23-7-12 16.30 acres Posey Co. IN | PC-0002 (IN) 201000226. This deed replaces WD 200900675 because of surveyor's error in description. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Trustee's Deed | 12/17/2008 | Old National Trust Company as Successor Trustee under the James L. Boerner Revocable Trust Agreement and SAVATRAN LLC | Pt. W/2 Section 23-7-12 70 acres Posey Co. IN | PC-0003 (IN) 200805149 | Owned | Yes |
| Warranty Deed | 12/15/2008 | Kenneth J. Juncker Mary L. Juncker Emily A Moore Robert E Moore Jr. Joseph T. Yount, Beth Ann Folz, as Guardian ad Litem for Alexander A. Moore, Dana M Junker, Rebecca A. Wildeman, Anna L Blankenbaker (each afore mentioned signing as an individual and as a partner in JARD Group, Allyn Simpson, Ronald Simpson, Edward L. Thompson, as personal Representative of the Estate of Marilyn Thompson, Nathalie A. Elderkin, Charles A. Thompson, L. David Allyn, Jennifer L. Velasquez, Matthew D. Allyn and Michael L. Allyn and SAVATRAN LLC | Pt. NWNW & NENW 14-7-12 72.741 acres & 27.986 acres off N side NWNW & Pt. N/2 14-7-12 Posey Co. Indiana | PC-0007 200804974 | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Quitclaim Deed | 12/15/2008 | Kenneth J. Juncker Mary L. Juncker Emily A Moore Robert E Moore Jr. Joseph T. Yount, Beth Ann Folz, as Guardian ad Litem for Alexander A. Moore, Dana M Junker, Rebecca A. Wildeman, Anna L Blankenbaker (each afore mentioned signing as an individual and as a | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0007 (IN) 200804975 This was an access road at the top of the Allyn Property. | Owned | Yes |
| Correction Quitclaim Deed | 12/17/2009 | Edward l. Thompson, Individually and SAVATRAN LLC | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0007 (IN) 200805013 Edward Thompson inadvertently signed as Personal Representative of the Estate of Marilyn K. Thompson by PRD dated 10/31/2008 | Owned | Yes |
| Correction Warranty Deed | 12/17/2009 | Edward l. Thompson, Individually and SAVATRAN LLC | Pt. NWNW  & NENW 14-7-12 72.741 acres & 27.986 acres off N side  NWNW & Pt. N/2 14-7-12 Posey Co. Indiana | PC-0007 (IN) 200805012 Edward Thompson inadvertently signed as Personal Representative of the Estate of Marilyn K. Thompson by PRD dated 10/31/2008 | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Rec Memo & Option to Purchase | 7/16/2008 | Gerald G. Mohr and Esther R. Mohr and Oeneus LLC d/b/a SAVATAN LLC | 6.89 acres within SW/4 south of Old State Rd. Section 11-7-12 Posey Co. IN | PC-0008 (IN)200803305 Option Expires 07/16/2010. We do not believe we will close on thim. | Owned | Yes |
| Warranty Deed | 3/26/2009 | Orval Ungethum and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW/4 Section 14-7-12 29.302 acres Posey Co. IN | PC-0009 (IN) 200901384 | Owned | Yes |
| Warranty Deed | 12/18/2008 | Raymond W. Boerner, Evelyn Staples, Ronald Lee Boerner & Ruben F. Roehr as Personal Rep. of the Estate of Dorothy Mae Roehr and SAVATRAN LLC | E/2 SWNW & NENWSW Section 14-7-12 & 1/2 interest to 5 feet on S Line N/2 NW/4 14-7-2 a distance of 68 1/2 rods and 5 feet in width. Posey Co. IN.30.675 acres | PC-0010 (IN) 200805150 | Owned | Yes |
| Rec Memo & Option to Purchase | 10/14/2008 | Margie J. Angermeier (Life Estate), Glenda S. Elpers(1/3 remainder); Paul L. Angermeier (1/3 remainder); Glenn V. Angermeier (1/3 remainder) and Oeneus LLC d/b/a SAVATRAN LLC | 8 acres as pt of S/2 SW/4 Section 10-7-12 Posey Co IN | PC-0012 (IN) 200804520 Expires 10/14/2010 We do not believe we will close on this. | Owned | Yes |
| Warranty Deed | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-00014 (IN) 200901505 Arthur reserves life estate in house and 1 ac tract B. Reserves road easement for access to house; right to farm for $1.00 any portion | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | left after construction. | | |
| Quitclaim Deed | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | 5 feet on S Line of N/2 NW/4 14-7-12 a distance of 68 1/2 rods and 5 feet in width. | PC-0014 (IN) 2009-01504 this is an access road across the top of the Alyn heirs property. | Owned | Yes |
| Non-Penetration Agreement | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (IN) Boerner Heirs own minerals would not sell this keeps them from having any development of the minerals. | Owned | Yes |
| Easement | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (IN) 200901506 Access easement to house and 1 ac and access to 30 acres that is land locked after construction. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Real Estate Mortgage, Security Agreement, Collateral Assignment of Rents and Leases, and Fixture Filing | 3/31/2009 | Arthur W. Boerner, as life tenant, Elizabeth A. Howery and Sharon L. Bauman and Oenues LLC d/b/a SAVATRAN LLC | S/2 NWNE 14-7-12 & all of SWNE east of Public Road 40.843 and 1acre part of SWNE 14-7-12 Posey Co Indiana | PC-0014 (IN) 200901507 Promissory note to Elizabeth Howery and Sharon L Bauman 1,075,000. paid as follows 287,500 yr1, 275,000 yr 2 262500 yr 3 1075000 | Owned | Yes |
| Rec Memo & Option to Purchase | 2/27/2009 | Larry E. Orth 5/12 int. Agnes L. York as Trustee of the Agnes L. York Revocable Trust Agreement 5/12 interest; Vickie L. Orth 2/12 interest and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SWSE 11-7-12 containing 0.90 acres | PC-0015 200900926 | Owned | Yes |
| | | | | | | |
| **EASEMENTS INDIANA** | | | | | | |
| | | | | | | |
| Easement | 9/16/2009 | Oeneus LLC to Southern Indiana Gas and Electric Company and Indiana corp d/b/a Vectren Energy Delivery of Indiana, Inc. | Pt.  NE/4 14-7-12 Posey Co IN containing 0.28 acres more or less. | PC-0017 (IN) Electric power line easement Gibson to Brown 345 line. | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Non-Exclusive Easement and Temporary Construction Easement | 10/20/2009 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC and Sitran LLC | Part of Southeast Quarter of the Southwest Quarter of Section 22 and part of the Northeast Quarter of the Northwest Quarter of Section 27 all being in Township 6 South, Range 12 West in Posey County, Indiana | PC-0018 (IN) 200904540 | Owned | No |
| Electric Distribution Line Easement | 7/13/2010 | Savatran LLC, to Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. | Pt N2 of NW Section 14, Township 7 South, Range 12 West Posey County, Indiana | PC-0021 (IN) Need Recorded Copy | Owned | No |
| Electric Distribution Line Easement | 7/13/2010 | Southern Indiana Gas and Electric Company an Indiana public utility company doing business as Vectren Energy Delivery of Indiana, Inc. and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W2 NE Section 14, Township 7 South, Range 12 West. Posey County, Indiana | PC-0022 (IN) Need Recorded Copy | Owned | No |
| | | | | | | |
| **SUGAR CAMP TO McLEANSBORO RAIL LINE ILLINOIS** | | | | | | |
| | | | | | | |
| Easement | 10/17/2008 | Kelly Markus & Gina Markus to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 BK 216 Pg 156 Rail Road Easement. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 10/17/2008 | Gerald Spihlman & Judith Spihlman to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 BK 216 Pg 147 Rail Road Easement. | Owned | Yes |
| Easement | 10/24/2008 | Thomas Markus & Jeanete Markus to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESE 3-5-5 Hamilton County IL 4.87 acres | HC-0001 Bk 216 Pg 163 Rail Road Easement | Owned | Yes |
| Easement | 7/24/2008 | White Oak Resources Land, LLC to Oeneus LLC d/b/a SAVATRAN | Pt. SW/4 & SE/4 6-5-5 Hamilton County IL containing 11.45 acres | HC-0002 Bk 217 Pg 732 Initial Option was with Larry Myers who sold to White Oak. | Owned | Yes |
| Warranty Deed | 2/4/2008 | Charles R. Moore & Nani Sue Moore to Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW/4 28-5-5 containing 3 acres more or Less Pt. SWNE 29-5-5 containing 13 acres more or less. | HC-0004 Traded 65.63 acres and 8.73 acres of the W/2 NW/4 28-5-5 to Clark. Traded 137 acres in NE/4 29-5-5 Hamilton Co. IL to Burris. Remaining property for wet lands mitigation 273-252 | Owned | Yes |
| Easement | 9/24/2009 | David Bert Lemke & Shirley K. Lemke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. N/2 SE/4 1-T5S-R5E  Hamilton Co. IL containing 10.16 ac | HC-0005 Bk 215 Pg 801 | Owned | Yes |
| Warranty Deed | 12/19/2007 | Terri S. Irvin, Successor Trustee to the Kenneth C. Myers and Eula P. Myers Revocable Trust to Oeneus LLC d/b/a SAVATRAN LLC | SW NW; NW SW 1-T5S-R5E; 40 acres within E/2 NE/4 and E/2 NE/4 11-T5S-R5E Hamilton Co IL | HC-0006 Bk 273 Pg 22 Traded part of this property to Kenneth Willis. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/28/2008 | Grover C. Galloway and Mildred F. Galloway to Oeneus LLC d/b/a SAVATRAN LLC | W/2 SWSE; and E/2 SW/4 3-T5S-R5E Hamilton Co IL containing 100 acres | HC-0008 Bk 273 Pg 812 6.10 acres used for rail. Farming agreement Kenny Waier. | Owned | Yes |
| Special Warranty Deed | 4/21/2008 | Kenneth P. Willis & Wilma June Willis to Oeneus LLC d/b/a SAVATRAN | South 5 acres of NESE 2-T5S-R5E Hamilton Co. IL | HC-0011 Bk 273 Pg614 | Owned | Yes |
| Warranty Deed | 2/28/2008 | Wilma June Willis to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SE 3-T5S-R5E Hamilton County IL containing 7.02 acres | HC-0012 Bk 273 Pg 321 | Owned | Yes |
| Easement | 11/3/2008 | Garry R. Heil & Karla Heil to Oeneus LLC d/b/a SAVATRAN | Pt. W/2 SW 16-T5S-R5E Hamilton Co. IL containing 10.08 acres | HC-0014 Bk216 Pg 221 | Owned | Yes |
| Warranty Deed | 9/15/2009 | David Willett & Robin Willett to Oeneus LLC d/b/a SAVATRAN | Undivided 1/2 interest pt SE/4 9-T5S-R5E Hamilton Co. IL containing 40 acres | HC-0015 Bk 274 Pg 445 Willett retained first right of refusal. | Owned | Yes |
| Warranty Deed | 9/30/2009 | Rickey L. Denham to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE/4 9-T5S-R5E Hamilton Co. IL containing 3.36 acres | HC-0016 Bk 274 Pg 535 The rail line goes through Mr. Denham's residence we had to replace the residence and barn. | Owned | Yes |
| Warranty Deed | 2/5/2008 | Melinda Hunter to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0017 Bk 273 Pg 290 Bennett Heirs. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 2/4/2008 | Joyce Annette Medley to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0018 Bk 273 Pg 293 Bennett Heirs. We deed her oil and gas back Quitclaim Deed 273/478 We did not option the oil and gas. | Owned | Yes |
| Warranty Deed | 5/7/2009 | Hobart J. Campbell & Helen B. Campbell to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 31-5-5 & pt NW/4 6-T5S-R5E containing 9.27 acres; Pt. SW/4 31-T5S-R5E containing 1.84 acres; Pt NW/4 6-T5S-R5E containing 1.28 acres Hamilton Co. IL | HC-0019 Bk 275 Pg 506 Both rail right of way and extra footage at Macedonia road crossing. | Owned | Yes |
| Warranty Deed | 10/10/2006 | Daniel R. Tennyson to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SE 6-T5S-R6E 3.21 acres Hamilton Co. IL 270-595 | HC-0020 Retained only rail right of way traded remainder to Kirsch. | Owned | Yes |
| Special Warranty Deed | 05/052009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. NEWS 6-T5S-R6E 13.003 acres Hamilton Co. IL | HC-0020 Bk 270 Pg 595 Portion traded to Kirsch. | Owned | Yes |
| Easement | 2/17/2009 | Wendell Myers & Judith Myers to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NESW 1-T5S-R5E Hamilton Co. IL containing 5.37 | HC-0021 Bk 216 Pg 654 Rail right of way easement | Owned | Yes |
| Warranty Deed | 2/5/2008 | Marilyn Ann Lynn to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0022 Bk 273 Pg 287 Bennett Heirs | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 10/25/2008 | Roy Dean Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0023 Bk 274 Pg 667 Bennett Heirs; Mr. Bennett refused to close we filed Specific Performance Complaint Mr. Bennett then decided to close. | Owned | Yes |
| Warranty Deed | 2/20/2008 | Mary Ellen Tennyson to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0024 Bk 273 Pg. 342 Bennett Heirs/ Mrs. Bennett has the option to repurchase. | Owned | Yes |
| Warranty Deed | 2/20/2008 | Robert L Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/5 interest to pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7 acres. | HC-0025 Bk 273 Pg. 318 Bennett Heirs/ Bennett has the option to repurchase. | Owned | Yes |
| Warranty Deed | 12/11/2009 | Joseph Rexing & Liudmyla Rexing to Oeneus LLC d/b/a SAVATRAN LLC | 22.68 acres all in Township 5 S. Range 5 E Hamilton Co IL | HC-0027 Bk 276 Pg 628  Mr. Rexing Refused to close filed suit forced to close etc. | Owned | Yes |
| Special Warranty Deed | 12/11/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Joseph Rexing | Pt. E/2 SW & pt. SENW of 20-T5S-R5E Hamilton Co. IL containing 112.13 acres | HC-0027 Bk  Pg Remainder of Judith Gregory traded to Rexing. | Owned | Yes |
| Warranty Deed | 2/14/2007 | Betty Gibbs to Oeneus LLC d/b/a SAVATRAN LLC | Surface only pt W/2 NW and N 10 Ac NWSW 10-T5S-R5E Hamilton Co. IL containing 11.83 acres | HC-0028 Bk 271 Pg 93 Retained only rail right of way traded remaining to Alan Kirsch Special | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | Warranty Deed Bk. 275 Pg 503 | | |
| Easement | 11/28/2006 | Jim Holms & Ruth Holms to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 & pt. W/2 SE/ 2-T5S-R5E Hamilton Co. IL containing 13.17 acres | HC-0029 Bk 212 Pg 209 Mr. Holms has the right to put a portion of his property to us upon completion of the rail. | Owned | Yes |
| Warranty Deed | 9/5/2009 | Judith A. Peters and Charles W. Peters to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in South 28.25 acres of W/2 SW 3-T5S-R5E Hamilton Co. IL | HC-0030 Bk 274 Pg 401 Kenny Waier has 10 year farming lease. Must relocate RLC water main. | Owned | Yes |
| Warranty Deed | 9/3/2009 | Jerry L. Stiverson; Paula J. Stiverson as individuals and as co-trustees of the Paula J Stiverson Trust to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in South 28.25 acres of W/2 SW 3-T5S-R5E Hamilton Co. IL | HC-0032 Bk 274 Pg 463 Kenny Waier has 10 yr farming lease. Must relocate RLC water main. | Owned | Yes |
| Corrected Warranty Deed | 9/5/2008 | Michael Hutchcraft and Melissa Hutchcraft to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest in pt SE/4 of 9-T5S-R5E containing 40 acres Hamilton Co IL | HC-0033 Bk 274 Pg 412 Deed Corrected to waive homestead rights. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/17/2007 | Laura Dennis f/k/a Laura Lane to Oeneus LLC d/b/a SAVATRAN | Pt NW NW 21-T5s-R5E being 300ft x 160ft. Hamilton Co. IL | HC-0034 Bk 271 Pg 494 Rail design went through Ms. Dennis house; house purchased and moved by Garry Heil. 0.17 acres of this property was conveyed to Dennis Smith by Special Warranty Deed 275/537 | Owned | Yes |
| Warranty Deed | 5/8/2009 | Katherine McRoy f/k/a Katherine Smith; Donald McRoy; Dennis L. Smith and Judy A. Smith to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW NW & Pt. NENW 21-T5S-R5E 3.37 acres Hamilton Co. IL | HC-0035 Bk275 Pg 541 | Owned | Yes |
| Warranty Deed | 7/30/2008 | Michael D. Burris & Tina Burris to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 21 & Pt. SW NW 21-T5S-R5E Hamilton County IL containing 15.72 acres | HC-0039 Bk 274 Pg237 | Owned | Yes |
| Special Warranty Deed | 7/30/2008 | Oeneus LLC d/b/a SAVATRAN LLC to Michael D. Burris & Tina Burris | Pt. NE/4 29-T5S-R5E Hamilton Co. IL containing 136.17 acres | HC-0039 Bk 274 Pg234 Traded pt Charlie Moore property HC-0004 | Owned | Yes |
| Warranty Deed | 11/6/2008 | Robert J. Gray & Denise Gray to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE/4 9-T5S-R5E Hamilton Co. IL containing 51.93 | HC-0040 274 Pg 715 Deed restriction of single family residence and grain farming only Mr. Gray's | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | son has a first right of refusal. | | |
| Warranty Deed | 7/26/2007 | Charles M. Bowers & Tammy Bowers to Oeneus LLC d/b/a SAVATRAN LLC | NE SE; W/2 SE NE 30-T5S-R5E Hamilton Co. IL containing 60 acres. | HC-0041 Bk 272 Pg 1 | Owned | Yes |
| Warranty Deed | 10/2/2008 | Jeffrey A. Lueke and Michele L. Lueke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW/4 16-T5S-R5E 2.65 acres; PT SWSE 9-T5S-R5E 0.02 acre Hamilton Co. IL | HC-0042 Bk 274 Pg 587 | Owned | Yes |
| Warranty Deed | 11/6/2007 | Jeffrey A. Lueke and Michele L. Lueke to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW/4 16-T5S-R5E 8.64 acres Hamilton Co. IL | HC-0042 Bk 272/710 | Owned | Yes |
| Warranty Deed | 5/5/2009 | Alan Kirsch & Denise Kirsch to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE/4 6-T5S-R6E & PT SESE 31-T4S-R6E 2.61 acres Hamilton Co. IL | HC-0043 Bk275/534 | Owned | Yes |
| Easement | 5/5/2009 | Alan Kirsch & Denise Kirsch to Oeneus LLC d/b/a SAVATRAN LLC | 8.33 acres pt SESE and E/2 SWSE 9-T5S-R5E; 7.36 acres pt NE/4 6-T5S-R6E & SESE 31-T4S-R6E; 2.70 ac pt NE 6-T5S-R6E Hamilton Co. IL | HC-0043 Bk 217/300 | Owned | No |
| Special Warranty Deed | 5/5/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. W/2 NW/4 10-T5S-R5E Hamilton Co. IL containing 11.51 & Pt W/2 NW/4 10-T5S-R5E containing 66.12 acres Hamilton Co. IL | HC-0043 Bk 275/503 (Traded the Betty Gibbs property less rail to Kirsch) | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 5/5/2009 | Oeneus LLC d/b/a SAVATRAN LLC to Alan Kirsch and Denise Kirsch | Pt. NW SE 6-T5S-R6E Hamilton County IL containing 13.03 acres; | HC-0043 Bk 275/499 (Traded the remainder of the Tennyson property to Kirsch) | Owned | Yes |
| Warranty Deed | 11/6/2008 | Kenneth A. Waier a/k/a Kenneth Waier to Oeneus LLC d/b/a SAVATRAN LLC | Pt SWSW & NWSW 32-T4S-R6E Hamilton Co IL containing 18.17 acres | HC-0044 274/711 (Kenny Waier has 10 yr farming agreement Galloway property) | Owned | Yes |
| Warranty Deed | 4/26/2009 | James Lee Maller to Oeneus LLC d/b/a SAVATRAN LLC | Pt SW/4 31-T5S-R5E Hamilton Co IL containing 5.11 acres | HC-0045 Bk 275/462 Rail line went through Mr. Mallers house and barn both have been removed. | Owned | Yes |
| Special Warranty Deed | 4/26/2009 | Oeneus LLC d/b/a SAVATRAN LLC to James Lee Maller | Pt. NE SE 36-T5S-R5E Franklin Co IL containing 5 acres | HC-0045 Bk 2009-1998 Property to purchase by SAVATAN 2009-1206 to replace Mr. Mallers homesite. | Owned | Yes |
| Warranty Deed | 3/25/2009 | Norman D. Melvin & Patricia K. Melvin to Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 SE/4 20-T5S-R5E Hamilton Co IL containing 12.14 acres | HC-0046 Bk 275/310 | Owned | Yes |
| Warranty Deed | 4/3/2009 | Gary Kearnery a/k/a Gary W. Kearney to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SWSW 20-T5S-R5E & pt NWNW 29-T5S-R5E Hamilton Co. IL containing 5acres | HC-0047 Bk275/362 | Owned | Yes |
| Warranty Deed | 12/8/2008 | Dale Miller & Denise Miller to Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 NW/4 31-T5S-R5E Hamilton Co. IL containing 7.51 acres | HC-0049 Bk274/873  We agreed by letter to relocate Mr. Millers water line. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 2/6/2009 | John M. Zelhart to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE/4 30-T5S-R5E Hamilton Co IL containing 1.0 acre | HC-0050 Bk 275/109 We agreed to build him an access road and gave him perpetual access to his property. | Owned | Yes |
| Warranty Deed | 3/6/2009 | Donald G. Zelhart & Margaret R. Zelhart as co-Trustees of Donald G. Zelhart Living Trust to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest to pt NE/4 30-T5S-R5E Hamilton Co IL containing 4.11 acres | HC-0051 Bk 275/663 Agreed to gravel access road & repurchase rights | Owned | Yes |
| Warranty Deed | 6/24/2008 | Judith G. Gregory to Oeneus LLC d/b/a SAVATRAN LLC | 6 acres pt SESW 20-T5S-R5E Hamilton Co IL | HC-0053 Bk 274/52 Traded 112 acres of this property to Joe Rexing. | Owned | Yes |
| Warranty Deed | 7/16/2008 | David Williams & Brandee Williams to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWNW 29-T5S-R5E Hamilton Co IL 0.65 acres | HC-0056 Bk274/141 Purchased house rail going through garage. House rented. | Owned | Yes |
| Rental Agreement | 9/12/2008 | SAVATRAN LLC to William Webb | Pt. NWNW 29-T5S-R5E Hamilton Co IL 0.65 acres | HC-57 Rented house. | Leased | No |
| Warranty Deed | 10/24/2008 | Alva James Bennett to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/20th Pt NW SE 3-T5S-R5E Hamilton Co. IL containing 7.02 acres | HC-0058 Bk 274/664 Mr. Bennett would not close. Filed partition suite to force closing. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 3/7/2009 | Wanda G. Downs & Cecil L Downs to Oeneus LLC d/b/a SAVATRAN LLC | Undivided 1/2 interest pt NE/4 30-T5S-R5E Hamilton Co IL containing 4.11 acres | HC-0059 Bk 275/667 Agreed to gravel access road & repurchase rights. | Owned | Yes |
| Corrected Warranty Deed | 11/17/2008 | Robert A. Williams & Barbara A. Williams to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SENE 1-T6S-R4E Franklin Co IL containing 4.474 | FC-0023 2008-6300 purchased house; house has been removed. | Owned | Yes |
| Warranty Deed | 10/10/2008 | James Gregory Payne, as trustee of James Gregory Payne Trust to Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 NE 11-T6S-R4E & pt W/2 NW 12-T6S-R4E Franklin Co. IL containing 15.33 acres | FC-0024 2008-5818 | Owned | Yes |
| Warranty Deed | 10/10/2008 | James Gregory Payne, as trustee of Zulene Payne Trust to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NE 11-T6S-R4E Franklin Co. IL containing 6.44 acres | FC-0025  2008-5817 | Owned | Yes |
| Warranty Deed | 1/11/2008 | Reba L. Stokes Revocable Living Trust by Reba L. Stokes & Kenneth D. Stokes to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NE;  NWSE;SWSE & SESW 1-T6S-R4E NWNE; NENW; N3/4 SE NW 12-T6S-R4E Franklin County IL | FC-0029 2008-0603 | Owned | Yes |
| Warranty Deed | 3/6/2008 | Morris R. Clark & Karan S. Clark to Oeneus LLC d/b/a SAVATRAN LLC | NE NE 1-T6S-R4E Franklin Co IL 40 acres | FC-0031 2008-1248 | Owned | Yes |
| Easement | 3/6/2008 | Morris R. Clark & Karan S. Clark to Oeneus LLC d/b/a SAVATRAN LLC | 0.685 of the SE SE 36 T5S-R4E Franklin Co IL | FC-0031 2008-1249 | Owned | Yes |
| Special Warranty Deed | 3/6/2008 | Oeneus LLC d/b/a/ SAVATRAN LLC to Morris R. Clark & Karan S. Clark | Pt. W/2 NW/4  28 T5S-R5E Hamilton Co. IL containing 74.36 acres | FC-0031 Bk273/361 Traded remained of Charlie Moore HC-0004 to Clarks. | Owned | Yes |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Quit Claim Deed | 4/7/2008 | Louise Harrison to Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW corner SE NE 1-T6S-R4E Franklin Co IL containing 1.26 | FC 2008-1877 | Owned | Yes |
| Quit Claim Deed | | Louise Harrison to Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE NE 1-T6S-R4E Franklin Co IL | FC 2009-5371 | Owned | Yes |
| | | | | | | |
| | | | | | | |
| **POND CREEK TO SUGAR CAMP CONNECTOR ROUTE** | | | | | | |
| | | | | | | |
| Recording Memo and Option to Purchase | 9/14/2007 | John H. Wiegand and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NE 10; Pt. NE NE10 T7S; R4E Franklin Co. IL | FC-0086 Purchase rail right of way. 2007-5356 | Owned | No |
| Recording Memo and Option to Purchase | 1/15/2008 | John H. Wiegand and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NE 10; Pt. NE NE10 T7S; R4E Franklin Co. IL | FC-0086 Purchase rail right of way opt 2 or plan B. 2008-0338 | Owned | No |
| Recording Memo and Option to Purchase | 9/18/2007 | Donald L. Bennett and Sharla Bennett and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 14; Pt NW SW 14 T6S R4E Franklin Co. IL | FC-0087 Purchase rail right of way. 2007-5293 | Owned | No |
| Recording Memo and Option to Purchase | 10/8/2007 | Daniel E. Harmon & Terri J. Harmon and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 2 T7S R4E Franklin Co. IL | FC-0106 Purchase rail right of way. 2007-5836 | Owned | No |
| Recording Memo and Option to Purchase | 10/10/2007 | Olen Max Harmon & Becky J Harmon and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 35 T6S R6E Franklin Co IL | FC-0108 Purchase rail right of way. 2007-5930 | Owned | No |
| Recording Memo and Option to Purchase | 10/11/2007 | Michael Pike & Brenda Pike and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE NE 27 T7S R4E Franklin Co. IL | FC-0109 Purchase rail right of way. | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 10/12/2007 | Marion Tow, George M. Tow & Karen L Tow and Oeneus LLC SAVATRAN LLC | Pt. SESE 22 T7S R4E Franklin Co. IL | FC-110 Purchase rail right of way. 2007-5931 | Owned | No |
| Recording Memo and Option to Purchase | 7/2/2008 | Marion Tow, George M. Tow & Karen L Tow and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SE SE 22 T7S R4E Franklin Co. IL | FC-110 Purchase of 12.1 acres in addition to right of way. 2008-3632 | Owned | No |
| Warranty Deed | 10/26/2007 | Carlton Heifner and Dixie Heifner and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW SW 22-T7S-R4E Franklin Co. IL 6 acres | FC-0111 Purchase of old rail bed. Hunting Lease to Marion Tow along rail bed. 2007-6200 | Owned | Yes |
| Warranty Deed | 4/25/2008 | Andrew C. Julian & Susan E. Julian and Oeneus LLC d/b/a SAVATRAN LLC | Pt.SW SE 10- T7S-R4E Franklin Co. IL 27.72 acres | FC-0112 Purchased house and rail right of way. House Rented to Eric Smith. | Owned | Yes |
| Recording Memo and Option to Purchase | 10/15/2007 | Gary L. Manis and Sharon L. Manis and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW NW 26-T6S-R4E Franklin Co. IL 4.65 acres | FC-0113 Purchase rail right of way. 2007-5932 | Owned | No |
| Recording Memo and Option to Purchase | 10/19/2007 | Eddie Essary and Eliane Essary and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSW 2-T7S-R4E Franklin Co. IL 2.25 acres | FC-0114 Purchase rail right of way. 2007-6073 | Owned | No |
| Recording Memo and Option to Purchase | 10/22/2007 | Cora Jane Taylor & Beth Benns and Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 NW 1; Pt.NWSW 11-T6S-R4E Franklin Co IL 24.86 acres | FC-0115 Purchase rail right of way and additional acres. 2007-6252 | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 11/9/2007 | David R. Payne & Rhonda Payne and Oeneus d/b/a SAVATRAN LLC | Pt.NWNE 15 T7S-R4E containing 9 ac; Pt. NW NW 26 T7S-R4E containing 4.64 acres Franklin Co. IL | FC-0122 Purchase rail right of way. 2007-6524 | Owned | No |
| Warranty Deed | 4/14/2008 | Robert G. Buntin and Marjorie A. Buntin as Trustees of the Robert G. Buntin and Marjorie A. Buntin Joint Living Trust, and Michael M. Buntin and Brenda Buntin as Trustees of the Michael M. Buntin and Brenda Buntin Joint Living Trust and Oeneus LLC d/b/a SAVATRAN | Pt. SW/4 23-6-4 Franklin County IL 7.07 acres; Pt. NW/4 23 and Pt. SW/14 T64-R4E Franklin Co 16.14 acres | FC-0123 Purchase rail right of way. 2008-2074 | Owned | Yes |
| Recording Memo and Option to Purchase | 11/12/2007 | Ruth E. Sweet & Danny Sweet and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 35 T7S R4E Franklin Co. IL 7.48 acres | FC-0125 Purchase of rail right of way. Will plant trees along right of way 2007-6522 | Owned | No |
| Recording Memo and Option to Purchase | 11/12/2007 | Ruth E. Sweet and Oeneus LLC d/b/a SAVATRAN LLC | Pt.SWNW 35 T7S R4E Franklin Co. IL 0.63 acres | FC-0126 Purchase of rail right of way. Purchased modular home and then sold and had moved. 2007-6523 | Owned | No |
| Warranty Deed | 4/23/2009 | James Gregory Payne, as trustee James Gregory Payne Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. E/2 SE NW & SW/4 11 T6S-R4E Franklin Co. Il 5.83 acres | FC-0130 Purchase of rail right of way. 2009-2110 | Owned | Yes |
| Recording Memo and Option to Purchase | 11/28/2007 | Ted Lawrence as Trustee of the Lawrence Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SW 2 T7S-R4E Franklin Co. IL 9.52 acres | FC-0131 Purchase of rail right of way and isolated land. Must plant trees | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| | | | | along rail 2007-6806 | | |
| Recording Memo and Option to Purchase | 11/30/2007 | Robert Leon McClerren & Cynthia McClerren and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NWSW 35 1.34 acres & Pt. W/2 NW 35 T7S-R4E Franklin Co. IL | FC-0132 Purchase of rail right of way. 2007-6905 | Owned | No |
| Recording Memo and Option to Purchase | 9/5/2008 | Robert Leon McClerren & Robert G. McClerren and Oeneus LLC d/b/a SAVATRAN LLC | Pt. SW/4 & Pt. NW SE 15 T7S R4E Franklin Co. IL 7.42 acres | FC-0132 Purchase rail right of way need to go around Jason Knight. 2008-5188 | Owned | No |
| Recording Memo and Option to Purchase | 11/28/2007 | Robert Shane Croslin and Jodi Croslin and Oeneus LLC d/b/a SAVATRAN LLC | pt. NWNW 35 4.53 acres; Pt. SWSW 26; Pt. NESE 27 4.71 acres T7S-R4E Franklin Co IL | FC-0133 Purchase rail right of way. 2007-6904 | Owned | No |
| Warranty Deed | 8/13/2008 | Anita Miller, Trustee Anita Miller Revocable Living Trust, and Oneida Ann Murphy as Trustee of the John Robert Miller Revocable Living Trust and Oeneus LLC d/b/a SAVATRAN LLC | Pt. S/2 SW 11-T6S-R4E Franklin Co IL containing 57.31 acres. | FC-0136 Purchase of rail right of way and DESIGNATED WET LANDS BANK 2008-5406 | Owned | Yes |
| Warranty Deed | 2/27/2009 | Stewart B Hungate and Oeneus LLC d/b/a SAVATRAN LLC | N/2 NE 27-T7S-4E Franklin Co IL containing 80 acres & a perpetual access easement | FC-0137 Purchase of rail right of way. 2009-1017 | Owned | Yes |
| Recording Memo and Option to Purchase and Amendment One | 1/18/2008 | R. Ernest Payne & Dorothy M. Payne and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 E/2 Section 15 T7S-R4E containing 12 acres; Pt. NE/4 of 22 T7S-R4E containing 23.33 acres | FC-0139 Purchase of rail right of way and rail right of way around Jason Knight. 2008-0389 | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Recording Memo and Option to Purchase | 2/19/2008 | Amos Clay Ing & Jo Ann Ing and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 SE 10 T7S-R4E Franklin Co. IL containing 4.64 acres | FC-0142 Purchase of rail right of way. FC 2008-1101 | Owned | No |
| Recording Memo and Option to Purchase | 3/5/2008 | Donald W. Manis & Delores J. Manis and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 35; Pt. W/2 SW 26 T6S-R4E Franklin Co IL 18.36 acres. | FC-0145 Purchase of rail right of way. FC 2008-1225 | Owned | No |
| Warranty Deed | 5/28/2008 | Dale Wes Williford & Melissa R Williford to Oeneus LLC d/b/a SAVATRAN LLC | N/2 NWNE 20 ac ±; N 10 ac NE NE T6S-R4E Franklin Co IL | FC-0152 Purchased for rail loop at Sugar Camp. FC 2008-2907 | Owned | Yes |
| Warranty Deed | 11/6/2009 | Mauris D Kern a/k/a Mauris Kern and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW SW 22-T7S-R4E 4.60 ac; Pt. NW SW 22 T7S-R4E 3.86 ac; Pt. S/2 S/2 22 T7S-R4E 39.01 ac; Pt. S/2 S/2 22 & NE NW 27 T7S-R4E 57.69 acres Franklin Co IL | FC-0159 Purchased rail right of way around Jason Knight. FC 2009-5485 | Owned | Yes |
| Warranty Deed | 11/3/2009 | Louis S Ison & Rose Ison and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 22 T7S-R4E Franklin Co IL  9.26 acres | FC-0160 Purchased rail right of way around Jason Knight. FC 2009-6069 | Owned | Yes |
| Recording Memo and Option to Purchase | 9/8/2008 | Kenneth D. Summers & Shelia K Summers and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NE SE 22; Pt. NWSW 23 T6S-R4E Franklin Co IL 9.31 acres | FC-0161 Purchase rail right of way and isolated land. FC 2008-5187 | Owned | No |
| Recording Memo and Option to Purchase | 10/25/2007 | Irene Wilkas and Oeneus LLC d/b/a SAVATRAN LLC | Pt. W/2 NW 2-T8S-R4E; Pt. NW SW 2 T8S-R4E; Pt. NESE 3 T8S-R4E Williamson County IL 15.73 acres. | WC-0106 Purchase rail right of way and isolated land. 308-59 | Owned | No |

