> **THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1125(a). THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS WILL NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS PROPOSED DISCLOSURE STATEMENT. THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT.**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT FOR JOINT
## CHAPTER 11 PLAN OF REORGANIZATION OF
## <u>FORESIGHT ENERGY LP AND ITS AFFILIATED DEBTORS</u>

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta
Alice Belisle Eaton
Alexander Woolverton
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Co-Counsel for Debtors and Debtors in Possession*

**ARMSTRONG TEASDALE LLP**
Richard W. Engel, Jr. (MO 34641)
John G. Willard (MO 67049)
Kathryn R. Redmond (MO 72087)
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile: (314) 621-5065

*Co-Counsel for Debtors and Debtors in Possession*

Dated: April 9, 2020

> **UNLESS EXTENDED BY THE DEBTORS, THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS <u>4:00 P.M. (PREVAILING CENTRAL TIME) ON JUNE 16, 2020</u> (THE "<u>VOTING DEADLINE</u>").  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS <u>MAY 11, 2020</u> (THE "<u>RECORD DATE</u>").**

# DISCLOSURE STATEMENT

*Solicitation of Votes on the Plan of Reorganization of*

## FORESIGHT ENERGY LP, *et al.* [1]

*from the Holders of outstanding*

### First Lien Facility Claims
### Second Lien Notes Claims
### General Unsecured Claims

Dated:  April 9, 2020

> **ONLY HOLDERS OF ALLOWED FIRST LIEN FACILITY CLAIMS (CLASS 3), SECOND LIEN NOTES CLAIMS (CLASS 4), AND GENERAL UNSECURED CLAIMS (CLASS 5 AND, COLLECTIVELY WITH CLASSES 3, 4, AND 5, THE "<u>VOTING CLASSES</u>") ARE ENTITLED TO VOTE ON THE PLAN AND ARE BEING SOLICITED TO VOTE ON THE PLAN (THE "<u>SOLICITATION</u>") UNDER THIS DISCLOSURE STATEMENT.**

---

[1]    The debtors and debtors in possession (collectively, the "<u>Debtors</u>," the "<u>Company</u>," or "<u>Foresight</u>") that are the subject of this Disclosure Statement and the Plan, along with the last four digits of each Debtor's federal tax identification number, are:  Foresight Energy LP (8894); Foresight Energy GP LLC (8332); Foresight Energy LLC (7685); Foresight Energy Employee Services Corporation (7023); Foresight Energy Services LLC (6204); Foresight Receivables LLC (2250); Sugar Camp Energy, LLC (8049); Macoupin Energy LLC (9005); Williamson Energy, LLC (9143); Foresight Coal Sales LLC (8620); Tanner Energy LLC (0409); Sitran LLC (9962); Seneca Rebuild LLC (0958); Oeneus LLC (6007); Adena Resources, LLC (4649); Hillsboro Transport LLC (6881); American Century Transport LLC (4059); Akin Energy LLC (1648); American Century Mineral LLC (8894); Foresight Energy Finance Corporation (5321); Foresight Energy Labor LLC (4176); Viking Mining LLC (4981); M-Class Mining, LLC (5272); MaRyan Mining LLC (7085); Mach Mining, LLC (4826); Logan Mining LLC (2361); LD Labor Company LLC (8454); Coal Field Repair Services LLC (9179); Coal Field Construction Company LLC (5694); Hillsboro Energy LLC (1639); and Patton Mining LLC (7251).   All of the Debtors are incorporated or organized in the state of Delaware.  The address of the Debtors' corporate headquarters is One Metropolitan Square, 211 North Broadway, Suite 2600, St. Louis, Missouri 63102.

**RECOMMENDATION BY THE BOARD AND KEY STAKEHOLDER SUPPORT**

The Board of Directors (the "<u>Board</u>") of Foresight Energy LP's ("<u>FELP</u>") general partner, Foresight Energy GP LLC ("<u>GP LLC</u>"), and the board of directors, managers, or members, as applicable, of each of its affiliated and subsidiary Debtors (as of the date hereof) have unanimously approved the transactions contemplated by the Plan and recommend that all creditors whose votes are being solicited submit ballots to **accept** the Plan.

Holders of over 69% of the First Lien Facility Claims (the "<u>Consenting First Lien Lenders</u>") and over 82% of the Second Lien Notes Claims (the "<u>Consenting Second Lien Noteholders</u>," and together with the Consenting First Lien Lenders, the "<u>Consenting Lenders</u>") have already agreed, subject to the terms and conditions of the Restructuring Support Agreement (as defined herein), to vote in favor of the Plan.

## DISCLAIMERS

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING ALL ATTACHED EXHIBITS AND DOCUMENTS INCORPORATED INTO THIS DISCLOSURE STATEMENT, AS WELL AS THE RISK FACTORS DESCRIBED IN ARTICLE IX OF THIS DISCLOSURE STATEMENT.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DIP PUT OPTION PREMIUM AND THE DIP EXIT PREMIUM, WILL BE ISSUED WITHOUT REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "<u>SECURITIES ACT</u>"), OR SIMILAR U.S. FEDERAL, STATE, OR LOCAL LAWS TO PERSONS RESIDENT OR OTHERWISE LOCATED IN THE UNITED STATES IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE (THE "<u>BANKRUPTCY CODE</u>").  CERTAIN OTHER SECURITIES WILL BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE U.S. FEDERAL AND APPLICABLE STATE AND LOCAL SECURITIES LAWS AND THE LAWS OF FOREIGN JURISDICTIONS, AS APPLICABLE.   TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR ISSUED TO PERSONS RESIDENT OR OTHERWISE LOCATED IN THE UNITED STATES EXCEPT PURSUANT TO (I) AN EFFECTIVE REGISTRATION STATEMENT OR (II) AN

EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

NO SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY WHETHER IN THE UNITED STATES OR ELSEWHERE. THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED FOR APPROVAL WITH THE SEC OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE IN THE UNITED STATES. NEITHER THIS SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS." SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," "FORECAST," "OUTLOOK," "BUDGET," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.

Forward-looking statements may include statements about:

- our exposure to fluctuations in the market price of coal;
- the price and availability of other fuels, including natural gas and other energy sources;
- our possible inability to win new contracts and to renew or extend existing contracts;
- a possible decline in or continued subdued activity by the Company's customers;
- our exposure to political, social, and economic instability in the Company's markets, acts of insurrection, terrorism, war or other conflict, possible adverse impacts of regulatory, legislative, tax, or other judicial developments;
- weather conditions;
- increased competition in the Company's industry and the Company's possible inability to retain or increase its prices and market shares;
- our possible inability to manage the Company's anticipated growth;
- our dependence on the Company's senior personnel and the Company's possible inability to attract and retain sufficient skilled personnel to meet the Company's operational requirements;
- a major accident or combustion event during the Company's operations;
- an increasing reliance on alternative, non-hydrocarbon energy sources;

- our possible inability to acquire and profitably integrate attractive technology, or develop and market new technology;
- our possible inability to obtain visas and work permits for the Company's employees on a timely basis;
- the policies of various domestic governments regarding development of their coal reserves, including the impact of social policy and mandatory local employment or supplier commitments;
- increased government regulation of the coal industry and energy and utility users thereof;
- changes in tax laws or tax rates;
- complaints or litigation against us;
- trade restrictions or embargoes by the United States and other countries;
- fluctuations in foreign currency exchange rates;
- foreign exchange controls;
- our cash flows and liquidity;
- our business strategy and prospect for growth;
- *force majeure* events and the economic impact related to COVID-19;
- the implementation of the Restructuring Transactions (as defined herein); and
- the factors as set out in Article IX of this Disclosure Statement—"Certain Risk Factors To Be Considered," and other factors that are not known to us at this time.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN, EXCEPT AS MAY BE REQUIRED BY APPLICABLE LAW. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE PRESENTED IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. FOR MORE INFORMATION REGARDING THE FACTORS THAT MAY CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE PRESENTED IN THE FORWARD-LOOKING STATEMENTS, PLEASE REFER TO ARTICLE IX OF THIS DISCLOSURE STATEMENT—"CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE

3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT AFTER THE PETITION DATE, AND THE OFFER OF CERTAIN NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE, AND THAT CERTAIN OTHER NEW SECURITIES ARE EXEMPT PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D PROMULGATED THEREUNDER, AND EXPECT THAT THE OFFER AND ISSUANCE OF THE SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND SECTION 4(A)(2) OF THE SECURITIES ACT.

ALL SECURITIES DESCRIBED HEREIN ARE EXPECTED TO BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS ("BLUE SKY LAWS") AND IT IS EXPECTED THAT THE OFFER AND ISSUANCE OF CERTAIN SECURITIES UNDER THE PLAN, INCLUDING THE NEW COMMON EQUITY, THE DIP PUT OPTION PREMIUM, AND THE DIP EXIT PREMIUM, BUT EXCLUDING SECURITIES ISSUED AS THE EXIT FACILITY EQUITY COMPONENT AND THE EXIT FACILITY PUT OPTION PREMIUM, WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAWS BY REASON OF THE APPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE.

TO THE EXTENT THAT THE DEBTORS RELY ON A PRIVATE PLACEMENT EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT FOR THE OFFER AND ISSUANCE OF ANY SECURITIES, THOSE SECURITIES WILL BE SUBJECT TO RESTRICTIONS ON TRANSFER UNDER THE SECURITIES ACT AND MAY ONLY BE RESOLD OR OTHERWISE TRANSFERRED PURSUANT TO (I) AN EFFECTIVE REGISTRATION STATEMENT OR (II) AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY NEW COMMON EQUITY PURSUANT TO THE CHAPTER 11 CASES CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH NEW COMMON EQUITY.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF

DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OR A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, A SUMMARY OF THE PLAN, CERTAIN EVENTS LEADING UP TO AND EXPECTED TO OCCUR IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE OR THAT MAY BE FILED LATER WITH THE PLAN SUPPLEMENT. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS, BY REFERENCE TO SUCH DOCUMENT OR STATUTORY PROVISIONS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT AS OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION AND THE LIQUIDATION ANALYSIS, THE FINANCIAL INFORMATION AND LIQUIDATION ANALYSIS CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS OTHERWISE EXPRESSLY PROVIDED HEREIN) AND NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

NEITHER THIS DISCLOSURE STATEMENT, THE PLAN, THE CONFIRMATION ORDER, NOR THE PLAN SUPPLEMENT WAIVE ANY RIGHTS OF THE DEBTORS WITH RESPECT TO THE HOLDERS OF CLAIMS OR INTERESTS BEFORE THE EFFECTIVE DATE. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A

STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS OR IS NOT IDENTIFIED IN THIS DISCLOSURE STATEMENT.  EXCEPT AS PROVIDED UNDER THE PLAN, THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS ON THE TERMS SPECIFIED IN THE PLAN.

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS SENT.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE COMPANY AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, BEFORE DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO

ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) AGAINST THE DEBTORS WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

NOTWITHSTANDING ANY RIGHTS OF APPROVAL PURSUANT TO THE RESTRUCTURING SUPPORT AGREEMENT OR OTHERWISE AS TO THE FORM OR SUBSTANCE OF THIS DISCLOSURE STATEMENT, THE PLAN, OR ANY OTHER DOCUMENT RELATING TO THE TRANSACTIONS CONTEMPLATED THEREUNDER, NONE OF THE CONSENTING LENDERS, OR THEIR RESPECTIVE REPRESENTATIVES, MEMBERS, FINANCIAL OR LEGAL ADVISORS OR AGENTS, HAVE INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN OR TAKES ANY RESPONSIBILITY THEREFOR AND NONE OF THE FOREGOING ENTITIES OR PERSONS MAKES ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER CONCERNING THE INFORMATION CONTAINED HEREIN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED (OR WAIVED).

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION.................................................................................................1

ARTICLE II. OVERVIEW OF FORESIGHT'S BUSINESSES AND OPERATIONS.............. 5
    A.      Overview of Foresight's Businesses and History ................................................. 5
    B.      Foresight's Mining & Other Operations ............................................................. 7
    C.      Foresight's Customer Base..................................................................................... 9
    D.      Foresight's Corporate Structure and Debtor Information..................................... 9
            1.      Foresight Entity Roles................................................................10
            2.      Foresight Corporate Management and Oversight.......................12
    E.      Overview of Foresight's Financial Position and Prepetition Debt Structure .......14
            1.      Foresight's Funded Indebtedness................................................14
            2.      Foresight's Other Financing Arrangements and Indebtedness.................17
            3.      Foresight's Equity Ownership ....................................................20

ARTICLE III. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11
            CASES ................................................................................................21
    A.      Adverse Market Conditions .................................................................................21
    B.      Foresight's Operational and Contingency Efforts ..............................................22
    C.      Restructuring Negotiations with Key Stakeholders ............................................23
    D.      Restructuring Support Agreement .......................................................................24
    E.      Milestones ...........................................................................................................24

ARTICLE IV. THE CHAPTER 11 CASES ............................................................................26
    A.      Commencement of the Chapter 11 Cases ...........................................................26
    B.      First Day Motions ...............................................................................................26
            1.      DIP Facility.................................................................................26
            2.      Cash Management.......................................................................27
            3.      Trade Creditors...........................................................................27
             4.      Wages.........................................................................................27
            5.      Coal Sale Contracts.....................................................................27
            6.      Customer Programs.....................................................................28
             7.      Taxes..........................................................................................28
            8.      Surety Bonds..............................................................................28
             9.      Insurance.....................................................................................28
            10.     Utilities.......................................................................................28
            11.     Other Procedural Motions and Retention of Professionals. ...................28
    C.      Confirmation Hearing ..........................................................................................29

ARTICLE V. RENEGOTIATED ARRANGEMENTS WITH KEY
            COUNTERPARTIES.......................................................................29

ARTICLE VI. SUMMARY OF PLAN....................................................................................30
    A.      Administrative, DIP Facility and Priority Claims and Statutory Fees.................30

|      | 1.  | Administrative Claims. ........................................................ | 30 |
|      | 2.  | Professional Fee Claims ...................................................... | 31 |
|      | 3.  | DIP Claims. ......................................................................... | 32 |
|      | 4.  | Priority Tax Claims............................................................. | 33 |
|      | 5.  | Statutory Fees. .................................................................... | 33 |
| B.   | Classification and Treatment of Claims and Interests............... | | 33 |
|      | 1.  | Classification in General. ................................................... | 33 |
|      | 2.  | Formation of Debtor Group for Convenience Only.............. | 34 |
|      | 3.  | Summary of Classification. ................................................ | 34 |
|      | 4.  | Treatment of Claims and Interests. .................................... | 35 |
| C.   | Means for Implementation of the Plan ...................................... | | 39 |
|      | 1.  | General Settlement of Claims and Interests........................ | 39 |
|      | 2.  | Restructuring Transactions. ............................................... | 40 |
|      | 3.  | Cancellation of Liens. ......................................................... | 41 |
|      | 4.  | Sources of Consideration for Plan Distributions. ............... | 41 |
|      | 5.  | Corporate Existence............................................................ | 43 |
|      | 6.  | Vesting of Assets in the Reorganized Debtors.................... | 44 |
|      | 7.  | Cancellation of Existing Securities and Agreements. ........ | 44 |
|      | 8.  | Corporate Action. ................................................................ | 46 |
|      | 9.  | Corporate Governance of Reorganized Debtors................. | 46 |
|      | 10. | Effectuating Documents; Further Transactions................... | 47 |
|      | 11. | Exemption from Certain Taxes and Fees............................ | 47 |
|      | 12. | Preservation of Causes of Action. ...................................... | 47 |
|      | 13. | Director and Officer Liability Insurance. ........................... | 48 |
|      | 14. | Management Incentive Plan. ............................................... | 48 |
|      | 15. | GUC Cash Pool Account...................................................... | 49 |
|      | 16. | GUC Administrator Account................................................ | 49 |
|      | 17. | Exemptions from Securities Act Registration Requirements. ......... | 49 |
|      | 18. | Notice of Effective Date..................................................... | 50 |
| D.   | Treatment of Executory Contracts and Unexpired Leases .......... | | 50 |
|      | 1.  | Assumption of Executory Contracts and Unexpired Leases. .......... | 50 |
|      | 2.  | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ................................................................ | 51 |
|      | 3.  | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.................................... | 52 |
|      | 4.  | Indemnification Obligations. .............................................. | 52 |
|      | 5.  | Insurance Policies. .............................................................. | 52 |
|      | 6.  | Modifications, Amendments, Supplements, Restatements or Other Agreements. ........................................................ | 52 |
|      | 7.  | Reservation of Rights. ......................................................... | 53 |
|      | 8.  | Nonoccurrence of Effective Date........................................ | 53 |
|      | 9.  | Contracts and Leases Entered into After the Petition Date. ......... | 53 |
| E.   | Disputed Claims........................................................................ | | 53 |
|      | 1.  | Retention of Claims, Rights Causes of Action, and Defenses............... | 53 |
|      | 2.  | GUC Administrator.............................................................. | 53 |
|      | 3.  | Claims Administration Responsibility................................. | 54 |

|   | 4. | Cooperation and Access................................................................54 |
|   | 5. | Objections to Claims.....................................................................54 |
|   | 6. | Disallowance of Claims.................................................................55 |
|   | 7. | Estimation of Claims.....................................................................55 |
|   | 8. | No Interest on Claims....................................................................55 |
|   | 9. | Amendments to Claims..................................................................56 |
| F. | Provisions Governing Distributions .............................................................56 |
|   | 1. | Disbursing Agent..........................................................................56 |
|   | 2. | Currency........................................................................................56 |
|   | 3. | No Distributions Pending Allowance............................................56 |
|   | 4. | Distribution Record Date...............................................................56 |
|   | 5. | Distributions on Account of Claims Allowed as of the Effective Date..................................................................................................56 |
|   | 6. | Distributions on Account of Claims Allowed After the Effective Date................................................................................................57 |
|   | 7. | Addresses for Distributions. .........................................................58 |
|   | 8. | Undeliverable Distributions...........................................................58 |
|   | 9. | Reversion.......................................................................................58 |
|   | 10. | *De Minimis* Distributions. ...........................................................59 |
|   | 11. | Fractional Distributions.................................................................59 |
|   | 12. | Accrual of Dividends and Other Rights..........................................59 |
|   | 13. | Compliance Matters.......................................................................59 |
|   | 14. | Claims Paid or Payable by Third Parties. ......................................60 |
|   | 15. | Applicability of Insurance Contracts..............................................60 |
|   | 16. | Setoffs...........................................................................................60 |
|   | 17. | Allocation of Plan Distributions Between Principal and Interest. ............61 |
| G. | Release, Injunction, and Related Provisions .................................................61 |
|   | 1. | Discharge of Claims and Termination of Interests. ...............................61 |
|   | 2. | Release of Liens. ...........................................................................61 |
|   | 3. | Releases by the Debtors. ...............................................................62 |
|   | 4. | Releases by Holders of Claims and Interests. .........................63 |
|   | 5. | Exculpation. ..................................................................................64 |
|   | 6. | Injunction. .....................................................................................64 |
|   | 7. | Waiver of Statutory Limitations on Releases............................65 |
|   | 8. | Protection Against Discriminatory Treatment. .........................65 |
|   | 9. | Special Provision Governing Professional Fee Claims and Final Fee Applications.............................................................................65 |
| H. | Conditions Precedent to Confirmation and Consummation of the Plan ..............65 |
|   | 1. | Conditions Precedent to Confirmation of the Plan. .................65 |
|   | 2. | Conditions Precedent to the Effective Date. ............................66 |
|   | 3. | Waiver of Conditions.....................................................................67 |
|   | 4. | Substantial Consummation.............................................................68 |
|   | 5. | Effect of Failure of a Condition. ..................................................68 |
| I. | Modification, Revocation or Withdrawal of the Plan ..........................68 |
|   | 1. | Modification and Amendments......................................................68 |
|   | 2. | Effect of Confirmation on Modifications. .................................68 |

      3.     Revocation or Withdrawal of the Plan. ...................................................68

J.     Retention of Jurisdiction.............................................................................69

ARTICLE VII. VALUATION OF THE REORGANIZED DEBTORS....................................71

ARTICLE VIII. TRANSFER RESTRICTIONS AND  CONSEQUENCES UNDER
              FEDERAL SECURITIES LAWS ..................................................72

A.    1145 Securities .........................................................................................72
      1.     Issuance ......................................................................................72
      2.     Subsequent Transfers .................................................................73
B.    Section 4(a)(2) Securities ..........................................................................74
      1.     Issuance ......................................................................................74
      2.     Subsequent Transfers .................................................................74

ARTICLE IX. CERTAIN UNITED STATES FEDERAL  INCOME TAX
              CONSEQUENCES OF THE PLAN..............................................77

A.    Introduction ...............................................................................................77
B.    The Restructuring Transactions ................................................................78
C.    U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims ........79
      1.     U.S. Federal Income Tax Consequences to U.S. Holders of
            Allowed First Lien FacilityClaims ...........................................79
      2.     U.S. Federal Income Tax Consequences to U.S. Holders of
            Allowed Second Lien Notes Claims ..........................................80
      3.     U.S. Federal Income Tax Consequences to U.S. Holders of
            Allowed General Unsecured Claims ..........................................81
      4.     Character of Gain and Loss ........................................................82
      5.     Accrued Interest and Original Issue Discount............................82
      6.     U.S. Federal Income Tax Consequences of the Ownership and
            Disposition of New Common Equity .........................................83
      7.     U.S Federal Income Tax Consequences of the Ownership and
            Disposition of the Exit Facility..................................................84
      8.     Tax Treatment of the Disputed Claims Reserve........................85
D.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed
    Claims ........................................................................................................85
      1.     U.S. Federal Income Tax Consequences to Non-U.S. Holders of
            Allowed Claims..........................................................................86
      2.     U.S. Federal Income Tax Consequences to Non-U.S. Holders of
            the Ownership and Disposition of New Common Equity........................87
      3.     U.S. Federal Income Tax Consequences to Non-U.S. Holders of
            the Ownership and Disposition of the New Facility................................89
      4.     FATCA .......................................................................................90
E.    Backup Withholding and Information Reporting .......................................90

ARTICLE X. CERTAIN RISK FACTORS TO BE CONSIDERED.......................................92

A.    Certain Bankruptcy Law Considerations .................................................92
      1.     Effect of Restructuring Proceedings...........................................92
      2.     Risk of Non-Confirmation of Plan under the Bankruptcy Code...............93

| | 3. | Non-Consensual Confirmation. .................................................93 |
|---|---|---|
| | 4. | Risk of Non-Occurrence of Effective Date..................................93 |
| | 5. | Risk of Termination of Restructuring Support Agreement. ...........93 |
| | 6. | Conversion into Chapter 7 Cases................................................93 |
| | 7. | Parties in Interest May Object to the Debtors' Classification of Claims and Interests................................................................94 |
| | 8. | Impact of the Chapter 11 Cases on the Debtors. ........................94 |
| | 9. | Releases, Injunctions, and Exculpations Provisions May Not Be Approved. ..............................................................................94 |
| | 10. | The Plan Is Based Upon Assumptions the Debtors Developed Which May Prove Incorrect and Could Render the Plan Unsuccessful. ......................................................................95 |
| | 11. | Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.......................................95 |
| | 12. | Claims Could Be More than Projected. ......................................96 |
| | 13. | Impact of Interest Rates..........................................................96 |
| | 14. | The Debtors May Fail to Obtain the Proceeds of the Exit Facility, and the Exit Facility Backstop Agreement May Terminate. ...................96 |
| | 15. | Contingencies May Affect Distributions to Holders of Allowed Claims...................................................................................96 |
| | 16. | The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan At Any Time before Confirmation.................................97 |
| | 17. | Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan. .................................97 |
| | 18. | The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan. ..............................................98 |
| B. | | Risks Relating to the Company's Business and Industry ....................98 |
| | 1. | Post-Effective Date Indebtedness. ............................................98 |
| | 2. | DIP Facility. .........................................................................99 |
| | 3. | Risks Associated with the Debtors' Business and Industry. ....................99 |
| C. | | Factors Relating to Securities to Be Issued Under the Plan Generally...............101 |
| | 1. | The Reorganized Debtors' New Common Equity Will Not Be Publicly Traded. .................................................................101 |
| | 2. | The Exit Facility Equity Component and the Exit Facility Put Option Premium Have Not Been Registered and They and Certain Section 1145 Securities Will Be Subject to Resale Restrictions. ...........101 |
| | 3. | Potential Dilution...................................................................101 |
| | 4. | The Estimated Valuation of the Reorganized Debtors and the New Common Equity and the Estimated Recoveries to Holders of Allowed Claims Are Not Necessarily Representative of the Private or Public Sale Values of the New Common Equity...............................102 |

5.    Small Number of Holders or Voting Blocks May Control the
      Reorganized Debtors....................................................................102
6.    Equity Interests Subordinated to the Reorganized Debtors'
      Indebtedness.................................................................................102
7.    Reorganized Foresight Will be a Private Company............................102
8.    Insufficient Cash Flow to Meet Debt Obligations. ...............................102
9.    Defects in Collateral Securing the Exit Facility. ..................................103
10.   Failure to Perfect Security Interests in Collateral...............................103
11.   Casualty Risk of Collateral................................................................104
12.   Any Future Pledge of Collateral Might Be Avoidable in a
      Subsequent Bankruptcy by the Reorganized Debtors..........................104
D.    Additional Factors ....................................................................................104
1.    Debtors Could Withdraw Plan. ...........................................................104
2.    Debtors Have No Duty to Update.........................................................104
3.    No Representations Outside This Disclosure Statement Are
      Authorized.....................................................................................105
4.    No Legal or Tax Advice Is Provided by this Disclosure Statement.........105
5.    No Representation Made. ...................................................................105
6.    Certain Tax Consequences. ................................................................105

ARTICLE XI. VOTING PROCEDURES AND REQUIREMENTS.......................................105
A.    Voting Instructions and Voting Deadline .......................................................105
B.    Voting Procedures....................................................................................106
1.    Holders of First Lien Facility Claims (Class 3) and General
      Unsecured Claims (Class 5) .............................................................106
2.    Holders of Second Lien Notes Claims (Class 4) ...................................107
C.    Parties Entitled to Vote.............................................................................108
D.    Fiduciaries and Other Representatives .........................................................109
E.    Agreements Upon Furnishing Ballots ...........................................................109
F.    Change of Vote ........................................................................................109
G.    Waivers of Defects, Irregularities, Etc..........................................................109
H.    Miscellaneous .........................................................................................110

ARTICLE XII. CONFIRMATION OF THE PLAN.........................................................111
A.    Confirmation Hearing ...............................................................................111
B.    Objections to Confirmation ........................................................................111
C.    Requirements for Confirmation of the Plan ..................................................113
1.    Requirements of Section 1129(a) of the Bankruptcy Code.....................113
2.    Equitable Distribution of Voting Power. ..............................................116
3.    Additional Requirements for Non-Consensual Confirmation. .................117

ARTICLE XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
              OF THE PLAN..................................................................................117
A.    Alternative Plan of Reorganization ..............................................................118
B.    Sale Under Section 363 of the Bankruptcy Code .............................................118
C.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ...................118

ARTICLE XIV. MISCELLANEOUS PROVISIONS..............................................................119

    A.    Immediate Binding Effect .........................................................................119

    B.    Additional Documents ...............................................................................119

    C.    Reservation of Rights ...............................................................................119

    D.    Successors and Assigns .............................................................................119

    E.    Term of Injunctions or Stays.....................................................................119

    F.    Entire Agreement ......................................................................................120

    G.    Exhibits ....................................................................................................120

    H.    Deemed Acts ............................................................................................120

    I.    Nonseverability of Plan Provisions ..........................................................120

    J.    Votes Solicited in Good Faith...................................................................121

    K.    Request for  Expedited Determination of Taxes.................................................121

    L.    Closing of Chapter 11 Cases.....................................................................121

ARTICLE XV. CONCLUSION AND RECOMMENDATION............................................121

## <u>EXHIBITS</u>

EXHIBIT A:     Joint Chapter 11 Plan of Reorganization of Foresight Energy LP and Its Affiliated Debtors

EXHIBIT B:     Restructuring Support Agreement

EXHIBIT C:     Corporate Structure Chart

EXHIBIT D:     Valuation Analysis

EXHIBIT E:     Liquidation Analysis

EXHIBIT F:     Financial Projections

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE INTO THIS DISCLOSURE STATEMENT EACH EXHIBIT ATTACHED HERETO BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

---

# ARTICLE I.
## INTRODUCTION

The Debtors submit this Disclosure Statement in connection with the Solicitation of votes on the *Joint Chapter 11 Plan of Foresight Energy LP and Its Affiliated Debtors*, dated April 9, 2020 (the "Plan") attached hereto as **Exhibit A**.[2]  The Debtors under the Plan are FELP and certain of its affiliates and subsidiaries, almost all of which are either borrowers, issuers, or guarantors under the First Lien Credit Agreement and the Second Lien Notes Indenture (each as defined below).   Following a recommendation from the Debtors' Conflicts Committee (as defined below) and approval by the Board, the Debtors filed voluntary petitions for relief under chapter 11 ("Chapter 11") of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as may be amended from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court") on March 10, 2020 (the "Petition Date").  The Debtors' Chapter 11 cases (the "Chapter 11 Cases") are jointly administered under Case No. 20-41308-659.

