<u>**Exhibit A**</u>

**Joint Chapter 11 Plan of Reorganization of Foresight Energy LP and Its Affiliated Debtors**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FORESIGHT ENERGY LP, *et al.*, | ) | Case No. 20-41308-659 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## FORESIGHT ENERGY LP AND ITS AFFILIATED DEBTORS

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
Paul M. Basta
Alice Belisle Eaton
Alexander Woolverton
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Co-Counsel for Debtors and
Debtors in Possession*

**ARMSTRONG TEASDALE LLP**
Richard W. Engel, Jr. (MO 34641)
John G. Willard  (MO 67049)
Kathryn R. Redmond (MO 72087)
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri  63105
Telephone: (314) 621-5070
Facsimile: (314) 621-5065

*Co-Counsel for Debtors and
Debtors in Possession*

Dated: April 9, 2020

# TABLE OF CONTENTS

**Page**

**ARTICLE I.   DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW** ..................................................................... 1
- A.   Defined Terms ............................................................................................. 1
- B.   Rules of Interpretation .............................................................................. 20
- C.   Computation of Time ................................................................................ 21
- D.   Governing Law ........................................................................................... 21
- E.   Reference to Monetary Figures ............................................................... 21
- F.   Reference to the Debtors or the Reorganized Debtors ....................... 21
- G.   Controlling Document ............................................................................... 21

**ARTICLE II.   ADMINISTRATIVE, DIP FACILITY, PRIORITY CLAIMS, AND STATUTORY FEES** ..................................................................................... 21
- A.   Administrative Claims ............................................................................... 22
- B.   Professional Fee Claims ............................................................................ 22
- C.   DIP Claims .................................................................................................. 23
- D.   Priority Tax Claims .................................................................................... 24
- E.   Statutory Fees ............................................................................................. 24

**ARTICLE III.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............ 25
- A.   Classification in General ............................................................................ 25
- B.   Formation of Debtor Group for Convenience Only ............................. 25
- C.   Summary of Classification ........................................................................ 25
- D.   Treatment of Claims and Interests .......................................................... 26
- E.   Confirmation of Certain, But Not All Cases .......................................... 30
- F.   Special Provision Governing Unimpaired Claims ................................. 30
- G.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ....... 30
- H.   Elimination of Vacant Classes ................................................................. 30
- I.   Voting Classes; Presumed Acceptance by Non-Voting Classes .......... 30
- J.   Subordinated Claims .................................................................................. 30

**ARTICLE IV.   MEANS FOR IMPLEMENTATION OF THIS PLAN** ....................................... 31
- A.   General Settlement of Claims and Interests .......................................... 31
- B.   Restructuring Transactions ...................................................................... 31
- C.   Cancellation of Liens ................................................................................. 32
- D.   Sources of Consideration for Plan Distributions .................................. 33
- E.   Corporate Existence ................................................................................... 35
- F.   Vesting of Assets in the Reorganized Debtors ...................................... 35
- G.   Cancellation of Existing Securities and Agreements ........................... 36
- H.   Corporate Action ........................................................................................ 37
- I.   Corporate Governance of Reorganized Debtors ................................... 38
- J.   Effectuating Documents; Further Transactions .................................... 38
- K.   Exemption from Certain Taxes and Fees ............................................... 38
- L.   Preservation of Causes of Action ............................................................ 39
- M.   Director and Officer Liability Insurance ................................................ 40
- N.   Management Incentive Plan ..................................................................... 40
- O.   GUC Cash Pool Account ........................................................................... 40
- P.   GUC Administrator Account ..................................................................... 41
- Q.   Exemptions from Securities Act Registration Requirements ............. 41
- R.   Notice of Effective Date ............................................................................ 41

**ARTICLE V.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...42**
    A.    Assumption of Executory Contracts and Unexpired Leases.................................42
    B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.......................43
    C.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases43
    D.    Indemnification Obligations....................................................44
    E.    Insurance Policies .............................................................44
    F.    Modifications, Amendments, Supplements, Restatements or Other Agreements...............44
    G.    Reservation of Rights .........................................................45
    H.    Nonoccurrence of Effective Date ...............................................45
    I.    Contracts and Leases Entered into After the Petition Date...........................45

**ARTICLE VI.    DISPUTED CLAIMS ...........................................................45**
    A.    Retention of Claims, Rights, Causes of Action, and Defenses .............................45
    B.    GUC Administrator ...........................................................45
    C.    Claims Administration Responsibility ............................................46
    D.    Cooperation and Access .......................................................46
    E.    Objections to Claims ..........................................................47
    F.    Disallowance of Claims .......................................................47
    G.    Estimation of Claims ..........................................................47
    H.    No Interest on Claims .........................................................48
    I.    Amendments to Claims ........................................................48

**ARTICLE VII.    PROVISIONS GOVERNING DISTRIBUTIONS .....................................48**
    A.    Disbursing Agent..............................................................48
    B.    Currency.....................................................................48
    C.    No Distributions Pending Allowance..............................................48
    D.    Distribution Record Date.......................................................49
    E.    Distributions on Account of Claims Allowed as of the Effective Date ...............49
    F.    Distributions on Account of Claims Allowed After the Effective Date.................50
    G.    Addresses for Distributions.....................................................50
    H.    Undeliverable Distributions ....................................................51
    I.    Reversion.....................................................................51
    J.    De Minimis Distributions.......................................................51
    K.    Fractional Distributions........................................................52
    L.    Accrual of Dividends and Other Rights ...........................................52
    M.    Compliance Matters...........................................................52
    N.    Claims Paid or Payable by Third Parties ..........................................53
    O.    Applicability of Insurance Contracts.............................................53
    P.    Setoffs.......................................................................53
    Q.    Allocation of Plan Distributions Between Principal and Interest.........................54

**ARTICLE VIII.    RELEASE, INJUNCTION, AND RELATED PROVISIONS .....................54**
    A.    Discharge of Claims and Termination of Interests...................................54
    B.    Release of Liens...............................................................54
    C.    Releases by the Debtors........................................................55
    D.    Releases by Holders of Claims and Interests ......................................56
    E.    Exculpation..................................................................57
    F.    Injunction....................................................................57
    G.    Waiver of Statutory Limitations on Releases ......................................58
    H.    Protection Against Discriminatory Treatment......................................58
    I.    Special Provision Governing Professional Fee Claims and Final Fee Applications............58

**ARTICLE IX.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION**
**OF THIS PLAN ...........................................................................59**
    A.    Conditions Precedent to Confirmation of the Plan...................................59
    B.    Conditions Precedent to the Effective Date ........................................59

C.    Waiver of Conditions..............................................................................61
D.    Substantial Consummation.....................................................................61
E.    Effect of Failure of a Condition............................................................61

**ARTICLE X.    MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN............62**
A.    Modification and Amendments...............................................................62
B.    Effect of Confirmation on Modifications...............................................62
C.    Revocation or Withdrawal of This Plan.................................................62

**ARTICLE XI.    RETENTION OF JURISDICTION** ........................................................**62**

**ARTICLE XII.  MISCELLANEOUS PROVISIONS**........................................................**65**
A.    Immediate Binding Effect.......................................................................65
B.    Additional Documents.............................................................................65
C.    Reservation of Rights..............................................................................66
D.    Successors and Assigns...........................................................................66
E.    Service of Documents..............................................................................66
F.    Term of Injunctions or Stays...................................................................67
G.    Entire Agreement.....................................................................................68
H.    Exhibits.....................................................................................................68
I.    Deemed Acts.............................................................................................68
J.    Nonseverability of Plan Provisions ........................................................68
K.    Votes Solicited in Good Faith.................................................................68
L.    Request for Expedited Determination of Taxes......................................69
M.    Closing of Chapter 11 Cases...................................................................69

## INTRODUCTION

Foresight Energy LP, Foresight Energy GP LLC, Foresight Energy LLC, Foresight Energy Employee Services Corporation, Foresight Energy Services LLC, Foresight Receivables LLC, Sugar Camp Energy, LLC, Macoupin Energy LLC, Williamson Energy, LLC, Foresight Coal Sales LLC, Tanner Energy LLC, Sitran LLC, Seneca Rebuild LLC, Oeneus LLC, Adena Resources, LLC, Hillsboro Transport LLC, American Century Transport LLC, Akin Energy LLC, American Century Mineral LLC, Foresight Energy Finance Corporation, Foresight Energy Labor LLC, Viking Mining LLC, M-Class Mining, LLC, MaRyan Mining LLC, Mach Mining, LLC, Logan Mining LLC, LD Labor Company LLC, Coal Field Repair Services LLC, Coal Field Construction Company LLC, Hillsboro Energy LLC and Patton Mining LLC (each, a "*Debtor*" and, collectively, the "*Debtors*") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. Capitalized terms used herein shall have the meanings set forth in Article I.A.

Holders of Claims and Interests may refer to the Disclosure Statement for a description of the Debtors' history, businesses, assets, results of operations, historical financial information and projections of future operations, as well as a summary and description of the Plan and the Restructuring Transaction contemplated thereby. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

**A.**     *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.     "*Ad Hoc Crossover Group*" means the ad hoc group comprising certain Consenting Lenders represented by Milbank LLP and Perella Weinberg Partners LP.

2.     "*Ad Hoc First Lien Group*" means the ad hoc group comprising certain Consenting Lenders represented by Akin Gump Strauss Hauer & Feld LLP and Lazard Frères & Co. LLC.

3.     "*Ad Hoc Groups*" means the Ad Hoc Crossover Group and the Ad Hoc First Lien Groups.

4.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to section 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the

businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) the Restructuring Expenses; and (d) the Statutory Fees.

5.        "*Administrative Claims Bar Date*" means the first Business Day that is at least thirty (30) calendar days following the Effective Date, except as specifically set forth in the Plan or a Final Order; provided, however, pursuant to the Bar Date Order, Administrative Claims related to Executory Contracts or Unexpired Leases that are rejected by the Debtors are required to be filed by the date that is twenty-one (21) calendar days following entry of the relevant order or deemed effective date of the rejection of such rejected Executory Contract or Unexpired Lease.

6.        "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.        "*Affiliate Agreements*" means the Debtors' agreements with (a) Murray Energy, including, without limitation, Murray American Coal, Inc., American Energy Corporation, Consolidated Land Company, and The American Coal Sales Company, (b) Javelin Global Commodities (UK) Ltd, (c) Foresight Reserves, and (d) any other affiliated entity or entity that the Debtors has previously considered a related party, including, without limitation, Natural Resource Partners LP and its direct and indirect subsidiaries, including HOD, LLC, WPP, LLC, Williamson Transport, LLC and Williamson Track, LLC.

8.        "*Allowed*" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim against any Debtor that (i) has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time, as liquidated in amount and not disputed or contingent, and for which no contrary or superseding Proof of Claim has been timely Filed, (ii) is evidenced by a Proof of Claim Filed by the Bar Date or a request for payment of an Administrative Claim, (iii) has been expressly allowed by Final Order or under the Plan, or (iv) has been compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court or Article VI of the Plan; provided, however, a Claim shall be considered Allowed under clause (i) or (ii) above only if and to the extent that with respect to such Claim no objection to the allowance thereof is Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or such an objection is so Filed and the Claim has been allowed by a Final Order; provided, further, Claims allowed solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed" for any other purpose under the Plan or otherwise, except if and to the extent otherwise determined to be Allowed as provided herein. Unless otherwise specified under the Plan, under the Bankruptcy Code, by order of the Bankruptcy Court, or as otherwise agreed by the Debtors, Allowed Claims shall not, for any purpose under the Plan, include any interest, costs, fees or charges on such Claims from and after the Petition Date. "*Allow*" and "*Allowing*" have correlative meanings.

9.        "*Avoidance Actions*" means any and all actual or potential Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including actions or remedies under sections 502, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553(b) of the Bankruptcy Code or under similar or related state, federal or foreign statutes or common law, including fraudulent transfer laws.

10.    "*Backstop Parties*" means the DIP Backstop Parties and the Exit Facility Backstop Parties.

11.    "*Ballot*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims and Interests entitled to vote may, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received by the Notice and Claims Agent on or before the Voting Deadline.

12.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as may be amended from time to time.

13.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Missouri, Eastern Division, having jurisdiction over the Chapter 11 Cases.

14.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, and the general, local and chambers rules of the Bankruptcy Court.

15.    "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court pursuant to the Plan, the Bar Date Order or other Final Order for filing Proofs of Claim in the Chapter 11 Cases, as the context may require.

16.    "*Bar Date Order*" means any Final Order of the Bankruptcy Court setting deadline(s) for filing Proofs of Claim in the Chapter 11 Cases, as the context may require.

17.    "*Benefit Plans*" means (i) each "employee benefit plan," as defined in section 3(3) of the Employee Retirement Income Security Act of 1974 and (ii) each other pension, retirement, supplemental retirement, bonus, incentive, equity or equity-based, health, life, disability, group insurance, vacation, holiday, and fringe benefit plan, program, contract, or arrangement, in each case whether written or unwritten, maintained, contributed to, or required to be contributed to, by the Debtors for the benefit of any of their current or former employees or independent contractors and existing as of the Petition Date.

18.    "*Business Day*" means any day other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

19.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

20.    "*Causes of Action*" means any action, Claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, at law or in equity or pursuant to any other theory of law. For the

3

avoidance of doubt, "Causes of Action" include: (a) any right of setoff, counterclaim or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including Avoidance Actions); and (d) any Claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

21.     "*Certified Eligible Holder*" means a Holder that is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) or institutional accredited investor (as defined in Regulation D under the Securities Act).