| Description/Title of Document | Date | Parties | Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 6/30/2008 | Central Illinois Public Service d/b/a Ameren CIPS and Oeneus LLC d/b/a SAVATRAN LLC | Pt. NW NW 2 T8S-R4E Williamson Co IL 0.28 ac | WC-0142 rail easement. 312-800 | Owned | Yes |
| | | | | | | |
| **SHAWNEETOWN RAIL LINE** | | | | | | |
| | | | | | | |
| Warranty Deed | 3/1/2007 | Jeffrey J. Drone & Toni L. Drone to Oeneus LLC d/b/a SAVATAN LLC | Pt. S/2 NE & Pt. N/2 SE 20 T9S-R7E; W/2 NW 28; E/2 NE 29 & access road T9S- R7E Saline Co. IL containing 227 acres. | SC-0009 Farm Leased to Jeff Drone. 1900-923 | Owned | Yes |
| Warranty Deed | 11/20/2007 | Jimmie G. Rodgers & Billie Rodgers to Oeneus LLC d/b/a SAVATRAN LLC | E/2 NW 4 T9S-R6E Saline Co IL 80 acres | SC-0017 Farm Leased to Jeff Drone. 1927-505 | Owned | Yes |
| Warranty Deed | 11/20/2007 | Oeneus LLC d/b/a SAVATRAN to Jimmie G. Rodgers & Billie Rodgers | Pt. SE 20 T9S-R7E Saline Co IL 89.864 acres | SC-0017 Farm Leased to Jeff Drone. 1927-508 | Owned | Yes |
| Warranty Deed | 8/29/2007 | James D. Kuhlman and Andrew M. Freebourn to Oeneus LLC d/b/a SAVATRAN LLC | NW NE 3 T9S-R6E Saline Co IL 40 acres | SC-0018 All woods no farm lease. 1921-463 | Owned | Yes |
| Quit Claim Deed | 5/23/2007 | CSX Transportation Inc and SAVATRAN LLC | six parcels lying in Gallatin County beginning at Equality and ending at Shawneetown individually referred to as Tracts 1,4,5A,6,8,and 42 containing 21.809 acres | GC-0004 Abandoned Rail Line across Gallatin County. 501-111 | Owned | Yes |

Debtor Grantor:

ADENA RESOURCES, LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 5/6/2009 | Mason, Marilyn Trustee & Adena Resources | Pt. SW Sec 31-5-3 & Pt. NW Sec 6-6-3 as described | Water & power lines, Complete, FC-0213, FC2009-2758 | Owned | No |

Debtor/ Grantor:

AMERICAN CENTURY TRANSPORT LLC

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/8/2016 | American Energy Corporation to American Century Transport LLC | See legal description set forth in the deed. | 201600000427 | Owned | Yes |

DEBTOR/GRANTOR:

HILLSBORO ENERGY LLC
12051 N. 9th Avenue
Hillsboro, IL  62049

**Montgomery County, Illinois**

**Bond County, Illinois (Coal Reserves only)**

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease and Sublease Agreement | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Short Form of Lease (Hillsboro) | 10/10/2009 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1346-428 | Leased | |
| Amendment No. 1 to the Coal Mining Lease and Sublease Agreement | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Short Form of Lease (Hillsboro) | 1/11/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1367-226 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amendment No. 2 to the Coal Mining Lease and Sublease Agreement | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Amended and Restated Short Form of Lease After Closing 4 and Closing 5 (Hillsboro) | 10/4/2010 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1412-134 <br><br> BC 917-329 | Leased | |
| Amendment No. 3 to the Coal Mining Lease and Sublease Agreement | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Amended and Restated Short Form of Lease After Closing 3 (Hillsboro) | 1/13/2011 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1426-275 | Leased | |
| Amended and Restated Short Form of Lease After Closing 6 (Hillsboro) | 2/2/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1477-459 <br><br> BC 964-143 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Amended and Restated Short Form of Lease After Closing 7 & 8 (Hillsboro) | 8/21/2012 | WPP LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Coal Mining Lease Agreement | 9/21/2007 | Montgomery Mineral LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| First Partial Termination of Lease | 9/9/2009 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | |
| Second Partial Termination of Lease | 1/8/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | |
| Third Partial Termination of Lease | 10/4/2010 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Fourth Partial Termination of Lease | 1/13/2011 | Montgomery Mineral LLC to Hillsboro Energy LLC | Terminated leasehold rights to certain No. 6 coal seam | Not recorded | Leased | |
| Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 1" and "Reserve 3") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-176  BC 910-257 | Leased | |
| Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | Not recorded | Leased | |
| Short Form or Memorandum of Coal Mining Lease (For "Reserve 2") | 8/12/2010 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1399-135  BC 910-286 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | | Leased | |
| Short Form or Memorandum of First Amendment to Colt Coal Lease 2 | 8/21/2012 | Colt LLC to Hillsboro Energy LLC | No. 6 coal seam | MC 1508-455 | Leased | |
| Deed | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Mine Site<br><br>RDA 1 & 2<br><br>Farmland & Bleeder Site #1 | 201000059726 | Owned | |
| Easement | 8/12/2010 | Montgomery Land Company to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201000059723 | Owned | |
| Easement | 5/9/2011 | George & Martha Spinner to Hillsboro Energy LLC | Corridor from Mine Site to Bleeder Shaft #1 | 201100063970 | Owned | |
| Deed | 8/23/2013 | Hillsboro Energy LLC to Hillsboro Transport, LLC | Loadout | 201300003499 | Owned | |

Schedule XIII-A to
Collateral Questionnaire

## LOCATIONS OF MINES AND MINING FACILITIES

**ALL MATERIAL RENTS ARE DISCLOSED IN COMBINED SCHEDULES XI AND XII**

**Macoupin Energy LLC**

Say No. 1 Mine
14300 Brushy Mound Road
Carlinville, Illinois  62626

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease | 1/27/10 | WPP LLC and Macoupin Energy LLC | Macoupin South Mine Assignment | | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | Macoupin North Mine Assignment | Not Recorded | Leased | Yes |
| Short Form of Lease | 8/12/2010 | Colt LLC and Macoupin Energy LLC | East Hornsby Mine Assignment | Not Recorded | Leased | Yes |
| Special Warranty Deed | 1/22/2009 | ExxonMobil Coal USA, Inc and Macoupin Energy LLC | Various tracts of surface and coal reserves.  The coal reserves were sold to WPP or Colt and leased back.  The surface not required for operations has been conveyed to New River Royalty LLC | MA-0019 493145 | Owned | Yes |
| Lease | 1/27/10 | HOD LLC and Macoupin Energy LLC | Rail Loop | Not Recorded | Leased | Yes |
| Lease | 1/27/10 | HOD LLC and Macoupin Energy LLC | Rail Load Out | Not | Leased | Yes |
| Option and Lease Agreement | 2/28/1967 | Jet Oil Company and Macoupin Energy LLC | Coal Reserves | Volume 628, Page 456 | Leased | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Lease | 2/7/2019 | Foresight Energy, LLC/Macoupin to Keyrock, LLC | Methane Gas lease | Document not recorded | Leased | |