The Debtors are commencing this Solicitation after extensive good faith, arm's-length discussions among the Debtors and members of their key constituencies.  As a result of these negotiations, prior to the Petition Date, the Debtors and the Consenting Lenders—which hold the vast majority[3] of the Debtors' funded indebtedness—executed a restructuring support agreement (the "Restructuring Support Agreement"), a copy of which is annexed hereto as **Exhibit B**.  Under the terms of the Restructuring Support Agreement, the Consenting Lenders have agreed, subject to the terms and conditions of the Restructuring Support Agreement, to support the value-maximizing restructuring of the Debtors reflected in the Plan (the "Restructuring"), which will reposition the Debtors for future success with a deleveraged and healthy balance sheet.  In addition, the Debtors have renegotiated, or are in the process of renegotiating, their arrangements with several of their key commercial counterparties to terms that are economically superior for the Debtors and the Reorganized Debtors.

The votes for acceptance of the Plan are being solicited from Holders of Allowed Claims in Class 3 (First Lien Facility Claims), Class 4 (Second Lien Notes Claims), and Class 5 (General Unsecured Claims).   For the avoidance of doubt, no First Lien Facility Claims or Second Lien Notes Claims are General Unsecured Claims.

The Debtors believe that the Restructuring reflected in the Plan is the best available option for Foresight.   Specifically, it eliminates significant financial burdens, provides the Debtors with an expeditious and cost-effective road to emergence, positions the Debtors for success and flexibility in the years to come in a challenging and heavily-regulated industry, and is in the best interests of all of the Debtors' stakeholders.   Taken as a whole, the Restructuring achieves:

---

2    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

3    The Consenting Lenders hold over 69% of the First Lien Facility Claims and over 82% of the Second Lien Notes Claims.

- a substantial deleveraging of the Debtors' balance sheets by providing, in pertinent part, (a) 92.75% of the New Common Equity, subject to the Full Equity Dilution, to the Holders of Allowed First Lien Facility Claims (Class 3), (b) 7.25% of the New Common Equity, subject to the Full Equity Dilution, to the Holders of Allowed Second Lien Notes Claims (Class 4), and (c) for Holders of Allowed General Unsecured Claims (Class 5), the right to receive its Pro Rata share of (i) a $[●] Cash pool if the Holders of General Unsecured Claims vote to accept the Plan or (ii) a $[●] Cash pool if the Holders of General Unsecured Claims vote to reject the Plan; and

- a substantial capital infusion into Foresight through a new senior secured first-priority Exit Facility with an aggregate principal amount of up to $225,000,000.

In accordance with the Exit Facility, the Plan, and the Exit Facility Backstop Agreement, all eligible holders of First Lien Facility Claims and Second Lien Notes Claims shall have the opportunity to participate in an Exit Facility Syndication (as defined below) for their respective share of the commitments under the Exit Facility, pursuant to the terms set forth in the Plan and the Exit Facility.

Through the Restructuring, the Debtors expect to emerge from Chapter 11 with a sustainable capital structure that will position the Debtors for success in the coal industry and will enable them to keep their coal prices and production costs at levels that are both efficient and economical in domestic and international markets. The Debtors also believe that the Restructuring will maximize the value of their businesses and preserve the integrity of their efficient coal production. Moreover, the Restructuring provides a framework for the long-term sustainability of the Debtors' businesses for the benefit of their employees, vendors, and customers, and positions the Debtors well from a liquidity perspective.

**WHO IS ENTITLED TO VOTE:** Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan of reorganization (unless, for reasons discussed in more detail below, such holders are deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (i) the plan leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or interest; or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

There are three (3) Classes entitled to vote on the Plan whose acceptances thereof are being solicited under this Disclosure Statement: (i) Holders of First Lien Facility Claims (Class 3), (ii) Holders of Second Lien Notes Claims (Class 4), and (iii) Holders of General Unsecured Claims (Class 5).

**THE PLAN PROVIDES THAT HOLDERS OF IMPAIRED CLAIMS WHO DO NOT SUBMIT A BALLOT TO ACCEPT OR REJECT THE PLAN OR WHO REJECT THE PLAN BUT DO NOT OPT OUT OF THE RELEASE PROVISIONS OF THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.**

The following table summarizes: (i) the treatment of Claims and Interests under the Plan; (ii) which Classes are Impaired by the Plan; (iii) which Classes are entitled to vote on the Plan; and (iv) the estimated recoveries for Holders of Claims and Interests.[4]   The table is qualified in its entirety by reference to the full text of the Plan.  A more detailed summary of the terms and provisions of the Plan is provided in the Summary of the Plan set forth in Article VI of this Disclosure Statement.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is provided in the Valuation Analysis (as defined below) set forth in Article VII and **Exhibit D** hereof.

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor, with the consent of the Required First Lien Lenders: (i) Reinstatement of its Claims; (ii) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, then such Allowed Other Secured Claim shall be paid in accordance with its terms); or (iii) the collateral securing its Allowed Other Secured Claim on the later of the Effective Date and the date such Other Secured Claims becomes an Allowed Claim or as soon thereafter as reasonable practicable. | Unimpaired | No (Presumed to Accept) | 100% |

---

4   Under Article III.H of the Plan, any Class of Claims that does not have a Holder of an Allowed Claim as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, such Allowed Other Priority Claim shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the Holder of an Allowed Other Priority Claim and the Debtors. | Unimpaired | No (Presumed to Accept) | 100% |
| 3 | First Lien Facility Claims | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the First Lien Facility Claims, each Holder of an Allowed First Lien Facility Claim shall receive its Pro Rata share of 92.75% of the New Common Equity, subject to the Full Equity Dilution. | Impaired | Yes | [●]% |
| 4 | Second Lien Notes Claims | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Second Lien Notes Claims, each Holder of an Allowed Second Lien Notes Claim shall receive its Pro Rata share of 7.25% of the New Common Equity, subject to the Full Equity Dilution. | Impaired | Yes | [●]% |
| 5 | General Unsecured Claims | *If Class 5 Accepts the Plan*: If Class 5 votes to accept the Plan as to all of the Debtors, then in full satisfaction, release and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive at its option, either: (a) its Pro Rata share of $[●] in Cash or (b) other less favorable treatment agreed to by the Holder.<br><br>*If Class 5 Rejects the Plan:* If Class 5 votes to reject the Plan with respect to any Debtor, then in full satisfaction, | Impaired | Yes | [●]% |

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | release and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive at its option, either: (a) its Pro Rata share of $[●] in Cash; or (b) other less favorable treatment agreed to by the Holder. | | | |
| 6 | Intercompany Claims | On the Effective Date, each Intercompany Claim shall be Reinstated, cancelled, or otherwise settled to the extent determined to be appropriate by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required First Lien Lenders. | Impaired or Unimpaired | No (Presumed to Accept or Deemed to Reject) | 100% or 0% |
| 7 | Intercompany Interests | On the Effective Date, each Intercompany Interest shall be Reinstated, cancelled, or otherwise settled to the extent determined to be appropriate by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required First Lien Lenders. | Impaired or Unimpaired | No (Presumed to Accept or Deemed to Reject) | 100% or 0% |
| 8 | Interests in FELP and Interests in GP LLC | On the Effective Date, all Interests in GP LLC and all Interests in FELP shall be cancelled and discharged and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and each Holder of such Interests shall not be entitled to receive any distribution under the Plan on account of such Interests. | Impaired | No (Deemed to Reject) | 0% |

## ARTICLE II.
## OVERVIEW OF FORESIGHT'S BUSINESSES AND OPERATIONS

### A.    Overview of Foresight's Businesses and History

Initially founded in 2006 by Christopher Cline and The Cline Group LLC (the "Cline Group"), Foresight is a leading producer of thermal coal. Foresight employs approximately 790 people and operates four (4) major mining complexes in the Illinois Basin encompassing central and southern Illinois. *See Declaration of Robert D. Moore, President and Chief Executive Officer of Foresight Energy LP, in Support of Chapter 11 Petitions*, ¶ 7 [ECF No. 17]. From its corporate headquarters in St. Louis, Missouri, Foresight has the rights to mine nearly 2.1 billion tons of proven and probable coal reserves strategically located near multiple road, rail, and river transportation access points in the Illinois Basin, including Foresight's wholly-owned barge-loading river terminal on the Ohio River and separate barge access along the Mississippi River.

From this strategic position, Foresight sells its coal primarily to electric utility and industrial companies located in the eastern half of the United States, and exports a substantial amount of coal internationally. Altogether, Foresight's operations generated approximately $834 million in revenue related to coal sales and $185 million of Adjusted EBITDA in the year 2019. *Id.*

Foresight's primary competitive advantage and business function has been its ability to efficiently mine and, from a strategic and central location, ship low-cost but high-quality thermal coal. The Illinois Basin has been a lucrative investment location for both its sediment geology and its coal type. Specifically, Foresight's thermal coal reserves can support a heat content (British Thermal Units, or "BTU") ranging from 10,800 BTU per pound to nearly 11,900 BTU per pound. *See* Moore Decl. ¶ 8. This level of BTU provides a higher-than-average heat ratio as against the total amount of coal purchased, enabling Foresight's customers to effectively purchase more energy with comparatively lower expenditures on transportation and storage costs.

In addition, the geological makeup of Foresight's coal reserves is compatible with the highly productive "longwall" mining method because they generally consist of three (3) large, contiguous blocks of thick-seam coal with a relatively consistent sediment content over the course of the reserves. Longwall mining systems, which are described further herein, are efficient due to their autonomous and continuous coal production, enabling Foresight to produce a high ratio of coal relative to the number of personnel needed to safely operate a longwall mining system. This allows Foresight to provide competitive prices to its customers per ton of coal produced.

Foresight currently operates four (4) of these longwall operations in addition to other mining methods. *See* Moore Decl. ¶ 10. Altogether, Foresight has capacity to maintain up to seven (7) longwall operations in its existing mining complexes without obtaining new coal reserves or materially modifying its existing mines.

Foresight also enjoys a central location in the United States near multiple forms of transportation, which ensures it can limit its transportation costs and remain a low-cost coal producer. From this central location, Foresight maintains a variety of coal transportation operations, including rail, truck, and river options, all of which Foresight uses to transport its coal in an economically efficient manner.

Chief among these options is Foresight's Sitran Terminal, a transloading facility located on the Ohio River near Evansville, Indiana. This facility is a transportation hub for enormous quantities of coal, capable of receiving coal originating from each of the Norfolk Southern, CSX Corporation, and Burlington Northern railroad networks via the Evansville Western Railroad, and is able to blend coal and store over 1 million tons of processed coal on site. *See* Moore Decl. ¶ 12. Collectively, these transportation and transloading options allow Foresight the flexibility necessary to ship or transport coal at competitive logistics costs in an otherwise challenging industry environment.

FELP completed its initial public offering on the New York Stock Exchange (the "NYSE") on June 23, 2014, with certain of its LP Units (as defined below) being tradeable by the public. Following this success, Foresight's now affiliate, Murray Energy Corporation

6

("MEC," and together with its direct and indirect subsidiaries, including Murray Metallurgical Coal Holdings, LLC and its direct and indirect subsidiaries, and excluding Foresight, "Murray"), purchased a significant equity stake in Foresight in April 2015, with a further equity acquisition taking place in March 2017. Today, as discussed further herein, Foresight operates as an independent producer of coal. As an unrestricted subsidiary within the Murray corporate group, Foresight uses its relationship with Murray and Murray's affiliates, along with Foresight's substantial logistical and customer relationships, to serve a number of major coal purchasers across the globe.

**B.    Foresight's Mining & Other Operations**

Foresight predominantly uses longwall mining methods in its coal production. Longwall operations are initially capital-intensive, but are highly productive with the correct sediment make-up and are operationally low-cost once implemented. These operations use underground hydraulic shields to support the roof and walls of a mine, while a shearing machine operates concurrently along the coal face—the portion of a coal seam being mined—to remove coal with each pass of the shearer. Coal mined from the longwall is then funneled into a large, armored conveyor belt that moves coal around the mine to the surface or to processing and cleaning centers.

A longwall operation is generally then supported by "continuous mining units," which both contribute to coal mining and production and also to prepare an area of the mine for new or additional longwall operations. Continuous mining units are essentially large underground vehicles that continuously mine sections of earth, and use mechanized rakes under the unit to scoop coal and other sediment automatically into a flexible conveyor belt that trails behind the unit.

Foresight uses these mining methods in operating its four mining complexes. In 2018 and 2019, respectively, Foresight's coal complexes produced approximately 23.3 million and 19.9 million tons of coal, generated approximately $1.1 billion and $834 million in coal sales revenue, and resulted in approximately $314 million and $185 million in Adjusted EBITDA. *See* Moore Decl. ¶ 16. The pertinent details of Foresight's mining operations are indicated below.

*Sugar Camp.* The Sugar Camp mining complex is Foresight's largest complex. It contains two integrated mining operations that share the same surface infrastructure and similar mining equipment and transportation. These mining operations consist of M-Class #1 Mine and the Viking Mine, each of which are owned by Debtor Sugar Camp Energy, LLC, and jointly operated by Debtors M-Class Mining LLC and Viking Mining LLC. The Sugar Camp complex operates two of Foresight's highly efficient longwall mining systems and four continuous mining units, and in 2018 and 2019, respectively, collectively produced approximately 14.5 million and 12.8 million tons of coal. *See* Moore Decl. ¶ 17. With two longwall operations, Sugar Camp was the most productive coal mine in the United States in 2019 on a "clean tons produced per underground man hour basis," which is determined by data held by the federal Mine Safety and Health Administration ("MSHA"). As of December 31, 2019, Sugar Camp maintained approximately 1,297.1 million tons of proven and probable coal reserves. *Id.*

*Williamson*.    The Williamson mine, denominated the Mach #1 Mine or the Pond Creek Mine No. 1, was Foresight's first operational mining complex started in 2008 and is owned by Debtor Williamson Energy, LLC and operated by Debtor Mach Mining LLC.  Williamson is a low-sulfur, high-BTU mine selling coal primarily to international markets.  Like the Sugar Camp complex, Williamson also maintains one longwall mining system with supporting continuous mining units, and in 2018 and 2019, respectively, collectively produced approximately 6.9 million and 5.2 million tons of coal.  Given its longwall operation, Williamson was the third-most productive underground coal mine in the United States in 2019.  As of December 31, 2019, Williamson maintained approximately 358.6 million tons of proven and probable coal reserves.  *See* Moore Decl. ¶ 18.

*Macoupin*.    The Macoupin mine, denominated the Shay #1 Mine, is owned by Debtor Macoupin Energy LLC and operated by Debtor MaRyan Mining LLC.  Macoupin operates two continuous miner units utilizing a flexible conveyor train system.    Of Foresight's mines, Macoupin is the only mine with no current plans to implement a longwall mining system, although it does have the capacity to use such a system in the future.  In 2018 and 2019, respectively, Macoupin produced approximately 2.0 million and 1.7 million tons of coal.  As of December 31, 2019, Macoupin maintained approximately 72.9 million tons of proven and probable coal reserves.  As discussed further herein, given its current and anticipated near-term deficiencies with its coal quality, each as compared with Foresight's other mines, Macoupin is scheduled to be closed in the near-term and will idle mining operations.  *See* Moore Decl. ¶ 19.

*Hillsboro*.    The Hillsboro mine, denominated the Deer Run Mine, is owned by Debtor Hillsboro Energy LLC and operated by Debtor Patton Mining LLC.  As discussed further herein, following a combustion event in March 2015 causing the temporary idling of mining operations, Hillsboro returned to operation in January 2019 with one continuous miner unit.    Following approximately $46.7 million in prepetition capital investments, Hillsboro has recommenced full longwall mining operations at a favorable cost structure during March of 2020.    With recommencement of longwall operations, Hillsboro is anticipated to have capacity to produce up to approximately 9.0 million tons of coal per year.    As of December 31, 2019, Hillsboro maintained approximately 321.9 million tons of proven and probable coal reserves.  *See* Moore Decl. ¶ 20.

Foresight also engages in the purchase, repair, maintenance, and sale of general and specialized mining equipment and supplies.  While certain of these operations relate to those made in transactions with third parties, most of these operations are performed by and between Foresight entities or with their non-Debtor affiliates in the ordinary course of business.

As mentioned above, Foresight owes much of its competitive ability to its flexible transportation options and centralized and streamlined transportation operations, enabling Foresight to reach a geographically broad and diverse customer base at prices the rest of the coal industry cannot generally reach.    As of December 31, 2019, Foresight owns three (3) locomotives and leases hundreds of railcars.  *See* Moore Decl. ¶ 22.  These transportation options are further empowered by river access to the Sitran Terminal, which is owned and operated by Debtor Sitran LLC.  The Sitran Terminal currently has a single rail loop, a bottom discharge rail car unloader, stacking tubes to facilitate ground storage and coal blending, barge loading capabilities, and throughput capacity of up to 25 million tons of coal per year.  Notably, all of

Foresight's mining complexes have access to the low-cost transportation provided by the Sitran Terminal's river and barge access.

These transportation options give Foresight great access to customers from the Midwest to the eastern seaboard of the United States. Indeed, using these options, for the year ended December 31, 2019, approximately 21% of Foresight's coal sales volume was shipped to domestic customers by barge, 48% to domestic customers by rail or truck, and the remainder exported internationally. *See* Moore Decl. ¶ 23. As discussed further herein, Foresight's international customers are reached through seaborne transportation and exports facilitated by Javelin Global Commodities (UK) Ltd. (collectively with its non-Debtor affiliates, "Javelin"), whose equity is owned 34% by Murray, with the remainder owned by Javelin's management team and Uniper Global Commodities SE (formerly EON). In connection with these international arrangements with Javelin, Foresight will generally transport its coal to drop-off locations where Javelin, with its expansive international export infrastructure, logistics, and customer relationships, will proceed to ship the coal globally to wherever the ultimate purchaser is located.

## C.    Foresight's Customer Base

Foresight's chief domestic customers include electric utility power plants and industrial companies making use of coal-heated steam boilers or other industrial processes using coal as a production material. Foresight's domestic customers are primarily spread across the eastern half of the United States.

Similar to Foresight's domestic customer base, Foresight's ultimate foreign end-users consist of utilities, industrial companies, or intermediaries that can make use of Foresight's scrubbed coal, or coal that is blended with materials sufficient to meet end-market emission standards. These end-users are located in Europe, South America, Africa, and Asia. Foresight does not negotiate directly with such foreign end-users and instead works with Javelin as its international broker and purchaser of coal. Upon locating a final international purchaser of Foresight's coal, Javelin will purchase Foresight's coal for itself and perform the logistics and transportation necessary to ship the coal to the ultimate international purchaser, who then buys the coal from Javelin. This arrangement allows Foresight to economically reach a broad international market for its coal without the associated costs and risks of marketing, transporting, and supplying such coal to the same. Altogether, export coal sales represented approximately 17%, 27%, 38%, and 31% of Foresight's total tons of coal sold for calendar years 2016, 2017, 2018, and 2019, respectively. *See* Moore Decl. ¶ 25.

## D.    Foresight's Corporate Structure and Debtor Information

Foresight consists of thirty-one (31) entities. A chart illustrating the Debtors' organizational structure is attached to this Disclosure Statement as **Exhibit C**. As noted above, FELP is itself an independent and unrestricted subsidiary of Murray, which also owns 80% of the voting interests in GP LLC, with the remainder owned by Foresight Reserves LP (together with its direct and indirect subsidiaries, excluding Foresight, "Foresight Reserves"), an affiliate of the Cline Group. *See* Moore Decl. ¶ 26. Notably, the Debtors have reviewed the facts surrounding the relationship between FELP, Murray, and certain other affiliates of the Debtors and believe

that FELP is not a member of the Murray "control group" for purposes of ERISA's control group liability rules.

The vast majority of Foresight's entities are "Restricted Subsidiaries" within the meaning of the documents governing Foresight's prepetition funded indebtedness (the "Restricted Subsidiaries").[5]   The Restricted Subsidiaries guarantee Foresight's prepetition funded debt, which is secured by substantially all of such entities' assets, including all assets and operations related to the Macoupin, Sugar Camp, and Williamson mining complexes, the Sitran Terminal, and Foresight's corporate headquarters.   Hillsboro Energy LLC and Patton Mining LLC (together, the "Deer Run Mine Entities") and Foresight Receivables LLC ("Foresight Receivables" and, together with the Deer Run Mine Entities, the "Non-Guarantors") are the only Foresight entities that are neither Restricted Subsidiaries nor direct borrowers under the documents governing Foresight's prepetition funded indebtedness.   The Non-Guarantors have not guaranteed Foresight's prepetition funded debt, and their assets—including the assets and operations related to the Hillsboro mining complex but excluding cash received by Foresight Receivables on account of coal contracts to which any Restricted Subsidiary is a party—are not subject to the liens securing Foresight's prepetition funded debt.   However, in the ordinary course of business, the Restricted Subsidiaries provide financial and operational support to the Deer Run Mine Entities, including corporate management services, to the extent necessary to perform business operations.   *See* Moore Decl.  ¶ 27.   As a result of such intercompany transactions, the Deer Rune Mine Entities owe approximately $120.6 million to the Restricted Subsidiaries on a net basis.

All of the Foresight entities (including the Deer Run Mine Entities) are either borrowers or guarantors under the DIP Credit Agreement, and all of their assets are subject to the liens securing the DIP Facility (as defined below).   *See* Final DIP Order ¶¶ 10–11.[6]   All of the Foresight entities (including the Deer Run Mine Entities) are also obligors with respect to certain claims and liens in favor of the prepetition secured lenders as adequate protection.   *See* Final DIP Order ¶¶ 17–18.

1.    **Foresight Entity Roles**

Each Foresight entity performs a specific role or function in the overall business enterprise.   Such roles generally fall into the following categories.

*Holding and Capital Structure Companies*.   These entities hold groups of other specific entities in the Foresight enterprise, and have a key role in major capital or management decisions at Foresight.   Foresight Energy LLC ("FELLC"), is the main holding company for the Foresight enterprise, and is wholly owned directly by FELP.   From this position, FELLC maintains control over the operating, labor, contracting and sales wings of the Foresight enterprise, and it performs key capital, cash management, debt and corporate management activities over the rest of the

---

[5]    Foresight's prepetition funded indebtedness is described in Article II.E.1 of this Disclosure Statement.

[6]    *Final Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [ECF No. 267].

structure.  Given its position as the key holding company, FELLC is the borrower under Foresight's First Lien Loans (as defined herein).  In addition, FELLC, together with Foresight Energy Finance Corporation ("Foresight Finance"), are co-issuers of Foresight's Second Lien Notes (as defined herein).  *See* Moore Decl. ¶ 29.

*Operating and Asset Owning Companies.*  Most of Foresight's physical assets and operations are held and conducted by its operating companies.  This primarily includes its mining complexes, coal reserves, and related coal mining machinery, equipment, materials, and supplies, which are held by Sugar Camp Energy, LLC, Williamson Energy, LLC, Macoupin Energy LLC, and Hillsboro Energy LLC.  These entities are Foresight's primary drivers of revenue, maintaining its coal mines, production and processing plants, and the facilities and equipment necessary to prepare the coal for broader transport to Foresight's customers.  Related to these operating entities is Seneca Rebuild LLC and Tanner Energy LLC, which perform Foresight's machinery and equipment rebuilding, maintenance, and repair operations.  *See* Moore Decl. ¶ 30.

Foresight also maintains a number coal transportation and transloading-based companies, whose primary functions are to facilitate the shipment of Foresight's coal to its customers or to prepare coal for international export with cooperation from Javelin.  As noted, Foresight's main transportation hub, the Sitran Terminal, is owned and operated by Sitran LLC.  Foresight also maintains additional transportation-related operating companies through Oeneus LLC (d/b/a Savatran LLC) and Hillsboro Transport LLC, which generally maintain transportation related assets such as locomotives, railcars, and coal hauling vehicles or maintain sale-leaseback arrangements or transportation contracts for the same with lessors or shipping companies.

*Labor Companies.*  Apart from its operating companies, Foresight maintains the employment for its employees through separate companies.  These labor-related companies then provide labor, mine operating and supervisory, and corporate employment services to the applicable Foresight entities.  Many of these labor companies are owned through a collection of labor-related holding companies such as Foresight Energy Employee Services Corporation and Foresight Energy Labor LLC.  The primary labor providers within the Foresight group are M-Class Mining LLC, Viking Mining LLC, MaRyan Mining LLC, Mach Mining LLC, and Patton Mining LLC.  These entities provide critical labor and operational services for Foresight's mining operations, and are essential for the production and processing of coal.  *See* Moore Decl. ¶ 33.

The other labor-related companies provide key or supplementary services across the Foresight enterprise.  For example, (a) Coal Field Construction Company LLC provides employees, management, and on-the-ground supervisors for Foresight's mining complexes, (b) Coal Field Repair Services LLC provides employees who perform the rebuild, maintenance, and repair services for Foresight's mining machinery, equipment, and related vehicles, and (c) Foresight Energy Services LLC provides corporate employee services.  Additional labor companies are Logan Mining LLC and LD Labor Company LLC, which provide supplementary labor services in the future in the event of expansion of Foresight's mining activities.  *See* Moore Decl. ¶ 33

*Contracting Companies*.  Foresight maintains two types of contracting companies.  The first consists of Adena Resources, LLC and Akin Energy LLC, whose primary function is to acquire and maintain various water right-of-way or other water-use rights to the Foresight enterprise.  These agreements and rights generally serve to facilitate Foresight's water-based coal shipment activities or otherwise service their coal production processes.  The other type of contracting companies consists of American Century Mineral LLC and American Century Transport LLC.  These two entities maintain Foresight's lease and overriding royalty agreements with subsidiary affiliates of Murray, whereby Murray pays Foresight for coal mined and sold from certain mines.  *See* Moore Decl. ¶ 34.

*Sales Companies*.  Finally, Foresight maintains two companies whose primary purpose is to facilitate the sale of Foresight's coal.  Foresight Coal Sales LLC is the primary contracting party for Foresight's coal sale agreements with its customers, covering the sales of coal produced from all of its mining complexes.  Any receipts on account of Foresight's coal sales are then received in a bank account owned and maintained by Foresight Receivables, which later sweeps such payments into a cash concentration account maintained at FELLC.  *See* Moore Decl. ¶ 35.