22.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case filed or to be filed for that Debtor under chapter 11 of the Bankruptcy Code before the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases filed or to be filed for the Debtors before the Bankruptcy Court.

23.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

24.     "*Claims Objection Deadline*" means 11:59 p.m. (prevailing Central Time) on the 180th calendar day after the Effective Date, subject to further extensions and/or exceptions as may be ordered by the Bankruptcy Court upon the request of the Reorganized Debtors or GUC Administrator, as applicable.

25.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

26.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

27.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

28.     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

29.     "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Debtors, the Required First Lien Lenders and the Required Exit Facility Backstop Parties, and solely to the extent the economic treatment of the Second Lien Claims is directly affected, shall be in form and substance reasonably acceptable to the Required Second Lien Noteholders.

30.     "*Consenting First Lien Lenders*" means the Holders of First Lien Facility Claims that are party to the Restructuring Support Agreement, together with their respective successors

4

and permitted assigns and any subsequent Holders of First Lien Facility Claims that become
party to the Restructuring Support Agreement in accordance with the terms thereof.

31.     "*Consenting Lenders*" means the Consenting First Lien Lenders and the
Consenting Second Lien Noteholders.

32.     "*Consenting Second Lien Noteholders*" means the Holders of Second Lien Notes
Claims that are party to the Restructuring Support Agreement, together with their respective
successors and permitted assigns and any subsequent Holders of Second Lien Notes Claims that
become party to the Restructuring Support Agreement in accordance with the terms thereof.

33.     "*Creditors' Committee*" means the statutory committee of unsecured creditors
appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the
Bankruptcy Code, as the same may be reconstituted from time to time.

34.     "*Cure Claim*" means a monetary Claim based upon the Debtors' defaults under
any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the
Debtors pursuant to section 365 of the Bankruptcy Code.

35.     "*Debtor Release*" means the releases, waivers, discharges, and acquittals deemed
to be provided pursuant to Article VIII.C.

36.     "*Debtors*" means, collectively:  Foresight Energy LP, Foresight Energy GP LLC,
Foresight Energy LLC, Foresight Energy Employee Services Corporation, Foresight Energy
Services LLC, Foresight Receivables LLC, Sugar Camp Energy, LLC, Macoupin Energy LLC,
Williamson Energy, LLC, Foresight Coal Sales LLC, Tanner Energy LLC, Sitran LLC, Seneca
Rebuild LLC, Oeneus LLC, Adena Resources, LLC, Hillsboro Transport LLC, American
Century Transport LLC, Akin Energy LLC, American Century Mineral LLC, Foresight Energy
Finance Corporation, Foresight Energy Labor LLC, Viking Mining LLC, M-Class Mining, LLC,
MaRyan Mining LLC, Mach Mining, LLC, Logan Mining LLC, LD Labor Company LLC, Coal
Field Repair Services LLC, Coal Field Construction Company LLC, Hillsboro Energy LLC and
Patton Mining LLC.

37.     "*DIP Agent*" means Cortland Capital Market Services LLC as the administrative
agent and collateral agent for the DIP Facility, and any successors thereto.

38.     "*DIP Backstop Agreement*" means Section 5.03 of the Restructuring Support
Agreement (including by reference the related provisions of the Restructuring Support
Agreement), pursuant to which the DIP Backstop Parties agreed to backstop the DIP New
Money Commitments on a several, and not joint and several, basis.

39.     "*DIP Backstop Parties*" means the members of the Ad Hoc Groups that are set
forth on Exhibit A of the Restructuring Term Sheet attached as Exhibit B to the Restructuring
Support Agreement and that, pursuant to the DIP Backstop Agreement, agreed to backstop the
DIP New Money Commitments.

40.     "*DIP Claim*" means any Claim of the DIP Agent or any DIP Lender arising from,
under or in connection with the DIP Facility, including, without limitation, the DIP Loans, the

DIP Roll-Up Loans, the DIP Upfront Fee, the DIP Exit Premium, the DIP Put Option Premium and the DIP Delayed Draw Term Loan Commitment Fee.

41.    "*DIP Credit Agreement*" means that certain *Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement* dated as of March 11, 2020 (as may be amended, restated or otherwise modified from time to time) among, inter alia, Foresight Energy LLC, as borrower, each of the other Debtors, as guarantors, the DIP Agent and the DIP Lenders.

42.    "*DIP Delayed Draw Term Loan Commitment Fee*" means the "Delayed Draw Term Loan Commitment Fee" as defined in Section 2.09(e) of the DIP Credit Agreement.

43.    "*DIP Exit Premium*" means the "Exit Fee," as defined in Section 2.09(d) of the DIP Credit Agreement.

44.    "*DIP Facility*" means the senior secured super-priority debtor-in-possession credit facility, consisting of the DIP Loans and the DIP Roll-Up Loans, made available to the Debtors pursuant to the DIP Credit Agreement and the DIP Orders.

45.    "*DIP Lenders*" means the DIP New Money Lenders and the DIP Roll-Up Lenders.

46.    "*DIP Loans*" means the loans advanced under the DIP Facility.

47.    "*DIP New Money Commitments*" means the commitments to fund a new money multi-draw term loan facility in an aggregate principal amount up to $100,000,000.00 under the DIP Facility.

48.    "*DIP New Money Lenders*" means certain members of the Ad Hoc Groups and other Consenting First Lien Lenders and Consenting Second Lien Noteholders that provided the DIP New Money Commitments.

49.    "*DIP Orders*" means, collectively, the Interim DIP Order and Final DIP Order.

50.    "*DIP Put Option Premium*" means the put option premium described in Section 2.09(c) of the DIP Credit Agreement.

51.    "*DIP Upfront Fee*" means the upfront fee described in Section 2.09(b) of the DIP Credit Agreement.

52.    "*DIP Roll-Up Loans*" means the "Roll-Up Loans" as defined in the DIP Credit Agreement.

53.    "*DIP Roll-Up Lenders*" means the "Roll-Up Lenders" as defined in the DIP Credit Agreement.

54.    "*Disallowed*" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim against any Debtor that: (a) has been disallowed by a Final Order (including any Bar Date Order that is a Final Order), a settlement, or as provided in this Plan;

(b) has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time, at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely Filed; or (c) is not listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time, and as to which a Bar Date has been established but no Proof of Claim has been timely Filed.

55.     "*Disbursing Agent*" means Reorganized Foresight or any Person or Entity designated or retained by the Reorganized Debtors, in their sole discretion and without the need for any further order of the Bankruptcy Court, to serve as disbursing agent for Claims.

56.     "*Disclosure Statement*" means the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Foresight Energy LP and Its Affiliated Debtors, as may be further amended from time to time, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law, in form and substance acceptable to the Debtors and the Required First Lien Lenders.

57.     "*Disputed*" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim against any Debtor that is neither Allowed nor Disallowed.

58.     "*Disputed GUC Reserve*" has the meaning set forth in Article VII.E.2**Error! Reference source not found.**.

59.     "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions under the Plan, which date shall be (a) ten (10) Business Days after entry of the Confirmation Order or (b) such other date as designated by an order of the Bankruptcy Court.

60.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors or under which any of the Debtors or their directors and officers are beneficiaries, for current or former directors', managers' and officers' liability.

61.     "*Effective Date*" means the date on which all conditions precedent specified in Article IX.B of the Plan have been satisfied (or waived in accordance with Article IX.C of the Plan).

62.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

63.     "*Equityholders Agreement*" means the agreement to be entered into (or as may be deemed entered into, as applicable) by Reorganized Foresight and the holders of New Common Equity on the Effective Date that will govern certain matters related to the internal affairs and governance of Reorganized Foresight and which, for the avoidance of doubt, may be Reorganized Foresight's limited liability company agreement if Reorganized Foresight is a limited liability company.

64.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

65.    "*Exculpated Claim*" means any Released Claim, Cause of Action or any claim related to any act or omission derived from, based upon, related to or arising from the Debtors' in or out-of-court prepetition restructuring efforts, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or Filing of the Disclosure Statement, the Plan or any contract, instrument, release or other agreement or document (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with any of the foregoing, including: (a) the Plan, (b) the Disclosure Statement, (c) the Confirmation Order, (d) the DIP Facility, (e) the Exit Facility Credit Agreement, (f) the Exit Facility Backstop Agreement, (g) the New Organizational Documents, (h) the Restructuring Support Agreement (including the DIP Backstop Agreement), (i) the Management Incentive Plan, and (j) any Schedule of Rejected Executory Contracts and Unexpired Leases (items (d) through (j) hereof, as may be amended from time to time, the "*Restructuring Documents*"), or any other agreement or ancillary document contemplated by the Plan; provided, however, the foregoing shall not be deemed to release, affect or limit any of the rights and obligations of the Released Parties from, or exculpate the Released Parties with respect to, any of the Released Parties' obligations or covenants arising under the Restructuring Documents and any contracts, instruments, releases and other agreements or documents delivered in connection with or contemplated by, the foregoing.

66.    "*Exculpation*" means the exculpation set forth in Article VIII.E of the Plan.

67.    "*Executory Contract*" means a contract to which a Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, including any modifications, amendments, addendums or supplements thereto or restatements thereof.

68.    "*Existing Intercreditor Agreement*" means that certain Collateral Trust Agreement, dated as of March 28, 2017 (as amended, modified, restated, or supplemented from time to time) among Foresight Energy LLC, the Grantors (as defined in the Existing Intercreditor Agreement) from time to time party thereto, The Huntington National Bank, as administrative agent, Wilmington Trust, National Association, as trustee, and Lord Securities Corporation, as collateral trustee.

69.    "*Exit Facility*" means a new senior secured first-priority term loan facility in the aggregate principal amount of up to $225,000,000.00 to be issued by the Reorganized Debtors on or immediately after the Effective Date pursuant to the Exit Facility Credit Agreement, as described in further detail in Article IV.D.2.

70.    "*Exit Facility Agent*" means the administrative agent and collateral agent under the Exit Facility Credit Agreement and the other Exit Facility Documents.

71.     "*Exit Facility Backstop Agreement*" means that certain commitment agreement by and among the Exit Facility Backstop Parties and FELP (on behalf of itself and the other Debtors) (as amended, modified and/or supplemented from time to time in accordance with the terms therein), to be entered into prior to the hearing of the Debtors' motion seeking the Bankruptcy Court's approval of the Disclosure Statement, pursuant to which the Exit Facility Backstop Parties will agree to backstop the Exit Facility on a several, and not joint and several, basis.

72.     "*Exit Facility Backstop Parties*" means the members of the Ad Hoc Groups that are signatories to the Exit Facility Backstop Agreement and make commitments thereunder.

73.     "*Exit Facility Commitments*" means the backstop and direct commitments of the Exit Facility Backstop Parties under the Exit Facility Backstop Agreement.

74.     "*Exit Facility Credit Agreement*" means that certain credit agreement to be entered into on the Effective Date by and among certain of the Reorganized Debtors, as borrowers, the Exit Facility Agent, and the other parties thereto, which shall be in form and substance acceptable to the Debtors, the Exit Facility Agent, the Required First Lien Lenders, and the Required Exit Facility Backstop Parties.

75.     "*Exit Facility Direct Debt Commitment*" has the meaning set forth in Article IV.D.2.b.

76.     "*Exit Facility Direct Debt Placement*" has the meaning set forth in Article IV.D.2.b.

77.     "*Exit Facility Direct Debt Placement Amount*" has the meaning set forth in Article IV.D.2.b.

78.     "*Exit Facility Documents*" means, collectively, the Exit Facility Credit Agreement and any related amendments, supplements, ancillary agreements, pledges, collateral agreements, mortgages, deeds of trust, and other documents or instruments to be executed or delivered in connection with the Exit Facility, which shall be in form and substance acceptable to the Debtors, the Exit Facility Agent, the Required First Lien Lenders, and the Required Exit Facility Backstop Parties, and consistent with the terms set forth in Article IV.D.2 and the Restructuring Support Agreement.

79.     "*Exit Facility Equity Component*" means the New Common Stock issued to the Exit Facility Lenders in an aggregate amount of 9.90% of the New Common Stock issued and outstanding on the Effective Date, subject to dilution for the Management Incentive Plan.

80.     "*Exit Facility Equity Issuances*" means, collectively, (a) the Exit Facility Equity Component and (b) the Exit Facility Put Option Premium.

81.     "*Exit Facility First Lien Backstop Parties*" has the meaning set forth in Article IV.D.2.b.

9

82.    "*Exit Facility First Lien Syndication*" has the meaning set forth in Article IV.D.2.b.

83.    "*Exit Facility Lenders*" means the lenders from time to time party to the Exit Facility Credit Agreement as lenders thereunder and their successors and permitted assigns.

84.    "*Exit Facility Loans*" means the loans advanced under the Exit Facility.

85.    "*Exit Facility Opportunity*" has the meaning set forth in Article IV.D.2.b.

86.    "*Exit Facility Put Option Premium*" means the premium issued to each Exit Backstop Party pursuant to the terms of the Exit Facility Backstop Agreement in an aggregate amount equal to 6.0% of the aggregate principal amount of the Exit Facility Commitments, which will be payable in the form of New Common Equity at a 35% discount to Stated Equity Value.

87.    "*Exit Facility Second Lien Backstop Parties*" has the meaning set forth in Article IV.D.2.b.

88.    "*Exit Facility Second Lien Syndication*" has the meaning set forth in Article IV.D.2.b.