**Sugar Camp Energy, LLC**

M-Class Mine
11351 N Thompsonville Road
Macedonia, Illinois  62860

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Mining Lease | 7/29/2005 | RGGS Land & Minerals & SCELLC | Properties located in Franklin County IL as described in Exhibit A | 2006-6919 | Leased | Yes |
| Consent to Mine | 1/22/2010 | Ruger Coal Company, LLC & SCELLC | Consent with respect to Illinois Fuels Lease | FC-0233 | Leased | Yes |
| Warranty Deed | 1/15/2009 | Rodney Smith and Marta Smith to SCELLC | PT Lot 121 and PT Lot 122 in Kokopelli Estates | Surface WC-0152, WC481-772 | Leased | Yes |
| Easement | 3/4/2010 | Glendall E Johnston a.k.a. Glen Johnston and Carolyn S. Johnston, a.k.a. Carolyn Johnston, husband and Wife to SCELLC | NW NW Sec 1-6-4 and NWNE Sec 1-6-4 Franklin County, Illinois | FC-0253 2010-1056 | Owned | Yes |
| Easement | 3/4/2010 | Morris R. Clark and Karan S. Clark to SCELLC | NWNE and W2E2NE Sec 2-6-4 Franklin, Illinois | FC-0254 2010-1057 | Owned | Yes |
| Easement | 3/1/2010 | David Blood and Melanie Blood, husband and wife to SCELLC | Pt E2NENE Sec 2-6-4 Franklin County, Illinois  2010-1058 | FC-0255 | Owned | Yes |
| Easement | 6/5/2010 | Roger L. Sanders and Mary Ellen Sanders to SCELLC | W 10 ac N3/4 of NESE Sec 6-6-5 Hamilton County, Illinois | HC-0078 221-117 | Owned | Yes |
| Warranty Deed | 6/1/2010 | Patrick G Mascal and Lori S. Mascal to SCELLC | W2NESW and E2S2NWSW Sec 6-6-5 Hamilton Illinois | HC-0075 277/311 | Owned | Yes |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to SCELLC | Right to mine on Illinois Fuels TVA Lease | Not Recorded | Leased | Yes |
| Overriding Royalty Interest Agreement | 8/12/2010 | Ruger Coal Company LLC to SCELLC | Right to Mine on Franklin County TVA Lease | Not Recorded | Leased | No |
| Deed | 8/12/2010 | Williamson Development Company LLC to SCELLC | Surface required for SCELLC Operations | Not Recorded | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to SCELLC | Surface in Hamilton County required for SCELLC Operations | Not Recorded | Owned | Yes |
| Deed | 8/12/2010 | Williamson Development Company LLC to SCELLC | Surface at former Akin site required for SCELLC Operations | Not Recorded | Owned | Yes |
| Coal Mining Lease | 8/12/2010 | Ruger Coal Company LLC to SCELLC | Coal Reserves | Not Recorded | Leased | Yes |
|  |  |  |  |  |  |  |
| Mining Lease | 01/04/18 | Roberts, Carol Ann Trustee  to SCELLC | Sugar Camp Mine Plan | HC 2018-0008 | Leased |  |
| Mining Lease | 01/04/18 | Engstrom, Amy  to SCELLC | Sugar Camp Mine Plan | HC 2018-0011 | Leased |  |
| Mining Lease | 01/04/18 | Hayes, Marshall Jr.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0013 | Leased |  |
| Mining Lease | 01/04/18 | Blanchard, Bonnie M.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0016 | Leased |  |
| Mining Lease | 01/04/18 | Palmer, James  to SCELLC | Sugar Camp Mine Plan | HC 2018-0017 | Leased |  |
| Mining Lease | 01/04/18 | Moxley, Linda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0018 | Leased |  |
| Coal Deed | 01/04/18 | Johnson, Susan L.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0019 | Owned |  |
| Mining Lease | 01/30/18 | McFarland, Carol A.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0110 | Leased |  |
| Mining Lease | 01/30/18 | Bowman, Debra Kate  to SCELLC | Sugar Camp Mine Plan | HC 2018-0111 | Leased |  |
| Mining Lease | 01/30/18 | Diaz, Donna J.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0112 | Leased |  |
| Mining Lease | 01/30/18 | Flannigan, James T.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0113 | Leased |  |
| Mining Lease | 01/30/18 | Leslie, Janet E.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0114 | Leased |  |
| Mining Lease | 01/30/18 | Reid, Jon M.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0115 | Leased |  |
| Mining Lease | 01/30/18 | Webster, Linda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0116 | Leased |  |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 01/30/18 | Henson, William  to SCELLC | Sugar Camp Mine Plan | HC 2018-0119 | Leased | |
| Coal Deed | 01/30/18 | Wake, Amanda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0120 | Owned | |
| Coal Deed | 01/30/18 | Trabant, Megan  to SCELLC | Sugar Camp Mine Plan | HC 2018-0121 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Pamela S.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0122 | Owned | |
| Coal Deed | 01/30/18 | Metheney, Rochelle  to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Owned | |
| Mining Lease | 01/30/18 | Bloomfield, Dora  to SCELLC | Sugar Camp Mine Plan | HC 2018-0123 | Leased | |
| Mining Lease | 01/30/18 | Flannigan, Donald  to SCELLC | Sugar Camp Mine Plan | HC 2018-0124 | Leased | |
| Mining Lease | 01/30/18 | Smith, Sharon  to SCELLC | Sugar Camp Mine Plan | HC 2018-0126 | Leased | |
| Mining Lease | 02/08/18 | Wood, Betty A.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0171 | Leased | |
| Mining Lease | 02/08/18 | Irish, Carol V.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0172 | Leased | |
| Mining Lease | 02/08/18 | Wicker, Darrell  to SCELLC | Sugar Camp Mine Plan | HC 2018-0173 | Leased | |
| Mining Lease | 02/08/18 | Kathleen M. Wright  to SCELLC | Sugar Camp Mine Plan | HC 2018-0174 | Leased | |
| Mining Lease | 02/08/18 | Irish, Lloyd Paul  to SCELLC | Sugar Camp Mine Plan | HC 2018-0175 | Leased | |
| Mining Lease | 02/08/18 | Patterson, Paul J.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0176 | Leased | |
| Mining Lease | 02/08/18 | Wicker, Paul R.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0177 | Leased | |
| Mining Lease | 02/28/18 | Krois, Bonnie C.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0270 | Leased | |
| Coal Deed | 02/28/18 | Tabor, Stephanie  to SCELLC | Sugar Camp Mine Plan | HC 2018-0271 | Owned | |
| Mining Lease | 02/28/18 | Petitte, Clyda  to SCELLC | Sugar Camp Mine Plan | HC 2018-0272 | Leased | |
| Mining Lease | 02/28/18 | Patterson, Emily Jo to SCELLC | Sugar Camp Mine Plan | HC 2018-0273 | Leased | |
| Mining Lease | 02/28/18 | Allen, Jane to SCELLC | Sugar Camp Mine Plan | HC 2018-0274 | Leased | |
| Coal Deed | 02/28/18 | Spaven, Laverne  to SCELLC | Sugar Camp Mine Plan | HC 2018-0276 | Owned | |
| Mining Lease | 02/28/18 | Jackson, Patricia Snyder to SCELLC | Sugar Camp Mine Plan | HC 2018-0277 | Leased | |
| Mining Lease | 02/28/18 | Gioia, Virginia M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0278 | Leased | |
| Mining Lease | 02/28/18 | Moffett, William R.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0279 | Leased | |
| Mining Lease | 02/28/18 | O'Dell, William to SCELLC | Sugar Camp Mine Plan | HC 2018-0280 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 02/28/18 | Reid, Dennis P. to SCELLC | Sugar Camp Mine Plan | HC 2018-0281 | Leased | |
| Coal Deed | 02/28/18 | Griffith, Janice Sue  to SCELLC | Sugar Camp Mine Plan | HC 2018-0284 | Owned | |
| Mining Lease | 02/28/18 | Knight, Kenneth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0287 | Leased | |
| Coal Deed | 02/28/18 | Metheney, Rickie W.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0289 | Owned | |
| Mining Lease | 02/28/18 | Olson, Ruth E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0291 | Leased | |
| Mining Lease | 02/28/18 | Sandy, Susan E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0293 | Leased | |
| Coal Deed | 02/28/18 | Miller, Micah A. & Marietta  to SCELLC | Sugar Camp Mine Plan | HC 2019-2023 | Owned | |
| Mining Lease | 04/06/18 | Mudge, Evelyn M. to SCELLC | Sugar Camp Mine Plan | HC 2018-0806 | Leased | |
| Mining Lease | 04/12/18 | Higginson, Leslie K. to SCELLC | Sugar Camp Mine Plan | HC 2018-0527 | Leased | |
| Coal Deed | 04/12/18 | Farris, Brenda K.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0528 | Owned | |
| Mining Lease | 04/12/18 | Cook, Becky Lynn to SCELLC | Sugar Camp Mine Plan | HC 2018-0529 | Leased | |
| Mining Lease | 04/12/18 | Snyder, Diane M.  to SCELLC | Sugar Camp Mine Plan | HC 2018-0530 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Kevin J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0531 | Leased | |
| Mining Lease | 04/12/18 | Wohlers, Karen J. to SCELLC | Sugar Camp Mine Plan | HC 2018-0532 | Leased | |
| Mining Lease | 04/12/18 | Heckert, Lauri to SCELLC | Sugar Camp Mine Plan | HC 2018-0533 | Leased | |
| Mining Lease | 04/12/18 | Page, Mary Jane by Sidney Bennett III AIF to SCELLC | Sugar Camp Mine Plan | HC 2018-0534 | Leased | |
| Mining Lease | 04/12/18 | Comp ton, Paulette N. to SCELLC | Sugar Camp Mine Plan | HC 2018-0535 | Leased | |
| Mining Lease | 04/12/18 | Taylor, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2018-0536 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Carol Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-0537 | Leased | |
| Mining Lease | 04/12/18 | O'Dell, Casey Joel to SCELLC | Sugar Camp Mine Plan | HC 2018-0538 | Leased | |
| Mining Lease | 05/08/18 | Lowman, Timothy A. to SCELLC | Sugar Camp Mine Plan | HC 2018-0548 | Leased | |
| Mining Lease | 05/08/18 | Neal, Douglas Allen to SCELLC | Sugar Camp Mine Plan | HC 2018-0754 | Leased | |
| Mining Lease | 05/08/18 | Williams, J. Mark to SCELLC | Sugar Camp Mine Plan | HC 2018-0755 | Leased | |
| Mining Lease | 05/08/18 | Barker, Lynne E. to SCELLC | Sugar Camp Mine Plan | HC 2018-0756 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 05/08/18 | Knight, Stephen L. to SCELLC | Sugar Camp Mine Plan | HC 2018-0757 | Leased | |
| Mining Lease | 05/08/18 | Neal, Walter Blake to SCELLC | Sugar Camp Mine Plan | HC 2018-0759 | Leased | |
| Coal Deed | 05/11/18 | Noma, Inc  to SCELLC | Sugar Camp Mine Plan | HC 2018-1036 | Owned | |
| Mining Lease | 05/16/18 | Hake, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-0807 | Leased | |
| Mining Lease | 05/16/18 | Hosner, Irene Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0808 | Leased | |
| Mining Lease | 05/16/18 | Duckworth, Nina Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0811 | Leased | |
| Mining Lease | 05/16/18 | Bailey, Velma Neal to SCELLC | Sugar Camp Mine Plan | HC 2018-0812 | Leased | |
| Mining Lease | 05/16/18 | Lovan, W. Robert to SCELLC | Sugar Camp Mine Plan | HC 2018-0813 | Leased | |
| Mining Lease | 05/16/18 | Neal, William Jerry to SCELLC | Sugar Camp Mine Plan | HC 2018-0814 | Leased | |
| Coal Deed | 06/27/18 | Bow ton, Barbara G.  to SCELLC | Sugar Camp Mine Plan | HC 2018-1027 | Owned | |
| Coal Deed | 06/27/18 | Whets tone, Dennis W.  to SCELLC | Sugar Camp Mine Plan | HC 2018-1028 | Owned | |
| Coal Deed | 06/27/18 | Whets tone, William R.  to SCELLC | Sugar Camp Mine Plan | HC 2018-1029 | Owned | |
| Coal Deed | 06/27/18 | Smith, Bernice  to SCELLC | Sugar Camp Mine Plan | HC 2018-1030 | Owned | |
| Coal Deed | 06/27/18 | Thompson, Beatrice % Billy E. Walker AIF  to SCELLC | Sugar Camp Mine Plan | HC 2018-1031 | Owned | |
| Coal Deed | 06/27/18 | First Church of the Nazarene  to SCELLC | Sugar Camp Mine Plan | HC 2018-1032 | Owned | |
| Coal Deed | 06/27/18 | Linn, Karen R.  to SCELLC | Sugar Camp Mine Plan | HC 2018-1034 | Owned | |
| Mining Lease | 06/27/18 | Seibert, Charles Ellis to SCELLC | Sugar Camp Mine Plan | HC 2018-1037 | Leased | |
| Mining Lease | 06/27/18 | Seibert, James Thomas to SCELLC | Sugar Camp Mine Plan | HC 2018-1038 | Leased | |
| Mining Lease | 06/27/18 | Drake, Terry W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1041 | Leased | |
| Mining Lease | 06/27/18 | Scott, Betsy Dawn to SCELLC | Sugar Camp Mine Plan | HC 2018-1042 | Leased | |
| Mining Lease | 06/27/18 | Lane, John Bradley to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 06/27/18 | Drake, Mark W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1045 | Leased | |
| Coal Deed | 06/27/18 | Mendyk, Julie to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Joyce Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1086 | Leased | |
| Mining Lease | 07/05/18 | Metheney, Donald W. to SCELLC | Sugar Camp Mine Plan | HC 2018-1084 | Leased | |
| Coal Deed | 07/05/18 | Sandidge, Joyce to SCELLC | Sugar Camp Mine Plan | HC 2018-1085 | Owned | |
| Coal Deed | 07/05/18 | Smith, Leon to SCELLC | Sugar Camp Mine Plan | HC 2018-1087 | Owned | |
| Coal Deed | 07/05/18 | Smith, Richard H. to SCELLC | Sugar Camp Mine Plan | HC 2018-1088 | Owned | |
| Mining Lease | 07/05/18 | Wall, Ronald M. to SCELLC | Sugar Camp Mine Plan | HC 2018-1089 | Leased | |
| Mining Lease | 07/18/18 | Martin, Marianne B. to SCELLC | Sugar Camp Mine Plan | HC 2018-1157 | Leased | |
| Mining Lease | 07/18/18 | Wilkie, Mary Jean to SCELLC | Sugar Camp Mine Plan | HC 2018-1158 | Leased | |
| Mining Lease | 07/18/18 | Jones, Michael J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1159 | Leased | |
| Mining Lease | 07/18/18 | Martin, Janet J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1160 | Leased | |
| Mining Lease | 07/30/18 | Kleber, LLC to SCELLC | Sugar Camp Mine Plan | HC 2018-1222 | Leased | |
| Mining Lease | 08/08/18 | Vickers, Rhonda Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1271 | Leased | |
| Mining Lease | 08/08/18 | Pike, Brenda L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1272 | Leased | |
| Mining Lease | 08/08/18 | Schwenn, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1273 | Leased | |
| Mining Lease | 08/14/18 | Lane, Juanita Dare to SCELLC | Sugar Camp Mine Plan | HC 2018-1301 | Leased | |
| Coal Deed | 08/14/18 | Metheney, Miranda to SCELLC | Sugar Camp Mine Plan | HC 2018-1302 | Owned | |
| Mining Lease | 08/14/18 | Yancey, George to SCELLC | Sugar Camp Mine Plan | HC 2018-1303 | Leased | |
| Mining Lease | 08/28/18 | Knob Prairie Baptist Cemetery Association to SCELLC | Sugar Camp Mine Plan | HC 2018-1040 | Leased | |
| Coal Deed | 09/12/18 | Buchanan, Cynthia E. to SCELLC | Sugar Camp Mine Plan | HC 2018-1439 | Owned | |
| Coal Deed | 09/12/18 | Brophy, Romaine widow of James Brophy to SCELLC | Sugar Camp Mine Plan | HC 2018-1440 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 09/12/18 | Wright, Donald L. to SCELLC | Sugar Camp Mine Plan | HC 2018-1441 | Leased | |
| Mining Lease | 09/12/18 | Dorion, Rhona to SCELLC | Sugar Camp Mine Plan | HC 2018-1442 | Leased | |
| Mining Lease | 09/12/18 | Wright, Laura to SCELLC | Sugar Camp Mine Plan | HC 2018-1443 | Leased | |
| Mining Lease | 10/03/18 | Simmons, Gavin T. to SCELLC | Sugar Camp Mine Plan | HC 2018-1523 | Leased | |
| Mining Lease | 10/03/18 | Wright, Curtis D. to SCELLC | Sugar Camp Mine Plan | HC 2018-1524 | Leased | |
| Mining Lease | 10/03/18 | Lane, Riley Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1525 | Leased | |
| Mining Lease | 10/24/18 | Winter, Carrie L Trust to SCELLC | Sugar Camp Mine Plan | HC 2018-1662 | Leased | |
| Mining Lease | 10/24/18 | Smith, Brett to SCELLC | Sugar Camp Mine Plan | HC 2018-1663 | Leased | |
| Mining Lease | 10/24/18 | Johnson, Flora Wymond to SCELLC | Sugar Camp Mine Plan | HC 2018-1665 | Leased | |
| Mining Lease | 10/24/18 | Collins, Sandra Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1666 | Leased | |
| Mining Lease | 10/24/18 | Koptez, Steven Gerald to SCELLC | Sugar Camp Mine Plan | HC 2018-1667 | Leased | |
| Mining Lease | 10/24/18 | Decker, Mary Lee to SCELLC | Sugar Camp Mine Plan | HC 2018-1783 | Leased | |
| Coal Deed | 10/30/18 | Jenkins, Thomas R  to SCELLC | Sugar Camp Mine Plan | HC 2018-1692 | Owned | |
| Mining Lease | 10/30/18 | Dry, Margaret Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1693 | Leased | |
| Mining Lease | 10/30/18 | Lane, Sydney Drew to SCELLC | Sugar Camp Mine Plan | HC 2018-1694 | Leased | |
| Mining Lease | 10/30/18 | touma, Elizabeth Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1695 | Leased | |
| Mining Lease | 10/30/18 | Myers, Phyllis Ann to SCELLC | Sugar Camp Mine Plan | HC 2018-1696 | Leased | |
| Mining Lease | 11/19/18 | Palmer, Gary to SCELLC | Sugar Camp Mine Plan | HC 2018-1785 | Leased | |
| Mining Lease | 11/19/18 | Jordon, Flora Johnson to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 11/20/18 | Waggoner, Amanda J to SCELLC | Sugar Camp Mine Plan | FC 2018-4821 | Leased | |
| Mining Lease | 11/20/18 | Bohannon, Barbara Ann to SCELLC | Sugar Camp Mine Plan | FC 2018-4822 | Leased | |
| Mining Lease | 11/20/18 | Otterson, Lloyd L. to SCELLC | Sugar Camp Mine Plan | FC 2018-4823 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 12/11/18 | Goforth, Heather J. to SCELLC | Sugar Camp Mine Plan | HC 2018-1905 | Leased | |
| Mining Lease | 12/11/18 | Goforth,  Matthew R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1906 | Leased | |
| Mining Lease | 12/11/18 | Smith, Kerry to SCELLC | Sugar Camp Mine Plan | HC 2018-1907 | Leased | |
| Mining Lease | 12/11/18 | Johnson, Katherine Elizabeth to SCELLC | Sugar Camp Mine Plan | HC 2018-1908 | Leased | |
| Mining Lease | 12/18/18 | Wright, Shelia P. to SCELLC | Sugar Camp Mine Plan | HC 2018-1974 | Leased | |
| Mining Lease | 12/18/18 | Wright, Richard A. to SCELLC | Sugar Camp Mine Plan | HC 2018-1975 | Leased | |
| Mining Lease | 12/18/18 | Wright, Michael S. to SCELLC | Sugar Camp Mine Plan | HC 2018-1976 | Leased | |
| Mining Lease | 12/18/18 | Brown, Gary R. to SCELLC | Sugar Camp Mine Plan | HC 2018-1977 | Leased | |
| Coal Deed | 01/09/19 | Jenkins, Mike  to SCELLC | Sugar Camp Mine Plan | HC 2019-0057 | Owned | |
| Mining Lease | 01/09/19 | Jenkins, Hellen to SCELLC | Sugar Camp Mine Plan | HC 2019-0058 | Leased | |
| Mining Lease | 01/09/19 | Bayne, Janet Jenkins to SCELLC | Sugar Camp Mine Plan | HC 2019-0059 | Leased | |
| Mining Lease | 01/09/19 | Jenkins, James J. to SCELLC | Sugar Camp Mine Plan | HC 2019-0060 | Leased | |
| Mining Lease | 01/16/19 | Wright, Steven Ray to SCELLC | Sugar Camp Mine Plan | HC 2019-0097 | Leased | |
| Mining Lease | 01/16/19 | Wright, Ida Louise to SCELLC | Sugar Camp Mine Plan | HC 2019-0098 | Leased | |
| Coal Deed | 01/29/19 | The Bonnie Camp Meeting  to SCELLC | Sugar Camp Mine Plan | HC 2019-0150 | Owned | |
| Coal Deed | 02/01/19 | Barnhill, Ruth Eloise Short  to SCELLC | Sugar Camp Mine Plan | HC 2019-0168 | Owned | |
| Coal Deed | 02/01/19 | Rappe, John James  to SCELLC | Sugar Camp Mine Plan | HC 2019-0169 | Owned | |
| Mining Lease | 02/01/19 | Willis, Bruce E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0172 | Leased | |
| Mining Lease | 02/01/19 | Knott, Elaine Mae to SCELLC | Sugar Camp Mine Plan | HC 2019-0173 | Leased | |
| Mining Lease | 02/01/19 | Seibert, John Walter to SCELLC | Sugar Camp Mine Plan | HC 2019-0174 | Leased | |
| Coal Deed | 02/08/19 | Short, Leon  to SCELLC | Sugar Camp Mine Plan | HC 2019-0210 | Owned | |
| Coal Deed | 02/08/19 | Avolt, Kathleen Eagan  to SCELLC | Sugar Camp Mine Plan | HC 2019-0218 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Deed | 02/08/19 | Avolt, Donna H. to SCELLC | Sugar Camp Mine Plan | HC 2019-0219 | Owned | |
| Mining Lease | 02/13/19 | Wall, Letitia to SCELLC | Sugar Camp Mine Plan | HC 2019-0223 | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | not recorded | Leased | |
| Mining Lease | 02/14/19 | Rexing, Joseph L. to SCELLC | Sugar Camp Mine Plan | not recorded | Leased | |
| Mining Lease | 02/19/19 | Hoffman, Elaine W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0245 | Leased | |
| Coal Deed | 03/12/19 | Banning, David W. to SCELLC | Sugar Camp Mine Plan | HC 2019-0368 | Owned | |
| Mining Lease | 03/22/19 | Kinsey, Frances E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0416 | Leased | |
| Mining Lease | 03/22/19 | Willis, George Darin to SCELLC | Sugar Camp Mine Plan | HC 2019-0417 | Leased | |
| Mining Lease | 03/22/19 | Burns, Lenore E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0418 | Leased | |
| Mining Lease | 03/22/19 | Gill, Lorella E. to SCELLC | Sugar Camp Mine Plan | HC 2019-0419 | Leased | |
| Mining Lease | 03/22/19 | Oberreiter, Jean Ann (Evans) to SCELLC | Sugar Camp Mine Plan | HC 2019-0420 | Leased | |
| Coal Deed | 03/22/19 | Doyle, Kymbra Drasil to SCELLC | Sugar Camp Mine Plan | HC 2019-0421 | Owned | |
| Coal Deed | 03/27/19 | Higgins, Cynthia Ann to Elaine May Knott | Sugar Camp Mine Plan | HC 2019-0446 | Owned | |
| Coal Deed | 03/28/19 | Short, Dian to SCELLC | Sugar Camp Mine Plan | HC 2019-0463 | Owned | |
| Coal Deed | 03/28/19 | Short, Richard to SCELLC | Sugar Camp Mine Plan | HC 2019-0464 | Owned | |
| Coal Deed | 04/03/19 | South Side Christian Church to SCELLC | Sugar Camp Mine Plan | HC 2019-0507 | Owned | |
| Mining Lease | 04/10/19 | Yorgan, Jennifer to SCELLC | Sugar Camp Mine Plan | HC 2019-0558 | Leased | |
| Mining Lease | 04/10/19 | Edmonds, James G. to SCELLC | Sugar Camp Mine Plan | HC 2019-0559 | Leased | |
| Mining Lease | 04/23/19 | Crowder, Nancee L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0669 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Patrick L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0671 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Scott L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0672 | Leased | |
| Mining Lease | 04/23/19 | Gunn, Kenneth to SCELLC | Sugar Camp Mine Plan | HC 2019-0673 | Leased | |
| Mining Lease | 05/01/19 | Foresight Energy LP to SCELLC | Sugar Camp Mine Plan | not recorded | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Mining Lease | 05/08/19 | Camden, Randy to SCELLC | Sugar Camp Mine Plan | HC 2019-0750 | Leased | |
| Mining Lease | 05/08/19 | Davis, Tamera L. to SCELLC | Sugar Camp Mine Plan | HC 2019-0751 | Leased | |
| Mining Lease | 05/30/19 | Fitts, David F. to SCELLC | Sugar Camp Mine Plan | HC 2019-0851 | Leased | |
| Coal Deed | 06/03/19 | Avolt, Geoffrey Barth to SCELLC | Sugar Camp Mine Plan | HC 2019-0870 | Owned | |
| Mining Lease | 06/10/19 | Buchman, Diana Sue Wright to SCELLC | Sugar Camp Mine Plan | HC 2019-0896 | Leased | |
| Mining Lease | 06/10/19 | Willis, Robert James to SCELLC | Sugar Camp Mine Plan | HC 2019-0897 | Leased | |
| Mining Lease | 06/10/19 | Sears, James R. & Gloria to SCELLC | Sugar Camp Mine Plan | HC 2019-0898 | Leased | |
| Mining Lease | 06/19/19 | Wise, Melodie Lea to SCELLC | Sugar Camp Mine Plan | HC 2019-0962 | Leased | |
| Mining Lease | 06/19/19 | Walker, Edwin N. to SCELLC | Sugar Camp Mine Plan | HC 2019-0963 | Leased | |
| Mining Lease | 07/17/19 | O'Dell, Paula J. to SCELLC | Sugar Camp Mine Plan | HC 2019-1079 | Leased | |
| Mining Lease | 07/17/19 | Walker, Ivan W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1080 | Leased | |
| Mining Lease | 07/25/19 | Hut ton, Catherine Ann to SCELLC | Sugar Camp Mine Plan | HC 2019-1118 | Leased | |
| Coal Deed | 07/25/19 | Nuss, Richard E. Sr. to SCELLC | Sugar Camp Mine Plan | HC 2019-1120 | Owned | |
| Mining Lease | 08/01/19 | Miltenberger, Cheryl G. to SCELLC | Sugar Camp Mine Plan | HC 2019-1162 | Leased | |
| Mining Lease | 08/01/19 | Lohman, Sandra E. to SCELLC | Sugar Camp Mine Plan | HC 2019-1163 | Leased | |
| Mining Lease | 08/01/19 | Entwistle, Craig W. to SCELLC | Sugar Camp Mine Plan | HC 2019-1164 | Leased | |
| Coal Deed | 08/28/19 | Society of St. Vincent de Paul Archdiocesan Council toSCELLC | Sugar Camp Mine Plan | HC 2019-1317 | Owned | |
| Mining Lease | 08/28/19 | Entwistle, Jacquelyn Marie to SCELLC | Sugar Camp Mine Plan | HC 2019-1318 | Leased | |
| Mining Lease | 08/28/19 | Oliver, Mil ton Donald to SCELLC | Sugar Camp Mine Plan | HC 2019-1318 | Leased | |
| Mining Lease | 09/24/19 | Prusha, Thomas M. to SCELLC | Sugar Camp Mine Plan | HC 2019-1584 | Leased | |
| Coal Deed | 10/09/19 | Lowe, Debra Short to SCELLC | Sugar Camp Mine Plan | HC 2019-1697 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Coal Deed | 11/14/19 | Lewis, Phyllis Ann  to SCELLC | Sugar Camp Mine Plan | HC 2019-1869 | Owned | |
| Coal Deed | 11/14/19 | Duncan, Barbara Joan  to SCELLC | Sugar Camp Mine Plan | HC 2019-1870 | Owned | |
| Coal Deed | 11/14/2019 | McKinney, Marsha  to SCELLC | Sugar Camp Mine Plan | HC 2019-1871 | Owned | |
| Coal Deed | 11/14/2019 | Kniffen, Susan  to SCELLC | Sugar Camp Mine Plan | HC 2019-1872 | Owned | |
| Coal Deed | 11/14/19 | Blackwell, William Loyd  to SCELLC | Sugar Camp Mine Plan | HC 2019-1873 | Owned | |
| Mining Lease | 11/14/19 | Flannigan, Monty D. to SCELLC | Sugar Camp Mine Plan | HC 2019-1874 | Leased | |
| Mining Lease | 11/20/19 | Irish, Wilmot Wheeler to SCELLC | Sugar Camp Mine Plan | HC 2019-1903 | Leased | |
| Coal Deed | 11/26/19 | McIntosh, Mark E.  to SCELLC | Sugar Camp Mine Plan | HC 2019-1945 | Owned | |
| Mining Lease | 12/10/19 | Bergen County Animal Shelter to SCELLC | Sugar Camp Mine Plan | FC 2019-4869 | Leased | |
| Mining Lease | 01/16/20 | Moore, Carolyn F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0098 | Leased | |
| Mining Lease | 01/16/20 | Rucker, Lezlie J. to SCELLC | Sugar Camp Mine Plan | HC 2020-0099 | Leased | |
| Mining Lease | 01/16/20 | Cooper, Rene F. to SCELLC | Sugar Camp Mine Plan | HC 2020-0100 | Leased | |
| Coal Deed | 01/21/20 | Drake, Roger  to SCELLC | Sugar Camp Mine Plan | HC 2020-0109 | Owned | |
| Mining Lease | 01/21/20 | Debow, Carolyn S. to SCELLC | Sugar Camp Mine Plan | HC 2020-0110 | Leased | |
| Mining Lease | 01/21/20 | Drake, Daphne to SCELLC | Sugar Camp Mine Plan | HC 2020-0111 | Leased | |
| Mining Lease | 02/18/20 | Rocky Mountain Lions Eye Institute Foundation, Inc. to SCELLC | Sugar Camp Mine Plan | HC 2020-0319 | Leased | |
| Mining Lease | 02/18/20 | Hoppe, Judy H. to SCELLC | Sugar Camp Mine Plan | HC 2020-0320 | Leased | |
| Mining Lease | 02/27/20 | Musselman, James Jay to SCELLC | Sugar Camp Mine Plan | HC 2020-0378 | Leased | |