## 2.    Foresight Corporate Management and Oversight

General decision making at Foresight is controlled by the Board of GP LLC, subject to Foresight's organizational documents, pursuant to GP LLC's role as FELP's general partner.  GP LLC is wholly-owned by MEC and Foresight Reserves.  MEC holds an 80% voting interest in GP LLC, with Foresight Reserves holding the remaining 20%.  GP LLC's six-person Board is comprised of (a) two members who are officers of MEC, (b) one member who is an officer of Foresight Reserves, and (c) three members who are independent directors (the "Independent Directors").  *See* Moore Decl. ¶ 36.  Foresight's current Board is comprised of the following individuals:

| Name | Position |
| --- | --- |
| Robert D. Moore | Chairman of the Board |
| G. Nicholas Casey | Director |
| Daniel S. Hermann | Director |
| Robert Ed. Murray | Director |
| Lesslie H. Ray | Director |
| Brian D. Sullivan | Director |

Foresight's current senior management team is comprised of the following individuals:

| Name | Position |
| --- | --- |
| Robert D. Moore | President & Chief Executive Officer |
| Jeremy J. Harrison | Chief Accounting Officer |
| Cody E. Nett | Corporate Secretary |

In accordance with section 1129(a)(5) of the Bankruptcy Code, before the entry of the order confirming the Plan, the Debtors will disclose the identity and affiliations of any individual

proposed to serve, after confirmation of the Plan, as a director or officer of each of the Reorganized Debtors.

*Conflicts Committee.* In connection with Foresight's restructuring and contemplated chapter 11 cases, and Murray's chapter 11 cases, which were commenced on October 31, 2019 (the "Murray Chapter 11 Cases"), the Board designated the conflicts committee (the "Conflicts Committee"), consisting of the three Independent Directors, with the power and authority to, on behalf of Foresight: (a) review and evaluate any and all matters (a "Restructuring Matter") relating to any financial or corporate restructuring of either Murray (each, a "Murray Restructuring") or Foresight (each, a "Foresight Restructuring," and together with a Murray Restructuring, a "Restructuring"); (b) exercise the full authority of the Board with respect to the approval of any Restructuring Matter; (c) determine whether any Restructuring is advisable and not adverse to the interest of Foresight and the holders of the LP Units (as defined herein) who are not affiliated with the members of GP LLC; and (d) as the Conflicts Committee determines appropriate, deem such other Restructuring Matters to be subject to the Conflicts Committee's authority or, alternatively, to be appropriate for evaluation and determination by the Board. This broad grant of authority to the Conflicts Committee was intended to ensure that all decisions made by Foresight with respect to any Murray Restructuring Matter, as well as all Foresight Restructuring Matters separate from Murray, are made impartially. *See* Moore Decl. ¶ 37.

In the period leading up to, and since, Foresight's Petition Date, the Board and the Conflicts Committee have regularly received reports from Foresight's management and advisors[7] regarding all material Foresight Restructuring Matters, updates on the Murray Chapter 11 Cases, and affiliate matters, including discussion of intercompany transactions among Foresight and each of Murray, Javelin, and Foresight Reserves. *See* Moore Decl. ¶ 38.

*Management Services Agreement.* In connection with Murray's acquisition of Foresight, Murray-affiliate Murray American Coal, Inc. and GP LLC entered into the *Third Amended and Restated Management Services Agreement*, effective as of March 28, 2017 (the "Management Services Agreement"). Pursuant to the Management Services Agreement, and as discussed further in the *Declaration of Alan Boyko, Senior Managing Director of FTI Consulting, Inc., in Support of Chapter 11 Petitions and First Day Relief* [ECF No. 18], Murray provides Foresight with certain key employees and manages and administers the general operations of GP LLC, FELP, and their subsidiaries. *See* Boyko Decl. ¶ 64-5; *see also* Moore Decl. ¶ 39. Under the Management Services Agreement, in return for these services, Foresight is obligated to pay a quarterly management fee of $5,000,000 and to reimburse certain expenses incurred by Murray on Foresight's behalf. *See* Boyko Decl. ¶ 65. As of the date hereof, key Foresight employees who are provided by Murray include, among others, Robert D. Moore as Chairman of Foresight's Board and Foresight's President and Chief Executive Officer, and Jeremy Harrison as Foresight's Chief Accounting Officer.

---

[7]    In connection with these cases and its restructuring, and to protect its own interests, Foresight has retained its own independent advisors, consisting of: Paul, Weiss, Rifkind, Wharton & Garrison LLP, as restructuring counsel, Armstrong Teasdale LLP, as local restructuring co-counsel, Jefferies LLC, as investment banker, and FTI Consulting, Inc., as financial advisor.

As discussed in Article V of this Disclosure Statement, the Debtors and Murray have engaged in discussions regarding potential amendments and modifications to the terms of the Management Services Agreement, which discussions are ongoing.

## E.    Overview of Foresight's Financial Position and Prepetition Debt Structure

Foresight generated total consolidated operating revenues of approximately $842 million for the fiscal year ending December 2019. These amounts were largely based on Foresight selling approximately 19.7 million tons of coal, which sold for an average of approximately $42 per ton, depending on coal quality, production costs, and transportation costs. Supporting this revenue, Foresight maintains approximately $2.2 billion in total consolidated assets as of the date hereof. As noted above, these assets are primarily spread across its four (4) mining complexes and the Sitran Terminal, with Foresight owning approximately $1.9 billion in mining and transportation property, equipment, and supplies, and approximately 2.1 billion tons of proven and probable coal reserves. *See* Moore Decl. ¶ 41. As of the date hereof, Foresight also has approximately $59.1 million in cash.

As of the date hereof, Foresight has approximately $1.5 billion in total secured debt obligations, including approximately: (a) $175 million in principal amount outstanding under its super-priority debtor-in-possession credit facility; (b) $743.3 million in principal amount outstanding under its prepetition revolving first lien credit facility; (c) $157 million in principal amount outstanding under its prepetition first lien term loan facility; and (d) $425 million in principal amount outstanding under its prepetition 11.5% second lien notes. In addition, as of the date hereof, Foresight had, among other liabilities, approximately: (i) $56.7 million in asset retirement and mine reclamation obligations; (ii) $97.9 million in outstanding surety bonds for performance and other bonding obligations; (iii) $11.5 million in workers' compensation and "black lung" obligations (including estimates for obligations incurred but not reported); and (iv) $96 million in general accounts payable and trade payable. Foresight also maintains a number of intercompany arrangements among its entities, and with each of Murray, Javelin, and Foresight Reserves, in the ordinary course of business. *See* Boyko Decl. ¶ 55–70; Moore Decl. ¶ 42.

### 1.    Foresight's Funded Indebtedness

#### a.    *DIP Facility.*

Pursuant to the DIP Orders,[8] Foresight owes $175 million in outstanding principal amount under its senior secured super-priority debtor-in-possession credit facility (the "DIP Facility"), comprised of (a) $100 million in new money debtor-in-possession financing (the "DIP New Money Commitments")[9] and (b) $75 million of rolled-up First Lien Facility Claims (the "DIP Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans"). As noted above, all of the Debtors are either borrowers or have guaranteed the DIP Facility (other

---

[8]    ECF Nos. 74, 267.

[9]    92.75% of the DIP New Money Commitments were funded by certain Consenting First Lien Lenders, and the remaining 7.25% of the DIP New Money Commitments were funded by certain Consenting Second Lien Lenders.

than Foresight Energy LLC, which is the borrower under the DIP Credit Agreement), and the DIP Facility is secured by all of the Debtors' assets (the "DIP Collateral"). The DIP Loans mature no later than September 4, 2020 and bear cash interest at the London Interbank Offered Rate ("LIBOR") plus 11.00%, subject to a 1.00% LIBOR floor. The DIP Facility is described in further detail in the Debtors' motion seeking authorization to enter into the DIP Facility and the Bankruptcy Court's DIP Orders granting the same.[10]

The Debtors are required to pay certain fees under the DIP Facility, including: (a) to the Consenting Lenders that backstopped the DIP New Money Commitments, a put option premium of 5% of the aggregate principal amount of the DIP New Money Commitments (the "DIP Put Option Premium"); and (b) to all DIP Facility lenders, an exit fee of 1% of the aggregate principal amount of the DIP New Money Commitments (the "DIP Exit Fee" and, together with the DIP Put Option Premium, the "DIP Fees"). The DIP Fees are payable upon the Effective Date in the form of New Common Equity valued at a 35% discount to the Stated Equity Value, subject to dilution by the Management Incentive Plan; provided, however, upon the occurrence of an "Event of Default" under the DIP Credit Agreement or upon repayment of the DIP Loans in full and termination of all DIP New Money Commitments without the occurrence of the Plan Effective Date, the DIP Put Option Premium and DIP Exit Fee will be immediately payable in Cash in amounts equal to $10 million and $2 million, respectively.

### b. First Lien Facilities.

FELLC, as borrower, and FELP and the subsidiaries of FELLC (other than the Non-Guarantors), as guarantors, are each a party to that certain Credit and Guaranty Agreement, dated as of March 28, 2017 (as amended, modified, restated, or supplemented from time to time, the "First Lien Credit Agreement") with The Huntington National Bank, as facilities administrative agent (the "First Lien Administrative Agent"), Lord Securities Corporation, as term administrative agent (the "Collateral Agent"), Goldman Sachs Lending Partners LLC, The Huntington National Bank, Deutsche Bank Securities Inc., and Citigroup Global Markets Inc., each as joint lead arrangers and joint bookrunners, Goldman Sachs Lending Partners LLC, as syndication agent, and the other lenders a party thereto (collectively, the "First Lien Lenders"). See Moore Decl. ¶ 43.

The First Lien Credit Agreement provides for both a revolving credit facility, including participation in letter of credit obligations and swing-line loans (collectively, the "First Lien Revolver") and a term loan facility (the "First Lien Term Loan," and collectively with the First Lien Revolver, the "First Lien Loans"). The obligations under the First Lien Credit Agreement in respect of the First Lien Revolver and First Lien Term Loan rank pari passu and are secured by (a) liens on substantially all of Foresight's assets, other than those assets held by the Non-Guarantors, and (b) a pledge of 100% of the equity interests of FELP's direct and indirect subsidiaries, including the Deer Run Mine Entities, and Foresight Receivables ((a) and (b) together, the "Prepetition Collateral"). The First Lien Credit Agreement is governed by New York law. See Moore Decl. ¶ 44.

---

[10]    ECF Nos. 29, 74, and 267.

The First Lien Credit Agreement provides that the First Lien Revolver bears interest at LIBOR plus 5.25% per annum, with a 1.0% LIBOR floor, and that the First Lien Term Loan bears interest at a rate of LIBOR plus 5.75%. The First Lien Revolver has a maturity date of March 28, 2021, and the First Lien Loan has a maturity date of March 28, 2022, though both are subject to earlier prepayment of outstanding borrowings based on excess cash flow, determined on an annual basis. The First Lien Credit Agreement contains a financial maintenance covenant solely for the benefit of the First Lien Revolver, requiring compliance on a quarterly basis with a maximum net first lien secured leverage ratio of 3.50 to 1.00. As of the date hereof, approximately $157 million in principal amount remains outstanding under the First Lien Revolver and approximately $743.3 million in principal amount remains outstanding under the First Lien Term Loan.

### c. Second Lien Notes.

FELLC and Foresight Finance co-issued the $425.0 million of 11.50% Second Lien Senior Secured Notes due 2023 (the "Second Lien Notes," and the holders of such notes, the "Second Lien Noteholders") pursuant to that certain Indenture, dated as of March 28, 2017 (as amended, modified, restated, or supplemented from time to time, the "Second Lien Notes Indenture"), by and among FELLC and Foresight Finance, as Issuers, the guarantors a party thereto, and Wilmington Trust, National Association, as trustee (the "Second Lien Indenture Trustee"). The guarantors of the Second Lien Notes are the same as the guarantors of the First Lien Loans, with the exclusion of FELP, who is not a guarantor of the Second Lien Notes, and Foresight Finance, who is only an issuer of the Second Lien Notes. *See* Moore Decl. ¶ 46.

The obligations under Second Lien Notes are secured by second priority secured liens and applicable equity pledges in the Prepetition Collateral. The Second Lien Notes Indenture and the Second Lien Notes are governed by New York law. The Second Lien Notes Indenture provides that the Second Lien Notes bear interest at a rate of 11.50% per annum and have a maturity date of April 1, 2023. As of the date hereof, approximately $425 million in principal amount remains outstanding under the Second Lien Notes.

### d. Existing Intercreditor Agreement.

The respective rights and interests of the First Lien Lenders and Second Lien Noteholders under the First Lien Credit Agreement and Second Lien Notes Indenture, respectively, are governed by that certain Collateral Trust Agreement, dated as of March 28, 2017 (as amended, modified, restated, or supplemented from time to time, the "Existing Intercreditor Agreement") among FELLC, the Grantors (as defined in the Existing Intercreditor Agreement) from time to time party thereto, the First Lien Administrative Agent, as administrative agent, the Second Lien Indenture Trustee, as trustee, and the Collateral Agent, as collateral trustee. Specifically, the Existing Intercreditor Agreement governs the lenders' respective rights and interests relating to, among other things, their rights to the Prepetition Collateral and their ability to exercise remedies in connection with an event of default. Additionally, the Existing Intercreditor Agreement sets forth the First Lien Lenders' and Second Lien Noteholders' relative rights and obligations in the event of a chapter 11 filing by Foresight, including various enforcement, standstill, turnover, and debtor-in-possession financing provisions. Pursuant to the Intercreditor Agreement, the liens covering the Second Lien Notes and their related obligations under the Second Lien Notes

16

Indenture are subordinate to any liens covering the First Lien Loans and their related obligations under the First Lien Credit Agreement.

## 2. Foresight's Other Financing Arrangements and Indebtedness

### a. *Asset Retirement and Mine Reclamation Obligations.*

As is standard in the coal industry, Foresight has general asset retirement obligations related to mine reclamation and closure costs. Reclamation obligations primarily represent the fair value of future anticipated costs to restore surface land to levels equal to or greater than pre-mining conditions, as required by the federal Surface Mining Control and Reclamation Act, as well as certain analogous state laws. *See* Moore Decl. ¶ 49.

Foresight's asset retirement obligations consist of spending estimates for surface land reclamation and support facilities at their mining complexes in accordance with applicable reclamation laws in the United States, as primarily defined by each mining permit. Asset retirement obligations are determined for each mine using various estimates and assumptions, including, among other items, estimates of disturbed acreage as determined from engineering data, estimates of future costs to reclaim the disturbed acreage, and the timing of these cash flows, discounted using a credit-adjusted, risk-free rate. As of the date hereof, Foresight estimates that it has approximately $56.7 million in asset retirement and mine reclamation obligations.

*Performance, Reclamation, and Surety Bond Obligations.* Foresight is required to provide various surety bonds to governmental and regulatory agencies in connection with its mining activities. The vast majority of these surety bonds relate to Foresight's asset retirement and reclamation obligations. The remaining bonds generally are performance, utility, or financial bonds to secure obligations Foresight is or may be required to pay under applicable law. Indemnity National Insurance Co. ("INIC") has issued all of these bonds, as rewritten to INIC from Argonaut Insurance Company as of December 10, 2019. Approximately $4.5 million of cash collateral has been posted with INIC to secure Foresight's obligations under the bonds, with Foresight obligated to post additional cash collateral with INIC pursuant to the applicable indemnity agreements. As of the date hereof, Foresight has outstanding surety bonds with a total face amount of $97.9 million, of which approximately $92.6 million secures its reclamation and other asset retirement obligations.

### b. *Sale-Leaseback and Similar Obligations with NRP.*

Foresight is party to several sale-leaseback arrangements with subsidiaries of Natural Resource Partners LP ("NRP"), whereby NRP's subsidiaries purchased certain coal reserves and rail facility assets from Foresight relating to its Macoupin and Sugar Camp mines, then leased such assets back to Foresight. *See* Moore Decl. ¶ 52. Foresight maintains continuing involvement in the assets sold and leased back. *Id.* As of the date hereof, the Macoupin sale-leaseback arrangement had a carrying value of $104 million and an effective interest rate of 8.1%, and the Sugar Camp sale-leaseback arrangement had a carrying value of $55 million and an effective interest rate of 3.5%.

As discussed in Article V of this Disclosure Statement, the Debtors and NRP have reached consensus regarding amendments to the terms of their current sale-leaseback arrangements. The renegotiated terms of such arrangements are subject to approval by the Bankruptcy Court in connection with its confirmation of the Plan.

c.    *Coal Reserve Royalty and Lease Agreements with Foresight Reserves.*

Foresight maintains various coal reserve royalty and lease agreements with Foresight Reserves. Foresight is obligated to pay royalties under the:

- *Coal Mining Lease*, between Debtor Sugar Camp Energy, LLC ("Sugar Camp") and Foresight Reserves-affiliate Ruger Coal Company, LLC ("Ruger"), dated August 12, 2010, and two related overriding royalty interest agreements in favor of Ruger (collectively, as amended, the "Ruger Royalty Agreements") relating to Ruger's lease of and interest in certain coal reserves in the Sugar Camp complex to the Debtors;

- *Coal Mining Lease and Sublease*, between Debtor Williamson Energy, LLC ("Williamson") and Foresight Reserves-affiliate Colt LLC ("Colt"), dated August 12, 2010 (as amended, the "Colt-Williamson Royalty Agreement"), relating to Colt's lease and sublease of certain coal reserves in the Williamson mine to the Debtors;

- *Coal Mining Lease (for "Reserve 1" and "Reserve 3")* and the *Coal Mining Lease (for "Reserve 2")*, each as between Hillsboro and Colt and dated August 12, 2010 (together, as amended, the "Colt-Hillsboro Royalty Agreements"), relating to Colt's leases of certain coal reserves in the Hillsboro mine to the Debtors; and

- *Coal Mining Lease and Sublease (Macoupin North Mine Assignment)* and *Coal Mining Lease and Sublease (Unassigned Reserves)*, each as between Debtor Macoupin Energy LLC ("Macoupin") and Colt and dated August 12, 2010, and *Coal Mining Lease (New Memphis/Monterey 2 Reserves)*, between the same parties and dated June 1, 2012 (together, as amended, the "Colt-Macoupin Royalty Agreements," and together with the Ruger Royalty Agreement, the Colt-Williamson Royalty Agreement, the Colt-Hillsboro Royalty Agreements, and any related agreements, the "Reserves Royalty Agreements"), relating to Colt's lease and sublease, as applicable, of certain coal reserves in the Macoupin mine to the Debtors.

In addition to the Reserves Royalty Agreements, Foresight maintains two (2) surface leases for a coal preparation plant and rail loadout facility between Foresight Reserves-affiliate New River Royalty, LLC ("New River") and Debtor Williamson Energy, LLC (the leases together, the "Williamson Leases"). The terms of the Williamson Leases expire on October 15, 2021, but may be extended for additional five (5) year terms at Foresight Reserves' election. The Debtors are required to pay an aggregate rent of $100,000 per year to Foresight Reserves under the Williamson Leases. The Debtors also maintain a surface lease for a transport terminal

between Debtor Sitran LLC and New River (the "Sitran Lease" and together with the Williamson Leases, the "Reserves Leases"). The terms of the New River Lease expire on December 31, 2020, but may be extended by additional five (5) year terms at the Debtors' election. The Debtors pay an annual rent of $50,000 to Foresight Reserves under the New River Lease.

As discussed in Article V of this Disclosure Statement, the Debtors and Foresight Reserves have reached consensus regarding amendments to the terms of the Reserves Royalty Agreements and Reserves Leases. The renegotiated terms of such arrangements are subject to approval by the Bankruptcy Court in connection with its confirmation of the Plan.

### d.    *Workers' Compensation and Black Lung Act Obligations.*

As required by the federal Black Lung Benefits Revenue Act of 1977 and the Black Lung Benefits Reform Act of 1977 (together, the "Black Lung Act"), Foresight provides benefits to employees related to workers' compensation and pneumoconiosis (commonly known as black lung disease). *See* Moore Decl. ¶ 53. Pursuant to the Black Lung Act, coal miners who suffer from pneumoconiosis and their dependents may file disability claims with the U.S. Department of Labor (the "DOL"), which then investigates the claims and assigns liability to make benefit payments for those claims ("Black Lung Act Claims") to a "responsible operator," usually the coal miner's most recent employer or a successor of the employer.

Black Lung Act Claims include claims for the payment of (a) disability benefits to workers who suffer from black lung disease and (b) taxes to fund the Black Lung Disability Trust Fund (the "Black Lung Fund"). If a responsible operator fails to pay applicable benefits, the Black Lung Fund will pay such benefits and the DOL may then (i) assert liens, with the same priority as tax claims, against the assets of the responsible operator and (ii) exercise subrogation rights of the underlying claimant. In addition, the Black Lung Act requires a coal operator to either secure its payment obligations by posting collateral, or to obtain insurance for its payment obligations. A coal operator's directors and officers may also be held personally liable for unpaid benefits.

Benefits under the Black Lung Act are in addition to typical workers' compensation benefits. Foresight maintains insurance for federal and state workers' compensation and black lung benefits for employees with Rockwood Casualty Insurance Company. In 2019, Foresight paid approximately $7.5 million under the aforementioned programs. As of the date hereof, Foresight estimates its liability under the Black Lung Act, as well as for general workers' compensation, totals approximately $11.5 million (including estimates for obligations incurred but not reported).

### e.    *Environmental Obligations.*

In addition to asset retirement and reclamation obligations, Foresight has ongoing obligations under federal environmental laws, including the Clean Water Act and the Clean Air Act, certain analogous state environmental laws, and Foresight's environmental permits, with respect to discharges to water bodies, air emissions, management and disposal of waste materials, subsidence, and other environmental concerns. From time to time, Foresight receives notices of noncompliance from regulatory agencies alleging violations of applicable

19

environmental laws and permit requirements, which in some cases result in the assessment of fines or penalties or construction of capital projects to address alleged violations. In addition, certain mining operations have given rise to obligations to treat impacted water resources or to address alleged subsidence of nearby third party properties. *See* Moore Decl. ¶ 56.

### f.    *Trade Vendor and Servicer Liabilities.*

In addition to the foregoing, Foresight has approximately $96 million in ordinary course trade debt owed to various vendors, suppliers, and servicers that was unpaid as of the date hereof. Such trade debt is described further in the Boyko Declaration. *See* Moore Decl. ¶ 57.

### 3.    Foresight's Equity Ownership

FELP is a limited partnership. GP LLC holds FELP's general partner interest, which conveys to GP LLC the authority to manage FELP and the other Debtors. The general partner interest does not include any rights to profits or losses or any rights to receive distributions from FELP.

FELP's limited partnership units ("LP Units") are split into two sets of equity: (a) subordinated units (the "Subordinated Units") and (b) common units (the "Common Units").[11] The Subordinated Units are not entitled to receive a distribution from FELP's operating surplus until the Common Units have received a certain minimum quarterly distribution. The Common Units were tradable on the NYSE after an initial public offering on June 23, 2014. However, due to the recent decline in the trading prices of FELP's Common Units following a coal industry downturn and the related events giving rise to Foresight's chapter 11 cases, the NYSE issued a notice on November 8, 2019 delisting FELP's Common Units. Since then, the Common Units have been tradable over the counter.

On April 16, 2015, Murray acquired a 34% non-controlling voting interest in GP LLC and all of the outstanding Subordinated Units of FELP, representing approximately 50% ownership of FELP's total LP Units. On March 28, 2017, Murray acquired an additional 46% voting interest in GP LLC, increasing its total control to 80% of GP LLC. *See* Moore Decl. ¶ 58.

As of the date hereof, Murray continues to hold 100% of the Subordinated Units and 80% of the voting interests in GP LLC. Foresight Reserves holds the other 20% of GP LLC's voting interests.[12] Significant holders of the Common Units include Murray (holding 12.1% of the Common Units), Cline Trust Company, LLC,[13] and the Estate of Christopher Cline[14] (together

---

[11]    As of March 20, 2020, FELP had 80,996,773 outstanding Common Units and 64,954,691 outstanding Subordinated Units.

[12]    In addition to these voting interests, GP LLC's members also hold the Debtors' incentive distribution rights (the "IDRs"), which represent the right to receive an increasing percentage of quarterly distributions from the Debtors' operating surplus after certain minimum quarterly distribution and target distribution levels have been achieved. Murray holds 77.5% of the IDRs, and Foresight Reserves holds the remaining 22.5%.

[13]    Timothy G. Elliott, Cindy Bower, and Lesslie H. Ray, the managers of Cline Trust Company, LLC, may be deemed to have voting and investment power over the common units held of record by Cline Trust Company. The members of Cline Trust Company are four trusts of which Greenway Wealth Management LLC, a Florida

20

with Cline Trust Company, LLC, holding 50.7% of the Common Units).  The remainder of the Common Units are publicly-held or owned in *de minimis* amounts by certain current and former employees of Foresight.

## ARTICLE III.
## KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

### A.    Adverse Market Conditions

The thermal coal markets Foresight traditionally serves have been meaningfully challenged over the last decade, both domestically and abroad.  These adverse market conditions are driven by changes in legislative priorities; the commercialization of shale gas, wind, solar, and nuclear electric generation subsidies; and low-cost natural gas exports.  In particular, the installed generation base of the U.S. power market has changed dramatically in response to both regulatory and economic forces.  Domestic regulation of emissions increased the cost of coal-fired generation, consequently incentivizing the installation of gas and renewables generation.  At the same time, technological developments in gas exploration and renewables generation have decreased the cost of alternative sources of electric power.  As a result, intrinsic demand for coal-fired electricity or heat generation by electric utilities and industrial manufacturers has fallen in the years leading up to the Petition Date.  For instance, coal-fired installed capacity as a percentage of total installed capacity has fallen from 26 percent in 2013 to 20 percent in 2019, with coal-fired generation as a percentage of total generation falling from 35 percent in 2013 to 27 percent in early 2019.  On the other hand, natural gas and renewables installed electricity generation capacity in the United States as a percentage of total installed capacity has increased from 59 percent in 2013 to 67 percent in 2019, and natural gas and renewables generation as a percentage of total generation increased from 42 percent in 2013 to 48 percent in early 2019.  *See* Moore Decl. ¶ 60.

In addition, demand for U.S. thermal coal from international utilities has also been subject to adverse market pressures.  The development of liquefied natural gas infrastructure has facilitated the export of cheap U.S. gas to Europe, reducing local utilities' reliance on Russian-sourced natural gas, and increasing the competitiveness of gas-fired generation as an alternative to coal-fired generation, resulting in reduced demand from European coal-fired generators.  Moreover, the increased supply of low-priced Russian thermal coal has increased the supply

---

family trust company, is Trustee.  The managers of Greenway Wealth Management LLC are Timothy G. Elliott, Cindy Bower, and Lesslie H. Ray.  Each trust owns an approximately equal interest in Cline Trust Company: (i) The Alex T. Cline 2017 Irrevocable Trust, the beneficiary of which is Alex T. Cline, a child of Mr. Cline; (ii) The Candice Cline Kenan 2017 Irrevocable Trust, the beneficiary of which is Candice Cline Kenan, a child of Mr. Cline; (iii) The Christopher L. Cline 2017 Irrevocable Trust, the beneficiary of which is Christopher L. Cline, a child of Mr. Cline; and (iv) The Kameron N. Cline 2017 Irrevocable Trust, the beneficiaries of which are the trusts identified in (i) through (iii) above.  Mr. Elliott was formerly the CFO of Cline Resource and Development Company and Ms. Ray was formerly VP of Business Development of the Cline Group, each of which is controlled by the Estate of Christopher Cline.

[14]    Timothy G. Elliott and Lesslie H. Ray, the personal representatives of the Estate of Christopher Cline, may be deemed to have voting and investment power over the common units held of record by the Estate of Christopher Cline.

available to satisfy the aforementioned diminished demand. These challenges are on top of a difficult regulatory environment in Western Europe which, like the United States, has subjected the coal-fired power industry to increased regulations and provided support for renewable energy power sources. As a result of these factors, the European benchmark price for imported thermal coal has halved in the past year. *See* Moore Decl. ¶ 61.

The foregoing market conditions have created a sort of race to the bottom for the coal industry, with heavy competition among coal suppliers for a shrinking customer base, all within a challenging regulatory and legislative atmosphere. Altogether, these market conditions have caused the price of coal per ton that existing or potential customers are willing to pay to drop in recent years. Recently, the international coal market has come under additional pressure as the result of a slowdown in the global economy due to concerns over COVID-19, which has rapidly spread to over 100 countries. *See* Moore Decl. ¶ 62.