89.    "*Exit Facility Syndication Amount*" has the meaning set forth in Article IV.D.2.b.

90.    "*FELP*" means Foresight Energy LP, a limited partnership formed under the Laws of Delaware, whose registered office is at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

91.    "*FELP Common LP Units*" means the common units representing FELP's limited partnership interests.

92.    "*FELP Subordinated LP Units*" means the subordinated units representing FELP's limited partnership interests, which are not entitled to receive a distribution from FELP's operating surplus until the Holders of FELP Common LP Units have received a certain minimum quarterly distribution from FELP's operating surplus.

93.    "*File*," "*Filed*," or "*Filing*" means file, filed or filing in the Chapter 11 Cases with the Bankruptcy Court.

94.    "*Final DIP Order*" means the order entered by the Bankruptcy Court approving the DIP Facility on a final basis, as such order may be amended from time to time, in form and substance acceptable to the Required DIP Backstop Lenders.

95.    "*Final Order*" means an order, ruling or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, stayed, modified, amended or vacated,

and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; _provided_, _however_, the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order, shall not cause an order not to be a Final Order.

96.    "***First Lien Agents***" means the First Lien Facilities Administrative Agent and the First Lien Term Administrative Agent.

97.    "***First Lien Credit Agreement***" means that certain credit and guaranty agreement, dated as of March 28, 2017, by and among (i) Foresight Energy LLC, as the borrower, (ii) FELP and certain subsidiaries of Foresight Energy LLC, as guarantors, (iii) The Huntington National Bank, as facilities administrative agent, (iv) Lord Securities Corporation, as term administrative agent, (v) the other lenders party thereto, (vi) Goldman Sachs Lending Partners LLC, The Huntington National Bank, Deutsche Bank Securities Inc., and Citigroup Global Markets Inc., as joint lead arrangers and joint bookrunners, and (vii) Goldman Sachs Lending Partners LLC, as syndication agent, as such agreement may be amended, supplemented, or otherwise modified from time to time.

98.    "***First Lien Credit Agreement Documents***" means the First Lien Credit Agreement, each other Loan Document (as defined in the First Lien Credit Agreement), and all other agreements, documents, and instruments delivered or entered into in connection therewith.

99.    "***First Lien Facilities Administrative Agent***" means The Huntington National Bank, in its capacity as facilities administrative agent under the First Lien Credit Agreement, and any successors thereto.

100.    "***First Lien Facility Claims***" means all Claims against any Debtor arising from, based upon, or relating to the First Lien Credit Agreement Documents; _provided_, for the avoidance of doubt, any First Lien Facility Claims that are converted into, or refinanced by, the DIP Roll-Up Loans shall no longer be First Lien Facility Claims.

101.    "***First Lien Lenders***" means the lenders from time to time party to the First Lien Credit Agreement as lenders thereunder and their successors and permitted assigns.

102.    "***First Lien Term Administrative Agent***" means Lord Securities Corporation, in its capacity as term administrative agent under the First Lien Credit Agreement, and any successors thereto.

103.    "**Foresight Reserves**" means Foresight Reserves, LP and its direct and indirect subsidiaries, including, without limitation, New River Royalty, LLC, Ruger Coal Company, LLC, and Colt LLC and, for the avoidance of doubt, excluding the Debtors.

104.    "**Full Equity Dilution**" means dilution by New Common Equity and any other equity interests in Reorganized Foresight issued pursuant to the Management Incentive Plan, the DIP Put Option Premium, the DIP Exit Premium, and the Exit Facility Equity Issuances.

105.    "**General Unsecured Claim**" means any Claim against any Debtor that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and that is not: (a) a DIP Claim; (b) an Administrative Claim or Statutory Fee; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Other Secured Claim; (f) a First Lien Facility Claim; (g) a Second Lien Notes Claim; or (h) an Intercompany Claim. For the avoidance of doubt, General Unsecured Claims shall include all claims against the Debtors by Murray Energy, Foresight Reserves, and any other Non-Debtor Affiliate.

106.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

107.    "**GP LLC**" means Foresight Energy GP LLC, a limited liability company formed under the Laws of Delaware, with registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

108.    "**GUC Administrator**" means the Person or Entity appointed by the Debtors, with the reasonable consent of the Required First Lien Lenders, in accordance with Article VI.B of the Plan.

109.    "**GUC Administrator Account**" has the meaning set forth in Article IV.P.

110.    "**GUC Administrator Costs**" means the reasonable costs and expenses of the GUC Administrator, including reasonable professionals' fees and expenses, which, for the avoidance of doubt, shall be paid by the Debtors or Reorganized Debtors in an aggregate amount not to exceed $250,000.

111.    "**GUC Cash Pool**" means: (a) $[_____] of Cash if, with respect to each of the Debtors, Class 5 either (i) votes as a Class to accept the Plan or (ii) is deemed eliminated pursuant to Article III.H of the Plan; and (b) otherwise $[_____] of Cash.

112.    "**GUC Cash Pool Account**" has the meaning set forth in Article IV.O.

113.    "**GUC Distribution Date**" means, solely with respect to General Unsecured Claims, the date or dates selected by the GUC Administrator, in its sole discretion, upon which distributions to Holders of Allowed General Unsecured Claims entitled to receive distributions under this Plan shall occur.

114.    "**Holder**" means any Entity holding a Claim or Interest.

115.   "*IDRs*" means the incentive distribution rights representing the right to receive an increasing percentage of quarterly distributions from the Debtors' operating surplus after certain minimum quarterly distribution and target distribution levels have been achieved.

116.   "*Impaired*" means, when used in reference to a Claim or an Interest, a Claim or an Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

117.   "*Initial Distribution Date*" means a Business Day selected by the Reorganized Debtors in their sole discretion that is on or as soon as reasonably practicable after the Effective Date.

118.   "*Intercompany Claim*" means any Claim against a Debtor that is held by any other Debtor; provided, for the avoidance of doubt, the Intercompany Claims shall not include any Claims between and among any of the Debtors, on the one hand, and Murray Energy, Foresight Reserves, or any other Non-Debtor Affiliate, on the other hand.

119.   "*Intercompany Interest*" means an Interest in one Debtor held by another Debtor; provided, for the avoidance of doubt, GP LLC's interest as general partner of FELP is not an Intercompany Interest.

120.   "*Interests*" means the ordinary shares (or its equivalent), limited liability company interests and any other equity, ownership or profits interests in any Debtor and options, warrants, rights or other securities or agreements to acquire the ordinary shares (or its equivalent), limited liability company interests or other equity, ownership or profits interests in any Debtor, including, for the avoidance of doubt, the FELP Common LP Units, the FELP Subordinated LP Units, and the IDRs.

121.   "**Interim DIP Order**" means the Interim Order (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief [ECF No. 74].

122.   "*IRS*" means the United States Internal Revenue Service.

123.   "*Joint Venture*" means any joint venture Entity, whether a company, unincorporated firm, undertaking, joint venture, association, partnership or any other entity.

124.   "*Liabilities*" means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, recovery actions, Causes of Action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

125.   "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

126.   "*Management Incentive Plan*" has the meaning set forth in Article IV.N.

127.    "*Murray Energy*" means Murray Energy Corporation and its direct and indirect subsidiaries, including Murray Metallurgical Coal Holdings, LLC and its direct and indirect subsidiaries, and excluding the Debtors.

128.    "*New Boards*" means, collectively, the initial board of directors, members or managers, as applicable, of each Reorganized Debtor, as applicable.

129.    "*New Common Equity*" means the new equity interests in Reorganized Foresight to be issued upon the Effective Date.

130.    "*New Organizational Documents*" means the form of the certificates or articles of formation or incorporation, any Equityholders Agreement or other operating agreement, any bylaws, any registration rights agreements, and such other applicable formation documents of each of the Reorganized Debtors, which shall be consistent with the terms of the Restructuring Support Agreement and determined by the Required First Lien Lenders, with the reasonable consent of the Required Second Lien Noteholders. The New Organizational Documents or a representative form thereof shall be included in the Plan Supplement.

131.    "*Non-Debtor Affiliate*" means any Affiliate of a Debtor that is not a Debtor.

132.    "*Notice and Claims Agent*" means Prime Clerk LLC.

133.    "*Other Priority Claim*" means any Allowed Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

134.    "*Other Secured Claim*" means any Secured Claim against any Debtor that is not a DIP Claim, a First Lien Facility Claim, or a Second Lien Notes Claim.

135.    "*Periodic Distribution Date*" means, with respect to all Claims other than General Unsecured Claims, as applicable, (a) the Initial Distribution Date and (b) thereafter, such Business Days selected by the Reorganized Debtors in their reasonable discretion, which shall be no less frequent than once every four (4) months.

136.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

137.    "*Petition Date*" means the date on which a Debtor commenced its Chapter 11 Case.

138.    "*Plan*" means this *Joint Chapter 11 Plan of Reorganization of Foresight Energy LP and Its Affiliated Debtors*, as the same may be further amended, supplemented or modified from time to time in accordance with the terms hereof and the terms of the Restructuring Support Agreement, including the Plan Supplement and all exhibits, supplements, appendices and schedules thereto, which shall be in form and substance acceptable to each of the Debtors, the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the Required Second Lien Noteholders.

139.    "*Plan Supplement*" means one or more supplemental appendixes to the Plan containing, among other things, substantially final forms of documents, schedules, and exhibits to the Plan to be Filed with the Bankruptcy Court, including, but not limited to, the following: (a) the Exit Facility Backstop Agreement; (b) the New Organizational Documents, (c) the identity of the members of the New Boards, (d) the Management Incentive Plan, (e) any Schedule of Rejected Executory Contracts and Unexpired Leases, (f) the key terms of any renegotiated Affiliate Agreements, and (g) the Exit Facility Credit Agreement; provided, however, through the Effective Date, the Debtors shall have the right to amend and supplement the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the Restructuring Support Agreement. The Plan Supplement shall be consistent with the Restructuring Support Agreement and satisfactory to the Debtors, the Required First Lien Lenders, and, solely with respect to the economic treatment on account of the Second Lien Notes Claims, the Required Second Lien Noteholders. The Debtors shall File the Plan Supplement with the Bankruptcy Court not later than seven (7) calendar days prior to the Confirmation Hearing.

140.    "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

141.    "*Priority Tax Claim*" means any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

142.    "*Pro Rata*" means the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

143.    "*Professional*" means an Entity employed pursuant to a Bankruptcy Court order in accordance with section 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to section 327, 328, 329, 330 or 331 of the Bankruptcy Code.

144.    "*Professional Fee Claim*" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

145.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Retained Professionals in the Chapter 11 Cases.

146.    "*Professional Fee Reserve Amount*" means the aggregate Professional Fee Claims through the Effective Date as estimated by the Retained Professionals in accordance with Article II.B.3 hereof.

147.    "*Proof of Claim*" means a proof of Claim timely Filed against any of the Debtors in the Chapter 11 Cases.

148.    "*Reinstated*" or "*Reinstatement*" means, unless the Plan specifies a particular method pursuant to which a Claim or Interest shall be reinstated, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

149.    "*Related Persons*" means with respect to an Entity, that Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), managed or advised accounts, funds or other entities, affiliated investment funds or investment vehicles, investment advisors, sub-advisors or managers, predecessors, successors and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners (including both general and limited partners), attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

150.    "*Released Claims*" has the meaning set forth in Article VIII.C of the Plan.

151.    "*Released Parties*" means: (i) the Debtors and the Reorganized Debtors; (ii) the Debtors' and the Reorganized Debtors' respective boards of directors and the members thereof; (iii) the DIP Agent; (iv) the DIP Lenders; (v) the First Lien Agents; (vi) the Consenting First Lien Lenders; (vii) the Consenting Second Lien Noteholders; (viii) the Backstop Parties; (ix) the Ad Hoc First Lien Group; (x) the Ad Hoc Crossover Group; (xi) Javelin Global Commodities (UK) Ltd.; (xii) Uniper Global Commodities UK Limited; and (xiii) with respect to each of the foregoing Entities in clauses (i) through (xii), each such Entity and its Related Persons.

152.    "*Releasing Parties*" means: (a) any Released Party; (b) all Holders of Claims or Interests that are deemed to accept the Plan; (c) all Holders of Claims or Interests who either (i) vote to accept or (ii) receive or are deemed to receive a Ballot but abstain from voting on the Plan and do not elect on their Ballot to opt-out of the releases granted pursuant to Article VIII.D; (d) all Holders of Claims or Interests entitled to vote who vote to reject the Plan that do not elect on their Ballot to opt-out of the release granted pursuant to Article VIII.D; (e) Holders of Interests who do not opt-out of the release granted pursuant to Article VIII.D; (f) all other Holders of Claims or Interests to the extent permitted by law; and (g) with respect to the foregoing clauses (a) through (f), each such Entity and its Related Persons.

153.    "*Reorganized Debtors*" means all Debtors as reorganized pursuant to the Confirmation Order upon or after the Effective Date pursuant to the Plan, including any transferee thereof, by entity or asset transfer, merger, consolidation or otherwise, including in connection with any Restructuring Transaction, including, without limitation, Reorganized Foresight.

154.    "*Reorganized Foresight*" means FELP (or any other holding company, ultimate parent entity, or successor in interest to FELP by entity or asset transfer, merger, consolidation or otherwise, including pursuant to any Restructuring Transaction, which Entity may, for the avoidance of doubt, be a subsidiary of FELP) as reorganized pursuant to the Confirmation Order upon the Effective Date.