**Williamson Energy, LLC**

Pond Creek No. 1 Mine
16468 Liberty School Road
Marion, IL 62959

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Short Form of Lease as amended | 8/14/2006 | WPP LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Franklin County: Doc 2006-6571<br><br>Williamson County: Misc. 301 page 480 | Leased | Yes |
| Short Form of Lease and Sublease | 5/1/2005 | Williamson Development Company LLC and Williamson Energy LLC | Coal Reserves in Williamson County, Illinois | Misc 291 page 461 | Leased | Yes |
| Short Form of Lease | 3/13/2006 | Independence Land Company, LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Illinois | Misc 301 Page 479 | Leased | Yes |
| First Amended and Restated Lease (Coal Prep Plant) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Processing Plant | Misc 313 Page 620 | Leased | Yes |
| Coal Mining Lease and Sublease | 8/12/10 | Colt LLC and Williamson Energy, LLC | Coal Reserves in Williamson County, Il | TBD | Leased | Yes |
| First Amended and Restated Lease (Rail Load Out Lease) | 10/15/2006 | Williamson Development Company, LLC and Williamson Energy, LLC | Pond Creek Rail Load Out | Misc 313 Page 619 | Leased | Yes |
| Deed | 8/12/10 | Williamson Development Company, LLC and Williamson Energy, LLC | Surface required for Williamson Energy, LLC Operations[4] | TBD | Owned | Yes |

---

[4] This excludes the real property released pursuant to that certain Fifth Amendment and Partial Release of Fee and Leasehold Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of September 26, 2016, by and between Williamson Energy, LLC, as Mortgagor, and Citibank, N.A., in its capacity as Agent, consisting of approximately 28.55 acres of surface land.

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Easement | 8/12/10 | Williamson Development Company, LLC and Williamson Energy, LLC | "Snake areas" required for Williamson Energy, LLC Operations | Not Recorded | Owned | Yes |
| Ground Lease | 8/12/10 | Eberhart to Williamson Development Company, LLC assigned to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 325-900 | Leased | Yes |
| Ground Lease | 8/12/10 | Summers to Independence Land Company, LLC to Williamson Energy, LLC | Ground lease required for Williamson Energy, LLC Operations | WC 327-750 | Leased | Yes |
| Warranty Deed | 6/14/2018 | Diana S. Dulle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-4356 | Owned | |
| Warranty Deed | 7/13/2018 | Linda Duncan to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5209 | Owned | |
| Warranty Deed | 7/20/2018 | Jeremy W. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-5434 | Owned | |
| Warranty Deed | 8/20/2018 | Lora L. Jones to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6259 | Owned | |
| Warranty Deed | 8/20/2018 | Shirley N. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6258 | Owned | |
| Warranty Deed | 9/4/2018 | Debra Ellen Moser to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6707 | Owned | |
| Warranty Deed | 9/4/2018 | Larry Dean Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6706 | Owned | |
| Warranty Deed | 9/4/2018 | Jerry R. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6705 | Owned | |
| Warranty Deed | 9/4/2018 | Wilma K. Harpole to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6704 | Owned | |
| Warranty Deed | 9/4/2018 | Kimberly A. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6703 | Owned | |
| Warranty Deed | 9/4/2018 | Gerald Lee Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6702 | Owned | |
| Warranty Deed | 9/4/2018 | Wendall Ray Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-6701 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 9/24/2018 | Edward W. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7338 | Owned | |
| Warranty Deed | 9/24/2018 | Barbara Jean Newton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7337 | Owned | |
| Warranty Deed | 9/24/2018 | Debra L. Caplick to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7336 | Owned | |
| Warranty Deed | 9/24/2018 | Don N. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7335 | Owned | |
| Warranty Deed | 9/24/2018 | Jim D. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7334 | Owned | |
| Warranty Deed | 9/24/2018 | Susan Elaine Bethard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7333 | Owned | |
| Warranty Deed | 9/24/2018 | Jerry D. Brookman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7332 | Owned | |
| Warranty Deed | 9/24/2018 | Linda E. Rector to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7331 | Owned | |
| Warranty Deed | 9/24/2018 | Marion E. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7330 | Owned | |
| Warranty Deed | 9/24/2018 | Sarah J. Glazebrook Perry to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7329 | Owned | |
| Warranty Deed | 10/16/2018 | Michelle McCabe-Doyle to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7977 | Owned | |
| Warranty Deed | 10/16/2018 | Richard R. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7976 | Owned | |
| Warranty Deed | 10/16/2018 | Robert Shon Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7975 | Owned | |
| Warranty Deed | 10/16/2018 | Elizabeth Jeanne Culli to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-7974 | Owned | |
| Warranty Deed | 10/23/2018 | Kathy Scott to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8178 | Owned | |
| Warranty Deed | 11/07/2018 | Roger W. Glazebrook to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-8581 | Owned | |
| Warranty Deed | 11/27/2018 | Tommy R. Sursa to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9311 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 12/03/2018 | Allen E. Heinbokel to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9490 | Owned | |
| Warranty Deed | 12/18/2018 | Jeremiah Wesley Seaman to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9920 | Owned | |
| Warranty Deed | 12/18/2018 | Alexandra Lewis DeMarino to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2018-9919 | Owned | |
| Warranty Deed | 1/07/2019 | Shannon Lee Brand to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-147 | Owned | |
| Warranty Deed | 1/31/2019 | Michael James Lewis to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-727 | Owned | |
| Warranty Deed | 1/31/2019 | Karolyn Kay Fullerton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-726 | Owned | |
| Mining Lease | 3/5/2019 | Susan E. Denton to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1569 | Leased | |
| Warranty Deed | 3/18/2019 | Ronald L. Smith to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-1877 | Owned | |
| Warranty Deed | 8/27/2019 | Deloris J. Hoehn to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | WC 2019-6215 | Owned | |
| Warranty Deed | 1/26/2018 | James Walter Hoyt to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-407 | Owned | |
| Warranty Deed | 2/13/2018 | Brenda Dora Spencer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-633 | Owned | |
| Warranty Deed | 3/21/2018 | Patricia K. Dyer to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1127 | Owned | |
| Warranty Deed | 3/21/2018 | Diana L. Bischler to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1126 | Owned | |
| Mining Lease | 3/23/2018 | Lisa M. Engeling to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1177 | Leased | |
| Warranty Deed | 4/19/2018 | Jeanette Fortney to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-1539 | Owned | |
| Mining Lease | 7/13/2018 | Jerry K. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-2781 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 8/1/2018 | Lorna Lynn Hines to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3095 | Owned | |
| Warranty Deed | 8/1/2018 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3094 | Owned | |
| Warranty Deed | 8/10/2018 | Brian M. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3251 | Owned | |
| Mining Lease | 8/29/2018 | Paula T. Hartzel, et al to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3551 | Leased | |
| Warranty Deed | 9/5/2018 | Janet J. Griffin to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3642 | Owned | |
| Warranty Deed | 9/5/2018 | Gary P. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3641 | Owned | |
| Warranty Deed | 9/5/2018 | Barbara Giles to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3640 | Owned | |
| Warranty Deed | 9/18/2018 | Katherine Ann Bradley to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-3870 | Owned | |
| Warranty Deed | 10/17/2018 | Shirley Whitehead to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4400 | Owned | |
| Warranty Deed | 10/23/2018 | Barbara Faye Sharkey to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2018-4481 | Owned | |
| Warranty Deed | 2/1/2019 | Emma L. Stetson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-335 | Owned | |
| Warranty Deed | 3/26/2019 | Ronald L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1004 | Owned | |
| Warranty Deed | 4/2/2019 | Sarah Greenwade to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1134 | Owned | |
| Warranty Deed | 4/2/2019 | Susan L. Naucke to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1154 | Owned | |
| Warranty Deed | 4/17/2019 | Brock D. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1351 | Owned | |
| Warranty Deed | 4/17/2019 | James Keith Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1352 | Owned | |
| Warranty Deed | 4/23/2019 | Marilyn S. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1419 | Owned | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 5/14/2019 | Miranda B. Harris to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1752 | Owned | |
| Warranty Deed | 5/14/2019 | Charlotte Jean to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-1751 | Owned | |
| Warranty Deed | 7/1/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2388 | Owned | |
| Mining Lease | 7/17/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2618 | Owned | |
| Warranty Deed | 7/17/2019 | Judith A. Woodard to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2617 | Owned | |
| Warranty Deed | 7/17/2019 | Debra Krantz to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2616 | Owned | |
| Warranty Deed | 7/24/2019 | Norma Adams Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2732 | Owned | |
| Warranty Deed | 7/30/2019 | Phillip R. Erthall to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2832 | Owned | |
| Warranty Deed | 7/30/2019 | Robert H. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-2833 | Owned | |
| Warranty Deed | 8/13/2019 | Kenneth L. Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3062 | Owned | |
| Warranty Deed | 8/13/2019 | William Wilmert to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3061 | Owned | |
| Warranty Deed | 9/4/2019 | Linda S. Lear to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3389 | Owned | |
| Deed | 9/16/2019 | Steven H. Machura to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3554 | Owned | |
| Warranty Deed | 10/17/2019 | Sharon A. Aiken-Peterson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-3990 | Owned | |
| Warranty Deed | 10/30/2019 | Raven N. Fager to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4153 | Owned | |
| Mining Lease | 11/05/2019 | Mary Lou Zech to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4251 | Leased | |

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Warranty Deed | 11/14/2019 | Daniel L. Johnson to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4371 | Owned | |
| Warranty Deed | 11/26/2019 | Colleen L. Taylor to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2019-4559 | Owned | |
| Warranty Deed | 2/25/2020 | Paula Kay Osteen-Cortez to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-728 | Owned | |
| Warranty Deed | 2/25/2020 | Monta Ray Jennings to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-726 | Owned | |
| Warranty Deed | 2/25/2020 | Robbie L. Osteen to Williamson Energy, LLC | Coal Reserves for Williamson Energy, LLC Operations | FC 2020-727 | Owned | |

**American Century Transport LLC**

Preparation Plant
43521 Mayhugh Hill Rd, Beallsville
OH 43716

Material Properties:

| Description/Title of Document | Date | Parties | Brief Legal Description | Recording Information | Owned or Leased | Subject to Mortgage |
|---|---|---|---|---|---|---|
| Special Warranty Deed | 1/8/2016 | American Energy Corporation to American Century Transport LLC | See legal description set forth in the deed. | 201600000427 | Owned | Yes |

Schedule XIII-B to Collateral Questionnaire

**MINING LEASES**

**WILLIAMSON ENERGY, LLC**:

1.  Amended and Restated Coal Mining Lease Agreement dated August 14, 2006 between WPP LLC, Lessor and Williamson Energy, LLC, Lessee, as amended.

2.  Coal Mining Lease and Sublease between Steelhead Development Company LLC (n/k/a Williamson Development Company LLC) and Williamson Energy, LLC dated May 1, 2005, as amended.

3.  Coal Mining Lease Agreement between Independence Land Company, LLC and Williamson Energy, LLC (5000-Foot Extension) dated March 13, 2006, as amended.

4.  First Amended and Restated Lease (Coal Prep Plant) dated October 15, 2006 between Williamson Energy, LLC and Williamson Development Company LLC.

5.  Amended and Restated Surface Sublease and Operation Agreement dated October 15, 2006 between Williamson Energy, LLC and Williamson Transport, LLC.

6.  Amended and Restated Surface Sublease and Operation Agreement dated October 15, 2006 between Williamson Energy, LLC and Williamson Track LLC.

7.  Coal Mining Lease and Sublease dated August 12, 2010 by and between Colt LLC as lessor and Williamson Energy, LLC as lessee, as amended.

**SUGAR CAMP ENERGY, LLC**:

1.  Coal Mining Lease dated July 29, 2005 between RGGS Land & Minerals LTD., L.P., Lessor and Sugar Camp Energy, LLC, Lessee, as amended. FC 2006-6919

2.  First Amendment to Coal Mining Lease dated August 11, 2008 between RGGS Land & Minerals, LTD, L.P. and Sugar Camp Energy, LLC. FC 2008-4441

3.  Illinois Coal Lease dated July 1, 2002 between United States of America, acting through its legal agent, the Tennessee Valley Authority, Lessor, and Illinois Fuel Company, LLC, Lessee (as assigned to Ruger Coal Company, LLC under that Assignment and Assumption Agreement dated August 4, 2009 by and among the United States of America, acting through its legal agent, the Tennessee Valley Authority, Lessor, Illinois Fuel Company, LLC, Assignor, and Ruger Coal Company, LLC, Assignee, and expressly granting Sugar Camp Energy LLC the right to mine the reserves subject to the Lease). FC 2007-5822

4.  Coal Mining Lease dated August 12, 2010 by and between Ruger Coal Company LLC as lessor and Sugar Camp Energy, LLC as lessee. FC 0283

5.  Contract Mining and Overriding Royalty Agreement dated August 12, 2010 by and between Ruger Coal Company LLC and Sugar Camp Energy, LLC (related to Illinois Fuels lease). FC 0290

6. Contract Mining and Overriding Royalty Agreement dated August 12, 2010 by and between Ruger Coal Company LLC and Sugar Camp Energy, LLC, as amended (related to Franklin County lease).  FC 0283

7. Franklin County Coal Lease dated July 1, 2002 between United States of America, acting through its legal agent, the Tennessee Valley Authority, Lessor, and Ruger Coal Company, Inc., Lessee, as assigned by Ruger Coal Company, Inc. to Ruger Coal Company, LLC, as amended. FC 2007-5132

**MACOUPIN ENERGY LLC**:

1. Coal Mining Lease and Sublease Agreement dated January 27, 2009 between WPP, LLC, Lessor and Macoupin Energy LLC, Lessee.

2. Lease Agreement dated January 27, 2009 between HOD, LLC, Lessor and Macoupin Energy LLC (Macoupin Rail Loop Lease), as amended.

3. Lease Agreement dated January 27, 2009 between HOD, LLC, Lessor and Macoupin Energy LLC, Lessee (Macoupin Rail Loadout), as amended.

4. Option and Lease Agreement made and entered into as of February 28, 1967, by and between Jet Oil Company, as Lessor, and James F. Gatewood, Trustee, under trust established by an agreement dated January 13, 1967 and known as the Gatewood-J Trust, as Lessee, a short form of which was recorded in Volume 628, Page 456 of the Macoupin County, Illinois Miscellaneous Records, as amended and/or assigned (the "SEIP Lease" or "Jet Lease").

5. Assignment of Leases dated January 27, 2009 between Macoupin Energy LLC, Assignor and WPP LLC, Assignee.

6. Corrective Assignment of Leases dated August 12, 2010 between Macoupin Energy LLC, Assignor and WPP LLC, Assignee.

7. Coal Mining Lease and Sublease (Unassigned Reserves) dated August 12, 2010 by and between Colt LLC as lessor and Macoupin Energy LLC as lessee, as amended.

8. Coal Mining Lease and Sublease (Macoupin North Mine Assignment) dated August 12, 2010 by and between Colt LLC as lessor and Macoupin Energy LLC as lessee.