**B.    Foresight's Operational and Contingency Efforts**

While the coal industry suffers from adverse market conditions, the costs to mine, produce, and transport coal to customers generally remain fixed at high rates, resulting in compressed margins over the past year, limiting Foresight's (a) ability to service its substantial outstanding indebtedness and other ongoing payment obligations and (b) operational liquidity and cash flexibility with which to maintain ordinary course operations. *See* Moore Decl. ¶ 63.

To ensure that Foresight remains competitive, Foresight has undertaken a series of go-forward coal production efficiency improvements and cost-cutting initiatives both within its mining operations and along its transportation and logistics routes. This includes operating mines at reduced hours and on a limited number of days (three or four) per week, depleting outstanding coal reserves (without or with limited coal reserve replacement) if such reserves were able to satisfy a customer's specific coal needs, and revamping a number of mine operations to reduce coal production, transportation, and logistics costs. To further reduce or delay cash expenditures, Foresight has also extended its trade payment terms with the vast majority of its ordinary course vendors and suppliers, and has renegotiated the amounts payable with several of its key vendors and suppliers for lower settled amounts. These efforts have ensured that Foresight maintains sufficient mining equipment, materials, supplies, and personnel to preserve safe ordinary course mining operations. In addition, Foresight was able to provide competitively priced coal in the marketplace, and in the months leading up to the Petition Date, Foresight won bids on coal sale contracts that enable Foresight to ship and sell up to 17.3 million tons of coal in 2020. *See* Moore Decl. ¶ 64.

In addition, in the months leading up to the Petition Date, Foresight successfully pursued insurance recoveries relating to a combustion event at its Hillsboro mining complex in 2015. That combustion event was a *force majeure* under various Hillsboro-related agreements and required the idling of mining operations for over three (3) years. While Foresight had previously received approximately $91 million in insurance recoveries related to Hillsboro mitigation costs, losses on mining equipment, and business interruption, Foresight sought further insurance recoveries for related damages to fund its operations and potentially restart efficient and productive longwall mining operations at Hillsboro. *See* Moore Decl. ¶ 65. Following extensive negotiations with its insurance carriers, in the fourth quarter of 2019, Foresight received

approximately $25.4 million in additional insurance proceeds. These proceeds provided necessary liquidity and time which Foresight used to engage in lengthy restructuring negotiations with key stakeholders, as discussed further below. *See* Moore Decl. ¶ 66.

The aforementioned insurance proceeds also allowed Foresight to discontinue mining operations at the Macoupin mining complex and provided Foresight with sufficient capital to rebuild and restart longwall mining operations at the Hillsboro mining complex. Specifically, Foresight determined in late 2019 that the fixed production and logistics costs of continued go-forward shipping of coal from Macoupin was unlikely to result in competitive customer prices in 2020. Moreover, given the limited availability of new sources of coal customers, if Foresight won bids for new or additional coal sales, Foresight determined that it would be better to fulfill such coal contracts through its other mining complexes, which were anticipated to maintain profitability at a margin that made continued operations of those mines valuable. In addition, and most importantly, Foresight determined that it could maintain efficient and competitive profitability if it were to spend the additional insurance proceeds to fully restart mining operations at its Hillsboro mine, which would then have the production capacity necessary to fulfill coal contracts that were otherwise required to be fulfilled through the Macoupin mining complex. *See* Moore Decl. ¶ 67.

Foresight spent approximately $46.7 million to transport, manufacture, and prepare for recommenced longwall mining operations at Hillsboro. The Hillsboro mining operations recommenced substantially contemporaneously with the Petition Date, are expected to fulfill up to 3.25 million tons of coal shipments under Foresight's various coal sale contracts and obligations this year alone, and are expected to maintain a profit margin comparable to Foresight's Sugar Camp and Williamson mines. Following the shuttering of operations at the Macoupin mine, Foresight also intends to satisfy a limited portion of its coal sale obligations through approximately 187,000 tons in standing reserves held in storage at the Macoupin mine or its Sitran Terminal, if and when such reserves can be economically transported and sold to customers. *See* Moore Decl. ¶ 68

## C.    Restructuring Negotiations with Key Stakeholders

Despite the anticipated benefits of the aforementioned operational improvements, Foresight still faced (and continues to face) challenging market, legislative, and regulatory conditions and substantial funded debt obligations. Accordingly, beginning in September 2019 Foresight engaged in lengthy, arm's-length negotiations with key stakeholders regarding a global financial restructuring.

As these negotiations progressed, Foresight was obligated to make a payment of interest under the Second Lien Notes Indenture to holders of the Second Lien Notes. Pursuant to the Second Lien Notes Indenture, a failure to pay interest on the Second Lien Notes when due constituted an Event of Default (as defined in the Second Lien Notes Indenture) if such failure continued for a period of thirty (30) days. To facilitate ongoing negotiations among its key constituencies, Foresight and the Second Lien Indenture Trustee, acting at the direction of a majority of the Second Lien Noteholders, entered into three (3) supplemental indentures to Foresight's Second Lien Notes Indenture, executed respectively on February 26, 2020, December 19, 2019, and October 30, 2019, which extended the thirty-day grace period to

23

March 29, 2020.  These extensions avoided defaults under the Second Lien Notes Indenture from becoming Events of Default (as defined in the Second Lien Notes Indenture) and thereby triggering cross-defaults under Foresight's First Lien Credit Agreement.

With this additional time, Foresight and its management team and advisors continued extensive arm's-length and good faith negotiations with its key constituencies.  The negotiations were ultimately successful.  As described in further detail below, Foresight and holders of a substantial majority of its prepetition funded debt entered into the Restructuring Support Agreement, pursuant to which they agreed to support the Restructuring that is to be implemented through the Plan.  In addition, Foresight renegotiated several of its arrangements with key counterparties to terms that are economically superior for Foresight.

D.    **Restructuring Support Agreement**

Foresight and the Consenting Lenders entered into the Restructuring Support Agreement on March 10, 2020, shortly before filing their chapter 11 petitions on the same date.  The Consenting Lenders hold over 69% of the First Lien Facility Claims and over 82% of the Second Lien Notes Claims.  Pursuant and subject to the terms of the Restructuring Support Agreement, Foresight and the Consenting Lenders agreed to support a comprehensive value-maximizing Restructuring, which is incorporated into, and to be effectuated through, the Plan.  The terms of the proposed Restructuring are summarized in a comprehensive term sheet attached as Exhibit B to the Restructuring Support Agreement.  A copy of the Restructuring Support Agreement, without individual holdings shown on the signature pages, is attached hereto as **Exhibit B**.

Importantly, pursuant to the Restructuring Support Agreement, certain Consenting Lenders have agreed to backstop, and in large part fund, significant capital infusions into the Debtors and Reorganized Debtors, in the form of: (i) the DIP Facility, which as discussed above in Article II.E.1.a, includes $100 million in principal amount of already-funded DIP New Money Commitments; and (ii) a new money senior secured first-priority term loan facility to be issued by Reorganized Foresight with an aggregate principal amount of up to $225 million (the "Exit Facility").[15]

The Restructuring Support Agreement is a key component of the Debtors' restructuring efforts.  It memorializes the commitments of holders of a substantial majority of Debtors' prepetition funded debt and provides the Debtors with significant assurances regarding the ultimate success of their chapter 11 cases.  In exchange, Foresight has agreed to provide the Consenting Lenders with certain consent rights, as set forth in the Restructuring Support Agreement and Plan.

E.    **Milestones**

To minimize costs and the potential disruptions to the business that could result from the chapter 11 filings, the Debtors and Consenting Lenders made it a priority to minimize the duration of the Chapter 11 Cases.  As a result, the Restructuring Support Agreement and the DIP

---

[15]    The Exit Facility, including related fees and the allocation of its funding, is described in detail in Article IV.D.2 of the Plan.

Credit Agreement obligate the parties to work expeditiously to consummate the Restructuring and establishes a number of milestones (the "Milestones") to govern that process, including the following:[16]

- no later than fifty (50) days after the Petition Date, the Debtors will have entered into renegotiated contracts/leases arrangements with (a) Murray, (b) Foresight Reserves, and (c) any other affiliated entity or entity that Foresight has previously considered a related party, including, without limitation, Natural Resource Partners LP and its direct and indirect subsidiaries ("NRP"), in each case (collectively, (a), (b), and (c), the "Renegotiated Contracts/Leases"), in form and substance acceptable to the Debtors and the Required First Lien Lenders;[17]

- no later than seventy (70) calendar days after the Petition Date, the Bankruptcy Court will have entered an order approving the Disclosure Statement in form and substance reasonably acceptable to the Debtors and the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Claims, reasonably acceptable to the Required Second Lien Lenders;[18]

- no later than one hundred fifteen (115) calendar days after the Petition Date, the Bankruptcy Court will have entered an order confirming the Plan in form and substance acceptable to the Debtors and the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Claims, reasonably acceptable to the Required Second Lien Lenders; and

- no later than one hundred thirty (130) calendar days after the Petition Date, the Plan's Effective Date will have occurred.

Failure to achieve the Milestones would, among other things: (i) under and subject to the terms of the Restructuring Support Agreement, give the Consenting Lenders the right to terminate their obligations to support the Restructuring; and (ii) under and subject to the terms of the DIP Orders and DIP Credit Agreement, accelerate the Debtors' obligations under the DIP Facility, terminate the Debtors' authorization to use cash collateral and the proceeds of the DIP Facility, and give the Consenting Lenders the right to exercise remedies on the DIP Collateral.

As discussed in Article V of this Disclosure Statement, the Debtors have already reached consensus regarding the terms of several of the Renegotiated Contracts/Leases, and they expect to reach consensus with respect to all Renegotiated Contracts/Leases prior to the relevant Milestone (as may be waived or amended from time to time). In addition, on [●], the

---

[16]   The Milestones are subject to waiver or extension in accordance with the terms of the Restructuring Support Agreement and the DIP Credit Agreement, as applicable.

[17]   "Required First Lien Lenders" means, as of the date of determination, Consenting First Lien Lenders holding in excess of 60% of the aggregate principal amount of First Lien Facility Claims held by all Consenting First Lien Lenders.

[18]   "Required Second Lien Lenders" means, as of the date of determination, Consenting Second Lien Noteholders holding in excess of 50% of the aggregate principal amount of Second Lien Notes Claims held by all Consenting Second Lien Noteholders.

Bankruptcy Court entered an order approving the adequacy of this Disclosure Statement and the Solicitation.[19]   Furthermore, a hearing for the Bankruptcy Court to consider confirmation of the Plan (the "Confirmation Hearing") has been scheduled for June 23, 2020 at 10:00 a.m. (prevailing Central Time).[20]

## ARTICLE IV.
## THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

In accordance with the Restructuring Support Agreement, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on March 10, 2020, *i.e.*, the Petition Date.   The filing of the petitions commenced the Chapter 11 Cases, at which time the Debtors were afforded the benefits and became subject to the limitations of the Bankruptcy Code.   Since the Petition Date, the Debtors have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.    First Day Motions

On the Petition Date, the Debtors filed several motions requesting the Bankruptcy Court to grant various relief designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations (the "First Day Motions").   The Bankruptcy Court granted all of the First Day Motions.   The following is a brief overview of the granted relief.[21]

1.    **DIP Facility.**   A critical goal of the Debtors' business stabilization efforts has been to ensure that the Debtors maintain sufficient liquidity to operate their business over the long term.   To that end, the Debtors sought, and the Bankruptcy Court granted, interim and final orders authorizing the Debtors to enter into the DIP Facility and use cash collateral.[22]   The DIP Facility is described above in Article II.E.1.a.   Importantly, the DIP Facility allows the Debtors to, among other things:  (a) continue to operate their business in an orderly manner; (b) maintain their valuable relationships with vendors, shippers, suppliers, customers and employees; (c) pay various administrative professionals' fees to be incurred in the Chapter 11 Cases; and (d) support the Debtors' working capital, general corporate and overall operational needs—all of which are necessary to preserve and maintain the going concern value of the Debtors' business and, ultimately, help ensure a successful reorganization under the Plan.

---

[19]    *Order Approving Disclosure Statement and Solicitation* [ECF No. [●]].

[20]    Scheduling Order [ECF No. [●]].

[21]    This Disclosure Statement's summary of the First Day Motions and related orders is qualified in its entirety by reference to First Day Motions and related orders themselves.  In the case of any inconsistency between this Disclosure Statement and the First Day Motions and related orders, the First Day Motions and related orders govern.

[22]    Interim DIP Order [ECF No. 74]; Final DIP Order [ECF No. 267].

**2.    Cash Management.**  The Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash among the various Debtors. The Debtors sought, and the Bankruptcy Court granted, authority for the Debtors to, among other things, continue the use of their existing cash management system, bank accounts, and related business forms, as well as to continue their intercompany arrangements, including those with Murray, Foresight Reserves, and Javelin.[23]

**3.    Trade Creditors.**  The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to their trade creditors in the ordinary course of business.  The trade creditors provide the Debtors with goods and services that are essential to the Debtors' corporate and coal mining operations, including, among other things, specialized mining equipment and technical and engineering services specific to the Debtors' operations, as well as information technology services, financial services, leases of property and equipment, utility services, maintenance and repair services, legal services, human resources services, and other basic business necessities for the operation of the Debtors' businesses.  Many of these creditors provide critical goods or services, may be able to assert liens, or whose prepetition claims will be entitled to administrative priority expense status under the Bankruptcy Code.  The Debtors sought, and the Bankruptcy Court granted, authority for the Debtors to pay certain of their trade creditors who are critical, have liens, or have priority claims, in the ordinary course and subject to customary trade terms.[24]

**4.    Wages.**  The Debtors' businesses are labor intensive and rely upon employees in various locations mining and transportation services located within the Midwest in the United States.  It is essential to the smooth operation of the Debtors' businesses that their workforce continues to perform in the normal course.  The Debtors sought, and the Bankruptcy Court granted, authority for the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.[25]

**5.    Coal Sale Contracts.**  To facilitate the purchase of their coal, the Debtors enter into coal sale contracts with various customers.  These customers may be unfamiliar with the protections afforded to the Debtors under the Bankruptcy Code and the scope of a debtor-in-possession's authority to continue its operations during a chapter 11 proceeding and to continue performing under their respective coal sale contracts.  Accordingly, the Debtors sought, and the Bankruptcy Court granted, orders confirming the Debtors' authority to continue entering into, amending, and performing under such contracts in the ordinary course of business during the pendency of the Chapter 11 Cases.[26]

---

[23]    Interim Cash Management Order [ECF No. 109]; Final Cash Management Order [ECF No. 241]

[24]    Interim Critical Vendors Order [ECF No. 115]; Final Critical Vendors Order [ECF No. 242].

[25]    Interim Wages Order [ECF No. 88]; Final Wages Order [ECF No. 243].

[26]    Interim Coal Sale Contracts Order [ECF No. 117]; Final Coal Sale Contracts Order [ECF No. [●]].

6.    **Customer Programs.**    To help maintain the Debtors' customer relationships during the pendency of the Chapter 11 Cases, the Debtors sought, and the Bankruptcy Court granted, authority for the Debtors to (i) pay any prepetition benefits that accrue to the benefit of the Debtors' customers and (ii) continue such customer programs in the ordinary course of business.[27]

7.    **Taxes.**    In the ordinary course of business, the Debtors incur various taxes, fees, and similar charges in jurisdictions around the world.    The Debtors sought, and the Bankruptcy Court granted, authority for the Debtors to pay all taxes, fees, and similar charges and assessments, whether arising pre- or postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course of the Debtors' businesses.[28]

8.    **Surety Bonds.**    In the ordinary course of business, the Debtors maintain a variety of reclamation and performance surety bonds.    The Debtors sought, and the Bankruptcy Court granted, authority for the Debtors to (i) continue their prepetition surety bond program and satisfy prepetition obligations related thereto and (ii) renew, supplement, or enter into new surety bonds in the ordinary course of business on a postpetition basis.[29]

9.    **Insurance.**    In the ordinary course of business, the Debtors maintain a variety of insurance policies and programs.    The Debtors sought, and the Bankruptcy Court granted, authority for the Debtors to (i) continue their prepetition insurance coverage and satisfy prepetition obligations related thereto and (ii) renew, supplement, or enter into new insurance coverage in the ordinary course of business on a postpetition basis.[30]

10.    **Utilities.**    In the ordinary course of business, the Debtors incur certain expenses related to essential utility services including, among others, water, electricity, natural gas, waste disposal, and telecommunication services.    The Debtors sought, and the Bankruptcy Court granted, orders (i) establishing procedures for determining adequate assurance of payment for the Debtors' domestic utility companies, (ii) deeming utility companies adequately assured of future performance, subject to their ability to seek additional assurance pursuant to the aforementioned procedures, and (iii) prohibiting utility companies from altering, refusing to provide, or discontinuing utility services to the Debtors other than in accordance with the aforementioned procedures.[31]

11.    **Other Procedural Motions and Retention of Professionals.**    The Debtors filed, and the Bankruptcy Court granted, various other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.

---

[27]    Interim Customer Programs Order [ECF No. 116]; Final Customer Programs Order [ECF No. 244].

[28]    Interim Taxes Order [ECF No. 120]; Final Taxes Order [ECF No. 246].

[29]    Interim Surety Bonds Order [ECF No. 118]; Final Surety Bonds Order [ECF No. 245].

[30]    Interim Insurance Order [ECF No 119]; Final Insurance Order [ECF No. [●]].

[31]    Interim Utilities Order [ECF No. 121]; Final Utilities Order [ECF No. 247].

## C.    Confirmation Hearing

Furthermore, with the authorization of the Bankruptcy Court, the Debtors have scheduled the Confirmation Hearing on June 23, 2020 at 10:00 a.m. (prevailing Central Time).[32] Notice of the Confirmation Hearing has been published and mailed to all known Holders of Claims and Interests.[33] Any objections to the Debtors' motion seeking confirmation of the Plan[34] must be filed by June 16, 2019 at 4:00 p.m. (prevailing Central Time).

### ARTICLE V.
### RENEGOTIATED ARRANGEMENTS WITH KEY COUNTERPARTIES

In tandem with its discussions with the Consenting Lenders, Foresight initiated discussions with the counterparties to its key contracts and leases. Foresight conducted such negotiations in parallel to its negotiations with the Consenting Lenders. While Foresight reached consensus with the Consenting Lenders and executed the Restructuring Support Agreement on March 10, 2020 (shortly prior to commencing the Chapter 11 Cases on the same date), Foresight's negotiations with certain of its key counterparties extended after the Petition Date.

As of the date hereof, Foresight has reached consensus with Murray, Javelin, Foresight Reserves, and NRP regarding the terms of certain of their Renegotiated Contracts/Leases. The renegotiated arrangements are economically superior for Foresight and will maximize Foresight's value for the benefit of its stakeholders. The key terms of the renegotiated arrangements will be filed with the Plan Supplement.

The Debtors, in consultation with the Required First Lien Lenders, remain engaged in ongoing negotiations with Murray regarding potential amendments and modifications to the terms of the Management Services Agreement. The Debtors expect to finish such negotiations prior to the applicable Milestone (as may be waived or amended from time to time). Pursuant to the Restructuring Support Agreement, any modifications or amendments to the Management Services Agreement must be acceptable to the Required First Lien Lenders. The key terms of any modified or amended Management Services Agreement or other arrangement between the Debtors and Murray will be filed with the Plan Supplement and will be subject to (i) the approval of the Bankruptcy Court in connection with its confirmation of the Plan and (ii) the occurrence of the Plan's Effective Date.

---

[32]    *See* Scheduling Order [ECF No. [●]].

[33]    *See* Certificate of Service of [●] Regarding Scheduling Order [ECF No. [●]].

[34]    *See* Confirmation Motion [ECF No. [●]].

# ARTICLE VI.
## SUMMARY OF PLAN

> THE FOLLOWING SUMMARIZES CERTAIN OF THE SIGNIFICANT ELEMENTS
> OF THE PLAN.   THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS
> ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET
> FORTH IN THE PLAN.  IN THE CASE OF ANY INCONSISTENCY BETWEEN THIS
> DISCLOSURE STATEMENT AND THE PLAN, THE PLAN SHALL GOVERN.

## A.    Administrative, DIP Facility and Priority Claims and Statutory Fees

All Claims and Interests, except Administrative Claims, DIP Claims, and Priority Tax Claims are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**1.    Administrative Claims.**  Except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the Allowed amount of such Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not due then, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 calendar days after the date on which an order Allowing such Administrative Claim becomes a Final Order or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claims; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in the Plan or a Final Order to the contrary, all requests for payment of an Administrative Claim that accrued on or before the Effective Date must be Filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date; provided, however, pursuant to the Bar Date Order, Administrative Claims related to Executory Contracts or Unexpired Leases that have been rejected by the Debtors are required to be Filed the date that is twenty-one (21) calendar days following entry of the relevant order or deemed effective date of the rejection of such rejected Executory Contract or Unexpired Lease. Holders of Administrative Claims that are, based on the preceding sentence, required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors,

the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

## 2. **Professional Fee Claims**

a. ***Final Fee Applications.*** All final requests for Professional Fee Claims shall be Filed no later than forty-five (45) calendar days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court. For the avoidance of doubt, any fees and expenses incurred by the professionals to the Ad Hoc Groups, the DIP Agent or the First Lien Agents shall not be considered Professional Fee Claims, and any such amounts shall be paid in accordance with the Restructuring Support Agreement, the DIP Orders, and the Plan, as applicable.

**b.**      ***Professional Fee Escrow Account.***      On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

**c.**      ***Professional Fee Reserve Amount.***      To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Professional Fee Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; provided that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

**d.**      ***Post-Effective Date Fees and Expenses.***      Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall pay in Cash the reasonable legal fees and expenses incurred by such Reorganized Debtor after the Effective Date in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court. Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**3.**      <u>DIP Claims.</u>      The DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement as of the Effective Date (including any unpaid accrued interest and unpaid fees, expenses and other obligations under the DIP Credit Agreement as of the Effective Date). In full satisfaction, settlement, discharge, and release of, and in exchange for, the DIP Claims, each Holder of an Allowed DIP Claim shall be indefeasibly paid and satisfied in full in Cash on the Effective Date except to the extent that a Holder of a DIP Claim agrees to less favorable treatment; provided, however, except to the extent that a Holder entitled to the DIP Exit Premium or DIP Put Option Premium agrees to less favorable treatment, the DIP Exit Premium and DIP Put Option Premium will be indefeasibly paid and satisfied in full in New Common Equity on the Effective Date in accordance with the terms of the DIP Credit Agreement and DIP Orders; provided, however, upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement) or upon repayment of the DIP Loans in full and termination of all DIP New Money Commitments without the occurrence of the Effective Date, (i) the DIP Exit Premium shall be immediately payable in Cash in an amount equal to $2,000,000.00 and (ii) the DIP Put Option Premium shall be immediately payable in

Cash in an amount equal to $10,000,000.00. Except as otherwise expressly provided in the DIP Credit Agreement or the DIP Orders, upon the indefeasible payment or satisfaction in full of the DIP Claims (other than any DIP Claims based on the Debtors' contingent obligations under the DIP Credit Agreement for which no claim has been made) in accordance with the terms of the Plan, all Liens and security interests granted to secure such DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order or approval of the Bankruptcy Court or any other Entity, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors to effectuate the foregoing. Notwithstanding the foregoing, the DIP Credit Agreement shall continue in effect solely for the purpose of preserving the DIP Agent's and the DIP Lenders' rights to any contingent or indemnification obligation of the Debtors pursuant and subject to the terms of the DIP Credit Agreement and DIP Orders.

**4.      Priority Tax Claims.** Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

**5.      Statutory Fees.** All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay all Statutory Fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee and File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code; provided, however, the GUC Administrator shall pay such fees and File such quarterly reports for any quarter in which, for the entirety of the quarter, all Claims that are not General Unsecured Claims have been resolved (either because they are Allowed Claims that have received the treatment provided under the Plan or because they have been Disallowed, expunged, or withdrawn).

**B.      Classification and Treatment of Claims and Interests**

**1.      Classification in General.** All Claims and Interests, other than Administrative Claims (including Professional Fee Claims and Statutory Fees), DIP Claims, and Priority Tax Claims are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan, only to the extent that such Claim or

Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

**2.        Formation of Debtor Group for Convenience Only.**    The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan.   Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.   Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.   The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, and the classifications set forth in Classes 1 through 8 shall be deemed to apply to each Debtor.   For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable.  Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable.

**3.        Summary of Classification.**    The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims and Statutory Fees), DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  All of the potential Classes for the Debtors are set forth herein.   Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.H of the Plan.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 3 | First Lien Facility Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote *(Presumed to Accept or Deemed to Reject)* |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 7 | Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote *(Presumed to Accept or Deemed to Reject)* |
| 8 | Interests in FELP and Interests in GP LLC | Impaired | Not Entitled to Vote *(Deemed to Reject)* |

4.   **Treatment of Claims and Interests.**   The treatment and voting rights provided under the Plan to each Class for distribution purposes is specified below:

a.   *Class 1 – Other Secured Claims.*

i.   Classification.   Class 1 consists of all Allowed Other Secured Claims.

ii.   Treatment.   On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor, with the consent of the Required First Lien Lenders: (i) Reinstatement of its Claims; (ii) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, then such Allowed Other Secured Claim shall be paid in accordance with its terms); or (iii) the collateral securing its Allowed Other Secured Claim on the later of the Effective Date and the date such Other Secured Claims becomes an Allowed Claim or as soon thereafter as reasonable practicable.

iii.   Voting.   Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan on account of such Claim.

b.   *Class 2 – Other Priority Claims.*

i.   Classification.   Class 2 consists of all Allowed Other Priority Claims.

ii.   Treatment.   Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of and

in exchange for each Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, such Allowed Other Priority Claim shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the Holder of an Allowed Other Priority Claim and the Debtors.

iii.    <u>Voting</u>.  Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan on account of such Claim.

**c.**    ***Class 3 – First Lien Facility Claims.***

i.    <u>Classification</u>.  Class 3 consists of all Allowed First Lien Facility Claims.

ii.    <u>Allowance</u>.  The First Lien Facility Claims are hereby Allowed in an aggregate amount of not less than $[●] against each of the Debtors that are obligors under the First Lien Credit Agreement and shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to Section 502(d) of the Bankruptcy Code; provided, however, such Allowed amount shall be reduced by the amount of the DIP Roll-Up Loans.

iii.    <u>Treatment</u>.  On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the First Lien Facility Claims, each Holder of an Allowed First Lien Facility Claim shall receive its Pro Rata share of 92.75% of the New Common Equity, subject to the Full Equity Dilution.

iv.    <u>Voting</u>.  Class 3 is Impaired under the Plan.  Each Holder of an Allowed First Lien Facility Claim is entitled to vote its Pro Rata share of the First Lien Facility Claims to accept or reject the Plan.

**d.**    ***Class 4 – Second Lien Notes Claims.***

i.    <u>Classification</u>.  Class 4 consists of all Allowed Second Lien Notes Claims.

ii.    <u>Allowance</u>.  The Second Lien Notes Claims are hereby Allowed in an aggregate amount of not less than $[●] against each of the Debtors that are obligors under the Second Lien Notes Indenture

and shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to Section 502(d) of the Bankruptcy Code.

iii.    <u>Treatment</u>.   On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Second Lien Notes Claims, each Holder of an Allowed Second Lien Notes Claim shall receive its Pro Rata share of 7.25% of the New Common Equity, subject to the Full Equity Dilution.

iv.    <u>Voting</u>.   Class 4 is Impaired under the Plan.   Each Holder of an Allowed Second Lien Notes Claim is entitled to vote its Pro Rata share of the Second Lien Notes Claims to accept or reject the Plan.

e.    ***Class 5 – General Unsecured Claims.***

i.    <u>Classification</u>.   Class 5 consists of all Allowed General Unsecured Claims.

ii.    <u>Treatment</u>.