155.    "*Representatives*" means, with respect to any Entity, any successor, officer, director, partner (including both general and limited partners), shareholder, manager, member, management company, investment manager, Affiliate, employee, agent, attorney, advisor, investment banker, financial advisor, investment advisor, accountant or other Professional of such Entity and committee of which such Entity is a member, in each case, solely in such capacity, serving on or after the Petition Date.

156.    "*Required DIP Backstop Lenders*" means DIP Backstop Parties that, pursuant to the DIP Backstop Agreement, agreed to backstop more than 60% of the total portion of the DIP New Money Commitments backstopped by all DIP Backstop Parties.

157.    "*Required Exit Facility Backstop Parties*" means Exit Facility Backstop Parties that, pursuant to the Exit Facility Backstop Agreement, agreed to backstop more than 60% of the total portion of the Exit Facility backstopped by all Exit Facility Backstop Parties.

158.    "*Required First Lien Lenders*" means, as of the date of determination, Consenting First Lien Lenders holding in excess of 60% of the aggregate principal amount of First Lien Facility Claims held by all Consenting First Lien Lenders.

159.    "*Required Second Lien Noteholders*" means, as of the date of determination, Consenting Second Lien Noteholders holding in excess of 50% of the aggregate principal amount of Second Lien Notes Claims held by all Consenting Second Lien Noteholders.

160.    "*Restructuring Documents*" has the meaning set forth in the definition of Exculpated Claim, above.

161.    "*Restructuring Expenses*" means all reasonable and documented fees, expenses and disbursements of the DIP Agent, the First Lien Agents, the Ad Hoc First Lien Group, and the Ad Hoc Crossover Group that are required to be paid under or pursuant to the DIP Credit Agreement, the DIP Orders, the First Lien Credit Agreement, or the Restructuring Support Agreement, which fees and expenses in respect of professionals shall be limited to the fees, expenses and disbursements of: (a) for the DIP Agent, (i) Ropes & Gray LLP, as lead counsel, and (ii) one local counsel in each jurisdiction where local counsel is required; (b) for the First Lien Facilities Administrative Agent, (i) Conway Mackenzie, Inc., as financial advisor, (ii) Buchanan Ingersoll & Rooney PC, as lead counsel, and (iii) one local counsel in each jurisdiction where local counsel is required; (c) for the First Lien Term Administrative Agent, (i) one financial advisor, (ii) Sullivan & Worcester LLP, as lead counsel, and (iii) one local counsel in each jurisdiction where local counsel is required; (d) for the Ad Hoc First Lien Group, (i) Lazard Frères & Co. LLC, as financial advisor, (ii) Akin Gump Strauss Hauer & Feld LLP, as lead counsel, and (iii) Thompson Coburn LLP, as local counsel; and (e) for the Ad Hoc Crossover Group, (i) Perella Weinberg Partners LP, as financial advisor, (ii) Milbank LLP, as lead counsel, and (iii) Bryan Cave Leighton Paisner LLP, as local counsel.

162.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of March 10, 2020, including all exhibits thereto, by and among the Debtors and the Consenting Lenders, as may be amended, amended and restated, supplemented or modified from time to time in accordance with the terms thereof, a copy of which, without

individual holdings shown on the signature pages, shall be attached as Exhibit B to the Disclosure Statement.

163.    "*Restructuring Transactions*" has the meaning set forth in Article IV.B of the Plan.

164.    "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

165.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs that will be Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

166.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means any schedule (including any amendments or modifications thereto) of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant hereto, as set forth in the Plan Supplement, as amended by the Debtors from time to time prior to the Confirmation Date.

167.    "*Second Lien Indenture Trustee*" means Wilmington Trust, National Association, in its capacity as trustee under the Second Lien Notes Indenture, and any successors thereto.

168.    "*Second Lien Noteholders*" means the 11.50% Second Lien Senior Secured Notes due 2023 issued by Foresight Energy LLC and Foresight Energy Finance Corporation pursuant to the Second Lien Notes Indenture.

169.    "*Second Lien Notes Claims*" means all Claims against any Debtor arising from, based upon, or relating to the Second Lien Notes Indenture, including all Obligations (as defined in the Second Lien Indenture) arising under the Second Lien Notes Indenture and any costs that are reimbursable by any Company Party pursuant to the Second Lien Notes Indenture.

170.    "*Second Lien Notes Indenture*" means that certain indenture, dated as of March 28, 2017 (as amended, modified, restated, or supplemented from time to time), by and among Foresight Energy LLC and Foresight Energy Finance Corporation, as issuers, and the Second Lien Indenture Trustee.

171.    "*Second Lien Notes Indenture Documents*" means the Second Lien Notes Indenture Documents, each other Note Document (as defined in the Second Lien Notes Indenture), and all other agreements, documents, and instruments delivered or entered into in connection therewith.

172.    "*Secured*" means, when referring to a Claim, a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

173.    "*Secured Tax Claim*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

174.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

175.    "*Security*" has the meaning set forth in section 101(49) of the Bankruptcy Code.

176.    "*Stated Equity Value*" means the equity value of Reorganized Foresight as set forth in the valuation analysis attached to the Disclosure Statement as Exhibit D.

177.    "*Statutory Fees*" means all fees for which the Debtors are obligated pursuant to 28 U.S.C. § 1930(a)(6), together with interest, if any, pursuant to 31 U.S.C. § 3717.

178.    "*Tax*" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value-added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group or being a party to any agreement or arrangement whereby liability for payment of any such amount is determined by reference to the liability of any other Entity.

179.    "*Taxing Authority*" means any governmental authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any tax.

180.    "*Third-Party Release*" means the releases, waivers, discharges, and acquittals deemed to be provided pursuant to Article VIII.D.

181.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors (or the Disbursing Agent, as the case may be) of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request (or the Disbursing Agent's request, as the case may be), for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

182.    *"**Unexpired Lease**"* means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

183.    *"**Unimpaired**"* means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

184.    *"**Unliquidated**"* means, when used in reference to a Claim, any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

185.    *"**U.S. Trustee**"* means the United States Trustee for the Eastern District of Missouri (Region 13).

186.    *"**Voting Deadline**"* means June 16, 2020 at 4:00 p.m., prevailing Central Time.

**B.    *Rules of Interpretation***

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (11) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (12) any effectuating provisions may be interpreted by the Reorganized Debtors in a manner consistent with the overall purpose and intent of the Plan, all without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control in all respects; (13) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as

reasonably practicable thereafter; and (14) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases.

**C.    *Computation of Time***

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**D.    *Governing Law***

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York (except for section 5-1401 and 5-1402 of the General Obligations Law of the State of New York), without giving effect to the principles of conflicts of law, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, corporate, partnership or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

**E.    *Reference to Monetary Figures***

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

**F.    *Reference to the Debtors or the Reorganized Debtors***

Except as otherwise specifically provided in the Plan, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**G.    *Controlling Document***

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless otherwise provided in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

**ARTICLE II.**
**ADMINISTRATIVE, DIP FACILITY,**
**PRIORITY CLAIMS, AND STATUTORY FEES**

All Claims and Interests, except Administrative Claims, DIP Claims, and Priority Tax Claims are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the

Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

## A.    *Administrative Claims*

Except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the Allowed amount of such Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not due then, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 calendar days after the date on which an order Allowing such Administrative Claim becomes a Final Order or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claims; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided in the Plan or a Final Order to the contrary, all requests for payment of an Administrative Claim that accrued on or before the Effective Date must be Filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date; provided, however, pursuant to the Bar Date Order, Administrative Claims related to Executory Contracts or Unexpired Leases that have been rejected by the Debtors are required to be Filed the date that is twenty-one (21) calendar days following entry of the relevant order or deemed effective date of the rejection of such rejected Executory Contract or Unexpired Lease. Holders of Administrative Claims that are, based on the preceding sentence, required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

## B.    *Professional Fee Claims*

### 1.    **Final Fee Applications**

All final requests for Professional Fee Claims shall be Filed no later than forty-five (45) calendar days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court. For the avoidance of doubt, any fees and expenses incurred by the professionals to the Ad Hoc Groups, the DIP Agent or the First Lien Agents shall not be considered Professional Fee Claims, and any

such amounts shall be paid in accordance with the Restructuring Support Agreement, the DIP Orders and the Plan, as applicable.

### 2.    Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

### 3.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Professional Fee Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; provided that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

### 4.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall pay in Cash the reasonable legal fees and expenses incurred by such Reorganized Debtor after the Effective Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### C.    DIP Claims

The DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement as of the Effective Date (including any unpaid accrued interest and unpaid fees, expenses and other obligations under the DIP Credit Agreement as of the Effective Date). In full satisfaction, settlement, discharge and release of, and in exchange for, the DIP Claims, each Holder of an Allowed DIP Claim shall be indefeasibly paid and satisfied in full in Cash on the Effective Date except to the extent that a Holder of a DIP

Claim agrees to less favorable treatment; provided, however, except to the extent that a Holder entitled to the DIP Exit Premium or DIP Put Option Premium agrees to less favorable treatment, the DIP Exit Premium and DIP Put Option Premium will be indefeasibly paid and satisfied in full in New Common Equity on the Effective Date in accordance with the terms of the DIP Credit Agreement and DIP Orders; provided, however, upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement) or upon repayment of the DIP Loans in full and termination of all DIP New Money Commitments without the occurrence of the Effective Date, (i) the DIP Exit Premium shall be immediately payable in Cash in an amount equal to $2,000,000.00 and (ii) the DIP Put Option Premium shall be immediately payable in Cash in an amount equal to $10,000,000.00. Except as otherwise expressly provided in the DIP Credit Agreement or the DIP Orders, upon the indefeasible payment or satisfaction in full of the DIP Claims (other than any DIP Claims based on the Debtors' contingent obligations under the DIP Credit Agreement for which no claim has been made) in accordance with the terms of the Plan, all Liens and security interests granted to secure such DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order or approval of the Bankruptcy Court or any other Entity, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors to effectuate the foregoing. Notwithstanding the foregoing, the DIP Credit Agreement shall continue in effect solely for the purpose of preserving the DIP Agent's and the DIP Lenders' rights to any contingent or indemnification obligation of the Debtors pursuant and subject to the terms of the DIP Credit Agreement and DIP Orders.

**D.     *Priority Tax Claims***

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

**E.     *Statutory Fees***

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay all Statutory Fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee and File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code; provided, however, the GUC Administrator shall pay such fees and File such quarterly reports for any quarter in which, for the entirety of the quarter, all Claims that are not General Unsecured Claims have been resolved (either because they are Allowed Claims that have received the treatment provided under the Plan or because they have been Disallowed, expunged, or withdrawn).

24

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.**    *Classification in General*

All Claims and Interests, other than Administrative Claims (including Professional Fee Claims and Statutory Fees), DIP Claims, and Priority Tax Claims are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation and distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan, only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

**B.**    *Formation of Debtor Group for Convenience Only*

This Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, and the classifications set forth in Classes 1 through 8 shall be deemed to apply to each Debtor. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable.

**C.**    *Summary of Classification*

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims and Statutory Fees), DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Article III. All of the potential Classes for the Debtors are set forth herein. Certain of the

Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.H.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote *(Presumed to Accept)* |
| 3 | First Lien Facility Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote *(Presumed to Accept or Deemed to Reject)* |
| 7 | Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote *(Presumed to Accept or Deemed to Reject)* |
| 8 | Interests in FELP and Interests in GP LLC | Impaired | Not Entitled to Vote *(Deemed to Reject)* |

**D.    *Treatment of Claims and Interests***

The treatment and voting rights provided under the Plan to each Class for distribution purposes is specified below:

**1.    Class 1 – Other Secured Claims**

a.    *Classification*: Class 1 consists of all Allowed Other Secured Claims.

b.    *Treatment*: On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor, with the consent of the Required First Lien Lenders: (i) Reinstatement of its Claims; (ii) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, then such Allowed Other Secured Claim shall be paid in accordance with its terms); or (iii) the collateral securing its Allowed Other Secured Claim on the later of the Effective Date and the date such Other Secured Claims becomes an Allowed Claim or as soon thereafter as reasonable practicable.

c.   *Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan on account of such Claim.

2.   **Class 2 – Other Priority Claims**

a.   *Classification*: Class 2 consists of all Allowed Other Priority Claims.

b.   *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, such Allowed Other Priority Claim shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the Holder of an Allowed Other Priority Claim and the Debtors.

c.   *Voting*: Class 2 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan on account of such Claim.

3.   **Class 3 – First Lien Facility Claims**

a.   *Classification*: Class 3 consists of all Allowed First Lien Facility Claims.

b.   *Allowance*: The First Lien Facility Claims are hereby Allowed in an aggregate amount of not less than \$[●] against each of the Debtors that are obligors under the First Lien Credit Agreement and shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to Section 502(d) of the Bankruptcy Code; provided, however, such Allowed amount shall be reduced by the amount of the DIP Roll-Up Loans.

c.   *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the First Lien Facility Claims, each Holder of an Allowed First Lien Facility Claim shall receive its Pro Rata share of 92.75% of the New Common Equity, subject to the Full Equity Dilution.

d.   *Voting*: Class 3 is Impaired under the Plan. Each Holder of an Allowed First Lien Facility Claim is entitled to vote its Pro Rata share of the First Lien Facility Claims to accept or reject the Plan.