## FILINGS AND JURISDICTION

| Grantor | Collateral | Instrument | Filing Jurisdiction |
|---|---|---|---|
| Foresight Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Energy GP LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Adena Resources, LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Franklin County, Illinois |
| Adena Resources, LLC | As-Extracted Collateral | UCC-1 Fixture Filing | Franklin County, Illinois |
| Adena Resources, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Akin Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| American Century Mineral LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| American Century Transport LLC | Owned Real Property | Fee Mortgage/Deed of Trust and Fixture Filing | Belmont County, Ohio |
| American Century Transport LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Coal Field Construction Company LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Coal Field Repair Services LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Coal Sales LLC | Personal Property. | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Energy Employee Services Corporation | Personal Property. | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Energy Finance Corporation | Personal Property. | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Energy Labor LLC | Personal Property. | UCC-1 Financing Statement | Delaware Secretary of State |

| Grantor | Collateral | Instrument | Filing Jurisdiction |
|---|---|---|---|
| Foresight Energy Services LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Foresight Receivables LLC | Personal Property | UCC-1 Financing Statement | Secretary of State |
| Hillsboro Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Hillsboro Transport LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| LD Labor Company LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Logan Mining LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| M-Class Mining, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Mach Mining, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Macoupin Energy LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Macoupin County, Illinois |
| Macoupin Energy LLC | As-Extracted Collateral | UCC-1 Fixture Filing | Macoupin County, Illinois |
| Macoupin Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| MaRyan Mining LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Oeneus LLC d/b/a Savatran LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Hamilton, Franklin, Williamson, Gallatin and Saline Counties, Illinois |
| Oeneus LLC d/b/a Savatran LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Patton Mining LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Seneca Rebuild LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Sitran LLC | Personal Property | UCC-1 Financing | Delaware |

| Grantor | Collateral | Instrument | Filing Jurisdiction |
|---|---|---|---|
|  |  | Statement | Secretary of State |
| Sugar Camp Energy, LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Franklin and Saline Counties, Illinois |
| Sugar Camp Energy, LLC | As-Extracted Collateral | UCC-1 Fixture Filing | Franklin and Saline Counties, Illinois |
| Sugar Camp Energy, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Tanner Energy LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Viking Mining LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |
| Williamson Energy, LLC | Owned and Leased Real Property | Fee and Leasehold Mortgage/Deed of Trust and Fixture Filing | Williamson Franklin and Saline Counties, Illinois |
| Williamson Energy, LLC | As-Extracted Collateral | UCC-1 Fixture Filing | Williamson Franklin and Saline Counties, Illinois |
| Williamson Energy, LLC | Personal Property | UCC-1 Financing Statement | Delaware Secretary of State |

**Schedule XV
to Collateral Questionnaire**

**RAILCARS**

| Description/ Title of Document | Parties | Brief Legal Description | Owned or Leased |
|---|---|---|---|
| Rental Agreement | THE AMERICAN COAL COMPANY to SAVATRAN LLC | 220 railcars | Leased |
| Rental Agreement | RLH1LLC to OENEUS LLC d/b/a SAVATRAN LLC | 98 railcars - expired/returning | Leased |
| Rental Agreement | ALF P-I, Inc. to OENEUS LLC d/b/a SAVATRAN LLC | 113 railcars | Leased |
| Rental Agreement - Schedule No. 2 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 296 railcars - expired/returning | Leased |
| Rental Agreement - Schedule No. 3 | INFINITY TRANSPORT 2018-1, LLC to SAVATRAN LLC | 90 railcars | Leased |
| Rental Agreement - Schedule No. 5 | THE CIT GROUP/EQUIPMENT FINANCING, INC to SAVATRAN LLC | 115 railcars | Leased |
| Rental Agreement - Schedule No. 6 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 11 railcars | Leased |
| Rental Agreement - Schedule No. 7 | CIT BANK, N.A. to SAVATRAN LLC | 27 railcars | Leased |
| Rental Agreement - Schedule No. 8 | THE CIT GROUP/EQUIPMENT FINANCING, INC to SAVATRAN LLC | 40 railcars | Leased |
| Rental Agreement - Schedule No. 9 | THE CIT GROUP/EQUIPMENT FINANCING, INC to SAVATRAN LLC | 25 railcars | Leased |
| Rental Agreement - Schedule No. 10 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 80 railcars | Leased |
| Rental Agreement - Schedule No. 13 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 150 railcars | Leased |
| Rental Agreement - Schedule No. 14 | THE CIT GROUP/EQUIPMENT FINANCING, INC to SAVATRAN LLC | 108 railcars | Leased |
| Rental Agreement - Schedule No. 15 | CIT RAILCAR FUNDING COMPANY, LLC to SAVATRAN LLC | 42 railcars | Leased |
| Rental Agreement | Riverside Rail ILLC, as ultimate assignee of BBRX Five LLC to Savatan LLC | 119 railcars | Leased |
| Rental Agreement | NBinv Riverside Cars 1, LLC, CCIX LLC and DCM RAIL LLC and Riverside Rail I LLC to Savatran LLC | 124 railcars | Leased |

**Schedule XVI**
**To Collateral Questionnaire**

**UNUSUAL TRANSACTIONS**

1. On August 23, 2013, the Company distributed 100% of its ownership interest in Adena Resources, LLC, Sitran LLC and Hillsboro Energy LLC to its members.  During the first quarter of 2015, Foresight Reserves, LP and a member of the Company's management contributed their 100% equity interest in Adena Resources, LLC, Akin Energy LLC, Hillsboro Transport LLC and Sitran LLC to the Company.

*EXHIBIT C-1*

**FORM OF TERM LOAN NOTE**

FOR VALUE RECEIVED, FORESIGHT ENERGY LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to [  ] or registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of $[ ] or so much thereof as shall constitute the aggregate principal amount of Term Loans made by the Lender to the Borrower under that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

The Borrower promises to pay interest on the unpaid principal amount of each Term Loan from the date of such Term Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender in Dollars and in Same Day Funds at the Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Note is one of the Term Loan Notes (as defined in the Credit Agreement) referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is also entitled to the benefits of the Guaranty. Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note may either become or be declared to be immediately due and payable all as provided in the Credit Agreement. Term Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount, currency and maturity of its Term Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

**FORESIGHT ENERGY LLC**

By:      _____
Name:  _____
Title:   _____

**LOANS AND PAYMENTS WITH RESPECT THERETO**

| Date | Type of Loan Made | Amount of Loan Made | End of Interest Period | Amount of Principal or Interest Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|-------------------|---------------------|------------------------|------------------------------------------------|-----------------------------------------|------------------|

*EXHIBIT C-2*

### FORM OF ROLL-UP LOAN NOTE

FOR VALUE RECEIVED, FORESIGHT ENERGY LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to [  ]  or registered assigns (the "Lender"), in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of $[ ] or so much thereof as shall constitute the aggregate principal amount of Roll-Up Loans made by the Lender to the Borrower under that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

The Borrower promises to pay interest on the unpaid principal amount of each Roll-Up Loan from the date of such Roll-Up Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement.  All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender in Dollars and in Same Day Funds at the Administrative Agent's Office.  If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Note is one of the Roll-Up Loan Notes (as defined in the Credit Agreement) referred to in the Credit Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein.  This Note is also entitled to the benefits of the Guaranty.  Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note may either become or be declared to be immediately due and payable all as provided in the Credit Agreement. Roll-Up Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business.  The Lender may also attach schedules to this Note and endorse thereon the date, amount, currency and maturity of its Roll-Up Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

**FORESIGHT ENERGY LLC**

By: _____
Name: _____
Title: _____

**LOANS AND PAYMENTS WITH RESPECT THERETO**

| Date | Type of Loan Made | Amount of Loan Made | End of Interest Period | Amount of Principal or Interest Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|-------------------|---------------------|------------------------|------------------------------------------------|-----------------------------------------|------------------|

*EXHIBIT D*

## FORM OF COMPLIANCE CERTIFICATE

To:    Cortland Capital Market Services LLC, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

The undersigned Responsible Officer hereby certifies as of the date hereof that he/she is the            of    the Borrower, and that, as such, he/she is authorized to execute and deliver this Certificate to the Administrative Agent on the behalf of the Borrower, and that:

*[Use following paragraph 1 for fiscal **year-end** financial statements]*

1.    Attached hereto as Schedule 1 are the year-end audited financial statements required by Section 6.01(a) of the Credit Agreement for the fiscal year of the Borrower ended as of the above date, together with the report and opinion of an independent certified public accountant required by such section.[4]

*[Use following paragraph 1 for fiscal **quarter-end** financial statements]*

2.    Attached hereto as Schedule 1 are the unaudited financial statements required by Section 6.01(b) of the Credit Agreement for the fiscal quarter of the Borrower ended as of the above date.  Such financial statements fairly present in all material respects the financial condition, results of operations, changes in shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP as at such date and for such period, subject only to normal year-end audit adjustments and the absence of footnotes.

3.    The undersigned has reviewed and is familiar with the terms of the Credit Agreement and has made, or has caused to be made under his/her supervision, a review of the financial condition of the Borrower during the accounting period covered by the attached financial statements.

4.    A review of the activities of the Borrower during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Borrower performed and observed all of its Obligations under the Loan Documents, and

*[select one:]*

---

[4]    In the event that Holdings or any Parent reports on a consolidated basis, such consolidated reporting at Holdings or such Parent's level in a manner consistent with that described in clauses (a) and (b) of this Section 6.01 for the Borrower will satisfy the requirements of such clauses.

**[to the best knowledge of the undersigned during such fiscal period, the Borrower performed and observed each covenant of the Loan Documents applicable to it and no Default or Event of Default has occurred and is continuing.]**

*—or—*

**[the following covenants have not been performed or observed and the following is a list of each such Default or Event of Default and its nature and status:]**

[5.     Except for the following Subsidiaries which are in the process of complying with the requirements of Section 6.12 of the Credit Agreement, as of the date hereof, there is no Subsidiary that is required to be a Guarantor, by virtue of the definition of Guarantor.][5]

[[6].     Since the [Closing Date][date of the last Compliance Certificate delivered by the Borrower pursuant to Section 6.02(a)], the Loan Parties have acquired the following Material Real Property:][6]

[7].     Unless as stated otherwise in a certificate of a Responsible Officer attached hereto, there has been no material change in accounting policies or financial reporting practices by the Borrower or any Subsidiary.

---

[5]     To include only if any Subsidiary that is not a Guarantor is required to become a Guarantor by virtue of the definition thereof as of the date of the Compliance Certificate.

[6]     To be included if any Material Real Property is acquired during the period specified, listing applicable Loan Party, nature of interest, location and, if leased, name and address of lessor.

*IN WITNESS WHEREOF*, the undersigned has executed this Certificate as of        ,          .

**FORESIGHT ENERGY LLC**

By: _____

Name: _____

Title: _____

For the Quarter/Year ended                    ("Statement Date")

**SCHEDULE 1**
to the Compliance Certificate

[See attached]

*EXHIBIT E*

**FORM OF ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption Agreement (this "Assignment") is dated as of the Closing Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "Standard Terms and Conditions") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Closing Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of the outstanding rights and obligations of the Assignor under the respective facilities identified below (including, without limitation, guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1.    Assignor:

2.    Assignee:                              [and is an Affiliate/Approved Fund of [*identify Lender*][7]]

3.    Borrower:                             FORESIGHT ENERGY LLC

4.    Administrative Agent: Cortland Capital Market Services LLC, as the Administrative Agent under the Credit Agreement

5.    Credit Agreement:                     Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March [  ], 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party

---

[7]    Select as applicable.

E - 1

hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

1.      Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[8] |
|---|---|---|---|
| [9] | $ | $ | $        % |
| | $ | $ | $        % |
| | $ | $ | $        % |

[7.    Trade Date:                    ][10]

Closing Date:      , 20      [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE CLOSING DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]
By: _____
        Title: _____

ASSIGNEE
[NAME OF ASSIGNEE]
By: _____
        Title: _____

[Consented to and][11] Accepted:

Cortland Capital Market Services LLC, as the Administrative Agent under the Credit Agreement]

By: _____
        Title: _____

[Consented to:

FORESIGHT ENERGY LLC


By: _____
Title: ][12]

_____

[8]     Set forth, to at least 10 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[9]     Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Initial Term Loan", "Delayed Draw Term Loan Commitment", "Delayed Draw Term Loan", "Roll-Up Loan", etc.)

[10]    To be completed if the Assignor and the Assignee intend that the minimum assignment amount is to be determined as of the Trade Date.

[11]    To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[12]    To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.  Note that the Borrower shall be deemed to have consented to an assignment unless it shall have objected thereto by written notice to the Administrative Agent within three (3) Business Days after having received notice thereof.

*ANNEX 1 TO ASSIGNMENT AND ASSUMPTION*

**CREDIT AGREEMENT**

**STANDARD TERMS AND CONDITIONS FOR**

**ASSIGNMENT AND ASSUMPTION**

1.      <u>Representations and Warranties</u>.

1.1.      <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.      <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement (subject to receipt of such consents as may be required under the Credit Agreement) and is not a Defaulting Lender, Disqualified Institution, a Loan Party or Affiliated Lender, (iii) from and after the Closing Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to <u>Section 6.01</u> thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on any Agent or any other Lender, and (v) if it is not an existing Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee (including an Administrative Questionnaire, all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, and all applicable tax forms); and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      <u>Payments</u>.  From and after the Closing Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Closing Date and to the Assignee for amounts which have accrued from and after the Closing Date.

3.      <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

*EXHIBIT F*

**[RESERVED]**

*EXHIBIT G*

**[RESERVED]**

*EXHIBIT H*

**FORM OF CRITICAL VENDOR REPORT**

[See Attached]

**Foresight Energy LP**
**Postpetition Payments of Prepetition Liabilities**
**Summary**

| FDM Categories | Amount Paid Week Ending | | | | | | | | Cumulative Total | Estimated Prepetition Liability | Motion Cap |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | | | |
| Employee Wage & Benefits | - | - | - | - | - | - | - | - | - | 17,065,000 | N/A |
| Customer Obligations | - | - | - | - | - | - | - | - | - | 360,000 | N/A |
| | | | | | | | | | | | |
| Shippers, Warehousemen and Service Providers | - | - | - | - | - | - | - | - | - | 12,800,000 | N/A |
| Critical Vendor | - | - | - | - | - | - | - | - | - | 27,400,000 | N/A |
| 503(b)(9) | - | - | - | - | - | - | - | - | - | 2,900,000 | N/A |
| Trade | | | | | | | | | - | 43,100,000 | 43,100,000 |
| | | | | | | | | | | | |
| Royalty and Leasehold Claims | - | - | - | - | - | - | - | - | - | 14,500,000 | 14,500,000 |
| Taxes | - | - | - | - | - | - | - | - | - | 13,085,000 | 13,085,000 |
| Insurance Programs | - | - | - | - | - | - | - | - | - | N/A | N/A |
| Cash Management | - | - | - | - | - | - | - | - | - | N/A | N/A |
| Executory Contracts | - | - | - | - | - | - | - | - | - | - | |
| Surety Bonds - Premiums / Fees | - | - | - | - | - | - | - | - | - | N/A | N/A |
| Surety Bonds - Collateral | - | - | - | - | - | - | - | - | - | 2,000,000 | 2,000,000 |
| Total | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 90,110,000 | $ 72,685,000 |

Case 20-41308 Doc 228 Filed 04/01/20 Entered 04/01/20 23:45:34 Main Document Pg 925 of 1005

*EXHIBIT I*

**FORM OF MONTHLY MINE-LEVEL FINANCIAL REPORT**

[See Attached]

**[TBD] Mine** [1]
**Statement of Operations / Operating Cash Flow**
**March 31, 2020**

| | MONTH-TO-DATE | |
| --- | --- | --- |
| | DOLLARS | PER TON |
| **Operational Statistics** | | |
| Ton produced | - | NA |
| Tons sold | - | NA |
| | | |
| **Revenues** | | |
| Coal sales | $ - | $ - |
| Other revenue | - | - |
| **Total revenues** | - | - |
| | | |
| **Operating Expenses** | | |
| Cost of coal sales | | |
| Labor - salary | - | - |
| Labor - hourly | - | - |
| Supplies | - | - |
| Repairs & maintenance | - | - |
| Power & utilities | - | - |
| Property & subsidence | - | - |
| Temporary mine closure costs | - | - |
| Longwall panel amortization | - | - |
| Allocations and Other Expenses | - | - |
| Overhead | - | - |
| Inventory change | - | - |
| Capitalized costs - cost of coal sales | - | - |
| **Total cost of coal sales** | - | - |
| Cost of coal purchased | - | - |
| Depreciation, depletion & amortization | - | - |
| Accretion on asset retirement obligations | - | - |
| Amortization of sales contracts, net | - | - |
| Transportation expense | - | - |
| Other (income) / expense | - | - |
| Selling, general & administrative expenses | - | - |
| **Total Operating Expenses** | - | - |
| | | |
| **Operating income** | - | - |
| Interest expense, net | - | - |
| **Net income (loss)** | - | - |
| | | |
| Add: | | |
| DD&A | - | - |
| Amortization of sales contracts, net | - | - |
| Accretion on AROs | - | - |
| **Operating cash flow** | - | - |
| Less: | | |
| Capital expenditures | - | - |
| **Operating cash flow less capital** | - | - |
| Debt service (principal) | - | - |
| **Net cash flow** | - | - |
| | | |
| **Adjusted EBITDA** | | |
| Net income (loss) | - | - |
| DD&A | - | - |
| Accretion on AROs | - | - |
| Amortization of sales contracts, net | - | - |
| Equity-based compensation-salary | - | - |
| Non-controlling interest | - | - |
| Interest expense, net | - | - |
| **Adjusted EBITDA** | $ - | $ - |

[1] Represents Statement of Operations / Operating Cash Flow template that will be provided monthly for the following six locations: (i) Williamson Mine, (ii) Sugar Camp Complex - M Class Mine, (iii) Sugar Camp Complex - Viking Mine, (iv) Hillsboro Mine, (v) Macoupin Mine, and (vi) the Sitran Dock/Terminal.

*EXHIBIT J*

**FORM OF MONTHLY CONSOLIDATED FINANCIAL REPORT**

[See Attached]

**Foresight Energy LP**

**Unaudited Consolidated Balance Sheets**

**(In Thousands)**

| | March 31, 2020 |
|---|---|
| **Assets** | |
| Current assets: | |
| Cash and cash equivalents | $ — |
| Accounts receivable | — |
| Due from affiliates | — |
| Financing receivables - affiliate | — |
| Inventories, net | — |
| Prepaid royalties | — |
| Deferred longwall costs | — |
| Other prepaid expenses and current assets | — |
| Contract-based intangibles | — |
| Total current assets | — |
| Property, plant, equipment, and development, net | — |
| Due from affiliates | — |
| Financing receivables - affiliate | — |
| Prepaid royalties | — |
| Other assets | — |
| Contract-based intangibles | — |
| Total assets | $ — |
| **Liabilities and partners' capital** | |
| Current liabilities: | |
| Current portion of long-term debt and finance lease obligations | $ — |
| Current portion of sale-leaseback financing arrangements | — |
| Accrued interest | — |
| Accounts payable | — |
| Accrued expenses and other current liabilities | — |
| Asset retirement obligations | — |
| Due to affiliates | — |
| Contract-based intangibles | — |
| Total current liabilities | — |
| Long-term debt and finance lease obligations | — |
| Sale-leaseback financing arrangements | — |
| Asset retirement obligations | — |
| Other long-term liabilities | — |
| Contract-based intangibles | — |
| Total liabilities not subject to compromise | — |
| Liabilities subject to compromise | — |
| Total liabilities | — |
| Limited partners' capital: | |
| Total limited partners' capital | — |
| Total liabilities and partners' capital | $ — |

**Foresight Energy LP**

**Unaudited Consolidated Statements of Operations**

**(In Thousands)**

| | Month Ended March 31, 2020 |
|---|---|
| Revenues | |
| Coal sales | $ — |
| Other revenues | — |
| Total revenues | — |
| | |
| Costs and expenses | |
| Cost of coal produced (excluding depreciation, depletion and amortization | — |
| Cost of coal purchased | — |
| Transportation | — |
| Depreciation, depletion and amortization | — |
| Contract amortization | — |
| Accretion and changes in estimates on asset retirement obligations | — |
| Selling, general and administrative | — |
| Long-lived asset impairments | — |
| Other operating (income) expense, net | — |
| Operating income | — |
| Other expenses | |
| Interest expense, net | — |
| Interest (benefit) expense, net - sale-leaseback financing arrangements | — |
| Reorganization items, net | — |
| Net loss | $ — |

*EXHIBIT K*

**INTERIM ORDER**

[See attached]

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-
PETITION FINANCING, (B) GRANT SENIOR SECURED PRIMING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH
COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; (IV)
SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion, dated March 10, 2020 (the "Motion"), of Foresight Energy L.P.