- **If Class 5 Accepts the Plan:** If Class 5 votes to accept the Plan as to all of the Debtors, then in full satisfaction, release and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive at its option, either:  (a) its Pro Rata share of $[●] in Cash; or (b) other less favorable treatment agreed to by the Holder.

- **If Class 5 Rejects the Plan:** If Class 5 votes to reject the Plan with respect to any Debtor, then in full satisfaction, release and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive at its option, either:  (a) its Pro Rata share of $[●] in Cash; or (b) other less favorable treatment agreed to by the Holder.

iii.    <u>Voting</u>.   Class 5 is Impaired under the Plan.   Each Holder of an Allowed General Unsecured Claim is entitled to vote its Pro Rata share of the General Unsecured Claims to accept or reject the Plan.

f.    ***Class 6 – Intercompany Claims.***

i.    <u>Classification</u>.   Class 6 consists of all Intercompany Claims.

ii.    <u>Treatment</u>.   On the Effective Date, each Intercompany Claim shall be Reinstated, cancelled, or otherwise settled to the extent determined to be appropriate by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required First Lien Lenders.

      iii.    <u>Voting</u>.  Class 6 is either (i) Unimpaired, and each Holder of an Intercompany Claim is therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (b) Impaired, and each Holder of an Intercompany Claim is therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**g.**    ***Class 7 – Intercompany Interests.***

      i.    <u>Classification</u>.   Class 7 consists of all Intercompany Interests.

      ii.    <u>Treatment</u>.   On the Effective Date, each Intercompany Interest shall be Reinstated, cancelled, or otherwise settled to the extent determined to be appropriate by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required First Lien Lenders.

      iii.    <u>Voting</u>.   Class 7 is either (i) Unimpaired, and each Holder of an Intercompany Interest is therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (b) Impaired, and each Holder of an Intercompany Interest is therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**h.**    ***Class 8 – Interests in FELP and Interests in GP LLC.***

      i.    <u>Classification</u>.   Class 8 consists of all Interests in GP LLC and all Interests in FELP, including, for the avoidance of doubt, the FELP Common LP Units, the FELP Subordinated LP Units, and the IDRs.

      ii.    <u>Treatment</u>.   On the Effective Date, all Interests in GP LLC and all Interests in FELP shall be cancelled and discharged and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and each Holder of such Interests shall not be entitled to receive any distribution under the Plan on account of such Interests.

      iii.    <u>Voting</u>.   Class 8 is Impaired under the Plan.  Each Holder of an Interest in FELP or an Interest in GP LLC is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each Holder of such Interest is not entitled to vote to accept or reject the Plan on account of such Interest.

5. **Confirmation of Certain, But Not All Cases.**  If the Plan is not confirmed as to one or more of the Debtors, but the other Debtors, with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders, determine to proceed with the Plan, then the Debtor(s), as to which the Plan may not be confirmed, shall be severed from, and the Plan shall not apply to, such Debtor(s).

6. **Special Provision Governing Unimpaired Claims.**  Nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims or Interests, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Interests.

7. **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.  The Debtors reserve the right to modify the Plan in accordance with Article X.A of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

8. **Elimination of Vacant Classes.**  Any Class of Claims that does not have a Holder of an Allowed Claim as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

9. **Voting Classes; Presumed Acceptance by Non-Voting Classes.**  If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims or Interests in such Class.

10. **Subordinated Claims.**  Unless otherwise expressly provided in the Plan or the Confirmation Order, the allowance, classification and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including the Existing Intercreditor Agreement, the First Lien Credit Agreement Documents, and the Second Lien Notes Indenture.

## C.    Means for Implementation of the Plan

1. **General Settlement of Claims and Interests.** Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such

compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. All distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

       **2.**     **Restructuring Transactions.**  On or after the Confirmation Date, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors to reorganize certain Debtor entities in a different form, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are organized, which restructuring may include one or more entity or asset transfers, mergers, consolidations, dispositions, liquidations, wind-downs, or dissolutions as may be determined by the Debtors, with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders, to be necessary or appropriate to result in substantially all or a part of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "<u>Restructuring Transactions</u>"). The Restructuring Transactions shall be acceptable to the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders. In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, the Debtor or such surviving, resulting, or acquiring Entity shall satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform such obligations. The Restructuring Transactions may, at the election of the Debtors with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders, include a taxable transfer of substantially all or a part of the Debtors' assets or subsidiary entities of any Debtor to a newly-formed entity (or an Affiliate or subsidiary of such entity) formed and controlled by any Debtor or by some or all of the Holders of Claims, and to which entity such Claims have or have not been contributed, and, in each case, some or all of the New Common Equity (and/or other interests) issued to Holders of Claims pursuant to the Plan may comprise equity of (and/or other interests in) such new entity (or an Affiliate or subsidiary of such entity). The fees, expenses, budgets, and any tax reporting obligations associated with the liquidation, wind-down, or dissolution of any entity in connection with the Restructuring Transactions shall be acceptable to each of the Debtors and the Required First Lien Lenders.

       In effecting the Restructuring Transactions, the Debtors shall be permitted to (i) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (ii) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (iii) file appropriate certificates or articles of merger, consolidation, or

dissolution pursuant to applicable state law; (iv) take any such steps as may be necessary or desirable, in the Debtors reasonable determination, to effect the taxable transfer described in the prior paragraph; and (v) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

For purposes of effecting the Plan, none of the transactions contemplated in Article IV.B of the Plan shall constitute a change of control under any agreement, contract, or document of the Debtors.

All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized Debtors, or any corporate organization, limited liability company formation, entity or asset transfer, or related action required by or desirable to the Debtors or Reorganized Debtors in connection herewith, with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the shareholders, partners, members, directors, or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the shareholders, partners, members, directors, or managers, as applicable, of the Debtors or Reorganized Debtors.

**3.**     **Cancellation of Liens.**     Upon the payment or other satisfaction of an Allowed Secured Claim, (1) the Holder of such Allowed Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any collateral or other property of the Debtors held by such Holder, and any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Secured Claim that may be required in order to terminate any Lien, related financing statements, mortgages, mechanic's liens, or *lis pendens*, or other similar interests or documents; and (2) the Debtors or Reorganized Debtors (as applicable) may file any termination statements, instruments of satisfaction, releases, or other related documents that the Debtors or Reorganized Debtors (as applicable) deem appropriate to evidence and/or effect the termination of any Lien, related financing statements, mortgages, mechanic's liens, or *lis pendens*, or other similar interests or documents, as applicable.

**4.**     **Sources of Consideration for Plan Distributions.**     Consideration for Plan distributions shall come from:

**a.**     *Equity Interests in Reorganized Foresight.*

On the Effective Date, all FELP Common LP Units, FELP Subordinated LP Units, and certain other Interests in other Debtors, shall be cancelled or contributed to Reorganized Foresight or an Affiliate thereof and Reorganized Foresight shall issue the New Common Equity to Holders of Allowed Claims entitled to receive the New Common Equity pursuant to Article II and Article III of the Plan.

All of the New Common Equity to be issued pursuant to the Plan (including under the Management Incentive Plan), the DIP Orders, the DIP Credit Agreement, and the Exit Facility Backstop Agreement shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance of the New Common Equity under the Plan, the DIP Orders, the DIP Credit Agreement, and the Exit Facility Backstop Agreement shall be governed by the terms and conditions set forth in the Plan, the DIP Orders, the DIP Credit Agreement, and the Exit Facility Backstop Agreement applicable to such distribution or issuance, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, each Holder of an Allowed Claim that receives New Common Equity under the Plan shall be deemed to have executed, without any further action by any party, any Equityholders Agreement, which shall be Filed as a Plan Supplement.  Notwithstanding the foregoing, all Entities shall be required to sign the Equityholders Agreement prior to the distribution  to such Entity of any New Common Equity under the Plan or otherwise.

**b.**    *Exit Facility.*

i.    <u>Terms of the Exit Facility</u>.  On the Effective Date, Reorganized Foresight shall enter into the Exit Facility Documents.  The Exit Facility will be issued by Reorganized Foresight and guaranteed by each of the other Reorganized Debtors and shall comprise a new senior secured first-priority term loan facility in an aggregate principal amount of up to $225,000,000.00.  Entry of the Confirmation Order shall constitute approval of the Exit Facility and the Exit Facility Documents, all transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith (including, without limitation, the payment of all reasonable and documented fees, indemnities, and expenses provided for therein), authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents, and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith.  The Exit Facility will be in form and substance acceptable to the Debtors, the Required First Lien Lenders, the Exit Facility Agent, and the Required Exit Facility Backstop Parties and will have terms consistent with those set forth in the Plan Supplement and the Restructuring Support Agreement.  Such terms shall include that the Exit Facility Lenders shall receive the Exit Facility Equity Component and, in the case of the Exit Facility Backstop Parties, the Exit Facility Put Option Premium.

The Exit Facility Agent and the Exit Facility Lenders shall have valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the Exit Facility Documents, which shall be deemed automatically perfected on the Effective Date.  The guarantees, mortgages, pledges, Liens, and other security interests granted pursuant to the Exit Facility Documents (i) are granted as an inducement to the lenders under the Exit Facility to extend credit thereunder, (ii) are granted in good faith, for legitimate business purposes, and for reasonable equivalent value, (iii) shall be deemed not to constitute a preferential transfer, voidable transfer, fraudulent conveyance, or fraudulent transfer under the Bankruptcy Code or any applicable non-bankruptcy law, and shall not otherwise be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever, and (iv) shall have the priorities as set forth in the relevant Exit Facility Documents.  In establishing the register of lenders under the Exit Facility, the Exit Facility Agent shall be entitled to conclusively rely upon

(without further inquiry) any certificate, schedule, register, list, or other document provided by the Required Exit Facility Backstop Parties, Debtors, and/or the Reorganized Debtors.

ii. Direct Debt Placement; Syndication of the Exit Facility; Exit Facility Backstop Agreement. The Exit Facility Backstop Parties shall, on a several, and not joint and several basis, fund in a direct private placement (the "Exit Facility Direct Debt Placement" and the commitments thereunder, the "Exit Facility Direct Debt Commitment") an amount equal to 50% of the aggregate principal amount of the Exit Facility Loans (the "Exit Facility Direct Debt Placement Amount"), allocated as follows: (i) 92.75% of the Exit Facility Direct Debt Placement Amount to the Exit First Lien Backstop Parties, pro rata based on such parties' First Lien Facility Claims; and (ii) 7.25% of the Exit Facility Direct Debt Placement Amount to the Exit Second Lien Backstop Parties, pro rata based on such parties' Second Lien Notes Claims. The Exit Facility Direct Debt Commitment will close concurrently with the closing of the Exit Facility Opportunity (as defined below) and the Effective Date.

Certified Eligible Holders of First Lien Facility Claims and/or Second Lien Notes Claims will have the opportunity to participate (the "Exit Facility Opportunity") in funding 50% of the aggregate principal amount of the Exit Facility Loans (the "Exit Facility Syndication Amount") as follows: (i) 92.75% of the Exit Facility Syndication Amount shall be available to Certified Eligible Holders of First Lien Facility Claims (which, for the avoidance of doubt, shall include the Exit Facility Backstop Parties), pro rata based on such Holders' First Lien Facility Claims (the "Exit Facility First Lien Syndication"); and (ii) 7.25% of the Exit Facility Syndication Amount shall be available to Certified Eligible Holders of Second Lien Notes Claims (which, for the avoidance of doubt, shall include the Exit Facility Backstop Parties), pro rata based on such Holders' Second Lien Notes Claims (the "Exit Facility Second Lien Syndication" and together with the Exit Facility First Lien Syndication, the "Exit Facility Syndication"). The Exit Facility Opportunity will be conducted on the terms and conditions to be set forth in the syndication procedures and related documentation for the Exit Facility, which procedures and documentation shall be consistent with the Restructuring Support Agreement and acceptable to the Debtors, the Required First Lien Lenders, and the Required Exit Facility Backstop Parties.

The Exit Facility will be backstopped on a several, and not joint and several, basis by the Exit Facility Backstop Parties pursuant to the terms of the Exit Facility Backstop Agreement. For the avoidance of doubt, (i) the Exit Facility First Lien Syndication shall be backstopped solely by those Exit Facility Backstop Parties holding First Lien Facility Claims (in such capacity, the "Exit Facility First Lien Backstop Parties"), pro rata based on such Holders' First Lien Facility Claims, and (ii) the Exit Facility Second Lien Syndication shall be backstopped solely by those Exit Facility Backstop Parties holding Second Lien Notes Claims (in such capacity, the "Exit Facility Second Lien Backstop Parties") pro rata based on such Second Lien Notes Claims. In exchange for backstopping the Exit Facility, each Exit Facility Backstop Party will receive its pro rata share of the Exit Facility Put Option Premium to the extent earned and payable pursuant to the Exit Facility Backstop Agreement, subject to dilution by the Management Incentive Plan.

5. Corporate Existence. Except as otherwise provided in the Plan, any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, or as a result of any Restructuring Transactions, on the Effective Date, each Debtor shall continue to exist after

the Effective Date as a separate corporation or other form of Entity under governing state or foreign law, as the case may be, with all the powers of such corporation or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal, or foreign law).   For the avoidance of doubt, nothing in Article IV.E of the Plan prevents, precludes, or otherwise impairs the Reorganized Debtors, or any one of them, from merging, amalgamating, or otherwise restructuring their legal Entity form in accordance with applicable non-bankruptcy law after the Effective Date.

6.      **Vesting of Assets in the Reorganized Debtors.**  Except as otherwise provided  in the Plan, any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, or pursuant to a Final Order of the Bankruptcy Court, on the Effective Date, all property in each Estate, all Causes of Action and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

7.      **Cancellation of Existing Securities and Agreements.**  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement,  on the Effective Date:

    i.    the obligations of the Debtors pursuant, relating, or pertaining to and any certificate, share, note, bond, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of, or Interests in, the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled as to the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder;

    ii.    the obligations of the Debtors pursuant, relating, or pertaining to the First Lien Credit Agreement Documents, the Second Lien Notes Indenture Documents, the DIP Credit Agreement, or any other agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, bonds, purchase rights,

options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, in the cases of clauses (i) and (ii) hereof, notwithstanding Confirmation or the occurrence of the Effective Date, any agreement (including the Existing Intercreditor Agreement) that governs the rights of the First Lien Agents, the Second Lien Indenture Trustee, the DIP Agent, or any other Holder of a Claim shall continue in effect solely for purposes of:

A. enabling Holders of Allowed Claims to receive distributions under the Plan as provided in the Plan and for enforcing any rights hereunder or thereunder against parties other than the Debtors, the Reorganized Debtors, or their Representatives;

B. determining the Lien and payment priority and other rights between the First Lien Facility Claims and the Second Lien Notes Claims pursuant to the Existing Intercreditor Agreement;

C. allowing the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent as applicable, in accordance with Article VII of the Plan, to make distributions to the Holders of the First Lien Facility Claims, the Second Lien Notes Claims, and the DIP Claims;

D. allowing the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to maintain any right of priority of payment, indemnification, exculpation, contribution, subrogation, or any other claim or entitlement it may have under the First Lien Credit Agreement Documents, the Second Lien Notes Indenture Documents, the Existing Intercreditor Agreement, or the DIP Credit Agreement, as applicable (which shall survive and not be released, except as otherwise expressly provided in the Plan, other than against the Debtors and the Reorganized Debtors);

E. allowing the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to enforce any obligations owed to each of them under the Plan or the Confirmation Order;

F. permitting the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to appear before the Bankruptcy Court or any other court;

G. permitting the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to exercise rights and obligations relating to the interests of the First Lien Lenders, the Second Lien Noteholders, and the DIP Lenders, as applicable, to the extent consistent with the Plan and the Confirmation Order; and

H. permitting the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to perform any functions that are necessary to effectuate the foregoing;

provided, further, however, the preceding proviso shall not affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; provided, further, for the avoidance of doubt, nothing in Article IV.G of the Plan shall affect a cancellation of any New Common Equity or Intercompany Interests.

Except as expressly provided in the Plan and Confirmation Order, on the Effective Date, each of the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent and their respective agents, successors, and assigns shall be fully discharged of all of their duties and obligations under the applicable First Lien Credit Agreement Documents, Second Lien Notes Indenture Documents, and DIP Credit Agreement.

**8.      Corporate Action.**   On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:

i.      the execution and delivery of the Restructuring Documents and any related instruments, agreements, guarantees, filings, or other related documents;

ii.      the implementation of the Restructuring Transactions and any related instruments, agreements, guarantees, filings, or other related documents; and

iii.      all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

On the Effective Date, all matters provided for in the Plan involving the corporate structure of the other Reorganized Debtors, and any corporate, partnership, or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Holders of Interests, directors, or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, the Restructuring Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**9.      Corporate Governance of Reorganized Debtors.**  The corporate governance for the Reorganized Debtors, including charters, certificates of formation, bylaws, operating

agreements, limited liability company agreements, shareholder or stockholder agreements, registration rights agreements, or other organizational or formation documents, and the terms thereof, as applicable, the corporate form of Reorganized Foresight, the initial structure, size, and composition of the new board of directors/managers, and any other governance provisions applicable to Reorganized Foresight shall be: (1) determined by the Required First Lien Lenders, with the reasonable consent of the Required Second Lien Noteholders, in each case consistent with the terms of Restructuring Support Agreement; (2) consistent with section 1123(a)(6) of the Bankruptcy Code; and (3) set forth in the Plan Supplement. The identities of the initial members of the New Boards shall also be set forth in the Plan Supplement.

10.    **Effectuating Documents; Further Transactions.**   On and after the Effective Date, the Reorganized Debtors, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Securities issued pursuant to the Plan, including the Restructuring Documents and the Restructuring Transaction, in each case in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents, except those expressly required pursuant to the Plan.

11.    **Exemption from Certain Taxes and Fees.**   Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan (including under any of the Restructuring Documents and related documents) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, transfer tax, sale or use tax, mortgage recording tax or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee or governmental assessment. Such exemption under section 1146(a) of the Bankruptcy Code specifically applies, without limitation, to: (1) the creation and recording of any mortgage, deed of trust, Lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the issuance, distribution and/or sale of any Securities of the Debtors or the Reorganized Debtors; and (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including (a) any merger agreements, (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution, (c) deeds, (d) bills of sale, or (e) instruments of transfer or assignment executed in connection with any Restructuring Transaction occurring under the Plan.

12.    **Preservation of Causes of Action.**   In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, unless expressly stated otherwise in the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and such rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action in accordance with the best interests of the

Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

13.    **Director and Officer Liability Insurance.**    The Debtors' D&O Liability Insurance Policies shall be Reinstated under the Plan to the fullest extent possible under applicable law. Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers and employees serving on or prior to the Effective Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan and no Proof of Claim, Administrative Claim or objection to Cure Claim need be Filed with respect thereto.

The Debtors or the Reorganized Debtors, as the case may be, shall maintain their D&O Liability Insurance Policies and their employment practices liability policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, causes of action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors.

14.    **Management Incentive Plan.**    The New Board of Reorganized Foresight will

adopt a management incentive plan reserving up to 10% of the New Common Equity on a fully diluted basis (the "Management Incentive Plan"), to be available for issuance pursuant to equity or equity-based incentive awards to management and other key employees of the Reorganized Debtors, as described in the Plan Supplement. The initial issuance of incentive awards under the Management Incentive Plan shall be determined by the Required First Lien Lenders in consultation with (i) a compensation consultant reasonably acceptable to the Required First Lien Lenders and (ii) the Chief Executive Officer of the Reorganized Foresight, with subsequent grants to be determined by the New Board of Reorganized Foresight.

15.  **GUC Cash Pool Account.**  On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and fund or cause to be funded a segregated account with Cash in an amount equal to the GUC Cash Pool (the "GUC Cash Pool Account"), which (1) shall not be, and shall not be deemed to be, property of the Debtors or the Reorganized Debtors or their Estates, (2) shall be held in trust by the GUC Administrator for Pro Rata distributions on account of General Unsecured Claims as provided in the Plan, and (3) shall not be encumbered by any Liens, Claims, or Interests in any way.

16.  **GUC Administrator Account.**  On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and fund or cause to be funded the GUC Administrator Account with Cash in the aggregate amount of $[●], which shall be held in trust for the payment of GUC Administrator Costs as provided in the Plan. The Debtors and the Reorganized Debtors shall have no further obligation or liability for the GUC Administrator's costs as provided in the Plan upon the funding of the GUC Administrator Account pursuant to Article IV.P of the Plan.

The GUC Administrator Account (1) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (2) shall be held in trust by the Debtors or Reorganized Debtors, as applicable, for the benefit of the GUC Administrator and the GUC Administrator's professionals and other employees, (3) shall not be encumbered by any Liens, Claims, or Interests in any way.

17.  **Exemptions from Securities Act Registration Requirements.**  The offer, issuance, and distribution of the New Common Equity on account of (x) the First Lien Facility Claims and Second Lien Notes Claims and (y) each of the DIP Put Option Premium and the DIP Exit Premium shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or other law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code. Such New Common Equity will not be "restricted securities" as defined in Rule 144(a)(3) of the Securities Act and will be freely tradable and transferable by the initial recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws, including Rule 144 of the Securities Act, any rules and regulations of the SEC, if any, and any transfer restrictions in the New Organizational Documents applicable at the time of any future transfer of such Securities or instruments.

The offer, issuance, and distribution of the New Common Equity pursuant to the Exit Facility Equity Issuances are being made only to Certified Eligible Holders in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S (and/or similar registration exemptions applicable outside of the United States).   Accordingly, such Securities will be considered "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to an effective registration statement under, or an applicable exemption from the registration requirements of, the Securities Act and other applicable law.

Any Securities offered and issued under the Management Incentive Plan will be offered and issued pursuant to a registration statement or available exemption from registration under the Securities Act and other applicable law.

18.   **Notice of Effective Date.**   On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall File a notice of the occurrence of the Effective Date with the Bankruptcy Court.   The notice of Effective Date shall (i) include notice of the Administrative Claims Bar Date and (ii) be served upon (a) the U.S. Trustee; (b) counsel to the Ad Hoc First Lien Group; (c) counsel to the Ad Hoc Crossover Group; (d) counsel to the Facilities Agent; (e) counsel to the Term Agent; (f) counsel to the Indenture Trustee; (g) counsel to the collateral trustee under the Debtors' secured debt facilities; (h) counsel to the DIP Agent; (i) counsel to DIP Lenders; (j) the Creditors' Committee; (k) counsel to Murray Energy Corporation; (*l*) counsel to Foresight Reserves; (m) counsel to Javelin Global Commodities (UK) Ltd; (n) counsel to Uniper Global Commodities UK Limited; (o) the Internal Revenue Service; (p) the Securities and Exchange Commission; (q) the United States Attorney's Office for the Eastern District of Missouri; (r) the state attorneys general for all states in which the Debtors conduct business; (s) the Holders of the thirty (30) largest unsecured claims against the Debtors, on a consolidated basis; (t) all Persons listed on the Debtors' creditor matrix; and (u) any party that has requested notice pursuant to Bankruptcy Rule 2002.

D.   **Treatment of Executory Contracts and Unexpired Leases**

1.   **Assumption of Executory Contracts and Unexpired Leases.**   As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Claims, all Executory Contracts and Unexpired Leases to which any of the Debtors are a party, including, without limitation, the DIP Backstop Agreement and the Exit Facility Backstop Agreement, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed assumed except for any Executory Contract or Unexpired Lease that (1) is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) has been previously rejected by a Final Order; (3) is the subject of a motion to reject an Executory Contract or Unexpired Lease that is pending on the Confirmation Date; or (4) is the subject of a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions provided for in the Plan or the Schedule of Rejected Executory Contacts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.   Unless otherwise indicated, assumptions of Executory Contracts

and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, but not assigned to a third party before the Effective Date, shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**2.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**
The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be delivered to the Reorganized Debtors and the Notice and Claims Agent on or before thirty (30) calendar days after the Effective Date. Any such request that is not timely delivered shall be hereby disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim; provided, however, nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to deliver such request for payment of such Cure Claim. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed on or before the deadline to object to Confirmation. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as

applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence or outcome of any such dispute.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to Article V.B of the Plan shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

3.      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**      Notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

4.      **Indemnification Obligations.**      Except to the extent inconsistent with the Plan, the obligation of each Debtor to indemnify any individual who is serving or served as one of such Debtor's directors, officers or employees on or after the Petition Date will be deemed and treated as Executory Contracts that are assumed by each Reorganized Debtor pursuant to the Plan as of the Effective Date on the terms provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor; provided, the Reorganized Debtors shall not indemnify officers, directors, equityholders, agents, or employees, as applicable, of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.      Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.      None of the Reorganized Debtors shall amend or restate any New Organizational Documents before or after the Effective Date to terminate or adversely affect any such indemnification obligations.

5.      **Insurance Policies.**      All insurance policies pursuant to which any Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors.

6.      **Modifications, Amendments, Supplements, Restatements or Other Agreements.**      Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Unless expressly agreed upon in writing, any modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority or amount of any Claims that may arise in connection therewith.

7.    **Reservation of Rights.**    Nothing contained in the Plan shall constitute a representation by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or, after the Effective Date, the Reorganized Debtors shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

8.    **Nonoccurrence of Effective Date.**  In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

9.    **Contracts and Leases Entered into After the Petition Date.**  Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

E.    **Disputed Claims**

1.    **Retention of Claims, Rights, Causes of Action, and Defenses.**  Except as expressly provided in the Plan, after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article IV.L of the Plan, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to a Final Order of the Bankruptcy Court.

Nothing contained in Article VI.A of the Plan shall constitute or be deemed a waiver of any claim, right, defense, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

2.    **GUC Administrator.**  The Debtors shall, with the reasonable consent of the Required First Lien Lenders, select and appoint, as of the Effective Date, a GUC Administrator (which administrator may be one or more of the Reorganized Debtors) with duties limited to (a) administering, disputing, objecting to, compromising, or otherwise resolving General Unsecured Claims, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to General Unsecured Claims, (ii) settling or compromising any General Unsecured Claims

without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) directing the Notice and Claims Agent to adjust the claims register to reflect any such Claim resolutions without any further notice to or action, order, or approval by the Bankruptcy Court, (b) directing the Disbursing Agent to make distributions from the GUC Cash Pool Account to the Holders of Allowed General Unsecured Claims as provided in the Plan, and (c) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the foregoing duties.  The GUC Administrator may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties as limited above, including any professionals retained in these Chapter 11 Cases, and the GUC Administrator Costs, including reasonable professional fees, shall be paid by the Debtors or Reorganized Debtors from the GUC Administrator Account in the ordinary course without further order of the Bankruptcy Court, <u>provided</u> that the Debtors and Reorganized Debtors shall not be required to reimburse such costs in excess of $[●] in the aggregate.

Immediately upon the resolution of all General Unsecured Claims and the making of the final distribution to Holders of Allowed General Unsecured Claims, the GUC Administrator shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.

**3.    Claims Administration Responsibility.**    After the Effective Date, the Reorganized Debtors, other than as to General Unsecured Claims, shall retain responsibility for (1) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against the Debtors, including, without limitation, (a) filing, withdrawing, or litigating to judgment objections to Claims, (b) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (c) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, and (2) directing the Disbursing Agent to make distributions  (if any) on account of all Claims and Interests.

With respect to General Unsecured Claims, the GUC Administrator shall exercise all of the aforementioned responsibilities set forth in Article VI.C of the Plan.

**4.    Cooperation and Access.**    The Reorganized Debtors shall cooperate in good faith with the GUC Administrator, including by (1) affording the GUC Administrator access to its properties, books, and records in connection with the GUC Administrator's satisfaction of its duties and responsibilities under the Plan and (2) using commercially reasonable efforts to make available to the GUC Administrator employees of the Reorganized Debtors whose assistance, expertise, testimony, notes, recollections, or presence are reasonably necessary in connection with the GUC Administrator's satisfaction of its duties and responsibilities under the Plan; <u>provided</u>, the Debtors' reasonable and documented out-of-pocket expenses from complying with Article VI.D of the Plan shall be reimbursable from the GUC Administrator Account.