4.   <u>**Class 4 – Second Lien Notes Claims**</u>

    a.   <u>*Classification*</u>: Class 4 consists of all Allowed Second Lien Notes Claims.

    b.   <u>*Allowance*</u>: The Second Lien Notes Claims are hereby Allowed in an aggregate amount of not less than $[●] against each of the Debtors that are obligors under the Second Lien Notes Indenture and shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to Section 502(d) of the Bankruptcy Code.

    c.   <u>*Treatment*</u>: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Second Lien Notes Claims, each Holder of an Allowed Second Lien Notes Claim shall receive its Pro Rata share of 7.25% of the New Common Equity, subject to the Full Equity Dilution.

    d.   <u>*Voting*</u>: Class 4 is Impaired under the Plan. Each Holder of an Allowed Second Lien Notes Claim is entitled to vote its Pro Rata share of the Second Lien Notes Claims to accept or reject the Plan.

5.   <u>**Class 5 – General Unsecured Claims**</u>

    a.   <u>*Classification*</u>: Class 5 consists of all Allowed General Unsecured Claims.

    b.   <u>*Treatment*</u>:

        i.   *If Class 5 Accepts the Plan:* If Class 5 votes to accept the Plan as to all of the Debtors, then in full satisfaction, release and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive at its option, either: (a) its Pro Rata share of $[●] in Cash or (b) other less favorable treatment agreed to by the Holder.

        ii.   *If Class 5 Rejects the Plan:* If Class 5 votes to reject the Plan with respect to any Debtor, then in full satisfaction, release and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive at its option, either: (a) its Pro Rata share of $[●] in Cash or (b) other less favorable treatment agreed to by the Holder.

    c.   <u>*Voting*</u>: Class 5 is Impaired under the Plan. Each Holder of an Allowed General Unsecured Claim is entitled to vote its Pro Rata share of the General Unsecured Claims to accept or reject the Plan.

6.   <u>**Class 6 – Intercompany Claims**</u>

    a.   <u>*Classification*</u>: Class 6 consists of all Intercompany Claims.

b.   *Treatment*: On the Effective Date, each Intercompany Claim shall be Reinstated, cancelled, or otherwise settled to the extent determined to be appropriate by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required First Lien Lenders.

c.   *Voting*: Class 6 is either (i) Unimpaired, and each Holder of an Intercompany Claim is therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (b) Impaired, and each Holder of an Intercompany Claim is therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**7.   Class 7 – Intercompany Interests**

a.   *Classification*: Class 7 consists of all Intercompany Interests.

b.   *Treatment*: On the Effective Date, each Intercompany Interest shall be Reinstated, cancelled, or otherwise settled to the extent determined to be appropriate by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required First Lien Lenders.

c.   *Voting*: Class 7 is either (i) Unimpaired, and each Holder of an Intercompany Interest is therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (b) Impaired, and each Holder of an Intercompany Interest is therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**8.   Class 8 – Interests in FELP and Interests in GP LLC**

a.   *Classification*: Class 8 consists of all Interests in GP LLC and all Interests in FELP, including, for the avoidance of doubt, the FELP Common LP Units, the FELP Subordinated LP Units, and the IDRs.

b.   *Treatment*: On the Effective Date, all Interests in GP LLC and all Interests in FELP shall be cancelled and discharged and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and each Holder of such Interests shall not be entitled to receive any distribution under the Plan on account of such Interests.

c.   *Voting*: Class 8 is Impaired under the Plan. Each Holder of an Interest in FELP or an Interest in GP LLC is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each Holder of such Interest is not entitled to vote to accept or reject the Plan on account of such Interest.

**E.**     *Confirmation of Certain, But Not All Cases*

If the Plan is not confirmed as to one or more of the Debtors, but the other Debtors, with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders, determine to proceed with the Plan, then the Debtor(s) as to which the Plan may not be confirmed shall be severed from, and the Plan shall not apply to, such Debtor(s).

**F.**     *Special Provision Governing Unimpaired Claims*

Nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims or Interests, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Interests.

**G.**     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.  The Debtors reserve the right to modify the Plan in accordance with Article X.A of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**H.**     *Elimination of Vacant Classes*

Any Class of Claims that does not have a Holder of an Allowed Claim as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**I.**     *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims or Interests in such Class.

**J.**     *Subordinated Claims*

Unless otherwise expressly provided in the Plan or the Confirmation Order, the allowance, classification and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including the Existing Intercreditor Agreement, the First Lien Credit Agreement Documents, and the Second Lien Notes Indenture.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

### A.    *General Settlement of Claims and Interests*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. All distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

### B.    *Restructuring Transactions*

On or after the Confirmation Date, the Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors to reorganize certain Debtor entities in a different form, or to organize certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are organized, which restructuring may include one or more entity or asset transfers, mergers, consolidations, dispositions, liquidations, wind-downs, or dissolutions as may be determined by the Debtors, with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders, to be necessary or appropriate to result in substantially all or a part of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Debtors vesting in one or more surviving, resulting, or acquiring Entities (collectively, the "*Restructuring Transactions*"). The Restructuring Transactions shall be acceptable to the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders. In each case in which the surviving, resulting, or acquiring Entity in any such transaction is a successor to a Debtor, the Debtor or such surviving, resulting, or acquiring Entity shall satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor shall perform such obligations. The Restructuring Transactions may, at the election of the Debtors with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders, include a taxable transfer of substantially all or a part of the Debtors' assets or subsidiary entities of any Debtor to a newly-formed entity (or an Affiliate or subsidiary of such entity) formed and controlled by any Debtor or by some or all of the Holders of Claims, and to which entity such Claims have or have not been contributed, and, in each case, some or all of the New Common Equity (and/or other interests) issued to Holders of Claims pursuant to the Plan may comprise equity of (and/or other interests in) such new entity (or an Affiliate or

subsidiary of such entity). The fees, expenses, budgets, and any tax reporting obligations associated with the liquidation, wind-down, or dissolution of any entity in connection with the Restructuring Transactions shall be acceptable to each of the Debtors and the Required First Lien Lenders.

In effecting the Restructuring Transactions, the Debtors shall be permitted to (i) execute and deliver appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (ii) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (iii) file appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; (iv) take any such steps as may be necessary or desirable, in the Debtors reasonable determination, to effect the taxable transfer described in the prior paragraph; and (v) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

For purposes of effecting the Plan, none of the transactions contemplated in this Article IV.B shall constitute a change of control under any agreement, contract, or document of the Debtors.

All matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, or any corporate organization, limited liability company formation, entity or asset transfer, or related action required by or desirable to the Debtors or Reorganized Debtors in connection herewith, with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the reasonable consent of the Required Second Lien Noteholders, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the shareholders, partners, members, directors, or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the shareholders, partners, members, directors, or managers, as applicable, of the Debtors or Reorganized Debtors.

## C.    *Cancellation of Liens*

Upon the payment or other satisfaction of an Allowed Secured Claim, (1) the Holder of such Allowed Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any collateral or other property of the Debtors held by such Holder, and any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Secured Claim that may be required in order to terminate any Lien, related financing statements, mortgages, mechanic's liens, or *lis pendens*, or other similar interests or documents; and (2) the Debtors or Reorganized Debtors (as applicable) may file any termination statements, instruments of satisfaction, releases, or other related documents that the Debtors or Reorganized Debtors (as applicable) deem appropriate to evidence and/or effect the termination of any Lien, related financing statements, mortgages, mechanic's liens, or *lis pendens*, or other similar interests or documents, as applicable.

**D.**    *Sources of Consideration for Plan Distributions*

Consideration for Plan distributions shall come from:

**1.**    **Equity Interests in Reorganized Foresight**

On the Effective Date, all FELP Common LP Units, FELP Subordinated LP Units, and certain other Interests in other Debtors, shall be cancelled or contributed to Reorganized Foresight or an Affiliate thereof and Reorganized Foresight shall issue the New Common Equity to Holders of Allowed Claims entitled to receive the New Common Equity pursuant to Article II and Article III hereof.

All of the New Common Equity to be issued pursuant to the Plan (including under the Management Incentive Plan), the DIP Orders, the DIP Credit Agreement, and the Exit Facility Backstop Agreement shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Equity under the Plan, the DIP Orders, the DIP Credit Agreement, and the Exit Facility Backstop Agreement shall be governed by the terms and conditions set forth in the Plan, the DIP Orders, the DIP Credit Agreement, and the Exit Facility Backstop Agreement applicable to such distribution or issuance, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, each Holder of an Allowed Claim that receives New Common Equity under the Plan shall be deemed to have executed, without any further action by any party, any Equityholders Agreement, which shall be Filed as a Plan Supplement. Notwithstanding the foregoing, all Entities shall be required to sign the Equityholders Agreement prior to the distribution to such Entity of any New Common Equity under the Plan or otherwise.

**2.**    **Exit Facility**

*a.*    *Terms of the Exit Facility*

On the Effective Date, Reorganized Foresight shall enter into the Exit Facility Documents. The Exit Facility will be issued by Reorganized Foresight and guaranteed by each of the other Reorganized Debtors and shall comprise a new senior secured first-priority term loan facility in an aggregate principal amount of up to $225,000,000.00. Entry of the Confirmation Order shall constitute approval of the Exit Facility and the Exit Facility Documents, all transactions contemplated thereby and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith (including, without limitation, the payment of all reasonable and documented fees, indemnities, and expenses provided for therein), authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and authorization for the Reorganized Debtors to create or perfect the Liens in connection therewith. The Exit Facility will be in form and substance acceptable to the Debtors, the Required First Lien Lenders, the Exit Facility Agent, and the Required Exit Facility Backstop Parties and will have terms consistent with those set forth in the Plan Supplement and the Restructuring Support Agreement. Such terms shall include that the

Exit Facility Lenders shall receive the Exit Facility Equity Component and, in the case of the Exit Facility Backstop Parties, the Exit Facility Put Option Premium.

The Exit Facility Agent and the Exit Facility Lenders shall have valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the Exit Facility Documents, which shall be deemed automatically perfected on the Effective Date. The guarantees, mortgages, pledges, Liens and other security interests granted pursuant to the Exit Facility Documents (i) are granted as an inducement to the lenders under the Exit Facility to extend credit thereunder, (ii) are granted in good faith, for legitimate business purposes, and for reasonable equivalent value, (iii) shall be deemed not to constitute a preferential transfer, voidable transfer, fraudulent conveyance or fraudulent transfer under the Bankruptcy Code or any applicable non-bankruptcy law, and shall not otherwise be subject to avoidance, recharacterization or equitable subordination for any purposes whatsoever, and (iv) shall have the priorities as set forth in the relevant Exit Facility Documents. In establishing the register of lenders under the Exit Facility, the Exit Facility Agent shall be entitled to conclusively rely upon (without further inquiry) any certificate, schedule, register, list, or other document provided by the Required Exit Facility Backstop Parties, Debtors, and/or the Reorganized Debtors.

          b.      *Direct Debt Placement; Syndication of the Exit Facility; Exit Facility Backstop Agreement*

The Exit Facility Backstop Parties shall, on a several, and not joint and several basis, fund in a direct private placement (the "***Exit Facility Direct Debt Placement***" and the commitments thereunder, the "***Exit Facility Direct Debt Commitment***") an amount equal to 50% of the aggregate principal amount of the Exit Facility Loans (the "***Exit Facility Direct Debt Placement Amount***"), allocated as follows: (i) 92.75% of the Exit Facility Direct Debt Placement Amount to the Exit First Lien Backstop Parties, pro rata based on such parties' First Lien Facility Claims; and (ii) 7.25% of the Exit Facility Direct Debt Placement Amount to the Exit Second Lien Backstop Parties, pro rata based on such parties' Second Lien Notes Claims. The Exit Facility Direct Debt Commitment will close concurrently with the closing of the Exit Facility Opportunity (as defined below) and the Effective Date.

Certified Eligible Holders of First Lien Facility Claims and/or Second Lien Notes Claims will have the opportunity to participate (the "***Exit Facility Opportunity***") in funding 50% of the aggregate principal amount of the Exit Facility Loans (the "***Exit Facility Syndication Amount***") as follows: (i) 92.75% of the Exit Facility Syndication Amount shall be available to Certified Eligible Holders of First Lien Facility Claims (which, for the avoidance of doubt, shall include the Exit Facility Backstop Parties), pro rata based on such Holders' First Lien Facility Claims (the "***Exit Facility First Lien Syndication***"); and (ii) 7.25% of the Exit Facility Syndication Amount shall be available to Certified Eligible Holders of Second Lien Notes Claims (which, for the avoidance of doubt, shall include the Exit Facility Backstop Parties), pro rata based on such Holders' Second Lien Notes Claims (the "***Exit Facility Second Lien Syndication***" and together with the Exit Facility First Lien Syndication, the "***Exit Facility Syndication***"). The Exit Facility Opportunity will be conducted on the terms and conditions to be set forth in the syndication procedures and related documentation for the Exit Facility, which procedures and documentation shall be consistent with the Restructuring Support Agreement and acceptable to the Debtors, the Required First Lien Lenders, and the Required Exit Facility Backstop Parties.