("FELP") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the

above-captioned chapter 11 cases (the "Cases") commenced on March 10, 2020 (the "Petition

Date") for interim (this "Interim Order") and final orders under sections 105, 361, 362, 363, 364,

503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended,

the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and the Local Bankruptcy Rules for

---

[1]     The Debtors in these cases are each incorporated or organized in the state of Delaware, and along with the last four digits of each Debtor's federal tax identification number (or SEC filing number if unavailable), are:  Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (SEC No. 5786); Akin Energy LLC (1648); American Century Mineral LLC (SEC No. 5788); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Mirepossouri 63102.

the United States Bankruptcy Court for the Eastern District of Missouri (this "Court") seeking, among other things,

(a)    authorization for Foresight Energy LLC, in its capacity as borrower (the "Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "Guarantors"), on a joint and several basis, the Borrower's obligations in connection with a debtor-in-possession financing, comprising a superpriority senior secured multiple-draw term loan facility in an aggregate principal amount of up to $175,000,000.00 (the "DIP Facility"), which consists of, (i) new money multi-draw term loan facility in an aggregate principal amount of $100,000,000.00 (the commitments thereunder, the "New Money DIP Commitments" and the loans advanced thereunder, the "New Money DIP Loans") to be funded by certain Prepetition First Lien Lenders (as defined herein) and Prepetition Second Lien Noteholders (as defined herein), and (ii) a term loan facility in an aggregate principal amount of $75,000,000.00, which shall (A) roll-up the Prepetition First Lien Debt (as defined herein), as further described in the DIP Facility and the Restructuring Support Agreement (as defined below), held by the participating Prepetition First Lien Lenders (or one or more of their respective affiliates or any investment advisory client managed or advised by such participating Prepetition First Lien Lenders) into the DIP Facility on a *pro rata* basis based on each such participating Prepetition First Lien Lender's New Money DIP Commitments (such rolled-up debt, the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans"), (C) be issued under the DIP Facility on a *pari passu* basis with the New Money DIP Loans, and (D) be approved in its entirety upon entry of and pursuant to the Final Order;

(b)    authorization for the Debtors to enter into that certain *Senior Secured Superpriority Debtor-In-Possession Credit and Guaranty Agreement* among the Borrower, the Guarantors, the lenders from time to time party thereto (collectively, the "DIP Lenders"), and Cortland Capital Market Services LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, together with the DIP Lenders, the "DIP Parties") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement," together with all agreements, documents, and instruments delivered or executed in connection therewith, including, without limitation, that certain Restructuring Support Agreement, dated as of March 10, 2020 (the "Restructuring Support Agreement"), as it relates to the commitments of the Backstop Parties (as defined herein) to fund the New Money DIP Commitments, the "DIP Documents"), which shall be in substantially the same form attached hereto as Exhibit 2, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(c)    authorization for the Debtors (x) to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the Cash Flow Forecast (as defined herein) as further described herein, to pay fees and

2

interest under the DIP Facility, to cash collateralize certain letters of credit issued and outstanding under the Prepetition First Lien Credit Documents (as defined herein) to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein) and (y) to effectuate the Roll-Up Loans;

(d)     the granting of adequate protection to (x) the term lenders (the "Prepetition First Lien Term Loan Lenders") and revolving lenders (the "Prepetition First Lien Revolving Lenders" and, collectively with the Prepetition First Lien Term Loan Lenders, the "Prepetition First Lien Lenders") under the Credit and Guaranty Agreement, dated as of March 28, 2017 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Prepetition First Lien Credit Agreement" and, all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified, the "Prepetition First Lien Credit Documents"), by and among Foresight Energy LLC, as borrower, the guarantors party thereto, (collectively with the borrower, the "Obligors"), The Huntington National Bank, as facilities administrative agent (in such capacity, the "Prepetition First Lien Administrative Agent"), Lord Securities Corporation, as term administrative agent (in such capacity, the "Prepetition First Lien Term Loan Agent," and together with Lord Securities Corporation in its capacity as collateral trustee under the Collateral Trust Agreement (as defined below), the "Prepetition Collateral Trustee" and the Prepetition First Lien Administrative Agent, the "Prepetition First Lien Agents"; and the Prepetition First Lien Agents, together with the Prepetition First Lien Lenders, the "Prepetition First Lien Parties"), and the Prepetition First Lien Lenders and (y) the noteholders (collectively, the "Prepetition Second Lien Noteholders") under the Indenture, dated as of March 28, 2017 (as amended, supplemented or otherwise modified, the "Prepetition Second Lien Indenture" and, together with all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified, the "Prepetition Second Lien Documents" and, together with the First Lien Credit Documents, the "Prepetition Credit Documents") among Foresight Energy LLC and Foresight Energy Finance Corporation, as co-issuers, the guarantors party thereto and Wilmington Trust, National Association as trustee for the Prepetition Second Lien Noteholders (together with the collateral agent for the Prepetition Second Lien Noteholders, the "Prepetition Second Lien Indenture Trustee" and together with the Prepetition Second Lien Noteholders, the "Prepetition Second Lien Parties," and the Prepetition Second Lien Indenture Trustee, together with the Prepetition First Lien Agents, the "Prepetition Agents"; and the Prepetition Agents collectively with the Prepetition First Lien Lenders, and the Prepetition Second Lien Noteholders, the "Prepetition Secured Parties");

(e)     granting of adequate protection to the Prepetition Secured Parties with respect to, among other things, the use of their Cash Collateral and the Prepetition Collateral (as defined below);

(f)      authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Upfront Fee (as defined herein), the Put Option Premium (as defined herein), the Exit Premium (as defined herein), the Delayed Draw Term Loan Commitment Fee (as defined herein), letter of credit fees, agency fees, audit fees, appraisal fees, valuation fees, administrative and collateral agents' fees, and the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(g)      the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors that is not subject to a valid and perfected lien on the Petition Date (such property and assets, the "Unencumbered Assets"), except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including, upon entry of the Final Order, the proceeds of Avoidance Actions (as defined herein), subject only to the Carve Out (as defined herein) and, if any, the Permitted Liens (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

(h)      the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein,  whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(i)      the granting of valid, enforceable, non-avoidable and fully perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition Liens, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(j)     the granting of superpriority administrative expense claims against each of the Debtors' estates to the DIP Agent and the DIP Lenders, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(k)     the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Petition Date);

(l)     authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined herein);

(m)     the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(n)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of this Interim Order, among other things, (1) authorizing the Borrower, on an interim basis, to borrow from the DIP Lenders under the DIP Documents in a single draw up to an aggregate principal amount not to exceed $55,000,000.00 in New Money DIP Loans (subject to any limitations of borrowing under the DIP Documents) (the "Initial DIP Term Loans"); (2) upon entry of the Final Order (as defined below), to borrow from the DIP Lenders under the DIP Documents (x) in a single draw New Money DIP Loans, in an aggregate principal amount, not to exceed $100,000,000.00  (less the Initial DIP Loans) (the "Delayed Draw DIP Term Loans"), and (y) the Roll-Up Loans for a total aggregate principal amount not to exceed $175,000,000.00; (3) authorizing the Guarantors to guaranty the DIP Obligations, (4) authorizing the Debtors' use of Cash Collateral, and (5) granting the adequate protection described in this Interim Order; and

(o)     that this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, among other things, the Borrower's borrowing from the DIP Lenders under the DIP Documents up to an aggregate principal amount of $100,000,000.00 in New Money DIP Loans, the Roll-Up Loans and the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and set forth in the DIP Documents.

The Court having considered the Motion, the Herman Declaration,[2] the evidence submitted

or proffered and the arguments of counsel made at Interim Hearing; and proper and sufficient

---

[2]    Declaration of Seth Herman in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority

notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Order having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:[3]

1.     *Disposition*.  The Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.     *Jurisdiction*.  This Court has core jurisdiction over the Cases commenced on Petition Date, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     *Notice*.  Under the circumstances, the notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

---

Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief (the "<u>Herman Declaration</u>")

[3]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact.

4.     *Debtors' Stipulations*.  Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 29 and 30 of this Interim Order, the Debtors represent, admit, stipulate, and agree as follows:

(a)     <u>Prepetition First Lien Obligations</u>.  As of the Petition Date, the Obligors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Prepetition First Lien Parties under the Prepetition First Lien Credit Documents in the aggregate amount of not less than $900,285,564.62, which consists of (x) approximately $157,000,000  in principal amount of revolving loans and $743,285,564.62 in principal amounts of term loans advanced under the Prepetition First Lien Credit Agreement, *plus* (y) no less than approximately $18,644,570.84 on account of accrued and unpaid interest thereon as of the Petition Date ((x) and (y) together, the "<u>Prepetition First Lien Obligations Amount</u>"), plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations (including on account of issued and undrawn letters of credit), charges, premiums, if any, additional interest, any other "Obligations" (as defined on the Prepetition First Lien Credit Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition First Lien Credit Documents (collectively, including the Prepetition First Lien Obligations Amount, the "<u>Prepetition First Lien Obligations</u>").  The Prepetition First Lien Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition First Lien Agents or Prepetition First Lien Parties by or on behalf of any of the Debtors

7

prior to the Petition Date under or in connection with any of the Petition First Lien Credit Documents is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(b)    <u>Prepetition First Liens</u>.  Pursuant to the Prepetition First Lien Credit Documents, the Prepetition First Lien Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "<u>Prepetition First Liens</u>") the "Collateral" (as defined in the Prepetition First Lien Credit Documents) (the "<u>Prepetition Collateral</u>"), subject only to certain Permitted Liens as permitted under the Prepetition First Lien Credit Documents.  The Prepetition First Liens (i) are valid, binding, perfected, and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or subordinate only to certain Permitted Liens (if any) as permitted by the terms of the Prepetition First Lien Credit Documents and (iv) constitute the legal, valid, and binding obligation of the Loan Parties (as defined in the Prepetition First Lien Credit Documents), enforceable in accordance with the terms of the applicable Prepetition First Lien Credit Documents.

(c)    <u>Prepetition Second Lien Obligations</u>.  As of the Petition Date, the Obligors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Prepetition Second Lien Parties under the Prepetition Second Lien Documents in the aggregate amount of not less than approximately $472,121,609.38, which consists of (x) $425,000,000 in principal amount outstanding under the Prepetition Second Lien Indenture, *plus* (y) no less than

approximately $47,121,609.38 on account of accrued and unpaid interest thereon as of the Petition

Date ((x) and (y) together, the "Prepetition Second Lien Obligations Amount"), plus all other fees,

costs, expenses, indemnification obligations, charges, premiums, if any, additional interest, any

other "Obligations" as defined in the Prepetition Second Lien Indenture and all other obligations

of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due,

owing or chargeable under the Prepetition Second Lien Documents (collectively, including the

Prepetition Second Lien Obligations Amount, the "Prepetition Second Lien Obligations" and,

together with the Prepetition First Lien Obligations, the "Prepetition Secured Obligations").  The

Prepetition Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations

against each of the Obligors and are not subject to any avoidance, recharacterization, effect,

counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any

kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments

or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the

Prepetition Second Lien Indenture Trustee or Prepetition Second Lien Parties by or on behalf of

any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition

Second Lien Documents is subject to avoidance, recharacterization, effect, counterclaim, defense,

offset, subordination, other claim, cause of action or other challenge of any kind or nature under

the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

   (d) <u>Prepetition Second Liens</u>.  Pursuant to the Prepetition Second Lien Documents, the

Prepetition Second Lien Obligations are secured by valid, binding, perfected and enforceable

second priority liens on and security interests in the Prepetition Collateral (the "Prepetition Second

Liens" and, together with the Prepetition First Liens, the "Prepetition Liens"), which Prepetition

Second Liens are subject and subordinate only to the Prepetition First Liens and certain Permitted

Liens.  The Prepetition Second Liens (i) are valid, binding, perfected, and enforceable second priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or subordinate only to the Prepetition First Liens and certain Permitted Liens (if any) as permitted by the terms of the Prepetition Second Lien Documents and (iv) constitute the legal, valid, and binding obligation of the Grantors (as defined in the Prepetition Second Lien Documents), enforceable in accordance with the terms of the applicable Prepetition Second Lien Documents.

(e)    Collateral Trust Agreement.  As of the Petition Date, the Borrower was party to that certain Collateral Trust Agreement, dated as of March 28, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time prior to the date of this Interim Order, the "Collateral Trust Agreement") among the Prepetition First Lien Administrative Agent, the Prepetition Collateral Trustee and the Prepetition Second Lien Indenture Trustee.  The Collateral Trust Agreement governs the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the Prepetition Collateral.  The Obligors have acknowledged and agreed to, and are bound by, the Collateral Trust Agreement.

(f)    Cash Collateral.  Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral (as defined herein) existing as of the Petition Date or from time to time, and the proceeds of any

10

of the foregoing, is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").[4]

     5.    *Findings Regarding the DIP Facility and Use of Cash Collateral.*

    (a)    Good cause has been shown for the entry of this Interim Order.

    (b)    As set forth in the Herman Declaration, the Debtors have an immediate need to obtain the DIP Facility and to use the Cash Collateral in each case on an interim basis, in order to, among other things: (i) permit the orderly continuation of their respective businesses; (ii) maintain business relationships with their vendors, suppliers, customers, and other parties; (iii) make payroll; (iv) make capital expenditures; (v) make adequate protection payments; and (vi) pay the costs of the administration of the Cases and satisfy other working capital and general corporate purposes of the Debtors.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' business.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Cases without the DIP Facility and authorized use of Cash Collateral.

    (c)    As set forth in the Herman Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and

---

[4]    As noted in the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Continued Use of the Debtors' Existing Cash Management System; (B) Authorizing Use of Existing Bank Accounts and Business Forms; (C) Granting A Limited Waiver of Requirements of Section 345(b) of the Bankruptcy Code; (D) Authorizing Continuation of Ordinary Course Intercompany Transactions; (E) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims; and (F) Granting Related Relief* (the "Cash Management Motion"), the Debtors receive coal sale proceeds into an account maintained by Foresight Receivable LLC with the Prepetition First Lien Administrative Agent, which proceeds are then swept into a concentration account on a daily basis.

are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  Other than with respect to the Unencumbered Assets, the Debtors are also unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Agent, for the benefit of itself and the DIP Lenders, subject to the Carve Out as provided for herein and the Permitted Liens (if any), the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and, subject to the Carve Out, incurring the Adequate Protection Obligations (as defined herein), in each case, under the terms and conditions set forth in this Interim Order and the DIP Documents.  For the avoidance of doubt, the DIP Liens include liens on and security interests in the Unencumbered Assets pursuant to Bankruptcy Code section 364(c)(2).

(d)     The terms of the DIP Facility, the DIP Documents, and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders (including the Backstop Parties (as defined herein)), and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans (including, upon entry of the Final Order, the Roll-Up Loans) made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other Obligations (as defined in the DIP Credit Agreement) (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).  The DIP Obligations,

12

the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise and any liens or claims granted to the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)    Subject to entry of the Final Order, the Roll-Up Loans as provided for under the DIP Facility are appropriate and the DIP Lenders would not be willing to provide the New Money DIP Loans or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Facility.

(g)    The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  For the reasons set forth in the Motion, the declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing, absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Interim Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

(h)    Pursuant to section 2.8 of the Collateral Trust Agreement and as set forth in the Restructuring Support Agreement, (x) the Prepetition Second Lien Noteholders have consented or are deemed to have consented to the terms of the DIP Facility and this Interim Order, (y) the Prepetition Second Liens and the Second Lien Adequate Protection Liens are subordinate to the

Carve Out, the Permitted Liens, the DIP Liens, the First Lien Adequate Protection Liens (as defined herein) and Prepetition First Liens, and (z) the Prepetition Second Lien Obligations are subject to the Carve Out and the Permitted Liens and the prior payment in full of the DIP Obligations, the First Lien Adequate Protection Obligations and, solely as provided in the Collateral Trust Agreement, the Prepetition First Lien Obligations.

6.      *Authorization of the DIP Facility and the DIP Documents.*

(a)      The Debtors are hereby expressly authorized and empowered to execute and deliver and, on such execution and delivery, directed to perform under the DIP Documents, including the DIP Credit Agreement, which is hereby approved and incorporated herein by reference.

(b)      Upon entry of this Interim Order, the Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $55,000,000.00 in New Money DIP Loans (plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP Credit Agreement), subject to and in accordance with this Interim Order and the DIP Documents.

(c)      Proceeds of the DIP Loans and Cash Collateral shall be used solely for the purposes permitted under the DIP Credit Agreement, this Interim Order and in accordance with the Cash Flow Forecast (as defined below), the DIP Documents, and this Interim Order.

(d)      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary and applicable, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby), and to pay all fees, expenses, indemnities, and other

amounts contemplated thereby or that may be reasonably required or necessary for the Debtors'

performance of their obligations under the DIP Facility including, without limitation:

(i)     the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents  (in each case in accordance with the terms of the DIP Documents and in such form as the Debtors, the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement) may agree), it being understood that no further approval of the Court shall be required for any amendments, waivers, consents or other modifications to and under the DIP Documents or the Cash Flow Forecast, except that any modifications or amendments to the DIP Documents that shorten the maturity thereof or increase the aggregate commitments thereunder or the rate of interest payable with respect thereto shall be on notice and subject to a hearing and Court approval, as necessary;

(iii)   the non-refundable and, upon entry of this Interim Order, irrevocable payment to each of the DIP Lenders or the DIP Agent, as applicable, of the fees referred to in the DIP Documents (which fees, in each case, shall be, and shall be deemed to have been, approved upon entry of this Interim Order, and which fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may

become due) in respect of any indemnification obligations under the DIP Documents, including:

- an upfront fee of 3.0% of the aggregate principal amount of New Money DIP Commitments (the "Upfront Fee"), which shall be structured as original issue discount against the New Money DIP Loans when advanced;

- an exit premium of 1.0% of the aggregate principal amount of the New Money DIP Commitments (the "Exit Premium"), payable in the form of equity in reorganized FELP upon the Plan Effective Date (as defined in the DIP Credit Agreement) pursuant to the terms and conditions set forth in the DIP Credit Agreement and the Restructuring Support Agreement; provided, however, that upon the occurrence of an Event of Default under the DIP Credit Agreement or upon repayment of the DIP Loans in full and termination of all New Money DIP Commitments without the occurrence of the Plan Effective Date, the Exit Premium shall be immediately payable in cash in an amount equal to $2,000,000.00;

- a put option premium of 5.0% of the aggregate principal amount of the New Money DIP Commitments of the Backstop Parties (as defined herein) (the "Put Option Premium"), payable in the form of equity in the reorganized FELP upon the Plan Effective Date pursuant to the terms and conditions set forth in the DIP Credit Agreement, the Restructuring Support Agreement and related backstop commitment arrangements; provided, however, that upon the occurrence of an Event of Default under the DIP Credit Agreement or upon repayment of the DIP Loans in full and termination of all New Money DIP Commitments without the occurrence of the Plan Effective Date, the Put Option Premium shall be immediately payable in cash in an amount equal to $10,000,000.00;

- a commitment fee on each DIP Lender's commitment to fund the Delayed Draw DIP Term Loans (the "Delayed Draw Term Loan Commitment Fee") at a rate per annum equal to 1.00%, payable pursuant to the terms and conditions set forth in the DIP Credit Agreement; and

- all reasonable costs and expenses as may be due from time to time under the DIP Documents, the Restructuring Support Agreement and this Interim Order, including, without limitation, fees and expenses of counsel, financial advisors and other professionals retained by the DIP Agent and the DIP Lenders as provided for in the DIP Documents and this Interim Order, subject to the provisions of paragraph 28 hereof;

(iv)     make the payments on account of the First Lien Adequate Protection Obligations provided for in this Interim Order; and

(v)      the performance of all other acts required under or in connection with the DIP Documents.

(e)      Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such DIP Documents shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code, or after the dismissal of any Case.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(f)      The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the DIP Obligations of the Borrower and to incur any DIP Obligations and DIP Liens in connection therewith.

7.      *The Backstop DIP Parties and Syndication Procedures*.

(a)      Funds and/or accounts affiliated with, or managed and/or advised by, Benefit Street Partners, LLC, DoubleLine Capital LP, GoldenTree Asset Management LP, Ivy Investments Management Company, KKR Credit Advisors (US) LLC, and Davidson Kempner Capital

17

Management LP (together with their respective successors and permitted assignees, each a "Backstop Party" and collectively, the "Backstop Parties") will, severally and not jointly, backstop the DIP Facility in the amounts set forth in the DIP Documents and the Restructuring Support Agreement.  Subject to entry of this Interim Order, (i) all eligible Prepetition First Lien Lenders (which, for the avoidance of doubt, includes any Backstop Party) shall be offered the right to participate in funding up to 46.375% of the New Money DIP Commitments based ratably on each such lender's holdings of Prepetition First Lien Debt and (ii) all eligible Prepetition Second Lien Noteholders (which, for the avoidance of doubt, includes any Backstop Party) shall be offered the right to participate in funding up to 3.625% of the New Money DIP Commitments based ratably on such noteholder's holdings of Prepetition Second Lien Debt, all as further set forth in the DIP Documents, the Restructuring Support Agreement and procedures satisfactory to the DIP Agent and the Backstop Parties, which shall include, among other things, a provision that any such participating Prepetition First Lien Lender or Prepetition Second Lien Noteholder agree to be bound by the Restructuring Support Agreement.

8. *Budget*.

(a)    Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facility in accordance with a projected statement of sources and uses of cash for the Debtors for the current and following 13 calendar weeks (but not any preceding weeks) attached hereto as Exhibit 1 (as may be amended, replaced, supplemented or otherwise modified in accordance with the terms of this Interim Order and the DIP Documents, the "Cash Flow Forecast"), including without limitation, for: (A) working capital requirements; (B) general corporate purposes; (C) to cash collateralize existing letters of credit; and (D) the costs and expenses (including making payments on account of the Adequate Protection Obligations hereunder and payment of the allowed fees and expenses of professionals retained by the Debtors' estates) of administering the Cases (including payments under the Carve Out as provided herein).  On the Thursday of the fourth calendar week following the week in which the Petition Date occurs, and thereafter on the Thursday following the end of every fourth calendar week, the Debtors shall deliver an updated Cash Flow Forecast, in each case substantially in the form attached hereto as Exhibit 1 (with only such

18

changes thereto as the Required Lenders shall agree in their sole discretion) or is otherwise in form and substance satisfactory to the Required Lenders in their sole discretion.

(b)    On the first Thursday of the first full week following the Petition Date, and every Thursday thereafter, the Debtors shall deliver to (i) the DIP Agent, (ii) Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and Lazard Frères & Co. LLC ("Lazard" and, together with Akin Gump, the "Ad Hoc First Lien Advisors"), and (iii) Milbank LLP ("Milbank") and Perella Weinberg Partners L.P. ("Perella" and, together with Milbank, the "Ad Hoc Crossover Advisors"), a weekly variance report for the one week period following the Closing Date, the two week period following the Closing Date, the three week period following the Closing Date and the four week period following the Closing Date, and thereafter, a weekly variance report for the one week period following the most recently delivered Cash Flow Forecast, the two week period following the most recently delivered Cash Flow Forecast, the three week period following the most recently delivered Cash Flow Forecast and the four week period following the most recently delivered Cash Flow Forecast, with the report for each week in a four week period including an individual report for such week and a cumulative report to date for such four week period (each such one week, two week, three week or four week cumulative period, a "Reporting Period"), in each case, setting forth for the applicable Reporting Period, ended on the immediately preceding Friday prior to the delivery thereof, (i) the negative variance (as compared to the applicable Cash Flow Forecast and the Budget[5]) of the operating cash receipts (on a line item by line item basis and an aggregate basis for all line items) of the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period, (2) the positive variance (as compared to the applicable Cash Flow Forecast and the Budget) of the disbursements (on a line item by line item basis and an aggregate basis for all line items) made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement (as defined in the DIP Credit Agreement)) for the applicable Reporting Period and for the last week of the applicable Reporting Period, (3) the positive variance (as compared to the applicable Cash Flow Forecast and the Budget) of the total disbursements (on a line item by line item basis and an aggregate basis for all line items) (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors for the applicable Reporting Period and for the last week of the applicable Reporting Period and (4) an explanation, in reasonable detail, for any material negative variance (in the case of receipts) or material positive variance (in the case of disbursements) set forth in such variance report, certified by an Authorized Officer of the Borrower (the "Budget Variance Report").  Without giving effect to the making of DIP Loans or the repayments or prepayments of DIP Loans, in no

---

[5]    As used herein, the term "Budget" shall have the meaning assigned to the term "DIP Budget" in the DIP Credit Agreement

event shall (a) beginning with the delivery of the initial Budget Variance Report and tested, as of the last day of each applicable two-week period commencing with the last day of the first two-week period ending after the Closing Date, for such two-week period (i) the negative variance (as compared to the applicable Cash Flow Forecast) of the actual aggregate operating cash receipts of the Debtors exceed 15% and (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) made by the Debtors shall exceed 15%, and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements  made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement)) exceed 15%, and (b) beginning with the delivery of the third Budget Variance Report, as of the last day of each applicable four-week period commencing with the last day of the first four-week period ending after the Closing Date, for such four-week period, (i) the negative variance (as compared to the applicable Cash Flow Forecast) of the actual aggregate operating cash receipts of the Debtors exceed 10%, (ii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate operating disbursements (excluding professional fees, interest payments and disbursements made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) made by the Debtors exceed 10%, and (iii) the positive variance (as compared to the applicable Cash Flow Forecast) of the aggregate disbursements  made by the Debtors set forth under "MEC Affiliate Disbursements" in the Cash Flow Forecast (including, without limitation, any payments pursuant to the Management Services Agreement) exceed 10%.