**5.    Objections to Claims.**    Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and Filed on or before the Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors, the Reorganized Debtors, the GUC Administrator or any other party in interest, as applicable, effect service in any of the following

manners: (1) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (2) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address), or (3) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

6.    **Disallowance of Claims.**  Nothing in the Plan shall in any way alter, impair or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC Administrator after the Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors (or the GUC Administrator, as the case may be) allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

7.    **Estimation of Claims.**  Before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any purpose permitted thereunder, regardless of whether any party previously has objected to such Claim or Interest, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court has entered a Final Order estimating any contingent or unliquidated Claim for the express purpose of determining what amount of such Claim shall be allowed for purposes of distributions pursuant to section 502(c), that estimated amount shall, unless otherwise ordered by the Bankruptcy Court or agreed between the relevant parties, constitute a maximum limitation on the Allowed amount of such Claim for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtors or the GUC Administrator may, to the extent applicable, elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

8.    **No Interest on Claims.**  Unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not

accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

9. **Amendments to Claims.** On or after the Bar Date, except as otherwise provided in the Plan, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full without any further notice to or action, order, or approval of the Bankruptcy Court.

F. **Provisions Governing Distributions**

1. **Disbursing Agent.** The Disbursing Agent shall make all distributions required under the Plan.

2. **Currency.** Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

3. **No Distributions Pending Allowance.** No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

4. **Distribution Record Date.** Notwithstanding anything in the Plan to the contrary, except with respect to publicly traded securities and DIP Claims, the claims register shall be closed on the Distribution Record Date, and the Disbursing Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date; provided, however, if a Claim or Interest is transferred less than twenty (20) calendar days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee to the extent practicable and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the applicable procedures of The Depository Trust Company.

5. **Distributions on Account of Claims Allowed as of the Effective Date**

a. ***Claims that Are Not General Unsecured Claims.*** Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, distributions with respect to Claims that are not General Unsecured Claims shall occur on the

56

Initial Distribution Date (or as soon as reasonably practicable thereafter); <u>provided</u>, <u>however</u>, for the avoidance of doubt, Allowed Priority Tax Claims shall be paid in full in Cash on the Initial Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(9)(c) of the Bankruptcy Code.

        **b.**    ***General Unsecured Claims.***    On the Effective Date, the GUC Administrator shall withhold and retain from the GUC Cash Pool Account a segregated reserve with (a) an amount reasonably determined by the GUC Administrator to be sufficient to pay Holders of Disputed General Unsecured Claims the amount such Holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, (b) such lesser amount as estimated or otherwise ordered by the Bankruptcy Court, or (c) such lesser amount as agreed to between the GUC Administrator and the Holders thereof (such account, the "<u>Disputed GUC Reserve</u>").

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, initial distributions on account of General Unsecured Claims that are Allowed as of the Effective Date shall be made on the first GUC Distribution Date; <u>provided</u>, <u>however</u>, such initial distributions shall not include any portion of the Disputed GUC Reserve; <u>provided</u>, <u>further</u>, the Disbursing Agent shall make subsequent Pro Rata distribution(s) to Holders of Allowed General Unsecured Claims to the extent the GUC Administrator determines that any portion of the funds originally allocated to the Disputed GUC Reserve subsequently becomes available for such distributions (as a result of the GUC Administrator's resolution of Disputed General Unsecured Claims or otherwise); <u>provided</u>, <u>further</u>, Disputed General Unsecured Claims that become Allowed, in whole or in part, shall be satisfied exclusively out of the Disputed GUC Reserve.

In the event that the Cash remaining in the GUC Cash Pool Account becomes insufficient to provide Holders of recently Allowed General Unsecured Claims with the same Pro Rata distribution received by previously Allowed General Unsecured Claims, such recently Allowed General Unsecured Claims shall (i) only be entitled to their pro rata share of whatever Cash remains in the GUC Cash Pool Account and Disputed GUC Reserve and (ii) have no recourse in respect of such Claims to the Debtors or the Reorganized Debtors, as applicable.

    i.    <u>Tax Treatment of Disputed GUC Reserve</u>. All parties to the Plan shall (i) treat the Disputed GUC Reserve as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable Law, report consistently with the foregoing for all federal, state, and local income tax purposes. All taxes imposed on assets or income of such Disputed GUC Reserve will be payable from the assets of the Disputed GUC Reserve.

    ii.    <u>Request for Expedited Determination of Taxes</u>. The GUC Administrator shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Disputed GUC Reserve filed or to be filed for any and all taxable periods of such reserve.

**6.**    <u>**Distributions on Account of Claims Allowed After the Effective Date.**</u>

Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it becomes an Allowed Claim after the Effective Date, shall be made in accordance with provisions of the Plan that govern distributions to such Holder of a Claim. On the first Periodic Distribution Date or GUC Distribution Date, as applicable, that is at least thirty (30) calendar days following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; provided, however, for the avoidance of doubt, Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty (30) calendar days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law; provided, further, the Disbursing Agent shall make subsequent Pro Rata distribution(s) to Holders of Allowed General Unsecured Claims to the extent the GUC Administrator determines that any portion of the funds originally allocated to the Disputed GUC Reserve subsequently becomes available for such distributions (as a result of the GUC Administrator's resolution of Disputed General Unsecured Claims or otherwise).

7.     **Addresses for Distributions.**   Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (i) at the addresses set forth on the Proofs of Claim Filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no Proof of Claim is Filed or if the Debtors or the Reorganized Debtors or the GUC Administrator, as applicable, have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address. The Debtors, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

8.     **Undeliverable Distributions.**   If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Disbursing Agent is notified of the then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date or GUC Distribution Date, as applicable. Notwithstanding the foregoing, following a period of one hundred eighty (180) calendar days after the Disbursing Agent's receipt of such returned undeliverable distribution, if the Disbursing Agent has not been notified of the then-current address of such Holder of a Claim, amounts in respect of such undeliverable distribution shall be returned to, revert to and vest in the Reorganized Debtors (or, with respect to the General Unsecured Claims, to the GUC Cash Pool Account) free of any restrictions thereon. Upon such vesting, the Claim of any Holder or successor to such Holder with respect to such returned undeliverable distribution shall be discharged, and the Holder of such Claim shall be forever barred, estopped and enjoined from asserting such Claim against the Reorganized Debtors or GUC Administrator, as applicable, or their property.

9.     **Reversion.**   Any distribution under the Plan that is an Unclaimed Distribution for

a period of one hundred eighty (180) calendar days after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors (or, with respect to General Unsecured Claims, to the GUC Cash Pool Account) free of any restrictions thereon. Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.

10.    *De Minimis* **Distributions.**    Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent shall not be required to make a distribution on account of an Allowed Claim if: (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date or GUC Distribution Date in question is or has a value less than $10,000, <u>provided</u> that the Reorganized Debtors, the GUC Administrator, or the Disbursing Agent, as applicable, shall make, or cause to be made, a distribution on a Periodic Distribution Date or a GUC Distribution Date, as applicable, of less than $10,000 if the Reorganized Debtors, the GUC Administrator, or the Disbursing Agent, as applicable, expect that such Periodic Distribution Date or GUC Distribution Date, as applicable, shall be the final Periodic Distribution Date or GUC Distribution Date, as applicable; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date or GUC Distribution Date, as applicable, does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

11.    **Fractional Distributions.**    Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent shall not be required to make partial distributions or distributions of fractional New Common Equity or distributions or payments of fractions of dollars. Whenever any payment or distribution of a fractional New Common Equity under the Plan would otherwise be called for, such fraction shall be deemed zero. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

12.    **Accrual of Dividends and Other Rights.**    For purposes of determining the accrual of dividends or other rights after the Effective Date, New Common Equity shall be deemed distributed as of the Effective Date regardless of the date on which they are actually issued, dated, authenticated, or distributed; <u>provided</u>, <u>however</u>, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New Common Equity actually take place.

13.    **Compliance Matters.**    In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, to the extent applicable, the Debtors, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including

liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors and GUC Administrator reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Any party entitled to receive cash or any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other entity designated by the Reorganized Debtors (which entity shall subsequently deliver to the Disbursing Agent all tax forms received) an IRS Form W-9 or (if the payee is a foreign Entity) the appropriate IRS Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local Taxing Authority. If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other entity designated by the Reorganized Debtors or Disbursing Agent and the Holder, fails to comply before the date that is one hundred and eighty (180) calendar days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or their respective properties.

**14.     Claims Paid or Payable by Third Parties.** The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

**15.     Applicability of Insurance Contracts.** Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contracts. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any of the Insurance Contracts, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**16.     Setoffs.** Except as otherwise expressly provided for in the Plan, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however,

neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has Filed a motion requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

17.    **Allocation of Plan Distributions Between Principal and Interest.**    To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

G.    **Release, Injunction, and Related Provisions**

1.    **Discharge of Claims and Termination of Interests.**    Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, including the Plan Supplement documents, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not the Holder of such a Claim has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring.

2.    **Release of Liens.**    Except as otherwise specifically provided in the Plan, the Confirmation Order or the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Facility Documents), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further

61

approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  In addition, on or after the Effective Date, at the expense the Reorganized Debtors, the DIP Agent, the First Lien Agents, and the Second Lien Indenture Trustee shall execute and deliver all documents reasonably requested by the Debtors, the Reorganized Debtors or the Exit Facility Agent to evidence the release of such mortgages, deeds of trust, Liens, pledges and other security interests (including as required under the laws of other jurisdictions for non-U.S. security interests) and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

3.    **Releases by the Debtors.**  Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the services of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date and to the fullest extent permitted by applicable law, the Debtors, the Reorganized Debtors, their Estates, and any Person seeking to exercise the rights of the Estates, including any successor to the Debtors and any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, discharged, and acquitted the Released Parties and their respective property from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, matured or unmatured, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim against, or interest in, any Debtor or other Entity, based on or relating to, or in any manner arising from or in connection with, in whole or in part, the Debtors, their Affiliates, the Estates, the conduct of the Debtors' businesses, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases and any related adversary proceedings, the Reorganized Debtors, the Reorganized Debtors' businesses, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Interests prior to or in the Chapter 11 Cases, the First Lien Credit Agreement Documents, the Second Lien Notes Indenture Documents, the negotiation, formulation, preparation, dissemination, or filing of the Restructuring Support Agreement, any of the Restructuring Documents, or any related agreements, term sheets, instruments, or other documents contemplated by the foregoing or appropriate to effectuate the foregoing, the pursuit of Confirmation, the pursuit of the occurrence of the Effective Date of the Plan, and any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing and taking place on or before the Effective Date of the Plan, except for any claim related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted fraud, gross negligence, or willful misconduct (all such claims and liabilities as described herein, collectively, the "Released Claims"); provided, nothing in the foregoing shall result in any of the Debtors' or Reorganized Debtors' officers and directors waiving any Claims arising under employment or severance agreements (after giving effect to any modifications contemplated by the Plan) or indemnification Claims against the

Debtors, Reorganized Debtors, any of the Debtors' or Reorganized Debtors' insurers, or any rights as beneficiaries of any insurance policies.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article VIII.C of the Plan do not release any post-Effective Date obligations of any party or Entity: (1) arising under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Renegotiated Contracts/Leases; or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any claim or Cause of Action released by the Debtor Release against any of the Released Parties.

4.    **Releases by Holders of Claims and Interests.**  Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the services of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, each of the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, discharged, and acquitted the Released Parties and their respective property from any and all Released Claims; provided, nothing in the foregoing shall result in any of the Debtors' or Reorganized Debtors' officers and directors waiving any Claims arising under employment or severance agreements (after giving effect to any modifications contemplated by the Plan) or indemnification Claims against the Debtors, Reorganized Debtors, any of the Debtors' or Reorganized Debtors' insurers, or any rights as beneficiaries of any insurance policies.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article VIII.D of the Plan do not release any post-Effective Date obligations of any party or Entity arising under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases contained in Article VIII of the Plan, which include, by reference, each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the releases contained in Article VIII of the Plan are: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the released claims; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and

opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases contained in Article VIII of the Plan against any of the Released Parties.

**5.** **Exculpation.** Except as otherwise specifically provided in the Plan, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from, any Exculpated Claim; provided, however, the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order to have constituted fraud, gross negligence or willful misconduct.

**6.** **Injunction**. Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims or Interests that have been released, discharged or are subject to exculpation pursuant to Article VIII of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, and/or the Released Parties:

    i. commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests;

    ii. enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests;

    iii. creating, perfecting or enforcing any lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests;

    iv. asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

    v. commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan.

7.     **Waiver of Statutory Limitations on Releases.**  Each Releasing Party in each of the releases contained in the Plan expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in his favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to Claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party, including the provisions of California Civil Code Section 1542.  The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

8.     **Protection Against Discriminatory Treatment.**  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9.     **Special Provision Governing Professional Fee Claims and Final Fee Applications.**  For the avoidance of doubt, the releases in Article VIII of the Plan shall not waive, affect, limit, restrict or otherwise modify the right of any party in interest to object to any Professional Fee Claim or final fee application Filed by any Professional in the Chapter 11 Cases.

H.     **Conditions Precedent to Confirmation and Consummation of the Plan**

1.     **Conditions Precedent to Confirmation of the Plan.**  The following are conditions precedent to confirmation of the Plan:

    i.     an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court, and such order shall be consistent in all respects with the Restructuring Support Agreement and acceptable to the Required First Lien Lenders; and

    ii.     the Plan and the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed and shall be consistent in all respects with the Restructuring Support Agreement and acceptable to the Required First Lien Lenders and, solely with respect to the economic treatment on account of Second Lien Notes Claims, the Required Second Lien Noteholders.

**2.      Conditions Precedent to the Effective Date.**   It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C of the Plan):

i.     the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtors, the Required First Lien Lenders, the Required Exit Facility Backstop Parties, and solely with respect to the economic treatment on account of Second Lien Notes Claims, reasonably acceptable to the Required Second Lien Noteholders;

ii.     the Confirmation Order shall have become a Final Order, and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the agreements and documents created in connection with the Plan;

iii.     all documents related to or contemplated by the Exit Facility shall be consistent in all material respects with the Restructuring Support Agreement and shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date, which shall occur simultaneously with the satisfaction of all conditions precedent under such documents);

iv.     all conditions precedent to the effectiveness of the Exit Facility shall have occurred or been waived;

v.     the Exit Facility shall have been fully funded;

vi.     the New Common Equity shall have been issued;

vii.     the Professional Fee Escrow Account shall have been established and funded in Cash in accordance with Article II.B.2 of the Plan;

viii.     the GUC Cash Pool Account shall have been established and funded in Cash in accordance with Article IV.O of the Plan;

ix.     the GUC Administrator Account shall have been established and funded in Cash in accordance with Article IV.P of the Plan;

x.     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (and any amendment thereto) shall have been Filed in a manner consistent in all respects with the Restructuring Support Agreement and shall otherwise be acceptable to the Required First Lien Lenders and, solely with respect to the economic treatment on account of Second Lien Notes Claims, the Required Second Lien Noteholders;

xi.     the Plan, the Restructuring Documents, and all documents contained in any Plan Supplement, including any exhibits, schedules, amendments, modifications or supplements thereto, shall have been executed and/or effectuated, in form and

substance consistent in all respects with the Restructuring Support Agreement and the Exit Facility Backstop Agreement, and shall otherwise be acceptable to the Debtors, the Required First Lien Lenders, and the Required Exit Facility Backstop Parties, as applicable, and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement or the Exit Facility Backstop Agreement;

xii.     the Debtors shall have renegotiated and/or rejected their Affiliate Agreements in a manner acceptable to the Debtors and the Required First Lien Lenders;

xiii.    no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing or prohibiting, in a material respect, the consummation of the Plan, the Restructuring, the Restructuring Support Agreement, the Exit Facility Backstop Agreement, or any of the Restructuring Documents contemplated thereby;

xiv.     the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring;

xv.      the Debtors shall have received any authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and that are required by law, regulation or order;

xvi.     there shall have been no Event of Default (as defined in the DIP Credit Agreement) or occurrence that, after expiration of any applicable notice or any cure period, would be an Event of Default (as defined in the DIP Credit Agreement) under the DIP Credit Agreement or DIP Orders, as applicable;

xvii.    the Exit Facility Backstop Agreement and the Restructuring Support Agreement shall remain in full force and effect, all conditions shall have been satisfied thereunder, and there shall be no breach that, after the expiration of any applicable notice or any cure period, would give rise to a right to terminate the Exit Facility Backstop Agreement or the Restructuring Support Agreement;

xviii.   the New Organizational Documents shall have been filed with the appropriate governmental authorities, as applicable; and

xix.     all unpaid Restructuring Expenses, and any other fees and expenses set forth in the DIP Orders and Exit Facility Backstop Agreement, shall have been paid in Cash.

**3.     Waiver of Conditions.**   Without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, the conditions to the Effective Date of the Plan set forth in Article IX.B of the Plan may be waived only if waived in writing by the Debtors, the Required First Lien Lenders and, solely with respect to the waiver of any conditions precedent that adversely impacts the economic treatment provided on account

of Second Lien Notes Claims, the Required Second Lien Noteholders, such consent not to be unreasonably conditioned, delayed or withheld.

**4.    Substantial Consummation.**    "Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**5.    Effect of Failure of a Condition.**    If the conditions listed in Article IX.B of the Plan are not satisfied or waived in accordance with Article IX.C of the Plan on or before the first Business Day that is more than forty (40) calendar days after the date on which the Confirmation Order is entered or by such later date as may be agreed between the Debtors and the Required First Lien Lenders and/or the Required Second Lien Lenders, as applicable, and set forth by the Debtors in a notice Filed prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

**I.    Modification, Revocation or Withdrawal of the Plan**

**1.    Modification and Amendments.**    Subject to the limitations contained in the Plan and in the Restructuring Support Agreement, the Debtors reserve the right, with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the Required Second Lien Noteholders, to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend or materially modify the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan.

**2.    Effect of Confirmation on Modifications.**    Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**3.    Revocation or Withdrawal of the Plan.**    Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, (ii) prejudice in any manner the rights of the Debtors or any

other Entity, including the Holders of Claims or Interests or the Non-Debtor Affiliates, or (iii) constitute a representation, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Affiliates.

## J.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

    i.    allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount or allowance of Claims;

    ii.    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

    iii.    resolve any matters related to: (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims; (b) any dispute regarding whether a contract or lease is or was executory or expired; and (c) any other issue related to an Executory Contract or Unexpired Lease;

    iv.    resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to the amount of a Cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

    v.    ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

    vi.    adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

    vii.    adjudicate, decide or resolve any and all matters related to Causes of Action;

    viii.    adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

ix.     enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan or the Disclosure Statement;

x.     enter and enforce any order for the sale of property pursuant to section 363, 1123 or 1146(a) of the Bankruptcy Code;

xi.     resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

xii.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

xiii.     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

xiv.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

xv.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the payment of General Unsecured Claims by the Debtors or the Reorganized Debtors;

xvi.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

xvii.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or the Plan Supplement; provided, however, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court;

xviii.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated in the Plan, subject to the proviso in sub-paragraph xvii above;

xix.   consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

xx.   determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

xxi.   resolve disputes as to the ownership of any Claim or Interest;

xxii.   hear and determine matters concerning state, local, federal and foreign taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

xxiii.   grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

xxiv.   hear, adjudicate, decide or resolve any and all matters related to Article VIII of the Plan, including without limitation, the releases, discharge, exculpation and injunctions issued thereunder;

xxv.   enforce all orders previously entered by the Bankruptcy Court;

xxvi.   hear any other matter not inconsistent with the Bankruptcy Code;

xxvii.   enter an order concluding or closing the Chapter 11 Cases; and

xxviii.   hear, determine, and resolve any cases, matters, controversies, suits, disputes or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including with respect to the settlements, compromises, discharges, releases, injunctions, exculpations and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions.

As of the Effective Date, notwithstanding anything in Article XI of the Plan to the contrary, the Exit Facility Documents and any documents set forth in the Plan Supplement shall be governed by the respective jurisdictional provisions therein.

## ARTICLE VII.
## VALUATION OF THE REORGANIZED DEBTORS

To provide information to parties in interest regarding the possible range of values of their distributions under the Plan, it is necessary to ascribe an estimated value, or range of values, to the Reorganized Debtors. The Debtors have been advised by their investment banker, Jefferies LLC ("Jefferies"), with respect to the estimated value of the Reorganized Debtors on a going-concern basis. Jefferies estimated the total enterprise value of the Reorganized Debtors to be approximately $[●] million to $[●] million, with a mid-point of $[●] million.

A summary of the valuation analysis performed by Jefferies is attached hereto as **Exhibit D**. The estimates of the enterprise value contained therein do not reflect values that

could be attainable in public or private markets, and are not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.

Depending on the results of the Reorganized Debtors' operations, changes in the financial markets and/or other economic conditions, the value of the Reorganized Debtors may change significantly. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Debtors' history in the Chapter 11 Cases, conditions affecting generally the industry in which the Debtors participate and by other factors not capable of accurate prediction. Accordingly, the reorganization enterprise value estimated by Jefferies does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets. The equity value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value. Such trading value may be materially different from the reorganization equity value ranges described in Jefferies' valuation analysis. Indeed, there can be no assurance that a trading market will develop for the New Common Equity. The estimated reorganization enterprise value depends highly upon achieving the future financial results set forth in the Financial Projections (as defined below), as well as the realization of certain other assumptions that are not guaranteed. The valuations set forth therein represent estimated reorganization enterprise values and do not necessarily reflect values that could be attainable in public or private markets. The estimated equity value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value. Such a market trading value, if any, may differ materially from the estimated reorganization equity value associated with the valuation analysis.

## ARTICLE VIII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

### A.    1145 Securities

#### 1.    Issuance

The Plan provides for the offer, issuance, sale, or distribution of New Common Equity on account of the First Lien Claims, the Second Lien Notes Claims, the DIP Put Option Premium, and the DIP Exit Premium (the "Section 1145 Securities"). The offer, issuance, sale, or distribution of the Section 1145 Securities by Reorganized Foresight will be exempt from registration under Section 5 of the Securities Act and under any state or local law requiring registration for offer or sale of a security pursuant to section 1145 of the Bankruptcy Code, except with respect to an entity that is an "underwriter", as defined in Section 1145(b) of the Bankruptcy Code (as further discussed below).

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in exchange for such claim or interest and "partly" for cash or property.

### 2. Subsequent Transfers

The Section 1145 Securities may be freely transferred by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the Section 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the Holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters", excluding, in each case, with respect to ordinary trading transactions of an entity that is not an issuer:

(i)    a person (as defined in section 101(41) of the Bankruptcy Code, a "Person") who purchases a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii)    a Person who offers to sell securities offered or sold under a plan for the holders of such securities;

(iii)    a Person who offers to buy securities offered or sold under a plan from the holders of such securities, if the offer to buy is:

(A)    with a view to distributing such securities; and

(B)    under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; and

(iv)    a Person who is an "issuer" (as defined in section 2(a)(11) of the Securities Act) with respect to the securities.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any Person directly or indirectly controlling or controlled by the issuer, or any Person under direct or indirect common control of the issuer.

To the extent that Persons who receive Section 1145 Securities pursuant to the Plan are deemed to be underwriters, resales by such Persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Persons deemed to be underwriters may, however, be permitted to resell such Section 1145 Securities without registration pursuant to the provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act. In addition, such Persons will also be

entitled to resell their Section 1145 Securities in transactions registered under the Securities Act following the effectiveness of a registration statement.

Holders of Section 1145 Securities who are deemed underwriters may resell Section 1145 Securities pursuant to the limited safe harbor resale provision under Rule 144 of the Securities Act. Generally, Rule 144 would permit the public sale of securities received by such Person if, at the time of the sale, certain current public information regarding the issuer is available and only if such Person also complies with the volume, manner of sale and notice requirements of Rule 144. If the issuer is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), adequate current public information as specified under Rule 144 is available if certain company information is made publicly available, as specified in Section (c)(2) of Rule 144. Reorganized Foresight will not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

Whether or not any particular Person would be deemed to be an underwriter with respect to the Section 1145 Securities or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any particular Person receiving Section 1145 Securities or other securities under the Plan would be an underwriter with respect to such Section 1145 Securities or other securities, whether such Person may freely resell such securities or the circumstances under which they may resell such securities.

Notwithstanding the foregoing, the Section 1145 Securities will also be subject to any applicable transfer restrictions in the New Organizational Documents.

## B.    Section 4(a)(2) Securities

### 1.    Issuance

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under Section 4(a)(2) of the Securities Act.

The Debtors believe that the Exit Facility Equity Issuances (comprised of the Exit Facility Equity Component and the Exit Facility Put Option Premium) (collectively, the "4(a)(2) Securities") are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder. The 4(a)(2) Securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

### 2.    Subsequent Transfers

The 4(a)(2) Securities will be deemed "restricted securities" (as defined by Rule 144 of the Securities Act), will bear customary legends and transfer restrictions and may not be offered, sold, exchanged, assigned, or otherwise transferred except pursuant to an effective registration

74

statement or under an available exemption from the registration requirements of the Securities Act.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144. *First*, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. *Second*, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). *Third*, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, non-affiliate Holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. It is currently contemplated that Reorganized Foresight will not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act; however, there may be a period after emergence from chapter 11 during which Reorganized Foresight is subject to the reporting requirements of Section 13 or 15(d). During any such period, the holding periods described above decrease from one-year to six months.

Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

Reorganized Foresight reserves the right to require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. Reorganized Foresight also reserves the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (i) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (ii) the 4(a)(2) Securities will be subject to the other restrictions described above.

In addition to the foregoing restrictions, the 4(a)(2) Securities will also be subject to any applicable transfer restrictions contained in the New Organizational Documents.

---

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN.

**THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

---

# ARTICLE IX.
## CERTAIN UNITED STATES FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

A summary description of certain United States ("U.S.") federal income tax consequences of the Plan is provided below. Only the principal consequences of the Plan and the Restructuring Transactions for the Debtors and for Holders that are entitled to vote to accept or reject the Plan are described below. This description is for informational purposes only and substantial uncertainties exist with respect to certain tax consequences of the Plan. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the United States Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained or will be sought with respect to any tax consequences of the Plan, and the discussion below is not binding on the IRS or such other authorities. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The following discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), judicial decisions, existing and proposed U.S. Treasury Regulations promulgated under the Tax Code ("Treasury Regulations"), and published administrative guidance, all as in effect as of the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

This summary does not address any estate or gift tax consequences of the Plan or tax consequences of the Plan under any state, local or non-U.S. laws. This discussion does not address all tax considerations that might be relevant to particular Holders in light of their personal circumstances and, in particular, this description of certain U.S. federal income tax consequences does not address all of the tax considerations that may be relevant to certain classes of Holders, such as: broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, entities electing S corporation treatment, partnerships or other entities treated as pass-through for U.S. federal income tax purposes, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of tax accounting for their security holdings, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long-term residents of the United States, persons who received their Claims as compensation, persons who are treated as related to the Debtors under the Tax Code, Holders of Claims who are themselves in bankruptcy and persons who use the accrual method of accounting and report income on an "applicable financial statement." Additionally, this discussion does not address the implications of the alternative minimum tax or the "Medicare" tax on net investment income.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Claim who is for U.S. federal income tax purposes: (1) an individual citizen or resident of the United States; (2) a corporation created or organized under the laws of the United States or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations promulgated under the Tax Code to be treated as a U.S. person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If an entity or arrangement treated as a partnership or other pass-through vehicle for U.S. federal income tax purposes is a Holder of a Claim, the tax treatment of its partners or other owners will generally depend upon the status of the individual partner (or other owner) and the activities of the entity or arrangement.  A partner (or other owner) of a partnership or other pass-through entity that is a Holder of a Claim should consult its own tax advisor regarding the tax consequences of the Plan based on such Holder's particular situation.