The Exit Facility will be backstopped on a several, and not joint and several, basis by the Exit Facility Backstop Parties pursuant to the terms of the Exit Facility Backstop Agreement. For the avoidance of doubt, (i) the Exit Facility First Lien Syndication shall be backstopped solely by those Exit Facility Backstop Parties holding First Lien Facility Claims (in such capacity, the "*Exit Facility First Lien Backstop Parties*"), pro rata based on such Holders' First Lien Facility Claims, and (ii) the Exit Facility Second Lien Syndication shall be backstopped solely by those Exit Facility Backstop Parties holding Second Lien Notes Claims (in such capacity, the "*Exit Facility Second Lien Backstop Parties*") pro rata based on such Second Lien Notes Claims. In exchange for backstopping the Exit Facility, each Exit Facility Backstop Party will receive its pro rata share of the Exit Facility Put Option Premium to the extent earned and payable pursuant to the Exit Facility Backstop Agreement, subject to dilution by the Management Incentive Plan.

**E.      *Corporate Existence***

Except as otherwise provided in the Plan, any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, or as a result of any Restructuring Transactions, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation or other form of Entity under governing state or foreign law, as the case may be, with all the powers of such corporation or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal or foreign law). For the avoidance of doubt, nothing in this Article IV.E prevents, precludes or otherwise impairs the Reorganized Debtors, or any one of them, from merging, amalgamating or otherwise restructuring their legal Entity form in accordance with applicable non-bankruptcy law after the Effective Date.

**F.      *Vesting of Assets in the Reorganized Debtors***

Except as otherwise provided in the Plan, any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, or pursuant to a Final Order of the Bankruptcy Court, on the Effective Date, all property in each Estate, all Causes of Action and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

G.   *Cancellation of Existing Securities and Agreements*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date:

1.   the obligations of the Debtors pursuant, relating, or pertaining to and any certificate, share, note, bond, purchase right, option, warrant or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of, or Interests in, the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled as to the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder;

2.   the obligations of the Debtors pursuant, relating or pertaining to the First Lien Credit Agreement Documents, the Second Lien Notes Indenture Documents, the DIP Credit Agreement, or any other agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged;

provided, however, in the cases of clauses (1) and (2) hereof, notwithstanding Confirmation or the occurrence of the Effective Date, any agreement (including the Existing Intercreditor Agreement) that governs the rights of the First Lien Agents, the Second Lien Indenture Trustee, the DIP Agent, or any other Holder of a Claim shall continue in effect solely for purposes of:

a.   enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein and for enforcing any rights hereunder or thereunder against parties other than the Debtors, the Reorganized Debtors or their Representatives;

b.   determining the Lien and payment priority and other rights between the First Lien Facility Claims and the Second Lien Notes Claims pursuant to the Existing Intercreditor Agreement;

c.   allowing the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent as applicable, in accordance with Article VII of the Plan, to make distributions to the Holders of the First Lien Facility Claims, the Second Lien Notes Claims, and the DIP Claims;

d.   allowing the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to maintain any right of priority of payment, indemnification, exculpation, contribution, subrogation or any other claim or entitlement it

may have under the First Lien Credit Agreement Documents, the Second Lien Notes Indenture Documents, the Existing Intercreditor Agreement or the DIP Credit Agreement, as applicable (which shall survive and not be released, except as otherwise expressly provided in the Plan, other than against the Debtors and the Reorganized Debtors);

e. allowing the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to enforce any obligations owed to each of them under the Plan or the Confirmation Order;

f. permitting the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to appear before the Bankruptcy Court or any other court;

g. permitting the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to exercise rights and obligations relating to the interests of the First Lien Lenders, the Second Lien Noteholders, and the DIP Lenders, as applicable, to the extent consistent with the Plan and the Confirmation Order; and

h. permitting the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent to perform any functions that are necessary to effectuate the foregoing;

provided, further, however, the preceding proviso shall not affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; provided, further, for the avoidance of doubt, nothing in this section shall affect a cancellation of any New Common Equity or Intercompany Interests.

Except as expressly provided in the Plan and Confirmation Order, on the Effective Date, each of the First Lien Agents, the Second Lien Indenture Trustee, and the DIP Agent and their respective agents, successors, and assigns shall be fully discharged of all of their duties and obligations under the applicable First Lien Credit Agreement Documents, Second Lien Notes Indenture Documents, and DIP Credit Agreement.

**H.** *Corporate Action*

On the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:

1. the execution and delivery of the Restructuring Documents and any related instruments, agreements, guarantees, filings or other related documents;

2. the implementation of the Restructuring Transactions and any related instruments, agreements, guarantees, filings or other related documents; and

3. all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date).

On the Effective Date, all matters provided for in the Plan involving the corporate structure of the other Reorganized Debtors, and any corporate, partnership or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Holders of Interests, directors, or officers of the Debtors or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, the Restructuring Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

## I.    *Corporate Governance of Reorganized Debtors*

The corporate governance for the Reorganized Debtors, including charters, certificates of formation, bylaws, operating agreements, limited liability company agreements, shareholder or stockholder agreements, registration rights agreements or other organizational or formation documents, and the terms thereof, as applicable, the corporate form of Reorganized Foresight, the initial structure, size, and composition of the new board of directors/managers and any other governance provisions applicable to Reorganized Foresight shall be: (1) determined by the Required First Lien Lenders, with the reasonable consent of the Required Second Lien Noteholders, in each case consistent with the terms of Restructuring Support Agreement; (2) consistent with section 1123(a)(6) of the Bankruptcy Code; and (3) set forth in the Plan Supplement. The identities of the initial members of the New Boards shall also be set forth in the Plan Supplement.

## J.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan, the Securities issued pursuant to the Plan, including the Restructuring Documents, and the Restructuring Transaction, in each case in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents, except those expressly required pursuant to the Plan.

## K.    *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan (including under any of the Restructuring Documents and related documents) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax,

mortgage tax, stamp act, transfer tax, sale or use tax, mortgage recording tax or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee or governmental assessment. Such exemption under section 1146(a) of the Bankruptcy Code specifically applies, without limitation, to: (1) the creation and recording of any mortgage, deed of trust, Lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction; (4) the issuance, distribution and/or sale of any Securities of the Debtors or the Reorganized Debtors; and (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including (a) any merger agreements, (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution, (c) deeds, (d) bills of sale, or (e) instruments of transfer or assignment executed in connection with any Restructuring Transaction occurring under the Plan.

## L.     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, unless expressly stated otherwise in the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and such rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation of the Plan.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

**M.**     *Director and Officer Liability Insurance*

The Debtors' D&O Liability Insurance Policies shall be Reinstated under the Plan to the fullest extent possible under applicable law. Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers and employees serving on or prior to the Effective Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan and no Proof of Claim, Administrative Claim or objection to Cure Claim need be Filed with respect thereto.

The Debtors or the Reorganized Debtors, as the case may be, shall maintain their D&O Liability Insurance Policies and their employment practices liability policies providing coverage for those insureds currently covered by such policies for the remaining term of such policies and shall maintain runoff policies or tail coverage under policies in effect as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, causes of action, or proceedings against such insureds in at least the scope and amount as currently maintained by the Debtors.

**N.**     *Management Incentive Plan*

The New Board of Reorganized Foresight will adopt a management incentive plan reserving up to 10% of the New Common Equity on a fully diluted basis (the "***Management Incentive Plan***"), to be available for issuance pursuant to equity or equity-based incentive awards to management and other key employees of the Reorganized Debtors, as described in the Plan Supplement. The initial issuance of incentive awards under the Management Incentive Plan shall be determined by the Required First Lien Lenders in consultation with (i) a compensation consultant reasonably acceptable to the Required First Lien Lenders and (ii) the Chief Executive Officer of the Reorganized Foresight, with subsequent grants to be determined by the New Board of Reorganized Foresight.

**O.**     *GUC Cash Pool Account*

On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and fund or cause to be funded a segregated account with Cash in an amount equal to the GUC Cash Pool (the "***GUC Cash Pool Account***"), which (1) shall not be, and shall not be deemed to be, property of the Debtors or the Reorganized Debtors or their Estates, (2) shall be held in trust by the GUC Administrator for Pro Rata distributions on account of General Unsecured Claims as provided herein, and (3) shall not be encumbered by any Liens, Claims, or Interests in any way.

**P.**     *GUC Administrator Account*

On the Effective Date, the Debtors (or the Reorganized Debtors, as the case may be) shall establish and fund or cause to be funded the GUC Administrator Account with Cash in the aggregate amount of $[●], which shall be held in trust for the payment of GUC Administrator Costs as provided herein. The Debtors and the Reorganized Debtors shall have no further obligation or liability for the GUC Administrator's costs as provided herein upon the funding of the GUC Administrator Account pursuant to this Article IV.P.

The GUC Administrator Account (1) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors or their Estates, (2) shall be held in trust by the Debtors or Reorganized Debtors, as applicable, for the benefit of the GUC Administrator and the GUC Administrator's professionals and other employees, (3) shall not be encumbered by any Liens, Claims, or Interests in any way.

**Q.**     *Exemptions from Securities Act Registration Requirements*

1.     The offer, issuance, and distribution of the New Common Equity on account of (x) the First Lien Facility Claims and Second Lien Notes Claims and (y) each of the DIP Put Option Premium and the DIP Exit Premium shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or other law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code. Such New Common Equity will not be "restricted securities" as defined in Rule 144(a)(3) of the Securities Act and will be freely tradable and transferable by the initial recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws, including Rule 144 of the Securities Act, any rules and regulations of the SEC, if any, and any transfer restrictions in the New Organizational Documents applicable at the time of any future transfer of such Securities or instruments.

2.     The offer, issuance, and distribution of the New Common Equity pursuant to the Exit Facility Equity Issuances are being made only to Certified Eligible Holders in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S (and/or similar registration exemptions applicable outside of the United States). Accordingly, such Securities will be considered "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to an effective registration statement under, or an applicable exemption from the registration requirements of, the Securities Act and other applicable law.

3.     Any Securities offered and issued under the Management Incentive Plan will be offered and issued pursuant to a registration statement or available exemption from registration under the Securities Act and other applicable law.

**R.**     *Notice of Effective Date.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall File a notice of the occurrence of the Effective Date with the Bankruptcy Court. The notice of

Effective Date shall (i) include notice of the Administrative Claims Bar Date and (ii) be served upon (a) the U.S. Trustee; (b) counsel to the Ad Hoc First Lien Group; (c) counsel to the Ad Hoc Crossover Group; (d) counsel to the Facilities Agent; (e) counsel to the Term Agent; (f) counsel to the Indenture Trustee; (g) counsel to the collateral trustee under the Debtors' secured debt facilities; (h) counsel to the DIP Agent; (i) counsel to DIP Lenders; (j) the Creditors' Committee; (k) counsel to Murray Energy Corporation; (*l*) counsel to Foresight Reserves; (m) counsel to Javelin Global Commodities (UK) Ltd; (n) counsel to Uniper Global Commodities UK Limited; (o) the Internal Revenue Service; (p) the Securities and Exchange Commission; (q) the United States Attorney's Office for the Eastern District of Missouri; (r) the state attorneys general for all states in which the Debtors conduct business; (s) the Holders of the thirty (30) largest unsecured claims against the Debtors, on a consolidated basis; (t) all Persons listed on the Debtors' creditor matrix; and (u) any party that has requested notice pursuant to Bankruptcy Rule 2002.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption of Executory Contracts and Unexpired Leases*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Claims, all Executory Contracts and Unexpired Leases to which any of the Debtors are a party, including, without limitation, the DIP Backstop Agreement and the Exit Facility Backstop Agreement, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed assumed except for any Executory Contract or Unexpired Lease that (1) is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) has been previously rejected by a Final Order; (3) is the subject of a motion to reject an Executory Contract or Unexpired Lease that is pending on the Confirmation Date; or (4) is the subject of a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions provided for in the Plan or the Schedule of Rejected Executory Contacts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, but not assigned to a third party before the Effective Date, shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**B.**     ***Cure of Defaults for Assumed Executory Contracts and Unexpired Leases***

        The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be delivered to the Reorganized Debtors and the Notice and Claims Agent on or before thirty (30) calendar days after the Effective Date. Any such request that is not timely delivered shall be hereby disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure Claim; provided, however, nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to deliver such request for payment of such Cure Claim. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed on or before the deadline to object to Confirmation. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

        If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence or outcome of any such dispute.

        Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure Claim pursuant to this Article V.B shall result in the full release and satisfaction of any Cure Claims, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

**C.**     ***Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases***

        Notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide,

warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

## D.    *Indemnification Obligations*

Except to the extent inconsistent with the Plan, the obligation of each Debtor to indemnify any individual who is serving or served as one of such Debtor's directors, officers or employees on or after the Petition Date will be deemed and treated as Executory Contracts that are assumed by each Reorganized Debtor pursuant to the Plan as of the Effective Date on the terms provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor; provided, the Reorganized Debtors shall not indemnify officers, directors, equityholders, agents, or employees, as applicable, of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date. None of the Reorganized Debtors shall amend or restate any New Organizational Documents before or after the Effective Date to terminate or adversely affect any such indemnification obligations.

## E.    *Insurance Policies*

All insurance policies pursuant to which any Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors.

## F.    *Modifications, Amendments, Supplements, Restatements or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Unless expressly agreed upon in writing, any modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority or amount of any Claims that may arise in connection therewith.

## G.   *Reservation of Rights*

Nothing contained in the Plan shall constitute a representation by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or, after the Effective Date, the Reorganized Debtors shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## H.   *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## I.   *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## DISPUTED CLAIMS

## A.   *Retention of Claims, Rights, Causes of Action, and Defenses*

Except as expressly provided in the Plan, after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article IV.L, except with respect to any Claim or Interest deemed Allowed under the Plan or pursuant to a Final Order of the Bankruptcy Court.