(c)     The consent of the DIP Lenders to the Budget or any applicable Cash Flow Forecast shall not be construed as consent to the use of any Cash Collateral or DIP Loans after the occurrence of an Event of Default (as defined in the DIP Credit Agreement), regardless of whether the aggregate funds shown on the Budget or any applicable Cash Flow Forecast have been expended.

9.     *Reporting Requirements/Access to Records*.  The Debtors shall provide the DIP Lenders, the Ad Hoc First Lien Advisors, and the Ad Hoc Crossover Advisors with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Agent and the DIP Lenders have under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Agent

and the DIP Lenders to: (i) have access to and inspect the Debtors' assets; (ii) examine the Debtors' books and records; and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors.

10.     *DIP Superpriority Claims*.  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Agent and the DIP Lenders, against each of the Debtors' estates (the "DIP Superpriority Claims"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, upon entry of the Final Order, the proceeds of any claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), subject only to the payment of the Carve Out to the extent specifically provided for herein.  Except as set forth in, or permitted by, this Interim Order, no other superpriority claims shall be granted or allowed in these Cases.

11.     *DIP Liens*.  As security for the DIP Obligations, effective and automatically perfected upon the date of this Interim Order, and without the necessity of the execution,

recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined herein), the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject only to the payment of the Carve Out to the extent specifically provided for herein and the Permitted Liens (if any) (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)    First Lien on Unencumbered Property.  Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and

22

outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action (including, upon entry of the Final Order, the proceeds of Avoidance Actions), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located.

(b)     <u>Liens Priming the Prepetition Liens</u>.    Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition Liens securing the Prepetition Secured Obligations.

(c)    <u>Liens Junior to Certain Other Liens</u>.    Pursuant to Bankruptcy Code

section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and

lien upon all prepetition and postpetition property of the Debtors (other than the property described

in clauses (a) or (b) of this paragraph 11, as to which the liens and security interests in favor of the

DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that

is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition

Date, if any, that are senior to the liens securing the Prepetition First Lien Obligations or to valid

and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected

subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to

the liens securing the Prepetition First Lien Obligations, which security interests and liens in favor

of the DIP Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable

liens (collectively, the "<u>Permitted Liens</u>").[6]

12.    *Carve Out*.

(a)    <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all

fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section

1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to

the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000.00 incurred

by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in

(iii) below); (iii) to the extent allowed, whether by interim order, procedural order, or otherwise,

all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms

retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor</u>

---

[6]    For the avoidance of doubt, "Permitted Liens" shall also include liens securing all pre and postpetition Cash
Management Obligations (as defined in the DIP Credit Agreement) of the Debtors.

Professionals") and, subject to the Committee Monthly Cap, an official committee of unsecured creditors (the "Creditors' Committee") pursuant to Bankruptcy Code section 328 or 1103 (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent or the Required Lenders of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons, in an aggregate amount not to exceed an amount to be agreed prior to the Final Hearing between the Debtors and the Required Lenders, incurred after the first business day following delivery by the DIP Agent or the Required Lenders of the Carve Out Trigger Notice, to the extent allowed, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Required Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee providing that a Termination Event (as defined herein) has occurred and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     Carve Out Reserves. On the day on which a Carve Out Trigger Notice is delivered (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of (i) the Allowed Professional Fees of Debtor Professionals, (ii) subject to the Committee Monthly Cap, the Allowed Professionals Fees of the Committee Professionals, and (iii) the obligations accrued as of the Termination Declaration Date with respect to clauses (i) and (ii) of the definition of Carve Out set

forth in paragraph 12(a) (the "Additional Carve Out Obligations").  The Debtors shall deposit and

hold such amounts in a segregated account in a manner reasonably acceptable to the Required

Lenders in trust to pay such then unpaid Allowed Professional Fees and Additional Carve Out

Obligations (the "Pre-Carve Out Trigger Notice Reserve") prior to the use of such reserve to pay

any other claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger

Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any

available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve

Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-

Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to the use of such reserve to

pay any other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to

pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth

above in paragraph 12(a) (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the

Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out

Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of itself

and the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and

all commitments under the DIP Facility have been terminated, in which case any such excess shall

be paid to the Prepetition Secured Parties in accordance with their rights and priorities as provided

in the Prepetition Credit Documents, the Collateral Trust Agreement, and this Interim Order.  All

funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set

forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"),

and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to

pay the DIP Agent for the benefit of itself and the DIP Lenders, unless the DIP Obligations have

been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been

terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as provided in the Prepetition Credit Documents, the Collateral Trust Agreement, and this Interim Order.  Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 12, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 12, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First Lien Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents and this Interim Order.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not increase or reduce the DIP Obligations, or constitute additional DIP Loans (unless, for the avoidance of doubt, additional DIP Loans are used to fund the Carve Out Reserves), (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Cash Flow Forecast, Carve Out, Post-Carve Out Trigger Notice Cap or the Carve Out Reserves, or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors to the Debtors' Professionals.  For the avoidance of doubt and notwithstanding anything to the

contrary in this Interim Order, the DIP Facility or in any Prepetition Credit Document, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the First Lien Adequate Protection Liens, the Second Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claim, the Second Lien Adequate Protection Superpriority Claim, the Prepetition Liens, the Prepetition Secured Obligations and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(c)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out under the DIP Facility shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the

protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

13.    *Limitation on Charging Expenses Against Collateral*.  Subject to entry of the Final Order (but retroactive to the Petition Date), no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties pursuant to Bankruptcy Code sections 105(a) or 506(c) or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.  Notwithstanding the foregoing, nothing contained in this paragraph shall affect or otherwise impact the charging lien available to the Prepetition First Lien Agents with respect to the Prepetition Collateral or any additional collateral subject to First Lien Adequate Protection Liens (as defined below) or funds or other property otherwise subject to distribution to recover payment of any unpaid fees, expenses or other amounts to which it is entitled under the Prepetition First Lien Credit Documents or the Collateral Trust Agreement, subject to the priority of the DIP Liens and DIP Claims in accordance with this Order.

14.    *No Marshaling/Application of Proceeds*.  Subject to entry of the Final Order (but retroactive to the Petition Date), the DIP Agent and the Prepetition Agents shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of the Interim Order or Final Order, as applicable, the DIP Documents and the Prepetition Credit Documents, as applicable, and in no event shall the DIP Agent, the DIP Lenders,

or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

15.    *Equities of the Case.*  Subject to entry of the Final Order (but retroactive to the Petition Date), (i) the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

16.    *Use of Cash Collateral.*  The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order, the DIP Documents and the Cash Flow Forecast including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of the Final Hearing. Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

17.    *Adequate Protection for the Prepetition First Lien Parties.*  Subject only to the Carve Out and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e), and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition First Lien Agents,

for the benefit of themselves and the Prepetition First Lien Lenders, are hereby granted the following (collectively, the "First Lien Adequate Protection Obligations"):

(a)      First Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral.  Subject to the terms of this Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens and (C) the Permitted Liens (if any).  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition Liens, the Second Lien Adequate Protection Liens and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(b)      First Lien Adequate Protection Superpriority Claim.   As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Cases, except the Carve Out and the DIP Superpriority Claims (the "First Lien Adequate Protection Superpriority Claim").  The First Lien Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, the Avoidance

31

Proceeds).  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the First Lien Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114.  The Prepetition First Lien Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.

(c)  Fees and Expenses.  As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "First Lien Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition First Lien Agents, and the Ad Hoc First Lien Group (as defined below), and the Ad Hoc Crossover Group (as defined below), including, without limitation, the reasonable and documented fees and expenses of (a) Sullivan & Worcester LLP, counsel to the Prepetition First Lien Term Loan Agent and the Prepetition Collateral Trustee, (b) Buchanan Ingersoll & Rooney PC, counsel to the Prepetition First Lien Administrative Agent, together with one local counsel to the Prepetition First Lien Agents, (c) in accordance with its engagement letter, Conway McKenzie, Inc., as financial advisor to the Prepetition First Lien Administrative Agent, (d) one local counsel, Thompson Coburn LLP, and one lead counsel, Akin Gump, as counsel to the ad hoc group of certain Prepetition First Lien Lenders (the "Ad Hoc First Lien Group"), (e) in accordance with its

engagement letter, one financial advisor, Lazard, as financial advisors to Ad Hoc First Lien Group, (f) one local counsel, Bryan Cave Leighton Paisner LLP, and one lead counsel, Milbank LLP, as counsel to the ad hoc group of certain Prepetition First Lien Lenders and Prepetition Second Lien Noteholders (the "Ad Hoc Crossover Group"), and (g) in accordance with its engagement letter, one financial advisor, Perella Weinberg Partners LP, as financial advisor Ad Hoc Crossover Group.  The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions.  The applicable professional shall serve copies of the invoices supporting the First Lien Adequate Protection Fees on counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if any), and any First Lien Adequate Protection Fees shall be subject to prior ten day review by the Debtors, the U.S. Trustee and the Creditors' Committee (if any), and in the event the Debtors, the U.S. Trustee or the Creditors' Committee shall file with this Court an objection to any such legal invoice, the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Court.  If no objection is filed within such ten day review period, such invoice shall be paid without further order of the Court within five days following the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement. For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.

(d)    First Lien Accrued Adequate Protection Payments.  As further adequate protection, the Prepetition First Lien Agents, on behalf of the Prepetition First Lien Lenders, shall receive, upon entry of this Interim Order, monthly adequate protection payments (the "First Lien Accrued Adequate Protection Payments") payable in-kind on the thirtieth day of each month equal to the interest at the Applicable Rate (as defined in the Prepetition First Lien Credit Agreement) that

would otherwise be owed to the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement during such monthly period in respect of the Prepetition First Lien Obligations that are not Roll-Up Loans, until such time as the full Prepetition First Lien Obligations Amount is paid in full, in cash.

(e)    Information Rights.  The Debtors shall promptly provide the Prepetition First Lien Agents and the Ad Hoc First Lien Advisors, respectively, as well as the Ad Hoc Crossover Advisors, with all required financial reporting and other periodic reporting that is required to be provided to the DIP Agent or the DIP Lenders under the DIP Documents.

18.    *Adequate Protection for the Prepetition Second Lien Noteholders*.  Subject only to the Carve Out, the Permitted Liens, the DIP Liens, the Prepetition First Liens, the First Lien Adequate Protection Liens, and the terms of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition Diminution in Value of such interests, resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Second Lien Noteholders are hereby granted the following (collectively, the "Second Lien Adequate Protection Obligations" and, together with the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)    Second Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the

date of this Interim Order (the "Second Lien Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral.  Subject to the terms of this Interim Order, the Second Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, (C) the First Lien Adequate Protection Liens, (D) the Prepetition First Liens and (E) the Permitted Liens (if any). The Second Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.

(b)    Second Lien Adequate Protection Superpriority Claim.  As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any postpetition Diminution in Value (the "Second Lien Adequate Protection Superpriority Claim" and, together with the First Lien Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims"), except the Carve Out, the DIP Superpriority Claims and the First Lien Adequate Protection Superpriority Claim.  Subject to the Carve Out, the DIP Superpriority Claims, the First Lien Adequate Protection Superpriority Claims, and the Prepetition First Lien Obligations in all respects, the Second Lien Adequate Protection Superpriority Claim will not be junior to any other claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b),

546(d), 726, 1113 and 1114.  The Prepetition Second Lien Noteholders shall not receive or retain any payments, property or other amounts in respect of the Second Lien Adequate Protection Superpriority Claim under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations, the Prepetition First Lien Obligations and the First Lien Adequate Protection Obligations have been indefeasibly paid in full, in cash, in each case as provided in the DIP Documents.

19.    *Section 507(b) Reservation*.  Subject in all respects to the terms of the Collateral Trust Agreement, nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

20.    *Restrictions on Disposition of Material Assets Outside the Ordinary Course of Business*.  Except as expressly permitted under the "first day" pleadings or the DIP Documents, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the Required Lenders at least five days (or such shorter period as the DIP Agent, at the direction of the Required Lenders, may agree) prior to the date on which the Debtors seek the Court's authority for such use, sale, or lease.  Except as otherwise provided under the DIP Documents, subject to the Carve Out and Permitted Liens, in the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes

DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order), the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the DIP Agent, for the benefit of the DIP Parties, 100% of the net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds.  Upon payment in full of the DIP Obligations, subject to the Carve Out and Permitted Liens, the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the Prepetition First Lien Agents, for the benefit of the Prepetition First Lien Lenders, 100% of the net cash proceeds resulting from any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order) no later than the second business day following receipt of such proceeds.  Except as otherwise provided under the DIP Documents, subject to the Carve Out and Permitted Liens, in the event of any casualty, condemnation, or similar event with respect to property that constitutes DIP Collateral, the Debtors are authorized and shall promptly pay to the DIP Agent, for the benefit of the DIP Parties, any insurance proceeds, condemnation award, or similar payment (excluding any amounts on account of any D&O policies) no later than the second business day following receipt of payment by the Debtors, unless the Required Lenders consent, each in its sole discretion, in writing, to the funds being reinvested by the Debtors.

21.    *Insurance.*  At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.  Upon entry of this Interim Order, the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as additional insured and

lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

22.     *Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition Secured Parties*.  Notwithstanding any other provision in this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection in all respects subject to the Collateral Trust Agreement; provided that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under this Interim Order and the DIP Documents; (b) any of the rights of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agent, the DIP Lenders, or the Prepetition First Lien Parties to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (in the case of the Prepetition Secured Parties, in all respects subject to the Collateral Trust Agreement).  The delay in or failure of the DIP Agent, the DIP Lenders and/or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agent's, the DIP Lenders' or the Prepetition First Lien Parties' rights and remedies.

23.     *Termination Event.*  Subject to paragraph 24, the Debtors' authorization to use Cash Collateral and the proceeds of the DIP Facility pursuant to this Interim Order shall automatically terminate, and the DIP Obligations shall become due and payable, without further notice or action by the Court following the earliest to occur of any of the following (each a "Termination Event"): (a) the occurrence of an Event of Default (as defined in the DIP Credit Agreement), which are explicitly incorporated by reference into this Interim Order; (b) the Debtors' failure to (i) comply with any provision of this Interim Order, (ii) comply with any other covenant or agreement specified in this Interim Order or the DIP Credit Agreement (which covenants and agreements, together with any applicable grace periods, are explicitly incorporated by reference into this Interim Order), or (iii) comply with any of the Milestones (as defined in, and as set forth in, the DIP Credit Agreement); (c) termination of the Restructuring Support Agreement or the Backstop Commitment Agreement (as defined in the DIP Credit Agreement), in either case, other than as a result of a breach by the DIP Lenders thereunder; or (d) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement).

24.     *Remedies Upon a Termination Event.*  The Debtors shall immediately provide notice to counsel to the DIP Agent, the DIP Lenders, the Prepetition First Lien Agents, the Ad Hoc First Lien Group, and the Ad Hoc Crossover Group (with a copy to counsel to the Creditors' Committee (if any)), of the occurrence of any Termination Event, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this paragraph 24) and the DIP Obligations shall become due and payable.  Upon the occurrence of a Termination Event and following the giving of not less than three business days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee (if any) (the "Notice Period"), (a) the DIP Agent

and the DIP Lenders may exercise any rights and remedies against the DIP Collateral available to them under this Interim Order, the DIP Documents, and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility and (b) the Prepetition First Lien Parties may exercise any rights and remedies to satisfy the Prepetition First Lien Obligations, the First Lien Adequate Protection Superpriority Claims and any other First Lien Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, Permitted Liens and, in each case, the Carve Out.  The only permissible basis for the Debtors, the Prepetition Second Lien Noteholders, the Creditors' Committee (if any), or any other party to contest, challenge or object to an Enforcement Notice shall be solely with respect to the validity of the Termination Event(s) giving rise to such Enforcement Notice (*i.e*., whether such Termination Event validly occurred and has not been cured or waived in accordance with this Interim Order).  The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Parties at the end of the Notice Period, without further notice or order of the Court, unless the DIP Agent, the DIP Lenders, the Prepetition First Lien Agents, and the Prepetition First Lien Lenders elect otherwise in a written notice to the Debtors, which may be by email.  Upon termination of the automatic stay, the DIP Agent, the DIP Lenders, and the Prepetition First Lien Parties shall be permitted to exercise all rights and remedies set forth herein, in the DIP Documents, and the Prepetition First Lien Credit Documents, as applicable, and as otherwise available at law against the DIP Collateral and/or Prepetition Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral or the Prepetition Collateral, or (y) the pursuit of any other rights

and remedies granted to the DIP Agent, the DIP Lenders, or the Prepetition First Lien Parties pursuant to the DIP Documents, the Prepetition First Lien Credit Documents, or this Interim Order; provided that during the Notice Period the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of a Termination Event) or Cash Collateral only to (i) fund operations in accordance with the DIP Credit Agreement and the Cash Flow Forecast and (ii) to fund the Carve Out Reserves; provided further that during the Notice Period the Debtors, the DIP Lenders, and the DIP Agent consent to a hearing on an expedited basis to consider whether a Termination Event has occurred; provided further, that if a hearing to consider the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five business days after delivery of the Enforcement Notice; provided further that any fees and expenses incurred by the Debtors or the Committee during the Notice Period shall permanently reduce the Post-Carve Out Trigger Notice Cap.  Any party in interest shall be entitled to seek an emergency hearing for the purpose of contesting whether assets constitute assets of the Debtors' estates and nothing in this Interim Order shall affect any party in interest's rights or positions at such hearing.

25.    *No Waiver for Failure to Seek Relief*.  The failure or delay of the DIP Agent, the DIP Lenders or any of the Prepetition Secured Parties to exercise rights and remedies under this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents, the Prepetition Second Lien Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

26.    *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)    Subject to the limitations in paragraph 27(a) of this Interim Order, the DIP Agent

and the Prepetition Agents are hereby authorized, but not required, to file or record (and to execute

in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to

the maximum extent permitted by law) financing statements, intellectual property filings,

mortgages, depository account control agreements, notices of lien, or similar instruments in any

jurisdiction in order to validate and perfect the liens and security interests granted hereunder.

Whether or not the DIP Agent or the Prepetition Agents shall, in their sole discretion, choose to

file such financing statements, intellectual property filings, mortgages, notices of lien, or similar

instruments, such liens and security interests shall be deemed valid, automatically perfected,

allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject

to the priorities set forth in this Interim Order), at the time and on the date of entry of this Interim

Order.  Upon the request of the DIP Agent, the Prepetition Collateral Trustee, or the Prepetition

Second Lien Indenture Trustee, as applicable, each of the Prepetition Secured Parties and the

Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file

such instruments (in the case of the Prepetition Secured Parties, without representation or warranty

of any kind) to enable the DIP Agent, the Prepetition Collateral Trustee, or the Prepetition Second

Lien Indenture Trustee to further validate, perfect, preserve, and enforce the DIP Liens and the

applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have

been recorded and filed as of the Petition Date.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agent or

the applicable Prepetition Agents, be filed with or recorded in filing or recording offices in addition

to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all

filing offices are hereby authorized to accept such certified copy of this Interim Order for filing

and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)      Effective upon entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order.

27.      *Preservation of Rights Granted Under this Interim Order.*

(a)      Unless and until all DIP Obligations, Prepetition First Lien Obligations, and First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the Prepetition Second Lien Noteholders shall, in each case solely to the extent provided for in the Collateral Trust Agreement and applicable law: (i) take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Second Lien Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) be restricted from exercising any rights and remedies or taking any other actions in respect of the DIP Collateral to the extent provided by the Collateral Trust Agreement and applicable law.

(b)      Subject to the Carve Out, other than as set forth in this Interim Order, neither the DIP Liens nor the First Lien Adequate Protection Liens shall be made subject to or *pari passu* with

43

any lien or security interest granted in any of the Cases or arising after the Petition Date, and

neither the DIP Liens nor the First Lien Adequate Protection Liens shall be subject or junior to any

lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under

Bankruptcy Code section 551.

(c)     In the event this Interim Order or any provision hereof is vacated, reversed, or

modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Parties

hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this

Interim Order shall be governed in all respects by the original provisions of this Interim Order,

including entitlement to all rights, remedies, privileges, and benefits granted herein, and the

Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section

363(m) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all

Adequate Protection Obligations.

(d)     Subject to the Carve Out, unless and until all DIP Obligations, Prepetition First

Lien Obligations, Prepetition Second Lien Obligations, and Adequate Protection Obligations are

indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are

terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly

or indirectly (i) except as permitted under the DIP Documents and with the prior written consent

of the DIP Agent and the Required Lenders (x) any modification, stay, vacatur, or amendment of

this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured

claim against any of the Debtors (now existing or hereafter arising of any kind or nature

whatsoever, including, without limitation, any administrative expense of the kind specified in

Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Cases, equal or superior to the

DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the Prepetition First Lien

Obligations, and the Prepetition Second Lien Obligations (or the liens and security interests securing such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, the Prepetition First Liens, or the Prepetition Second Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases.

(e)     Notwithstanding any order dismissing any of the Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(f)        Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agents, and the Prepetition First Lien Lenders granted by the provisions of this Interim Order and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required Lenders).

28.        *Expenses and Indemnification.*

(a)        All (i) reasonable and documented out-of-pocket fees and expenses incurred by professionals or consultants retained by the DIP Agent and the DIP Lenders, including (x) the Ad

Hoc First Lien Advisors and (z) the Ad Hoc Crossover Group Advisors (collectively, the "DIP Professionals"), incurred in connection with the Cases (in any capacity) and the DIP Facility, whether or not the DIP Facility is successfully consummated, and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Agent and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby, are to be paid by the Debtors.  All fees and expenses described above shall be payable by the Debtors (whether accrued or incurred prior to, on, or after the Petition Date) within ten calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information) to the Debtors, the U.S. Trustee, and the Creditors' Committee (if any), without the necessity of filing motions or fee applications and such fees and expenses shall not be subject to any further review, challenge, or disgorgement following the expiration of such period.