This discussion assumes that Holders entitled to vote hold their Claims as "capital assets" (generally, property held for investment) for U.S. federal income tax purposes and that, except as otherwise specified below, the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

The following discussion is for general information only and is not intended to be, nor should it be construed to be, legal or tax advice to any Holder and no opinion or representation is made with respect to the U.S. federal income tax consequences to any such Holder.  Holders are urged to consult their own tax advisors regarding the application of U.S. federal, state, and local tax laws based on their particular situation.

## B.      The Restructuring Transactions

Though the Debtors have not yet determined precisely what form the ultimate Restructuring Transactions implemented under the Plan will take, the Debtors currently expect that these Restructuring Transactions will be effected in a manner that would be treated as a taxable transfer of substantially all of the Debtors' assets to Reorganized Foresight for U.S. federal income tax purposes.  As currently contemplated, the Restructuring Transactions would involve the formation of a new chain of entities that will receive all of the assets of FELLC, with equity in the parent (which is expected to elect to be treated as a corporation for U.S. federal income tax purposes) of such chain transferred to the Holders of Allowed First Lien Facility Claims and Allowed Second Lien Notes Claims in satisfaction of their Claims.  It is further expected that the Restructuring Transactions will be treated as a taxable exchange by Holders of Allowed First Lien Facility Claims and Allowed Second Lien Notes Claims of their respective Allowed First Lien Facility Claims and Allowed Second Lien Notes Claims for U.S. federal income tax purposes.  However, the Restructuring Transactions may be effected in a different manner and the U.S. federal income tax consequences resulting from the

Restructuring Transactions could differ materially from the consequences generally described below. Holders of Allowed First Lien Facility Claims and Allowed Second Lien Notes Claims are urged to consult with their own tax advisors as to the potential implications of the Plan and the Restructuring Transactions in their particular situations.

FELLC is a disregarded entity for U.S. federal income tax purposes and, accordingly, all of its assets are generally treated for such purposes as owned directly by FELP. As a partnership and disregarded entity, respectively, neither FELP nor FELLC is itself generally subject to U.S. federal income tax. Rather, each Holder of Interests in FELP is, and will be, required to report on its U.S. federal income tax return, and is, and will be, subject to tax in respect of, its distributive share of any items of income, gain, loss, deduction and credit allocated to such Interests, including any such amounts arising in connection with the Restructuring Transactions. As a result, the Restructuring Transactions described immediately above generally will not give rise to U.S. federal income tax to any of the Debtors, and the U.S. federal income tax impacts of these transactions will generally instead be borne directly by Holders of Interests in FELP. Each Holder of Interests in FELP is urged to consult with its own tax advisor as to the tax implications to it of the Plan and the Restructuring Transactions.

## C.     U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims

The following section discusses certain U.S. federal income tax consequences of the transactions contemplated by the Plan to U.S. Holders of Allowed First Lien Facility Claims, Allowed Second Lien Notes Claims, and Allowed General Unsecured Claims. U.S. Holders should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the Restructuring Transactions and all other transactions contemplated under the Plan.

### 1.     U.S. Federal Income Tax Consequences to U.S. Holders of Allowed First Lien Facility Claims

Pursuant to the Plan, on the Effective Date, each Holder of Allowed First Lien Facility Claims will receive its Pro Rata share of 92.75% of the New Common Equity, subject to the Full Equity Dilution. In addition, eligible holders of Allowed First Lien Facility Claims will receive the opportunity to participate in the Exit Facility First Lien Syndication.

As a result of the Restructuring Transactions, it is expected that U.S. Holders of Allowed First Lien Facility Claims will be treated as exchanging their Allowed First Lien Facility Claims for New Common Equity and for the right to participate in the Exit Facility in accordance with the applicable syndication procedures. Accordingly, a U.S. Holder of Allowed First Lien Facility Claims will generally recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the aggregate fair market value of its New Common Equity and the rights it receives in respect of the Exit Facility Opportunity (other than any consideration received in respect of its Allowed First Lien Facility Claims for accrued but unpaid interest or original issue discount to the extent not previously taxed), and (ii) the U.S. Holder's adjusted tax basis in its Allowed First Lien Facility Claims. For a discussion of the character of such gain or loss, see Section C.4, "Character of Gain or Loss," below. A U.S.

79

Holder of Allowed First Lien Facility Claims is expected to recognize ordinary interest income to the extent of any consideration received allocable to accrued but unpaid interest or original issue discount not previously included in income, see Section C.5, "Accrued Interest and Original Issue Discount," below.

A U.S. Holder of Allowed First Lien Facility Claims should have a tax basis in each of the New Common Equity and the Exit Facility participation rights received in satisfaction of its Claims equal to the respective fair market values of such New Common Equity and such participation rights. The U.S. Holder's holding period in respect of the New Common Equity received should begin on the day following the Effective Date.

The Debtors expect that a U.S. Holder's exercise of rights received under the Plan in respect of the Exit Facility Opportunity will be treated, for U.S. federal income tax purposes, as the exercise of an option, and accordingly, no gain or loss would generally be recognized upon such exercise. A U.S. Holder's aggregate tax basis in the Exit Facility and New Common Equity received as a result of the exercise of the right to participate in the Exit Facility should be equal to the sum of (i) the amount of Cash paid upon such exercise and (ii) the U.S. Holder's tax basis in such rights. Such aggregate tax basis should be allocated between the Exit Facility and the New Common Equity so received in accordance with their relative fair market values. A U.S. Holder's holding period in the Exit Facility and such New Common Equity generally should commence the day following the Effective Date. Assuming that these rights are treated as options to invest in the Exit Facility and such New Common Equity, upon lapse of any such rights unexercised, the U.S. Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in such rights. In general, such loss should be treated as a short-term capital loss.

2. **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Second Lien Notes Claims**

Pursuant to the Plan, on the Effective Date, each Holder of Allowed Second Lien Notes Claims will receive its Pro Rata share of 7.25% of the New Common Equity, subject to the Full Equity Dilution. In addition, eligible holders of Allowed Second Lien Notes Claims will receive the opportunity to participate in the Exit Facility Second Lien Syndication.

As a result of the Restructuring Transactions, it is expected that U.S. Holders of Allowed Second Lien Notes Claims will be treated as exchanging their Allowed Second Lien Notes Claims for New Common Equity and for the right to participate in the Exit Facility in accordance with the applicable syndication procedures. Accordingly, a U.S. Holder of Allowed Second Lien Notes Claims will generally recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the aggregate fair market value of its New Common Equity and the rights it receives in respect of the Exit Facility Opportunity (other than any consideration received in respect of its Allowed Second Lien Notes Claims for accrued but unpaid interest or original issue discount to the extent not previously taxed), and (ii) the U.S. Holder's adjusted tax basis in its Allowed Second Lien Notes Claims. For a discussion of the character of such gain or loss, see Section C.4, "Character of Gain or Loss," below. A U.S. Holder of Allowed Second Lien Notes Claims is expected to recognize ordinary interest income to the extent of any consideration received allocable to accrued but

unpaid interest or original issue discount not previously included in income, see Section C.5, "Accrued Interest and Original Issue Discount," below.

A U.S. Holder of Allowed Second Lien Notes Claims should have a tax basis in each of the New Common Equity and the Exit Facility participation rights received in satisfaction of its Claims equal to the respective fair market values of such New Common Equity and such participation rights. The U.S. Holder's holding period in respect of the New Common Equity received should begin on the day following the Effective Date.

The Debtors expect that a U.S. Holder's exercise of rights received under the Plan in respect of the Exit Facility Opportunity will be treated, for U.S. federal income tax purposes, as the exercise of an option, and accordingly, no gain or loss would generally be recognized upon such exercise. A U.S. Holder's aggregate tax basis in the Exit Facility and New Common Equity received as a result of the exercise of the right to participate in the Exit Facility should be equal to the sum of (i) the amount of Cash paid upon such exercise and (ii) the U.S. Holder's tax basis in such rights. Such aggregate tax basis should be allocated between the Exit Facility and the New Common Equity so received in accordance with their relative fair market values. A U.S. Holder's holding period in the Exit Facility and such New Common Equity generally should commence the day following the Effective Date. Assuming that these rights are treated as options to invest in the Exit Facility and such New Common Equity, upon lapse of any such rights unexercised, the U.S. Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in such rights. In general, such loss should be treated as a short-term capital loss.

3.    **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed General Unsecured Claims**

Pursuant to the Plan, on the Effective Date, each Holder of Allowed General Unsecured Claims will generally receive its Pro Rata share of a designated cash amount (the "GUC Cash"). Holders of Allowed General Unsecured Claims may receive one or more distributions of Cash following the Effective Date depending on the extent of the use of Cash in, and timing of, the resolution of any Disputed Claims. See Article IX.C.8, "Tax Treatment of the Disputed Claims Reserve," below.

A U.S. Holder of an Allowed General Unsecured Claim will be treated as accepting, in satisfaction of such Holder's Claim, its Pro Rata share of the GUC Cash (as such may be finally determined pursuant to the process set out in respect of the resolution of General Unsecured Claims under Article VI of the Plan). Accordingly, a U.S. Holder of an Allowed General Unsecured Claim will generally recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received (other than any consideration received in respect of its General Unsecured Claim for accrued but unpaid interest), and (ii) the U.S. Holder's adjusted tax basis in its Allowed General Unsecured Claim. For a discussion of the character of such gain or loss, see Section C.4, "Character of Gain or Loss," below. A U.S. Holder of an Allowed General Unsecured Claim is expected to recognize ordinary interest income to the extent of any consideration received allocable to accrued but unpaid interest, see Section C.5, "Accrued Interest and Original Issue Discount," below.

In the event of the subsequent disallowance of any General Unsecured Claim that is Disputed, it is possible that, under the "installment method" rules, U.S. Holders of an Allowed General Unsecured Claim will have additional gain, as well as imputed interest income, as a result of its receipt of its Pro Rata share of the Cash previously retained in the GUC Cash Pool in respect of the disallowed Disputed Claim. In addition, it is possible that the recognition of any loss realized by such U.S. Holders with respect to an Allowed General Unsecured Claim may be deferred until all such Disputed Claims are finally allowed or disallowed, or are otherwise compromised, settled, withdrawn or resolved. U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting amounts recognized in respect of their Claims in a taxable year subsequent to the taxable year in which the Effective Date occurs.

### 4.    Character of Gain and Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and its holding period, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction. A U.S. Holder's use of capital losses may be subject to material limitations.

A U.S. Holder that purchased its Claim from a prior holder with "market discount" may be subject to the tax rules governing market discount. A debt instrument may be considered to have been acquired with "market discount" if the Holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a statutory *de minimis* amount. Under these rules, any gain recognized in respect of a Holder's Claims generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the Holder, on a constant yield basis) during the Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts should generally become deductible at the time such U.S. Holder receives a distribution in respect of its Claims pursuant to the Plan.

### 5.    Accrued Interest and Original Issue Discount

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or amortized original issue discount was previously included in its gross income and is not paid in full. It is unclear whether the U.S. Holder can claim any such loss as an ordinary loss, or whether it would be required to instead recognize a capital loss, with respect to previously included original issue discount that is not paid in full.

The Plan provides that distributions with respect to Allowed Claims shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any. There is no assurance that the IRS will respect such allocation.  U.S. Holders are urged to consult their own tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including original issue discount) and the character of any loss claimed with respect to accrued but unpaid interest (including original issue discount) previously included in gross income for U.S. federal income tax purposes.

6.    **U.S. Federal Income Tax Consequences of the Ownership and Disposition of New Common Equity**

a.    *Ownership of New Common Equity*

Cash distributions with respect to the New Common Equity generally will be treated as taxable dividends to the extent allocable to Reorganized Foresight's current and/or accumulated "earnings and profits" as determined under U.S. federal income tax principles, and will, subject to the discussion below, be includable as ordinary income by the U.S. Holder when received.  To the extent the amount of any distribution exceeds available earnings and profits with respect to such distribution, the excess will be treated (a) as a non-taxable return of the holder's adjusted tax basis (on a dollar-for-dollar basis) and (b) thereafter as capital gain from the sale or exchange of such stock.

Dividends received by non-corporate U.S. Holders may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied.  The length of time that a U.S. Holder has held its New Common Equity is reduced for any period during which the U.S. Holder's risk of loss with respect to such interests is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions.  Non-corporate U.S. Holders are urged to consult their own tax advisors regarding the applicability of such lower rates in their particular situations. Subject to applicable limitations, a distribution that is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends-received deduction if such amount is distributed to a corporate U.S. Holder and certain other requirements are satisfied.

b.    *Sale, Transfer or Redemption of New Common Equity*

Unless a nonrecognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of New Common Equity, in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Common Equity, and (ii) the sum of the Cash plus the fair market value of any property received from such disposition.  Any such gain or loss generally would be treated as long-term if the holder's holding period for its New Common Equity is more than one year at the time of the sale or exchange.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  A U.S. Holder's use of capital losses may be subject to material limitations.

7. **U.S Federal Income Tax Consequences of the Ownership and Disposition of the Exit Facility**

   a.    *Ownership of the Exit Facility*

The Exit Facility may be treated as being issued with original issue discount for U.S. federal income tax purposes. The Exit Facility will be treated as issued with original issue discount if the stated principal amount of the Exit Facility exceeds its "issue price" by an amount equal to or greater than a statutorily defined *de minimis* amount. In such case, a U.S. Holder of an interest in the Exit Facility generally will be required to include original issue discount in gross income as it accrues over the term of the loan in accordance with a constant yield to maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the obligation. Accordingly, a U.S. Holder may be treated as receiving interest income in advance of a corresponding receipt of cash. Any original issue discount that a U.S. Holder includes in income will increase its adjusted tax basis in its interest in the Exit Facility.

Other than in respect of payments of "qualified stated interest," a U.S. Holder generally will not be required to include separately in income cash payments received in respect of the Exit Facility; instead, such payments will either reduce its adjusted tax basis by the amount of the payment or be treated as a pro rata prepayment. Generally, qualified stated interest is stated interest that is unconditionally payable at least annually at a constant rate in cash or property (other than debt of the issuer). The stated interest payable on the Exit Facility is expected to be considered qualified stated interest for this purpose. Payments of stated interest on the Exit Facility generally should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with its regular method of tax accounting).

If the Exit Facility is treated as issued with original issue discount for U.S. federal income tax purposes, the amount of original issue discount includable by a U.S. Holder in income for each taxable year generally is equal to the sum of the daily portions of original issue discount accruing on its interest in the Exit Facility for each day during the taxable year in which such holder holds such interest, whether such Holder uses the cash or accrual basis of accounting for U.S. federal income tax purposes. The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a *pro rata* portion of the original issue discount allocable to such accrual period. The amount of original issue discount that will accrue during an accrual period is the product of the "adjusted issue price" of the U.S. Holder's interest in the Exit Facility at the beginning of the accrual period multiplied by the yield to maturity of the Exit Facility less the amount of any qualified stated interest allocable to such accrual period. The "adjusted issue price" of an interest in the Exit Facility at the beginning of an accrual period will equal its original issue price, increased by the aggregate amount of original issue discount that has accrued on such interest in all prior accrual periods, and decreased by any payments made during all prior accrual periods other than payments of qualified stated interest.

The rules regarding the determination of issue price and original issue discount are complex, and the original issue discount rules described above may not apply in all cases.

Accordingly, each U.S. Holder of Allowed First Lien Facility Claims and Allowed Second Lien Notes Claims is urged to consult its tax advisor regarding the application of the original issue discount rules to the Exit Facility and the consequences of its exercise of rights in respect of the Exit Facility Opportunity. Reorganized Foresight will provide its determination of the issue price and amount of original issue discount, if any, for the Exit Facility in accordance with applicable Treasury Regulations.

**b.**     *Sale or Exchange of the Exit Facility*

Upon the disposition of the Exit Facility by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the Exit Facility. A U.S. Holder's adjusted tax basis will generally reflect increases resulting from any accrued original issue discount previously included in such U.S. Holder's gross income.

The discussion in this section has assumed that the Exit Facility will not be treated as a "contingent payment debt instrument" for U.S. federal income tax purposes. The precise terms of the Exit Facility are not yet known, and U.S. Holders should consult with their own tax advisors with respect to the consequences of holding the Exit Facility in their particular situations, including if the "contingent payment debt instrument" rules were to apply.

**8.**     **Tax Treatment of the Disputed Claims Reserve**

In the case of any amounts withheld from distribution in respect of Disputed General Unsecured Claims, such amounts will be held in the Disputed GUC Reserves. The Plan provides that the Disputed GUC Reserve will be treated as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9 for U.S. federal income tax purposes, and all parties must, to the extent permitted by applicable Law, report consistently with the foregoing for all federal, state and local income Tax purposes. Any net income earned with respect to assets allocable to, or held on account of, Disputed Claims in the Disputed GUC Reserve will be subject to tax annually on a separate entity basis, with any tax imposed thereon paid out of the assets of the Disputed GUC Reserve. All distributions made from such assets will be treated as received by Holders of Allowed General Unsecured Claims in respect of their Claims, as if distributed by the Debtors. See Section C.3, "U.S. Federal Income Tax Consequences to Holders of Allowed General Unsecured Claims," above.

**D.**     **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims**

The following section discusses certain U.S. federal income tax consequences of the transactions contemplated by the Plan to Non-U.S. Holders of Allowed First Lien Facility Claims, Allowed Second Lien Notes Claims and Allowed General Unsecured Claims. Non-U.S. Holders should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the Restructuring Transactions and all other transactions contemplated under the Plan.

1.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims**

        a.      *Gain Recognition*

Subject to the discussion of FATCA and backup withholding below, any gain realized by a Non-U.S. Holder of Allowed First Lien Facility Claims, Allowed Second Lien Notes Claims and Allowed General Unsecured Claims on the exchange of its claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, such Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, such Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

        b.      *Accrued But Unpaid Interest*

Subject to the discussion of FATCA and backup withholding below, payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but unpaid interest generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined capital or profits interests in FELP and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E (or successor form)) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but unpaid interest

at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but unpaid interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but unpaid interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

2.   **U.S. Federal Income Tax Consequences to Non-U.S. Holders of the Ownership and Disposition of New Common Equity**

a.   *Ownership of New Common Equity*

Any distributions made with respect to New Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Foresight's current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below under "FIRPTA" and "FATCA," dividends paid with respect to New Common Equity held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Equity held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

b.   *Sale, Transfer or Redemption of New Common Equity*

Subject to the discussion below under "FIRPTA," "FATCA" and "Information Reporting and Backup Withholding," a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Equity unless: (1) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who

is subject to special rules applicable to former citizens and residents of the United States; (2) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (3) Reorganized Foresight is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). If the third exception applies, the Non-U.S. Holder will be subject to U.S. federal income tax as discussed below under "FIRPTA."

### c.    *FIRPTA*

Under the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"), gain or loss of a foreign person on a disposition of a United States real property interest ("USRPI") is deemed to be effectively connected with a trade or business carried on in the United States and subject to U.S. federal income tax. A USRPI includes any interest (other than solely as a creditor) in a domestic corporation if the domestic corporation is a United States real property holding corporation ("USRPHC"). Any class of stock that is regularly traded on an established securities market is, however, excepted from treatment as a USRPI if the holder of such stock does not, at any time during an applicable measuring period, own more than 5% of that class of stock (the "5% Public Shareholder Exception").

If the common stock of the corporation were not considered regularly traded on an established securities market during the calendar year in which the relevant disposition by a Non-U.S. Holder occurs, the Non-U.S. Holder (regardless of the percentage of common stock owned) would be subject to U.S. federal income tax on a taxable disposition of the common stock, and a 15% withholding tax would apply to the gross proceeds from such disposition.

As discussed above, Reorganized Foresight will elect to be treated as a corporation for U.S. federal income tax purposes. The determination of whether Reorganized Foresight will be a USRPHC is based on facts and circumstances that are not yet known, and the Debtors have not determined whether Reorganized Foresight may be treated as a USRPHC. If Reorganized Foresight is a USRPHC, the New Common Equity will be treated as a USRPI unless a Non-U.S. Holder qualifies for the 5% Public Shareholder Exception. It is not clear whether the New Common Equity will be considered to be regularly traded on an established securities market such that a Non-U.S. Holder would be able to qualify for the 5% Public Shareholder Exception.

3.    **U.S. Federal Income Tax Consequences to Non-U.S. Holders of the Ownership and Disposition of the New Facility**

a.    *Treatment of Interest (Including Original Issue Discount)*

Subject to the discussion of FATCA and backup withholding below, a non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax on interest (including original issue discount) paid or accrued on the Exit Facility, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of stock of the Debtors and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to interest (including original issue discount) at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest (including original issue discount) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest (including original issue discount). For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

b.    *Sale or Exchange of the Exit Facility*

Subject to the discussion below regarding FATCA and backup withholding, a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to gain realized upon a sale, exchange, retirement, redemption or other taxable disposition of the Exit Facility, unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Exit Facility is sold or disposed of and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, such Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains

allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 4.      FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### E.      Backup Withholding and Information Reporting

In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Payments of interest (including accruals of original issue discount) or dividends and any other reportable payments may be subject to "backup withholding" (currently at a rate of 24%) unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 (or successor form) and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax and may be refunded to the extent it results in an overpayment of tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as, in certain circumstances, corporations and financial

institutions. Information may also be required to be provided to the IRS concerning the transactions contemplated by the Plan, unless an exemption applies. Holders should consult their own tax advisors regarding any available exemptions from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders are urged to consult their own tax advisors regarding these regulations and whether the contemplated transactions under the Plan (including the Restructuring Transactions) will be subject to these regulations and require disclosure on your tax return.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF THEIR CLAIMS PURSUANT TO THE PLAN.**

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.

**ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE AND LOCAL, INCOME AND NON-INCOME, TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.**

## ARTICLE X.
## CERTAIN RISK FACTORS TO BE CONSIDERED

BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.  ADDITIONAL RISK FACTORS IDENTIFIED IN THE DEBTORS' PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE.  THE RISK FACTORS SET FORTH IN THE DEBTORS' ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2019 FILED WITH THE SEC ON APRIL 6, 2020 ARE HEREBY INCORPORATED BY REFERENCE.  ANY CURRENT REPORTS ON FORM 8-K (OTHER THAN INFORMATION FURNISHED PURSUANT TO ITEMS 2.02 OR 7.01 AND ANY RELATED EXHIBITS OF ANY FORM 8-K, UNLESS EXPRESSLY STATED OTHERWISE THEREIN), QUARTERLY REPORTS ON FORM 10-Q OR ANNUAL REPORTS ON FORM 10-K FILED BY THE DEBTORS WITH THE SEC AFTER THE DATE OF THIS DISCLOSURE STATEMENT MAY ALSO INCLUDE RISK FACTORS AND WILL BE CONSIDERED A PART OF THIS DISCLOSURE STATEMENT FROM THE DATE OF THE FILING OF SUCH DOCUMENTS.  NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

## A.      Certain Bankruptcy Law Considerations

### 1.      Effect of Restructuring Proceedings.

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' businesses.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers, suppliers, and employees.  The proceedings will also involve additional expenses and will divert some of the attention of the Debtors' management away from business operations.

2.    **Risk of Non-Confirmation of Plan under the Bankruptcy Code.**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan.  Even if Classes 3, 4, and 5 vote in favor of the Plan and the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court may decline to confirm the Plan, if it finds that any of the requirements for confirmation are not met.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims under a subsequent plan of reorganization.

3.    **Non-Consensual Confirmation.**

In the event that any impaired class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such plan at the Debtors' request if at least one impaired class has voted to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. In the event that Holders of General Unsecured Claims in Class 5 vote to reject the Plan, the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation.

4.    **Risk of Non-Occurrence of Effective Date.**

There can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX.B of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

5.    **Risk of Termination of Restructuring Support Agreement.**

The Restructuring Support Agreement contains provisions that give the Consenting Lenders the ability to terminate their obligations to support the Restructuring thereunder upon the occurrence of certain events or if certain conditions are not satisfied, including the failure to achieve the Milestones.  Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, employees, and major customers.

6.    **Conversion into Chapter 7 Cases.**

If no Chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be

appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. For a discussion of the effects that a chapter 7 liquidation would have on the recoveries to Holders of Claims, see Article XII.C.1.b hereof, as well as the Liquidation Analysis attached hereto as **Exhibit E**.

7.     **Parties in Interest May Object to the Debtors' Classification of Claims and Interests.**

Parties in interest may object to the Debtors' Classification of Claims and Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

8.     **Impact of the Chapter 11 Cases on the Debtors.**

The Chapter 11 Cases may affect the Debtors' relationships with, and their ability to negotiate favorable terms with, creditors, customers, vendors, suppliers, employees, and other personnel and counterparties. While the Debtors expect to continue normal operations, public perception of their continued viability may affect, among other things, the desire of new and existing customers to enter into or continue their agreements or arrangements with the Debtors. The failure to maintain any of these important relationships could adversely affect the Debtors' businesses, financial condition, and results of operations.

Because of the public disclosure of the Chapter 11 Cases and concerns vendors may have about the Debtors' liquidity, the Debtors' ability to obtain or maintain normal credit terms with vendors may be impaired. Also, the Debtors' transactions that are outside of the ordinary course of business are generally subject to the approval of the Bankruptcy Court, which may limit the Debtors' ability to respond on a timely basis to certain events or take advantage of certain opportunities. As a result, the effect that the Chapter 11 Cases will have on the Debtors' businesses, financial conditions, and results of operations cannot be accurately predicted or quantified at this time.

Additionally, the terms of the DIP Orders limit the Debtors' ability to undertake certain business initiatives, as described therein.

9.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the

Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, including by agreeing to convert certain of their claims against the Debtors' Estates into equity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and the significant deleveraging and financial benefits embodied in the Plan.

## 10.    The Plan Is Based Upon Assumptions the Debtors Developed Which May Prove Incorrect and Could Render the Plan Unsuccessful.

The Restructuring affects both the Debtors' capital structure and the ownership structure and operation of their businesses and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances.

Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to (i) the ability to implement the changes to the Debtors' capital structure; (ii) the ability to obtain adequate liquidity and financing sources; (iii) the ability to maintain customers' confidence in the Debtors' viability as continuing entities and to attract and retain sufficient business from them; (iv) the ability to retain key employees; and (v) the overall strength and stability of general economic conditions of the coal industry in the United States and global markets generally. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' businesses.

In addition, the feasibility of the Plan for confirmation purposes under the Bankruptcy Code relies on financial projections, including with respect to revenues, EBITDA, debt service, and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate.

The Debtors expect that its actual financial condition and results of operations may differ, perhaps materially, from what was anticipated. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization the Debtors may implement will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their respective subsidiaries or their businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

## 11.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections that may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond

the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

### 12.    Claims Could Be More than Projected.

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from estimates included in the Financial Projections set forth in **Exhibit F** and the Liquidation Analysis attached hereto at **Exhibit E**, and the variation may be material.

### 13.    Impact of Interest Rates.

Changes in interest rates may affect the fair market value of the Reorganized Debtors' assets or the distributions to Holders of Claims under the Plan.

### 14.    The Debtors May Fail to Obtain the Proceeds of the Exit Facility, and the Exit Facility Backstop Agreement May Terminate.

Notwithstanding the Exit Facility Backstop Agreement applicable to the Exit Facility, because the Exit Facility Syndication has not yet commenced, there can be no assurance that the Debtors will receive any or all of the proceeds of the Exit Facility.  If the Debtors do not receive the proceeds of the Exit Facility, the Debtors would not be able to consummate the Plan in its current form.

### 15.    Contingencies May Affect Distributions to Holders of Allowed Claims.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including whether the Bankruptcy Court orders certain Allowed Claims to be subordinated and turned over to other Allowed Claims.  The occurrence of any and all such contingencies could affect distributions under the Plan.

16.     **The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan At Any Time before Confirmation.**

Subject to and in accordance with the terms of the Restructuring Support Agreement, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, the Debtors seek to modify the Plan after receiving sufficient acceptances but before the Bankruptcy Court's Confirmation of the Plan, the previously solicited acceptances will be valid only if (i) all classes of adversely affected Holders accept the modification in writing, or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims, or is otherwise permitted by the Bankruptcy Code.