Nothing contained in this Article VI.A shall constitute or be deemed a waiver of any claim, right, defense, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Entity in connection with or arising out of any Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

## B.   *GUC Administrator*

The Debtors shall, with the reasonable consent of the Required First Lien Lenders, select and appoint, as of the Effective Date, a GUC Administrator (which administrator may be one or more of the Reorganized Debtors) with duties limited to (a) administering, disputing, objecting to, compromising, or otherwise resolving General Unsecured Claims, including, without limitation, (i) filing, withdrawing, or litigating to judgment objections to General Unsecured Claims, (ii) settling or compromising any General Unsecured Claims without any further notice

to or action, order, or approval by the Bankruptcy Court, and (iii) directing the Notice and Claims Agent to adjust the claims register to reflect any such Claim resolutions without any further notice to or action, order, or approval by the Bankruptcy Court, (b) directing the Disbursing Agent to make distributions from the GUC Cash Pool Account to the Holders of Allowed General Unsecured Claims as provided herein, and (c) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the foregoing duties. The GUC Administrator may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties as limited above, including any professionals retained in these Chapter 11 Cases, and the GUC Administrator Costs, including reasonable professional fees, shall be paid by the Debtors or Reorganized Debtors from the GUC Administrator Account in the ordinary course without further order of the Bankruptcy Court, provided that the Debtors and Reorganized Debtors shall not be required to reimburse such costs in excess of $[●] in the aggregate.

Immediately upon the resolution of all General Unsecured Claims and the making of the final distribution to Holders of Allowed General Unsecured Claims, the GUC Administrator shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.

**C.**     ***Claims Administration Responsibility***

After the Effective Date, the Reorganized Debtors, other than as to General Unsecured Claims, shall retain responsibility for (1) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against the Debtors, including, without limitation, (a) filing, withdrawing, or litigating to judgment objections to Claims, (b) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (c) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, and (2) directing the Disbursing Agent to make distributions (if any) on account of all Claims and Interests.

With respect to General Unsecured Claims, the GUC Administrator shall exercise all of the aforementioned responsibilities set forth in this Article VI.C.

**D.**     ***Cooperation and Access***

The Reorganized Debtors shall cooperate in good faith with the GUC Administrator, including by (1) affording the GUC Administrator access to its properties, books, and records in connection with the GUC Administrator's satisfaction of its duties and responsibilities under the Plan and (2) using commercially reasonable efforts to make available to the GUC Administrator employees of the Reorganized Debtors whose assistance, expertise, testimony, notes, recollections, or presence are reasonably necessary in connection with the GUC Administrator's satisfaction of its duties and responsibilities under the Plan; provided, the Debtors' reasonable and documented out-of-pocket expenses from complying with this Article VI.D shall be reimbursable from the GUC Administrator Account.

E.     *Objections to Claims*

Unless otherwise extended by the Bankruptcy Court, any objections to Claims shall be served and Filed on or before the Claims Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors, the Reorganized Debtors, the GUC Administrator or any other party in interest, as applicable, effect service in any of the following manners: (1) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (2) to the extent counsel for a Holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address), or (3) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance.

F.     *Disallowance of Claims*

Nothing herein shall in any way alter, impair or abridge the legal effect of the Bar Date Order, or the rights of the Debtors, the Reorganized Debtors, the Creditors' Committee before the Effective Date, the GUC Administrator after the Effective Date, or other parties-in-interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors (or the GUC Administrator, as the case may be) allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.     *Estimation of Claims*

Before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any purpose permitted thereunder, regardless of whether any party previously has objected to such Claim or Interest, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court has entered a Final Order estimating any contingent or unliquidated Claim for the express purpose of determining what amount of such Claim shall be allowed for purposes of distributions pursuant to section 502(c), that estimated amount shall, unless otherwise ordered by the Bankruptcy Court or agreed between the relevant parties, constitute a maximum limitation on the Allowed amount of such Claim for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtors

or the GUC Administrator may, to the extent applicable, elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**H.      *No Interest on Claims***

Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

**I.      *Amendments to Claims***

On or after the Bar Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE VII.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.      *Disbursing Agent***

The Disbursing Agent shall make all distributions required under the Plan.

**B.      *Currency***

Except as otherwise provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

**C.      *No Distributions Pending Allowance***

No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed

Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

**D.      *Distribution Record Date***

Notwithstanding anything in this Plan to the contrary, except with respect to publicly traded securities and DIP Claims, the claims register shall be closed on the Distribution Record Date, and the Disbursing Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date; provided, however, if a Claim or Interest is transferred less than twenty (20) calendar days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee to the extent practicable and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the applicable procedures of The Depository Trust Company.

**E.      *Distributions on Account of Claims Allowed as of the Effective Date***

**1.      Claims that Are Not General Unsecured Claims**

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, distributions with respect to Claims that are not General Unsecured Claims shall occur on the Initial Distribution Date (or as soon as reasonably practicable thereafter); provided, however, for the avoidance of doubt, Allowed Priority Tax Claims shall be paid in full in Cash on the Initial Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(9)(c) of the Bankruptcy Code.

**2.      General Unsecured Claims**

On the Effective Date, the GUC Administrator shall withhold and retain from the GUC Cash Pool Account a segregated reserve with (a) an amount reasonably determined by the GUC Administrator to be sufficient to pay Holders of Disputed General Unsecured Claims the amount such Holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims, (b) such lesser amount as estimated or otherwise ordered by the Bankruptcy Court, or (c) such lesser amount as agreed to between the GUC Administrator and the Holders thereof (such account, the "***Disputed GUC Reserve***").

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, initial distributions on account of General Unsecured Claims that are Allowed as of the Effective Date shall be made on the first GUC Distribution Date; provided, however, such initial distributions shall not include any portion of the Disputed GUC Reserve; provided, further, the Disbursing Agent shall make subsequent Pro Rata distribution(s) to Holders of Allowed General Unsecured Claims to the extent the GUC Administrator determines that any portion of the funds originally allocated to the Disputed GUC Reserve subsequently becomes available for such distributions (as a result of the GUC Administrator's resolution of Disputed General Unsecured Claims or otherwise); provided, further, Disputed General Unsecured Claims

that become Allowed, in whole or in part, shall be satisfied exclusively out of the Disputed GUC Reserve.

In the event that the Cash remaining in the GUC Cash Pool Account becomes insufficient to provide Holders of recently Allowed General Unsecured Claims with the same Pro Rata distribution received by previously Allowed General Unsecured Claims, such recently Allowed General Unsecured Claims shall (i) only be entitled to their pro rata share of whatever Cash remains in the GUC Cash Pool Account and Disputed GUC Reserve and (ii) have no recourse in respect of such Claims to the Debtors or the Reorganized Debtors, as applicable.

a.    <em>Tax Treatment of Disputed GUC Reserve</em>.

All parties to the Plan shall (i) treat the Disputed GUC Reserve as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable Law, report consistently with the foregoing for all federal, state, and local income tax purposes. All taxes imposed on assets or income of such Disputed GUC Reserve will be payable from the assets of the Disputed GUC Reserve.

b.    <em>Request for Expedited Determination of Taxes</em>.

The GUC Administrator shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Disputed GUC Reserve filed or to be filed for any and all taxable periods of such reserve.

**F.    *Distributions on Account of Claims Allowed After the Effective Date***

Payments and distributions to each respective Holder of a Claim on account of a Disputed Claim, to the extent that it becomes an Allowed Claim after the Effective Date, shall be made in accordance with provisions of this Plan that govern distributions to such Holder of a Claim. On the first Periodic Distribution Date or GUC Distribution Date, as applicable, that is at least thirty (30) calendar days following the date when a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the Holder of such Allowed Claim the distribution that such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law; provided, however, for the avoidance of doubt, Disputed Claims that are Allowed Priority Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty (30) calendar days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law; provided, further, the Disbursing Agent shall make subsequent Pro Rata distribution(s) to Holders of Allowed General Unsecured Claims to the extent the GUC Administrator determines that any portion of the funds originally allocated to the Disputed GUC Reserve subsequently becomes available for such distributions (as a result of the GUC Administrator's resolution of Disputed General Unsecured Claims or otherwise).

**G.    *Addresses for Distributions***

Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (i) at the addresses set forth on the Proofs of Claim Filed by such Holders of Claims (or at the last

known addresses of such Holders of Claims if no Proof of Claim is Filed or if the Debtors or the Reorganized Debtors or the GUC Administrator, as applicable, have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address. The Debtors, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

**H.      *Undeliverable Distributions***

If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Disbursing Agent is notified of the then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date or GUC Distribution Date, as applicable. Notwithstanding the foregoing, following a period of one hundred eighty (180) calendar days after the Disbursing Agent's receipt of such returned undeliverable distribution, if the Disbursing Agent has not been notified of the then-current address of such Holder of a Claim, amounts in respect of such undeliverable distribution shall be returned to, revert to and vest in the Reorganized Debtors (or, with respect to the General Unsecured Claims, to the GUC Cash Pool Account) free of any restrictions thereon. Upon such vesting, the Claim of any Holder or successor to such Holder with respect to such returned undeliverable distribution shall be discharged, and the Holder of such Claim shall be forever barred, estopped and enjoined from asserting such Claim against the Reorganized Debtors or GUC Administrator, as applicable, or their property.

**I.      *Reversion***

Any distribution under the Plan that is an Unclaimed Distribution for a period of one hundred eighty (180) calendar days after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Reorganized Debtors (or, with respect to General Unsecured Claims, to the GUC Cash Pool Account) free of any restrictions thereon. Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled, discharged and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.

**J.      *De Minimis Distributions***

Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent shall not be required to make a distribution on account of an Allowed Claim if: (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date or GUC Distribution Date in question is or has a value less than $10,000, underline(provided) that the Reorganized Debtors, the GUC Administrator, or the Disbursing Agent, as applicable, shall make, or cause to be made, a distribution on a Periodic Distribution Date or a GUC Distribution Date, as applicable, of less than $10,000 if the

Reorganized Debtors, the GUC Administrator, or the Disbursing Agent, as applicable, expect that such Periodic Distribution Date or GUC Distribution Date, as applicable, shall be the final Periodic Distribution Date or GUC Distribution Date, as applicable; or (ii) the amount to be distributed to the specific Holder of the Allowed Claim on the particular Periodic Distribution Date or GUC Distribution Date, as applicable, does not both (x) constitute a final distribution to such Holder and (y) have a value of at least $50.00.

**K.**    *Fractional Distributions*

Notwithstanding any other provision of the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent shall not be required to make partial distributions or distributions of fractional New Common Equity or distributions or payments of fractions of dollars. Whenever any payment or distribution of a fractional New Common Equity under the Plan would otherwise be called for, such fraction shall be deemed zero. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**L.**    *Accrual of Dividends and Other Rights*

For purposes of determining the accrual of dividends or other rights after the Effective Date, New Common Equity shall be deemed distributed as of the Effective Date regardless of the date on which they are actually issued, dated, authenticated, or distributed; provided, however, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New Common Equity actually take place.

**M.**    *Compliance Matters*

In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, to the extent applicable, the Debtors, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the GUC Administrator, and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors and GUC Administrator reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Any party entitled to receive cash or any property as an issuance or distribution under this Plan shall, upon request, deliver to the Disbursing Agent or such other entity designated by the Reorganized Debtors (which entity shall subsequently deliver to the Disbursing Agent all tax forms received) an IRS Form W-9 or (if the payee is a foreign Entity) the appropriate IRS Form

W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local Taxing Authority. If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other entity designated by the Reorganized Debtors or Disbursing Agent and the Holder, fails to comply before the date that is one hundred and eighty (180) calendar days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or their respective properties.

**N.    *Claims Paid or Payable by Third Parties***

The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or the Reorganized Debtors. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors or the Reorganized Debtors on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

**O.    *Applicability of Insurance Contracts***

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contracts. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any of the Insurance Contracts, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**P.    *Setoffs***

Except as otherwise expressly provided for in the Plan, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtors of any such Claims, rights, and Causes of Action that the Reorganized Debtors may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder has Filed a motion requesting the authority to perform such setoff on or before the Confirmation Date, and

notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

**Q.**    *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## ARTICLE VIII.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

**A.**    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, including the Plan Supplement documents, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not the Holder of such a Claim has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring.