(b)      As set forth in the DIP Facility, the Debtors will, jointly and severally, indemnify the DIP Lenders, the DIP Agent, and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement and other DIP Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable

judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence, or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in an final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's actual fraud, gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

29.    *Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral*

(a)    Notwithstanding anything to the contrary set forth in this Interim Order or in any other order of this Court to the contrary, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, shall be used to pay fees or expenses in excess of $150,000.00 per month in the aggregate on account of all Committee Professionals (the "Committee Monthly Cap"); provided that any unused amounts may be carried forward to a subsequent month.

(b)    Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used: (a) to investigate (except as expressly provided herein), initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (i) against any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (each in their capacities as such) or seeking relief that would impair the rights and remedies of the

48

DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (each in their capacities as such) under the DIP Documents, this Interim Order, or the Prepetition Credit Documents to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, as provided for herein, or seeking affirmative relief against any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties related to the DIP Obligations, or the Prepetition Secured Obligations, (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Agent's and the DIP Lenders' liens or security interests in the DIP Collateral, the Prepetition Secured Obligations or the Prepetition Liens, or (iii) for monetary, injunctive, or other affirmative relief against the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties (each in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority Claims, that would impair the ability of any of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Obligations to the extent permitted or provided hereunder; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations, or by or on behalf

of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as defined herein) related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations, or the Prepetition Liens; (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations or the Prepetition Liens; and (e) assert any claims, defenses, or any other causes of action any non-Debtor affiliates with respect to prepetition relationships with the Debtors; provided that (i) no more than $25,000.00 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate the foregoing matters with respect to the Prepetition Secured Obligations, and the Prepetition Liens within the Challenge Period (as defined herein); and (ii) no more than $25,000.00 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate the any claims or causes of action against

non-Debtor affiliates within the Challenge Period (clauses (i) and (ii), collectively, the "Challenge Budget").

(c)      All fees and expenses of the Committee Professionals in excess of (i) the Committee Monthly Cap and/or (ii) the Challenge Budget, as applicable, shall not be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code or otherwise.

30.      *Effect of Stipulations on Third Parties.*

(a)      The Debtors' acknowledgments, stipulations, admissions, waivers, and releases set forth in this Interim Order shall be binding on the Debtors, their respective representatives, successors and assigns upon entry of this Interim Order.  The acknowledgments, stipulations, admissions, waivers, and releases contained in this Interim Order shall also be binding upon the Debtors' estate and all other parties in interest, including the Creditors' Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (a) such party with requisite standing, has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Secured Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition Liens or the Prepetition Secured Obligations by no later than (i) with respect to any Creditors' Committee, the date that is 60 days after the Creditors' Committee's formation or (ii) with respect to other parties in interest, no later than the date that is 75 days after the entry of this Interim Order (the time period established by the later of the foregoing clauses (i) and (ii), the "Challenge Period"); provided that in the event that, prior to the expiration of the Challenge Period, (x) these chapter 11 cases are converted to chapter 7 or (y) a

chapter 11 trustee is appointed in these chapter 11 cases, then, in each such case, the Challenge

Period shall be extended for a period of 60 days solely with respect to any Trustee, commencing

on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (b) an

order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor

of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding.

If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period,

without further order of this Court: (x) the Prepetition Secured Obligations shall constitute allowed

claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff,

subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment,

reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined

by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual

or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-

bankruptcy law), for all purposes in these Cases and any subsequent chapter 7 cases, if any; (y) the

Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding,

perfected and of the priority specified in paragraphs 4(b) and 4(d), not subject to setoff,

subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction,

recoupment, or recovery; and (z) the Prepetition Secured Obligations, the Prepetition Liens on the

Prepetition Collateral and the Prepetition Secured Parties (in their capacities as such) shall not be

subject to any other or further challenge and any party in interest shall be forever enjoined and

barred from seeking to exercise the rights of the Debtors' estates or taking any such action,

including any successor thereto (including any estate representative or a Trustee, whether such

Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If

any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, (a)

the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding and (b) any Claims and Defenses not brought in such adversary proceeding shall be forever barred; underlined provided that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)     Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Credit Documents or the Prepetition Secured Obligations.

31.     *Release*.  Subject to the rights and limitations set forth in paragraphs 29 and 30 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Secured Parties, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions,

suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations or the Prepetition Liens, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties.

32.    *Collateral Trust Agreement.*  The rights of the Prepetition Secured Parties shall at all times remain subject to the Collateral Trust Agreement.

33.    *Credit Bidding.*  (a) The DIP Agent, or any assignee or designee of the DIP Agent, acting at the direction of the Required Lenders and on behalf of the DIP Parties, shall have the unqualified right to credit bid up to the full amount of any DIP Obligations in the sale of any of the Debtors' assets, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, and (b) subject to the indefeasible payment in full in cash of the DIP Obligations, the Prepetition First Lien Agents (on behalf of the Prepetition First Lien Lenders) shall have the right to credit bid (x) up to the full amount of the Prepetition First Lien Obligations and (y) the First Lien Adequate Protection Obligations in the sale of any of the Debtors' assets, including, but not limited to, pursuant to (i)

Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725.  The DIP Agent, at the direction of the Required Lenders, and on behalf of the DIP Parties, shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Parties to any acquisition entity or joint venture formed in connection with such bid.

34.     *Prepetition Undrawn Letter of Credit.*  Subject to the Cash Flow Forecast in all respects, (i) within ten (10) days from entry of this Interim Order, the Debtors shall (i) post cash collateral with the Prepetition First Lien Administrative Agent equal to 103% of the face amount of that issued and undrawn letter of credit in favor of Rockwood Insurance (relating to the Debtors' workers' compensation program) (the "Prepetition Undrawn Letter of Credit") and (ii) within thirty (30) days from entry of this Interim Order, provide the Prepetition First Lien Administrative Agent with evidence of the release and/or cancellation of all other issued and undrawn letters of credit in existence as of the Petition Date.  Notwithstanding anything to the contrary set forth in this Interim Order or in the Final Order, the Prepetition First Lien Administrative Agent (for the benefit of the Prepetition First Lien Revolving Lenders) shall have a first priority lien and security interest in and to such cash collateral as security for any unreimbursed obligations owing to the Prepetition First Lien Revolving Lenders on account of any draws or presentments on such letters of credit.  In the event of any presentment of the Prepetition Undrawn Letter of Credit which are not immediately reimbursed by the Debtors pursuant to the terms of the Prepetition First Lien Credit Agreement, the Prepetition First Lien Administrative Agent is authorized to apply such cash collateral to the payment of such unreimbursed obligations.

35.     *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order or the DIP Documents, the provisions of this Interim Order shall govern.

36.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any Creditors' Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, and the Prepetition First Lien Parties, <u>provided</u> that, except to the extent expressly set forth in this Interim Order, the Prepetition First Lien Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

37.     *Limitation of Liability*.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents, the Prepetition First Lien Credit Documents, or the Prepetition Second Lien Documents, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary

56

duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

38.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

39.    *Final Hearing*.  The Final Hearing is scheduled for [___] at [___], prevailing Central time, before this Court.  The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to any Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file a written objection thereto, which shall be served upon the Notice Parties, and shall also be filed with the Clerk of the United States Bankruptcy Court, Eastern District of Missouri, in each case to allow actual receipt by the foregoing no later than [___] at [___], prevailing Central Time.

Dated: _____, 2020

THE HONORABLE KATHY SURRATT-STATES
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**Cash Flow Forecast**

## **Exhibit 2**

**DIP Credit Agreement**

*EXHIBIT L*

**[RESERVED]**

*EXHIBIT M-1*

### FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BENE-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]


By: _____
    Name:
    Title:

Date:    , 20[ ]

*EXHIBIT M-2*

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as amended, restated, supplemented or otherwise modified from time to time) (the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By: _____
    Name:
    Title:

Date:   , 20[ ]

*EXHIBIT M-3*

### FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as amended, restated, supplemented or otherwise modified from time to time) (the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]


By: _____
    Name:
    Title:

Date:    , 20[ ]

*EXHIBIT M-4*

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of March 11, 2020 (as amended, restated, supplemented or otherwise modified from time to time) (the "Credit Agreement"; the terms defined therein being used herein as therein defined), among FORESIGHT ENERGY LLC, a Delaware limited liability company, as a debtor and debtor-in-possession, as borrower (the "Borrower"), FORESIGHT ENERGY GP LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "General Partner"), FORESIGHT ENERGY LP, a Delaware limited partnership, as a debtor and debtor-in-possession ("Holdings"), CERTAIN SUBSIDIARIES OF BORROWER, each as a debtor and debtor-in-possession, as Guarantors, each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender") and Cortland Capital Market Services LLC, as Administrative Agent and Collateral Agent.

Pursuant to the provisions of Section 3.01 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881 (c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS

Form W-8BEN or W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By: _____
Name:
Title:

Date:    , 20[ ]

## **<u>Exhibit G</u>**

Exhibit G

Depositories and Nominees Service List

Served via Email

| Name | Email |
|------|-------|
| Broadridge | SpecialProcessing@broadridge.com; BankruptcyJobs@broadridge.com |
| Clearstream | nathalie.chataigner@clearstream.com; cherifa.maameri@clearstream.com; CA_Luxembourg@clearstream.com; david.mccauley@clearstream.com; ca_mandatory.events@clearstream.com; hulya.din@clearstream.com |
| DTC | MandatoryReorgAnnouncements@dtcc.com; voluntaryreorgannouncements@dtcc.com; LegalAndTaxNotices@dtcc.com; rgiordano@dtcc.com; |
| Euro Clear | drit@euroclear.com; 'JPMorganInformation.Services@jpmorgan.com'; eb.ca@euroclear.com |
| Mediant | darchangel@mediantonline.com'; mtaylor@mediantonline.com; mdickens@mediantonline.com; 'mhamdan@mediantonline.com' 'mkoester@mediantonline.com'; 'documents@mediantonline.com' |
| SIS | ca.notices@six-securities-services.com |
| Ameriprise Financial (0216) | Email Redacted |
| Bank of America Corporate Actions | Email Redacted |
| Bank of America (0955) | Email Redacted |
| BANK OF NEW YORK MELLON (0901/2510/8320) | Email Redacted |
| BARCLAYS CAPITAL /BARCLAYS BANK (0229/7254/510 | Email Redacted |
| BB & T SECURITIES(0702) | Email Redacted |
| BMO NSBT BURNS (5043) | Email Redacted |
| BNP PARIBAS (2787/1569/2154) | Email Redacted |
| BNY MELLON/ NE TRUST (0954/2485) | Email Redacted |
| BROWN BROTHERS HARRIMAN & CO. (0010) | Email Redacted |
| CANTOR FITZGERALD (7311/0197) | Email Redacted |
| CAVALI ICLV S.A. (2011) | Email Redacted |
| CHARLES SCHWAB & CO., INC. (0164) | Email Redacted |
| CIBC Mellon (0954/5030) | Email Redacted |
| CITIBANK, N.A. (0908/0418/0505/0274) | Email Redacted |
| COMERICA BANK (2108) | Email Redacted |
| CREDIT SUISSE SECURITIES USA LLC - (0355) | Email Redacted |
| CREST INTL NOMINEES LIMITED (2012) | Email Redacted |
| DAVENPORT & COMPANY LLC (0715) | Email Redacted |
| DESERET TRUST COMPANY - I (2497) | Email Redacted |

In re: Foresight Energy LP, *et al.*
Case No. 20-41308-659

Exhibit G

Depositories and Nominees Service List

Served via Email

| Name | Email |
|---|---|
| DEUTSCHE BANK SECURITIES (0573) | Email Redacted |
| E*TRADE /RIDGE CLEARING (0158/0358) | Email Redacted |
| EDWARD JONES (0057) | Email Redacted |
| FIRST CLEARING, LLC (0141) | Email Redacted |
| FIRST SOUTHWEST COMPANY (0309) | Email Redacted |
| GOLDMAN SACHS (0005 / 5208 / 2941) | Email Redacted |
| HSBC (8396) | Email Redacted |
| Huntington (2305) | Email Redacted |
| INGALLS & SNYDER, L.L.C. (0124) | Email Redacted |
| INTERACTIVE BROKERS/TH (0534) | Email Redacted |
| INTL FCSTONE, INC.f.k.a STERNE, AGEE & LEACH, INC. | Email Redacted |
| J.P. MORGAN CLEARING CORP. (0352/2035/0902) | Email Redacted |
| JANNEY MONTGOMERY SCOTT INC. (0374) | Email Redacted |
| JEFFERIES (0019) | Email Redacted |
| JPMorgan (2424) | Email Redacted |
| JPMorgan (8187) | Email Redacted |
| JPMs LLC (187) | Email Redacted |
| KEYBANK NA/FBO TREASURER OF OHIO (2769) | Email Redacted |
| LPL FINANCIAL CORPORATION (0075) | Email Redacted |
| M&I MARSHALL & ILSLEY BANK (0992) | Email Redacted |
| MERRILL LYNCH (0161/5198/0773) | Email Redacted |
| MITSUB UFJ (2932) | Email Redacted |
| Morgan Stanley (0050) | Email Redacted |
| MORGAN STANLEY SMITH BARNEY LLC (0015) | Email Redacted |
| MUFG (2145) | Email Redacted |
| NATIONAL FINANCIAL SERVICES LLC (0226) | Email Redacted |
| NOMURA SECURITIES/FIXED INCOME (5222) | Email Redacted |
| NORTHERN TRUST CO (2669) | Email Redacted |
| OPPENHEIMER & CO. INC. (0571) | Email Redacted |
| PERSHING LLC (0443) | Email Redacted |
| RAYMOND JAMES & ASSOCIATES, INC. (0725) | Email Redacted |
| REGIONS BANK (0971) | Email Redacted |

Exhibit G

Depositories and Nominees Service List

Served via Email

| Name | Email |
|------|-------|
| ROBERT W. BAIRD & CO. (0547) | Email Redacted |
| SCOTIA CAPITAL INC. /CDS (5011/4812) | Email Redacted |
| Scottrade (0705) | Email Redacted |
| SEI PRIVATE (2039/2663) | Email Redacted |
| SOUTHWEST SECURITIES, INC. (0279) | Email Redacted |
| STATE STREET BANK AND TRUST (0997/2319/2950) | Email Redacted |
| STIFEL, NICOLAUS & CO (0793) | Email Redacted |
| TD AMERITRADE CLEARING, INC. (0188) | Email Redacted |
| TD Waterhouse /CDS ( 5036) | Email Redacted |
| TRADESTATION | Email Redacted |
| U.S. BANK N.A. (2803) | Email Redacted |
| UBS FINANCIAL SERVICES LLC (0221) | Email Redacted |
| US Bank (2803) | Email Redacted |
| VANGUARD (0062) | Email Redacted |
| WEDBUSH MORGAN SECURITIES (0103) | Email Redacted |
| WELLS FARGO (0250/2027) | Email Redacted |
| CDS | Email Redacted |
| DESJARDINS(5028) | Email Redacted |
| Cor Clearing LLC(0052) | Email Redacted |

**Exhibit H**

Exhibit H

Lenders Service List

Served via Email

| NAME | EMAIL |
|------|-------|
| BANK OF AMERICA N.A | Emails Redacted |
| BARCLAYS BANK PLC NY | Emails Redacted |
| BLUEMOUNTAIN CLO 2013-1 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2014-2 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2015-1 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2015-2 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2015-3 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2015-4 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2016-1 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2016-3 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2018-1 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2018-2 LTD | Emails Redacted |
| BLUEMOUNTAIN CLO 2018-3 LTD | Emails Redacted |
| BLUEMOUNTAIN FUJI US CLO II | Emails Redacted |
| VENTURE XXVIII CLO | Emails Redacted |
| CENT CLO 19 LIMITED | Emails Redacted |
| CENT CLO 21 LIMITED | Emails Redacted |
| CENT CLO 24 LIMITED | Emails Redacted |
| COLUMBIA CENT CLO 27 LTD | Emails Redacted |
| COLUMBIA CENT CLO 28 LIMITED | Emails Redacted |
| COLUMBIA FLOATING RATE FUND | Emails Redacted |
| CORBIN ERISA OPPORTUNITY FUND | Emails Redacted |
| CORBIN OPPORTUNITY FUND LP | Emails Redacted |
| CREDIT SUISSE LOAN FUNDING LLC | Emails Redacted |
| CVP CLO 2017-2 LTD | Emails Redacted |
| CVP CLO 2017-1 LTD | Emails Redacted |
| DEUTSCHE BANK AG CAYMAN ISLAND | Emails Redacted |
| ELLINGTON CLO I | Emails Redacted |
| ELLINGTON CLO II LTD | Emails Redacted |

Exhibit H

Lenders Service List
Served via Email

| NAME | EMAIL |
|------|-------|
| ELLINGTON CLO III LTD | Emails Redacted |
| ELLINGTON CLO IV LTD | Emails Redacted |
| NEWSTAR FAIRFIELD FUND CLO LTD | Emails Redacted |
| NEWSTAR EXETER FUND CLO LLC | Emails Redacted |
| GOLDMAN SACHS LENDING PTNRS | Emails Redacted |
| MARATHON CLO IX LTD | Emails Redacted |
| MARATHON CLO V LTD | Emails Redacted |
| MARATHON CLO VI, LTD | Emails Redacted |
| MARATHON CLO VII, LTD | Emails Redacted |
| MARATHON CLO VIII, LTD | Emails Redacted |
| MARATHON CLO X LTD | Emails Redacted |
| MARATHON CLO XI LTD | Emails Redacted |
| QUAMVIS SCA SICAV-FIS: CMAB | Emails Redacted |
| MEADOWVEST FUNDING LLC | Emails Redacted |
| VENTURE 28A CLO LIMITED | Emails Redacted |
| VENTURE 35 CLO LIMITED | Emails Redacted |
| VENTURE 36 CLO | Emails Redacted |
| VENTURE XII CLO LIMITED | Emails Redacted |
| VENTURE XIII CLO LIMITED | Emails Redacted |
| VENTURE XIV CLO LIMITED | Emails Redacted |
| VENTURE XIX CLO LIMITED | Emails Redacted |
| VENTURE XV CLO LIMITED | Emails Redacted |
| VENTURE XVI CLO LIMITED | Emails Redacted |
| VENTURE XVII CLO LIMITED | Emails Redacted |
| VENTURE XVIII CLO LIMITED | Emails Redacted |
| VENTURE XX CLO LIMITED | Emails Redacted |
| VENTURE XXI CLO LIMITED | Emails Redacted |
| VENTURE XXII CLO LIMITED | Emails Redacted |
| VENTURE XXIII CLO LIMITED | Emails Redacted |

In re: Foresight Energy LLC, et al.
Case No. 20-41308-659

Page 2 of 4

Exhibit H

Lenders Service List

Served via Email

| NAME | EMAIL |
|------|-------|
| VENTURE XXIV CLO LIMITED | Emails Redacted |
| VENTURE XXIX CLO LIMITED | Emails Redacted |
| VENTURE XXV CLO LIMITED | Emails Redacted |
| VENTURE XXVI CLO LIMITED | Emails Redacted |
| VENTURE XXVII CLO LIMITED | Emails Redacted |
| OAKTREE CLO 2014-1 LTD. | Emails Redacted |
| OAKTREE CLO 2015-1 LTD | Emails Redacted |
| OAKTREE CLO 2018-1 LTD | Emails Redacted |
| OAKTREE CLO 2019-1 LTD | Emails Redacted |
| OAKTREE EIF III SERIES I, LTD | Emails Redacted |
| OAKTREE EIF III SERIES II | Emails Redacted |
| OAKTREE SENIOR LOAN FUND | Emails Redacted |
| OAKTREE CLO 2019-2 LTD | Emails Redacted |
| THE MANGROVE PARTNERS MST FD | Emails Redacted |
| B&M CLO 2014-1 LTD | Emails Redacted |
| TICP CLO VI 2016-2 FUNDING LTD | Emails Redacted |
| AIG SENIOR FLOAT RATE | Emails Redacted |
| BRITISH COAL STAFF SUP ANN SCH | Emails Redacted |
| HARTFORD TOTAL RETURN BOND ETF | Emails Redacted |
| HARTFORD TOTAL RETURN BOND HLS | Emails Redacted |
| METROPOLITAN SERIES FUND - MET | Emails Redacted |
| MINEWORKERS PENSION SCHEME | Emails Redacted |
| SAEV MASTERFONDS WELLINGTON GL | Emails Redacted |
| SAFETY INSURANCE COMPANY | Emails Redacted |
| SEASONS SERIES TRUST-SA MULTI | Emails Redacted |
| THE HARTFORD FLOAT RATE FUND | Emails Redacted |
| THE HARTFORD FLOAT RATE HIGH | Emails Redacted |
| THE HARTFORD STRATEGIC INC FD | Emails Redacted |
| THE HARTFORD TOTAL RETURN BOND | Emails Redacted |

Exhibit H

Lenders Service List

Served via Email

| NAME | EMAIL |
|---|---|
| WCF MUTUAL INSURANCE COMPANY | Emails Redacted |
| WELLINGTON MULTI-SECTOR CR FD | Emails Redacted |
| WELLINGTON TS CO MULSEC CRD II | Emails Redacted |
| WELLINGTON TST CO NAMCIF TSTII | Emails Redacted |
| WELLINGTON TST CO NAMCTFT CBP | Emails Redacted |
| WELLINGTON TST CO NAMCTFT OFIA | Emails Redacted |
| WELLINGTON TST CO NAMCTFT OISB | Emails Redacted |
| WELLINGTON WORLD BOND FUND | Emails Redacted |
| JOHN HANCOCK VARIABLE INS TST | Emails Redacted |
| ZAIS CLO 1 LTD | Emails Redacted |
| ZAIS CLO 11 LTD | Emails Redacted |
| ZAIS CLO 13 LTD | Emails Redacted |
| ZAIS CLO 2 LTD | Emails Redacted |
| ZAIS CLO 3 LTD | Emails Redacted |
| ZAIS CLO 5 LTD | Emails Redacted |
| ZAIS CLO 6 LTD | Emails Redacted |
| ZAIS CLO 7 LTD | Emails Redacted |
| ZAIS CLO 8 LIMITED | Emails Redacted |
| ZAIS CLO 9 LTD | Emails Redacted |

In re: Foresight Energy LLC, et al.
Case No. 20-41308-659

Page 4 of 4