17.     **Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan.**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the petition date. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court. If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and may seek to exclude such Holders from retaining any equity under their proposed plan. An alternative plan of reorganization also may treat less favorably the Claims of a number of other constituencies. The Debtors consider maintaining relationships with their lenders, shareholders, employees, vendors, and customers as critical to maintaining the value of Foresight following the Effective Date and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims or Interests of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive. If this were to occur, or if the Debtors' employees, vendors, or other constituencies important to the Debtors' businesses were to react adversely to an alternative plan of reorganization, the adverse consequences discussed below in Article X.A.18 also could occur.

18. **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan.**

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last in a range of approximately 100 to 130 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or the Plan's Effective Date are not satisfied or waived. Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- customers could move to the Debtors' competitors;
- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and
- business partners and vendors could terminate their relationships with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses, as well as create concerns for employees, vendors, and other parties with whom the Debtors interact.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan, a delay in the approval of the adequacy of this Disclosure Statement, or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

The Debtors will also be required to seek approvals of the Bankruptcy Court and certain federal and state regulators in connection with certain actions in the Chapter 11 Cases, including with respect to the Plan, and certain parties may intervene and protest approval, absent the imposition of conditions to resolve their concerns. The approvals by governmental entities may be denied, conditioned or delayed.

B. **Risks Relating to the Company's Business and Industry**

1. **Post-Effective Date Indebtedness.**

Following the Effective Date, the Reorganized Debtors will seek to enter into the Exit Facility, resulting in outstanding indebtedness of approximately $225 million under the Exit Facility. The Reorganized Debtors' ability to service their debt obligations will depend on,

among other things, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

## 2. **DIP Facility.**

The DIP Facility, along with the use of cash on hand (cash collateral), is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases. If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing. There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

## 3. **Risks Associated with the Debtors' Business and Industry.**

The risks associated with the Debtors' businesses and industry are more fully described in the Debtors' SEC filings, including the Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on April 6, 2020. The risks associated with the Debtors' businesses and industry described in the Debtors' SEC filings include, but are not limited to, the following:

- risk and uncertainties relating to the effects of disruption from the Chapter 11 Cases making it more difficult to maintain business and operational relationships, to retain key executives and to maintain various licenses and approvals necessary for the Debtors to conduct the Debtors' business;

- risk and uncertainties relating to the Debtors' ability to complete definitive documentation in connection with any financing and the amount, terms and conditions of any such financing; and the Debtors' ability to comply with the terms of the Restructuring Support Agreement;

- risk and uncertainties relating to the Debtors' ability to obtain requisite support for the Plan from various stakeholders; the Debtors' ability to confirm and consummate the Plan in accordance with the terms of the Restructuring Support Agreement; and Reorganized Foresight's ability to continue as a going concern;

- risks related to the trading of the Debtors' securities;

- the market price for coal;

- the supply of, and demand for, domestic and foreign coal;

- the supply of, and demand for, electricity;

- competition from other coal suppliers;

- the cost of using, and the availability of, other fuels, including the effects of technological developments;

- advances in power technologies;

- the efficiency of the Debtors' mines;

- the amount of coal the Debtors are able to produce from the Debtors' properties, which could be adversely affected by, among other things, mine fires, roof collapses, operating difficulties and unfavorable geologic conditions;

- the pricing terms contained in the Debtors' long-term contracts;

- cancellation or renegotiation of contracts;

- legislative, regulatory and judicial developments, including those related to the release of greenhouse gases;

- the value of the U.S. dollar;

- air emission, wastewater discharge and other environmental standards for coal-fired power plants or coal mines

- delays in the receipt of, failure to receive, or revocation of necessary government permits;

- inclement or hazardous weather conditions and natural disasters;

- availability and cost or interruption of fuel, equipment and other supplies;

- transportation costs;

- availability of transportation infrastructure, including flooding and railroad derailments;

- technological developments, including those related to alternative energy sources;

- availability of skilled employees;

- work stoppages or other labor difficulties; and

- *force majeure* events and the economic impact related to COVID-19.

### C.    Factors Relating to Securities to Be Issued Under the Plan Generally

#### 1.    The Reorganized Debtors' New Common Equity Will Not Be Publicly Traded.

There can be no assurance that an active market for the New Common Equity will develop, nor can any assurance be given as to the prices at which such shares might be traded. The New Common Equity to be issued under the Plan and in connection with the Exit Facility Equity Component, the Exit Facility Put Option Premium, the DIP Exit Fee, and the DIP Put Option Premium, will not be listed on or traded on any nationally recognized market or exchange.

The Reorganized Debtors are under no obligation to list the New Common Equity on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

#### 2.    The Exit Facility Equity Component and the Exit Facility Put Option Premium Have Not Been Registered and They and Certain Section 1145 Securities Will Be Subject to Resale Restrictions.

The Exit Facility Equity Component and the Exit Facility Put Option Premium to be issued in connection with the Exit Facility and/or the Exit Facility Backstop Agreement have not been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. The Exit Facility Equity Component and the Exit Facility Put Option Premium are being issued and sold pursuant to an exemption from registration under applicable securities laws. Accordingly, such securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law. In addition, holders of New Common Equity issued pursuant to section 1145(a) of the Bankruptcy Code who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to resale restrictions. See Article VIII of this Disclosure Statement for a further discussion of the transfer restrictions applicable to the Securities.

#### 3.    Potential Dilution.

The ownership percentage represented by the New Common Equity (including New Common Equity issued in satisfaction of the Exit Facility Equity Component, the Exit Facility Put Option Premium, the DIP Exit Fee, and the DIP Put Option Premium) will be subject to dilution from any other shares that may be issued post-emergence, including through the Management Incentive Plan and the conversion or exercise of any other options, warrants,

convertible securities, exercisable securities, or other securities that may be issued post-emergence. In the future, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Equity. The amount and dilutive effect of any of the foregoing could be material.

4. **The Estimated Valuation of the Reorganized Debtors and the New Common Equity and the Estimated Recoveries to Holders of Allowed Claims Are Not Necessarily Representative of the Private or Public Sale Values of the New Common Equity.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of Reorganized Foresight's securities. The estimated recoveries are based on numerous assumptions (the realization of many of which are beyond the control of the Reorganized Debtors), including, among other things, (i) the successful reorganization of the Debtors; (ii) an assumed date for the occurrence of the Effective Date; (iii) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (iv) the Debtors' ability to maintain adequate liquidity to fund operations.

5. **Small Number of Holders or Voting Blocks May Control the Reorganized Debtors.**

Consummation of the Plan may result in a small number of holders owning a significant percentage of the New Common Equity. These holders may, among other things, exercise a controlling influence over the Reorganized Debtors and have the power to elect directors and approve significant transactions.

6. **Equity Interests Subordinated to the Reorganized Debtors' Indebtedness.**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Equity would rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Common Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

7. **Reorganized Foresight Will be a Private Company.**

Reorganized Foresight is not expected to be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act. As a result, holders of the New Common Equity may receive less information with respect to the Debtors' businesses than they would have received if Reorganized Foresight was subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

8. **Insufficient Cash Flow to Meet Debt Obligations.**

The Reorganized Debtors' earnings and cash flow may vary significantly from year to year. Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments, including its obligations under the Exit Facility, increasing the risk that they may default on such debt obligations. Any insufficiency could negatively

impact the Reorganized Debtors' businesses.  A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt.  Many of these factors are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as refinancing or restructuring debt, selling assets, reducing or delaying capital investments, or seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Debtors to meet their debt obligations.  An inability to generate sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could materially and adversely affect the Reorganized Debtors' ability to make payments on the Exit Facility, as well as the Reorganized Debtors' business, financial condition, results of operations, and prospects.

## 9.      Defects in Collateral Securing the Exit Facility.

The indebtedness under the Exit Facility will be secured.  As such, this indebtedness may be subject to certain exceptions and permitted liens, as applicable, by security interests in the principal assets of the Debtors (henceforth, the "Collateral").  The Collateral potentially securing this secured debt may be subject to exceptions, defects, encumbrances, liens and other imperfections.  Accordingly, it cannot be assured that the remaining proceeds from a sale of the Collateral would be sufficient to repay holders of the secured funded debt securities all amounts owed under them.  The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors.  The amount received upon a sale of Collateral would be dependent on numerous factors, including, but not limited to, the actual fair market value of the Collateral at such time, and the timing and manner of the sale.  By its nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value.  In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Reorganized Debtors' obligations under the new secured funded debt, in full or at all.  There can also be no assurance that the Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain.  Accordingly, there may not be sufficient Collateral to pay all or any of the amounts due on the Reorganized Debtors' new secured funded debt.

## 10.      Failure to Perfect Security Interests in Collateral.

The failure to properly perfect liens on the Collateral could adversely affect the collateral agent's ability to enforce its rights with respect to the Collateral for the benefit of the holders of the Reorganized Debtors' secured funded debt.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the collateral agent will monitor, or that the Reorganized Debtors will inform the

trustee or the collateral agent of, the future acquisition of property and rights that constitute Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral. The collateral agent has no obligation to monitor the acquisition of additional property or rights that constitute Collateral or the perfection of any security interests therein. Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of such liens against third parties.

### 11. Casualty Risk of Collateral.

The Reorganized Debtors will be obligated under the various secured funded debt documents and instruments to maintain adequate insurance or otherwise insure against hazards as is customarily done by companies having assets of a similar nature in the same or similar localities. There are, however, certain losses that may either be uninsurable or not economically insurable, in whole or in part. As a result, it is possible that the insurance proceeds will not compensate the Reorganized Debtors fully for losses. If there is a total or partial loss of any of the pledged Collateral, the insurance proceeds received may be insufficient to satisfy the secured obligations of the Reorganized Debtors.

### 12. Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors.

Any future pledge of Collateral in favor of the collateral agent, including pursuant to security documents delivered after the date of the Exit Facility, might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the securities under the secured funded debt to receive a greater recovery than if the pledge had not been given, and a U.S. bankruptcy case in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period. Similar or longer reachback periods may exist if a case or proceeding is commenced under the insolvency laws of a non-U.S. jurisdiction with similar legal principles.

### D. Additional Factors

### 1. Debtors Could Withdraw Plan.

Subject to the terms of, and without prejudice to, the rights of the Consenting Lenders under the Restructuring Support Agreement, the Debtors could revoke or withdraw the Plan before the Confirmation Date.

### 2. Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside This Disclosure Statement Are Authorized.

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by this Disclosure Statement.

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder should consult its own legal counsel and accountant as to legal, tax, and other matters concerning its Claim. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Representation Made.

Nothing contained herein or in the Plan shall constitute a representation of the tax or other legal effects of the Plan on the Debtors or Holders of Claims.

### 6. Certain Tax Consequences.

For a discussion of certain tax considerations to the Debtors and certain Holders of Claims in connection with the implementation of the Plan, see Article IX hereof.

## ARTICLE XI.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each Holder of a First Lien Claim, a Second Lien Notes Claim, or a General Unsecured Claim as of May 11, 2020 (the Record Date, and each such Holder as of the Record Date, a "Record Holder") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

### A. Voting Instructions and Voting Deadline

All Record Holders have been sent a Ballot together with this Disclosure Statement. Such Holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

The Debtors have engaged Prime Clerk LLC as their voting agent (the "Voting Agent") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING CENTRAL TIME) ON JUNE 16, 2020, UNLESS EXTENDED BY THE DEBTORS.**

IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Prime Clerk LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**
**Attention:  Foresight Energy Balloting**
**Tel:  (646) 998-7132 (Local / International); (877) 720-6580 (Toll free)**

Questions (but not documents) may be directed to the following email (please reference "Foresight Energy" in the subject line): foresightenergyballots@PrimeClerk.com.

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent at the telephone numbers or e-mail address set forth immediately above.

**B.**     **Voting Procedures**

The Debtors are providing copies of this Disclosure Statement (including all exhibits thereto), a Ballot (either just a ballot for Class 3 and 5 or master and beneficial holder ballots for Class 4), and related materials (collectively, a "Solicitation Package") to Record Holders of the First Lien Facility Claims, and General Unsecured Claims, and to the nominees of the Record Holders of the Second Lien Notes Claims.  Any Record Holder or nominee of a Record Holder who has not received an applicable Ballot should contact the Voting Agent.

**1.**     **Holders of First Lien Facility Claims (Class 3) and General Unsecured Claims (Class 5)**

Holders of First Lien Facility Claims in Class 3 and General Unsecured Claims in Class 5 should provide all of the information requested by the Ballot and ***promptly*** return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Voting Agent by the Voting Deadline.

Alternatively, such holders may submit their Ballots electronically through the Voting Agent's online portal, at https://cases.primeclerk.com/foresightenergy.  Holders should click on the "Submit E-Ballot" section of the website and follow the instructions to submit their Ballot electronically.  Each Holder will receive a unique e-ballot identification number with which to submit their Ballot electronically on the Voting Agent's online portal.

The Voting Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  **Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**  Holders of First Lien Facility Claims or General

Unsecured Claims who cast a Ballot using the Voting Agent's online portal should NOT also submit a paper Ballot.

### 2. Holders of Second Lien Notes Claims (Class 4)

Holders of Second Lien Notes Claims (Class 4) held in "street name" through a nominee may vote on the Plan by one of the following two methods (as selected by such Holder's nominee):

- Complete and sign the enclosed beneficial holder ballot. Return the beneficial holder ballot to your nominee as promptly as possible and in sufficient time to allow such nominee to process your instructions and return a completed master ballot to the Voting Agent by the Voting Deadline. If no self-addressed, postage-paid envelope was enclosed for this purpose, contact the Voting Agent for instructions; or

- Complete and sign the pre-validated beneficial holder ballot (as described below) provided to you by your nominee. Return the pre-validated beneficial holder ballot to the Voting Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any beneficial holder ballot returned to a nominee will not be counted for purposes of acceptance or rejection of the Plan until such nominee properly completes and delivers to the Voting Agent that beneficial holder ballot (properly validated) or a master ballot casting the vote of such Holder.

If any Holder holds Second Lien Notes Claims through more than one nominee, such Holder may receive multiple mailings containing beneficial holder ballots. The Holder should execute a separate beneficial holder ballot for each block of Second Lien Notes Claims that it holds through any particular nominee and return each beneficial holder ballot to the respective nominee in the return envelope provided therewith. Holders who execute multiple beneficial holder ballots with respect to Second Lien Notes Claims held through more than one nominee must indicate on each beneficial holder ballot the names and DTC participant numbers of all such other nominees and the additional amounts of such Second Lien Notes Claims so held and voted.

A nominee that, on the Record Date, is the Record Holder of the Second Lien Notes Claims for one or more Holders can obtain the votes of the Holders of such Second Lien Notes Claims, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

#### a. *Pre-Validated Ballots.*

The nominee may "pre-validate" a beneficial holder ballot by: (i) signing the beneficial holder ballot and indicating on the beneficial holder ballot the name of the nominee and DTC participant number; (ii) indicating on the beneficial holder ballot the amount and the account number of the Second Lien Notes Claim held by the nominee for the Holder; and (iii) including a medallion guarantee stamp on the ballot or attaching an authorized signatory list validating the Beneficial Holder's position as of the Voting Record Date; and (iv) forwarding such beneficial

107

holder ballot—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Voting Agent, and other materials requested to be forwarded—to the Holder for voting.  The Holder must then complete the remaining portions of the beneficial holder ballot and return the beneficial holder ballot directly to the Voting Agent in the pre-addressed, postage-paid return envelope so that it is actually received by the Voting Agent on or before the Voting Deadline.  A list of the Holders to whom "pre-validated" beneficial holder ballots were delivered should be maintained by nominees for inspection for at least one year from the Voting Deadline.

### b. *Master Ballots.*

If the nominee elects not to pre-validate beneficial holder ballots, the nominee may obtain the votes of Holders by forwarding to the applicable Holders the unsigned beneficial holder ballots—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded.  Each such Holder must then indicate its vote on the beneficial holder ballot, complete the information requested on the beneficial holder ballot, review the certifications contained on the beneficial holder ballot, execute the beneficial holder ballot, and return the beneficial holder ballot to the nominee.  After collecting the beneficial holder ballots, the nominee should, in turn, complete a master ballot compiling the votes and other information from the beneficial holder ballots, execute the master ballot, and deliver the master ballot to the Voting Agent so that it is ***actually received*** by the Voting Agent on or before the Voting Deadline.  All beneficial holder ballots returned by Holders should either be forwarded to the Voting Agent (along with the master ballot) or retained by nominees for inspection for at least one year from the Voting Deadline.

EACH NOMINEE SHOULD ADVISE ITS APPLICABLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE VOTING AGENT SO THAT IT IS ***ACTUALLY RECEIVED*** BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.

---

**If you have any questions about the solicitation or voting process, please contact the solicitation agent at (877) 720-6580 (toll free) or (646) 998-7132 (local / international) or via electronic mail to foresightenergyballots@PrimeClerk.com.**

---

### C.   Parties Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject the plan.  For a detailed description of the treatment of Claims under the Plan, see Article VI of this Disclosure Statement.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code as necessary.  Section 1129(b) of the Bankruptcy Code permits the

confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests. Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article X.A.3 of this Disclosure Statement.

The Claims in Classes 3, 4, and 5 are impaired under the Plan and entitled to vote to accept or reject the Plan. Class 3 includes First Lien Facility Claims, Class 4 includes Second Lien Notes Claims, and Class 5 includes General Unsecured Claims.

**D.**     **Fiduciaries and Other Representatives**

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, including a nominee on behalf of beneficial holders of Second Lien Notes Claims, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should (i) submit the separate Ballot of each Record Holder of a First Lien Claim in Class 3 or General Unsecured Claims in Class 5 for whom they are voting or (ii) follow the instructions set forth in Article X.B.2 above for Record Holders of Second Lien Notes Claims in Class 4.

UNLESS A BALLOT, OR ANY PROVISIONAL BALLOTS AS NECESSARY, IS SUBMITTED TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW ANY SUCH BALLOTS TO BE COUNTED.

**E.**     **Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the Holder with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Article VIII therein. All parties in interest retain their right to object to confirmation of the Plan, subject to any applicable terms of the Restructuring Support Agreement.

**F.**     **Change of Vote**

Except as provided in the Restructuring Support Agreement, any party who has previously submitted to the Voting Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

**G.**     **Waivers of Defects, Irregularities, Etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will

be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective Holders not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their Holders. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## H.     **Miscellaneous**

All Ballots must be signed by the Record Holder of the First Lien Facility Claims, Second Lien Notes Claims, or General Unsecured Claims, as applicable, or any person who has obtained a properly completed Ballot proxy from the Record Holder of the First Lien Facility Claims, Second Lien Notes Claims, or General Unsecured Claims, as applicable, on such date. For purposes of voting to accept or reject the Plan, the Record Holders of the First Lien Facility Claims, Second Lien Notes Claims, or General Unsecured Claims will be deemed to be the "Holders" of such Claims. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such Holders to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If a Holder returns more than one Ballot voting First Lien Facility Claims, Second Lien Notes Claims, or Class 5 Claims, the Ballots are not voted in the same manner, and the Holder do not correct this before the Voting Deadline, the last Ballot submitted will be the Ballot counted, provided that, if a Holder timely submits both a paper Ballot and electronic Ballot on account of the same Claim, the electronic Ballot shall supersede the paper Ballot. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots, including any provisional ballots, as necessary, provided to Holders will reflect the principal amount of such Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders of the First Lien Facility Claims, Second Lien Notes Claims, or General Unsecured Claims, as applicable, who actually vote will be counted. The failure of a Holder to deliver a duly executed Ballot to the Voting Agent will be deemed to

constitute an abstention by such Holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless a Ballot, or any provisional ballots as necessary, is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

## ARTICLE XII.
## CONFIRMATION OF THE PLAN

**A.**      **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing to confirm a plan of reorganization upon appropriate notice to all required parties.   Notice of the Combined Hearing for confirmation of the Plan will be provided to all known creditors or their representatives.   The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Combined Hearing, at any subsequent continued Combined Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

**B.**      **Objections to Confirmation**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.   Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

1.      The Debtors at:

Foresight Energy LP.
One Metropolitan Square
211 North Broadway, Suite 2600
St. Louis, MO 63102
Attn:   Cody Nett, Esq.
Email:  codynett@coalsource.com

111

2.      Counsel to the Debtors at:

        Paul, Weiss, Rifkind, Wharton & Garrison LLP
        1285 Avenue of the Americas
        New York, NY 10019-6064
        Fax:   (212) 492-0545
        Attn:  Paul M. Basta
              Alice Belisle Eaton
              Alexander Woolverton
        Email: pbasta@paulweiss.com
              aeaton@paulweiss.com
              awoolverton@paulweiss.com

        -- and --

        Armstrong Teasdale LLP
        7700 Forsyth Boulevard, Suite 1800
        St. Louis, MO 63105
        Fax: (314) 621-5065
        Attn:  Richard W. Engel, Jr.
              John G. Willard
              Kathryn Redmond
        Email: rengel@atllp.com
              jwillard@atllp.com
              kredmond@atllp.com

3.      Counsel to the Consenting Lenders at:

        Akin Gump Strauss Hauer & Feld LLP
        1 Bryant Park
        New York, NY 10036
        Attn:  Ira Dizengoff
              Brad Kahn
        Email: idizengoff@AkinGump.com
              bkahn@akingump.com

        -- and --

        Akin Gump Strauss Hauer & Feld LLP
        Robert S. Strauss Tower
        2001 K Street, N.W.
        Washington, DC 20006
        Attn:  James Savin
        Email: jsavin@akingump.com

        -- and --

Milbank  LLP
55 Hudson Yards
New York, NY 10001
Attn:   Dennis F. Dunne
        Parker Milender
Email:  ddunne@milbank.com
        pmilender@milbank.com

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

C.    **Requirements for Confirmation of the Plan**

1.    **Requirements of Section 1129(a) of the Bankruptcy Code**

    a.    *General Requirements.  At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:*

i.    the Plan complies with the applicable provisions of the Bankruptcy Code;

ii.   the Debtors have complied with the applicable provisions of the Bankruptcy Code;

iii.  the Plan has been proposed in good faith and not by any means forbidden by law;

iv.   any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

v.    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

vi.   with respect to each Class of Claims or Interests, each Holder of an impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if

---

the Debtors were liquidated on the Effective Date of the Plan under Chapter 7 of the Bankruptcy Code;

vii.    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

viii.    except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

ix.    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

x.    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

xi.    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Combined Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

    **b.**    ***Best Interests Test.***

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7"). This requirement is referred to as the "best interests test."

This test requires the Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under Chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

A liquidation analysis (the "Liquidation Analysis") has been prepared solely for purposes of estimating proceeds available in a liquidation under Chapter 7 of the Debtor's estates and is attached as **Exhibit E** to this Disclosure Statement. The Liquidation Analysis is based on a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies that are beyond the control of the

Debtors or a trustee under Chapter 7. Furthermore, the actual amounts of claims against the Debtors' estates could vary materially from the estimates set forth in the Liquidation Analysis, depending on, among other things, the claims asserted during Chapter 7. Accordingly, while the information contained in the Liquidation Analysis is necessarily presented with numerical specificity, the Debtors cannot assure you that the values assumed would be realized or the claims estimates assumed would not change if the Debtors were in fact liquidated, nor can assurances be made that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.

As set forth in detail on the Liquidation Analysis, the Debtors believe that the Plan will produce a greater recovery for the Holders of Claims than would be achieved in a Chapter 7 liquidation. Consequently, the Debtors believe that the Plan, which provides for the continuation of the Debtors' businesses, will provide a substantially greater ultimate return to the Holders of Claims than would a Chapter 7 liquidation.

c.     *Feasibility.*

Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This condition is often referred to as the "feasibility" of the Plan. The Debtors believe that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the Debtors' management prepared a projected financial outlook. These financial outlooks, and the assumptions on which they are based, are annexed hereto as **Exhibit F** (the "Financial Projections") and reflects, among other things, the Company's substantially deleveraged balance sheet. Based upon the Financial Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. The Debtors also believe that they will be able to repay or refinance on commercially reasonable terms any and all of the indebtedness under the Plan at or before the maturity of such indebtedness.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and in the Plan in their entirety. The Debtors prepared the Financial Projections based upon, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors. The Debtors do not, as a matter of course, publish their business plans, strategies, projections, or their anticipated results of operations or financial condition. Accordingly, the Company does not intend to update or otherwise revise the Financial Projections, or to include such information in documents required to be filed with the SEC or otherwise make such information public to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE FINANCIAL ACCOUNTING STANDARDS BOARD. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS. EXCEPT AS MAY OTHERWISE BE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE COMPANY'S AND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE FINANCIAL PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE ARTICLE X OF THIS DISCLOSURE STATEMENT (CERTAIN RISK FACTORS TO BE CONSIDERED).

IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

**2.    Equitable Distribution of Voting Power.**

Pursuant to section 1123(a)(6) of the Bankruptcy Code, to the extent applicable to these Chapter 11 Cases, the New Organizational Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities.

### 3. Additional Requirements for Non-Consensual Confirmation.

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

### a. *Unfair Discrimination Test.*

The "no unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

### b. *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class.

The Debtors believe that the Plan satisfies the "fair and equitable" test. The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### ARTICLE XIII.
### ALTERNATIVES TO CONFIRMATION
### AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and

presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

## A.    Alternative Plan of Reorganization

Subject to the terms of the Restructuring Support Agreement, if the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets. The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

## B.    Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. Holders of Claims in Class 3 and Class 4 would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property. Alternatively, the security interests in the Debtors' assets held by Holders of Claims in Class 3 and Class 4 would attach to the proceeds of any sale of the Debtors' assets. After these Claims are satisfied, the remaining funds could be used to pay any deficiency claims of the Holders in Class 3 and Class 4, as well as other Holders of Allowed General Unsecured Claims. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for Holders of Claims than the Plan.

## C.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Liquidation Analysis sets forth the effect a Chapter 7 liquidation would have on the recovery of Holders of allowed Claims and Interests.

As noted in the Liquidation Analysis, the Debtors believe that liquidation under Chapter 7 would result in lower distributions to creditors than those provided for under the Plan. Among other things, the value that the Debtors expect to obtain from their assets in a Chapter 7 liquidation, instead of continuing as a going concern as provided in the Plan, would be materially less. A Chapter 7 liquidation would also generate more unsecured claims against the Debtors' estates from, among other things, damages related to rejected contracts. In addition, a Chapter 7 liquidation would result in a delay from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases.

# ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.    Additional Documents

On or before the Effective Date, the Debtors may File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order or the Plan Supplement waives any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

### D.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiary or guardian, if any, of each Entity.

### E.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force

and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**F.    Entire Agreement**

Except as otherwise indicated, the Plan, the Confirmation Order, the Restructuring Documents, the Plan Supplement and documents related thereto supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

**G.    Exhibits**

All exhibits and documents included in the Plan and the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/foresightenergy or the Bankruptcy Court's website at https://www.moeb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**H.    Deemed Acts**

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**I.    Nonseverability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, may alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted; provided, however, any such alteration or interpretation shall be acceptable to the Debtors, the Required First Lien Lenders and, solely with respect to any such alteration or interpretation that adversely impacts the economic treatment provided on account of Second Lien Notes Claims, the Required Second Lien Noteholders, and the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

120

## J.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, each of the Consenting Lenders, and the Backstop Parties and each of their respective Affiliates, agents, representatives, members, principals, equityholders (regardless of whether such interests are held directly or indirectly), officers, directors, partners (including both general and limited partners), managers, employees, advisors (including investment advisers) and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

## K.    Request for Expedited Determination of Taxes

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

## L.    Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

## ARTICLE XV.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Voting Classes to vote in favor thereof.

Dated:    April 9, 2020                    FORESIGHT ENERGY GP LLC (for itself and on behalf of each of the other Debtors and Debtors in Possession)


_/s/  [DRAFT]_____
Name:   [_____]
Title:    [_____]

121