**B.**    *Release of Liens*

Except as otherwise specifically provided in the Plan, the Confirmation Order or the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Facility Documents), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by

the Debtors. In addition, on or after the Effective Date, at the expense the Reorganized Debtors, the DIP Agent, the First Lien Agents, and the Second Lien Indenture Trustee shall execute and deliver all documents reasonably requested by the Debtors, the Reorganized Debtors or the Exit Facility Agent to evidence the release of such mortgages, deeds of trust, Liens, pledges and other security interests (including as required under the laws of other jurisdictions for non-U.S. security interests) and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

## C.   *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the services of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date and to the fullest extent permitted by applicable law, the Debtors, the Reorganized Debtors, their Estates, and any Person seeking to exercise the rights of the Estates, including any successor to the Debtors and any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, discharged, and acquitted the Released Parties and their respective property from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, matured or unmatured, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any claim against, or interest in, any Debtor or other Entity, based on or relating to, or in any manner arising from or in connection with, in whole or in part, the Debtors, their Affiliates, the Estates, the conduct of the Debtors' businesses, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases and any related adversary proceedings, the Reorganized Debtors, the Reorganized Debtors' businesses, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors and any Released Party, the restructuring of claims and Interests prior to or in the Chapter 11 Cases, the First Lien Credit Agreement Documents, the Second Lien Notes Indenture Documents, the negotiation, formulation, preparation, dissemination, or filing of the Restructuring Support Agreement, any of the Restructuring Documents, or any related agreements, term sheets, instruments, or other documents contemplated by the foregoing or appropriate to effectuate the foregoing, the pursuit of Confirmation, the pursuit of the occurrence of the Effective Date of the Plan, and any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing and taking place on or before the Effective Date of the Plan, except for any claim related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted fraud, gross negligence, or willful misconduct (all such claims and liabilities as described herein, collectively, the "*Released Claims*"); provided, nothing in the foregoing shall result in any of the Debtors' or Reorganized Debtors' officers and directors waiving any Claims arising under employment or severance agreements (after giving effect to

any modifications contemplated by the Plan) or indemnification Claims against the Debtors, Reorganized Debtors, any of the Debtors' or Reorganized Debtors' insurers, or any rights as beneficiaries of any insurance policies.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article VIII.C do not release any post-Effective Date obligations of any party or Entity: (1) arising under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Renegotiated Contracts/Leases; or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any claim or Cause of Action released by the Debtor Release against any of the Released Parties.

## D.    *Releases by Holders of Claims and Interests*

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the services of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, effective as of the Effective Date, each of the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, discharged, and acquitted the Released Parties and their respective property from any and all Released Claims; provided, nothing in the foregoing shall result in any of the Debtors' or Reorganized Debtors' officers and directors waiving any Claims arising under employment or severance agreements (after giving effect to any modifications contemplated by the Plan) or indemnification Claims against the Debtors, Reorganized Debtors, any of the Debtors' or Reorganized Debtors' insurers, or any rights as beneficiaries of any insurance policies.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article VIII.D do not release any post-Effective Date obligations of any party or Entity arising under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases contained in this Article VIII, which include, by reference, each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the releases contained in this Article VIII are: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good

and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the released claims; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the releases contained in this Article VIII against any of the Released Parties.

**E.**     *Exculpation*

Except as otherwise specifically provided in the Plan, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from, any Exculpated Claim; provided, however, the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order to have constituted fraud, gross negligence or willful misconduct.

**F.**     *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims or Interests that have been released, discharged or are subject to exculpation pursuant to Article VIII of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, and/or the Released Parties:

1.     commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests;

2.     enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests;

3.     creating, perfecting or enforcing any lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests;

4.     asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and

5.     commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument or agreement (including those attached to the Disclosure Statement or included in the Plan Supplement) executed to implement the Plan.

## G.    *Waiver of Statutory Limitations on Releases*

Each Releasing Party in each of the releases contained in the Plan expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in his favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or Claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to Claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party, including the provisions of California Civil Code Section 1542. The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

## H.    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## I.    *Special Provision Governing Professional Fee Claims and Final Fee Applications*

For the avoidance of doubt, the releases in this Article VIII of the Plan shall not waive, affect, limit, restrict or otherwise modify the right of any party in interest to object to any Professional Fee Claim or final fee application Filed by any Professional in the Chapter 11 Cases.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THIS PLAN

**A.**  *Conditions Precedent to Confirmation of the Plan*

The following are conditions precedent to confirmation of the Plan:

1.  an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court, and such order shall be consistent in all respects with the Restructuring Support Agreement and acceptable to the Required First Lien Lenders; and

2.  the Plan and the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed and shall be consistent in all respects with the Restructuring Support Agreement and acceptable to the Required First Lien Lenders and, solely with respect to the economic treatment on account of Second Lien Notes Claims, the Required Second Lien Noteholders.

**B.**  *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C of the Plan):

1.  the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtors, the Required First Lien Lenders, the Required Exit Facility Backstop Parties, and solely with respect to the economic treatment on account of Second Lien Notes Claims, reasonably acceptable to the Required Second Lien Noteholders;

2.  the Confirmation Order shall have become a Final Order, and shall, among other things, provide that the Debtors and the Reorganized Debtors are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the agreements and documents created in connection with the Plan;

3.  all documents related to or contemplated by the Exit Facility shall be consistent in all material respects with the Restructuring Support Agreement and shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date, which shall occur simultaneously with the satisfaction of all conditions precedent under such documents);

4.  all conditions precedent to the effectiveness of the Exit Facility shall have occurred or been waived;

5.  the Exit Facility shall have been fully funded;

6.      the New Common Equity shall have been issued;

7.      the Professional Fee Escrow Account shall have been established and funded in Cash in accordance with Article II.B.2 of the Plan;

8.      the GUC Cash Pool Account shall have been established and funded in Cash in accordance with Article IV.O of the Plan;

9.      the GUC Administrator Account shall have been established and funded in Cash in accordance with Article IV.P of the Plan;

10.     the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (and any amendment thereto) shall have been Filed in a manner consistent in all respects with the Restructuring Support Agreement and shall otherwise be acceptable to the Required First Lien Lenders and, solely with respect to the economic treatment on account of Second Lien Notes Claims, the Required Second Lien Noteholders;

11.     the Plan, the Restructuring Documents, and all documents contained in any Plan Supplement, including any exhibits, schedules, amendments, modifications or supplements thereto, shall have been executed and/or effectuated, in form and substance consistent in all respects with the Restructuring Support Agreement and the Exit Facility Backstop Agreement, and shall otherwise be acceptable to the Debtors, the Required First Lien Lenders, and the Required Exit Facility Backstop Parties, as applicable, and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement or the Exit Facility Backstop Agreement;

12.     the Debtors shall have renegotiated and/or rejected their Affiliate Agreements in a manner acceptable to the Debtors and the Required First Lien Lenders;

13.     no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing or prohibiting, in a material respect, the consummation of the Plan, the Restructuring, the Restructuring Support Agreement, the Exit Facility Backstop Agreement, or any of the Restructuring Documents contemplated thereby;

14.     the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring;

15.     the Debtors shall have received any authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and that are required by law, regulation or order;

16.     there shall have been no Event of Default (as defined in the DIP Credit Agreement) or occurrence that, after expiration of any applicable notice or any

cure period, would be an Event of Default (as defined in the DIP Credit Agreement) under the DIP Credit Agreement or DIP Orders, as applicable;

17.   the Exit Facility Backstop Agreement and the Restructuring Support Agreement shall remain in full force and effect, all conditions shall have been satisfied thereunder, and there shall be no breach that, after the expiration of any applicable notice or any cure period, would give rise to a right to terminate the Exit Facility Backstop Agreement or the Restructuring Support Agreement;

18.   the New Organizational Documents shall have been filed with the appropriate governmental authorities, as applicable; and

19.   all unpaid Restructuring Expenses, and any other fees and expenses set forth in the DIP Orders and Exit Facility Backstop Agreement, shall have been paid in Cash.

**C.    *Waiver of Conditions***

Without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, the conditions to the Effective Date of the Plan set forth in Article IX.B may be waived only if waived in writing by the Debtors, the Required First Lien Lenders and, solely with respect to the waiver of any conditions precedent that adversely impacts the economic treatment provided on account of Second Lien Notes Claims, the Required Second Lien Noteholders, such consent not to be unreasonably conditioned, delayed or withheld.

**D.    *Substantial Consummation***

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

**E.    *Effect of Failure of a Condition.***

If the conditions listed in Article IX.B of the Plan are not satisfied or waived in accordance with Article IX.C of the Plan on or before the first Business Day that is more than forty (40) calendar days after the date on which the Confirmation Order is entered or by such later date as may be agreed between the Debtors and the Required First Lien Lenders and/or the Required Second Lien Lenders, as applicable, and set forth by the Debtors in a notice Filed prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

**A.**    *Modification and Amendments*

Subject to the limitations contained herein and in the Restructuring Support Agreement, the Debtors reserve the right, with the consent of the Required First Lien Lenders and, solely with respect to the economic treatment provided on account of the Second Lien Notes Claims, the Required Second Lien Noteholders, to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend or materially modify the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan.

**B.**    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**C.**    *Revocation or Withdrawal of This Plan*

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or Interests or the Non-Debtor Affiliates, or (iii) constitute a representation, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Affiliates.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction

over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount or allowance of Claims;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to: (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims; (b) any dispute regarding whether a contract or lease is or was executory or expired; and (c) any other issue related to an Executory Contract or Unexpired Lease;

4.  resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to the amount of a Cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

5.  ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

6.  adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.  adjudicate, decide or resolve any and all matters related to Causes of Action;

8.  adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

9.  enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan or the Disclosure Statement;

10. enter and enforce any order for the sale of property pursuant to section 363, 1123 or 1146(a) of the Bankruptcy Code;

11.  resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

13.  issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

14.  resolve any cases, controversies, suits, disputes or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

15.  resolve any cases, controversies, suits, disputes or Causes of Action with respect to the payment of General Unsecured Claims by the Debtors or the Reorganized Debtors;

16.  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

17.  determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or the Plan Supplement; provided, however, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court;

18.  adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated herein, subject to the proviso in sub-paragraph 17 above;

19.  consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.  determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.  resolve disputes as to the ownership of any Claim or Interest;

22.  hear and determine matters concerning state, local, federal and foreign taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

23.  grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

24.  hear, adjudicate, decide or resolve any and all matters related to Article VIII of the Plan, including without limitation, the releases, discharge, exculpation and injunctions issued thereunder;

25.  enforce all orders previously entered by the Bankruptcy Court;

26.  hear any other matter not inconsistent with the Bankruptcy Code;

27.  enter an order concluding or closing the Chapter 11 Cases; and

28.  hear, determine, and resolve any cases, matters, controversies, suits, disputes or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including with respect to the settlements, compromises, discharges, releases, injunctions, exculpations and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the Exit Facility Documents and any documents set forth in the Plan Supplement shall be governed by the respective jurisdictional provisions therein.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A.  *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B.  *Additional Documents*

On or before the Effective Date, the Debtors may File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and

conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.       *Reservation of Rights***

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order or the Plan Supplement waives any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

**D.       *Successors and Assigns***

The rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiary or guardian, if any, of each Entity.

**E.       *Service of Documents***

Any pleading, notice or other document required by the Plan to be served on or delivered shall be served by first class or overnight mail:

If to the Debtors or the Reorganized Debtors:

> Foresight Energy LP
> One Metropolitan Square
> 211 North Broadway, Suite 2600
> St. Louis, MO 63102
> Attention:  Cody Nett
> E-Mail:       codynett@coalsource.com

with copies to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> Attention:  Paul M. Basta
>                     Alice Belisle Eaton
>                     Alexander Woolverton
> E-Mail:       pbasta@paulweiss.com
>                     aeaton@paulweiss.com
>                     awoolverton@paulweiss.com

> *-- and --*

Armstrong  Teasdale  LLP
7700 Forsyth Blvd., Suite 1800
St. Louis,  MO 63105-1847
Attention:  Richard W. Engel, Jr.
              John G. Willard
              Kathryn Redmond
E-Mail:     rengel@atllp.com
              jwillard@atllp.com
              kredmond@atllp.com

If to the Consenting  Lenders:

Akin  Gump Strauss Hauer & Feld LLP
1 Bryant Park
New York, NY 10036
Attention:  Ira Dizengoff
              Brad Kahn
E-mail:     idizengoff@akingump.com
              bkahn@akingump.com

-- *and* --

Akin  Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington,  DC 20006
Attention:  James Savin
E-mail:     jsavin@akingump.com

-- *and* --

Milbank  LLP
55 Hudson Yards
New York, NY 10001
Attention:  Dennis F. Dunne
              Parker Milender
E-Mail:     ddunne@milbank.com
              pmilender@milbank.com

## F.  *Term of Injunctions or Stays*

Unless otherwise provided  in the Plan or in the Confirmation  Order, all injunctions  or
stays in effect in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or
any order of the Bankruptcy Court, and existing on the Confirmation  Date (excluding any
injunctions  or stays contained in the Plan or the Confirmation  Order) shall remain in full force
and effect until  the Effective Date.  All injunctions  or stays contained in the Plan or the
Confirmation  Order shall remain in full force and effect in accordance with their terms.

## G.    *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Restructuring Documents, the Plan Supplement and documents related thereto supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

## H.    *Exhibits*

All exhibits and documents included in the Plan and the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/foresightenergy or the Bankruptcy Court's website at https://www.moeb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

## I.    *Deemed Acts*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

## J.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, may alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted; provided, however, any such alteration or interpretation shall be acceptable to the Debtors, the Required First Lien Lenders and, solely with respect to any such alteration or interpretation that adversely impacts the economic treatment provided on account of Second Lien Notes Claims, the Required Second Lien Noteholders, and the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

## K.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section

1125(e) of the Bankruptcy Code, the Debtors, each of the Consenting Lenders, and the Backstop Parties and each of their respective Affiliates, agents, representatives, members, principals, equityholders (regardless of whether such interests are held directly or indirectly), officers, directors, partners (including both general and limited partners), managers, employees, advisors (including investment advisers) and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

**L.**     *Request for Expedited Determination of Taxes*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**M.**     *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*[Signature Page Follows]*

Respectfully submitted, as of the date first set forth above by the Debtors,

Dated: April 9, 2020                    FORESIGHT ENERGY GP LLC (for itself and on behalf of
                                        each of the other Debtors and Debtors in Possession)


                                        /s/  [DRAFT]                              
                                        Name:  [_____]
                                        Title:  [_____]